IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BRIDGESTONE SPORTS CO., LTD., and BRIDGESTONE GOLF, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ACUSHNET COMPANY, <br><br> Defendant. <br><br> ACUSHNET COMPANY, <br><br> Counterclaim Plaintiff, <br><br> v. <br><br> BRIDGESTONE SPORTS CO., LTD. and BRIDGESTONE GOLD, INC. <br><br> Counterclaim Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> C. A. No. 05-132 (JJF) <br><br> **DEMAND FOR JURY TRIAL** |

**ACUSHNET'S REPLY BRIEF IN SUPPORT OF ITS MOTION
TO BIFURCATE LIABILITY FROM DAMAGES AND WILLFULNESS**

OF COUNSEL:

Alan M. Grimaldi
Joseph P. Lavelle
Matthew J. Moore
Vivian S. Kuo
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone (202) 783-0800

Dated: December 22, 2005

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P. O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant
Acushnet Company*

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................1

II.  THE CASE PRESENTLY IS TOO COMPLEX AND
     BURDENSOME TO FACILITATE DISCOVERY OR PRESENT
     TO A JURY ....................................................................................................2

III. DAMAGES AND LIABILITY ARE DISTINCTLY SEPARATE
     CASES ............................................................................................................6

IV.  BIFURCATION WILL NOT PREJUDICE BRIDGESTONE....................9

     A.   Bifurcation will reduce the burden on both parties and the
          jury by streamlining liability and narrowing the damages
          and willfulness issues..........................................................................9

     B.   Bridgestone's claims of prejudice are unsupported ........................11

          1.   Bifurcation would disadvantage neither party with
               regard to damages discovery already produced ...................11

          2.   Bifurcation would lower Bridgestone's discovery
               costs and minimize disruption ...............................................11

V.   THE CASE IS RIPE FOR BIFURCATION................................................12

VI.  CONCLUSION.............................................................................................14

# TABLE OF AUTHORITIES

## CASES

*Air-Shields Inc. v. BOC Group*, 1992 U.S. Dist. LEXIS 17398 (D. Md. Feb. 28, 1992) ............7, 9

*B. Braun Med. Inc. v. Abbott Labs.*, 32 U.S.P.Q.2d 1211 (E.D. Pa. 1994) ............9

*Dentsply Int'l, Inc. v. New Tech. Co.*, 1996 U.S. Dist. LEXIS 19846 (D. Del. 1996) ............7

*Eaton Corp. v. Auburn Gear Inc.*, 1988 U.S. Dist. LEXIS 15885 (N.D. Ind. 1988) ............5, 6

*Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970) ............5, 8

*Industrias Metalicas Marva, Inc. v. Lausell*, 172 F.R.D. 1 (D.P.R. 1997) ............6

*Lemelson v. Apple Computer, Inc.*, 1993 U.S. Dist. LEXIS 20128 (D. Nev. June 4, 1993) ............6, 7

*Matsushita Elec. Indus. Co. v. Cinram Int'l, Inc.*, C.A. No. 01-882-SLR (D. Del. Dec. 15, 2003) ............8

*Novophram Ltd. v. Torpharm, Inc.*, 181 F.R.D. 308 (E.D.N.C. 1998) ............5

*Paine, Webber, Jackson & Curtis, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 587 F. Supp. 1112 (D. Del. 1984) ............6, 7

*St. Clair Intellectual Property Consultants, Inc. v. Canon, Inc.*, 2004 U.S. Dist. LEXIS 17489 (D. Del. Aug. 31, 2004) ............8

*Swofford v. B&W Inc.*, 336 F.2d 406 (5th Cir. 1964) ............7

*Willemijn Houdstermaatschaapij BV v. Apollo Computer Inc.*, 707 F. Supp. 1429 (D. Del. 1989) ............8

## STATUTES

35 U.S.C. § 103 ............4

35 U.S.C. § 102 ............4

## TREATISES

3 R. White, R. Caldwell and J. Lynch, Patent Litigation: Procedure and Tactics, §404[5] at 4-76 (1984) ............6

I.  **INTRODUCTION**

Bridgestone, trapped in the classic patentee's litigation mentality, attempts to prevent a narrowing of the case by understating the level of complexity and manufacturing claims of prejudice where none exists. A simple objective review of the claims and issues before the Court reveals that, regardless of what the Court chooses to do with regard to representative claims, this case is too complex and burdensome to facilitate discovery, much less present to a jury. For example, even if the Court limits the parties to one claim per patent, the case still involves 15 patents asserted against 15 accused products, with multiple noninfringement and invalidity defenses for each.

Because of the large number of patents and potential outcomes of the liability phase, the damages case will be at least equally complex. Thus, it does not make sense to waste significant resources during discovery (including expensive and time-consuming Japanese discovery) preparing for trial on damages and willfulness theories – many of which will be irrelevant after a determination of the liability issues.

Bifurcation will not unduly prejudice Bridgestone or burden judicial resources. To the contrary, bifurcation would streamline the liability phase for speedier resolution and reduce the number of Bridgestone witnesses that would need to travel to the United States for deposition or trial. Moreover, the determination on liability will significantly focus damages and willfulness discovery.

II.  **THE CASE PRESENTLY IS TOO COMPLEX AND BURDENSOME TO FACILITATE DISCOVERY OR PRESENT TO A JURY**

A simple review of the asserted claims indicates that the case is not as "basic and easy to understand" as Bridgestone would have the Court believe. (Bridgestone Opp. at 3.) Although the patents all relate to golf balls, they relate to many varied aspects such as dimple configurations, aerodynamic properties, the chemical composition of the core or cover layers, the interplay between the various layers in two and three piece golf balls, and their impacts on aerodynamics, durability, spin, and feel. For example, looking only at Bridgestone's ten patents-in-suit, the asserted claims include the following limitations:

- "The three-piece solid golf ball of claim 1 wherein the dimples in the ball surface total in number to 360 to 450 and include at least two types of dimples having different diameters, and an index (Dst) of overall dimple surface area given by the following expression is at least 4,

$$Dst = \frac{n \sum_{k=1}^{n}(Dmk^2 + Dpk^2) \times V_o k \times Nk}{4R^2}$$

wherein R is a ball radius, n is the number of dimple types (n≥2), Dmk is diameter of dimples k, Dpk is a depth of dimples k, Nk is the number of dimples k wherein k=1, 2, 3, ... n, and $V_o$ is the volume of the dimple space below a plane circumscribed by the dimple edge divided by the volume of a cylinder whose bottom is the plane and whose height is the maximum depth of the dimple from the bottom." U.S. Patent No. 5,782,707, col. 11, l. 14 – col. 12, l. 14 (claim 6);

- "... the solid core is molded from a rubber composition comprising 100 parts by weight of a base rubber composed of (a) 20 to 100 wt % of a polybutadiene having a cis-1,4 content of at least 60% and a 1,2 vinyl content of at most 2%, having a viscosity η at 25°C as a 5 wt % solution in toluene of up to 600 mPa-s, being synthesized using a rare-earth catalyst and satisfying the relationship: 10B+5≤A≤10B+60, wherein A is the Mooney viscosity ($ML_{1+4}$

2

(100°)) of the polybutadiene and B is the ratio Mw/Mn between the weight-average molecular weight Mw and the number-average molecular weight Mn of the polybutadiene, in combination with (b) 0 to 80 wt % of a diene rubber other than component (a) ...." U.S. Patent No. 6,634,961, col. 14, ll. 10-23 (claim 1);

- "... the value of the spatial volume of each dimple below a plane defined by an edge of the dimple divided the volume of a cylinder wherein the bottom of said cylinder is defined by said plane and the height is determined by the maximum depth of the dimple from said plane ranges from 0.390 to 0.550 ...." U.S. Patent No. 5,813,924, col. 10, ll. 1-6 (claim 1);

- "... said cover bring composed mainly of an ionomer resin and having a Shore D hardness in the range of 50 to 60 and a 300% modulus in the range of 15 to 35 MPa." U.S. Patent No. 5,695,413, col. 6, ll. 11-13 (claim 1);

- "A solid golf ball having ... about 25 to about 40 parts by weight of a zinc or magnesium salt of an unsaturated fatty acid having 3 to 8 carbon atoms ...." U.S. Patent No. 5,252,652, col. 5, ll. 4-11 (claim 1);

- "The golf ball of claim 1 wherein said intermediate layer is formed of a high repulsion ionomer resin base composition." U.S. Patent No. 5,553,852, col. 7, ll. 10-12 (claim 2);

- "... the ratio of core distortion under a load of 100 kg divided by a ball distortion under a load of 100 kg ranges from 1.0 to 1.3 ...." U.S. Patent No. 5,743,817, col. 6, ll. 52-54 (claim 1);

- "... said solid core has such a distribution of hardness as measured by a JIS-C scale hardness meter that a surface hardness is up to 85 degrees, a center hardness is lower than the surface hardness by not less than 8 to less than 20 degrees, and a hardness within 5 mm inside the core surface is up to 8 degrees lower than the surface hardness ...." U.S. Patent No. 5,803,834, col. 7, ll. 34-40 (claim 1);

- "... wherein said elastic core is formed of a rubber as the base material comprising an ingredient of zinc salt of pentachlorothiophenol added in an amount of 0.4 to 2.0 parts by weight, to per 100 parts by weight of the base rubber." U.S. Patent No. 6,679,791, col. 9, ll. 32-36 (claim 12); and

- "A multi-piece solid golf ball comprising ... a product of the Shore D hardnesses of said inner cover layer multiplied by the Shore D

3

hardness of said outer cover layer and a proportion $V_R$ (%) of the total of the volumes of dimple space each defined below a plane circumscribed by the dimple edge to the overall volume of a phantom sphere given on the assumption that the golf ball surface is free of dimples ...." U.S. Patent No. 6,780,125, col. 9, l. 45 – col. 10, l. 2 (claim 2).

Thus, it is apparent that the patents are not quite as "easy to understand" and "related" as Bridgestone suggests. (Bridgestone Opp. at 7.) Even if the case were reduced to only those ten *limitations* cited above, the parties would have to educate the jury on such disparate and complicated areas as Mooney viscosities, molecular weights, polymer and organic chemistry, three-dimensional geometry involving "phantom spheres" and equations such as:

$$Dst = \frac{n\sum_{k-1}^{n}(Dmk^2 + Dpk^2) x V_o kx Nk}{4R^2}$$

Of course, the liability phase extends beyond those limitations to include the rest of Bridgestone's claims and the claims from the five Acushnet patents, which are equally complex. All told, the liability phase includes 15 patents against 15 accused products and many different liability defenses, including noninfringement (literal and doctrine of equivalents), multiple grounds of invalidity under 35 U.S.C. §§ 102 and 103 (including many different patents and publications as well as multiple examples public uses and/or on-sale bars based on prior art golf balls), and multiple theories of inequitable conduct. (Acushnet's Br. at 3.) It will be difficult for any jury, no matter how qualified, to grasp and apply such a varied array of concepts and theories, just as it will be difficult for the parties to conduct simultaneous discovery on them all.

4

Yet Bridgestone would have the parties and the jury deal with those issues while at the same time grappling with the numerous issues related to damages and willfulness. For although Bridgestone has limited its damages claim to a reasonable royalty, foregoing a claim for lost profits, the damages phase remains complex. A reasonable royalty is calculated by examining the fifteen factors set forth in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), which include the royalty rates paid for comparable patents, the patent owner's licensing policy, the effect of selling the patented invention in promoting the sale of other products, the product's profitability, any advantages over older products, the benefits to those who have used the invention, and the proportion of the profit or selling price attributable to the invention or analogous inventions as distinguished from any non-patented features of the product. Such information typically is derived in patent cases through the analysis of voluminous financial data and marketing materials. *See, e.g., Novophram Ltd. v. Torpharm, Inc.*, 181 F.R.D. 308, 310 (E.D.N.C. 1998) (concluding that "litigating the complex damages issues would place a heavy burden on [the parties] to produce voluminous documents"); *Eaton Corp. v. Auburn Gear Inc.*, 1988 U.S. Dist. LEXIS 15885 at *5-6 (N.D. Ind. 1988) (Ex. 1 hereto) (recognizing that damages evidence includes voluminous financial data). As part of its damages defense, Acushnet alone must conduct the 15-part *Georgia-Pacific* analysis on 83 Bridgestone claims against multiple models and versions of six different accused golf balls.

Indeed, the complexity of the damages case is underscored by Bridgestone's requests for damages-related discovery to date. As is evident from Bridgestone's many

5

interrogatories and document requests related to damages and willfulness, Bridgestone is seeking a very broad scope of discovery to make its damages case.[1]

Accordingly, both the liability and damages phases of this case involve numerous complex claims, multiple accused products and a wide range of legal theories. As such, this case is an ideal candidate for bifurcation of liability from damages and willfulness for both discovery and trial.

### III. DAMAGES AND LIABILITY ARE DISTINCTLY SEPARATE CASES

Bifurcation of liability from damages and willfulness is appropriate because the evidence related to liability does not overlap significantly with the evidence regarding damages and willfulness. *See Paine, Webber, Jackson & Curtis, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 587 F. Supp. 1112, 1116 (D. Del. 1984); *Lemelson v. Apple Computer, Inc.*, 1993 U.S. Dist. LEXIS 20128, at *8 (D. Nev. June 4, 1993) (Ex. 4 hereto); *Eaton*, 1988 U.S. Dist. LEXIS at *3 (Ex. 1 hereto) (quoting 3 R. White, R. Caldwell and J. Lynch, Patent Litigation: Procedure and Tactics, §404[5] at 4-76 (1984)); *Industrias Metalicas Marva, Inc. v. Lausell*, 172 F.R.D. 1, 4 (D.P.R. 1997). The liability phase involves the issues of infringement and invalidity based on the Court's claim constructions. With regard to the issues, liability discovery will likely include deposition testimony from over 20 named inventors on the patents-in-suit (3 of whom are Japanese), numerous technical employees of Acushnet and Bridgestone regarding the development, construction, composition and performance of the accused golf balls, technical experts (Bridgestone has already disclosed three) and fact witnesses regarding prior art.

The damages phase, on the other hand, will involve the economic issues of reasonable royalties and willfulness. With regard to damages, the parties will have to

---

[1] (*See* Pls.' Interrog. ## 10, 18-21, 23, 25, 31, and 33 (Ex. 2 hereto); Pls.' Doc. Req. ## 31, 32, 64, 65, 82, 84-90, 96, 102, 109-13, and 147-55 (Ex. 3 hereto)).

6

depose each other's damages experts and financial and marketing employees of the parties on whom the damages experts will rely to form their opinions.

Bridgestone contends that there is an overlap in evidence based on the proof of commercial success, licensing, sales and marketing. (Bridgestone's Opp. at 6.) Courts, however, have long rejected that argument in deciding whether to bifurcate. *See Air-Shields Inc. v. BOC Group*, 1992 U.S. Dist. LEXIS 17398, at *5 (D. Md. Feb. 28, 1992) (Ex. 5 hereto) (finding that any overlap in evidence of commercial success and damages is *de minimus*); *Paine, Webber*, 587 F. Supp. at 1116 ("there is no substantial overlap of testimony between the proof of commercial success and proof of damages"); *Swofford v. B&W Inc.*, 336 F.2d 406, 415 (5th Cir. 1964) ("we cannot think of an instance in a patent action where the damage issue is so interwoven with the other issues that it cannot be submitted to a jury independently of the others"). The district court in *Lemelson* expressed the point as follows:

> Regarding the first claimed area of overlap, commercial success, [defendant] Kodak has cited persuasive precedent to the effect that "evidence introduced to show 'commercial success' will be less extensive and of a different character from that to prove damages." [Patentee] Lemelson need not dig into damage evidence in order to show commercial success. Thus, even if Lemelson were to rely of defendants' sales of allegedly infringing products to establish commercial success, the Court believes that this can be done with minimal information regarding sales. Detailed financial information is not necessary to prove commercial success and, accordingly, the Court concludes that there is no substantial overlap between the issues of commercial success and damages.

*Lemelson*, 1993 U.S. Dist. LEXIS 20128, at *11-12 (Ex. 4 hereto), quoting *Paine Webber*, 587 F. Supp. at 1116. Indeed, if there was substantial overlap between liability and damages evidence, patent cases, rather than being regularly bifurcated, would never be bifurcated at all.

In support of its argument that liability and damages cannot be severed, Bridgestone relies on four cases that do not apply to the instant motion. (Bridgestone Opp. at 6). The first, *Dentsply Int'l, Inc. v. New Tech Co.*, 1996 U.S. Dist. LEXIS

7

19846 (D. Del. 1996), addressed the question of bifurcating patent claims from *antitrust* claims. *Id.* at *3 (Ex. 6 hereto). The court did not consider whether patent claims should be bifurcated from damages and willfulness.

In the second, *Willemijn Houdstermaatschaapij BV v. Apollo Computer Inc.*, 707 F. Supp. 1429 (D. Del. 1989), damages discovery was far less extensive than that required in the instant case. There, the plaintiff alleged that the only infringing aspect of the defendant's product was a "token ring" used in defendant's data transmission system. *Id.* at 1434. Thus the *Georgia-Pacific* analysis in that case would be limited to one component of one product. Here, as indicated above, Bridgestone has accused a wide variety of aspects from various models and versions of six different Acushnet golf balls, which will entail a much more complex damages analysis.[2]

In the third case relied upon by Bridgestone, *Matsushita Elec. Indus. Co. v. Cinram Int'l, Inc.*, C.A. No. 01-882-SLR (D. Del. Dec. 15, 2003), the court found that "the liability issues are fairly narrowly drawn." *Id.* at 2 (Ex. 7 hereto). As demonstrated above, the liability issues present in this case are far from narrow.

Finally, *St. Clair Intellectual Property Consultants* involved only 16 asserted claims from only four patents-in-suit, each of which shared the same specification. *St. Clair Intellectual Property Consultants, Inc. v. Canon, Inc.*, 2004 U.S. Dist. LEXIS 17489, at *3 (D. Del. Aug. 31, 2004) (Ex. 8 hereto). In the instant case, Bridgestone alone has asserted 83 claims from 10 patents against multiple variants of six Acushnet products.

---

[2] In addition, *Willemijn* was scheduled for a bench trial, not a jury trial, causing the court to remark that "[s]ince this case will not be tried to a jury, the type of prejudice referred to in [Fed. R. Civ. P. 42(b)] is not a concern." *Id.* at 1433.

## IV. BIFURCATION WILL NOT PREJUDICE BRIDGESTONE

### A. Bifurcation will reduce the burden on both parties and the jury by streamlining liability and narrowing the damages and willfulness issues

By bifurcating damages and willfulness, both parties can focus on the substantive and potentially case-dispositive issues of infringement and validity. Bifurcation is regularly granted in patent cases because a separate trial on liability issues may be dispositive of all or some of the asserted claims. Bifurcation can thus eliminate or substantially decrease the length and complexity of a damages trial and the cost and burden of damages discovery. *See Air-Shields*, 1992 U.S. Dist. LEXIS 17398 at *5 (Ex. 5 hereto) ("A determination that the patent is not infringed or ... is invalid ... will circumvent the need for a lengthy damages phase, saving the time of the court, the jurors, the witnesses and the parties."). *Accord Novopharm*, 181 F.R.D. at 311 (granting bifurcation because "much of the work going into preparation of the [damages] case for trial could be avoided if the jury finds for the accused infringer ... at the liability stage"); *B. Braun Med. Inc. v. Abbott Labs.*, 32 U.S.P.Q.2d 1211, 1215 (E.D. Pa. 1994) (holding that "judicial convenience will be served by trying damages and willfulness separately from liability" in a patent case).

That reasoning applies to the instant case. As is evident from the parties' pre-suit correspondence, the parties have basic disagreements as to certain measurements that will determine whether or not Acushnet infringes certain Bridgestone claims. Because the measurements should be objectively identifiable, discovery during the liability phase should determine which party is correct, potentially disposing of damages related to those claims if Acushnet's measurements are correct. For example, every claim of the Bridgestone's '834 patent requires that the hardness of a solid golf ball core within 5 mm inside the core surface be "up to 8 degrees lower than the surface hardness." '834 patent, col. 7, ll. 31-41. Bridgestone claims that the hardness of Acushnet's Titleist NXT golf

9

ball within 5 mm of the core surface is "within the claimed range." (Pls.' Resp. to Def.'s Interrog. #2.) (Ex. 9 hereto.) Acushnet's measurements, however, which it has provided to Bridgestone, show that the core hardness of the NXT within 5 mm of the core surface is *14 degrees* lower than the hardness of the surface core -- almost double the claimed amount. Discovery will show which party's measurements are correct, thereby potentially disposing of the '834 patent. Moreover, irrespective of which party prevails on liability, resolving such issues could place the case in a settlement posture and, through settlement, obviate the need for a damages/willfulness trial.

Further, given the complexity of the liability phase, it is unlikely we will be able to hold the current schedule if the parties must also address all damages and willfulness issues. In its opposition brief on the issue of representative claims, Bridgestone complains that "[w]ith the large production of documents from Acushnet ... and the numerous invalidity defenses raised, Bridgestone cannot in a matter of a few months distill the information down to a point of selecting the best claims to proceed at trial." (Bridgestone Representative Claims Opp. at 3.) Bridgestone's identification of representative claims will flow from its final contentions, which are due on February 28, 2006. Thus, the current schedule requires both parties to distill that information "in a matter of a few months." Bifurcation will significantly aid the distillation process by removing the currently broad scope of damages and willfulness discovery from consideration. Then, once resolution of the liability phase narrows the scope of damages and willfulness, discovery on those topics can most likely occur concurrently with the post-trial briefing.

### B. Bridgestone's claims of prejudice are unsupported

#### 1. Bifurcation would disadvantage neither party with regard to damages discovery already produced

In its attempt to avoid bifurcation, Bridgestone attempts to manufacture prejudice by grossly mischaracterizing the state of discovery. Although Bridgestone accuses Acushnet of withholding damages-related discovery, the financial data Bridgestone claims Acushnet has withheld is connected to a database of transaction-level sales records that, while arguably responsive to Bridgestone's document requests, are so granular and voluminous as to be both cumulative to the documents already produced by Acushnet and extremely burdensome to produce. Nevertheless, Acushnet has offered to work with Bridgestone to produce whatever documents Bridgestone deems necessary. At the same time, Acushnet is entitled to a similarly granular level of financial data, which Acushnet has requested, but not yet received.[3] Further, if Bridgestone is genuinely concerned that the balance of financial discovery to date would favor Acushnet upon bifurcation, Acushnet can alleviate that concern by returning all damages-related documents produced to it by Bridgestone.

#### 2. Bifurcation would lower Bridgestone's discovery costs and minimize disruption

Nor would bifurcation prejudice Bridgestone by disrupting its business. Although Bridgestone contends that bifurcation would require its witnesses to make repeated trips

---

[3] In fact, despite Bridgestone's repeated assurances to the Court that its document production is complete, Acushnet has identified numerous deficiencies in Bridgestone's document production that Bridgestone has yet to remedy. For example, Bridgestone has produced virtually no e-mail from its Japanese facilities. Although Bridgestone's counsel stated during a November 23, 2005 meet-and-confer that Bridgestone's Japanese employees do not communicate by e-mail, that statement is contradicted by documents from Bridgestone's Japanese production containing an e-mail distribution list. Unless the parties resolve this issue before the January 13 discovery hearing, Acushnet intends to raise this issue with the Court at that time and raises it now only to correct Bridgestone's misstatements.

11

to the United States, it has identified no such witness who would be required to travel to the United States more than once. As indicated above, there is little overlap between liability and damages discovery. In fact, by narrowing the damages and willfulness phase, bifurcation will likely *reduce* the total number of Bridgestone witnesses who will have to travel to the United States for deposition and trial.

### V.    THE CASE IS RIPE FOR BIFURCATION

The time is ripe for bifurcation. As Bridgestone indicates in its opposition, the parties have been dealing with the issues of infringement and validity for over two years. (Bridgestone Representative Claims Opp. at 1.) During that time, Acushnet has provided significant detail about its noninfringement and invalidity contentions. Thus, Bridgestone has had more than enough time and information to understand Acushnet's positions. The parties now have until August 8, 2006 – less than eight months – to complete fact discovery on 15 patents involving over 20 named inventors and countless fact witnesses on the development, composition, characteristics and performance of various models and versions of 15 accused products and the prior art.

Further, with the anticipated number of depositions, deposition time is a finite commodity. Bifurcation would allow each party to focus their depositions on issues that will be raised at trial. To date, neither party has taken a deposition, so neither party would be prejudiced by a focusing of the case at this time.

In addition, if the case is going to get narrowed, it makes sense to narrow it prior to the deadline for final contentions on February 28. As the Court observed at the October 5, 2005 discovery hearing, the exchange of final contentions prior to a narrowing of the case would be both burdensome and unfair to the parties. (Oct. 5, 2005 Tr. at 25:6-

28:5 ("when this case is narrowed down, I'm going to make them give you detailed contention responses").) (Ex. 10 hereto). Otherwise, both parties will be forced to prepare defenses for and respond to issues that may not make it to trial. (*Id.* 27:19-28:1 ("[I]f I grant [Acushnet's Rule 37] motion today, all I've done is caused a lot more paper to come over the [transom] for no purpose, because it's going to go away. And you'd be preparing defenses to all that paper.")). Although that discussion focused primarily on the question of representative claims, the same rationale applies to bifurcation, as there is no need for the parties and the Court to expend resources addressing damages and willfulness issues that may be eliminated from trial due to the resolution of liability.

## VI.     CONCLUSION

For the foregoing reasons, Acushnet respectfully requests that the Court grant its motion to bifurcate liability from damages and discovery.

          Respectfully submitted,

          POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Alan M. Grimaldi
Joseph P. Lavelle
Matthew J. Moore
Vivian S. Kuo
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004
Telephone (202) 783-0800

Dated:  December 22, 2005

By:  /s/ David E. Moore
     Richard L. Horwitz (#2246)
     David E. Moore (#3983)
     Hercules Plaza, 6th Floor
     1313 North Market Street
     P. O. Box 951
     Wilmington, DE  19899-0951
     (302) 984-6000
     rhorwitz@potteranderson.com
     dmoore@potteranderson.com

*Attorneys for Defendant*
*Acushnet Company*

712526

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I, David E. Moore, hereby certify that on December 22, 2005, the attached document was hand delivered to the following persons and was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following and the document is available for viewing and downloading from CM/ECF.

Jack B. Blumenfeld
Maryellen Noreika
Leslie A. Polizoti
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
Wilmington, DE 19801

I hereby certify that on December 22, 2005, I have Federal Expressed the documents to the following non-registered participants:

Robert M. Masters
John T. Callahan
Raja Saliba
Sughrue Mion, PLLC
2100 Pennsylvania Avenue, NW
Washington, DC 20037

/s/ *David E. Moore*
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

680012