# EXHIBIT 1

LEXSEE 1988 US DIST. LEXIS 15885

**EATON CORPORATION, Plaintiff, v. AUBURN GEAR, INC., Defendant**

**Civil No. F 88-80**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
INDIANA, FORT WAYNE DIVISION**

*1988 U.S. Dist. LEXIS 15885; 8 U.S.P.Q.2D (BNA) 1373*

**July 18, 1988, Decided and Filed**

**COUNSEL:** [*1]

Daniel J. Sammon, John R. Hlavka; Watts, Hoffman, Fisher & Heinke Co., L.P.A., Cleveland, Ohio, Albert L. Jeffers; Jeffers, Hoffman & Newyk, Fort Wayne, IN, Attorneys for Plaintiff

Thomas P. Schiller; Pearne, Gordon, McCoy & Granger, Cleveland, Ohio, James P. Fenton; Barrett & McNagny, Fort Wayne, IN, Attorneys for Defendant

**OPINIONBY:**

LEE

**OPINION:**

ORDER

WILLIAM C. LEE, UNITED STATES DISTRICT JUDGE

On May 16, 1988, defendant Auburn Gear, Inc. filed a motion for a separate trial under Rule 42(b). The defendant wants the court to bifurcate the plaintiff's patent infringement theory from the damage issues, so that the damage issues will be tried separately. Oral argument was held on this motion on June 22, 1988. For the following reasons, the defendant's motion will be granted.

I.

Separate Trial Standards

Auburn's motion is made pursuant to *Fed. R. Civ. P. 42(b).* That rules provides that:

(b) Separate Trials. The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any

number of claims, cross-claims, counterclaims, [*2] third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution, or as given by a statute of the United States. *Fed. R. Civ. P. 42(b).* Rule 42(b) envisions severed claims Which are tried as entirely independent actions in separate trials. Wright and Miller, Federal Practice and Procedure: Civil § 2387, p. 277 (1971). If a possibly dispositive issue is to be tried separately, the court may limit discovery on that issue for the time being. *Ellingson Timber Co. v. Great Northern Rye Co., 424 F. 2d 497 (9th Cir. 1970).*

From the plain language of the rule, courts have enunciated the standards which are to be applied when a separate trial on any claim, cross-claim, counterclaim, or third-party claim has been requested. The rule is intended to further convenience, avoid delay and prejudice, and serve the ends of justice. *Guess v. Chenault, 108 F.R.D. 446, 449 (N.D.Ind. 1985).* Singling out a claim for a separate trial is not the normal procedure, see *Ingram Corp. v. J. Ray McDermott & Co., Inc., 495 F.Supp. 1321 (E.D.La. 1980),* and whether or not a separate trial is ordered is a matter committed [*3] totally to the discretion of the trial court. *Guess, 108 F.R.D. at 449.* See also *Davis v. Freels, 583 F. 2d 337, 343 (7th Cir. 1978)*

Separate trials are particularly appropriate in patent cases because *28 U.S.C. § 1292*(c)(2), provides that finding of liability for infringement is an appealable interlocutory order. This allows for easy bifurcation throughout the litigation process. If no liability is determined, the time and expense of trying damages is avoided.

The most common application of Rule 42(b) in patent cases involves a separation of the liability issues from the damage issues. In many districts this division is routine practice, and the court will make the necessary order on its own intiative, at the pretrial [conference] if not

Case 1:05-cv-00132-JJF    Document 57-2    Filed 12/22/2005    Page 3 of 47

Page 2

1988 U.S. Dist. LEXIS 15885, *; 8 U.S.P.Q.2D (BNA) 1373

before. It is suggested, however, that some contests in the area of discovery can be avoided and both parties can focus their trial preparation more effectively if the matter is resolved at an early date.

The separation of the liability and damages issues in patent cases is firmly grounded in the case law, undoubtedly due to the complexity of such cases, the lack of any substantial community among the issues, and the hazard that a lengthy [*4] and expensive trial on the damages issue will be erased by reversal of the patent owner's judgment on appeal.

3. R. White, R. Caldwell and J. Lynch, Patent Litigation: Procedure and Tactics § 4.04[5], at 4-76 (1984). One court has even gone so far as to say "[w]e cannot think of an instance in a patent action where the damage issue was so interwoven with the other issues that it cannot be submitted to the jury independently of the others . . . ." *Swofford v. B & W, Inc., 336 F.2d 406, 415 (5th Cir. 1964).*

II.

Analysis

The defendant contends that the plaintiff will be unable to prove patent infringement because the patent is invalid and that the issue of damages in this case is particularly complex, so that the plaintiff should first be made to prove patent infringement before any time is wasted on the issue of damages. The plaintiff argues that the defendant has not shown that a separate trial on damages will further the convenience of the court, avoid prejudice to the defendant, or be conducive to expedition and economy. The court disagrees.

The defendant has submitted an exhibit, which is a printed publication describing the invention (showing limited slip-differential [*5] side gears with an odd number of teeth), which was disclosed in the patent at issue more than one year prior to the date the patent application was filed, February 14, 1968. The defendant contends, in view of this exhibit, that the patent is invalid. If this is true, the defendant will prevail and the issue of damages will be avoided altogether. While the court is clearly not in a position to weigh the merits of the defendant's argument at this point, the court notes that there is at least some chance that the defendant will show that the patent is invalid and avoid the issue of damages altogether.

Given the complexity of the damage issues, it makes sense to bifurcate those issues in order to consider issues of patent infringement and invalidity first. The damage issues in this case may involve reasonable royalties or lost profits. The calculation of these damages are typically complex and involved. Expert witnesses may be necessary to establish a link between the defendant's actions and harm to the plaintiff and voluminous financial data may need to be weighed in the balance. Since the plaintiff never licensed the patent, extensive evidence may be required to establish any reasonable [*6] royalty. It seems to the court that if these difficult damage considerations can be avoided they ought to be.

Obviously, the court must decide the defendant's motion based on the representations before it and the reasonable conclusions that can be drawn from the state of the record at this point. At oral argument, the defendant represented to the court that the issue of damages would consume three to five days of trial. And even the plaintiff agreed that two days would need to be devoted to the issue of damages. Given the representations made at oral argument, and given the possibility that the issue of damages may not be reached at all, the court agrees, as a matter of efficient judicial administration, that the damage issue must be bifurcated. And as a number of courts have noted, it is the interest of efficient judicial administration that controls the court's exercise of discretion, rather than the wishes of one or more of the parties. See, e.g., *Martin v. Bel Helicopter Co., 85 F.R.D. 654, 658 (D. Col. 1980); Pearl Brewing Co. v. Joseph Schlitz Brewing Co., 425 F.Supp. 1122, 1133 (S.D. Tex. 1976).* Considering all of the factors set forth above, the court concludes [*7] that ordering a separate trial on the issue of damages will in fact serve the purposes of Rule 42(b). Both parties and the court may be saved a great deal of time if the damage issues are not reached.

III.

Conclusion

The defendant's motion for separate trials under Rule 42(b) is hereby GRANTED. Since the issues of infringement and invalidity may be dispositive, the court will limit discovery to those issues for the time being. See *Ellingson, 424 F.2d at 497.*

Enter: July 18, 1988.

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

BRIDGESTONE SPORTS CO., LTD.,
and BRIDGESTONE GOLF, INC.,

                Plaintiffs,

    v.

ACUSHNET COMPANY,

                Defendant.

C. A. No.  05-132 (JJF)

## BRIDGESTONE'S FIRST SET OF INTERROGATORIES
## (INTERROGATORY NOS. 1-24)

Pursuant to Fed. R. Civ. P. 33, Plaintiffs Bridgestone Sports Co. Ltd. and Bridgestone Golf, Inc., by their undersigned attorneys, propound these Interrogatories, to which Defendant Acushnet Company shall respond separately and fully, in writing and under oath, within the time prescribed by the Federal Rules of Civil Procedure, in accordance with the Definitions and Instructions set forth hereinafter.

## DEFINITIONS

Notwithstanding any definition set forth below, each word, term, or phrase used in this Request is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure.  As used in this set of interrogatories, the following terms are to be interpreted in accordance with these definitions:

1)      The term "Bridgestone," "Plaintiff," and/or "Plaintiffs" means Bridgestone Sports Company, Ltd. and/or Bridgestone Golf, Inc., the plaintiffs in this action, and all predecessors, successors, subsidiaries, divisions, parents and/or affiliates thereof, past or present, and all past

7.      Separately, for each of the Bridgestone patents-in-suit, provide the first date that Acushnet became aware of the patent, state how Acushnet became aware of that patent and describe the circumstances under which Acushnet became aware of that patent.

8.      Separately, for each of the Bridgestone patents-in-suit, state whether an opinion of counsel was prepared by or on behalf of Acushnet, and if so, when it was prepared, by whom it was prepared, to whom it was addressed, whether the opinion is in written form or oral, and whether Acushnet plans to rely on such opinion(s) to defend against a charge of willful patent infringement.

9.      Separately, for each of the Acushnet patents-in-suit, identify each claim that you contend is infringed by Bridgestone, the Bridgestone product that you contend has infringed or infringes each such claim, whether infringement is literal or under the doctrine of equivalents, and in the form of a claim chart, set forth in detail on a limitation-by-limitation basis, the factual basis for your assertion that Bridgestone products have infringed or infringe, and identify each Document that supports or refutes your contention of infringement.

10.     State the date on which Acushnet contends that Bridgestone received notice of each of the Acushnet patents-in-suit and the first date Acushnet claims it is entitled to damages for each of the Acushnet patents-in-suit.

11.     State each fact on which Acushnet bases its Fourth Defense that the '125 patent is unenforceable and identify each person with knowledge of that fact and each document concerning that fact.

12.     State each fact on which Acushnet bases its Fourth Defense that the '924 patent is unenforceable and identify each person with knowledge of that fact and each document concerning that fact.

13.    State each fact on which Acushnet bases its Fourth Defense that the '817 patent is unenforceable and identify each person with knowledge of that fact and each document concerning that fact.

14.    State each fact on which Acushnet bases its Fourth Defense that the '707 patent is unenforceable and identify each person with knowledge of that fact and each document concerning that fact.

15.    State each fact on which Acushnet bases its Fifth Defense (Unclean Hands) set forth in the Answer and identify each person with knowledge of that fact and each document concerning that fact.

16.    State each fact on which Acushnet bases its Sixth Defense (Waiver/Estoppel/Laches) set forth in the Answer and identify each person with knowledge of that fact and each document concerning that fact.

17.    State each fact on which Acushnet bases its Seventh Defense (Failure to State a Claim) set forth in the Answer and identify each person with knowledge of that fact and each document concerning that fact.

18.    State the sales, by year, of each of the Accused Acushnet products, from their introduction to the present.

19.    Separately, for each product, the identification of which is requested by Interrogatory No. 1, state separately for U.S. and foreign sales, on a monthly, quarterly and annual basis, beginning March 7, 1998, and that product's unit sales, dollar sales, average wholesale selling price, cost of goods sold, average unit cost of goods sold, gross profit margin, average gross profit margin per unit, net profit margin, and average net profit margin per unit.

20.     State whether any of the Acushnet patents-in-suit have been licensed, and if so, state the name of the licensee(s), the date of the license(s), the parties to the license(s), and the terms of the license(s), including but not limited to, the royalty rate.

21.     Describe the damage theories on which Acushnet is seeking recovery for alleged patent infringement, state all facts supporting that claim for damages, including the period for which Acushnet seeks such recovery, and in the case of a reasonable royalty, the royalty base and rate or, in the case of lost profits, the specific lost sales and the relevant accounting data to ascertain all costs and the profit margins by product.

22.     For each of the Acushnet patents-in-suit, identify all Acushnet products which have practiced or practice any of the claims.

23.     For each product, the identification of which his requested by Interrogatory No. 24, state whether Acushnet, or its licensees, have marked that product with the number of any patent pursuant to 35 U.S.C. § 287, identify the patent numbers with which each product has been marked, and provide the dates during which the product was marked.

24.     Provide the names and addresses of the persons most knowledgeable about the testing of and analysis of each of the Accused Bridgestone products.

MORRIS, NICHOLS, ARSHT & TUNNELL

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
Leslie A. Polizoti (#4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19801
(302) 658-9200
*Attorneys for Bridgestone Sports Co., Ltd.
and Bridgestone Golf, Inc.*

OF COUNSEL:

Robert M. Masters
John T. Callahan
Raja Saliba
SUGHRUE MION, PLLC
2100 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
(202) 293-7060

June 7, 2005

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

BRIDGESTONE SPORTS CO., LTD.,
and BRIDGESTONE GOLF, INC.,

              Plaintiffs,

     v.

ACUSHNET COMPANY,

              Defendant.

C. A. No. 05-132 (JJF)

## BRIDGESTONE'S SECOND SET OF INTERROGATORIES
## (INTERROGATORY NOS. 25-39)

Pursuant to Fed. R. Civ. P. 33, Plaintiff Bridgestone Sports Co. Ltd., by their undersigned attorneys, propound these Interrogatories, to which Defendant Acushnet Company shall respond separately and fully, in writing and under oath, within the time prescribed by the Federal Rules of Civil Procedure, in accordance with the Definitions and Instructions set forth hereinafter.

## INTERROGATORIES

25.    Identify on a claim-by-claim basis all facts that support your contention that Bridgestone has willfully infringed the Acushnet patents-in-suit, including without limitation when and how you contend Bridgestone first became aware of each patent that includes the claim.

26.    Identify on a claim-by-claim basis, for each claim of the Acushnet patents-in-suit identified in your response to Interrogatory No. 9 of Bridgestone's First Set of Interrogatories, any alleged dates of conception; any alleged diligence from such conception until reduction to practice; any alleged dates of actual reduction to practice of the claimed invention; any written descriptions or drawings of the claimed invention prepared prior to the filing date; the date of the first constructive reduction to practice of the subject matter defined by the claim; the names, titles, and place of work (at the time of their involvement and current) of all persons who were involved in connection with such conception, diligence, or reduction to practice; and the earliest effective filing date Acushnet will assert for each such claim. State in detail all factual bases supporting Acushnet's identification of each such date, and identify all persons, documents, and tangible things corroborating each such date.

27.    Describe in detail on a claim-by-claim basis, for each claim of the Acushnet patents-in-suit identified in your responses to Interrogatory No. 9 of Bridgestone's First Set of Interrogatories, the first public use, the first offer for sale, and the first sale which you are aware in the United States and in any foreign country of any product embodying the alleged claimed invention.

28.    Identify all known Prior Art to the Acushnet patents-in-suit, and separately state as to each item of Prior Art the date that Acushnet became aware thereof, all persons that were

aware of each item of Prior Art, the circumstances under which Acushnet became aware of each item of Prior Art, and whether and/or when and in what manner each item of Prior Art was disclosed to the PTO during the prosecution of the Acushnet patents-in-suit.

29.    Identify and describe in detail all Acushnet and/or all third-party products that have ever been sold commercially or used in the public that embody any of the claims of the Acushnet patents-in-suit, and for each such product, identify the time period(s) and geographical location in which that product was made, used and/or sold.

30.    Separately for each of the Acushnet patents-in-suit, state whether you contend there is objective evidence of nonobviousness, and if so, identify on a claim-by-claim basis all facts that you contend support or evidence such alleged objective evidence of nonobviousness or secondary considerations (including but not limited to commercial success, long-felt need, failure of others, commercial acquiescence, unexpected results, improved results, and/or new results) that should be considered in determining whether the claim is invalid for obviousness.

31.    Identify and describe in detail each instance in which Acushnet has communicated with any person or entity regarding a potential license of one or more of the Acushnet patents-in-suit, including offers to license, demands that the person or entity license, and any agreements concerning any of the Acushnet patents-in-suit.

32.    Separately for each claim and each product identified in Acushnet's response to Interrogatory No. 9 of Bridgestone's First Set of Interrogatories, describe all testing, analysis and/or evaluation by you or on your behalf of such products, including the type of test(s) performed, the testing equipment, test parameters and conditions, and all facts, opinions or results obtained, and identify all documents referring or relating to such testing, analysis and/or

evaluation and the persons who are most knowledgeable of such testing, analysis, and/or evaluation.

33.    For each claim and each product identified in Acushnet's response to Interrogatory No. 9 of Bridgestone's First Set of Interrogatories, describe in detail each and every item of damages sought, including any bases for the damages claim. If any damages identified is allegedly based upon lost profits, described whether there was a demand for the product, whether there was an absence of acceptable non-infringing substitutes, whether Acushnet had the ability to meet the demand, the amount of Acushnet's incremental profit, whether there was price erosion or any tag along sales, and the amount of such price erosion or tag along sales, and identify all documents with respect to such lost profit claim and the persons having the most knowledge thereof. Similarly, if any damages identified is allegedly based upon reasonable royalty, describe in detail the amount of such royalty, Acushnet's willingness to license others in the past, Acushnet's profit margin on sales, the availability of like products from others, any collateral sales benefits, the expected profit margin of Acushnet or any other alleged infringer, royalty rates of comparable patents in the field, and identify all documents with respect to such reasonable royalty claim and the persons having the most knowledge thereof.

34.    If Acushnet alleges the invention in the United States of any apparatus, product, device, process, method, act or other instrumentality that practiced any invention claimed in the Bridgestone patents-in-suit prior to the earliest claimed priority date of such claims, identify, separately for each such claim, the circumstances of such prior invention, including all places or facilities involved in research and development related to the prior invention, all persons involved in the conception and reduction to practice of the prior invention, and the dates of conception and reduction to practice of the prior invention.

39.    On a claim-by-claim basis, for each claim of the Bridgestone patents-in-suit that Acushnet contends is not infringed by Acushnet by reasons of the proceedings in the U.S. Patent and Trademark Office during prosecution of the Bridgestone patents-in-suit, identify each term in each such claim and state all factual bases for your contention, including the page and line number of any portion of the prosecution history relied upon.

Date:  July 29, 2005

By:

**MORRIS, NICHOLS, ARSHT & TUNNELL**
JACK B. BLUMENFIELD (#1014)
MARYELLEN NOREIKA (#3208)
LESLIE A. POLIZOTI (#4299)
1201 N. Market St.
P.O. Box 1347
Wilmington, DE 19801
Telephone:  (302) 658-9200

OF COUNSEL:

**SUGHRUE MION, PLLC**
ROBERT M. MASTERS
JOHN T. CALLAHAN
RAJA SALIBA
2100 Pennsylvania Ave., N.W.
Washington, D.C. 20037
Telephone:  (202) 293-7060

Attorneys for Plaintiffs

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BRIDGESTONE SPORTS CO., LTD.,
and BRIDGESTONE GOLF, INC.,

          Plaintiffs,

    v.

ACUSHNET COMPANY,
    a Delaware Corporation,

          Defendant.

C. A. No.  05-132 (JJF)

## BRIDGESTONE'S FIRST SET OF REQUESTS FOR PRODUCTION DOCUMENTS AND THINGS (REQUEST NOS. 1-100)

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, plaintiffs Bridgestone Sports Co., Ltd. and Bridgestone Golf, Inc. hereby request that defendant Acushnet Company produce and permit inspection and copying, the documents and things described herein. Production should be made at the offices of plaintiffs' attorneys, Sughrue Mion, PLLC, 2100 Pennsylvania Avenue, NW, Washington. DC 20037 within thirty (30) days of these requests.

### DEFINITIONS

Notwithstanding any definition set forth below, each word, term, or phrase used in this Request is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure.  As used in this Request, the following terms are to be interpreted in accordance with these definitions:

1.    The term "Bridgestone," "Plaintiff," and/or "Plaintiffs" means Bridgestone Sports Company, Ltd. and/or Bridgestone Golf, Inc., the plaintiffs in this action, and all predecessors, successors, subsidiaries, divisions, parents and/or affiliates thereof, past or present, and all past

26.    All Documents and Things concerning any of the Bridgestone patents-in-suit, the file histories for each of the Bridgestone patents-in-suit, and prior art to each of the Bridgestone patents-in-suit.

27.    All Documents and Things concerning any foreign counterpart of the Bridgestone patents-in-suit.

28.    All Documents and Things concerning the definition or meaning of any claim term, phrase or element in any of the Bridgestone patents-in-suit.

29.    All Documents and Things constituting, or referring or relating to, any communication between Acushnet and any Third Party concerning the Bridgestone patents-in-suit and/or any foreign counterparts of the Bridgestone patents-in-suit.

30.    All Documents and Things constituting, or referring or relating to, any communication between Acushnet and any Third Party concerning any of Bridgestone's U.S. or foreign patents or published patent applications.

31.    All Documents and Things constituting, or referring or relating to, opinions of counsel concerning the Bridgestone patents-in-suit, including without limitation, formal and informal opinions of counsel, written opinions of counsel, and any Document concerning oral opinions of counsel.

32.    All Documents and Things concerning the infringement or non-infringement by any Acushnet product of the Bridgestone patents-in-suit, including without limitation, all Documents concerning any infringement study or analysis, claim scope study or analysis, and test results or analysis used to determine whether a claim element or term is met by an Acushnet product, and any other consideration by or on behalf of Acushnet with respect to the Bridgestone patents-in-suit, and including, but not limited to, all Documents provided to and received from

13

counsel, all memoranda, comments, summaries, claim charts, presentation materials, correspondence, notes, reports, clearance searches, clearance studies, opinions, or "design around" documents.

33.    All Documents and Things concerning the alleged infringement or non-infringement of any of the claims of the Bridgestone patents-in-suit.

34.    All Documents and Things concerning your allegations and denials in the Answer that Acushnet does not, and/or that Acushnet products do not, infringe the Bridgestone patents-in-suit.

35.    All Documents and Things concerning any of the claims or claim elements of the Bridgestone patents-in-suit and/or the scope or interpretation of any of the claims or claim elements of the Bridgestone patents-in-suit, including all Documents and Things concerning the definition or meaning of any claim term, phrase or element in any of the Bridgestone patents-in-suit.

36.    All Documents and Things concerning the allegations in your Answer that one or more of the Bridgestone patents-in-suit is invalid or unenforceable.

37.    All Documents and Things concerning the validity or invalidity of the Bridgestone patents-in-suit, including without limitation, all Documents and Things concerning any studies or analyses regarding validity, invalidity or claim scope, by or on behalf of Acushnet with respect to the Bridgestone patents-in-suit, including but not limited to, all Documents and Things provided to and received from counsel, all memoranda, comments, summaries, presentation materials, test results and measurements, correspondence, notes, reports, or opinions.

38.    All Documents and Things concerning prior art (including Prior Art Golf Ball and any other Things) to the Bridgestone patents-in-suit, including without limitation all Documents

14

58.     All Documents and Things concerning the Acushnet patents-in-suit, including, but not limited to the validity, invalidity, enforceability or unenforceability of the claims.

59.     All Documents and Things constituting, or referring or relating to, any comparison of the Acushnet patents-in-suit and any Bridgestone product, and/or a determination by Acushnet to assert each of the Acushnet patents-in-suit against Bridgestone.

60.     All Documents and Things constituting, or referring or relating to, any competitive analysis of any golf ball, including without limitation, any tests, inspections, investigations, comparisons or examinations of the design, composition, features, functionality and/or performance of such golf ball products.

61.     All Documents and Things concerning prior litigation involving any of the Acushnet patents-in-suit, including without limitation pleadings, motions, declarations, orders, discovery requests, discovery responses, documents produced in response to requests for production of documents or subpoenas, deposition exhibits, deposition transcripts, trial exhibits, trial transcripts, witness statements, expert reports and communications.

62.     All Documents and Things constituting, or referring to, or relating to, any comparison of any Acushnet product with any of the Acushnet patents-in-suit.

63.     All Documents and Things concerning the date each Acushnet product was first sold, offered for sale, or used publicly.

64.     All Documents and Things concerning the marking of any Acushnet products with patent number(s) including the number of the Acushnet patents-in-suit.

65.     All Documents and Things concerning the decision or consideration to not mark any of the Acushnet products with the patent number of any of the Acushnet patents-in-suit.

74.    All Documents and Things, including without limitation any article, abstract, publication, patent, or piece of literature, authored or co-authored by any Acushnet patent inventor.

75.    Documents and Things sufficient to show the employer, job title, description and/or responsibilities for all inventors of the '861 patent from 1972 to the present.

76.    Documents and Things sufficient to show the employer, job title, description and/or responsibilities for all inventors of the '587 patent from 1972 to the present.

77.    Documents and Things sufficient to show the employer, job title, description and/or responsibilities for all inventors of the '367 patent from 1972 to the present.

78.    Documents sufficient to show the employer, job title, description and/or responsibilities for all inventors of the '976 patent from 1997 to the present.

79.    Documents sufficient to show the employer, job title, description and/or responsibilities for all inventors of the '705 patent from 1997 to the present.

80.    All Documents and Things concerning Acushnet's awareness that any accused Bridgestone product allegedly infringed any of the Acushnet patents-in-suit.

81.    All Documents and Things constituting, or referring or relating to, notice to Bridgestone from Acushnet alleging infringement of any of the Acushnet patents-in-suit.

82.    All Documents and Things concerning any consideration, negotiation, recommendation or proposal regarding obtaining a license or any form of an agreement from Bridgestone to use any of the Bridgestone patents-in-suit, or any other patent assigned to Bridgestone, involving technology related to any model, version, type or revision of any of the Acushnet products, or any other products manufactured, sold or distributed by Acushnet.

83.    All Documents and Things constituting, or referring or relating to, any communication between Acushnet and any Third Party concerning this lawsuit or any defense that Acushnet has asserted or may assert in this lawsuit.

84.    All Documents and Things concerning the licensing of each of the Acushnet patents-in-suit, including, but not limited to:

(a)    any and all licenses agreements;
(b)    any and all documents evidencing any payments made under any such licenses;
(c)    any and all licensing policies;
(d)    any and all expressions of interest in licensing any of the Acushnet patents-in-suit; and
(e)    any and all rejections of an offer to take a license to any of the Acushnet patents-in-suit.

85.    All Documents and Things concerning sales and marketing literature and other sales tools developed that evidence, relate or refer to any of the Acushnet products, including, without limitation:

(a)    business and/or marketing plans,
(b)    product comparisons,
(c)    product launch plans, and
(d)    promotional and advertising materials

86.    All Documents and Things concerning any studies or evaluations of the market or business done by or for Acushnet, including without limitation:

(a)    business marketing or strategic plans,
(b)    product launch plans,
(c)    lost order reports,
(d)    sales call reports, and
(e)    general market studies.

87.    All Documents and Things concerning Acushnet's annual revenues and annual revenues derived on a per customer basis from the license, sale, export or use of the Acushnet products since March 7, 1998.

88.    All Documents and Things concerning sales, pricing and profit margin information for each of the Acushnet products since March 7, 1998, including, without limitation, each product's:

(a) total gross unit sales;
(b) total net unit sales;
(c) total gross dollar sales;
(d) total net dollar sales;
(e) average unit gross wholesale selling price;
(f) average unit net wholesale selling price;
(g) total cost of goods sold;
(h) average unit cost of goods sold;
(i) revenue and unit summaries by geography;
(j) revenue and unit summaries by customer;
(k) revenue and unit summaries by product;
(l) revenue and unit summaries by month, quarter and/or year;
(m) total gross profit margin;
(n) average gross profit margin per unit;
(o) total net profit margin;
(p) average net profit margin per unit;
(q) product line gross/standard margin reports;
(r) electronic sales databases;
(s) corporate profit and loss statements;
(t) divisional profit and loss statements;
(u) product line profit and loss statements;
(v) price elasticity/sensitivity analyses;
(w) product line contribution reports;
(x) production summaries; and
(y) cost allocation procedures.

89.    All Documents and Things concerning any estimates or projections Acushnet has made with respect to the sales, pricing and profit margin information for each of the Acushnet products since March 7, 1998, including, without limitation, each product's:

(a) total gross unit sales;
(b) total net unit sales;
(c) total gross dollar sales;
(d) total net dollar sales;
(e) average unit gross wholesale selling price;
(f) average unit net wholesale selling price;
(g) total cost of goods sold;
(h) average unit cost of goods sold;
(i) revenue and unit summaries by geography;
(j) revenue and unit summaries by customer;
(k) revenue and unit summaries by product;
(l) revenue and unit summaries by month, quarter and/or year;

(m) total gross profit margin;
(n) average gross profit margin per unit;
(o) total net profit margin;
(p) average net profit margin per unit;
(q) product line gross/standard margin reports;
(r) electronic sales databases;
(s) corporate profit and loss statements;
(t) divisional profit and loss statements;
(u) product line profit and loss statements;
(v) price elasticity/sensitivity analyses;
(w) product line contribution reports;
(x) production summaries; and
(y) cost allocation procedures

90.    All Documents and Things concerning actual or projected market share information for the Acushnet products since March 7, 1998.

91.    All Documents and Things concerning the submission of any model, version, type or revision of the Acushnet products to the USGA for listing on the List of Conforming Golf Balls since March 7, 1998, including, but not limited to, all USGA applications, USGA testing results, communications either to or from the USGA, and documents and things concerning or referencing such submissions or communications.

92.    All Documents and Things concerning the use and/or testing of any model, version, type or revision of the Acushnet products by any member of the Professional Golfers' Association of America ("PGA") or Ladies Professional Golf Association ("LPGA") from March 7, 1998 to the present, including, but not limited to, endorsement contracts, licenses, and the models, versions, types or revisions of the Acushnet products used and/or tested.

93.    All Documents and Things concerning the number, type, model and configuration of each of the Acushnet products sold, provided, exported or otherwise supplied by Acushnet to each of its customers since March 7, 1998.

94.    All Documents and Things concerning the number, type, model and configuration of each of the Acushnet products manufactured by Acushnet since March 7, 1998.

95.    All Documents and Things concerning the number, type, model and configuration of each of the Acushnet products exported by Acushnet since March 7, 1998.

96.    All Documents and Things concerning the sale or potential sale of Acushnet or the merger of Acushnet with another corporate entity, including, without limitation, any valuations of Acushnet.

97.    Documents and Things sufficient to describe Acushnet's document retention, management and/or destruction policies and practices, including policies and practices related to electronic mail from 1990 to the present.

98.    All Documents and Things concerning the allegations and denials set forth by Acushnet in the Answer, including, but not limited to, all Documents and Things which tend to contradict or draw into question any of the allegations and denials set forth in the Answer.

99.    All Documents and Things concerning resilience index, as that phrase is used in the '705 patent.

100.    All Documents and Things concerning CB23, CB22, BR-60, BR-40, Taktene 8855, CARIFLEX BR1220, BUDENE 1207G, and BR11, and the resilience index, lost tangent thereof, and the analysis, investigation, inspection, and use of any of the foregoing materials in golf balls.

MORRIS, NICHOLS, ARSHT & TUNNELL


_____

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
Leslie A. Polizoti (#4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19801
(302) 658-9200
  *Attorneys for Bridgestone Sports Co., Ltd.*
  *and Bridgestone Golf, Inc.*

OF COUNSEL:

Robert M. Masters
John T. Callahan
Raja Saliba
SUGHRUE MION, PLLC
2100 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(202) 293-7060

June 7, 2005

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BRIDGESTONE SPORTS CO., LTD.,
and BRIDGESTONE GOLF, INC.,

               Plaintiffs,

      v.

ACUSHNET COMPANY,

               Defendant.

C. A. No.  05-132 (JJF)

## BRIDGESTONE'S SECOND SET OF REQUESTS FOR PRODUCTION DOCUMENTS AND THINGS (REQUEST NOS. 101-155)

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, plaintiffs Bridgestone Sports Co., Ltd. and Bridgestone Golf, Inc. hereby request that defendant Acushnet Company produce and permit inspection and copying, the documents and things described herein. Production should be made at the offices of plaintiffs' attorneys, Sughrue Mion, PLLC, 2100 Pennsylvania Avenue, NW, Washington. DC 20037 within thirty (30) days of these requests.

## DEFINITIONS

Bridgestone incorporates by reference the DEFINITIONS set forth in BRIDGESTONE'S FIRST SET OF REQUESTS FOR PRODUCTION DOCUMENTS AND THINGS (REQUEST NOS. 1-100) as though fully set forth herein.

Additionally, the following terms in this Request are to be interpreted in accordance with these definitions:

1.      The term "on-course retailer" means a retailer of golf equipment, including golf balls, located on a golf course facility.

2.    The term "off-course retailer" means a specialty retailer of golf equipment, including golf balls not located on a golf course facility.

3.    The term "sporting goods retailer" means a specialty retailer of several types of sporting equipment, including golf and other sporting equipment.

## INSTRUCTIONS

Bridgestone incorporates by reference the INSTRUCTIONS set forth in BRIDGESTONE'S FIRST SET OF REQUESTS FOR PRODUCTION DOCUMENTS AND THINGS (REQUEST NOS. 1-100) as though fully set forth herein.

## DOCUMENT REQUESTS

101.    All Documents used, relied on or referred to in responding to Bridgestone's Second Set of Interrogatories.

102.    All Documents and Things concerning persons involved in the research, design, development, testing, experimentation, patent activities, manufacture, production, quality control, licensing, marketing, promotion, sales, accounting, finance, and investments related to any of the Acushnet patents-in-suit.

103.    All prior art charts, claim construction charts, infringement or non-infringement charts, and invalidity or validity charts prepared, served, or exchanged in any past or present litigation involving any of the Bridgestone patents-in-suit and foreign counterparts thereof, and Acushnet patents-in-suit and foreign counterparts thereof.

2

104.    All Documents and Things concerning Acushnet's knowledge or awareness of any Prior Art to any of the Acushnet patents-in-suit and foreign counterparts thereof.

105.    All Documents and Things concerning any commercial success of products, machines, processes, services, and/or technology covered by one or more of the Acushnet patents-in-suit.

106.    All Documents and Things that Acushnet contends support or undercuts its interpretation of any of the asserted claims for any of the Acushnet patents-in-suit and for any claim of any of the Bridgestone patents-in-suit.

107.    All Documents and Things concerning the maintenance of the Acushnet patents-in-suit by payment of fees to the United States Patent and Trademark Office as required by 35 U.S.C. § 41.

108.    All Documents and Things concerning all domestic and foreign administrative and judicial proceedings, including prosecution, oppositions and any other challenges to the patentability or validity thereof, involving any of the Acushnet patents-in-suit and foreign counterparts and instructions and communications related thereto.

109.    All reports prepared for use by management, whether periodic or not, referring or relating to Acushnet's costs, returns, discounts and rebates, including without limitation, costs for manufacture, sales, marketing, distribution, overhead administration, advertising, promotion,

production, labor, taxes, research and development for products, machines, processes, services, and technology covered by the Acushnet patents-in-suit and foreign counterparts.

110.    All Documents and Things concerning any computation, calculation or estimation of damages suffered by Acushnet, whether in terms of lost profits or royalties, as a consequence of Bridgestone's alleged infringement of the Acushnet patents-in-suit.

111.    All Documents and Things concerning market demand for products, machines, processes, services, and/or technology covered by the Acushnet patents-in-suit as related to Acushnet's ability to manufacture or have manufactured, use or sell sufficient products, machines, processes, services, and/or technology to meet such demand.

112.    All reports prepared for use by management, whether periodic or not, referring or relating to unit quantities and dollar amounts of sales by Acushnet relating to products, machines, processes, services, and/or technology covered by the Acushnet patents-in-suit and foreign counterparts and all price lists, promotional materials, show specials and associated literature.

113.    All Documents and Things concerning the design of all Acushnet products that Acushnet believes would have been commercially acceptable alternatives to the Accused Products.

147.    All Documents and Things concerning any Acushnet lost sales or business because of Bridgestone's alleged infringement of the Acushnet patents-in-suit.

148.    All Documents and Things concerning Acushnet's sales programs and agreements for the Acushnet products with retailers between 1999 to the present, including without limitation sales programs and agreements with on-course retailers, off-course retailers, sporting goods retailers, and all other retailers.

149.    A list of the on-course retailers with which Acushnet has had and/or currently has sales agreements for the Acushnet products between 1999 to the present.

150.    A list of the off-course retailers with which Acushnet has had and/or currently has sales agreements for the Acushnet products between 1999 to the present.

151.    A list of the sporting goods retailers with which Acushnet has had and/or currently has sales agreements for the Acushnet products between 1999 to the present.

152.    A list of all retailers other than on-course, off-course and sporting goods retailers with which Acushnet has had and/or currently has sales agreements for the Acushnet products between 1999 to the present.

153.    All Documents and Things disclosing the sales of golf balls to the retailers by dollar amount and by volume for the Acushnet products between 1999 to the present, separately by type of retailer, including without limitation on-course retailers, off-course retailers, sporting goods retailers, and all other retailers.

12

154.    All Documents and Things concerning any differences between types of retailers, including without limitation on-course retailers, off-course retailers, sporting goods retailers, and all other retailers, and including without limitation differences in prices, profit margins, and separate tracking by Acushnet and industry of distribution of golf balls through each type of retailer.

155.    All Documents and Things concerning Acushnet's market share by type of retailer, including without limitation on-course retailers, off-course retailers, sporting goods retailers, and all other retailers.

Date:  July 29, 2005

**MORRIS, NICHOLS, ARSHT & TUNNELL**
JACK B. BLUMENFIELD (#1014)
MARYELLEN NOREIKA (#3208)
LESLIE A. POLIZOTI (#4299)
1201 N. Market St.
P.O. Box 1347
Wilmington, DE 19801
Telephone:  (302) 658-9200

OF COUNSEL:

**SUGHRUE MION, PLLC**
ROBERT M. MASTERS
JOHN T. CALLAHAN
RAJA SALIBA
2100 Pennsylvania Ave., N.W.
Washington, D.C. 20037
Telephone:  (202) 293-7060

Attorneys for Plaintiffs

13

# EXHIBIT 4

LEXSEE 1993 U.S. DIST. LEXIS 20128

**JEROME LEMELSON, Plaintiff, v. APPLE COMPUTER INCORPORATED, EASTMAN KODAK CORPORATION, and UNISYS CORPORATION, Defendants.**

**CASE NO. CV-N-92-665-HDM(PHA)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA**

*1993 U.S. Dist. LEXIS 20128; 28 U.S.P.Q.2D (BNA) 1412*

**June 4, 1993, Decided**
**June 4, 1993, Filed**

**JUDGES:** [*1] Atkins

**OPINIONBY:** PHYLLIS HALSEY ATKINS

**OPINION:**

ORDER

This is an action by Jerome Lemelson against Apple Computer Incorporated (Apple), Eastman Kodak Company (Kodak), and UNISYS Corporation (Unisys) for patent infringement.

On November 16, 1992, Kodak moved for separate trials on the issues of liability and damages and to stay discovery on damages issues pursuant to *F.R.Civ.P. 42(b)* [Doc. #20.] Apple and Unisys joined in Kodak's motion and Lemelson filed an opposition. A hearing was conducted on April 9, 1993, and the court heard argument from all parties. Appearing on behalf of Plaintiff Jerome Lemelson was Larry Selander of Keck, Mahin & Cate of Chicago, Illinois and Keegan G. Low of Robison, Belaustegui, Robb & Sharp of Reno, Nevada. Appearing on behalf of Defendant Apple Computer Incorporated was Keith Weed of Bronson, Bronson & McKinnon, of San Francisco, California, and Philip Bartlett of Reno, Nevada. Appearing on behalf of Eastman Kodak Company was James F. Davis, Joseph P. Lavelle and Brian T. Foley of Howrey & Simon, Washington, D.C., and Katherine J. Savage of Laxalt & Nomura, Reno, Nevada. Appearing on behalf of Defendant UNISYS Corporation was Lawrence A. O'Rourke of Finnegan, Henderson, [*2] Farabow, Garrett & Dunner, Washington, D.C., and Steven S. Kent of Beckley, Singleton, De Lanoy, Jemison & List of Reno, Nevada.

The Court granted Kodak's motion for separate trials on liability and damages and to stay damages discovery.

(Tr. 41-2, 105.) This constitutes the Court's memorandum decision pursuant to *28 U.S.C. § 636(b)(1)(A)*.

BACKGROUND

Plaintiff, Jerome Lemelson (Lemelson) is the holder of U.S. Patent No. *4,213,163* (the "*'163* patent") entitled "Videotape Recording." The *'163* patent discloses, inter alia, a method of recording single frames of analog video signals from a video camera on magnetic tape together with coded signals containing information about the content of the images. The *'163* patent derives from an application filed in 1957 and supplemented with further disclosure in 1962. The *'163* patent has 73 claims. n1

n1 In addition, plaintiff recently moved to amend his complaint by adding claims for infringement of another patent related to the *'163* patent, Patent No. 5,177,645, the "'645 patent." The '645 patent, issued on January 15, 1993, itself contains 76 claims. On April 9, 1993, this Court, on Lemelson's unopposed motion, order that the complaint be amended to include Lemelson's allegations concerning the '645 patent.

[*3]

The Plaintiff alleges that the Defendants have infringed the *'163* patent and the '645 patent (which may include infringement of some or all of the claims of these patents). n2

n2 Because discovery on the liability issues is in the initial stages, this Court does not know how many of the 149 total claims (the *'163* patent and its 73 claims plus the '645 patent and its 76 claims) Plaintiff is alleging are infringed. Al-

though there are a number of specific products already accused of infringement, the exact number of accused products is presently unknown. Further, Lemelson has also broadly accused entire lines of products sold by Kodak and Apple.

At oral argument, counsel for Plaintiff stated his expectation that, following discovery, Plaintiff will maintain this action with respect to only five or six claims of the patents in suit, and the allegedly infringing products will be grouped by similar characteristics. (Tr. at 22.) However, for purposes of this motion, the Court must assume at this stage that this case will involve a large number of claims asserted against a great many products.

[*4]

In support of its motion, Kodak asserts that the number of patents, the number of allegedly infringing products, and the number of defendants makes the instant action enormously complicated. Kodak argues that trying damages issues at the same time as liability issues would not promote judicial economies, because a finding on the question of liability may make moot the damage inquiry, thus saving the court and counsel time, and the parties, money. Kodak also argues that the complicated file history and parentage of the patents in suit also makes this case more complicated than usual. Finally, Kodak states that the issues of liability are not intertwined with those of damages and that Plaintiff will not be prejudiced if the trial is bifurcated.

Lemelson objects to bifurcation of the trial, stating that many of the same issues pertain to damages and liability, and many of the same witnesses would be called. Plaintiff also states it would suffer undue prejudice by bifurcation.

Kodak also moves for a stay of discovery on damage issues if the Court decides to rule in favor of its motion for a separate trial on damages. Plaintiff opposes this motion, and argues that even if the Court orders [*5] separate trials on liability and damages, the Court should not stay discovery on damages.

## SEPARATE TRIAL STANDARDS

*Federal Rule of Civil Procedure 42(b)*, on which Kodak's motion is based, reads:

> (b) Separate Trials. The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim,

counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counter-claims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution, or as given by a statute of the United States.

Rule 42(b) thus authorizes the court to order separate trials "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, . . . ." The rule is intended to further convenience, avoid delay and prejudice and serve the ends of justice, and whether a separate trial is ordered is a matter committed totally to the discretion of the trial court. *Eaton Corp. v. Auburn Gear Inc., 1988 U.S. Dist. LEXIS 15885, 8 USPQ 2d 1373,* [*6] (N.D. Ind. 1988), citing *Guess v. Chenault, 108 F.R.D. 446, 449 (N.D. Ind. 1985).*

Kodak argues that separate trials on liability and damages are particularly appropriate in patent cases. Some courts have even noted "a 'presumption in favor of bifurcation' in patent infringement suits." *Acme Resin Corp. v. Ashland Oil, Inc., 689 F. Supp. 751, 753 (S.D. Ohio 1987),* aff'd, *1992 U.S. App. LEXIS 1475, 24 USPQ 2d 1475 (Fed. Cir. 1992)* (quoting *Naxon Telesign Corp. v. GTE Information Sys., Inc., 89 F.R.D. 333,* 341 N. 10 (N.D. Ill. 1980)). The rule favoring severance of liability from damages in patent suits is set forth in *Swofford v. B&W Inc., 34 F.R.D. 15, 19-20 (S.D. Tex. 1963),* aff'd, *336 F.2d 406 (5th Cir. 1964),* cert. denied, *379 U.S. 962, 13 L. Ed. 2d 557, 85 S. Ct. 653 (1965).* After noting that "in a patent infringement suit considerations exist which suggest that efficient judicial administration would be served by separate [*7] trials on the issues of liability and damages," the court concluded that "the trial of the damages question in such a suit is often difficult and expensive, while being easily severed from the trial of the questions of validity and infringement of the patent." *Id. at 19-20.* This is, of course, because "[a] preliminary finding on the question of liability may well make unnecessary the damages inquiry, and thus result in substantial saving of time of the court and counsel and reduction of expense to the parties." *Id. at 20.* Accord: *Rohm & Haas Co. v. AZS Corp., 229 USPQ 399, 440 (N.D. Ga 1986); Paine, Webber, Jackson & Curtis, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, 587 F. Supp. 1112, 1115-17 (D. Del. 1984); Slater Elec. Inc. v. Indian Head, Inc., 223 USPQ 729, 729-30 (S.D.N.Y. 1983); Shepard v. I.B.M., 45 F.R.D. 536, 537 (S.D.N.Y. 1968).*

Thus, while it is clear that a judge should not routinely order separate trials, in patent cases, bifurcation is

1993 U.S. Dist. LEXIS 20128, *; 28 U.S.P.Q.2D (BNA) 1412

"particularly appropriate" under *28 U.S.C. § 1292* [*8] (c)(2), which allows a finding of liability to be appealed as an interlocutory order. *Eaton Corp., supra, 8 USPQ 2d at 1374.* A finding in favor of the defendant on the question of liability eliminates any need to have a trial on the issue of damages, saving time and expense. *Slater, supra, 223 USPQ at 729.* Quoting from a well-known patent litigation manual, the court in Eaton stated:

> The separation of the liability and damages issues in patent cases is firmly grounded in the case law, undoubtedly due to the complexity of such cases, the lack of any substantial community among the issues, and the hazard that a lengthy and expensive trial on the damages issue will be erased by reversal of the patent owner's judgment on appeal.

*8 USPQ 2d at 1373,* quoting 3 R. White, R. Caldwell, and J. Lynch, Patent Litigation: Procedure and Tactics § 404[5], at 4-76 (1984). n3

> n3 Moreover, if the issue is resolved in the plaintiff's favor, the defendant might well settle on the amount of damages to avoid a lengthy trial on that question. Id. quoting *Smith v. Alyeska Pipeline Service Co., 538 F. Supp. 977, 983 (D. Del. 1982);* see also, *Swofford v. B & W, Inc., supra, 34 F.R.D. at 19-20.*

[*9]

In patent cases, the issues of liability are usually not intertwined with those of damages. Thus, severing the issue of liability from damages permits the court to focus on the technical issues of validity and infringement without the inevitable distraction caused by the presentation of extraneous evidence relating to accounting procedures, costs, marketing and sales of products which may or may not be found to infringe, and proof as to what may be considered a reasonable royalty rate. *Mag Instrument, Inc. v. J. Baxter Brinkmann Int'l Corp., 123 F.R.D. 543, 545 (N.D. Tex. 1988), Air-Shields, Inc. v. BOC Group, 1992 U.S. Dist. LEXIS 17398, 23 USPQ 2d 1955, 1956-57 (D. Md. 1992).* Indeed, in *Swofford, supra,* the court concluded that it could not "think of an instance in a patent action where the damage issue is so interwoven with the other issues that it cannot be submitted to the jury independently of the others. . . ." *336 F.2d at 415.*

Having considered the standards set forth above, the Court concludes that the facts and equities of this case require [*10] bifurcation. Ordering a separate trial on the issue of damages will further convenience the Court and the parties, and will avoid delay and prejudice, and serve the ends of justice.

Furthermore, where a possibly dispositive issue is to be tried separately, the court may limit discovery on that issue for the time being. *Ellingson Timber Co. v. Great Northern Ry. Co., 424 F.2d 497 (9th Cir. 1970).* A stay of damages discovery is appropriate in patent cases "to defer costly and possibly unnecessary discovery proceedings on the damages issues pending resolution of the liability issues." *Paine, Webber, supra, 587 F. Supp. at 1117;* see also *Eaton Corp., supra, 8 USPQ 2d at 1374-5, Slater Elec., 223 USPQ at 731-32.* Accordingly, the Court also grants Kodak's motion to stay damages discovery.

ANALYSIS - BIFURCATION

In deciding to grant Kodak's motion to bifurcate under Rule 42(b), this Court has considered first the nature of the issues -- i.e., is there linkage between the issues of damages and liability. Kodak claims that the evidence of liability [*11] and damages will be distinct and will involve different witnesses and documents. Kodak states that testimony and evidence regarding liability is mostly technical in nature, whereas proving damages involves separate accounting and financial issues.

Lemelson contests this view and states there is substantial overlap of liability and damages issues. According to Lemelson, trying damages separately would necessitate a new jury being impaneled to reexamine the same factual issues as the liability jury, in contravention of plaintiff's Seventh Amendment right to a jury trial. However, Lemelson only cites two possible areas of overlap -- commercial success and willful patent infringement. The Court has reviewed the parties' arguments and the case law regarding these two areas, and does not find Lemelson's arguments persuasive.

Regarding the first claimed area of overlap, commercial success, Kodak has cited persuasive precedent to the effect that "evidence introduced to show 'commercial success' will be less extensive and of a different character from that to prove damages." *Paine, Webber, supra, 587 F. Supp. at 1116.* n4 Lemelson need not dig into damage evidence [*12] in order to show commercial success. Id. Thus, even if Lemelson were to rely on defendants' sales of allegedly infringing products to establish commercial success, the Court believes that this can be done with minimal information regarding sales. Detailed financial information is not necessary to prove commercial success and, accordingly, the Court concludes that there is

1993 U.S. Dist. LEXIS 20128, *; 28 U.S.P.Q.2D (BNA) 1412

no substantial overlap between the issues of commercial success and damages.

n4 As the court noted in Paine, Webber:

The question of commercial success is not ordinarily determined by a detailed analysis of exhaustive and intricate financial data, such as is required for proof of damages, but rather by whether the claimed invention is, broadly speaking, an accepted product and a big seller.

*Id., at 1116* (citations omitted)

Willful patent infringement is the second area in which overlap is alleged by Plaintiff. Presumably, Plaintiff's argument is that evidence pertinent to a knowing and deliberate infringement [*13] by the Defendants of its patents is also pertinent to the question of increased (treble) damages under *35 U.S.C. § 284.* The Court disagrees.

Whether to impose increased damages under the patent damages statute is an area left to the sole discretion of the trial judge, not to the jury. *Smith, supra, 538 F. Supp. at 986.* Also, willfulness is not part of the liability finding, and the issue need not be reached if the patent is found invalid or not infringed. *Amsted Industries v. National Castings, Inc., 1990 U.S. Dist. LEXIS 8553, 16 USPQ2d 1737, 1739 (N.D. Ill. 1990).* Any claimed overlap on the willfulness issue is, therefore, insubstantial and provides no reason to deny bifurcation.

Accordingly, this Court finds that Defendants have demonstrated persuasively that there is minimal overlap of issues on liability and damages.

The second aspect the Court has considered is that of the complexity of the liability and damages issues. While the Court may not at this time weigh the merits of the infringement claims, the Court concludes that the issues surrounding infringement are [*14] likely to be extremely complex and time consuming. As Defendants note, this case involves many patent claims and many products. This point was underscored by counsel for Kodak and Apple at oral argument. n5 Regarding Kodak, Lemelson claims many products, including a number of digital camera systems and an entire line of imaging products, as potentially infringing. n6 Apple is in a similar position, as its Apple and Macintosh computer lines

are accused. Finally, one point this Court finds extremely persuasive is that each of the defendants are in different industries involving different technologies.

n5 While at this juncture Lemelson has accused only one allegedly infringing Unisys product, it is claimed to be very different than the products sold by Kodak and Apple. Tr. 16-17.

n6 Kodak's counsel stated:

It's the entire Eastman Kodak image line which is accused. [This] is a substantial part of Eastman Kodak's business. Tr. at 9.

As detailed above, Defendants are all large corporations who manufacture [*15] myriad products accused in this case. This case alone suffices to convince the Court that adding to this mix complex issues of profits and other damage considerations would both distract the Court from the technical infringement issues and would most certainly confuse a jury. As the Court noted in *Eaton, supra,* "it seems to the court that if . . . difficult damage considerations can be avoided they ought to be." *8 USPQ2d at 1375.* n7

n7 Further, the court cannot agree with plaintiff's claim that the damages calculations are not complicated because he seeks only a reasonable royalty and not lost profits. Precedent cited by Kodak demonstrates that the factors which go into a determination of a reasonable royalty are both complicated and extensive. At least one court has noted that the calculation of a reasonable royalty "is often more complicated than a lost profits analysis." *Slater, supra, 223 USPQ at 731.*

[*16]

Finally, in deciding whether to bifurcate, the court must ensure that bifurcation does not prejudice a plaintiff. *Willemijn Houdstermaatschaapij BV v. Apollo Computer, 707 F. Supp. 1429, 1435 (D. Del. 1989).* Lemelson claims that he will suffer prejudice because he will be forced to present documentary evidence twice and to call several of the same witnesses twice to offer almost identical testimony twice. This, according to Plaintiff, also violates his seventh amendment right to jury trial. *Gasoline Products Co. v. Champlin Refining Co., 283*

1993 U.S. Dist. LEXIS 20128, *; 28 U.S.P.Q.2D (BNA) 1412

*U.S. 494, 500, 75 L. Ed. 1188, 51 S. Ct. 513 (1931).* The Court disagrees.

The Federal Circuit has held that bifurcation of a trial to adjudicate unrelated issues separately does not violate the Seventh Amendment, nor does it deprive a plaintiff of his right to a fair trial. See, *In Re Innotron Diagnostics, Inc., 800 F.2d 1077, 1086 (Fed. Cir. 1986),* quoting *Paine, Webber, Jackson, and Curtis, supra, 587 F. Supp. at 1117.* Traditionally, in patent cases, two different juries try the liability and damage [*17] issues. *Smith, supra, 538 F. Supp. at 982-986.*

Since the Court has concluded that the liability and damages issues in this case have little or no overlap, the Court does not agree that Lemelson will be prejudiced. n8 For all of the foregoing reasons, this Court concludes that the purposes of Rule 42(b) will be well served by ordering a separate trial on the issue of damages.

> n8 Lemelson also claims that a refusal to bifurcate may promote settlement. However, it is just as likely that a separate determination of liability will promote settlement without the need for a lengthy trial on damages issues. See, supra, note 3 and accompanying text.

ANALYSIS -- STAY OF DISCOVERY

Kodak also moved that discovery on damages issues be stayed until the liability claim is determined. Kodak argues that staying discovery on damages will promote judicial economy and efficiency. Kodak cites Lemelson's first written discovery requests, which ask for suggested retail prices, direct manufacturing [*18] costs, gross margins, and actual and estimated net profits for a broad range of Kodak products, as illustrating the burden of the information requested and the need to postpone damages discovery. See, Kodak Mem. at 14. If Kodak (and/or either of the other defendants) is found not to have infringed, these discovery requests need not be answered.

Lemelson opposes Defendants' motion. He argues that even if this Court orders separate trials on liability and damages, the Court should not stay discovery on damages. As support for his view, Lemelson states that the Court would be constantly called upon to decide whether discovery requests and deposition questions touched impermissibly on issues of damages. Further, Lemelson cites *Naxon, supra, 89 F.R.D. at 341,* for the proposition that it is preferable for the same jury to consider both damages and liability. He claims that if these issues are separated in discovery, the same jury will not be able to decide both issues.

Lemelson also claims that, because discovery is in its initial stages, a stay of damages discovery would be premature. Finally, he states that the discovery requests which have already been [*19] served upon Defendants touch on issues of both liability and damages, and therefore, judicial economy will be furthered by proceeding with discovery on both issues.

This Court concludes that no purpose will be served by going forward on damages discovery given the decision to try damages issues separately. Again, the complexities of this case convince the Court that to allow discovery to proceed on damages, without a clear understanding at this point of exactly which patent claims are alleged to be infringed and which products are alleged to be infringing, would result in a great deal of wasted time and effort. Particularly because this case is in the early stages of discovery, and because there is no overlap between liability and damages issues, staying damages discovery is appropriate. Furthermore, where courts have ordered separate trials on issues of liability and damages, the courts have routinely stayed damages discovery. See, *Paine, Webber, Jackson & Curtis, supra, 587 F. Supp. at 1117, Slater Elec., supra, 223 USPQ at 731-732;* and *Eaton, supra, 8 USPQ2d at 1374.*

This [*20] Court has the authority to order a stay of all discovery on damages issues. *Ellingson, supra, 424 F.2d at 499* (9th Cir.). The Court has determined that exercising this authority, and ordering a stay of discovery on damages issues until liability is resolved, is in the interests of judicial efficiency and does not prejudice the Plaintiff.

CONCLUSION

Defendant Kodak's Motion for Separate Trials on the Issues of Liability and Damages and to Stay Discovery on the Damages Issue (Doc. #20) with joinders by Apple (Doc. #34) and Unisys (Doc. #55) is GRANTED.

IT IS SO ORDERED this 4th day of June, 1993.

Phyllis Halsey Atkins

UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 5

LEXSEE 1992 US. DIST. LEXIS 17398

**AIR-SHIELDS, INC. v. THE BOC GROUP, et al.**

**CIVIL ACTION NO. WN-91-2571**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

*1992 U.S. Dist. LEXIS 17398; 23 U.S.P.Q.2D (BNA) 1955*

**February 28, 1992, Decided**
**February 28, 1992, Filed and Entered**

**JUDGES:** [*1] Nickerson

**OPINIONBY:** WILLIAM M. NICKERSON

**OPINION:**

### MEMORANDUM

Now before the Court is Defendants' Motion For Separate Trials and a Stay of Damages Discovery (Paper No. 7). Plaintiff has filed an opposition (Paper No. 13) and Defendants replied (Paper No. 15). Upon a review of the pleadings, this Court determines that no hearing is necessary (Local Rule 105.6), and that Defendants' motion should be granted.

### DISCUSSION

Plaintiff Air-Shields, Inc. ("Air-Shields") filed suit against Defendants BOC Group, et al. ("BOC") on September 6, 1991, for the alleged infringement of patent 4,361,137. Patent 4,361,137 is for an infant incubator.

The instant dispute arises out of BOC's Motion For Separate Trials and a Stay of Damages Discovery (Paper No. 7). In its Motion, BOC requests: (1) separate trials on the issues of liability and damages, pursuant to *Fed. R. Civ. P. 42(b)*; (2) postponement of the issue of willfulness until the damages trial; and (3) a stay of discovery on damages issues, including the alleged willfulness of infringement, pursuant to *Fed. R. Civ. P. 26(c)*.

1. Separate Trials

The Federal Rules of Civil Procedure provide that:

The court, in furtherance of convenience [*2] or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue, or of any number of claims, cross claims, counterclaims, third-party claims,

or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

*Fed. R. Civ. P. 42(b)*.

BOC argues that separate trials should be granted for two major reasons. First, BOC argues that bifurcation will serve judicial economy. In support, BOC argues that the damages issues in this case are complex and protracted, particularly because Air-Shields will be proceeding on two theories of recovery, lost profits and reasonable royalty. Thus, a finding that the patent is not infringed or is invalid in the liability phase will obviate the need for a lengthy damages trial. Second, BOC argues that bifurcation will facilitate jury understanding of the complex issues involved in both the liability and damages phases of this case.

Air-Shields argues against bifurcation, in large part because of an asserted overlap [*3] in evidence between damages and liability issues. Specifically, Air-Shields alleges that: (1) evidence of commercial success in the liability phase will overlap with evidence of lost profits and reasonable royalty in the damages phase; and (2) evidence of the patent claims, crucial to the liability phase, may also be needed in the damages phase. Air-Shields also argues that bifurcation will inconvenience jurors and witnesses, complicate discovery and increase the complexity of the case. Moreover, Air-Shields contends that it will be prejudiced by separate trials because the resolution of its claims will be delayed.

The Court determines that trial in this case should be bifurcated. Bifurcation is warranted when the issues are particularly complex and/or the proof of damages is essentially independent of the proof of liability. *Brad Ragan, Inc. v. Shrader's Inc., 89 F.R.D. 548, 550 (S.D. Ohio 1981)*. Courts have not hesitated to separate the issues of damages and liability in patent suits pursuant to Rule 42(b) in appropriate circumstances. See, e.g., *Mag*

Case 1:05-cv-00132-JJF    Document 57-2    Filed 12/22/2005    Page 40 of 47

Page 2

1992 U.S. Dist. LEXIS 17398, *; 23 U.S.P.Q.2D (BNA) 1955

*Instrument Inc. v. J. Baxter Brinkmann Int'l Corp.*, 123 F.R.D. 543 (N.D. Tex. 1988); [*4] *White Chemical Corp. v. Walsh Chemical Corp.*, 116 F.R.D. 580 (W.D.N.C. 1987), *Slater Elec., Inc. v. Indian Head, Inc.*, 38 Fed. R. Serv. 2d 488 (S.D.N.Y. 1983).

Bifurcation is proper in this case for several reasons. First, judging from the technical nature of this case, Plaintiff's detailed discovery requests, see BOC's Motion at 6-7, and Plaintiff's dual theories of recovery, the damages and liability issues will be complex. Plaintiff's damages theories alone will require proof of numerous factors. See *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y 1970), cert. denied, 404 U.S. 870 (1971) (listing fifteen factors pertinent to proving reasonable royalty); *Slater*, 38 Fed. R. Serv. 2d at 452 (listing four factors pertinent to proving lost profits). Separate trials will foster a clear presentation of this complicated case to the jury. n1

n1 Plaintiff has requested a jury trial in this matter. Courts have bifurcated patent trials when a jury has been requested. See, e.g., *Paine, Webber, Jackson & Curtis, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 587 F. Supp. 1112, 1115-17 (D. Del. 1984); *Haglund v. Dow Chemical Co.*, 35 Fed. R. Serv. 2d 107, 111 (E.D. Cal. 1982).

[*5]

Second, separate trials will promote judicial economy. A determination that the patent is not infringed or a determination that the patent is invalid in the liability phase will circumvent the need for a lengthy damages phase, saving the time of the Court, the jurors, the witnesses and the parties. Moreover, a finding of liability may promote settlement, potentially obviating the need for the damages trial.

Third, the Court finds that proof of damages in this case is largely independent of proof of liability. See *Molinaro v. Watkins-Johnson CEI Div.*, 60 F.R.D. 410, 413 (D. Md. 1973) (before granting separate trials, the Court must insure that the issues are clearly separable and that evidence will not overlap between the two trials). Plaintiff argues, to the contrary, that overlapping evidence in this case should preclude bifurcation. Plaintiff argues mainly that evidence of commercial success in the liability phase will overlap with evidence of lost profits and reasonable royalties in the damages phase. Additionally, Plaintiff alleges that some evidence of the patent claims may be needed in the damages phase. The Court finds, however, that any overlap [*6] in proof between damages and liability is likely to be de minimis. As the

court in *Mag* stated in refuting a similar argument on commercial success:

. . . commercial success will not require the juries to determine the same issues. In the liability case, the jury will focus on the success of Mag's patent, so as to determine obviousness under 35 U.S.C. § 103. Such proof is best demonstrated by the activities of Mag, as the patentee, not the activities of Brinkmann. In the damages trial, on the other hand, the jury will focus on Brinkmann's degree of success. Moreover, proof of commercial success in the liability phase does not require the exhaustive and intricate financial data used in the trial on damages. While the two juries may hear some of the same evidence in both phases, they will not determine the same essential issues.

*Mag*, 123 F.R.D. at 546. Regarding the alleged evidentiary overlap on patent claims, even if some evidence is needed on patent claims in the damages phase, this can be accomplished through limited testimony.

In short, the Court finds that bifurcation in this case will serve convenience and [*7] judicial economy. See *Fed. R. Civ. P. 42(b)*. In so doing, the Court notes with approval the reasoning of the district court in *White*:

It is obvious that this case involves complex issues, but any overlap between questions of liability and damages, and the resulting duplication of some evidence, appears minimal as well as outweighed by interests of convenience and economy in resolving in a separate trial issues of patent validity, enforceability, infringement . . . . Evidence of costing factors, profit levels, etc., are unique to issues of damages and would involve a good deal of additional trial time in addition to adding complexity and confusion which will face the jury. Bifurcation would simplify the juror's task and a determination of no liability would avoid entirely the need for a trial pertaining to damages, while a determination of liability may likely result in a settlement of the action. Further, the Court is not persuaded that Plaintiff will suffer unfair prejudice by a separate trial on liability and damages, at least no more than Defendants stand to lose.

*White*, 116 F.R.D. at 582. This Court is similarly not persuaded that Plaintiff [*8] Air-Shields will suffer prejudice in this case by a separate trial on liability and damages. n2 Accordingly, Defendants' Motion for a Separate Trial is granted.

n2 Air-Shields argues that it will be prejudiced because the resolution of its lawsuit will be delayed. This is not necessarily true, however, as a finding for BOC in the liability phase will pro-

1992 U.S. Dist. LEXIS 17398, *; 23 U.S.P.Q.2D (BNA) 1955

duce a more swift resolution of Air-Shields' claims. Moreover, a finding a liability may produce a speedy settlement before the second phase even begins.

2. Postponement of Willfulness Until Damages Phase

If this court finds, after a jury finding of liability, that BOC willfully infringed Air-Shields' patent, the court can award increased damages and attorney fees. See *35 U.S.C. § § 284*, 285. Defendants argue that the determination of willfulness should be deferred until the damages trial. This Court agrees.

Willfulness is an inquiry into bad faith, and thus an inquiry into intent. See *Bott v. Four Star Corp.*, *807 F.2d 1567, 1572 (Fed. Cir. 1986)* [*9] (listing factors to consider when determining willfulness). Although Plaintiff argues that evidence of willfulness will overlap with evidence of infringement, evidence of infringement is largely concerned with Air-Shields' patent and BOC's product. Thus little, if any, evidentiary overlap will occur. Accordingly, Defendants' motion to postpone determinations of willfulness until the damages phase is granted.

3. Stay of Discovery

Defendants argue that costly and possibly unnecessary damages discovery should be stayed pending the resolution of the liability issues. See *Paine Webber, 587 F. Supp. at 1117*. Although there is some merit to Defendants' argument, this Court determines that discovery should not be stayed.

Defendants have unilaterally refused to produce discovery relating to damages pending the outcome of the instant motion. Specifically, Defendants have refused to respond to Plaintiff's "Category II" requests for discovery, categorizing these requests as damages discovery. Although Plaintiff has attempted to gain discovery materials under its "Category II" requests relating to liability issues, the parties have argued over the categorization [*10] of certain "Category II" requests as liability or damages related. See Plaintiff's Letter to the Court dated February 13, 1991, at 3-5; Defendants' Letter to the Court dated February 18, 1992, at 2-3. There is no indication that such arguments over the scope of discovery will not continue, in future discovery requests, as well as in depositions.

This Court again follows the logic of the White court in refusing to grant a stay of discovery. In White, the court bifurcated trial but not discovery, holding:

With respect to discovery, however, the Court believes that a protective order effectively separating discovery of liability from that of damages would merely result in added judicial involvement into objections, motions to compel and the like. Therefore, the Court will deny Defendants' Motion [for a stay of discovery].

*White, 116 F.R.D. at 582*. This Court agrees that a stay of discovery will result in "unnecessary judicial involvement" in disputes in this case over the scope of discovery, disputes which have already begun. Accordingly, Defendants' Motion for a Stay of Discovery is denied.

A separate order will be issued.

William [*11] M. Nickerson
United States District Judge

Dated: February 28, 1992.

# EXHIBIT 6

LEXSEE 1996 US DIST. LEXIS 19846

**DENTSPLY INTERNATIONAL, INC., AND TULSA DENTAL PRODUCTS, INC.,
Plaintiffs, v. NEW TECHNOLOGY COMPANY (aka NT COMPANY), TYCOM
CORPORATION, and TYCOM DENTAL CORPORATION, Defendants.**

**Civil Action No. 96-272 MMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1996 U.S. Dist. LEXIS 19846*

**November 26, 1996, Argued
December 19, 1996, Decided**

**NOTICE:** [*1]   FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Plaintiffs' motion to bifurcate the patent and trade secret trial for the antitrust trial granted. Plaintiffs' motion to stay antitrust discovery denied.

**COUNSEL:** Edward B. Maxwell, 2nd, Esq., and Josy W. Ingersoll, Esq., of Young Conaway Stargatt & Taylor, Wilmington, Delaware; Of Counsel: Dale M. Heist, Esq., Albert J. Marcellino, Esq., and Lynn A. Malinoski, Esq., of Woodcock Washburn Kurtz Mackiewicz & Norris, Philadelphia, Pennsylvania; attorneys for plaintiffs.

Jack B. Blumenfeld, Esq., and Julia Heaney, Esq., of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Of Counsel: Don W. Martens, Esq., Craig S. Summers, Esq., and Stephen M. Lobbin, Esq., of Knobbe, Martens, Olson & Bear, Newport Beach, California; George L. Graff, Esq., and Davis S. Benyacar, Esq., of Paul, Hastings, Janofsky & Walker LLP, New York, New York; attorneys for defendants.

**JUDGES:** Murray M. Schwartz, Senior District Judge

**OPINIONBY:** Murray M. Schwartz

**OPINION:**

### MEMORANDUM OPINION

Argued: November 26, 1996
Dated: December 19, 1996

**Murray M. Schwartz, Senior District Judge**

### I. INTRODUCTION

Plaintiff corporations Dentsply International, Inc. ("Dentsply")   [*2]   and Tulsa Dental Products, Inc. ("Tulsa") (collectively, "plaintiffs"), have brought three claims against defendant corporations New Technology Co. ("New Technology"), NT Acquisition Corp. ("NT Acquisition"), and Tycom Dental Corp. ("Tycom Dental") (collectively, "defendants"). Docket Item Number ("D.I.") 7. The claims arise from the alleged infringement of two Dentsply patents--U.S. Patent Number ("No.") *4,934,934* entitled "Dental File/Reamer Instrument" and U.S. Patent No. *5,464,362* entitled "Endodontic Instrument." D.I. 7 at Exhibits ("Exh.") 1, 2. In Count I of the Amended Complaint, plaintiffs allege patent infringement. D.I. 7 at 3. In Count II, plaintiffs allege trade secret misappropriation, D.I. 7 at 4, and in Count III, plaintiffs allege breach of contract, D.I. 7 at 8. Plaintiffs invoke this Court's jurisdiction under *28 U.S.C. § § 1338* and 1367.

Defendants answered and brought a four-count counterclaim. D.I. 12. Their first count seeks a declaration of noninfringement and invalidity of Dentsply's two patents. D.I. 12 at 6. Their second count alleges violations of the Sherman Antitrust Act, *15 U.S.C. § 2.* D.I. 12 at 7. Counts III and IV allege violations of Delaware law;   [*3]   specifically, Count III alleges tortious interference with business relations, and Count IV asserts plaintiffs engaged in unfair competition. D.I. 12 at 8, 9. After oral argument, defendants dropped Counts III and IV of their counterclaim. D.I. 67.

Plaintiffs have moved to: (1) bifurcate the antitrust counterclaim pursuant to *Rule 42(b) of the Federal Rules of Civil Procedure*; and (2) stay all discovery on the antitrust counterclaim until trial on the patent infringement issues has concluded. D.I. 23. n1 For the reasons below, the Court will grant the motion to bifurcate, but the motion to stay will be denied.

1996 U.S. Dist. LEXIS 19846, *

n1 Plaintiffs also moved to dismiss the state law counterclaims for an alleged failure to plead sufficient information to outline the elements of the claims and an alleged failure to plead with specificity pursuant to *Rule 9(b) of the Federal Rules of Civil Procedure* D.I. 23. This aspect of plaintiffs' motion was mooted when defendants agreed to the voluntary dismissal of the state law counterclaims without prejudice. D.I. 67.

[*4]

## II. DISCUSSION

### A. Motion to Bifurcate

*Rule 42(b) of the Federal Rules of Civil Procedure* provides that a district court, "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim [or] ... counterclaim." The decision on whether to order separate trials under Rule 42(b) is a matter of "informed discretion" by the district court. *Lis v. Robert Packer Hosp., 579 F.2d 819, 824* (3d Cir.) (citations omitted), *cert. denied, 439 U.S. 955, 58 L. Ed. 2d 346, 99 S. Ct. 354 (1978).* n2

n2 Defendants argue that the Court should only grant the motion to bifurcate upon a showing of substantial prejudice by the plaintiffs. D.I. 33 at 11 (quoting 5 MOORE'S FEDERAL PRACTICE P42.03, at 43-46). This request is belied by the plain text of the bifurcation Rule itself. The Rule clearly provides bifurcation may be ordered "in furtherance of convenience *or* to avoid prejudice, *or* when separate trials will be conducive to expedition and economy. . . ." *FED. R. Civ. P. 43(b)* (emphasis added).

[*5]

Plaintiffs offer four justifications as to why bifurcation is warranted in this case. First, they assert that bifurcation will remove patent and trade secret issues from the counterclaim, thus simplifying or even eliminating the antitrust count of the counterclaim. Second, they contend there will be little or no overlap in evidence on the patent and antitrust claims. Third, they state that bifurcation, given the complex nature of this case, will reduce confusion of the jury. Finally, they submit, an order of separate trials will streamline the resolution of the entire controversy. According to plaintiffs, these four factors--all subserving the ideal of thorough and efficient justice-- militate toward an order of bifurcation under Rule 42(b). See *In re Innotron Diagnostics, 800 F.2d 1077, 1085*

*(Fed. Cir. 1986)* (considering substantially similar factors).

Defendants, on the other hand, weigh these four factors much differently. They argue that the Court, after deliberating on all of the factors in this case, should refrain from ordering separate trials. The Court turns now to the contentions of each side.

### 1. Will Bifurcation Simplify or Eliminate the Antitrust Counterclaim? [*6]

In their antitrust counterclaim, defendants allege plaintiffs acted in three ways to monopolize the market for endodontic files n3 in violation of the antitrust laws; by:

> (a) Instituting this litigation in bad faith and without good grounds to believe, founded upon reasonable inquiry that defendants have infringed one or more of the patents-in-suit, have misappropriated any valid trade secrets or breached any contract, for the express purpose of hindering and preventing defendants from engaging in lawful competition.
>
> (b) Acquiring competitors and potential competitors with the purpose and effect of eliminating lawful competition.
>
> (c) Using their monopoly power in an effort to compel customers to enter into long-term supply contracts in order to foreclose entry into the market of lawful competition.

D.I. 12 at 7, P15.

> n3 Endodontic files are flexible dental instruments, used in dental surgery, including root canal surgery. The files at issue in this lawsuit are configured to follow a curved tooth root canal. D.I. 7 at Exh. 1.

[*7]

In the first count of its counterclaim, defendants allege plaintiffs violated the antitrust laws by engaging in "sham" litigation--using spurious claims as a thug tactic of intimidation and harassment. In *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49, 123 L. Ed. 2d 611, 113 S. Ct. 1920 (1993),* the Supreme Court established a two-part test to identify such "sham" litigation. First, a lawsuit must be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and

1996 U.S. Dist. LEXIS 19846, *

second, the litigant's "subjective motivation" must have been "to interfere *directly* with the business relationships of a competitor." *508 U.S. at 60-61* (quoting *Eastern R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 144, 5 L. Ed. 2d 464, 81 S. Ct. 523 (1961))* Further, "only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation." Id

Thus, plaintiffs are correct in their assertion that if they can convince a jury that defendants have infringed their patent, an important aspect of the defendants' antitrust counterclaim--their allegations [*8] of "sham" litigation--will be mooted. A winning lawsuit cannot be considered a "sham," despite a subjective, anticompetitive motive by the litigant. *Professional Real Estate Investors, 508 U.S. at 60 n 5* ("A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham."); *U.S. Philips Corp. v. Sears Roebuck & Co., 55 F.3d 592, 597* (Fed. Cir.) ("The charge that Philips' patent infringement suit in Florida was sham can not be deemed to have substance, for Philips prevailed in Florida on that issue."), cert. denied, *133 L. Ed. 2d 492, 116 S. Ct. 567 (1995); Columbia Pictures Indus., Inc. v. Redd Horne Inc., 749 F.2d 154, 161 (3d Cir. 1984)* (holding that success on the merits of an infringement action demonstrates clearly that it would be impossible to prove bad faith necessary for antitrust claim of "sham" litigation); *Levine v. McLeskey, 881 F. Supp. 1030, 1042 (E.D. Va. 1995).* Further, although defendants contend plaintiffs must prevail in a first trial on both the patent and trade secret counts of their claim for an accusation of "sham" to be dismissed, they have not supported this contention with law. In fact, courts [*9] have indicated that litigation will not be considered a "sham" so long as at least one claim in the lawsuit has objective merit. See *Professional Real Estate Investors, 508 U.S. at 60* (specifying *"lawsuit* must be objectively baseless") (emphasis added); *Eden Hannon & Co. v. Sumitomo Trust & Banking Co., 914 F.2d 556, 565 (4th Cir. 1990)* (holding since plaintiff succeeded on one of four claims, suit was "hardly a sham."), cert. denied, *499 U.S. 947, 113 L. Ed. 2d 467, 111 S. Ct. 1414 (1991)* Therefore, if plaintiffs prevail on one of their counts, the sham aspect of the antitrust counterclaim must fail.

But as defendants point out, the "sham" allegation is just one aspect of their antitrust counterclaim. Defendants also allege two other instances of unlawful behavior by plaintiffs: the unlawful acquisition of competitors and the use of monopoly power to coerce customers into long-term supply contracts. See D.I. 12 at 7, P15. Even if plaintiffs prevail in a first trial, defendants argue, these two bases for an antitrust claim would still be viable and ripe for determination.

Defendants' vision of the antitrust claims surviving an adverse patent ruling is somewhat clouded. [*10] There is a possibility that all aspects of the antitrust counterclaim--including the two non-"sham" allegations--could be resolved by a first trial on patent infringement. A patent gives a patent owner the right to exclude others from the marketplace for a statutory number of years. Accordingly, a patent confers upon its owner the ability to bring monopolistic characteristics to the marketplace--the very antithesis of a prime purpose of antitrust legislation. "Where a patent has been lawfully acquired, subsequent conduct permissible under the patent laws cannot trigger any liability under the antitrust laws." *SCM Corp. v. Xerox Corp., 645 F.2d 1195, 1206 (2d Cir. 1981),* cert. denied, *455 U.S. 1016, 72 L. Ed. 2d 132, 102 S. Ct. 1708 (1982); Crucible, Inc. v. Stora Kopparbergs Bergslags AB, 701 F. Supp. 1157, 1160 (W.D. Pa. 1988)* (quoting Xerox). Thus, if the validity of the patents at issue is sustained, and a jury determines defendants have produced infringing products, defendants' allegations about illegal acquisition of competitors may be irrelevant. See *Axis, S.P.A. v. Micafil, Inc., 870 F.2d 1105, 1107* (6th Cir.) (dismissing antitrust allegation of illegal acquisition [*11] of competitors because patents were "impenetrable barrier" to plaintiff company's entry into market), cert. denied, *493 U.S. 823, 107 L. Ed. 2d 49, 110 S. Ct. 83 (1989); Valley Products Inc. v. Landmark, 877 F. Supp. 1087, 1091-93 (W.D. Tenn. 1994)* (following reasoning of Axis, above); *United States v. L.D. Caulk Co., 126 F. Supp. 693, 705 (D. Del. 1954)* (reasoning that "a holder of a valid patent monopoly and without any unlawful combination or conspiracy with others is not limited to any percentage of control of that article which is covered by the patent. Such I think is the very purpose of the patent laws . . . ."). Further, plaintiffs have asserted they have not entered into long-term contracts that extend beyond the applicable terms of its patents; a portion of the antitrust counterclaim alleges such long-term contracts exist. Like the allegations of illegal acquisition of competitors, this could be the subject of a summary judgment motion in a later proceeding. n4

n4 There is also a distinct possibility defendants lack standing to press the counterclaims based on illegal acquisition of competitors and long-term contracts. At oral argument, counsel for defendants fleshed out its antitrust argument; by acting in violation of the antitrust laws, plaintiffs had kept the price for endodontic instruments artificially high, thereby allowing defendants to adopt a favorable pricing structure. Accordingly, there is reason to question whether defendants have suffered an antitrust injury, a prerequisite to a justiciable antitrust claim. See *Matsushita Elec.*

*Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 582-83, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)* ("Respondents [cannot] recover damages for any conspiracy by petitioners to charge higher than competitive prices in the . . . market. Such conduct would indeed violate the Sherman Act, but it could not injure respondents: as petitioners' competitors, respondents stand to gain from any conspiracy to raise the market price.") (internal citations omitted).

[*12]

Defendants also warn the merits of the patent, trade secret and contract claims brought by plaintiffs will have to be completely relitigated in a second antitrust jury. The Federal Circuit Court of Appeals does not share this concern. In *In re Innotron Diagnostics, 800 F.2d 1077 (Fed. Cir. 1986)*, the court ordered a separation of patent and antitrust trials and explained why such concerns are misplaced. "Economy is served," the court wrote, "because in the trial of the patent issues the validity of the patent . . . will be determined and become law of the case and thus removed from trial on the original antitrust issues." *Id. at 1085.* Thus, if defendants prevail at a first trial and demonstrate the invalidity of plaintiffs' patents, they need not again prove the same issues at a second trial. Id.

Defendants stress these situations are mere possibilities and all of the antitrust issues may not be resolved in a first trial. This argument, however, misapprehends the goal of bifurcation. Separate trials may be warranted so long as some of the issues in a second trial would be simplified. *Akzona, Inc. v. E.I. Du Pont de Nemours & Co., 607 F. Supp. 227, 232 (D. Del. 1984)*, [*13] all of the issues in a second trial need not be implicated in the first. See *Baxter Travenol Lab. v. LeMay, 536 F. Supp. 247, 252 (S.D. Ohio 1982)* (explaining "while Defendant's antitrust counterclaim is not based entirely on the allegedly 'sham' litigation, the Court deems it appropriate . . . to permit Plaintiffs' complaint to go to trial first, in order to aid in the determination of whether said complaint is baseless.").

### 2. Is There An Overlap of Proofs?

Plaintiffs argue that bifurcation is further warranted because there is no overlap in proofs between the allegations in the complaint and the antitrust counterclaim. To prove the allegations in the complaint, plaintiffs anticipate introducing evidence regarding the patents, defendants' products, and the manner in which the defendants' products were developed and made. By contrast, plaintiffs assert evidence of a very different sort will be needed for the antitrust claim; proofs will focus on plaintiffs' actions in initiating this lawsuit, on the companies

acquired by plaintiffs, on plaintiffs' business practices with its own customers, and proofs that endodontic instruments comprise a relevant product market in which plaintiffs [*14] exercised a monopoly. Thus, plaintiffs forcefully argue, the minuscule overlap in proof does not warrant a single trial.

Defendants concede there is not much overlap in proofs when the elements of the antitrust claims are compared with the elements of plaintiffs' claims. Defendants do expect a significant overlap of proofs, however, if and when the plaintiffs try to establish damages. According to defendants, plaintiffs will try to establish damages by calculating their loss in profits caused by the alleged infringement of their patents. But these profits should be reduced, defendants posit, because plaintiffs have "augmented their profitability by virtue of their unlawfully acquired market power[.]" D.I. 33 at 9. Defendants attach an affirmation by an economist to demonstrate that the determination of damages in claims such as plaintiffs' generally depends upon what proportion of the alleged infringer's sales would have been recouped by plaintiff. See D.I. 33 at Exh. A. Thus, defendants argue, they are entitled to present evidence that plaintiffs engaged in anticompetitive activities as a defense to plaintiffs' damage claims; even if bifurcation is ordered, the parties would have [*15] to present the same issues twice, to two juries.

Plaintiffs respond by pointing out that no damage theories have been determined, and no damage proofs have been collected. But even if lost profits are pursued, plaintiffs argue, defendants have not pled any affirmative defenses based on antitrust or patent misuse allegations. n5 Finally, plaintiffs state they are willing to sever and stay any damage proceedings so that damages could be adjudicated either in a separate trial, or in conjunction with any antitrust claims that may remain viable for a second trial. See *Smith v. Alyeska Pipeline Serv. Co., 538 F. Supp. 977, 982-86 (D. Del. 1982)* (ordering separate trials for liability and damages in patent case because issue of damages was complex), aff'd mem., *758 F.2d 668 (Fed. Cir. 1984)*, cert. denied, *471 U.S. 1066, 85 L. Ed. 2d 499, 105 S. Ct. 2142 (1985)*.

n5 Patent misuse is "an affirmative defense that must be pleaded and proved." *Bio-Rad Lab., Inc. v. Nicolet Instrument Corp., 739 F.2d 604, 617* (Fed. Cir.), cert. denied, *469 U.S. 1038, 83 L. Ed. 2d 405, 105 S. Ct. 516 (1984)*. Further, plaintiffs have cited authority which indicates if such an affirmative defense were proved, it would be a complete bar to the enforceability of a patent; there would not be any damages. *United States Gypsum Co. v. National Gypsum Co., 352 U.S.*

457, 465, 1 L. Ed. 2d 465, 77 S. Ct. 490 (1957) (holding "courts will not aid a patent owner who has misused his patents to recover *any* of their emoluments accruing during a period of misuse or thereafter until the effects of such misuse have been dissipated . .") (emphasis added).

[*16]

### 3. Will Bifurcation Avoid Jury Confusion and Expedite Trial?

This is the primary end to which any order of separate trials under Rule 42(b) is directed. All of the arguments advanced by both parties so far address, directly or indirectly, the issues of judicial economy and jury comprehension. In plaintiffs' view, if all of the diverse and complex evidence is presented in a single trial, the jury will be left numb and bewildered; application of Rule 42(b) will permit the jury to adroitly separate the antitrust chaff from the central patent and trade secret claims. Plaintiffs point out that, if both the complaint and counterclaims were presented in a single trial, a jury would not only have to determine whether the plaintiffs' patents were valid and infringed, but also whether its trade secrets were misappropriated--rigorous chores in and of themselves. If the antitrust counterclaims were tried at the same time, the jury would also have to consider, at a minimum, intricate factual and economic analyses regarding (1) the relevant market before and after plaintiffs' allegedly acquired competitors, (2) actual and potential shares in that market, (3) barriers to defendants' entry [*17] into the market, (4) long-term contracts plaintiffs' may or may not have had with customers, and whether those contracts violated the antitrust laws, (5) the issue of whether the claims of the complaint were, viewed both objectively and subjectively, baseless, (6) antitrust damages, and (7) all the remaining concomitant antitrust considerations.

Defendants have countered by arguing a jury cannot eliminate antitrust considerations from its deliberations on plaintiffs' claims without severely prejudicing its defense. But this ignores the fact that courts have been bifurcating antitrust and patent infringement claims on a frequent and long-standing basis. Indeed, the Federal Circuit has endorsed the "now-standard practice of separating for trial patent issues and those raised in an

antitrust counterclaim." *Innotron, 800 F.2d at 1084.* See also *Fischer & Porter Co. v. Sheffield Corp., 31 F.R.D. 534, 540 (D. Del. 1962)* (quoting recommendation from Report of the Attorney General's National Committee To Study the Antitrust Laws that antitrust and patent issues should be considered in separate trials); but see *Genentech Inc. v. The Wellcome Found., Ltd., 1990 U.S. Dist. LEXIS 3806,* [*18] *14 U.S.P.Q.2D (BNA) 1363, 1373 (D. Del. 1990)* (denying bifurcation because proof that plaintiffs knew of prior art but intentionally withheld information from patent office bears on both defense to patent infringement and antitrust counterclaim). In this case, the only real and significant overlap of evidence defendants can delineate pertains to damages. This is not enough. Separate trials are warranted, and will be granted, pursuant to Rule 42(b).

### B. Motion to Stay Discovery on Antitrust Counterclaim

Although separate trials have been ordered, there remains a distinct and important issue: whether the Court should order a stay in discovery on the antitrust counterclaims. Replicating much of its argument in favor of bifurcation, plaintiffs argue that antitrust discovery should await a disposition of a first trial, since the first trial may remove some of antitrust claims. Plaintiffs also express their dread at engaging separate antitrust counsel for antitrust discovery; a stay in discovery would, no doubt, spare them considerable expense.

The Court is skeptical about plaintiffs' concern about expense; after all, they brought the suit and are asking for discovery in their own [*19] right. Moreover, they should have expected an antitrust counterclaim, now commonplace in patent litigation. More importantly, a stay of discovery on antitrust issues would most likely devolve into a series of time-consuming and expensive discovery disputes as to whether particular discovery is directed at the patent or antitrust claims. Efficiency dictates that discovery on all claims, including the antitrust counterclaims, continue apace.

An order will be entered granting plaintiffs' motion to bifurcate the patent and trade secret trial from the antitrust trial. Plaintiffs' motion to stay antitrust discovery, however, will be denied.