# EXHIBIT 1

1

```
          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE


BRIDGESTONE SPORTS CO.,    )
LTD, and BRIDGESTONE GOLF,)
INC.,                      )
                           )
           Plaintiffs,     )
                           )  C.A. No. 05-132 (JJF)
v.                         )
                           )
ACUSHNET COMPANY,          )
                           )
           Defendant.      )
- - - - - - - - - - - - - - - - - - - - -
ACUSHNET COMPANY,          )
                           )
           Plaintiff,      )
                           )
v.                         )
                           )
BRIDGESTONE SPORTS CO.,    )
LTD, and BRIDGESTONE GOLF,)
INC.,                      )
                           )
           Defendants.     )
```

```
               Wednesday, October 5, 2005
               1:35 p.m.
               Courtroom 4B
```

```
 BEFORE:  THE HONORABLE JOSEPH J. FARNAN, JR.
          United States District Court Judge
```

2

APPEARANCES:


        MORRIS, NICHOLS, ARSHT & TUNNELL
        BY:  JACK BLUMENFELD, ESQ.

                -and-

        SUGHRUE MION, PLLC
        BY:  ROBERT M. MASTERS, ESQ.
        BY:  STEVEN M. GRUSKIN, ESQ.
        BY:  RAJA N. SALIBA, ESQ.

                    Counsel for the Plaintiff


        POTTER, ANDERSON & CORROON, LLP
        BY:  RICHARD HORWITZ, ESQ.

                -and-

        HOWREY, LLP
        BY:  ALAN M. GRIMALDI, ESQ.
        BY:  MATTHEW MOORE, ESQ.

                    Counsel for the Defendant

25

1   discovery we're entitled to.

2              And, in fact, to just give us in the

3   contentions that the Pro V-1 satisfies all the

4   claim limitations defeats the whole purpose of

5   discovery.

6              THE COURT:  See what they're trying

7   to do is help you from having to rent another

8   room, because if you got contention interrogatory

9   responses to all the junk they already have in

10  the case, that would be unfair to you, because

11  you'd have to put it all some place.  And

12  eventually a lot of that would be outside the

13  motion.

14              And you're going to win if you don't

15  have an agreement eventually.  So they're really

16  trying to help you.

17              You're a little too soon to get them

18  to give you a serious response to contention

19  interrogatories because there's too many claims

20  in the case.

21              MR. MOORE:  Well, they've identified

22  and provided infringement contentions.  They

23  filed a complaint, and they had all the

24  measurements right in the complaint.  I can give

1    you a copy of that.

2              THE COURT:  That's probably why

3    they've given you some because they're the ones

4    you're going to see ultimately in the case.  Your

5    motion -- I mean, your request is important.

6              And I mean this seriously, that you

7    should have detailed responses to your contention

8    interrogatories.  And when I'll get serious about

9    it is when we have the claims and patents that

10   are actually going to be in the case.

11             Now, there's no burden on you except

12   what you would say is we don't know how to get

13   our expert ready, but that goes to the timing of

14   your motions or your agreement to get this case

15   narrowed down.

16             When this case is narrowed down, I'm

17   going to make them give you detailed contention

18   responses.

19             MR. MOORE:  Okay.  Candidly, our

20   problem now is that the case is so overwhelming,

21   we're getting all this discovery.  A large

22   percentage of which -- I think we have ten boxes

23   of Japanese documents.  And our effort to prepare

24   our defense is getting way late and just a burden

1    in this case.

2              THE COURT:  Well, then it may be

3    time to get it narrowed down by the end of the

4    year.

5              MR. MOORE:  And that's exactly the

6    point we're going at.

7              THE COURT:  See, I'd put that horse

8    before the cart of getting the case narrowed

9    before you bring motions to get their contentions

10   detailed out.

11             MR. MOORE:  Okay.  Because we were

12   also considering --

13             THE COURT:  And maybe get an

14   agreement to narrow the case.  But if you can't

15   get an agreement, bring it to me, and we'll get

16   it narrowed.

17             MR. MOORE:  We were thinking of

18   filing Rule 11 and Rule 37 motions.

19             THE COURT:  I would grant your

20   motion if the case is where it's going to be.

21   But if I grant the motion today, all I've done is

22   caused a lot more paper to come over the transfer

23   for no purpose, because it's going to go away.

24   And you'd be preparing defenses against all that

28

1    paper.

2              So I understand what you need.  It's

3    a little too early, but you're going to get it.

4    And that goes to that the time is going to be

5    better for you.

6              MR. MOORE:  One last fairness point

7    here is that we've already provided this

8    information to them on all the accused claims,

9    all our invalidity claims, element by element,

10   all our measurements, element by element.

11             We have already gone through that

12   work trying to resolve the issues and focus the

13   issues of this case.  We've done a huge burden to

14   go after all those claims.

15             THE COURT:  And it's going to lay on

16   the side of the scale that you should get an

17   earlier claim reduction.

18             MR. MOORE:  Okay.

19             THE COURT:  I mean, that's the

20   rational way to do this.

21             MR. MOORE:  Yeah.

22             THE COURT:  So stop giving them

23   stuff and file the motion.

24             MR. MOORE:  Okay.

1    that's timely for you to get an answer to that.

2                 MR. MASTERS:  Yes.  Fair enough.

3                 Marking is there.  When we get their

4    discovery, we could supplement with respect to

5    that.

6                 MR. MOORE:  Thank you, Your Honor.

7                 THE COURT:  Now, I am sorry.  Go

8    ahead.

9                 MR. MOORE:  Mr. Grimaldi was going

10   to deal with some of the case scheduling issues.

11                MR. HORWITZ:  Your Honor, if I could

12   raise one issue first, just to go back to the

13   first point where Your Honor said I'm not going

14   to make everybody give everything until the case

15   is narrowed.

16                But what would be very useful for us

17   to have now on their infringement contentions

18   with respect to the specific values akin to what

19   Your Honor just ruled with respect to third-party

20   balls, if they have something in their files

21   already, we think that it wouldn't be burdensome

22   for them, at least for the products that they've

23   specifically accused of infringing, to say these

24   are the numbers.

1              MR. MASTERS:  Your Honor, dealing

2    with many of these claim limitations, that is

3    work product, to the extent we have numbers that

4    this test conducted at the eyes of counsel under

5    our direction.

6              If there is other data in the file

7    done because of competitive analysis that was

8    unrelated to these claims, and it deals with the

9    Pro V1 golf balls or the accused golf balls,

10   they'll get that information, but not necessarily

11   in the infringement contentions.

12             The specific values that they're

13   seeking, that was just addressed, is work

14   product.  At this time, we still have a lot of

15   discovery to go through, their discovery, their

16   document discovery, expert analysis, testing

17   protocols to set up to get them that information

18   they're asking for.

19             THE COURT:  Well, when you say "work

20   product", you mean in the purest instance, it was

21   produced in strict contemplation and in the

22   context of this litigation?

23             MR. MASTERS:  That's correct, Your

24   Honor.  It was prepared at the advice of counsel,

1    with consulting with us.

2              THE COURT:  Well, I'm going to let

3    the issue lie now, because it will get -- when I

4    read these papers, I had a certain decision

5    dynamic that I was adopting.

6              I'm going to keep that, because I

7    think it keeps me -- well, to the extent you can

8    be consistent in patent discovery disputes, it

9    helps me stay consistent.  So I'm going to give

10   them a little extension after that.

11             One thing I wanted to go back to was

12   willfulness.  You know, sometimes we try all the

13   issues, sometimes we don't.

14             But one of the things that I come

15   upon, you may want to discuss this, is

16   willfulness is a bad thing to have in an

17   infringement trial for me.  Because it allows

18   everybody to argue something, well, it overlaps

19   into willfulness.

20             And it -- it just really muddies the

21   water on a straight forward infringement case.

22   So you ought to talk about putting willfulness

23   someplace else for the time being, because I

24   think it will damage your ability, if you ever

# EXHIBIT 2

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 3

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

EXHIBIT 4

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 5

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                           - - -

 4    CIBA SPECIALTY CHEMICALS         :      CIVIL ACTION
      CORPORATION, INC.,               :
 5                                      :
                    Plaintiff and      :
 6                  Counter-defendant,  :
                                        :
 7         v                            :
                                        :
 8    HERCULES INC., and CYTEC          :
      INDUSTRIES INC.,                  :
 9                                      :
                    Defendants and      :     NO. 04-293 (KAJ)
10                  Counter-claimants.

11                           - - -

12                   Wilmington, Delaware
                Wednesday, July 13, 2005 at 11:00 a.m.
13                   TELEPHONE CONFERENCE

14                           - - -

15    BEFORE:        HONORABLE KENT A. JORDAN, U.S.D.C.J.

16                           - - -
      APPEARANCES:
17

18         RICHARDS LAYTON & FINGER
           BY:  CHAD MICHAEL SHANDLER, ESQ.
19
                   and
20
           LEYDIG, VOIT & MAYER, LTD.
21         BY:  ELEY O. THOMPSON, ESQ., and
                GREGORY C. BAYS, ESQ.
22              (Chicago, Illinois)

23                   Counsel for Ciba Specialty
                     Chemicals Corporation
24

25                            Brian P. Gaffigan
                              Registered Merit Reporter
```

12

1    all that testing.

2              Now, to reach your point, Your Honor, there has

3    been some discussion at the deposition, and there is quite a

4    bit of it, about interaction with counsel, in-house counsel

5    from Ciba involved with the sample preparation and involved

6    in how the tests were conducted at Ciba.  The relevance of

7    that is, is that that information was obviously incorporated

8    in the results.  The results of that testing are what Ciba

9    is relying on.

10             So I guess my point is if they're preparing

11   samples according to what counsel has directed, and if

12   counsel is involved with the actual testing and they are

13   saying that they are relying on those tests, it seems to me

14   that we're entitled to that information.

15             THE COURT:  All right.

16             MR. FUES:  Counsel actually interjected

17   themselves into the testing.

18             THE COURT:  Well, we're going to move past this

19   one relatively quickly, too, because maybe this is harder

20   than it seems on its face, but I hope not.

21             Ciba has got it right to this extent.  The facts

22   are not protected and if you are not getting the facts, you

23   tell me you're not getting the facts.  If there is something

24   about the testing that you believe you should know and don't

25   know, make me aware of that.  But the facts being embedded

13

1    in a letter between a lawyer and a client doesn't

2    automatically make that letter discoverable.  Now, if you've

3    got a basis for saying that in-house counsel stepped out of

4    their role as lawyer and they were acting in the role of a

5    business person or a scientist and therefore their

6    communications aren't deserving of the attorney-client

7    privilege because of those communications weren't associated

8    with the seeking and the giving of legal advice, if we have

9    to have full blown briefing on it, I guess we'll have full

10   blown-briefing on it.  But:

11              For right now, it sounds to me as if I have a

12   party saying we have given the factual information.  And I'm

13   prepared to accept their representation unless you can

14   demonstrate to me, Mr. Hughes, that that is just not so

15   because we know there is this gap in factual information and

16   we're entitled to get it.  For example, if there is testing

17   protocol and they're not telling you the testing protocol

18   and the reason they're not telling the testing protocol is

19   because they say their lawyer told us not to tell you what

20   is the testing protocol, I would agree it's not legal

21   advice, it's scientific information and they can't turn it

22   into attorney-client privilege by putting it in the mouth of

23   their lawyer first; but short of something like that, I'm

24   not stripping away the privilege.  Do you have something

25   specific like that, sir?

# EXHIBIT 6

1

1              IN THE UNITED STATES DISTRICT COURT

2            IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -

4   CIBA SPECIALTY CHEMICALS         :      CIVIL ACTION
    CORPORATION, INC.,               :
5                                    :
                 Plaintiff and       :
6               Counter-defendant,   :
                                     :
7        v                           :
                                     :
8   HERCULES INC., and CYTEC         :
    INDUSTRIES INC.,                 :
9                                    :
                 Defendants and      :   NO. 04-293 (KAJ)
10              Counter-claimants.

11                         - - -

12                  Wilmington, Delaware
           Wednesday, August 31, 2005 at 4:00 p.m.
13                 TELEPHONE CONFERENCE

14                         - - -

15   BEFORE:        HONORABLE KENT A. JORDAN, U.S.D.C.J.

16                         - - -
     APPEARANCES:
17

18          RICHARDS LAYTON & FINGER
            BY:  CHAD MICHAEL SHANDLER, ESQ.
19
                    and
20
            LEYDIG, VOIT & MAYER, LTD.
21          BY:  ELEY O. THOMPSON, ESQ., and
                 GREGORY C. BAYS, ESQ.
22               (Chicago, Illinois)

23                    Counsel for Ciba Specialty
                      Chemicals Corporation
24

25                           Brian P. Gaffigan
                             Registered Merit Reporter

3

1           MR. HORWITZ:  Good afternoon, Your Honor.  It's

2    Rich Horwitz from Potter Anderson on behalf of defendants;

3    and with me for Hercules, Ford Farabow, Joanne Neth and Eric

4    Fues; and also for Cytec, Tom Creel and Marta Gross.

5           THE COURT:  Okay.  This is our opportunity to

6    talk for a few minutes about the status of the case.  I got

7    the letter that was sent over on behalf of all parties by

8    Mr. Shandler last week.  I appreciate you folks sending that

9    in.

10          I want to begin by disposing of the discovery

11    dispute that was outstanding following our conference call

12    back on July 13th.  I reviewed the documents that were

13    submitted in camera.

14          (Telephone beeps heard.)

15          THE COURT:  Okay.  Are we still all together?

16          (UNIDENTIFIED SPEAKER):  Yes, sir.

17          (UNIDENTIFIED SPEAKER):  Yes.

18          THE COURT:  I reviewed the documents that were

19    submitted in camera as well as the supplemental submissions

20    that I asked for and here is a ruling I have for you:

21          With one limited exception which I will

22    describe in a moment, the two documents are not privileged

23    and will be turned over.  My read of these documents is

24    that they are, again with one exception that I'll describe,

25    exclusively factual testing data.  They reveal nothing in

4

1    the way of seeking advice or giving opinions.  There is

2    no legal decision whatsoever.  This is purely a rendition

3    of lab results, samples tested, viscosity, cross-linking

4    levels, statements of amounts by percentage and by molar

5    amounts.  I mean this is no more privileged than if somebody

6    were to drop a lab notebook in an envelope, address it

7    to a lawyer and then say, "well, now my lab work is all

8    privileged."  It's factual information.  It's not privileged

9    information.

10             The single exception to that is the opening two

11   paragraphs of the Thursday, January 29, 2004 e-mail from Mr.

12   Heard to Joanne Villamizar -- and I hope I'm saying her name

13   right.  I apologize to wherever she is if I have that wrong.

14   That may be hard for me to know for sure but it appears to

15   be Mr. Heard's or Dr. Heard's attempt to summarize or

16   describe a certain patent that I think could reasonably be

17   viewed as a statement by a client representative to a lawyer

18   of information that's of a legal character and therefore

19   would also call for perhaps some legal advice or direction

20   in return.

21             So those opening lines of that January 29, 2004

22   e-mail will not be turned over but be redacted.  It begins

23   with "United States patent," and runs through the words

24   "absence of the cross-linker."  And it's one full paragraph

25   and a one line following paragraph.

# EXHIBIT 7

LEXSEE 1987 US DIST. LEXIS 16792

**J. T. EATON & CO., INC., Plaintiff v. ATLANTIC PASTE & GLUE COMPANY, Defendant**

**CV-84-4438 (EHN)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*1987 U.S. Dist. LEXIS 16792; 1987-2 Trade Cas. (CCH) P67,709*

**August 31, 1987, Decided**
**August 31, 1987, Filed**

**COUNSEL:** [*1] For J.T. EATON & CO., INC., plaintiff: D. Peter Hochberg, Cleveland, OH. Jane C. Schlicht, Esq., Cook & Franke S.C., Milwaukee, WS.

For ATLANTIC PASTE & GLUE CO., defendant: Bernard Malina, Malina & Wolson, New York, NY.

**JUDGES:** JOHN L. CADEN, United States Magistrate, Eastern District of New York.

**OPINIONBY:** JOHN L. CADEN

**OPINION:**

MEMORANDUM AND ORDER

In the above captioned action plaintiff J. T. Eaton & Company, Inc. ("Eaton") alleges that Atlantic Paste and Glue Company ("Atlantic") has infringed upon its United States Patent No. *4,438,584*, entitled, "Trap For Rats, Mice and Other Vermin." Eaton claims that prior and subsequent to the issuance of the patent on March 27, 1984, Atlantic manufactured and/or sold articles embodied in the patent, thereby infringing upon Eaton's rights as holder of the patent. Plaintiff seeks injunctive relief as well as damages.

In its answer, Atlantic challenges the validity of Eaton's patent and interposes counterclaims against Eaton, seeking declaratory judgment that the patent is invalid and unenforceable. Atlantic also charges Eaton with violations of various federal antitrust laws. Specifically, Atlantic alleges that Eaton has engaged in unfair competition [*2] by monopolizing the United States market for adhesive glue traps, and that Eaton obtained its patent by fraudulent means.

At this juncture, Atlantic seeks to compel Eaton to produce documents that Eaton has withheld under claims of attorney-client privilege and/or work product immunity. Pursuant to the court's request, Eaton has submitted these documents under seal for an in camera inspection. The documents fall into seven general categories: (1) correspondence between Eaton's United States patent counsel and its European patent agents; (2) communications between Eaton's attorneys and Eaton, or third parties, which refer to the patent application; (3) internal memoranda drafted by Eaton's counsel regarding various telephone conversations; (4) communications between Eaton and its counsel regarding a proposed public announcement; (5) communications between Eaton, or its counsel, and technical consultants; (6) documents relating to the testing of Atlantic's and third parties' products; and (7) sales and profit data (and related documents) more specific than that already submitted to the patent office by Eaton.

1. Correspondence between Eaton's United States patent counsel [*3] and its European patent agents

Atlantic argues that Eaton's British patent agent, A. A. Thornton & Company ("Thornton"), is not a member of the bar of any court and thus communications between Thornton and Eaton's counsel are not subject to the attorney-client privilege. Atlantic is correct to the extent that the attorney-client privilege does not apply to communications with foreign patent agents. *Status Time Corp. v. Sharp Electronics Corp., 95 F.R.D. 27, 32 (S.D.N.Y. 1982); Detection Systems, Inc. v. Pittway Corp., 96 F.R.D. 152, 155 (W.D.N.Y. 1982)*. However, where the foreign law is not in conflict with the public policy interests of the forum, comity is given to foreign statutes. *Detection Systems, Inc., 96 F.R.D. at 155.*

Since Thornton was retained solely to assist in the prosecution of Eaton's European patent application there is no conflict with the policy interests of the United States. Thus, comity will be given to British law. See

Case 1:05-cv-00132-JJF    Document 82-2    Filed 01/30/2006    Page 27 of 32

Page 2

1987 U.S. Dist. LEXIS 16792, *; 1987-2 Trade Cas. (CCH) P67,709

Detection Systems, Inc. at 155; *In re Ampicillin Antitrust Litigation, 81 F.R.D. 377, 391-92 (D.D.C. 1978)*

The law applicable on this issue is the British Civil Evidence Act of 1968, currently referred to as the Patent [*4] Act of 1977. Among other things, this Act establishes that communications between a British patent agent and its client, or its client's representative, are protected by the attorney-client privilege. *Detection Systems, Inc., 96 F.R.D. at 155; In Re Ampicillin, 81 F.R.D. at 392.* Therefore, communications between Thornton and Eaton's counsel are not discoverable absent a waiver.

As a general rule, a party waives the attorney-client privilege when it produces some documents which deal with the same subject matter as those it seeks to protect from discovery. The rationale behind this principle is that a party cannot choose to produce only so much privileged matter as is helpful to its case. *Burlington Industries v. Exxon Corp., 65 F.R.D. 26, 46 (D.C.Md. 1974),* citing 8 Wigmore, Evidence § 2327 (McNaughton Rev. 1961). See *Detection Systems, Inc., 96 F.R.D. at 156.*

Atlantic contends that Eaton has voluntarily waived the attorney-client privilege for these documents by producing communications between its United States counsel and other foreign patent agents, as well as certain communications between Eaton's United States counsel and Thornton pertinent to the European [*5] patent application. Eaton denies that it waived the privilege, claiming that the subject matter of the communications produced either has no relation to the European patent application or refers to the European patent application in a non-substantive manner.

A review of the documents in issue supports Eaton's claim. Thus, Eaton has not waived the attorney-client privilege and need not produce documents containing confidential communications between its United States counsel and Thornton.

2. Documents referring to Eatons patent application

Atlantic claims that communications and other documents regarding patent searches which refer to Eaton's United States patent application are not privileged. Eaton asserts that the patent searches should be protected as work-product since they were made in anticipation of litigation and contain opinions, mental impressions and conclusions of its counsel. Eaton claims this privilege, notwithstanding the fact that the patent searches were undertaken three years prior to the issuance of the challenged patent.

Work product immunity applies only where the document has been prepared or obtained in anticipation of litigation. The mere prospect [*6] of litigation is not enough. *Status Time Corp. v. Sharp Electronics Corp.,*

*95 F.R.D. at 29,* Advisory Committee's Notes to Rule 26(b)(3), *48 F.R.D. 487, 501 (1970).* The court's in camera inspection of the documents reveals that the patent searches were indeed made in anticipation of litigation. The fact that the patent searches were undertaken three years prior to the issuance of the patent suggests only that Eaton's attorneys were aware of the possibility of infringement while the patent was pending, and were preparing for litigation in the event that the patent actually issued. Therefore, these documents are protected from discovery under the work product doctrine as outlined in *Rule 26(b)(3) of the Federal Rules of Civil Procedure.* See, also, *Hickman v. Taylor, 329 U.S. 495, 91 L. Ed. 451, 67 S. Ct. 385 (1947).*

The remaining communications in this category refer directly to Eaton's patent application. Eaton claims that such communications fall within the parameters of the attorney-client privilege.

Atlantic contends that the privilege does not apply to any documents related to the prosecution of a patent application. There is little merit to this contention, notwithstanding Atlantic's interpretation [*7] of the meaning of full and complete disclosure of an invention to the Patent and Trademark Office.

The purpose of the attorney-client privilege is to protect confidentiality and to encourage full disclosure of information by a client to his attorney. The privilege does not apply to all possible communications between an attorney and his client and the following requirements must be met:

> (1) the asserted holder of the privilege is or sought to be a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Status Time Corp., 95 F.R.D. at 29,* quoting *United States v. United Shoe Machinery Corp., 89 F. Supp. 357, 358-59 (D.C. Mass. 1950)* [*8]

Case 1:05-cv-00132-JJF    Document 82-2    Filed 01/30/2006    Page 28 of 32

Page 3

1987 U.S. Dist. LEXIS 16792, *; 1987-2 Trade Cas. (CCH) P67,709

It is true that documents which are exclusively technical are outside of the privilege. *D&S Plug Corp. v. Colvin Motor Parts, Inc., 166 U.S.P.Q. 391 (E.D.N.Y. 1970).* However, as Judge Neaher noted in *Eutectic Corp. v. Metco, Inc., 61 F.R.D. 35, 40-41 (E.D.N.Y. 1973),* communications which primarily contain legal advice to the client remain privileged, even if they may contain "considerable factual information." In fact, in D&S Plug Corp., upon which Atlantic relies, the court specifically protected an attorney's letter to his client which contained the results of a patent search and the attorney's opinion as to the patentability of the product. *166 U.S.P.Q. at 392.*

In this case, the documents withheld by Eaton contain legal advice, or requests for legal advice. Such confidential communications are immune from discovery unless the client waives the privilege. No such waiver has been made here since documents previously produced by Eaton were not primarily concerned with legal advice. Accordingly, Eaton is not required to produce these communications.

### 3. Internal file memoranda by Eaton's attorney

Atlantic argues that certain file memoranda drafted by Eaton's [*9] attorney are not privileged because they are not communications with a client and presumably were not prepared in anticipation of litigation. The court's inspection of the memoranda reveals that these documents contain attorney's mental impressions and legal conclusions as well as references to parties against whom litigation was anticipated. Accordingly, these memoranda are protected by the work product doctrine as laid out by the Supreme Court in *Hickman v. Taylor, 329 U.S. 495, 91 L. Ed. 451, 67 S. Ct. 385,* and codified in *Fed. R. Civ. P. 26(b)(3).* Atlantic may not obtain discovery without establishing that it has a substantial need for the documents. See *Rohm and Haas Co. v. Dawson Chemical Co., 214 U.S.P.Q. 56, 59 (S.D. Texas 1981),* citing *Fed. R. Civ. P. 26(b)(3).* Since Atlantic has not shown substantial need for these memoranda, Eaton will not be required to produce them.

### 4. Communications concerning a proposed public announcement about the issuance of the challenged patent

Eaton has withheld communications between itself, through a board member, and its patent counsel claiming attorney-client privilege. The withheld documents concern a proposal for a public announcement about the issuance [*10] of its patent.

These communications between Eaton and its attorneys involve requests for, and the giving of, legal advice regarding the proposed public announcement. For reasons noted earlier, the attorney-client privilege attaches

under these circumstances. See *Status Time Corp. 95 F.R.D. at 29-31.* Therefore, these communications are not discoverable.

### 5. Communications with technical consultants

Eaton claims a work product privilege under *Fed. R. Civ. P. 26(b)(3)* for its communications with a technical consultant regarding this litigation. The court agrees with Eaton's claim that Thom Kearnes Designers was retained as a consultant to assist Eaton in preparing for this litigation. Rule 26(b)(3) protects the work product of such representatives, including their mental impressions, opinions and conclusions. See *Status Time Corp. 95 F.R.D. at 29.* Atlantic has made no showing of substantial or even particular need for these communications. Thus, Eaton will not be required to produce them. See *Rhom and Haas Co., 214 U.S.P.Q. at 59; Fed. R. Civ. P. 26(b)(3).*

### 6. Test results

As the court understands it, Eaton also claims that technical data and expert opinions [*11] contained in documents prepared for Eaton by Adhesive Consultants, Inc. are not discoverable under *Fed. R. Civ. P. 26.* Eaton argues that Adhesive Consultants was not retained specifically for the purpose of trial preparation, but rather has been regularly consulted in the usual course of business over a period of time. Thus, Eaton argues, the adhesives expert was only consulted informally in preparation for trial, and discovery against it is not permitted by Rule 26(b)(4)(B), which protects from discovery "facts known or opinions held by and expert… who is not expected to be called as a witness at trial."

The results of the court's inspection of the documents supports Eaton's argument. The extent of discovery against experts is limited to what is specifically provided for in *Fed. R. Civ. P. 26(b)(4). Fed. R. Civ. P. 26(b)(4)* allows discovery against experts expected to be called as witnesses at trial or, under a "showing of exceptional circumstances," n1 those "retained or specially employed" in anticipation of litigation. Experts who were "informally consulted in preparation of trial" but not "retained or specially employed" are not subject to discovery. *USM Corp v.* [*12] *American Aerosols, Inc., 631 F.2d 420, 424-25 (6th Cir. 1980)* (emphasis in original); *Advisory Committee's Note, 48 F.R.D. 497, 504 (1970).* Since the circumstances in this case show only that Adhesive Consultants was consulted informally, its information is not discoverable. See *USM Corp. 631 F.2d at 425.* n2

n1 Defendant has attempted to show "exceptional circumstances" by making only the bare assertion that the test results "are absolutely nec-

Case 1:05-cv-00132-JJF    Document 82-2    Filed 01/30/2006    Page 29 of 32

Page 4

1987 U.S. Dist. LEXIS 16792, *; 1987-2 Trade Cas. (CCH) P67,709

essary for the preparation of defendant's case and that such data cannot be easily obtained elsewhere by defendant." (emphasis added). This is not an exceptional circumstance. It should not be particularly difficult for defendant to carry out its own tests.

n2 Defendant relies on *Loctite Corp. v. Fel-Pro, Inc., 667 F.2d 577 (7th Cir. 1981)* to support its contention that Eaton must produce the test results because Atlantic has the right to discover the "specific facts upon which plaintiff bases its charge of infringement." The facts in Loctite Corp., however are not analogous to the facts in this case. Loctite Corp. was concerned with a chemical patent infringement, which is a unique category of patent:

> "Infringement depends upon the identity or equivalence of the ingredients and upon substantial sameness of the proportions in which the ingredients are used: 3 Walker on Patents (Deller's ed.) § 489. It is not enough in such cases for the purpose of establishing infringement to show that some one else has made, by using different ingredients, a composition that has the same useful qualities."

*American Chemical Paint Co. v. Firestone Steel Products Co., 117 F.2d 927, 931 (6th Cir. 1941).* See *Loctite Corp., 117 F.2d at 582.* Discovery by defendant was allowed on tests by the plaintiff in Loctite Corp. because the presence of specific ingredients is the only basis for establishing a justiciable controversy in a chemical patent infringement action. See e.g., *Loctite Corp. 117 F.2d at 582.* Eaton's case does not rely solely upon whether Atlantic has used patented ingredients, but rather upon whether Atlantic's product has largely the same "useful qualities". Because this case does not involve a chemical patent and because the test results do not constitute the sole basis of Eaton's claim, Loctite Corp. is not applicable here.

[*13]

7. Specific sales and profit data

Atlantic requests certain specific sales and profit data for the years 1979 to date. (Interrogatory No. 47).

Atlantic argues that such data is relevant to both the issue of Eaton's damages and the issue of patent validity. Eaton claims that compiling this data would be unduly burdensome at this point in the litigation and that such data is confidential.

There is little merit to Eaton's blanket claim of undue burden. Eaton has already set forth monthly sales figures for the years 1979 through 1984 in the file history of the challenged patent. The number of products produced from 1980 through 1985 has also been submitted to the Patent Office. Furthermore, in its answer to interrogatory no. 47, Eaton provided the approximate sales increase figures for the years 1980 through 1984. As Eaton obviously must have data available from which to arrive at these figures, and will need the specific data to show both the extent of its damages as well as to defend the validity of the patent, n3 production of the evidence cannot be deemed an undue burden. Cf., *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 529 F. Supp. 866 (E.D. Pa. 1981)* (the court's [*14] common sense is a helpful guide in determining whether to issue a protective order under *Fed. R. Civ. P. 26(c)(7)*). Eaton is thus directed to produce the specific sales and profit data requested by Atlantic in sections (a) through (i) of Interrogatory No. 47.

n3 Eaton considered the commercial success of the product to be an essential part of its argument made before the Patent Office in support of its patent application.

However, Eaton's complaints have merit to the extent that they relate to subsection (j) of interrogatory no. 47 which requests the identification of "all documents (i) referring or relating to the commercial success of each such product and (ii) relied upon in answering this interrogatory." Although there is no question that this information is relevant, Eaton claims that there are over 21,000 invoices for the years 1979 through 1985. The burden to Eaton in listing each one separately would be substantial. In addition, the identification of these documents is likely to reveal confidential [*15] information, such as the identity of customers, which may be protected by the court from discovery pursuant to *Fed. R. Civ. P. 26(c)(7).*

Accordingly, rather than identify all of the documents, Eaton may provide the information requested in Interrogatory 47(j) pursuant to the options set forth in *Fed. R. Civ. P. 33(c).* However, as a condition precedent to Eaton's obligation to produce pertinent documents, the parties must agree to the terms of a protective order that will adequately safeguard Eaton's legitimate interest in preserving the confidentiality of its customer lists.

1987 U.S. Dist LEXIS 16792, *; 1987-2 Trade Cas. (CCH) P67,709

CONCLUSION

Plaintiff is not required to produce documents in response to Interrogatories Nos. 14, 16, 17, 30 or 42, since they are protected by attorney-client and/or work product privilege.

Plaintiff is directed to produce the data related to the challenged patent that was requested by Atlantic in subdivisions (a) through (i) of Interrogatory No. 47. As to subdivision (j) of Interrogatory 47, Eaton must produce the documents containing the information requested pursuant to the options set forth in *Fed. R. Civ. P. 33(c)*. However, Eaton's obligation to produce such documents is conditioned upon the parties [*16] entering into an agreement which adequately protects Eaton's legitimate interest in preserving the confidentiality of its customer lists.

SO ORDERED.

JOHN L. CADEN

United States Magistrate

Eastern District of New York

Dated: Brooklyn, New York
August 3rd, 1987

# EXHIBIT 8

**THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY**