# EXHIBIT A

# HOWREY LLP

1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
www.howrey.com

Alan M. Grimaldi
Partner
202.383.6989
202.383.6610
grimaldia@howrey.com

File 00634 0002

May 16, 2006

BY FACSIMILE

Robert M. Masters, Esq.
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, D.C. 20005

> Re:   *Bridgestone Sports Co. v. Acushnet Co.*,
>        *C.A. No. 05-132 (JJF) (D. Del.)*
>        <u>Response to Your Letter of May 10</u>

Dear Rob:

We received your letter of May 10 regarding alleged deficiencies in Acushnet's discovery responses. As an initial matter, I note that we have addressed several of the matters discussed in your letter in separate correspondence and on multiple occasions confirmed that Acushnet is not withholding non-privileged documents related to specific requests. Nonetheless, we again address these matters herein.

## I.    ACUSHNET'S DOCUMENT COLLECTION EFFORT

We object to your characterization of Mr. Lester's preparation for his deposition, which we address by separate letter. With regard to your specific complaints about Acushnet's collection of documents, however, we note Mr. Lester's testimony that he met with Acushnet personnel and attorneys with Howrey upon receipt of Bridgestone's document requests. At that meeting Acushnet personnel received instructions on searching for documents. (*See, e.g.*, Lester Dep. at 9:5-10:9; 39:7-18; 89:3-16). He testified that the individuals were instructed specifically to search for documents related to the accused Acushnet balls (including developmental files), the accused Bridgestone balls and prior art golf balls. (*See, e.g.*, Lester Dep. at 40:19-42:2; 103:5-104:13.)

Mr. Lester identified a number of individuals present at that meeting and testified that each individual was responsible for searching their own files, including electronic files, e-mail, and databases. (*See, e.g.*, Lester Dep. at 38:8-40:9; 45:4-6; 86:19-87:2.) He further testified that certain individuals were tasked with searching for documents in specific archives and databases, including databases for research and development, manufacturing, golf ball testing, and quality control, and that those individuals produced documents to him from those databases. (*See, e.g.*, Lester Dep. at 60:16-62:6; 74:5-75:21; 113:19-114:15; 117:18-121:11.) He also testified that his document collection efforts covered files contained in offsite storage. (*See, e.g.*, Lester Dep. at 88:9-22; 93:22-95:4.)

# HOWREY

Mr. Lester's testimony, therefore, shows that Acushnet's document collection efforts were exhaustive, both in terms of subject matter and physical locations searched. Each time Bridgestone has identified a perceived deficiency, Acushnet has responded by producing additional information where possible or by confirming that Acushnet is not withholding responsive documents. Bridgestone's complaint appears to be that Mr. Lester did not personally search every file or interview every individual who searched for responsive documents – a requirement for which there is no basis and which is manifestly unreasonable.

Nevertheless, we have agreed to research further answers to certain questions, just as we asked you to research further answers to questions Bridgestone's 30(b)(6) witness on document collection could not answer. (*See* Masters Ltr. to Seal, Feb. 2, 2006 at 1.) In addition, we agreed to provide additional deponents on specific document collection topics, including Acushnet's searches of certain databases and the collection of financial documents.

Further, the facts refute your claim that the volume of each party's production evidences "an overwhelming discrepancy in document production to date." While you state that Acushnet has produced fewer than 90,000 pages of hardcopy documents, you ignore Acushnet's production of a CD of data that, by your own admission, would comprise about <u>90 boxes</u> of information if printed in hardcopy. (*See* Masters and Gruskin Ltr. to Moore, Sep. 12, 2005 at 4.) In addition, your claim that Bridgestone "has produced more than 200,000 pages" fails to account for the fact that for almost half of those documents – 95,000 pages, belatedly produced on January 30 – you refused to admit that the documents were either (1) responsive to any of Acushnet's document requests, (2) relevant to any issues in this case, or (3) non-duplicative of documents already produced. (*See* Masters Ltr. Seal, Jan. 30, 2006.)

## II.    ACUSHNET'S DOCUMENT RETENTION POLICY

Acushnet has not been intentionally withholding its document retention policy, much less for "many months" as your letter suggests.[1] The first time Bridgestone even suggested that Acushnet had not produced a complete copy of its document retention policy was during Mr. Lester's deposition on April 26, 2006. In any event, we produced that document on May 12 in response to your request. (*See* AB 087740-AB 0087772.)

## III.    ACUSHNET'S SOURCE LOG

In your letter, you conclude that Acushnet's document production is deficient based on the omission of "key personnel" such as Wally Uihlein, Bill Burke, Jerry Bellis, Eric Bartsch, Ray Cebula and Michael Kramer from Acushnet's source log. We are in the process of speaking

---

[1] Bridgestone took longer than two weeks to get a <u>complete</u> copy of Bridgestone's document retention policy to Acushnet after Acushnet identified its absence in Bridgestone's document production.

# HOWREY

with each of them and will confirm whether they have searched their files and turned over any responsive documents.

Our research into the preparation of Acushnet's source log suggests that the individuals identified therein not only collected their own documents, but also forwarded documents collected by other individuals who do not appear on the source log. We are researching this matter further and will supplement the source log to the extent possible.

## IV.    ORGANIZATION CHARTS

Contrary to your assertion, Acushnet is not withholding any previous organization charts. The chart produced as AB 0052390-AB 0052419 is the only responsive chart in Acushnet's possession, custody or control.

## V.    ACUSHNET'S PRIVILEGE LOG

You previously raised a number of perceived issues with regard to Acushnet's privilege log. (*See* Bensen Ltr. to Seal, Mar. 14, 2006.) With regard to a small number of issues, we are addressing your concerns by providing more detail with regard to certain entries in the privilege log, which we will provide to you in advance of the meet and confer on Monday.

A number of your complaints, however, are unfounded. For example, your complaint that certain entries "appear to concern business matters rather than legal advice" is belied by the entries themselves, which clearly state that privileged documents concern legal advice. *See, e.g.,* Acushnet's Privilege Log, entries 82 ("Email to counsel providing confidential information to counsel for the purpose of rendering legal advice regarding corporate planning issues"), 84 ("Email reflecting legal advice of counsel regarding product promotion issues"), and 261-262 ("Email to counsel seeking legal advice of counsel re marketing issues"). Similarly, there is no basis for Bridgestone's contention that the distribution of certain privileged documents "went well beyond that necessary to convey or consider the legal advice, if any, rendered." (Bensen Ltr. to Seal, Mar. 14, 2006 at 2.)

## VI.    FINANCIAL DOCUMENTATION

Your letter makes some allegations regarding the volume of Acushnet's financial document production. You indicate that it constitutes a "small number of documents" and that in view of Mr. Moore's comments in court related to the "massive" volume transactional-level documents (e.g., invoices and orders) our production should include additional documents.[2] The

---

[2] During a hearing before the Court, you stated that you were not seeking production of this "massive volume" of transactional-level documents. (Tr. Jan. 13, 2006 at 24, line 8-24 (Mr. Masters informing Judge Farnan that "we're not asking for the gigantic database that the corporation has and has to have just to conduct its everyday business.").)

# HOWREY.

volume of Acushnet's damages production is irrelevant. What is relevant is that Acushnet has given you responsive financial reports to the extent that the information is available to satisfy each of your requests.

Despite your allegations that Acushnet's damages document production was "wholly insufficient," Acushnet has provided you responsive documents as outlined in your February 28, 2006 letter to us. We understand that the documents you were seeking under the Court's January 13th Order were outlined in that letter. Your most recent letter, however, raises additional categories of documents not outlined in that letter. To the extent that you have new, last-minute requests, our investigation is ongoing as noted below.

The following categories of documents were identified in Bridgestone's February 28th letter:

*"Monthly and annual sales data (dollar and units) by accused ball and/or corresponding side stamp for 2000-2006."* Acushnet has produced financial reports to you in response to this request and confirms that it is not withholding any responsive documents. (*See, e.g.*, AB 0048224-AB 0048825; AB 0084256-AB 0085137; AB 0085432-AB 0085499; AB 0085928-AB 0086231; AB 0086717-AB 0086871.)[3] Further, to the extent that you may have not been provided with monthly data, no responsive documents exist.

*Monthly and annual manufacturing costs, COGS and standard cost data (dollar and units) by accused ball and/or corresponding side stamp for 2000-2006.* Acushnet produced documents responsive to your request. (*See, e.g.*, AB 0080359-AB 0080402.) Acushnet is not withholding any responsive documents. Further, to the extent that you may have not been provided with monthly data, no responsive documents exist.

*"Quarterly and annual Acushnet Company income statements and P & Ls for the period 2000-2006."* We have produced documents showing Acushnet's income from the accused products. (*See, e.g.*, AB 47975-AB 47977; AB 70606-AB 70610; AB 71264-AB 71268; AB 73503-AB 73507; AB 74165-74169; AB 84267-84369.) Your May 10, 2006 accuses Acushnet of withholding "quarterly income statements or P&L's including on a divisional or operating group level." Your February 28th letter never requested any documents on a division or operating group level. Regardless, we are looking into whether Acushnet has any such documents.

*"Profit projections for each accused ball and/or corresponding side stamp at the time of its introduction."* In response to your requests, we produced documents related to Acushnet's

---

Thus, you provided us with a letter outlining the types of documents you were seeking. (*See* Bensen Ltr. to Moore, Feb. 28, 2006.) Acushnet produced responsive financial documents on April 3, 2006 pursuant to the Court's order.

[3] These bates ranges, as well as the others listed herein, are provided pursuant to the parties' agreement to identify bates numbers in response to perceived deficiencies in the document production. The documents identified by these ranges are exemplary and are not intended to be exhaustive.

**HOWREY** L.L.P.

Robert M. Masters
May 16, 2006
Page 5

"Golf Ball Demand Team" that include demand projection information. (*See, e.g.*, AB 0085500-AB 0086247.) Acushnet is not withholding any documents related to such projections.

*"Golf Ball Product Plans."* In response to your letter, we are confirming whether we have any additional golf ball product plans such as the one produced as AB 0047574-0047578. If we have any such documents for the accused Acushnet golf balls, we will produce them.

*"Representative samples of brochures and advertisements for 2000-2005."* In addition to documents we produced to you prior to April 3, 2006, we produced more samples of Acushnet's advertising and brochures to you. (*See* AB 0085217-AB 0085418.)

*"Monthly and annual market share data by accused ball and/or corresponding side stamp for 2000-2006" and "Surveys and Third Party Reports" including "Golf Datatech" and "NGF Reports and data from 2000-2006."*[4] Acushnet obtains its market share information based on third party information. Responsive Golf Datatech and NGF reports were produced to you. (*See, e.g.*, AB 0082102-AB 0083689.)

*"Licenses and or Agreements relating to Acushnet patents-in-countersuit and other patents relating in any way to golf balls or materials used in golf balls, or other Acushnet golf ball technology" and "licenses relating to third party patents used in Acushnet golf ball products."* We have produced responsive documents to you. (*See, e.g.*, AB 0085422-AB 0085429; AB 0086248-AB 0086276; AB 0087773-0087795.)[5] We are not withholding any additional responsive documents.

Finally, your letter states that "Acushnet has not produced any documents reporting to Fortune Brands, Acushnet's parent company, nor has Acushnet produced executive summaries." Neither of these issues were raised in your February 28th letter, despite the parties stipulation that you would supply us with a list of the documents that you needed to make your damages case. We are currently investigating whether responsive reports to Fortune Brands or "executive summaries" exist. If any such documents are located, we will produce them to Bridgestone.

---

[4] In recent letters, you complain about the volume of these documents produced by Acushnet, despite your requests for such information. (*See, e.g.*, White Ltr. to Seal, Apr. 6, 2006 at 6 ("98% of the first box comprised third party sales compilations purchased from NGF and Golf Datatech.").) Given your request for such data, that complaint is unfounded.

[5] We note that the document at AB 0085422-AB 0085429 is a license agreement between Bridgestone and Acushnet. While Acushnet has produced this document to you, Bridgestone has not produced its copy of the agreement. This further reinforces our belief that Bridgestone's document production remains substantially deficient. We reiterate our request that you produce all responsive licenses relating to golf balls or golf ball technology immediately.

# HOWREY LLP

## VII.    MANUFACTURING GUIDELINES

In your letter, you conclude that "Its [sic] seems unlikely that Acushnet would not finalize these document prior to a manufacturing run." You request that Acushnet produce *final* manufacturing guidelines immediately.

This is not the first time that you have raised this issue with us. (*See* Wikberg Ltr. to Seal, Apr. 20, 2006; Wikberg Ltr. to Seal, May 4, 2006.) The answer to your demand is still the same: Acushnet is not withholding any responsive manufacturing guidelines in its possession, custody or control. (*See* Seal Ltr. to Wikberg, Apr. 21, 2006; Seal Ltr. to Wikberg, May 12, 2006.)

Additionally, in your letters to us, you note that Acushnet "has not produced manufacturing guidelines for each for each of the Acushnet golf balls identified in the May 1 supplementation." We assume that you are referring to Acushnet's supplemental response to Bridgestone Interrogatory No. 4 and the 10 Acushnet golf balls identified as including "390 to 450 dimples," as required by, for example, Bridgestone's '924 patent. Acushnet relied on those prior art golf balls solely for the purpose of establishing that a vast majority of publicly-available golf balls had dimple counts within the claimed range, which is shown by documents already produced by Acushnet. (*See, e.g.*, AB 0044436-AB 0044709.) Bridgestone has not shown that any other feature of those 10 golf balls is relevant to any claim or defense in this case.

Additionally, Acushnet is investigating whether it has any of these golf balls in its possession, custody or control. If Acushnet has any such golf balls, it is willing to make these golf balls available for Bridgestone's inspection so that Bridgestone can verify the number of dimples on these golf balls. Because Acushnet is relying on certain golf balls cited in Appendix A of its response to Interrogatory No. 4 solely to establish that the claimed number of dimples were prevalent in the art, complete manufacturing guidelines are irrelevant and cumulative of documents produced by Acushnet in August 2005.

## VIII.    ON COURSE/OFF COURSE RETAILER AGREEMENTS, DISTRIBUTOR SALES AGREEMENTS & SUBSIDIARY SALES AGREEMENTS

Your letter indicates that Mr. Lester testified to the effect that Acushnet had entered into agreements with foreign subsidiaries, foreign distributors and on-course and off-course retailers and that such documents were produced.

You then state that "to date, no such production has occurred." Acushnet, however, has produced its agreements with its foreign subsidiaries and its foreign distributors. (*See, e.g.*, AB 0083690-AB 0084255.) We are investigating whether we have any on-course or off-course retailer agreements that have not already been produced.

# HOWREY␣␣

### IX.        EMAILS AND ATTACHMENTS

Contrary to your letter, Acushnet has not "refused to produce copies of attachments whose icons appear on the hard copies of documents produced by Acushnet." Bridgestone raised this issue previously. Now, as before, we confirm that we are not withholding any e-mail attachments.

Further, while you suggest that such attachments may be found in Acushnet's "numerous databases," Mr. Lester testified that electronic files, e-mail, and databases were searched for responsive documents. (*See, e.g.,* Lester Dep. at 38:8-40:9; 45:4-6.) He further testified that certain individuals were tasked with searching for documents in specific databases, including databases for research and development, manufacturing, golf ball testing, and quality control, and that those individuals produced documents to him from those databases. (*See, e.g.,* Lester Dep. at 60:16-62:6; 74:5-16.)

Thus, Acushnet confirms once again that it is not withholding any responsive e-mail attachments in its possession, custody or control.

### X.        MEETING MINUTES

You again raise the complaint about alleged gaps in Acushnet's production of meeting minutes, a complaint Bridgestone first raised on November 17, 2005. (*See* Saliba Ltr. to Moore, Nov. 17, 2005 at 1.) Now, as then, our response is that we are not withholding any such meeting minutes in our possession, custody or control. (*See* Seal Ltr. to Saliba, Nov. 28, 2005 at 2.)

As with your complaint above regarding e-mail attachments, you suggest that "Acushnet maintains numerous databases where documents such as e-mailed meeting minutes might be stored ...." I refer you to our response above in paragraph IX.

### XI.        QUALITY CONTROL MANUALS

Your letter complains that "Acushnet has produced no quality control and inspection documents." That statement is not true. In fact, in a letter dated September 12, 2005, you complained that that Acushnet had produced a CD of such information that, if printed in hardcopy, would comprise over 90 boxes of information. (*See* Masters and Gruskin Ltr. to Moore, Sep. 12, 2005 at 4.) As we have previously informed you, this CD constitutes Acushnet's QAS database, and includes Acushnet's responsive "inspection documents." Likewise, your belief that Acushnet's production of its quality control manuals is "grossly deficient" is once again misplaced. In August of 2005, Acushnet also produced its responsive quality control testing manuals. (*See, e.g.,* AB 0022937-AB 0023118.)

We are in the process of confirming that each of the individuals identified in your letter have produced all their responsive documents. To the extent that any additional responsive documents are located, we will produce them to Bridgestone.

# HOWREY LLP

## XII.    DATABASES

Your complaint that Acushnet has not adequately searched its "databases" is unfounded. As stated above, Mr. Lester testified that certain individuals were tasked with searching for documents in specific databases, including databases for research and development, manufacturing, golf ball testing, and quality control, and that those individuals produced documents to him from those databases. (*See, e.g.*, Lester Dep. at 60:16-62:6; 74:5-16.) Nonetheless, upon receipt of your letter, we are investigating whether any relevant database has yet to be searched. We expect to conclude this investigation in advance of the 30(b)(6) deposition on that topic scheduled for May 19.

## XIII.    SAMPLES, COMPONENTS & BALLS

Your letter grossly misstates the Court's instructions to the parties at the January 13th hearing. The Court indicated to the parties that how the parties agreed to test the golf balls requested by Bridgestone was up to them and that the parties may agreed to perform testing under a "compressed time table." (1/13/06 Hearing Tr. at 15, ll. 16-24.) But that was up to the parties. (*Id.*) Moreover, the Court indicated that "If you can't agree … then you'll have to submit a specific proposal, and I'll choose." (1/13/06 Hearing Tr. at 15, ll. 21-23.) The Court never indicated that Bridgestone was entitled to samples "without restriction."

Pursuant to our most recent meet-and-confer on this issue, we are preparing a proposal for joint testing, whereby we would attempt to agree on a time period for exchange and testing of certain golf balls of which there is a limited number. Hopefully, we can resolve some issues such as handling requirements, time periods for return of golf balls and numbers of prior art golf balls to be exchanged. Because the number of certain balls is limited, however, Acushnet has consistently maintained it is hesitant to turn over its best evidence of invalidity of some of Bridgestone's patents-in-suit "without restriction," as you demand.

Finally, we will agree to produce "components, as well as golf ball rejects," as requested by Bridgestone within the next 10 business days. We will be producing some materials in sealed packages. You will be taking possession of such materials at your own risk and you assume all potential liability from any improper use or handling of any such materials.

## XIV.    ACUSHNET'S INVALIDITY CONTENTIONS

Your complaints regarding the sufficiency of Acushnet's Invalidity Contentions are unfounded. You state that Acushnet's response to Bridgestone's interrogatories 4 and 35 must "state specific combinations of prior art references Acushnet relies on to support its contention that one or more of the claims are invalid under 35 U.S.C. § 103." Acushnet's invalidity contentions do just this. Acushnet maintains that each of the primary references cited may be used to invalidate each applicable claim as asserted in Acushnet's invalidity contentions.

Moreover, as we have already noted to you, Bridgestone has not even identified which claim elements it contends render the claims of Acushnet's Lynch patents invalid. Accordingly,

# HOWREY™

Bridgestone is in no position to complain about the sufficiency of Acushnet's invalidity contentions. Bridgestone's final invalidity contentions with respect to three of Acushnet's patents provide no more detail than Bridgestone's original complaint for declaratory judgment. (*Compare* Bridgestone's Complaint for Declaratory Judgment *with* Pls.'s Fifth Supp. Responses to Def.'s First Set of Interrogs. (Bridgestone's "final invalidity contentions" with respect to the Acushnet patents-in-suit.).)

Bridgestone is the party that brought this matter before the Court and sought a declaratory judgment that Acushnet's patents were invalid. As set forth in previous correspondence, based on Bridgestone's failure to provide any invalidity contentions for the Lynch patents or claims 2 and 4-7 of the '705 patent under § 102 or any specific invalidity contentions under § 112 by the deadline for any such contentions, Bridgestone is precluded from raising any such contentions now that the deadline has passed. (*See* Seal Ltr. to Masters, May 4, 2006 at 2.)

If you maintain that Acushnet's invalidity contentions fail to express the specific combinations of references that Acushnet relies upon to support its contention that each asserted claim of each of the Bridgestone patents-in-suit is invalid, please describe in detail how Acushnet's contentions fail to set forth the specific combination of references so that we may be in a position to consider your complaint. At present, however, we believe that your complaints have been addressed and we stand on our invalidity contentions.

## XV.    ACUSHNET'S RESPONSE TO INTERROGATORY NO. 1

The product list provided by Acushnet in response to Bridgestone Interrogatory No. 1 was submitted in response to – and fully complies with – the Court's November 2, 2005 Order. As you may recall, Bridgestone sought a motion to compel a further response from Acushnet to Interrogatory No. 1. The Court granted that motion, but limited Acushnet's response to the provision of "a product list of every Acushnet golf ball sold or offered for sale anywhere in the world for the past four years." (*See* Order dated November 2, 2005.) The list provided by Acushnet complies with that Order.

While the basis for your statement that Acushnet's response is "misleading, incomplete, and inaccurate" is unclear, I understand it to refer to the issues raised by Mr. Wikberg of your office in separate correspondence. (*See* Wikberg Ltr. to Seal, Apr. 20, 2005; Wikberg Ltr. to Seal, May 4, 2006.) Mr. Wikberg complained that the list is organized by year, but does not accurately reflect the sales of each identified product by year.

As we responded to Mr. Wikberg, however, that was not the purpose of the list. (*See* Seal Ltr. to Wikberg, Apr. 21, 2006; Seal Ltr. to Wikberg, May 12, 2006.) Instead, as stated by you at the October 5, 2005 hearing, the purpose was to inform Bridgestone of every model and version of the golf balls sold by Acushnet for the past four years so that Bridgestone could identify and investigate all allegedly infringing products. (*See* 10/5/05 Hearing Tr. at 6-12.) The list provided by Acushnet provides just such a list for the past five years, organized by the year in which each product appears in Acushnet's product catalogs. That list, therefore, more than

# HOWREY LLP

Robert M. Masters
May 16, 2006
Page 10

complies with the Court's November 2, 2005 Order and is thus a full and complete response to Interrogatory No. 1.

## XVI.    NEWLY ASSERTED PRIOR ART

Your letter asserts that Acushnet "inserted into the litigation scores of additional prior art references" and that Acushnet should have informed you earlier of the additional prior art. Your allegations are baseless and assume that Acushnet and its attorneys had prepared these positions long ago and merely rested on them for an unreasonable period of time. You express no basis for making such allegations. Remember, Bridgestone has asserted 83 claims from 10 patents against different models and/or versions of seven Acushnet golf balls. Addressing each of those claims has been a substantial and time-consuming undertaking for Acushnet.

In any event, Acushnet produced all but a few prior art documents relied upon in its invalidity contentions to Bridgestone long ago. Since the production of those documents to Bridgestone, Acushnet had to obtain translations of non-English-language prior art references, analyze the prior art documents and prepare its invalidity contentions. All of this had to be done in the period between September 28, 2005, when Acushnet served Bridgestone with nearly 200 pages of invalidity contentions and the May 1 deadline for supplementing invalidity contentions.[6] As you noted, Acushnet identified numerous prior art references that render the claims of the Bridgestone patents-in-suit invalid—preparation of Acushnet's final invalidity contentions was a very time-consuming endeavor.

Your assertion that Bridgestone cannot evaluate the patentability of its claims until "Acushnet satisfies its discovery obligations" is unfounded. Acushnet has given you *detailed* final invalidity contentions. You are in a position to evaluate Acushnet's defenses and chose representative claims.

As for Acushnet's position that its Project X2 Veneer Ball invalidates a number of claims of the Bridgestone patents-in-suit, Acushnet has provided Bridgestone with documents in its possession sufficient to show its prior public uses of the Pro V1 as well as documents related to its conception, design and construction. (*See, e.g.,* AB 0080233; AB 0080234-AB 0080238; AB 0080245-0080245; AB 0080247-AB 0080358; AB 0080416-AB 0080425; AB 0080426-AB 0080436; AB0080437-AB 0080743; AB 0081065-AB0081745; AB 0086403-AB 0086457.) When the existence of this ball came to Acushnet's attention, it promptly supplemented its production as its investigation continued. Acushnet believes that it has produced all documents relevant to its defenses regarding the Project X2 Veneer golf ball as well as the early stages of

---

[6] Acushnet's efforts were further impeded by Bridgestone's January 30, 2006 production of over 95,000 pages of Japanese-language documents that you indicated were not even necessarily responsive or relevant to any Acushnet document request or even non-duplicative of documents previously produced by Bridgestone. (*See* Masters Ltr. to Seal, Jan. 30, 2006.) Hundreds of e-mail documents to and from the inventors of the patents-in-suit were contained in that production despite Mr. Saliba's prior representations to us that Bridgestone simply did not use e-mail. Acushnet's review of that production took, and continues to take significant resources.

# HOWREY L.L.P.

development of the Titleist® Pro V1™ golf ball. To the extent that Acushnet locates additional non-privileged documents related to the Project X2 Veneer golf ball or the Pro V1™, it will produce them immediately and has never indicated otherwise.

Additionally, Acushnet has located at least one Project X2 Veneer golf ball. Once we reach an agreement on the exchange and testing of golf balls of which there are limited numbers, we will produce it. In the meantime, we will make it available for inspection. Acushnet's investigation is continuing into this defense and it will continue to provide Bridgestone with additional information in a reasonable and timely manner.

Finally, in your letter you reserve the right to seek sanctions for what you allege is Acushnet's failure to seasonably supplement its interrogatories. While you allege that Acushnet's conduct is sanctionable, you ignore the fact that Bridgestone's recent conduct in failing to notify Acushnet of Bridgestone's newly asserted claims is far worse.

Acushnet's efforts associated with compiling and analyzing the prior art to address each of the 83 claims Bridgestone asserted in its Responses to Acushnet's first set of interrogatories in July 2005 were significant. On May 1, 2006, <u>over 13 months into this case,</u> Bridgestone appears to have dropped four of its claims and has added five new claims to this case. Not only did Acushnet waste efforts addressing claims that Bridgestone dropped at the last minute, but now needs to go back through the huge volume of prior art produced in this litigation and consider whether or not to have additional searches of the prior art performed. Bridgestone's failure to inform Acushnet earlier of these additional claims and that Bridgestone was no longer going to pursue certain claims it had previously raised led to a significant waste of resources.[7] As you know, Acushnet withdrew one if its asserted patents three weeks before final contentions so that you would not have go through the wasteful exercise of preparing final contentions on it. We did not receive the same courtesy from Bridgestone.

We are prepared to discuss these matters with you, as well as the matters raised in my letter of May 5, during the meet and confer on Monday, May 22. We will call you that morning at 10:00 a.m. In the meantime, we await your response to my deficiencies letter of May 5 so that we may advance those issues in preparation for Monday's discussion.

Sincerely,

*Alan M Grimaldi* /eej

Alan M. Grimaldi

---

[7] As we requested, please confirm that Bridgestone is no longer pursuing U.S. Patent No. 5,252,652, claim 11; U.S. Patent No. 5,782,707, claim 3; and U.S. Patent No. 6,679,791, claims 12 and 23. (*See* Seal Ltr. to Masters, May 4, 2006 at 2).

# EXHIBIT B

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT C

**From:**   Grimaldi, Alan
**Sent:**   Wednesday, June 28, 2006 2:54 PM
**To:**     .MRCK - jblumenfeld; _Moore, David
**Cc:**     RobMasters@paulhastings.com; Seal, Brian; Sommer, Andrew
**Subject:** RE: Bridgestone/Acushnet

Jack and Rob- we will be asking the court by email later today to revisit the representative claims issue. Rob, as I said yesterday your proposal is not satisfactory, it did not even address the dates you are going to claim for invention on those patents where you may be allowed to go behind the filing dates. To include prior art golf balls as part of the 3 "references" is too limiting as I said, and narrowing to 30 claims after we do all this work is still to many. I may be be able to limit to 5 references, plus golf balls ( plus 112 ) if I get the invention dates and you are willing to limit to around 20 claims for all BS patents- we would limit to 8 claims for the 4 Acushnet patents.

---

**From:** Jack B. Blumenfeld [mailto:JBlumenfeld@MNAT.com]
**Sent:** Wednesday, June 28, 2006 10:10 AM
**To:** _Moore, David; Grimaldi, Alan
**Cc:** RobMasters@paulhastings.com
**Subject:** Bridgestone/Acushnet

David and Alan --

Can we see whether the Judge is available Monday, July 10?

Jack

This message, including any accompanying documents or attachments,
may contain information that is confidential or that is privileged.
If you are not the intended recipient of this message, please note
that the dissemination, distribution, use or copying of this message
or any of the accompanying documents or attachments is strictly
prohibited. If you believe that you may have received this message
in error, please contact me at (302) 658-9200 or by return e-mail.

# EXHIBIT D

# HOWREY LLP

1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
T 202.783.0800
F 202.383.6610
www.howrey.com

Direct Dial 202.383.6904
File 00634.0002

July 25, 2006

BY FACSIMILE

Terry J. Wikberg, Esq.
Paul, Hastings, Janofsky & Walker, LLP
875 15th Street, N.W.
Washington, D.C. 20005

> Re: ***Bridgestone Sports Co. v. Acushnet Co.,***
> **C.A. No. 05-132 (JJF) (D. Del.)**
> <u>**Response to Your Letter of July 24**</u>

Dear Terry:

We have received your letter of July 24. You stated Bridgestone was going to raise these issues with Judge Farnan which we think will be either a waste of time and/or premature. A number of the issues you raise have been addressed in previous correspondence. (*See* Grimaldi Ltr. to Masters, May 16, 2006.) Others, however, you raised for the first time in your letter without any meet and confer.

### A.    Acushnet's Source Log

We note initially that we are puzzled by your question "how was Acushnet able to generate the source log previously provided to Bridgestone." As we indicated to you previously on at least two occasions, the source log produced by Acushnet identifies the persons primarily responsible for the collection of the documents produced by Acushnet. In some instances, the person so identified on the log collected documents from other individuals whose names do not appear on the source log. To the extent the individuals listed on the source log recall from whom they collected documents, we will provide that information to you next week. These documents were produced in the manner in which they were kept by Acushnet in the ordinary course of business.

We further offered to resolve any issues regarding Acushnet's source log by attempting to identify the custodian and physical location of any document identified by Bridgestone for which that information was in question. We remain willing to do so. Your request, however, that we do so for "<u>all</u> documents produced by Acushnet throughout the course of this litigation" places an undue burden on Acushnet. Such an undertaking would require us to return our entire document production – which, as you acknowledge, consists of over 87,000 pages – to Acushnet and have Acushnet's employees identify their documents from the production—to the extent possible.

# HOWREY LLP

Such a burden is further unwarranted because it is unnecessary. In most cases, the author or custodian of the documents within Acushnet's document production is not in question. The documents produced by Acushnet are in English. In many cases the authors and recipients clearly identified. This stands in sharp contrast to the documents within Bridgestone's production, most of which are in Japanese and identify relevant Bridgestone personnel by employee or group number only. Despite our repeated requests that you identify the Bridgestone personnel associated with each employee or group number, you have refused to do so, instead referring us to organizational charts that provide minimal detail. (*See* White Ltr. to Seal, Apr. 19, 2006 at 1;[1] Masters Ltr. to Grimaldi, May 17, 2006 at 4.) We chose not to burden Judge Farnan with this issue and at great expense with translators have tried to work through the problem ourselves. This has been a hindrance on our ability to notice depositions of your client.

In light of the nature of Acushnet's document production and our willingness to work with you to resolve any specific issues, we fail to see any prejudice to Bridgestone, much less the "overwhelming" prejudice you claim. Instead, your failure to work with us to resolve any actual concerns you might have and your identification of these issues three days before the Court's discovery hearing suggests that these concerns are just posturing before the Court. Both parties have been able to work through numerous discovery issues but we obviously cannot do this without meeting and conferring.

## B.    Acushnet's Document Production

Contrary to your statement, Acushnet is not withholding any relevant and responsive non-privileged discovery from Bridgestone. As we note below, you raise a number of these issues on the eve of the discovery hearing for the very first time. We address your specific comments below.

- "all e-mail attachments" – Bridgestone first raised this issue months ago, to which we responded. (*See* Masters and Gruskin Ltr. to Moore, Sep. 30, 2005.) In response to your letter, Acushnet produced numerous e-mail attachments. Acushnet believes that it had satisfied its obligations. However, to the extent you believe Acushnet has failed to provide you with any specific e-mail attachments, please identify the e-mail by bates number and we will attempt to provide you with the appropriate attachment. Acushnet has never indicated otherwise.

- "all attachments to Change Notices" – You raised this issue for the first time in your July 24 letter. We have already contacted our client regarding this newly-raised concern and are working to see if Acushnet has any documents responsive to this request. If such documents are located, we will produce them to you.

---

[1] We have yet to receive a response to my May 31st letter to Mr. White regarding issues raised by the April 19, 2006 letter and your "courtesy copy" provided on May 17th. (*See* Seal Ltr. to White, May 31, 2006.)

# HOWREY.

- "all complete and final versions of manufacturing guidelines, including all revisions and versions thereof" – This alleged "deficiency" has was raised several times over the past few months in correspondence. (*See* Wikberg Ltr. to Seal, Apr. 20, 2006; Wikberg Ltr. to Seal, May 4, 2006; Masters Ltr. to Grimaldi, May 10, 2006.) As Acushnet has informed you on **no less than three occasions,** Acushnet is not withholding any manufacturing guidelines in its possession, custody, or control for the accused Acushnet golf balls. (*See* Seal Ltr. to Wikberg, Apr. 21, 2006; Seal Ltr. to Wikberg May 12, 2006; Grimaldi Ltr. to Masters May 16, 2006.)

- "all presentations prepared and/or presented by Mr. Bill Morgan" – This is yet another issue that you have raised for the first time in your July 24 letter. Acushnet is not withholding any non-privileged presentations made by Mr. Morgan. However, we will confirm with him whether he has any additional presentations and, if so, produce them to the extent they are relevant, responsive and non-privileged.

- "all documents from the Recipe Change database from every Ball Plant used to make any of the accused products" – This issue was raised for the first time in your letter of July 24. Acushnet has produced responsive documents from the Recipe Change databases (see, for example, AB0013685-AB0015262). However, we have already contacted our client and will confirm whether or not any relevant and responsive documents have yet to be produced. If we locate any such documents, we will produce them promptly.

- "all presentation materials presented to the Board of Directors of Fortune Brands" – As Acushnet has informed you, we will produce responsive presentation materials to you. We will make this production by Friday, July 28, 2006.

- "all documents from the 'weigh feed' management system" – This is another issue that you have raised for the first time on July 24, 2006. We have contacted our client and are looking further into this matter. We will keep you apprised of this matter and should have an answer for you this week.

- "all documents and reports generated and stored in the 'QAS' system or database" – Acushnet is not withholding documents from the QAS database. In September 2005, you complained that Acushnet produced a CD that contained nearly 90 boxes of documents. (Masters and Gruskin Ltr. to Moore, Sep. 12, 2005 at 4.) As we informed you in May, this data constitutes Acushnet's QAS database. We are at a loss to understand what information you believe Acushnet is withholding. A meet and confer to discuss this issue in further detail is needed to better understand what you are asking for, particularly in light of Acushnet's voluminous production in this area.

# HOWREY₋₋ₚ

Terry J. Wikberg
July 25, 2006
Page 4

- "all 'Titleist Solid Construction Golf Balls' charts" – This is the first time you have raised this issue. Again, Acushnet is not withholding any such relevant and responsive documents. Nevertheless, we will confirm whether any additional relevant and responsive documents exist and if, so, will produce them.

- "all responsive documents from the 'hob' database" – Acushnet expects to produce all such relevant and responsive hob database documents by August 1, 2006.

- "all on and off-course retail agreements" – Acushnet will produce documents responsive to your request by the end of next week.

- "all material specification and data sheets and all of the development documents for the Pro V1, 'veneer' and 'Project X' technology – Acushnet believes it has produced all such relevant and responsive documents. (*See* Grimaldi Ltr. to Masters, May 16, 2006 at 10.) Acushnet is not withholding any documents responsive to your request.

- "all of the product catalogs containing the accused golf balls" – Acushnet is not withholding any of its product catalogs. Acushnet is once again confirming that it has produced these documents to you. (*See* AB 52321-52376).

### C.    Redactions in Acushnet's Document Production

Contrary to your statement, Acushnet's redactions are proper, as evidenced by the very document you identify in your letter. That document is a December 22, 1999 memorandum from Herb Boehm regarding a December 20, 1999 golf ball product development team meeting. At that time, the only accused Acushnet golf ball in existence was the in-development Pro V1, then identified as the "urethane veneer ball." Accordingly, all references to the "urethane veneer ball" in that memorandum were retained in the document produced to Bridgestone, while all other information relating to non-accused Acushnet products was redacted.

We suggest discussing these matters in a meet-and-confer as required by the Local Rules.

Regards,

Brian S. Seal

# EXHIBIT E

04/05/2006 23:42 FAX  202 551 1700      PHJ LLP WDC



Paul, Hastings, Janofsky & Walker LLP
875 16th Street N.W. • Washington, DC 20005
telephone 202 551 1700 • facsimile 202 551 1705 • www.paulhastings.com

Atlanta
Beijing
Brussels
Hong Kong
London
Los Angeles
Milan
New York
Orange County
Palo Alto
Paris
San Diego
San Francisco
Shanghai
Stamford
Tokyo
Washington, DC

(202) 551-1754
brandonwhite@paulhastings.com

70416.00002

April 6, 2006

VIA FACSIMILE TO (202) 383-6610

Brian S. Seal
Howrey LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004

Re:    *Bridgestone v. Acushnet -- Acushnet's April 3, 2005 Production*

Dear Brian:

We are writing regarding Acushnet's production on April 3, 2006.

During our telephone conversation on Monday, April 3, you indicated that your April 3, 2006 production completed Acushnet's production.[1] However, after reviewing your production, it is clear that Acushnet remains deficient in its production in several areas. In particular, Acushnet's production of Pro V1* documents, which you agreed to produce, and Acushnet's production of financial information, as ordered by the Court, is entirely deficient.[2]

With respect to the Pro V1* documents, you have not produced, *inter alia*, manufacturing guidelines,[3] retail testing summaries,[4] ball construction summary sheets,[5] developmental meeting minutes and testing reports. You have also failed to produce unredacted copies of the many documents in your prior productions where Pro V1* was redacted.

It appears from Acushnet's production that each commercialized Acushnet golf ball has a corresponding set of manufacturing guidelines. Indeed, the Pro V1* manufacturing guidelines are shown as an attachment in the e-mail at AB-0004833. Yet, you chose not to produce these guidelines.

---

[1] Two file histories relating to the Acushnet patents-in-suit were produced on Tuesday, April 4.
[2] We continue to believe that Acushnet remains deficient in its production of many other categories of documents as outlined repeatedly in our letters to you. We expect these deficiencies to be highlighted in the unnecessarily-delayed 30(b)(6) deposition finally scheduled for April 26.
[3] Our usage of the term "manufacturing guidelines" is a reference to documents such as AB 0015588 *et seq* (Pro V1x manufacturing guidelines).
[4] Our usage of the term "retail testing summaries" is a reference to documents such as AB 0004699 *et seq* (test results for Pro V1x balls purchased at Golfer's Warehouse).
[5] Our usage of the term "ball construction summary sheets" is a reference to documents such as AB 0050822 *et seq* (redacted ball construction summary sheet for Pro V1x).

LEGAL_US_E # 70067?.1

**Paul**Hastings

Brian S. Seal
April 6, 2006
Page 2

Similarly, it appears from Acushnet's production that Acushnet tests physical and chemical properties of its golf balls purchased from retail stores. These types of documents were previously produced for each of the accused Acushnet golf balls. However, in your latest production, no such documents were produced for the Pro V1*.

Acushnet also previously produced construction sheets summarizing the physical and chemical properties of the accused Acushnet golf balls. Once again, however, no such documents were produced for the Pro V1*.

During Acushnet's prior rounds of production, it appears that an effort was made to redact the Pro V1* golf ball from the produced documents, despite the unmistakable relevance of the Pro V1* golf ball. However, you have yet to produce unredacted copies of these documents. For example, document AB 50822, is a construction sheet for 4-piece golf balls in the Pro V1 family manufactured between 1999 and 2003. It would certainly seem that the redacted columns represent the Pro V1*. In any event, whatever balls are identified under these redactions are relevant and responsive as they are in the Pro V1 family.

With respect to your production of financial documents, 98%[6] of the first box comprised third-party sales compilations purchased from NGF and Golf Datatech. The second box is hardly an improvement.

Among other things, this latest round of Court-ordered production is missing periodic reports, be they weekly, monthly, quarterly, or annual, prepared for internal use and prepared to report to Acushnet's parent, Fortune Brands, Inc. You have not produced executive summaries of the financial success or failure of Acushnet's golf ball lines. You have not produced quarterly presentations given to employees on the sales of Acushnet's golf balls. It strains credibility to argue that executives, accountants and marketing personnel at Acushnet and Fortune Brands operate with only the Product Analysis reports, such as that shown in AB 0084987. Every large entity produces some level of executive-style summaries of their sales. Certainly, Acushnet, maker of the self-proclaimed "No. 1 Ball in Golf" routinely analyzes its sales, market share, profitability and competitive position.

Acushnet has not produced documents on the wholesale price of golf balls sold to its subsidiaries and distributors around the world.[7] While we may now finally know the number of golf balls Acushnet Japan sold in a given month, we do not know the price Acushnet Japan paid for these balls, nor do we have any accounting for the profits made by Acushnet Japan for sales of infringing balls outside of the U.S. The same holds true for the remainder of Acushnet's subsidiaries and distributors.

[6] 1588 pages out of 1621 total pages (AB 0082102 to AB 0083722).
[7] According to Fortune Brands's latest 10-K, about 30% of Acushnet's sales are to international markets. December 2005 10-K at p. 8.
LEGAL_US_E # 70760737.1

04/05/2006 23:43 FAX  202 551 1700      PRO LLI *OO          —

**Paul**Hastings
ATTORNEYS

Brian S. Seal
April 6, 2006
Page 3

You have not produced documents relating to Acushnet's division of costs among
different divisions (i.e., golf ball, golf club, accessories) and product families (i.e., Pro V1,
DT So/Lo, NXT, NXT Tour).

The categories of documents outlined above, among many others, are relevant to the
issues in this case, are responsive to Bridgestone's requests and should have been
produced long ago. These examples represent only the glaring deficiencies obvious from
our initial review of your production. We do not endeavor here to, once again, outline the
documents we need and are entitled to – this exercise has been done repeatedly in the past
to no avail.

It is our fervent belief that Acushnet has failed to comply with the Court's Order
regarding the production of financial documents and your agreement with respect to the
production of Pro V1* documents, despite nearly three months to compile and produce
these documents. More than six months after the August 31, 2005 document production
date, Acushnet still has not fully complied with its obligations under the Federal Rules.

We request a prompt response as to each of the issues raised herein.

Sincerely,

Brandon M. White
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

LEGAL_US_R #70767571.1

# EXHIBIT F

# HOWREY LLP

1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
T 202.783.0800
F 202.383.6610
www.howrey.com

Direct Dial 202.383.6904
File 00634.0002

June 15, 2006

BY FACSIMILE

Robert M. Masters, Esq.
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, D.C. 20005

Re:    *Bridgestone Sports Co. v. Acushnet Co.*,
       **C.A. No. 05-132 (JJF) (D. Del.)**
       Certain Prior Art Golf Balls Identified In Acushnet's
       Invalidity Contentions

Dear Rob:

As we discussed during our May 22 meet and confer, Acushnet stipulates that it will only rely on the following complete publicly-available and commercialized golf balls to show that the dimple count in certain claims of the Bridgestone patents-in-suit were well known in the art at the time of the alleged invention:

| Prior Art Golf Ball | Dimple Count |
|---|---|
| Pinnacle Distance Extreme manufactured by Acushnet Co. | The Pinnacle Distance Extreme has 392 dimples. |
| Maxfli XD | The Maxfli XD has 432 dimples. |
| Maxfli Tour Special Metal Mix | The Maxfli Tour Special Metal Mix has 410 dimples. |
| Titleist Tour Balata manufactured by Acushnet Co. | The Titleist Tour Balata has 392 dimples. |
| Titleist Professional manufactured by Acushnet Co. | The Titleist Professional has 392 dimples. |
| Maxfli HT Balata | The Maxfli HT Balata has 432 dimples. |
| Maxfli Tour Balata | The Maxfli HT Tour Balata has 432 dimples. |
| Maxfli Royal Maxfli | The Maxfli Royal Maxfli has 432 dimples. |
| Bridgestone Reygrande 2x2 manufactured by Bridgestone | The Bridgestone Reygrande 2x2 has 396 dimples. |
| Titleist DT manufactured by Acushnet Co. | The Titleist DT has 392 dimples. |
| Maxfli XP | The Maxfli XP has 432 dimples. |
| Maxfli Long Distance | The Maxfli Long Distance has 408 dimples. |

AMSTERDAM  BRUSSELS  CHICAGO  EAST PALO ALTO  HOUSTON  IRVINE  LONDON
LOS ANGELES  NORTHERN VIRGINIA  PARIS  SALT LAKE CITY  SAN FRANCISCO  TAIPEI  WASHINGTON, DC

DM_US\8352241.v1

# HOWREY LLP

Robert M. Masters
June 15, 2006
Page 2

| Prior Art Golf Ball | Dimple Count |
|---|---|
| Titleist HP2 Tour manufactured by Acushnet Co. | The Titleist HP2 Tour has 440 dimples. |
| Titleist HP2 Tour manufactured by Acushnet Co. | The Titleist HP2 Tour has 440 dimples. |
| Titleist HP2 Distance manufactured by Acushnet Co. | The Titleist HP2 Distance has 440 dimples. |
| Maxfli HS | The Maxfli HS has 432 dimples. |
| Slazenger 420t Touch Spin | The Slazenger 420t Touch Spin has 432 dimples. |
| Top-Flite Strata | The Top-Flite Strata has 422 dimples. |
| Top-Flite Z-Balata | The Top-Flite Z-Balata has 422 dimples. |
| Top-Flite SD | The Top-Flite SD has 422 dimples. |
| Bridgestone Reygrande EXE manufactured by Bridgestone | The Bridgestone Reygrande EXE has 392 dimples. |
| Slazenger 420t Raw Distance | The Slazenger 420t Raw Distance has 420 dimples. |
| Titleist Tour 100 manufactured by Acushnet Co. | The Titleist Tour 100 has 392 dimples. |
| Titleist Pro Trajectory manufactured by Acushnet Co. | The Titleist Pro Trajectory has 392 dimples. |
| Bridgestone Precept Pro Model manufactured by Bridgestone | The Bridgestone Precept Pro Model has 392 dimples. |
| RAM Tour Lithium Balata 90 | The RAM Tour Lithium Balata 90 has 392 dimples. |
| RAM Tour Lithium Balata 100 | The RAM Tour Lithium Balata 100 has 442 dimples. |
| Titleist 384 Tour manufactured by Acushnet Co. | The Titleist 384 Tour has 384 dimples. |
| Tour Ltd. HT | The Tour Ltd. HT has 432 dimples. |
| Rextar Pro Model 100 | The Rextar Pro Model 100 has 396 dimples. |
| Bridgestone SS-01 manufactured by Bridgestone | The Bridgestone SS-01 has 432 dimples. |

      With respect to the Bridgestone-manufactured golf balls identified in the list above, please inform us if will contest the dimple counts specified in the chart. If you believe that the dimple count in the chart is inaccurate for any Bridgestone-manufactured golf ball, please identify which golf ball(s) you believe have a dimple count different from that specified and provide us with documents sufficient to show any such difference of dimple count.

**HOWREY**LLP

Regards,

*fce*    Brian S. Seal

EXHIBIT G

ichiniose060106ji.txt

☐                                                                    1


 1                    N O T I C E
 2                This transcript is a ROUGH DRAFT,
 3   UNEDITED, UNCERTIFIED TRANSCRIPT ONLY.  It contains
 4   the raw output from the court reporter's stenotype
 5   machine, translated into English by the court
 6   reporter's computer, without the benefit of
 7   proofreading.  It will contain untranslated steno
 8   strokes, mistranslations (wrong words), and
 9   misspellings.  These and any other errors will be
10   corrected in the final transcript.
11                Since this rough draft transcript has
12   not been proofread, the court reporter cannot assume
13   responsibility for any errors.   This rough draft
14   transcript is intended to assist attorneys in their
15   case preparation and is not to be construed as the
16   final transcript.  It is not to be read by the witness
17   or quoted in any pleading or for any other purpose and
18   may not be filed with any court.
19
20                THE VIDEOGRAPHER:   We are on the record.
21   This is volume two in the videotaped deposition of Jun
22   Ichinose.  My name is Billy Fahnert I am the

☐                                                                    2


 1   videographer here today.  The court reporter is
 2   Cassandra Ellis.  Both represent Digital Evidence
                          Page 1

ichiniose060106ji.txt
 9  Bridgestone corporation prior to January, 1991?

10       A   I don't know.

11       Q   You testified earlier that under Japanese

12  patent law Bridgestone is required to preserve the

13  inventor assignment document; do you recall that

14  testimony?

15       A   Yes, I do remember.

16       Q   Does Japanese patent law, to your

17  knowledge, require Bridgestone to maintain or preserve

18  any other categories of inventor documents?

19           MR. MASTERS:  Object to form, the

20  question's outside the scope of the notice, calls for

21  speculation and legal conclusion.

22       A   Although I don't know precisely, but most

                                                    25


 1  likely I believe there is nothing else.

 2       Q   Does Bridgestone Corporation have any

 3  document retention policy, written or otherwise, other

 4  than the one we've marked as Exhibit 5?

 5           MR. MASTERS:  Object to form, question's

 6  outside the scope of the notice.  Calls for

 7  speculation.

 8       A   Yes, I have heard of that, Bridgestone

 9  Corporation has a new document retention policy in

10  place.

11           MR. FIELD:  Just to be precise the term the

12  witness is using is document handling policy.

13           THE INTERPRETER:  Oh, okay, that's right.

14           MR. SEAL:

                    Page 20

ichiniose060106ji.txt

15 THE ATTORNEY:

16     Q   When did Bridgestone Corporation institute

17 the new document handling policy?

18         MR. MASTERS:  Same objections.

19     A   I cannot tell you the exact date, but as

20 far as I heard Bridgestone Corporation revised a

21 document handling policy after they constructed LAN

22 network.

26

1     Q   Do you know approximately when that was?

2         MR. MASTERS:  Same objections, it's outside

3 the scope of the notice, beyond this witness's

4 knowledge.

5     A   I don't know exactly when, however I

6 believe it was sometime after the year 2000.

7     Q   Before giving your testimony in this case

8 at today's deposition and the one in January did you

9 make any effort to determine whether or not

10 Bridgestone Corporation had a written document

11 retention policy?

12     A   Yes, I did.

13     Q   Did you collect any written document

14 retention policy from Bridgestone Corporation?

15         MR. MASTERS:  Object to form, question's

16 overly broad, beyond the scope of this deposition.

17     A   I don't believe I was -- excuse me -- I

18 don't believe I collected any document from

19 Bridgestone Corporation.

20     Q   You say any document do you just mean a

Page 21

ichiniose060106ji.txt
21  document handling policy or any document at all for

22  this litigation?

27

1        A    What I meant is I didn't get the document

2  handling policy.

3        Q    Did you collect any documents, at all, from

4  Bridgestone Corporation for this litigation?

5        A    Most -- most likely I didn't.

6        Q    But you can't say for certain one way or

7  another?

8        A    I meant not hundred percent certain.

9        Q    Did anyone, to your knowledge, collect

10  documents from Bridgestone Corporation for purposes of

11  this litigation?

12            MR. MASTERS:  Objection, question lacks

13  foundation, it's vague and ambiguous, and beyond the

14  scope of this deposition notice.

15        A    I don't think they obtained any.

16        Q    Who would you ask if you had to find out

17  for certain?

18            MR. MASTERS:  Same objections.

19        A    Probably if I ask our vice president Mr.

20  Tomita, Tomita, I will find out hundred percent, with

21  hundred percent certainty, but I myself did not get

22  any document.

28

1            MR. SEAL:  All right we're running out of
                        Page 22

# EXHIBIT H

# HOWREY LLP

1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
T 202.783.0800
F 202.383.6610
www.howrey.com

Direct Dial 202.383.6904
File 00634.0002

May 16, 2006

BY FACSIMILE

Brandon M. White, Esq.
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, D.C. 20005

> Re:  *Bridgestone Sports Co. v. Acushnet Co.,*
> **C.A. No. 05-132 (JJF) (D. Del.)**
> <u>Bridgestone's Third 30(b)(6) Notice of Deposition</u>

Dear Brandon:

Thank you for your letter of April 28.  We object to your characterization therein of Mr. Lester's preparation for his deposition, which we address herein.

Topic 1 of Bridgestone's deposition notice sought testimony on the "identification of those persons from whom Acushnet sought documents responsive to Bridgestone's First Set of Requests for the Production of Documents and Things (Request Nos. 1-100) and Bridgestone's Second Set of Requests for the Production of Documents and Things (Request Nos. 101-155) and physical locations, storage facilities, servers, personal computers and/or electronic devices searched for such responsive documents." (Attachment A to Pls.' Third 30(b)(6) Notice of Deposition to Def. at 1.)  As the individual at Acushnet responsible for Acushnet's document collection efforts in response to Bridgestone's discovery requests, Mr. Lester is the person at Acushnet most knowledgeable regarding the document collection efforts.  In particular, he has extensive percipient knowledge relating to (1) the instructions given to Acushnet's employees for the collection of documents (*see, e.g.,* Lester Dep. at 9:5-10:9; 39:7-18; 89:3-16; 103:5 – 104:13), (2) the specific employees who received such instructions (*See, e.g.,* Lester Dep. at 38:8-40:9; 45:4-6; 86:19-87:2), and (3) the locations to be searched pursuant to those instructions (*see, e.g.,* Lester Dep. at 39:7-40:9; 42:14-47:22; 60:16-62:6; 74:5-75:21; 103:13-17; 113:19-114:15; 117:18-121:11).

Instead of pursuing those subjects, however, you directed your questions to the actions taken by specific individuals at Acushnet in response to instructions from Mr. Lester and attorneys from Howrey.  It is manifestly unreasonable to expect any 30(b)(6) witness to speak to

# HOWREY LLP

Brandon M. White
May 16, 2006
Page 2

the individual file searches of each and every person at person at Acushnet.[1]  In fact, when I said as much to you and Rob during our phone conversation on April 28, neither you nor Rob disagreed.  Instead, you took the narrower – though still unsupported – position that Mr. Lester should have spoken to some undefined subset of individuals.  Neither of you, however, offered any criteria for the identification of that subset.  In any event, discovery related to the specific actions taken by any individual as part of Acushnet's document collection is more appropriate for a substantive deposition of each individual from whom you seek such information.

Mr. Lester's deposition did reveal that certain individuals who collected documents in response to Bridgestone's requests do not appear on the source log produced by Acushnet.  (*See*, *e.g.*, Lester Dep. at 106:21-109:21.)  Our subsequent research into the preparation of Acushnet's source log suggests that the individuals identified therein not only collected their own documents, but also forwarded documents collected by other individuals who do not appear on the source log.  We are researching this matter further and agree to supplement the source log to the extent possible.

Topic 2 of Bridgestone's deposition notice sought testimony on "Acushnet's production of documents to Bridgestone, including, but not limited to, Acushnet's production of documents related to: (a) United States Golf Association approval of any Acushnet product; (b) sales, pricing, and profit margin of the Acushnet products; (c) Acushnet's annual revenues for the sale of the Acushnet products; (d) sales and marketing literature; (e) dimple geometries and patterns for the Acushnet products; (f) manufacturing quality control standards and testing for the Acushnet products; (g) evaluations or studies of the market or business done by or for Acushnet; (h) estimates with respect to the sales, pricing and profit margin for the Acushnet products; (i) testing of the Acushnet products; (j) meeting minutes related to the Acushnet products; (k) any license agreements with Callaway Golf Company; and (l) the Titleist Eclipse and Tour Distance golf balls." (Attachment A to Pls.' Third 30(b)(6) Notice of Deposition to Def. at 1-2.)  Here again, Mr. Lester was prepared to discuss the instructions given to Acushnet employees for the collection of such documents, the employees so instructed, and the scope of the physical locations to be searched.  And again, your questions were directed to the specific actions taken by various individuals in response to those instructions.

While we disagree that your notice required any more detailed information than that provided by Mr. Lester on topic 2, we nonetheless agreed on April 28 to present a new witness on the subparts of topic 2 related to finance, i.e, subparts (b), (c), (d), and (h).  We are attempting to schedule that deposition as soon as possible and will let you know promptly once we have available dates.

---

[1] Bridgestone's own 30(b)(6) witness on its document collection – Mr. Juri Ichinose – similarly was unaware of the specific search methods used by other Bridgestone personnel.  (*See*, *e.g.*, Ichinose Dep. at 91:17-92:3; 95:16-96:9.)

# HOWREY␣␣

In your letter, you request additional testimony on subparts (i) (production of Acushnet documents related to "testing of the Acushnet products") and (j) (production of "meeting minutes related to the Acushnet products"). For the reasons set forth above, however, we maintain that Mr. Lester's level of preparation was more than sufficient to provide testimony on those subjects.

In addition, with regard to subpart (i), Mr. Lester testified specifically that Ken Welchman searched for documents related to testing and that he received documents from Mr. Welchman. (*See, e.g.*, Lester Dep. at 113:10-18; 114:16-118:22.) If you have any specific concerns about Mr. Lester's testimony regarding subpart (i), please inform us and we will consider whether any additional testimony is warranted.

With regard to subpart (j), Mr. Lester has percipient knowledge regard to his specific instructions to Acushnet employees to collect all meeting minutes both in response to Bridgestone's document requests and to numerous letters from your firm requesting the production of additional meeting minutes (to which we have repeatedly responded that we are not withholding any such minutes in our possession, custody, or control). In fact, Mr. Lester testified that "there are very specific instructions" to pull documents from meetings that related to the accused Acushnet products, the accused Bridgestone products and prior art golf balls. (*See, e.g.*, Lester Dep. at 103:5-104:13.) Bridgestone's notice requires no more. We are, however, willing to discuss with you what additional testimony you believe might be necessary on that subject.[2]

Topic 3 of Bridgestone's notice requested testimony on "[a]ny and all databases maintained by or for Acushnet containing or storing manufacturing, testing or research data and/or information, including without limitation, indoor test range data and analyses of competitive golf balls." (Attachment A to Pls.' Third 30(b)(6) Notice of Deposition to Def. at 2.) While we object to that topic as vague, ambiguous and overly broad, we note that Mr. Lester identified a number of individuals present at the meeting with outside counsel and testified that each individual was responsible for searching his or her own files, including electronic files, e-mail, and databases. (*See, e.g.*, Lester Dep. at 38:8-40:9; 45:4-6.) He further testified that certain individuals were tasked with searching for documents in specific databases, including databases for research and development, manufacturing, golf ball testing, and quality control, and that those individuals produced documents to him from those databases. (*See, e.g.*, Lester Dep. at 60:16-62:6; 74:5-16.) Nevertheless, we have agreed to provide a new 30(b)(6) witness on topic 3, which is currently scheduled for deposition on May 19. The witness will be prepared to discuss any shared databases in Acushnet's manufacturing, testing or research and development departments.

---

[2] I note further that Bridgestone has not requested any additional testimony on subparts (a), (e)-(g), (k) or (l) of Topic 2.

# HOWREY.

With respect to Topic 3, you state in your letter that Acushnet must produce any indices of contents in its Lotus Notes database. While I have not yet confirmed that any such indices exist, please first explain the basis for your assertion and identify any Bridgestone document request for which you believe any such indices are responsive.

In an effort to resolve your concerns regarding Mr. Lester's deposition testimony regarding Topic 4 (Acushnet's document retention policies), we had a copy of Acushnet's document retention policy faxed to the deposition so that Mr. Lester could review it during a break. Although Mr. Lester testified after the break that he had reviewed the policy (*see* Lester Dep. at 140:20-141:5), you chose not to ask any additional questions. Instead, you ended the deposition shortly before 12:30 p.m, with a substantial amount of deposition time remaining for the day. Having thus failed to take advantage of Mr. Lester's review and availability, Bridgestone is not entitled to any additional testimony on that topic. Nevertheless, we have produced a copy of the document retention policy (AB 087740-AB 0087772) and are willing to discuss with you what additional testimony you feel might be necessary.

Topic 5 calls for testimony on "Acushnet's storage, archiving, retention or destruction of any Things, including, but not limited to any golf balls or prototypes of golf balls, golf ball cores, golf ball cover materials, and golf ball test samples, whether manufactured by Acushnet or any third party, the use of any such stored, archived or retained Thing, and the chain of custody of such Things." (Attachment A to Pls.' Third 30(b)(6) Notice of Deposition to Def. at 3.) Mr. Lester testified extensively on that subject. (*See, e.g.*, Lester Dep. at 113:10-18; 117:18-122:1.) Nevertheless, we have agreed to produce an additional witness for that topic.

Mr. Lester has similar percipient knowledge regarding Topic 6, which calls for "Acushnet's inventory of golf balls, including, but not limited to, the following golf balls: the Wilson Ultra Competition 90, Wilson Ultra Competition 100, the Dynawing Double Cover S+, the Precept EV Extra Spin, the Reygrande WF, the Altus Newing Massy, the Wilson Ultra Tour Balata 90, the Wilson Ultra Tour 100, the Top Flite System C, the Tour Stage U-Spin, and each of the Acushnet products and the accused Bridgestone products." Although we provided an inventory list of such golf balls to you long ago, you chose not to ask him any questions about that list. Bridgestone has agreed, however, that no additional witness is necessary for this topic.

Regards,

Brian S. Seal

# EXHIBIT I

# Paul Hastings
## ATTORNEYS

Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W. • Washington, DC 20005
telephone 202 551 1700 • facsimile 202 551 1705 • www.paulhastings.com

Atlanta
Beijing
Brussels
Hong Kong
London
Los Angeles
Milan
New York
Orange County
Palo Alto
Paris
San Diego
San Francisco
Shanghai
Stamford
Tokyo
Washington, DC

(202) 551-1756
terrywikberg@paulhastings.com

July 24, 2006                                                          70416.00002

**VIA FACSIMILE (202) 383-6610**


Brian S. Seal, Esq.
Howrey LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004


Re:    Bridgestone v. Acushnet


Dear Brian:

This letter is to, yet again, ask Acushnet to (1) provide Bridgestone with a complete and accurate source log for all of Acushnet's document production, (2) produce all responsive documents in its possession, custody and control, immediately, and (3) to produce unredacted versions of documents.

**SOURCE LOG:**

During the meet and confer on July 14, you indicated that because of Acushnet's document collection efforts, Acushnet is unable to accurately identify the source of all the documents produced prior to April 12, 2006. Since Acushnet has produced a total of about 87,448 pages of documents, only about 1,300 of which occurring on or after April 12, 2006, by your own admission Acushnet is unable to provide an accurate source log for over 98% of the documents produced.[1] This is wholly and completely unacceptable, and the prejudice to Bridgestone is overwhelming.

Further, during the meet and confer on July 14, in an effort to cure this highly prejudicial deficiency, you offered to "try" and identify the source of any documents identified by Bridgestone.

In response to this proposal, Bridgestone accepts your offer and requests Acushnet to identify the physical location and custodian/keeper of all documents produced by Acushnet throughout the course of this litigation, immediately.

---

[1] This begs the question "how was Acushnet able to generate the source log previously provided to Bridgestone?"

**Paul**Hastings
ATTORNEYS

Brian S. Seal
July 24, 2006
Page 2

## DOCUMENT PRODUCTION:

Throughout the course of discovery in this case, Bridgestone has repeatedly identified obvious deficiencies in Acushnet's document production, and Acushnet has repeatedly asserted that the production was complete.

However, the depositions of both Messrs. Michael Jordan and Jeff Dalton have confirmed that Acushnet continues to withhold documents, and Bridgestone hereby requests Acushnet immediately supplement its entire document production to produce all responsive documents not yet produced.

For the purposes of providing examples, Bridgestone identifies the following types of documents: all e-mail attachments, and all attachments to Change Notices (including but not limited to the attachment to Bates No. AB 0015825 which Mr. Dalton indicated could be viewed with a "click"); all complete and final versions of manufacturing guidelines, including all revisions and versions thereof (as identified by Mr. Jordan); all of the product catalogs containing the accused golf balls (as identified by Mr. Dalton as the documents used in preparation of Acushnet's response to Bridgestone Interrogatory #1); all presentations prepared and/or presented by Mr. Bill Morgan (as identified by Mr. Jordan); all documents from the Recipe Change database from every Ball Plant used to make any of the accused products (and any components thereof), including but not limited to Pro V1 (star) and Pro V1x (as identified by Mr. Dalton); all presentation materials presented to the Board of Directors of Fortune Brands (as identified by Mr. Jordan); all documents from "weight feed" management system (as identified by Mr. Jordan); all documents and reports generated and stored in the "QAS" system or database (as identified by both Messrs. Jordan and Dalton as containing any and all specification changes and acceptable measurement tolerances for the accused products); all "Titleist Solid Construction Golf Balls" charts, including but not limited to those charts containing the newer versions of the accused Acushnet golf balls, and any other responsive documents from the "competitive ball database"; all responsive documents from the "hob" database; all on and off-course retail agreements; all material specification and data sheets and all of the development documents for the Pro V1, "veneer" and "Project X" technology.

It must be made clear that the above listing is not intended to be exclusive in any way, but is merely set forth to establish the glaring and unacceptable gaps in Acushnet's haphazard document collection and production efforts.

Bridgestone requests that Acushnet immediately produce all responsive documents.

Paul*Hastings*
ATTORNEYS

Brian S. Seal
July 24, 2006
Page 3

## REDACTIONS:

It is clear that Acushnet has improperly redacted many documents. The result of the redactions is to withhold relevant information from Bridgestone, to prevent Bridgestone from understanding the context of a document, and generally to frustrate the discovery process. One example is Exhibit 30 that was marked during Mr. Dalton's deposition. We demand that Acushnet produce unredacted versions of all documents, with the sole exception being redactions made for purposes of maintaining privileges.

## JULY 27 HEARING:

Because of the proximity of the next discovery conference before the Court, Bridgestone plans on bringing up each of these items before the Court.

In the meantime, please confirm that (1) Acushnet will immediately provide Bridgestone with an accurate Source log for all of Acushnet's document production, (2) Acushnet will immediately supplement its document production and produce all remaining responsive documents, and (3) Acushnet will remove all unwarranted and unjustified redactions.

Sincerely,

Terry J. Wikberg
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

TJW

LEGAL_US_E # 71475649.2

# EXHIBIT J

Page 1

```
 1              THE STATES DISTRICT COURT

 2           FOR THE DISTRICT OF DELAWARE

 3    _____
                                      )  H I G H L Y
 4    BRIDGESTONE SPORTS CO., LTD.,  )
                                      )  CONFIDENTIAL
 5    AND BRIDGESTONE GOLF, INC.      )
                                      )
 6         Plaintiffs,               )
                                      )  C.A. No.
 7         v.                        )
                                      )  05-132 (JJF)
 8    ACUSHNET COMPANY               )
                                      )
 9         Defendant.                )
      _____)
10                                    )
      ACUSHNET COMPANY,              )
11                                    )
           Counterclaim Plaintiff,  )
12                                    )
           v.                        )
13                                    )
      BRIDGESTONE SPORTS CO., LTD.,  )
14                                    )
      and BRIDGESTONE GOLD, INC.,    )
15                                    )
           Counterclaim Defendant.  )
16    _____)

17              Washington, D.C.

18           Tuesday, June 20, 2006

19        Videotape deposition of:
                HITOSHI OTSUKA,
20    ------------------------------------------------
            DIGITAL EVIDENCE GROUP
21        1111 16th Street, NW Suite 410
              Washington, DC  20036
22              (202) 232-0646
```

Page 2

```
 1    a witness called in the above-entitled action,

 2    before MARIJANE W. SIMON, RDR, CLR, a notary

 3
      public in and for the District of Columbia, taken
 4    at the offices of Howrey, LLP, 1299 Pennsylvania

 5    Avenue, N.W., Washington, D.C., beginning at 9:32

 6    a.m.

 7

 8

 9

10

11

12    APPEARANCES:

13

14        On behalf of the Plaintiffs:

15        ERIC E. BENSEN, ESQUIRE

16        PAUL HASTINGS, JANOFSY & WALKER LLP

17        75 East 55th Street

18        New York, NY  10022-3205

19        (212) 318-6643

20        (212) 339-9150 (Fax)

21        ericbensen@paulhastings.com

22        . . .
```

Page 86

1                 THE WITNESS:  I do not recall that

2    clearly but it -- I -- I remember it was -- it --

3    it -- it took place quite soon so I would think

4    it -- it was maybe a week or two weeks after the

5    rumor.

6                 BY MR. SOMMER:

7         Q.   Okay.  And -- And the agreement

8    between Nike and Bridgestone took less than a

9    year.  Could it have been about six months to

10   negotiate?

11                MR. BENSEN:  Object to form.

12                THE WITNESS:  I don't remember.

13                BY MR. SOMMER:

14        Q.   You had mentioned that the Bridgestone

15   Corporation, the -- the parent company's legal

16   department, handled the drafting of this license.

17   Were you involved personally with the negotiation

18   of -- of this agreement, actually?  I

19   mischaracterized it as a license.

20                THE LEAD INTERPRETER:  Agreement.

21                (Conversation in Japanese between the

22                 lead interpreter and the defendant's

Page 87

```
 1                    interpreter.)

 2                DEFENDANT'S INTERPRETER:  Signing.

 3                MR. BENSEN:  Object to form.

 4                THE WITNESS:  I was not involved in

 5      the negotiation.

 6                BY MR. SOMMER:

 7           Q.   Was Bridgestone Corporation's legal

 8      affairs department involved in the negotiation of

 9      this agreement?

10           A.   Yes, it was.

11           Q.   And did Bridgestone Corporation's

12      legal affairs department communicate directly with

13      Nike or did they go through you as the -- the

14      contact person for the Nike account?

15                MR. BENSEN:  Object to the form.

16                THE WITNESS:  I recall that it was

17      done through me.  Yes, I -- Yes, it did

18      communicate through me.

19                BY MR. SOMMER:

20           Q.   When Nike had comments on this

21      agreement, did they communicate directly with you

22      about the agreement?
```

Page 88

```
 1        A.    Yes.

 2        Q.    And so, then, you would take Nike's

 3   comments or correspondence and forward it to

 4   Bridgestone Corporation's legal affairs

 5   department; is that correct?

 6        A.    Yes, it is correct.

 7        Q.    Okay.  Would it be possible that

 8   Bridgestone Corporation's legal affairs department

 9   might still have some correspondence received from

10   Nike regarding this manufacturing agreement?

11            THE LEAD INTERPRETER:  Still have.

12            MR. BENSEN:  Objection to form.

13   Foundation.

14            THE WITNESS:  I do not know.

15            BY MR. SOMMER:

16        Q.    Since 1998 have you reviewed this

17   document?

18        A.    So I saw it again yesterday.

19        Q.    And that was the last time or --

20   Let -- Let me rephrase.

21            Since 1998 you've only seen that

22   agreement once and that was yesterday; is that
```