IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BRIDGESTONE SPORTS CO., LTD., and BRIDGESTONE GOLF, INC.,<br><br>    Plaintiffs,<br><br>  v.<br><br>ACUSHNET COMPANY,<br><br>    Defendant. | C.A. No.  05-132 (JJF)<br><br>**REDACTED – PUBLIC VERSION** |

## BRIDGESTONE'S OPENING CLAIM CONSTRUCTION BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (# 1014)
Maryellen Noreika (# 3208)
Leslie A. Polizoti (# 4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
  *Attorneys for Bridgestone Sports Co., Ltd.*
  *and Bridgestone Golf, Inc.*

OF COUNSEL:

Robert M. Masters
Scott M. Flicker
Terrance J. Wikberg
Brandon M. White
PAUL, HASTINGS, JANOFSKY & WALKER LLP
875 15th St., N.W.
Washington, DC  20005
(202) 551-1700

Original Filing Date:  November 2, 2006

Redacted Filing Date:  November 2, 2006

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES                                                                    ii

I.      NATURE AND STAGE OF THE PROCEEDING                                              1

II.     SUMMARY OF ARGUMENT                                                             1

III.    STATEMENT OF FACTS                                                              2

        A.      BACKGROUND OF THE TECHNOLOGY                                            2

        B.      THE TECHNOLOGY AT ISSUE                                                 3

IV.     ARGUMENT                                                                        5

        A.      GENERAL PRINCIPLES OF CLAIM CONSTRUCTION                                5

        B.      THE BRIDGESTONE PATENTS-IN-SUIT AND CLAIM CONSTRUCTION
                ISSUES                                                                  8

        C.      THE ACUSHNET PATENTS-IN-SUIT AND CLAIM CONSTRUCTION
                ISSUES                                                                  26

V.      CONCLUSION                                                                      37

## TABLE OF AUTHORITIES

Page

## Cases

*Abbott Labs. v. Baxter Pharm. Prods.*
    334 F.3d 1274 (Fed. Cir. 2003) ...................................................................................... 9

*ACTV, Inc. v. Walt Disney Co.*
    346 F.3d 1082 (Fed. Cir. 2003) ...................................................................................... 5

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*
    314 F.3d 1313 (Fed. Cir. 2003) ...................................................................................... 5

*Atofina v. Great Lakes Chem. Corp.*
    441 F.3d 991 (Fed. Cir. 2006) ........................................................................................ 5

*CCS Fitness, Inc. v. Brunswick Corp.*
    288 F.3d 1359 (Fed. Cir. 2002) ...................................................................................... 6

*Chef America, Inc. v. Lamb-Weston, Inc.*
    358 F.3d 1371 (Fed. Cir. 2004) .................................................................................... 35

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*
    438 F.3d 1374 (Fed. Cir. 2006) .................................................................................... 21

*Dow Chem. Co. v. Sumitomo Chem. Co.*
    257 F.3d 1364 .................................................................................................................. 7

*Electro Scientific Indus., Inc. v. Dynamic Details, Inc.*
    307 F.3d 1343 (Fed. Cir. 2002) ........................................................................... 6, 14, 37

*Ferguson Beauregard/Logic Controls, Div. of Dover Resources, Inc. v. Mega Sys., LLC*
    350 F.3d 1327 (Fed. Cir. 2003) ...................................................................................... 7

*Hoganas AB v. Dresser Indus.*
    9 F.3d 948 (Fed. Cir. 1993) .......................................................................................... 35

*Intel Corp. v. VIA Techs., Inc.*
    319 F.3d 1357 (Fed. Cir. 2003) ...................................................................................... 7

*Inverness Med. Switz. GmbH v. Warner Lambert Co.*
    309 F.3d 1373 (Fed. Cir. 2002) ...................................................................................... 6

*KCJ Corp. v. Kinetic Concepts, Inc.*
    223 F.3d 1351 (Fed. Cir. 2000) ...................................................................................... 9

*Liebel-Flarsheim Co. v. Medrad, Inc.*
    358 F.3d 898 (Fed. Cir. 2004) .................................................................................. 20, 22

## TABLE OF AUTHORITIES

Page

*Markman v. Westview Instruments, Inc.*
    52 F.3d 967 (Fed. Cir. 1995), aff'd 517 U.S. 370 (1996)...........................................6, 7

*Merck & Co. v. Teva Pharms. USA, Inc.*
    395 F.3d 1364 (Fed. Cir. 2005) .........................................................................11

*Modine Mfg. Co. v. I.T.C.*
    75 F.3d 1545 (Fed. Cir. 1996)........................................................................11, 14

*Multiform Desiccants, Inc. v. Medzam, Ltd.*
    133 F.3d 1473 (Fed. Cir. 1998) ...........................................................................6

*Novartis Pharms. Corp. v. Eon Labs Mfg., Inc.*
    215 F. Supp. 2d 452 (D. Del. 2002) .....................................................................12

*Pall Corp. v. Micron Separations*
    66 F.3d 1211 (Fed Cir. 1995).........................................................................11, 12

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*
    429 F.3d 1364 (Fed. Cir. 2005) ...........................................................................6

*Phillips v. AWH Corp.*
    415 F.3d 1303 (Fed. Cir. 2005).......................................................................5, 6, 7

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*
    242 F.3d 1337 (Fed. Cir. 2001) ...........................................................................6

*Vanderlande Indus. Nederland BV v. I.T.C.*
    366 F.3d 1311 (Fed. Cir. 2004) ...........................................................................5

*Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*
    212 F.3d 1377 (Fed. Cir. 2000) .........................................................................15

*Vitronics Corp. v. Conceptronic, Inc.*
    90 F.3d 1576 (Fed. Cir. 1996)).........................................................................5, 7

*Voice Techs. Group, Inc. v. VMC Sys., Inc.*
    164 F.3d 605 (Fed. Cir. 1999).........................................................................33

*W.E. Hall Co. Inc. v. Atlanta Corrugating, LLC*
    370 F.3d 1343 (Fed. Cir. 2004).......................................................................5, 20

*Warner-Lambert Co. v. Apotex Corp.*
    316 F.3d 1348 (Fed. Cir. 2003).........................................................................34

**Statutes**

35 U.S.C. §112                                                   34

## I.     NATURE AND STAGE OF THE PROCEEDING

This is a patent infringement action between Plaintiffs Bridgestone Sports Co., Ltd., and Bridgestone Golf, Inc. ("Bridgestone") and Defendant Acushnet Company ("Acushnet"). A *Markman* hearing has been scheduled for November 29, 2006. The parties filed a Joint Claim Construction Statement (D.I. 228), which includes a number of agreed-upon definitions for terms in the asserted claims. Bridgestone submits this brief seeking constructions of terms that remain in dispute.

## II.     SUMMARY OF ARGUMENT

Bridgestone seeks constructions of disputed terms in the following five Bridgestone patents: (1) U.S. Patent No. 5,252,652 ("the '652 Patent," Ex. A); (2) U.S. Patent No. 5,553,852 ("the '852 Patent," Ex. B); (3) U.S. Patent No. 5,743,817 ("the '817 Patent," Ex. C); (4) U.S. Patent No. 6,679,791 ("the '791 Patent," Ex. D); and (5) U.S. Patent No. 6,634,961 ("the '961 Patent," Ex. E).

Bridgestone also seeks constructions of disputed terms in the claims of four asserted Acushnet patents: (1) U.S. Patent No. 4,729,861 ("the '861 Patent," Ex. F); (2) U.S. Patent No. 4,936,587 ("the '587 Patent," Ex. G); (3) U.S. Patent No. 5,080,367 ("the '367 Patent," Ex. H); and (4) U.S. Patent No. 6,818,705 ("the '705 Patent," Ex. I).

The disputed terms to be construed, along with each party's proposed constructions for those terms, are set forth in the Joint Claim Construction Statement (D.I. 228).

Bridgestone's proposed constructions rely primarily on the intrinsic record of the respective patents. This approach is mandated by Federal Circuit precedent. It also makes sense with respect to these particular terms, because each is either used according to its plain and ordinary meaning, or is readily discernible from the context of the claim of the intrinsic evidence. These terms contain no ambiguity that requires the Court to resort to extrinsic evidence to construe them.

In contrast, Acushnet's proposed definitions consistently violate fundamental principles of claim construction. Acushnet disregards actual claim language and improperly imports details that are either taken from particular embodiments of the invention described in the patent's specification or are

simply made up.  Acushnet also fashions definitions by pulling otherwise clear claim language out of context and paraphrasing it in a manner contradicted by the intrinsic evidence.  This yields definitions unrepresentative of the fair scope of the respective patent claims.

## III.    STATEMENT OF FACTS

### A.    BACKGROUND OF THE TECHNOLOGY

#### 1.    History of Bridgestone

Bridgestone was founded in 1931, and began producing golf balls in 1935.  Over the next 70 years, Bridgestone developed into an elite manufacturer of golf balls, and today designs and manufactures a full range of technologically advanced golf balls sold worldwide.

Through its advanced technology and manufacturing quality, Bridgestone has garnered a substantial market share of the highly competitive Japanese golf ball market.  Further, through its U.S. operations, which employ almost two hundred people, Bridgestone has established a growing market share of the U.S. market.

Bridgestone's technology has been recognized worldwide, and it has been rewarded with hundreds of U.S. patents on golf ball technology.  Seven of these patents are the subject of this litigation.

#### 2.    History of Golf Ball Technology

Golf balls have been manufactured in many different forms over the past 500 years, including solid wood balls, hand-sewn leather bags stuffed with feathers, and balls molded in one piece from tree sap.  In 1898, the first ball that approximates a modern construction appeared.  It was made of a central rubber core, a layer of high-tension rubber thread wound around the core, and a cover.  Due to the layer of wound rubber thread, this type of ball popularly became known as a "wound" ball.

"Wound" ball technology dominated the marketplace almost until the end of the 20th century.  As a result, many manufacturers heavily invested in development of "wound" constructions, and made large capital investments in machinery to produce these balls.  Acushnet, in fact, was generally

known in the industry as the "wound ball company." However, as often happens, these investments were soon brought into question by a paradigm shift in ball construction.

This shift began in the early 1990's, when Bridgestone led the way in providing a new kind of golf ball – one in which a solid rubber core (of one or multiple layers) replaced the combination of a small central rubber core and layer of high-tension rubber thread. Additionally, either a single-layer cover (*e.g.*, FIG. 1), or a double-layer cover (*e.g.*, FIG. 2), was placed directly on the solid rubber core. This new kind of ball became known as a "solid" core golf ball (hereinafter "solid ball"), and was successfully brought to market by Bridgestone with its "Altus Newing" line of balls. The "Altus Newing" line quickly became very popular, and set the standard of solid ball construction for years to come.



**FIG. 1**

**FIG. 2**

The replacement of the high-tension rubber thread in the wound ball provided improved manufacturability and performance. For example, the manufacturing cost of golf balls was reduced due to the elimination of winding machinery. Ex. I, col. 1:31-49. Further, solid balls fly much farther than wound balls, while maintaining the other desirable characteristics of wound balls – providing, as an Acushnet corporate designee admitted, the          REDACTED

**B.    THE TECHNOLOGY AT ISSUE**

The technology at issue in this litigation deals with golf ball construction. Bridgestone's patents can be generally divided into two categories.

Bridgestone's '652 (Ex. A) and '961 Patents (Ex. E) are related to specific materials used within the cores of solid golf balls and the synergistic effect of providing those cores in solid balls.

Bridgestone's '852 (Ex. B), '817 (Ex. C), and '791 (Ex. D) Patents are directed to specific physical characteristics, and the synergistic effect therebetween, of various cores, intermediate layers, and/or covers of solid balls. With respect to these patents, there is often no direct relationship between the variance of one particular physical characteristic of a ball layer and ball performance. In other words, a change in one layer that has a positive performance effect in one ball construction might undermine other aspects of performance in another ball. Thus, when designing a new golf ball, it is often necessary to explore the effects of simultaneous variation of many physical characteristics of ball layers to improve overall ball performance.

Bridgestone's patents-in-suit discuss different aspects of ball performance. For example, performance can be quantified by:

- a ball's "initial velocity," or its initial speed as it leaves a club face after being struck. A higher initial velocity usually translates into a ball that travels farther;

- a ball's "spin," or the amount the ball rotates after being struck. Higher spin rates usually translate into a ball that has more reaction to the manner in which it is struck;

- a ball's "durability," or the number of times that a ball can be struck before the ball fails; and

- how a ball "feels" to a user, i.e., whether the ball is "soft" or "hard" when struck.

Each of these aspects of performance needs to be independently "tuned" for different skill levels and personal preferences. For example, a professional player might best be matched with a high-spin ball with an initial velocity tuned for a high swing speed, while a beginning player might best be matched with a low-spin ball having an initial velocity tuned for a low swing speed.

Acushnet's patents-in-suit can also generally be placed in two categories. Acushnet's '861 (Ex. F), '587 (Ex. G), and '367 (Ex. H) Patents are directed to very specific dimple configurations used on golf balls, and Acushnet's '705 Patent (Ex. I) is directed to materials used in cores of solid balls.

The remaining facts are set forth below, in the Argument section.

## IV.    ARGUMENT

### A.    GENERAL PRINCIPLES OF CLAIM CONSTRUCTION

Claim construction is a matter of law to be determined by the Court, while applying certain well-established principles. The claims of a patent serve to define the scope, or metes and bounds, of an invention. *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1324 (Fed. Cir. 2003). The goal of construing patent claims is not to rewrite the claims, but to explain, where necessary, how the terms chosen by the patentee would have been understood by one of ordinary skill reading the patent. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).

#### 1.    Intrinsic Evidence

When construing a claim, the Court should primarily focus on the intrinsic evidence related to the particular patent, which includes the language of the claims, the patent specification (including the drawings) and the prosecution history. *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 996 (Fed. Cir. 2006). Such "'intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language.'" *Vanderlande Indus. Nederland BV v. I.T.C.*, 366 F.3d 1311, 1318 (Fed. Cir. 2004) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

The claim construction inquiry begins and ends with the actual words of the claims. *W.E. Hall Co. Inc. v. Atlanta Corrugating, LLC*, 370 F.3d 1343, 1353 (Fed. Cir. 2004). The words of a claim "'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics*, 90 F.3d at 1582). The ordinary and customary meaning of a claim term is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Id.* at 1313. The claims themselves provide "substantial" guidance as to the meaning of claim terms. *Id.* at 1314. The context of the surrounding words of the claim (and other claims) must also be considered. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003); *Vitronics*, 90 F.3d at 1582. The

claims must be read in light of the specification, the "'single best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582).

The person of ordinary skill in the art is also deemed to read the claim term not only in the context of the claim in which the term appears, but in the context of the entire patent, including the specification. *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998). Indeed, the Federal Circuit has indicated that the specification is always highly relevant to a claim construction analysis, is the single best guide to the meaning of a term, and is usually dispositive. *Phillips*, 415 F.3d at 1313-14. In this regard, the specification may reveal a special definition given to a claim term by the patentee, or may reveal an intentional disclaimer, or disavowal, of claim scope. In either case, the patentee's lexicography or disclaimer governs. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001).

This does not mean, however, that the specific examples or embodiments contained in the specification can be converted into claim limitations, because "particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments." *Electro Scientific Indus., Inc. v. Dynamic Details, Inc.*, 307 F.3d 1343, 1349 (Fed. Cir. 2002) (quoting *Electro Med. Sys. S.A. v. Cooper Life Sci.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994). Nevertheless, a "claim construction that excludes a preferred embodiment . . . is 'rarely, if ever, correct.'" *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1374 (Fed. Cir. 2005) (internal citations omitted).

In addition to consulting the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

The Federal Circuit, however, has cautioned that, while the prosecution history may provide evidence of how the PTO and the inventor understood the patent, it often lacks the clarity of the specification and thus is less useful for claim construction purposes. *Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380-82 (Fed. Cir. 2002). Nonetheless, the prosecution history is

informative of the meaning of claim language by demonstrating how the inventor understood the invention and whether the inventor limited the claim scope in the course of prosecution. *Vitronics*, 90 F.3d at 1582-83.

### 2.     Extrinsic Evidence

The Federal Circuit has authorized, when necessary, the review of extrinsic evidence to construe a term. This extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Such extrinsic evidence, however, is generally considered less reliable than the patent and its prosecution history. Although it may be useful to the court, it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence. *Phillips*, 415 F.3d at 1317. In any event, extrinsic evidence cannot be used to contradict a claim meaning that is unambiguous in light of the intrinsic evidence. *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003).

Further, the Court should exercise caution when using non-technical dictionaries with respect to technical terms, "'lest dictionary definitions. . .be converted into technical terms of art having legal, not linguistic significance.'" *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1372-73 (internal citation omitted). Moreover, "dictionary definitions, while reflective of the ordinary meanings of words, do not always associate those meanings with context or reflect the customary usage of words by those skilled in a particular art." *Ferguson Beauregard/Logic Controls, Div. of Dover Resources, Inc. v. Mega Sys., LLC*, 350 F.3d 1327, 1338 (Fed. Cir. 2003).

B.    THE    BRIDGESTONE    PATENTS-IN-SUIT    AND    CLAIM
CONSTRUCTION ISSUES

1.    The '652 Patent

a.    General Description Of The '652 Patented Invention

The '652 Patent (Ex. A) is generally directed
toward materials used in the core of a solid ball to improve initial
velocity and rebound performance.  The inventors discovered that
adding an organic sulfur compound and/or a metal-containing
organic sulfur compound to the rubber material from which the core
(23) is formed improves initial velocity and flying performance of
the resultant golf ball (ball 21 with cover 25). Ex. A, col. 1:43-57.



**FIG. 2**

Bridgestone asserts claims 1, 5 and 9 of the '652 Patent.  The parties disagree about the proper
construction of the terms in claim 1 emphasized below:

> 1. A solid golf ball, having an improved rebound property and initial
> velocity, comprising a rubber composition containing 100 parts by
> weight of a base rubber selected from the group consisting of
> polybutadiene rubber, natural rubber, polyisoprene rubber and styrene-
> butadiene rubber, about 25 to about 40 parts by weight of a zinc or
> magnesium salt of an unsaturated fatty acid having 3 to 8 carbon atoms,
> about 0.05 to about 2 parts by weight of a sulfur compound selected from
> the group consisting of pentachlorothiophenol, 4-t-tubyl-o-thiocresol, 4-
> t-butyl-p-thiocresol, 2-benzamidothiophenol, thiobenzoic acid, and zinc
> salts thereof, and about 0.5 to about 3 parts by weight of an organic
> peroxide.

b.    "A Base Rubber Selected From The Group
Consisting Of ..."

Bridgestone proposes that the term "a base rubber selected from the group consisting of
polybutadiene rubber, natural rubber, polyisoprene rubber, and styrene-butadiene rubber" be afforded its
plain and ordinary meaning, because no special definition of this term has been advanced in the claims,
specification or prosecution history.

Here, the disputed term is in the form of a "Markush group." A "Markush group"
provides "a listing of specified alternatives of a group …, typically expressed in the form: a member

selected from the group consisting of A, B, and C." *Abbott Labs. v. Baxter Pharm. Prods.,* 334 F.3d 1274, 1280 (Fed. Cir. 2003). Thus, this term indicates what a "base rubber" used in the claimed golf ball can be made of, but does not modify the term "base rubber" itself. In this respect, the language is simple and clear, namely, that "a base rubber" can be any of the types of the rubbers listed in this Markush group.

In contrast, Acushnet contends that "[t]he use of 'consisting of' in this claim means that one and only one base rubber selected from the group of polybutadiene rubber, natural rubber, polyisoprene rubber, and styrene-butadiene rubber." Acushnet's definition is confusing, but seems to attempt to either limit the claimed "rubber composition" to "one and only one base rubber," or to limit the "base rubber" to only a single one of the listed rubbers (*i.e.*, only one of polybutadiene rubber, natural rubber, polyisoprene rubber, and styrene-butadiene rubber). Neither of these asserted limitations is proper, because they are inconsistent with the claims, specification, and prosecution history of the '652 Patent.

No proper reading of claim 1 would indicate that "a base rubber" is limited to "one and only one base rubber." Claim 1 recites "[a] solid golf ball, … comprising a rubber composition containing 100 parts by weight of a base rubber…" (emphasis added). According to the Federal Circuit, "an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) (citations omitted). Here, the indefinite article "a" precedes both the recited "base rubber," and the recited "rubber composition" (of which the base rubber is a part). Further, the claim utilizes the open-ended transitional terms "comprising" and "containing."[1] Thus, Acushnet's proffered construction is inconsistent with the clear claim language and established principles of claim construction.

---

[1]    "[L]ike the term 'comprising,' the claim term 'containing' is open-ended." *Mars, Inc. v. H.J. Heinz Co., L.P.*, 377 F.3d 1369, 1377 (Fed. Cir. 2004).

Further, no proper reading of claim 1 would indicate that the "base rubber" be limited to only one of polybutadiene rubber, natural rubber, polyisoprene rubber, and styrene-butadiene rubber, as interpreting claim 1 in such a manner would be inconsistent with the plain language of dependent claims 9 and 10. Claims 9 and 10 explicitly provide for a base rubber that includes poly(1,4-butadiene) rubber blended with a natural rubber, a polyisoprene rubber, or a styrene-butadiene rubber. Claim 9 recites that "said base rubber comprises at least 80% by weight of said poly(1,4-butadiene) rubber," and claim 10 recites that "said poly(1,4-butadiene) rubber is blended with a natural rubber, a polyisoprene rubber of a styrene-butadiene rubber."

The specification of the '652 Patent also contradicts the construction asserted by Acushnet. The specification discusses base rubbers at length, and expressly discloses that the rubbers may be blends of different types of rubbers. Ex. A, col. 2:29-32. The '652 Patent also indicates that multiple rubbers can be added together to form a "base rubber," such as blends of poly(cis-1,4-butadiene) and poly(cis-isoprene) in the examples of cores in Table 1. As an example, in Core No. 2 in Table 1, a base rubber is a blend of 90 parts by weight of poly(cis-1,4-butadiene) and 10 parts by weight of poly(cis-isoprene).

Accordingly, one of ordinary skill would have understood this claim language to mean a base rubber selected from polybutadiene rubber, natural rubber, polyisoprene rubber and styrene-butadiene rubber, and including blends of the same rubbers (*e.g.*, claim 9 and 10), such that all these types of rubber can be included in a base rubber. Acushnet's narrow reading is inconsistent with the intrinsic evidence, and should be rejected.

### c.     "About"

Bridgestone proposes that the word "about" be construed according to its plain and ordinary meaning as "approximately, in the stylistic and technological context in which it is used." *See*

*Pall Corp. v. Micron Separations*, 66 F.3d 1211, 1217 (Fed Cir. 1995).[2]  The Federal Circuit has also instructed that when "about" is used in conjunction with ranges, as it is in claim 1, it "avoids a strict numerical boundary to the specified parameter." *Id.* at 1217.  The claims, specification, and file history of the '652 Patent are consistent with such a construction.

       In contrast, Acushnet proposes that the term "about" be construed as "approximately, as would be understood by those skilled in the art to mean the precision with which the quantity the term is used to modify can be measured."  Acushnet seeks to narrow the numerical ranges of the materials of claim 1 modified by "about" to the tolerance or variance of some unknown measuring device(s) or scale(s).  Such a construction adds a <u>new</u> limitation – one not contemplated in the patent specification – that represents an undefined quantitative measuring variance related to unspecified measuring scales.  Such a new limitation is both unsupported by and inconsistent with the intrinsic record.

       Claim 1 recites the term "about" six times in conjunction with numerical ranges for amounts of core ingredients ("about 25 to about 40 parts by weight of a zinc or magnesium salt," "about 0.05 to about 2 parts by weight of a sulfur compound," and "about 0.5 to about 3 parts by weight of an organic peroxide").  However, neither claim 1 nor any dependent claims ascribe any specific or unique definition for "about," let alone any indication that it should be defined in conjunction with measuring precision as Acushnet argues.

       Further, the ranges recited in claim 1 specify precision to different degrees (*i.e.*, ones, tenths, and hundredths parts by weight).  Thus, the intrinsic evidence demonstrates that the inventors ably defined parts by weight to a precision, but chose not to claim all limits of all ranges in that manner.  If the inventors had intended to define a more precise limit in, for example, the upper range for "organic peroxide," they could have written "about 3" to be "about 3.0" or "about 3.00," or simply not used the

---

[2]   *See also Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1369 (Fed. Cir. 2005) (regarding the term 'about', "such term should be given its ordinary meaning of 'approximately'"); *Modine Mfg. Co. v. I.T.C.*, 75 F.3d 1545, 1554 (Fed. Cir. 1996) ("[a]lthough it is rarely feasible to attach a precise limit to 'about,' the usage can usually be understood in light of the technology embodied in the invention") (citations omitted).

word "about." They did not do this, and Acushnet should not now be able to restrict the claim to something never intended by the inventors.

       The specification of the '652 Patent also does not define the term "about." Rather, it uses this term in conjunction with various ranges for the core ingredients in a similar fashion as in claim 1. Ex. A, col. 2:48 – col. 3:24. The term "about" is not used on any manner inconsistent with its plain and ordinary meaning.

       Bridgestone submits that "about" be construed according to its plain and ordinary meaning as "approximately, in the stylistic and technological context in which it is used" consistent with Federal Circuit precedent. *Pall Corp.*, 66 F.3d at 1217.[3]

### 2.    The '852 Patent

       The '852 Patent (Ex. B) is directed to a solid ball with a relatively hard intermediate layer (2) between a center core (1) and a cover (3), and to balancing the specific gravity of the respective layers. By providing a golf ball with such features, the center core (1) and cover (3) can be made relatively soft, and the golf ball will have improved feeling and controllability, without any corresponding deterioration of flying performance and durability. Ex. B, col. 1:65-2:2 and col. 2:48-56.



       Bridgestone asserts claims 1, 6 and 7 of the '852 Patent. The parties disagree about the proper construction of the terms in claim 1 <u>emphasized</u> below:

---

[3]    Although Bridgestone does not believe further definition is necessary, this Court has previously determined that "about," when used in the context of a range, "should be given its ordinary meaning in a mathematical context, whereby decimals are rounded up or down to the nearest integer [or significant digit] according to numeric value." *Novartis Pharms. Corp. v. Eon Labs Mfg., Inc.*, 215 F. Supp. 2d 452, 456-57 (D. Del. 2002). Applied here, for example, the range in claim 1 of "about 0.05 to about 2 parts by weight of a sulfur compound" would include within its literal scope 0.046 to 2.5 parts by weight of sulfur compound.

1. A three-piece solid golf ball comprising; a center core, an intermediate layer, and a cover enclosing the core through the intermediate layer, said center core having a diameter of at least 29 mm and a specific gravity of less than 1.4, said intermediate layer having a thickness of at least 1 mm, a specific gravity of less than 1.2, and a hardness of at least 85 on JIS C scale, the specific gravity of said intermediate layer being lower than the specific gravity of said center core, and said cover having a thickness of 1 to 3 mm and being softer than said intermediate layer.

Bridgestone proposes that the terms "a thickness of at least 1 mm" and "a thickness of 1 to 3 mm" be afforded their plain and ordinary meaning, as no special definitions have been advanced in the claims, specification or prosecution history of the '852 Patent. Both the claims and the specification indicate that the thickness of the intermediate layer is "at least 1 mm," and that the thickness of the cover is "1 mm" to "3 mm." Ex. B, col. 3:32-33; and 60-62. No portion of the prosecution history discusses what the terms "at least 1 mm" or "a thickness of 1 to 3 mm" mean.

These terms are also recitations that are clearly understood by one of ordinary skill in the art. They are not technical terms, or terms whose meanings were somehow altered or redefined in the specification. The terms are part of daily parlance and require no construction.

In contrast, Acushnet proposes that "a thickness of at least 1 mm" be construed as "a thickness that is no less than 1.0 mm," and that "a thickness of 1 to 3 mm" be construed as "a thickness that is no less than 1.0 mm and is no greater than 3.0 mm." Acushnet's definitions seek to redefine two parts of each term.

The first change ("at least" to "no less than" and "to" to "is no less than... and is no greater than") is not only unnecessary rewording, but also limits the scope of the claim in a manner inconsistent with the intrinsic record. Acushnet's attempt to change the language "1 to 3 mm" to "a thickness that is no less than 1.0 mm and is no greater than 3.0 mm" represents an attempted narrowing, as there is no equivalence between "to" and the boundary language proposed by Acushnet. In other words, a thickness could be under 1 mm or over 3 mm and still satisfy the claim language of "1 to 3 mm," based on the context in which this limitation appears in the '852 Patent. But, adding words such as "no less than" or "no greater than" emphasizes a more precise boundary where none was intended.

The second change ("1 mm" to "1.0 mm" and "3 mm" to "3.0 mm") improperly seeks to impart a level of numerical precision not contemplated by claim 1. Claim 1 recites an "intermediate layer having a thickness of at least 1 mm" and a "cover having a thickness of 1 to 3 mm." Thus, the precision specified in the claim, and intended by the inventors, for these thicknesses are "1 mm" and "3 mm," not the more precise "1.0 mm" and "3.0 mm" which Acushnet seeks to force into these terms. In fact, this forced precision has been specifically disapproved of by the Federal Circuit, which has stated that "[i]t is usually incorrect to read numerical precision into a claim from which it is absent." *Modine Mfg. Co.*, 75 F.3d at 1551.

Further, in other parts of claim 1, values with more precise numerical ranges are recited, demonstrating that additional precision was used by the inventors when desired. For example, the inventors elected to recite the specific gravity in claim 1 to values of tenths ("a specific gravity of less than 1.4"). Thus, the plain language of the claim reveals that the inventors did not intend to provide the precision to the thicknesses of the intermediate layer and cover, and the claim should not be rewritten as Acushnet asks this Court to do.

Second, the specification also discloses thicknesses of the cover and intermediate layer measured to the nearest whole millimeter, such as "1 mm" and "3 mm," just as the respective thicknesses are recited in the claims. Ex. B, col. 3:32-33; and 60-62. Further, the specification indicates, in various exemplary embodiments, thicknesses measured to the tenths (*e.g.*, in Table 2, Example 1, an intermediate layer thickness is 3.4 mm and a cover thickness is 2.2 mm). Ex. B, cols. 5-6. Thus, the inventors' use of numbers to different levels of precision in the '852 Patent demonstrates that they did not seek to specify such a level of precision in the claims. Instead, the claims are intentionally drafted more broadly than the specific exemplary embodiments. *See Electro Scientific Indus.*, 307 F.3d at 1349.

Acushnet's proffered constructions are inconsistent with the intrinsic evidence related to the '852 Patent. As the intrinsic evidence does not afford any special meaning to the terms "a thickness of at least 1 mm," and "a thickness of l to 3 mm," these terms should be afforded their plain and ordinary meaning.

### 3.    The '817 Patent

The '817 patent is directed to a golf ball having a core (12) with certain distortions under a 100 kg load and a cover (13) having a certain thickness and hardness. Ex. C, col. 1:34-45. A ball made according to this arrangement provides an improved feel, along with better spin properties and iron control, without detracting from the ball's trajectory and flying distance. Ex. C, col. 2:5-10.



Bridgestone asserts claim 1 of the '817 patent. The parties disagree about the proper construction of the term <u>emphasized</u> below:

> 1. A golf ball comprising a core and a cover wherein said core and said ball has a core hardness and a ball hardness respectively, wherein said core has a distortion of 2.9 to 4.0 mm under a load of 100 kg, the ratio of a core distortion under a load of 100 kg divided by a ball distortion under a load of 100 kg ranges from 1.0 to 1.3, and <u>said cover consists of an ionomer resin as a resin component</u> and has a thickness of 1.3 to 1.8 mm and a Shore D hardness of up to 60.

Bridgestone proposes that the phrase "said cover consists of an ionomer resin as a resin component" be construed as "the resin component[4] in the cover is ionomer resin," a construction entirely consistent with the intrinsic evidence related to the '817 patent.

In patent law, the term "consists of" is a term of art used to signify a "closed" list. *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1382-83 (Fed. Cir. 2000). Here, the group that is a "closed" list is the elements that form the "resin component" of the golf ball's cover. In other words, the "resin component" of the golf ball cover can only be "ionomer resin" (as opposed to non-ionomeric resin). When reading this claim term in its entirety and in the context of the specification, the

---

[4]    The "resin component" does not include other components of a cover, *e.g.*, colorants or fillers.

proper construction of this term is "the resin component in the cover is ionomer resin." Nothing in the specification or prosecution history leads to a different construction.

On the other hand, Acushnet proposes that "'consists of' means that the resin component of the cover includes only one ionomer resin and excludes other resins or blends of ionomer resins." This proposed construction attempts to narrow the scope of this claim to something akin to "the cover is entirely formed from a single ionomer resin type." Such a construction, however, is not what is claimed and is inconsistent with the intrinsic record. Indeed, Acushnet's proposed construction would exclude every single exemplary embodiment disclosed in the '817 patent because each of these embodiments comprises a blend of two ionomer resin types to form the cover. Ex. C, col. 5:16-42 and Table 2. That is entirely inconsistent with established Federal Circuit precedent, which holds that if a claim construction would result in the only "embodiment in the specification … not [falling] within the scope of the patent claim[, s]uch an interpretation is rarely, if ever, correct and would require highly persuasive evidentiary support." *Vitronics*, 90 F.3d at 1583. Such persuasive evidentiary support is absent here.

Similarly, Acushnet's proposal is inconsistent with the prosecution history. During prosecution, claim 1 was amended to include the recitation that the cover "consists of an ionomer resin as a resin component." Ex. K at p.1. In this Amendment, the inventors stated that this language was supported by the examples of the Application, thus demonstrating that the amendment was intended to cover the embodiments that Acushnet's construction would exclude. Ex. K at p.2.

The term "said cover consists of an ionomer resin as a resin component" should be construed as "the resin component in the cover is ionomer resin."