# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRIDGESTONE SPORTS CO., LTD.,  )
and BRIDGESTONE GOLF, INC.,    )
                               )
        Plaintiffs,            )
                               )
    v.                         )    C.A. No. 05-132 (JJF)
                               )
ACUSHNET COMPANY,              )
                               )
        Defendant.             )

## BRIDGESTONE'S REQUESTS FOR ADMISSION TO ACUSHNET

Pursuant to Fed. R. Civ. P. 36, Plaintiffs Bridgestone Sports Co., Ltd. and Bridgestone

Golf, Inc. (collectively, "Bridgestone") hereby request that Acushnet Co. ("Acushnet") admit the

truth of the matters set forth below in writing and under oath, by serving written responses on the

offices of Paul, Hastings, Janofsky & Walker LLP, 875 15th Street, NW, Washington, DC

20005, within thirty (30) days from the date of service. Responses must satisfy the requirements

of Fed. R. Civ. P. 36(a).

## DEFINITIONS

The Definitions contained in Bridgestone's First Set of Interrogatories to Acushnet are

incorporated by reference and shall apply to each one of these Requests for Admission. In

addition, the following definitions apply to these Requests for Admission:

40.    The term "Pro V1 Family" means each make, model and revision of the Pro V1

golf ball made, used, offered for sale, or sold since at least 2000, including, but not limited to,

golf balls having the following sidestamps: Pro V1 392, Pro V1 392 (stretched), ◄Pro

V1•392►, ◄•Pro V1 392•► and ◄Pro V1-392►, and any other golf ball made, used or sold by Acushnet having a construction substantially the same as these golf balls.

41.     The term "Pro V1x Family" means each make, model and revision of the Pro V1x golf ball made, used, offered for sale, or sold since at least 2002, including, but not limited to, golf balls having the following sidestamps: ◄•Pro V1x 332•► and ◄Pro V1x-332►, and any other golf ball made, used or sold by Acushnet having a construction substantially the same as these golf balls.

42.     The term "Pro V1* Family" means each make, model and revision of the Pro V1* golf ball made, used, offered for sale, or sold since at least 2001, including, but not limited to, golf balls having the following sidestamp: ◄Pro V1* 392►, and any other golf ball made, used or sold by Acushnet having a construction substantially the same as these golf balls.

43.     The term "NXT Family" means each make, model and revision of the NXT golf ball made, used, offered for sale, or sold since at least 2002, including, but not limited to, golf balls having the following sidestamps: ◄NXT►, ◄N-X-T► and ◄-NXT-►, and any other golf ball made, used or sold by Acushnet having a construction substantially the same as these golf balls.

44.     The term "NXT Tour Family" means each make, model and revision of the NXT Tour golf ball made, used, offered for sale, or sold since at least 2001, including, but not limited to, golf balls having the following sidestamps: ◄NXT Tour►, ◄N-X-T Tour► and ◄NXT-Tour►, and any other golf ball made, used or sold by Acushnet having a construction substantially the same as these golf balls.

45.     The term "DT Solo Family" means each make, model and revision of the DT SoLo golf ball and PTS SoLo golf ball made, used, offered for sale, or sold since at least 2002,

including, but not limited to, golf balls having the following sidestamps: ◀PTS So/Lo▶ (PTS / in red) (◀▶ So Lo in blue); ◀PTS-So/Lo▶ (PTS / in red) (◀▶ So Lo in blue); ◀DT So/Lo▶ (DT / in red) (◀▶ So Lo in blue); and ◀DT-So/Lo▶ (DT / in red) (◀▶ So Lo in blue); DT So/Lo (DT / in red) (So Lo in blue), and any other golf ball made, used or sold by Acushnet having a construction substantially the same as these golf balls.

46.     The term "Exception Family" means each make, model and revision of the Pinnacle Exception golf ball made, used, offered for sale, or sold since at least 2002, including, but not limited, to golf balls having the following sidestamps:  Pinnacle Exception with airfoil logo in blue/black, and any other golf ball made, used or sold by Acushnet having a construction substantially the same as these golf balls.

47.     The terms "core," "inner core," "outer core," "inner cover," and "cover" have the meanings attributed to them by Acushnet's Manufacturing Guidelines (see, *e.g.*, AB 0015274-0015290; AB 0015304-0015320; AB 0015338-0015355; AB 0015374-0015390; AB 0015471-0015497; AB 0015563-0015617 and AB 0086603-0086638).

### REQUESTS FOR ADMISSIONS

1.     Admit that golf balls in the NXT Family, the Exception Family, and the DT SoLo Family have a core having a surface hardness as measured by a JIS-C scale hardness meter of 85 degrees or less.

2.     Admit that golf balls in the NXT Family, the Exception Family and the DT SoLo Family have a solid core having a center hardness as measured by a JIS-C scale hardness meter that is lower than the surface hardness of the solid core by between 8 degrees and 20 degrees.

3.     Admit that golf balls in the NXT Family, the Exception Family, and the DT SoLo Family have a core and a cover, where the cover has a hardness as measured by a JIS-C scale hardness meter which is higher than the surface hardness of the core by between 1 and 15 degrees.

4.     Admit that golf balls in the NXT Family, the Exception Family, and the DT SoLo Family have a cover that has a thickness of between 1.5 mm and 1.95 mm.

5.     Admit that golf balls in the NXT Family, the Exception Family and the DT SoLo Family have a solid core having a distortion of 2.8 to 4.0 mm under a load of 100 kg.

6.    Admit that golf balls in the NXT Family, the Exception Family and the DT SoLo Family have a cover having between 360 and 450 dimples thereon.

7.    Admit that golf balls in the NXT Family, the NXT Tour Family, the DT SoLo Family, and the Pinnacle Exception Family have a core having a distortion of 2.9 to 4.0 mm under a load of 100 kg.

8.    Admit that golf balls in the NXT Family, the NXT Tour Family, the DT SoLo Family, and the Pinnacle Exception Family have a core having a distortion of 2.9 to 4.0 mm under a load of 100 kg.

9.    Admit that golf balls in the NXT Family, the NXT Tour Family, the DT SoLo Family, and the Pinnacle Exception Family, have a ratio of core distortion under a load of 100 kg divided by ball distortion under a load of 100 kg in the range of 1.0 to 1.3.

10.    Admit that golf balls in the NXT Family, the NXT Tour Family, the DT SoLo Family, and the Pinnacle Exception Family have a cover made with an ionomer resin.

11.    Admit that golf balls in the NXT Tour Family have a cover having a Shore D hardness less than 60.

12.    Admit that golf balls in the NXT Family, the DT SoLo Family, and the Pinnacle Exception Family have a cover having a thickness of 1.3 to 1.8 mm.

13.    Admit that Acushnet cannot show the exact date that any of the "Wilson Ultra Competition 90" golf balls currently in Acushnet's possession were first obtained by Acushnet.

14.    Admit that all "Wilson Ultra Competition 90" golf balls currently in Acushnet's possession have had a compression measurement performed thereon.

15.    Admit that Acushnet cannot show the exact date that any of the "Wilson Ultra Competition 100" golf balls currently in Acushnet's possession were first obtained by Acushnet.

16.    Admit that all "Wilson Ultra Competition 100" golf balls currently in Acushnet's possession have had a compression measurement performed thereon.

17.    Admit that Acushnet cannot show the exact date that any of the "Precept EV Extra Spin" golf balls currently in Acushnet's possession were first obtained by Acushnet.

18.    Admit that all "Precept EV Extra Spin" golf balls currently in Acushnet's possession have had a compression measurement performed thereon.

19.    Admit that golf balls in the Pro V1 Family, the Pro V1x Family, the Pro V1* Family, the NXT Family, the NXT Tour Family, the Exception Family and the DT SoLo Family have a core made of a base rubber selected from the group consisting of polybutadiene rubber, natural rubber, polyisoprene rubber and styrene-butadiene rubber.

20.    Admit that Pro V1 golf balls having the sidestamp ◄•Pro V1 392•►, have a core made of a rubber composition containing: (1) 100 parts by weight of a base rubber made of polybutadiene rubber; and (2) 25 to 40 parts by weight of a zinc salt of an unsaturated fatty acid having 3 to 8 carbon atoms.

21.    Admit that golf balls in the Pro V1x Family and the Pro V1* Family, and NXT Tour golf balls having the sidestamp ◄NXT-Tour►, have an inner core, an outer core or both made of a rubber composition containing: (1) 100 parts by weight of a base rubber made of

- 4 -

polybutadiene rubber; and (2) 25 to 40 parts by weight of a zinc salt of an unsaturated fatty acid having 3 to 8 carbon atoms.

22.    Admit golf balls in the NXT Family and golf balls in the Exception Family, have a core made of a rubber composition containing: (1) 100 parts by weight of a base rubber made of polybutadiene rubber; and (2) 24.5 to 40 parts by weight of a zinc salt of an unsaturated fatty acid having 3 to 8 carbon atoms.

23.    Admit that golf balls in the Pro V1* Family have an inner core, an outer core or both made of a rubber composition containing: (1) 100 parts by weight of a base rubber made of polybutadiene rubber; and (2) 0.05 to 2 parts by weight of a sulfur compound made of pentachlorothiophenol.

24.    Admit that NXT Tour golf balls having the sidestamp ◄NXT-Tour► have an inner core, an outer core or both made of a rubber composition containing: (1) 100 parts by weight of a base rubber made of polybutadiene rubber; and (2) 0.05 to 2 parts by weight of a sulfur compound made of zinc salt of pentachlorothiophenol.

25.    Admit that golf balls in the DT SoLo Family have a core made of a rubber composition containing: (1) 100 parts by weight of a base rubber made of polybutadiene rubber; and (2) 0.05 to 2 parts by weight of a sulfur compound made of zinc salt of pentachlorothiophenol.

26.    Admit that golf balls in the Exception Family have a core made of a rubber composition containing: (1) 100 parts by weight of a base rubber made of polybutadiene rubber; and (2) 0.05 to 2 parts by weight of a sulfur compound made of zinc salt of pentachlorothiophenol.

27.    Admit that golf balls in the Pro V1 Family, the NXT Family, the DT SoLo Family, and the Exception Family, have a core made of a rubber composition containing: (1) 100 parts by weight of a base rubber made of polybutadiene rubber; and (2) 0.05 to 2.4 parts by weight of a sulfur compound made of zinc salt of pentachlorothiophenol.

28.    Admit that golf balls in the Pro V1x Family and NXT Tour Family have an inner core, an outer core or both made of a rubber composition containing: (1) 100 parts by weight of a base rubber made of polybutadiene rubber; and (2) 0.05 to 2.4 parts by weight of a sulfur compound made of zinc salt of pentachlorothiophenol.

29.    Admit that golf balls in the Pro V1 Family, the Pro V1x Family, the NXT Family, the NXT Tour Family, the Exception Family and the DT SoLo Family have a core, or an inner core, an outer core or both, made of a rubber composition containing: (1) 100 parts by weight of a base rubber made of polybutadiene rubber; and (2) 0.5 to 2.45 parts by weight of a sulfur compound made of zinc salt of pentachlorothiophenol.

30.    Admit that golf balls in the Pro V1 Family, the Pro V1x Family, the NXT Family, the NXT Tour Family and the DT SoLo Family have a core, or an inner core, an outer core or both, made of a rubber composition containing: (1) 100 parts by weight of a base rubber made of polybutadiene rubber; and (2) 0.5 to 2.4 parts by weight of a sulfur compound made of zinc salt of pentachlorothiophenol.

31.    Admit that golf balls in the Pro V1 Family, the Pro V1x Family, the NXT Family, the NXT Tour Family, the Exception Family and the DT SoLo Family have a core, or an inner

core, an outer core or both, made of a rubber composition containing: (1) 100 parts by weight of a base rubber made of polybutadiene rubber; and (2) 0.5 to 2.35 parts by weight of a sulfur compound made of zinc salt of pentachlorothiophenol.

32.    Admit that golf balls in the Pro V1 Family, the Pro V1x Family, the NXT Family, the NXT Tour Family, the Exception Family and the DT SoLo Family have a core, or an inner core, an outer core or both, made of a rubber composition containing: (1) 100 parts by weight of a base rubber made of polybutadiene rubber; and (2) 0.5 to 2.3 parts by weight of a sulfur compound made of zinc salt of pentachlorothiophenol.

33.    Admit that golf balls in the Pro V1 Family, the Pro V1x Family, the NXT Family, the NXT Tour Family, the Exception Family and the DT SoLo Family have a core, or an inner core, an outer core or both, made of a rubber composition containing: (1) 100 parts by weight of a base rubber made of polybutadiene rubber; and (2) 0.5 to 3 parts by weight of an organic peroxide.

34.    Admit that golf balls in the NXT Family, the NXT Tour Family, the Exception Family and the DT SoLo Family have a cover enclosing a core or at least one of an inner core, outer core or combined dual core.

35.    Admit that golf balls in the Pro V1 Family, the Pro V1x Family, and the Pro V1* Family have a cover, and an inner cover between a core, or an inner core, an outer core or both, and the cover.

36.    Admit that a base rubber used in a core or an inner core, an outer core or both of golf balls in the Pro V1 Family, the Pro V1x Family, the Pro V1* Family, the NXT Family, the NXT Tour Family, the Exception Family and the DT SoLo Family is a poly(1,4-butadiene) rubber containing at least 40 mol % of cis-1,4 bond.

37.    Admit that a base rubber used in the core or an inner core, an outer core or both of golf balls in the Pro V1 Family, the Pro V1x Family, the Pro V1* Family, the NXT Family, the NXT Tour Family, the Exception Family and the DT SoLo Family contains at least 80% by weight of poly(1,4-butadiene) rubber.

38.    Admit that none of US Patent 4,556,220, US Patent 4,683,257, US Patent 4,683,257, Japanese Kokai Publication No. 02-92378, the article "Mastication of Rubber" by H. Fries et al., US Patent 4,722,977, GB 2 161 710, US Patent 2,467,789, US Patent 4,955,613, US Patent 4,431,193, US Patent 4,674,751, US Patent 4,848,770, when read singly, explicitly discloses a golf ball made of a rubber composition containing: (1) 100 parts by weight of a base rubber; and (2) about 0.05 to about 2 parts by weight of a sulfur compound of pentachlorothiophenol, 4-t-butyl-o-thiocresol, 4-t-butyl-p-thiocresol, 2-benzamidothiophenol, thiobenzoic acid, or zinc salts thereof.

39.    Admit that Pro V1 golf balls having the sidestamp ◄Pro V1-392► are a multi-piece solid golf ball having a solid core, an inner cover and a cover.

40.    Admit that Pro V1 golf balls having the sidestamp ◄Pro V1-392► have a solid core molded from a rubber composition containing 100 parts by weight of a base rubber that is 20 to 100 wt % of a polybutadiene having a cis-1,4 content of at least 60% and a 1,2 vinyl content of at most 2%.

- 6 -

41.    Admit that Pro V1 golf balls having the sidestamp ◀Pro V1-392▶ have a solid core molded from a rubber composition containing 100 parts by weight of a base rubber that is 20 to 100 wt % of a polybutadiene having a viscosity η at 25° C. as a 5 wt % solution in toluene of up to 600 mPa·s.

42.    Admit that Pro V1 golf balls having the sidestamp ◀Pro V1-392▶ have a solid core molded from a rubber composition containing 100 parts by weight of a base rubber that is 20 to 100 wt % of a polybutadiene which is synthesized using a rare-earth catalyst.

43.    Admit that Pro V1 golf balls having the sidestamp ◀Pro V1-392▶ have a solid core molded from a rubber composition containing 100 parts by weight of a base rubber that is 20 to 100 wt % of a polybutadiene, where the polybutadiene satisfies the relationship: $10B+5 \leq A \leq 10B+60$, wherein A is the Mooney viscosity ($ML_{1+4}$ (100° C.)) of the polybutadiene and B is the ratio Mw/Mn between the weight-average molecular weight Mw and the number-average molecular weight Mn of the polybutadiene.

44.    Admit that Pro V1 golf balls having the sidestamp ◀Pro V1-392▶ have a solid core which is molded from a rubber composition containing 100 parts by weight of a base rubber that is: (a) 20 to 100 wt % of a polybutadiene having a cis-1,4 content of at least 60% and a 1,2 vinyl content of at most 2%; and (b) 0 to 80 wt % of a diene rubber other than component (a).

45.    Admit that Pro V1 golf balls having the sidestamp ◀Pro V1-392▶ have a solid core which is molded from a rubber composition containing 100 parts by weight of a base rubber and 10 to 60 parts by weight of an unsaturated carboxylic acid or a metal salt thereof or both.

46.    Admit that Pro V1 golf balls having the sidestamp ◀Pro V1-392▶ have a solid core which is molded from a rubber composition containing 100 parts by weight of a base rubber and 0.1 to 5 parts by weight of an organosulfur compound.

47.    Admit that Pro V1 golf balls having the sidestamp ◀Pro V1-392▶ have a solid core which is molded from a rubber composition containing 100 parts by weight of a base rubber and 5 to 80 parts by weight of an inorganic filler.

48.    Admit that Pro V1 golf balls having the sidestamp ◀Pro V1-392▶ have a solid core which is molded from a rubber composition containing 100 parts by weight of a base rubber and 0.1 to 5 parts by weight of an organic peroxide.

49.    Admit that Pro V1 golf balls having the sidestamp ◀Pro V1-392▶ have an inner cover having a Shore D hardness of 50 to 80.

50.    Admit that Pro V1 golf balls having the sidestamp ◀Pro V1-392▶ have a cover having a Shore D hardness of 35 to 60.

51.    Admit that Pro V1 golf balls having the sidestamp ◀Pro V1-392▶ have a cover which has a lower Shore D hardness than the inner cover.

52.    Admit that Pro V1 golf balls having the sidestamp ◀Pro V1-392▶ have a solid core which is molded from a rubber composition containing 100 parts by weight of a base rubber that is: (a) 20 to 100 wt % of a polybutadiene having a cis-1,4 content of at least 60% and a 1,2 vinyl content of at most 2%; and (b) 0 to 80 wt % of a diene rubber other than component (a) which includes 30 to 100 wt % of a second polybutadiene which has a cis-1,4 content of at least 60% and a 1,2 vinyl content of at most 5%.

- 7 -

53.    Admit that Pro V1 golf balls having the sidestamp ◄Pro V1-392► have a solid core which is molded from a rubber composition containing 100 parts by weight of a base rubber that is: (a) 20 to 100 wt % of a polybutadiene having a cis-1,4 content of at least 60% and a 1,2 vinyl content of at most 2%; and (b) 0 to 80 wt % of a diene rubber other than component (a) which includes 30 to 100 wt % of a second polybutadiene which has a Mooney viscosity ($ML_{1+4}$ (100° C.)) of not more than 55.

54.    Admit that Pro V1 golf balls having the sidestamp ◄Pro V1-392► have a solid core which is molded from a rubber composition containing 100 parts by weight of a base rubber that is: (a) 20 to 100 wt % of a polybutadiene having a cis-1,4 content of at least 60% and a 1,2 vinyl content of at most 2%; and (b) 0 to 80 wt % of a diene rubber other than component (a) which includes 30 to 100 wt % of a second polybutadiene which satisfies the relationship: $\eta \leq$ 20A-550, where A is the Mooney viscosity ($ML_{1+4}$ (100° C.)) of the second polybutadiene and $\eta$ is the viscosity of the second polybutadiene, in mPa·s, at 25° C. as a 5 wt % solution in toluene.

55.    Admit that Shell 1220 is a polybutadiene rubber which has a cis-1,4 content of at least 60% and a 1,2 vinyl content of at most 5%.

56.    Admit that Shell 1220 is a polybutadiene rubber which has a Mooney viscosity ($ML_{1+4}$ (100° C.)) of not more than 55.

57.    Admit that Shell 1220 is a polybutadiene rubber which satisfies the relationship: $\eta \leq$ 20A-550, where A is the Mooney viscosity ($ML_{1+4}$ (100° C.)) of Shell 1220 and $\eta$ is the viscosity of Shell 1220, in mPa·s, at 25° C. as a 5 wt % solution in toluene.

58.    Admit that CB 23 is a polybutadiene rubber which has a cis-1,4 content of at least 60% and a 1,2 vinyl content of at most 2%.

59.    Admit that CB 23 is a polybutadiene rubber which has a viscosity $\eta$ at 25° C. as a 5 wt % solution in toluene of up to 600 mPa·s.

60.    Admit that CB 23 is a polybutadiene rubber which is synthesized using a rare-earth catalyst.

61.    Admit that CB 23 is a polybutadiene rubber which satisfies the relationship: 10B+5 $\leq$ A $\leq$ 10B+60, wherein A is the Mooney viscosity ($ML_{1+4}$ (100° C.)) of CB 23 and B is the ratio Mw/Mn between the weight-average molecular weight Mw and the number-average molecular weight Mn of CB 23.

62.    Admit that none of US Patent 6,486,261, US Publication 2003/0171166, US Patent 6,875,131, US Patent 6,162,135, US Patent 6,612,940, US Patent 6,325,730, US Patent 6,739,985, US Patent 6,315,684, US Patent 6,435,983, US Patent 6,921,345, US Patent 6,422,953, and US 6,419,594 singly explicitly disclose a multi-piece solid golf ball, where the solid core is molded from a rubber composition including a base rubber composed of (a) a polybutadiene having a viscosity $\eta$ at 25° C. as a 5 wt % solution in toluene of up to 600 mPa·s, and satisfying the relationship: 10B+5 $\leq$ A $\leq$ 10B+60, wherein A is the Mooney viscosity ($ML_{1+4}$ (100° C.)) of the polybutadiene and B is the ratio Mw/Mn of the polybutadiene, in combination with (b) a diene rubber other than component (a) where the diene rubber (b) satisfies the relationship: $\eta \leq$ 20A-550, where A is the Mooney viscosity and $\eta$ is the viscosity of the second polybutadiene.

- 8 -

63.    Admit that the golf balls in the Pro V1 Family have a core with a diameter greater than 29 mm.

64.    Admit that the golf balls in the Pro V1x Family and Pro V1* Family have an outer core with a diameter greater than 29 mm.

65.    Admit that golf balls in the Pro V1 Family have a core with a specific gravity less than 1.4.

66.    Admit that golf balls in the Pro V1x Family and Pro V1* Family have an inner core, an outer core or both with a specific gravity less than 1.4.

67.    Admit that Pro V1 golf balls bearing the side stamp ◄Pro V1-392► have an inner cover having a thickness greater than 1 mm.

68.    Admit that golf balls in the Pro V1 Family, Pro V1* Family, and Pro V1x Family have an inner cover having a thickness of at least 0.85 mm.

69.    Admit that golf balls in the Pro V1 Family, Pro V1* Family, and Pro V1x Family have a cover having a thickness of at least 0.8 mm.

70.    Admit that golf balls in the Pro V1 Family, Pro V1* Family, and Pro V1x Family have a cover having a thickness of at least 0.85 mm.

71.    Admit that golf balls in the Pro V1 Family, Pro V1* Family, and Pro V1x Family have a cover having a thickness of at least 0.9 mm.

72.    Admit that golf balls in the Pro V1 Family, Pro V1* Family, and Pro V1x Family have a cover having a thickness of at least 0.95 mm.

73.    Admit that golf balls in the Pro V1 Family, Pro V1* Family, and Pro V1x Family have a cover having a thickness of at least 1 mm.

74.    Admit that Acushnet has tested the cover thickness of golf balls in any one of the Pro V1 Family, Pro V1* Family, and Pro V1x Family to be greater than 0.8 mm.

75.    Admit that Acushnet has tested the cover thickness of golf balls in any one of the Pro V1 Family, Pro V1* Family, and Pro V1x Family to be greater than 0.85 mm.

76.    Admit that Acushnet has tested the cover thickness of golf balls in any one of the Pro V1 Family, Pro V1* Family, and Pro V1x Family to be greater than 0.9 mm.

77.    Admit that Acushnet has tested the cover thickness of golf balls in any one of the Pro V1 Family, Pro V1* Family, and Pro V1x Family to be greater than 0.95 mm.

78.    Admit that Acushnet has tested the cover thickness of golf balls in any one of the Pro V1 Family, Pro V1* Family, and Pro V1x Family to be greater than 1 mm.

79.    Admit that golf balls in the Pro V1 Family, Pro V1x Family, and Pro V1* Family have an inner cover with a specific gravity less than 1.2.

80.    Admit that golf balls in the Pro V1 Family, Pro V1x Family, and Pro V1* Family have an inner cover layer with a hardness of at least 85 on the JIS C scale.

81.    Admit that golf balls in the Pro V1 Family have an inner cover and a core and that the specific gravity of the inner cover is less than the specific gravity of the core.

82.    Admit that golf balls in the Pro V1x Family and Pro V1* Family have an inner cover and an inner core and outer core, and that the specific gravity of the inner cover is less than the specific gravity of the inner core and outer core.

83.    Admit that golf balls in the Pro V1 Family, the Pro V1x Family and Pro V1* Family have a cover and an inner cover and the cover is softer than the inner cover when measured using the Shore D scale.

84.    Admit that golf balls in the Pro V1 Family, the Pro V1x Family and Pro V1* Family have a cover and an inner cover and the cover is softer than the inner cover when measured using the JIS C scale.

85.    Admit that golf balls in the Pro V1 Family have an inner cover and a core, and that the difference in specific gravity between the core and inner cover is between 0.1 to 0.5.

86.    Admit that golf balls in the Pro V1x and Pro V1* Family have an inner cover, an inner core and an outer core, and that the difference in specific gravity between the inner core and the inner cover, and the outer core and the inner cover is between 0.1 to 0.5.

87.    Admit that golf balls in the Pro V1 Family, the Pro V1x Family and the Pro V1* Family have an inner cover with a specific gravity between 0.9 and 1.0.

88.    Admit that US Patent 4,431,193 fails to explicitly disclose any specific gravity of core 12 disclosed therein.

89.    Admit that US Patent 4,431,193 fails to explicitly disclose any specific gravity of any golf ball core, including core 12, disclosed therein.

90.    Admit that US Patent 4,431,193 fails to explicitly disclose any specific gravity of inner layer 14 disclosed therein.

91.    Admit that US Patent 4,431,193 fails to explicitly disclose any specific gravity of any intermediate layer or inner cover, including inner layer 14, disclosed therein.

92.    Admit that US Patent 5,314,187 fails to explicitly disclose any specific gravity of solid core 12 disclosed therein.

93.    Admit that US Patent 5,314,187 fails to explicitly disclose any specific gravity of any core, including solid core 12, disclosed therein.

94.    Admit that US Patent 5,314,187 fails to explicitly disclose any specific gravity of inner layer 13 disclosed therein.

95.    Admit that US Patent 5,314,187 fails to explicitly disclose any specific gravity of any intermediate layer or inner cover, including inner layer 13, disclosed therein.

96.    Admit that Acushnet has measured exemplary golf balls of the type identified as the "Wilson Ultra Tour Balata 90 golf ball" and "Wilson Ultra Tour Balata 90 golf ball" in Acushnet's May 31, 2006 responses to Bridgestone's Interrogatories 4 and 5, as having inner covers less than .035" thick.

97.    Admit that Acushnet cannot show the exact date that any of the "Wilson Ultra Tour Balata 90" golf balls currently in Acushnet's possession were first obtained by Acushnet.

98.    Admit that all "Wilson Ultra Tour Balata 90" golf balls currently in Acushnet's possession have had a compression measurement performed thereon.

99.    Admit that Acushnet cannot show the exact date that any of the "Wilson Ultra Tour Balata 100" golf balls currently in Acushnet's possession were first obtained by Acushnet.

100.    Admit that all "Wilson Ultra Tour Balata 100" golf balls currently in Acushnet's possession have had a compression measurement performed thereon.

101.    Admit that US Patent 4,848,770 fails to disclose any cover, including cover 3, that has a Shore C hardness less than any intermediate layer or inner cover, including intermediate layer 2.

102.    Admit that US Patent 5,002,281 fails to disclose any cover, including cover 3, that has a Shore C hardness less than any intermediate layer or inner cover, including outer shell 2.

103.    Admit that US Patent 5,002,281 fails to disclose any core, including inner core 1, that has a specific gravity greater than any intermediate layer or inner cover, including outer shell 2.

104.    Admit that US Application 08/070,510 fails to explicitly disclose any specific gravity of any core, including core 10, therein.

105.    Admit that US Application 08/070,510 fails to explicitly disclose any specific gravity of any intermediate layer or inner cover, including inner layer 14, therein.

106.    Admit that golf balls in the Pro V1 Family bearing the side stamps Pro V1 392, Pro V1 392 (stretched), and ◄Pro V1•392► have a solid core and the hardness of the solid core at the center of the solid core is 75 or less on the JIS C scale.

107.    Admit that golf balls in the Pro V1 Family bearing the side stamps Pro V1 392, Pro V1 392 (stretched), and ◄Pro V1•392► have a solid core and the hardness of the solid core at the outer surface of the solid core is 85 or less on the JIS C scale.

108.    Admit that golf balls in the Pro V1 Family bearing the side stamps Pro V1 392, Pro V1 392 (stretched), and ◄Pro V1•392► have a solid core and the hardness difference between the hardness of the solid core at the outer surface of the solid core and the hardness at the center of the solid core is in the range of 8 to 20 degrees, on the JIS C scale.

109.    Admit that golf balls in the Pro V1 Family bearing the side stamps Pro V1 392, Pro V1 392 (stretched), and ◄Pro V1•392► have an inner cover and a solid core, and that the hardness of the inner cover is 5 degrees or higher than the hardness of the solid core at the outer surface of the solid core, on the JIS C scale.

110.    Admit that golf balls in the Pro V1 Family bearing the side stamps Pro V1 392, Pro V1 392 (stretched), and ◄Pro V1•392► have an inner cover and a cover, and that the hardness of the inner cover is 5 degrees or higher than the hardness of the cover, on the JIS C scale.

111.    Admit that golf balls in the Pro V1 Family bearing the side stamps Pro V1 392, Pro V1 392 (stretched), and ◄Pro V1•392► have a cover with dimples, where the dimples occupy at least 62% of the golf ball surface.

112.    Admit that EP 0 633 043 fails to explicitly disclose any hardness values for any core, including center core 1, therein.

113.    Admit that Acushnet has measured exemplary golf balls of the type identified as the "Wilson Ultra Tour Balata 100 golf ball," in Acushnet's May 31, 2006 responses to Bridgestone's Interrogatories 4 and 5, as having a difference between inner cover hardness and hardness at the outer surface of the core of less than 5 JIS C.

114.    Admit that Acushnet has measured exemplary golf balls of the type identified as the "Wilson Ultra Tour Balata 100 golf ball," as having a difference between inner cover hardness and cover hardness of less than 5 JIS C.

115.    Admit that golf balls of the Pro V1 Family bearing the side stamps ◀•Pro V1 392•▶ and ◀Pro V1-392▶ have an inner cover and a cover, and the inner cover is harder than the cover when measured on a JIS C scale.

116.    Admit that golf balls of the Pro V1x Family have an inner cover and a cover, and the inner cover is harder than the cover when measured on a JIS C scale.

117.    Admit that golf balls of the Pro V1 Family bearing the side stamps ◀•Pro V1 392•▶ and ◀Pro V1-392▶ have an inner cover and a core, and the inner cover is harder than the outer surface of the core when measured on a JIS C scale.

118.    Admit that golf balls of the Pro V1x Family have an inner cover and an outer core, and the inner cover is harder than the outer surface of the outer core when measured on a JIS C scale.

119.    Admit that golf balls of the Pro V1 Family bearing the side stamps ◀•Pro V1 392•▶ and ◀Pro V1-392▶ have a core, and the hardness of the core at the center of the core is less than the hardness of the outer surface of the core when measured on a JIS C scale.

120.    Admit that golf balls of the Pro V1 Family bearing the side stamps ◀•Pro V1 392•▶ and ◀Pro V1-392▶ have a core, and the hardness of the core increases gradually from the center of the core to the outer surface of the core when measured on a JIS C scale.

121.    Admit that golf balls in the Pro V1x Family have an inner core and an outer core, and the hardness of the inner core at the center of the inner core is less than the hardness of the outer surface of the outer core when measured on a JIS C scale.

122.    Admit that golf balls in the Pro V1x Family have an inner core and an outer core, and the hardness increases gradually from the center of the inner core to outer surface of the outer core when measured on a JIS C scale.

123.    Admit that golf balls of the Pro V1 Family bearing the side stamps ◀•Pro V1 392•▶ and ◀Pro V1-392▶ have a core, and the difference of hardness between the center of the core and the outer surface of the core, when measured on a JIS C scale, is at least 22.

124.    Admit that golf balls in the Pro V1x Family have an inner core and an outer core, and the difference of hardness between the center of the inner core and the outer surface of the outer core, when measured on a JIS C scale, is at least 22.

125.    Admit that golf balls of the Pro V1 Family bearing the side stamps ◀•Pro V1 392•▶ and ◀Pro V1-392▶ have a core which is partly formed of a zinc salt of pentachlorothiophenol.

- 12 -

126.    Admit that golf balls in the Pro V1x Family have an inner core and an outer core, and that each of the inner core and outer core are partly formed of a zinc salt of pentachlorothiophenol.

127.    Admit that golf balls of the Pro V1 Family bearing the side stamps ◀•Pro V1 392•▶ and ◀Pro V1-392▶ have an inner cover which has a Shore D hardness between 50 and 67.

128.    Admit that golf balls of the Pro V1x Family have an inner cover which has a Shore D hardness between 50 and 67.

129.    Admit that golf balls of the Pro V1 Family bearing the side stamps ◀•Pro V1 392•▶ and ◀Pro V1-392▶ have a cover which has a Shore D hardness of 45 to 58.

130.    Admit that golf balls of the Pro V1x Family have a cover which has a Shore D hardness of 45 to 58.

131.    Admit that US Patent 6,390,935 fails to disclose that outer shell 2 is formed of a resin.

132.    Admit that US Patent 6,390,935 fails to disclose any hardness values of outer shell 2.

133.    Admit that US Patent 6,390,935 fails to disclose any use of pentachlorothiophenol, pentafluorothiophenol, pentabromothiophenol, p-chlorothiophenol, or the zinc salt of pentachlorothiophenol, in any core or layer disclosed therein.

134.    Admit that, in the example 4 ball construction of US Patent 6,465,578, shown in columns 27 and 28, the "mantle" is not formed of resin.

135.    Admit that, in the example 5 ball construction of US Patent 6,465,578, shown in columns 27 and 28, the "inner cover" is softer than the "cover" on the Shore D scale.

136.    Admit that, in the example 5 ball construction of US Patent 6,465,578, shown in columns 27 and 28, the "inner cover" has a hardness of less than 50 Shore D.

137.    Admit that US Patent 6,465,578 fails to disclose any hardnesses of "inner cover" or "mantle layers" outside of examples 4 and 5 in columns 27 and 28.

138.    Admit that US Patent 6,465,578 fails to disclose any use of pentachlorothiophenol, pentafluorothiophenol, pentabromothiophenol, p-chlorothiophenol, or the zinc salt of pentachlorothiophenol, in any core or layer disclosed therein.

139.    Admit that Acushnet has measured exemplary golf balls of the type identified as the "Top Flite System C" golf ball, in Acushnet's May 31, 2006 responses to Bridgestone's Interrogatories 4 and 5, as having a hardness difference of less than 22 between the center and surface of its core, when measured using the JIS C scale.

140.    Admit that Acushnet has not found any exemplary balls of the type identified as the "Top Flite System C"   that contain pentachlorothiophenol, pentafluorothiophenol, pentabromothiophenol, p-chlorothiophenol, or the zinc salt of pentachlorothiophenol, in any core or layer therein.

141.    Admit that Acushnet cannot show the exact date that any of the "Top-Flite System C" golf balls currently in Acushnet's possession were first obtained by Acushnet.

- 13 -

142.    Admit that all "Top-Flite System C" golf balls currently in Acushnet's possession have had a compression measurement performed thereon.

143.    Admit that Acushnet has measured exemplary golf balls of the type identified as the "Tour Stage U-Spin" golf ball, in Acushnet's May 31, 2006 responses to Bridgestone's Interrogatories 4 and 5, as having a hardness difference of less than 22 between the center and surface of its core, when measured using the JIS C scale.

144.    Admit that Acushnet has not found any exemplary balls of the type identified as the "Tour Stage U-Spin" golf ball, that contain any pentachlorothiophenol, pentafluorothiophenol, pentabromothiophenol, p-chlorothiophenol, or the zinc salt of pentachlorothiophenol, in any core or layer therein.

145.    Admit that Acushnet cannot show the exact date that any of the "Tour Stage U-Spin" golf balls currently in Acushnet's possession were first obtained by Acushnet.

146.    Admit that all "Tour Stage U-Spin" golf balls currently in Acushnet's possession have had a compression measurement performed thereon.

147.    Admit that all documents bearing Bates Nos. AB 0000001 to AB 0112437 are true and authentic copies of documents within Acushnet's custody, control or possession.

148.    The documents bearing Bates Nos. AB 0000001 to AB 0112437 are authentic, genuine and true and correct copies of business records of Acushnet.

149.    The documents bearing Bates Nos. AW 000001 to AW 004632 are authentic, genuine and true and correct copies of business records of Arnold Worldwide, Inc.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
Leslie A. Polizoti (#4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19801
(302) 658-9200
    *Attorneys for Bridgestone Sports Co., Ltd. and*
    *Bridgestone Golf, Inc.*

- 14 -

OF COUNSEL:

Robert M. Masters
Scott M. Flicker
Terrance J. Wikberg
Brandon M. White
PAUL, HASTINGS,
    JANOFSKY & WALKER LLP
825 15th Street, N.W.
Washington, DC  20005
(202) 551-1700

September 8, 2006

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that copies of the foregoing were caused to be served this 8th day of September, 2006 upon the following in the manner indicated:

### BY HAND

Richard L. Horwitz
Potter Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE  19801


### BY FEDERAL EXPRESS

Alan M. Grimaldi
Howrey LLP
1299 Pennsylvania Avenue, NW
Washington, DC  20004


_____
Jack B. Blumenfeld

# Exhibit B

| From: | Seal, Brian [SealB@howrey.com] |
|---|---|
| Sent: | Monday, September 18, 2006 10:13 AM |
| To: | White, Brandon M. |
| Cc: | Grimaldi, Alan |
| Subject: | Depositions and other discovery |
| Follow Up Flag: | Follow up |
| Flag Status: | Completed |

Brandon -

If possible, Acushnet's witnesses for this week, Messrs. Morgan and Bartsch, need to leave their depositions by 4:15. We can start as early as 8:30 if that will help.

We would like to depose Dan Murphy, but may not need to depose him depending our Alan's deposition of Mr. Nakayama. Can we schedule Mr. Murphy's deposition after Mr. Nakayama's with that understanding?

We need to know as soon as possible whether you intend to represent Messrs. Grissinger and Tsutsumi so that we can subpoena them, if necessary.

Also, we have received your deposition notices for Messrs. Lester, Jepson, Brown, Hebert, Rajagopalan, Wrigley, Bissonnette and Aoyama. Of those, we would be willing to agree that we will not call Messrs. Jepson, Brown, Rajagopalan and Wrigley at trial if that would eliminate your need to depose them. Additionally, we will agree not to call Mr. Lester at trial for any purpose other than willfulness, if that will eliminate your need to depose him during the non-willfulness discovery phase.

Finally, we have reviewed your set of requests for admission and, due to their compound nature, have identified over 1,600 discrete requests. While we intend to object to them as compound, we need additional time in which to respond so that we may answer as many as we can. Are you agreeable to a deadline of October 31 for our responses?

Regards,

Brian

```
Brian S. Seal
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: 202.383.6904
Fax: 202.383.6610
mailto:sealb@howrey.com
```

CONFIDENTIALITY NOTICE:  This e-mail may have information that is CONFIDENTIAL or legally privileged as ATTORNEY-CLIENT COMMUNICATION or ATTORNEY WORK-PRODUCT.  If you are not the intended recipient, delete this e-mail without disclosing, copying or using any of the information in it, and inform me of the error by reply e-mail at sealb@howrey.com or by telephone at (202) 383-6904.  Thank you.

---------------------------------------------------------------------------------------------

This email and any attachments contain information from the law firm of Howrey LLP, which may be confide
The information is intended to be for the use of the individual or entity named on this email.

1/8/2007

you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents
If you receive this email in error, please notify us by reply email immediately so that we can arrange for the re

1/8/2007

# EXHIBIT C

## FULLY REDACTED

# Exhibit D

# Paul*Hastings*

Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W. • Washington, DC 20005
telephone 202 551 1700 • facsimile 202 551 1705 • www.paulhastings.com

Atlanta
Beijing
Brussels
Chicago
Hong Kong
London
Los Angeles
Milan
New York
Orange County
Palo Alto
Paris
San Diego
San Francisco
Shanghai
Stamford
Tokyo
Washington, DC

(202) 551-1754
brandonwhite@paulhastings.com

December 23, 2006

70416.00002

**VIA FACSIMILE (202) 383-6610**

Brian S. Seal, Esq.
Howrey LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004

    **Re:**    **Bridgestone Sports v. Acushnet**

Dear Brian,

I write in regard to several issues raised by Acushnet's recent supplementation of its discovery responses.

    1.    **Translations of Prior Art**

Acushnet's invalidity contentions refer to translations of Japanese patent documents. (*See, e.g.,* Tab A2 ('652 patent) to *Acushnet's' Sixth Supplemental Responses to Bridgestone's First Set of Interrogatories Directed To Acushnet* at Japanese Kokai Publication No. 02-092378). Please produce all English-language translations of foreign-language documents cited in Acushnet's invalidity contentions immediately.

    2.    **Acushnet's Refusal To Answer Bridgestone's Requests for Admissions**

Starting with Bridgestone's Request for Admission No. 68, Acushnet has failed to answer based on the assertion that Bridgestone's 149 Requests exceed the number of requests for admissions authorized in the Rule 16 Scheduling Order (D.I. 18). We disagree with Acushnet's position.

The Rule 16 Scheduling Order authorized 150 requests for admission. Bridgestone's has propounded only 150 requests. Further, requests for admissions are designed to simplify the issues for trial by eliminating non-controversial issues from dispute. (*See* Advisory Committee Notes to Rule 36). Bridgestone's admissions are narrowly tailored to the issues in dispute in this case and designed to simplify the issues for trial. Acushnet's failure to answer more than half of Bridgestone's Request is improper and serves only to unnecessarily complicate this case.

Brian Seal
December 23, 2006
Page 2

Please let us know by December 29, 2006 if Acushnet intends to stand on its objections.

### 3.   Acushnet's Identification of Newly-Asserted Prior Art

Acushnet's supplement response to Bridgestone Interrogatory No. 4 identifies several new references not previously identified.   For example, with respect to the '707 patent, Acushnet now identifies the Altus Newing Massy golf balls as alleged prior art.  With respect to the '791 patent, Acushnet added five patents as allegedly anticipatory references, more than doubling the number of allegedly anticipatory references it intends to assert.  This is improper on several grounds.

First, as set forth in our previously-filed Motion to Compel (D.I. 22), Acushnet has failed to narrow its infringement contentions as ordered by the Court.  Adding new references at this stage of the case only compounds this problem.

Second, the Court ordered all invalidity contentions to be disclosed by August 11, 2006. (D.I. 154 at ¶3).  Adding new prior art after August 11, 2006 is foreclosed by the Court's Order.

Accordingly, please let us know by December 29, 2006 if Acushnet intends to proceed with the infringement positions set forth in *Acushnet's Sixth Supplemental Responses To Bridgestone's First Set of Interrogatories Directed to Acushnet.*

We continue to review Acushnet's discovery responses, and reserve the right to later identify other issues that may arise.

Sincerely,

*Brandon White*

Brandon M. White
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

# Paul Hastings

Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W. • Washington, DC 20005
telephone 202 551 1700 • facsimile 202 551 1705 • www.paulhastings.com

## FACSIMILE TRANSMISSION

| to: | company/office: | facsimile: | telephone: |
|-----|-----------------|------------|------------|
| Brian Seal | Howrey LLP | (202) 383-6610 | (202) 383-6904 |

| from: | facsimile: | telephone: | initials: |
|-------|------------|------------|-----------|
| Brandon M. White | (202) 551-1705 | (202) 551-1754 | BMW2 |

| client name: | Bridgestone Sports | client matter number: | 70416.00002 |
|--------------|--------------------|-----------------------|-------------|
| date: | December 22, 2006 | pages (with cover): | 3 |

comments:

---

**If you do not receive all pages, please call immediately Facsimile Center: (202) 551-1275**

*This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via the U.S. Postal Service. Thank you.*

12/22/2006 15:12 FAX 202 551 1705          PAUL HASTINGS          @001

```
                    *********************
                    ***   TX REPORT   ***
                    *********************

    TRANSMISSION OK


    TX/RX NO              2099
    CONNECTION TEL           ##081532#ppp3836610#
    CONNECTION ID
    ST. TIME             12/22 15:12
    USAGE T              00'53
    PGS. SENT            3
    RESULT               OK
```

# EXHIBIT E

## FULLY REDACTED

# Exhibit F

# HOWREY LLP

1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
T 202.783.0800
F 202.383.6610
www.howrey.com

July 28, 2006

Direct Dial 202.383.6904
File 00634.0002

BY FACSIMILE

Terry J. Wikberg, Esq.
Paul, Hastings, Janofsky & Walker, LLP
875 15th Street, N.W.
Washington, D.C. 20005

Re:   ***Bridgestone Sports Co. v. Acushnet Co.***,
      **C.A. No. 05-132 (JJF) (D. Del.)**
      <u>**Upcoming Depositions**</u>

Dear Terry:

Acushnet will provide a witness in response to Bridgestone's Ninth Notice of 30(b)(6)
deposition on August 22, 2006. Please let me know as soon as possible whether you can take the
deposition on that date.

Our review of Bridgestone's Tenth Notice of 30(b)(6) deposition, served on July 10,
reveals that the topics contained therein are substantially duplicative of the topics in
Bridgestone's Fifth, Sixth, Seventh, and Eighth Notices for which Jeff Dalton just gave four days
of testimony over the past two weeks. For example, topic 4 from Bridgestone's Tenth Notice
calls for:

> Acushnet's manufacturing guidelines for cores, including and without limitation
> manuals, schematics, specifications, quality controls and changes thereto related
> to each of the accused Acushnet Golf Ball.

Compare that language to topics 4 and 5 for Bridgestone's Fifth through Eighth Notices[1], which
call for:

> Acushnet's <u>manufacturing guidelines, including and without limitation</u> the
> construction, material, chemical and physical characteristics and requirements of
> all models and versions of the Products, and reasons therefore, and <u>all manuals,
> schematics, specifications, and subsequent, interim and/or final changes thereto</u>
> (Topic 4) (emphases added).

---

[1] As you know, the numbered topics from Bridgestone's Fifth through Eighth Notices are repeated verbatim in each
notice, though the notices themselves are divided among the accused Acushnet products.

AMSTERDAM  BRUSSELS  CHICAGO  EAST PALO ALTO  HOUSTON  IRVINE  LONDON
LOS ANGELES  NORTHERN VIRGINIA  PARIS  SALT LAKE CITY  SAN FRANCISCO  TAIPEI  WASHINGTON, DC

# HOWREY LLP

and

    The <u>quality control and compliance employed by Acushnet in the</u> design and <u>manufacture of each and every model and version of the Products</u> (Topic 5) (emphases added).

    Thus, every aspect of topic 4 from Bridgestone's Tenth Notice was covered in topics 4 and 5 from Bridgestone's previous notices. There is similar duplication for the remaining topics contained in Bridgestone's Tenth Notice.

    In fact, the only apparent distinction between Bridgestone's Tenth Notice and the previous notices is that the Tenth Notice is limited to the accused Acushnet golf ball cores and core compositions while the previous notices were directed to the accused Acushnet golf balls as a whole. Mr. Dalton, however, devoted substantial portions of his four days of testimony to the cores and core compositions of Acushnet's products. Consequently, we do not intend to provide a witness for Bridgestone's Tenth Notice unless and until you can articulate a justification for duplicating Mr. Dalton's prior testimony. To that end, we are willing to discuss this further with you.

    In the meantime, note that Acushnet's witness for Bridgestone's Fourth Notice of 30(b)(6) Deposition, scheduled for Tuesday, August 1, will <u>not</u> be designated to testify with regard to topic 17 of that notice. He will, however, be prepared to testify with regard to topics 1-16.

    Finally, we repeat our request that you provide us with depositions dates for Hideo Watanabe in his individual capacity. We noticed his individual deposition on January 19, 2006 and have been requesting dates repeatedly for several weeks. As this is an individual deposition, and not a 30(b)(6) deposition, this should be a simple matter of ascertaining Mr. Watanabe's available dates from him directly. Thus, we fail to see any cause for the delay.

    Regards,

Brian S. Seal

# Exhibit G

# Paul Hastings

Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W. • Washington, DC 20005
telephone 202 551 1700 • facsimile 202 551 1705 • www.paulhastings.com

Atlanta
Beijing
Brussels
Hong Kong
London
Los Angeles
Milan
New York
Orange County
Palo Alto
Paris
San Diego
San Francisco
Shanghai
Stamford
Tokyo
Washington, DC

(202) 551-1754
brandonwhite@paulhastings.com

August 8, 2006

70416.00002

**VIA FACSIMILE**

Brian S. Seal, Esq.
Howrey LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004

Re:    Bridgestone v. Acushnet – Tenth Notice of Deposition

Dear Brian:

I am writing in response to your letter to Terry Wikberg of July 28, 2006, particularly with regard to Bridgestone's Tenth Notice of Deposition.[1]  In your letter, you stated that it is Acushnet's position that the topics from Bridgestone's Tenth Notice of Deposition appear to be substantially duplicative of the topics in Bridgestone's Fifth, Sixth, Seventh, and Eighth Notices, and that Acushnet would not provide a witness for Bridgestone's Tenth Notice of Deposition.

Bridgestone disagrees with Acushnet's objection.  The scope of the topics as a whole in the Tenth Notice of Deposition are not substantially duplicative from previous Notices, and Acushnet's objection is improper, for at least the reasons discussed below.

First, although Mr. Dalton's testimony was directed to the accused Acushnet golf balls in general, he did not fully testify to the more detailed technical topics included in Bridgestone's Tenth Notice of Deposition.  For example, Bridgestone has not yet had an opportunity to elicit testimony from a designated Acushnet witness on many documents related to core compositions including documents such as specific Material Code RM data sheets, lab notebooks, memorandum, and emails.

Second, Bridgestone believes that Acushnet has not yet produced documents on manufacturing core recipe formulations, including measurements in standardized parts per hundred (of a base rubber), which Bridgestone is entitled to based on at least

---

[1] Bridgestone's Tenth Notice of Deposition has five topics which generally relate to the technical aspects of core compositions in the accused Acushnet golf balls as well as the research and development leading up to formulation of core compositions.

LEGAL_US_E # 71579615.1

Brian Seal
August 8, 2006
Page 2

Bridgestone's First Set of Requests for Production Documents and Things.[2] Thus, upon receipt of this relevant and critical discovery, Bridgestone is entitled to further discovery through an Acushnet witness under the Tenth Notice of Deposition.

Third, Acushnet's objection to Bridgestone's Tenth Notice of Deposition was not timely. The deposition of Jeff Dalton occurred <u>after</u> Bridgestone's Tenth Notice of Deposition was served on Acushnet. Thus, Acushnet was fully aware of Bridgestone's Tenth Notice of Deposition, yet waited until after Mr. Dalton's recent testimony to object.

In view of the above, Bridgestone believes that its Tenth Notice is proper and that Acushnet is obligated to provide a witness in response. *See* <u>Chase Manhattan Mortg. Corp. v. Advanta Corp.</u>, 2003 U.S. Dist. LEXIS 18015 (D. Del. 2003) (Preparing designated witnesses for Rule 30(b)(6) depositions can be burdensome. However, that burden is expected from the complexities of litigation and from the "privilege of being able to use the corporate form in order to conduct business." citing <u>U.S. v. Taylor</u>, 166 F.R.D. 356, 362 (M.D.N.C.): aff'd, 166 F.R.D. 367 (M.D.N.C. 1996)).

Nevertheless, we are willing to discuss delaying scheduling a witness for Bridgestone's Tenth Notice of Deposition until after Bridgestone finishes its currently requested personal depositions, in particular the depositions of Peter Voorheis and Derek Ladd. These personal depositions have already been noticed by Bridgestone. Please provide deposition dates for Peter Voorheis and Derek Ladd promptly. Based on the testimony obtained in these personal depositions, Bridgestone may no longer need testimony on some or all of the topics of the Tenth Notice. Nevertheless, Bridgestone reserves its rights with respect to the topics included in the Tenth Notice.

Sincerely,

Brandon M. White
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

---

[2] Missing discovery from Acushnet on this point was raised in John Shin's facsimile letter to you dated August 1, 2006. Please let us know as soon as possible when this discovery will be produced.

LEGAL_US_E # 71579615.1

# Exhibit H

**Paul**Hastings

Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W. • Washington, DC 20005
telephone 202 551 1700 • facsimile 202 551 1705 • www.paulhastings.com

Atlanta
Beijing
Brussels
Hong Kong
London
Los Angeles
Milan
New York
Orange County
Palo Alto
Paris
San Diego
San Francisco
Shanghai
Stamford
Tokyo
Washington, DC

(202) 551-1754
brandonwhite@paulhastings.com

October 6, 2006

70416.00002

VIA FACSIMILE TO (202) 383-6610

Brian S. Seal, Esq.
Howrey LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004

Re:     *Bridgestone Sports v. Acushnet*

Dear Brian:

Further to John Shin's letter of August 1, 2006, and my letter of August 8, 2006, in which Bridgestone reserved its right to proceed with the Tenth Notice of Deposition,[1] in view of recent testimony and in view of Acushnet's continued failure to produce, among other thing, golf ball core recipes, in part because of an "undue burden," and specific Material Code RM data sheets, we now require a witness to Bridgestone's Tenth Notice of Deposition Pursuant to Rule 30(b)(6).

Please let me know if Acushnet will provide a witness prepared to testify as to the Topics in Bridgestone's Tenth Notice of Deposition.

Sincerely,

Brandon M. White
for PAUL, HASTINGS, JANOFSKY & WALKER LLP
LEGAL_US_E # 72105069.1

---

[1] Served on July 10, 2006, Bridgestone's Tenth Notice of Deposition has five topics which generally relate to the technical aspects of core compositions in the accused Acushnet golf balls as well as the research and development leading up to formulation of core compositions.

# EXHIBIT I

## FULLY REDACTED

# EXHIBIT J
## FULLY REDACTED

# EXHIBIT K

## FULLY REDACTED

# EXHIBIT L

## FULLY REDACTED

# EXHIBIT M

## FULLY REDACTED

# EXHIBIT N

## FULLY REDACTED

# EXHIBIT O

## FULLY REDACTED

# EXHIBIT P

## FULLY REDACTED

# EXHIBIT Q
## FULLY REDACTED