# EXHIBIT A

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT B

LEXSEE



Analysis
As of: Jan 18, 2007

INLINE CONNECTION CORPORATION, BROADBAND TECHNOLOGY IN-
NOVATIONS, LLC, AND PIE SQUARED, LLC, Plaintiffs, v. AOL TIME WAR-
NER INCORPORATED, et al., Defendants. INLINE CONNECTION CORPORA-
TION, BROADBAND TECHNOLOGY INNOVATIONS, LLC, AND PIE
SQUARED, LLC, Plaintiffs, v. EARTHLINK, INC., Defendant.

C. A. No. 02-272-MPT, C. A. No. 02-477-MPT Consolidated Cases

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2007 U.S. Dist. LEXIS 756

January 8, 2007, Decided

**CORE TERMS:** supplemental report, invalidity, deposi-
tion, expert report, discovery, declaration, disclosure,
depose, prepare, patents-in-suit, supplemental, rebuttal,
reliability, scheduled, pretrial, timing, trial preparation,
expert testimony, prejudicial, reservation, prejudiced,
exchanged, answering, responded, reciting, untimely,
deadline, terminal, deposed, recited

**COUNSEL:** [*1] Thomas C. Grimm, Esquire and Julia
Heaney, Esquire, Morris, Nichols, Arsht & Tunnell LLP,
Wilmington, Delaware, Of Counsel: Ky E. Kirby, Es-
quire, and C. Joel Van Over, Esquire, Bingham
McCutchen LLP, Washington, D.C., James B. Lewis,
Esquire, Bingham McCutchen LLP, Palo Alto, CA,
Donn P. Pickett, Esquire, Bingham McCutchen LLP, San
Francisco, California; Counsel for Plaintiffs Inline Con-
nection Corporation, Broadband Technology Innova-
tions, LLC and Pie Squared, LLC.

Frederick L. Cottrell, III, Esquire, and Kelly E. Farnan,
Esquire, Richards, Layton & Finger, P.A., Wilmington,
Delaware, Of Counsel: Robert J. Gunther, Jr., Esquire
and Kurt M. Rogers, Esquire, Latham & Watkins LLP,
New York, New York, David A. Nelson, Esquire,
Latham & Watkins LLP, Chicago, Illinois; Counsel for
Defendant America Online, Inc.

Gary W. Lipkin, Esquire, Duane Morris LLP, Wilming-
ton, Delaware, Of Counsel: L. Norwood Jameson, Es-
quire and Matthew C. Gaudet, Esquire, Duane Morris

LLP, Atlanta, Georgia; Counsel for Defendant Earth-
Link, Inc.

**JUDGES:** Mary Pat Thynge, U.S. Magistrate Judge.

**OPINION BY:** Mary Pat Thynge

**OPINION:**

**MEMORANDUM OPINION**

January 8, 2007

Thynge, U.S. Magistrate Judge [*2]

**I. INTRODUCTION**

This is a patent infringement case. Inline Communi-
cation Corporation n1 ("Inline") sued America Online
Inc. ("AOL") on April 12, 2002, and EarthLink, Inc.
("EarthLink") on June 4, 2002, alleging infringement of
U.S. Patent Nos. 5,844,596 ("the '596 patent"), 6,243,446
("the '446 patent"), and 6,236,718 ("the '718 patent"). n2

n1 Inline initially sued AOL and Earthlink.
Since the original filing of the complaints, other
plaintiffs have been added because of their con-
tractual relationships with Inline. For ease of ref-
erence, all plaintiffs shall be referred to as Inline.

n2 Inline's U.S. Patent No. 6,542,585 ("the '585 patent") was subsequently added to the litigation after it was issued in 2003. The '718 patent is no longer at issue in the litigation.

Inline filed two separate motions requesting that the court preclude defendants' invalidity expert, David L. Waring, from offering certain testimony at trial. Inline's first motion is directed at Waring's April 18, 2006 expert report [*3] (the "April 18 Report") reciting his opinions of lack of enablement and obviousness. n3 Inline contends that the opinions recited therein are the product of improper standards and unreliable methods. Inline's motion directed to the April 18 Report will be addressed in a separate opinion. Inline's second motion is directed at Waring's October 20, 2006 supplemental expert report (the "Supplemental Report"), which Inline argues should be excluded as untimely and prejudicial. n4 For the reasons discussed, Inline's motion to exclude the Supplemental Report and testimony related thereto from trial will be granted in part and denied in part.

n3 D.I. 524 (Plaintiffs' Motion to Exclude Certain Testimony Relating to the Expert Report of David L. Waring).

n4 D.I. 526 (Plaintiff's Motion to Exclude Testimony relating to the Supplemental Expert Report of David L. Waring).

## II. POSITIONS OF THE PARTIES

On April 18, 2006, defendants served Waring's expert report, which included opinions concerning, among other things, [*4] the defense of invalidity. On June 30, 2006, Inline responded by submitting a rebuttal expert report by Dr. William Beckmann. Subsequently, the parties deposed both individuals, with the final day of depositions completed on the date expert depositions were to have been completed, July 21, 2006. n5 On October 20, 2006, subsequent to the October 16, 2006 date motions seeking to limit or exclude expert testimony were originally due, n6 and a week prior to the extended deadline for filing of those motions, n7 defendants served the Waring's Supplemental Report reciting invalidity opinions based on two additional prior art references. n8

n5 D.I. 392 (Amended Scheduling Order).

n6 Id.

n7 D.I. 505 (Stipulation for Extension of Time).

n8 D.I. 547, Ex. 1 (Supplemental Expert Report of David L. Waring Regarding the Invalidity of U.S. Patents Nos. 5,844,596, 6,243,446, and 6,542,585). The two new prior art references are: (1) A.H. Ithell and W.G.T. Jones, A Proposal for the Introduction of Digital Techniques into Local Distribution, Proceedings of the International Zurich Seminar on Digital Communications (March 7-9, 1978) (the "Ithell & Jones Article"); and (2) the AT&T Voice Data Multiplexer system (the "VDM System").

[*5]

Inline complains of the timing of this filing, and defendants' failure to seek leave of the court for its filing. Inline moves for the exclusion from trial of the Supplemental Report and any testimony about the information and opinions contained therein. Inline contends that the Supplemental Report is based on two prior art references that have never before been raised by defendants. Since discovery in this case is closed, Inline has had no opportunity to conduct discovery necessary to challenge Waring's newly-raised assertions of invalidity. Therefore, Inline contends that testimony regarding the Supplemental Report will substantially prejudice its right to a fair trial and should be excluded pursuant to Federal Rule of Civil Procedure 37(c)(1) and Federal Rule of Evidence 403.

Defendants contend that despite diligent effort to locate relevant prior art, they were not aware of the two new references prior to serving Waring's April 18 Report. They first learned of those references when provided courtesy copies by Verizon Internet Services, Inc. ("Verizon"), who had produced them to Inline in separate litigation [*6] involving the patents-in-suit pending before another judge in this court. n9 Defendants assert that upon receipt of those references, Waring and defendants evaluated them and promptly served the Supplemental Report. Defendants characterize Inline's motion as effectively one to sanction defendants for failing to find the "proverbial needle in the haystack." Defendants maintain that Inline ignores the fact that finding prior art is often an extremely difficult exercise, particularly in a case such as this where prosecution of the patents-in-suit continued for many years, thereby complicating the location of prior art. Defendants assert that the two new references are important to presentation of their invalidity defenses. Finally, defendants argue that Inline ignores the Federal Rules of Civil Procedure and precedent from the Third Circuit Court of Appeals which, they maintain,

2007 U.S. Dist. LEXIS 756, *

provides for supplemental expert disclosure based on newly discovered information.

n9 *Inline Connection Corp. v. Verizon Internet Servs., Inc.*, District of Delaware Civil Action No. 05-866 (JJF). That case was partially stayed on April 13, 2006 pending the outcome of this case. 05-886 (JJF), D.I. 92.

[*7]

## III. DISCUSSION

The Supplemental Report recites Waring's opinions that the Ithell & Jones Article and the VDM System invalidate the claims of the patents-in-suit. Inline argues that the Supplemental Report is untimely and permitting Waring's testimony of the opinions contained therein will greatly prejudice its ability to prepare for trial and, therefore, such testimony should be excluded.

Federal Rule of Civil Procedure 26(a)(2)(B) requires an expert report to "contain a complete statement of all opinions to be expressed and the basis and reasons therefore." Rule 26(a)(2)(C) states that "[t]he parties shall supplement these disclosures when required under subdivision (e)(1)." Rule 26(e)(1) states that:

A party who has made a disclosure under subdivision (a) . . . is under a duty to supplement or correct the disclosure or response to include information thereafter acquired if ordered by the court or in the following circumstances: (1) A party is under a duty to supplement at appropriate intervals its disclosures under subdivision (a) if the party learns that in some material respect the information disclosed is incomplete or [*8] incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. With respect to testimony of an expert from whom a report is required under subdivision (a)(2)(B) the duty extends both to information contained in the report and to information provided through a deposition of the expert . . . .

Federal Rule of Civil Procedure 37(c)(1) states, "[a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial . . . ."

The determination of whether to exclude evidence is committed to the court's discretion. n10 The Third Circuit has noted, however, that:

While evidentiary rulings are generally subject to a particularly high level of deference because the trial court has a superior vantage point to assess the evidence . . . , evaluating the reliability of scientific methodologies and data does not generally involve assessing the truthfulness of the expert witnesses and thus is often not significantly more difficult on a cold [*9] record. Moreover, here there are factors that counsel in favor of a hard look at (more stringent review of) the district court's exercise of discretion. For example, because the reliability standard of Rules 702 and 703 is somewhat amorphous, there is a significant risk that district judges will set the threshold too high and will in fact force plaintiffs to prove their case twice. Reducing this risk is particularly important because the Federal Rules of Evidence display a preference for admissibility. n11

n10 *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir. 1994).

n11 *Id.* at 749-50 (citation omitted).

The Third Circuit also noted that "'the exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence,'" n12 and identified several factors for the court to consider in deciding whether to exclude testimony:

(1) the prejudice [*10] or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the district court's order. n13

2007 U.S. Dist. LEXIS 756, *

The Third Circuit also stated that "'the importance of the excluded testimony' should be considered." n14

> n12 *Id.* at 791-92 (quoting *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894, 905 (3d Cir.1977)).

> n13 *Paoli,* 35 F.3d at 791.

> n14 *Konstantopoulos v. Westvaco Corp.,* 112 F.3d 710, 719 (3d Cir. 1997) (quoting *Meyers,* 559 F.2d at 904).

Expert reports on which each party bears the burden of proof were exchanged on April 18, 2006, rebuttal reports were exchanged on June 30, 2006. On July 11, 2006, defendants [*11] sent a letter to Inline stating that the previous day they had received from Verizon certain documents previously unknown to them and that, based on an initial review of those documents, the documents appeared to be prior art relevant to the validity of the patents. The letter stated that "[w]e reserve the right to supplement Defendants' expert report regarding the invalidity of the patents-in-suit based on these materials." n15 Inline did not respond to that letter. n16 Waring was deposed on July 18 and 19, 2006 and all expert depositions were completed on July 21, 2006. On October 20, 2006, defendants served the Supplemental Report.

> n15 D.I. 528, Ex. D (July 11, 2006 Letter from Claus D. Melarti to Ky E. Kirby).

> n16 D.I. 546 at 10.

Inline argues that the delay in serving that report, and consequent prejudice to its trial preparation is sufficient grounds for the court to exclude Waring's testimony concerning the opinions contained therein. Defendants explain that the time of receipt of the new references [*12] caused any delay in filing the Supplemental Report, not because of any dilatory or bad faith motives. On July 10, 2006, Verison produced invalidity disclosures to Inline which included documents relating to the VDM System. Those are the documents referenced in defendants' July 11, 2006 letter to Inline. Defendants had not previously been aware of the VDM System nor seen the VDM System documents produced by Verizon to Inline. Defendants state that the VDM System includes the elements of the inventions described in the patents-in-suit, but that the documents they received on July 10, 2003 did not contain details of a remote terminal implementation of that system. Defendants maintain that it was not until receiving a copy of the report of Arthur B. Williams, one of the designers of the VDM System, dated October 15, 2006, that they and Waring had the complete picture of exactly how the VDM System remote terminal implementation worked. According to defendants, without Williams' report, Waring could not have opined in detail as to that implementation. The Supplemental Report was served less than a week after defendants' received Williams' report.

On September 13, 2006, Verizon produced [*13] the Itbell & Jones Article and other prior art documents to Inline, and provided a copy to defendants. Defendants state that neither they nor Waring had any knowledge of this article prior to Verizon's invalidity disclosure to Inline. Waring reviewed that article and concluded that it anticipated the asserted claims of the patents-in-suit, including that opinion in the Supplemental Report.

Inline emphasizes that the Supplemental Report was served six months after the deadline for filing expert reports and one week before motions *in limine* were due. Inline argues that despite the alleged difficulty in locating the references discussed in that report, "it is without dispute that defendants had many of them in their possession months before they served" the Supplemental Report. n17 Defendants dispute that they possessed all of the documentation necessary for Waring to complete the Supplemental Report.

> n17 D.I. 575 at 1 (citing Melarti's July 11, 2006 letter).

The documents defendants received on July 10, 2006 relate [*14] to the VDM System. Defendants have represented, however, that Waring was unable to fully detail his invalidity opinion on that system until receipt of Williams' report on October 15, 2006. Moreover, defendants' July 11, 2006 letter specified the Bates numbers of the documents upon which they based their reservation of the right to supplement Waring's invalidity opinions. This reservation was repeated by Waring during his deposition. Inline asked Waring if the April 18 Report "is intended to set forth a complete statement of all the opinions you expect to offer in this case," to which he responded, "I believe that I've reserved the right to add or change my opinions if some of the assumptions change." n18 Inline again asked Waring if the April 18, 2006 report "includes a complete statement of the basis and reasons for your opinion" to which he reiterated "[a]gain, I think I've reserved right to perhaps amend those and augment those." n19 Waring's answers clearly refer to the July 11, 2006 letter which cites the VDM System

documents. It is dubious that Inline was surprised that Waring would supplement his invalidity opinions to include the VDM System. Also, defendants did not receive [*15] the Ithell & Jones Article on September 13, 2006. Defendants served the Supplemental Report approximately five weeks later, and mere days after receipt of Williams' report.

n18 D.I. 528, Ex. C, Waring Dep. at 28:13-18.

n19 *Id.*, Ex. C, Waring Dep. at 29:1-5.

Nevertheless, Inline suggests that the facts here are reflected in this court's denial of a defendant's request to submit a supplemental expert report in *Chase Manhattan Mortgage Corp. v. Advanta Corp.* n20 The *Chase* court found that the supplemental report sought to be submitted would be highly prejudicial. Contrary to Inline's contention that each factor identified in that case is present here, that case is readily distinguishable. There, Advanta delivered its supplemental report to Chase six months after the close of expert discovery, one month before trial was scheduled to begin, and after the filing of the proposed final pretrial order. n21 Here, defendants' Supplemental Report was served three months after the close of expert discovery, [*16] more than three and a half months before trial, and nearly three months before the proposed final pretrial order. Significantly, after listing the above factors, the *Chase* court noted, "*[m]ore to the point,* if the evidence it now sought to bring into the trial were genuinely critical, Advanta *could have* and should have made a motion to supplement months ago, but it did not." n22 Accepting defendants' representations as to when they received the documents relied upon by Waring in the Supplemental Report, which is consistent with the time period when Inline received the same materials, Waring could not have served that report months earlier. The court also notes that had defendants sought leave to submit the Supplemental Report, which ordinarily would have been preferred practice, that based on when they received all of the information necessary for Waring to adequately formulate the opinions expressed therein, little, if any, time would have been saved. The parties undoubtedly would have made the same arguments in promoting and opposing the filing of that report. In light of defendants' supplementation obligations under Fed. R. Civ. P. 26(a)(2)(B) [*17] and 26(e)(1), and the relatively prompt filing of the Supplemental Report following receipt of the documents about which Waring opines, the court determines that exclusion of that report is not warranted on the basis of the timing of its service.

n20 C.A. 01-507 (KAJ), 2004 U.S. Dist. LEXIS 7377, 2004 WL 912949 (D. Del. Apr. 22, 2004).

n21 2004 U.S. Dist. LEXIS 7377, [WL] at *1.

n22 2004 U.S. Dist. LEXIS 7377, [WL] at *1 (emphasis added).

In addition to the timeliness of the Supplemental Report, however, Inline contends it will be severely prejudiced in its ability to prepare for trial if the court denies its motion. Inline argues that both the amount of material it must review as well as the amount of deposition discovery it will have to conduct to prepare a proper response for trial is prejudicial. Inline points out that the Supplemental Report is over 30 pages long with nearly 350 pages of declarations and technical materials attached to and cited in the report, as well as errors in citation with regard to the VDM System, [*18] would require a substantial amount of time to prepare a proper response for trial.

Defendants served the Supplemental Report on October 20, 2006 and Inline filed its motion *in limine* on October 27, 2007, over three months before trial. Inline is also reminded that the court's May 18, 2006 scheduling order contemplated that motions seeking to limit or exclude expert testimony were to be filed no later than October 16, 2006. n23 On October 10, 2006, the parties filed a stipulation to extend the filing of those motions until October 27, 2006, which the court signed the following day. n24 After filing those motions and associated opening briefs on October 27, 2006 (and after Inline was served with the Supplemental Report) the parties filed--*on the day answering briefs were due*--yet another stipulation to extend the filing of answering and reply briefs such that briefing was not completed until December 1, 2006. n25 Prudence being the better part of valor, the court is confident that Inline and its expert have been digesting the material contained in the Supplemental Report and preparing a response thereto since its receipt rather than presuming the court would automatically exclude [*19] testimony related thereto.

n23 D.I. 392.

n24 D.I. 505.

n25 D.I. 543.

2007 U.S. Dist. LEXIS 756, *

Inline also contends that substantial deposition discovery would need to be conducted to prepare a response to the Supplemental Report, particularly with regard to the VDM System. Inline asserts that it would need to depose five individuals whose declarations Waring relied upon and who purport to have intimate knowledge of the VDM System. Those individuals' declarations are said to contain information on how the VDM system operated, its configuration, and the equipment that was used in manufacturing the system. n26 Inline also argues it would need to depose Coherent Communications Systems Corp. ("Coherent") and AT&T, the companies who manufactured and sold the VDM System.

n26 *See* D.I. 575 at 3, 3 n.3 (identifying Arthur B. Williams, Frank Scolaro, Howard C. Lee, David Hoerl, and Jerry F. Skene as necessary deponents).

[*20]

To the extent deposition discovery is required by Inline to properly respond about the VDM System, defendants contend that Inline would only need to depose Williams. Defendants point out that the Williams' declaration is the only one Waring relied on in the chart purportedly demonstrating invalidity. Defendants maintain that the other declarations cited in the Supplemental Report concerning the VDM System primarily apply to background information or authenticity of documents. Moreover, defendants represent that they "would agree not to rely on any of the other declarations at trial to ensure that Inline need only take one fact deposition." n27 With regard to the Ithell & Jones article, defendants argue that Inline would not be prejudiced by having its expert develop its opinion on this five page article and

that no fact depositions would be needed to respond to the Ithell & Jones article. They maintain that discovery can easily be reopened for the limited purpose of (1) having Beckmann submit a limited rebuttal report and (2) allowing depositions of Waring and Beckmann limited to the subject matter of the Supplemental Report should the parties so desire. Inline does not argue that [*21] it would need to depose any witnesses concerning the Ithell & Jones article, but reiterates that Inline and their expert would, nevertheless, be required to investigate and prepare their responses, resulting in prejudice.

n27 D.I. 546 at 12 n.5.

Although the court believes that Inline has had sufficient time to review the new prior art references and substantially prepare a response thereto, in order to limit Inline's additional trial preparation and allow it to complete its response to the opinions recited in the Supplemental Report, the court determines the following: (1) It will exclude reference to the declarations cited in the Supplemental Report other than that of Williams; (2) Inline will be permitted to depose Williams and defendants shall produce Williams and will not challenge any subpoena to Williams on personal jurisdiction, or other, grounds; (3) Inline will be permitted to depose Waring on the opinions contained in the Supplemental Report; (4) Beckmann will submit a report in rebuttal to the Supplemental [*22] Report no later than 72 hours before his scheduled testimony; and (5) defendants will not be permitted to depose Beckmann on that rebuttal report.

## IV. CONCLUSION

For the reasons stated above, Inline's motion is granted in part and denied in part.

# EXHIBIT C



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3159054 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

H
Briefs and Other Related Documents
Praxair, Inc. v. ATMI, Inc.D.Del.,2005.Only the
Westlaw citation is currently available.
United States District Court,D. Delaware.
PRAXAIR, INC. and Praxair Technology, Inc.,
Plaintiffs,
v.
ATMI, INC. and Advanced Technology Materials,
Inc., Defendants.
No. Civ. 03-1158-SLR.

Nov. 28, 2005.

Jack B. Blumenfeld, Rodger Dallery Smith, II, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Plaintiffs.
Frederick L. Cottrell, III, Robert H. Richards, III, Alyssa M. Schwartz, Richards, Layton & Finger, Keith A. Walter, Jr., Fish & Richardson P.C., Nicholas L. Coch, Theodore J. Mlynar, Kramer Levin Naftalis & Frankel LLP, New York, NY, for Defendants.

MEMORANDUM ORDER
ROBINSON, J.

## I. INTRODUCTION

*1 Praxair, Inc. and Praxair Technology Inc. ("plaintiffs") filed this patent infringement action on January 9, 2004 against ATMI, Inc. and Advanced Technology Materials, Inc. ("defendants"). (D.I.1) A pretrial conference was held on November 9, 2005 in which several issues from the Joint Pretrial Order (D.I.230) were addressed. (D.I.239) The court requested brief memoranda from defendants on three of these issues by November 16, with replies by plaintiffs due on November 23. (D.I.239)

## II. BACKGROUND

Plaintiffs sued defendants for infringement of certain claims of United States Patent Nos. 6,045,115 ("the '115 patent"), 6,007,609 ("the '609 patent") and 5,937,895 ("the '895 patent"). (D.I.1) The patents in suit disclose embodiments of an apparatus, which

safely controls the discharge of pressurized fluids from the outlet of pressurized tanks. (D.I. 131 at 7) The inventions disclosed by the patents help control the handling, storage and delivery of toxic fluids and constrain the flow of gas during normal operating, as well as during any kind of valve mishandling or downstream failure. Id. at 8

On November 8, 2005, the court granted partial summary judgment to defendants that claim 1, and all depending claims, of the '895 patent were invalid as indefinite. (D.I.233) The remaining claims at issue are claims 1, 2, 6, 7 and 8 of the '609 patent and claims 18 and 20 of the '115 patent. The court also granted plaintiffs' motion to exclude several belatedly-identified prior art references. (D.I.233)

During the pretrial conference, the court ruled on several discovery and evidentiary disputes. The court decided that Mr. Sackett of Swagelok, who was not identified by name during discovery, is precluded from testifying regarding the identity of the filter disclosed in the Zang reference.[FN1] (D.I. 239 at 52) The court also ruled that any documents inadvertently disclosed by plaintiffs need not be returned because plaintiffs did not properly follow the provisions of the protective order to regain possession of the documents. (D.I. 239 at 56) The court ruled that no legal impediment exists for defendants to assert that any of the remaining claims at issue are indefinite. (D.I. 239 at 57) Finally, the court concluded that Dr. Sherman's expert testimony is admissible because defendants were given the name of every past case in which Dr. Sherman testified, even though they were not given the actual trial or deposition testimony. (D.I. 239 at 67)

FN1. Defendants did disclose Swagelok during discovery and that a representative would be testifying pursuant to the scheduling order. The representative was identified by topic and document discovery was performed. However, the document discovery had nothing to do with Mr. Sackett's testimony regarding the type of filter disclosed in the Zhang patent.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3159054 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

The remaining issues, on which the court did not rule, were: whether defendants can present evidence of plaintiffs' commercial product and its prototypes; whether defendants timely disclosed the issue of simultaneous invention during the discovery phase of the trial; whether Dr. Karvelis' supplement to his expert report of the proper testing protocol prejudiced defendants and, therefore, should be excluded;[FN2] whether capillary action in sintered metal filters is excluded from the case; and whether the Skousgaard and Miller references were timely identified.

> FN2. Defendants no longer assert the need to rebut the supplement to Dr. Karvelis' expert report because the testing relates only to the '895 patent, which is no longer in the case. (D.I.235)

### III. DISCUSSION

### A. Definiteness of Construed Claims

*2 As an initial matter, the court revisits a ruling made on the bench during the pretrial conference. In light of _Bancorp Servs., L.L.C. v. Hartford Life Ins. Co., 359 F.3d 1367 (Fed.Cir.2004),_ the construed claims are definite as a matter of law. "We have held that a claim is not indefinite merely because it poses a difficult issue of claim construction, i.e., it is not insolubly ambiguous, it is not invalid for indefiniteness. _Id._ at 1371, (citing _Honeywell Int'l, Inc. v. Int'l Trade Comm'n, 341 F.3d 1332, 1338-39 (Fed.Cir.2003)._ "That is, if the meaning of the claim is discernible, 'even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds.' _Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed.Cir.2001)._" _Id._ Because the court was able to construe the limitation "at about the axial midpoint," the claims are definite, as a matter of law. _Id._ at 1371.

### B. Commercial Embodiment of Claimed Invention

Defendants argue that evidence of plaintiffs' commercial embodiment of the claimed invention, UpTime, and "events leading up to the filing of the patents-in-suit" are relevant to the issues of noninfringement and the reverse doctrine of equivalents. (D.I.237) The court concludes, however, that such evidence shall be excluded in the infringement determination.[FN3]

> FN3. While evidence leading up to the filing of the patents may have been relevant evidence, the court notes that the earliest date noted on any of the documents produced was 1999, by which time all the patents in issue had been filed. Therefore, even though defendants' brief states "events leading up to the filing of the patents" (D.I. 237 at 4), the documents instead relate to events leading up to the commercial embodiment.

The Federal Circuit has been very clear that "it is error for a court to compare in its infringement analysis the accused product or process with the patentee's commercial embodiment or other version of the product or process; the only proper comparison is with the claims of the patent," as construed by the court. _Zenith Laboratories, Inc. v. Bristol-Myers Squibb Co., 19 F.3d 1418, 1423 (Fed.Cir.1994)._ Defendants argue that, because the UpTime product has both a "flow restrictor" and a "filter," plaintiffs referred to, and considered, a flow restrictor as separate from a filter. The claims, as construed by this court, define a flow restrictor as something that "serve[s] to restrict the rate of flow [of gas]." (D.I.234) Whether or not a filter serves to restrict the flow of gas is a question for the jury and does not require analysis of the UpTime product.[FN4] Therefore, the court declines to allow as evidence of noninfringement the UpTime product or the events in its development. The risks of jury confusion and prejudice far outweigh the probative value of such evidence.

> FN4. The only evidence of this kind that could be relevant is evidence that plaintiffs admitted in some tests or prototypes that the filters did not restrict the rate of flow of the gas.

### C. Disclosure of Simultaneous Invention

Plaintiffs assert that any testimony[FN5] or evidence regarding when defendants designed the inventions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3159054 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

claimed in defendants' U.S. Patent Nos. 6,101,816 (the '816 patent) and 6,089,027 (the '027 patent) should be excluded because the '816 and '027 patents cannot be considered prior art and the evidence will only confuse the jury. In this case, witnesses (including Luping Wang) were made available to plaintiffs for discovery regarding the time of conception and reduction to practice of the claimed inventions of the '816 and '027 patents. These patents disclose the use of a membrane [FN6] (D.I. 236 at 1) and plaintiffs assert that a membrane can be a flow restrictor, as defined in the patents at issue.

> FN5. Specifically, plaintiffs contest the testimony of Luping Wang.

> FN6. The parties apparently had an agreement to consolidate deposition discovery in this Delaware action and in a New York law suit involving the '816 and '027 patents. An interrogatory was answered by defendants on August 19, 2004 in the New York action disclosing the relevant information.

*3 Evidence of simultaneous invention is relevant to the issue of obviousness, as a factor in the determination of the level of skill in the art. *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1379 (Fed.Cir.2000) ("The fact of near-simultaneous invention, though not determinative of statutory obviousness, is strong evidence of what constitutes the level of ordinary skill in the art.... [T]he possibility of near simultaneous invention by two or more equally talented inventors working independently, ... may or may not be an indication of obviousness when considered in light of all the circumstances.")(internal citations omitted). However, in the case at bar, defendants repudiated their claim to an early conception date; in the New York litigation, defendants did not dispute that the inventors of plaintiffs' patents were first to invent. Therefore, plaintiffs had no reason to conduct discovery on the issue of first to invent. Furthermore, the disclosure of the invention dates of the '816 and '027 patents contains no mention of a simultaneous invention argument, giving plaintiffs no reason to conduct discovery on the issue of simultaneous invention. To avoid unfair surprise, the testimony of Luping Wang is inadmissible as evidence of simul-

taneous invention.

## D. Capillary Action

The claims at issue use the term "capillary" to describe tubes and passageways. Plaintiffs argued, during the claim construction phase of the case, that "capillary passages" must be construed to mean "passages that exhibit capillary action." (D.I. 234 at 8) The court concluded that, as used in the specification and the claims, the term "capillary" means "pertaining to or resembling a hair; fine and slender." (D.I. 234 at 9) Plaintiffs assert that capillary action is still relevant to the issues at bar in that it is a test for the existence of capillary tubes, as properly construed. Plaintiffs contend that placing a filter into a liquid is one way to test for the existence of fine and slender tubes. If the liquid disappears, the filter must have fine and slender tubes into which the liquid is flowing.[FN7] If the liquid does not disappear, no such tubes exists.

> FN7. This phenomenon is called capillary action.

The court finds that evidence of capillary action will be unduly confusing to the jury. Capillary action is not required in the claim construction. Presenting the jury with this test and calling it "capillary action" and then reading the claims which require "capillary passageways" will confuse and mislead the jury. Furthermore, the phenomenon of upward movement of a liquid through a narrow tube is not relevant to the invention at issue. The invention, as claimed and construed, is related to the restriction of gas flow through fine and slender tubes. The court concludes that evidence of the phenomenon of capillary action is excluded under Fed.R.Evid. 403 because its probative value, as one way to prove the existence of thin and slender tubes, is outweighed by the danger of unfair prejudice, confusion of the proper claim construction and the potential for misleading the jury.

## E. Prior Art References

*4 Defendants have raised reargument on the issue of excluding United States Patent Nos. 2,666,297 (the "Skousgaard patent") and 3,245,583 (the "Miller patent"). The court declines to change its prior ruling re-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3159054 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

garding the two prior art references. (D.I.233) Prior art references must be disclosed during fact discovery and the parties must disclose their intent to rely thereon, regardless of whether or not the opposing party is aware of the reference. It is undisputed that the two references at issue, and the intent to rely on them for invalidating the asserted claims, were not disclosed to plaintiffs by defendants until after the close of fact discovery. Therefore, these references are excluded from defendants' invalidity case.

### IV. CONCLUSION

At Wilmington this 28th day of November, 2005, having reviewed the evidentiary disputes raised at the pretrial conference;[FN8]

> FN8. The evidentiary disputes are detailed in the transcript for the pretrial conference. (D.I.239)

IT IS SO ORDERED that:

1. Defendants are precluded, as a matter of law, from raising the issue of indefiniteness as it relates to claims that have been construed.

2. Evidence of the commercial embodiment of the claimed invention is not admissible for the infringement analysis, but may be used for the reverse doctrine of equivalents analysis.

3. Testimony by Luping Wang regarding simultaneous invention is inadmissible.

4. Evidence of capillary action is excluded.

5. The Skousgaard and Miller references are excluded.

D.Del.,2005.
Praxair, Inc. v. ATMI, Inc.
Not Reported in F.Supp.2d, 2005 WL 3159054 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1813931 (Trial Motion, Memorandum and Affidavit) Praxair's Motion for a Permanent Injunction (May 9, 2006) Original Image of this Docu-

ment with Appendix (PDF)
• 2006 WL 1182413 (Trial Motion, Memorandum and Affidavit) ATMI's Reply Brief in Support of its Inequitable Conduct Case (Mar. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 1182414 (Trial Motion, Memorandum and Affidavit) ATMI's Reply Brief in Support of its Renewed Motion for Judgment as A Matter of Law (Mar. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 1182415 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Atmi's Motion for A New Trial (Mar. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 1182410 (Trial Motion, Memorandum and Affidavit) Praxair's Answering Brief in Opposition to ATMP's Motion for Judgment as a Matter of Law (Mar. 2, 2006) Original Image of this Document (PDF)
• 2006 WL 1182411 (Trial Motion, Memorandum and Affidavit) Praxair's Answering Brief in Opposition to Atmps Post-Trial Motion Concerning Inequitable Conduct (Mar. 2, 2006) Original Image of this Document (PDF)
• 2006 WL 1182412 (Trial Motion, Memorandum and Affidavit) Praxair's Answering Brief in Opposition to ATMI's Motion for a New Trial (Mar. 2, 2006) Original Image of this Document (PDF)
• 2006 WL 809089 (Trial Motion, Memorandum and Affidavit) Atmi's Reply Brief in Support of its Motion to Compel Production of Documents from Praxair and Uop Based on Waiver of Attorney-Client Privilege and Work Product Immunity (Feb. 3, 2006) Original Image of this Document (PDF)
• 2006 WL 809088 (Trial Motion, Memorandum and Affidavit) Atmi's Amended Opening Brief in Support of its Renewed Motion for Judgment as A Matter of Law (Feb. 1, 2006) Original Image of this Document (PDF)
• 2006 WL 819615 (Trial Motion, Memorandum and Affidavit) Atmi's Amended Opening Brief in Support of its Inequitable Conduct Case (Feb. 1, 2006) Original Image of this Document (PDF)
• 2006 WL 819620 (Trial Motion, Memorandum and Affidavit) Amended Opening Brief in Support of Atmi's Motion for A New Trial (Feb. 1, 2006) Original Image of this Document (PDF)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3159054 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

• 2005 WL 3667341 (Trial Motion, Memorandum and Affidavit) Praxair's Discovery Designations, Atmi's Counter Designations and Objections to Praxair's Discovery Designations and Praxair's Objections to Atmi's Counter Designations (Nov. 4, 2005) Original Image of this Document (PDF)
• 2005 WL 3666787 (Trial Motion, Memorandum and Affidavit) Praxair's Motion to Strike Another New Witness and more New Documents Identified by Atmi and to Preclude Atmi from Relying on them at Trial (Oct. 31, 2005) Original Image of this Document (PDF)
• 2005 WL 2867905 (Trial Motion, Memorandum and Affidavit) Praxair's Reply Brief in Support of its Motion to Strike the Declarations of Philip Chen and Christopher Jones (Sep. 19, 2005) Original Image of this Document (PDF)
• 2003 WL 24229530 (Trial Pleading) Complaint for Patent Infringement (Dec. 22, 2003) Original Image of this Document (PDF)
• 1:03cv01158 (Docket) (Dec. 22, 2003)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

LEXSEE 1996 US DIST LEXIS 22616



Warning
As of: Jan 18, 2007

**GEORGIA-PACIFIC CORPORATION, Plaintiff, v. UNITED STATES GYPSUM COMPANY and L & W SUPPLY CORPORATION, Defendants.**

**Civil Action No. 94-489-RRM**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1996 U.S. Dist. LEXIS 22616*

**December 27, 1996, Decided**

**DISPOSITION:** [*1] Defendants' motions for judgment as a matter of law (D.I. 268 and 294) denied. Defendants' motion in the alternative for a new trial granted in part and defendants entitled.

**COUNSEL:** Jack B. Blumenfeld, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, for plaintiff.

Albert E. Fey, Esquire, W. Edward Bailey, Esquire, Steven C. Cherny, Esquire, Stacy L. Kelly, Esquire, Fish & Neave, New York, New York, for plaintiff.

Joseph F. Posillico, Esquire, Synnestvedt & Lechner, Philadelphia, Pennsylvania, for plaintiff.

Robert A. Currie, Esquire, Georgia-Pacific Corporation, Atlanta, Georgia, for plaintiff.

Richard K. Herrmann, Esquire, Stradley, Ronon, Stevens & Young, LLP, Wilmington, Delaware, for defendants.

James M. Amend, P.C., David K. Callahan, Esquire, Paul R. Garcia, Esquire, Christian C. Taylor, Esquire, Kirkland & Ellis, John M. Lorenzen, Esquire, USG Corporation, Chicago, Illinois, for defendants.

**JUDGES:** Roderick R. McKelvie, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Roderick R. McKelvie

**OPINION:**

**MEMORANDUM OPINION**

Dated: December 27, 1996

McKELVIE, District Judge

This is a patent case. Plaintiff Georgia-Pacific Corporation owns U.S. Patent Nos. [*2] *4,647,496* (the " *'496* patent"), *4,810,569* (the " *'569* patent"), *5,319,900* (the " *'900* patent"), and *5,371,989* (the " *'989* patent"). The patents relate to the manufacture and use of fibrous mat-faced gypsum board.

Georgia-Pacific alleges defendants United States Gypsum Company and L&W Supply (collectively hereinafter referred to as "U.S. Gypsum") are willfully infringing the *'496, '569, '900* and *'989* patents by manufacturing and selling a gypsum sheathing called Weatherock. U.S. Gypsum has denied infringement and counter claimed for a judgment that these patents are invalid and unenforceable.

The case was tried to a jury beginning on January 29, 1996. On February 9, 1996, the jury returned with a verdict finding U.S. Gypsum infringed claims of the *'569* and *'900* patents and had infringed, induced others to infringe and had contributed to the infringement of claims of the *'496* and *'989* patents. A copy of the verdict is attached. The jury found U.S. Gypsum had failed to show there was no infringement of these claims under the reverse doctrine of equivalents. The jury also found U.S. Gypsum had failed to show by clear and convincing evidence that the asserted claims of the four patents are [*3] invalid due to obviousness or for lack of enable-

1996 U.S. Dist. LEXIS 22616, *

ment, or that the claims of the '989 patent are invalid due to obviousness-type double patenting.

U.S. Gypsum has moved for an order granting it judgment as a matter of law, or, in the alternative, for a new trial. The parties have completed briefing on the motions and the court heard oral argument on May 6, 1996. This is the court's decision on these motions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

A. The Fields of the Invention and the Plaintiff's Patents

1. The Field of Invention: Gypsum Board and Exterior Insulating Systems

Gypsum is a mineral. Plaster of Paris is a fine powder of ground gypsum. When water is added to Plaster of Paris, it makes a slurry. Gypsum board is a panel with a core of hardened gypsum slurry sandwiched between paper cover sheets. Gypsum sheathing is a gypsum board designed for exterior use. Its gypsum core contains additives which improve its water resistance.

Builders have used gypsum sheathing in construction as a part of an exterior insulation system in which the builder will place the insulation on the outside rather than on the inside of the building. In an exterior insulation system, [*4] the gypsum sheathing is attached as a support surface to the frame of the outside wall. The insulation is then attached to the sheathing. A mesh-like material is affixed to the insulation and an exterior finish, such as stucco or aluminum or wood siding, is attached to the mesh.

Traditionally, gypsum sheathing included a core of gypsum sandwiched between layers of water-repellant paper cover sheets. The sheathing was mechanically attached to the frame of the building with, for example, nails or screws. The insulation was then glued to the sheathing.

A number of problems were identified with this paper-covered sheathing. As the paper tended to absorb water, it needed to be covered when stored at a job site and when it was being installed. Otherwise, the water might penetrate the paper and be absorbed into the core, which substantially reduced the strength of the sheathing. If the paper became wet after the sheathing was installed, the bond between the paper and the core might deteriorate, which could lead to cracking of the exterior finish.

Paper is also limited in its adhesive strength. As the insulation was typically glued to the paper on the sheathing, this tended to undermine [*5] the adhesive strengths of the various components of the system. While a builder might seek to overcome that problem by screwing or nailing insulation to the sheathing and the frame, that would both increase the installation costs and the risk that the fastener would provide a path for water to penetrate the insulation, the paper and the gypsum core.

2. February 27, 1984: Georgia-Pacific's Patent Application

On February 27, 1984, Georgia-Pacific, as assignee of Charles W. Lehnert and Brian Randall, filed an application with the United States Patent and Trademark Office for a patent on an invention relating to an improved gypsum board or sheathing. The application described a method of manufacturing a board on a conventional wallboard machine in which a gypsum slurry of a particular viscosity and including fire and water resistant additives was fed onto a moving sheet of glass fiber mat. The slurry penetrated substantially through some portions of the underlying mat to form a thin film on portions of the outer surface of that mat. At that viscosity, the slurry did not penetrate through portions of the overlying mat.

The application reported that the fibrous mat-faced sheathing [*6] was an improvement over the paper-faced sheathing in that it had improved rigidity, strength and water resistance, and can be installed with water-based adhesives or secured by nailing. It set out 20 claims, including claims to an exterior insulating system comprising a fibrous mat-faced gypsum support system, a board with a gypsum core sandwiched between two sheets of porous glass mat, a process for manufacturing the board, the board with water-resistant additives, and the board with an outer surface substantially fee of gypsum.

By an action dated June 5, 1985, an examiner with the Patent and Trademark Office rejected all 20 of the claims as being unpatentable over U.S. Patent No. 4,504,533 to Altenhofer et al., which disclosed a gypsum construction panel comprising a gypsum core having fibrous mat facings.

In a reply dated December 6, 1985, John T. Synnestvedt, counsel for Georgia-Pacific, sought to distinguish Altenhofer as directed to improving adhesive bonding of a composite web on the side of a gypsum sheet and as nothing in Altenhofer suggested: 1) a method for installing a panel in an exterior insulating system; 2) a glass mat-faced gypsum board in which one face of the [*7] board has set gypsum and the other is substantially free of gypsum; 3) a method for regulating gypsum slurry viscosity; 4) a fibrous mat-faced gypsum board having water resistant additives; and 5) a shaft wall assembly.

Following a March 1986 telephone conference with the Examiner, Alexis Barron of Synnestvedt & Lechner, filed an amendment adding a claim 21 directed to an

1996 U.S. Dist. LEXIS 22616, *

exterior finishing system, declarations of the inventors describing the dramatic weatherability of the board and identifying and distinguishing certain prior art, including Canadian Patent No. 993,779 to Morrone, U.S. Patent Nos. 4,378,405 and 4,477,300 to Pilgrim, U.S. Patent No. 3,993,822 to Knauf, and U.S. Patent No. 3,944,698 to Dierks.

By an action dated April 18, 1986, the Examiner reported that he had found three distinct inventions described in the patent and required the applicant pursuant to 35 U.S.C. § 121 to restrict the application to one of the three. Barron initially objected to the Examiner's decision. Thereafter, he confirmed Georgia-Pacific had elected to proceed with the product claims. In August, Barron filed a supplemental amendment that, among other things, amended the [*8] board claims to claim an exterior insulating system that incorporated a glass mat-faced gypsum board. He added 26 claims, reviewed certain other prior art and renewed Georgia-Pacific's position that none of the prior art discloses the use of a glass mat-faced gypsum support surface as a structural support member in an exterior system.

By a notice dated September 5, 1986, the Examiner allowed the pending claims.

3. March 1987: The Systems Patent (the '496 patent) Issues and Georgia-Pacific Files a Divisional Application on the Board Claims

Georgia-Pacific's patent on the systems claims issued on March 3, 1987 as No. 4,647,496, titled Use of Fibrous Mat-Faced Gypsum Board in Exterior Finishing Systems for Buildings. Georgia-Pacific contends U.S. Gypsum has infringed five claims of the '496 patent: claims 1, 2, 5, 6 and 11. Claims 1 and 11 are independent claims. They read:

1. An exterior insulation system for a building comprising a glass mat-faced gypsum support surface, insulating material having an inner surface and an outer surface, the inner surface of which is adhered to said support surface by an adhesive material, the insulating material being substantially free [*9] of channels penetrating therethrough and between said inner and outer surfaces, and an exterior finishing material overlying the outer surface of said insulating material.

11. An exterior finishing system for a building comprising an underlying structural support element which is covered with an overlying finishing material, said support element including gypsum board comprising a set gypsum core sandwiched between two sheets of porous glass fiber mat, the gypsum core including one or more additives which are effective in improving the water-resistant properties of the board in an amount at least sufficient to impart to the board improved water-resistant properties.

On March 2, 1987, Georgia-Pacific filed a request for a divisional application for the board claims. By a decision dated June 19, 1987, the Examiner rejected the board claims as unpatentable over Altenhofer, both Pilgrim patents, and Morrone. The Examiner noted Altenhofer disclosed a gypsum board with a gypsum core layered with a glass fiber web, Pilgrim disclosed a gypsum board between two facing sheets of nonwoven glass fiber, and Morrone disclosed a process for making a gypsum board wherein a slurry is applied [*10] to a glass mat.

Barron responded by a paper dated December 22, 1987. He argued that Altenhofer is distinguishable as it claimed an outer surface that is a composite sheet of nonwoven and woven fiberglass, it did not claim a board in which portions of one of the glass mats are coated with gypsum and it did not disclose the process for making the boards as described in Georgia-Pacific's application. He distinguished Pilgrim as claiming a board in which the glass mats are covered by a thin layer of core gypsum. He distinguished Morrone as also calling for a total coating of the glass fiber mat facing by the core gypsum. He noted that an advantage of the applicant's claimed invention is that it avoided a bleed through of gypsum during the manufacturing operation, avoided a build-up of slurry on the equipment, and thus allowed a manufacturer to change from paper board to fiber glass board without having to shut down and clean up the manufacturing line. He also noted that the gypsum-free surface of the applicant's board was stronger than the board where the gypsum had bled through, and it offered a convenient surface to print product data.

On March 8, 1988, Barron supplemented his earlier [*11] reply to the Examiner by adding nine claims directed to a board and a process for making a board in which both surfaces of the glass mat are substantially free of set gypsum. In this paper, he acknowledged that the prior art disclosed a gypsum product of the type in which a set gypsum core is sandwiched between two glass mats, and argued that this art did not disclose a gypsum board in which the outer surface of each of the glass mats is substantially free of set gypsum. In that paper, he also distinguished Knauf, in that the board described in Knauf has an underlying glass mat that is not substantially free of set gypsum, and that in Knauf's

1996 U.S. Dist. LEXIS 22616, *

process for manufacturing the board, a barrier material was placed below the mat to prevent the slurry from penetrating through the mat. He wrote:

> In summary, it can be said that the prior art does not disclose that a glass mat-faced gypsum board can be produced by means of controlling the viscosity of a gypsum slurry in a manner such that the slurry penetrates but part-way into a porous glass mat, thereby affixing firmly one surface of the mat to the set gypsum core while the other surface remains gypsum-free.

In a second supplementary [*12] reply dated March 22, 1988, Barron added ten more claims directed to the nature and thickness of the mats and the slurry in various embodiments of the invention.

4. March 1987: The Board Patent (the '569 patent) Issues

By an office action dated May 9, 1988, the Examiner allowed the pending claims subject to certain modifications. Patent No. 4,810,569, titled Fibrous Mat-Faced Gypsum Board was issued on March 7, 1989. Georgia-Pacific contends U.S. Gypsum has infringed claim 1 of that patent. It reads:

> 1. Gypsum board comprising a set gypsum core sandwiched between two sets of porous glass mat, each of which has an inner and outer surface, said mat comprising randomly distributed glass fibers bonded by an adhesive material, the inner surface of each of said mats adhered to said gypsum core by a portion of the set gypsum comprising said core, the outer surface of one of said mats having portions thereof coated with set gypsum comprising portions of the set gypsum of said core, and the outer surface of the other of said mats being substantially free of set gypsum.

In February 1992, Peter Cronk of Synnestvedt and Lechner filed a continued application based on Georgia-Pacific's [*13] original February 27, 1984 application. This application set out 26 claims directed to a gypsum board for use in an exterior finishing system. The application included claims to a board with water-resistant additives and a method of manufacturing that board.

By an action dated April 27, 1993, the Examiner rejected all of the claims. One reason cited by the Exam-

iner for rejecting certain claims directed to the method of forming the board is that they were anticipated by German Utility Model No. 7,806,114, which had been assigned to Rigips Baustoffwerke GmbH & Co. The Examiner rejected other claims directed to the board as obvious over Morrone in view of Novak, as the German patent disclosed a gypsum board comprising a core of set gypsum sandwiched between two sheets of porous glass fibers mats, with an outer surface permeated by the gypsum and Novak disclosed a board formed of a gypsum core between sheets of fiber with the outer surfaces uncalendered. The Examiner concluded it would have been obvious to one of ordinary skill in the art to leave the outer surface of the board of the German patent unpermeated by gypsum. The examiner also concluded it would have been obvious to one of [*14] ordinary skill in the art to comprise the core of the German patent of a fire-resistant additive to protect the structure to which the board is applied.

By a paper dated October 27, 1993, Cronk responded to the rejection with comments, canceled a claim, and amended certain other claims. Cronk argued that while Rigips disclosed a gypsum board including a set gypsum core bound by a pair of composite glass mat layers, it could be distinguished for a number of reasons, including that the composite layers were more expensive and complicated than the mats claimed in Georgia-Pacific's application, in that the mats included an inner fabric, a middle layer of chopped glass mat and an outer layer of glass mat with an increased density. He also argued that those of ordinary skill in the art would not have deciphered the applicants' viscosity control solution from the disclosure in the Rigips reference. Cronk argued that Morrone did not disclose the use of its board in exterior insulation or finishing systems and did not show a mat substantially free of gypsum on the exterior surface.

By an office action dated February 14, 1994, the Examiner again rejected all of the claims under 35 U.S.C. § 112, [*15] for failure of the specification to point out particularly how the mats are adhered to the gypsum core, for failure to show how the gypsum flow is controlled, and as to certain claims as indefinite. The Examiner noted that the claims would be allowable if rewritten or amended to overcome the rejections.

> No prior art of record shows a gypsum board comprising a set gypsum core sandwiched between mats comprising randomly distributed glass fibers, with the set gypsum being adhered to the mats by a portion of the set gypsum and having an outer surface of the mats free of set gypsum.

1996 U.S. Dist. LEXIS 22616, *

Joseph Posillico of Synnestvedt & Lechner responded by a paper dated May 16, 1996, in which he reviewed where the specification described how the mats adhere to the core, and set out the viscosity flow-control parameter.

5. December, 1994: The Second Board Patent (the '989 patent) Issues

On June 2, 1994, the Examiner confirmed the claims would be allowed. Patent No. *5,371,989*, titled Use of Fibrous Mat-Faced Gypsum Board, issued December 13, 1994. Georgia-Pacific contends U.S. Gypsum has infringed claims 1, 6, 8, 9, 10, 12, 15 and 17 of that patent. The independent claims 1, 9 and 17 read as [*16] follows:

> 1. A gypsum board comprising a set gypsum-containing core sandwiched between two sheets of porous glass mat, each of said mats consisting of said randomly distributed glass fibers bonded by an adhesive material, said mats adhered to said set gypsum core by a portion of said set gypsum, at least a first of said mats having an outer surface which is substantially free of set gypsum.

> 9. An exterior insulation system for a building, comprising a support surface, insulating material having an inner surface and an outer surface, the inner surface of which is adhered to the support surface by an adhesive material, and an exterior finishing material overlying the outer surface of the insulating material, said support surface comprising a gypsum board according to claim 1.

> 17. A gypsum board comprising a set gypsum core having at least one porous, non-woven glass mat thereon, said mat consisting of randomly distributed glass fibers bonded by an adhesive material, said mat adhered to said gypsum core by mechanical interlocking means formed from a portion of said randomly distributed glass fibers bonded to said set gypsum, whereby an outer surface of said mat is substantially [*17] free of set gypsum.

On May 6, 1993, Peter Cronk of Synnestvedt and Lechner filed a continued application based on Georgia-Pacific's original February 27, 1984 application. This application set out 16 claims directed to a gypsum board for use in an exterior finishing and roof deck system. The application included claims to a finishing system with a fibrous mat-faced gypsum board with a core having one or more additives which improve the board's water and fire resistance. The application describes adding mineral fibers to the gypsum core to improve the ability of the set gypsum composition to maintain its integrity when subjected to the heat of fire, and describes mineral fibers, such as glass fibers, asbestos fibers and calcium sulfate whisker fibers, as examples of the materials.

In August 1993, the Examiner reported that the application contained claims directed to patentably distinct species, including exterior, interior and roof deck systems, and called on the applicant to elect a single disclosed species for prosecution on the merits. Cronk elected to pursue claims 1 and 4 through 7, which were directed to an exterior finishing system; and claims 12 through 16, which were [*18] directed to a board with fire and water resistant additives. Consequently, Cronk withdrew claims 2, 3 and 8 through 11. The examiner then rejected the claims for obviousness-type double patenting over claims of the '496 and U.S. Patent No. *5,220,762* issued to Lehnert et al. and assigned to Georgia-Pacific, titled Fibrous Mat-Faced Gypsum Board in Exterior and Interior Finishing Systems for Buildings.

By an amendment filed on October 10, 1993, Cronk canceled claims 1, 4 through 6, 7 and 11. In addition, Cronk requested that the Examiner reconsider the rejection of claims 12-16 in light of a disclaimer filed with the amendment by which Georgia-Pacific disclaimed the terminal part of any patent granted on the application which would extend beyond the expiration date of the '762 patent.

By a notice dated November 11, 1993, the Examiner allowed claims 12-16 of the application. Patent No. *5,319,900*, titled Finishing and Roof Deck Systems Containing Fibrous Mat-Faced Gypsum Boards, was issued on June 14, 1994. Georgia-Pacific contends U.S. Gypsum has infringed claims 1 and 2 of that patent. They read as follows:

> 1. Gypsum board comprising a set gypsum core faced with a fibrous mat, [*19] the gypsum core including one or more additives which are effective in simultaneously improving the water resistance and fire resistance properties of the board in an amount at least sufficient to impart to the board improved water resistance and fire resistance properties.

> 2. The gypsum board of claim 1, wherein said fibrous mat contains glass fibers.

1996 U.S. Dist. LEXIS 22616, *

### B. Pre-Trial and Trial Proceedings

### 1. Pretrial Proceedings

Georgia-Pacific filed this action against United States Gypsum Company and L & W Supply Corporation on September 24, 1994, alleging they have willfully infringed claims of the '496, '569 and '900 patents and that they have actively induced and contributed to infringement by others. U.S. Gypsum responded on November 18, 1994, by denying infringement, and asserting a number of affirmative defenses, including a defense that the patents are invalid for a failure to meet the conditions in *35 U.S.C. § 102*, that the inventions claimed are not new, for a failure to meet the conditions of *35 U.S.C. § 103*, that the subject matter of the patent would not have been obvious at the time of the invention to a person having ordinary [*20] skill in the art to which it pertains, and for a failure to comply with the conditions of *35 U.S.C. §§ 111* and 112, that the claims of the patent particularly point out and distinctly claim the subject matter which the patentee regards as his invention or the preferred embodiment thereof. U.S. Gypsum also counterclaimed for a judgment that the three patents are invalid and unenforceable for the reasons identified in its answer.

Following a conference on December 9, 1994, the court entered a Scheduling Order providing that all discovery be initiated so that it would be completed on or before July 1, 1995 and scheduling the case for a ten-day jury trial beginning on September 25, 1995.

In January 1995, Georgia-Pacific moved for an order compelling U.S. Gypsum to provide more responsive answers to interrogatories Georgia-Pacific had served on November 4, 1995, seeking, among other things, the factual basis for U.S. Gypsum's contentions that the patents in suit were invalid or unenforceable. During a January 6, 1995 conference on the motion, the court reviewed with counsel the opinions in *Scovill Mfg. Co. v. Sunbeam Corp., 61 F.R.D. 598 (D. Del. 1973)* [*21] and *Wesley-Jessen Corp. v. Pilkington Visioncare, Inc., 844 F. Supp. 987 (D. Del. 1994)* and the court's view that contention interrogatories can be an important tool to be used early on in discovery. In granting Georgia-Pacific's motion, the court noted:

> To the extent that you don't fairly disclose those matters in response to the contention interrogatories, then I will prevent you at trial from arguing or offering proof on those claims, or those arguments. . . . There will come a time at trial where each of you may stand up and say, Judge, we asked them back in November on this is-

sue and they didn't produce the information. We haven't had a fair chance to take discovery on it and we ask you to preclude them from offering proof. And, consistent with these matters, I will preclude a party from offering facts or argument on points where they haven't fairly disclosed those matters in response to a contention interrogatory that seeks that information. . . . The party who is seeking the information should be comfortable. If you can show me the other side has been unreasonable, I will prevent them from ambushing you later on.

On January 10, 1995, the court entered [*22] an order implementing a stipulation filed by the parties by which Georgia-Pacific amended its complaint to add claims alleging defendants infringed the claims of the '989 patent. In answering the amended complaint, U.S. Gypsum no longer contended plaintiff's patents were invalid for failure to comply with the requirements in *35 U.S.C. § 111*. Otherwise, it answered the amended complaint by again denying infringement, asserting the same affirmative defenses and counterclaiming for a judgment that all of the patents are invalid and unenforceable. U.S. Gypsum joined a new affirmative defense and claim for relief allegations that Georgia-Pacific had sought to mislead the Patent and Trademark Office about the nature of the '405 patent issued to Pilgrim as to whether Pilgrim disclosed the inclusion of a water-resistant additive in the core of the board.

As the parties continued to report their disagreement on the adequacy and timing of responses to contention interrogatories, the court wrote to counsel on March 16, 1995 and reminded counsel of the court's view on the subject by sending counsel a transcript of a recent proceeding in another case where the court told [*23] counsel:

> If you show me you're fairly responding with the information you've got when you've got it and you update and give the other side notice before the pretrial conference and before the trial, that's fine. But if it looks like you're holding back on something and the other side hasn't had a fair chance to respond in preparation for trial, I'll just preclude you from putting those facts or evidence in at trial. . . . And part of the reason I'm all over everybody in the early stages of the case is because there will come a time at the pretrial conference where I'll start cutting some heads

1996 U.S. Dist. LEXIS 22616, *

and arms off. I've done it a couple of times and people have been a little upset, but part of my theory is we've talked about it for two months and if you haven't fairly disclosed it, it's too late at the pre-trial conference to say "By the way, Judge."

The court reviewed these issues with counsel again during a conference on March 23, 1995, during which the court discussed setting firm dates in March and April by which the parties would respond to contention inter-rogatories. Thereafter, any party seeking to supplement a response as to a contention or the basis for a contention would [*24] have to show why that party could not have provided that response sooner.

The court reviewed these issues with counsel again during an April 6, 1995 conference. During that confer-ence the court set May 1, 1995 as a date by which U.S. Gypsum's position on the bases for its defenses would be fixed.

Following the April 6, 1995 conference, the court entered an Amended Scheduling Order extending the date for the completion of discovery to October 13, 1995 and rescheduling the trial to January 1996.

On September 6, 1995, Georgia-Pacific moved for an order precluding U.S. Gypsum from relying on certain prior art or asserting certain defenses, reporting that on September 1, U.S. Gypsum had served a Fourth Amended Reply to Georgia-Pacific's contention inter-rogatories and in those answers identified 57 prior art references not previously asserted, and new bases for defenses based on invalidity, including the Morrone '779 patent, a Pearson '371 patent, and a contention U.S. Gyp-sum invented a board similar to Weatherock in the late 1970's. During a conference on September 13, 1995, the court granted Georgia-Pacific's request for relief, subject to a further showing by U.S. Gypsum as to why [*25] it had failed to provide the information in these answers earlier. With regard to newly disclosed facts or art, the court invited U.S. Gypsum to show it had only recently learned of these facts or the art. With regard to new con-tentions based on previously disclosed facts, the court invited U.S. Gypsum to show that Georgia-Pacific would not be unfairly prejudiced by having to respond to them at the trial.

U.S. Gypsum followed up on that invitation with further argument on why it should not be precluded from obtaining relief based on matters, facts or contentions identified for the first time in its Fourth Amended Reply. After reviewing the matter and having found U.S. Gyp-sum failed to show why it could not have set out the fac-tual and legal bases for these contentions earlier, the court entered an order precluding U.S. Gypsum from

relying at trial on the new matter disclosed in the Sep-tember 1st Fourth Amended Reply.

2. The Trial

The case was tried to a jury beginning on Monday, January 29, 1996. At the trial, Georgia-Pacific offered evidence on Brian Randall and William Lehnert's work in the early 1980's that led to the development of the inventions that are the subject of [*26] the patents, in-cluding a glass-mat-surfaced gypsum board and Georgia-Pacific's introduction and marketing of products based on their invention, including a glass-mat faced gypsum board called Dens Glass and later a board called Dens Glass Gold, by which Georgia-Pacific added a gold-colored acrylic coat on the outer surface of the Dens Glass. Georgia-Pacific manufactures its Dens Glass Gold on a traditional gypsum board manufacturing line, by pouring a gyspum slurry onto that mat. It increases the viscosity of the slurry to prevent it from flowing or bleeding through the mat. It then places a mat on top of the slurry. As some slurry may seep through the bottom mat, portions of the outer surface of the bottom mat may be covered by gypsum. However, the outer surface of the top mat is gypsum-free.

Georgia-Pacific offered evidence showing that Georgia-Pacific was losing sales on Dens Glass products with customers buying U.S. Gypsum's competing prod-uct, Weatherock, which U.S. Gypsum began selling in the 1990s. U.S. Gypsum manufactures its Weatherock board by placing a fiber glass-mat on release paper, pouring a densified gypsum slurry on the mat, forcing the slurry into and through the [*27] mat, adding a foamed gypsum slurry as a core, and placing a fiber glass-mat on top of the core slurry. It then removes the paper, to have a board with 95% of the bottom surface (where the paper had been) covered with gypsum, and with the outer surface of the top mat substantially free of gypsum. U.S. Gypsum admits it adds a water resistant additive to its slurry, but denies it adds a fire resistant additive.

Brian Randall testified he had taken a sample of Weatherock and soaked it in water. As the core gypsum dissolved, he found glass fiber filaments in the core, which he concluded U.S. Gypsum had added to make the board more fire-resistant.

Georgia-Pacific called Robert Bruce to offer opin-ions as an expert witness on the subject of gypsum manufacturing. He testified to his opinions that Weatherock infringed claims of the patents in issue, such as, for example, claims 1 of the '569 and claim 1 of the '989 patent. They read:

Claim 1 of the '569 patent.

1996 U.S. Dist. LEXIS 22616, *

1. Gypsum board comprising a set gypsum core sandwiched between two sets of porous glass mat, each of which has an inner and outer surface, said mat comprising randomly distributed glass fibers bonded by an adhesive material, [*28] the inner surface of each of said mats adhered to said gypsum core by a portion of the set gypsum comprising said core, the outer surface of one of said mats having portions thereof coated with set gypsum comprising portions of the set gypsum of said core, and the outer surface of the other of said mats being substantially free of set gypsum.

Claim 1 of the '989 patent.


1. A gypsum board comprising a set gypsum-containing core sandwiched between two sheets of porous glass mat, each of said mats consisting of randomly distributed glass fibers bonded by an adhesive material, said mats adhered to said set gypsum core by a portion of said set gypsum, at least a first of said mats having an outer surface which is substantially free of set gypsum.

Bruce based his opinions in part on his conclusions that: 1) the gypsum coating on the bottom of the Weatherock board covered only portions of the board; 2) the core of the Weatherock board was sandwiched between two glass mats; and 3) the facing of a gypsum board is a surface reinforcing material and, therefore, the Weatherock board with fiber glass-mat covered with gypsum is a glass-mat faced board.

U.S. Gypsum called a number [*29] of witnesses to testify, including Dr. Richard A. . Dr. Kuntze. Dr. Kuntze offered opinions as an expert witness in the field of gypsum board design, manufacture and use. He testified that the words glass-mat faced as used in the exterior insulation and finishing systems (EIFS) industry mean glass-mat on the face, or outer surface of the board (and nothing on top of the glass). Consequently, as Weatherock had gypsum on one outer surface of the board, that side was not glass-mat faced.

Dr. Kuntze reviewed prior art in the field, including the Morrone Canadian Patent No. 993779, U.S. Patent 3,993,822 to Knauf, German utility model number 7806114 to Rigips Baustoffwerke, and the Pilgrim Patent, U.S. patent 4,378,405. He offered his opinion that the prior art described the same kind of invention that is contained in the board claims of the patent. Rigips describes a board with gypsum free surfaces. Morrone and Pilgrim described a board using randomly-oriented fiberglass mat. Pilgrim described adding fiberglass to increase fire resistance of the core of the board.

In instructing the jury, the court construed the disputed terms of the claims as follows. The word "portions" should be read [*30] with its ordinary meaning, "a part of a whole." The word "sandwiched" should be read with its ordinary meaning, "between two things and not through and outside one of those two things." To those skilled in the art, the words "glass mat-faced" mean "glass mat surface reinforcing material."

In closing arguments, counsel for Georgia-Pacific conceded that with the court's claim construction Georgia-Pacific would not be able to establish the bottom surface of Weatherock was only covered with portions of gypsum, thus conceding a failure to prove infringement of claim 1 of the '569 patent and claim 6 of the '496 patent.

Counsel argued Georgia-Pacific had establish Weatherock infringed the balance of the asserted claims, as Weatherock was a "glass mat-faced" gypsum board, in that it had a glass mat surface reinforcing material. Counsel argued Weatherock met the "sandwiched" limitation, in that the gypsum core was sandwiched between the two mats, and what was through and outside the bottom mat was not the core gypsum, but the densified layer of gypsum. Counsel also argued Georgia-Pacific established Weatherock had sufficient fibers in the core to create a fire-resistant additive.

In [*31] responding to U.S. Gypsum's evidence as to obviousness, counsel argued that Rigips taught away from the invention, in that the text of the patent suggested the invention solved a problem that would otherwise arise from using fiberglass, that Morrone and Pilgrim had gypsum on the outside of both mats, and that Knauf was made from a composite mat, a woven fabric.

Counsel reviewed other evidence relating to secondary considerations as to obviousness and other evidence relating to Georgia-Pacific's claim for $ 650,000 as damages for lost profits.

In his closing argument, counsel for U.S. Gypsum argued Georgia-Pacific had failed to prove infringement and failed to rebut U.S. Gypsum's evidence on obviousness.

The jury's verdict is attached. It shows the jury found Georgia-Pacific had met its burden of showing U.S. Gypsum infringed the assert claims of the patents, that Georgia-Pacific had failed to meet its burden of

1996 U.S. Dist. LEXIS 22616, *

proof to show no infringement under the reverse doctrine of equivalents, or invalidity due to obviousness, double-type patenting, a lack of enablement. The jury found Georgia-Pacific had proved damages of $ 325,000.

U.S. Gypsum has moved for judgment as a matter of law or [*32] in the alternative for a new trial. Its briefing includes three arguments. First, it argues the court improperly precluded it from presenting certain defenses. Second, it contends there was insufficient evidence to support the jury's infringement findings. Third, it contends the claims in issue are invalid as a matter of law.

II. DISCUSSION

In deciding whether to grant judgment as a matter of law on a particular issue after a jury has returned a verdict, the court must determine whether substantial evidence exists in the record to support the jury's verdict when the correct legal standard is applied. *Markman v. Westview Instruments, Inc., 52 F.3d 967, 975 (Fed. Cir. 1995),* aff'd, *517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996).* Substantial evidence is the quantum of evidence that reasonable jurors would accept as adequate to support the finding under review. *The Perkin-Elmer Corp. v. Computervision Corp., 732 F.2d 888, 893 (Fed. Cir.),* cert. denied, *469 U.S. 857, 83 L. Ed. 2d 120, 105 S. Ct. 187 (1984).* The court must consider all evidence and draw all reasonable inferences from the evidence in the [*33] light most favorable to the nonmovant. Id. In addition, the court may not determine the credibility of the witnesses, and it may not "substitute its choice for that of the jury as between conflicting elements of the evidence." Id.

In deciding whether to grant a new trial, the court may consider, among other things, whether the verdict is against the weight of the evidence, *Wagner v. Fair Acres Geriatric Center, 49 F.3d 1002, 1017 (3d Cir. 1995),* whether the verdict turned on erroneously admitted evidence, *Blanche Road Corporation v. Bensalem Township, 57 F.3d 253 (3d Cir.),* cert. denied, *516 U.S. 915, 116 S. Ct. 303, 133 L. Ed. 2d 208 (1995),* or whether the court improperly instructed the jury. *Cooper Distributing Co. v. Amana Refrigeration, 63 F.3d 262 (3d Cir. 1995);* see generally *Lind v. Schenley Industries, Inc., 278 F.2d 79, 90 (3d Cir.),* cert. denied, *364 U.S. 835, 5 L. Ed. 2d 60, 81 S. Ct. 58 (1960).* In determining whether a verdict is against the weight of the evidence, the court should not substitute its view of the facts for that of the jurors. *Wagner, 49 F.3d at 1017.* [*34] Nevertheless, the court may grant a new trial even when judgment as a matter of law is inappropriate. Id. Ultimately, the grant of a new trial is within the sound discretion of the district court. Id.

1. Did the court improperly preclude U.S. Gypsum from presenting certain defenses?

U.S. Gypsum contends the court improperly precluded it from seeking relief based on claims that the board and additive claims are anticipated by a single prior art reference, that the asserted claims fail to distinctly point out and claim what Lehnert and Randall regard as their invention, and that Georgia-Pacific failed to name the proper inventors in the patents in suit. It is not clear why U.S. Gypsum is calling on this court to revisit this issue. Early on in the case, the court put counsel on notice of its view that discovery relating to contentions and the basis for contentions is an effective tool that can assist the court and counsel in formulating and simplifying issues consistent with *Federal Rule of Civil Procedure 16.* Early on in the case, the court set deadlines for counsel to respond to these discovery questions and warned counsel of the consequences that would follow from a [*35] failure to respond, or to identify why counsel could not respond at that time. Georgia-Pacific heard that message and used that tool. When Georgia-Pacific concluded U.S. Gypsum had not heard that message, it asked the court for assistance well before the close of discovery. As noted above, the court's decision to preclude U.S. Gypsum from making certain arguments and offering certain evidence came after a number of conferences, and after U.S. Gypsum had numerous opportunities to respond to Georgia-Pacific's discovery requests or to show why it should be relieved from having to respond. This court sees no reason to revisit this issue.

2. Is there sufficient evidence in the record to support the jury's verdicts as to infringement?

U.S. Gypsum argues that Georgia-Pacific's evidence as to infringement was deficient in two respects. First, U.S. Gypsum argues there was insufficient evidence from which the jury could conclude Weatherock contained fire resistant additives so as to infringe that element of claims 1 and 2 of the *'900* patent, and claim 8 of the *'989* patent. The court agrees. Even if we accept Georgia-Pacific's evidence that it found some glass fibers in Weatherock's gypsum [*36] core—which was disputed by U.S. Gypsum—that testimony is not sufficient to show there were enough fibers to give the boards a fire resistant property. For example, in prosecuting the *'900* patent, Georgia-Pacific reported that the amount of glass fibers to be included in the core to provide the fire resistant properties should be at least 0.03% of the weight of the slurry. Georgia-Pacific has not offered evidence to show that the fibers they contend they found in Weatherock are sufficient to meet this minimum weight. As the verdict as to these claims is against the weight of the evidence, the court will enter an order granting U.S.

Case 1:05-cv-00132-JJF   Document 273-2   Filed 01/19/2007   Page 26 of 50

Page 10
1996 U.S. Dist. LEXIS 22616, *

Gypsum's motion for a new trial as to Georgia-Pacific's claims it is infringing these claims.

Second, U.S. Gypsum contends there is insufficient evidence to support a finding of infringement as to claims 6 and 11 of the '496 patent, and claims 1, 6, 8, 9, 10, 12, and 15 of the '989 patent, as they claim a gypsum board or a system with a gypsum board with the core gypsum "sandwiched" between two mats. U.S. Gypsum contends that as Weatherock has gypsum penetrating through and on the outside of one of the mats, its core is not "sandwiched" between the mats [*37] and thus it does not infringe.

Georgia-Pacific had initially argued Weatherock met this "sandwiched" limitation by having the gypsum slurry between the two mats and that U.S. Gypsum had simply added a feature by also forcing the gypsum through one mat and onto its outer surface. After the court construed sandwich to read "between two things and not through and outside of one of those two things," Georgia-Pacific offered a new argument: Weatherock still met this limitation as its core slurry was sandwiched between the two mats, what penetrated through the mat and to the outside on the Weatherock was not the core gypsum slurry, but the densified layer of gypsum U.S. Gypsum added and pressed through the mat before it added the gypsum slurry. Needless to say, this new argument, this new view of the facts (and perhaps new construction of the claims) caused some stir in the courtroom, as it came during the rebuttal portion of plaintiff's closing argument.

A review of the prosecution history of the patents as set out above shows Lehnert and Randall started out claiming they had developed a method of manufacturing a gypsum board with fiber glass mats on a conventional wallboard machine. [*38] They accomplished this by controlling the viscosity of the slurry as it was fed onto a moving sheet of glass fiber mat. With a porous mat, they reported the slurry would penetrate the mat to form a thin film on portions of the outer surface of the mat. The words they used in claiming their invention, included a "gypsum slurry," which was to be poured between "two glass mats." In that context, they described the slurry as sandwiched between the mats and the term "sandwich" can be read with its ordinary meaning, that is to place between two things (but not on the outside of either). Lehnert and Randall further described the mats in their claims as "porous," and noted that for certain claims at least one of them would allow the core gypsum to penetrate through the porous mat. In that context, by claiming "a board comprising a set gypsum core sandwiched between two sheets of porous glass mat...the outer surface of one of said mats having portions thereof coated with set gypsum," they added words to further describe the sandwich as having a core of slurry that penetrated

through a porous mat and formed a thin film on portions of the outer surface. For other claims, they claimed a sandwich [*39] where at least one mat had an outer surface that was substantially free of gypsum (implying that the other need not). In others, they claimed a sandwich were both surfaces were substantially free of gypsum. And in others, they claimed a board of core gypsum sandwiched between two mats, without claiming any unique or particular surface on the outside of the mats.

As counsel maneuvered through the Patent and Trademark office and around and past the prior art, they refined and rewrote the claims frequently to limit the extent to which they claimed the core gypsum would penetrate through the glass mats.

By construing the word sandwiched, the court did not constrain Georgia-Pacific from arguing (or the jury from finding) that a claim may describe a board with a gypsum core sandwiched between two porous glass mats and (where the additional matter is claimed) through the porous mat and on the outer surface of one mat. See for example, claim 1 of the '569 patent, which reads:

> 1. Gypsum board comprising a set gypsum core sandwiched between two sets of porous glass mat, each of which has an inner and outer surface, said mat comprising randomly distributed glass fibers bonded by an [*40] adhesive material, the inner surface of each of said mats adhered to said gypsum core by a portion of the set gypsum comprising said core, the outer surface of one of said mats having portions thereof coated with set gypsum comprising portions of the set gypsum of said core, and the outer surface of the other of said mats being substantially free of set gypsum.

The issue raised by the jury's finding of infringement, is whether the claims asserted by Georgia-Pacific cover Weatherock, a board with slurry that is through and on the outside of one of the mats. Claim 6 of the '496 patent does, but as noted above, U.S. Gypsum does not infringe that claim as the claim includes the limitation that the gypsum on the outside cover only a portion of the mat. Georgia-Pacific now concedes more than portions of one side of Weatherock are covered with gypsum.

Claim 11 of the '496 patent does not cover a board with slurry that is through and on the outside of the mat, as it claims in part a board with a gypsum core sandwiched between two mats, but does not claim a board where the core penetrates through and onto the outside of

the mat. It appears, therefore, there was no substantial evidence [*41] to support the jury's verdict U.S. Gypsum infringes this claim.

Claim 1, 6, 9, 10, 12, 15 and 17 of the '989 patent do claim a board or a system with a board where the outer surface of one mat is substantially free of gypsum (and by implication the other is not). As Weatherock has the other elements of these claims, it infringes each of these claims of the patent.

In summary, the court will affirm the jury's verdict as to infringement of claims 1, 2 and 5 of the '496 patent and of claims 1, 6, 9, 10, 12, 15 and 17 of the '989 patent. The court will grant defendants' motion for a new trial on Georgia-Pacific's claim U.S. Gypsum infringes and induces others to infringe claim 11 of the '496 patent, claim 8 of the '989 patent, and its motion for a new trial on claims 1 and 2 of the '900 patent.

3. Is there sufficient evidence to support the jury's verdict that U.S. Gypsum failed to show by clear and convincing evidence that the claims in issue are invalid due to obviousness?

U.S. Gypsum contends it is entitled to a judgment as a matter of law that all of the asserted claims are obvious. An inventor cannot obtain a patent" if the differences between the subject matter sought to [*42] be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which" the invention pertains. 35 U.S.C. § 103. Facts to consider when determining whether the claims of a patent were obvious include: 1) the scope and content of the prior art; 2) the level of ordinary skill in the art; 3) the differences between the subject matter claimed and the prior art; and 4) other objective indicia of nonobviousness. See Graham v. John Deere Co. 383 U.S. 1, 17-18, 15 L. Ed. 2d 545, 86 S. Ct. 684 (1966). U.S. Gypsum has the burden of proving these facts by clear and convincing evidence. Greenwood v. Hattori Seiko Co., 900 F.2d 238, 241 (Fed. Cir. 1990). The ultimate determination of obviousness, however, is a question of law. Graham, 383 U.S. at 17; Connell v. Sears, Roebuck & Co., 722 F.2d 1542, 1547 (Fed. Cir. 1983).

As to the systems claims, U.S. Gypsum contends it established at trial that system claims are old, that a glass mat faced board was known in the prior art, that the EIFS industry [*43] recognized that exterior insulation systems could be put up over virtually any sound substrate and that fiberglass reinforced gypsum board was a sound substrate. It also argues that it has shown that paper-reinforced gypsum boards had been used as a substrate and that it would have been obvious to replace a paper-reinforced board with a fiberglass-reinforced board (because paper had been identified as the weak link in the

systems using paper-faced gypsum sheathing). It also points to evidence offered at the trial showing that years before Georgia-Pacific applied for the patents, U.S. Gypsum researches had considered fiberglass-reinforced gypsum boards as being desirable for use in exterior insulation systems.

U.S. Gypsum argues the board claims would have been obvious in light of the prior art, including Morrone and Rigips. It contends it showed Morrone contained each of the following elements: (1) gypsum board sandwiched between two sheets of porous glass mat; (2) each mat having an inner and outer surface; (3) the mats comprising randomly distributed glass fibers bonded by an adhesive material; (4) the inner surface of each mat being adhered to the core by a portion of the core [*44] gypsum; and (5) one of the mats having a surface free of gypsum, and the other having portions which are coated with gypsum. It contends Rigips discloses a fiberglass mater-reinforced board with the outer surfaces of both glass-mats gypsum free.

Georgia-Pacific has responded by arguing there is substantial evidence the jury could have looked to in rejecting U.S. Gypsum's arguments. As to the system claims, Georgia-Pacific relies on the testimony of Hopkins, Randall and Lehnert and their identification of the unique problems in developing a board for the EIFS industry, including problems relating to developing a board that would be exposed to the weather. Georgia-Pacific notes that each of the references cited by U.S. Gypsum discloses interior boards. None discloses or suggests an exterior system. It also relies on Hopkins' testimony that while the EIFS industry had been looking for a better substrate for years, it was not until Randall and Lehnert conducted their experiments and developed their fiberglass mat that the need was met.

Georgia-Pacific is correct that this evidence does suggest the system claims would not have been obvious to one of ordinary skill in the art. It is sufficient [*45] to support the jury's finding U.S. Gypsum failed to meet its burden of coming forward with clear and convincing evidence that the system claims were invalid due to obviousness.

As to the board claims, Georgia-Pacific responds that it offered evidence at the trial (evidence the jury was entitled to rely on) to show that Morrone does not have a gypsum free surface. That evidence included U.S. Gypsum's pre-trial admissions that Morrone did not have a gypsum-free surface. While Dr. Kuntze testified at trial that he believed it did, he appears to have conceded on cross examination that the drawings in Morrone and the text to the drawings appear to refer to gypsum on the outside of both sheets. Georgia-Pacific argues it is the gypsum free surface that makes its board claims pat-

1996 U.S. Dist. LEXIS 22616, *

entable over the prior art, as it is the gypsum free surface that allows a manufacturer to make the fiber glass-mat faced boards on a conventional gypsum board line. Georgia-Pacific argues the jury was entitled to credit its evidence on this point.

During the oral argument following the post trial briefing counsel for U.S. Gypsum identified the following language from claim 1 of the Morrone patent as showing the [*46] patent disclosed both a gypsum-free surface and a surface coated with gypsum.

> ...thin glass fiber sheet adhered to at least one major side of the core, a portion of the fibers comprising said sheet being exposed on the exterior surface...a substantial number of interstices between adjacent fiber at the exterior surface of the sheet.

It appears this sentence speaks to whether the fibers are exposed, rather than to what portion of the fibers on the outer surface may otherwise be covered by gypsum. In any event, reading this sentence does not clearly show Morrone claimed a gypsum free surface. Perhaps the best evidence that it does not show that, comes from U.S.Gypsum's pre-trial admissions that it did not read Morrone as disclosing a gypsum free surface.

Georgia-Pacific also argues the jury was entitled to credit its evidence and arguments as to Rigips, including that it taught away from manufacturing a board with simple, clear, resin-bonded glass fiber maters (as used by Morrone and Georgia-Pacific).

Georgia-Pacific also relies on substantial evidence as to secondary considerations relevant to obviousness. It cites testimony by Hopkins, Kuntz and others that Georgia-Pacific's [*47] Dens Glass products met a long felt need in the industry, its proof as to the commercial success of its Dens Glass products, including evidence that they had gained a substantial share of the market, their sales were growing at relatively high rates (38%, 28% and 50% per year) and that they were generating substantial profits for Georgia-Pacific (1994 Georgia-Pacific made over $ 10 million worth of incremental profits on its Dens Glass products).

A review of the record confirms there is substantial evidence to support the jury's conclusion U.S. Gypsum failed to show by clear and convincing evidence that the claims in issue are invalid due to obviousness.

U.S. Gypsum has included other arguments in its post trial briefing. Certain of them are more in the nature of reargument of pretrial and trial decisions. To the ex-

tent they are not addressed in this opinion, they are denied for the reasons previously identified by the court. As to other arguments not addressed in this opinion, the court has reviewed them and finds them to be without merit.

## VERDICT

### I. INFRINGEMENT

#### A. The '496 Patent

1. Do you find that Georgia-Pacific has shown by a preponderance of the evidence [*48] that defendants United States Gypsum Company and L & W Supply Corporation (collectively, "USG") have infringed any of the following claims of the '496 patent? (A "YES" answer to this question is a finding for Georgia-Pacific. A "NO" answer is a finding for USG.)

| | | |
|---|---|---|
| Claim 1 | YES X | NO |
| Claim 2 | YES X | NO |
| Claim 5 | YES X | NO |
| Claim 6 | YES | NO X |
| Claim 11 | YES X | NO |

2. Do you find that Georgia-Pacific has shown by a preponderance of the evidence that USG has induced infringement of any of the following claims of the '496 patent? (A "YES" answer to this question is a finding for Georgia-Pacific. A "NO" answer is a finding for USG.)

| | | |
|---|---|---|
| Claim 1 | YES X | NO |
| Claim 2 | YES X | NO |
| Claim 5 | YES X | NO |
| Claim 6 | YES | NO X |
| Claim 11 | YES X | NO |

3. Do you find that Georgia-Pacific has shown by a preponderance of the evidence that USG has contributed to the infringement of any [*49] of the following claims of the '496 patent? (A "YES" answer to this question is a finding for Georgia-Pacific. A "NO" answer is a finding for USG.)

| | | |
|---|---|---|
| Claim 1 | YES X | NO |
| Claim 2 | YES X | NO |
| Claim 5 | YES X | NO |
| Claim 6 | YES | NO X |
| Claim 11 | YES X | NO |

#### B. The '569 Patent

1996 U.S. Dist. LEXIS 22616, *

1. Do you find that plaintiff Georgia-Pacific Corporation ("Georgia-Pacific") has shown by a preponderance of the evidence that USG has infringed claim 1 of the '569 patent? (A "YES" answer to this question is a finding for Georgia-Pacific. A "NO" answer is a finding for USG).

YES ___    NO X

**C. The '900 Patent**

1. Do you find that Georgia-Pacific has shown by a preponderance of the evidence that USG has infringed any of the following claims of the '900 patent? (A "YES" answer to this question is a finding for Georgia-Pacific. A "NO" answer is a finding for USG.)

Claim 1    YES X    NO ___

Claim 2    YES X    NO ___

**D. The '989 Patent**

1. Do you find that [*50]    Georgia-Pacific has shown by a preponderance of the evidence that USG has infringed any of the following claims of the '989 patent? (A "YES" answer to this question is a finding for Georgia-Pacific. A "NO" answer is a finding for USG).

Claim 1    YES X    NO ___

Claim 6    YES X    NO ___

Claim 8    YES X    NO ___

Claim 9    YES X    NO ___

Claim 10    YES X    NO ___

Claim 12    YES X    NO ___

Claim 15    YES X    NO ___

Claim 17    YES X    NO ___

2. Do you find that Georgia-Pacific has shown by a preponderance of the evidence that USG has induced infringement of any of the following claims of the '989 patent? (A "YES" answer to this question is a finding for Georgia-Pacific. A "NO" answer is a finding for USG).

Claim 9    YES X    NO ___

Claim 10    YES X    NO ___

Claim 12    YES X    NO ___

Claim 15    YES X    NO ___

3. Do you find that Georgia-Pacific has shown by [*51]    a preponderance of the evidence that USG has contributed to the infringement of any of the following claims of the '989 patent? (A "YES" answer to this question is a finding for Georgia-Pacific. A "NO" answer is a finding for USG).

Claim 9    YES X    NO ___

Claim 10    YES X    NO ___

Claim 12    YES X    NO ___

Claim 15    YES X    NO ___

**II. REVERSE DOCTRINE OF EQUIVALENTS**

Do you find that USG has shown by a preponderance of the evidence that there is no infringement of any of the following claims of the patents in suit under the reverse doctrine of equivalents? (A "YES" answer to this question is a finding for USG. A "NO" answer is a finding for Georgia-Pacific).

**The '496 Patent**

Claim 1    YES ___    NO X

Claim 2    YES ___    NO X

Claim 5    YES ___    NO X

Claim 6    YES ___    NO X

Claim 11    YES ___    NO X

**The '569 Patent**

Claim 1    YES ___    NO X

**The '900 Patent [*52]**

Claim 1    YES ___    NO X

Claim 2    YES ___    NO X

**The '989 Patent**

Claim 1    YES ___    NO X

Claim 6    YES ___    NO X

Claim 8    YES ___    NO X

Claim 9    YES ___    NO X

Claim 10    YES ___    NO X

Claim 12    YES ___    NO X

Claim 15    YES ___    NO X

Claim 17    YES ___    NO X

**III. VALIDITY**

1. Do you find that USG has shown by clear and convincing evidence that any of the following claims of the '496 patent are invalid due to obviousness? (A "YES" answer to this question is a finding for USG. A "NO" answer is a finding for Georgia-Pacific).

Claim 1    YES ___    NO X

Claim 2    YES ___    NO X

1996 U.S. Dist. LEXIS 22616, *

Claim 5    YES    NO X

Claim 6    YES    NO X

Claim 11    YES    NO X

2. Do you find that USG has shown by clear and convincing evidence that the following claim [*53] of the '569 patent is invalid due to obviousness? (A "YES" answer to this question is a finding for USG. A "NO" answer is a finding for Georgia-Pacific).

Claim 1    YES    NO X

3. Do you find that USG has shown by clear and convincing evidence that any of the following claims of the '900 patent are invalid due to obviousness? (A "YES" answer to this question is a finding for USG. A "NO" answer is a finding for Georgia-Pacific).

Claim 1    YES    NO X

Claim 2    YES    NO X

4. Do you find that USG has shown by clear and convincing evidence that any of the following claims of the '989 patent are invalid due to obviousness? (A "YES" answer to this question is a finding for USG. A "NO" answer is a finding for Georgia-Pacific).

Claim 1    YES    NO X

Claim 6    YES    NO X

Claim 8    YES    NO X

Claim 9    YES    NO X

Claim 10    YES    NO X

Claim 12    YES    NO X

Claim 15    YES    NO X [*54]

Claim 17    YES    NO X

5. Do you find that USG has shown by clear and convincing evidence that any of the following claims of the '989 patent are invalid due to obviousness-type double patenting? (A "YES" answer to this question is a finding for USG. A "NO" answer is a finding for Georgia-Pacific).

Claim 1    YES    NO X

Claim 6    YES    NO X

Claim 8    YES    NO X

Claim 9    YES    NO X

Claim 10    YES    NO X

Claim 12    YES    NO X

Claim 15    YES    NO X

Claim 17    YES    NO X

6. Do you find that USG has shown by clear and convincing evidence that any of the following claims of the '496 patent are invalid for lack of enablement. A "YES" answer to this question is a finding for USG. A "NO" answer is a finding for Georgia-Pacific).

Claim 1    YES    NO X

Claim 2    YES    NO X

Claim 5    YES    NO X

Claim 6    YES [*55]    NO X

Claim 11    YES    NO X

7. Do you find that USG has shown by clear and convincing evidence that the following claim of the '569 patent is invalid for lack of enablement? (A "YES" answer to this question is a finding for USG. A "NO" answer is a finding for Georgia-Pacific).

Claim 1    YES    NO X

8. Do you find that USG has shown by clear and convincing evidence that any of the following claims of the '900 patent are invalid for lack of enablement? (A "YES" answer to this question is a finding for USG. A "NO" answer is a finding for Georgia-Pacific).

Claim 1    YES    NO X

Claim 2    YES    NO X

9. Do you find that USG has shown by clear and convincing evidence that any of the following claims of the '989 patent are invalid for lack of enablement? (A "YES" answer to this question is a finding for USG. A "NO" answer is a finding for Georgia-Pacific).

Claim 1    YES    NO X

Claim 6    YES    NO X

Claim 8    YES    NO X

Claim 9    YES    [*56]    NO X

Claim 10    YES    NO X

Claim 12    YES    NO X

Claim 15    YES    NO X

Claim 17    YES    NO X

## III. DAMAGES

1. If you found at least one claim infringed and not invalid, what amount of damages do you find Georgia-Pacific has proved by a preponderance of the evidence?

Amount $ 325,000,00

1996 U.S. Dist. LEXIS 22616, *

You each must sign this verdict form:

/s/ Marian JoAnn Boyd

/s/ Kathaline D. Mauro

/s/ Arthur J. Waite

/s/ [Signature]

/s/ [Signature]

/s/ William R. Hudghton

/s/ [Signature]

/s/ Linda L. Brady

/s/ [Signature]

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS MOTION FOR JUDGMENT AS A MATTER OF LAW**

For the reasons set out in the court's December 27, 1996 Memorandum Opinion,

IT IS HEREBY ORDERED as follows:

1) Defendants' motions for judgment as a matter of law (D.I. 268 and 294) are denied.

2) Defendants' motion in the alternative for a new trial is granted in part and defendants are entitled to a new trial on plaintiff's claims defendants infringe claims 1 and 2 of the '900 patent and plaintiffs claims defendants infringe and induced others to [*57] infringe claim 8 of the '989 patent and claim 11 of the '496 patent.

Roderick R. McKelvie

UNITED STATES DISTRICT JUDGE

December 27, 1996

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FILED

NOV 2 9 1993

TIME_____
CLERK, U.S. DISTRICT COURT
DISTRICT OF DELAWARE

THE LIPOSOME COMPANY, INC.,        )
                                   )
            Plaintiff,             )
                                   )
      v.                           )   Civil Action No. 92-332-RRM
                                   )
VESTAR, INC.,                      )
                                   )
            Defendant.             )

## ORDER RESOLVING VESTAR'S MOTIONS FOR RECONSIDERATION

Vestar has moved for reconsideration of two decisions made by the Court during the November 12, 1993 Pretrial Conference. First, it has moved for reconsideration of the Court's decision to preclude it from calling Thomas D. Kiley as an expert witness. Second, it has moved for reconsideration of the Court's decision that plaintiff could assert the doctrine of equivalents as a basis for infringement. The Court having reviewed the additional papers submitted by the parties on these motions,

IT IS ORDERED AS FOLLOWS:

1. Vestar's Motion for Reconsideration as to Plaintiff's Motion In Limine to Preclude Defendant's Rebuttal Expert from Testifying (Docket Item 131)    Vestar's Motion for reconsideration of the Court's decision to preclude it from calling Thomas D. Kiley to testify as an expert is denied.    Vestar failed to identify Mr. Kiley as an expert within the time period provided by the Court in the Scheduling Order in this matter. The deadlines in that Order are consistent with the Court's interest in setting the time for completion of discovery

and ensuring compliance with appropriate requested discovery in a timely fashion.  See 28

U.S.C. § 473(a)(2)(C).

    2. <u>Vestar's Motion to Exclude from this Case Plaintiff's Claim of Infringement Under</u>

<u>the Doctrine of Equivalents (Docket Item 130)</u>  Vestar's Motion to preclude Liposome from

relying on the doctrine of equivalents is granted.  In its Motion, Vestar has shown that

during the period for discovery it served an interrogatory on Liposome asking it to state

whether it alleged claims were infringed under the doctrine of equivalents.  In responding,

Liposome did not report that it intended to allege infringement under the doctrine of

equivalents.  Liposome did not disclose it intended to rely on the doctrine of equivalents

until November 7, 1993, after the date for completion of discovery.  As Liposome failed to

identify this contention in response to Vestar's discovery request, the Court will preclude it

from relying on it at trial.


                                                                  
_____
                                               United States District Judge

Dated:  November 24, 1993

# EXHIBIT F

LEXSEE



Caution
As of: Jan 18, 2007

**IXYS CORPORATION, Plaintiff, v. ADVANCED POWER TECHNOLOGY, INC.,
Defendant. AND RELATED COUNTERCLAIMS.**

**No. C 02-03942 MHP**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA**

**2004 U.S. Dist. LEXIS 10934**

**June 15, 2004, Decided
June 16, 2004, Filed**

**SUBSEQUENT HISTORY:** Partial summary judgment denied by Ixys Corp. v. Advanced Power Tech., Inc., 321 F. Supp. 2d 1156, 2004 U.S. Dist. LEXIS 10945 (N.D. Cal., June 15, 2004)

**PRIOR HISTORY:** IXYS Corp. v. Advanced Power Tech., Inc., 2004 U.S. Dist. LEXIS 4200 (N.D. Cal., Mar. 18, 2004)

**DISPOSITION:** Defendant's motion to amend granted in part and denied in part. Plaintiff's motion to preclude granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant corporation filed a motion to amend its final invalidity contentions in connection with plaintiff patentee's action for infringement of patents on an improved design for power MOSFET devices. The patentee filed a motion to preclude the corporation from introducing or employing untimely produced documents.

**OVERVIEW:** The corporation sought to add materials produced by its expert and corresponding claim charts. The court denied the corporation's motion to amend its final invalidity contentions as to 90 pages that the patentee received only six days before its expert's rebuttal report was due. The corporation did not provide any mask layer data as accompaniment to its final invalidity contentions and stated that it had produced all technical

information on which its contentions of non-infringement were based. Later that day, the corporation filed a motion for summary judgment of non-infringement, and the next day it provided mask layer data for a large number of the corporation's devices. The court held that U.S. Dist. Ct., N.D. Cal., Patent R. 3-4(b) required the corporation to produce more than the "identity" of the prior art upon which it sought to rely, and if the corporation believed that a mask layer photograph was relevant, then Rule 3-4(b) required the corporation to provide that document. The corporation's decision to deliver the documents upon which its motion for summary judgment relied to the patentee only after it had already filed that motion was unconscionable.

**OUTCOME:** The court denied the corporation's motion to amend it final invalidity contention with respect to 90 pages produced six days before an expert rebuttal was due, but granted the motion in all other respects. The court precluded the corporation from introducing into evidence any documents that referenced any of the corporation's products that the patentee had already accused of infringing its patents.

**CORE TERMS:** chart, layer, mask, compact, patent, invalidity, non-infringement, infringement, referenced, documents produced, summary judgment, rebuttal, introducing, Local Rules, ninety, motion to amend, production of documents, corresponding, correction, forwarded, bates

**LexisNexis(R) Headnotes**

2004 U.S. Dist. LEXIS 10934, *

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court*
[HN1] Prejudice is the touchstone of the inquiry when considering a motion for leave to amend a complaint.

*Patent Law > Anticipation & Novelty > Elements*
*Patent Law > Infringement Actions > Defenses > Patent Invalidity > General Overview*
[HN2] U.S. Dist. Ct., N.D. Cal., Patent R. 3-3(a) states that a party's preliminary invalidity contentions (and, by extension, its final invalidity contentions) must reveal the identity of each item of prior art that allegedly anticipates each asserted claim.

*Patent Law > Infringement Actions > Defenses > Patent Invalidity > General Overview*
[HN3] The preliminary invalidity contentions must contain a chart identifying where specifically in each alleged item of prior art each element of each asserted claim is found. U.S. Dist. Ct., N.D. Cal., Patent R. 3-3(c).

*Patent Law > Inequitable Conduct > General Overview*
*Patent Law > Infringement Actions > Defenses > Patent Invalidity > General Overview*
[HN4] U.S. Dist. Ct., N.D. Cal., Patent R. 3-4(b) requires the party asserting invalidity to produce a copy of each item of prior art identified pursuant to U.S. Dist. Ct., N.D. Cal., Patent R. 3-3(a) which does not appear in the file history of the patent(s) at issue.

**COUNSEL:** [*1] For IXYS Corporation, Plaintiff: Robert Paul Feldman, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA. Christopher D. Catalano, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA. Michael Barclay, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA.

For Advanced Power Technology, Inc., Defendant: Vickie L. Feeman, Orrick Herrington & Sutcliffe LLP, Menlo Park, CA. Alexander Charles Johnson, Marger Johnson & McCollom, P.C., Portland, OR. James Edward Harris, Marger Johnson & McCollom, P.C., Portland, OR. William Sloan Coats, III, Orrick Herrington & Sutcliffe, Menlo Park, CA. Bas de Blank, Orrick, Herrington & Sutcliffe LLP, Menlo Park, CA. Robert Paul Feldman, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA. Tarek J. Helou, Orrick Herrington & Sutcliffe LLP, Menlo Park, CA.

**JUDGES:** MARILYN HALL PATEL, Chief Judge, United States District Judge.

**OPINION BY:** MARILYN HALL PATEL

**OPINION:**

### MEMORANDUM AND ORDER RE: DEFENDANT'S MOTION TO AMEND FINAL INVALIDITY CONTENTIONS AND PLAINTIFF'S MOTION TO PRECLUDE UNTIMELY PRODUCED EVIDENCE

Plaintiff IXYS Corporation ("IXYS") filed this action against defendant Advanced Power Technology, Inc. ("APT"), alleging infringement of two U.S. patents, numbered 5,486,715 [*2] (the "'715 patent") and 5,801,419 (the "'419 patent"), that it holds on an improved design for power MOSFET devices. Now before the court are APT's motion to amend its final invalidity contentions and IXYS's motion to preclude APT from introducing or employing untimely produced documents. After having considered the parties' arguments and submissions, and for the reasons set forth below, the court rules as follows.

I. APT's Motion to Amend Final Invalidity Contentions

APT has come before this court seeking leave to amend its final invalidity contentions to add materials produced by its expert, John Neilson (the "GE/Harris documents") and corresponding claim charts, as well as claim charts organizing the technical references relied upon by APT's expert, Dr. Shenai, in his opening report. The court construed disputed claim terms in this case on January 22, 2004, and the deadline in this case for the filing of Final Invalidity Contentions was March 1, 2004. However, on March 8, 2004, at oral argument, the court notified the parties of a typographical error in the original claim construction order and announced that a correction would be forthcoming; the court's written order [*3] of March 18, 2004, contained this correction.

According to APT, sometime after the March 8, 2004, hearing Mr. Neilson became aware of the court's modification of its claim construction order and realized that certain documents in his possession had become relevant. On March 15, 2004, Mr. Neilson faxed nineteen pages of GE/Harris documents to APT's counsel; the documents were promptly forwarded to IXYS by facsimile the following day. Johnson Dec. P9. At some subsequent point Mr. Neilson forwarded another 90 pages of documents to APT's counsel. Id. P10. APT's attorney photocopied these documents and delivered copies of them to IXYS on March 31, 2004. Rebuttal expert reports in this case were due on April 6, 2004.

2004 U.S. Dist. LEXIS 10934, *

Under Patent Local Rule 3-6(b), APT has the right to amend its final invalidity contentions in light of the adjustment made to the court's claim construction. However, as in all cases of amendment, that right is subject to the court's (and APT's) countervailing duty to avoid prejudicing IXYS through eleventh-hour alterations. Cf. Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003)  [HN1] ("Prejudice is the touchstone of the inquiry" when [*4] considering a motion for leave to amend a complaint.) IXYS's expert was able to incorporate the first nineteen pages of GE/Harris material (delivered March 16, 2004) into his rebuttal report. See Barclay Dec., Exh. 7, PP10-11. The same cannot be said for the remaining ninety pages, which IXYS received only six days before Dr. Blanchard's rebuttal report was due. See id. P5g. The court is further puzzled as to why APT only delivered to IXYS the claim charts accompanying Dr. Shenai's report on March 26, 2004, when that report was due on March 1, 2004. Nevertheless, there seems little to be gained from striking these claim charts while the underlying technical references remain part of the case.

Accordingly, APT's motion is DENIED with respect to the ninety pages of GE/Harris documents provided to IXYS on March 31, 2004, and GRANTED in all other respects.

II. IXYS's Motion to Preclude

On March 31, 2003, APT served its Preliminary Invalidity Contentions ("PIC") on IXYS as required under the set schedule. APT's PIC specifically referenced several of APT's devices, including the 208, 208x, and 526 as prior art devices, and APT delivered mask layers corresponding to those [*5] devices to IXYS on April 17, 2003. See Barclay Dec., Exh. 3. The PICs also mentioned APT's 108 device as relevant prior art, and a paper by Douglas Pike--presumably the inventor of the 108--was attached as a reference to the PIC. See id. at 1, 4 ("If the 208x is found to not be a 'high frequency' device, claim 23 would be obvious based on APT's high-frequency 108 product... The 108 product of Reference 9 actually uses an Al-on-polysilicon gate to operate at 10 MHz."). n1 APT did not produce any mask layer documents for the 108, or for its 206 and 207 devices, at this point.

    n1 However, IXYS points out that this document almost surely does not refer to the 108, since APT claims to have invented that device only in 1991. Regardless, the resolution of this question is not necessary for the purposes of IXYS's motion, given the court's holding.

On March 1, 2004, pursuant to the schedule set several months earlier, APT served its Final Invalidity Contentions ("FIC") upon IXYS. This document again referred [*6] to the APT 108, as well as the APT 206 and 207, and provided the same Pike paper as a reference. De Blank Dec., Exh. L. Again, APT did not provide any mask layer data to IXYS as accompaniment to its FIC.

On March 29, 2004, APT's counsel stated in a letter to IXYS's attorney that "APT has already produced all of the technical information on which its contentions of non-infringement are based." n2 Barclay Dec., Exh. 15. Later that day, however, APT filed a motion for summary judgment of non-infringement that referenced the APT 108 via declarations by several of APT's experts and officers. See Def. Mot., at 20-22. The next day, APT provided to IXYS a compact disc Bates-numbered APT 024649 that contained mask layer data for a large number of APT devices, including the APT 108. On April 16, 2004, APT filed the aforementioned motion to amend its FIC. The amended documents made no further reference to the 108, 206 or 207 devices.

    n2 APT's letter also stated that APT was in the process of "analyzing IXYS's infringement allegations" and planned to supplement its response to IXYS's interrogatory regarding APT's non-infringement contentions only after APT's expert reports were complete. Notwithstanding this guarantee, APT filed its motion for summary judgment of non-infringement the same day as it delivered this letter to IXYS. The court is simply stunned by the disingenuousness of APT's March 29, 2004, letter.

[*7]

Patent Local Rule 3-3(a)  [HN2] states that a party's PIC (and, by extension, its FIC) must reveal "the identity of each item of prior art that allegedly anticipates each asserted claim." In addition,  [HN3] the PIC must contain "[a] chart identifying where specifically in each alleged item of prior art each element of each asserted claim is found...." Patent L.R. 3-3(c). Finally, Patent Local Rule 3-4(b)  [HN4] requires the party asserting invalidity to produce "[a] copy of each item of prior art identified pursuant to Patent L.R. 3-3(a) which does not appear in the file history of the patent(s) at issue." APT alleges that Rules 3-3(a)and 3-4(b) require only what they literally describe--disclosures of the "identity" and a "copy" of the prior art--not other "ancillary" documents such as the mask layer data provided on the 024649 compact disc. APT also alleges that it provided "representational" claim charts for the 108, 206, and 207 devices along with its FIC, while IXYS argues that the only claim charts

2004 U.S. Dist. LEXIS 10934, *

provided for devices APT alleges as prior art are the 208 and 208x. See De Blank Dec., Exh. L.

APT's reading of the Patent Local Rules is untenable at best, and insultingly tendentious at worst. [*8] The Local Rules exist to further the goal of full, timely discovery and provide all parties with adequate notice and information with which to litigate their cases, not to create supposed loopholes through which parties may practice litigation by ambush. Rule 3-4(b) quite obviously requires APT to produce more than the "identity" of the prior art upon which it seeks to rely--if APT believes that a mask layer photograph or drawing is relevant to this action, then Rule 3-4(b) requires APT to serve upon IXYS a copy of that same document. n3

n3 Indeed, if APT's reading of the Local Rules were correct, its production of mask layers for the 208 devices would have been utterly unnecessary.

Moreover, IXYS's requests for production of documents targeted precisely these types of prior art documents. See Barclay Dec., Exh. 1, at 9-11. APT's decision to deliver the documents upon which its motion for summary judgment relies to IXYS only *after* it has already filed that motion is simply unconscionable; unlike the materials [*9] that APT received from Dr. Neilson (referenced above) there is every indication that APT has held these documents in its possession, ready for use, since the beginning of this litigation. Their deployment against APT at this late stage in the proceedings will obviously cause IXYS a great deal of needless prejudice. APT is hereby precluded from introducing into evidence any prior art documents produced on the compact disc bates numbered APT 024649, and the court strikes all references to those documents in APT's motion papers.

The documents produced on this compact disc that do not constitute prior art are a different matter. Patent Local Rule 3-4(a) requires that APT turn over to IXYS any and all documents describing the operation or structures of APT's accused devices, but does not mention other devices that have not been accused. Similarly, IXYS's requests for production of documents specifically referenced the accused devices, not APT's complete line of products. See Barclay Dec., Exh. 1, at 5-6. IXYS has accused the following APT devices of infringement: "(a) any and all Power MOS 7(R) products or Power MOS V(R) (Generation 5) products with dual-layer metallization manufactured, [*10] used, sold, or offered for sale by APT on or after August 15, 1996, and (b) any and all products manufactured, used, sold, or offered for sale by APT on or after August 15, 1996 that are designed in substantially the same way, or function in substantially the same way, as APT 5018BLL [a Power MOS 7 TM MOSFET]." Pl. Disclosure of Asserted Claims and Preliminary Infringement Contentions. By consequence, it is documents describing *those* devices that APT was obligated to produce; APT's failure to produce documents relating to products that IXYS has never accused is not in error. Accordingly, APT is hereby precluded from introducing into evidence any documents produced on the compact disc bates numbered APT 024649 that reference or describe any of the products IXYS has *already* accused of infringing its patents. APT's 546, 846, and 1046 devices are deemed representative of all APT devices that IXYS has heretofore accused of infringement.

IT IS SO ORDERED.

Dated: June 15, 2004

MARILYN HALL PATEL

Chief Judge

United States District Court

Northern District of California

# EXHIBIT G

LEXSEE 2005 US DIST LEXIS 26059



Analysis
As of: Jan 18, 2007

**DAIICHI PHARMACEUTICAL CO., LTD. and DAIICHI PHARMACEUTICAL
CORPORATION, Plaintiffs, v. APOTEX, INC. and APOTEX CORP., Defendants.**

**Civ. No. 03-937 (WGB)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*2005 U.S. Dist. LEXIS 26059*

**November 1, 2005, Decided
November 1, 2005, Filed**

**SUBSEQUENT HISTORY:** Motion denied by *Daiichi
Pharm. Co. v. Apotex, Inc., 2005 U.S. Dist. LEXIS 26062
(D.N.J., Nov. 1, 2005)*

**PRIOR HISTORY:** *Daiichi Pharm. Co. v. Apotex, Inc.,
380 F. Supp. 2d 478, 2005 U.S. Dist. LEXIS 16174
(D.N.J., 2005)*

**COUNSEL:** [*1] James P. Flynn, Esp., EPSTEIN,
BECKER & GREEN, P.C., Newark, New Jersey; Brian
P. Murphy, Esq., David Leichtman, Esq., MORGAN
LEWIS & BOCKIUS LLP, New York, New York, for
Plaintiffs.

Steven Gerber, Esq., ADORNO & YOSS, LLP, Wayne,
New Jersey; Robert B. Breisblatt, Esq., Julie A. Katz,
Esq., WELSH & KATZ, LTD., Chicago, Illinois, for
Defendants.

**JUDGES:** BASSLER, SENIOR DISTRICT JUDGE.

**OPINION BY:** WILLIAM G. BASSLER

**OPINION:**

**MEMORANDUM OPINION**

**BASSLER, SENIOR DISTRICT JUDGE:**

Plaintiffs Daiichi Pharmaceutical Co. Ltd., and Dai-
ichi Pharmaceutical Corporation (collectively as "Dai-
ichi" or "Plaintiffs") filed a motion *in limine* to preclude
defendants Apotex, Inc. and Apotex Corp. (collectively

as "Apotex" or "Defendants") from asserting an affirma-
tive defense of failing to name the proper inventors of
Daiichi's patent pursuant to *35 U.S.C. § 102(f)*.

For the reasons set forth below, Daiichi's motion is
**granted.**

**I. BACKGROUND**

Daiichi brought suit against Apotex alleging patent
infringement of all seven claims of Daiichi's *U.S. Patent
No. 5,401,741* ("the *'741 patent*"), entitled a "Topical
Preparation for Treating Otopathy." Daiichi now [*2]
argues that Apotex did not sufficiently put Daiichi on
notice of the defense that it is not entitled to the *'741
patent* for failure to name the proper inventors pursuant
to *35 U.S.C. § 102(f)*. *Section 102* states: "A person shall
be entitled to a patent unless... (f) he did not himself in-
vent the subject matter sought to be patented...."

Daiichi argues that *section 102* provides an affirma-
tive defense that. must be pled in a way that sufficiently
gives a plaintiff notice of the defense, and by failing to
do so Apotex waived such defense. Furthermore, Daiichi
contends that allowing Apotex to present evidence to that
end not only unduly prejudices Daiichi but also thwarts
the purpose of contention interrogatories.

Apotex asserts that it raised the *section 102(f)* issue
in its Amended Answer. Apotex also argues that *Fed. R.
Civ. P. 8(c)* does not list *102(f)* as an affirmative defense
and, therefore, it need not be specifically pleaded. In
addition, Apotex makes argues that Daiichi will not be
prejudiced and was aware of the likelihood of the de-
fense because of questioning during depositions. More-

2005 U.S. Dist. LEXIS 26059, *

over, Appotex argues Daiichi was [*3] in possession of documents that suggested the defense would be raised. n1

> n1 The Court will not address Apotex's *Fed. R. Civ. P. 15(b)* argument because it does not apply. "Although *Rule 15(b)* does allow a court, under certain circumstances, to amend pleadings to conform to evidence even when the opposing party objected to that evidence, application of any portion of *Rule 15(b)* is appropriate only when an issue 'not raised by the pleadings' has, in fact, been presented." *Koch v. Koch Indus., 203 F.3d 1202, 1218 (10th Cir. 2000)*; see also *Deakyne v. Commissioners of Lewes, 416 F.2d 290 (3d Cir. 1969)*.

## II. DISCUSSION

### A. Affirmative Defenses Under *Rule 8(c)*

*Rule 8(c) of the Federal Rules of Civil Procedure* requires that "In a pleading to a preceding pleading, a party shall set forth affirmatively... any [] matter constituting an avoidance or affirmative defense...." (Emphasis added.) The Rule itself does not list every [*4] affirmative defense. The fact that the defense under *35 U.S.C. § 102(f)* is not provided for under *Rule 8(c)* does not mean that it falls outside the category of affirmative defenses; this is evident from the plain language of *Rule 8(c)*. See e.g. *Williams v. Ashland Engineering Co., Inc., 45 F.3d 588, 593 (1st Cir. 1995)* (discussing preemption as an affirmative defense); *Cornwall v. U.S. Constr. Mfg., Inc., 800 F.2d 250, 252 (Fed. Cir. 1986)* (discussing invalidity as an affirmative defense); *Freedman Seating Co. v. American Seating Co., 420 F.3d 1350, 1363 n.6 (Fed. Cir. 2005)* (discussing enforceability as an affirmative defense); *Ray v. Kertes, 285 F.3d 287, 291-92 (3d Cir. 2002)* (discussing exhaustion as an affirmative defense); *Shechter v. Comptroller of City of New York, 79 F.3d 265, 270 (2d Cir. 1996)* (discussing immunity as an affirmative defense); *Kennan v. Dow Chemical Co., 717 F.Supp. 799, 808-09 (M.D.Fla. 1989)* (discussing preemption as an affirmative defense).

The issue for the Court is whether *section 102(f)* falls within the category of a matter constituting [*5] avoidance or an affirmative defense. "Generally speaking, the rule's reference to 'an avoidance or affirmative defense' encompasses two types of defensive allegations: those, that admit the allegations of the complaint but suggest some other reason why there is no right to recovery, and those that concern allegations outside of the

plaintiff's prima facie case that the defendant therefore cannot raise by a simple denial in the answer." 5 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1271 (3d ed. 2004). The argument underlying *section 102(f)*, that a plaintiff is not entitled to recover because he is not the true inventor, falls well within the category of affirmative defenses considered by other courts as well as the first type of defensive allegations listed by Wright and Miller.

### B. Pleading Affirmative Defenses

"Parties are generally required to assert affirmative defenses early in litigation, so they may be ruled upon, prejudice may be avoided, and judicial resources may be conserved." *Robinson v. Johnson, 313 F.3d 128, 134 (3d. Cir. 2002)*. The Rule technically requires that such a defense be pleaded in the answer. *Id. at 135.* [*6] The purpose behind *Rule 8(c)* is to put "plaintiff on notice well in advance of trial that defendant intends to present a defense in the nature of an avoidance." *Marino v. Otis Engineering Corp., 839 F.2d 1404, 1408 (10th Cir. 1988)* (internal citations omitted). "A defendant should not be permitted to 'lie behind a log' and ambush a plaintiff with an unexpected defense." *Perez v. United States, 830 F.2d 54, 57 (5th Cir. 1987)* (internal citations omitted).

In order to assert an affirmative defense under *Rule 8(c)* the pleading party must at least put plaintiff on reasonable notice of that defense. While some courts have considered harmless a technical failure to comply with *Rule 8(c)*, others have taken into account the stage of the proceeding in deciding whether fair notice was satisfied. See *Venters v. City of Delphi, 123 F.3d 956, 968-69 (7th Cir. 1997)* (holding that defendants' statute of limitations defense, submitted after an exhaustive discovery process and a trial scheduled a month away, deprived the plaintiff of fair notice and a reasonable opportunity to respond) (cited in *Robinson, 313 F.3d at 136*).

The Court [*7] must therefore determine whether Apotex put Daiichi on reasonable notice of its intent to argue *section 102(f)*. Apotex argues that Daiichi was fully aware that the issue of the proper inventor was on the table: (1) *section 102(f)* was raised in its Answer, (2) the issue was explored throughout discovery and depositions, and (3) Daiichi's internal documents flagged the issue.

### C. Whether Sufficient Notice Was Provided

While Apotex's Answer and Additional Defenses, at paragraph 20, broadly lists *35 U.S.C. § 102* among other statutes as an Additional Defense, this is insufficient to apprise Daiichi that it is raising the inventorship defense. As the Court in *Advanced Cardiovascular Systems, Inc.*

2005 U.S. Dist. LEXIS 26059, *

*v. Medtronic, Inc. 41 U.S.P.Q.2d 1770, 1773 (N.D.Cal. 1996)*, noted, "since [*35 U.S.C.*] sections 101, 102, 103, and 112 provide numerous grounds for finding a patent invalid, defendant must provide a more specific statement of the basis for this defense in order to give [plaintiff] fair notice of the claims being asserted."

The purpose of raising an affirmative defense early on in litigation is to put the plaintiff on reasonably fair notice of that [*8] defense. In light of the contention interrogatories and extensive discovery between the parties, broadly citing the statute does not provide sufficient notice. While the general pleading standards of *Rules 8(b) and (e)* should be "consulted" when considering an affirmative defense, it cannot be said that Apotex's perfunctory listing provides the reasonably fair notice necessary under *Rule 8(c)*. WRIGHT & MILLER at § 1274; see also *Cornwall v. U.S. Const. Mfg. Inc., 800 F.2d 250 (Fed. Cir. 1986)*; *Shechter v. Comptroller of City of New York, 79 F.3d 265, 270 (2d Cir. 1996)*.

Apotex also claims that Daiichi was on notice of its *section 102(f)* claims because the issue was explored throughout discovery and depositions. Defendants, however, cite no authority for the contention that a plaintiff may be sufficiently put on notice of an affirmative defense by the implications underlying discovery requests. This diverges from the purpose of providing notice of an affirmative defense and it makes no sense. In essence, Apotex argues Daiichi should be considered on reasonable notice of the *section 102(f)* claim based on Defendants' trial tactics. If this were true, [*9] it would undermine the purpose of early notification of affirmative defenses; a plaintiff would have to guess whether the affirmative defense will be raised, along with any other defenses, at trial based on the materials sought in discovery or the line of questions asked during depositions.

In Transclean Corp. v. Bridgewood Services, Inc., the court dealt with a similar issue and reached a similar result. *Transclean Corp. v. Bridgewood Services, Inc., 77 F.Supp.2d 1045, 1062 (M.D.Minn. 1999)* rev'd on other grounds, *290 F.3d 1364 (Fed. Cir. 2002)*. The defendant argued that plaintiffs were put on notice of its contentions by way of discovery requests. The court held that following this line of thinking would "condone 'hide the ball' discovery practices, and subvert the purposes of *Rule 26(e)*, by permitting contention discovery to be an elusive guessing exercise." Id.

Daiichi was not implicitly put on notice by its discovery requests and its questions during depositions.

The same can be said for Apotex's argument that Daiichi's own documents put Daiichi on notice of the issue of inventorship. The fact that Daiichi is in possession of documents [*10] relating to inventorship does not mean it is on notice of an affirmative defense under

*section 102(f)*. How would the Plaintiffs know which of its documents or evidence the Defendants plan to introduce to prove the *section 102(f)* defense? Only Apotex's discovery responses could properly provide Daiichi with notice of their *102(f)* claim before the expiration of the discovery period. See *Transclean Corp., 77 F.Supp.2d at 1062*. The purpose of an affirmative defense is to hedge against the complete litigation of a full defense. The Court rejects Apotex's arguments that Daiichi was on reasonable notice to the *section 102(f)* defense based on discovery, depositions, and Daiichi's own documents.

This conclusion is further supported by Apotex's failure to raise the defense of *102(f)* in its answers to Daiichi's contention interrogatories. In their third set of interrogatories to Defendants, interrogatory number 32, Plaintiffs make the following request:

> Explain the factual and legal bases for any and all allegations by Apotext that any of claims 1-7 of Daiichi's patent-in-suit is invalid or otherwise unenforceable due to alleged patent misuse and identify all knowledgeable [*11] individuals and the documents and deposition testimony reviewed, considered and/or relied on in support thereof.

In its response, Apotex provides no specific justifications for its belief that Daiichi is not entitled to the '741 patent based on *section 102(f)*. Rather, Apotex blandly states that it "adopts and incorporates by reference all prior art reference and factual and legal bases... pursuant to *35 U.S.C. § 102...*." The Court emphasizes the fact that a *section 102(f)* claim is not a run-of-the-mill defense. "Misjoinder or nonjoinder of inventors must be proven by facts supported by clear and convincing evidence." *Trovan, Ltd. v. Sokymat SA, Irori, 299 F.3d 1292, 1301 (Fed. Cir. 2002)*. Multiple inventors may be involved without equal rights to the patent. *Id. at 1302*. Inventorship is determined on a claim-by-claim basis, and involves a complex analysis of the contributions of each individual to the subject matter at issue. Id. This is the type of complicated information that is best considered as early in the litigation as possible so as to clearly define the issues for trial.

The purpose of contention interrogatories [*12] is to narrow and define issues for trial beyond what may be ascertained from the parties' pleadings. *Transclean Corp., 77 F.Supp.2d at 1062*; *Thorn EMI N. Am. v. Intel Corp., 936 F.Supp. 1186, 1191 (D.Del. 1996)* ("The court will prevent a party from raising a claim or defense at trial that was not adequately described in a response to a contention interrogatory."); *Sperling v. Hoffman-La Roche, Inc., 924 F.Supp. 1396, 1411-12 (D.N.J. 1996)*.

"It is well-recognized that complete and accurate responses to discovery are imperative to the functioning of the modern trial process... The 'modern instruments of discovery' are thus a principal means by which trials are rendered 'less a game of blindman's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.'" *Averbach v. Rival Mfg. Co.*, *879 F.2d 1196, 1201 (3d. Cir. 1989)* citing *United States v. Procter & Gamble Co.*, *356 U.S. 677, 682, 78 S. Ct. 983, 2 L. Ed. 2d 1077 (1958)*. A failure to disclose may be grounds for automatic exclusion of the evidence under *Fed. R. Civ. P. 37(c)(1)*. See *Transclean Corp.*, *77 F.Supp.2d at 1063* [*13] (considering four factors in "assessing the substantiality of any proffered justification for the failure to disclose, as well as the harmlessness of that failure.")

Apotex does not dispute the fact that an affirmative defense as to the proper inventor was not fully laid out in its responses to Daiichi's interrogatories, rather it argues that it "assumed that the inventorship issue had been raised by Bausch & Lomb...." Apotex's Opp. Br. at 16 (emphasis added). Such an assumption does not excuse Apotex's failure to sufficiently address the affirmative defense in its answer or responses to interrogatories.

"A party who fails to raise an affirmative defense in a timely fashion is deemed to have waived the defense." *McCoy v. Bd. of Trs. of the Laborers' Int'l Union Local #222 Pension Plan*, *188 F.Supp.2d 461, 468 (D.N.J. 2002)* aff'd, *60 Fed. Appx. 396, 2003 U.S. App. LEXIS 5756 (3d Cir. 2003)*; see also WRIGHT & MILLER at § 1278 ("It is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by Federal *Rule 8(c)* results in the waiver of that defense and its exclusion from [*14] the case...."). The Third Circuit has held that a defendant does not waive an affirmative defense if he raised the issue at a pragmatically sufficient time, and the plaintiff was not prejudiced in its ability to respond. *Eddy v. V.I. Water & Power Auth.*, *256 F.3d 204, 209 (3d. Cir. 2001)*. The Court, however, finds that the issue of proper inventorship was not raised at "a pragmatically sufficient time" and Daiichi will be prejudiced by Apotex's eleventh-hour defense.

Daiichi served three separate interrogatories on Apotex. Apotex did not respond with a clear statement on the grounds for its *section 102(f)* defense. Only after the close of extensive discovery and at the hearing to set the trial date did Apotex place Plaintiffs on notice. See 07-21-2005 Transcript of Hearing Before Magistrate Judge Arlea at 50-51. The Court, therefore, finds this affirmative defense has been untimely raised and is deemed waived.

Daiichi is now without opportunity to take discovery on the *section 102(f)* defense or retain an expert on the issue. The issue of true inventorship is complex and is determined on a case-by-case basis. *Trovan, 299 F.3d at 1302*. It involves [*15] comparing the contributions of each asserted co-inventor to each claim of the patent. Id. The contributors must prove their contribution with corroborating evidence; that is, more than their own testimony. Id. Because of the intricacy of a *102(f)* claim it demands adequate notice so that a plaintiff might properly counter the argument.

The Court agrees with Daiichi's argument that Apotex has frustrated the purpose of contention interrogatories. Affirmative defenses need to be asserted early in litigation to avoid this type of surprise and undue prejudice. See *Long v. Wilson, 393 F.3d 390, 397 (3d Cir. 2004)*. If there is good cause for not raising an affirmative defense in the answer, "it must be raised as early as practicable thereafter." *Id. at 398* (internal citations omitted). The Court finds that Apotex missed several opportunities throughout discovery to raise the *section 102(f)* defense, to fully flesh out the basis behind the claim, and to give Daiichi ample notice and time to demonstrate why the affirmative defense should not succeed. The Court, therefore, holds Apotex has waived its *section 102(f)* affirmative defense.

## III. CONCLUSION [*16]

For the foregoing reasons, Daiichi's motion *in limine* is **granted**. Apotex is precluded from asserting an affirmative defense of alleged improper inventorship pursuant to *35 U.S.C. § 102(f)*.

An appropriate Order follows.

/s/ William G. Bassler

William G. Bassler, U.S.S.D.J.

Dated: November 1, 2005

**ORDER** This matter having come before the Court on Plaintiffs' motion *in limine* to preclude Defendants from asserting an affirmative defense of alleged improper inventorship pursuant to *35 U.S.C. § 102(f)*; and

The Court having considered the submissions of counsel and having held oral argument; and

For the reasons set forth in the Court's Memorandum Opinion issued this day; and

For good cause shown;

IT IS on this 1st day of November, 2005, hereby ORDERED that Plaintiffs' motion to preclude Defendants from asserting an affirmative defense of alleged improper inventorship is **granted.**

2005 U.S. Dist. LEXIS 26059, *

/s/ William G. Bassler                    WILLIAM G. BASSLER U.S.S.D.J.

# EXHIBIT H

LEXSEE

ECKHARD U. ALT, MD Plaintiff vs. MEDTRONIC, INC., a Minnesota Corp., Defendant

CASE NO. 2:04-CV-370

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
TEXAS, MARSHALL DIVISION

2006 U.S. Dist. LEXIS 4435

February 1, 2006, Decided

**CORE TERMS:** patent, deadline, good cause, infringement, invalidity, accelerometer, discovery, sensor, continuance, scheduling, amend, invention, potential prejudice, defibrillator, requesting, briefing, modification, interview, motion to amend, accelerometer-based, diligent, lawsuit, timely filed, in-suit, modify, cure, press release, Patent Rule, technology, patents-in-suit

**COUNSEL:** [*1] For MD Eckhard U Alt, MD, Plaintiff: David J Healey, Ana Elena Kadala, Weil Gotshal & Manges -- Houston, Houston, TX; Franklin Jones, Jr, Jones & Jones -- Marshall Marshall, TX; Otis W Carroll, Jr, Ireland Carroll & Kelley, PC, Tyler, TX; Robert Christopher Bunt, Parker & Bunt, P.C., Tyler, TX; Sidney Calvin Capshaw, III, Brown McCarroll -- Longview, Longview, TX; Thomas John Ward, Jr, Law Office of T John Ward Jr PC, Longview, TX.

For Medtronic Inc, a Minnesota Corporation, Defendant: Samuel Franklin Baxter, Attorney at Law, Marshall, TX.

For MD Eckhard U Alt, MD, Counter Defendant: David J Healey, Weil Gotshal & Manges -- Houston, Houston, TX.

**JUDGES:** LEONARD DAVIS, Judge.

**OPINION BY:** LEONARD DAVIS

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Defendant, Medtronic, Inc. ("Medtronic"), has filed a Motion for Leave to Amend its Preliminary Invalidity Contentions (Docket No. 94). For the reasons set forth below, the Court **GRANTS** Medtronic's motion.

### BACKGROUND

Dr. Eckhard Alt ("Alt") filed suit against Medtronic on October 15, 2004 alleging infringement of four patents, U.S. Patent Nos. 5,014,700 ("the 4,700 patent"), 5,031,615 ("the 615 patent"), 6,076,014 ("the 014 patent"), [*2] and 6,249,700 ("the 9,700 patent"). Pursuant to the Court's Docket Control Order, Alt timely filed his Preliminary Infringement Contentions on February 28, 2005. Similarly, Medtronic timely filed its Preliminary Invalidity Contentions on March 30, 2005 identifying roughly thirty prior art references. On September 23, 2005, Medtronic's counsel sent a letter to Alt's counsel notifying Alt of six additional prior art references discovered by Medtronic relating to the 014 and 9,700 patents:

. U.S. Patent Number 5,193,550: "Method and apparatus for discriminating among normal and pathological tachyarrhythmias." Filed: November 30, 1990: Issued: March 16, 1993;

. Yee, R., et al.; "Initial Clinical Experience with the Pacemaker-Cardioverter-Defibrillator," THE CANADIAN JOURNAL OF CARDIOLOGY, Vol. 6, No. 4, May 1990;

. Bonnet, C.A., et al., "Long-Term Efficacy of Antitachycardia Pacemaker and Implantable Defibrillator Combination," PACE, Vol. 14, No. 5, Pt. I, May 1991;

. Saksena, S., "The Implantable Cardioverter-Defibrillator: Future Directions," Chapter 48 in IMPLANTABLE CARDIOVERTER-DEFIBRILLATORS:    A

COMPREHENSIVE TEXTBOOK, (N.A. Mark Estes III, ed., 1994);

. [*3] Saksena, S., "New Generations of Implantable Pacemaker Defibrillators for Ventricular and Atrial Tachyarrhythmias," ARCHIVES DES MALADIES DU COEUR ET DES VAISSEAUX, Vol. 89, February 1996; and

. June 30, 1997, Business Wire Press Release, "Guidant announces first implants of VENTAK AV II DR defibrillation system in Europe."

Medtronic's letter stated: "In light of the upcoming deadline for the parties to serve their P.R. 3-6 final contentions, we believe there is no need to amend and/or supplement Medtronic's P.R. 3-3 Preliminary Infringement Contentions with the foregoing information. If you disagree with this approach, please let us know in writing within five (5) days hereof." Additionally, on October 12, 2005, Medtronic's counsel sent Alt's counsel a letter supplementing the September 23, 2005 letter and identifying two additional prior art references:

. U.S. Patent Number 5,792,183: "Combination Pacemaker and Defibrillator Having Dynamic Ventricular Refractory Period." Filed January 27, 1997; Issued: August 11, 1998; and

. U.S. Patent Number 6,128,529: "Device and Method Providing Pacing and Anti-Tachyarrhythmia Therapies." Filed January 29, 1997; Issued: [*4] October 3, 2000.

The October 12th letter also indicated that Medtronic did not intend on providing the additional prior art before serving its Final Invalidity Contentions. Alt did not respond in writing to either of Medtronic's letters. On October 21, 2005, Alt's counsel informed Medtronic's counsel that it would object to Medtronic adding the new prior art references in its Final Invalidity Contentions and that Alt would oppose a motion for leave to amend Medtronic's Preliminary Invalidity Contentions. Medtronic filed its motion on November 11, 2005 requesting leave to amend its Preliminary Invalidity Contentions pursuant to Patent Rule 3-7 to add the eight additional prior art references mentioned above. Alt claims that

Medtronic has not shown the requisite good cause necessary to amend its Preliminary Invalidity Contentions.

### APPLICABLE LAW

Federal Rule of Civil Procedure 16(b) requires a showing of good cause to modify dates set forth in the Court's scheduling order. Fed. R. Civ. P. 16(b) (providing in part, "a schedule [scheduling order] shall not be modified except upon a showing [*5] of good cause and by leave of the district court . . . ."). Patent Rules are considered part of the Court's scheduling order; therefore, a party seeking relief must obtain "the Court's leave on a good cause showing to modify the Patent Rule's deadlines." STMicroelectronics, Inc. v. Motorola, Inc., 307 F. Supp. 2d 845, 849 (E.D. Tex. 2004). "Patent Rule 3-7 incorporates Rule 16(b)'s good cause standard by stating amendment or modification of the Preliminary or Final Infringement Contentions or the Preliminary or Final Invalidity Contentions . . . may be made only by order of the Court, which shall be entered only upon a showing of good cause." Id. (quoting P.R. 3-7). "The good cause standard requires the party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension.'" Id. at 850 (quoting S & W Enters., L.L.C. v. Southtrust Bank of Ala., NA, 315 F.3d 533, 535 (5th Cir. 2003)). A trial court has broad discretion in allowing scheduling order modifications. Id. The Court should consider four factors when determining whether to allow a scheduling order modification: [*6] (1) the explanation for the failure to meet the deadline; (2) the importance of the thing that would be excluded; (3) potential prejudice in allowing the thing that would be excluded; and (4) the availability of a continuance to cure such prejudice. Id. (citing S & W Enter., L.L.C., 315 F.3d at 535-36).

### ANALYSIS

Medtronic's Explanation for Its Failure to Meet the Deadline

Medtronic argues that its inability to identify the additional prior art references before filing its Preliminary Invalidity Contentions was not unreasonable. Medtronic claims that it only had five months from the date the suit was filed and one month from the date Alt filed its Preliminary Infringement Contentions to identify prior art to include in its Preliminary Invalidity Contentions. Medtronic argues that Alt's infringement claims were very broad and unclear during the first four months of the lawsuit and that it was not until Medtronic received Alt's Amended Preliminary Infringement Contentions, Markman briefing, and Technology Tutorials in June through August of 2005 that Medtronic could confidently focus its prior art searches to only those devices using accelerometer-based [*7] activity sensors. Alt argues that the

accelerometer has clearly been at issue from the beginning of the case in that claim two of the 4,700 patent indicates that the detecting means includes an "accelerometer." Alt also contends that accelerometer-based products have clearly been at issue throughout Alt's history of trying "to get paid" for his inventions. Medtronic responds that Alt's interpretation of accelerometer was much broader early in the case and included devices that measured vibrations. Medtronic's piezoelectric crystal activity sensor measures vibrations and is found in many of its devices. Consequently, more of Medtronic's pacemaker and defibrillator products were at issue in the case. Medtronic claims that it was not until June 12, 2005 that Alt eliminated Medtronic's devices with piezoelectric crystal activity sensors from the accused products in the case. Furthermore, Medtronic argues that Alt initially identified the corresponding structure of "means for detecting movements" as "activity sensor 3 or its equivalent" before narrowing its focus to "accelerometer" in its Opening *Markman* Brief filed on July 29, 2005.

Furthermore, Medtronic claims it did not learn [*8] that Alt intended to rely on a conception date that predated the effective filing dates for all of the patents-in-suit until April 6, 2005. Medtronic contends that this change required it to expand its prior art searches by nearly four years in the case of the 014 patent, whose filing date is August 1, 1997 and claimed invention date is October 7, 1993. Medtronic claims learning of the 1993 conception date required it to broaden its research to find prior art references that predated the 1993 conception date as opposed to a 1997 conception date. Alt claims that even if Medtronic was unaware of the 1993 conception date during its early searching, it had no effect on the range of years Medtronic searched. Alt also argues that Medtronic was not disadvantaged by not knowing Alt's alleged conception date in searching for prior art because "the earlier, the better" as far as prior art is concerned. Medtronic argues that prior art closely related in time to the conception date is usually the most similar and, therefore, the most relevant as it applies to invalidity.

Medtronic claims to have diligently collected and read books and articles on cardiac pacing and arrhythmia treatment and [*9] detection before turning certain articles over to its invalidity experts in August and September of 2005. The four articles referenced in the September 23, 2005 letter above are the product of this process. Alt argues that Medtronic was not diligent in researching articles and had previous insight into Alt's infringement claims. Alt basis this conclusion on the fact that Medtronic admits that its own in-house counsel investigated the asserted patent claims in 1999 and 2003 and in some cases as far back as 1990. Medtronic points out that the

in-house analysis Alt refers to related to infringement and did not concentrate on invalidity issues related to Alt's patents. Medtronic claims it did not have a reason to research prior art until the present suit was filed.

Medtronic also claims it continued to interview current and former Medtronic employees with possible knowledge of facts relevant to the lawsuit after filing its Preliminary Invalidity Contentions. In September 2005, while interviewing Ed Duffin, a Medtronic Employee, Medtronic learned that Cardiac Pacemakers, Inc. ("CPI") had released a rate responsive implantable cardioverter defibrillator ("ICD") called the Ventak AV II DR. [*10] Upon further research, Medtronic's counsel discovered a press release indicating that the Ventak device used an accelerometer as its activity sensor. Consequently, Medtronic discovered two Ventak-related patents, U.S. Patent Nos. 5,792,183 and 6,128,529. Medtronic then concluded that the Ventak patents and device were potential prior art to both the 014 and 9,700 patents-in-suit. Additionally, Medtronic's interviews with Mr. Duffin led it to conclude that U.S. Patent No. 5,193,550 ("the 550 patent"), a Medtronic patent, was also potential prior art to 014 and 9,700 patents-in-suit.

Alt claims that Medtronic's was not diligent in asking for information from its own employees once the suit was filed, evidenced by the fact that Medtronic waited until September to interview "Medtronic technical people." Alt claims that the Ventak product should not have been a "new discovery" to Medtronic because the product was made by one of Medtronic's direct competitors and was first used in Europe in 1997. Medtronic responds that its delay in discovering the Ventak product and patents was due to Alt's failure to identify the Ventak products in answers to interrogatories requesting information [*11] on all licensees using Alt's patents and prior infringement assertions relating to the patents-in-suit.

Medtronic has shown that it was diligent in its attempts to discover relevant prior art before and after the filing of its Preliminary Invalidity Contentions. Alt apparently had a broader definition of activity sensor at the beginning of the case, which directed Medtronic's research to a larger spectrum of devices than are presently at issue in the case. Medtronic's discovery of more relevant prior art after narrowing a key issue in this complex and document intensive case is not surprising. Alt's argument that Medtronic's prior art search related to the 014 patent was not effected by its delayed knowledge of the 1993 conception date is not persuasive. Upon learning of Alt's 1993 conception date, Medtronic needed to find prior art predating the 1993 conception date. The closer in time prior art is to the conception date the more relevant the prior art is likely to be in terms of invalidity. In complex litigation such as the present case, each party

Page 3

relies heavily on the discovery responses of the opposing party to help guide future research. A party that fails to disclose information [*12] in a discovery response has little room to complain of the requesting party's timeliness when the requesting party later discovers the same information through the requesting party's own research. Thus, it appears Alt hindered Medtronic's ability to meet the March 30 deadline. Furthermore, the fact that Ventak was made by a competitor of Medtronic does not ensure that Medtronic actually had knowledge of the product prior to this lawsuit. In the context of the circumstances described above, it is not unreasonable that Medtronic could not meet the March 30, 2005 Preliminary Invalidity Contentions deadline with regards to additional prior art references.

The Importance of the Additional Prior Art References

Medtronic argues that the Ventak patents and press release are particularly important to this case in that they show a prior invention of an ICD using an accelerometer by someone other than the alleged inventor, as well as prior knowledge of such a product within the United States. Both of these determinations could potentially have a strong impact on Alt's claims related to accelerometer-based devices. Medtronic claims that the 550 patent is important in that it evidences [*13] Medtronic's independent and earlier invention of the technology that Alt claims in the 014 and 9,700 patents. Such evidence supports Medtronic's claim that it was not knowingly and willfully infringing by copying Alt's technology. Finally, Medtronic claims that the four articles demonstrate that rate-responsive capabilities in an ICD were known to the medical world before Alt's alleged invention. Medtronic contends that these prior art references are very important to its ability to mount a defense to Alt's infringement claims and that Medtronic would suffer significant prejudice in the event it was not allowed to present these references. The Court is persuaded by Medtronic's arguments.

The Potential Prejudice to Alt in Allowing the Additional Prior Art References

Medtronic claims that Alt would not suffer any potential prejudice by the addition of the eight prior art references. Medtronic argues that Alt had notice of Medtronic's intentions to claim invalidity of its patents and of the additional prior art references since September 23 and October 12, 2005. Alt argues that he will be prejudiced by not being able to account for these references in his claim construction [*14] briefing *and Markman* arguments. Alt relies on language from the Court's Order of October 28, 2005 denying Alt's motion to amend its infringement contentions that states, "Considering that the claim construction briefing and the *Markman* hearing

have already concluded, a continuance is not likely to remedy any potential prejudice that [the party opposing the motion to amend] might suffer." The present situation is distinguishable from that addressed by the Court in Alt's motion to amend its Preliminary Infringement Contentions. In Alt's motion, he requested leave to amend his Preliminary Infringement Contentions to add a new claim. The addition of prior art references post *Markman* do not have the same implications upon *Markman* briefing and arguments as the addition of a patent claim. Alt's position requires a *per se* rule that invalidity contentions cannot be amended after *Markman*. The Court is unwilling to adopt such a rule. Furthermore, Alt does not identify any particular arguments or additional claims that he would have asserted in response to the additional prior art references.

Alt also claims that he will be prejudiced because Medtronic has not yet disclosed [*15] its Rule 3-3 analysis of the prior art references and the initial expert report deadline was December 30, 2005 with a discovery deadline of February 10, 2006. Expert witness reports are now due on January 31, 2006 and the discovery deadline is now February 28, 2006. There is a potential that Alt could suffer prejudice in regards to these dates at this point in time. However, the fact that Alt has been aware of Medtronic's intent to add the additional prior art references since at least October 12 diminishes the likelihood that he would suffer prejudice. Alt had the opportunity to inform Medtronic that he objected to the addition of the prior art references in response to the letters sent by Medtronic in September and October of 2005. Alt did not take this opportunity. Alt chose to lay behind the log, and the Court does not consider Alt blameless for any prejudice he might suffer from the addition of the references. Additionally, any prejudice that Alt might suffer could be cured by a continuance, as discussed below.

Availability of a Continuance to Cure Such Prejudice

The Court is not convinced that Alt will suffer prejudice as a result of Medtronic's amending its Preliminary [*16] Invalidity Contentions. However, in the event that Alt does suffer any prejudice, it would likely arise in connection with the discovery deadline or Alt's ability to prepare expert witness reports. If the Court finds that Alt suffers such prejudice, it can easily be cured with an appropriate continuance of these deadlines.

## CONCLUSION

Medtronic has met the good cause standard required to amend its Preliminary Invalidity Contentions to add the eight additional prior art references listed above. Accordingly, the Court **GRANTS** Medtronic's Motion for Leave to Amend its Preliminary Invalidity Contentions.

February 1, 2006