# EXHIBIT A

020207Bridgestone(1).txt

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRIDGESTONE SPORTS CO.,    )
LTD.,                      )
                           )
            Plaintiff,     )
                           ) C.A. No. 05-132-JJF
v.                         )
                           )
ACUSHNET COMPANY,          )
                           )
            Defendant.     )

February 2, 2007
10:39 a.m.
Courtroom 4B

844 King Street
Wilmington, Delaware

BEFORE:  THE HONORABLE JOSEPH J. FARNAN, JR.
         United States District Court Judge

APPEARANCES:

        MORRIS, NICHOLS, ARSHT & TUNNELL
        BY:  JACK B. BLUMENFELD, ESQ.

              -and-

        PAUL HASTINGS
        BY:  ROBERT M. MASTERS, ESQ.
        BY:  BRANDON WHITE, ESQ.

                    Counsel for Plaintiff

2

1    APPEARANCES CONTINUED:

2
            POTTER, ANDERSON & CORROON, LLP
3           BY:  RICHARD HORWITZ, ESQ.

4                  -and-
                    Page 1

020207Bridgestone(1).txt

```
5          HOWREY, LLP
           BY:  JOSEPH LAVELLE, ESQ.
6          BY:  BRIAN SEAL, ESQ.

7                     Counsel for the Defendant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

                                                        3

```
1               THE COURT:  All right.  Bridgestone.

2               Okay.  Do you want to announce your

3     appearances?

4               MR. BLUMENFELD:  Your Honor, on the

5     Bridgestone side, Jack Blumenfeld, with my

6     associate, Leslie Polizoti from Morris, Nichols.

7               Robert Masters and Brandon White

8     from Paul Hastings.

9               THE COURT:  Good morning.

10              Mr. Horwitz.
```
                        Page 2

020207Bridgestone(1).txt

11          MR. HORWITZ:  Good morning, Your

12  Honor.  Rich Horwitz from Potter Anderson on

13  behalf of Acushnet.  And with me today from

14  Howrey, Joe Lavelle and Brian Seal.

15          MR. LAVELLE:  Good morning, Your

16  Honor.

17          THE COURT:  Good morning.

18          Well, fortunately, I'm familiar with

19  all of you, and we still haven't had a need for a

20  special master.  So that's good.

21          With you folks, because I am so

22  familiar and enjoy your company so much, I did a

23  little extra work.  And what I'm going to do is

24  give you the decisions on what I think of the

4

1   principal disputes today and then give you a

2   chance to, not to immediately ask me to

3   reconsider, but to bring up anything else that

4   might keep you moving along.  That is my hope.

5           So we'll first start out with, and

6   I'm going to put this in a better form, but I

7   wanted to get you a decision today and give you

8   the reasons, because I think it's a serious

9   matter that you've presented.

10          And so I'm going to give you some

11  reasons today, and I'm going to put it in a

12  better form in another probably memorandum

13  opinion or something.

14          All right.  Plaintiff, Bridgestone's

15  motion to preclude prior art references.

16  Preclusion of evidence pursuant to the rules is a

Page 3

020207Bridgestone(1).txt

17  strong sanction, which some characterize as

18  extreme, and one that is applied sparingly and

19  only as a remedy for litigation conduct that is

20  clearly unprofessional or inappropriate and

21  prejudicial in the context of the case before the

22  Court.

23          The decision to preclude evidence is

24  within the discretion of the Court based on a

                                                    5

1   consideration of the specific conduct complained

2   of and findings regarding that conduct.  In this

3   case, I find that, one, the parties are two

4   sophisticated business entities represented by

5   counsel experienced in complex litigation

6   matters, specifically patent litigation.

7          Two, there have been numerous

8   disputes that have arisen between the parties

9   during the pretrial proceedings that required

10  intervention by the Court.  And I find that on

11  both sides the disputes were sometimes strategic

12  in nature.

13          Three, the Court finds that the

14  evidence at issue is relevant to defendants'

15  invalidity defenses, but not critical.  Defendant

16  has available for its invalidity defense similar

17  evidence.

18          And further, I find that the

19  evidence at issue was available to the defendant

20  at a minimum in the earlier stages of the

21  discovery period.

22          Fourth, I find that the plaintiff
                        Page 4

020207Bridgestone(1).txt

23  would be required to conduct additional

24  discovery, fact and expert beyond the deadlines

6

1   established by the existing Court orders.

2           Additionally, although the

3   extensions of deadlines that would be required

4   may fairly be characterized as moderate, and the

5   time and expense they entail, however, were

6   avoidable or was avoidable.

7           In sum, based on these findings, I

8   conclude that the preclusion in this case is

9   warranted given the circumstances.  And,

10  therefore, plaintiff's motion is denied.

11          Now, with regard to plaintiff

12  Bridgestone's motion to compel --

13          MR. BLUMENFELD:  Your Honor, I think

14  you said denied.  I think our motion would have

15  been granted.

16          THE COURT:  Granted.  I'm sorry.

17          I meant to say granted.

18          MR. BLUMENFELD:  Thank you.

19          THE COURT:  The plaintiff,

20  Bridgestone's motion to compel the number of

21  requested admissions is excessive, and therefore,

22  the motion to compel will be denied.

23          With regard to the 30(b)6 notices, I

24  find that the depositions requested are

7

1   warranted; however, per the parties' agreement,

2   no revisiting of topics will be permitted during

Page 5

020207Bridgestone(1).txt

3   the course of the depositions.  And I'm going to

4   grant leave to Acushnet to suspend a deposition

5   if they believe that the testimony sought is

6   outside that agreement.

7           And hopefully you'll be able to get

8   me on the phone.  And if you can't, you can

9   suspend the deposition and leave, and then I'll

10  take up the matter separately.  So it will be

11  important to be careful in the examination during

12  those depositions.

13          All right.  I thought that that

14  would -- there's one other, in my view, minor

15  matter pending, which I'll get to, but I thought

16  decision on these matters would help you move

17  along.  Is there anything else that you think I

18  could address that would help you move along

19  given the stage of where we are?

20          MR. BLUMENFELD:  From our side, I

21  don't think so, Your Honor.  We're moving along

22  with expert discovery and have a pretrial

23  conference in May.  And I think things are moving

24  in that direction.

8

1           THE COURT:  All right.

2           MR. LAVELLE:  Your Honor, Joe

3   Lavelle, from our side.  I would like to be heard

4   for a moment on the order precluding the prior

5   art references, and essentially what I'm going

6   to -- what I'm going to say is that two of these

7   patents are critical to one of our patents.  And

8   if they're going to be excluded, that has an

Page 6

020207Bridgestone(1).txt

 9  impact.  We won't have evidence on one patent

10  then in our current expert report.

11          And I wondered if there's a

12  mechanism within our system unit to go back and

13  supplement that expert report, because in one of

14  these patents --

15          THE COURT:  Is this a portion of the

16  report that -- the portion was included as an

17  exhibit?

18          MR. LAVELLE:  Yes.  The Falco report

19  on the '791 patent.

20          THE COURT:  Sure.

21          MR. LAVELLE:  These two patents.

22          THE COURT:  In other words, if I

23  made a ruling that affects that report and

24  requires some sort of supplementation, is that

                                                9

 1  the question?

 2          MR. LAVELLE:  Yeah.  The question

 3  is:  Your ruling excluding these patents

 4  essentially takes away the invalidity defense

 5  that Acushnet had on that patent.  We don't have

 6  a prior art defense, as a practical matter, to

 7  that patent anymore.  And that's a severe

 8  prejudice to the client.

 9          You correctly articulated all the

10  factors, and what I wanted to articulate to you

11  first before we talk about what the relief should

12  be, are just really quickly three things, because

13  I know you made a ruling.

14          But first of all, the art came up,

                        Page 7

020207Bridgestone(1).txt

15   not the knowledge of the patents, but the fact

16   that they had that core gradient.  This is like

17   the brownies.  This is something that we didn't

18   learn until the cores were tested, and they were

19   tested in November.

20          And we made cores pursuant to the

21   patents in November and tested them and disclosed

22   the data promptly when we had it.  So this was

23   not a sandbagging.

24          This was not people who were holding

                                      10

1   things to the last minute.  This was giving them

2   data as soon as we got it.

3          And with respect to the '791 patent,

4   this is pretty much our prior art defense.  These

5   are just central and critically important to our

6   invalidity defense.  And if you strike this,

7   Acushnet doesn't have, as a practical matter, a

8   prior art invalidity defense on that '791 patent.

9          Our entire theory on that defense is

10   that the cores that are made and disclosed in

11   that '791 patent are no different from the cores

12   that Bridgestone was making before they applied

13   for the patent.

14          And that's essentially what their

15   inventors -- well, what their inventors said in

16   deposition.  We asked them in depositions at the

17   end of August and in October, what did you do

18   different?  Why are these cores different from

19   the cores you are were making before?  And they

20   couldn't recall anything.

020207Bridgestone(1).txt

21          And that testimony is what caused us

22   to go back and look at their prior cores.  So our

23   position is that they just tried to put a patent

24   off something that was already old.  And if you

11

1   strike these Bridgestone prior art references,

2   the company doesn't have expert testimony on the

3   invalidity issue in front of it.  And so I guess

4   what I'm asking you to do is reconsider.

5          THE COURT:  Well, here's what you --

6   with respect to '791, I misunderstood what you

7   were saying.

8          I thought that you wanted to modify

9   an expert report to adjust to these rulings, but

10   what you're really saying is you want me to

11   reconsider the decision.  You can certainly --

12          MR. LAVELLE:  Both.

13          THE COURT:  Let me say,  whatever I

14   said about reconsideration earlier didn't mean I

15   wouldn't consider a motion to reconsider my

16   ruling.  And what you should do is, within the

17   time frames allowed, file a motion saying that I

18   have, it sounds like, misapprehended the facts,

19   not the law.

20          MR. LAVELLE:  I think you have the

21   law exactly correct.  And I think perhaps we

22   weren't as articulate as we could have been to

23   explain the importance of this to you.

24          THE COURT:  So I think some of the

12

1    things you've raised here today were in the
                        Page 9

020207Bridgestone(1).txt

2    papers about prior testing, and I'm not going to

3    get into this now, because I was going to put

4    that into a fuller explanation in the memorandum

5    opinion.

6              But I want you to feel free to file

7    a motion to reconsider.  They'll get a chance to

8    answer it, and then I'll take it up on that

9    basis.

10              I'm not one that's going to take

11    umbrage on the fact that either you think I'm

12    wrong or, in fact, I am wrong.  But I think it

13    would be better if you go back and put it in the

14    papers so they can answer it in the same kind of

15    detail you'd like to present it.

16              MR. LAVELLE:  That would be fine,

17    Your Honor.

18              THE COURT:  I'm happy to consider

19    it, and I'll do it on a timely basis, so it

20    doesn't affect the moving forward.

21              MR. LAVELLE:  Just two procedural

22    questions.

23              THE COURT:  Sure.

24              MR. LAVELLE:  Do you want us to

                                                    13

1    await your written memorandum?

2              THE COURT:  No.

3              MR. LAVELLE:  Just file it

4    immediately?

5              THE COURT:  No.  You -- essentially,

6    you'll get a transcript.

7              MR. LAVELLE:  That's fine.
                        Page 10

020207Bridgestone(1).txt

8              THE COURT:  And all I've done is,

9     you know, there's a lot of cases out here that

10    have those factors in them.  There's Third

11    Circuit cases.  There's Federal Circuit cases.

12              There's District Court cases.  I

13    just put them conversationally for this morning,

14    and I'm going to lay them out a little

15    differently in the written thing.  You have my

16    order today.

17              MR. LAVELLE:  That's fine.

18              THE COURT:  So you should start

19    working on your motion to reconsider.

20              MR. LAVELLE:  We'll do that

21    immediately.  And procedurally if we want to ask

22    for any ability to amend that expert report,

23    we'll just put it into our motion for

24    reconsideration?

                                              14

1              THE COURT:  That will be fine.

2              MR. LAVELLE:  Okay.

3              THE COURT:  Mr. Horwitz has

4     something he wants to say to you.

5              MR. HORWITZ:  Your Honor, with the

6     new procedures, we're now I think --

7              THE COURT:  Oh, no.

8              MR. HORWITZ:  -- going to be outside

9     the window.  We don't need to do that.

10              So we come back here?

11              THE COURT:  The motion to reconsider

12    can be filed immediately.

13              MR. HORWITZ:  Within ten days of
                         Page 11

020207Bridgestone(1).txt

14    today?
15              THE COURT:  Ongoing disputes in
16    patent cases, some people are going to find out
17    they're going to file a motion for a notice day,
18    and I'm going to put them for a separate hearing
19    or additional briefing.  It all depends on what's
20    presented.
21              But, no, you aren't restricted in
22    this instance, because I've told you you can file
23    it, to the procedure.
24              MR. HORWITZ:  Perfect.  Thank you.

                                                    15

1              MR. LAVELLE:  Thank you, Your Honor.
2              MR. BLUMENFELD:  Your Honor, that's
3    fine.  I expect we'll get that motion and we'll
4    respond.
5              THE COURT:  Probably get it today
6    from what it sounds like.
7              MR. BLUMENFELD:  We may.
8              Mr. Lavelle doesn't have a plane to
9    catch.  He's only going to Washington.
10              But we have answering expert
11    reports.  I think we're going to proceed on the
12    assumption that what you put out is out.  If this
13    comes back in, we'll deal with it when it comes
14    back in, but --
15              THE COURT:  Sounds right.
16              MR. BLUMENFELD:  Thank you.
17              MR. LAVELLE:  Thank you, Your Honor.
18              THE COURT:  All right.  Thank you
19    very much.
                        Page 12

020207Bridgestone(1).txt

```
20              MR. MASTERS:  Thank you, Your Honor.
21              MR. LAVELLE:  Thank you, Your Honor.
22              THE COURT:  I'm sure you'll be back.
23              (Hearing concluded at 10:50 a.m.)
24
```

                                                    16

```
1    State of Delaware    )
                          )
2    New Castle County    )
3
4
5              CERTIFICATE OF REPORTER
6
7          I, Heather M. Triozzi, Registered
8    Professional Reporter, Certified Shorthand
9    Reporter, and Notary Public, do hereby certify
10   that the foregoing record, Pages 1 to 16
11   inclusive, is a true and accurate transcript of
12   my stenographic notes taken on February 2, 2007,
13   2001, in the above-captioned matter.
14
15         IN WITNESS WHEREOF, I have hereunto
16   set my hand and seal this 5th day of February,
17   2007, at Wilmington.
18
19
20
21              Heather M. Triozzi, RPR, CSR
22
23
24
```

                         Page 13

020207Bridgestone(1).txt

# EXHIBIT B



US006780125B1

(12) **United States Patent**
Yamagishi et al.

(10) Patent No.: **US 6,780,125 B1**
(45) Date of Patent: **Aug. 24, 2004**

(54) **MULTI-PIECE SOLID GOLF BALL**

(75) Inventors: **Hisashi Yamagishi**, Chichibu (JP); **Hiroshi Higuchi**, Chichibu (JP); **Junji Hayashi**, Chichibu (JP); **Akira Kawata**, Chichibu (JP)

(73) Assignee: **Bridgestone Sports Co., Ltd.,** Tokyo (JP)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 662 days.

(21) Appl. No.: **09/129,883**

(22) Filed: **Aug. 6, 1998**

**Related U.S. Application Data**

(60) Provisional application No. 60/058,563, filed on Sep. 11, 1997.

(30) **Foreign Application Priority Data**

Aug. 11, 1997 (JP) ................................................. 9-228902

(51) Int. Cl.⁷ ................................................ A63B 37/12
(52) U.S. Cl. ........................................ 473/374; 473/384
(58) Field of Search ................................... 473/373, 384

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,840,381 A | * 6/1989 | Ihara et al. | 473/384 X |
| 5,439,227 A | * 8/1995 | Egashira et al. | 473/373 |
| 5,695,413 A | * 12/1997 | Yamagishi | 473/374 |
| 5,702,311 A | * 12/1997 | Higuchi et al. | 473/373 |
| 5,779,563 A | * 7/1998 | Yamagishi et al. | 473/384 X |
| 5,816,942 A | * 10/1998 | Hayashi | 473/359 |
| 5,830,087 A | * 11/1998 | Sullivan et al. | 473/373 X |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| GB | 2 298 583 | 9/1996 |
| GB | 2 301 291 | 12/1996 |
| GB | 2 306 118 | 4/1997 |

OTHER PUBLICATIONS

European Search Report dated Apr. 25, 2001.

* cited by examiner

*Primary Examiner*—Stephen Blau
*(74) Attorney, Agent, or Firm*—Sughrue Mion, PLLC

(57) **ABSTRACT**

A multi-piece solid golf ball comprises a solid core and a cover of two inner and outer layers surrounding the core. The outer cover layer has a surface formed with a plurality of dimples is characterized in that a product of the Shore D hardnesses of the inner cover layer multiplied by the Shore D hardnesses of the outer cover layer and a proportion $V_R$ (%) of the total of the volumes of dimple spaces each defined below a plane circumscribed by the dimple edge to the overall volume of a phantom sphere given on the assumption that the golf ball surface is free of dimples satisfy any one of the following combinations (1) to (5):

(1) 1,500 to less than 2,000

   $V_R$: 0.8 .to 1.1%

(2) 2,000 to less than 2,500

   $V_R$: 0.75 to 1.05%

(3) 2,500 to less than 3,000

   $V_R$: 0.7 to 1%

(4) 3,000 to less than 3,500

   $V_R$: 0.65 to 0.95%

(5) 3,500 to 4,000

   $V_R$: 0.6 to 0.9%. The dimples include at least three types of dimples which are different in at least one of a diameter, a depth, and a value $V_0$ which is the volume of one dimple space defined below a plane circumscribed by the dimple edge divided by the volume of a cylinder whose bottom is the plane and whose height is the maximum depth of the dimple from the bottom.

**14 Claims, 3 Drawing Sheets**



Patent provided by Sughrue Mion, PLLC - http://www.sughrue.com



| DIMPLE | |
|---|---|
| THREE TYPES | |
| DIAMETER | 3.7 - 4.5 mm |
| DEPTH | 0.15 - 0.25 mm |
| VOLUME | $V_0$ 0.38 - 0.55 |

FIG. 1



FIG. 2



# FIG. 3



DIMPLES 1
VOLUME
PROPORTION
$V_R$ (%) TO
SHORE D PRODUCT
OF INNER &
OUTER COVERS

SOLID CORE 20
DISTORTION
2.6 - 6.5 mm
UNDER 100 kg LOAD

16
SHORE D ≤ 63
GAGE 0.5 - 2.5 mm

14
SHORE D
28-68
GAGE 0.5 - 3.0 mm

28

FIG. 4

US 6,780,125 B1

1

# MULTI-PIECE SOLID GOLF BALL

## CROSS REFERRENCE TO RELATED APPLICATION

This application is an application files under 35 U.S.C. § 111(a) claiming benefit pursuant to 35 U.S.C. § 119(e)(i) of the filing date of the Provincial Application 60/058,5,63 filed on Sep. 11, 1997 pursuant to 35 U.S.C. § 111(b).

## BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to a multi-piece solid golf ball having a cover of inner and outer layers and more particularly, to a multi-piece solid golf ball in which cover hardness and dimples are optimized to improve flight distance performance.

2. Prior Art

Golf balls are generally classified into solid golf balls in which a solid core is enclosed with at least one layer of cover and wound golf balls in which a wound core in the form of a center ball having thread rubber wound thereon is enclosed with a cover. Numerous modifications were heretofore proposed to improve flight distance properties, spin performance, and controllability.

As one example of such proposals, an approach of increasing a spin rate by forming the cover soft or to low hardness falls under the category of the prior art. In particular, improvements in multi-piece solid golf balls are by adjusting the composition and hardness of the thermoplastic resin of which each cover layer is constructed. For example, if it is desired to increase a spin rate, the cover cover layer coming in direct contact with the club face is formed relatively soft in consideration of a friction phenomenon upon impact. Inversely, if it is desired to decrease a spin rate, the outer cover layer is formed relatively hard.

However, the multi-piece solid golf balls wherein the outer cover layer is formed relatively soft have the problem that a desired spin rate is not always obtained because the hardness of the inner cover layer in contact with the outer cover layer is not optimized. Therefore, the deformation process upon impact differs among the respective layers.

Also proposed were techniques of forming the inner cover layer relatively soft in order to increase a spin rate and forming the outer and inner cover layers relatively soft in order to further increase a spin rate. There arises the problem that the trajectory changes in flight to adversely affect the flight distance.

On the other hand, for those golf balls required to have flight distance performance, it is difficult to form dimples suitable for the spin range and restitution which vary with the cover hardness. Golf balls with dimples of one type suffer from the problem that they rise too high or drop to detract from flight distance performance.

## SUMMARY OF THE INVENTION

The present invention has been made under the above-mentioned circumstances and its object is to provide a golf ball comprising a solid core enclosed with two inner and outer layers enabling an increase of flight distance.

Making extensive investigations to achieve the above object, the inventors have found in connection with a multi-piece solid golf ball comprising a solid core and a cover of two inner and outer layers surrounding the core, the outer cover layer being formed in the surface with a plurality

2

of dimples, that a spin rate is approximately explained in terms of a product of the Shore D hardnesses of the inner cover layer multiplied by the Shore D hardnesses of the outer cover layer. More particularly, a higher spin rate is obtained when the product of the Shore D hardnesses of the inner and outer layers has a relatively smaller value. Inversely, a reduced spin rate is obtained when the same product has relatively larger value. Accordingly, one effective means for taking full advantage of the spin property dependent on the product of the Shore D hardnesses of the inner and outer layers and improving the flight performance of the golf ball is to divide the range of the product into sub-ranges and form dimples so as to satisfy the following two requirements associated with the sub-ranges of the product. More particularly, it has been found effective as a first requirement to specify a proportion $V_R$ (%) of the total of the volumes of dimple spaces each defined below a plane circumscribed by the dimple edge to the overall volume of a phantom sphere given on the assumption that the golf ball surface is free of dimples. A second requirement is to form at least three types of dimples which are different in at least one of a diameter, a depth, and a value $V_0$ which is the volume of one dimple space defined below a plane circumscribed by the dimple edge divided by the volume of a cylinder whose bottom is the plane and whose height is the maximum depth of the dimple from the bottom. The inventors have also found that to specify the distortion of the solid core and to specify the Shore D hardnesses of the inner and outer cover layers are more effective. The present invention is predicated on this finding.

Specifically, the present invention provides:

1) A multi-piece solid golf ball comprising a solid core and a cover of two inner and outer layers surrounding the core, the outer cover layer having a surface formed with a plurality of dimples, characterized in that

a product of the Shore D hardnesses of said inner cover layer multiplied by the Shore D hardnesses of said outer cover layer and a proportion $V_R$ (%) of the total of the volumes of dimple spaces each defined below a plane circumscribed by the dimple edge to the overall volume of a phantom sphere given on the assumption that the golf ball surface is free of dimples satisfy any one of the following combinations (1) to (5):

(1) the product of Shore D hardnesses of inner and outer cover layers: 1,500 to less than 2,000

$V_R$: 0.8 to 1.1%

(2) the product of Shore D hardnesses of inner and outer cover layers: 2,000 to less than 2,500

$V_R$: 0.75 to 1.05%

(3) the product of Shore D hardnesses of inner and outer cover layers: 2,500 to less than 3,000

$V_R$: 0.7 to 1%

(4) the product of Shore D hardnesses of inner and outer cover layers: 3,000 to less than 3,500

$V_R$: 0.65 to 0.95%

(5) the product of Shore D hardnesses of inner and outer cover layers: 3,500 to 4,000

$V_R$: 0.6 to 0.9%,

and said dimples include at least three types of dimples which are different in at least one of a diameter, a depth, and a value $V_0$ which is the volume of one dimple space defined below a plane circumscribed by the dimple edge divided by the volume of a cylinder whose bottom is the plane and whose height is the maximum depth of the dimple from the bottom.

2) The multi-piece solid golf ball of 1) wherein the solid core has a distortion of 2.6 to 6.5 mm under an applied load of 100 kg.

Patent provided by Sughrue Mion, PLLC - http://www.sughrue.com

US 6,780,125 B1

3

3) The multi-piece solid golf ball of 1) or 2) wherein both the hardnesses of the inner and outer cover layers are up to 63 in Shore D hardness.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a cross-sectional view of a dimple illustrating how to calculate a value $V_o$.

FIG. 2 is a perspective view of the dimple illustrating how to calculate a value $V_o$.

FIG. 3 is a cross-sectional view of the dimple illustrating how to calculate a value $V_o$.

FIG. 4 is a cross-section of the solid golf ball of this invention.

DETAILED DESCRIPTION OF THE INVENTION

The invention will now be described in more detail. The multi-piece solid golf ball 28 of the invention is defined as comprising a solid core 20 and a cover of $2n$ inner and $2n$ outer cover layer 14, 16 surrounding the core, the outer cover layer having a surface formed with a plurality of dimples. When the range of the product of the Shore D hardnesses of the inner and outer cover layers is divided into sub-ranges, a dimple parameter can be specified in conjunction with each of the sub-ranges of the product for achieving optimization.

First, the solid core 20 is described. The solid core may be formed of a well-known rubber composition. For example, it is prepared by mixing 1,4-cis-polybutadiene as a base with a well-known crosslinking agent, co-crosslinking agent, filler and so on in a roll mill, introducing a necessary amount of the composition into a solid core-shaping mold, and effecting vulcanization and heat molding. In this regard, the solid core may consist of a single layer or plural layers. In the practice of the invention, the solid core preferably undergoes a distortion or deformation of 2.6 to 6.5 mm, more preferably 2.7 to 6.3 mm, most preferably 2.8 to 6.0 mm under an applied load of 100 kg. A distortion of less than 2.6 mm (hard core) would exacerbate hitting feel. A distortion of more than 6.5 mm (soft core) would result in a ball with less restitution.

The golf ball of the invention is constructed by forming a cover of two (inner and outer) layer structure 14, 16 around the aforementioned solid core 20. The inner and outer layers may be formed of well-known cover stocks. Specifically, ionomer resins, thermoplastic polyester elastomers, and thermoplastic polyurethane elastomers may be used alone or in admixture of two or more. In the practice of the invention, cover stocks must be selected such that the product of the Shore D hardnesses of the inner cover layer multiplied by the Shore D hardnesses of the outer cover layer fall in the range of 1,500 to 4,000.

The Shore D hardnesses of the inner and outer cover layers may be identical with or different from each other insofar as the product of Shore D hardnesses falls in the range of 1,500 to 4,000. That is, the Shore D hardnesses of the inner cover layer may be substantially identical with the Shore D hardnesses of the outer cover layer. Alternatively, either one of the inner and outer cover layers may be softer or harder than the other. The hardness difference between the inner and outer cover layers may be appropriately determined.

Preferably the outer cover layer 16 has a Shore D hardness of up to 63, more preferably 30 to 62, especially 35 to 61. With a Shore D hardnesses of more than 63, there is a risk that no spin Is acquired due to a slip phenomenon between

4

the cover and the club face. If the hardness of the outer cover layer is below 30, the ball would lose restitution.

On the other than, the inner cover layer preferably has a Shore D hardnesses of 28 to 68. Restitution would be lost with an inner cover layer hardness of less than 28 whereas hitting feel would be exacerbated by a hardness above 68.

The method for forming the inner and outer cover layers around the solid core is not critical and can be in accord with conventional ones. Included are a method of enclosing the solid core with a pair of hemispherical half cups of an inner cover layer composition, compression molding to join the cups to the core, placing it in an injection mold, and injecting an outer cover layer composition and another method of forming half cups from inner and outer cover layer compositions, respectively, mating them to form half cups of the two layer structure, enclosing the solid core with the half cups, and effecting compression molding.

The thus formed cover of the inner and outer layers may have any desired gage. Usually the inner cover layer has a gage of 0.5 to 3.0 mm, especially 1.0 to 2.5 mm, the outer cover layer has a gage of 0.5 to 2.5 mm, especially 1.0 to 2.3 mm, and the cover has a total gage of 1.0 to 5.5 mm, preferably 1.5 to 5.0 mm, especially 1.5 to 3.5 mm.

The multi-piece solid golf ball of the invention has a plurality of dimples formed in the outer cover layer. The dimples are formed such that when the product of the Shore D hardnesses of the inner cover layer multiplied by the Shore D hardnesses of the outer cover layer is in the range from 1,500 to 4,000, which is divided into sub-ranges, a factor $V_R$ associated with the dimples, that is, a proportion $V_R$ (%) of the total of the volumes of dimple spaces each defined below a plane circumscribed by the dimple edge to the overall volume of a phantom sphere given on the assumption that the golf ball surface is free of dimples has the following value.

(1) The product of Shore D hardnesses of inner and outer cover layers: 1,500 to less than 2,000

$V_R$: 0.8 to 1.1%

(2) The product of Shore D hardnesses of inner and outer cover layers: 2,000 to less than 2,500

$V_R$: 0.75 to 1.05%

(3) The product of Shore D hardnesses of inner and outer cover layers: 2,500 to less than 3,000

$V_R$: 0.7 to 1%

(4) The product of Shore D hardnesses of inner and outer cover layers: 3,000 to less than 3,500

$V_R$: 0.65 to 0.95%

(5) The product of Shore D hardnesses of inner and outer cover layers: 3,500 to 4,000

$V_R$: 0.6 to 0.9%

More preferred ranges of $V_R$ are given below.

(1) The product of Shore D hardnesses of inner and outer cover layers: 1,500 to less than 2,000

$V_R$: 0.82 to 1.08%

(2) The product of Shore D hardnesses of inner and outer cover layers: 2,000 to less than 2,500

$V_R$: 0.77 to 1.03%

(3) The product of Shore D hardnesses of inner and outer cover layers: 2,500 to less than 3,000

$V_R$: 0.72 to 0.98%

(4) The product of Shore D hardnesses of inner and outer cover layers: 3,000 to less than 3,500

$V_R$: 0.67 to 0.93%

(5) The product of Shore D hardnesses of inner and outer cover layers: 3,500 to 4,000

US 6,780,125 B1

5

$V_R$: 0.62 to 0.88%

With respect to the aforementioned range, if the value of $V_R$ relative to the product of Shore D hardnesses deviates from the specified range, the result is a prematurely falling trajectory and a reduced flight distance.

The value $V_R$ is the sum of volumes Vp of dimple spaces defined in the golf ball surface to be described later and is calculated according to the following equation:

$$V_R = \frac{V_S}{\frac{4}{3}\pi R^3} \times 100$$

wherein Vs is the sum of the volumes Vp of dimple spaces each below a circular plane circumscribed by the dimple edge and R is a ball radius.

It is noted that Vs in the above equation is represented by the following equation and $V_R$ can be calculated by substituting the value of Vs into the above equation of $V_R$.

$$V_S = N_1 Vp_1 + N_2 Vp_2 + \ldots + N_n Vp_n = \sum_{i=1}^{n} N_i Vp_i$$

$Vp_1$, $Vp_2$, . . . $Vp_n$ represent the volumes of dimples of different dimensions and $N_1$, $N_2$, . . . $N_n$ represent the number of dimples having the volumes $Vp_1$, $Vp_2$, . . . $Vp_n$, respectively.

In addition to the above-mentioned requirement of $V_R$ value, the dimples formed in the golf ball of the invention must further satisfy the requirement that there are included at least three types of dimples which are different in at least one of a diameter, a depth, and a value $V_0$ which is the volume of one dimple space defined below a plane circumscribed by the dimple edge divided by the volume of a cylinder whose bottom is the plane and whose height is the maximum depth of the dimple from the bottom. If the number of dimple types is less than 3, there arises the problem that the golf ball lofts too high or drops prematurely.

The value $V_0$ associated with the dimple requirement is described below. In the event that the planar shape of a dimple is circular, as shown in FIG. 1, a phantom sphere 2 having the ball diameter and another phantom sphere 3 having a diameter smaller by 0.16 mm than the ball diameter are drawn in conjunction with a dimple 1. The circumference of the other sphere 3 intersects with the dimple 1 at a point 4. A tangent 5 at intersection 4 intersects with the phantom sphere 2 at a point 6 while a series of intersections 6 define a dimple edge 7. The dimple edge 7 is so defined for the reason that otherwise, the exact position of the dimple edge cannot be determined because the actual edge of the dimple 1 is rounded. The dimple edge 7 circumscribes a plane 8 (circle having a diameter Dm). Then, the dimple space 9 located below the plane 8 as shown in FIGS. 2 and 3 has a volume Vp. A cylinder 11 whose bottom is the plane 8 and whose height is the maximum depth Dp of the dimple from the plane 8 has a volume Vq. The ratio $V_0$ of the dimple space volume Vp to the cylinder volume Vq is calculated.

$$Vp = \int_0^{Dp} 2\pi xy\,dx$$

$$Vq = \frac{\pi Dm^2 Dp}{4}$$

6

-continued

$$V_0 = \frac{Vp}{Vq}$$

In the event that the planar shape of a dimple is not circular, the maximum diameter or length of a dimple is determined, the plane projected shape of the dimple is assumed to be a circle having a diameter equal to this maximum diameter or length, and $V_0$ is calculated as above based on this assumption.

With respect to having dimples of different types according to the invention, dimples of the largest type preferably have a diameter of 3.7 to 4.5 mm, especially 3.8 to 4.3 mm and a depth of 0.15 to 0.25 mm, especially 0.155 to 0.23 mm, and their number is preferably 5 to 80%, especially 10 to 75% of the total dimple number. They are preferably set to have a $V_0$ value of 0.38 to 0.55. More preferably $V_0$ is 0.4 to 0.52.

Among the dimples of different types, dimples of the smallest type preferably have a diameter of 2.0 to 3.7 mm, especially 2.4 to 3.6 mm and a depth of 0.08 to 0.23 mm, especially 0.09 to 0.21 mm, and their number is preferably 1 to 45%, especially 2 to 30% of the total dimple number. They are preferably set to have a $V_0$ value of 0.38 to 0.55, especially 0.4 to 0.52.

The golf ball as a whole should preferably have a $V_0$ value of 0.38 to 0.55, more preferably 0.4 to 0.52, especially 0.42 to 0.5. A $V_0$ value of less than 0.38 is likely to lead to a non-long-lasting trajectory whereas a $V_0$ value of more than 0.55 is likely to lead to a high rise or aloft trajectory.

In the practice of the invention the total number of dimples is not critical although usually 360 to 460 dimples, especially 370 to 450 dimples are formed.

The golf ball of the invention can be used as tournament golf balls and constructed in accordance with the Rules of Golf to a diameter of not less than 42.67 mm and a weight of not greater than 45.93 grams.

The multi-piece solid golf ball of the invention has the advantages that various properties including spin, feeling and durability inherent to the multi-piece construction are further improved and an increased flight distance is expected due to the elimination of a high rise or dropping trajectory.

EXAMPLE

Examples of the present invention are given below together with Comparative Examples by way of illustration and not by way of limitation.

Examples and Comparative Examples

Solid cores having a diameter of 36.7 mm were prepared by mixing a rubber composition of the formulation shown in Table 1 in a roll mill and heat compression molding the composition at 155° C. for 15 minutes.

Each solid core was enclosed with cover stocks shown in Table 2 in the order shown in Tables 4 and 5 to form an inner cover layer and an outer cover layer. The outer cover layer on the surface was formed with dimples shown in Tables 3, 4, and 5. Three-piece solid golf balls were obtained in this way.

The golf balls thus obtained were examined for flight distance and trajectory by the following tests. The results are shown in Tables 4 and 5.

Flight Performance

Using a swing robot by True Temper Co., the ball was hit with a driver at a head speed of 48 m/sec. (#W1/HS48) to measure a spin, carry and total distance.

US 6,780,125 B1

7

### Trajectory

Twelve golf balls of each example were hit under the same conditions as in the flight performance test to visually observe a trajectory.

#### TABLE 1

| Solid core composition (pbw) | I | II | III | IV |
|---|---|---|---|---|
| 1,4-polybutadiene (cis structure) | 100 | 100 | 100 | 100 |
| Zinc acrylate | 32 | 32 | 23 | 33 |
| Dicumyl peroxide | 1.2 | 1.2 | 1.2 | 1.2 |
| Antioxidant | 0.1 | 0.1 | 0.1 | 0.1 |
| Zinc oxide | 5 | 5 | 5 | 4 |
| Barium sulfate | 13.2 | 23.1 | 26.8 | 0 |
| Peptizer | 1 | 1 | 1 | 0 |

#### TABLE 2

| Cover stock (pbw) | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| Hytrel 4047 | 100 | — | — | — | — | — |
| Surlyn 8120 | — | 50 | — | 30 | — | — |
| Himilan 1557 | — | 50 | — | — | — | 50 |
| Himilan 1856 | — | — | 90 | — | — | — |
| NO825J | — | — | 10 | — | — | — |
| Himilan 1605 | — | — | — | 20 | — | 50 |
| Himilan 1706 | — | — | — | 50 | — | — |
| PANDEX T-7890 | — | — | — | — | 100 | — |

Hytrel 4047: Toray duPont K.K., polyester base thermoplastic elastomer
NO825J: Mitsui duPont K.K., ethylene/methacrylic acid/methacrylate ter-polymer (auofel)
Surlyn 8120: E. I. duPont, ionomer resin
Himilan 1557: Mitsui duPont Polychemicals K.K., ionomer resin
Himilan 1856: Mitsui dupont Polychemicals K.K., ionomer resin
Himilan 1605: Mitsui duPont Polychemicals K.K., ionomer resin
Himilan 1706: Mitsui duPont Polychemicals K.K., ionomer resin
PANDEX T-7890: Dai-Nihon Ink Chemical Industry K.K., thermoplastic polyurethane elastomer

Note that an appropriate amount of titanium dioxide was blended in resin compositions A to F.

#### TABLE 3

| Type | Diameter (mm) | Depth (mm) | $V_o$ | Number | $V_R$ (%) |
|---|---|---|---|---|---|
| 1 | 4.100 | 0.195 | 0.440 | 32 | 0.89 |
| | 4.200 | 0.195 | 0.440 | 40 | |
| | 4.000 | 0.195 | 0.440 | 184 | |
| | 3.900 | 0.195 | 0.440 | 16 | |
| | 3.400 | 0.195 | 0.440 | 104 | |
| | 3.350 | 0.195 | 0.440 | 16 | |
| 2 | 4.100 | 0.210 | 0.450 | 32 | 0.86 |
| | 4.200 | 0.180 | 0.450 | 40 | |
| | 4.000 | 0.165 | 0.450 | 184 | |
| | 3.900 | 0.200 | 0.450 | 16 | |
| | 3.400 | 0.155 | 0.450 | 104 | |
| | 3.350 | 0.160 | 0.450 | 16 | |
| 3 | 3.850 | 0.160 | 0.500 | 288 | 0.80 |
| | 3.250 | 0.150 | 0.500 | 72 | |
| | 2.500 | 0.140 | 0.500 | 42 | |
| 4 | 3.850 | 0.175 | 0.525 | 288 | 0.93 |
| | 3.250 | 0.170 | 0.530 | 72 | |
| | 2.500 | 0.170 | 0.530 | 42 | |
| 5 | 4.000 | 0.160 | 0.480 | 114 | 0.77 |
| | 4.000 | 0.180 | 0.480 | 42 | |
| | 3.650 | 0.140 | 0.480 | 180 | |
| | 3.600 | 0.140 | 0.480 | 24 | |
| | 2.550 | 0.100 | 0.480 | 50 | |
| 6 | 3.900 | 0.150 | 0.470 | 240 | 0.66 |
| | 3.200 | 0.150 | 0.470 | 120 | |
| 7 | 3.850 | 0.170 | 0.465 | 340 | 1.04 |
| | 3.600 | 0.170 | 0.465 | 140 | |
| 8 | 3.850 | 0.185 | 0.460 | 340 | 1.12 |
| | 3.600 | 0.185 | 0.460 | 140 | |

8

#### TABLE 4

| | E1 | E2 | E3 | E4 | E5 |
|---|---|---|---|---|---|
| **Solid core** | | | | | |
| Composition | I | II | III | IV | III |
| Hardness* (mm) | 3.0 | 3.0 | 4.5 | 2.8 | 4.5 |
| **Inner cover layer** | | | | | |
| Stock | A | C | D | A | B |
| Shore D hardness | 40 | 49 | 55 | 40 | 58 |
| Gage (mm) | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 |
| **Outer cover layer** | | | | | |
| Stock | B | D | B | E | F |
| Shore D hardness | 58 | 55 | 58 | 42 | 60 |
| Gage (mm) | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 |
| Dimple type | 1 | 2 | 3 | 4 | 5 |
| Inner layer Shore D × outer layer Shore D | 2320 | 2695 | 3190 | 1680 | 3480 |
| $V_R$ (%) #W1/HS48 | 0.89 | 0.86 | 0.80 | 0.93 | 0.77 |
| Spin (rpm) | 2530 | 2540 | 2450 | 2680 | 2250 |
| Carry (m) | 225 | 229 | 228 | 228 | 227 |
| Total (m) | 255 | 257 | 258 | 257 | 258 |
| Trajectory | somewhat rising, long-lasting, relatively low trajectory | rising, similar balata ball | liner-like, long-lasting, medium trajectory | rising, similar balata ball | liner-like, long-lasting, medium trajectory |

*a distortion (mm) of the solid core under an applied load of 100 kg

#### TABLE 5

| | CE1 | CE2 | CE3 |
|---|---|---|---|
| **Solid core** | | | |
| Composition | I | III | IV |
| Hardness* (mm) | 3.0 | 4.5 | 2.8 |
| **Inner cover layer** | | | |
| Stock | A | D | A |
| Shore D hardness | 40 | 55 | 40 |
| Gage (mm) | 1.5 | 1.5 | 1.5 |
| **Outer cover layer** | | | |
| Stock | B | B | E |
| Shore D hardness | 58 | 58 | 42 |
| Gage (mm) | 1.5 | 1.5 | 1.5 |
| Dimple type | 6 | 7 | 8 |
| Inner layer Shore D × outer layer Shore D | 2320 | 3190 | 1680 |
| $V_R$ (%) #W1/HS48 | 0.73 | 1.04 | 1.12 |
| Spin (rpm) | 2530 | 2450 | 2680 |
| Carry (m) | 220 | 218 | 217 |
| Total (m) | 247 | 243 | 245 |
| Trajectory | liner-like, high | liner-like, low, dropping | liner-like, low, dropping |

*a distortion (mm) of the solid core under an applied load of 100 kg

As seen from the results of Examples, the multi-piece solid golf balls of the invention exhibit a satisfactory trajectory and are excellent in all of spin, carry, and total flight distance

In contrast, the multi-piece solid golf ball of Comparative Example 1 wherein $V_R$ is below the specified range associated with the product of the Shore D hardnesses of the inner and outer cover layers was inferior in flight distance performance. The multi-piece solid golf balls of Comparative

US 6,780,125 B1

9

Examples 2 and 3 wherein $V_R$ is above the specified range was inferior in flight distance performance and exhibited a dropping trajectory.

What is claimed is:

1. A multi-piece solid golf ball comprising; a solid core and a cover consisting of inner and outer layers surrounding the core, the outer cover layer having a surface formed with a plurality of dimples,

said solid core having a distortion of 2.8 to 6.5 mm under an applied load of 100 kg, and

a product of the Shore D hardnesses of said inner cover layer multiplied by the Shore D hardness of said outer cover layer and a proportion $V_R$ (%) of the total of the volumes of dimple spaces each defined below a plane circumscribed by the dimple edge to the overall volume of a phantom sphere given on the assumption that the golf ball surface is free of dimples satisfy any one of the following combinations (1) to (5):

(1) the product of Shore D hardnesses of inner and outer cover layers: 1,500 to less than 2,000
  $V_R$: 0.8 to 0.93%

(2) the product of Shore D hardnesses of inner and outer cover layers: 2,000 to less than 2,500
  $V_R$: 0.75 to 1.05%

(3) the product of Shore D hardnesses of inner and outer cover layers: t2,500 to less than 3,000
  $V_R$: 0.7 to 1%

(4) the product of Shore D hardnesses of inner and outer cover layers: 3,000 to less than 3,500
  $V_R$: 0.65 to 0.95%

(5) the product of Shore D hardnesses of inner and outer cover layers: 3,500 to 4,000
  $V_R$: 0.6 to 0.9%,

and said dimples include at least three types of dimples which are different in at least one of, diameter, depth, and value $V_0$ which is the volume of one dimple space defined below a plane circumscribed by the dimple edge divided by the volume of a cylinder whose bottom is the plane and whose height is the maximum depth of the dimple from the bottom; and

wherein both the hardness of the inner and outer cover layers are up to 63 in Shore D hardness.

2. A multi-piece solid golf ball comprising; a solid core and a cover consisting of inner and outer layers surrounding the core, the outer cover layer having a surface formed with a plurality of dimples,

said solid core having a distortion of 2.8 to 3.0 mm under an applied load of 100 kg, and

a product of the Shore D hardnesses of said inner cover layer multiplied by the Shoe D hardness of said outer cover layer and a proportion $V_R$ (%) of the total of the volumes of dimple space each defined below a plane circumscribed by the dimple edge to the overall volume of a phantom sphere given on the assumption that the

10

golf ball surface is free of dimples satisfy any one of the following combinations (1) to (5):

(1) the product of Shore D hardnesses of inner and outer cover layers: 1,500 to less than 2,000
  $V_R$: 0.8 to 1.1%

(2) the product of Shore D hardnesses of inner and outer cover layers: 2,000 to less than 2,500
  $V_R$: 0.75 to 1.05%

(3) the product of Shore D hardnesses of inner and outer cover layers: 2,500 to less than 3,000
  $V_R$: 0.7 to 1%

(4) the product of Shore D hardnesses of inner and outer cover layers: 3,000 to less than 3,500
  $V_R$: 0.65 to 0.95%

(5) the product of Shore D hardnesses of inner and outer cover layers: 3,500 to 4,000
  $V_R$: 0.6 to 0.9%,

and said dimples include at least three types of dimples which are different in at least one of, diameter, depth, and value $V_0$ which is the volume of one dimple space defined below a plane circumscribed by the dimple edge divided by the volume of a cylinder whose bottom is the plane and whose height is the maximum depth of the dimple from the bottom.

3. A multi-piece solid golf ball of claim 2, wherein both the hardness of the inner and outer cover layer are up to 63 in Shore D hardness.

4. The multi-piece solid golf ball of claim 2, wherein said solid cow has a distortion of 2.8 to 6.0 mm under an applied load of 100 kg.

5. The multi-piece golf ball of claim 2, wherein said outer cover layer has a Short D hardness in the range of 30 to 62.

6. The multi-piece golf ball of claim 2, wherein the inner cover layer has a Shore D hardnesses in the range of 28 to 68.

7. The multi-piece golf ball of claim 2, wherein said inner cover layer has a gage in the range of 0.5 to 3.0 mm.

8. The multi-piece golf ball of claim 2, wherein said outer cover layer has a gage in the range of 0.5 to 25 mm.

9. The multi-piece golf ball of claim 2, wherein said cover has a total gage of 1.0 to 5.0 mm.

10. The multi-piece golf ball of claim 2, wherein said dimples have diameters such that a largest diameter is in the range of 3.7 to 4.5 mm.

11. The multi-piece golf ball of claim 2, wherein dimple depth for a largest size dimple is in the range of 0.15 to 0.25 mm.

12. The multi-piece golf ball of claim 2, wherein $V_0$ is in a range of 0.4 to 0.52 for a largest size dimple.

13. The multi-piece golf ball of claim 2, wherein $V_0$ for the golf ball as a whole is in the range 0.38 to 0.55.

14. The multi-piece golf ball of claim 2, wherein dimples of a smallest type have a diameter in the range of 2.0 to 3.7 mm and a depth in the range of 0.08 to 023 mm.

*  *  *  *  *

# EXHIBIT C

## FULLY REDACTED

# EXHIBIT D

## FULLY REDACTED

# EXHIBIT E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BRIDGESTONE SPORTS CO., LTD.,<br>and BRIDGESTONE GOLF, INC., | ) )<br>) | |
| Plaintiffs, | ) )<br>) | |
| v. | ) )<br>) | |
| ACUSHNET COMPANY, | ) )<br>) | C. A. No. 05-132 (JJF) |
| Defendant. | ) )<br>) | **DEMAND FOR JURY TRIAL** |
| ACUSHNET COMPANY, | ) )<br>) | |
| Counterclaim Plaintiff, | ) )<br>) | |
| v. | ) )<br>) | |
| BRIDGESTONE SPORTS CO., LTD.,<br>and BRIDGESTONE GOLF, INC., | ) )<br>) )<br>) | |
| Counterclaim Defendant. | ) | |

### ACUSHNET'S OBJECTIONS AND RESPONSES TO
### BRIDGESTONE'S FIRST SET OF INTERROGATORIES
### DIRECTED TO ACUSHNET (NOS. 1-24)

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, defendant and counterclaim plaintiff Acushnet Company ("Acushnet") hereby responds to *the First Set of Interrogatories Directed to Acushnet (Nos. 1-24)* ("First Set of Interrogatories") of defendants Bridgestone Sports Co., Ltd. and Bridgestone Golf, Inc. (collectively, "Bridgestone").

### GENERAL STATEMENT

In responding to Bridgestone's First Set of Interrogatories, Acushnet does not waive any objection that may be applicable to: (a) the use, for any purpose, of any information or documents given in response to Bridgestone's First Set of Interrogatories; or (b) the admissibility, relevancy, or materiality of any information or documents to any issue in this case.

United States Patent No. 5,024,444 to Yamagishi et al., titled "Golf Ball" (issued Jun. 18, 1991).

**Interrogatory No. 5:**

Separately, for each claim of the Bridgestone patents-in-suit that Acushnet contends is invalid, identify all Prior Art and/or Prior Art Golf Balls that Acushnet contends affects or relates to the validity of the Bridgestone patents-in-suit.

**Response to Interrogatory No. 5:**

Acushnet incorporates all of its General Objections and Objections to Definitions as though fully set forth herein and further specifically objects to this interrogatory as overly broad to the extent it seeks information protected by attorney-client privilege and/or work-product immunity. Acushnet further objects to this interrogatory as premature, overly broad and unduly burdensome. Bridgestone, with the service of this First Set of Interrogatories (Nos. 1-24) has just identified which claims it believes are infringed by Accused Acushnet Products. Acushnet is continuing its investigation of the Bridgestone patents-in-suit. Accordingly, Acushnet reserves the right to supplement, amend or change any part of the entirety of its response to this interrogatory. Without waiving, and subject to, these objections, Acushnet responds as follows:

To the extent that Bridgestone claims that the Bridgestone patents-in-suit cover the Accused Acushnet products, then the claims of the Bridgestone patents-in-suit are invalid for at least the following reasons:

| Bridgestone Patent | Claim No. | Prior Art Related to Validity |
|---|---|---|
| 6,679,791 | 1 | • United States Patent No. 6,390,935 to Kazushige Sugimoto, titled "Three-Piece Solid Golf Ball" (effective filing date Oct. 7, 1999).<br><br>• United States Patent No. 6,465,578 to Bissonnette et al., titled "Low Compression, Resilient Golf Balls Including an Organosulfur Catalyst and Method for Making Same" (effective filing date Dec. 24, 1998).<br><br>• EP 0 577 058 B1 to Wilson Sporting Goods Company, titled "Golf Ball with Improved Cover" (published Jan. 5, 1994).<br><br>• Top Flite System C golf ball manufactured by the Top Flite Golf Company.<br><br>• Tour Stage U-Spin golf Ball manufactured by Bridgestone Sports, Ltd. |
|  | 2 | • United States Patent No. 6,390,935 to Kazushige Sugimoto, titled "Three-Piece Solid Golf Ball" (effective filing date Oct. 7, 1999).<br><br>• United States Patent No. 6,465,578 to Bissonnette et al., titled "Low Compression, Resilient Golf Balls Including an Organosulfur Catalyst and Method for Making Same" (effective filing date Dec. 24, 1998).<br><br>• EP 0 577 058 B1 to Wilson Sporting Goods Company, titled "Golf Ball with Improved Cover" (published Jan. 5, 1994).<br><br>• Top Flite System C golf ball manufactured by the Top Flite Golf Company.<br><br>• Tour Stage U-Spin golf Ball manufactured by Bridgestone Sports, Ltd. |

| Bridgestone Patent | Claim No. | Prior Art Related to Validity |
|---|---|---|
| | 3 | • United States Patent No. 6,390,935 to Kazushige Sugimoto, titled "Three-Piece Solid Golf Ball" (effective filing date Oct. 7, 1999).<br><br>• United States Patent No. 6,465,578 to Bissonnette et al., titled "Low Compression, Resilient Golf Balls Including an Organosulfur Catalyst and Method for Making Same" (effective filing date Dec. 24, 1998).<br><br>• EP 0 577 058 B1 to Wilson Sporting Goods Company, titled "Golf Ball with Improved Cover" (published Jan. 5, 1994).<br><br>• Top Flite System C golf ball manufactured by the Top Flite Golf Company.<br><br>• Tour Stage U-Spin golf Ball manufactured by Bridgestone Sports, Ltd. |
| | 4 | • United States Patent No. 6,390,935 to Kazushige Sugimoto, titled "Three-Piece Solid Golf Ball" (effective filing date Oct. 7, 1999).<br><br>• United States Patent No. 6,465,578 to Bissonnette et al., titled "Low Compression, Resilient Golf Balls Including an Organosulfur Catalyst and Method for Making Same" (effective filing date Dec. 24, 1998).<br><br>• EP 0 577 058 B1 to Wilson Sporting Goods Company, titled "Golf Ball with Improved Cover" (published Jan. 5, 1994).<br><br>• Top Flite System C golf ball manufactured by the Top Flite Golf Company.<br><br>• Tour Stage U-Spin golf Ball manufactured by Bridgestone Sports, Ltd. |

29

| Bridgestone Patent | Claim No. | Prior Art Related to Validity |
|---|---|---|
| | 5 | • United States Patent No. 6,390,935 to Kazushige Sugimoto, titled "Three-Piece Solid Golf Ball" (effective filing date Oct. 7, 1999).<br><br>• United States Patent No. 6,465,578 to Bissonnette et al., titled "Low Compression, Resilient Golf Balls Including an Organosulfur Catalyst and Method for Making Same" (effective filing date Dec. 24, 1998).<br><br>• EP 0 577 058 B1 to Wilson Sporting Goods Company, titled "Golf Ball with Improved Cover" (published Jan. 5, 1994).<br><br>• Top Flite System C golf ball manufactured by the Top Flite Golf Company.<br><br>• Tour Stage U-Spin golf Ball manufactured by Bridgestone Sports, Ltd. |
| | 6 | • United States Patent No. 6,390,935 to Kazushige Sugimoto, titled "Three-Piece Solid Golf Ball" (effective filing date Oct. 7, 1999).<br><br>• United States Patent No. 6,465,578 to Bissonnette et al., titled "Low Compression, Resilient Golf Balls Including an Organosulfur Catalyst and Method for Making Same" (effective filing date Dec. 24, 1998).<br><br>• EP 0 577 058 B1 to Wilson Sporting Goods Company, titled "Golf Ball with Improved Cover" (published Jan. 5, 1994).<br><br>• Top Flite System C golf ball manufactured by the Top Flite Golf Company.<br><br>• Tour Stage U-Spin golf Ball manufactured by Bridgestone Sports, Ltd. |
| | 8 | • United States Patent No. 6,390,935 to Kazushige Sugimoto, titled "Three-Piece Solid Golf Ball" (effective filing date Oct. 7, 1999).<br><br>• United States Patent No. 6,465,578 to Bissonnette et al., titled "Low Compression, Resilient Golf Balls Including an Organosulfur Catalyst and Method for Making Same" (effective filing date Dec. 24, 1998). |

30

| Bridgestone Patent | Claim No. | Prior Art Related to Validity |
|---|---|---|
| | 9 | • United States Patent No. 6,390,935 to Kazushige Sugimoto, titled "Three-Piece Solid Golf Ball" (effective filing date Oct. 7, 1999). |
| | | • United States Patent No. 6,465,578 to Bissonnette et al., titled "Low Compression, Resilient Golf Balls Including an Organosulfur Catalyst and Method for Making Same" (effective filing date Dec. 24, 1998). |
| | | • EP 0 577 058 B1 to Wilson Sporting Goods Company, titled "Golf Ball with Improved Cover" (published Jan. 5, 1994). |
| | | • Top Flite System C golf ball manufactured by the Top Flite Golf Company. |
| | | • Tour Stage U-Spin golf Ball manufactured by Bridgestone Sports, Ltd. |
| | 10 | • United States Patent No. 6,390,935 to Kazushige Sugimoto, titled "Three-Piece Solid Golf Ball" (effective filing date Oct. 7, 1999). |
| | | • United States Patent No. 6,465,578 to Bissonnette et al., titled "Low Compression, Resilient Golf Balls Including an Organosulfur Catalyst and Method for Making Same" (effective filing date Dec. 24, 1998). |
| | | • EP 0 577 058 B1 to Wilson Sporting Goods Company, titled "Golf Ball with Improved Cover" (published Jan. 5, 1994). |
| | | • Top Flite System C golf ball manufactured by the Top Flite Golf Company. |
| | | • Tour Stage U-Spin golf Ball manufactured by Bridgestone Sports, Ltd. |
| | | • United States Patent No. 5,252,652 to Egashira et al., titled "Solid Golf Ball" (issued Oct. 12, 1993). |
| | | • United States Patent No. 4,556,220 to Tominaga et al., titled "Solid Golf Balls" (issued Dec. 3, 1985). |
| | | • United States Patent No. 4,722,977 to Heinz Fischer, titled "Process and Composition for Viscosity Degradation of Diene Rubbers" (issued Feb. 2, 1988). |
| | | • H. Fries et al. "Mastication of Rubber," Vol. 55, Rubber Chemistry and Technology, pp. 309-327. |

31

| Bridgestone Patent | Claim No. | Prior Art Related to Validity |
|---|---|---|
| | 11 | • United States Patent No. 6,390,935 to Kazushige Sugimoto, titled "Three-Piece Solid Golf Ball" (effective filing date Oct. 7, 1999).<br><br>• United States Patent No. 6,465,578 to Bissonnette et al., titled "Low Compression, Resilient Golf Balls Including an Organosulfur Catalyst and Method for Making Same" (effective filing date Dec. 24, 1998).<br><br>• Tour Stage U-Spin golf Ball manufactured by Bridgestone Sports, Ltd.<br><br>• United States Patent No. 5,252,652 to Egashira et al., titled "Solid Golf Ball" (issued Oct. 12, 1993).<br><br>• United States Patent No. 4,556,220 to Tominaga et al., titled "Solid Golf Balls" (issued Dec. 3, 1985).<br><br>• United States Patent No. 4,722,977 to Heinz Fischer, titled "Process and Composition for Viscosity Degradation of Diene Rubbers" (issued Feb. 2, 1988).<br><br>• H. Fries et al. "Mastication of Rubber," Vol. 55, Rubber Chemistry and Technology, pp. 309-327. |
| | 12 | • United States Patent No. 6,390,935 to Kazushige Sugimoto, titled "Three-Piece Solid Golf Ball" (effective filing date Oct. 7, 1999).<br><br>• United States Patent No. 6,465,578 to Bissonnette et al., titled "Low Compression, Resilient Golf Balls Including an Organosulfur Catalyst and Method for Making Same" (effective filing date Dec. 24, 1998).<br><br>• Tour Stage U-Spin golf Ball manufactured by Bridgestone Sports, Ltd.<br><br>• United States Patent No. 5,252,652 to Egashira et al., titled "Solid Golf Ball" (issued Oct. 12, 1993).<br><br>• United States Patent No. 4,556,220 to Tominaga et al., titled "Solid Golf Balls" (issued Dec. 3, 1985).<br><br>• United States Patent No. 4,722,977 to Heinz Fischer, titled "Process and Composition for Viscosity Degradation of Diene Rubbers" (issued Feb. 2, 1988).<br><br>• H. Fries et al. "Mastication of Rubber," Vol. 55, Rubber Chemistry and Technology, pp. 309-327. |

32

| Bridgestone Patent | Claim No. | Prior Art Related to Validity |
|---|---|---|
| | 13 | • United States Patent No. 6,390,935 to Kazushige Sugimoto, titled "Three-Piece Solid Golf Ball" (effective filing date Oct. 7, 1999). |
| | | • United States Patent No. 6,465,578 to Bissonnette et al., titled "Low Compression, Resilient Golf Balls Including an Organosulfur Catalyst and Method for Making Same" (effective filing date Dec. 24, 1998). |
| | | • EP 0 577 058 B1 to Wilson Sporting Goods Company, titled "Golf Ball with Improved Cover" (published Jan. 5, 1994). |
| | | • Top Flite System C golf ball manufactured by the Top Flite Golf Company. |
| | | • Tour Stage U-Spin golf Ball manufactured by Bridgestone Sports, Ltd. |
| | 14 | • United States Patent No. 6,390,935 to Kazushige Sugimoto, titled "Three-Piece Solid Golf Ball" (effective filing date Oct. 7, 1999). |
| | | • United States Patent No. 6,465,578 to Bissonnette et al., titled "Low Compression, Resilient Golf Balls Including an Organosulfur Catalyst and Method for Making Same" (effective filing date Dec. 24, 1998). |
| | | • EP 0 577 058 B1 to Wilson Sporting Goods Company, titled "Golf Ball with Improved Cover" (published Jan. 5, 1994). |
| | | • Top Flite System C golf ball manufactured by the Top Flite Golf Company. |

| Bridgestone Patent | Claim No. | Prior Art Related to Validity |
|---|---|---|
| | 15 | • United States Patent No. 6,390,935 to Kazushige Sugimoto, titled "Three-Piece Solid Golf Ball" (effective filing date Oct. 7, 1999).<br><br>• United States Patent No. 6,465,578 to Bissonnette et al., titled "Low Compression, Resilient Golf Balls Including an Organosulfur Catalyst and Method for Making Same" (effective filing date Dec. 24, 1998).<br><br>• EP 0 577 058 B1 to Wilson Sporting Goods Company, titled "Golf Ball with Improved Cover" (published Jan. 5, 1994).<br><br>• Top Flite System C golf ball manufactured by the Top Flite Golf Company. |
| | 16 | • United States Patent No. 6,390,935 to Kazushige Sugimoto, titled "Three-Piece Solid Golf Ball" (effective filing date Oct. 7, 1999).<br><br>• United States Patent No. 6,465,578 to Bissonnette et al., titled "Low Compression, Resilient Golf Balls Including an Organosulfur Catalyst and Method for Making Same" (effective filing date Dec. 24, 1998).<br><br>• EP 0 577 058 B1 to Wilson Sporting Goods Company, titled "Golf Ball with Improved Cover" (published Jan. 5, 1994).<br><br>• Top Flite System C golf ball manufactured by the Top Flite Golf Company. |

| Bridgestone Patent | Claim No. | Prior Art Related to Validity |
|---|---|---|
| | 17 | • United States Patent No. 6,390,935 to Kazushige Sugimoto, titled "Three-Piece Solid Golf Ball" (effective filing date Oct. 7, 1999).<br><br>• United States Patent No. 6,465,578 to Bissonnette et al., titled "Low Compression, Resilient Golf Balls Including an Organosulfur Catalyst and Method for Making Same" (effective filing date Dec. 24, 1998).<br><br>• United States Patent No. 5,252,652 to Egashira et al., titled "Solid Golf Ball" (issued Oct. 12, 1993).<br><br>• United States Patent No. 4,556,220 to Tominaga et al., titled "Solid Golf Balls" (issued Dec. 3, 1985).<br><br>• United States Patent No. 4,722,977 to Heinz Fischer, titled "Process and Composition for Viscosity Degradation of Diene Rubbers" (issued Feb. 2, 1988).<br><br>• H. Fries et al. "Mastication of Rubber," Vol. 55, Rubber Chemistry and Technology, pp. 309-327. |
| | 19 | • United States Patent No. 6,390,935 to Kazushige Sugimoto, titled "Three-Piece Solid Golf Ball" (effective filing date Oct. 7, 1999).<br><br>• United States Patent No. 6,465,578 to Bissonnette et al., titled "Low Compression, Resilient Golf Balls Including an Organosulfur Catalyst and Method for Making Same" (effective filing date Dec. 24, 1998).<br><br>• United States Patent No. 5,252,652 to Egashira et al., titled "Solid Golf Ball" (issued Oct. 12, 1993).<br><br>• United States Patent No. 4,556,220 to Tominaga et al., titled "Solid Golf Balls" (issued Dec. 3, 1985).<br><br>• United States Patent No. 4,722,977 to Heinz Fischer, titled "Process and Composition for Viscosity Degradation of Diene Rubbers" (issued Feb. 2, 1988).<br><br>• H. Fries et al. "Mastication of Rubber," Vol. 55, Rubber Chemistry and Technology, pp. 309-327. |

| Bridgestone Patent | Claim No. | Prior Art Related to Validity |
|---|---|---|
| | 21 | • United States Patent No. 6,390,935 to Kazushige Sugimoto, titled "Three-Piece Solid Golf Ball" (effective filing date Oct. 7, 1999).<br><br>• United States Patent No. 6,465,578 to Bissonnette et al., titled "Low Compression, Resilient Golf Balls Including an Organosulfur Catalyst and Method for Making Same" (effective filing date Dec. 24, 1998).<br><br>• United States Patent No. 5,252,652 to Egashira et al., titled "Solid Golf Ball" (issued Oct. 12, 1993).<br><br>• United States Patent No. 4,556,220 to Tominaga et al., titled "Solid Golf Balls" (issued Dec. 3, 1985).<br><br>• United States Patent No. 4,722,977 to Heinz Fischer, titled "Process and Composition for Viscosity Degradation of Diene Rubbers" (issued Feb. 2, 1988).<br><br>• H. Fries et al. "Mastication of Rubber," Vol. 55, Rubber Chemistry and Technology, pp. 309-327. |
| | 22 | • United States Patent No. 6,390,935 to Kazushige Sugimoto, titled "Three-Piece Solid Golf Ball" (effective filing date Oct. 7, 1999).<br><br>• United States Patent No. 6,465,578 to Bissonnette et al., titled "Low Compression, Resilient Golf Balls Including an Organosulfur Catalyst and Method for Making Same" (effective filing date Dec. 24, 1998).<br><br>• United States Patent No. 5,252,652 to Egashira et al., titled "Solid Golf Ball" (issued Oct. 12, 1993).<br><br>• United States Patent No. 4,556,220 to Tominaga et al., titled "Solid Golf Balls" (issued Dec. 3, 1985).<br><br>• United States Patent No. 4,722,977 to Heinz Fischer, titled "Process and Composition for Viscosity Degradation of Diene Rubbers" (issued Feb. 2, 1988).<br><br>• H. Fries et al. "Mastication of Rubber," Vol. 55, Rubber Chemistry and Technology, pp. 309-327. |

| Bridgestone Patent | Claim No. | Prior Art Related to Validity |
|---|---|---|
| | 23 | • United States Patent No. 6,390,935 to Kazushige Sugimoto, titled "Three-Piece Solid Golf Ball" (effective filing date Oct. 7, 1999).<br><br>• United States Patent No. 6,465,578 to Bissonnette et al., titled "Low Compression, Resilient Golf Balls Including an Organosulfur Catalyst and Method for Making Same" (effective filing date Dec. 24, 1998).<br><br>• United States Patent No. 5,252,652 to Egashira et al., titled "Solid Golf Ball" (issued Oct. 12, 1993).<br><br>• United States Patent No. 4,556,220 to Tominaga et al., titled "Solid Golf Balls" (issued Dec. 3, 1985).<br><br>• United States Patent No. 4,722,977 to Heinz Fischer, titled "Process and Composition for Viscosity Degradation of Diene Rubbers" (issued Feb. 2, 1988).<br><br>• H. Fries et al. "Mastication of Rubber," Vol. 55, Rubber Chemistry and Technology, pp. 309-327. |
| 6,780,125 | 2 | • United States Patent No. 5,779,563 to Yamagishi et al., titled "Multi-Piece Solid Golf Ball" (issued Jul 14, 1998).<br><br>• JP 09-056848 to Bridgestone Sports, Ltd., titled "Multipiece Solid Golf Ball" (published Mar. 4, 1997).<br><br>• WO 97/09093 to Acushnet Company, titled "Enhanced Lofting Golf Balls" (published Mar. 13, 1997).<br><br>• Altus Newing Massy golf ball manufactured by Bridgestone Sports, Ltd.<br><br>• Precept Dynawing Double Cover S+ golf ball manufactured by Bridgestone Sports, Ltd. |

it seeks information that is subject to the attorney-client privilege and/or attorney work-product privilege.

Without waiver and subject to these objections, Acushnet identifies Jeff Dalton of the Acushnet Company, located at 333 Bridge Street, Fairhaven, Massachusetts 02719-0965 as a person having knowledge of the testing of the Bridgestone products.

As To Objections:

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By: _____

Alan M. Grimaldi
Joseph P. Lavelle
Matthew J. Moore
Vivian S. Kuo
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004
Telephone (202) 783-0800

Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 North Market Street
P. O. Box 951
Wilmington, DE  19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

Dated: July 7, 2005

*Attorneys for Defendant Acushnet Company*

689610

64

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on July 7, 2005, a true and correct copy of

the within document was caused to be served on the attorney of record at the following addresses

as indicated:

### VIA HAND DELIVERY

Jack B. Blumenfeld
Maryellen Noreika
Leslie A. Polizoti
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
Wilmington, DE  19801

### VIA FEDERAL EXPRESS

Robert M. Masters
John T. Callahan
Raja Saliba
Sughrue Mion, PLLC
2100 Pennsylvania Avenue, NW
Washington, DC  20037

David E. Moore

680013

# EXHIBIT F

## FULLY REDACTED

# EXHIBIT G

Paul**Hastings**

Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W. • Washington, DC 20005
telephone 202 551 1700 • facsimile 202 551 1705 • www.paulhastings.com

Atlanta
Beijing
Brussels
Chicago
Hong Kong
London
Los Angeles
Milan
New York
Orange County
Palo Alto
Paris
San Diego
San Francisco
Shanghai
Stamford
Tokyo
Washington, DC

(202) 551-1754
brandonwhite@paulhastings.com

December 23, 2006                                                          70416.00002

**VIA FACSIMILE (202) 383-6610**

Brian S. Seal, Esq.
Howrey LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004

   **Re:**  **Bridgestone Sports v. Acushnet**

Dear Brian,

I write in regard to several issues raised by Acushnet's recent supplementation of its discovery responses.

   1.  **Translations of Prior Art**

Acushnet's invalidity contentions refer to translations of Japanese patent documents. (*See, e.g.,* Tab A2 ('652 patent) to *Acushnet's' Sixth Supplemental Responses to Bridgestone's First Set of Interrogatories Directed To Acushnet* at Japanese Kokai Publication No. 02-092378). Please produce all English-language translations of foreign-language documents cited in Acushnet's invalidity contentions immediately.

   2.  **Acushnet's Refusal To Answer Bridgestone's Requests for Admissions**

Starting with Bridgestone's Request for Admission No. 68, Acushnet has failed to answer based on the assertion that Bridgestone's 149 Requests exceed the number of requests for admissions authorized in the Rule 16 Scheduling Order (D.I. 18). We disagree with Acushnet's position.

The Rule 16 Scheduling Order authorized 150 requests for admission. Bridgestone's has propounded only 150 requests. Further, requests for admissions are designed to simplify the issues for trial by eliminating non-controversial issues from dispute. (*See* Advisory Committee Notes to Rule 36). Bridgestone's admissions are narrowly tailored to the issues in dispute in this case and designed to simplify the issues for trial. Acushnet's failure to answer more than half of Bridgestone's Request is improper and serves only to unnecessarily complicate this case.

Brian Seal
December 23, 2006
Page 2

Please let us know by December 29, 2006 if Acushnet intends to stand on its objections.

### 3.    Acushnet's Identification of Newly-Asserted Prior Art

Acushnet's supplement response to Bridgestone Interrogatory No. 4 identifies several new references not previously identified.   For example, with respect to the '707 patent, Acushnet now identifies the Altus Newing Massy golf balls as alleged prior art.  With respect to the '791 patent, Acushnet added five patents as allegedly anticipatory references, more than doubling the number of allegedly anticipatory references it intends to assert.  This is improper on several grounds.

First, as set forth in our previously-filed Motion to Compel (D.I. 22), Acushnet has failed to narrow its infringement contentions as ordered by the Court.  Adding new references at this stage of the case only compounds this problem.

Second, the Court ordered all invalidity contentions to be disclosed by August 11, 2006. (D.I. 154 at ¶3).  Adding new prior art after August 11, 2006 is foreclosed by the Court's Order.

Accordingly, please let us know by December 29, 2006 if Acushnet intends to proceed with the infringement positions set forth in *Acushnet's Sixth Supplemental Responses To Bridgestone's First Set of Interrogatories Directed to Acushnet.*

We continue to review Acushnet's discovery responses, and reserve the right to later identify other issues that may arise.

Sincerely,

Brandon M. White
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

LEGAL_US_E # 73790790.1

# Paul Hastings

Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W. • Washington, DC 20005
telephone 202 551 1700 • facsimile 202 551 1705 • www.paulhastings.com

## FACSIMILE TRANSMISSION

| to: | company/office: | facsimile: | telephone: |
|---|---|---|---|
| Brian Seal | Howrey LLP | (202) 383-6610 | (202) 383-6904 |

| from: | facsimile: | telephone: | initials: |
|---|---|---|---|
| Brandon M. White | (202) 551-1705 | (202) 551-1754 | BMW2 |

| client name: | Bridgestone Sports | client matter number: | 70416.00002 |
|---|---|---|---|
| date: | December 22, 2006 | pages (with cover): | 3 |

comments:

**If you do not receive all pages, please call immediately Facsimile Center: (202) 551-1275**

*This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via the U.S. Postal Service. Thank you.*

12/22/2006 15:12 FAX 202 551 1705        PAUL HASTINGS                              ☒001

```
                    *********************
                    ***   TX REPORT   ***
                    *********************


     TRANSMISSION OK


     TX/RX NO              2099
     CONNECTION TEL            ##081532#ppp3836610#
     CONNECTION ID
     ST. TIME             12/22 15:12
     USAGE T              00'53
     PGS. SENT            3
     RESULT               OK
```

# EXHIBIT H

## FULLY REDACTED

# EXHIBIT I

# HOWREY LLP

1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
T 202.783.0800
F 202.383.6610
www.howrey.com

February 16, 2007

File 00634.0002

<u>BY FACSIMILE</u>

Brandon M. White, Esq.
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, D.C. 20005

Re:    *Bridgestone Sports Co. v. Acushnet Co.,*
         **C.A. No. 05-132 (JJF) (D. Del.)**
         <u>**Acushnet's Core Recipe Data**</u>

Dear Brandon:

In the course of preparing Acushnet's witness for Bridgestone's Tenth 30(b)(6) Notice on the cores of the accused Acushnet products, we realized that our production of change notices from Ball Plant II was last produced only through August 2005. Accordingly, we are providing you with copies of the change notices that have been entered since August 2005. In addition, for this deposition we are providing a paper set of recipe change notices from Ball Plant III largely duplicative of the information provided in November in the form of Lotus Notes. Finally, given the topics on which the Court has ordered Acushnet to prepare and provide a witness for this deposition, we are planning to have available at the deposition for review by the witness and Bridgestone Acushnet's Mesabi Mix Vision software in its native electronic format.

With regard to Bridgestone's Fifth through Eighth 30(b)(6) Notices, topics 5 and 6, we repeat our offer to make the entire QAS system available to you for your inspection. We are in the process of finding out whether we can make the database available for review in Washington -- whether at a deposition or otherwise -- and will let you know shortly.

Please let me know if you have any questions.

Regards,

Brian S. Seal /sc

Brian S. Seal

Enclosure

AMSTERDAM  BRUSSELS  CHICAGO  EAST PALO ALTO  HOUSTON  IRVINE  LONDON  LOS ANGELES
MUNICH  NEW YORK  NORTHERN VIRGINIA  PARIS  SALT LAKE CITY  SAN FRANCISCO  TAIPEI  WASHINGTON, DC

# EXHIBIT J

# HOWREY LLP

1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
T 202.783.0800
F 202.383.6610
www.howrey.com

Direct Dial 202.383.6904
File 00634.0002

November 3, 2006

<u>BY FACSIMILE</u>
Brandon M. White, Esq.
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, D.C. 20005

> Re:  *Bridgestone Sports Co. v. Acushnet Co.,*
> *C.A. No. 05-132 (JJF) (D. Del.)*
> <u>Response to Your Letter of October 26</u>

Dear Brandon:

Thank you for your letter of October 26 regarding alleged discovery deficiencies. We respond herein to the matters raised in your letter.

## 1.  Deposition Issues

### a.  Deposition of Mr. Shimosaka

Per our e-mail correspondence of October 31, we have agreed to depose Mr. Shimosaka on November 16-17.

### b.  Depositions of Dr. Bissonnette and Mr. Jones

Per my e-mail to Terry Wikberg on Monday, October 30, Mr. Jones agreed to move his deposition from November 2 to November 3.

Per our e-mail correspondence of October 31, you have agreed to depose Dr. Bissonnette on November 15.

### c.  Depositions of Mr. Drumm, Ms. Olson and Mr. Williams

While we note your objection to the addition of Mr. Drumm, Ms. Olson and Mr. Williams to Acushnet's initial disclosures, your letter acknowledges that they were added prior to the close of fact discovery. Further, we have agreed to offer Ms. Olson and Mr. Williams for deposition after the close of fact discovery. We are obtaining available dates from them and will

AMSTERDAM  BRUSSELS  CHICAGO  EAST PALO ALTO  HOUSTON  IRVINE  LONDON
LOS ANGELES  NORTHERN VIRGINIA  PARIS  SALT LAKE CITY  SAN FRANCISCO  TAIPEI  WASHINGTON, DC

**HOWREY** LLP

Brandon M. White, Esq.
November 3, 2006
Page 2

inform you promptly once we have them. Acushnet has agreed not to call Mr. Drumm as a witness at trial.

     **d.**    **JSR Witness**

    The topics for Mr. Morikawa's deposition are:

    (1) the manufacturing processes used by JSR to manufacture the polybutadiene rubbers sold by JSR to Bridgestone for use in golf ball cores, including but not limited to BR 730, from their initial manufacture to the present;

    (2) the manufacturing processes used by JSR to manufacture BR 11 and BR 18, from their initial manufacture to the present;

    (3) the design, development and manufacturing targets or specifications set by JSR for its polybutadiene rubbers, including but not limited to BR 11, BR 18, and BR 730;

    (4) the quality control procedures used by JSR in the manufacture of its polybutadiene rubbers, including but not limited to BR 11, BR 18, and BR 730; and

    (4) the origin and chain of custody for the BR 11 and BR 18 polybutadiene rubber samples produced by Bridgestone to Acushnet.

    We will serve a formal deposition notice on Monday that identifies the above categories.

    **e.**    **Bridgestone's 10th Rule 30(b)(6) Notice**

    Per my letter of July 28, we maintain the Bridgestone's 10th Notice of 30(b)(6) Deposition regarding, *inter alia*, the research, development, and manufacturing of the cores of the accused Acushnet products is duplicative of the topics in Bridgestone's 5th through 8th Notices. As I stated in our e-mail correspondence today, we would like more specific details from you regarding the information you believe justifies further deposition on those topics so that we may make an informed decision about whether to offer an additional witness.

    **f.**    **Bridgestone's 11th Rule 30(b)(6) Notice**

    As I indicated in my e-mail of today, we will provide a document to you early next week in response to Bridgestone's 11th Rule 30(b)(6) Notice.

**HOWREY** LLP

2.    **Missing RM Codes**

      We are investigating the existence of data sheets or material specifications for the specific RM codes identified in John Shin's letter of August 1, 2006. To the extent any such data sheets or material specifications exist, we will produce them shortly.

3.    **Electronic Databases for Recipes, Change Notices and Recipe Changes**

      In your letter of September 27, 2006, you request that Acushnet produce copies of a number of databases, including its change notice database, recipe change databases and Ball Manufacturing Information database in their native electronic formats. Having already produced the relevant documents from these databases in hardcopy, we do not believe we are obligated to reproduce them, in their native electronic format or otherwise. If Bridgestone can demonstrate some basis for such reproduction, however, we remain willing to consider your request.

      In addition, we are undertaking a specific review of the databases referenced in your letter. To the extent responsive, non-privileged documents from any such database have not yet been produced, we will agree to produce them in their native electronic format, if possible. We expect reciprocity from Bridgestone, however, so that we would receive any as yet unproduced documents from Bridgestone in their native electronic formats. Please confirm whether you agree to this mutual arrangement.

4.    **Documents Identified During the Deposition of Ken Welchman**

    a.    **QAS/SPC Documentation and Testimony**

      We disagree strongly with your statement that Mr. Dalton "was unprepared to testify" on the topics related to quality control. To the contrary, Mr. Dalton testified extensively on "[t]he quality control and compliance employed by Acushnet in the design and manufacture of each and every model and version of the [accused Acushnet golf balls]" and "[t]he testing of the [accused Acushnet golf balls], and all preliminary, intermediary and end product components, including without limitation cores, cover layers and intermediate layers by or for Acushnet in developing and manufacturing of the [accused Acushnet golf balls]." *See*, for example, Dalton Depo., July 25, 2006, pp. 407:15-411:18.

      In support of your statement that Mr. Dalton was "unprepared," you cite a portion of Mr. Dalton's testimony discussing a specific document created by Bridgestone from the native-format QAS data produced by Acushnet. Considering the breadth of the topics in your notices related to quality control, it is unreasonable to expect Mr. Dalton to be familiar with every such document, particularly when it was not identified in your request. If you have specific questions about that document, we can attempt to answer them via written correspondence.

**HOWREY**<sub>LLP</sub>

Otherwise, given that you have obtained extensive testimony from Mr. Dalton on Acushnet's quality control procedures as set forth in your notices and have also deposed Mr. Welchman, who is Acushnet's Director of Quality for Golf Ball Operations, we see no need to provide additional witnesses on those topics. We remain willing to discuss this matter further, however, should you articulate a sufficient justification for additional testimony.

**b.    Pro V1\* Information**

We are collecting the QAS data for the Pro V1 Star golf ball and will produce it to you shortly.

**c.    Finished Ball Specifications**

We are investigating the existence of "finished ball specifications" or finished core specifications for the accused Acushnet products. To the extent any responsive, non-privileged documents exist, we will produce them shortly.

**d.    Recipe Changes with Recipes Printed Thereon (Ball Plant III)**

We are in the process of investigating whether there are any recipe changes from Ball Plant III that have the full recipes printed on them. To the extent any responsive, non-privileged documents exist, we will produce them.

**e.    QAS Data**

Acushnet has conducted a reasonable search for all QAS data in its possession, custody, or control for the accused products. Other than the data for the Pro V1 Star golf ball identified above (which will be produced shortly), Acushnet has produced all responsive data located as a result of that search.

**f.    Tech Data Sheets**

We are investigating the existence of any "Tech Data Sheets" that relate to the accused Acushnet products. To the extent any responsive, non-privileged documents exist, we will produce them shortly.

**g.    Bills of Materials**

Acushnet has conducted a reasonable search for all Bills of Material in its possession, custody, or control for the accused products and has produced all responsive data located as a result of that search.

**HOWREY** LLP

Brandon M. White, Esq.
November 3, 2006
Page 5

5.     **Documents Identified During the Deposition of Eric Bartsch**

   a.     **Intermediate Layer and Cover Layer Change Database**

   We are investigating the existence of any databases that exist at Acushnet for data regarding changes in intermediate layers and/or cover layers for the accused Acushnet products. To the extent any such data exists that is responsive and non-privileged, we will produce it shortly.

   b.     **Production and Cost Information**

   We are investigating the existence of any Peoplesoft system documents concerning production and/or cost information for the accused Acushnet products. To the extent any responsive, non-privileged documents exist, we will produce them shortly.

6.     **Documents Identified During the Deposition of Chris Cavallaro**

   a.     **Golf Ball Data Charts from the Product Development Database**

   Acushnet has conducted a reasonable search – including a search of the product development database – for all Golf Ball Data Charts in its possession, custody, or control for the accused products, and has produced all responsive documents located as a result of that search.

   b.     **Pro V1 and Pro V1\* (Star) Core Recipes in PHR (Parts-Per-Hundred)**

   Any responsive, non-privileged documents provided by Mr. Cavallaro to Mr. Lester for this litigation have been produced. We are investigating whether Mr. Cavallaro has any additional responsive, non-privileged documents, including parts-per-hundred formulations for the Pro V1 and Pro V1 Star golf balls. To the extent any responsive, non-privileged documents exist, we will produce them shortly.

   c.     **Performance Testing Between US and Japan Versions of Pro V1 Golf Balls**

   We are investigating the existence of any responsive, non-privileged documents concerning performance testing between the US and Japan versions of the Pro V1 golf balls. We note, however, that any such documents created after the March 7, 2005 filing date are subject to Acushnet's General Objection No. 14 in response to Bridgestone's Requests for the Production of Documents.

**HOWREY** LLP

   d.   **Additional Pro V1 Binder**

   As noted above in subparagraph (b), any responsive, non-privileged documents provided by Mr. Cavallaro to Mr. Lester for this litigation have been produced. We are investigating whether Mr. Cavallaro has any additional responsive, non-privileged documents, including any additional Pro V1 binders. To the extent any responsive, non-privileged documents exist, we will produce them shortly.

   e.   **Notebooks for "Latest Version" of Pro V1, Pro V1* (Star), and NXT Tour**

   As noted above in subparagraphs (b) and (d), any responsive, non-privileged documents provided by Mr. Cavallaro to Mr. Lester for this litigation have been produced. We are investigating whether Mr. Cavallaro has any additional responsive, non-privileged documents, including any additional notebooks for the Pro V1, Pro V1 Star and/or NXT Tour golf balls. To the extent any responsive, non-privileged documents exist, we will produce them shortly.

   f.   **Testing of Pro V1x Golf Balls**

   We are investigating the existence of any documents that exist at Acushnet regarding test data for changes in the levels of ZnPCTP in the Pro V1x golf balls. To the extent any such data exists that is responsive and non-privileged, we will produce it.

7.   **Documents Identified During the Deposition of David Bulpett**

   In its collection of documents from the competitive ball database, Acushnet collected information included under the "Additional Data" heading, where any such information appeared that was both responsive and non-privileged.

   Your letter states that "[o]ther deficiencies in Acushnet's production were established during deposition," but does not identify them. To the extent you believe that any further deficiencies exist, we ask that you bring them to our attention promptly so that we may address them. Otherwise, we will understand your silence to mean that no further alleged deficiencies exist.

   We look forward to discussing these matters with you on Monday, along with the deficiencies raised in Alan Grimaldi's October 27 letter to Scott Flicker, to which we have yet received no response.

                                        Regards,

                                        Brian S. Seal

NOV. 3. 2006  6:52PM    HOWREY SIMON ARNOLD    NO. 568    P. 1

# HOWREY LLP

1299 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, DC 20004-2402
PHONE: 202.783.0800 • FAX: 202.383.6610

## FACSIMILE COVER SHEET

| | | |
|---|---|---|
| DATE: | November 3, 2006 | |

| | | | | |
|---|---|---|---|---|
| TO: | NAME: | Brandon M. White | | |
| | COMPANY: | Paul Hastings | | |
| | FAX NUMBER | 202.551.1705 | PHONE NUMBER: | 202.551.1700 |
| | CITY: | Washington, DC | | |

| | | | | |
|---|---|---|---|---|
| FROM: | NAME: | Brian S. Seal | | |
| | DIRECT DIAL NUMBER: | 202.383.6904 | USER ID: | 2233 |

| | | | |
|---|---|---|---|
| NUMBER OF PAGES, INCLUDING COVER: | 7 | CHARGE NUMBER: | 00634.0002 |

☐ ORIGINAL WILL FOLLOW VIA:

☐ REGULAR MAIL    ☐ OVERNIGHT DELIVERY    ☐ HAND DELIVERY    ☐ OTHER: _____

☒ ORIGINAL WILL NOT FOLLOW

SUPPLEMENTAL MESSAGE:

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED
ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF
THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND
RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

IF THERE ARE ANY QUESTIONS OR PROBLEMS WITH THE TRANSMISSION OF THIS FACSIMILE, PLEASE CALL 202-383-6787.

PAGE 1/7 * RCVD AT 11/3/2006 7:00:45 PM [Eastern Standard Time] * SVR:WDCRF1/2 * DNIS:9998 * CSID: * DURATION (mm-ss):02-42

## CERTIFICATE OF SERVICE

I certify that on February 21, 2007 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Richard L. Horowitz, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE 19801

I further certify that I caused copies to be served upon the following on February 21, 2007 in the manner indicated:

### BY HAND & E-MAIL

Richard L. Horwitz, Esquire
POTTER ANDERSON & CORROON LLP
1313 N. Market Street
Wilmington, DE 19801

### BY FEDERAL EXPRESS AND E-MAIL

Joseph P. Lavelle, Esquire
HOWREY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004

*/s/ Leslie A. Polizoti (#4299)*
Leslie A. Polizoti (#4299)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Wilmington, DE 19801
(302) 658-9200
jblumenfeld@mnat.com