# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BRIDGESTONE SPORTS CO., LTD., and BRIDGESTONE GOLF, INC., | ) ) ) | C. A. No. 05-132 (JJF) |
| Plaintiffs, | ) ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| ACUSHNET COMPANY, | ) ) | **PUBLIC VERSION** |
| Defendant. | ) ) | |

## ACUSHNET'S BRIEF IN SUPPORT OF ITS MOTION TO PRECLUDE BRIDGESTONE FROM RELYING ON CERTAIN EVIDENCE REGARDING <u>INFRINGEMENT, INVALIDITY AND DAMAGES</u>

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P. O. Box 951
Wilmington, DE 19899-0951
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant*
*Acushnet Company*

OF COUNSEL:

Alan M. Grimaldi
Joseph P. Lavelle
Kenneth W. Donnelly
Brian S. Seal
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel: (202) 783-0800

Dated: March 20, 2007
Public Version Dated: March 27, 2007

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................1

II.   NATURE AND STAGE OF THE PROCEEDINGS .............................................1

III.  SUMMARY OF ARGUMENT .............................................................1

IV.   STATEMENT OF FACTS ...........................................................................2

    A.    During fact discovery, Bridgestone failed to disclose the factual bases on which it is now relying to support its infringement claims. ..........2

        1.    During fact discovery, Bridgestone failed to disclose any facts in response to Acushnet's contention interrogatories..............2

        2.    Bridgestone failed to produce its test results in response to Acushnet's Interrogatory No. 14......................................................8

        3.    Bridgestone failed to identify a number of documents on which it is now relying....................................................................12

    B.    During fact discovery, Bridgestone failed to disclose the facts and documents on which it is relying to support its invalidity contentions regarding Acushnet's '705 Patent. .........................................13

    C.    During fact discovery, Bridgestone failed to disclose the factual bases on which it is now relying to support its contentions of nonobviousness and commercial success. ..................................................14

    D.    During fact discovery, Bridgestone failed to disclose the facts on which it is now relying to support its damages claims. .............................16

V.    ARGUMENT.................................................................................................19

    A.    Legal Standards...............................................................................19

    B.    The Court should preclude Bridgestone from relying on fact evidence in support of its contentions that it did not disclose during fact discovery. ....................................................................................20

        1.    Bridgestone failed to provide any meaningful responses to Acushnet's interrogatories. ........................................................20

        2.    Preclusion is an appropriate sanction for Bridgestone's deliberate failure to respond meaningfully to Acushnet's interrogatories. ..........................................................................21

a.    Bridgestone's failure to disclose fact evidence has prejudiced Acushnet............................................................22

b.    Bridgestone cannot cure the prejudice to Acushnet without a substantial disruption of the trial schedule.........25

c.    Bridgestone's failure to disclose the factual bases for its contentions during fact discovery was willful.........26

d.    The importance of the evidence to Bridgestone does not excuse its failure to timely disclose it during fact discovery. ...................................................................26

VI.    CONCLUSION.........................................................................................28

# TABLE OF AUTHORITIES

## CASES

Astrazeneca AB v. Mutual Pharm Co.,
    278 F. Supp. 2d 491 (E.D. Pa. 2003) .................................................................. 20

Cornell Research Foundation v. Hewlett Packard Co.,
    223 F.R.D. 55 (N.D.N.Y. 2003) .......................................................................... 20

Mead Corp. v. Riverwood Natural Resources Corp.,
    145 F.R.D. 512 (D. Minn. 1992) ......................................................................... 20

Meyers v. Pennypack Woods Home Ownership Ass'n,
    559 F.2d 894 (3d Cir. 1977) ................................................................................ 20

Micro Chem., Inc. v. Lextron, Inc.,
    317 F.3d 1387 (Fed. Cir. 2003) ........................................................................... 19

Primos Inc. v. Hunter's Specialties, Inc.,
    451 F.3d 841 (Fed. Cir. 2006) ............................................................................. 27

Wesley-Jessen Corp. v. Pilkington Visioncare,
    844 F. Supp. 987 (D. Del. 1994) .................................................................. 21, 22

## RULES

Fed. R. Civ. P. 37(c)(1) ................................................................................................ 19

## I.    INTRODUCTION

Despite repeated requests by Acushnet that Bridgestone provide the factual bases for its infringement, invalidity and damages contentions – including the filing of two motions to compel with this Court – Bridgestone withheld is contentions, relying instead on conclusory statements and claims of work product protection during fact discovery, only to disclose those factual bases during expert discovery.

By waiting until after the close of fact discovery to provide the factual bases and support for virtually its entire case against Acushnet, Bridgestone prejudiced Acushnet by preventing it from conducting fact discovery to counter the factual support for Bridgestone's contentions and needlessly complicated the case for trial.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

This is a patent infringement suit brought by Plaintiffs Bridgestone Sports Co., Ltd. and Bridgestone Golf, Inc. (collectively, "Bridgestone") against Defendant Acushnet Company ("Acushnet") in March 2005.  Under the Court's Scheduling Orders, fact discovery closed on October 10, 2006.  The parties, however, agreed to extend fact discovery until December 18, 2006.  The parties are presently engaged in expert discovery, which closes this week.  Summary judgment is ordered to be briefed by April 13.  And trial is scheduled to begin on June 18, 2007.

## III.    SUMMARY OF ARGUMENT

With the service of its expert reports on January 16 and February 20, Bridgestone has for the first time disclosed factual evidence, including hundreds of test results, test protocols, and third-party licensing arrangements, on which it is relying to support its contentions regarding infringement, invalidity, and damages.  That fact evidence was properly discoverable – and should have been disclosed – during fact discovery in response to the Federal Rules, the Court's Scheduling Orders and Acushnet's discovery requests.  Acushnet now moves to preclude Bridgestone from relying on any fact

evidence in support of its contentions at trial, including hundreds of facts and documents relating to Bridgestone's testing of Acushnet's products, that was in Bridgestone's possession but never disclosed by Bridgestone until after the parties' agreed-upon fact discovery cut-off of December 18, 2006.

### IV.    STATEMENT OF FACTS

**A.    During fact discovery, Bridgestone failed to disclose the factual bases on which it is now relying to support its infringement claims.**

**1.    During fact discovery, Bridgestone failed to disclose any facts in response to Acushnet's contention interrogatories.**

Due to Bridgestone's failure to identify the factual bases for its infringement contentions during fact discovery in response to Acushnet's discovery requests, including Acushnet's interrogatories, the Court should preclude Bridgestone from relying on any factual bases now. Acushnet repeatedly requested during fact discovery the factual bases for Bridgestone's infringement contentions, but Bridgestone continually refused to provide the facts it clearly now intends to use at trial to prove infringement.

Acushnet's Interrogatory No. 2, served June 13, 2005, requested that Bridgestone

> describe[] in detail on an element-by-element basis how you contend each product identified infringes each claim, specifying whether such infringement is alleged to be literal or under the doctrine of equivalents.

(Ex. A – Def.'s Interrog. No. 2 to Pls.)[1]. Throughout fact discovery, Bridgestone responded to this interrogatory with nothing more than conclusory assertions that Acushnet's accused golf balls satisfy all of the recited limitations. In the face of this, Acushnet filed two separate motions to compel the factual bases for Bridgestone's

---

[1] Exhibits referenced herein ("Ex. __") are included in the Appendix of Exhibits to Acushnet's Brief in Support of its Motion to Preclude Bridgestone From Relying on Certain Evidence Regarding Infringement, Invalidity and Damages.

infringement assertions (D.I. 34 and D.I. 47), both of which the Court denied as premature, giving Bridgestone an opportunity to cure its failure to offer any specificity. Yet Bridgestone did not thereafter ever cure its deficiency. Because of Bridgestone's tactics, Acushnet did not learn the basis for any of Bridgestone's contentions until the service of Bridgestone's expert reports on January 16, 2007. Thus, despite repeated requests by Acushnet, it learned no more about Bridgestone's factual contentions for infringement over approximately two years of litigation than it learned when Bridgestone filed its Complaint on March 7, 2005.

Bridgestone's refusal to provide its factual evidence is exemplified by its interrogatory infringement responses for claim 1 of Bridgestone's U.S. Patent No. 5,553,852 ("the '852 patent"). That claim requires, *inter alia*, a "cover having a thickness of 1 to 3 mm." (Ex. B – '852 Patent, Col. 7, l. 8). In its first set of interrogatory responses, served on June 13, 2005, Bridgestone's response to Acushnet's Interrogatory No. 2 with regard to that limitation was ████████████████ ████████████████████████." (Ex. C – Pls.' Resp. to Def.'s Interrog. No. 2 at B-1) (emphasis added).

Because Bridgestone refused to provide additional detail in response to Acushnet's requests, Acushnet filed a motion on October 3, 2005, asking the Court to compel Bridgestone to produce the factual bases for its infringement contentions. (*See* D.I. 34 at 1-2). The Court denied that motion as premature. (*See* D.I. 42 at 2). At the hearing, the Court stated that it was "a little too soon to get [Bridgestone] to give [Acushnet] a serious response to contention interrogatories because there's too many claims in the case." (Ex. D – Oct. 5, 2005 Hearing Tr. at 25:17-20). The Court noted that "[w]hen this case is narrowed down, I'm going to make them give you detailed contention responses." (*Id.* at 26:16-18).

On December 2, 2005, Acushnet again moved the Court to compel Bridgestone to provide the factual bases for its contentions. (*See* D.I. 48 at 4-7). Once again, the Court

denied the motion. (*See* D.I. 72 at 1). But the reason for the Court's denial was somewhat different. This time at the hearing, the Court indicated that Bridgestone must provide "some facts by February 28," (Ex. E – 1/13/06 Hearing Tr. at 35:7-8), the then-deadline for supplementation of responses to contention interrogatories. Bridgestone's counsel agreed to comply with the Court's request, stating "We will by February 28." (*Id.* at 35:14-15).

Thereafter, pursuant to the Court's Revised Scheduling Order and a further agreement between the parties, the deadline for supplementation of contention responses moved to May 1, 2006. Although Bridgestone served supplemental responses on that date, its responses provided no more detail than its first responses. As one of many examples, Bridgestone's infringement contentions with regard to a "cover having a thickness of 1 to 3 mm" in claim 1 of the '852 patent stated only that "          ." (Ex. F – Pls.' 5th Supp. Resp. to Def.'s 1st Set of Interrogs. at B-4). Thus, even though Bridgestone's counsel informed both Acushnet and the Court that it would provide facts in support of its contentions and answers to Acushnet's interrogatories by the deadline for contentions supplementation, Bridgestone again did not do so.

In fact, Bridgestone did not provide facts in support of its contentions even on the final deadline for fact discovery. Pursuant to the parties' agreement, the deadline for fact discovery, including supplementation of contention responses, was moved to December 18, 2006. (*See* D.I. 262 at Ex. J). However, Bridgestone's supplemental response on that date regarding the cover thickness limitation of claim 1 of the '852 patent was again conclusory: "          ." (Ex. G – Pls.' 9th Supp. Responses to Def.'s 1st Set of Interrogs. at B-6). Once again, Bridgestone failed to provide Acushnet and the Court with any detailed factual responses.

Indeed, Bridgestone did not provide *any* factual bases to support its infringement contentions until it served its expert reports on January 16 – approximately one month after the final deadline for fact discovery, more than eight months after the deadline for contention supplementation and more than *one year* after Bridgestone's counsel had agreed in open court to provide factual responses.  Remarkably, only then did Acushnet learn that Bridgestone's infringement contentions relating to the "1 to 3 mm" cover thickness limitation from claim 1 of the '852 patent, for example, were ███████

██." (*See* Ex. H – Cadorniga 1/16/07 Report at C-34)[2].

And that is but one example; the list of factual evidence not disclosed by Bridgestone over the course of fact discovery is a long one.  In fact, *every single one* of Bridgestone's infringement contention responses followed a similar pattern.  Following the Court's August 3, 2006 Order regarding representative claims, Bridgestone is asserting a total of 14 patent claims against various models of seven accused Acushnet products.  For each limitation in those claims, Bridgestone simply repeated the language of the limitation.  For each limitation that disclosed a range, Bridgestone stated, in

---

[2] The cover thickness limitation was also the subject of Acushnet's requests for admission.  Because Acushnet specifies the cover thickness for its Pro V1 and Pro V1x golf balls to be less than 1 mm, it served Request for Admission Nos. 21 and 22 on Bridgestone, requesting that Bridgestone admit that it had tested the outer cover thickness of the Pro V1 and Pro V1x golf balls to be less than 1 mm.  Bridgestone's initial responses, served on January 17, 2006, again took the conclusory position that ████████████████████████████████." (Ex. I – Pls.' Responses to Def.'s Requests for Admission Nos. 21-22).  Only when Acushnet identified Bridgestone documents showing measurements ████████ (*see* Ex. J – 2/23/06 Seal Ltr. to Masters at 1-2) – documents on which Bridgestone is not relying – did Bridgestone admit that "████████████████████." (Ex. K – Pls.' Supp. Responses to Def.'s Requests for Admission Nos. 21-22) (emphasis added).  Bridgestone's responses, however, never identified the cover thickness measurements actually taken and Bridgestone produced no documents describing those measurements.

essence, only that the accused Acushnet products were "within the scope of the claimed range." It provided no measurements or testing data to support those claims. Only in its expert reports did it finally reveal how it believed Acushnet met each limitation.

Acushnet did not even learn during fact discovery which limitations Bridgestone was asserting literally or under the doctrine of equivalents. After receiving Bridgestone's supposedly "final" contentions on May 1, 2006, Acushnet specifically requested Bridgestone to identify which contentions it was asserting literally and which it was asserting under the doctrine of equivalents, rather than "making Acushnet guess as to what Bridgestone's infringement case will be." (Ex. L – Seal Ltr. to White, 7/28/06 at 1). Bridgestone responded that, although it disagreed that it "must elect between literal infringement and infringement under the doctrine of equivalents at this time, or at any time," it would supplement its contentions "to explain more fully Bridgestone's position concerning infringement, and specifically the doctrine of equivalents." (Ex. M – White Ltr. to Seal, Aug. 31, 2006, at 1). Bridgestone, however, never did.

Instead, Bridgestone's third and last set of infringement contentions, served on December 18, 2006, asserted literal infringement for each limitation, once again relying only conclusory statements that the accused Acushnet products met the language of the claims. For the claimed ranges, Bridgestone once again stated only that ███████████ ████████████████████████████████████ again providing no measurements or testing data to support those claims. (*See*, for example, Ex. G – Pls.' 9th Supp. Responses to Def.'s 1st Set of Interrogs. at B-6).

Interestingly, by the time of Bridgestone's December 18 supplementation in which it asserted literal infringement of each limitation, it had data in its possession showing that the accused Acushnet golf balls did *not* literally meet certain limitations. For example, Bridgestone accused Acushnet's Titleist NXT Tour golf balls of infringing claim 1 of U.S. Patent No. 5,743,817 ("the '817 patent"), which includes a limitation requiring the golf ball core to have a distortion of 2.9 mm to 4.0 mm under a load of 100

6

kg. (*See* Ex. G – Pls.' 9th Supp. Responses to Def.'s Interrog. No. 2 at C-8). More than a month earlier, however, Bridgestone's experts had reported (as Acushnet has recently learned) the core distortion of many NXT Tour golf balls were ███████████████████ ████. (*See* Ex. N – "NT2-Compression.xls" spreadsheet, dated Nov. 14, 2006) (████████████████████████████████████). Bridgestone, however, did not disclose that data during fact discovery, nor even that it was asserting infringement under the doctrine of equivalents.

      In another example, Bridgestone accused several models of Acushnet's Titleist NXT, Titleist DT So/Lo, and Pinnacle Exception golf balls of infringing claim 1 of U.S. Patent No. 5,803,834 ("the '834 patent"). (*See* Ex. C – Pls.' Responses to Def.'s Interrog. No. 2 at F-1 to F-3). One claim limitation requires that the golf ball core have a distribution of JIS-C hardness such that "a center hardness is lower than the surface hardness by not less than 8 to less than 20 degrees." (*Id.*) In its December 18 supplementation, Bridgestone asserted that █████████████████████████ ████████████████████████████████████████████████████." (*See* Ex. G – Pls.' 9th Supp. Responses to Def.'s Interrog. No. 2 at E-1, E-4, E-7). Bridgestone's experts, however, performed testing that showed that ████ ████████████████████████████. (*See* Ex. H – Cadorgnia 1/16/07 Report at F-7; Ex. O – Caulfield 1/16/07 Report at Ex. 18). An examination of the raw data used to generate these results reveals that the testing to generate these results commenced around September 5, 2006 and was completed by October 31, 2006. (*See* Ex. P – Selected Spreadsheets from Raw Data Provided by Bridgestone on February 1, 2007). Although not all tests are dated, Bridgestone's testing protocols explicitly state that █████████████████████████ ████████████████████████. (*See* Ex. O – Caulfield 1/16/07 Report at Ex. 9). Bridgestone likewise did not disclose this data during fact discovery.

Instead, it was not until Bridgestone served its January 16 expert reports that, contrary to Bridgestone's representations in its cursory interrogatory answers, Acushnet learned for the first time that, for a substantial number of limitations, Bridgestone had *not* measured or tested Acushnet's products to be "within the claimed range." Examples of such instances are identified in the chart attached as Exhibit Q.

Acushnet should not have had to wait for almost two years to find out the true nature of Bridgestone's infringement contentions.

### 2. Bridgestone failed to produce its test results in response to Acushnet's Interrogatory No. 14.

Bridgestone similarly failed to produce thousands of pages of test results and data relating to its testing of Acushnet's products during fact discovery in response to Acushnet's Interrogatory No. 14. Acushnet's Interrogatory No. 14, served on June 13, 2005, requested Bridgestone to

> describe all testing, analysis and/or evaluation by you or on your behalf of [the accused Acushnet] products, including the type of test(s) performed, the testing equipment, test parameters and conditions, and all facts, opinions or results obtained, and identify all documents referring or relating to such testing, analysis and/or evaluation and the persons who are most knowledgeable of such testing, analysis and/or evaluation.

(Ex. A – Def.'s Interrog. No. 14 to Pls.)[3]. Bridgestone initially responded to Acushnet's first set of interrogatories, including Interrogatory No. 14, on June 13, 2005. It then

---

[3] Bridgestone's test results are also responsive to Acushnet's Requests for Production Nos. 14 ("all documents referring or relating to any testing or investigation conducted by or on behalf of Bridgestone of any products … of Acushnet for the purpose of determining whether such products … allegedly infringe any of the Bridgestone Patents"), 15 ("all documents on which Bridgestone relies in support of its allegations that Acushnet infringes the Bridgestone Patents"), and 21 ("all documents … referring or relating to any analysis or test performed by or on behalf of Bridgestone of any of the Accused Products, including those documents and things containing any description of any performance test or analysis, testing equipment, test parameters and conditions, calibration records, products tested, manufacturer of products tested, date and location of test or analysis, and persons conducting the test or analysis").

served nine supplemental sets of interrogatory responses, the last on the parties' agreed-upon cutoff of December 18, 2006. In none of them did Bridgestone disclose any testing results (or even that it had done testing) relating to its testing of Acushnet's products.

Now, in support of its infringement claims, Bridgestone says it intends to rely upon at trial hundreds of tests performed by Packer Engineering, a laboratory commissioned by Bridgestone to test Acushnet's products. This testing data, first produced by Bridgestone in connection with Dr. Caulfield's expert reports, shows that testing was performed – and in some cases fully completed – by Packer Engineering as early as September 5, 2006, before the Court's scheduled close of fact discovery on October 10, 2006 and well before the close of fact discovery on the parties' agreed-upon date of December 18, 2006. (*See* Ex. O – Caulfield 1/16/07 Report at Ex. 34). In fact, Larry Cardoniga, one of Bridgestone's expert witnesses, testified at deposition that Bridgestone had protocols in place and began testing the accused Acushnet balls as early as August 2006. (*See* Ex. R – Cadorniga Tr. (rough) at 238-39).

Between at least September 5, 2006 and December 13, 2006, personnel at Packer Engineering performed over 3,700 tests on the accused products, including tests of golf ball compression, core compression, core diameter, cover thickness, core surface hardness, core hardness at 5 mm from the surface, core center hardness, specific gravity, and core rebound. The data generated by Bridgestone, with the approximate dates on which that data was generated, is summarized at Exhibit S.

This testing generated thousands of pages of test results, including approximately 3,000 photographs of Acushnet balls in the testing process, and dozens of spreadsheets summaries, none of which Bridgestone produced in response to Interrogatory No. 14, but nearly all of which Bridgestone had in its possession at the time of fact discovery. The complete set of data, when printed out, fills eight boxes. It can be placed on four CD-ROMs, which are included with this motion. (Ex. T – "Compression Testing – Raw Data" CD; Ex. U – "Raw Data Ball Types" CD; Ex. V – Caulfield Ex. 34 CD; Ex. W –

"Rebound Test Image Files" CD). (While Acushnet did not wish to burden the Court by submitting all eight boxes as an exhibit, it is prepared to do so if the Court wishes to see the complete data in printed form.)

As is shown by the summary at Exhibit S, the vast majority of Bridgestone's testing was completed well before the parties' agreed-upon fact discovery deadline of December 18, 2006 – in fact, over 3,300 of the approximately 3,700 tests were completed before that date. None of that data, however, was provided to Acushnet until January 2007, more than three months after the Court's October 10, 2006 fact discovery deadline.

Moreover, even when Bridgestone served its opening expert reports on January 16, 2007, it still did not provide the actual test data. Instead, it attempted to provide to Acushnet only purported summaries of the test data obtained by its experts. Acushnet had to demand the production of the actual test data in a letter dated January 23, 2007. (*See* Ex. X – Seal Ltr. to White, 1/23/07, at 1). After receiving the raw test data, Acushnet then realized that the raw data did not support all of the summaries reported and relied upon by Bridgestone's experts.

For example, recall that claim 1 of the '817 patent requires a golf ball core to have a distortion of 2.9 to 4.0 mm under a load of 100 kg. (Ex. Y – '817 Patent, Col. 6, ll. 51-54). In support of Bridgestone's infringement contentions for that limitation, Caulfield measured the core distortion of several of Acushnet's Titleist NXT Tour golf balls bearing the "◄NXT Tour►" sidestamp, a model Caulfield labeled as "NT2" for testing purposes. In his expert report, he reported ███████████████████████████████████. (*See* Ex. O – Caulfield 1/16/06 Report at Ex. 15). His maximum distortion came from a ball he labeled as "NT2.UU.05." (*See* Ex. N – Caulfield "NT2 – Compression.xls" Spreadsheet, dated 11/4/06). After Acushnet demanded and received Caulfield's raw testing data, however, it learned that ████████

██████████████████████████████████████

██████████████████████. (*See* Ex. Z – Caulfield's "NT2.UU.05.asc" File).[4] Neither

of those values corresponds to the ████████ distortion reported by Caulfield and relied

upon by Bridgestone. A similar analysis shows that *none* of the core distortion values

reported by Caulfield for any of the accused Acushnet golf balls are supported by his raw

data. After Acushnet demanded and received Caulfield's raw testing data, Acushnet also

learned from the data that testing demonstrating all of this was completed by Bridgestone

by November 7, 2006. (*See* Ex. T – "Compression Testing – Raw Data" CD).

Similarly, as another example among many, with regard to claim 1 of U.S. Patent

No. 5,782,707 ("the '707 patent"), which Bridgestone alleges is infringed by various

models of Acushnet's Titleist Pro V1 golf balls, Bridgestone asserted in its December 18

supplementation that "the Pro V1's solid core . . . [has] a hardness as measured by a JIS-

C scale hardness meter wherein the core center hardness, the core surface hardness . . .

are within the scope of the claim ranges." (*See* Ex. G – Pls.' 9th Supp. Responses to

Def.'s Interrog. No. 2 at D-2). Claim 1 requires that the core have a hardness as

measured by a JIS-C hardness meter wherein "the core surface hardness is higher than the

core center hardness by 8 to 20 degrees." (*Id.*). Bridgestone's experts base their

infringement analysis for this limitation on ████████████████████████████████

██████████████████. (*See* Ex. AA – "P2-Hardness CoreSurface (Used).xls" spreadsheet,

dated Dec. 12, 2006; Ex. BB – "P2-Hardness Core Center (Used).xls" spreadsheet, dated

Dec. 12, 2006). ███████████████████████████████████████████

████████████████████████████████████████. (*See id.*)

---

[4] Caulfield did not record the measurements precisely at 100 kg. Instead, he applied an
increasing load from close to zero up to 175 kg, then decreased the load back down to
near zero, measuring the distortion at numerous points along the way. (*See* Ex. O –
Caulfield 1/16/07 Report at Ex. 7). The two measurements discussed above are the
closest measurements to 100 kg on either side, taken by Caulfield as the load increased.

The balls identified as "P2.ZA.06" and "P2.ZA.08" had differences in average hardness of 20.8 and 20.4, respectively.

Likewise, in its December 18 supplementation, Bridgestone maintained its assertion that ███████████████████████████████████████████████████████ and that the balls therefore literally infringed dependent claim 11 of U.S. Patent No. 6,679,791 ("the '791 patent"). (*See* Ex. G – Pls.' 9th Supp. Responses to Def.'s Interrog. No. 2 at G-3 to G-4). Bridgestone's core hardness distribution testing for the Pro V1 golf balls had been completed prior to December 2006. (*See* Ex. S (showing "hardness - core distribution" testing)). The results for several of the golf balls tested show that ████████ ██████████████████████████████████████████████████████████████. (*See* Ex. O – Caulfield 1/16/06 Report at Exs. 32-33 (showing that the balls identified as "P3.ZZ.03," "P4.PP.25," "P4.AA.02," "P4.BB.24," "P4.CC.17," and "P4.JJ.15" had a decreasing hardness)).

These are factual issues that Acushnet should have been able to investigate during fact discovery by, for example, questioning the Bridgestone inventors on the correctness of the parties' respective protocols and the purported equivalency of Bridgestone's measurements. Bridgestone's decision not to disclose its facts during fact discovery, however, deprived Acushnet of that opportunity.

### 3. Bridgestone failed to identify a number of documents on which it is now relying.

Additionally, although in its responses to Acushnet's Interrogatory No. 2 Bridgestone purported to identify the documents (by bates number) and deposition transcripts on which it intended to rely, its expert witnesses now rely on additional documents and deposition testimony not identified by Bridgestone in response to Interrogatory No. 2. Specifically, Bridgestone witness Dr. Bryan Coughlin relies on

documents produced by third-party Lanxess as early as August 17, 2006 and bearing

bates numbers LAN0025, LAN30829, and LAN87052, as well as deposition testimony

from Lanxess witnesses Timothy Rae and Jonathan Doyle. (*See* Ex. CC – Coughlin

Report, 1/16/07, at Ex. B). Further, Bridgestone witness Larry Cadorniga relies on

documents bearing bates labels AB 76-80, AB 1525, AB 4836, AB 15274-90, AB 15341,

AB 15471-497, AB 15563-587, AB 16622-25, AB 30829, AB 36397-98, AB 36405, AB

37703-05, AB 45453-68, AB 50834, AB 51526, AB 86305-31, AB 86604-29, AB 86662,

AB 86687, and AB 87052 and on the deposition of Peter Voorheis. (*See* Ex. H –

Cadorniga Report, 1/16/07, at Ex. B). None of the above-identified documents or

transcripts was identified by Bridgestone in response to either Interrogatory No. 2 or 14.

> **B.**     **During fact discovery, Bridgestone failed to disclose the facts and documents on which it is relying to support its invalidity contentions regarding Acushnet's '705 Patent.**

During fact discovery, Acushnet also served Interrogatory No. 19, which

requested that Bridgestone "[i]dentify all publications and other materials alleged by

Bridgestone to be relevant to the patentability of the Acushnet Patents, including each

document, thing, or other evidence supporting [Bridgestone's invalidity charts]." (Ex. A

– Def.'s Interrog. No. 19 to Pls.). Bridgestone responded by identifying a number of

prior art patents, as well as "the prior art of record for the Acushnet patents and Acushnet

Related Patents" and the "documents bearing the Bates Nos. BSP096001-098279." In a

January 16 expert report, however, Bridgestone's witness Dr. Avraam Isayev now relies

on the depositions of Acushnet witnesses Laurent Bissonnette, Peter Voorheis, and Derek

Ladd, as well as third-party witness Akihiko Morikawa, and all of the exhibits attached

thereto. (*See* Ex. DD – Isayev Report, 1/16/07, at Ex. 2). None of that evidence is

identified by Bridgestone in response to Acushnet's Interrogatory No. 19. Dr. Isayev also

relies on evidence of certain properties of BR-18 and CB-22 polybutadiene rubbers, also

not identified previously by Bridgestone. (*See id.* at pp. 12-14 and Exs. 2-7). None of

that evidence is identified by Bridgestone in response to Acushnet's Interrogatory No. 19.

> **C.    During fact discovery, Bridgestone failed to disclose the**
> **factual bases on which it is now relying to support its**
> **contentions of nonobviousness and commercial success.**

Acushnet's Interrogatory No. 10, served on June 13, 2005, sought Bridgestone's

factual bases for its contention that each of the Bridgestone patents-in-suit is non-obvious

by requesting that Bridgestone

> identify on a claim-by-claim basis all facts that you contend support or
> evidence such alleged objective evidence of nonobviousness or secondary
> considerations (including but not limited to commercial success, long-felt
> need, failure of others, commercial acquiescence, unexpected results,
> improved results, and/or new results) that should be considered in
> determining whether the claim is invalid for obviousness.

(Ex. A – Def.'s Interrog. No. 10 to Pls.)  Bridgestone objected to this interrogatory as

"unduly burdensome," "oppressive," and "neither relevant nor reasonably calculated to

lead to the discovery of admissible evidence," but purported to answer by identifying the

deposition testimony (and related exhibits) of a number of Acushnet and Bridgestone

witnesses as evidence of nonobviousness and unexpectedly better performance results on

account of Bridgestone's claimed technology. (*See* Ex. G - Pls.' 9th Supp. Responses to

Def.'s 1st Set of Interrogs. at 10-11).  Bridgestone identified the manufacture and sale of

certain Acushnet golf balls and a Bridgestone-Callaway license agreement as evidence of

commercial success. (*Id.*)  Bridgestone also identified what it claimed were the

Bridgestone golf balls demonstrating the non-obviousness of its technology, specifically

the "Precept MC Lady, Precept Lady, and Precept Laddie." (*Id.*).

Bridgestone's "experts" on the commercial success and nonobviousness of

Bridgestone's patents, however, now rely on numerous undisclosed facts, documents and

different golf balls to form their opinions as to the nonobviousness and commercial

success of Bridgestone's patents-in-suit.  Specifically, both John Calabria and Kim Blair

in expert reports now provide detailed factual accounts of the development of golf balls, describe inventions and balls related to multi-layer golf balls not in suit, and discuss Bridgestone's "technology leadership" in allegedly bringing to market all manner of different multi-layer solid core golf balls. (Ex. EE – Calabria Report at 7-19; Ex. FF – Blair Report at 9-18, 21-26). Both of these witnesses support such undisclosed claims of Bridgestone's technological commercial success by relying on a variety of papers, news articles and books that were never offered in response to Acushnet's Interrogatory No. 10, despite the fact that the materials were clearly within the scope of the requests if Bridgestone planned to rely on those materials as evidence of commercial success. (*See* Ex. FF – Blair Exs. 2-37, 51, 57, 61-62, 65, 65-70, 72; Ex. EE – Calabria Exs. 2-7). Both Calabria and Blair also rely on numerous Bridgestone-manufactured golf balls that were never disclosed in response to Acushnet's Interrogatory No. 10. Calabria relies on

████████████████████████████████████████████████████████████

████ to argue the commercial success of Bridgestone's technology, (*see* Ex. EE – Calabria Report at 15, 17), while Blair argues that successful Bridgestone golf balls included the ████████████████████████████████████████████

████████████████████████     (*See* Ex. FF – Blair Report at 17-18, 21.) Notably, the ████████████████ is the ball the Court precluded Acushnet's expert to rely upon as invalidating one of Bridgestone's patents-in-suit. (*See* D.I. 288 at 13.)

Similarly, Acushnet's Interrogatory No. 52 requested that Bridgestone "[i]dentify and describe the factual basis for any assertion or contention that current or potential customers of each Bridgestone or Nike ball sold in the United States value the patented feature of the ball, as covered by a Bridgestone Patent." (Ex. GG – Def.'s Interrog. No. 52 to Pls.) Bridgestone refused to answer this Interrogatory, as it believed that it was not relevant in light of Bridgestone's agreement not to seek lost profits. (Ex. HH – Pls.' Response to Interrog. No. 52). Now, however, Bridgestone seeks to rely upon the testimony of its so-called "experts" – including professional golfer Nick Price – each to

15

discuss, in one form or another, the allegedly sought-after features of Bridgestone's

patents and the current preference among golf consumers and professionals for those

features, as a means of demonstrating that customers value the allegedly patented features

of Bridgestone's patents. (Ex. II – Price Report at 2-4; Ex. EE – Calabria Report at 13-

19; Ex. FF – Blair Report at 16-20; 23-26). Additionally, in each case, Bridgestone's

proffered "expert" relies at least in part on ███████████████████████████████████

███████████████████████████████████████████████████████. (*See* Ex. II –

Price Report at 4; Ex. EE – Calabria Report at 16-17; Ex. FF – Blair Report at 23-24).

> **D.    During fact discovery, Bridgestone failed to disclose the facts on which it is now relying to support its damages claims.**

Acushnet also sought to learn in fact discovery the amount of and basis for

Bridgestone's damages claim. Acushnet's Interrogatory No. 15 requested Bridgestone to

> describe in detail each and every item of damages sought, including any bases for the damages claim. ... [I]f any damages identified is allegedly based upon reasonable royalty, describe in detail the amount of such royalty, Bridgestone's willingness to license others in the past, Bridgestone's profit margin on sales, the availability of like products from others, any collateral sales benefits, the expected profit margin of Bridgestone or any other alleged infringer, royalty rates of comparable patents in the field, and identify all documents with respect to such reasonable royalty claim and the persons having the most knowledge thereof.

(Ex. A – Def.'s Interrog. No. 15 to Pls.).

In response, however, Bridgestone refused to provide (1) any computation or even

an estimate of its damages, (2) the identification of any documents that might support

Bridgestone's damages, or (3) a list of individuals with knowledge relevant to

Bridgestone's damages. Even in its final December 18, 2006 version of its response to

Interrogatory No. 15, Bridgestone continued to object to Acushnet's request for damages-

related information as "premature" and "unduly burdensome." Bridgestone's only

damages-related disclosure in the entire period of fact discovery thus was a December 18,

2006 statement that ████████████████████████████████████████
██████████████████████████████████████. (Ex. G – Pls.'s 9th Supp. Responses to Def.'s 1st
Set of Interrogs. at 15-16).

As Acushnet has learned from Bridgestone's first substantive disclosure of its
damages – a disclosure in the form of a January 2007 report citing hundreds of
documents and nearly a dozen individuals with information – Bridgestone now says it
seeks to claim at trial more than ████████████████████████████
██████████████, which Bridgestone calculates from a review of both Bridgestone and
Acushnet documents, as well as from a review of third-party documents and survey
databases. (Ex. JJ – Jarosz Report at 3-4, 47 and Tabs 2 and 4). Notably, this amount
now sought by Bridgestone is magnitudes greater than anything stated by Bridgestone as
its damages previously. In pre-suit discussions (the last time Bridgestone ever revealed
what it would claim in damages), Bridgestone claimed its past damages was ████████
███████████████████████████████████. (*See* Ex.
KK – AB 0000531).

It also turns out to be shown by Bridgestone's belated damages disclosure that
Bridgestone intentionally delayed providing Acushnet any identification of the factual
and documentary basis for its damages claims until after the close of fact discovery, even
though it had nearly all of the information by which it could have answered Acushnet's
interrogatory. In particular, the Court's Scheduling Order required the parties to comply
with Rule 26 by providing "the information required by Fed. R. Civ. P. 26(a)(1) and D.
Del. LR 16.2" (D.I. 18 at 1).[5] Bridgestone served two sets of Rule 26 disclosures

---

[5] Rule 26(a)(1)(C) provides that "a party must, without awaiting a discovery request,
provide to other parties: ... *a computation* of any category of damages claimed" and
make "available for inspection and copying . . . *the documents or other evidentiary
material ... on which such computation is based* ...." (emphases added). Bridgestone
did not comply with any aspect of this section of Rule 26 in discovery.

pursuant to the Court's Order – one on June 21, 2005, and an amended set on September 12, 2006.  In both cases Bridgestone stated only that:



(D.I. 17 at 17; D.I. 192 at 13) (emphasis added).

Yet, as can be seen from the Mr. Jarosz's January 2007 report first disclosing anything about Bridgestone's damages claims, Bridgestone's September Rule 26 representation that, "the information that forms a basis for computation of damages for its claims against Acushnet is in the possession of Acushnet," was mere boilerplate to avoid complying with both Acushnet's Interrogatory No. 15 and the requirements of Rule 26(a)(1)(C).  This is substantiated by the fact that by May 19, 2006 – almost four months before Bridgestone prepared this statement – Acushnet had produced all but *five* of the hundreds of ranges of documents that Bridgestone now says it actually considered and relied upon to calculate its damages claim.  (*Compare* Ex. LL – May 19, 2006 Letter Producing Documents AB0087859-0087865 *with* Ex. JJ – Jarosz Report at Tab 2 (Jarosz's Documents Reviewed)).[6]  This is also substantiated by the fact that Mr. Jarosz was retained by Bridgestone in August 2005 and began preparing Bridgestone's damages claims in 2005.  (Ex. MM – 8/19/05 Letter from Mr. Saliba to Acushnet's Counsel, disclosing Mr. Jarosz as retained by Bridgestone).  Indeed, Mr. Jarosz recently testified

---

[6] The handful of documents Acushnet had not produced by four months prior to Bridgestone's September 12, 2006 statement are identified on page 2 of Tab 2 of the Jarosz's Report as AB0090062-065, AB0090066-85, AB0090086-93, AB00112438-513, and AB113325-377.  These documents, in the case of the first three ranges, were produced to Bridgestone on August 9, 2006, still more than a month before Bridgestone's amended Rule 26 disclosures claiming to be unable to calculate Bridgestone's damages.

he began preparing Bridgestone's damages claims in 2005 and that he completed a close approximation of his final report in the fourth quarter of 2006. (Ex. NN – Jarosz Rough Tr. at 32-33, 45-46). In addition, Bridgestone relies upon hundreds of **_Bridgestone_** and **_third-party_** documents in addition to Acushnet documents, none of which were every disclosed as documents on which its damages would be based when Acushnet sought such information in discovery. (*See* Ex. JJ – Jarosz 1/16/07 Report at Tabs 2, 30-34, 36-39). Many of the documents relied upon by Mr. Jarosz to compute Bridgestone's alleged damages are documents that were available for consideration by Bridgestone prior to the litigation itself, many of them being Bridgestone's documents. (*Id.*, Tab 2). Some of the documents relied upon, including licensing transactions  Bridgestone's expert points to as "actual transfers of comparable technology" (*see* Ex. JJ, Jarosz Report at 20), have never been a part of the discovery record or produced at all in the case.  Tab 34 of Jarosz's report, for example, cites ██████████████████████████████████████

█████. (*Id.*). None of this was ever disclosed, produced or identified in response to Interrogatory No. 15 or otherwise.

## V.      ARGUMENT

Knowing that it should have disclosed at least some factual bases in support of its contentions during fact discovery, as shown above, Bridgestone nevertheless chose to withhold its alleged factual support.  It has offered no justification for its failure to disclose the requested facts during fact discovery.

### A.      Legal Standards

The discovery issues raised above are not unique to patent law and are therefore governed in this case by the law of the regional circuit. *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003).

Fed. R. Civ. P. 37(c)(1) provides that "a party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence at a trial ... any witness or information not so disclosed." In considering the exclusion of evidence under Fed. R. Civ. P. 37, the Third Circuit has identified the following factors: (1) the prejudice or surprise to the party against whom the evidence is offered, (2) the ability of the injured party to cure the prejudice, (3) the likelihood of disruption of the trial schedule, (4) bad faith or willfulness involved in not complying with the disclosure rules, and (5) the importance of the evidence to the party offering it. (D.I. 288 at 9, citing *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 905 (3d Cir. 1977)).

As this Court has noted previously in this case, "[c]ourts applying the *Pennypack* factors in the case of sophisticated, complex litigation involving parties represented by competent counsel have been less indulgent in their application and more willing to exclude evidence without a strict showing that each of the *Pennypack* factors has been satisfied." (D.I. 288 at 8-9, citing *Astrazeneca AB v. Mutual Pharm Co.*, 278 F. Supp. 2d 491 (E.D. Pa. 2003)). The Court has already found that "the parties to this litigation are sophisticated business entities, leaders in their field, who are represented by counsel well-versed in complex patent litigation." (D.I. 288 at 10).

> **B.  The Court should preclude Bridgestone from relying on fact evidence in support of its contentions that it did not disclose during fact discovery.**

> **1.  Bridgestone failed to provide any meaningful responses to Acushnet's interrogatories.**

By failing to provide any factual support for its contentions before the close of fact discovery, Bridgestone effectively kept Acushnet in the dark as to the true nature of Bridgestone's contentions. "Mutual knowledge of all relevant facts gathered by both parties is essential to proper litigation." *Mead Corp. v. Riverwood Natural Res. Corp.*,

20

145 F.R.D. 512, 520 (D. Minn. 1992). This is particularly true with regard to contentions. *See Cornell Research Found. v. Hewlett Packard Co.*, 223 F.R.D. 55, 67 (N.D.N.Y. 2003) ("fundamental fairness dictates, at a minimum, that HP be required to flesh out the contentions associated with this affirmative defense in sufficient detail to allow CRF to conduct meaningful discovery concerning it"). Here, however, despite Acushnet's attempts to elicit from Bridgestone the factual bases for its contentions, Bridgestone provided no meaningful responses before the close of fact discovery.

Rather, Bridgestone waited until January 16, 2007 – approximately two years after filing its complaint, more than three months after the Court's scheduled October 10, 2006 close of discovery, and only five months before trial – to disclose any facts supporting its infringement case.

As a result, Bridgestone is forcing Acushnet to litigate against Bridgestone's entire case-in-chief in the five-month window between the exchange of opening expert reports and trial.

### 2. Preclusion is an appropriate sanction for Bridgestone's deliberate failure to respond meaningfully to Acushnet's interrogatories.

Preclusion of all facts and documents not disclosed during fact discovery, including the test data relied upon by Bridgestone's experts, is an appropriate sanction for Bridgestone's failure to provide meaningful responses to Acushnet's contention interrogatories. *See Wesley-Jessen Corp. v. Pilkington Visioncare*, 844 F. Supp. 987, 990 (D. Del. 1994). In that case, as here, the plaintiff provided vague and unresponsive answers to the defendant's interrogatories regarding the plaintiff's infringement contentions. *Id.* at 988-89. With approximately one month before the close of fact discovery in that case, the court sought to craft a remedy that would "ensure that [the defendant] has an adequate opportunity to obtain discovery on the factual basis for [the plaintiff's] contentions." *Id.* The court held that

21

> Within five business days from the date of this order [approximately three weeks before the close of fact discovery], Wesley-Jessen may supplement its responses to these interrogatories. Thereafter, Visioncare can expect that the Court will look to Wesley-Jessen's responses as setting out its position on the subject matter covered by the interrogatories. Where an interrogatory seeks a disclosure of each fact supporting a contention, and an identification of each document evidencing that fact and each person with knowledge of that fact, the Court will look to Wesley-Jessen's response as identifying the facts, documents and witnesses it may rely on at trial as containing or offering evidence supporting that contention, and Wesley-Jessen should expect *that the Court will not allow it to offer into evidence in its case in chief documents or testimony supporting that contention that are not disclosed in its response*.

*Id.* at 990 (emphasis added). Here, however, unlike *Wesley-Jessen*, fact discovery has closed.

Bridgestone had ample opportunities to remedy its deficient responses in response to requests from Acushnet – Acushnet even *twice* filed motions to compel precisely this type of discovery from Bridgestone. Acushnet also agreed with Bridgestone to an extension of the interrogatory supplementation date until December 18, 2006. Nevertheless, even after informing both the Court and Acushnet that it would provide factual responses to Acushnet's discovery requests, including contention interrogatories, it chose not to do so.

Even without accounting for the lower level of scrutiny afforded to sophisticated parties, application of the *Pennypack* factors supports preclusion of Bridgestone's reliance on its untimely-disclosed factual evidence.

a.    **Bridgestone's failure to disclose fact
        evidence has prejudiced Acushnet.**

Bridgestone's failure to disclose the factual bases for its contentions has prejudiced Acushnet and has unnecessarily complicated the issues for trial. Now that fact discovery has closed, Acushnet is not able to solicit fact discovery on the evidence relied upon by Bridgestone. For example, one of the issues now raised by Bridgestone in expert discovery is the appropriate load rate to be used when measuring the amount of

compression, or "distortion," of golf balls and golf ball cores when they are subjected to a load of 100 kg as claimed by Bridgestone's '817 patent. As discussed above, claim 1 of the '817 patent is directed to a golf ball whose core has "a distortion of 2.9 to 4.0 mm under a load of 100 kg" and in which "a ratio of a core distortion under a load of 100 kg divided by a ball distortion under a load of 100 kg ranges from 1.0 to 1.3." (Ex. Y – '817 Patent, Col. 6, ll. 51-54). The '817 patent is silent as to the rate at which the 100 kg load should be applied. In support of its contentions, Acushnet used a rate of one inch per minute. (*See* Ex. OO – Felker Report, 1/16/07, at 30). That rate was set forth in "Compression By Any Other Name," an article written by Acushnet's current Vice President of Intellectual Property Jeffrey Dalton and published in 2002 in the peer-reviewed publication SCIENCE AND GOLF IV. Mr. Dalton discussed the article during his August 22, 2006 deposition. (*See* Ex. PP – Dalton Dep., 8/22/06, at 115:19-124:10). The article itself was entered as Exhibit 6 to that deposition.

   In an expert report served on January 16, 2007, Dr. Caulfield used a rate of 20 in/min in his testing for 100 kg distortion. (*See* Ex. O – Caulfield Report, 1/16/07, at Ex. 7, p. 1). Nowhere prior to January 16, 2007 did Bridgestone identify 20 in/min as the rate it believed appropriate for that testing. In fact, that rate is not identified on any of the documents produced by Bridgestone discussing procedures for the testing of 100 kg distortion. (*See* Ex. QQ – BSP 59780-82; Ex. RR – BSP 59861). Nevertheless, in an expert report served on February 20, 2007, Bridgestone's expert witness John Calabria compares the 100 kg distortion data obtained by Dr. Felker with that obtained by Dr. Caufield and concludes that "[t]he results from [Caulfield's] testing were very different from those measured by Dr. Felker, which can be attributed to the speed of deformation." (Ex. SS – Calabria Report, 2/20/07, at ¶ 9).

   Another example of how Acushnet is prejudiced is with respect to the method of measuring hardness at 5 millimeters from the core surface. Claim 1 of the '834 patent contains the limitation "a hardness within 5mm inside the core surface is up to 8 degrees

lower than the surface hardness."[7]  In his January 16, 2007 expert report, Dr. Caulfield

performed testing to measure the core hardness at a point located approximately 5mm

from the core surface.  (*See* Ex. O – Caulfield Report, 1/16/07, at Ex. 9).  Dr. Caulfield

measured values ███████████████████████████████████████████████.

(*See* Ex. O – Caulfield Report, 1/16/07, at Ex. 18).  However, the method that he

employed was, by Mr. Cadorniga's own admission, █████████████████████

███████████████████████████████.  (Ex. R – 3/12/07

Cadorniga Rough Tr. at 288:15-290: 4; 294:1-10).  After reviewing Bridgestone's report,

Acushnet performed tests for hardness at 5mm from the core surface using a technique

conventionally employed in the golf ball industry, and obtained measurements that ████

████████████████.  (*See* Ex. TT – Felker Report, 2/20/07, at 108-112).

      These manufactured disputes about test results and protocols are precisely the

types of disputes that Acushnet sought to avoid when it proposed that the parties rely on

independent joint testing.  (*See* Ex. E – 1/13/06 Hearing Tr. at 16:6-24).[8]  Rather than

trying to focus the issues for trial, however, Bridgestone chose to reject joint testing, hid

the results of its own testing until after the close of fact discovery, and has now created a

situation where it is too late for Acushnet, for example, to question the Bridgestone

inventors on the appropriateness of the parties' respective protocols or obtain fact

discovery on the rates used in the industry.  Nor can Acushnet so near to trial conduct

additional testing using Bridgestone's protocols to potentially eliminate any dispute over

which is correct.

---

[7] Despite the parties' agreement that this term is to be construed as "the hardness of each point within the region of the core which radially extends from the surface to a depth of 5mm in cross section" (DI 228 at 13), Bridgestone based its infringement test on ████████████████████████████████████████████████████████.

[8] This motion identifies only some of the examples and ways in which Acushnet has been prejudiced by Bridgestone's late disclosures.  Further examples, based on the thousands of pages of test results and numerous testing protocols Bridgestone elected to withhold until after the close of fact discovery, could fill dozens of pages.

**b.    Bridgestone cannot cure the prejudice to Acushnet without a substantial disruption of the trial schedule.**

Even if Bridgestone could somehow cure the prejudice to Acushnet by offering Acushnet the ability to conduct additional fact discovery, any such discovery would substantially disrupt the trial schedule. For example, in support of Bridgestone's damages analysis, Mr. Jarosz relies on thirty-four third-party license agreements from the sporting goods industry as "comparable licenses" to establish what he considers to be a reasonable royalty. (*See* Ex. JJ – Jarosz 1/16/07 Report at Tab 34). Acushnet's fact discovery into those licenses would entail serving third-party subpoenas for documents and depositions of the parties to those licenses to determine whether the licenses were arms-length transactions and to learn the factors involved in the negotiation of those licenses. Even if none of the parties objected to the subpoenas, the process of collecting the relevant documents and deposing the witnesses would require considerable time.

This Court has already found that "any additional discovery that would be required to afford [Acushnet] a fair opportunity to respond would necessarily require extensions of the deadlines set by the Court in its Scheduling Orders." (D.I. 288 at 11). The Court further noted that "[w]hile one could fairly characterize the extensions that would be required as 'moderate' in nature, the Court concludes that the additional time and expense that would follow are consequences which could have been avoided." (D.I. 288 at 11-12). Here, the proximity of trial means that the consequences of any delay, no matter how moderate, will be substantial and could have been avoided had Bridgestone disclosed the requested evidence during fact discovery.

25

        **c.**      **Bridgestone's failure to disclose the**
                  **factual bases for its contentions during**
                  **fact discovery was willful.**

The willfulness of Bridgestone's failure to timely disclose the factual bases for its contentions is evident. As noted above, Acushnet repeatedly requested the disclosure of those facts from Bridgestone, only to be refused at every turn.

Nor can Bridgestone argue that it was unaware of its obligations. During the January 13, 2006 hearing on Acushnet's second motion to compel, the Court expressly informed Bridgestone that it must provide "some facts by February 28," which was then the deadline for supplementation of responses to contention interrogatories. (Ex. E – 1/13/06 Hearing Tr. at 35:7-8). Bridgestone's counsel agreed to do so, stating "We will by February 28." (*Id.* at 35:14-15). Bridgestone, however, did not. It provided no facts by February 28, nor by the May 1 deadline for contention supplementation, nor by the Court's October 10, 2006 deadline for fact discovery, nor by the parties agreed-upon December 18, 2006 date for supplementation of discovery responses, including responses to contention interrogatories. Despite the numerous opportunities in the case's schedule for Bridgestone to timely disclose its factual bases, it did not do so.

        **d.**      **The importance of the evidence to**
                  **Bridgestone does not excuse its failure to**
                  **timely disclose it during fact discovery.**

Although Bridgestone may argue that it cannot maintain its infringement, invalidity, or damages cases without the untimely-disclosed factual bases, that does not excuse Bridgestone's failure to disclose those factual bases during fact discovery. This Court has held that even "critical" evidence may be precluded when it was available to the offering party before the close of fact discovery. (D.I. 288 at 10).

Here, there is no question that Bridgestone was aware of the factual bases for its contentions well before the close of fact discovery. As noted above, the factual evidence relied upon by Caulfield, Cadorniga, Isayev, Jarosz, Calabria, and Blair was all available

to Bridgestone before the close of fact discovery. Rather than disclosing it, however, Bridgestone chose to withhold its evidence from Acushnet until after the close of fact discovery.

Even if certain evidence was not available to Bridgestone before the close of fact discovery, it would have been but for Bridgestone's lack of diligence in pursuing the evidence. *See Primos Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 851 (Fed. Cir. 2006) ("The district court prevented Hunter's Specialties from introducing the Aluminum Flap Call into evidence because it 'did not demonstrate diligence in attempting to locate the call during discovery' and because during discovery Hunter's Specialties did not assert that it was claiming the Aluminum Flap Call as invalidating prior art. That determination was not an abuse of discretion."). Acushnet should not be required to suffer prejudice caused by Bridgestone's lack of diligence.

In any event, Bridgestone's responses to Acushnet's contention interrogatories cite to voluminous amounts of Acushnet documents and depositions. (*See*, for example, Ex. G – Pls.' 9th Supp. Responses to Def.'s 1st Set of Interrogs. at C-4 to C-14). Thus, in many instances, Bridgestone does have timely-disclosed evidence on which it can rely.

## VI.    CONCLUSION

Based on the foregoing, Acushnet respectfully requests that the Court preclude Bridgestone from relying on any fact evidence in support of its infringement, invalidity and damages contentions that it failed to disclose during fact discovery, or any facts or documents not identified by Bridgestone in response to Acushnet's discovery requests .

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Alan M. Grimaldi
Joseph P. Lavelle
Kenneth W. Donnelly
Brian S. Seal
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004
Tel:  (202) 783-0800

Dated:  March 20, 2007
Public Version Dated:  March 27, 2007

785902 / 28946

By:  /s/ David E. Moore
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 North Market Street
P. O. Box 951
Wilmington, DE  19899-0951
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant*
*Acushnet Company*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### <u>CERTIFICATE OF SERVICE</u>

I, David E. Moore, hereby certify that on March 27, 2007, the attached document was

hand delivered to the following persons and was electronically filed with the Clerk of the Court

using CM/ECF which will send notification to the registered attorney(s) of record that the

document has been filed and is available for viewing and downloading:

Jack B. Blumenfeld
Maryellen Noreika
Leslie A. Polizoti
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
Wilmington, DE 19801

I hereby certify that on March 27, 2007, I have Electronically Mailed the documents to

the following:

Robert M. Masters
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, D.C. 20005
RobMasters@paulhastings.com

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

680012 / 28946