# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| BRIDGESTONE SPORTS CO., LTD., AND BRIDGESTONE GOLF, INC.,      ) ) ) ) | |
| Plaintiff,      ) ) | C.A. No. 05-132(JJF) |
| v.      ) ) | |
| ACUSHNET COMPANY,      ) ) | |
| Defendant.      ) | |

### DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, defendant Acushnet Company ("Acushnet") hereby requests that plaintiff Bridgestone Sports Co., Ltd. and Bridgestone Golf, Inc. (collectively "Bridgestone") answer the following interrogatories in the time required by law at the offices of Howrey LLP, 1299 Pennsylvania Avenue, NW, Washington DC 20004.

### DEFINITIONS

The following definitions apply to these requests:

1.      The term "Bridgestone" or "you" or "your" shall mean Bridgestone Sports Co., Ltd., Bridgestone Golf, Inc., and any parent, subsidiary, partner (including general and limited partners), member and/or affiliated entities, past or present, of Bridgestone, and any person or entity, past or present, acting on behalf of Bridgestone, including each of its present and former officers, executives, general partners, limited partners, directors, employees, attorneys, agents and/or representatives.

2.      The term "Acushnet" as used herein each shall refer to the named defendant, Acushnet Company and its present and/or former officers, directors, employees, agents, attorneys, and/or representatives.

3.      "Complaint" means Bridgestone's Complaint For Patent Infringement in the above captioned action.

4.      "Bridgestone Patents" means the patents that Bridgestone alleges Acushnet is infringing in its Complaint, namely:

U.S. Patent No. 5,252,652 ("the '652 patent");

U.S. Patent No. 5,553,852 ("the '852 patent");

U.S. Patent No. 5,695,413 ("the '413 patent");

U.S. Patent No. 5,743,817 ("the '817 patent");

U.S. Patent No. 5,782,707 ("the '707 patent");

U.S. Patent No. 5,803,834 ("the '834 patent");

U.S. Patent No. 5,813,924 ("the '924 patent");

U.S. Patent No. 6,634,961 ("the '961 patent");

U.S. Patent No. 6,679,791 ("the '791 patent"); and

U.S. Patent No. 6,780,125 ("the '125 patent").

5.      "Bridgestone Related Patents" means patents or patent applications related to any of the Bridgestone Patents, including all parents, continuations, continuations-in-parts, divisions, reissues, reexaminations, and foreign counterparts.

6.      "Acushnet Patents" means patents that Acushnet has asserted that Bridgestone is infringing in its Answer and Counterclaim, namely:

U.S. Patent No. 4,729,861 ("the '861 patent");

U.S. Patent No. 4,936,587 ("the '587 patent");

U.S. Patent No. 5,080,367 ("the '367 patent");

U.S. Patent No. 6,729,976 ("the '976 patent"); and

U.S. Patent No. 6,818,705 ("the '705 patent").

7.      "Acushnet Related Patents" means patents or patent applications related to any of the Acushnet Patents, including all parents, continuations, continuations-in-parts, divisions, reissues, reexaminations, and foreign counterparts.

2

8.    "Accused Products" means the products, services, actions, or activities of Acushnet that Bridgestone contends infringe, directly or indirectly, any of the claims of Bridgestone's Patents, including but not limited to the Titleist Pro V1®, Pro V1x™, NXT® Tour, NXT®, and DT SoLo, and the Pinnacle® Exception™ golf balls.

9.    "Documents" shall be defined as synonymous in meaning and equal in scope to the use of that term in Fed. R. Civ. P. 34(a) and applicable case law, and shall include "things," electronic mail, drawings and information in computer-readable format, invention disclosure documents, sketches, drawings, schematics, memoranda, drafts, reports, correspondence, records of tests, records of meetings, comments, edits, marginalia, notebook entries, and notes of any kind, and any other "writings" and "recordings" as defined in Fed. R. Evid. 1001.

10.    "Thing" shall be defined as synonymous in meaning and equal in scope to the use of that term in Fed. R. Civ. P. 34(a), and includes any tangible object, other than a document.

11.    "Communications" or "Communicated" means all conveyances of information between any person or entity by or through any mode or medium including the spoken word, written or electronic correspondence, face-to-face meetings, and/or conveying information through third persons.

12.    "Referring or relating to" means making reference to, pertaining to, mentioning, discussing, representing, embodying, illustrating, describing, reflecting, supporting, negating, rebutting, contradicting, evidencing, and/or constituting.

13.    "Person" means: (a) any natural person or individual; or (b) any entity, whether business, legal, governmental, or other, regardless of whether or not for profit, including any corporation, partnership, sole proprietorship, organization, club, committee, joint venture, foreign corporation or foreign entity, or any associate, general partner, limited partner, employee, subsidiary, parent, or other affiliate of any such entity.

14.    "Prior Litigation" refers to any lawsuit, interference, arbitration, mediation, opposition proceeding, or any other dispute or adversarial proceeding involving either

Bridgestone or any other Assignors of Bridgestone, and any of the Bridgestone Patents or any Bridgestone Related Patents.

15.    "Prior Art" means all publications (including notes and slides from oral presentations, meeting abstracts, and/or posters), patents, physical specimens, uses, sales, offers for sales or other activities relating to the subject matter of any Bridgestone Patents (including activities relating to conception, reduction-to-practice, and/or derivation of any of the Claimed Subject Matter) and existing or occurring at any time before the filing of the Bridgestone Patents such as to be potentially relevant under any subsection of 35 U.S.C. §§ 102 or 103.

16.    "Commercial success," "long-felt need," "failure of others," "commercial acquiescence," "unexpected result," "improved result," and "new result" shall refer to the well-established secondary considerations used to respond to a 35 U.S.C. §103 argument of invalidity due to obviousness.

17.    "Asserted Claim" means any claim of the Bridgestone Patents that Bridgestone contends is infringed by Acushnet either directly, indirectly, literally, under the doctrine of equivalents, and/or in any other manner.

18.    "And" and "or" shall be construed either disjunctively or conjunctively, as necessary, to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of such scope.

19.    "Each" shall include the word "every" and "every" shall include the word "each." "Any" shall include the word "all" and "all" shall include the word "any."

20.    "Includes," "including," or "such as" shall be used nonexclusively (i.e. to mean "including without limitation…" or "including, but not limited to,…").

21.    The use of the singular form of any word includes the plural and vice versa.

## INSTRUCTIONS

1.    These interrogatories shall be deemed to seek answers as of the date hereof and to the full extent of the Federal Rules of Civil Procedure. Furthermore, these interrogatories are

4

continuous in nature, and pursuant to Fed. R. Civ. P. 26(e), Bridgestone is under a duty to timely amend each prior response to an interrogatory if Bridgestone learns that the response is in some material respect incomplete or incorrect, or if any information or documents are hereafter acquired.

2.    With respect to the answer to each interrogatory or subpart thereof, state the source of the information given therein with as much particularity as is reasonably possible, including the nature and designation of any files that contain such information and the identification of each person who provided any information included in such answer.  In addition, identify each other person known or believed to have some or all of the information sought in such interrogatory or subpart thereof.

3.    If any information called for by an interrogatory is withheld on the basis of a claim of privilege, the nature of the claim of privilege and the nature of the information in respect of which it is claimed shall be set forth.  Where the claimed privileged subject matter forms only part of the entire document involved, indicate that such is the case and whether you will produce the document with the privileged portions blocked out or obliterated in a copy thereof.

4.    If you object to any part of an interrogatory and refuse to answer that part, state your objection and answer the remaining portion of that interrogatory.  If you object to the scope or time period of an interrogatory and refuse to answer for that scope or time period, state your objection and answer the interrogatory for the scope or time period you believe is appropriate. Include in each objection a specific statement as to why you believe the scope or time period is inappropriate.

5.    If the answer to any interrogatory is "None," or if a section is not applicable to your business, so indicate rather than leaving the space blank.

6.    If any of the following interrogatories cannot be answered in full after exercising due diligence to secure the information, please so state and answer to the extent possible, specifying your inability to answer the remainder and stating whatever information you have

5

concerning the unanswered portions. If your answer is qualified in any particular manner, set forth the details of such qualification.

## INTERROGATORIES

### INTERROGATORY NO. 1.

Identify on a claim-by-claim basis for the Bridgestone Patents, each Acushnet product that you contend infringes any claim of the Bridgestone Patents.

### INTERROGATORY NO. 2.

For each claim that is alleged to be infringed by Acushnet in your response to Interrogatory No. 1, provide a claim chart that describes in detail on an element-by-element basis how you contend each product identified infringes each claim, specifying whether such infringement is alleged to be literal and/or under the doctrine of equivalents.

### INTERROGATORY NO. 3.

Identify on a claim-by-claim basis all facts that support your contention that Acushnet has engaged in contributory infringement and/or inducement of infringement of the Bridgestone Patents.

### INTERROGATORY NO. 4.

Identify on a claim-by-claim basis all facts that support your contention that Acushnet has willfully infringed the Bridgestone Patents, including without limitation when and how you contend Acushnet first became aware of the patent that includes the claim.

### INTERROGATORY NO. 5.

Separately for each of the Bridgestone Patents, state your contention as to when and how Acushnet was notified of the alleged infringement of the Bridgestone patents in accordance with 35 U.S.C. § 287(a), identifying all facts that support your contention.

**INTERROGATORY NO. 6.**

Identify on a claim-by-claim basis, for each claim of the Bridgestone Patents identified in your responses to Interrogatory No. 1 above, any alleged dates of conception; any alleged subsequent diligence until reduction to practice; any alleged dates of actual reduction to practice of the claimed invention; any written descriptions or drawings of the claimed invention prepared prior to the filing date; the date of the first constructive reduction to practice of the subject matter defined by the claim; the names, titles, and place of work (at the time of their involvement and current) of all persons who were involved in connection with such conception, diligence, or reduction to practice; and the earliest effective filing date Bridgestone will assert for each such claim. State in detail all factual bases supporting Bridgestone's identification of each such date, and identify all persons, documents, and tangible things corroborating each such date.

**INTERROGATORY NO. 7.**

Describe in detail on a claim-by-claim basis, for each claim of the Bridgestone Patents identified in your responses to Interrogatory No. 1, the first public use, the first offer for sale, and the first sale which you are aware in the United States and in any foreign country of any product embodying the alleged claimed invention.

**INTERROGATORY NO. 8.**

Identify all known prior art to the Bridgestone Patents, and separately state as to each item of Prior Art the date that Bridgestone became aware thereof, all persons that were aware of each item of Prior Art, the circumstances under which Bridgestone became aware of each item of Prior Art, and whether and/or when and in what manner each item of Prior Art was disclosed to the PTO during the prosecution of the Bridgestone Patents.

**INTERROGATORY NO. 9.**

Identify and describe in detail all Bridgestone and/or all third-party products that have ever been sold commercially or used in the public that embody any of the claims of the

7

Bridgestone Patents, and for each such product, identify the time period(s) and geographical location in which that product was made, used and/or sold.

## INTERROGATORY NO. 10.

Separately for each of the Bridgestone Patents, state whether you contend there is objective evidence of nonobviousness, and if so, identify on a claim-by-claim basis all facts that you contend support or evidence such alleged objective evidence of nonobviousness or secondary considerations (including but not limited to commercial success, long-felt need, failure of others, commercial acquiescence, unexpected results, improved results, and/or new results) that should be considered in determining whether the claim is invalid for obviousness.

## INTERROGATORY NO. 11.

Identify and describe in detail each instance in which Bridgestone has communicated with any person or entity regarding a potential license of one or more of the Bridgestone Patents, including offers to license, demands that the person or entity license, and any agreements concerning any of the Bridgestone Patents.

## INTERROGATORY NO. 12.

Separately for each of the Bridgestone Patents, state whether Bridgestone contends it has complied with the marking provision of 35 U.S.C. § 287, and if so, identify the article so marked and describe all facts supporting such contention, including dates of first alleged compliance and whether such compliance has been continuous to the filing of the Complaint.

## INTERROGATORY NO. 13.

Separately for each of the Bridgestone Patents, describe in detail any investigation relating to the allegations against Acushnet undertaken by you or on your behalf prior to filing the Complaint.

## INTERROGATORY NO. 14.

Separately for each claim and each product identified in response to Interrogatory No. 1, describe all testing, analysis and/or evaluation by you or on your behalf of such products, including the type of test(s) performed, the testing equipment, test parameters and conditions, and all facts, opinions or results obtained, and identify all documents referring or relating to such testing, analysis and/or evaluation and the persons who are most knowledgeable of such testing, analysis, and/or evaluation.

## INTERROGATORY NO. 15.

For each claim and each product identified above in response to Interrogatory No. 1, describe in detail each and every item of damages sought, including any bases for the damages claim. If any damages identified is allegedly based upon lost profits, described whether there was a demand for the product, whether there was an absence of acceptable non-infringing substitutes, whether Bridgestone had the ability to meet the demand, the amount of Bridgestone's incremental profit, whether there was price erosion or any tag along sales, and the amount of such price erosion or tag along sales, and identify all documents with respect to such lost profit claim and the persons having the most knowledge thereof. Similarly, if any damages identified is allegedly based upon reasonable royalty, describe in detail the amount of such royalty, Bridgestone's willingness to license others in the past, Bridgestone's profit margin on sales, the availability of like products from others, any collateral sales benefits, the expected profit margin of Bridgestone or any other alleged infringer, royalty rates of comparable patens in the field, and identify all documents with respect to such reasonable royalty claim and the persons having the most knowledge thereof.

## INTERROGATORY NO. 16.

On a claim-by-claim basis, identify and describe in detail in a claim chart the factual bases for Bridgestone's non-infringement contention in its First Affirmative Defense in the *Reply and Counterclaim of Bridgestone to Acushnet's Answer and Counterclaim*, namely, that

"Bridgestone has not infringed and does not infringe, either directly or indirectly and either literally or by application of the doctrine of equivalents," any claim of any of the Acushnet Patents, including all witnesses with knowledge of such facts and all documents that support such facts.

## INTERROGATORY NO. 17.

If Bridgestone alleges the invention in the United States of any apparatus, product, device, process, method, act or other instrumentality that practiced any invention claimed in the Acushnet Patents prior to the earliest claimed priority date of such claims, identify, separately for each such claim, the circumstances of such prior invention, including all places or facilities involved in research and development related to the prior invention, all persons involved in the conception and reduction to practice of the prior invention, and the dates of conception and reduction to practice of the prior invention.

## INTERROGATORY NO. 18.

Identify on a claim-by-claim basis for each one of the Acushnet Patents that Bridgestone contends is invalid and provide a chart identifying specifically under which section(s) of the Patent Code that Bridgestone contends each identified claim is invalid and how Bridgestone contends that each identified claim fails to satisfy such section(s), including where, specifically, in the prior art Bridgestone contends a teaching or suggestion of or motivation to combine each element of each identified claim is found.

## INTERROGATORY NO. 19.

Identify all publications and other materials alleged by Bridgestone to be relevant to the patentability of the Acushnet Patents, including each document, thing, or other evidence supporting the chart requested in Interrogatory No. 18.

10

**INTERROGATORY NO. 20.**

Identify each term in the claims of the Bridgestone Patents and Acushnet Patents that you contend should be given a meaning other than the plain and ordinary meaning for that term, and for each such identified term, state the meaning you contend it should be given and the factual basis for your contention.

**INTERROGATORY NO. 21.**

On a claim-by-claim basis, for each claim of the Acushnet Patents that Bridgestone contend is not infringed by Bridgestone by reasons of the proceedings in the U.S. Patent and Trademark Office during prosecution of the Acushnet Patents, identify each term in each such claim and state all factual bases for your contention, including the page and line number of any portion of the prosecution history relied upon.

**INTERROGATORY NO. 22.**

Identify in detail for each of the Acushnet Patents the factual bases for Bridgestone's Sixth Affirmative Defense in the *Reply and Counterclaim of Bridgestone to Acushnet's Answer and Counterclaim*, namely, that "Acushnet's claims are barred by the equitable doctrine of wavier, estoppel and laches," including all witnesses with knowledge of such facts and all documents that support such facts.

**INTERROGATORY NO. 23.**

Identify in detail for each of the Acushnet Patents the factual bases for Bridgestone's Seventh Affirmative Defense in the *Reply and Counterclaim of Bridgestone to Acushnet's Answer and Counterclaim*, namely, that Acushnet's Counterclaims are "barred or limited by the failure of Acushnet to mark its products or to otherwise give notice to Bridgestone pursuant to 35 U.S.C. § 287," including all witnesses with knowledge of such facts and all documents that support such facts.

11

**INTERROGATORY NO. 24.**

Identify in detail for each of the Acushnet Patents the factual bases for Bridgestone's Eighth Affirmative Defense in the *Reply and Counterclaim of Bridgestone to Acushnet's Answer and Counterclaim*, namely, that "Acushnet's Counterclaims are barred in whole or in part because Acushnet comes to this Court with unclean hands," including all witnesses with knowledge of such facts and all documents that support such facts.

**INTERROGATORY NO. 25.**

Identify the circumstances under which Bridgestone became aware of any of the Acushnet Patents or Acushnet Related Patents prior to the filing of this lawsuit, including how Bridgestone became so aware, the date, the persons within Bridgestone who first became so aware, and any actions taken by Bridgestone in response to such awareness.

**INTERROGATORY NO. 26.**

Separately for each of the Acushnet Patents that Bridgestone contend is unenforceable due to inequitable conduct, identify specifically all the factual basis for such contention, all witnesses with knowledge of such facts, and all documents that support such facts.

**INTERROGATORY NO. 27.**

Identify each witness Bridgestone expects to call at trial in this action and for each such person, state the subject matter upon which the witness is expected to testify.

**INTERROGATORY NO. 28.**

Identify each document Bridgestone expects to use at trial in this action.

OF COUNSEL:

Alan M. Grimaldi
Joseph P. Lavelle
Matthew J. Moore
Vivian S. Kuo
HOWREY LLP

1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone (202) 783-0800

Dated:  June 10, 2005

686174

POTTER ANDERSON & CORROON LLP

BY: _____
     Richard L. Horwitz (#2246)
     David E. Moore (#3983)
     Hercules Plaza, 6th Floor
     1313 N. Market Street
     Wilmington, DE  19801
     Telephone (302) 984-6000
     rhorwitz@potteranderson.com
     dmoore@potteranderson.com

*Attorneys for Defendant*

13

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on June 10, 2005, a true and correct copy of the within document was caused to be served on the attorney of record at the following addresses as indicated:

**VIA HAND DELIVERY**

Jack B. Blumenfeld
Maryellen Noreika
Leslie A. Polizoti
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
Wilmington, DE 19801

**VIA FEDERAL EXPRESS**

Robert M. Masters
John T. Callahan
Raja Saliba
Sughrue Mion, PLLC
2100 Pennsylvania Avenue, NW
Washington, DC 20037

_____
David E. Moore

680013

# EXHIBIT B

US005553852A

## United States Patent [19]

### Higuchi et al.

[11] Patent Number: 5,553,852

[45] Date of Patent: Sep. 10, 1996

[54] **THREE-PIECE SOLID GOLF BALL**

[75] Inventors: **Hiroshi Higuchi; Hisashi Yamagishi,** both of Yokohama; **Yoshinori Egashira,** Hidaka; **Tadatoshi Yamada,** Mitaka, all of Japan

[73] Assignee: **Bridgestone Sports Co., Ltd.,** Tokyo, Japan

[21] Appl. No.: **271,953**

[22] Filed: **Jul. 8, 1994**

[30] **Foreign Application Priority Data**

Jul. 8, 1993 [JP] Japan ...................... 5-193065

[51] Int. Cl.$^6$ .................................. **A63B 37/06**
[52] U.S. Cl. ............................ **473/373; 473/378**
[58] Field of Search ...................... 273/228, 230,
273/218, 220, 219, 225, 229, 214, 217

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,650,193 | 3/1987 | Molitor et al. | 273/228 |
| 4,714,253 | 12/1987 | Nakahara et al. | 273/230 X |
| 4,781,383 | 11/1988 | Kamada et al. | 273/230 X |
| 5,048,838 | 9/1991 | Chikaraishi et al. | 273/230 X |
| 5,184,828 | 2/1993 | Kim et al. | 273/230 X |
| 5,253,871 | 10/1993 | Viollaz | 273/228 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 2666018 | 2/1992 | France . |
| 2185890 | 8/1987 | United Kingdom . |
| 2228874 | 9/1990 | United Kingdom . |
| 2232162 | 12/1990 | United Kingdom . |

*Primary Examiner*—George J. Marlo
*Attorney, Agent, or Firm*—Sughrue, Mion, Zinn, Macpeak & Seas

[57] **ABSTRACT**

A three-piece solid golf ball comprising a center core, an intermediate layer, and a cover. The center core (1) has a diameter of at least 29 mm, a hardness in the range of 45–80 JIS C and a specific gravity of less than 1.4. The intermediate layer (2) has a thickness of at least 1 mm, a specific gravity of less than 1.2, and a hardness of at least 85 on JIS C scale. The cover (3) has a thickness of 1–3 mm and a hardness of 50–85 JIS C. The ball has a good total balance of properties in that feeling and controllability are improved at no sacrifice of flying performance and durability.

**8 Claims, 1 Drawing Sheet**

**U.S. Patent**          Sep. 10, 1996          5,553,852

# FIG.1



5,553,852

**1**

### THREE-PIECE SOLID GOLF BALL

### BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to three-piece solid golf balls comprising a center core, an intermediate layer, and a cover and more particularly, to three-piece solid golf balls which are improved in feeling on impact, controllability, and durability.

2. Prior Art

Among a variety of golf balls, thread-wound golf balls and solid golf balls are now popular. The solid golf balls are currently increasing to be a mainstream product. Among them, two-piece solid golf balls consisting of a core and a cover are most widespread.

Most amateur golfers are fond of two-piece solid golf balls which have excellent flying performance and durability although these balls have the disadvantages of a very hard feel on hitting and low control due to rapid ball separation on hitting. For this reason, many of professional golfers and skilled amateur golfers who impose weight on feeling and control prefer wound golf balls, especially wound golf balls using a soft balata cover, to two-piece solid golf balls. The wound golf balls are superior in feeling and control, but inferior in flying distance and durability to the two-piece solid golf balls.

Under the present situation that two-piece solid golf balls and wound golf balls have contradictory characteristics as mentioned above, players make a choice of golf balls depending on their own skill and taste.

In order to develop solid golf balls having a hitting feel approximate to the wound golf balls, two-piece solid golf balls of the soft type have been considered. For such two-piece solid golf balls of the soft type, soft cores must be used. If the cores are soft, however, repulsion becomes low with a concomitant loss of flying performance and durability is considerably deteriorated. That is, the superior flying performance and durability which are a characteristic of two-piece solid golf balls are lost, and in an extreme case, the balls become unacceptable for practical use.

Controllability, which is required even on full shots with drivers, is most important on control shots like approach shots. In an exemplary situation that the next shot should fly beyond the bunker and a short distance from the green edge to the cup, the player who is either professional or amateur will naturally wish to hit a ball with a minimal run. Such controllability of a golf ball largely depends on spin properties.

On a full shot with a club having a relatively large loft, the club loft is dominant to that the ball itself so that almost all balls are given an appropriate amount of spin and few balls overrun. However, on an approach shot over a short distance of 30 or 50 yards, balls will significantly vary in run or controllability. The major factor causing such a difference is not a basic structure, but the identity of cover material. In two-piece solid golf balls, however, covers made of soft material are effective for improving controllability, but detrimental for gaining flying distance.

### SUMMARY OF THE INVENTION

Therefore, an object of the present invention is to provide a solid golf ball which is improved in feeling and controllability while maintaining the superior flying performance

**2**

and durability which are characteristic of solid golf balls, that is, improved in total balance.

In connection with a solid golf ball having a core forming the center and a cover forming the outermost layer, the inventors have found that by providing a relatively hard intermediate layer between the center core and the cover, and controlling the size and specific gravity of the core, intermediate layer and cover, the center core and core can be made relatively soft to improve feeling and controllability without deteriorating flying performance and durability. The feeling and controllability can be improved in a favorable way.

Briefly stated, an intermediate layer having a thickness of at least 1 mm, a specific gravity of less than 1.2, and a hardness of at least 85 on JIS C scale is formed around a center core having a diameter of at least 29 mm and a specific gravity of less than 1.4 and greater than the intermediate layer specific gravity. A cover having a thickness of 1 to 3 mm is formed on the outer surface of the intermediate layer to complete a solid golf ball. Then even when the center core is softened to a JIS C scale hardness of 45 to 80 and the cover softened to a JIS C scale hardness of 50 to 85, the feeling and controllability can be improved at no sacrifice of flying distance and durability. Further when the intermediate layer is formed of a resin composition based on a high repulsion ionomer resin, the hitting feel and controllability can be further improved with no sacrifice of flying distance and durability.

The present invention provides a three-piece solid golf ball comprising a center core, an intermediate layer, and a cover wherein the center core has a diameter of at least 29 mm and a specific gravity of less than 1.4, the intermediate layer has a thickness of at least 1 mm, a specific gravity of less than 1.2, and a hardness of at least 85 on JIS C scale. The cover has a thickness of 1 to 3 mm. The specific gravity of the intermediate layer is lower than the specific gravity of the center core. In one preferred embodiment, the intermediate layer is formed of a composition based on a high repulsion ionomer resin.

### BRIEF DESCRIPTION OF THE DRAWING

The sole figure, FIG. 1 is a schematic cross section of a three-piece solid golf ball according to the invention.

### DETAILED DESCRIPTION OF THE INVENTION

Referring to FIG. 1, there is schematically illustrated a typical three-piece solid golf ball according to the invention. The ball includes a spherical center core 1 forming the center of the ball and a cover 3 forming the outermost layer of the ball. A relatively hard intermediate layer 2 is disposed between the core 1 and the cover 3. The size and specific gravity of the core 1, intermediate layer 2, and cover 3 are set in specific ranges.

The center core has a diameter of at least 29 mm, preferably 29 to 37 mm and a specific gravity of less than 1.4, preferably 1.05 to 1.38. With a diameter of less than 29 mm, the intermediate layer must be relatively thick with losses of repulsion and feeling. With a specific gravity of 1.4 or more, the ball has a heavier weight which exceeds the weight requirement of golf balls.

On an impact entailing substantial deformation as found on driver shots, the player gets a feeling which largely depend on the hardness of the center core 1 and varies with the club head speed given by the player. Therefore, the

5,553,852

| 3 | 4 |

hardness of the center core 1 should be set in accordance with the head speed of the target players. In this sense, the center core hardness is not particularly limited although it preferably ranges from 45 to 80, more preferably from 60 to 80 on JIS C scale (at the center core surface).

The center core 1 is generally formed from a well-known rubber composition comprising a base rubber, co-crosslinking agent and peroxide through heating, pressing and molding steps. The base rubber may be one conventionally used in solid golf balls and preferably be selected from polybutadiene rubber and mixtures of polybutadiene rubber and polyisoprene rubber. Use of 1,4-polybutadiene rubber containing more than 90% of cis structure is preferred for high repulsion. The co-crosslinking agents used in conventional solid golf balls include zinc and magnesium salts of unsaturated fatty acids such as methacrylic acid and acrylic acid and esters of unsaturated fatty acids such as trimethylpropane trimethacrylate and they may be used in the present invention. Zinc acrylate is preferred for high repulsion. The co-crosslinking agent is blended in amounts of about 15 to 30 parts by weight per 100 parts by weight of the base rubber. The peroxide may be selected from a variety of peroxides, preferably dicumyl peroxide and mixtures of dicumyl peroxide and 1,1-bis(t-butylperoxy)-3,3,5-trimethylcyclohexane. The peroxide is blended in amounts of about 0.5 to 1 part by weight per 100 parts by weight of the base rubber. If desired, zinc oxide and barium sulfate may be blended in the rubber composition for specific gravity adjustment while antioxidants may also be blended.

The intermediate layer 2 has a radial thickness of at least 1 mm, preferably 1.5 to 3.5 mm, a specific gravity of less than 1.2, preferably 0.9 to 1 and lower than the center core specific gravity, and a hardness of at least 85, preferably 85 to 100 on JIS C scale. With a thickness of less than 1 mm, repulsion is lowered to reduce flying distance. With a specific gravity of 1.2 or more, the center core must have a relatively low specific gravity so that the golf ball may be increased in inertia moment and reduced in spin property and thus lose some controllability. A similar detrimental effect is observed when the intermediate layer specific gravity is greater than the center core specific gravity. A layer with a JIS C scale hardness of less than 85 detracts from flying performance. The intermediate layer preferably has an outer diameter of 38 to 41 mm though not limited thereto. Also preferably the difference in specific gravity between the center core and the intermediate layer is 0.1 or more, especially 0.1 to 0.5 though not limited thereto.

The intermediate layer 2 is effective in compensating for lowering repulsion of the center core 1 which is made soft. It is then formed of a relatively hard (JIS C scale hardness≧85), repulsive material. Although the material is not critical, preferred materials are ionomer resins, for example, Himilan 1706 and 1605 commercially available from Mitsui-dupont Polychemical K.K. and Surlyn commercially available from E.I. dupont. A 1:1 blend of Himilan 1706 and Himilan 1605 is most preferred. In addition to the ionomer resin, the composition of which the intermediate layer is formed may further contain weight control agents, for example, inorganic fillers such as zinc oxide and barium sulfate, coloring agents such as titanium dioxide, and other additives.

The cover 3 has a radial thickness of 1 to 3 mm, preferably 1.5 to 2.5 mm. A cover more than 3 mm thick is low in repulsion whereas a cover less than 1 mm thick is low in durability such as cut resistance. Although the hardness of the cover 3 is not particularly limited, it is preferably set in a relatively soft range of 50 to 85, more preferably 60 to 85 on JIS C scale because in this range, improvements in all of repulsion (flying performance), durability and controllability are expected.

The cover 3 is generally formed of resinous materials which are conventionally used as the cover of solid golf balls, preferably those materials which are relatively soft (JIS C scale hardness 50 to 85) and highly repulsive. Examples include ionomer resins such as Himilan 1650 commercially available from Mitsui-dupont Polychemical K.K., Surlyn 8120 commercially available from E.I. dupont, and mixtures thereof, thermoplastic polyester elastomers such as Hytrel 4047 commercially available from Toray-dupont K.K., and balata resins. If necessary, inorganic fillers may be blended in these resins for coloring purposes.

## EXAMPLE

Examples of the present invention are given below by way of illustration and not by way of limitation.

### Examples and Comparative Examples

Using a center core, intermediate layer, and cover having the composition shown in Table 1, three-piece solid golf balls (Examples 1–6, Comparative Examples 1–3) were prepared. The center core was prepared by kneading the respective components in a roll mill and pressure molding at 155° C. for 15 minutes. The intermediate layer was formed by injection molding so as to enclose the outer surface of the center core. The cover was formed around the intermediate layer by injection molding. The three-piece solid golf balls were completed in this way. The parameters associated with the core, intermediate layer and cover are shown in Table 2.

The golf balls were evaluated for spin characteristic, flying performance, feeling, and durability by the following tests. The results are shown in Table 2.

### Spin Characteristic

Using a swing robot manufactured by True Temper Co., the ball was hit by the driver at a head speed of 45 m/s (abbreviated as W1 HS45 in Table 2) and by the sand wedge at a head speed of 17.6 m/s (abbreviated as SW HS17.6 in Table 2). The ball spin (rpm) was observed using a science eye (manufactured by Bridgestone Corporation).

### Feeling

Professional golfers evaluated a feeling on impact according to the following criterion.

○: good
△: average
×: poor

### Flying Performance

In the spin and feeling tests, the flying distance the ball traveled was also measured. Total evaluation was made according to the following criterion.

○: good
△: average
×: poor

### Durability

Using a flywheel hitting machine, the ball was repeatedly hit at a head speed of 38 m/s until the ball was broken. With the number of hits counted, the ball was rated according to the following criterion.

○: good
△: average
×: poor

5,553,852

5                                                                                    6

### TABLE 1

| Center core | Example 1 | 2 | 3 | 4 | 5 | 6 | Comparative Example 1 | 2 | 3 |
|---|---|---|---|---|---|---|---|---|---|
| Cis-1,4-polybutadiene | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Zinc acrylate | 20 | 20 | 20 | 30 | 20 | 20 | 20 | 25 | 20 |
| Zinc oxide | 56 | 36 | 36 | 20 | 23 | 10 | 90 | 25 | 55 |
| Antioxidant | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Dicumyl peroxide | 0.65 | 0.65 | 0.65 | 0.65 | 0.65 | 0.65 | 0.65 | 0.65 | 0.65 |
| Intermediate layer | | | | | | | | | |
| Himilan 1706 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 |
| Himilan 1605 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 |
| Cover | | | | | | | | | |
| Himilan 1650 | 50 | 50 | 50 | | | 50 | 50 | | 50 |
| Surlyn 8120 | 50 | 50 | 50 | | | 50 | 50 | | 50 |
| Hytrel 4047 | | | | 100 | | | | 100 | |
| Trans-isoprene rubber | | | | | 90 | | | | |
| Natural rubber | | | | | 10 | | | | |

Note:
The amounts of components blended are parts by weight and their proportion is independent among the center core, intermediate layer, and cover.

### TABLE 2

| Center core | Example 1 | 2 | 3 | 4 | 5 | 6 | Comparative Example 1 | 2 | 3 |
|---|---|---|---|---|---|---|---|---|---|
| Outer diameter, mm | 31.52 | 35.28 | 35.28 | 35.28 | 35.29 | 36.40 | 27.68 | 35.24 | 31.52 |
| Hardness, JIS C | 66 | 66 | 66 | 79 | 66 | 66 | 66 | 73 | 66 |
| Specific gravity | 1.36 | 1.24 | 1.24 | 1.24 | 1.19 | 1.16 | 1.56 | 1.19 | 1.35 |
| Intermediate layer | | | | | | | | | |
| Thickness, mm | 3.4 | 1.7 | 2.2 | 2.2 | 1.7 | 2.0 | 5.7 | 1.8 | 1.6 |
| Hardness, JIS C | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 82 | 91 |
| Specific gravity | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 | 0.97 | 0.95 |
| Outer diameter, mm | 38.35 | 38.73 | 39.65 | 39.66 | 38.73 | 40.40 | 39.00 | 38.91 | 34.56 |
| Cover | | | | | | | | | |
| Thickness, mm | 2.2 | 2.0 | 1.5 | 1.5 | 2.0 | 1.8 | 1.8 | 1.9 | 4.0 |
| Specific gravity | 0.97 | 0.97 | 0.97 | 1.10 | 1.13 | 0.97 | 0.97 | 1.10 | 0.97 |
| Hardness, JIS C | 82 | 82 | 82 | 61 | 78 | 82 | 82 | 61 | 82 |
| Ball | | | | | | | | | |
| Outer diameter, mm | 42.68 | 42.67 | 42.67 | 42.70 | 42.70 | 44.00 | 42.65 | 42.63 | 42.65 |
| Weight, g | 45.50 | 45.45 | 45.50 | 45.55 | 45.53 | 45.60 | 45.50 | 45.55 | 45.50 |
| Performance | | | | | | | | | |
| Spin (rpm) W1 HS45 | 3300 | 3020 | 3030 | 3920 | 3600 | 3030 | 35 | 3600 | 3250 |
| SW HS17.6 | 3900 | 4000 | 4300 | 6390 | 5800 | 4100 | 4100 | 4050 | 3500 |
| Feeling | Δ | ○ | ○ | Δ | ○ | ○ | X | ○ | ○ |
| Flying performance | ○ | ○ | ○ | ○ | Δ | ○ | X | X | X |
| Durability | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

As is evident from Table 2, the three-piece solid golf balls of the present invention have a good balance of properties in that the center core and cover can be made soft to ensure a pleasant feeling and controllability (spin) without deteriorating flying performance and durability.

There has been described a three-piece solid golf ball which includes a core, intermediate layer and cover having controlled size, hardness and specific gravity so that the ball has a good total balance of properties in that a relatively soft center core and cover are used to ensure a pleasant feeling and controllability at no sacrifice of flying performance and durability.

Japanese Patent Application No. 5-193065 is incorporated herein by reference.

Although one preferred embodiment have been described, many modifications and variations may be made thereto in the light of the above teachings. It is therefore to be understood that within the scope of the appended claims, the invention may be practiced otherwise than as specifically described.

We claim:
1. A three-piece solid golf ball comprising;
a center core, an intermediate layer, and a cover enclosing the core through the intermediate layer,

5,553,852

7

said center core having a diameter of at least 29 mm and a specific gravity of less than 1.4,

said intermediate layer having a thickness of at least 1 mm, a specific gravity of less than 1.2, and a hardness of at least 85 on JIS C scale, the specific gravity of said intermediate layer being lower than the specific gravity of said center core, and

said cover having a thickness of 1 to 3 mm and being softer than said intermediate layer.

2. The golf ball of claim 1 wherein said intermediate layer is formed of a high repulsion ionomer resin base composition.

3. The golf ball of claim 1 wherein said center core has a hardness of 45 to 80 on JIS C scale and said cover has a hardness of 50 to 85 on JIS C scale.

8

4. The golf ball of claim 1 wherein said center core is comprised of a polybutadiene base rubber composition.

5. The golf ball of claim 1 wherein the diameter of said center core is in the range of 29–37 mm.

6. The golf ball of claim 1 wherein a difference in the specific gravity between the center core and the intermediate layer is in the range of 0.1 to 0.5.

7. The golf ball of claim 1 wherein the specific gravity of said intermediate layer is in the range of 0.9 to 1.0.

8. The golf ball of claim 1 wherein the hardness of said intermediate layer is in the range of 85–100 on JIS C.

*  *  *  *  *

# EXHIBIT C

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT D

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRIDGESTONE SPORTS CO.,      )
LTD, and BRIDGESTONE GOLF,   )
INC.,                        )
                             )
          Plaintiffs,        )
                             )  C.A. No. 05-132 (JJF)
     v.                      )
                             )
ACUSHNET COMPANY,            )
                             )
          Defendant.         )
- - - - - - - - - - - - - - - - - - - - - - - -
ACUSHNET COMPANY,            )
                             )
          Plaintiff,         )
                             )
     v.                      )
                             )
BRIDGESTONE SPORTS CO.,      )
LTD, and BRIDGESTONE GOLF,   )
INC.,                        )
                             )
          Defendants.        )

Wednesday, October 5, 2005
1:35 p.m.
Courtroom 4B

BEFORE:  THE HONORABLE JOSEPH J. FARNAN, JR.
         United States District Court Judge

1    discovery we're entitled to.

2         And, in fact, to just give us in the

3    contentions that the Pro V-1 satisfies all the

4    claim limitations defeats the whole purpose of

5    discovery.

6         THE COURT:  See what they're trying

7    to do is help you from having to rent another

8    room, because if you got contention interrogatory

9    responses to all the junk they already have in

10   the case, that would be unfair to you, because

11   you'd have to put it all some place.  And

12   eventually a lot of that would be outside the

13   motion.

14        And you're going to win if you don't

15   have an agreement eventually.  So they're really

16   trying to help you.

17        You're a little too soon to get them

18   to give you a serious response to contention

19   interrogatories because there's too many claims

20   in the case.

21        MR. MOORE:  Well, they've identified

22   and provided infringement contentions.  They

23   filed a complaint, and they had all the

24   measurements right in the complaint.  I can give

1    you a copy of that.

2              THE COURT:  That's probably why

3    they've given you some because they're the ones

4    you're going to see ultimately in the case.  Your

5    motion -- I mean, your request is important.

6              And I mean this seriously, that you

7    should have detailed responses to your contention

8    interrogatories.  And when I'll get serious about

9    it is when we have the claims and patents that

10    are actually going to be in the case.

11             Now, there's no burden on you except

12    what you would say is we don't know how to get

13    our expert ready, but that goes to the timing of

14    your motions or your agreement to get this case

15    narrowed down.

16             When this case is narrowed down, I'm

17    going to make them give you detailed contention

18    responses.

19             MR. MOORE:  Okay.  Candidly, our

20    problem now is that the case is so overwhelming,

21    we're getting all this discovery.  A large

22    percentage of which -- I think we have ten boxes

23    of Japanese documents.  And our effort to prepare

24    our defense is getting way late and just a burden

# EXHIBIT E

*Bridgestone Sports Co., LTD, et al.    v.*
*Acushnet Company*

---

*Hearing*
*January 13, 2006*

---

*Hawkins Reporting Service*
*715 N King Street*
*Suite 3*
*Wilmington, DE   United States of America   19801*
*(302) 658-6697*

Original File 011306~1.TXT, 41 Pages
Min-U-Script® File ID: 4283608519

**Word Index included with this Min-U-Script®**

[4] MR. BLUMENFELD: Right.

[5] THE COURT: And I'm not going to [6] dictate how you're going to — because I don't [7] know enough, I'm not going to dictate a specific [8] method to accomplish the testing.

[9] That's essentially what I'm saying. [10] And I gave an example that I understand what the [11] problem is.

[12] That even if you took two balls, and [13] tested them simultaneously with your own testers, [14] you know, you could even get a different result, [15] or that's maybe the way to resolve it.

[16] What I think is that the balls have [17] to be tested, though, by both sides, if both [18] sides want to test them in a compressed time [19] period under the same conditions. How you agree [20] to do that is your business.

[21] If you can't agree, I've given you [22] what I'm thinking. If you can't agree, then [23] you'll each have to submit a specific proposal, [24] and I'll choose.

Page 16

[1] Does that help you?

[2] MR. BLUMENFELD: Yes. Thank you.

[3] THE COURT: In other words, I was [4] deciding it by giving you guidance and trying [5] to — did I understand the problem?

[6] MR. MOORE: Yes, Your Honor. That's [7] exactly our concern, that because they change [8] with time and we're just worried about if they go [9] back in their lab, and we don't see anything, [10] they've got different equipment, different balls, [11] different atmospheric conditions, they're going [12] to come up with one set of tests.

[13] We go back in our black lab, do the [14] same thing, the parties are going to be wrangling [15] over what was the humidity, what was the [16] calibration, the equipment used, what type of [17] equipment used.

[18] It just introduces hundreds of [19] variables. So no matter how the tests differ, [20] each party is going to be able to squawk about [21] how the tests were improperly performed.

[22] What we were proposing and were [23] repeatedly denied is that we pick one lab [24] independent. We'll agree on it with them.

Page 17

[1] THE COURT: And what I said is you [2] don't have to do that.

[3] MR. MOORE: Yeah, I know. That's [4] just been our proposal to date to try to minimize [5] some of these variables.

[6] THE COURT: I understand.

[7] MR. MOORE: And get down to the [8] issues.

[9] THE COURT: Yeah. But that's what I [10] understood the issue to be, and that's why I gave [11] the guidance I did.

[12] MR. MOORE: And one more issue to [13] raise.

[14] THE COURT: Okay.

[15] MR. MOORE: With the damage [16] discovery, I understand we were ordered to [17] produce responsive damages discovery. The [18] dispute is more, What is responsive?

[19] What we have, and I've got a sample [20] of it right here is what we've done is we've got [21] a sales database that has all our sales [22] information from the U.S. sales, export sales, [23] intercondition sales. And we've given them [24] reports, which show sales.

Page 18

[1] And we ran these reports for this [2] purpose, that show the units, the dollars, the [3] costs, the profit margins. The information you [4] need for a damages analysis.

[5] The problem we have is we've got two [6] burden problems here. The first problem is they [7] may want all the data underlying those — that [8] sale sheet data. And it's a huge amount of data, [9] which ultimately rolls up into this. This is it.

[10] Everything under it, that rolls up [11] into this. This is cumulative.

[12] The only other type of reports the [13] sales data produces is by sales representative, [14] because that's what it's for. How much did sales [15] representative Judge Farnan sell?

[16] How much did Matt Moore sell? And [17] all those other reports, which there are a lot [18] of, and all those underlying invoices, which make [19] up the sales don't give them anymore information [20] that's relevant to a patent case than this.

[21] And our problem is, in that huge [22] massive amount of data that's underneath, we've [23] got sales for golf clubs. We've got sales for [24] shoes. We've got sales for non-accused golf

Page 19

[1] balls.

[2] And for us to go through, because it [3] is between competitors, and to try to carve out [4] that data and get all the invoices and all the [5] data that we have just for the accused balls is [6] going to be a very time consuming, you know, [7] maybe months of man hours to do that.

[8] So we think by giving them this [9] report, we've given them all they need. And —

[10] THE COURT: See, but they don't [11] trust you.

[12] MR. MOORE: Exactly. I've [13] repeatedly asked them, What's not here?

What do [14] you need that's not in this report?

[15] And the only specifics I've gotten [16] on that, there's a letter they've gotten into [17] that we're looking to see if we have documents.

[18] I understand that's not before us [19] today, but they pointed to foreign sales, sales [20] outside. And our position, our immediate [21] reaction was, well, foreign sales are irrelevant [22] to a U.S. patent infringement case.

[23] And the problem is the we've got [24] subsidiaries in Japan, Thailand, Canada, U.K.

Page 20

[1] There's about seven of them all over the world.

[2] And in our discussions, they've been [3] wanting the operating costs and the minutia sales [4] detail from the subsidiaries all over the world, [5] which we've already got enormous Japanese [6] discovery problems just trying to take the 30(b)6 [7] on documents.

[8] That deposition is going to take two [9] full days. They produced a witness that only [10] speaks Japanese. And they made every question, [11] every answer, and every objection with a [12] translator.

[13] THE COURT: Well, see, I hear [14] everything you're saying. And why I ordered it [15] is because I think they're entitled to the type [16] of information they're seeking.

[17] And what you're telling me is you [18] agree with that, but Judge, we've prepared a [19] report that really gives them what they're [20] looking for. And their response to that is, [21] Well, but we don't trust it as being the full [22] combination of damages and documents that we're [23] entitled to.

[24] Now, as lawyers in a world economy,

Page 21

[1] how are you going to litigate these cases? And I [2] agree with you, can you imagine the sales of an [3] international company's in invoicing and [4] everything else?

[5] Now, what I try to do is tell you [6] you've got to give them the material, and maybe [7] it's misplaced. But I kind of then think that [8] lawyers who litigate these kind of cases, once [9] you know that I'm saying what you've given is [10] inadequate, that you go back, and you talk, and [11] you find some solution.

[12] Now, let me go out on a limb here [13] and tell you, if I was a lawyer in this case and [14] I was in your position what I might do. I might [15] say, You guys are crazy.

[16] You don't understand what we have to [17] go through here. But I'll tell you

what, you're [18] eventually going to have to go back in front of [19] Farnan, and I'm going to have a convincing case [20] 'en you go back in front of him.

[21] What I'm going to do, see this [22] report I have. It's like a 1006 summary, which [23] you would have to verify the underlying [24] information to be able to present that as an

[1] evidentiary matter if we ever got to a trial.

[2] MR. MOORE: Yes.

[3] THE COURT: So what I'm going to do, [4] because I think probably Farnan has got a little [5] bit of common sense, he's going to slice out a [6] piece of this report that I prepared. And I'm [7] going to — I'm not going to spend months, but [8] I'm going to get my client to spend a week. And [9] I'm going to prove up a small portion of this [10] report.

[11] And which, I mean, if you're happy [12] with getting in that litigation posture. And I'm [13] going to prove to you that this report is really [14] all you can have.

[15] And I'm going to give you the [16] exhaustive documents for a very small portion of [17] it, and then if you're foolish enough to go back [18] in front of him and ˜que that this doesn't pan [19] out for ald :rest of my submission to you, [20] we'll see what happens.

[21] But what you've come to me and said, [22] they've asked for something, and we've decided [23] how to do it. And they're not happy. Judge, you [24] have to side with me.

[1] I can't do that.

[2] MR. MOORE: That's fine. Your [3] proposal is fine with us. That's exactly — I am [4] just trying avoid the burden here.

[5] THE COURT: I don't know if that's a [6] good proposal. Here's what I'm saying.

[7] MR. MOORE: You don't know I [8] understand.

[9] THE COURT: I mean, but if it makes [10] sense to you, I mean, that's the way I resolve [11] these things.

[12] You know, as we go forward in [13] litigation in the next decade or so, the more I [14] see these cases, I don't know how they're going [15] to be lawyered.

[16] Because the information is so [17] dispersed, so massive. And I think there's a lot [18] of foreign companies that want ro infringe [19] patents. So we've got to rn how to do these [20] things some-...ow.

[21] Now, they'll certainly keep pushing [22] the envelope, rightly so, because that's why I [23] ordered they could have the information. So [24] you've got to sit

down and work it out

[1] yourselves.

[2] MR. MOORE: We agree.

[3] THE COURT: Okay.

[4] MR. MOORE: Thank you, Your Honor.

[5] THE COURT: I don't think you're [6] being unreasonable, but I think, you know, I mean [7] in a sense of what you're asking for —

[8] MR. MASTERS: Just very quickly, [9] Your Honor. We're not asking for every [10] invoice [10] and detailed thing coming out of their computer. [11] We have given them summaries of the data we need.

[12] There's different levels of [13] summaries. And maybe we're arguing right now [14] over the data summaries, but we're not asking for [15] the gigantic database that the corporation has [16] and has to have just to conduct its everyday [17] business.

[18] We're working with our expert, and [19] they're telling us that this financial data is [20] missing from their production. Yes, we did get [21] that, but it's incomplete.

[22] And we've tried to tell them. So [23] we're trying to work and find that common ground. [24] We understand clearly what you've said here

[1] today.

[2] THE COURT: So if they slice it up, [3] and then you can look through it, you can say [4] what's actually missing or it's there and give us [5] this line.

[6] MR. MASTERS: Well, that's what [7] we're trying to do, just work with them on that.

[8] THE COURT: If you keep working [9] together — I think if you just keep working [10] together, you'll resolve this.

[11] MR. MASTERS: And just very quickly, [12] because the issue was raised, I know the Sixers [13] are on tonight, and we all want to watch them.

[14] THE COURT: Well, actually I've got [15] to get up there.

[16] MR. MASTERS: Yes, I understand [17] that. So this is going to be quick.

[18] The foreign sales, all their golf [19] balls are made here in the United States. So [20] anything made isn't — is independent of a U.S. [21] patent regardless of where it is sold, and so [22] that's why —

[23] THE COURT: I saw your papers, that [24] they're manufactured. Right.

[1] MR. MASTERS: That's all I have. [2] Thank you, Your Honor.

[3] THE COURT: Don't feel rushed, [4]

because the game is at eight o'clock tonight, [5] because it's televised. I don't —

[6] MR. MASTERS: It's foggy out there. [7] The weather isn't great.

[8] I want to make sure you get there.

[9] THE COURT: I have to be there at [10] 7:15.

[11] MR. MASTERS: It's an important [12] game.

[13] THE COURT: Now, yeah. Now, I don't [14] think you're outside the lines on being [15] aggressive or contentious.

[16] But I — and we had — you know, [17] this case is moving along, and you know, you have [18] a little different view about its complexity. [19] And some of the dates look like they're out [20] pretty far, so you might be getting a comfort [21] level.

[22] Don't get that comfort level, [23] because we're going to have the Markman in July. [24] We're going to move to the pretrial. We're going

[1] to move to dispositive motions.

[2] We're going to move to the pretrial [3] and we're not going to lose the dates, because [4] remember we originally talked and we said we were [5] pretty happy with those dates. But what we will [6] do, and I don't know how this will help you, but [7] as I read the bifurcation motion, this case will [8] be chopped up for trial.

[9] And everybody ought to remind me of [10] that when we get there. Because I'm aging each [11] year and I might forget.

[12] But, you know, we'll do an [13] infringement trial probably, and then a validity [14] trial, so that the jury can, you know, get its [15] hands around it, and so I'll have an easier job [16] making evidentiary rulings.

[17] I don't have to hear, [18] Well, it overlaps, Judge. There's not going to [19] be a lot of overlap evidence.

[20] So when you're developing your [21] evidence keep that in mind that the end game is a [22] sliced up game. And I think that will be [23] important to you as you go through this.

[24] Yes.

[1] MR. MOORE: Just one more [2] clarification, while we are all together here.

[3] THE COURT: Sure.

[4] MR. MOORE: The detailed [5] infringement contentions to date, we gave it [6] months ago. We gave our actual measurements on [7] balls, and we expected that you'd order the [8] detailed contentions. But you said they would be [9] due the last day of supplements, February 28th.

[10] Are we going to get their actual [11]

measurements, because right now the one thing [12] we're, frankly, frustrated with, I don't know [13] anything more about their infringement case then [14] I did the day they filed the complaint.

[15] We're seven months into discovery, [16] and I have learned nothing about their [17] infringement case. And two things will be [18] critical when we're getting ready for Markman.

[19] One, we need to know which are [20] literal, which are DOE, and because our [21] measurements are showing us we don't infringe.

[22] The other factor that's going to be [23] key for claim construction in this case is how [24] we perform the test, because I've got a feeling

## Page 29

[1] they're doing a test that Japanese companies do. [2] We're doing a test that U.S. companies do.

[3] And the testing methods are [4] different. Can we get in our detailed [5] infringement contentions also how not just the [6] data, the actual measurements, but how the tests [7] are performed, because that's going to be a key [8] issue for Markman when it's talking about [9] hardness, how do you measure that hardness.

[10] The company's — it seems based on [11] what our data is showing us where we don't [12] infringe that how the measurements were formed is [13] going to be critical for claim construction [14] issues.

[15] THE COURT: Well, remember when I [16] gave my brief statement in opening here?

[17] MR. MOORE: Yeah.

[18] THE COURT: And I referenced the [19] February date. I think I did.

[20] MR. MOORE: Yes.

[21] THE COURT: Didn't I? Okay.

[22] All this for me is not timely, but I [23] do expect that the infringement contentions will [24] be complete by that February date. So you should

## Page 30

[1] have complete contentions by that date.

[2] If you don't, then you are going to [3] have to come back to me.

[4] MR. MOORE: Okay.

[5] THE COURT: Does that answer your [6] question?

[7] MR. MOORE: Yes.

[8] THE COURT: February is the date. [9] In other words, I only have so many decisions in [10] me a month.

[11] This is, like, January 13th. I [12] don't want to start using my February allotm-

ent [13] in January.

[14] MR. MOORE: That's fine.

[15] THE COURT: So I'm holding off. But [16] I'll hear all that if they don't comply. But [17] they understand they have to give you what it is [18] they contend by that date.

[19] MR. MOORE: Okay.

[20] THE COURT: Don't you?

[21] MR. MASTERS: Yes, Your Honor. We [22] do believe we have to give the final contention [23] at the end of February.

[24] But we have given them detailed

## Page 31

[1] infringement contentions to date, and this is [2] part of the briefs. They're confusing the proofs [3] of infringement that you're developing during [4] fact discovery with their contentions.

[5] We told them we contend you infringe [6] this patent of Bridgestone's. These golf balls [7] infringe, and how the materials are, and the [8] different components of those golf balls satisfy [9] the limitations of the claims.

[10] And now what they're trying to do is [11] speed up the expert discovery, have all of the [12] experts testing done, and in our final [13] contentions before the end of February with [14] actual test results. And that's something [15] that —

[16] THE COURT: Before the end of [17] February.

[18] MR. MASTERS: That's what they're [19] looking for.

[20] THE COURT: But by the end of [21] February, they will be in there.

[22] MR. MASTERS: The actual test [23] result?

[24] THE COURT: No. No.

## Page 32

[1] Because you haven't had your [2] experts.

[3] MR. MOORE: We want the facts. And [4] the fact is it's a fact what the hardness, what [5] they measure the ball is. We want the facts that [6] support it.

[7] THE COURT: Right. You're going to [8] have what it is you contend makes up the factual [9] support for your allegation of infringement.

[10] MR. MASTERS: That's correct, Your [11] Honor.

[12] THE COURT: Okay.

[13] MR. MOORE: And just because — I'm [14] not sure this is the same debate we've had, I [15] know there's no secrets here.

[16] Right now all they say is we think [17] the accused ball measures within this range. All [18] that tells us is they think it satisfies it.

[19] They don't say how it satisfies it. [20]

They don't show — it doesn't show if it's [21] literal.

[22] It doesn't show if it's Doctrine of [23] Equivalents. There's got to be a measurement.

[24] If the range is 10 to 20, do they

## Page 33

[1] measure at 11? Did they measure at 19?

[2] THE COURT: Okay. I think I have to [3] back you up a little bit.

[4] The key word here is contention. [5] You see, they are going to provide you with what [6] they contend as of that February date is the [7] basis of their infringement claim; right?

[8] Now, contend means at this point, [9] this is what we believe. Now, they're not going [10] to be able to sucker you and come in with a whole [11] new body of factual support down the road, [12] because the reason why we set a contention date [13] is so that sets the parameters of your ongoing [14] discovery.

[15] So if they tell you — I don't know [16] anything about golf balls. But how big are the [17] golf balls?

[18] MR. MASTERS: 1.6 inches in [19] diameter.

[20] MR. MOORE: There's no facts in the [21] current contentions.

[22] THE COURT: Here is what I'm saying. [23] What is it?

[24] MR. MASTERS: 1.6 inches in

## Page 34

[1] diameter.

[2] THE COURT: In diameter. A golf [3] ball is 1.6 inches in diameter.

[4] So if that's important to the [5] infringement contention, they will tell you that [6] your ball is within the range of 1.4 to 1.8 — [7] what is it, inches?

[8] MR. MASTERS: Inches.

[9] THE COURT: In diameter, and certain [10] materials.

[11] Now, when you actually get to when [12] you're beyond contentions, in other words, you [13] actually developed your record of proof, then [14] they'll tell you that your ball infringes because [15] it's 1.62 inches.

[16] MR. MASTERS: That's our position, [17] Your Honor.

[18] THE COURT: You have contentions. [19] Now, they can't come back down the road after [20] you've gone five months preparing to get ready [21] for a Markman and everything else and say, We [22] think you infringe, because the way we interpret [23] the claim, it's a five-inch diameter ball. And [24] yours is — you have a five-inch ball.

Page 35

[1] So you infringe.

[2] MR. MOORE: The only problem — [3] only problem I'm having with that [4] is that all [4] we're getting is notice that [5] they accuse us of [5] infringement of [6] which we learned in the [6] complaint. [7] We're not getting any facts.

[7] THE COURT: But they're not — you [8] ought to give him some facts by February 28th.

[9] MR. MOORE: Okay.

[10] MR. MASTERS: Yes. We have already [11] and —

[12] THE COURT: The kind of facts I'm [13] talking about.

[14] MR. MASTERS: We will by February [15] 28th.

[16] THE COURT: And your facts from [17] February 28th to July 24th aren't going [18] to become [18] 1.6 inches to five inches.

[19] MR. MASTERS: No. And we don't [20] plan [20] to add new claims after February [21] 28th, because [21] that would be a new [22] contention.

[22] THE COURT: Right.

[23] MR. MASTERS: We're not going to [24] add [24] new claims or new contentions [25] of invalidity after

Page 36

[1] February 28th. We don't plan to [2] because that [2] would be a new con-[3] tention.

[3] THE COURT: See what happens on [4] February 28th, Mr. Moore.

[5] MR. MOORE: Okay. Great.

[6] THE COURT: And then if you suspect [7] that they are — because the whole [8] problem would be [8] they're suckering you.

[9] MR. MOORE: And we need some time [10] to [10] prepare our defenses.

[11] THE COURT: Right. So if you think [12] you're getting, you know, hit in the back [13] of the [13] head, then you come, and you [14] tell me that. And [14] we'll have another [15] hearing, and we'll talk about [15] how [16] adequate or inadequate their con-[17] tentions are.

[16] MR. MOORE: Okay. Thank you, Your [17] Honor.

[18] THE COURT: I think you're getting [19] along fine. I think you have to be [20] more [20] trusting.

[21] I think you have to kind of let [22] yourself go and, like, reach out a little bit, [23] Mr. Moore. See Mr. Blumenfeld, very [24] axed [24] there. He feels comfortable [25] with you on the

Page 37

[1] other side of the case.

[2] MR. MOORE: And I've made my [3]

[3] reaching in this case. I've made a hun-[4] dred [4] proposals in this case. Not one [5] has been [5] accepted. Independent test-[6] ing, et cetera. I'm [6] reaching.

[7] THE COURT: Just remember no good [8] deed goes unpunished. I'm learning [9] that in my [9] life every day.

[10] Okay. In a serious vein, have we [11] resolved what was pending, and where I [12] didn't [12] give you a direct ruling, you [13] have enough of what [13] I'm thinking [14] about to go take care of it where I [14] didn't?

[15] MR. MASTERS: Yes.

[16] MR. MOORE: Yes.

[17] THE COURT: All right. So let's [18] pick a date.

[19] Do you have calendars with you or —

[20] MR. BLUMENFELD: They won't let [21] our [21] Blackberries in.

[22] THE COURT: Oh, yeah.

[23] MR. MOORE: The only thing I know [24] is [24] I've got a trial scheduled for the first [25] two

Page 38

[1] weeks of February. I don't think it will [2] take [2] two weeks.

[3] It should only take a week. But I [4] know that.

[5] THE COURT: Okay. Why don't we do [6] that. We can't have Blackberries in [7] here, [7] because you would be sus-[8] pected of trying to blow [8] Mr. Dibbs up.

[9] Nobody would want to blow me up, [10] though. We do all this for Mr. Dibbs to [11] protect [11] him.

[12] Why don't you talk about some dates [13] and then call my case manager next [14] week. And [14] after you've had a chance [15] to talk, and we'll set [15] something for you.

[16] And I can give you some guidance [17] from my calender, and then you can take [18] that up [18] as you talk.

[19] In February, I'm reasonably [20] avail-[21] able the week of February 6th. I'm [21] reasonably available the week of the [22] 13th.

[22] And the — well, the 20th is, you [23] know, President's Day. But from Tuesday [24] the 21st [24] through the end of the week, [25] even if I have a

Page 39

[1] trial, I can put you in at lunchtime or [2] later.

[2] I apologize I had to move this. I [3] had a [3] family medical thing that I had to take [4] care of early through the day from this [5] morning.

[5] So, but typically I can come early, [6] or I [6] can come at the end of the day, or at [7] lunchtime, if that helps you get in and [8] out of [8] Wilmington.

Page 40

[9] Okay. All right. [10] I hope everybody [11] continues to work [11] together to try and [12] keep the case moving. I [12] think it's [13] moving pretty good so far.

[13] And the discovery disputes you're [14] having are really more, I think, concerns [15] rather [15] than true disputes. I really [16] haven't seen a true [16] dispute yet.

[17] Because you typically are willing to [18] give up stuff. It's just parameters and [19] things [19] like that.

[20] So if you keep that up, I think [21] we'll [21] be able to keep the case moving.

[22] All right. Thank you.

[23] MR. BLUMENFELD: Thank you, Your [24] Honor.

[1] MR. MOORE: Thank you.

[2] THE CLERK: All rise.

[3] (Court was recessed at 4:10 p.m.)

Page 41

State of Delaware        )
New Castle County        )
        CERTIFICATE OF REPORTER
    I, Heather M. Triozzi, Registered
Professional Reporter, Certified Shorthand
Reporter, and Notary Public, do hereby certify
that the foregoing record, Pages 1 to 41
inclusive, is a true and accurate transcript of
my stenographic notes taken on January 13, 2006,
in the above-captioned matter.
    IN WITNESS WHEREOF, I have hereunto
set my hand and seal this 16th day of January,
2006, at Wilmington.

        Heather M. Triozzi, RPR, CSR

# EXHIBIT F

# (part 1)

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY