IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BRIDGESTONE SPORTS CO., LTD., and BRIDGESTONE GOLF, INC., | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 05-132 (JJF) |
| v. | ) ) ) | **REDACTED – PUBLIC VERSION** |
| ACUSHNET COMPANY, | ) ) | |
| Defendant. | ) ) | |

## BRIDGESTONE'S OPENING BRIEF IN SUPPORT OF <u>ITS MOTION FOR SANCTIONS</u>

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
Leslie A. Polizoti (#4299)
1201 N. Market St.
P.O. Box 1347
Wilmington, DE 19801
(302) 658-9200
*Attorneys for Bridgestone Sports Co., Ltd.*
*and Bridgestone Golf, Inc.*

OF COUNSEL:

Robert M. Masters
Scott M. Flicker
Terrance J. Wikberg
Brandon M. White
PAUL, HASTINGS, JANOFSKY & WALKER LLP
875 15th St., N.W.
Washington, DC 20005
(202) 551-1700

Original Filing Date:  March 20, 2007

Redacted Filing Date:  April 10, 2007

TABLE OF CONTENTS

| | Page |
|---|---|
| TABLE OF CITATIONS | ii |
| NATURE AND STAGE OF THE PROCEEDINGS | 1 |
| SUMMARY OF ARGUMENT | 1 |
| STATEMENT OF FACTS | 3 |
| I.   DR. FELKER'S JANUARY 16, 2007 INVALIDITY REPORT | 4 |
| A.   Acushnet's Violation Of The Court's Order And Destruction Of Evidence | 4 |
| B.   The October 2000 Opinion Of Counsel Was Shielded, But Is Now A Sword | 7 |
| C.   Acushnet Has Still Not Produced The Data Underlying The Dimple Exhibit | 8 |
| D.   Acushnet's "Mistake" With The Wilson Ultra Competition Balls | 9 |
| E.   The 1993 Competitive Ball Log | 9 |
| II.  THE DALTON DECLARATION | 10 |
| A.   Bridgestone Asked For Recipes | 11 |
| B.   Acushnet Told Bridgestone To Look At Manufacturing Guidelines And Change Notices | 12 |
| C.   Acushnet Told Its Expert That Mesabi Has The "Best" Information, But Didn't Tell Bridgestone | 13 |
| D.   Acushnet Finally Told Bridgestone That Mesabi Is The Best Source For Recipe Data | 14 |
| E.   Other Exhibits To Dalton's Declaration | 16 |
| III. DR. FELKER'S NON-INFRINGEMENT REPORT | 17 |
| A.   Acushnet Never Produced Any Of The Data From Exhibit 12 To Dr. Felker's Non-infringement Report | 18 |
| B.   Acushnet Never Produced Most Of The Data Underlying Exhibit 19 To Dr. Felker's Non-infringement Report, And Its Own | |

ii.

TABLE OF CONTENTS (continued)

Page

　　　　Employees Did Not Even Understand What The Data Showed　　19

IV.　SOME OF ACUSHNET'S NEWLY-PRODUCED DATA WOULD
　　　HAVE HELPED BRIDGESTONE　　20

　　　A.　Bridgestone Could Have Accused Other Balls – With Revenues Of
　　　　　 ▮▮▮▮▮ – Of Infringement　　21

　　　B.　The New Data Helps Prove Infringement Under Bridgestone's
　　　　　 Claim Construction　　21

　　　C.　Acushnet's QAS Data Supports Bridgestone's Infringement
　　　　　 Contentions　　22

　　　D.　After All This, Bridgestone Doubts That Acushnet Has Produced
　　　　　 All Relevant Documents　　23

ARGUMENT　　24

I.　LEGAL STANDARDS　　24

　　　A.　Requested-But-Not-Produced Documents Are Excluded　　24

　　　B.　Discovery Sanctions In Addition To Preclusion　　25

　　　C.　Spoliation Also Warrants Rule 37 Sanctions　　26

II.　THIS COURT SHOULD EXCLUDE ALL INFORMATION IN DR.
　　　FELKER'S INVALIDITY REPORT THAT WAS NOT TIMELY
　　　DISCLOSED　　27

III.　THE COURT SHOULD EXCLUDE THE DALTON DECLARATION
　　　 AND ITS EXHIBITS AND APPLY ANY VERDICT OF
　　　 INFRINGEMENT TO THE PRO V1 AND PRO V1X BALLS THAT
　　　 BRIDGESTONE COULD HAVE ACCUSED OF INFRINGEMENT　　30

IV.　THE COURT SHOULD PRECLUDE ACUSHNET FROM RELYING
　　　ON EXHIBITS 12 AND 19 TO DR. FELKER'S NON-INFRINGEMENT
　　　REPORT　　31

V.　THE COURT SHOULD ORDER A THIRD PARTY TO INSPECT
　　　ACUSHNET'S FACILITY　　32

VI.　BRIDGESTONE SHOULD BE AWARDED ITS ATTORNEYS' FEES　　33

CONCLUSION　　34

## TABLE OF CITATIONS

**FEDERAL CASES**

*AstraZeneca AB v. Mutual Pharm. Co.,*
    278 F. Supp. 2d 491 (E.D. Pa. 2003) ...................................................................29

*Chambers v. NASCO, Inc.,*
    501 U.S. 32 (1991).................................................................................................33

*Coca-Cola Bottling Co. of Shreveport, Inc. v. The Coca-Cola Company,*
    110 F.R.D. 363 (D. Del. 1986) .............................................................................25

*Durst v. FedEx Express,*
    C.A. No. 03-5186, 2006 WL 1541027 (D.N.J. June 2, 2006) ..............................27

*Erie Ins. Exchange v. Applica Consumer Prods., Inc.,*
    C.A. No. 3:02-1040, 2005 WL 1165562 (M.D. Pa. 2005) ...................................26

*In re NTL, Inc. Sec. Litigation,*
    C.A. Nos. 02-3013, -7377, 2007 WL 241344 (S.D.N.Y. Jan. 30, 2007)..........26-27

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,*
    456 U.S. 694 (1982)........................................................................................26, 29

*Kamatani v. BenQ,*
    C.A. No. 2:03-437, 2005 WL 2455825 (E.D. Tex. 2005) .....................................33

*Liafail, Inc. v. Learning 2000, Inc.,*
    C.A. No. 01-599-GMS...........................................................................................30

*Positran Mfg., Inc. v. Diebold, Inc.,*
    C.A. No. 02-466-GMS, 2003 WL 21104954 (D. Del. May 15, 2003)..............26-27

*Tracinda Corp. v. DaimlerChrysler AG,*
    C.A. No. 00-993-JJF, 2005 WL 927187 (D. Del. Apr. 20, 2005) ..........................33

**RULES**

Federal Rule of Civil Procedure 16(f) ........................................................ 3, 24-25, 33

Federal Rule of Civil Procedure 37 ..........................................................................24, 25

## NATURE AND STAGE OF THE PROCEEDINGS

This is a patent infringement action brought by Plaintiffs Bridgestone Sports Co., Ltd., and Bridgestone Golf, Inc. ("Bridgestone") against Defendant Acushnet Company ("Acushnet") in March 2005. Fact discovery began in June 2005. The Court initially set August 31, 2005 as the document production deadline (D.I. 8), and then ordered as "final" that "all document production shall be completed by September 1, 2006" (D.I. 154 at 2). The extended deadline for fact discovery closed on October 10, 2006. Bridgestone took more than 30 depositions and propounded numerous interrogatories and document requests.

Expert discovery ends on March 30, 2007 (there are two depositions remaining). Summary judgment motions are due on April 13, and the pretrial conference is scheduled for May 25. Trial begins on June 18, and, as the Court has noted, "the parties have much work to be done before that date" (D.I. 291 at 5).

This is Bridgestone's opening brief in support of its motion for sanctions.

## SUMMARY OF ARGUMENT

1.    On February 27, 2007, this Court denied Acushnet's motion for leave to supplement Dr. Felker's invalidity report. A week later, Acushnet supplemented it anyway (actually, twice). One of the supplements indicates that Acushnet manufactured and tested golf ball cores in February 2007, but destroyed the cores and the test results when it realized they were unfavorable – specifically, that they contradicted Dr. Felker's inherent anticipation opinion with respect to Bridgestone's '707 patent. Acushnet should be sanctioned for the spoliation of evidence that was not only relevant, but also favorable to Bridgestone. (*See* Section I, Statement of Facts.)

2.

2.      Dr. Felker's invalidity report also includes an opinion that the '707 patent is invalid based on testing of a core performed by Acushnet engineers. During discovery, however, Acushnet asserted privilege in response to discovery requests that called for this testing – and it waited until Bridgestone questioned how that core was made before deciding to produce the opinion on March 2, 2007. According to Acushnet, that core "no longer exists." (*See* Statement of Facts, Section I.)

3.      The Court-ordered final document production cutoff was September 1, 2006 (D.I. 154 at 2). On February 2, 2007, the Court precluded Acushnet from relying on prior art that it disclosed its reliance on too late (D.I. 285, 288). Despite the discovery deadlines and the Court's enforcement of them, on February 16, 2007, Acushnet produced documents that Bridgestone had requested – in document requests, interrogatories, letters, depositions and motions – since 2005. The next business day, its non-infringement expert (also Dr. Felker) relied on them and on other requested-but-not-produced documents (and had the nerve to criticize Bridgestone's experts for not having done so). Acushnet should be precluded from relying on these documents. (*See* Statement of Facts, Sections II & III.)

4.      Exclusion alone, however, is not an adequate remedy because many of the documents Acushnet just produced help Bridgestone. For example, some of them would have allowed Bridgestone to accuse additional Pro V1 golf balls and Acushnet's Pro V1x golf balls – with U.S. revenues of ▉▉▉▉▉▉ – of infringement. Under the circumstances, any verdict of infringement should be applied to these balls, after trial. (*See* Statement of Facts, Section IV.)

5.      Bridgestone also asks that the Court make certain findings of fact in connection with Acushnet's untimely production of information from its QAS quality control database. (*See* Statement of Facts, Section IV.)

3.

6.    In reviewing Acushnet's late production, and based on depositions taken by Bridgestone as recently as last Saturday, March 17, 2007, Bridgestone has learned that Acushnet continues to withhold other relevant information about the manufacture of the accused Acushnet golf balls.  (*See* Statement of Facts, Section IV.)

7.    The Court should award Bridgestone reasonable attorneys' fees under Federal Rule of Civil Procedure 16(f), 37 or its inherent powers.

<u>STATEMENT OF FACTS</u>

Bridgestone's earlier motion to preclude pales in comparison to what Acushnet has done since then.  For example:

- After the Court said it could not do so, Acushnet supplemented its invalidity report in March.  That supplement, which was prepared at the direction of Acushnet's outside counsel, states that Acushnet destroyed evidence that was unfavorable.  Although Acushnet intends to rely on this report, its outside counsel stated that they did not know anything about who authored the report or the circumstances of the destruction of evidence – only to be contradicted the next day, when the author of the report testified that Acushnet's outside counsel were the ones who asked him to write it.

- If Acushnet had produced the documents that it does not dispute that Bridgestone unquestionably requested, Bridgestone could have accused additional Acushnet golf balls with U.S. sales of ███████████ of infringement.

- Bridgestone asked for Mesabi data, and Acushnet refused to produce it ▋



These are some of the highlights – many other examples are discussed below.

4.

I.  DR. FELKER'S JANUARY 16, 2007 INVALIDITY REPORT

Dr. Felker has opined that Bridgestone's '852, '817, '707, '834 and '791 patents are invalid (Ex. 1). His opinions are based in part on: (A) two supplemental reports that the Court expressly prohibited – one of which says that Acushnet destroyed unfavorable test results, (B) test results from 2000 that were withheld as privileged during discovery, and were not produced until weeks after Dr. Felker's invalidity report, (C) exhibits of golf ball data that was requested but has never been produced, (D) a prior art golf ball that ███████████████████ ██ when Bridgestone asked for it during discovery – and was denied the opportunity to test them – but ████████████████████████████████████, and (E) a competitive log that was requested but never produced during discovery, but which Acushnet was able to provide to its counsel within a day of counsel's request.

A.  Acushnet's Violation Of The Court's Order And Destruction Of Evidence

On February 2, 2007, the Court precluded Acushnet from relying on the Altus Newing Massy ball as prior art to the '707 patent – a ruling that Acushnet did not challenge (D.I. 283 at 2). In an end run attempt to bolster its remaining defense, however, Acushnet told Bridgestone on February 13 that, "given the Court's decision," it "is considering remanufacturing cores based on the EP '043 patent in order to provide updated testing data" for Dr. Felker (Ex. 2, 2/13/07 Stasio Ltr). (As Bridgestone later found out, as of that date, Acushnet had already remanufactured at least one batch of cores.)

Two weeks later, the Court denied Acushnet's motion to supplement Dr. Felker's invalidity report with respect to the '791 patent. The Court found that "there is insufficient time to allow further supplementation of Acushnet's expert report" and that "the prejudice Acushnet

5.

may suffer is of its own making" (D.I. 291 at 5).    Acushnet went ahead and supplemented anyway – twice, in fact.

The first supplement, on March 2, 2007, concerned Dr. Felker's invalidity opinion with respect to Bridgestone's '817 patent (Ex. 3). ███████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████████ Although Dr. Felker submitted his invalidity report on January 16, he apparently continued to run more tests thereafter.

The second supplement concerned the '707 patent and came by email at 7:40 p.m. on March 7, 2007, the night before Dr. Felker's deposition. ████████████████████████████



6.

Bridgestone wrote to Acushnet, asking about the circumstances of the destruction

of cores.  During a meet and confer with respect to this motion, Acushnet's counsel stated only

7.

██████████████████████████████████████████████████████

████████████████████████ The next day, Acushnet's counsel was contradicted, when

the author of the report testified that Acushnet's counsel were the ones who asked him to write it.

      B.     The October 2000 Opinion Of Counsel Was Shielded, But
              Is Now A Sword

      Dr. Felker opined that Bridgestone's '707 patent is obvious in light of the EP '043

patent and the knowledge of one skilled in the art, because balls manufactured according to that

patent inherently (*i.e.*, necessarily) have all of the properties recited in claim 1 of the '707 patent.

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

      About two weeks later, on February 13, when Bridgestone wanted to inspect the

core, Acushnet acknowledged █████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

      Bridgestone had never heard about this testing before – even though it was

responsive to its discovery requests (Ex. 8) – because Acushnet had claimed privilege.

      On March 2, 2007, at the beginning of Mr. Dalton's deposition, Acushnet

produced the October 2000 opinion for the first time (Ex. 9), apparently attempting to support

Dr. Felker's reliance on a core that purportedly showed that the '707 patent is invalid. Although

8.

C.   Acushnet Has Still Not Produced The Data Underlying The
     Dimple Exhibit

Dr. Felker also relied on a chart of dimple characteristics for more than 130 balls

(Ex. 11) to opine that a ball produced according to EP '043 would have dimples on "at least 62%

of the ball surface," a limitation of the '707 patent (Ex. 1 at 50).  Acushnet first produced this

chart on January 16, 2007 by attaching it to Dr. Felker's report –

and that Bridgestone had requested documents relating to the "competitive

analysis of any golf ball" (Ex. 12).

When Bridgestone asked Acushnet to limit the basis for Dr. Felker's opinion to

the four balls on Exhibit 48 that had been disclosed during fact discovery (even though none of

the underlying data for the entire exhibit had been produced – even to this day), Acushnet

refused, on the basis that Dr. Felker was not relying on the balls as "prior art," but "to inform his

understanding of one of ordinary skill in the golf ball art as to what the standard percentage of

golf ball dimple coverage was in 1996" (Ex. 13).  Whatever that statement was intended to mean,

9.

D.   Acushnet's "Mistake" With The Wilson Ultra Competition
      Balls

Dr. Felker also opined that Bridgestone's U.S. Patent No. 5,803,834 was invalid,

based in part on his testing of alleged prior art Wilson Ultra Competition golf balls.  During fact

discovery, both parties wanted to test certain golf balls.  The testing, however, is destructive –

which was an issue because there were limited quantities available.  When the parties exchanged

lists of alleged prior art balls of which they had a "limited number," ███████████████████

███████████████████████████████████    The parties then agreed "not [to]

conduct any destructive testing on any golf ball…until we have resolved this matter" (Ex. 15).

The issue was never resolved.



E.   The 1993 Competitive Ball Log

On March 15, 2007, during the deposition of John Calabria, one of Bridgestone's

experts, Acushnet's counsel marked as an exhibit a "1993 Competitive Log" (Ex. 16).  This

document identifies when certain golf balls were acquired and what tests were performed on

them.  It was called for by many of Bridgestone's discovery requests (*e.g.*, Ex. 17).  When

Bridgestone's counsel objected, and asked whether the document had been produced at any time

before the questioning, Acushnet's counsel did not know (Ex. 18 at 141):

10.

Apparently, Acushnet's counsel has been able to obtain documents from Acushnet that were not produced to Bridgestone.

II.    THE DALTON DECLARATION

Days after Bridgestone agreed to Acushnet's request for an extension for rebuttal expert reports until February 20, Acushnet produced, on February 16, documents that Bridgestone had requested repeatedly during discovery. Then, on February 20, Acushnet attached most of these documents – plus more new ones – to a declaration submitted by its Vice President of Intellectual Property, Jeff Dalton. The documents attached to Mr. Dalton's declaration are highly relevant to infringement – and, from Acushnet's perspective, to non-infringement: Dr. Felker relies on them to conclude that some of the accused balls do not infringe Bridgestone's '961 and '652 patents. Those patents cover the chemical compositions of the balls, and the recipes that are actually used to manufacture the accused balls are evidence of infringement.

The raw data attached to Mr. Dalton's declaration is kept by Acushnet in the ordinary course of business, in its Mesabi Mix Vision database (and the predecessor to that database, the weigh-feed system) and in its recipe change database.



███████████████████████████████████████████████████

Not a single document cited in Mr. Dalton's declaration was produced to Bridgestone before the September 1, 2006 document production cutoff (Declaration of Brandon M. White at ¶10) or even before the close of fact discovery. Some of the documents attached were produced in November 2006, and the rest – which happened to be the critical part necessary to interpret the earlier-produced documents – in February 2007 (Ex. 19 at 91-92).

A.     Bridgestone Asked For Recipes

Bridgestone has asked for information about golf ball recipes many times. For example, on July 29, 2005, Bridgestone requested all documents "concerning the composition, recipe, and manufacture…of the components of the Acushnet products…" (Ex. 20). Acushnet objected to this request as "duplicative of Requests Nos. 12, 14, 15, 93, 94, 114, 116-121, 123 and 124," and agreed to produce responsive, non-privileged documents (*id.*).

Bridgestone specifically and repeatedly requested recipes and the databases that contained them, and also asked the Court to compel Acushnet to produce "all documents from the Recipe Change database…used to make any of the accused products…" (Ex. 21; D.I. 142, July 25, 2006, Polizoti Ltr).

Bridgestone also served comprehensive interrogatory 52 asking for all recipes, in chronological order and by accused product (Ex. 22):

> Separately, for each of the Accused Acushnet products, identify, explain and describe in detail:
>
> a.     all recipes, in their entirety and in chronological order of use, of each of the Accused Acushnet products;
>
> b.     for each recipe listed in Acushnet's response to paragraph (a.), the dates during which that recipe was used; …

f.    all    documents    supporting    Acushnet's    response    to
paragraphs (a.)-(e.).

B.    Acushnet Told Bridgestone To Look At Manufacturing
      Guidelines And Change Notices

Acushnet responded to interrogatory 52 by listing documents "from which
responsive information may be derived by Bridgestone as readily as Acushnet" (Ex. 22).



On September 6, 2006, after the document production cutoff, Acushnet responded
to Bridgestone's request for "core formulation recipes" and enclosed sample data from the
Mesabi database (Ex. 26).  Rather than produce the documents, however, Acushnet said that the
data from Mesabi was "cumulative," and that producing it would be "unduly burdensome" (*id.*):



13.

Although counsel said that Acushnet "might" be willing to allow Bridgestone to inspect the Mesabi database, Bridgestone reiterated its requests that Acushnet produce it (Ex. 27).

Over the next month, Bridgestone told Acushnet that data from Mesabi and the recipe change database was highly relevant and responsive, and asked that Acushnet produce its "core recipes" and "recipe change databases" (Ex. 28).   On November 3, 2006, Acushnet represented again that it had "already produced the relevant documents from these databases in hardcopy," but would look again and produce any documents that had not been produced (Ex. 29).   Acushnet then made another production in November, which included additional recipe change notices – but still no Mesabi data (White Decl. at ¶7-8).

Because fact discovery was long over, and because Acushnet had represented that the Mesabi data was duplicative, cumulative and unduly burdensome to produce, and that it had produced all of the manufacturing guidelines and change notices, Bridgestone did not pursue the Mesabi issue.

C.     Acushnet Told Its Expert That Mesabi Has The "Best" Information, But Didn't Tell Bridgestone



14.

Then, on February 16, 2007 – nearly two years since the filing of this action, four and a half months after the document production cutoff, a month after Bridgestone had served its expert reports on infringement, and two weeks after the Court precluded Acushnet from relying on prior art that was not timely disclosed – Acushnet produced change notices "from August 2005 to the present" and "recipe change notices" that Bridgestone had requested long ago (Ex. 30).[2]

### D.     Acushnet Finally Told Bridgestone That Mesabi Is The Best Source For Recipe Data

The next business day, February 20, Acushnet ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ That's not surprising, because Acushnet

██████████████████████████████████ did not produce any data during fact discovery that was comparable to the data attached to Mr. Dalton's declaration.

████████████████████████████████████████████████████████

█████ – the vast majority of which was produced with the Dalton Declaration in February, after

---

[2]     In its February 16 letter, Acushnet also said that it was "planning to have available at the deposition" the Mesabi Mix Vision, "given the topics on which the Court has ordered Acushnet to prepare and provide a witness" (Ex. 30).  That was a pretext.  Bridgestone asked for this deposition because Acushnet produced new (non-Mesabi) documents in November 2006 and because its earlier witnesses could not explain the QAS data it had produced.  The Court was very clear that, "no revisiting of topics will be permitted," and gave "leave to Acushnet to suspend a deposition if they believe that the testimony sought is outside that agreement" (D.I. 285 at 7).  This was not a deposition for Bridgestone to learn about Mesabi (which, at this point, it still did not know that Acushnet was planning to rely on).

15.

Bridgestone's experts had already served their reports, and the remainder of which was produced

over two months after the Court-ordered document production cutoff (Ex. 23 at 8):



Acushnet continues to maintain that its reliance on the Mesabi data was "proper"

because it "already had produced much of the information that was the source" for the Dalton

Declaration, citing the bates ranges in its response to interrogatory 52 and for exhibit J to

Dalton's Declaration (Ex. 31, 2/28/07 Stasio Ltr). ███████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████ And it does Acushnet no good

to cite to exhibit J to Dalton's declaration, which mostly contains documents that it produced on

16.

February 16, 2007 – long after the September 1, 2006 document production cutoff and after Bridgestone had served its expert reports on infringement (White Decl. at ¶10).

Acushnet has also justified its reliance on Mesabi because it offered Bridgestone the opportunity to inspect it (after fact discovery and after telling Bridgestone that it was cumulative). ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

E.    Other Exhibits To Dalton's Declaration

Exhibits A-D of Dalton's Declaration were not produced to Bridgestone until February 20, 2007. Acushnet cannot argue that the exhibits – which are letters and certificates of analysis concerning chemicals used in the accused balls – are not covered by Bridgestone's numerous document requests for communications about "specifications of raw materials" and "certificates of analysis" (Ex. 32).

Again, Dr. Felker criticizes Bridgestone's experts for not relying on these new documents. For example (Ex. 23 at 35):



(*See also* Ex. 33 for more examples of Dr. Felker criticizing Bridgestone for not relying on documents that it did not have.)[5]

III.    DR. FELKER'S NON-INFRINGEMENT REPORT

On February 20, 2007, Acushnet served a non-infringement report from Dr. Felker concerning Bridgestone's '961, '652, '852, '817, '707, '834 and '791 patents. Not only did Dr. Felker rely on the Dalton Declaration and all its newly-produced documents, but he relied on data that Acushnet never produced from its QAS quality control system to show that some of the accused balls do not infringe the '652 and '852 patents. This data includes comparative testing for which Acushnet had previously objected to producing, in part on grounds of privilege.



And, like the information attached to the Dalton Declaration, Bridgestone had requested data from QAS numerous times.

---

5    There are a few other "miscellaneous" documents that Dr. Felker relied on, but which were never produced: five articles (exhibits 28-31, 45 to his report) in connection with his invalidity report, and exhibits 4 and 5 in his non-infringement report (one is Acushnet intra-company correspondence from 1990 and another is a scale brochure from Mettler). After Acushnet's representation that Dr. Felker searched for and found the public articles while preparing for his non-infringement report, Bridgestone agreed not to challenge Acushnet's use of them (Ex. 6). Bridgestone, however, still challenges Acushnet's use of exhibits 4 and 5.

During and after fact discovery, therefore, Acushnet represented that Bridgestone had all of its QAS data. The data Acushnet gave Bridgestone, however, was not the data Acushnet gave to its expert.

> A.  Acushnet Never Produced Any Of The Data From Exhibit
>     12 To Dr. Felker's Non-infringement Report

Bridgestone alleges that Acushnet's Pro V1 ball infringes claim 1 of U.S. Patent No. 5,252,652, which requires that the ball have "an improved rebound property" because it contains certain rubbers. Dr. Felker relies on exhibit 12 to show that the Japanese versions of the ProV1, ProV1x and NXT do not meet this limitation (Ex. 23 at 24). Exhibit 12 is QAS data that was requested, but never produced (Ex. 34).

Specifically, Acushnet produced some QAS data for the NXT ball through August 2005, but Dr. Felker relied on QAS data for that ball starting in fall 2006 (White Decl. at ¶12-13). Similarly, Acushnet produced some data for the Pro V1 and Pro V1x balls through August 2005, but Dr. Felker relied on data for those balls beginning in January 2006 (*id.*). None of the data he relied on had been produced (*id.*).

Similarly, Acushnet produced no QAS data for the Japanese market NXT, Pro V1 or Pro V1x balls (White Decl. at ¶14-15), but Dr. Felker relied on QAS data for those balls starting in January 2006. It did this after telling Bridgestone during discovery that it was looking for "responsive, non-privileged documents concerning performance testing between the US and Japan versions of the Pro V1 golf balls," but noting that any such documents are subject to Acushnet's objection that producing documents (except for sales-related information) after the

19.

March 7, 2005 filing date "particularly with regard to identifying documents entitled to attorney work product and/or attorney client communication privilege, would be unduly burdensome" (Exs. 29, 35, 25).

      B.      Acushnet Never Produced Most Of The Data Underlying Exhibit 19 To Dr. Felker's Non-infringement Report, And Its Own Employees Did Not Even Understand What The Data Showed

      Dr. Felker's exhibit 19 (Ex. 36) represents ████████████████

████████████████████████████████████████

████████████ Again, although Acushnet said it had produced all of this data, it had not (*see* White Decl. at ¶¶12-13).

      In fact, as described in the briefing on Bridgestone's earlier motion to compel (D.I. 267 at 5-6), ████████████████████████████

████████████ Over Acushnet's objection that it had made QAS available (beginning on December 18, 2006) (D.I. 275 at 6), the Court granted Bridgestone's motion to compel and ordered a deposition that included the QAS data (D.I. 285).



20.



Acushnet's first invitation to Bridgestone to inspect its QAS system came on December 18, 2006, long after the document production and fact discovery cutoff (and after Acushnet decided that it couldn't deliver on its promise to provide a written summary of the QAS data that it had produced). It made a second offer on January 3, 2007 (during a meet-and-confer about Bridgestone's motion to compel), and reiterated it during expert discovery. Acushnet's offers to inspect were inadequate and came far too late. Moreover, although Acushnet represented multiple times during discovery that it had produced all QAS data, its employees could not even explain what Acushnet produced (even in a court-ordered deposition), and it never once cited to the QAS data in its interrogatory responses (White Decl. at ¶16). It cannot make those representations during all of fact discovery and – now that it realizes it wants to use the QAS data – say, "um, ok, Bridgestone, time for you to look at it."

IV.    SOME OF ACUSHNET'S NEWLY-PRODUCED DATA
       WOULD HAVE HELPED BRIDGESTONE

Some of the documents that Acushnet has been producing help Bridgestone prove infringement – but were only produced until after Bridgestone served its opening expert reports.

A.    Bridgestone Could Have Accused Other Balls – With
       Revenues ███████████ – Of Infringement

Bridgestone asserts that, from November 2004 to the present, Acushnet's Pro V1 ball infringes claim 2 of U.S. Patent No. 6,634,961. Claim 2 depends from claim 1, which requires that the core contain a base rubber composed of at least 20% polybutadiene rubber synthesized using a rare earth catalyst, and optionally another diene rubber (for example, CB 23 and Shell BR-1220). Claim 2 requires a blend of these rubbers.

The documents attached to the Dalton Declaration, which were first produced in February 2007, ████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████ Because these balls otherwise meet the limitations of claim 2, Bridgestone could and would have accused the Pro V1 ball beginning in October 2003 (when the '961 patent issued), and could have accused the Pro V1x ball of infringing entirely (*id*. at ¶8). The Pro V1 and Pro V1x balls are Acushnet's two highest-selling balls, with combined U.S. ███████████████████

B.    The New Data Helps Prove Infringement Under
       Bridgestone's Claim Construction

Bridgestone also accuses Acushnet of infringing claims 1, 5 and 9 of U.S. Patent No. 5,252,652. These claims include a limitation that the rubber in the golf balls contains "about 0.05 to about 2 parts by weight" of a sulfur compound. Acushnet uses pentachlorothiophenol ("PCTP"), or zinc salts of PCTP ("ZnPCTP"). Bridgestone's interrogatory 40 asked for information about the use of ZnPCTP in Acushnet's golf balls (Ex. 38).

Before Acushnet produced the data from the Dalton Declaration, the evidence about the amount of ZnPCTP was contained in various manufacturing guidelines, many of which

22.



That even further supports infringement under Bridgestone's construction of "about" (*id*.).[6]



C.     Acushnet's QAS Data Supports Bridgestone's Infringement Contentions

Bridgestone also asserted claims 1, 6 and 7 of U.S. Patent No. 5,553,852. One of the limitations in those claims is that the "intermediate layer [has] a thickness of at least 1 mm." Bridgestone expended significant resources on testing to prove that the accused balls meet this limitation. This testing could have been avoided had Acushnet produced its QAS data.

For example, Dr. Caulfield used digital imaging to show that the accused balls infringe because they have an "intermediate layer" that is at least 1 mm thick.

---

[6]     Both Bridgestone and Acushnet define "about" to mean approximately, but to differing degrees.

23.



     D.     After All This, Bridgestone Doubts That Acushnet Has
           Produced All Relevant Documents

     Bridgestone still does not know whether Acushnet has produced all of the documents that Bridgestone requested. The documents and things identified in this motion – the October 2000 opinion of counsel and core; the dimple data that Acushnet created as part of its routine competitive testing; the alleged prior art Wilson Ultra Competition balls; the 1993 Competitive Ball Log; the certificates of analysis attached to Mr. Dalton's declaration; the Mesabi data; and the QAS data – were all specifically requested by Bridgestone during fact discovery. All of those documents were produced long after fact discovery ended, and many only with Acushnet's expert reports.

     In the recent depositions of Acushnet's "employee experts" that have occurred, Acushnet's witnesses have testified to other documents and data that exist, but have not been produced: ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████

ARGUMENT

I.     LEGAL STANDARDS

    A.     Requested-But-Not-Produced Documents Are Excluded

"Our system of discovery was designed to increase the likelihood that justice will be served in each case, not to promote principles of gamesmanship and deception in which the person who hides the ball most effectively wins the case." *Tdata Inc. v. Aircraft Tech. Publishers*, C.A. Nos. 2:03-264; 2:04-1072, 2007 WL 433295, *1 (S.D. Ohio Feb. 5, 2007) (quoting *Abrahamsen v. Trans-State Exp., Inc.*, 92 F.3d 425, 428-29 (6th Cir. 1996)). Thus, Federal Rule of Civil Procedure 37(c)(1) provides that a party cannot use information that it failed to disclose, unless that party has substantial justification for the nondisclosure or the failure to disclose is harmless. Similarly, Rule 16(f) provides for sanctions for a party's failure to obey a scheduling order. The parties have already briefed the Third Circuit's *Pennypack* factors in connection with an earlier motion: (1) prejudice or surprise to a party against whom the evidence is offered; (2) the ability of the injured party to cure the prejudice; (3) the likelihood of disruption to the trial schedule; (4) bad faith or willfulness involved in not complying with the disclosure rules; and (5) the importance of the evidence to the party offering it (D.I. 288 at 8).

    This Court routinely warns that a party cannot rely on requested documents that it does not produce during discovery. For example, the Court recently explained the consequences of non-production on a motion to compel source code:

> You either give it to them now in response to their motion or you never ever get -- am I being clear -- ever get to use it -- ever for anything. And any prejudice you've incurred by your actions in response to the motion, any prejudice to you is incurred by your own decision making and strategizing in the case.

(Ex. 40, *Prism Techs., LLC v. Verisign*, C.A. No. 05-214, Mar. 2, 2007 Tr. at 13.)

Similarly, the Court demonstrated that it means what it says when it ruled on February 2, 2007 that Acushnet was precluded from using prior art that had not been timely identified (D.I. 285).

### B.     Discovery Sanctions In Addition To Preclusion

Under Rule 37, the Court may award other sanctions "in addition to" preclusion:

> [T]he court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions.  In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include any of the actions authorized under Rule 37(b)(2)(A), (B) and (C)....

*See also* FED. R. CIV. P. 16(f) ("the judge...may make such orders...as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C), (D).").

Rule 37(b)(2)(A) allows a court to "order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order."  Subsection (B) allows a court to "refus[e] to allow the disobedient party to support or oppose designated claims or defenses, or prohibit[] that party from introducing designated matters into evidence." *See Coca-Cola Bottling Co. of Shreveport, Inc. v. The Coca-Cola Company*, 110 F.R.D. 363 (D. Del. 1986) (sanctioning defendant that failed to obey a court order to disclose secret formula for coke by establishing facts, prohibiting defendant from rebutting them and from introducing certain matters into evidence, awarding reasonable fees and expenses to plaintiffs, and giving plaintiffs "the advantage of every possible inference that fairly could be drawn from the formulae evidence sought.").

The 1993 Advisory Committee Notes to Rule 37 explain that additional sanctions are particularly appropriate when the late information supports the opposing party's case:

> Preclusion of evidence is not an effective incentive to compel disclosure of information that, being supportive of the position of the opposing party, might advantageously be concealed by the disclosing party. However, the rule provides the court with a wide range of other sanctions – such as declaring specified facts to be established, preventing contradictory evidence….

Although sanctions must be "just" and must be "specifically related to the particular 'claim' which was at issue in the order to provide discovery," the Court has broad discretion to impose them. *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982).

C.      Spoliation Also Warrants Rule 37 Sanctions

Spoliation is the "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *In re NTL, Inc. Sec. Litigation*, C.A. Nos. 02-3013, -7377, 2007 WL 241344, *13 (S.D.N.Y. Jan. 30, 2007). The Third Circuit considers three factors in analyzing spoliation claims:

> (1) The degree of fault of the party who altered or destroyed the evidence;
>
> (2) The degree of prejudice suffered by the opposing party; and
>
> (3) Whether there is a lesser sanction [compared to the complete exclusion of evidence] that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

*Erie Ins. Exchange v. Applica Consumer Prods., Inc.*, C.A. No. 3:02-1040, 2005 WL 1165562 (M.D. Pa. 2005) (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994)). With respect to the first factor, the Court must examine whether the party "intended to impair the ability of the other side to effectively litigate its case." *Positran Mfg., Inc. v. Diebold, Inc.*, C.A. No. 02-466-GMS, 2003 WL 21104954, *2 (D. Del. May 15, 2003).

Discovery sanctions under Rule 37 can be awarded for spoliation. *In re NTL, Inc. Sec. Litigation*, 2007 WL 241344 at \*13; *Durst v. FedEx Express*, C.A. No. 03-5186, 2006 WL 1541027, \*2 (D.N.J. June 2, 2006).

II.    THIS COURT SHOULD EXCLUDE ALL INFORMATION IN DR. FELKER'S INVALIDITY REPORT THAT WAS NOT TIMELY DISCLOSED

Acushnet knew that it had to ask permission from the Court to supplement its expert reports – it did that already (D.I. 283). It also knew that the Court denied that request (D.I. 288). But Acushnet supplemented anyway.

Even though there is no apparent reason why Acushnet could not have done so earlier, it began testing around February 1 (and then misrepresented to Bridgestone on February 13 that it was "considering" remanufacturing cores). Acushnet then did not produce the supplemental testing until March 7 (the night before Dr. Felker's deposition and long after Bridgestone's rebuttal reports were served). Moreover, putting all that aside – *the supplement states that Acushnet destroyed the cores and the unfavorable test results in the middle of expert discovery – results that go to the heart of Acushnet's invalidity defense to the '707 patent.*

Acushnet was trying to show that cores made according to EP '043 inherently had hardness gradients of between 8 and 20. ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████    *Positran*, 2003 WL 21104954 at \*2 (the

28.

Court must examine whether the party "intended to impair the ability of the other side to effectively litigate its case.").

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████ The destruction of the actual results and cores, therefore, is prejudicial to Bridgestone.

Dr. Felker's invalidity report relies on other evidence that should be excluded too. Acushnet made a choice early on in the litigation not to waive privilege. Bridgestone does not dispute that Acushnet properly claimed privilege for the testing it performed in October 2000 in connection with the opinion of counsel. Having made that choice, however, Acushnet is stuck with it. A party cannot claim privilege during discovery in response to a request and then decide to waive after seeing how things go:

> What I'm looking at is if they have asserted the privilege, they can't use any of that information or anything stemming from that information, because you're going to be vigilant for this now, because they've been successful here.

> *   *   *

> Now, but if there's something real good in that test for them, and they – or something drawn from that test is real good for them, and they come back and try to hammer you with it, they're not getting it in.

(Ex. 41, *Ansell Healthcare Prods., LLC v. Tillotson Corp.*, C.A. No. 06-527 (JJF), Feb. 2, 2007 Tr.). Acushnet, therefore, should be precluded from relying on the October 2000 test results and the opinion of counsel.[7]

---

[7]     Bridgestone believes that, by producing the October 2000 opinion of counsel, Acushnet waived privilege and work product protection. Acushnet disagrees, and Bridgestone also intends to raise this issue with the Court.

Acushnet should also be precluded from relying on the summary of dimple characteristics attached to Dr. Felker's invalidity report and the tests it performed on the Wilson Ultra Competition ball, samples of which Acushnet refused to produce during discovery, and then later tested in violation of the parties' agreement (and without even saying a word to Bridgestone). Finally, Acushnet should be precluded from relying on anything in Dr. Felker's March 2 supplemental report and the 1993 Competitive Log.

\*    \*    \*

If the Court grants the relief requested, it will remove essentially all evidence upon which Acushnet bases its invalidity defense for the '707 patent. This is appropriate, however, in light of the fact that Acushnet ignored a Court order and destroyed unfavorable test results. Anything short of preclusion would reward Acushnet – which was on notice that it was at risk of being precluded – and prejudices Bridgestone. *See Ins. Corp. of Ireland, Ltd.*, 456 U.S. at 709 ("The sanction took as established the facts – contacts with Pennsylvania – that CBG was seeking to establish through discovery. That a particular legal consequence – personal jurisdiction of the court over the defendants – follows from this, does not in any way affect the appropriateness of the sanction.").

Moreover, as a result of the destroyed test results, Acushnet has disproved its own invalidity case. ██████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████ *See AstraZeneca AB v. Mutual Pharm. Co.*, 278 F. Supp. 2d 491, 510 (E.D. Pa. 2003) (excluding evidence and stating that "even if all of Defendant's newest evidence were introduced, Defendant would not be able to show the inherent

30.

presence of a solubizer in the Kawata invention – which is essential to Defendant's theory that Kawata anticipates the 081 patent.").

> III.   THE COURT SHOULD EXCLUDE THE DALTON DECLARATION AND ITS EXHIBITS AND APPLY ANY VERDICT OF INFRINGEMENT TO THE PRO V1 AND PRO V1x BALLS THAT BRIDGESTONE COULD HAVE ACCUSED OF INFRINGEMENT

Acushnet has never disputed that the information attached to Dalton's Declaration is relevant (indeed, it wants to rely on it). Acushnet has never disputed that the data underlying Mr. Dalton's exhibits is created and kept in the ordinary course of business. And it has never disputed that Bridgestone asked for this information during discovery.



*See Liafail, Inc. v. Learning 2000, Inc.*, C.A. No. 01-599-GMS; 01-678-GMS, 2002 WL 31954396 (D. Del. Dec. 23, 2002) (stating that it would be "entirely appropriate" to sanction Liafail "immediately," "based on the conflicting stories Liafail has espoused in an apparent attempt to perform an end-run around both L2K's discovery requests and the current motion.").

Acushnet argues that its reliance on Mesabi was "proper" because it offered the database for inspection. Acushnet's offers, however, came after the document production cutoff and after it told Bridgestone to look at the manufacturing guidelines and change notices, not at Mesabi.

The prejudice to Bridgestone is huge. Had this data been timely produced, Bridgestone would have been able to accuse ███████████████████ additional golf balls of infringement. The Court, therefore, should let the jury resolve the infringement issue, and then, after trial, apply the jury's verdict to the balls that Bridgestone could have accused.

Finally, Dr. Felker criticized Bridgestone's experts for not relying on the same data that he did – even though Bridgestone did not even have it (*see* Ex. 33). Acushnet should be prohibited from criticizing the methodology used by, and conclusions drawn by, Bridgestone's experts on these issues.

IV.     THE COURT SHOULD PRECLUDE ACUSHNET FROM RELYING ON EXHIBITS 12 AND 19 TO DR. FELKER'S NON-INFRINGEMENT REPORT

Like the exhibits to the Dalton Declaration, there is no dispute that information stored on the QAS system is created and kept in the ordinary course of Acushnet's business. And, like the exhibits to the Dalton Declaration, there is no dispute that Bridgestone requested QAS data numerous times. In August and November 2006, Acushnet said it had already produced all QAS data, and would produce it for a particular ball "shortly." After telling Bridgestone that its production was complete, Acushnet then created exhibits for Dr. Felker based on summary QAS data that it never gave Bridgestone.

Acushnet's invitations to inspect QAS, which began on December 18, 2006, came far too late. Acushnet represented numerous times during and after fact discovery that it had

32.

produced all QAS data. ███████████████████████████████████████████ It

cannot now fix everything by giving Bridgestone access to the database.  Acushnet should be

precluded from relying on Exhibits 12 and 19 to Dr. Felker's non-infringement report.

   In addition, Dr. Felker should be precluded from criticizing the sufficiency of the

data obtained by Bridgestone's experts' or the methodology and conclusions they reached

relating to testing of the cover thickness and intermediate layer thickness, when they did not have

the same data that Dr. Felker did.

   V.  THE  COURT  SHOULD  ORDER  A  THIRD  PARTY  TO
      INSPECT ACUSHNET'S FACILITY

    The Court has already explained that:

    If there's no production or if there's a belief that the production is
    inadequate, I'll entertain a search proposal by an independent
    contractor, and it can include interviewing of personnel.

    I'll entertain any idea that you think will expose the failure to
    comply with my order.  If there's one document after that search
    proposal is ordered that's found, I'll entertain a second application
    for serious sanctions.

(D.I. 73, January 13, 2006 Tr. at 11).

   Acushnet  has  produced  large  parts  of  the  evidence  supporting  its  non-

infringement  case  long  after  fact  discovery  closed  and  long  after  the  Court's  document

production cutoff.  Many of the documents it produced help Bridgestone – and yet Acushnet's

expert, Dr. Felker, attempts to discredit Bridgestone's experts for not relying on data that it

didn't have.  Given Acushnet's repeated representations during discovery that it had produced all

responsive documents, when it plainly had not, Bridgestone requests that the Court order "an

independent contractor" to inspect Acushnet's facility (at Acushnet's expense) and ensure that all

responsive documents have been produced.

VI.    BRIDGESTONE SHOULD BE AWARDED ITS ATTORNEYS'
       FEES

Federal Rule of Civil Procedure 37 permits the Court to award "payment of reasonable expenses, including attorney's fees, caused by the failure" to provide discovery. Rule 16(f) requires the Court, if it finds a violation, to award "the reasonable expenses incurred because of any noncompliance with this rule, including attorney's fees," unless noncompliance was substantially justified. Imposing monetary sanctions under Rule 16(f) does not require the Court to find bad faith. *Tracinda Corp. v. DaimlerChrysler AG*, C.A. No. 00-993-JJF, 2005 WL 927187, *2 (D. Del. Apr. 20, 2005). The Court also has inherent discretionary power to award attorneys' fees "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) (internal quotation and citation omitted).

Because of Acushnet's failure to produce responsive, relevant documents after they were properly requested throughout discovery, Bridgestone has written letters, taken depositions, hired a non-testifying expert to review manufacturing guidelines and change notices, filed motions, and hired experts to perform testing. That effort and expense could have been avoided if Acushnet had abided by court orders and the rules of discovery.

Bridgestone, therefore, requests its attorneys' fees in connection with the briefing on this motion. In addition, because of Acushnet's conduct during discovery, Bridgestone incurred direct expenses that could have been avoided, for example, ███████████████ ████████████████████████████████████████████████ ███████████████████ Bridgestone requests that Acushnet reimburse it for those fees and expenses as well. *See also Kamatani v. BenQ*, C.A. No. 2:03-437, 2005 WL 2455825, *15 n.14 (E.D. Tex. 2005) (noting that Court's docket includes 60+ active patent cases and noting

34.

that $500,000 sanction paid to the Court "will hopefully also act as a deterrent to other patent litigants that might consider engaging in similar behavior.").

<u>CONCLUSION</u>

For the foregoing reasons, Bridgestone requests that the Court grant its motion for sanctions.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Leslie A. Polizoti*

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
Leslie A. Polizoti (#4299)
1201 N. Market St.
P.O. Box 1347
Wilmington, DE 19801
(302) 658-9200
*Attorneys for Bridgestone Sports Co., Ltd.
and Bridgestone Golf, Inc.*

OF COUNSEL:

Robert M. Masters
Scott M. Flicker
Terrance J. Wikberg
Brandon M. White
PAUL, HASTINGS, JANOFSKY & WALKER LLP
875 15th St., N.W.
Washington, DC 20005
(202) 551-1700

March 20, 2007

764700

## CERTIFICATE OF SERVICE

I certify that on April 10, 2007, I electronically filed the foregoing with the Clerk

of the Court using CM/ECF, which will send notification of such filing(s) to Richard L. Horwitz.

I further certify that I caused copies to be served upon the following on April 10,

2007 in the manner indicated:

### BY HAND & E-MAIL

Richard L. Horwitz, Esquire
POTTER ANDERSON & CORROON LLP
1313 N. Market Street
Wilmington, DE 19801


### BY E-MAIL and FEDERAL EXPRESS

Joseph P. Lavelle, Esquire
HOWREY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004


_/s/ Leslie A. Polizoti_
Leslie A. Polizoti (#4299)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Wilmington, DE 19801
(302) 658-9200
lpolizoti@mnat.com