IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BRIDGESTONE SPORTS CO., LTD., and BRIDGESTONE GOLF, INC., | |
| Plaintiffs, | C.A. No. 05-132 (JJF) |
| v. | **REDACTED –** **PUBLIC VERSION** |
| ACUSHNET COMPANY, | |
| Defendant. | |

## BRIDGESTONE'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SANCTIONS

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
Leslie A. Polizoti (#4299)
1201 N. Market St.
P.O. Box 1347
Wilmington, DE 19801
(302) 658-9200
  *Attorneys for Bridgestone Sports Co., Ltd.*
  *and Bridgestone Golf, Inc.*

OF COUNSEL:
Robert M. Masters
Scott M. Flicker
Terrance J. Wikberg
Brandon M. White
PAUL, HASTINGS, JANOFSKY & WALKER LLP
875 15th St., N.W.
Washington, DC 20005
(202) 551-1700

Original Filing Date: April 9, 2007

Redacted Filing Date: April 10, 2007

i.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... iii

INTRODUCTION ..................................................................................... 1

ARGUMENT ............................................................................................ 1

I.   ACUSHNET SHOULD BE PRECLUDED FROM RELYING ON
     EVIDENCE NOT DISCLOSED IN A TIMELY MANNER ................................2

     A.   Destruction Of Cores And Unfavorable Test Results And
          The Supplemental Felker Report .......................................................2

          1.   Acushnet Now Tells A New Story..................................................2

          2.   This Was A Supplemental Report....................................................3

          3.   Bridgestone Has Been Prejudiced..................................................5

     B.   Mesabi.....................................................................................................7

          1.   Acushnet Says That Bridgestone Didn't Ask The
               Right Question ...............................................................................7

          2.   Acushnet Says It Offered Mesabi And Provided
               Witnesses .......................................................................................8

          3.   Acushnet Says That It Was Difficult To Get
               Information Out Of Mesabi, And That Bridgestone
               Would Have Ignored It Anyway..................................................10

          4.   Acushnet Still Has Not Produced All Of The
               Information About Its Core Formulations ...................................11

     C.   October 2000 Test Data And Opinion Of Counsel ...................................11

     D.   QAS Data................................................................................................12

     E.   1993 Competitive Ball Log......................................................................14

     F.   The Dimple Exhibit 48............................................................................14

     G.   Exhibits A-D To The Dalton Declaration..................................................15

ii.

    H.      Destructive Testing .................................................................................15

II.     RELIEF SOUGHT IN ADDITION TO PRECLUSION .......................................16

    A.      Apply The Jury's Verdict To Balls That Could Have Been Accused ......................................................................................................16

    B.      Prohibit Acushnet From Criticizing Bridgestone's Testing ......................17

    C.      Attorneys Fees .......................................................................................17

III.    BRIDGESTONE'S DISCLOSURES WERE PROPER .........................................18

CONCLUSION                                 20

iii.

# TABLE OF AUTORITIES

**Page**

Cases

*In re Napier*,
    55 F.3d 610 (Fed. Cir. 1995)         6

*In re Oelrich*,
    666 F.2d 578 (C.C.P.A. 1981)         6

*Paris v. R.P. Scherer Corp.*,
    C.A. No. 02-1044, 2006 WL 2177253 (D.N.J. July 31, 2006)     5

*Praxair, Inc. v. ATMI, Inc.*,
    C.A. No. 03-1158-SLR, Memorandum Op. at 14-15 (D. Del., Nov.
    8, 2003)     4

Statutes

Fed. R. Civ. P. 26(e)(1)     5

Fed. R. Civ. P. 34(a)     13

1.

## INTRODUCTION

On March 20, 2007, Bridgestone moved for sanctions against Acushnet (D.I. 304) and Acushnet moved to preclude Bridgestone (D.I. 294). The parties' opposition briefs are telling: Bridgestone responded that it had complied with its discovery obligations. In contrast, the gist of Acushnet's response is that its failure to comply did not prejudice Bridgestone, saying that Bridgestone's brief is "particularly infirm" in showing prejudice (D.I. 323 at 3).

Bridgestone agrees that "the discovery rules must be applied in an even-handed manner" (D.I. 323 at 4). That is what Bridgestone is asking the Court to do – and the outcome is that Acushnet should be sanctioned for its violations of the Federal Rules and the Court's scheduling order.

## ARGUMENT

There is no question that Acushnet:

- "did not retain" (*i.e.*, destroyed) test results and cores that were unfavorable to it (*see* I.A);

- relied on Mesabi data during expert discovery that it had refused to produce during fact discovery on the basis that it was "cumulative" and too burdensome (*see* I.B);

- relied on test data during expert discovery that it had withheld as privileged during fact discovery (*see* I.C);

- relied on QAS data, not all of which was produced to Bridgestone (and the part that was produced was in an un-useable format) (*see* I.D); and

- relied on documents that were not produced during fact discovery, even though they were requested (the 1993 competitive ball log (*see* I.E), the dimple exhibit (*see* I.F), and most of exhibits A-D to the Dalton Declaration (*see* I.G)).

Preclusion is not an adequate sanction, however, because much of what Acushnet withheld helps Bridgestone – ███████████████████ (a number that Acushnet does not dispute) in additional infringing sales (*see infra*, section II).

2.

I.    ACUSHNET SHOULD BE PRECLUDED FROM RELYING ON
      EVIDENCE NOT DISCLOSED IN A TIMELY MANNER

      A.    Destruction Of Cores And Unfavorable Test Results And
            The Supplemental Felker Report

            1.    Acushnet Now Tells A New Story

Bridgestone has been asking about the circumstances surrounding the destruction

of the February 2007 cores and measurement results since it received the report from Acushnet

over a month ago, on March 7.



Acushnet's brief is the first time that it has provided an explanation for what

happened to the cores and measurement results that it "did not retain."

---

1    Acushnet states that Bridgestone "deposed [Mr. Bulpett,] the author of the additional
     testing data memorandum" (D.I. 323 at 1).  But it was not until the middle of his
     deposition that Bridgestone realized that he was the author.

3.



2.    This Was A Supplemental Report

The scheduling order does not permit supplemental expert reports, and the Court

denied Acushnet's earlier request to supplement Dr. Felker's report because there was

4.

"insufficient time" to do so (D.I. 291 at 5).[2]  Acushnet argues, therefore, that the document

prepared by Mr. Bulpett did not supplement Dr. Felker's report because "what actually occurred

is that Acushnet engineers provided additional test data to Dr. Felker" (D.I. 323 at 1), which

"supports Dr. Felker's *pre-existing un-supplemented* opinion that the '707 patent" is invalid (*id.*)

(emphasis in original).  Acushnet explains that the report "does not add any new art," "nor does

it offer any new opinions" (*id.* at 32).

       That misses the point – Dr. Felker is relying on new data created after the date for

expert reports because he didn't like the old data.  ████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

       Even if Acushnet could supplement, its argument that "under Rule 26, it was

proper for Acushnet to disclose to Bridgestone what Acushnet's recent test results had

demonstrated" (D.I. 323 at 5) is legally unsupported.  Acushnet cannot add new data because its

expert wanted some after submitting his report.  *E.g., Praxair, Inc. v. ATMI, Inc.*, C.A. No. 03-

1158-SLR, Memorandum Op. at 14-15 (D. Del., Nov. 8, 2003) (excluding supplemental expert

report that contained new testing) (Ex. 2); *Paris v. R.P. Scherer Corp.*, C.A. No. 02-1044, 2006

---

[2]     Acushnet says that the Court "simply denied Acushnet's request to supplement Dr.
Felker's opinion with new art that the Court found to be untimely included in Acushnet's
interrogatory answers" (D.I. 323 at 32).  That is incorrect.  Acushnet had already
strategically chosen to have Dr. Felker include this untimely art in his report, even though
it knew Bridgestone was challenging it.  Acushnet wanted to supplement Dr. Felker's
opinion by "combin[ing] the '935 patent [which was timely disclosed] with other art to
assert obviousness" (D.I. 283 at 8).

5.

WL 2177253, *2 (D.N.J. July 31, 2006) (plaintiffs were allowed to supplement their expert report "only under the standard stated in Fed. R. Civ. P. 26(e)(1)," "namely…to the extent that the report contained incomplete or incorrect information, but…not…new data or evidence").[3]



### 3.    Bridgestone Has Been Prejudiced

Bridgestone would rather show the jury Acushnet's cores and test results that did not meet the claim limitation, instead of a piece of paper 

Acushnet agrees that "barring all evidence related to the '707 testing would…only be appropriate if Bridgestone had been deprived of the use of evidence" (D.I. 323 at 36). Bridgestone has been deprived of the use of this evidence – because Acushnet did not "retain" it.

---

[3]    The cases that Acushnet cites do not help it. In *Inline* and *Montgomery*, the supplements were allowed because they included information that was not available to the parties, despite their diligence, until after the expert report deadline. In *Tucker*, the supplement was timely. *Mineba* prohibited the supplement, except parts of it that have nothing to do with new test data (for example, correcting an error in the original report).

6.

Acushnet further argues that it "had no reason to intentionally destroy the batch of cores that produced results favorable to Bridgestone" (*id.* at 36). Although Acushnet admits that "the core gradients of a first batch of cores did not meet what is claimed" (*id.* at 1), it argues that the discarded cores did not harm its case because the other batches "tend[] to show that, without undue experimentation, one skilled in the art can use the EP '043 teachings to create the properties claimed in the '707 patent" (*id.* at 2, 7). That is not what Acushnet has to show.



*E.g., In re Napier,* 55 F.3d 610, 613 (Fed. Cir. 1995) ("The inherent teaching of a prior art reference, a question of fact, arises both in the context of anticipation and obviousness."); *see also In re Oelrich,* 666 F.2d 578, 581 (C.C.P.A. 1981). Because an inherency argument requires that the property is necessarily present, the fact that Acushnet made a batch of cores that did not meet the claim limitation defeats Acushnet's challenge to the '707 patent and helps Bridgestone's case.

Acushnet argues that, if the Court excludes the updated testing, it would suffer "severe" prejudice, and notes that "[t]he Court has already precluded Acushnet from relying on

7.

the Altus Newing Massy golf ball" (D.I. 323 at 34).   That this Court has found that Acushnet

violated the rules before does not mean that Acushnet should get a break now.  To the contrary –

Acushnet supplemented its expert report anyway, after the Court denied its request to do so.

      B.    <u>Mesabi</u>

      Acushnet refused to produce Mesabi data during fact discovery ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ What does Acushnet say about all of this?

      1.    Acushnet Says That Bridgestone Didn't Ask The
               <u>Right Question</u>

      Acushnet argues that the "information provided to Acushnet's experts and the

information from the Mesabi database requested by Bridgestone are materially different"

because Bridgestone requested "all of the core formulations within Mesabi," whereas Dr. Felker

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Bridgestone, however, requested that very information in its first set of discovery requests in

June 2005 and again in a comprehensive interrogatory no. 52 on July 24, 2006 – months before

Dr. Felker did:

        Separately for, each of the Accused Acushnet products, identify,
        explain and describe in detail:

8.

(a) all recipes, in their entirety and in chronological order of use, of each of the Accused Acushnet products;

(b) for each recipe listed in Acushnet's response to paragraph (a.), the dates during which that recipe was used.



## 2.   Acushnet Says It Offered Mesabi And Provided Witnesses

Acushnet identifies three occurrences when it "offered to make [its] Mesabi system available to Bridgestone for inspection" (D.I. 324, Ex. R, Seal Decl., ¶5):

Incredibly, Acushnet says that if Bridgestone had inspected Mesabi, it "could have determined some other method to extract information…just as Acushnet did in assistance to

9.

Dr. Felker for his non-infringement report" (D.I. 323 at 14).  That is surprising, given Acushnet's

statements ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████ An inspection would have been no substitute for

production of this information.   And, if there were some way to extract the information,

Acushnet had the obligation to do so in response to Bridgestone's document requests, not to

argue that Bridgestone "could have determined how to do so" (D.I. 323 at 14).

Acushnet also argues that it "made four witnesses available for five days of

deposition to allow Bridgestone to seek information from the databases" (D.I. 323 at 3, 17).

These were not fact-finding depositions – they all occurred *after* Bridgestone served its

infringement expert report.

Acushnet says that the court-ordered deposition was "related to Mesabi" (D.I. 323

at 10), ignoring footnote 2 of Bridgestone's sanctions brief (D.I. 305), which explained why that

deposition was not an opportunity for Acushnet to sweep in new data that it decided to rely on

during expert discovery.

Acushnet's assertion that the Dalton deposition was "related to Mesabi" is also

surprising, because Mr. Dalton testified that ████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████ Bridgestone had asked to depose Messrs.

10.

Elliott and Gajic because they were two of eleven Acushnet employees identified on its Rule 26(a)(2)(A) expert disclosures – and Acushnet had not provided expert reports for any of them (Bridgestone intends to raise this issue in a motion *in limine*).  By the time Bridgestone took these two depositions, it realized that they were the people who compiled the Mesabi information attached to the Dalton Declaration, and Bridgestone was able to question them about what they did.  The depositions were not, however, a substitute for the fact discovery that Bridgestone had requested during fact discovery.

> 3.  Acushnet Says That It Was Difficult To Get Information Out Of Mesabi, And That Bridgestone Would Have Ignored It Anyway

There are two points to take from Acushnet's lengthy explanation of how to get information out of Mesabi (D.I. 323 at 9-12).



Moreover, when Bridgestone asked for the information, it was told "it's unduly burdensome" and "cumulative."



Acushnet has an entire section on pages 14-17 entitled "Bridgestone would have ignored Mesabi information just like they ignored recipe change notices."  This absurd speculation does not excuse Acushnet's failure to timely disclose information.  In any event,

11.

Bridgestone's experts did not "ignore" recipe change notices,

████████████████████████████████████████████████████████

### 4. Acushnet Still Has Not Produced All Of The Information About Its Core Formulations

████████████████████████████████████████████████████████

Amazingly, Bridgestone still does not have a complete set of recipe changes and Mesabi data. Acushnet explains that "only certain [core formulation] changes are relevant to the determination of infringement in this case," so it "filter[ed] out the relevant changes from the irrelevant ones" (D.I. 323 at 13 n.6). In other words, Acushnet still seeks to use only the Mesabi data it thinks is relevant, without producing the rest.

### C. October 2000 Test Data And Opinion Of Counsel

████████████████████████████████████████████████████████

It was, therefore, completely proper for Acushnet to assert the privilege with respect to that opinion and the testing described in it in response to Bridgestone's discovery request. That is exactly what Acushnet did. What was not proper was for Acushnet to withhold that information as privileged during fact discovery and

12.

then decide to show it to its expert and rely on it during expert discovery – *see Ansell* (D.I. 307,

Vol. 2, Ex. 41).



D.     QAS Data

Acushnet says that it "produced a CD of the QAS data to Bridgestone in August

2005" (D.I. 323 at 21), but explains that

_____

4     Acushnet also argues that it "again" reminded Bridgestone "of its reliance on EP 043 testing" because its interrogatory responses said that "at least one claim of the '707 patent is obvious over any one of…EP '043" (D.I. 323 at 8 n.4).  That confuses contentions with proofs.  That Acushnet contended that EP '043 rendered Bridgestone's '707 patent invalid does not disclose its proof of that contention, *i.e.*, the testing.

13.

████ Production in that form is inadequate under the Federal Rules.  Acushnet had to translate

such data compilations "into reasonably usable form."  Fed. R. Civ. P. 34(a).

Acushnet then argues that its December 18, 2006 and January 3, 2007 post-

discovery offers to make its QAS system available gave "Bridgestone and its expert witnesses

the same access and opportunity to review the database as Acushnet and its witnesses had" (D.I.

323 at 21).  That is incorrect.  Acushnet's employees use QAS on a daily basis and have

unlimited access to it.  Acushnet does not dispute that:

- Even though it told Bridgestone that it had produced "all QAS data," it did not produce – and still has not produced – all of the QAS data that its expert relied on;

████████████████████████████████████████

- Acushnet repeatedly told Bridgestone that it would provide a summary of its QAS data in November and December 2006, but did not.

Acushnet's offers are "too little, too late."

Acushnet argues that "as late as March 2007, Bridgestone sought and was granted

discovery on the data contained within Acushnet's...QAS databases" (D.I. 323 at 30).  Not so.

In January 2007, Bridgestone sought discovery on the QAS data that Acushnet had produced to

that point, but had not been able to explain (D.I. 266).  Given the Court's statements about the

scope of that deposition, it was not intended to allow Acushnet to sweep in data that was not

produced in a usable format, and on which Acushnet decided (after fact discovery) that it wanted

to rely. ████████████████████████████████████████

████████████████████████████████████████

Acushnet tries to justify its untimely production on the basis that Bridgestone did

not properly ask for documents.  Acushnet argues that it did not produce the QAS data for the

14.

accused Japanese-market balls on which its expert relied because



### E.     1993 Competitive Ball Log

Like the other information that Acushnet failed to produce, this is Acushnet "play[ing] that game of dropping it on you in rebuttal" (D.I. 307, Vol. 2, Ex. 40 (*Prism* Tr.) at 6). Acushnet produced the 1993 competitive ball log in the middle of a deposition in expert discovery

Acushnet's reason for not producing this document earlier, in response to Bridgestone's document requests (Ex. 7 (Bridgestone Req. Nos. 38, 39, 41)), was that it was "in a locked drawer that no one had used in years" (D.I. 323 at 26). Even though this drawer was not searched when Bridgestone requested documents for its case, when Acushnet wanted the document for its case, it got it within 24 hours (D.I. 305 at 9). Acushnet cannot "wait and see" what Bridgestone's case is, and then run back and search its files for documents to rebut it.

### F.     The Dimple Exhibit 48

Acushnet did not produce all of the underlying data for dimple Exhibit 48. It says that "many" documents in its production show the dimple percentages (D.I. 323 at 28), but has not produced all of the underlying data to this day.

Acushnet identifies six balls and their corresponding bates ranges that "frequently embody the same data that was summarized in Exhibit 48" (*id*. at 27). Acushnet can use data that was properly produced during discovery, and Bridgestone does not challenge Acushnet's use of dimple occupancy for the six balls identified in its brief (but does challenge the use of the rest of the balls listed on Exhibit 48). Acushnet should, however, remove the "Altus Newing" ball from that chart in its brief – the bates range identified indicates that that is a reference to the Altus Newing Massy ball that the Court precluded Acushnet from using.

      G.      <u>Exhibits A-D To The Dalton Declaration</u>

In its brief, Acushnet finally identified where in its production it provided two pages of Exhibit B to the Dalton Declaration. (Bridgestone had asked Acushnet to identify this information on February 23, but it didn't provide those pages (D.I. 307, Ex. 31)). Bridgestone does not challenge Acushnet's use of these two pages. Although the rest of the documents in Exhibits B-D were not produced, Acushnet says that they "disclose the same information" as documents that were produced (D.I. 323 at 20). If so, then Acushnet should use the documents that were timely produced. It can hardly claim prejudice from that.

Acushnet argues that Exhibit A was "obtained in rebuttal to arguments made for the first time in Bridgestone's expert reports" and was not in Acushnet's files (D.I. 323 at 19). Just like with the 1993 competitive ball log, this is factual information about Acushnet's product that Bridgestone requested during discovery (*e.g.*, Ex. 8, Req. No. 122). Acushnet cannot wait to see what Bridgestone did during expert discovery, and then go out and find the factual evidence to rebut Bridgestone's assertions.

      H.      <u>Destructive Testing</u>

Acushnet argues that the agreement not to perform destructive testing depended on whether the parties would jointly test the prior art golf balls, so the agreement "became moot"

after the Court refused to compel joint testing (D.I. 323 at 24, 25). That is incorrect. According to Acushnet, the reason for the agreement was because the parties' testing could "exhaust or even outstrip the number of available balls" (D.I. 324 at Ex. KK). The Court did not order joint testing – the way that Acushnet proposed to solve this issue – but the parties never reached agreement on what to do. Bridgestone's request no. 125 for samples was still pending. Acushnet was not free to ignore its commitment.

II.     RELIEF SOUGHT IN ADDITION TO PRECLUSION

    A.     Apply The Jury's Verdict To Balls That Could Have Been Accused

Some of the Mesabi data that Acushnet produced with its rebuttal expert report would have allowed Bridgestone to accuse the Pro V1 ball of infringing beginning in October 2003, and to accuse the Pro V1x ball of infringing entirely (D.I. 305 at 21). Bridgestone, therefore, requested that the Court apply any jury verdict of infringement to those balls. Acushnet does not contest this relief for the Pro V1x, so it should be awarded.

Acushnet argues with respect to the Pro V1 ball that "Bridgestone has long since known that the earlier ProV1 ball used a blend of rubbers" (D.I. 323 at 18). That is incorrect. For the reasons set forth in the Declaration of John Shin, Bridgestone could not determine infringement during the relevant time period of October 21, 2003 through December 2004 from

[REDACTED]

**B.**     Prohibit Acushnet From Criticizing Bridgestone's Testing

Bridgestone noted that Acushnet criticized Bridgestone's experts for relying on the same documents that Acushnet had cited in its representations to the Court during *Markman* briefing (*see* D.I. 305 at 22). [REDACTED]

[REDACTED]

Acushnet does not even address the fact that its expert improperly criticized Bridgestone's experts for relying on documents that Acushnet had not produced before their reports. Bridgestone, therefore, asks that the Court preclude Acushnet's experts from criticizing Bridgestone's experts for not relying on data they did not have (*see* Ex. 9, Proposed Order).

**C.**     Attorneys Fees

Acushnet does not challenge Bridgestone's request for attorneys fees pursuant to Rules 16(f) and 37 and the Court's inherent powers (D.I. 305 at 33). Bridgestone also requested certain costs incurred by its expert Dr. Caulfield, who conducted testing relating to the cover and intermediate cover thicknesses. [REDACTED]

[REDACTED]

███████████████████████████████████████████████████

### III.   BRIDGESTONE'S DISCLOSURES WERE PROPER

Acushnet argues that Bridgestone "never disclosed the factual basis for its infringement contentions during fact discovery" (D.I. 323 at 3) and that, "[i]f Bridgestone intends to pursue its motion, it must acknowledge that all of the factual data it provided for the first time after that date, including all of the factual bases for its claims of infringement in this case, should be excluded from evidence as well" (*id.* at 4). That is incorrect, as set forth in Bridgestone's opposition to Acushnet's motion to preclude (D.I. 321).

Acushnet also alleges that Bridgestone produced ██████████████████ ██████ after September 1, 2006 (D.I. 323 at 3, 4). Most of that is Bridgestone's experts' test data, which Bridgestone disclosed in January 2007 with its expert reports because that is when it was due. With the exception of those test results, additional financial documents (which both parties agreed to update), certified English translations of documents already produced, and two single pages, the rest was produced in October 2006 (April 9, 2007 White Decl.).

Bridgestone produced some documents in October 2006 because Acushnet asked for them then, usually after depositions. It would be difficult for Acushnet to dispute that Bridgestone's production was complete on September 1, 2006 – because Bridgestone had asked Acushnet to "identify any issues that you believe to be outstanding" before the September 1 document production cutoff, and noted that, "with the exception of your August 28, 2006 letter discussed below, we have heard nothing from you on any alleged deficiencies in Bridgestone's document production" (Ex. 10, 9/1/06 White Ltr). That August 28 letter requested documents that were identified during two depositions the week before, and concluded with Acushnet telling Bridgestone that: "We understand that since the September 1, 2006 [document production]

19.

deadline is coming up in a matter of a few days, you may need some additional time to address the issues raised in this letter" (Ex. 11, 8/28/06 Seal Ltr).

Acushnet's later letters requesting documents begin with "we have just determined that Bridgestone's document production appears deficient" with respect to certain documents (*e.g.*, Ex. 12, 9/5/06 Seal Ltr; 9/8/06 Dubiansky Ltr). Bridgestone produced the requested documents, and noted that:

> Despite our repeated requests that Acushnet identify any deficiencies it believed to exist in Bridgestone's document production, the first allegation of a deficiency with respect to the issues cited in these letters comes...more than a year after the production that is now alleged to be deficient.

More importantly, the non-financial and non-expert test result documents that Acushnet identifies – which include two publicly-available file histories and a handful of pages from the litigation between Bridgestone and Acushnet in Japan – are not documents that the parties are primarily relying on (if at all). Acushnet, in contrast, produced in February 2007 documents that Bridgestone requested repeatedly during fact discovery that Acushnet did not produce, but that it now relies on.[5]

Acushnet also says that Bridgestone produced "previously-withheld data [that] shows that the accused Acushnet golf balls *do not infringe* the '834 patent" in March 2007.

_____

[5]    In its January 2007 motion, Acushnet said that "fact discovery officially closed on October 10, 2006, but the parties agreed to extend the supplementation date" until December 18, 2006 (D.I. 262 at 5 n.6). Similarly, Acushnet referred in its March 2007 motion to the "October 10, 2006 close of fact discovery" (D.I. 311 at 3). Now, Acushnet says that the parties agreed to extend the fact discovery until December 18, 2006 (D.I. 323 at 9-10, n.5, 23). That is not correct. Fact discovery closed on October 10, 2006.

20.

When Bridgestone discovered in preparation for its expert's deposition that it had not produced 26 pages of limited test data (on which it's not relying – and which do not show that the accused products do not infringe), it produced them immediately.

Finally, Acushnet's statement that it "only recently learned from Dr. Caulfield that he captured video from a number of tests [that he performed for this litigation in connection with his expert report], which video still has not been disclosed to Acushnet" (D.I. 323 at 4) is surprising in light of the parties' discussion about that video during a March 30, 2007 deposition.



## CONCLUSION

Bridgestone requests that the Court grant its Motion for Sanctions, enter the proposed order attached hereto, and grant any other relief that the Court finds just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:
Robert M. Masters
Scott M. Flicker
Terrance J. Wikberg
Brandon M. White
PAUL, HASTINGS, JANOFSKY &
WALKER LLP
875 15th St., N.W.
Washington, DC 20005
(202) 551-1700

April 9, 2007

/s/ Leslie A. Polizoti
_____
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
Leslie A. Polizoti (#4299)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200
*Attorneys for Bridgestone Sports Co., Ltd.
and Bridgestone Golf, Inc.*

## CERTIFICATE OF SERVICE

I certify that on April 9, 2007, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to Richard L. Horwitz.

I further certify that I caused copies to be served upon the following on April 9, 2007 in the manner indicated:

### BY HAND & E-MAIL

Richard L. Horwitz, Esquire
POTTER ANDERSON & CORROON LLP
1313 N. Market Street
Wilmington, DE  19801


### BY E-MAIL and FEDERAL EXPRESS

Joseph P. Lavelle, Esquire
HOWREY LLP
1299 Pennsylvania Avenue, NW
Washington, DC  20004


*/s/  Leslie A. Polizoti*
Leslie A. Polizoti (#4299)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Wilmington, DE  19801
(302) 658-9200
lpolizoti@mnat.com

# EXHIBIT 1

REDACTED

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PRAXAIR, INC. and PRAXAIR TECHNOLOGY, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. No. 03-1158-SLR |
| ATMI, INC. and ADVANCED TECHNOLOGY MATERIALS, INC., | ) ) ) | |
| Defendants. | ) | |

Jack B. Blumenfeld, Esquire of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Herbert F. Schwartz, Esquire, Christopher J. Harnett, Esquire and Steven Pope, Esquire of Ropes & Gray LLP, New York, New York, Steven T. Trinker, Esquire of Praxair, Inc., Danbury, Connecticut.

Frederick L. Cottrell, III, Esquire and Alyssa M. Schwartz, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware. Counsel for Defendant. Of Counsel: Nicholas L. Coch, Esquire, Theodore J. Mlynar, Esquire and Keith A. Walter, Esquire of Kramer Levin Naftalis & Frankel, LLP, New York, New York.

**MEMORANDUM OPINION**

Dated: November 8 , 2003
Wilmington, Delaware

ROBINSON, Chief Judge

## I.    INTRODUCTION

On December 22, 2003, Praxair, Inc. and Praxair
Technologies, Inc. (collectively called "plaintiffs") filed this
action against ATMI, Inc. and Advanced Technology Materials, Inc.
(collectively called "defendants") for infringement of certain
claims of United States Patent Nos. 6,045,115 ("the '115
patent"), 6,007,609 ("the '609 patent") and 5,937,895 ("the '895
patent").  (D.I. 1)

Currently before the court are the parties' numerous motions
for summary judgment regarding infringement, invalidity and
discovery.  (D.I. 98, 123, 130, 134, 136, 138, 162, 201)

## II.    BACKGROUND

Many manufacturing processes involve the use of corrosive,
pyrophoric, highly toxic or otherwise dangerous gases, such as
trifluoride, silane, arsine or phosphine.  (D.I. 131 at 7)
Gases, including highly hazardous materials, have traditionally
been supplied in standard high-pressure cylinders or pressurized
tanks.  (D.I. 139 at 5)  High pressure gas distribution systems
used for delivering hazardous specialty gases in industrial
operations present a potential for toxic release of gas into
working areas and the environment.  (D.I. 139 at 3)

### A.    The Patents in Suit

The patents in suit disclose embodiments of an apparatus,
which safely controls the discharge of pressurized fluids from

the outlet of pressurized tanks.  (D.I. 131 at 7)  The inventions
disclosed by the patents help control the handling, storage and
delivery of toxic fluids and constrain the flow of gas during
normal operating, as well as during any kind of valve mishandling
or downstream failure.  Id. at 8

The '895 patent is titled "Fail-Safe Delivery Valve for
Pressurized Tanks."  Id.  The '895 patent discloses a delivery
valve that limits the release of toxic fluid delivered through
the outlet of the tank.  Id.  The valve prevents accidental
release of dangerous gases from a pressurized tank by maintaining
a seal until a prescribed pressure engages the valve and opens
the tank.  Id.  The patent claims: a port body for communication
with the outlet of the pressurized tank; a valve element in or
upstream of the port body and adapted for movement between a
sealing position that blocks fluid flow and an open position that
permits fluid flow; and a diaphragm engaged with the valve
element to control the movement of the valve element so that the
valve element retains the sealing position until a pressure
differential between the interior of the diaphragm and the
interior of the port body moves the valve element to the open
position.  (D.I. 131 at 9)

The '115 patent is titled "Fail-Safe Delivery Arrangement
For Pressurized Containers."  (D.I. 131 at 9)  The '115 patent
teaches inventions that may be used in combination with or

2

separately from the inventions of the '895 patent. (D.I. 131 at 10) The '115 patent teaches the use of a flow restrictor inside the pressurized container that minimizes the discharge of gas flow from the container. (D.I. 131 at 10)

The '609 patent is titled "Pressurized Container With Restrictor Tube Having Multiple Capillary Passages." (D.I. 131 at 11) Like the '115 patent, the '609 patent teaches inventions that can be used in combination with or separate from the invention of the '895 patent. The '609 patent teaches a flow restrictor in the form of multiple capillary passages, which minimize the discharge of toxic gas from the pressurized tank. (D.I. 131 at 11)

The claims asserted are: claims 3, 4, 5, 7 and 8 of the '895 patent; claims 1, 2, 6, 7 and 8 of the '609 patent; and claims 18 and 20 of the '115 patent.

B.    The Accused Products

In 1997, ATMI developed a gas cylinder product named VAC (Vacuum-Actuated Cylinder). (D.I. 139 at 6) VAC is designed to reduce the risks associated with using high-pressure toxic gases by pre-regulating the pressure at which gas leaves the cylinder with either one or two pressure regulators inside the cylinder. (D.I. 139 at 6) The VAC technology incorporates a pressure regulator in the cylinder before the valve assembly. Id. The VAC pressure regulator controls pressure using an internal

3

pressure-sensing assembly ("PSA").  (D.I. 139 at 12)  The PSA is
calibrated by filling an internal bellows with a helium/argon
mixture to a preset pressure and sealing it.  When a pressure
below the PSA set point is applied downstream of the pressure
regulator, the bellows in the PSA expands, opening the valve and
allowing gas to flow through the regulator.  (D.I. 139 at 12)
The VAC products also incorporate two or three sintered[1] metal
filters manufactured by Mott Corporation.  (D.I. 139 at 10)

III. STANDARD OF REVIEW

        A court shall grant summary judgment only if "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(c).  The moving party bears the burden of proving that no
genuine issue of material fact exists.  See Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986).
"Facts that could alter the outcome are 'material,' and disputes
are 'genuine' if evidence exists from which a rational person
could conclude that the position of the person with the burden of

---

        [1]The term "sintering" refers to a high temperature solid-
state diffusion bonding process in which metal powder is heated
to a temperature just below the melting point of metal.  The
metal bonds to create a porous media having a random internal
structure that can be seen in a Scanning Electron Microscope
("SEM") image.  (D.I. 139 at 11)

proof on the disputed issue is correct." Horowitz v. Fed. Kemper

Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal

citations omitted). If the moving party has demonstrated an

absence of material fact, the nonmoving party then "must come

forward with 'specific facts showing that there is a genuine

issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R.

Civ. P. 56(e)). The court will "view the underlying facts and

all reasonable inferences therefrom in the light most favorable

to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63

F.3d 231, 236 (3d Cir. 1995). The mere existence of some

evidence in support of the nonmoving party, however, will not be

sufficient for denial of a motion for summary judgment; there

must be enough evidence to enable a jury reasonably to find for

the nonmoving party on that issue. See Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 249 (1986).

IV.  DISCUSSION

   A.  Indefiniteness

   A patent specification shall conclude with one or more

claims that "particularly [point] out and distinctly [claim]

subject matter which the applicant regards as his invention." 35

U.S.C. § 112, P 2 (2003). The Federal Circuit has explained that

a claim satisfies section 112 paragraph 2 if one skilled in the

art would understand the bounds of the claim when read in light

of the specification. See Miles Labs., Inc. v. Shandon, Inc.,

5

997 F.2d 870, 875 (Fed. Cir. 1993). In determining whether this standard is met, the Federal Circuit has advised that a claim is not indefinite merely because it poses a difficult issue of claim construction. Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1376 (Fed. Cir. 2001). Rather, the Federal Circuit has held a claim sufficiently clear to avoid invalidity on indefiniteness grounds "[i]f the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree." Id. "A determination of claim indefiniteness is a legal conclusion that is drawn from the Court's performance of its duty as the construer of patent claims." Personalized Media Communications, LLC v. Int'l Trade Comm'n, 161 F.3d 696, 705 (Fed. Cir. 1998). The Federal Circuit noted that "[b]y finding claims indefinite only if reasonable efforts at claim construction prove futile, [the court] accord[s] respect to the statutory presumption of patent validity, ... and [the court] protect[s] the inventive contribution of patentees, even when the drafting of their patents has been less than ideal." Id. Claims are indefinite "if reasonable efforts at claim construction prove futile," that is, if a claim "is insolubly ambiguous, and no narrowing construction can properly be adopted." Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001).

6

1.    **Flow Restrictors**

Claims 1, 2 and 6-8 of the '895 patent and claims 18 and 20 of the '115 patent contain a flow restriction element.[2] As properly construed, a restrictor is a structure that serves to restrict the rate of flow of pressurized gas. Defendants' attempts to incorporate "severely limit" into the construction was rejected and, therefore, the claim is not indefinite as not defining "severely limit." Defendants' motion to hold the flow restriction limitations invalid as indefinite is denied.

2.    **Port Body**

The court finds claim 1 of the '895 patent invalid as indefinite. The term "port body," used in claim 1, is not described, labeled, or coherently discussed in the patent. The meaning of the term "port body" is not discernable from the patent specification.

Plaintiffs argue that the port body is the area labeled in Figure 2 as the "valve body." '895 patent, Fig. 2: 50. The court cannot rationalize this construction for several reasons. As a starting point, the functional descriptions of "port body" found in the "Summary of the Invention" and the claims[3] are not

---

[2]Claims 1, 2 and 6-8 of the '609 patent require "a conduit with a restricted flow path." Claims 18 and 20 of the '895 patent require "a restrictor in the form of a restricted flow path."

[3]"The valve assembly includes a port body adapted for sealing engagement with the cylinder opening. A fluid inlet port

at all related to the written description of the preferred
embodiments as illustrated in the figures.[4]  For example, claim 1
states that the "valve element" can be in or upstream of the
"port body."  The detailed description sets forth a cylinder head
valve, a valve outlet, a valve inlet, "a valve element in the
form of a poppet" called a poppet valve, a valve seat, a valve
seal, a valve inlet port, a valve body, a valve stem, a valve
plunger, and a valve outlet.  The court cannot determine what the
"port body" is by looking at its relationship with the "valve
element," because the term "valve element" is itself unclear.
The "Summary of the Invention" states that the "port body"
defines a "fluid inlet port" and a "fluid outlet port."  The
detailed description shows a "valve inlet," a "valve outlet," a
"valve inlet port" and an "outlet port."  Plaintiffs'
construction of port body demands that "fluid inlet port" and
"fluid outlet port" are synonymous with "valve inlet" and "valve
outlet."  Unfortunately, the court has no basis on which to reach

---

is defined by the port body and communicates with the cylinder
opening.  A fluid outlet port is defined by the port body and
located outside the cylinder."  '895 patent, col. 4, ll. 48-54.
"[A] port body for communication with the outlet of a pressurized
tank defining a fluid discharge path."  '895 patent, col. 8, ll.
30-31 (claim 1)  "[A] diaphragm defining an interior volume . . .
engaged with the valve element . . . [by] a pressure differential
between the interior volume of the diaphragm and the interior of
the port body . . .."  '895 patent, col. 8, ll. 37-43.

[4]No mention of a port body in the "Detailed Description of
the Preferred Embodiments" or the Figures.

8

that same conclusion.

Furthermore, no ordinary meaning for the term "port body" exists. Neither party has set forth a meaning for this term, whether ordinary or as a term of art. Finally, the Detailed Description of the Preferred Embodiments sets forth multiple structures with similar names (notably, none of the names exactly match the claim language). The "port body" is related to a diaphragm by supplying a pressure differential, as set forth in claim 1. However, two different diaphragms exist in the detailed description, making it impossible to determine how the "port body" is related to "the diaphragm." In addition, as stated above, several inlets and outlets are disclosed in the detailed description, making it difficult to ascertain which are referred to in the claims that define "port body."

The court declines to speculate as to what was intended by the patentee. Novo Indus., L.P. v. Micro Molds Corp., 350 F.3d 1348, 1358 (Fed. Cir. 2003). The court is forced to conclude that the term is indefinite and the claim invalid. All the asserted claims of the '895 patent are invalid as indefinite because they depend on claim 1.[5]

---

[5]Defendants also argue that the term "packing" as used in claim 4 of the '895 patent is indefinite. Because the court has already concluded claim 4 is invalid, the issue is moot. However, the court believes packing is definite and construed to mean "material packed in the conduit," because it is so described in column 4, lines 1-4, column 6, lines 56-65, and in claim 4 of the '895 patent.

B.    **Infringement**

A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States . . . during the term of the patent." 35 U.S.C. § 271(a). A court should employ a two-step analysis in making an infringement determination. Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995). First, the court must construe the asserted claims to ascertain their meaning and scope. Id. Construction of the claims is a question of law subject to de novo review. See Cybor Corp. v. FAS Techs., 138 F.3d 1448, 1454 (Fed. Cir. 1998). The trier of fact must then compare the properly construed claims with the accused infringing product. Markman, 52 F.3d at 976. This second step is a question of fact. See Bai v. L & L Wings, Inc., 160 F.3d 1350, 1353 (Fed. Cir. 1998). Literal infringement occurs where each limitation of at least one claim of the patent is found exactly in the alleged infringer's product. Panduit Corp. v. Dennison Mfg. Co., 836 F.2d 1329, 1330 n.1 (Fed. Cir. 1987). An accused product that does not literally infringe a claim may still infringe under the doctrine of equivalents if each limitation of the claim is met in the accused product either literally or equivalently. See Sextant Avionique, S.A. v. Analog Devices, Inc., 172 F.3d 817, 826 (Fed. Cir. 1999). Occasionally, "the issue of literal infringement may be resolved with the step of

10

claim construction, for upon correct claim construction, it may

be apparent whether the accused device is within the claims."

Multiform Desiccants, Inc. v. Medzam, 133 F.3d 1473, 1476 (Fed.

Cir. 1998). The patent owner has the burden of proving

infringement and must meet its burden by a preponderance of the

evidence. SmithKline Diagnostics, Inc. v. Helena Lab. Corp., 859

F.2d 878, 889 (Fed. Cir. 1988) (citations omitted).

Defendants' motion for summary judgment of non-infringement

is denied. The court finds that a genuine issue of material fact

exists in determining whether a filter is a flow restrictor. The

court construed the flow restrictor term in claims 1, 2 and 6-8

of the '609 patent and claims 18 and 20 of the '115 patent to

mean: A structure that serves to restrict the rate of flow of

gas. The patent states that "filter materials" may serve as a

restrictor. ('115 patent, col. 3, ll. 24-28) Both plaintiffs

and defendants have expert witnesses to address whether a filter

restricts the rate of flow of gas. The issue of whether the

accused product has an element that serves to restrict the flow

of gas is a question of fact for the jury.

Defendants' remaining theories of non-infringement are

likewise rejected as a direct result of the claim construction.

The claims were not construed according to defendants'

construction requiring a "severely restrict" limitation. The

claims were not construed to differentiate between the size of

tanks and cylinders.  The capillary tubes were not construed to
require uniform bores.  Finally, defendants do not present
conclusive evidence that the accused product does not contain
tubes, as required by claim 20 of the '115 patent.  Defendants'
motion for summary judgment of non-infringement is denied.[6]

C.    Dr. Glew's Expert Testimony

Two issues have resulted from the expert reports of Dr.
Glew.  First, plaintiffs have moved to strike invalidity defenses
in Dr. Glew's May 2, 2005 expert report.[7]  Plaintiffs assert that
Dr. Glew's report relies heavily on prior art references that
were disclosed after the close of discovery and in violation of
the court's scheduling order.[8]

The second issue stemming from Dr. Glew's expert report is
plaintiffs' motion to strike the July 19, 2005 supplemental
expert report of Dr. Glew.  Expert discovery was closed on June
29, 2005.  Several depositions were taken, by agreement of both
parties, in July.  Dr. Glew's supplemental report was filed on
July 19, 2005, close to a month after discovery was closed.

---

[6]Plaintiffs' motion for summary judgment for infringement of
claims 7 and 8 of the '895 patent is denied because the asserted
claims of the '895 patent are invalid as indefinite and cannot be
construed.

[7]The court denies defendants' motion for leave to file a
sur-reply to plaintiffs' motion to strike defenses and expert
analysis.

[8]The court issued an amended scheduling order on March 28,
2005 closing fact discovery on April 15, 2005.

12

The court recognizes that the exclusion of otherwise admissible testimony because of a party's failure to meet a timing requirement is a harsh measure and should be avoided where possible. <u>Central Maine Power Co. v. Foster Wheeler Corp.</u>, 115 F.R.D. 295, 297 (D. Me. 1987). "However, sometimes, such exclusion is necessary; fidelity to the constraints of Scheduling Orders and deadlines is critical to the Court's case management responsibilities." <u>Finch v. Hercules, Inc.</u>, 1995 WL 785100 at *9 (D. Del. 1995). The "flouting of discovery deadlines causes substantial harm to the judicial system." <u>Id.</u> (internal citations omitted). As a sanction for failure to comply with the scheduling order in this case, the court is authorized to exclude evidence proffered by the disobedient party. <u>United States v. 68.94 Acres of Land</u>, 918 F.2d 389, 396 (3d Cir. 1990).

When considering whether to exclude testimony, courts generally look to the following: "[T]he ability of the party to have discovered the witnesses earlier, validity of the excuse offered by the party, willfulness of the party's failure to comply with the court's order, the party's intent to mislead or confuse his adversary, and the importance of the excluded testimony." <u>Stewart v. Walbridge, Aldinger Co.</u>, 162 F.R.D. 29, 31 (D. Del. 1995) (citing <u>Meyers v. Pennypack Woods Home Ownership Ass'n</u>, 559 F.2d 894, 904 (3d Cir. 1977), overruled on other grounds, <u>Goodman v. Lukens Steel</u>, 777 F.2d 113 (3d Cir.

13

1985), aff'd, 482 U.S. 656 (1987)).  Based on these
considerations, the court must weigh:  (1) the prejudice or
surprise to the party against whom the excluded witnesses would
have testified; (2) the party's ability to cure the prejudice;
(3) the extent to which calling an undisclosed witness would
disrupt the trial process; and (4) bad faith or wilfulness in
failing to comply with the court's order.  Meyers, 559 F.2d at
904-05.

     The scheduling order at bar did not allow for supplemental
reports.  Dr. Glew's supplemental report contained new testing,
conclusions and theories of invalidity not contained in his
original report.  The report was filed ten days before the
summary judgment motions were due, so plaintiffs had no
opportunity to conduct rebuttal discovery for the summary
judgment motions.  While the prejudice may be cured by allowing
plaintiffs additional expert discovery, this would undoubtedly
disrupt the trial process, as trial is set to begin in less than
a month.  Defendants blame the allegedly contradicting opinions
of plaintiffs' experts, but this contradiction should have been
evident months ago when the expert reports were filed.  Finally,
defendants argue that plaintiffs should have been able to
question Dr. Glew on the supplemental report during the
deposition.  It is not plaintiffs' responsibility to study and
analyze an expert report overnight to save defendants' discovery

14

flaw.  No substantial justification for the delay exists,
therefore, the expert evidence contained in Dr. Glew's
supplemental expert report is excluded.

The second issue regarding discovery is the disclosure of
prior art references during the fact discovery extension between
the dates of March 21, 2005 and April 15, 2005.  Defendants
disclosed several new prior art references in this time period[9]
and new invalidity defenses in Dr. Glew's expert report were
based on these references.  The court grants plaintiffs' motion
to strike defendants' invalidity defenses based on these prior
art references.  The motion granted by the court extending
discovery was to bring closure to open discovery issues, not to
open new discovery issues.  Therefore, prior art identified after
March 21, 2005 is not admissible absent good cause.  No good

---

[9]The references disclosed after this date are United States
Patent Nos. 2,666,297 (the "Skousgaard patent"), 3,245,583 ("the
Miller patent"), 3,897,968 ("the Allen patent"), 6,007,609 ("the
Semerdjian patent"), 5,381,998 ("the Griffin patent"), 4,697,611
("the Winland patent"), 4,275,752 ("the Collier patent"),
3,838,598 ("the Tompkins patent"), 5,080,131 ("the Ono patent"),
5,007,548 ("the Corley patent"), "How Many Wires Can Be Packed
Into A Circular Conduit" by Jacques Dutka, the Semiconductor
Equipment and Materials Institute, Inc. Guideline titled "Safety
Guidelines For Flow Limiting Devices," and 49 C.F.R.  Arguing
that the plaintiffs were aware of the prior art references is not
sufficient to put the plaintiffs on notice that defendants are
relying on the references in their invalidity defenses.
Therefore, these prior art references, and any invalidity
defenses that rely on them, are stricken.

cause is shown here.[10]  Furthermore, the portions of Dr. Glew's
expert report that refer to these references are stricken.

**D.    Invalidity**

An issued patent is presumed valid.  See 35 U.S.C. § 282.
To overcome this presumption, the party challenging validity
bears the burden of proving by clear and convincing evidence that
the invention fails to meet the requirements of patentability.
See Hewlett-Packard Co. v. Bausch & Lomb, Inc., 909 F.2d 1464,
1467 (Fed. Cir. 1990).  Clear and convincing evidence is evidence
that "could place in the ultimate fact finder an abiding
conviction that the truth of [the] factual contentions are
'highly probable.'"  Colorado v. New Mexico, 467 U.S. 310, 316
(1984).  The court denies defendants' motion for summary judgment
on invalidity.

Defendants' motion for summary judgment relies heavily on
Dr. Glew's expert report and supplemental expert report.  As a
result of the court granting plaintiffs' motion to strike the
belated prior art references and portions of Dr. Glew's expert
report that rely thereon, and granting the plaintiffs' motion
that the supplemental expert report of Dr. Glew is excluded, the
court concludes there are genuine issue of material fact as to

---

[10]The court rejects defendants' argument that the new prior
art was a result of plaintiffs' altered claim construction.  The
claim construction amendment did not substantially or materially
change the plaintiffs' theory on claim construction.

16

invalidity due to anticipation and obviousness.

### E.    Declarations of Philip Chen and Christopher Jones

Defendants attached, for the first time, the declarations of Philip Chen and Christopher Jones to their reply brief in support for their motion for summary judgment of invalidity. Neither of the declarants were on the defendants' witness list. Instead, defendants argue that these declarants are rebuttal witnesses. The court concludes this evidence is not in rebuttal of any facts plaintiffs presented. The evidence is applicable to defendants' burden of proving invalidity. Presenting this evidence at such a late date in the proceedings is a violation of D. Del. LR 7.1.3 and is excluded under Fed. R. Civ. P. 16(f).[11]

### V.    CONCLUSION

For the reasons discussed above, plaintiffs' motion to strike the late invalidity defenses and portions of Dr. Glew's expert report is granted, defendants' motion to file a sur-reply is denied, plaintiffs' motion for summary judgment of infringement is denied, defendants' motion for summary judgment of invalidity is denied, defendants' motion for summary judgment of indefiniteness is denied in part and granted in part,

---

[11]In addition, the <u>Pennypack</u> factors militate in favor of striking the Chen and Jones declarations. Plaintiffs would be prejudiced by the new evidence. Fact and expert discovery are both closed. Trial is less than a month away. There is no time to cure the prejudice. Allowing new discovery on these witnesses will undoubtably disrupt the trial of this case.

defendants' motion for summary judgment of non-infringement is denied, plaintiffs' motion to strike the supplemental expert report of Dr. Glew is granted, and plaintiffs' motion to strike the declarations of Philip Chen and Christopher Jones is granted. An order consistent with this memorandum opinion shall issue.

# EXHIBIT 3

REDACTED

# EXHIBIT 4

REDACTED

# EXHIBIT 5

REDACTED

# EXHIBIT 6

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

BRIDGESTONE SPORTS CO., LTD.,
and BRIDGESTONE GOLF, INC.,

              Plaintiffs,

       v.

ACUSHNET COMPANY,
      a Delaware Corporation,

              Defendant.

C. A. No. 05-132 (JJF)

## BRIDGESTONE'S FIRST SET OF REQUESTS FOR PRODUCTION DOCUMENTS AND THINGS (REQUEST NOS. 1-100)

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, plaintiffs Bridgestone Sports Co., Ltd. and Bridgestone Golf, Inc. hereby request that defendant Acushnet Company produce and permit inspection and copying, the documents and things described herein. Production should be made at the offices of plaintiffs' attorneys, Sughrue Mion, PLLC, 2100 Pennsylvania Avenue, NW, Washington. DC 20037 within thirty (30) days of these requests.

### DEFINITIONS

Notwithstanding any definition set forth below, each word, term, or phrase used in this Request is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure. As used in this Request, the following terms are to be interpreted in accordance with these definitions:

1.    The term "Bridgestone," "Plaintiff," and/or "Plaintiffs" means Bridgestone Sports Company, Ltd. and/or Bridgestone Golf, Inc., the plaintiffs in this action, and all predecessors, successors, subsidiaries, divisions, parents and/or affiliates thereof, past or present, and all past

5.    All Documents and Things concerning any communication between Acushnet and any Third Party concerning this action between Bridgestone and Acushnet.

6.    All Documents and Things concerning any communication between Acushnet and Bridgestone.

7.    All Documents and Things concerning one or more of the Bridgestone patents-in-suit and/or Acushnet patents-in-suit.

8.    All Documents and Things sufficient to identify each model, type, and version of the Acushnet products.

9.    All Documents and Things concerning the conception, development, design and performance of each model, type, version and revision of each of the Acushnet products and prototypes for the Acushnet products, including, but not limited to, design specifications, performance specifications, engineering notebooks, laboratory notebooks, testing results, composition specifications, design meeting notes and minutes, or other forms of descriptions, explanations or manuals.

10.    All Documents and Things concerning any changes, alterations, revisions or modifications made in the design, make-up, composition, physical attributes, physical characteristics, and performance of any of the model, version, type or revision of the Acushnet products, including, but not limited to, all Documents concerning (a) types of changes, alterations, revisions or modifications made, (b) rational and reasoning for the changes, alterations, revisions or modifications made, (c) effect of the changes, alterations, revisions or modifications made, and (d) when the changes, alterations, revisions or modifications were made.

22.    All Documents and Things concerning any changes, revisions and updates made to any golf ball testing devices, testing equipment and/or testing facilities used by Acushnet from 1990 to the present.

23.    All Documents and Things concerning the results of any testing and/or analysis conducted or used by Acushnet of any of the Acushnet products, including, but not limited to, the product characteristics, performance, physical attributes, composition and make-up, and further including without limitation size, layer thickness, weight, compression, Shore D hardness, Shore C hardness, JIS-C hardness, velocity, spin, distance (carry and roll), Reynolds number, aerodynamic coefficient, aerodynamic force angle, and trajectory thereof.

24.    All Documents and Things from 1990 to the present sufficient to identify Acushnet's corporate management and personnel responsible for management, research and development, engineering, design, production, manufacturing, testing, patenting or any patent-related activities, licensing, sales and marketing, technical services, and distribution of the Acushnet products, including but not limited to specific organizations of each such department and parent-subsidiary-division and joint venture relationships, including names and titles of all professional and managerial employees.

25.    All Documents and Things concerning organization charts and employee rosters that show the job assignment and/or identification of personnel involved in the conception, research, development, design, specification, testing, production, manufacture, assembly, marketing, advertising, promotion, sales and/or distribution of each model, type, version and revision of the Acushnet products.

MORRIS, NICHOLS, ARSHT & TUNNELL

_____
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
Leslie A. Polizoti (#4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19801
(302) 658-9200
    *Attorneys for Bridgestone Sports Co., Ltd.
    and Bridgestone Golf, Inc.*

OF COUNSEL:

Robert M. Masters
John T. Callahan
Raja Saliba
SUGHRUE MION, PLLC
2100 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
(202) 293-7060

June 7, 2005

25

## CERTIFICATE OF SERVICE

I, Jack B. Blumenfeld, hereby certify that copies of the foregoing were caused to be served this 7th day of June, 2005 upon the following in the manner indicated:

### BY HAND

Richard L. Horwitz
Potter Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE 19801

### BY FEDERAL EXPRESS

Alan M. Grimaldi
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004

Jack B. Blumenfeld

14

# EXHIBIT 7

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

BRIDGESTONE SPORTS CO., LTD.,
and BRIDGESTONE GOLF, INC.,

        Plaintiffs,

      v.

ACUSHNET COMPANY,
    a Delaware Corporation,

        Defendant.

C. A. No.  05-132 (JJF)

## BRIDGESTONE'S FIRST SET OF REQUESTS FOR PRODUCTION
## DOCUMENTS AND THINGS (REQUEST NOS. 1-100)

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, plaintiffs Bridgestone Sports Co., Ltd. and Bridgestone Golf, Inc. hereby request that defendant Acushnet Company produce and permit inspection and copying, the documents and things described herein. Production should be made at the offices of plaintiffs' attorneys, Sughrue Mion, PLLC, 2100 Pennsylvania Avenue, NW, Washington. DC 20037 within thirty (30) days of these requests.

## DEFINITIONS

Notwithstanding any definition set forth below, each word, term, or phrase used in this Request is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure. As used in this Request, the following terms are to be interpreted in accordance with these definitions:

1.     The term "Bridgestone," "Plaintiff," and/or "Plaintiffs" means Bridgestone Sports Company, Ltd. and/or Bridgestone Golf, Inc., the plaintiffs in this action, and all predecessors, successors, subsidiaries, divisions, parents and/or affiliates thereof, past or present, and all past

counsel, all memoranda, comments, summaries, claim charts, presentation materials, correspondence, notes, reports, clearance searches, clearance studies, opinions, or "design around" documents.

33.    All Documents and Things concerning the alleged infringement or non-infringement of any of the claims of the Bridgestone patents-in-suit.

34.    All Documents and Things concerning your allegations and denials in the Answer that Acushnet does not, and/or that Acushnet products do not, infringe the Bridgestone patents-in-suit.

35.    All Documents and Things concerning any of the claims or claim elements of the Bridgestone patents-in-suit and/or the scope or interpretation of any of the claims or claim elements of the Bridgestone patents-in-suit, including all Documents and Things concerning the definition or meaning of any claim term, phrase or element in any of the Bridgestone patents-in-suit.

36.    All Documents and Things concerning the allegations in your Answer that one or more of the Bridgestone patents-in-suit is invalid or unenforceable.

37.    All Documents and Things concerning the validity or invalidity of the Bridgestone patents-in-suit, including without limitation, all Documents and Things concerning any studies or analyses regarding validity, invalidity or claim scope, by or on behalf of Acushnet with respect to the Bridgestone patents-in-suit, including but not limited to, all Documents and Things provided to and received from counsel, all memoranda, comments, summaries, presentation materials, test results and measurements, correspondence, notes, reports, or opinions.

38.    All Documents and Things concerning prior art (including Prior Art Golf Ball and any other Things) to the Bridgestone patents-in-suit, including without limitation all Documents

14

and Things Acushnet relies upon to support the allegations in the Answer that any of the Bridgestone patents-in-suit is invalid, and including without limitation all prior art that Acushnet contends or plans to rely upon to support an allegation that the Bridgestone patents-in-suit are invalid.

39.    All Documents and Things concerning any analysis, test reports, or inspections of any information or golf ball or component or layer of a golf ball considered by Acushnet to be prior art to the Bridgestone patents-in-suit.

40.    All Documents and Things concerning any prior art searches conducted by or on behalf of Acushnet relating to the Bridgestone patents-in-suit.

41.    All Documents and Things concerning when and how Acushnet became aware of all purported prior art upon which Acushnet relies to allege that one or more claims of the Bridgestone patents-in-suit is invalid, including without limitation all Documents and Things that tend to show or establish the date any such purported prior art was first obtained by Acushnet.

42.    All Documents and Things concerning the results of any testing and/or analysis conducted or used by Acushnet of any of the Prior Art Golf Balls, including, but not limited to, the Prior Art Golf Balls' characteristics, performance, physical attributes, composition and make-up, and further including without limitation size, layer thickness, weight, compression, Shore D hardness, Shore C hardness, JIS-C hardness, velocity, spin, distance (carry and roll), Reynolds number, aerodynamic coefficient, aerodynamic force angle, and trajectory thereof.

43.    All Documents and Things concerning the results of any testing and/or analysis conducted or used by Acushnet of any Prior Art Golf Ball asserted to be prior art to any of the Bridgestone patents-in-suit, including, but not limited to the product characteristics, performance, physical attributes, composition and make-up, and further including without limitation size, layer

MORRIS, NICHOLS, ARSHT & TUNNELL

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
Leslie A. Polizoti (#4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19801
(302) 658-9200
   *Attorneys for Bridgestone Sports Co., Ltd.
   and Bridgestone Golf, Inc.*

OF COUNSEL:

Robert M. Masters
John T. Callahan
Raja Saliba
SUGHRUE MION, PLLC
2100 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
(202) 293-7060

June 7, 2005

25

### CERTIFICATE OF SERVICE

I, Jack B. Blumenfeld, hereby certify that copies of the foregoing were caused to be served this 7th day of June, 2005 upon the following in the manner indicated:

**BY HAND**

Richard L. Horwitz
Potter Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE 19801

**BY FEDERAL EXPRESS**

Alan M. Grimaldi
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004

Jack B. Blumenfeld

14

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BRIDGESTONE SPORTS CO., LTD.,
and BRIDGESTONE GOLF, INC.,

               Plaintiffs,

      v.

ACUSHNET COMPANY,

               Defendant.

C. A. No.  05-132 (JJF)

## BRIDGESTONE'S SECOND SET OF REQUESTS FOR PRODUCTION DOCUMENTS AND THINGS (REQUEST NOS. 101-155)

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, plaintiffs Bridgestone Sports Co., Ltd. and Bridgestone Golf, Inc. hereby request that defendant Acushnet Company produce and permit inspection and copying, the documents and things described herein. Production should be made at the offices of plaintiffs' attorneys, Sughrue Mion, PLLC, 2100 Pennsylvania Avenue, NW, Washington. DC 20037 within thirty (30) days of these requests.

### DEFINITIONS

Bridgestone incorporates by reference the DEFINITIONS set forth in BRIDGESTONE'S FIRST SET OF REQUESTS FOR PRODUCTION DOCUMENTS AND THINGS (REQUEST NOS. 1-100) as though fully set forth herein.

Additionally, the following terms in this Request are to be interpreted in accordance with these definitions:

1.    The term "on-course retailer" means a retailer of golf equipment, including golf balls, located on a golf course facility.

121.　All Documents and Things concerning the composition, recipe, and manufacture, including without limitation all manufacturing specifications, of the plaques and sample blocks of Request No. 120.

122.　All Documents and Things concerning the composition, recipe, and manufacture, including without limitation all manufacturing specifications, of the components of the Acushnet products, including the cores, intermediate layers and covers.

123.　One (1) kg of each type of Fusablend® material used in the Acushnet products, with an identification of which Acushnet product(s) uses or has the specific type of Fusablend® material.

124.　All Documents and Things concerning the composition, recipe, and manufacture, including without limitation all manufacturing specifications, of Fusablend® material.

125.　Six of each type of the Wilson golf balls that Acushnet has analyzed and alleges anticipates or renders obvious one or more claims of the patents-in-suit, including, without limitation, the Wilson Ultra Tour Balata 90, Wilson Ultra Tour Balata 100, Wilson Ultra Competition 90, and Wilson Ultra Competition 100.

126.　Six Bridgestone Tour Stage U Spin golf balls that Acushnet has analyzed and alleges anticipates or renders obvious one or more claims of the patents-in-suit.

127.　Six Top-Flight System C golf balls that Acushnet has analyzed and alleges anticipates or renders obvious one or more claims of the patents-in-suit.

8

154.   All Documents and Things concerning any differences between types of retailers, including without limitation on-course retailers, off-course retailers, sporting goods retailers, and all other retailers, and including without limitation differences in prices, profit margins, and separate tracking by Acushnet and industry of distribution of golf balls through each type of retailer.

155.   All Documents and Things concerning Acushnet's market share by type of retailer, including without limitation on-course retailers, off-course retailers, sporting goods retailers, and all other retailers.

Date:  July 29, 2005

**MORRIS, NICHOLS, ARSHT & TUNNELL**
JACK B. BLUMENFIELD (#1014)
MARYELLEN NOREIKA (#3208)
LESLIE A. POLIZOTI (#4299)
1201 N. Market St.
P.O. Box 1347
Wilmington, DE 19801
Telephone:  (302) 658-9200

OF COUNSEL:

**SUGHRUE MION, PLLC**
ROBERT M. MASTERS
JOHN T. CALLAHAN
RAJA SALIBA
2100 Pennsylvania Ave., N.W.
Washington, D.C. 20037
Telephone:  (202) 293-7060

Attorneys for Plaintiffs

13

## CERTIFICATE OF SERVICE

I, Mary Krizan, hereby certify that copies of the foregoing BRIDGESTONE'S SECOND SET OF REQUESTS FOR PRODUCTION DOCUMENTS AND THINGS (REQUEST NOS. 101-155) were caused to be served this 29th day of July, 2005, upon the following in the manner indicated:

**BY HAND**
Alan M. Grimaldi, Esq.
Howrey LLP
1299 Pennsylvania Avenue, NW
Washington, DC  20004

**BY FEDERAL EXPRESS**
Richard L. Horwitz
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801

Mary Krizan

## CERTIFICATE OF SERVICE

I, Mary Krizan, hereby certify that copies of the foregoing BRIDGESTONE'S SECOND SET OF REQUESTS FOR PRODUCTION DOCUMENTS AND THINGS (REQUEST NOS. 101-155) were caused to be served this 29th day of July, 2005, upon the following in the manner indicated:

**BY HAND**
Alan M. Grimaldi, Esq.
Howrey LLP
1299 Pennsylvania Avenue, NW
Washington, DC  20004

**BY FEDERAL EXPRESS**
Richard L. Horwitz
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801

Mary Krizan

EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRIDGESTONE SPORTS CO., LTD.,  )
and BRIDGESTONE GOLF, INC.,    )
                               )
            Plaintiffs,        )        C.A. No. 05-132 (JJF)
                               )
       v.                      )
                               )
ACUSHNET COMPANY,              )
                               )
            Defendant.         )

## PROPOSED ORDER

The Court, having considered Bridgestone's Motion for Sanctions and the opposition thereto;

IT IS HEREBY ORDERED that:

1.    Acushnet and its experts are precluded from relying on, for any purpose, all documents attached to Dr. Felker's January 16, 2007 invalidity and February 20, 2007 non-infringement reports that were not produced before October 10, 2006, including but not limited to:

> a. the October 2000 opinion of counsel and the invalidity testing and results performed in connection with it;
>
> b. the balls listed on Exhibit 48, except the Wilson Ultra Tour Balata, Ultra Tour Balata 90, Ultra Tour Balata 100, and Ultra Competition balls, and any opinions relating thereto;
>
> c. Acushnet's March 2, 2007 and March 7, 2007 supplemental reports; and
>
> d. Acushnet's testing of the Wilson Ultra Competition balls and the results therefrom.

2.      Acushnet and its experts are precluded from relying on the 1993 Competitive Log that was marked as exhibit 6 at the March 15, 2007 deposition of John Calabria.

3.      It is established that golf ball cores made according to Example 2 of the EP 0 633 043 patent fall outside the range for the core hardness differential in claim 1 of U.S. Patent No. 5,782,707.

4.      It is established that golf ball cores made according to Example 2 of the EP 0 633 043 patent do not necessarily have the core hardness differential in claim 1 of U.S. Patent No. 5,782,707.

5.      It is established that U.S. Patent No. 5,782,707 is not invalid over EP 0 633 043.

6.      Acushnet and its experts are precluded from relying on all documents attached to the Dalton Declaration, except for the documents bearing bates numbers AB 0024488 and AB 0024496.

7.      Acushnet and its experts are precluded from relying on any information from the Mesabi database and any information from the Chronos-Richardson weigh-feed database.

8.      Acushnet and its experts are precluded from relying on all information and documents from the QAS database, including exhibits 12 and 19 to Dr. Felker's February 20, 2007 non-infringement report.

9.      Any judgment or verdict of infringement in favor of Bridgestone with respect to U.S. Patent No. 6,634,961 will be applied to the Pro V1 and Pro V1x balls beginning October 21, 2003.

10.      There is a rebuttable presumption that the balls accused of infringing claims 1, 5 and 9 of U.S. Patent No. 5,252,652 contain "about 0.05 to about 2 parts by weight" of ZnPCTP.

11.    There is a rebuttable presumption that the balls accused of infringing claims 1, 5 and 9 of U.S. Patent No. 5,252,652 contain "about 25 to about 40 parts by weight" of ZDA.

12.    Acushnet and its experts are precluded from criticizing the methodology and test results of Bridgestone's experts on the basis that they did not rely on QAS, Mesabi, or Chronos-Richardson weigh-feed data, including but not limited to the testing performed by Bridgestone in connection with the cover thickness and intermediate layer thickness limitations of claims 1, 6 and 7 of U.S. Patent No. 5,553,852.

13.    Acushnet and its experts are precluded from criticizing Bridgestone and its experts for relying on manufacturing guidelines for each of the accused Acushnet golf balls.

14.    Bridgestone is awarded its reasonable attorneys' fees incurred in connection with its Motion for Sanctions. Bridgestone is directed to submit a declaration setting forth the amount of such attorneys' fees by _____, 2007.

15.    Bridgestone is also awarded its expenses for the thickness testing that Dr. Caulfield performed. Bridgestone is to submit a declaration setting forth the amount of such expenses by _____, 2007.

SO ORDERED, this ___ day of _____, 2007.


_____
United States District Judge


765336

3

# EXHIBIT 10

# Paul**Hastings**

Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W. • Washington, DC 20005
telephone 202 551 1700 • facsimile 202 551 1705 • www.paulhastings.com

Atlanta
Beijing
Brussels
Hong Kong
London
Los Angeles
Milan
New York
Orange County
Palo Alto
Paris
San Diego
San Francisco
Shanghai
Stamford
Tokyo
Washington, DC

(202) 551-1754
brandonwhite@paulhastings.com

September 1, 2006                                              70416.00002

**VIA COURIER**

Brian S. Seal, Esq.
Howrey LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004

Re:    *Bridgestone Sports v. Acushnet*

Dear Brian:

Today we produce to you documents bearing production numbers BSP-204291 to BSP-231977. This letter is indented to identify the documents being produced to you. I also direct your attention to my letter of August 18, 2006 relating to Bridgestone's document production.

We have previously requested (*see* Letter, Masters to Grimaldi, August 18, 2006) that you identify any issues that you believe to be outstanding in advance of the September 1, 2006 document production deadline set by the court. With the exception of your August 28, 2006 letter discussed below, we have heard nothing from you on any alleged deficiencies in Bridgestone's document production.

### 1.    Nike One Black and Nike One Platinum Documents

We are producing documents located in a search for documents that mention the Nike One Platinum and/or Nike One Black golf balls which Acushnet first accused of infringement on May 1, 2006. Although we made every effort not to produce documents duplicative of documents already produced, some documents in this production may have been previously produced.

We produced the specifications for the Nike One Black and Nike One Platinum golf balls to you on June 14, 2006 as BSP-202315 to BSP-202418.

### 2.    Bridgestone Corporation Documents

Documents from the files of Bridgestone Corporation related to the golf ball manufacturing agreements between Bridgestone and Nike are produced at BSP-230817 to BSP-230996. Production of these documents does not constitute an agreement to

Brian S. Seal, Esq.
September 1, 2006
Page 2

produce any additional documents from Bridgestone Corporation or an acknowledgement that Bridgestone Sports and/or Bridgestone Golf have now or had in the past any obligation to search the files of Bridgestone Corp.

3.    **Financial Documents for Rule 37 Agreements**

The financial documents agreed to be produced to resolve Acushnet's Rule 37 motions can be found at BSP-230756 to BSP-230813 and BSP-230997. If you believe any documents agreed to be produced are absent from the production, please let us know.

4.    **Documents Removed from Privilege Log**

The documents bearing production numbers BSP-231427 to BSP-231977 are documents removed from Bridgestone's privilege log in complete or redacted form.

5.    **Documents Identified in your letter of August 28, 2006 from Depositions of Takahashi and Watanabe**

We are investigating the issues raised in your letter of August 28. We are not likely to be in a position to substantively address the issues raised in this letter until sometime next week once our client is able to return to Japan. We will keep you informed.

Please let me know if you have any questions.

Sincerely,

Brandon M. White
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

LEGAL_US_E # 71778162.3

# EXHIBIT 11

# HOWREY LLP

1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
T 202 783 0800
F 202.383 6610
www howrey com

Direct Dial 202 383 6904
File 00634 0002

August 28, 2006

BY FACSIMILE

Brandon M. White, Esq.
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, D.C. 20005

Re:   ***Bridgestone Sports Co. v. Acushnet Co.,***
      **C.A. No. 05-132 (JJF) (D. Del.)**
      **Documents Identified in Depositions of Messrs. Takahashi and**
      **Watanabe**

Dear Brandon:

Last week Acushnet took the depositions of Messrs. Takahashi and Watanabe and identified certain areas that it appears Bridgestone overlooked when searching for documents to be produced in this litigation. This letter summarizes those deficiencies and requests that you produce these documents as soon as possible.

(1) **Shipment Records:** We are not sure if these documents identified by Mr. Takahashi were produced. Please confirm that Bridgestone has produced all of the relevant shipment records for the Seki plant. Additionally, we have not seen any such documents from the Chichibu factory. Please confirm whether any such documents exist.

(2) **Quality Control Records:** During his deposition, Mr. Takahashi testified that Bridgestone kept quality control manuals at the Seki factory on a bookshelf in the production department. (Takahashi Tr., 8/22/2006 at 54:18-55:7.) He also indicated that he did not give them to Bridgestone's counsel for production. Please also confirm whether there are any corresponding documents at the Chichibu factory.

(3) **Quality Control Database:** Mr. Takahashi also stated that he entered information related to defects of products in a database. (Takahashi Tr., 8/22/2006 at 64:4-10.) We have not seen these documents in your production although they seem to be similar to Acushnet's QAS database that you have requested from our client. Please confirm that this database has been produced.

(4) **Quality Manual:** Mr. Takahashi testified that Bridgestone has a quality manual and that he did not provide it for production in this litigation. (Takahashi Tr., 8/22/2006 at 66:2-12.) Please produce the quality manual located in the Production Department at the Seki factory. To the extent that the Chichibu factory has a different manual, please produce that one as well.

AMSTERDAM  BRUSSELS  CHICAGO  EAST PALO ALTO  HOUSTON  IRVINE  LONDON
LOS ANGELES  NORTHERN VIRGINIA  PARIS  SALT LAKE CITY  SAN FRANCISCO  TAIPEI  WASHINGTON, DC

# HOWREY.

Brandon M. White, Esq.
August 28, 2006
Page 2

(5) **"Surpass VI" Meeting Minutes:** Mr. Takahashi indicated that he was not sure that all of the "Surpass VI" meeting minutes had been produced. (Takahashi, 8/23/2006, at 98:8-21.) Please confirm that Bridgestone has searched for and produced all "Surpass VI" meeting minutes.

(6) **Printouts from Scales for Weighing Polymer and Chemicals:** Mr. Takahashi testified that the scales in the Seki factory generated printouts that were kept by the scale for a month and then archived in a filing cabinet. (Takahashi, 8/23/2006 at 82:21-84:19.) We have not found any such documents in Bridgestone's document production. Please locate and produce these documents to us for the accused Bridgestone products. Additionally, if corresponding documents are maintained at the Chichibu factory, please produce those as well.

(7) **Documents from Bridgestone's Database on Golf Ball Design:** According to Mr. Takahashi, Bridgestone keeps a database that includes design information for its golf balls (Takahashi Tr. at 91:3-92:4.) It appears from the documents themselves that this database goes back at least as far as 2000. (*See* BSP19060-BSP196096.) We have seen only a very limited number of these database printouts. Please produce all such database records that relate to either the accused Bridgestone products or the prior art golf balls.

(8) **Documents Related to Competitive Analysis/Patent Analysis:** As Mr. Rosenthal requested during Mr. Watanabe's deposition, please confirm that Bridgestone has produced all of Mr. Watanabe's analysis of Acushnet's products and comparison to Bridgestone's patent claims. (Watanabe Tr., 8/24/2006 at 34:1-38:13.)

(9) **Mr. Watanabe's Competitive Analysis of Products:** Mr. Watanabe testified that he would periodically "investigate or look into those new products as to what kind of balls they are or what kind of technology is used ...." (Watanabe Tr., 8/24/2006, at 40:1-41:9; *see also* 42:20-44:1.) We have not seen many of Mr. Watanabe's competitive analyses that he performed as an ordinary course of his work. Moreover, Mr. Watanabe stated that he told the IP Department where some competitive ball data was located, however, we do not believe we have received these documents. (Watanabe Tr., 8/24/2006 at 44:5-45:5.) Mr. Rosenthal informed you of our request for these documents at the deposition. (Watanabe Tr., 8/24/2006 at 46:7-13.)

(10) **Documents Showing Bridgestone's Conversion from Distortion to PGA Compression and JIS C Hardness to Shore D hardness:** During his deposition, Mr. Watanabe testified that there were documents that showed how Bridgestone converts between 100 kg distortion and PGA compression. (Watanabe Tr., 8/24/2006 at 102:6-106:2.) Additionally, Mr. Watanabe testified that he used documents to convert between JIS C hardness and Shore D hardness. (Watanabe Tr., 8/24/2006, at 107:13-108:22.)

(11) **Sumitomo Prior Art to '791 Patent:** During his deposition, Mr. Watanabe stated that there were some Sumitomo references that were related to the '791 patent. He said that he was not sure whether he had copies of them, but could look them up in a database. (Watanabe,

# HOWREY

Brandon M. White, Esq.
August 28, 2006
Page 3

8/25/2006 at 110:5-111:21.)  To the extent that these documents are accessible or in Bridgestone's possession, please provide them to us.

We understand that since the September 1, 2006 deadline is coming up in a matter of a few days, you may need some additional time to address the issues raised in this letter.   Please contact us as soon as possible with a date that you will be able to supplement your production.

Regards,

Brian S. Seal

# EXHIBIT 12

# HOWREY LLP

1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
T 202 783 0800
F 202.383.6610
www.howrey.com

Direct Dial 202 383 6904
File 00634 0002

September 5, 2006

<u>BY FACSIMILE</u>

Robert M. Masters, Esq.
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, D.C. 20005

    Re:   ***Bridgestone Sports Co. v. Acushnet Co.,***
           <u>Civil Action No. 05-132 (JJF) (D. Del.)</u>

Dear Rob:

    We have just determined that Bridgestone's document production appears deficient with regard to advertisement and promotional material for the accused golf balls. Acushnet's Request for Production No. 65 asks for, *inter alia*, all "promotional and advertising materials" for the "Precept Laddie, Precept Lady, Precept U-Tri Tour, Precept U-Tri Extra Spin, Precept U-Tri Extra Distance, Nike One, Nike OneGold, Nike One TW, U-Tri Spin, and Bridgestone Tour B330 golf balls."

    While we have identified one set of documents titled "1997 Print Ads & Win Ads (1997 – current)" (*see* BSP 008965), we have not, however, identified any additional such documents. Please confirm whether this is the only such set of documents in Bridgestone's possession, custody or control.

    In addition, although we have identified a number of marketing-related presentations which include promotional and advertising materials as presentation slides, we have not found a corresponding set of exemplary advertisements representative of those used as attachments in these presentations. (*See, e.g.,* BSP 048909-BSP049010.)

    Furthermore, our review of your production has identified the following deficiencies with regard to certain periodic reports:

- The "Monthly Reporting Meeting" reports, such as BSP 25931 - BSP 25950, have not been produced prior to 2000 nor for the months of April 2000, and May, July, August, and December 2001;

- The "Production Monthly Reports," such as BSP 066636-066648, are missing for 1998, 1999, all of 2000, with the exception of July, all of 2002, with the exception

AMSTERDAM  BRUSSELS  CHICAGO  HOUSTON  IRVINE  LONDON
LOS ANGELES  MENLO PARK  NORTHERN VIRGINIA  PARIS  SAN FRANCISCO  WASHINGTON, DC

# HOWREY

Robert M. Masters, Esq.
July 7, 2006
Page 2

of April and December, January, May, July, November, and December 2003,
February, April, May, and December 2004, and all of 2005;

- The "Profit & Loss Reports," as exemplified by BSP 066668 - BSP 066669, are
  missing for all times prior to 2003, the second half of 2003, and all periods after
  February 2005;

- The "BSPA Overview Reports," such as BSP 076714 - BSP 076723, which were
  not produced prior to 2002, are also missing for all periods in 2002 except for
  February and May, May, July, November, and December 2003, March and April
  2004, and all periods in 2005 and after;

- The "Japan Shipments & Distributors' Sales Reports," such as BSP 066255 - BSP
  066261, are also missing for all periods prior to December 2002, January - March
  2003, all of 2004 except for March and May, and all of 2005 except for June,
  July, August, and October;

- The "Actual Results" reports, such as BSP 196055-BSP196058, were not
  produced prior to 2002;

- The "Settlement of Accounts" reports, such as BSP 24991 - BSP 25006, were not
  produced after 2003; and

- The "Bridgestone Sports Monthly Reports," such as BSP 049339 - BSP 049343,
  are missing from November 2003 to June 2004, and after January 2005.

We understand that it may take you some time to confirm whether all of the documents
requested above have been produced. Accordingly, we do not intend to raise these deficiencies
with the Court unless necessary and only after you have had an adequate opportunity to respond.
Please let us know how much time you believe you will require.

Regards,

Brian S. Seal



1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
T 202.783.0800
F 202.383.6610
www.howrey.com

Direct Dial 202.383.6710
File 00634.0002

September 8, 2006

BY FACSIMILE

Timothy P. Cremen
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, DC 20005

      Re:   *Bridgestone Sports Co. v. Acushnet Co.,*
             **C.A. No. 05-132 (JJF) (D.Del)**
             **Documents Identified in Deposition of Mr. Kasashima**

Dear Tim:

      During the deposition of Atsuki Kasashima last week Acushnet uncovered several documents which it appears Bridgestone may have overlooked while collecting documents to be produced in this litigation. Please address these deficiencies as soon as possible.

      (1) **Precept Laddie Testing:** Mr. Kasashima testified that he had performed testing of the Precept Laddie and compared it to the claims of the '861 patent. (Kasashima Rough Tr. 9/1/06 at 111:12 – 113:8). He further testified that he calculated the parameters described in the '861 patent and may have saved his results onto his computer's hard drive. (Kasashima Rough Tr. 9/1/06 at 115:9 – 117:12). We have been unable to locate any such computer printout in the documents identified in Mr. Girgenti's March 10, 2006 letter as having been produced from Mr. Kasashima's files. Please ensure that all documents reflecting these tests, including the computer file which he had discussed, have been produced.

      (2) **Testing of Bridgestone Products:** Acushnet's Request for Production no. 24 requests all documents relating to "any analysis or test performed" by Bridgestone on its products, including any description of any "test parameters and conditions . . . date and location of test or analysis, and persons conducting the test or analysis." Mr. Kasashima indicated that he had performed this test many times, prior to the introduction of new products. (Kasashima Rough Tr. 9/1/2006 at 111:12 – 112:3). Please ensure that all documents which Mr. Kashima generated during his testing of any Bridgestone product against the claims of any of the Acushnet patents-in-suit have been produced.

      (3) **Testing Equipment:** Acushnet's Request for Production no. 21 requests all documents referring or relating to any test performed by Bridgestone on the Accused Products, including any description of any "testing equipment, test parameters and conditions, calibration

# HOWREY LLP

Timothy P. Cremen
September 8, 2006
Page 2

records . . . date and location of test or analysis." Mr. Kasashima identified two pieces of
equipment used by Bridgestone to test dimple parameters.  One was identified as being
manufactured by "Tokyo Koon Demper." (Kasashima Rough Tr. 9/1/06 at 83:22-84:15). The
second was identified as being developed by Bridgestone. (Kasashima Rough Tr. 9/1/06 86:22-
87:20).  Furthermore, Mr. Kasashima indicated that two of Bridgestone's factories had similar
equipment which he could not specifically identify. (Kasashima Rough Tr. 9/1/06 84:20-85:9).
Please ensure that all manuals and calibration records for all such devices have been produced.

   **(4) Testing of Acushnet Products:**  Acushnet's Request for Production no. 21 requests
documents referring to any test performed on the Accused Acushnet Products.  Mr. Kasashima
indicated that he and a Mr. Sato had performed such tests. (Kasashima Rough Tr. 9/1/06 98:19-
100:13).  Please further confirm that all records of any such testing of Accused Products, such as
that discussed in BSP 157394 – BSP 157423, have been produced.

   We recognize that you may require some time to confirm whether all of the documents
discussed above have been produced.  Therefore, we do not intend to raise these deficiencies
with the Court unless necessary and only after you have has an adequate opportunity to respond.
Please let us know how much time you will need to respond.

Sincerely,

John E. Dubiansky*

---

* *Admitted only in New York.  Not yet admitted in the District of Columbia. Practicing under the supervision of
firm principals.*

SEP-08-06  18:24  From:                          2026248960              T-620  P.01/03  Job-663

# HOWREY LLP

1299 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, DC 20004-2402
PHONE: 202.783.0800 • FAX: 202.383.6610

## FACSIMILE COVER SHEET

**DATE:**    September 8, 2006

**TO:**    NAME:    Timothy Cremen

         COMPANY:    Paul, Hastings, Janofsky & Walker LLP

         FAX NUMBER    (202) 551-0238          PHONE NUMBER:    (202) 551-1838

         CITY:    Washington, D.C.

**FROM:**    NAME:    John Dubiansky

         DIRECT DIAL NUMBER:    (202) 383-6710          USER ID:    2713

NUMBER OF PAGES, _INCLUDING_ COVER:    3          CHARGE NUMBER:    00634.0002

☐ ORIGINAL WILL FOLLOW VIA:

   ☐ REGULAR MAIL    ☐ OVERNIGHT DELIVERY    ☐ HAND DELIVERY    ☐ OTHER:    _____

☒ ORIGINAL WILL NOT FOLLOW

SUPPLEMENTAL MESSAGE:

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

IF THERE ARE ANY QUESTIONS OR PROBLEMS WITH THE TRANSMISSION OF THIS FACSIMILE, PLEASE CALL 202.383.7131.

# EXHIBIT 13

REDACTED

# EXHIBIT 14

REDACTED