# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BRIDGESTONE SPORTS CO., LTD.,  )
and BRIDGESTONE GOLF, INC.,   )    C. A. No. 05-132 (JJF)
                               )
    Plaintiffs,            )
                               )    **JURY TRIAL DEMANDED**
    v.                     )
                               )    **PUBLIC VERSION**
ACUSHNET COMPANY,              )
                               )
    Defendant.             )

## ACUSHNET'S BRIEF IN OPPOSITION TO
## BRIDGESTONE'S MOTION FOR SANCTIONS

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P. O. Box 951
Wilmington, DE  19899-0951
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant
Acushnet Company*

OF COUNSEL:

Alan M. Grimaldi
Joseph P. Lavelle
Kenneth W. Donnelly
Brian S. Seal
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004
Tel:  (202) 783-0800

Dated:  April 3, 2007
Public Version Dated:  April 10, 2007
788447/28946

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................1

    A.    The Facts Provided By Bridgestone Do Not Support the
        Relief Sought. ...........................................................................1

    B.    The Facts Bridgestone Failed to Disclose Further Show
        Why the Requested Relief Should Not Be Granted....................3

II.    STATEMENT OF FACTS ....................................................................5

    A.    The EP '043 Testing ..................................................................5

        1.    Dr. Felker Did Not Supplement His Opinion
              Regarding Invalidity of the '707 Patent............................5

        2.    Acushnet Did Not Despoil Evidence Harmful to Its
              Case....................................................................................7

        3.    Acushnet Did Not Improperly Withhold an Opinion
              of Counsel from Bridgestone. ...........................................7

    B.    Acushnet Offered Bridgestone the Opportunity to Inspect
        its Mesabi System, but Bridgestone Declined. ..........................8

        1.    Extracting Information Out of Mesabi..........................11

             a.    Reports Database .................................................11

             b.    Mix Vision ...........................................................12

        2.    Acushnet's Expert's Use of Mesabi Information............................13

        3.    Bridgestone Would Have Ignored Mesabi
             Information Just Like They Ignored Recipe Change
             Notices. .............................................................................14

        4.    Bridgestone Has Known That The Pro V1 Uses a
             Blend of Polybutadiene Rubbers. ...................................17

        5.    Exhibits A-D of Dalton Declaration ..............................18

             a.    Exhibit A: Third Party Letter Indicating
                  Purity of ZDA Powder ........................................18

             b.    Exhibits B: Certificates of Analysis for Zn-
                  PCTP Powder.....................................................20

i

          c.     Exhibits C-D:  Pellet Formulations for ZDA and Zn-PCTP ................................................................20

C.    Bridgestone Had the Access and Opportunity to Review the Same QAS Data on Which Acushnet's Expert Relied, But Chose Not to Review It................................................................21

D.    Acushnet's Testing of the Wilson Ultra Competition Golf Balls Was Appropriate and Did Not Prejudice Bridgestone.....................23

    1.    Acushnet's Agreement Not to Perform Destructive Testing Lasted Only Until the Parties Resolved the Question of Joint Testing...............................................24

    2.    In Seeking the Agreement, Bridgestone Withheld the Fact That It Had Over Two Dozen Wilson Ultra Competition Golf Balls In Its Possession. ......................25

E.    Acushnet's 1993 Competitive Ball Log Notebook....................................25

F.    The Dimple Data Relied Upon by Dr. Felker ............................................27

III.    ARGUMENT ........................................................................................28

A.    Because Bridgestone Has Shown No Prejudice Other Than That Of Its Own Making, the Court Should Deny Its Motion.......................................................................................29

    1.    The Court Should Not Exclude Evidence That Bridgestone Had An Opportunity to Inspect, But Declined ........................................................................29

    2.    Dr. Felker Properly Relied on the Summary Dimple Data................................................................30

    3.    Acushnet's Testing of the Wilson Ultra Competition Golf Balls Was Proper ................................................31

    4.    Bridgestone Is Not Prejudiced By Acushnet's Reliance on the Handwritten Competitive Log Notebook......................................................................31

B.    Acushnet Did Not Supplement Dr. Felker's Opinion Regarding the Invalidity of the '707 Patent and Acted Properly in Disclosing Acushnet's Additional Testing .............................32

C.  The Circumstances Surrounding Acushnet's Alleged
    Failure to Preserve Certain Evidence Do Not Rise to the
    Level of Spoliation.................................................................................34

D.  Bridgestone's Request for an Inspection of Acushnet's
    Facilities is Meritless and Untimely ........................................................36

E.  Bridgestone's Request for Costs Related to Testing Should
    Be Denied................................................................................................38

IV.  CONCLUSION........................................................................................................39

# TABLE OF AUTHORITIES

## CASES

*Braun v. Agri-Systems,*
    CV-F-02-6482, 2006 U.S. Dist. LEXIS 25185  (E.D. Cal., Feb. 1, 2006) .......... 29

*Brewer v. Quaker State Oil Ref. Corp.,*
    72 F.3d 326 (3d Cir. 1995)................................................................... 35

*Goldbloss v. Reiman,*
    55 F. Supp. 811 (D.C.N.Y. 1943) ......................................................... 29

*Helen of Troy, L.P. v. Zotos Corp.,*
    235 F.R.D. 634 (W.D. Tex. 2006) .................................................... 30, 33

*In re DaimlerChrysler AG,*
    C.A. No. 00-993-JJF, Slip op. (D. Del. Nov. 25, 2003) ........................ 35

*In re Paoli R.R. Yard PCB Litigation,*
    35 F.3d 717 (3d Cir. 1994)................................................................... 28

*Inline Connection Corp. v. AOL Time Warner, Inc.,*
    C.A. No. 02-477-MPT, 2007 WL 61883 (D. Del., Jan. 8, 2007) .................. 28, 33

*Meyers v. Pennypack Woods Home Ownership Ass'n,*
    559 F.2d 894 (3d Cir. 1977).......................................................... 28, 29

*Minebea Co., Ltd. v. Pabst,*
    231 F.R.D. 3 (D.D.C. 2005).................................................................. 33

*Montgomery v. Mitsubishi Motors Corp.,*
    448 F. Supp.2d 619 (E.D. Pa. 2006) ................................................33-34

*Positran Mfg., Inc. v. Diebold, Inc.,*
    C.A. No. 02-466-GMS, 2003 WL 21104954 (D. Del. May 15, 2003)................ 35

*Schmid v. Milwaukee Elec. Tool Corp.,*
    13 F.3d 76 (3d Cir. 1994).............................................................. 35, 36

*Tucker v. Ohtsu Tire & Rubber Co., Ltd.,*
    49 F. Supp.2d 456 (D. Md. 1999) ........................................................ 33

**RULES**

Fed. R. Civ. P. 26(a)(2)(B) ............................................................................................. 30

Fed. R. Civ. P. 26(e)(1).............................................................................................. 32, 33

## I.      INTRODUCTION

Bridgestone's Motion for Sanctions should be denied in its entirety. Bridgestone's motion contains many factual inaccuracies and numerous overzealous arguments, made in an apparent attempt to prejudice the Court against Acushnet. The Court should look closely at the facts behind Bridgestone's motion and not simply at what Bridgestone claims in its brief. When Bridgestone's errors are corrected, the record will show that the Court should deny the motion.

### A.      The Facts Provided By Bridgestone Do Not Support the Relief Sought.

Among other things, the facts show that:

1. Contrary to what Bridgestone repeatedly claims, Dr. Felker submitted no "supplemental" report regarding the invalidity of the '707 patent. Instead, what actually occurred is that Acushnet engineers provided additional test data to Dr. Felker. That data was also produced to Bridgestone. The data supports Dr. Felker's *pre-existing un-supplemented* opinion that the '707 patent is obvious in light of the EP '043 publication. Dr. Felker did not change or supplement his opinion at all. As experts often continue to review data relevant to their opinions and are required by the Rules to disclose any supplemental data they might consider, it does not appear that the additional data prejudices Bridgestone in any way. In fact, Bridgestone deposed Dr. Felker on this data and deposed the author of the additional testing data memorandum. Hence, the Court should allow this data into evidence.

2. Acushnet did not despoil evidence harmful to its case. Nor did Acushnet "destroy[] the cores and the test results when it realized they were unfavorable." (D.I. 305 at 1). There is no evidence of intentional destruction. What actually happened is that, during the testing for the data Acushnet provided to Dr. Felker and Bridgestone, the core gradients of a first batch of cores did not meet what is claimed in the '707 patent.

The technician testing the cores recorded this result (which was disclosed to Bridgestone) and then set aside those cores and their cut remnants onto a workbench. When the cores were requested a week or so later, it was discovered that they had been misplaced and either potentially discarded or mixed in with cores in the ordinary course of cleaning up the lab. So while it is unfortunate that the cut cores from the null test were not retained, no harm was intended or done. Again, the fact of the testing and the null result were facts disclosed to both Dr. Felker and Bridgestone, and Bridgestone is free to make whatever arguments it wishes regarding the null experiment.

3.    The discarded cores were not harmful to Acushnet's case in any event. Quite to the contrary, the entirety of the Acushnet testing showed that in three of the four experiments Acushnet performed, the EP '043 core recipe was used to make cores with the properties claimed in the '707 patent. This data supports Acushnet's position that the '707 patent is invalid as obvious in light of the EP '043 disclosure, as it tends to show that, without undue experimentation, one skilled in the art can use the EP '043 teachings to create the properties claimed in the '707 patent.

4.


5.    Acushnet did not improperly withhold access to the various databases,

, from Bridgestone. To the contrary, Bridgestone was apprised of the existence of the databases and of the difficulty in extracting and printing information from the databases during discovery. Acushnet offered, during discovery, to allow Bridgestone to inspect the databases, and Bridgestone

refused. When Acushnet's non-infringement expert relied on information from these databases, Acushnet made four witnesses available for five days of deposition to allow Bridgestone to seek information from the databases.

In all of these respects, and others described herein, Bridgestone's motion overreaches and is inaccurate. The motion is particularly infirm in establishing any prejudice to Bridgestone. Bridgestone's motion should therefore be denied.

### B.    The Facts Bridgestone Failed to Disclose Further Show Why the Requested Relief Should Not Be Granted.

At least as troubling as the inaccurate arguments is Bridgestone's failure to acknowledge to the Court that it has been far less forthcoming in its dealings with Acushnet. Bridgestone never disclosed the factual basis for its infringement contentions during fact discovery, despite being directed to do so by February 2006. Acushnet never learned the factual bases for Bridgestone's infringement contentions until it received Bridgestone's expert reports. Bridgestone also objected to numerous of Acushnet's other requests for factual information in the fact discovery period, only to produce a flood of such information after fact discovery closed.

Indeed, while Bridgestone repeatedly accuses Acushnet of violating the Court-ordered September 1, 2006 document production deadline (wholly ignoring the parties' express agreement to extend fact discovery to December 18), Bridgestone itself produced after September 1, 2006 more than 39,000 pages of documents. (*See, e.g.*, Ex. A[1] – White Ltr. to Seal, 9/14/06; White Ltr. to Seal, 9/26/06; White Ltr. to Seal, 10/4/06; White Ltr. to Seal, 10/6/06; White Ltr. to Seal, 10/10/06; White Ltr. to Seal, 10/12/06; White Ltr. to Seal, 10/17/06; White 2d Ltr. to Seal, 10/17/06; White Ltr. to Seal, 11/17/06; White Ltr. to Seal, 12/18/06; White Ltr. to Seal, 1/16/07; White Ltr. to Seal, 11/27/06; Weber Ltr. to Stasio, 3/16/07; White Ltr. to Stasio, 3/28/06). Bridgestone also

---

[1] Exhibits listed herein refer to Appendix filed herewith.

withheld from producing at any time in fact discovery thousands of testing-related documents (roughly eight boxes worth) pertinent to its infringement contentions. (Bridgestone's failure to produce those documents and data are the subject of a separate motion. *See* D.I. 294).

Even more recently, on March 28, 2007 – a week after it filed its instant motion for sanctions – Bridgestone revealed previously-unproduced English versions of its test protocols and produced still further test data, both of which were requested by Acushnet long ago. (*See* Ex. B – White Ltr. to Stasio, Mar. 28, 2007; Ex. C – Seal Ltr. to White, 3/29/07; Ex. D – White Ltr. to Seal, 4/2/07). In fact, Bridgestone's March 28 production included test data relating to the '834 patent. As it turns out, the earlier, previously-withheld data shows that the accused Acushnet golf balls ***do not infringe*** the '834 patent. Although Acushnet requested this data months ago, Bridgestone withheld it until after Mr. Cadorniga's expert deposition, producing it late in the afternoon on the day before Dr. Caulfield's deposition. Further, Acushnet only recently learned from Dr. Caulfield that he captured video from a number of tests, which video still has not been disclosed to Acushnet. (*See* Ex. E – Caulfield Dep. (rough) at 211:13-19).

Undoubtedly, many documents have been produced in this case, by both sides, after September 1, 2006. This is in large part because the parties agreed to extend discovery and extend the date for supplementing discovery responses, including contentions, until December 18, 2006. However, the discovery rules must be applied in an even-handed manner, for adherence to neutral procedures is precisely what constitutes fairness. If Bridgestone intends to pursue its motion, it must acknowledge that all of the factual data it provided for the first time after that date, including all of the factual bases for its claims of infringement in this case, should be excluded from evidence as well.

## II.    STATEMENT OF FACTS

### A.    The EP '043 Testing

Contrary to the inaccurate presentation in Bridgestone's brief, nothing whatsoever improper occurred in Acushnet's testing of the EP '043 cores. For one, Dr. Felker did not "supplement" his report of invalidity on the '707 patent. Indeed, under Rule 26, it was proper for Acushnet to disclose to Bridgestone what Acushnet's recent test results had demonstrated. Acushnet gave that evidence to Bridgestone before Dr. Felker's deposition and before the deposition of the employee who wrote up that information. Acushnet also did not despoil evidence by "destroy[ing] the cores and the test results when it realized they unfavorable." (D.I. 305 at 1). That is a gross exaggeration of what took place. Finally, Acushnet did not improperly withhold from Bridgestone an opinion of counsel or earlier test results relied upon by Dr. Felker. Bridgestone has had the test results relied upon in Dr. Felker's invalidity report since before it filed suit against Acushnet. As for the opinion of counsel, it was disclosed to Bridgestone just as soon as it was no longer privileged to withhold.

### 1.    Dr. Felker Did Not Supplement His Opinion Regarding Invalidity of the '707 Patent.

Contrary to what Bridgestone states, Dr. Felker did not "supplement" his report on the '707 patent. What Bridgestone inaccurately calls Dr. Felker's '707 patent "supplemental report" was neither created nor signed by Dr. Felker and does not even purport to supplement any opinions in Dr. Felker's report. (*See* D.I. 305 at Ex. 4).[2] Rather, the document was prepared by David Bulpett, Acushnet's Analytics Lab Manager, in early March 2007 and produced to Bridgestone on March 7. There is no

---

[2] Dr. Felker did provide a 3-page supplement to his report related to a minor issue on the '817 patent, which supplementation he anticipated and discussed in his originally filed report. (*See* Ex. F – Felker 1/16/07 Report at 32; Ex. G – Felker 3/2/07 Report at 1-3).

opinion expressed in this document on the invalidity of the '707 patent; instead, the

document provides only recent testing results obtained by Acushnet.[3]



The additional cores made pursuant to the EP '043 recipe and the results of the

testing were provided to Dr. Felker, and because he reviewed the test results, Acushnet

disclosed those results to Bridgestone, as it was obligated to do. The document, however,

did not alter or impact Dr. Felker's opinion in any way – it simply confirmed his

previously-disclosed opinion that the '707 patent is invalidated by the EP '043 reference.

As experts often continue to review data relevant to their opinions, and as

Bridgestone had the opportunity to depose both Dr. Felker and Mr. Bulpett on this data,

the additional data does not prejudice Bridgestone in any way.

---

[3] Contrary to Bridgestone's naked assertion, counsel for Acushnet **never** stated that it "did not know anything about who authored the report." (D.I. 305 at 3). In the meet-and-confer that preceded Bridgestone's motion, Bridgestone never even asked Acushnet who authored the document. (*See* Ex. H – Stasio Decl. at ¶¶ 4-5). Acushnet's counsel stated simply that it did not know the facts surrounding Acushnet's failure to retain or find some of the cores in connection with the first two batches of EP '043. (*See id.*).

### 2.    Acushnet Did Not Despoil Evidence Harmful to Its Case.

Acushnet did not despoil evidence harmful to its case. Rather, Acushnet cannot locate the cores from a first batch of cores made under the EP '043 recipe. Nevertheless, Acushnet disclosed the results of that testing to Bridgestone.

Nor was the data harmful to Acushnet's case regarding the '707 patent in any event. Contrary to Bridgestone's characterization, Dr. Felker never opined in his January 16, 2007, report that that "balls manufactured according to that patent [EP '043] inherently (*i.e.*, necessarily) have all the properties recited in claim 1 of the '707 patent." (D.I. 305 at 7). Inherency is a form of anticipation under 35 U.S.C. § 102. However, Dr. Felker's opinion on this point is based on obviousness under 35 U.S.C. § 103. His actual opinion is that the '707 patent is "invalid based on obviousness in light of the combination of the European Patent 0 633 043, which discloses the claimed intermediate layer and core, ***and the knowledge of one skilled in the art***." (*See* Ex. F – Felker 1/16/07 Report at p. 48) (emphasis added). The EP '043 testing, taken in its entirety, shows that one of ordinary skill in the art can use the teachings of the EP '043 reference to create the properties claimed in the '707 patent without undue experimentation.

### 3.    Acushnet Did Not Improperly Withhold an Opinion of Counsel from Bridgestone.

7



**B.**

4





















---

8 Depositions of Rastko Gajic as 30(b)(6) Designee (3/1/07); Jeff Dalton (3/2/07);  Pat Elliott (3/17/07); and Rastko Gajic (3/20/07).



### 5.    Exhibits A-D of Dalton Declaration

Bridgestone also seeks to preclude ▮▮▮▮▮ data that was attached to Mr. Dalton's declaration as Exhibits A-D.  This request is also without merit.

#### a.    Exhibit A:  Third Party Letter Indicating Purity of ZDA Powder

Exhibit A to the Dalton declaration is a letter from ▮▮▮▮▮ that Acushnet received on January 31, 2007, disclosing the maximum purity of ZDA powder.

---

9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

This letter was not in the possession, custody or control of Acushnet during fact discovery. It was obtained *in rebuttal to arguments made for the first time in Bridgestone's expert reports.* (*See* Ex. R – Seal Decl. at ¶ 6). Dr. Felker, Acushnet's non-infringement expert, requested counsel to inquire into the purity of ZDA powder, after reading Bridgestone's infringement report from Mr. Cadorniga, in which Mr. Cadorniga attempted to use actual purity information in determining the parts per hundred of the ingredients used in the golf ball cores. (*See id.* at ¶ 7).

In his expert report, Mr. Cadorniga stated, without support, that the ZDA powder is assumed to be 100% pure ZDA. (*See* Ex. Z – Cadorniga 1/16/2007 Report at B-16, n. 34). Mr. Cadorniga also stated that Zn-PCTP powder (another critical ingredient to the determination of infringement) was only 98% pure. (*See id.* at B-18, n. 35). The latter statement was based solely on testimony from a former Acushnet employee. (*See id.*).

Not surprisingly, assuming the ZDA powder level is 100% pure and minimizing the purity of Zn-PCTP powder to 98% is beneficial to Bridgestone's case. As any expert in golf ball manufacturing should know, however, neither the ZDA powder nor the Zn-PCTP powder will be 100% pure.[10]  In fact, with respect to ZDA powder, anyone of ordinary skill in the art would know that a 100% pure ZDA powder would not work, as it would end up clumping together. Thus, it is commonly known that the ZDA powder contains a flowing agent, such as zinc stearate in the formulation. (*See, e.g,* Ex. O – Elliott 3/17/07 Dep. at 53:16-55:16 (rough tr.)). Nevertheless, Mr. Cadorniga assumes the ZDA is 100% pure. To rebut that assumption, Dr. Felker requested that the

---

[10] ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

manufacturer be asked to provide the purity of the ZDA powder. (*See* Ex. R – Seal Decl. at ¶ 7). That request was granted and attached as exhibit A to the Dalton declaration.

Mr. Cadorniga could have obtained the ZDA purity information from ███████ just as easily as Dr. Felker did. However, Mr. Cadorniga failed to even try. (*See* Ex. DD – Cadorniga Dep. at 139:2-17). There is no basis for excluding this exhibit.

### b.    Exhibits B:  Certificates of Analysis for Zn-PCTP Powder

Exhibit B to the Dalton declaration contains certificates of analysis showing the purity of Zn-PCTP powder obtained from Acushnet's suppliers (████████████

████). The information disclosed in Exhibit B, however, is not new. As long ago as August 2005, Acushnet produced certificates of analysis related to the Zn-PCTP powder. (*See, e.g.,* Ex. EE – AB 24478-79, AB 24488, AB 24496).



In fact, Bridgestone used such information during the deposition of Rastko Gajic. (*See* Ex. W – Gajic 3/20/07 Dep. at 310:9-17 (rough tr.); Deposition Exhibit No. 3). The Exhibit B documents disclose the same information and were relied on by Dr. Felker to rebut Mr. Cadorniga's assumption, based on the deposition testimony of a former employee, that the Zn-PCTP purity is 98%.

### c.    Exhibits C-D:  Pellet Formulations for ZDA and Zn-PCTP

Similarly, in August 2005, Acushnet produced the information contained in Exhibits C-D to the Dalton declaration in this litigation, and therefore, there is no basis for them to be excluded. (*See, e.g.,* Ex. FF – AB 28964, 29016). Exhibits C and D are purchase material specifications for Acushnet's ZDA and Zn-PCTP pellet formulations. ZDA and Zn-PCTP can be purchased in either pellet or powder form. (*See* Ex. X – Dalton Decl. at ¶¶10-16). The pellets are formed by mixing the powder with rubber and other minor ingredients. (*See id.*)

Bridgestone's expert, Mr. Cadorniga, relied on the same information contained in Exhibits C-D to determine the actual percentage of ZDA and Zn-PCTP powder in the pellets to calculate the parts per hundred of these ingredients in Acushnet's accused products. (*See* Ex. Z – Cadorniga 1/16/07 Report at B-15) (citing AB 29016). Since this information was previously produced and relied on by Bridgestone's own expert, there is no basis to exclude these documents.





11



**D.   Acushnet's Testing of the Wilson Ultra Competition Golf Balls Was Appropriate and Did Not Prejudice Bridgestone.**

Bridgestone misrepresents Acushnet's limited agreement not to conduct destructive testing on the Wilson Ultra Competition golf balls in its possession. Contrary to Bridgestone's characterizations, Acushnet agreed not to perform destructive testing on

golf balls that the parties possessed in limited numbers only until the parties resolved the issue of joint testing using an independent laboratory. That issue became moot after the January 13, 2006 discovery hearing in which the Court indicated that, in the face of Bridgestone's refusal to agree to joint testing, it would not compel such testing.

In fact, given that Bridgestone had over two dozen Wilson Ultra Competition golf balls in its own possession, it cannot have been prejudiced by Acushnet's testing of six samples.

### 1. Acushnet's Agreement Not to Perform Destructive Testing Lasted Only Until the Parties Resolved the Question of Joint Testing.

Early in the case, in order to eliminate fact issues regarding test procedures and protocols for the testing of certain prior art golf balls, Acushnet proposed that the parties agree to independent third party testing. (*See* Ex. JJ – Gruskin Ltr. to Moore, 12/22/05, at 1). In response, Bridgestone stated that it was "considering the proposal," but noted that

> it appears that from Acushnet's inventory (see list of golf balls attached to Mr. Seal's November 28 letter), the biggest issue is what testing will need to be performed on the Wilson Ultra Competition ball, given that there are only two samples. ***Until this issue is resolved, please confirm that Acushnet will not conduct any destructive testing on this ball.***

(*Id.*) (emphasis added).

On January 3, Acushnet confirmed that it would "not conduct and destructive testing on any golf ball, component or material until we have resolved this matter." (Ex. KK – Moore Ltr. to Gruskin, 1/3/06, at 2). In return, Acushnet asked that Bridgestone "also confirm that [it] will not conduct any destructive testing on any golf ball, component or material in its possession until we have agreed on a procedure." (*Id.*).

The correspondence makes clear that "this issue" and "this matter" referred to Acushnet's proposal for joint testing, a proposal to which Bridgestone never agreed. At the January 13, 2006 discovery hearing, the Court rejected Acushnet's proposal for an independent testing lab. (*See* Ex. LL – 1/13/06 Hearing Tr. at 7:14-21). Thus, by that

date, the "issue" and "matter" of joint testing had been resolved – it was rejected. Accordingly, Acushnet's agreement not to conduct destructive testing ended on that date.

### 2. In Seeking the Agreement, Bridgestone Withheld the Fact That It Had Over Two Dozen Wilson Ultra Competition Golf Balls In Its Possession.

Although Acushnet's agreement was based on Bridgestone's representation that there were "only two samples" of the Wilson Ultra Competition golf ball, Acushnet learned six months later that Bridgestone's representation was incorrect. On June 13, 2006, after repeated requests by Acushnet, Bridgestone finally provided its list of certain prior art golf balls in its possession, indicating that it had 26 Wilson Ultra Competition golf balls. (*See* Ex. MM – White Ltr. to Seal, 6/13/06 at 3). Given that Bridgestone had premised its request on the incorrect statement that there were "only two samples" of that golf ball, Bridgestone's possession of more than two dozen additional samples rendered the request no longer necessary. For comparison, note that Acushnet's list included 13 golf ball models for which Acushnet had between 10 and 26 samples. (*See* Ex. NN – Seal Ltr. to White, 11/28/05 at Attachment A). Bridgestone did not ask for similar non-destruction agreements for any of those other golf balls.

Nor did Bridgestone produce any of its golf balls to Acushnet. Instead, Bridgestone was content to let the ball remain untested and hoped that, by refusing to reach any agreement on testing with Acushnet, it could preclude Acushnet from testing and relying on the samples in its possession. This type of gamesmanship should be rejected by the Court.





### F.    The Dimple Data Relied Upon by Dr. Felker

Bridgestone also complains about a demonstrative chart attached as Exhibit 48 to Dr. Felker's report relating to the '707 patent. Dr. Felker opined that the limitation of the '707 patent, "the dimples occupy at least 62% of the ball surface," was obvious in light of the combination of the teachings of the EP '043 reference and the knowledge of one of ordinary skill in the art when that patent was filed. Dr. Felker opined that "one of ordinary skill in the golf ball art would have looked to what was common in the golf ball art at the time the patentee filed the application that resulted in the EP '043 patent and use a comparable design." (*See* Ex. F – Felker 1/16/07 Report at 50). Dr. Felker concluded that it was common during the early 1990s for golf balls to have dimple coverage well in excess of 62%. (*See id.*) Bridgestone's expert does not disagree with this conclusion. (*See* Ex. QQ – Calabria 2/20/07 Report at C-13 to C-15).

Dimple occupancy is a property that can be observed by inspection of the surface of any golf ball. Acushnet routinely monitors it competitors' product dimple occupancy, and reports these observations in documents such as its annual Competitive Ball Reviews and its Competitive Ball Database.

Dr. Felker consulted with Acushnet engineers during the preparation of his expert report to corroborate his own golf-industry experience that the state-of-the-art dimple occupancy in the mid-1990s was well over 62%. Acushnet engineers researched the issue for him, and created an exhibit chart which Dr. Felker confirmed as consistent with his own knowledge and then attached as Exhibit 48 to his report. Notably, more than a dozen of the balls on this chart are Bridgestone's own golf balls, making it difficult for Acushnet to even understand how Bridgestone could claim any prejudice in allegedly first learning of these facts.

27



Thus, although Dr. Felker relied upon conversations with Acushnet engineers and the exhibit they created for him to corroborate his personal understanding of common dimple occupancies, many documents in Acushnet's document production show the same thing. As a result of the prior production, Bridgestone's position should be rejected.

## III.    ARGUMENT

In deciding whether to preclude evidence under Fed. R. Civ. P. 37, the court should analyze the following factors: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the injured party to cure the prejudice; (3) likelihood of disruption of trial; (4) bad faith or will fullness involved in not complying with discovery rules; and (5) importance of the evidence to the proffering party. *See Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 905 (3d Cir. 1977); *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 791-21 (3d Cir. 1994).

Generally, courts have allowed parties to rely on newly-identified evidence when no prejudice is caused to the other party. *See Inline Connection Corp. v. AOL Time Warner, Inc.*, C.A. No. 02-477-MPT, 2007 WL 61883, *1-4 (D. Del., Jan. 8, 2007) (Ex.

YY) (allowing party to rely on newly-identified evidence when no prejudice caused to opposing party).

> **A.     Because Bridgestone Has Shown No Prejudice Other Than That Of Its Own Making, the Court Should Deny Its Motion.**

Here, there is no prejudice to Bridgestone except that of its own making. Nor does Bridgestone establish that *any* of the *Pennypack* factors favor exclusion. Thus, the Court should deny Bridgestone's motion in its entirety.

> **1.     The Court Should Not Exclude Evidence That Bridgestone Had An Opportunity to Inspect, But Declined.**

The duty imposed by Rule 34(a) on a responding party is to permit the inspection of documents ("to produce and permit the party making the request, or someone acting on the requestor's behalf, to inspect and copy, any designated documents ..."). Bridgestone has no basis to seek the exclusion of documents or data, ███████████████ , when it had an opportunity to inspect it and declined. *See Braun v. Agri-Systems*, CV-F-02-6482, 2006 U.S. Dist. LEXIS 25185, *10-13 (E.D. Cal., Feb. 1, 2006) (Ex. ZZ). *See also Goldbloss v. Reiman*, 55 F. Supp. 811, 821 (D.C.N.Y. 1943) (rejecting request for discovery of documents because plaintiff failed to inspect the documents when defendant made them available).

In *Braun*, although the plaintiff offered the defendant a production of documents that was disparately located in three different places, the defendant chose to inspect the documents in only one of the three locations. *Braun*, 2006 U.S. Dist. LEXIS 25185 at *11-12. When the defendant later moved to compel the production of the documents from the other two locations, the court denied it, finding that the plaintiff fulfilled its duty when it gave the defendant access to the documents. *Id.* at *12-13.

Similarly, Acushnet gave Bridgestone the opportunity to inspect the documents and data it now seeks to exclude. Having chosen to reject that opportunity, Bridgestone

now seeks to impose the consequences of that decision on Acushnet, which is improper. Bridgestone's decision should not preclude Acushnet from relying on the data.

Further, as late as March 2007, Bridgestone sought and was granted discovery on ██████████████████████████████████████. Bridgestone cannot willingly participate in discovery and then seek to exclude the fruit of that discovery as untimely. *See Helen of Troy, L.P. v. Zotos Corp.*, 235 F.R.D. 634, 637 (W.D. Tex. 2006) ("it is inconsistent for Spentech to willingly participate in a discovery event and later complain that a report based on that event and mandated by the Federal Rules is untimely merely because it took place after the discovery deadline."). Accordingly, Bridgestone's motion should be denied.

### 2.   Dr. Felker Properly Relied on the Summary Dimple Data.

Nor is Bridgestone prejudiced by Dr. Felker's reliance on a summary of readily ascertainable dimple coverage used on golf balls in the period from 1992 to 1994. The Federal Rules expressly allow experts to create such exhibits for their reports. *See* Fed. R. Civ. P. 26(a)(2)(B) ("The report shall contain ... any exhibits to be used as a summary of or support for the opinions ...."). As already explained, this document was created by Acushnet engineers at the request of Dr. Felker and counsel after the close of fact discovery, so it was not available during discovery to produce to Bridgestone. Moreover, Acushnet produced numerous documents in fact discovery that lead to the same conclusion. Bridgestone is not prejudiced by the fact that Dr. Felker engaged Acushnet's engineers to prepare a summary document for his review, particularly considering the fact that he attached the document to his expert report. Moreover, Bridgestone takes no issue – nor could it – with the underlying fact that the vast majority of golf balls produced in the early 1990s has a dimple coverage of more than 62%. (*See* D.I. 305 at 8; Ex. QQ – Calabria 2/20/07 Report at C-13 to C-15). More than a dozen of the golf balls listed on the exhibit, in fact, are Bridgestone's golf balls. Bridgestone's motion to exclude is thus

little more than an effort to exclude an indisputable fact from the Court's consideration based upon the manner in which it was presented.

### 3. Acushnet's Testing of the Wilson Ultra Competition Golf Balls Was Proper.

In its brief, Bridgestone makes no claim of prejudice from Acushnet's testing of the Wilson Ultra Competition golf balls. Nor can it. As shown above, Bridgestone itself had 26 samples of the Wilson Ultra Competition golf ball available to it for testing, had it desired to do so.

Further, Acushnet had located additional Wilson Ultra Competition golf balls in its possession and offered to produce them to Bridgestone for testing. (*See* Ex. RR – White Ltr. to Stasio, 2/15/07, at 1). On February 8, 2006, before rebuttal reports were due, Acushnet presented Bridgestone with samples of the ball and even offered Bridgestone an extension of the deadline in which to complete any testing it wished to perform. Bridgestone declined and now seeks to have the results from Acushnet's tests excluded. Bridgestone's actions underscore its strategy of avoiding a resolution of the case on the merits.



**B.    Acushnet Did Not Supplement Dr. Felker's Opinion Regarding the Invalidity of the '707 Patent and Acted Properly in Disclosing Acushnet's Additional Testing.**

Bridgestone identifies the Bulpett document (Exhibit 4 to D.I. 305) as a "supplementation" of Dr. Felker's report. It appears to do so to suggest that Acushnet violated the Court's February 2, 2007 Order in undertaking its experiments relating to the EP '043 cores. (*See, e.g.*, D.I. 305 at 4-5). Bridgestone is wrong in both cases.

As already noted, the Bulpett document was neither authored nor signed by Dr. Felker. Further, it is clear that the Court did not order Acushnet never to supplement Dr. Felker's report – instead, it simply denied Acushnet's request to supplement Dr. Felker's opinion with new art that the Court found to be untimely included in Acushnet's interrogatory answers. (*See* D.I. 288 at 10-12). The Bulpett document does not add any new art. (*See* D.I. 305 at Ex. 4). Nor does it offer any new opinions from Dr. Felker.[12] It merely confirms Dr. Felker's previously-disclosed opinion that the '707 patent is invalid as obvious in light of the EP '043 reference. It was in the spirit of complying with Rule 26 that Acushnet disclosed to Bridgestone this new information provided to Dr. Felker:

> A party who has made a disclosure under subdivision (a) ... is under a duty to supplement or correct the disclosure or response to include information thereafter acquired ... or in the following circumstances: (1) A party is under a duty to supplement at appropriate intervals its disclosures under subdivision (a) if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or

---

[12] Dr. Felker did provide a three-page supplement on March 2, 2007, only to confirm the cover Shore D hardness testing he disclosed in his January 16 report. (*See* Ex. G – Felker 2/2/07 Report at 1-3; Ex. F – Felker 1/16/07 Report at 32). As stated above, the Court's February 2 Order did not preclude such a supplement, which was in fact required by Fed. R. Civ. P. 26(e)(1). Nor has Bridgestone made any claim of prejudice from that supplementation. Accordingly, the Court should deny Bridgestone's motion.

> corrective information has not otherwise been made known to the other parties during the discovery process or in writing. With respect to testimony of an expert from whom a report is required under subdivision (a)(2)(B) the duty extends both to information contained in the report and to information provided through a deposition of the expert....

Fed. R. Civ. P. 26(e)(1).

Here, Bridgestone has failed to argue that it is even prejudiced by Acushnet's further testing and disclosure. Bridgestone in fact cannot make a credible argument that is it prejudiced. In the course of preparing these new cores, Acushnet told Bridgestone it was undertaking these additional tests (*see* D.I. 305 at 4), and even went to the effort of fully preserving six uncut cores so that Bridgestone could conduct its own testing of them, if it so desired. (*See* Ex. H – Stasio Decl. at ¶ 6). While Bridgestone has never asked Acushnet for those cores (or any of the preserved tested cores), it has had one of its own engineers manufacture cores under the teachings of EP '043 and included the tests results in its own expert report. (*See* Ex. QQ – Calabria 2/20/07 Report at C-11).[13] Bridgestone is also not prejudiced by the fact that the Bulpett document was made quickly available to Bridgestone upon completion, and then after having received it, Bridgestone took the full opportunity to depose both Mr. Bulpett and Dr. Felker on the information within it.

In the absence of prejudice, this district has allowed experts to rely on additional information and even supplement their reports. *See Inline Connection Corp.*, 2007 WL 61883 at *1-4. *See also Tucker v. Ohtsu Tire & Rubber Co., Ltd.*, 49 F. Supp.2d 456, 462 (D. Md. 1999) (expert allowed to rely on supplemental "corroborating testing" where such testing was central to party's case); *Minebea Co., Ltd. v. Pabst*, 231 F.R.D. 3, 7-8 (D.D.C. 2005); *Helen of Troy, L.P.*, 235 F.R.D. at 637 (noting that the Federal rules allowing supplementation up to thirty days before trial); *Montgomery v. Mitsubishi*

---

13 Notably, the preparation of cores pursuant to the teachings of EP '043 takes all of approximately 45 minutes of work time. (*See* Ex. I – Goguen Decl. at ¶ 5). The testing of the cores thereafter takes approximately an hour. (*See id.* at ¶ 11)·

*Motors Corp.,* 448 F. Supp.2d 619, 632-634 (E.D. Pa. 2006) (allowing evidence that confirmed expert's previously-disclosed opinion). For example, in *Inline*, the defendant served a supplemental expert report court six months after the deadline for expert reports. *Id.* at *5. The court nevertheless allowed the expert to rely on the additional information because it was disclosed more than three and half months before trial. *Id.* at *5-6. Specifically, the court found that the plaintiff "had sufficient time to review the new prior art references and substantially prepare a response thereto." *Id.* at *6. Here, the updated testing merely confirms Dr. Felker's previously-disclosed opinion. Thus, Bridgestone was not required to perform any further analysis, nor is it required to prepare any new response.

On the flip side, any prejudice to Acushnet from exclusion of the updated testing would be severe. The Court has already precluded Acushnet from relying on the Altus Newing Massy golf ball to invalidate the '707 patent. (*See* D.I. 288 at 9-10). And given the unavailability of the cores used for the previous testing under the EP '043 reference, should the Court now preclude evidence of Acushnet's updated testing, Acushnet will have no physical evidence left to support the invalidity of the '707 patent.

Because any potential prejudice to Bridgestone is far less than was present in *Inline* – and, in fact, Bridgestone has not made any claim of prejudice – the updated testing should be allowed.

### C. The Circumstances Surrounding Acushnet's Alleged Failure to Preserve Certain Evidence Do Not Rise to the Level of Spoliation.

Bridgestone presents the court with an unusual set of facts relevant to its spoliation argument:

- Acushnet voluntarily disclosed that its testing results for Batch No. 1 were, as Bridgestone believes, unfavorable;

34

- Acushnet specifically disclosed that the hardness gradient was less than eight and therefore outside the limitation of the asserted claim of the '707 patent;

- Acushnet disclosed the exact recipe it used to make Batch No. 1 cores; and

- Dr. Felker later testified that cores made according to EP 043 do not "always result in a hardness gradient that satisfies claim 1 of the '707 patent."

Yet Bridgestone unbelievably argues that it has suffered prejudice as a result of Acushnet's inability to locate the cores from the first batch and that, therefore, all Acushnet's updated EP '043 testing should be excluded. (D.I. 305 at 28).

In determining whether sanctions are an appropriate remedy for the alleged destruction of evidence, the court must consider three factors: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party, and where the offending party is seriously at fault, will serve to deter conduct in the future. *See In re DaimlerChrysler AG*, C.A. No. 00-993-JJF, Slip op. (D. Del. Nov. 25, 2003) (Ex. AAA), citing *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994).

Bridgestone has failed to present any evidence that Acushnet had any "intent to impair the ability of [Bridgestone]...to effectively litigate its case," which is necessary prove a spoliation claim. *Positran Mfg., Inc. v. Diebold, Inc.*, C.A. No. 02-466-GMS, 2003 WL 21104954, *2 (D. Del. May 15, 2003) (Ex. BBB). Acushnet's inability to locate certain cores does not rise to the level of spoliation of evidence. *See In re DaimlerChrysler AG*, C.A. No. 00-993-JJF, Slip op. (D. Del. Nov. 25, 2003), citing *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995) (no unfavorable inference arises when the circumstances indicate that the evidence in question "has been lost or accidentally destroyed, or where the failure to produce it is otherwise accounted for."). Acushnet had no reason to intentionally destroy the batch of cores that produced

results favorable to Bridgestone – not to mention the fact that Acushnet voluntarily disclosed those results to Bridgestone. (*See* Ex. I – Goguen Decl. at ¶ 12).

Moreover, Dr. Felker's invalidity opinion regarding the '707 patent is based on obviousness in light of the combination of the EP '043 reference and the knowledge of one of ordinary skill in the art, i.e., it would have been obvious for one of ordinary skill in the art to make cores according to the recipe and conditions taught in the EP '043 reference and based on his knowledge of various rubbers and/or antioxidants produce cores that had a gradient within the claimed range without undue experimentation. The fact that one batch out of four batches produced cores outside the claimed range does not "gut" Acushnet's invalidity argument as Bridgestone alleges.

Nor has Bridgestone been prejudiced. As noted above, Acushnet informed Bridgestone of the results of the testing. In most spoliation cases, "courts have admitted evidence tending to show that a party destroyed evidence relevant to the dispute being litigated. Such evidence permitted an inference, the 'spoliation inference,' that the destroyed evidence would have been unfavorable to the position of the offending party." *Schmid*, 13 F.3d at 78. Here, that sanction is unnecessary because Acushnet has voluntarily disclosed the "unfavorable" evidence.

Barring all evidence related to the '707 testing would be a "drastic" sanction that would only be appropriate if Bridgestone had been deprived of the use of evidence to prove its claim. *Id.* at 79. That is not the case here. Bridgestone's motion to exclude evidence of the updated EP '043 testing should be denied.

### D. Bridgestone's Request for an Inspection of Acushnet's Facilities is Meritless and Untimely.

In an attempt to further prejudice Acushnet, Bridgestone makes the unnecessary and untimely request that the Court order a third-party inspection of Acushnet's facilities, at Acushnet's expense. To support that request, Bridgestone cites the Court's January 13, 2006 statement that it would "entertain a search proposal by an independent contractor."

36

(Ex. LL – 1/13/06 Hearing Tr. at 11).  What Bridgestone fails to acknowledge, however, is that the Court's statement was directed to ***Bridgestone*** for Bridgestone's failure to produce documents related to the research and development of its golf balls.  (*See id.*).

At that hearing, in response to Acushnet's motion to compel, the Court ordered Bridgestone to produce all documents related to the development of its golf balls by January 30, 2006 and noted that it would entertain the independent search "[i]f there's no production or of there's a belief that the production is inadequate."  (*Id.*)  The Court further noted that "If there's one document after that search proposal is ordered that is found, I'll entertain a second application for serious sanctions."  (*Id.*)

Despite that clear warning, Bridgestone still did not produce all of its development documents by the Court-ordered deadline.  On January 30, in response to the Court's Order, Bridgestone dumped over 95,000 pages of documents on Acushnet, while at the same time refusing to admit that the documents (the overwhelming majority of which were in Japanese) were either responsive, relevant, or non-duplicative of documents already produced.  (*See* Ex. SS – Masters Ltr. to Seal, 1/30/06, at 1).  Nevertheless, when Acushnet began deposing Bridgestone's witnesses, it identified several deficiencies in Bridgestone's production.

███████████████████████████████████████████████████ Thus,

if any party should be subjected to a third-party search, it is Bridgestone.

Regardless, Bridgestone's request is meritless because the documents it identifies

as outstanding were made available to it for inspection, but Bridgestone declined to do so.

The two categories of documents identified by Bridgestone in its brief are ████



Bridgestone

declined those offers and now seeks to penalize Acushnet for its decision.

Also, the request is untimely. As Bridgestone has repeatedly informed this Court,

fact discovery has closed, and "there is no time for Bridgestone to conduct additional

discovery." (D.I. 276 at 10). Because Bridgestone declined to inspect the databases and

documents about which it now complains when it had the opportunity to do so, it is

apparent that Bridgestone's request is intended to harass Acushnet, rather to conduct any

meaningful discovery.

### E. Bridgestone's Request for Costs Related to Testing Should Be Denied.

Bridgestone seeks reimbursement from Acushnet for testing performed by Dr.

Caulfield to determine the cover thicknesses, because his resulting data is somewhat

similar to the QAS data relied on by Dr. Felker. (*See* D.I. 305 at 33). The facts,

however, show that Bridgestone's request is without merit and should be denied. Dr.

Caulfield began the testing process in 2003, even before the litigation began. (*See* Ex.

XX – Caulfield Dep. at 237:10-238:9 (rough)). Further, he testified that he presumed

Acushnet had data such as ████████ on which Dr. Felker relied, but did not review it

because he was not interested in it. (*See id.*). He further stated that, even had he had the

data, he still would have measured cover thickness using the method disclosed in his report, because he believes it to be more reliable than the method used to obtain ███. (*See id.* at 245:15-24; 254:1-14). Thus, regardless of whether Bridgestone had ███ or not, Dr. Caulfield would not have tested cover thickness any differently than he did. Accordingly, Bridgestone's motion for costs associated with that testing should be denied.

## IV.    CONCLUSION

For the foregoing reasons, Acushnet respectfully requests that the Court deny Bridgestone's motion for sanctions.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Alan M. Grimaldi
Joseph P. Lavelle
Kenneth W. Donnelly
Brian S. Seal
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004
Tel:  (202) 783-0800

Dated:  April 3, 2007
Public Version Dated:  April 10, 2007
788447/28946

By:   */s/ David E. Moore*
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 North Market Street
P. O. Box 951
Wilmington, DE  19899-0951
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant*
*Acushnet Company*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on April 10, 2007, the attached document was hand

delivered to the following persons and was electronically filed with the Clerk of the Court using

CM/ECF which will send notification to the registered attorney(s) of record that the document

has been filed and is available for viewing and downloading:

Jack B. Blumenfeld
Maryellen Noreika
Leslie A. Polizoti
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
Wilmington, DE 19801

I hereby certify that on April 10, 2007, I have Electronically Mailed the documents to the

following:

Robert M. Masters
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, D.C. 20005
RobMasters@paulhastings.com

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

680012 / 28946