# EXHIBIT AA

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT BB

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT CC

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT DD

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT EE

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT FF

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT GG

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT HH

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT II

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRIDGESTONE SPORTS CO.,        )
LTD.,                          )
                               )
            Plaintiff,         )
                               ) C.A. No. 05-132-JJF
v.                             )
                               )
ACUSHNET COMPANY,               )
                               )
            Defendant.         )


February 2, 2007
10:39 a.m.
Courtroom 4B


844 King Street
Wilmington, Delaware


BEFORE:  THE HONORABLE JOSEPH J. FARNAN, JR.
         United States District Court Judge


APPEARANCES:


        MORRIS, NICHOLS, ARSHT & TUNNELL
        BY:  JACK B. BLUMENFELD, ESQ.

              -and-

        PAUL HASTINGS
        BY:  ROBERT M. MASTERS, ESQ.
        BY:  BRANDON WHITE, ESQ.

                    Counsel for Plaintiff

6

1    established by the existing Court orders.

2              Additionally, although the

3    extensions of deadlines that would be required

4    may fairly be characterized as moderate, and the

5    time and expense they entail, however, were

6    avoidable or was avoidable.

7              In sum, based on these findings, I

8    conclude that the preclusion in this case is

9    warranted given the circumstances.  And,

10   therefore, plaintiff's motion is denied.

11              Now, with regard to plaintiff

12   Bridgestone's motion to compel --

13              MR. BLUMENFELD:  Your Honor, I think

14   you said denied.  I think our motion would have

15   been granted.

16              THE COURT:  Granted.  I'm sorry.

17              I meant to say granted.

18              MR. BLUMENFELD:  Thank you.

19              THE COURT:  The plaintiff,

20   Bridgestone's motion to compel the number of

21   requested admissions is excessive, and therefore,

22   the motion to compel will be denied.

23              With regard to the 30(b)6 notices, I

24   find that the depositions requested are

1    warranted; however, per the parties' agreement,

2    no revisiting of topics will be permitted during

3    the course of the depositions.  And I'm going to

4    grant leave to Acushnet to suspend a deposition

5    if they believe that the testimony sought is

6    outside that agreement.

7             And hopefully you'll be able to get

8    me on the phone.  And if you can't, you can

9    suspend the deposition and leave, and then I'll

10   take up the matter separately.  So it will be

11   important to be careful in the examination during

12   those depositions.

13            All right.  I thought that that

14   would -- there's one other, in my view, minor

15   matter pending, which I'll get to, but I thought

16   decision on these matters would help you move

17   along.  Is there anything else that you think I

18   could address that would help you move along

19   given the stage of where we are?

20            MR. BLUMENFELD:  From our side, I

21   don't think so, Your Honor.  We're moving along

22   with expert discovery and have a pretrial

23   conference in May.  And I think things are moving

24   in that direction.

# EXHIBIT JJ



2100 Pennsylvania Avenue, NW
Washington, DC 20037-3213

T 202.293.7060
F 202.293.7860

www.sughrue.com

December 22, 2005

*Via Facsimile: (202) 383-6610*

Mr. Matthew J. Moore
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004

> Re:  **Deficiencies in Acushnet Production**
> *Bridgestone Sports Co., Ltd. et al. v. Acushnet Co.*
> Civil Action No. 05-132 (JJF)

Dear Matt:

This is in response to your December 12, 2005 letter regarding Bridgestone's discovery response.

Initially, we note that Bridgestone supplemented its response to Acushnet Interrogatory No. 18 on September 30, 2005, and will further supplement its response by the end of this week.

Bridgestone plans to supplement its response to Acushnet Interrogatory No. 7-9, 12, 17, 19, 21, 22, and 25 by the end of this week.

Regarding paragraph 2, first, Acushnet's interrogatory responses are deficient because they do not set forth Acushnet's contention as to the specific combinations of prior art and why it would have been obvious to make such combinations. Bridgestone reserves the right to supplement its response to Interrogatory No. 10 at a later date.

Regarding paragraph 3, we have produced the Bridgestone-Callaway agreement and related documents bearing Bates Nos. BSP058856-95 and BSP058908 -58982 on December 22, 2005. We confirm that Bridgestone has neither licensed nor offered to license the Bridgestone Patents to any other entity, excluding Bridgestone's discussions with Acushnet.

Regarding paragraph 8, Acushnet bears the burden to prove damages it claims are not limited by 35 U.S.C. §287. In addition, the Interrogatory No. 23 is premature and Bridgestone's investigation is ongoing. Bridgestone will amend or supplement its contentions after further investigation, to the extent Bridgestone maintains this affirmative defense.

Regarding paragraph 10, as noted in our letter of December 22, 2005, Bridgestone has produced non-privileged, responsive documents. *See e.g.*, BSP0058896-58898; BSP058856-95, and BSP058908 -58982. In addition, we are providing documents bearing Bates Nos. BSP099230-99629. We believe our production in response to Acushnet Request No. 10 is complete.

12/22/2005 17:15 FAX  2022937860

 **Sughrue**
SUGHRUE MION, PLLC

Mr. Matthew J. Moore
HOWREY LLP
December 22, 2005
Page 2

Regarding paragraphs 11 and 12, see our letter of December 22 responding to your letter of November 10.

We can discuss these issues during our next meet and confer.

Very truly yours,

Steven M. Gruskin
Raja N. Saliba

SMG/RNS/KKT

/22/2005 17:15 FAX  2022937860                                              ☑001/003



**Sughrue**

2100 Pennsylvania Avenue, NW
Washington, D.C 20037-3213
T 202.293.7060
F 202.293.7860

www.sughrue.com



| | | |
|---|---|---|
| Date | Matthew J. Moore | |
| Of | Howrey LLP | |
| Fax | 202-383-6610 | |
| From | Steve Gruskin | |
| Subject | Bridgestone v. Acushnet | |
| Our Ref | L10518 | Your Ref |
| Pages (including cover sheet) | 3 | |

Please call attention to problems with this transmission by return fax or telephone. Thank you.

THE INFORMATION CONTAINED IN THIS COMMUNICATION IS CONFIDENTIAL, MAY BE ATTORNEY-CLIENT PRIVILEGED, AND IS INTENDED ONLY FOR THE USE OF THE ADDRESSEE. UNAUTHORIZED USE, DISCLOSURE OR COPYING IS STRICTLY PROHIBITED AND MAY BE UNLAWFUL. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US.

# EXHIBIT KK

*Draft 8/30/06 & License*

# HOWREY LLP

1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
www.howrey.com

**Matthew J. Moore**
Partner
T 202.383.7275
F 202.383.6610
moorem@howrey.com

January 3, 2006

BY FACSIMILE

Steven M. Gruskin, Esq.
Raja N. Saliba, Esq.
Sughrue Mion, PLLC
2100 Pennsylvania Avenue, N.W.
Washington, D.C. 20037-3213

> Re:  **Testing Procedures**
> *Bridgestone Sports Co. v. Acushnet Co.*
> **Civil Action No. 05-132 (JJF) (D. Del.)**

Dear Steve and Raja:

We have received your letter of December 22 regarding our proposal for joint testing by an independent third party.

While we agree that the question of testing is important with regard to the Wilson Ultra Competition ball, due to the extremely limited number of those balls in Acushnet's possession, the question applies with equal importance to a number of other prior art golf balls. For example, Acushnet has only two dozen or fewer samples of most of the prior art golf balls in its possession. Bridgestone, however, has requested six samples of each golf ball. Depending upon the number of tests you intend to perform under your testing protocols, which we would then need to duplicate and vice versa, the testing requirements could exhaust or even outstrip the number of available balls. That is the reason we proposed testing by an independent third party, which should, at a minimum, eliminate the need for each party to duplicate the testing performed by the other party.

With regard to the plaques, finished balls and ball components, due to manufacturing variances, each plaque, ball and component is separate and distinct from the others and thus may have different properties. Therefore, so that both parties have access to the same data, we need to come to an agreement regarding the prompt return of any plaque, ball, or ball component tested.

**HOWREY** LLP

Steven M. Gruskin, Esq.
Raja N. Saliba, Esq.
January 3, 2006
Page 2

We confirm that we will not conduct any destructive testing on any golf ball, component or material until we have resolved this matter. In return, we ask that you also confirm that Bridgestone will not conduct any destructive testing on any golf ball, component or material in its possession until we have agreed on a procedure.

Very truly yours,

*Matt Moore*

Matthew J. Moore

# EXHIBIT LL

*Bridgestone Sports Co., LTD, et al.   v.*
*Acushnet Company*

---

*Hearing*
*January 13, 2006*

---

*Hawkins Reporting Service*
*715 N King Street*
*Suite 3*
*Wilmington, DE   United States of America   19801*
*(302) 658-6697*

Original File 011306~1.TXT, 41 Pages
Min-U-Script® File ID: 4283608519

**Word Index included with this Min-U-Script®**

Bridgestone Sports Co., LTD, et al.  v.
Acushnet Company

---

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
BRIDGESTONE SPORTS CO.,)
LTD and BRIDGESTONE GOLF.)
INC.                    )
          Plaintiffs.    )
                         )  C.A. No. 05-192 JJF
v                        )
                         )
ACUSHNET COMPANY.)
          Defendant.    )
     Friday, January 13. 2006
          3:37 p.m
          Courtroom 4B
          844 King Street
        Wilmington, Delaware
BEFORE: THE HONORABLE JOSEPH J. FARNAN. JR
     United States District Court Judge
     APPEARANCES:
     MORRIS. NICHOLS, ARSHT & TUNNELL
     BY: JACK BLUMENFELD, ESQ
          -and-
     SUGHRUE MION, PLLC
     BY: ROBERT M. MASTERS. ESQ.
     BY: STEVEN M. GRUSKIN, ESQ.
     BY: RAJA M. SALIBA, ESQ.
          Counsel for the Plaintiffs

---

Page 2

APPEARANCES CONTINUED:
     POTTER, ANDERSON & CORROON. LLP
     BY: DAVID E. MOORE. ESQ.
          -and-
     HOWREY, LLP
     BY: MATTHEW MOORE, ESQ
     BY: BRIAN S. SEAL, ESQ
          Counsel for Defendant

---

Page 3

[1] THE CLERK: All rise.

[2] THE COURT: All right. Good [3] afternoon. Be seated, please.

[4] (Everyone said Good afternoon, Your [5] Honor.)

[6] THE COURT: All right. This is [7] going to be kind of like one of those, what do [8] they call them, presidential news conferences.

[9] I'm going to make a brief statement [10] and then I'll entertain a few questions, and then [11] I'm going back to the gold room or something. So [12] my plan is to give you — I've read your papers [13] and have a sense about where each side is.

[14] So I'm going to make my rulings. [15] I'm going to allow each side to take up after it [16] today one of the rulings on a motion to [17] reconsider. So if I have hurt you terribly and [18] prejudiced you unduly, you'll have the [19] opportunity to file against one of the issues.

[20] You can pick any one you don't like [21] the ruling on, and put it out there more fully to [22] me to explain why I'm such a fool. And then I'm [23] going to have you back in short order, because I [24] can just tell that you're not getting along well

---

Page 4

[1] enough to move the discovery forward.

[2] So I'm going to probably have to get [3] you back maybe the first week of February after I [4] give you a little time, and we'll pick that date [5] today so you

---

[6] know when you're coming back.

[6] And let me start by these rulings on [7] some motions. Defendant's motion to bifurcate [8] liability from damages and willfulness, DI44 is [9] denied.

[10] Defendant's motion for [11] representative claims and to require detailed [12] infringement contentions, DI47 is denied with [13] leave to renew.

[14] Now, when can that be renewed? That [15] can be renewed sometime around May 1 of 2006.

[16] That's a little bit of time before [17] the July 24, 2006 Markman. So somebody in one of [18] the papers said when? That's when, around May 1.

[19] Next, plaintiff — excuse me. [20] Plaintiff's motion to strike defendant's reply [21] brief, DI627. That's going to be granted.

[22] And in my view, the document was, [23] you know, labeled for Rule 4087 with discussions. [24] I've classified this, and I've read where it was

---

Page 5

[1] obtained independently. And I read the [2] paragraph, and I went all through that.

[3] But that wasn't persuasive enough [4] for me. I'm going to call this the fruit of the [5] poisonous plant, you see, because it grew out of [6] that.

[7] You just can't have it. So you lose [8] it. So that motion is granted.

[9] Now, next I'm going to turn to [10] Bridgestone's letter, and I guess the best way — [11] I'm not going to jump around. Let's just take [12] what's numbered Number 1, and then go to Page 4.

[13] And I was particularly struck by the [14] final paragraph, regardless of whether Acushnet [15] thinks the Pro 6 — what's that, Pro V1?

[16] No, Pro V1.

[17] MR. MOORE: Pro, V1 star. That's [18] supposed to be a star, but...

[19] THE COURT: Are they the ones that [20] cost $60 a box?

[21] MR. MOORE: No. They were just [22] introduced in 2002 and discontinued in 2002.

[23] And it has not — it's a completely [24] different ball than the Pro V1 or the Pro V1*,

---

Page 6

[1] completely different instructions, [2] completely [2] different properties. Not part of the same [3] development project, not part of the same —

[4] THE COURT: You're not allowed to [5] argue. You're not allowed to argue. I just [6] asked you how to say that ball's name.

[7] All documents relating to golf balls [8] are clearly relevant and responsive bec-

---

[8] ause they [9] form part of the development history of the [10] entire family of golf balls. Solely on this [11] basis, Bridgestone is entitled to complete [12] discovery.

[13] On this, I think you've got [14] discovery and I'm going to deny the request. Of [15] course, if you want to take that one and do it in [16] more detail and show me how it's relevant, and if I [17] really prejudiced you by that ruling, I'll take [18] it up.

[19] Number two, Bridgestone's entitled [20] to full and complete responses to its [21] damages-related discovery. Absolutely.

[22] You got my ruling on bifurcation. [23] So, you know, you've got to get it done.

[24] And I was asked for a date certain.

---

Page 7

[1] I'll just say March 1, 2006.

[2] And if you can agree on some other [3] date, I'll be willing to accept that. But if [4] you can't, it's March 1, 2006.

[5] Number 3, Bridgestone's entitled to [6] samples of golf balls components and component [7] materials requested in Document Request 116, 117, [8] and 119.

[9] I'm told Acushnet's counsel now [10] takes the position that it will not produce the [11] samples unless the parties agree to conduct joint [12] testing or alternatively return new tested [13] samples promptly after testing is complete.

[14] According to Acushnet's counsel, I [15] went back and I read Exhibit H. Any component or [16] ball subject to such testing must be returned to [17] us within two days.

[18] But I think the letter said you need [19] it back in a week as certain properties of that [20] component may change shortly after the [21] destructive testing. Candidly, I don't get it, [22] because I guess there can be some variance [23] between golf balls.

[24] I mean, they're the same make golf

---

Page 8

[1] ball. And I guess one side could test it, and [2] then when it tests the same ball that was tested, [3] or have it independently tested.

[4] But I don't understand why you just [5] can't have two golf balls in my, you know, [6] uninformed way, out of a sleeve and [7] test it the same way. If you get different [8] results, then we've got some fun.

[9] MR. MOORE: That's exactly what we [10] want, because undoubtedly when you test the ball, [11] you expose the core. It may change because of [12] atmospheric conditions like moisture in the air.

[13] So, and we just want to be able to [14]

---

Min-U-Script®

Hearing
January 13, 2006

Bridgestone Sports Co., LTD, et al.   v.
Acushnet Company

**Page 9**

[15] retest exactly what they test. And this is actually part of the larger issue that we would [16] like to propose, an independent testing lab.

[17] THE COURT: Well, I'm not going to [18] go there. But I've given my explanation. I [19] think that's what ought to occur.

[20] I don't understand the problem, I [21] guess, if that's not a solution.

[22] Number 4, Bridgestone's entitled to [23] a complete response to its Interrogatory Number [24] 8. Bridgestone requests the Court to order — in

**Page 9**

[1] the end of the paragraph — Acushnet to identify [2] what patents, the opinions relate or patents [3] relate to, and whether the opinion is oral or [4] written.

[5] And that very simple application [6] will be granted. This is the last one.

[7] Now, we're going to go to Acushnet's [8] letter. The first issue identified is [9] identification of facts regarding alleged failure [10] to mark.

[11] Again, I don't think we're at the [12] point where I would entertain any motions to [13] strike affirmative defenses, but I'll grant the [14] application as structured.

[15] The next issue is identification of [16] facts regarding objective evidence of [17] non-obviousness of the Bridgestone's patents. [18] Acushnet had not contended a Bridgestone patent [19] was invalid for obviousness, and you know, it [20] goes on to tell me all about that.

[21] And then in the next paragraph I [22] read that Bridgestone states that Acushnet's [23] interrogatory responses are deficient because [24] they do not set forth Acushnet's contention as to

**Page 10**

[1] the specific combination of prior art, and why it [2] would have been obvious to make such [3] combinations.

[4] That's Number 1. And that cites the [5] Gruskin letter.

[6] There are a number of responsive [7] facts. And then the key word when a judge reads [8] these kind of letters, however. See, that's a [9] bad thing to do, because it sets me up to go back [10] and look at the first request, the prior art [11] combinations.

[12] However, which Bridgestone must [13] produce including facts supporting any claim or [14] commercial success, long-felt need, et cetera. [15] Acushnet is entitled to the production of [16] documents. I agree, and the application will be [17] granted.

[18] The next issue, production of [19] development data. That's going to be granted.

**Page 11**

[20] The production of development data [21] for Bridgestone's patents and the accused [22] Bridgestone golf balls including e-mail and [23] documents from the personal files of the named [24] inventors.

**Page 11**

[1] Now, that was ordered before. And, [2] I guess, after the 30(b)6, there's some question [3] that it wasn't — the information wasn't properly [4] polled or something.

[5] So I'm going to grant that request [6] and order it be produced in ten days. If there's [7] no production or if there's a belief that the [8] production is inadequate, I'll entertain a search [9] proposal by an independent contractor, and it can [10] include interviewing of personnel.

[11] I'll entertain any idea that you [12] think will expose the failure to comply with my [13] order. If there's one document after that search [14] proposal is ordered that's found, I'll entertain [15] a second application for serious sanctions.

[16] So next is production of data on the [17] Titleist HP Eclipse and Tour Distance golf balls. [18] That's granted and should be produced within 20 [19] days.

[20] As to the last request, detailed [21] infringement contentions, infringement in the [22] request itself, it cites the February date. So [23] I'm not going to entertain any application on [24] that, because I'm going to — I've concluded that

**Page 12**

[1] that's premature.

[2] But certainly it's not an [3] unreasonable request. I guess you're just going [4] to have to wait.

[5] You're getting pushed up against [6] dates, which seems to be part of your [7] interaction. Okay.

[8] That resolves the two letters and [9] the motions that were filed. And I'll now [10] entertain questions.

[11] MR. MOORE: Your Honor, one question [12] about the representative claims motion that was [13] denied. You said that we could file again on [14] May 1st, or —

[15] THE COURT: Yes.

[16] MR. MOORE: — do you want the [17] briefing done by May 1st for representative [18] claims by around May 1st?

[19] THE COURT: Here's what I want you [20] to do.

[21] MR. MOORE: Okay.

[22] THE COURT: I want you — because [23] we're going to get ready for the Markman hearing.

[24] MR. MOORE: Yes.

**Page 13**

[1] THE COURT: So if the Markman [2] hearing is going to be about claim construction, [3] we ought to know what claims are in the case, the [4] representative claims. So I have to know what [5] the representative claims are by May 1, so that [6] you can prepare for the July Markman.

[7] MR. MOORE: Okay. So we agree [8] representative claims will be picked by May 1?

[9] THE COURT: Yes.

[10] MR. MOORE: Okay. Thank you.

[11] THE COURT: Is that helpful?

[12] MR. MOORE: Will that is the date to [13] bring the motion, or we could bring it earlier or [14] before representative claims on that date. Do [15] you have an idea of what number of claims you're [16] thinking about?

[17] THE COURT: Two.

[18] MR. MOORE: Perfect.

[19] THE COURT: But you can expand on [20] that if you want. Now, I have no idea.

[21] I've read what you said and I mean, [22] I understand there's a little different view [23] about whether the case is complex or how many [24] claims you should have in.

**Page 14**

[1] I can tell you that I've listened to [2] a couple of Federal Circuit judges who agree [3] that district judges have the authority to do [4] that. And they've talked about, like, taking [5] hundreds of claims and reducing them to, like, 15 to 20.

[6] And then they've debated. I've [7] heard them go back and forth.

[8] I think you have to make a proposal [9] and then I have to — I can order a proposal be [10] submitted. Then I can listen to each side, and [11] then I'll decide what I think will work in this [12] case.

[13] And then I think it's an abuse of [14] discretion standard. So I'm — what I'm trying [15] to tell you is I'm open.

[16] MR. MOORE: Okay. Great. [17] Thank you.

[18] THE COURT: Does that help?

[19] MR. MOORE: Yes.

[20] MR. BLUMENFELD: Your Honor, we had [21] one question. On the Bridgestone letter, the [22] third item, the golf ball components, we just [23] weren't exactly clear as to what you ordered [24] Acushnet to do.

**Page 15**

[1] THE COURT: Okay. Let's go back to [2] the Bridgestone letter. And that's — [3] we're talking about testing.

# EXHIBIT MM

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT NN

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT OO

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT PP

# EXHIBIT QQ

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT RR

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT SS



2100 Pennsylvania Avenue, NW
Washington, DC 20037-3213
T 202.293.7060
F 202.293.7860

www.sughrue.com

**Robert M. Masters**
T 202.663.7434
RMasters@Sughrue.com

January 30, 2006

*__Via Hand Delivery__*

Brian S. Seal
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004

        Re:    Bridgestone Sports v. Acushnet
               Our Ref.: L10518

Dear Brian:

        Pursuant to the Court's January 18, 2006 Order, Bridgestone is producing under cover of this letter documents bearing Bates Nos. BSP101389-196422, and four compact discs containing documents bearing Bates Nos. BSP145269-177749 and 196422.

        Bridgestone does not admit that all of these documents are responsive to Acushnet's Document Request Nos. 1, 4, 5, 48 and 62 and reserves the right to argue otherwise. Bridgestone also does not admit that these documents are relevant to the issues in this matter. Lastly, while we made attempts to eliminate duplicates, some of the documents may have been previously produced to Acushnet.

        Please contact me if you have any questions.

                            Sincerely,

                            Robert M. Masters

# EXHIBIT TT

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT UU

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT VV

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT WW

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT XX

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT YY



Slip Copy
Slip Copy, 2007 WL 61883 (D.Del.)
(Cite as: Slip Copy)

Page 1

**H**
Inline Connection Corp. v. AOL Time Warner Inc.D.Del.,2007.Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
INLINE CONNECTION CORPORATION,
Broadband Technology Innovations, LLC, and PIE Squared, LLC, Plaintiffs,
v.
AOL TIME WARNER INCORPORATED, et al., Defendants.
INLINE CONNECTION CORPORATION,
Broadband Technology Innovations, LLC, and PIE Squared, LLC, Plaintiffs,
v.
EARTHLINK, INC., Defendant.
**No. CIVA 02-272 MPT, CIVA 02-477 MPT.**

Jan. 8, 2007.

Thomas C. Grimm, and Julia Heaney, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, Ky E. Kirby, and C. Joël Van Over, Bingham McCutchen LLP, Washington, D.C., James B. Lewis, Bingham McCutchen LLP, Palo Alto, CA, Donn P. Pickett, Bingham McCutchen LLP, San Francisco, California, for Plaintiffs Inline Connection Corporation, Broadband Technology Innovations, LLC and Pie Squared, LLC., of counsel.
Frederick L. Cottrell, III, and Kelly E. Farnan, Richards, Layton & Finger, P.A., Wilmington, Delaware, Robert J. Gunther, Jr., and Kurt M. Rogers, Latham & Watkins LLP, New York, New York, David A. Nelson, Latham & Watkins LLP, Chicago, Illinois, for Defendant America Online, Inc., of counsel.
Gary W. Lipkin, Duane Morris LLP, Wilimington, Delaware, L. Norwood Jameson, and Matthew C. Gaudet, Duane Morris LLP, Atlanta, Georgia, for Defendant EarthLink, Inc., of counsel.

*MEMORANDUM OPINION*
THYNGE, Magistrate J.

### I. INTRODUCTION

*1 This is a patent infringement case. Inline Communication Corporation [FN1] ("Inline") sued America Online Inc. ("AOL") on April 12, 2002, and EarthLink, Inc. ("EarthLink") on June 4, 2002,

alleging infringement of U.S. Patent Nos. 5,844,596 ("the '596 patent"), 6,243,446 ("the '446 patent"), and 6,236,718 ("the '718 patent"). [FN2]

> FN1. Inline initially sued AOL and Earthlink. Since the original filing of the complaints, other plaintiffs have been added because of their contractual relationships with Inline. For ease of reference, all plaintiffs shall be referred to as Inline.

> FN2. Inline's U.S. Patent No. 6,542,585 ("the '585 patent") was subsequently added to the litigation after it was issued in 2003. The '718 patent is no longer at issue in the litigation.

Inline filed two separate motions requesting that the court preclude defendants' invalidity expert, David L. Waring, from offering certain testimony at trial. Inline's first motion is directed at Waring's April 18, 2006 expert report (the "April 18 Report") reciting his opinions of lack of enablement and obviousness. [FN3] Inline contends that the opinions recited therein are the product of improper standards and unreliable methods. Inline's motion directed to the April 18 Report will be addressed in a separate opinion. Inline's second motion is directed at Waring's October 20, 2006 supplemental expert report (the "Supplemental Report"), which Inline argues should be excluded as untimely and prejudicial. [FN4] For the reasons discussed, Inline's motion to exclude the Supplemental Report and testimony related thereto from trial will be granted in part and denied in part.

> FN3. D.I. 524 (Plaintiffs' Motion to Exclude Certain Testimony Relating to the Expert Report of David L. Waring).

> FN4. D.I. 526 (Plaintiff's Motion to Exclude Testimony relating to the Supplemental Expert Report of David L. Waring).

### II. POSITIONS OF THE PARTIES

On April 18, 2006, defendants served Waring's expert report, which included opinions concerning, among other things, the defense of invalidity. On June 30,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 61883 (D.Del.)
**(Cite as: Slip Copy)**

2006, Inline responded by submitting a rebuttal expert report by Dr. William Beckmann. Subsequently, the parties deposed both individuals, with the final day of depositions completed on the date expert depositions were to have been completed, July 21, 2006.[FN5] On October 20, 2006, subsequent to the October 16, 2006 date motions seeking to limit or exclude expert testimony were originally due,[FN6] and a week prior to the extended deadline for filing of those motions,[FN7] defendants served the Waring's Supplemental Report reciting invalidity opinions based on two additional prior art references. [FN8]

FN5. D.I. 392 (Amended Scheduling Order).

FN6. *Id.*

FN7. D.I. 505 (Stipulation for Extension of Time).

FN8. D.I. 547, Ex. 1 (Supplemental Expert Report of David L. Waring Regarding the Invalidity of U.S. Patents Nos. 5,844,596, 6,243,446, and 6,542,585). The two new prior art references are: (1) A.H. Ithell and W.G.T. Jones, *A Proposal for the Introduction of Digital Techniques into Local Distribution,* Proceedings of the International Zurich Seminar on Digital Communications (March 7-9, 1978) (the "Ithell & Jones Article"); and (2) the AT & T Voice Data Multiplexer system (the "VDM System").

Inline complains of the timing of this filing, and defendants' failure to seek leave of the court for its filing. Inline moves for the exclusion from trial of the Supplemental Report and any testimony about the information and opinions contained therein. Inline contends that the Supplemental Report is based on two prior art references that have never before been raised by defendants. Since discovery in this case is closed, Inline has had no opportunity to conduct discovery necessary to challenge Waring's newly-raised assertions of invalidity. Therefore, Inline contends that testimony regarding the Supplemental Report will substantially prejudice its right to a fair trial and should be excluded pursuant to Federal Rule of Civil Procedure 37(c)(1) and Federal Rule of Evidence 403.

Defendants contend that despite diligent effort to locate relevant prior art, they were not aware of the two new references prior to serving Waring's April

18 Report. They first learned of those references when provided courtesy copies by Verizon Internet Services, Inc. ("Verizon"), who had produced them to Inline in separate litigation involving the patents-in-suit pending before another judge in this court.[FN9] Defendants assert that upon receipt of those references, Waring and defendants evaluated them and promptly served the Supplemental Report. Defendants characterize Inline's motion as effectively one to sanction defendants for failing to find the "proverbial needle in the haystack." Defendants maintain that Inline ignores the fact that finding prior art is often an extremely difficult exercise, particularly in a case such as this where prosecution of the patents-in-suit continued for many years, thereby complicating the location of prior art. Defendants assert that the two new references are important to presentation of their invalidity defenses. Finally, defendants argue that Inline ignores the Federal Rules of Civil Procedure and precedent from the Third Circuit Court of Appeals which, they maintain, provides for supplemental expert disclosure based on newly discovered information.

FN9. *Inline Connection Corp. v. Verizon Internet Servs., Inc.,* District of Delaware Civil Action No. 05-866(JJF). That case was partially stayed on April 13, 2006 pending the outcome of this case. 05-886(JJF), D.I. 92.

### III. DISCUSSION

**\*2** The Supplemental Report recites Waring's opinions that the Ithell & Jones Article and the VDM System invalidate the claims of the patents-in-suit. Inline argues that the Supplemental Report is untimely and permitting Waring's testimony of the opinions contained therein will greatly prejudice its ability to prepare for trial and, therefore, such testimony should be excluded.

Federal Rule of Civil Procedure 26(a)(2)(B) requires an expert report to "contain a complete statement of all opinions to be expressed and the basis and reasons therefore." Rule 26(a)(2)(C) states that "[t]he parties shall supplement these disclosures when required under subdivision (e)(1)." Rule 26(e)(1) states that:
A party who has made a disclosure under subdivision (a) ... is under a duty to supplement or correct the disclosure or response to include information thereafter acquired if ordered by the court or in the following circumstances: (1) A party is under a duty to supplement at appropriate intervals its disclosures

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 61883 (D.Del.)
(Cite as: Slip Copy)

under subdivision (a) if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. With respect to testimony of an expert from whom a report is required under subdivision (a)(2)(B) the duty extends both to information contained in the report and to information provided through a **deposition** of the expert....

Federal Rule of Civil Procedure 37(c)(1) states, "[a] party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence at a trial...."

The determination of whether to exclude evidence is committed to the court's discretion.[FN10] The Third Circuit has noted, however, that:

> FN10. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir.1994).

While evidentiary rulings are generally subject to a particularly high level of deference because the trial court has a superior vantage point to assess the evidence ..., evaluating the reliability of scientific methodologies and data does not generally involve assessing the truthfulness of the expert witnesses and thus is often not significantly more difficult on a cold record. Moreover, here there are factors that counsel in favor of a hard look at (more stringent review of) the district court's exercise of discretion. For example, because the reliability standard of Rules 702 and 703 is somewhat amorphous, there is a significant risk that district judges will set the threshold too high and will in fact force plaintiffs to prove their case twice. Reducing this risk is particularly important because the Federal Rules of Evidence display a preference for admissibility.[FN11]

> FN11. *Id.* at 749-50 (citation omitted).

The Third Circuit also noted that " 'the exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence," ' [FN12] and identified several factors for the court to consider in deciding whether to exclude testimony:

> FN12. *Id.* at 791-92 (quoting *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 905 (3d Cir.1977)).

*3 (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the district court's order.[FN13]

> FN13. *Paoli*, 35 F.3d at 791.

The Third Circuit also stated that " 'the importance of the excluded testimony' should be considered." [FN14]

> FN14. *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir.1997) (quoting *Meyers*, 559 F.2d at 904).

Expert reports on which each party bears the burden of proof were exchanged on April 18, 2006, rebuttal reports were exchanged on June 30, 2006. On July 11, 2006, defendants sent a letter to Inline stating that the previous day they had received from Verizon certain documents previously unknown to them and that, based on an initial review of those documents, the documents appeared to be prior art relevant to the validity of the patents. The letter stated that "[w]e reserve the right to supplement Defendants' expert report regarding the invalidity of the patents-in-suit based on these materials." [FN15] Inline did not respond to that letter.[FN16] Waring was deposed on July 18 and 19, 2006 and all expert depositions were completed on July 21, 2006. On October 20, 2006, defendants served the Supplemental Report.

> FN15. D.I. 528, Ex. D (July 11, 2006 Letter from Claus D. Melarti to Ky E. Kirby).

> FN16. D.I. 546 at 10.

Inline argues that the delay in serving that report, and consequent prejudice to its trial preparation is sufficient grounds for the court to exclude Waring's testimony concerning the opinions contained therein. Defendants explain the that the time of receipt of the new references caused any delay in filing the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 61883 (D.Del.)
(Cite as: Slip Copy)

Page 4

Supplemental Report, not because of any dilatory or bad faith motives. On July 10, 2006, Verison produced invalidity disclosures to Inline which included documents relating to the VDM System. Those are the documents referenced in defendants' July 11, 2006 letter to Inline. Defendants had not previously been aware of the VDM System nor seen the VDM System documents produced by Verizon to Inline. Defendants state that the VDM System includes the elements of the inventions described in the patents-in-suit, but that the documents they received on July 10, 2003 did not contain details of a remote terminal implementation of that system. Defendants maintain that it was not until receiving a copy of the report of Arthur B. Williams, one of the designers of the VDM System, dated October 15, 2006, that they and Waring had the complete picture of exactly how the VDM System remote terminal implementation worked. According to defendants, without Williams' report, Waring could not have opined in detail as to that implementation. The Supplemental Report was served less than a week after defendants' received Williams' report.

On September 13, 2006, Verizon produced the Ithell & Jones Article and other prior art documents to Inline, and provided a copy to defendants. Defendants state that neither they nor Waring had any knowledge of this article prior to Verizon's invalidity disclosure to Inline. Waring reviewed that article and concluded that it anticipated the asserted claims of the patents-in-suit, including that opinion in the Supplemental Report.

*4 Inline emphasizes that the Supplemental Report was served six months after the deadline for filing expert reports and one week before motions *in limine* were due. Inline argues that despite the alleged difficulty in locating the references discussed in that report, "it is without dispute that defendants had many of them in their possession months before they served" the Supplemental Report .[FN17] Defendants dispute that they possessed all of the documentation necessary for Waring to complete the Supplemental Report.

FN17. D.I. 575 at 1 (citing Melarti's July 11, 2006 letter).

The documents defendants received on July 10, 2006 relate to the VDM System. Defendants have represented, however, that Waring was unable to fully detail his invalidity opinion on that system until receipt of Williams' report on October 15, 2006.

Moreover, defendants' July 11, 2006 letter specified the Bates numbers of the documents upon which they based their reservation of the right to supplement Waring's invalidity opinions. This reservation was repeated by Waring during his deposition. Inline asked Waring if the April 18 Report "is intended to set forth a complete statement of all the opinions you expect to offer in this case," to which he responded, "I believe that I've reserved the right to add or change my opinions if some of the assumptions change." [FN18] Inline again asked Waring if the April 18, 2006 report "includes a complete statement of the basis and reasons for your opinion" to which he reiterated "[a]gain, I think I've reserved right to perhaps amend those and augment those." [FN19] Waring's answers clearly refer to the July 11, 2006 letter which cites the VDM System documents. It is dubious that Inline was surprised that Waring would supplement his invalidity opinions to include the VDM System. Also, defendants did not receive the Ithell & Jones Article on September 13, 2006. Defendants served the Supplemental Report approximately five weeks later, and mere days after receipt of Williams' report.

FN18. D.I. 528, Ex. C, Waring Dep. at 28:13-18.

FN19. *Id.,* Ex. C, Waring Dep. at 29:1-5.

Nevertheless, Inline suggests that the facts here are reflected in this court's denial of a defendant's request to submit a supplemental expert report in *Chase Manhattan Mortgage Corp. v. Advanta Corp.*[FN20] The *Chase* court found that the supplemental report sought to be submitted would be highly prejudicial. Contrary to Inline's contention that each factor identified in that case is present here, that case is readily distinguishable. There, Advanta delivered its supplemental report to Chase six months after the close of expert discovery, one month before trial was scheduled to begin, and after the filing of the proposed final pretrial order.[FN21] Here, defendants' Supplemental Report was served three months after the close of expert discovery, more than three and a half months before trial, and nearly three months before the proposed final pretrial order. Significantly, after listing the above factors, the *Chase* court noted, *"[m]ore to the point,* if the evidence it now sought to bring into the trial were genuinely critical, Advanta *could have* and should have made a motion to supplement months ago, but it did not." [FN22] Accepting defendants' representations as to when they received the documents relied upon by Waring in the Supplemental Report, which is consistent with

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the time period when Inline received the same materials, Waring could not have served that report months earlier. The court also notes that had defendants sought leave to submit the Supplemental Report, which ordinarily would have been preferred practice, that based on when they received all of the information necessary for Waring to adequately formulate the opinions expressed therein, little, if any, time would have been saved. The parties undoubtedly would have made the same arguments in promoting and opposing the filing of that report. In light of defendants' supplementation obligations under Fed.R.Civ.P. 26(a)(2)(B) and 26(e)(1), and the relatively prompt filing of the Supplemental Report following receipt of the documents about which Waring opines, the court determines that exclusion of that report is not warranted on the basis of the timing of its service.

> FN20. C.A. 01-507(KAJ), 2004 WL 912949 (D.Del. Apr. 22, 2004).
>
> FN21. *Id.* at *1.
>
> FN22. *Id.* at *1 (emphasis added).

**\*5** In addition to the timeliness of the Supplemental Report, however, Inline contends it will be severely prejudiced in its ability to prepare for trial if the court denies its motion. Inline argues that both the amount of material it must review as well as the amount of deposition discovery it will have to conduct to prepare a proper response for trial is prejudicial. Inline points out that the Supplemental Report is over 30 pages long with nearly 350 pages of declarations and technical materials attached to and cited in the report, as well as errors in citation with regard to the VDM System, would require a substantial amount of time to prepare a proper response for trial.

Defendants served the Supplemental Report on October 20, 2006 and Inline filed its motion *in limine* on October 27, 2007, over three months before trial. Inline is also reminded that the court's May 18, 2006 scheduling order contemplated that motions seeking to limit or exclude expert testimony were to be filed no later than October 16, 2006.[FN23] On October 10, 2006, the parties filed a stipulation to extend the filing of those motions until October 27, 2006, which the court signed the following day.[FN24] After filing those motions and associated opening briefs on October 27, 2006 (and after Inline was served with the Supplemental Report) the parties filed-*on the day answering briefs were due*-yet another stipulation to

extend the filing of answering and reply briefs such that briefing was not completed until December 1, 2006.[FN25] Prudence being the better part of valor, the court is confident that Inline and its expert have been digesting the material contained in the Supplemental Report and preparing a response thereto since its receipt rather than presuming the court would automatically exclude testimony related thereto.

> FN23. D.I. 392.
>
> FN24. D.I. 505.
>
> FN25. D.I. 543.

Inline also contends that substantial deposition discovery would need to be conducted to prepare a response to the Supplemental Report, particularly with regard to the VDM System. Inline asserts that it would need to depose five individuals whose declarations Waring relied upon and who purport to have intimate knowledge of the VDM System. Those individuals' declarations are said to contain information on how the VDM system operated, its configuration, and the equipment that was used in manufacturing the system.[FN26] Inline also argues it would need to depose Coherent Communications Systems Corp. ("Coherent") and AT & T, the companies who manufactured and sold the VDM System.

> FN26. *See* D.I. 575 at 3, 3 n. 3 (identifying Arthur B. Williams, Frank Scolaro, Howard C. Lee, David Hoerl, and Jerry F. Skene as necessary deponents).

To the extent deposition discovery is required by Inline to properly respond about the VDM System, defendants contend that Inline would only need to depose Williams. Defendants point out that the Williams' declaration is the only one Waring relied on in the chart purportedly demonstrating invalidity. Defendants maintain that the other declarations cited in the Supplemental Report concerning the VDM System primarily apply to background information or authenticity of documents. Moreover, defendants represent that they "would agree not to rely on any of the other declarations at trial to ensure that Inline need only take one fact deposition." [FN27] With regard to the Ithell & Jones article, defendants argue that Inline would not be prejudiced by having its expert develop its opinion on this five page article and that no fact depositions would be needed to respond to the

Slip Copy
Slip Copy, 2007 WL 61883 (D.Del.)
(Cite as: Slip Copy)

Ithell & Jones article. They maintain that discovery can easily be reopened for the limited purpose of (1) having Beckmann submit a limited rebuttal report and (2) allowing depositions of Waring and Beckmann limited to the subject matter of the Supplemental Report should the parties so desire. Inline does not argue that it would need to depose any witnesses concerning the Ithell & Jones article, but reiterates that Inline and their expert would, nevertheless be required to investigate and prepare their responses, resulting in prejudice.

FN27. D.I. 546 at 12 n. 5.

*6 Although the court believes that Inline has had sufficient time to review the new prior art references and substantially prepare a response thereto, in order to limit Inline's additional trial preparation and allow it to complete its response to the opinions recited in the Supplemental Report, the court determines the following: (1) It will exclude reference to the declarations cited in the Supplemental Report other than that of Williams; (2) Inline will be permitted to depose Williams and defendants shall produce Williams and will not challenge any subpoena to Williams on personal jurisdiction, or other, grounds; (3) Inline will be permitted to depose Waring on the opinions contained in the Supplemental Report; (4) Beckmann will submit a report in rebuttal to the Supplemental Report no later than 72 hours before his scheduled testimony; and (5) defendants will not be permitted to depose Beckmann on that rebuttal report.

IV. CONCLUSION

For the reasons stated above, Inline's motion is granted in part and denied in part.

D.Del.,2007.
Inline Connection Corp. v. AOL Time Warner Inc.
Slip Copy, 2007 WL 61883 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT ZZ

LEXSEE 2006 U.S. DIST. LEXIS 25185



Analysis
As of: Apr 02, 2007

## GREG BRAUN, Plaintiff, vs. AGRI-SYSTEMS, Defendant.

### CASE NO. CV-F-02-6482 AWI LJO

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA

### *2006 U.S. Dist. LEXIS 25185*

### February 1, 2006, Decided
### February 2, 2006, Filed

**SUBSEQUENT HISTORY:** Partial summary judgment granted by, Partial summary judgment denied by *Braun v. Agri-Systems, 2006 U.S. Dist. LEXIS 29947 (E.D. Cal., May 15, 2006)*

**PRIOR HISTORY:** *Braun v. Agri-Systems, 2005 U.S. Dist. LEXIS 37604 (E.D. Cal., Dec. 8, 2005)*

**COUNSEL:** [*1] For Greg Braun, Chapter 11 Trustee for Coast Grain Company, a California corporation, Plaintiff: Riley C. Walter, Walter Law Group, Fresno, CA; Steven Dale McGee, Amanda Jean Glenn, Henry Y. Chiu, Kimble, MacMichael & Upton, Fresno, CA.

For Agri-Systems, a Montana corporation, Defendant: Henry Dorame Nunez, Law Offices of Henry D Nunez, Fresno, CA; Jon E. Doak, Doak & Associates, P.C., Billings, MT; Mark D. Parker -- PRO HAC VICE, Parker, Heitz & Cosgrove, PLLC, Billings, MT.

For Agri-Systems, a Montana corporation, Counter Claimants: Henry Dorame Nunez, Law Offices of Henry D Nunez, Fresno, CA; Jon E. Doak, Doak & Associates, P.C., Billings, MT; Mark D. Parker -- PRO HAC VICE, Parker, Heitz & Cosgrove, PLLC, Billings, MT.

For Greg Braun, Counter Defendant: Riley C. Walter, Walter Law Group, Fresno, CA; Steven Dale McGee, Kimble, MacMichael & Upton, Fresno, CA.

For Greg Braun, Chapter 11 Trustee for Coast Grain Company, a California corporation, Counter Defendant:

Steven Dale McGee, Kimble, MacMichael & Upton, Fresno, CA.

**JUDGES:** Lawrence J. O'Neill, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** Lawrence J. O'Neill

**OPINION:**

ORDER ON DEFENDANT'S MOTION TO COMPEL AND [*2] FOR DISCOVERY SANCTIONS (Doc 202)

Pursuant to a notice filed on December 8, 2005, Defendant Agri-Systems seeks to compel further production of documents from plaintiff Greg Braun and seeks monetary sanctions. Plaintiff Greg Braun, as Plan Agent for Coast Grain Company, and Agri-Systems filed a joint statement of discovery disagreement on January 13, 2006. Supplemental evidence was filed by the parties on January 16, 2006 through January 18, 2006, January 20, 2006 and January 26, 2006. The matter came on regularly for hearing on January 31, 2006 in Department 8 of the above-entitled court. Greg Braun appeared by counsel Steven McGee and Amanda Glenn of Kimble, Mac-Michael & Upton. Defendant Agri-Systems appeared by counsel Henry Nunez, Law Offices of Henry Nunez and by Jon Doak, Doak & Associates. Having considered the joint statement and all of the evidence filed on behalf of the parties, as well as the arguments of counsel and the Court's file, the Court issues the following order.

### FACTUAL AND PROCEDURAL BACKGROUND

**Factual Overview**

Coast Grain was in the business of operating grain mill facilities in California. After an involuntary bankruptcy was filed on its [*3] behalf, Coast Grain's plan was confirmed on October 9, 2003. Plaintiff Greg Braun is the plan Agent and pursues this action on behalf of Coast Grain. Agri-Systems was in the business of designing and constructing grain mill facilities. Agreements were entered into between Coast Grain and Agri-Systems under which Agri-Systems was to design, engineer and construct a grain mill facility, including the construction of a fast rail receiving and steam flaking system, on property owned by Coast Grain on Avenue 12 in Madera ("project"). By this lawsuit, Coast Grain (through plaintiff) seeks to recover damages it claims to have suffered as a result of alleged acts, omissions and breaches of Agri-Systems. Agri-Systems denies any further responsibility to Coast Grain and alleges that Agri-Systems has been damaged by virtue of nonpayment of contractual obligations.

Plaintiff alleges six claims for relief:

1. First claim -- Breach of contract for failing to complete the project timely, not obtaining appropriate government approvals, not completing the work according to the plans, overbilling, etc.

2. Second claim -- Breach of Express warranty

3. Third claim-Breach of Implied [*4] warranty

4. Fourth claim -- Negligence

5. Fifth Claim -- Breach of Confidentiality Agreement

6. Sixth claim -- Declaratory relief.

Discovery cut off was January 9, 2006. Expert discovery cut off is February 17, 2006. The pretrial conference is set for April 19, 2006 and trial is set for June 6, 2006 before the Hon. Anthony W. Ishii.

**SCOPE OF MOTION FOR PRODUCTION OF DOCUMENTS**

The motion involves Agri-Systems Third request for production of document served in July 2005. Defendant asks for the following remedies:

(A) Further document production: Defendant asks for the documents to be produced from these document requests at issue:

(1) Request no. 6 and 7 -- all communications, reports and other documents from 1/1/02 by and between plaintiff and brokers McCarthy and Co. ("the McCarthy Documents") regarding the Madera Project and the sale of the property. (McCarthy was the broker retained by plaintiff to sell the project.)

(2) Request no. 8, 9 and 10 -- all communications reports and other documents from 3/1/02 and June 2003 between plaintiff and prospective purchasers of the Madera property, including Pacific Ethanol and the Pacific Ethanol sale documents. [*5] (Pacific Ethanol ultimately purchased the property)

(3) Request no. 11 -- all documents regarding the condition of the Madera Project.

(4) Request no. 13 -- all documents regarding settlements between March 2002 and January 2005 brought by plaintiff against third party contractors, materialmen or suppliers who performed work on the project.

(5) Request no. 14 -- all communications, reports and other documents from plaintiff and members of the unsecured creditors' committee appointed in the Coast Grain bankruptcy during 10/17/01 and October 2003 re Agri-Systems, the Madera property or the sale of the property.

(6) Request no. 15 -- all documents regarding attorneys' and expert witness fees and costs claimant by plaintiff as damages.

(B) **Index of digital documents**: Compel plaintiff to produce indexes, lists or other serial description of documents produced in a digital format.

(C) **Privilege Log**: if responsive documents in plaintiffs possession and control are subject to a privilege, plaintiff should be compelled to list and describe the privilege.

(D) **Request for attorney's fees**: defendant should be reimbursed for its fees and costs.

**ANALYSIS & DISCUSSION** [*6]

**Scope Of Discovery**

The purpose of discovery is to make trial "less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent possible," *United States v. Procter & Gamble Co., 356 U.S. 677, 683, 78 S.Ct. 983, 987, 2 L. Ed. 2d 1077 (1958)*, and to narrow and clarify the issues in dispute, *Hickman v. Taylor, 329 U.S. 495, 501, 67 S.Ct. 385, 388, 91 L. Ed. 451 (1947)*.

*F.R.Civ.P. 26(b)(1)* establishes the scope of discovery and states in pertinent part:

> Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

"The party who resists discovery has the burden to show [*7] that discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections." *Oakes v. Halvorsen Marine Ltd., 179 F.R.D 281, 283 (C.D. Cal. 1998); Nestle Foods Corp. v. Aetna Casualty & Surety Co., 135 F.R.D. 101, 104 (D. N.J. 1990); see Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975)* (parties opposing discovery are required to carry a heavy burden to show why discovery should be denied).

### Standards for Document Production

*F.R.Civ.P. 34(b)* requires a written response to a request for production to "state, with respect to each item or category, that inspection and related activities will be permitted as requested, unless the request is objected to, in which event the reasons for the objection shall be stated." (Emphasis added.) A party is obliged to produce all specified relevant and nonprivileged documents or other things which are in its "possession, custody or control." *F.R.Civ.P. 34(a); Norman Rockwell Int'l Corp. v. H. Wolfe Iron & Metal Co., 576 F.Supp. 511, 512 (W.D. Pa. 1983).* "A party who produces documents for inspection shall produce [*8] them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request." *Rule 34(b)* (emphasis added).

Motions to compel for failure to comply with *Rule 34* are authorized by *Rule 37 of the Federal Rules of Civil Procedure*: "[If] a party, in response to a request for inspection submitted under *Rule 34*, fails to respond that inspection will be permitted as requested or fails to permit inspection as requested, the discovering party may move for an order compelling an answer, or a designa-

tion, or an order compelling inspection in accordance with the request." (Emphasis added.)

### Inspection of the Documents

According to plaintiff, the documents are physically located in three locations: (1) San Francisco-at the document retention firm, O'Connell and Assoc., (2) Fresno -- at counsel's office in which copies of the construction file are retained in approximately nine (9) boxes, and (3) Ontario, California, where Coast Grain had offices.

Braun argues, and Agri-Systems does not dispute, that Braun offered to make the documents in San Francisco, Fresno and Ontario available for inspection by Agri-Systems. [*9] Braun argues that Agri-Systems never contacted Braun about arranging a date for the document inspection of the San Francisco or Ontario documents. Agri-Systems only inspected the 9 boxes that are located in Fresno. These boxes were at Kimble, MacMichael and Upton and were substantially all of the documents that counsel for Braun believed related to the project. There is no objection from Agri-Systems as to the "location" of the documents; no argument from Agri-Systems that the documents were moved to a "distant" location or moved from where they were originally maintained. **Agri-Systems did not inspect the remainder of the documents.**

At oral argument, Agri-Systems argued that it was not told that the original documents were in San Francisco or Ontario and that representation was made that true and correct copies of all of the documents were at Kimble, MacMichael's office. Also at oral argument, counsel acknowledged that after the document inspection of the 9 boxes at the Kimble, MacMichael office, counsel became aware that not all of the requested documents were at the Kimble, MacMichael office.

As early as June 30, 2005, in its response to another request for production of documents, [*10] Braun suggested that arrangements be made to inspect the documents. (Exh. B to McGee Decl.; Exh. 3 to Nunez Decl.) On August 15, 2005, when Braun responded to the Third set of requests for production of documents, he identified the three addresses where the documents are located. (Exh. J to McGee Decl.) At the Braun deposition on August 15, 2005, Braun testified that digitized documents were retained at the O'Connell document retention firm in San Francisco. This information was confirmed in a letter from plaintiff's counsel on August 16, 2005. (Exh. C to McGee Decl.) *Rule 34* only requires that the "response shall state, with respect to each item or category, that inspection and related activities will be permitted as requested" and does not require Braun to contemporaneously produce the actual documents. Therefore, Agri-Systems was informed that the documents were located

in various places, but inspected only one location. Had it inspected the other locations, this motion may have been unnecessary.

### Documents Produced Voluntarily

At oral argument, the parties disputed a continued trickling stream of documents being produced by Braun. This was a major source of contention [*11] between the parties because the "production" was incomplete and delayed. Braun has produced some documents at various times following its response to the document request on August 16, 2005. For instance, on October 5, 2005, Braun physically produced discs containing documents the parties refer to as the "McCarthy documents," along with a privilege log. In another example, the discs of documents from the inspection of the 9 boxes were produced on October 4, 2005. Then, plaintiff demanded they be returned, due to inadvertent disclosure of attorney client documents, and replacements were not provided until November 4, 2005. Other documents continued to dribble in, such as photographs. Plaintiff also produced two different indexes which had been generated by the document retention firm, O'Connell. On November 7, 2005, a 112 page index was produced -- it listed the boxes of original Coast Grain documents and included a general description of the document in the boxes. n1 A second index was a 7 page index which listed the documents that had been produced by or obtained from third parties. In addition, Braun recently "discovered" escrow documents in its co-counsel's off-site storage, which [*12] would be responsive to the document requests.

n1 The index is of the boxes not the documents.

At oral argument, plaintiff's counsel said that when defendant identified specific documents they wanted, plaintiff would try to accommodate defendant. At oral argument, plaintiff's counsel represented this piecemeal production was of documents maintained at the document retention firm in San Francisco and which were available for inspection by defendant. Counsel originally stated that plaintiff had a legal obligation to give defendant these documents. Later, counsel clarified that plaintiff only had the duty to make the documents available for inspection, which plaintiff did.

The Court agrees that *Rule 34* does not require a contemporaneous production of documents. The duty imposed by *Rule 34* on a responding party is to permit the inspection of documents. *Rule 34(a)* ("to produce and permit the party making the request, or someone acting on the requestor's behalf, to inspect and copy, any designated documents [*13] . . ."). Plaintiff did so. Plaintiff offered the documents for inspection in San Francisco

and Ontario. Agri-Systems was on notice the documents were maintained at these locations, but did not inspect the documents. The dispute in this motion centers on the inadequate "trickle of documents" plaintiff voluntarily copied and sent to plaintiff. This was a duty not imposed by *Rule 34*. Although plaintiff undertook to voluntarily produce documents, even in a haphazard and much less than thorough fashion, this Court cannot expand the duty under *Rule 34* and force Braun to comply with a duty he now has expanded.

Braun points out that the date for discovery cut-off has passed and therefore Agri-Systems has waived its right to inspect the documents in San Francisco and Ontario. The Court agrees, with the exceptions noted below.

### Request for Index of Documents or Lists

Agri-Systems requests an Index of documents or List of documents. Braun produced, as the parties agreed, digitized documents from Agri-Systems' inspection of the 9 boxes of documents -- some 10,000 pages. Agri-Systems wants an index of those documents.

An index, whether of documents produced or those in existence (i.e, [*14] San Francisco or Ontario), is not required under *Rule 34*. "A party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request." *Rule 34(b)*.

Braun argues, and it is uncontroverted, that Braun/Coast Grain does not maintain a "index" of documents in its normal course of business. *Rule 34* does not require a party to create such an index.

At oral argument, Agri-Systems also argued that an index of all of the documents was created by the O'Connell document retention firm and should be produced. Agri-Systems argues that the index was created for the purpose of operating in the normal course of business for Braun as the Plan Agent. Braun argues that the index of documents created by O'Connell is attorney work product because it was created for the purpose of litigation and in anticipation of litigation. To be protected by the work product, the documents or things must have been prepared in anticipation of litigation or trial. Work product protection applies to "documents and tangible things prepared in anticipation of litigation or for trial" by or on behalf [*15] of a party. *F.R.Civ.P. 26(b)(3)*. The "work product" doctrine protects trial preparation materials that reveal an attorney's strategy, intended lines of proof, evaluation of strengths and weaknesses, and inferences drawn from interviews. *F.R.Civ.P. 26(b)(3)*; *see Hickman v. Taylor, 329 U.S. 495, 511, 67 S.Ct. 385, 393-394, 91 L. Ed. 451 (1947)*. Work product protection is designed to preserve the privacy of attorneys' thought proc-

esses, and to prevent parties from "borrowing the wits of their adversaries." *Holmgren v. State Farm Mut. Auto. Ins. Co., 976 F.2d 573, 576 (9th Cir. 1992)*. Work product protection may be waived by disclosure or other conduct, such as testimonial use of the materials. *United States v. Nobles, 422 U.S. 225, 239, 95 S.Ct. 2160, 2170-2171, 45 L. Ed. 2d 141 (1975)*.

Documents may fall within the ambit of the work product doctrine where their litigation purpose so permeates any non-litigation purpose that the two purposes cannot be discretely separated from the factual nexus as a whole.' *In re Grand Jury Subpoena (Mark Torf/Torf Environmental Management), 357 F.3d 900, 908-909 (9th Cir. 2003)* (environmental clean-up documents created [*16] by attorney's consultant in response to administrative agency request were protected from discovery in grand jury proceedings commenced against client relating to same pollution). The question of entitlement to work product protection cannot be decided simply by looking at one motive that contributed to a document's preparation. The circumstances surrounding the document's preparation must also be considered. "[T]he nature of the document and the factual situation of the particular case" are key to a determination of whether work product protection applies. *Id.*

The Court is convinced that the overall document index created by the O'Connell firm was created for and in anticipation of litigation. The parties acknowledge that several hundred other adversary proceedings and other litigations are pending related to this bankruptcy estate. Even if the index has some purpose of "operation in the normal course of business," the Court finds that the litigation purpose so permeates the index that it must be considered privileged.

### Photographs

Defendant argues that photographs of the Madera Facility taken by David Van Diver between mid September 2001 and January 2002 have not [*17] been produced. Defendant argues that plaintiff produced a disc of photographs, which plaintiff describes as some 1,500 pictures, but that there are critical gaps of pictures. At oral argument, defendant argued that these gaps were intentional on the part of plaintiff's counsel. At oral argument, plaintiff denied any such intentional gap, reiterating that all photographs have been produced and that none have been removed. Counsel agreed that the discs could be inspected and a comparison made. Defendant acknowledged that it desired to confirm that the photographs on the original disc were accurately provided.

Defense counsel has accused plaintiff's counsel of intentional wrongful conduct, a serious accusation by an officer of the Court. The Court will permit defendant to examine the discs containing the photographs, by way of

appropriate expert only, to determine whether the discs have been tampered. The process of arranging for the inspection of the discs must be in progress within 10 days and accomplished within 40 days. This Court is to be notified, in writing, of the result. The Court wishes notice to enable it to determine the presence or absence of merit of counsel's serious accusation. [*18]

### Braun has agreed to produce the following documents

Plaintiff acknowledges that two categories of documents have not been produced and which should be produced: (1) documents on Mr. Braun's hard drive computer -- it crashed and has been sent to service to recover the data -- if recovery is successful, the unprivileged documents will be produced and a privilege log will be produced for documents which are not produced. (2) The second category is escrow documents, which are in the process of being bate stamped, redacted and a privilege log created. These documents were recently discovered in co-counsel's offsite storage. These documents will be ordered produced within 20 days of the date of service of this order. Within this same time frame, plaintiff shall report to defense counsel on the status of recovery efforts for Braun's computer hard drive.

### Adversary Proceedings

At oral argument, plaintiff indicated that he would be producing documents related to adversary proceedings/litigation identified in defendant's Request no. 13. The document request was specific and the representation was that the documents would not be located at the document retention firm. Accordingly, [*19] the documents will be ordered produced within 20 days of the date of service of this order.

### Privilege Log

In request no. 14, defendant asked for all communications reports and other documents from plaintiff and members of the unsecured creditors' committee appointed in the Coast Grain bankruptcy regarding the Madera property.

Braun claimed a privilege but did not provide a privileged log of the documents or categories of documents he contends are privileged. Braun cites *Kaiser Steel Corp v. Frates, 84 B.R. 202* (Bktcy d. Colo 1988) which held that reports prepared by accounting firm for unsecured creditors' committee to use in evaluating merits of litigation were exempt from discovery. However, in *Kaiser Steel*, the 3rd party provided a schedule of privileged documents and also submitted the schedule to the court for an *in camera* inspection. Here, a privilege log has not been provided. Accordingly, plaintiff must submit a privilege log within 20 days of the date of service of this order.

### Attorney and Expert Fees

Agri-Systems asked for all document regarding attorneys' and expert witness fees and costs claimant by plaintiff as damages. [*20] Braun objected to the production of billing statements as attorney client privilege.

Not all communications between attorney and client are privileged. The Ninth Circuit has recognized that the identity of the client, the amount of the fee, the identification of payment by case file name, and the general purpose of the work performed are usually not protected from disclosure by the attorney-client privilege. *Clarke v. American Commerce Nat. Bank, 974 F.2d 127, 129 (9th Cir. 1992).* However, correspondence, bills, ledgers, statements, and time records which also reveal the motive of the client in seeking representation, litigation strategy, or the specific nature of the services provided, such as researching particular areas of law, fall within the privilege. *Clarke v. American Commerce Nat. Bank, 974 F.2d at 129.* In *Clarke*, the court concluded that the billing records were discoverable because of the general nature of the information provided therein, e.g., information on the identity of the client, the case name for which payment was made, and the amount of the fee. *Id. at 130.* The attorney's bills in *Clarke* contained "nothing [*21] [that] . . . reveal[ed] specific research or litigation strategy which would be entitled to protection from disclosure." *Id. at 130.*

Here, plaintiff argues that the bills cover a four year period of representation and contain specific information about strategies and trial preparation, including issues researched, analyzed, documents reviewed and prepared. Plaintiff argues that over the four year representation, the bills show a shift of strategies and focus of representation.

Without viewing the documents reflecting attorneys' fees, the Court cannot determine whether the documents fall within the exception carved out by *Clarke v. American Commerce Nat. Bank* or whether the documents are attorney client privileged. Accordingly, the Court orders that the documents reflecting attorneys' fees are to be submitted to Department 8 of this Court within 15 days of the date of this order, for an *in camera* inspection.

Plaintiff agrees to produce a summary of its expert witness fees. The Court will order that these be produced within 20 days of the date of service of this order.

### SANCTIONS

Courts generally consider the reasons for the failure to properly [*22] respond to discovery requests and reserve the harshest sanctions only for flagrant violations of discovery rules. *Eureka Financial Corp. v. Hartford Acci. & Indem. Co., 136 F.R.D. 179, 185 (E.D.Cal.,1991).*

The request for sanctions will be denied for the above reasons, but sanctions may be noticed by either party and reconsidered by the Court based on the results of the expert photo analysis.

### CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part, defendant's motion to compel as follows:

1. DENIES the motion to compel further production/inspection of documents located in San Francisco or Ontario, except as noted specifically in the body of this order.

2. DENIES the request for an Index or List of documents.

3. GRANTS the request for a comparison of discs containing photographs of the project, subject to the limitations noted in the body of this order.

4. GRANTS the request for further production of documents from Braun's computer hard drive and the escrow documents, as described in the body of this order.

5. GRANTS the request for documents described in Request no. 13.

6. GRANTS the request for [*23] a privilege log of documents responsive to Request no. 14.

7. GRANTS the request for production of a summary of expert fees.

8. ORDERS that documents be submitted for an *in camera* inspection, as described in the body of this order.

9. DENIES the request for sanctions.

IT IS SO ORDERED.

Dated: February 1, 2006

/s/ Lawrence J. O'Neill

UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE: DAIMLERCHRYSLER AG      :
SECURITIES LITIGATION         :
                              :
——————————————————           :
TRACINDA CORPORATION,         :
a Nevada Corporation,         :
                              :
          Plaintiff,          : **CONSOLIDATED ACTION**
     v.                       : Civil Action No. 00-993-JJF
                              :
DAIMLERCHRYSLER AG, a Federal :
Republic of Germany           :
corporation; DAIMLER-BENZ AG, :
a Federal Republic of Germany :
corporation; JURGEN SCHREMPP, :
a citizen of the Federal      :
Republic of Germany;          :
MANFRED GENTZ, a citizen of   :
the Federal Republic of       :
Germany,                      :
                              :
          Defendants.         :

A. Glichrist Sparks, III, Esquire, Alan J. Stone, Esquire, and
Jessica Zeldin, Esquire of MORRIS, NICHOLS, ARSHT & TUNNELL,
Wilmington, Delaware.
Of Counsel: Terry Christensen, Esquire, Mark G. Krum, Esquire,
Eric P. Early, Esquire of CHRISTENSEN, MILLER, FINK, JACOBS,
GLASER, WEIL & SHAPIRO, LLP, Los Angeles, California.
William G. McGuinness, Esquire, Julie E. Kamps, Esquire and
Midwin Charles, Esquire of FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON, New York, New York.
Attorneys for Plaintiff.

Thomas J. Allingham II, Esquire, and Robert S. Saunders, Esquire,
of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington,
Delaware.
Of Counsel: Jonathan J. Lerner, Esquire, J. Michael Schell,
Esquire, Lea Haber Kuck, Esquire and Joseph N. Sacca, Esquire of
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York.
Attorneys for Defendants.

**MEMORANDUM OPINION**

November 25, 2003

Wilmington, Delaware

**Farnan, District Judge.**

Pending before me is a Motion For Relief For Spoilation Of Evidence (D.I. 584) filed by Defendants, DaimlerChrysler AG, Daimler-Benz AG, Jürgen Schrempp and Manfred Gentz. By their Motion, Defendants contend that Tracinda deliberately destroyed relevant evidence thereby prejudicing Defendants' ability to defend this action. As relief, Defendants request the dismissal of Tracinda's claims of common law fraud (Counts 7 and 8 of the Complaint) and violations of Section 10(b) of the Securities and Exchange Act of 1934 (Count 1 of the Complaint). In the alternative, Defendants ask me to draw an adverse inference against Tracinda at trial based on the destruction of this evidence. For the reasons discussed, I will deny Defendants' Motion.

## I.   THE PARTIES' CONTENTIONS

By their Motion, Defendants contend that Mr. Kirk Kerkorian's personal assistant, Jaclyn Thode, destroyed documents that she used to prepare a list of meetings and/or conversations between Mr. Kerkorian and Mr. Robert Eaton. Defendants contend that Tracinda's general counsel, Richard Sobelle, instructed Ms. Thode to prepare the list, but failed to instruct her to preserve the documents used in making the list. Based on these allegations, Defendants contend that Tracinda engaged in the willful and systematic destruction of relevant evidence.

2

In response to Defendants' allegations, Tracinda contends that Ms. Thode did not engage in any willful or intentional destruction of evidence. Tracinda contends that Ms. Thode has no knowledge of the underlying allegations of this lawsuit beyond "coffee room talk," and that any destruction of evidence was unintentional. Tracinda contends that the underlying documents are no more than 18 pieces of paper consisting primarily of steno notes or "While You Were Out" pink message notes. According to Tracinda, the substantive content of these notes was transcribed by Ms. Thode into a single list virtually verbatim. Tracinda also contends that the notes did not contain anything about the substance of the conversations between Mr. Kerkorian and Mr. Eaton, and merely reflected the fact that a meeting or telephone conversation occurred. Tracinda further maintains that Ms. Thode followed her routine practice of destroying the notes after she documented them. Because the content of the documents was preserved by Ms. Thode's list and the destruction of the documents was unintentional, Tracinda contends that Defendants cannot establish that sanctions are warranted.

## II. DISCUSSION

In determining whether sanctions are an appropriate remedy for the alleged destruction of evidence, I must consider three factors: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by

3

the opposing party; and (3) whether there is a lesser sanction
that will avoid substantial unfairness to the opposing party, and
where the offending party is seriously at fault, will serve to
deter conduct in the future.  Schmid v. Milwaukee Elec. Tool
Corp., 13 F.3d 76, 79 (3d Cir. 1994).  After considering
Defendants' allegations and the evidence submitted on this issue
in the context of the applicable law, I conclude that sanctions
are not warranted as a result of the alleged spoilation of
evidence in this case.  The unrebutted deposition testimony and
affidavit of Ms. Thode establish that she discarded her
handwritten notes after converting them into typewritten form,
consistent with her practice in the past.[1]  (Thode Decl. at ¶ 8,
Thode Tr. 15:6-9).  Ms. Thode had no information or understanding
about the substance of this litigation and no information as to
the purpose of Mr. Sobelle's request, and thus she had no reason
to alter or omit any information from the documents.  (Thode
Decl. at ¶ 2, 12-13, 15; Thode Tr. 41:16-25, 52:24-25, 53:2-23,
55:2-6).  I am persuaded that Ms. Thode had every incentive to

---

[1]    See e.g. Brewer v. Quaker State Oil Ref. Corp., 72 F.3d
326, 334 (3d Cir. 1995) (recognizing that adverse inference is
not warranted against party who destroyed evidence where
destruction of evidence was a matter of routine with no
fraudulent intent or otherwise innocently accounted for); Ziegler
v. Anesthesia Assoc. of Lancaster, Ltd., 2002 WL 387174 (E.D. Pa.
Mar. 12, 2002) (holding that spoilation doctrine was inapplicable
where president of defendant company destroyed voter list at
conclusion of meeting consistent with his past personal
practice).

correctly and fully document the notes she was working from in order to comply with Mr. Sobelle's request for information. In these circumstances, I find that Ms. Thode acted unintentionally when she discarded the steno pads and pink message notes. See S.C. Johnson & Son, Inc. v. Louis & Nashville R.R. Co., 695 F.2d 253, 259 (7th Cir. 1982) (finding that destruction of evidence was not intentional where handwritten notes were discarded after being typed and person handling evidence had no reason to omit or alter necessary information). I further find that Defendants have not suffered any prejudice as a result of Ms. Thode's actions, because they have a complete and accurate chronology of the contents of the documents that were discarded.

Defendants focus on the fact that the documents from which Ms. Thode made her typewritten list had been stored for two years prior to their destruction. However, Ms. Thode testified that those documents were packed and stored when her office was moved, and she did not have the opportunity to go through them either before or after the move until Mr. Sobelle's request for information. (Thode Decl. at ¶ 9, Thode Tr. at 41:5-15). Ms. Thode explained that when Mr. Sobelle asked her for any information about meetings between Mr. Eaton and Mr. Kerkorian, she initially doubted that she had anything relevant, but later remembered the two boxes that had been shipped from her previous office. (Thode Decl. at ¶ 10-11, Thode Tr. at 40:22-41:15). Ms.

Thode also explained that the majority of the contents of the boxes did not contain anything relevant to this litigation, but that she did uncover her pink message notes and steno pads. (Thode Decl. at ¶ 12). In my view, the circumstances Ms. Thode described appear to be consistent with the type of events that occur during the often confusing and hectic move of an office. As such, I do not find anything sinister about the fact that the documents had been in storage for such a long period of time prior to their destruction.

Defendants also suggest that these documents may have contained information regarding the substance of the conversations between Mr. Kerkorian and Mr. Eaton, such that the destruction of these documents prejudiced Defendants' ability to defend this lawsuit and deprived them of relevant information. To establish prejudice, Defendants must show "'a reasonable possibility, based on concrete evidence rather than a fertile imagination" that access to the [lost material] would have produced evidence favorable to his cause.'"[2] <u>Gates Rubber Co. v. Bando Chem. Indus., Ltd.</u>, 167 F.R.D. 90, 104, 109 (D. Colo. 1996); <u>Schmid</u>, 13 F.3d at 80 (overturning sanction of judgment in favor of defendant where defendant did not "come forward with

---

[2]    The burden of establishing prejudice must be shown by "direct evidence which is clear and convincing" when dispositive sanctions are sought, and by a preponderance of the evidence when non-dispositive sanctions are sought.    <u>Gates</u>, 167 F.R.D. at 108.

plausible, concrete suggestions as to what that [lost] evidence
might have been"). This standard is not satisfied where the
evidence lost is merely "cumulative, insignificant or of marginal
relevance." Gates, 167 F.R.D. at 104, 109.

After considering the facts and circumstances related to
this issue, I conclude that Defendants have not met their burden
of establishing prejudice under either a clear and convincing or
preponderance of the evidence standard. Ms. Thode's unrebutted
testimony is that she included all the information from her pink
message notes and steno pads into the list she transcribed and
that she discarded the pink message notes and steno pads
consistent with her past practice of discarding such documents
after she has looked through them. Ms. Thode also testified that
she was not present for any meetings or conversations between Mr.
Kerkorian and Mr. Eaton, that she had no knowledge about the
content of any such conversations or meetings, and that the
documents she discarded had no information regarding the
substance or duration of any conversations or meetings. (Thode
Decl. at ¶ 6,7, 9-15; Thode Tr. at 41:16-25, 52:24-25, 53:2-23,
55:2-6). Because the content of this evidence was preserved, and
the nature of the discarded documents was unlikely to reveal
anything regarding the content or duration of the conversations
that took place, I conclude that Defendants have not been
prejudiced by the destruction of these documents. See e.g.

7

Mathias v. Jacobs, 197 F.R.D. 29, 39 (S.D.N.Y. 2001) (finding no
prejudice where the substance of the discarded computer printout
was transferred to plaintiff's palm pilot, which was produced),
vacated on other grounds, 167 F. Supp. 2d 606 (S.D.N.Y. 2001).
Further, I note that Defendants have represented Mr. Eaton
throughout this litigation and have deposed Mr. Kerkorian
regarding his conversations with Mr. Eaton.  Thus, Defendants
have had ample opportunity to garner the substance of these
conversations from the actual participants, sources which are
undoubtedly more accurate and more substantive than the telephone
message notes of an assistant who was not present during the
actual conversations.

     To the extent that Defendants suggest that Mr. Sobelle acted
nefariously in failing to instruct Ms. Thode to preserve the
documents, I find that Mr. Sobelle's conduct does not evidence
any bad faith.  I have read the testimony of Mr. Sobelle and Ms.
Thode in this regard and find nothing beyond mere speculation to
support Defendants' assertion that Mr. Sobelle made a deliberate
choice not to assure the preservation of the phone message slips
and steno pads.  While it may have been a better litigation
practice for Mr. Sobelle to have instructed Ms. Thode to preserve
the documents, Defendants have not persuaded me that Mr. Sobelle
acted intentionally to impair Defendants' ability to defend
against Tracinda's claims.  See e.g. Brewer, 72 F.3d at 334

8

(holding that negative inference arises "'only when the
spoilation or destruction [of evidence] was intentional, and
indicates a desire to suppress the truth'") (citations omitted);
Universe Tankships, Inc. v. United States, 388 F. Supp. 276, 286
(E.D. Pa. 1974), aff'd, 528 F.2d 73 (3d Cir. 1975) (holding that
negligence resulting in the destruction of evidence is
insufficient to require the court to draw an adverse inference).

      With regard to the cases cited by Defendants to support
their position that sanctions are warranted, I find the majority
of those cases to be distinguishable from the circumstances in
this case.  The cases cited by Defendants involve the destruction
of key pieces of evidence, without which the defendants could not
establish a defense or refute the plaintiff's allegations.  See
e.g. In re Wechsler, 121 F. Supp. 2d 404, 428-429 (D. Del. 2000)
(entering an interlocutory finding of liability against plaintiff
where plaintiff destroyed his yacht, the central piece of
evidence, before inspectors could determine if faulty wiring
caused the fire, thereby preventing defendants from discovering
the cause of the fire or establishing that the fire was started
on plaintiff's yacht); Bowman v. American Medical Systems, 1998
WL 721079 (E.D. Pa. Oct. 9, 1998) (holding that defendants were
prejudiced where they could not examine the prosthesis which was
the subject of the action because plaintiff destroyed it, and
they could not obtain the relevant information from the doctor

9

because he died); <u>Walters v. General Motors Corp.</u>, 209 F. Supp. 2d 481 (W.D. Pa. 2002) (finding prejudice where plaintiff destroyed the vehicle that was the subject of her defective-manufacturing claim). By contrast, as I have observed, Defendants have had ample opportunity to gather the information they seek about the conversations between Mr. Eaton and Mr. Kerkorian from the participants themselves. Thus, I conclude that the destruction of the documents sought by Defendants will not impair their ability to defend this litigation.

In sum, I find that the destruction of the documents used by Ms. Thode in compiling her list of contacts between Mr. Eaton and Mr. Kerkorian was not intentional and did not result in any prejudice to Defendants. Once Ms. Thode discovered these documents, she handled them in a manner consistent with her past practice. The content of the documents has been fully preserved, and I am not persuaded that those documents, by their nature, would have contained the information which Defendants seek. In these circumstances, I conclude that sanctions are not appropriate, and therefore, I will deny Defendants' Motion For Relief For Spoilation Of Evidence.

## III. CONCLUSION

For the reasons discussed, Defendants' Motion For Relief For Spoilation Of Evidence will be denied.

An appropriate Order will be entered.

10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE: DAIMLERCHRYSLER AG    :
SECURITIES LITIGATION        :
                             :
_____ :
TRACINDA CORPORATION,        :
a Nevada Corporation,        :
                             :
              Plaintiff,     : **CONSOLIDATED ACTION**
      v.                     : Civil Action No. 00-993-JJF
                             :
DAIMLERCHRYSLER AG, a Federal :
Republic of Germany          :
corporation; DAIMLER-BENZ AG, :
a Federal Republic of Germany :
corporation; JURGEN SCHREMPP, :
a citizen of the Federal     :
Republic of Germany;         :
MANFRED GENTZ, a citizen of  :
the Federal Republic of      :
Germany,                     :
                             :
              Defendants.    :

## O R D E R

At Wilmington, this 25th day of November 2003, for the reasons discussed in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that Defendants' Motion For Relief For Spoilation Of Evidence (D.I. 584) is DENIED.

```
      JOSEPH J. FARNAN, JR.
UNITED STATES DISTRICT JUDGE
```

# EXHIBIT AAA

1 of 3 DOCUMENTS

**POSITRAN MANUFACTURING, INC., Plaintiff/Counter-Defendant, v. DIEBOLD, INC., Defendant/Counter-Claimant.**

**C.A. No. 02-466 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2003 U.S. Dist. LEXIS 8114*

**May 15, 2003, Decided**

**DISPOSITION:** [*1] Diebold's Motion for Relief from Intentional Destruction of Evidence GRANTED; Positran's Motion to Exceed Its Answering Brief Page Limit declared MOOT.

**COUNSEL:** For Positran Manufacturing Inc, PLAINTIFF: William D Sullivan, Elzufon Austin Reardon Tarlov & Mondell, PA, Wilmington, DE USA.

For Diebold Inc, DEFENDANT: Frederick L Cottrell, III, Thomas Henry Kovach, Richards, Layton & Finger, Wilmington, DE USA.

For Diebold Inc, COUNTER-CLAIMANT: Frederick L Cottrell, III, Thomas Henry Kovach, Richards, Layton & Finger, Wilmington, DE USA.

For Positran Manufacturing Inc, COUNTER-DEFENDANT: William D Sullivan, Elzufon Austin Reardon Tarlov & Mondell, PA, Wilmington, DE USA.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

On May 31, 2002, the plaintiff, Positran Manufacturing Inc. ("Positran"), filed the above-captioned action asserting claims for breach of contract. In response, the defendant, Diebold, Inc. ("Diebold") has asserted counterclaims for breach of contract, fraud, and unjust enrichment. A two-day bench trial is scheduled to begin on June 16, 2003.

Presently before [*2] the court is Diebold's motion for relief from Positran's allegedly intentional destruction of evidence. For the following reasons, the court will grant Diebold relief, albeit not in the requested form.

**II. BACKGROUND**

In the first count of its counterclaim, Diebold asserts that Positran failed to make payments to Mosler as they became due for goods tendered by Mosler under its agreement with Positran. n1 Positran, however, argues that this obligation was "canceled out" under a supposed oral agreement between it and Mosler to "net" that obligation against amounts Mosler allegedly owed to Positran.

> n1 Diebold subsequently purchased Mosler's assets and accounts-receivable, including the roughly $ 1.3 million account-receivable against Positran.

Diebold now contends that, while its discovery requests were pending, and just days before his deposition, Positran's Vice-President, Joseph Uhl ("Uhl"), intentionally destroyed relevant evidence. Specifically, Diebold alleges that Uhl destroyed his handwritten [*3] notes which set forth his contemporaneous account of events that are the subject of both Positran's claim and Diebold's counterclaim. This fact is not in contention because, at his July 11, 2002 deposition, Uhl admitted that, just before his deposition, he did, in fact, throw away his handwritten notes.

Diebold alleges that the destroyed notes reflected communications between Positran and Mosler regarding Mosler's product orders to Positran. According to Diebold, these communications are crucial to the issue of the scope of the implied license to make Mosler goods. Die-

bold further alleges that the destroyed notes contained information on the Positran-Diebold negotiations that led to the agreement upon which Positran bases its "netting" claim.

Additionally, Diebold maintains that, not only did Uhl destroy documents, he fabricated a typewritten document which was subsequently produced to Diebold in discovery. Uhl then falsely testified that the document was a verbatim, typed version of the destroyed handwritten notes. In support of its contention that this document is fraudulent, Diebold points to the following testimony taken from Uhl at his July 11, 2002 deposition. At that deposition, [*4] Uhl stated that the only documents to which he referred in creating the typed document were the handwritten notes that he destroyed. He further testified that the only difference between the documents is that, whereas the destroyed documents were handwritten, the produced document is typewritten.

Upon closer inspection of the produced document, however, Diebold noticed that it duplicates, often verbatim, excerpts from Positran's complaint. Additionally, while Uhl stated that his handwritten notes did not refer to exhibits, the typed document does refer to exhibits. Those exhibit references in turn exactly match the exhibit references in Positran's complaint.

## III. DISCUSSION

A party who has reason to anticipate litigation has an affirmative duty to preserve evidence which might be relevant to the issues in the lawsuit. *See, e.g., Howell v. Maytag, 168 F.R.D. 502, 505 (M.D. Pa. 1996)* (citing *Baliotis v. McNeil, 870 F. Supp. 1285, 1290 (M.D. Pa. 1994))*; *accord Shamis v. Ambassador Factors Corp., 34 F. Supp.2d 879, 888-89 (S.D.N.Y. 1999)* (asking whether the party "knew or should have known that the destroyed evidence was relevant [*5] to pending, imminent, or reasonably foreseeable litigation"); *Bass v. GMC, 929 F. Supp. 1287, 1288 (W.D. Mo. 1996)* (same). A party who breaches this duty by destroying relevant evidence or by allowing relevant evidence to be destroyed may be sanctioned by the court. *See, e.g., Howell, 168 F.R.D. at 505; accord TeleCom Intn'l Am. Ltd. v. AT&T Corp., 189 F.R.D. 76, 81 (S.D.N.Y. 1999)*. When this destruction is willful or in bad faith and intended to prevent the other side from examining the evidence, the court may impose the most severe sanction of them all--the outright dismissal of a claim or the entry of a default judgment. *See Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 74 (S.D.N.Y. 1991)* ("The even harsher sanction of default [or dismissal] may be imposed as a sanction for the intentional destruction of evidence if the party seeking the evidence has been severely prejudiced and no lesser sanction is adequate."); *accord TeleCom, 189 F.R.D. at 81* (noting that the sanction of dismissal is a "drastic

remedy" which should be imposed only in "extreme circumstances," such as [*6] when a party wilfully destroys evidence or otherwise acts in bad faith) (relying on *West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999))*; *Baliotis, 870 F. Supp. at 1289* ("A sanction that has the 'drastic' result of judgment being entered against the party who has lost or destroyed evidence must be regarded as a 'last resort,' to be imposed only 'if no alternative remedy by way of a lesser, but equally efficient, sanction is available.'") (citations omitted).

When determining whether to impose sanctions for the spoliation of evidence, the court must consider the following three factors:

> (1) the degree of fault and personal responsibility of the party who destroyed the evidence;

> (2) the degree of prejudice suffered by the other party; and

> (3) the availability of lesser sanctions which would avoid any unfairness to the innocent party while, at the same time, serving as a sufficient penalty to deter the same type of conduct in the future.

*See Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994); accord Indemnity Ins. Co. of N. Am. v. Liebert Corp., 1998 U.S. Dist. LEXIS 9475, 1998 WL 363834, at * 3 (S.D.N.Y. June 29, 1998) [*7]* .

As the *Schmid* court emphasized, when determining the degree of fault and personal responsibility attributable to the party that destroyed the evidence, the court must consider whether that party intended to impair the ability of the other side to effectively litigate its case. *13 F.3d at 80; see also Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 334 (3d Cir. 1995)* ("It must appear that there has been an actual suppression or withholding of the evidence. No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for."); *accord Collins v. Throckmorton, 425 A.2d 146, 150 (Del. 1980)* ("Where a litigant intentionally suppresses or destroys pertinent evidence, an inference arises that such evidence would be unfavorable to his case.").

In addition, when considering the degree of prejudice suffered by the party that did not destroy the evidence, the court should take into account whether that party had a meaningful opportunity to examine the evi-

dence [*8] in question before it was destroyed. *See Thiele v. Oddy's Auto & Marine, Inc., 906 F. Supp. 158, 162 (W.D.N.Y. 1995).* As the *Thiele* court explained, when one side is completely deprived of the opportunity to inspect the evidence because it was destroyed after the other side had a chance to examine it, sanctions for spoliation are generally appropriate. *Id. at 162-63* ("Without any ability to examine the boat, [the third-party defendant] will be greatly frustrated in its ability to defend its case. Since [the plaintiff] is plainly at fault for allowing the boat to be placed in a landfill, any claims against [the third-party defendant] must be dismissed."); *see also Baliotis, 870 F. Supp. at 1290-91* ("At a minimum ... an opportunity for inspection should be afforded ... before relevant evidence is destroyed.").

In the present case, it is clear that Uhl's destruction of his notes reflects an extreme degree of fault and personal responsibility. Indeed, he admits that he personally destroyed his contemporaneous account of events that are, at a minimum, relevant to the central issues in this case. Further, he destroyed the evidence, [*9] not before litigation ensued, but rather, months after Diebold served document requests in a related case, a month after Positran filed its complaint in the present case, and mere days before his own deposition. On these facts, Positran cannot credibly claim that Uhl was unaware of his obligations.

More disturbing still, Positran now attempts to explain the similarities between Uhl's typewritten document and its complaint by arguing that the typewritten document is verbatim only to the extent that portions of the information were taken from Uhl's handwritten notes. Positran further explains that Uhl may have also referred to other documents in preparing his typewritten notes. Thus, Positran's explanation is basically that some of the typewritten document is a verbatim transcript of Uhl's handwritten notes, but not necessarily all of it reflects his notes. Moreover, although Uhl himself denied having referred to outside documents at his April 16, 2003 deposition, Positran takes the position that he was "intimidated" during the questioning, and was thus incorrect on this point.

While the problems with Positran's explanation are manifold, the court need only address one to make its [*10] point. Assuming that Positran's version is correct, this position merely exacerbates the problem because it makes it even less clear whether the typed document bears any resemblance to Uhl's handwritten notes. Neither the court, nor Diebold, can know what Uhl culled from his notes, what he pulled from other sources, and what may have been destroyed in notes he ultimately omitted from the typewritten document.

Likewise, because Diebold has no means of determining what Uhl's contemporaneous notes described, the prejudice to Diebold is not insignificant. There is no question that Diebold did not have the opportunity to examine Uhl's notes prior to their destruction. Additionally, Diebold has presented evidence that the information in Uhl's handwritten document would have been relevant to its case. For instance, focusing just on the May 7, 2001 entry in Uhl's typed document, the meeting that day allegedly related to a "credit hold," Positran's refusal to ship products, a production cut-back, quality issues, and a possible account "netting" arrangement. These are all issues in the present case and in its related companion case. Instead of Uhl's contemporaneous notes of this meeting, however, [*11] Diebold is left with Positran's assurance that Uhl completely and accurately transcribed all of his notes from that meeting. Moreover, Uhl's actions have deprived Diebold of the opportunity to use a contemporaneous record to cross-examine Positran's representative to determine what really occurred. Thus, given Positran's own inability to coherently and consistently explain what the typewritten document actually consists of, the court is compelled to conclude that Diebold has suffered prejudice through the loss of the handwritten document.

In light of the circumstances surrounding Uhl's destruction of his notes, the unavoidable inference is that the notes would have been helpful to Diebold's case. The court does not, however, believe that Diebold's requested sanction of dismissal is warranted in this case. Diebold has not argued that Uhl's handwritten notes are the only evidence available to prove its claims and adequately defend itself. Thus, while a sanction is clearly warranted, dismissal would be unjustly harsh. The court will, therefore, impose a "spoliation inference" in this case. This inference will allow the trier of fact, in this case, the court, to assume the destroyed evidence [*12] would have been unfavorable to the offending party. Such a sanction is sufficient to avoid substantial unfairness to Diebold, while at the same time serving as a deterrent to Positran, as well as other future litigants who may consider engaging in similar dilatory tactics.

## IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Diebold's Motion for Relief from Intentional Destruction of Evidence (D.I. 25) is GRANTED.

2003 U.S. Dist. LEXIS 8114, *

2. Positran's Motion to Exceed Its An-
swering Brief Page Limit (D.I. 44) is de-
clared MOOT.

Dated: May 15, 2003

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT BBB

1 of 3 DOCUMENTS

**POSITRAN MANUFACTURING, INC., Plaintiff/Counter-Defendant, v. DIEBOLD, INC., Defendant/Counter-Claimant.**

**C.A. No. 02-466 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2003 U.S. Dist. LEXIS 8114*

**May 15, 2003, Decided**

**DISPOSITION:** [*1] Diebold's Motion for Relief from Intentional Destruction of Evidence GRANTED; Positran's Motion to Exceed Its Answering Brief Page Limit declared MOOT.

**COUNSEL:** For Positran Manufacturing Inc, PLAINTIFF: William D Sullivan, Elzufon Austin Reardon Tarlov & Mondell, PA, Wilmington, DE USA.

For Diebold Inc, DEFENDANT: Frederick L Cottrell, III, Thomas Henry Kovach, Richards, Layton & Finger, Wilmington, DE USA.

For Diebold Inc, COUNTER-CLAIMANT: Frederick L Cottrell, III, Thomas Henry Kovach, Richards, Layton & Finger, Wilmington, DE USA.

For Positran Manufacturing Inc, COUNTER-DEFENDANT: William D Sullivan, Elzufon Austin Reardon Tarlov & Mondell, PA, Wilmington, DE USA.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

On May 31, 2002, the plaintiff, Positran Manufacturing Inc. ("Positran"), filed the above-captioned action asserting claims for breach of contract. In response, the defendant, Diebold, Inc. ("Diebold") has asserted counterclaims for breach of contract, fraud, and unjust enrichment. A two-day bench trial is scheduled to begin on June 16, 2003.

Presently before [*2] the court is Diebold's motion for relief from Positran's allegedly intentional destruction of evidence. For the following reasons, the court will grant Diebold relief, albeit not in the requested form.

**II. BACKGROUND**

In the first count of its counterclaim, Diebold asserts that Positran failed to make payments to Mosler as they became due for goods tendered by Mosler under its agreement with Positran. n1 Positran, however, argues that this obligation was "canceled out" under a supposed oral agreement between it and Mosler to "net" that obligation against amounts Mosler allegedly owed to Positran.

> n1 Diebold subsequently purchased Mosler's assets and accounts-receivable, including the roughly $ 1.3 million account-receivable against Positran.

Diebold now contends that, while its discovery requests were pending, and just days before his deposition, Positran's Vice-President, Joseph Uhl ("Uhl"), intentionally destroyed relevant evidence. Specifically, Diebold alleges that Uhl destroyed his handwritten [*3] notes which set forth his contemporaneous account of events that are the subject of both Positran's claim and Diebold's counterclaim. This fact is not in contention because, at his July 11, 2002 deposition, Uhl admitted that, just before his deposition, he did, in fact, throw away his handwritten notes.

Diebold alleges that the destroyed notes reflected communications between Positran and Mosler regarding Mosler's product orders to Positran. According to Diebold, these communications are crucial to the issue of the scope of the implied license to make Mosler goods. Die-

bold further alleges that the destroyed notes contained information on the Positran-Diebold negotiations that led to the agreement upon which Positran bases its "netting" claim.

Additionally, Diebold maintains that, not only did Uhl destroy documents, he fabricated a typewritten document which was subsequently produced to Diebold in discovery. Uhl then falsely testified that the document was a verbatim, typed version of the destroyed handwritten notes. In support of its contention that this document is fraudulent, Diebold points to the following testimony taken from Uhl at his July 11, 2002 deposition. At that deposition, [*4] Uhl stated that the only documents to which he referred in creating the typed document were the handwritten notes that he destroyed. He further testified that the only difference between the documents is that, whereas the destroyed documents were handwritten, the produced document is typewritten.

Upon closer inspection of the produced document, however, Diebold noticed that it duplicates, often verbatim, excerpts from Positran's complaint. Additionally, while Uhl stated his handwritten notes did not refer to exhibits, the typed document does refer to exhibits. Those exhibit references in turn exactly match the exhibit references in Positran's complaint.

## III. DISCUSSION

A party who has reason to anticipate litigation has an affirmative duty to preserve evidence which might be relevant to the issues in the lawsuit. *See, e.g., Howell v. Maytag, 168 F.R.D. 502, 505 (M.D. Pa. 1996)* (citing *Baliotis v. McNeil, 870 F. Supp. 1285, 1290 (M.D. Pa. 1994)); accord Shamis v. Ambassador Factors Corp., 34 F. Supp.2d 879, 888-89 (S.D.N.Y. 1999)* (asking whether the party "knew or should have known that the destroyed evidence was relevant [*5] to pending, imminent, or reasonably foreseeable litigation"); *Bass v. GMC, 929 F. Supp. 1287, 1288 (W.D. Mo. 1996)* (same). A party who breaches this duty by destroying relevant evidence or by allowing relevant evidence to be destroyed may be sanctioned by the court. *See, e.g., Howell, 168 F.R.D. at 505; accord TeleCom Intn'l Am. Ltd. v. AT&T Corp., 189 F.R.D. 76, 81 (S.D.N.Y. 1999).* When this destruction is willful or in bad faith and intended to prevent the other side from examining the evidence, the court may impose the most severe sanction of them all--the outright dismissal of a claim or the entry of a default judgment. *See Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 74 (S.D.N.Y. 1991)* ("The even harsher sanction of default [or dismissal] may be imposed as a sanction for the intentional destruction of evidence if the party seeking the evidence has been severely prejudiced and no lesser sanction is adequate."); *accord TeleCom, 189 F.R.D. at 81* (noting that the sanction of dismissal is a "drastic

remedy" which should be imposed only in "extreme circumstances," such as [*6] when a party wilfully destroys evidence or otherwise acts in bad faith) (relying on *West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999)); Baliotis, 870 F. Supp. at 1289* ("A sanction that has the 'drastic' result of judgment being entered against the party who has lost or destroyed evidence must be regarded as a 'last resort,' to be imposed only 'if no alternative remedy by way of a lesser, but equally efficient, sanction is available.'") (citations omitted).

When determining whether to impose sanctions for the spoliation of evidence, the court must consider the following three factors:

> (1) the degree of fault and personal responsibility of the party who destroyed the evidence;
>
> (2) the degree of prejudice suffered by the other party; and
>
> (3) the availability of lesser sanctions which would avoid any unfairness to the innocent party while, at the same time, serving as a sufficient penalty to deter the same type of conduct in the future.

*See Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994); accord Indemnity Ins. Co. of N. Am. v. Liebert Corp., 1998 U.S. Dist. LEXIS 9475, 1998 WL 363834, at * 3 (S.D.N.Y. June 29, 1998) [*7] .*

As the *Schmid* court emphasized, when determining the degree of fault and personal responsibility attributable to the party that destroyed the evidence, the court must consider whether that party intended to impair the ability of the other side to effectively litigate its case. *13 F.3d at 80; see also Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 334 (3d Cir. 1995)* ("It must appear that there has been an actual suppression or withholding of the evidence. No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for."); *accord Collins v. Throckmorton, 425 A.2d 146, 150 (Del. 1980)* ("Where a litigant intentionally suppresses or destroys pertinent evidence, an inference arises that such evidence would be unfavorable to his case.").

In addition, when considering the degree of prejudice suffered by the party that did not destroy the evidence, the court should take into account whether that party had a meaningful opportunity to examine the evi-

dence [*8] in question before it was destroyed. *See Thiele v. Oddy's Auto & Marine, Inc., 906 F. Supp. 158, 162 (W.D.N.Y. 1995)*. As the *Thiele* court explained, when one side is completely deprived of the opportunity to inspect the evidence because it was destroyed after the other side had a chance to examine it, sanctions for spoliation are generally appropriate. *Id. at 162-63* ("Without any ability to examine the boat, [the third-party defendant] will be greatly frustrated in its ability to defend its case. Since [the plaintiff] is plainly at fault for allowing the boat to be placed in a landfill, any claims against [the third-party defendant] must be dismissed."); *see also Baliotis, 870 F. Supp. at 1290-91* ("At a minimum ... an opportunity for inspection should be afforded ... before relevant evidence is destroyed.").

In the present case, it is clear that Uhl's destruction of his notes reflects an extreme degree of fault and personal responsibility. Indeed, he admits that he personally destroyed his contemporaneous account of events that are, at a minimum, relevant to the central issues in this case. Further, he destroyed the evidence, [*9] not before litigation ensued, but rather, months after Diebold served document requests in a related case, a month after Positran filed its complaint in the present case, and mere days before his own deposition. On these facts, Positran cannot credibly claim that Uhl was unaware of his obligations.

More disturbing still, Positran now attempts to explain the similarities between Uhl's typewritten document and its complaint by arguing that the typewritten document is verbatim only to the extent that portions of the information were taken from Uhl's handwritten notes. Positran further explains that Uhl may have also referred to other documents in preparing his typewritten notes. Thus, Positran's explanation is basically that some of the typewritten document is a verbatim transcript of Uhl's handwritten notes, but not necessarily all of it reflects his notes. Moreover, although Uhl himself denied having referred to outside documents at his April 16, 2003 deposition, Positran takes the position that he was "intimidated" during the questioning, and was thus incorrect on this point.

While the problems with Positran's explanation are manifold, the court need only address one to make its [*10] point. Assuming that Positran's version is correct, this position merely exacerbates the problem because it makes it even less clear whether the typed document bears any resemblance to Uhl's handwritten notes. Neither the court, nor Diebold, can know what Uhl culled from his notes, what he pulled from other sources, and what may have been destroyed in notes he ultimately omitted from the typewritten document.

Likewise, because Diebold has no means of determining what Uhl's contemporaneous notes described, the prejudice to Diebold is not insignificant. There is no question that Diebold did not have the opportunity to examine Uhl's notes prior to their destruction. Additionally, Diebold has presented evidence that the information in Uhl's handwritten document would have been relevant to its case. For instance, focusing just on the May 7, 2001 entry in Uhl's typed document, the meeting that day allegedly related to a "credit hold," Positran's refusal to ship products, a production cut-back, quality issues, and a possible account "netting" arrangement. These are all issues in the present case and in its related companion case. Instead of Uhl's contemporaneous notes of this meeting, however, [*11] Diebold is left with Positran's assurance that Uhl completely and accurately transcribed all of his notes from that meeting. Moreover, Uhl's actions have deprived Diebold of the opportunity to use a contemporaneous record to cross-examine Positran's representative to determine what really occurred. Thus, given Positran's own inability to coherently and consistently explain what the typewritten document actually consists of, the court is compelled to conclude that Diebold has suffered prejudice through the loss of the handwritten document.

In light of the circumstances surrounding Uhl's destruction of his notes, the unavoidable inference is that the notes would have been helpful to Diebold's case. The court does not, however, believe that Diebold's requested sanction of dismissal is warranted in this case. Diebold has not argued that Uhl's handwritten notes are the only evidence available to prove its claims and adequately defend itself. Thus, while a sanction is clearly warranted, dismissal would be unjustly harsh. The court will, therefore, impose a "spoliation inference" in this case. This inference will allow the trier of fact, in this case, the court, to assume the destroyed evidence [*12] would have been unfavorable to the offending party. Such a sanction is sufficient to avoid substantial unfairness to Diebold, while at the same time serving as a deterrent to Positran, as well as other future litigants who may consider engaging in similar dilatory tactics.

## IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

> 1. Diebold's Motion for Relief from Intentional Destruction of Evidence (D.I. 25) is GRANTED.

2003 U.S. Dist. LEXIS 8114, *

2. Positran's Motion to Exceed Its Answering Brief Page Limit (D.I. 44) is declared MOOT.

Dated: May 15, 2003

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE