# Exhibit A

LEXSEE 2002 U.S. DIST. LEXIS 12560

Warning
As of: Apr 09, 2007

**AMERICAN REALTY TRUST, INC., ET AL., Plaintiffs, VS. MATISSE PARTNERS, L.L.C., ET AL., Defendants, VS. GENE E. PHILLIPS, ET AL., Third-Party Defendants.**

**CIVIL ACTION NO. 3:00-CV-1801-G**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

***2002 U.S. Dist. LEXIS 12560***

**July 10, 2002, Decided**
**July 10, 2002, Filed**

**DISPOSITION:** **[*1]** Defendants' motion to exclude evidence of damages arising from securities liquidated due to margin calls granted. Plaintiffs' motion to supplement their discovery responses and to amend their complaint denied.

**COUNSEL:** For AMERICAN REALTY TRUST, INC, plaintiff: Lawrence J Friedman, James R Krause, Attorneys at Law, Friedman & Feiger, Dallas, TX USA.

For BASIC CAPITAL MANAGEMENT INC, plaintiff: John F Redwine, Attorney at Law, Redwine Law Offices, Dallas, TX USA.

For MATISSE CAPITAL PARTNERS, LLC, PAUL BAGLEY, JACK TAKACS, defendants: Michael D Napoli, Attorney at Law, Kirkpatrick & Lockhart, Dallas, TX USA.

JEFF ABRAMS, ADR Provider, Pro se, Dallas, TX USA.

HESHA ABRAMS, ADR Provider, Pro se, Dallas, TX USA.

For KARL BLAHA, movant: Charles I Appler, Attorney at Law, Bennett Weston & LaJone, Dallas, TX USA.

For MATISSE CAPITAL PARTNERS, LLC, PAUL BAGLEY, JACK TAKACS, counter-claimants: Michael D Napoli, Attorney at Law, Kirkpatrick & Lockhart, Dallas, TX USA.

For AMERICAN REALTY TRUST, INC, counter-defendant: Lawrence J Friedman, James R Krause, Attorneys at Law, Friedman & Feiger, Dallas, TX USA.

For GENE PHILLIPS, A CAL ROSSI, counter-defendants: **[*2]** Mitchell Madden, Attorney at Law, Law Office of Mitchell Madden, Dallas, TX USA.

For BASIC CAPITAL MANAGEMENT INC, counter-defendant: John F Redwine, Attorney at Law, Redwine Law Offices, Dallas, TX USA.

**JUDGES:** A. JOE FISH, CHIEF JUDGE.

**OPINION BY:** A. JOE FISH

**OPINION:**

**MEMORANDUM ORDER**

Before the court is the motion of the defendants, Matisse Capital Partners, L.L.C. ("Matisse"), Paul Bagley ("Bagley"), and Jack Takacs ("Takacs") (collectively, "the defendants"), to exclude evidence offered by the plaintiffs, American Realty Trust, Inc. ("ART") and Basic Capital Management, Inc. ("BCM") (collectively, "the plaintiffs"), for damages arising from securities liquidated due to margin calls. Also before the court is the plaintiffs' related motion for leave to supplement their

discovery responses and to amend their complaint. For the reasons discussed below, the defendants' motion to exclude evidence is granted, and the plaintiffs' motion to supplement their discovery responses and to amend their complaint is denied.

I. BACKGROUND

During the pre-trial conference held May 3, 2002, the defendants moved to exclude any evidence of damages by the plaintiffs for damages arising from securities [*3] liquidated due to margin calls. The crux of the defendants' motion is that the plaintiffs are attempting to try this case by ambush. The defendants contend that "throughout the nearly two years that this case has been pending, Plaintiffs' only claims for damages have been for return of the $ 400,000 that they paid to Matisse under the contract plus attorneys' fees." Defendants' Motion to Exclude Evidence of Plaintiffs' Claim for Damages Arising from Securities Liquidated Due to Margin Calls and Memorandum in Support ("Motion to Exclude") at 1; Appendix in Support of Defendants' Motion to Exclude Evidence of Plaintiffs' Claim for Damages Arising from Securities Liquidated Due to Margin Calls ("Defendants' Appendix") at 5. Further, as the defendants correctly point out, BCM limited its claim for damages to $ 200,000 in its Answers to Defendants' First Set of Interrogatories, Defendants' Appendix at 31, which were served on March 1, 2002. *Id.* at 32.

Pursuant to this court's scheduling order issued November 14, 2001, discovery was to be completed by February 28, 2002. Amended Order Establishing Schedule and Certain Pretrial Requirements P 6, Appendix in Support of American Realty [*4] Trust, Inc. and Basic Capital Management, Inc.'s Response to Defendants' Motion to Exclude Evidence of Plaintiffs' Claim for Damages Arising From Securities Liquidated Due to Margin Calls at 3. In ART's Supplemental Responses to Defendants' Second Set of Interrogatories, served March 13, 2002, Defendants' Appendix at 17-18, ART disclosed for the first time a claim for damages for $ 30 million arising out of the liquidation by ART's margin lenders of the shares securing some of the loans. *Id.* at 22. Thus, after the close of discovery, and less that two months before trial was set to begin, "ART added an entirely new category of damages and increased its total claim for damages 150-fold." Motion to Exclude at 2. The defendants also point out that in the Joint Pretrial Order, not only has ART included this new claim, but also "BCM, in direct contravention of its sworn interrogatory responses served the month before, has now claimed that it is entitled to some unspecified portion of the $ 30 million previously claimed by ART." *Id.*

The defendants maintain that the plaintiffs have violated the disclosure requirements of *FED. R. CIV. P. 26* and are attempting to try this case by ambush. [*5] *Id.* Under Rule 26, the plaintiffs were required to provide the defendants with a calculation of damages and all documents related to the damages allegedly suffered by the plaintiffs. *FED. R. CIV. P. 26(a)(1)(C)*. The defendants assert that despite numerous opportunities to do so, the plaintiffs "have failed to make any meaningful disclosure of their $ 30 million claim for damages." Motion to Exclude at 2.

The plaintiffs' claim at issue is based on losses the plaintiffs allegedly suffered when shares that they owned were sold by margin lenders to satisfy margin calls, but the defendants aver that the plaintiffs have not provided them with any information regarding the specifics of this claim. *Id.* at 2-3. According to the defendants, the only written disclosure the plaintiffs have provided regarding this claim is a single sentence in ART's supplemental discovery responses:

> Lastly, when several of the margin lenders sold ART's margined shares, the Plaintiff suffered damages in the amount of $ 30,000,000.00 caused by the Defendants' failures to adequately address the margin debt situation, both before and after the indictments.

Defendants' Appendix at 22.

Since [*6] the above disclosure, the defendants have deposed two witnesses regarding the plaintiffs' claim for damages: Kenneth Nye ("Nye"), and Gene Phillips ("Phillips"). Motion to Exclude at 3. The defendants claim that not only did these witnesses fail to provide significant information, they actually contradicted one another. *Id.* Nye, an attorney for ART, has been designated as the corporate representative for both BCM and ART to testify as to damages. *Id.* When asked about damages to ART or BCM from the liquidation of margin shares, Nye testified that he didn't have a "specific amount," but that he thought it was somewhere between $ 30 and $ 40 million. Deposition of Kenneth Francis Nye ("Nye Dep.") at 62-63, Defendants' Appendix at 35-37. Nye did not know how ART or BCM calculated its damages, but he testified that an acceptable method would be to take the difference between the liquidation price and the market value of the shares at the time of sale and multiply that number by the number of shares. Nye Dep. at 64-65, Defendants' Appendix at 38-39. While Nye provided several pages of "what appear to be a summary of purchases and sales by BCM and ART during June 2000, as well as [*7] a printout showing the price of each stock during June 2000," (Nye Exhibits 8,

9, 10, Defendants' Appendix at 41-51), "he was unable to describe how [the damage] calculation of $ 30 to $ 40 million could be derived from these documents." Motion to Exclude at 4. Furthermore, the defendants contend that they are unable to determine any reasonable calculation based on these documents that "even approaches" $ 30 million.

As for Phillips, the second deponent, he too was unable to provide an exact calculation but estimated that the damages were approximately $ 30 million. Deposition of Gene E. Phillips ("Phillips Dep.") at 213, 233, Defendants' Appendix at 52, 53, 67. The defendants point out that, unlike Nye, Phillips testified that the plaintiffs' calculation was based on the difference between the liquidation price and either the price at which the plaintiffs repurchased the shares or the current market price at some point in time following the liquidation. Phillips Dep. at 213, Defendants' Appendix at 53. Further, Phillips could only identify the liquidating margin holder for half of the shares the plaintiffs claim were liquidated. Phillips Dep. at 215-16, Defendants' Appendix at [*8] 55-56. Phillips did, however, identify a number of documents he believes contain the information supportive of the plaintiffs' damage calculation. n1 Phillips Dep. at 228-232, Defendants' Appendix at 62-66. The defendants requested these documents at Phillips' deposition, and again by a letter following the deposition. Phillips Dep. at 228-232, Defendants' Appendix at 62-66; April 15, 2002 Letter from Paul Ridley, Defendants' Appendix at 72-74. The defendants claim that additionally, all of the above-mentioned documents are responsive to the defendants' first request for production, No. 26, which requested all documents concerning the existence, amount and calculation of damages, served on December 1, 2000, and by the disclosure requirements of Rule 26. Motion to Exclude at 5. Thus, the defendants maintain, the plaintiffs should have produced them months ago. *Id.* Of these documents, however, only the Gotham Partners option agreement was produced in discovery -- and that was allegedly incomplete, missing the page which set forth the price to be paid by ART. *Id.* Nor have the plaintiffs produced any records or documents showing that the Gotham Partners option was exercised. [*9] *Id.* The defendants have numerous questions regarding the plaintiffs' damages calculation which have not been answered, and without the answers, the defendants claim, they cannot "even begin to prepare a defense against this claim for damages." n2 Motion to Exclude at 6.

n1 These documents include:

1. October 2000 agreement between Gotham Partners and ART for the repurchase of margin stock liquidated by Morgan Stanley;

2. Correspondence between ART and Gotham pertaining to the repurchase of the stock;

3. Company general ledgers and brokerage firm confirmations of sales of the stock by the liquidating margin lenders substantiating the price at which the stock was sold;

4. Trade confirmations, contracts, option agreements or other documents reflecting the price at which the margin shares were repurchased or other shares were purchased in the open market to replace the liquidated shares;

5. Accounting records reflecting the repurchase price.

Phillips Dep. at 228-232, Defendants' Appendix at 62-66.

n2 The defendants pose the following questions:

1. What shares were allegedly liquidated by margin lenders as a result of some misconduct by Defendants -- shares of ART, National Realty, LP ("NRLP"), Income Opportunities Realty Investors ("IORI"), Transcontinental Realty Investors ("TCI") or some other entity?

2. How many shares?

3. Who owned the shares -- ART, BCM or some other entity?

4. When were the shares liquidated?

5. By which margin lender?

6. How is the alleged loss calculated? Is it the difference between

> the liquidation price and some value placed on the shares? If so, what was the liquidation price for each sale of securities? How was the value of the shares calculated -- average historical price, book value of the shares as shown on Plaintiffs' accounting records, cost of cover, an expert's valuation of the shares as of the time of liquidation, some other method?
>
> 7. Do Plaintiffs plan to submit expert testimony on the value of these shares? And, if so, who is the expert? -- none has been designated.
>
> 8. What conduct of Defendants is alleged to have proximately caused the liquidation of which shares?
>
> 9. Plaintiffs sued Gotham Partners and Morgan Stanley Dean Witter alleging that they conspired to convert margined shares belonging to Plaintiffs. Counsel for Plaintiffs informed us at the pretrial conference that the Gotham litigation had been dismissed. Are the shares subject to the Gotham litigation included in Plaintiffs' damage calculation? Did Plaintiffs receive a settlement from Gotham or Morgan Stanley? If so, are Defendants entitled to a settlement credit?
>
> 10. Who performed the calculation of damages for Plaintiffs?
>
> 11. Who has knowledge of the facts underlying the calculation?

Motion to Exclude at 6.

**[*10]**

II. ANALYSIS

A. *Motion to Exclude Evidence*

This court issued an Order Regarding Conduct of Trial (docket entry 233), which states that "the tactic of 'trial by ambush' will not be condoned." n3 *Id.* P 5.4. The plaintiffs were required by *FED. R. CIV. P. 26* to provide complete disclosure to the defendants of all relevant facts regarding this latest claim for damages. Rule 26 states, in relevant part:

> a party must, without awaiting a discovery request, provide to other parties . . . (C) a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered[.]

*FED. R. CIV. P. 26(a)(1)(C).*

n3 The court notes that although the court's order on this point discusses exhibits, the same principle applies to the instant issue.

**[*11]**

In addition to the requirements of Rule 26, which imposes a duty to make disclosure without a discovery request, the plaintiffs had discovery obligations that were triggered by specific requests from the defendants. The defendants served interrogatories on each plaintiff requesting that it provide the defendants a complete description of its claim for damages, including the amount claimed and the facts supporting each claim. Defendants' Second Set of Interrogatories to ART, Nos. 3-5, Defendants' Appendix at 7, 12-13; Defendants' First Set of Interrogatories to BCM, No. 3, Defendants' Appendix at 27, 30. Additionally, the defendants requested production of documents from ART related to the existence, amount, and calculation of any damages claimed by ART. Defendants' First Request for Production, No. 26, Defendants' Appendix at 75, 96. Further, the defendants point out that they also noticed the deposition of a corporate representative of each plaintiff on the topic of damages. Motion to Exclude at 8; Notice of Deposition to ART, Defendants' Appendix at 101-103; Notice of Deposition to BCM, Defendants' Appendix at 104-107. For all of these reasons, the defendants argue, it is "without **[*12]** question" that the plaintiffs were obligated to disclose the full facts regarding their claim for damages, and it is "equally without question" that the plaintiffs have failed to comply with their discovery obligations. Motion to Exclude at 8. The court agrees.

The plaintiffs disclosed a claim for damages arising out of losses due to liquidation of margin shares for the

first time on March 13, 2002, nearly two weeks after the discovery deadline. Since then, the plaintiffs have not complied with their obligation to disclose the facts underlying their damages claim. They have failed to specify the calculation utilized to arrive at their $ 30 million damage figure. Furthermore, the plaintiffs have failed to provide complete information as to the elements that comprise their damage calculation, including "the number of shares involved, who owned the shares, the price at which each block of shares was liquidated or the price that [the plaintiffs] claim is the true value." Motion to Exclude at 9. Finally, the court agrees with the defendants *(Id.)* that the plaintiffs have failed to produce a number of documents relevant to this element of damages.

Pursuant to the Federal Rules, information **[*13]** not provided in discovery should be excluded from evidence unless the disclosing party can establish that the failure to disclose was either harmless or justified. *FED. R. CIV. P. 37(c)(1)*. In determining whether the plaintiffs' failure to disclose is harmless, the court should consider the following factors: (1) the importance of the evidence; (2) the prejudice to the opposing party of allowing the evidence to be presented; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation, if any, for the party's failure to provide the evidence in discovery. *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Company Inc., 73 F.3d 546, 572* (5th Cir.) (discussing a district court's decision to strike expert testimony), *cert. denied, 519 U.S. 811, 136 L. Ed. 2d 20, 117 S. Ct. 57 (1996)*. Each of these factors is discussed separately below.

1. Importance of the Evidence

The evidence regarding the claim for damages arising from securities liquidated due to margin calls and calculation of such damages is undoubtedly significant, given that it potentially transforms the case from one worth roughly $ 400,000 to one in the $ 30 to $ 40 million range. With **[*14]** a transformation of this magnitude, the importance of the evidence cannot be disputed.

2. Prejudice to the Defendants

The court agrees with the defendants (Motion to Exclude at 10) that they have been significantly prejudiced by the plaintiffs' failure to disclose this element of damages, and by their failure to provide the necessary supporting calculations and documentation. The defendants correctly point out that by waiting until after the discovery deadline to disclose this claim, the plaintiffs have "effectively foreclosed [the] defendants from taking discovery as to the lion's share of [the plaintiffs'] claim of damages." Additionally, because the plaintiffs' disclosure was incomplete, the defendants do not have adequate information with which they can prepare for trial on this issue.

3. Possibility of Curing Prejudice by Granting a Continuance

The court likewise agrees with the defendants (Motion to Exclude at 11) that to grant a continuance to allow the plaintiffs to properly disclose their claim for damages arising from liquidation of the margin shares would work further injustice upon the defendants. This case has been pending for almost two years, and the trial setting **[*15]** has already been continued twice: the first time at the instance of third-party defendants Phillips and A. Cal Rossi (docket entry 115), and the second at the instance of the court, for docket management reasons (docket entries 145, 289, and 294). Further delay would only serve to increase the cost to both parties.

4. Reasonable Excuse for Delay

Finally, the court agrees with the defendants that the plaintiffs have not offered a reasonable explanation for the belated and incomplete disclosure of this element of damages. The liquidation of shares and of all of the alleged misconduct by the defendants occurred in 2000. The plaintiffs had ample opportunity to assert a claim for damages arising out of the liquidation of shares, and they have given the court no valid reason for their not doing so before March 13, 2002. Nor have the plaintiffs established that their tardy and incomplete disclosure is harmless to the defendants. The plaintiffs' only explanation for their tardiness appears to be that the parties had agreed in the past to extend discovery deadlines. American Realty Trust, Inc. and Basic Capital Management, Inc.'s Response to Defendants' Motion to Exclude evidence of Plaintiffs' **[*16]** Claim for Damages Arising from Securities Liquidated Due to Margin Calls ("Response to Motion to Exclude") at 4-5. The plaintiffs do not assert, however, that the parties had made such an agreement in this instance. Additionally, the plaintiffs claim that some of the information, namely BCM's brokerage statements, was only obtained by the plaintiffs shortly before it was produced. *Id.* at 6. The plaintiffs further contend that their "live pleadings contain sufficient factual and legal allegations to put [the defendants] on notice as to the claims they would have to defend." *Id.* The plaintiffs fail, however, to provide adequate support for this assertion, and instead have filed a motion to supplement their discovery responses and to amend their complaint. The court notes that the documents filed in this case are voluminous, to say the least. For the plaintiffs to argue that the defendants should have put two and two together and guessed that the plaintiffs would make such a claim and guessed at what the damage calculation would be is absurd. All of the events giving rise to the plaintiffs' claims in this case occurred nearly two years ago, and the in-

formation necessary to make [*17] a calculation of their damages is within the plaintiffs' sole possession. The court finds that the plaintiffs made a tactical decision to ambush the defendants by withholding their main claim for damages until after the close of discovery. This is an example of the plaintiffs simply delaying answering interrogatories until the brink of trial, when all facts are known and theories finalized, before informing the defendants of a key part of the plaintiffs' theory of the case. n4 *Cf. Barker v. Bledsoe, 85 F.R.D. 545, 548 (W.D. Okl. 1979).* The plaintiffs should have disclosed their damage claim based on the information available at the beginning of this case.

> n4 In *Barker v. Bledsoe, 85 F.R.D. 545, 548 (D.C. Okl. 1979),* a district court discussed the duty to supplement discovery responses, and held that parties could not simply delay answering interrogatories until the day or month before trial, merely to gain a tactical advantage. The court takes a similar position today.

On facts [*18] similar to those presented here, the court in *Texas Instruments, Inc. v. Hyundai Electronics Industries Company, Ltd., 50 F. Supp. 2d 619 (E.D. Tex. 1999),* excluded evidence and theories disclosed only at the end of discovery. In *Texas Instruments,* the plaintiff disclosed a new defensive theory and its supporting evidence at the end of the discovery period. *Id. at 623.* In deciding an argument over whether the disclosure was within the discovery cutoff, the court refused to split hairs in light of the several months that the defendants sat on the knowledge they had. *Id.* Likewise, the plaintiffs here had all of the necessary facts to disclose their damage theory months ago, and they have never provided proper support for their damage calculations. Therefore, for all of the reasons discussed, the court grants the defendants' motion to exclude the plaintiffs' evidence of damages arising from securities liquidated due to margin calls.

B. *Motion to Supplement Discovery and Amend Complaint*

In response to the defendants' motion to exclude evidence, the plaintiffs have filed a motion to supplement their discovery responses and to amend their complaint. [*19] Despite the requirements of Local Rule 15.1, n5 however, they have not provided the court with the proposed amendment. *Federal Rule of Civil Procedure 15(a),* which governs the amendment of pleadings, provides that leave to amend should be "freely given when justice so requires." In the absence of any apparent or declared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, futility of the amendment, etc.--leave sought should be freely given. *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962).*

> n5 Local Civil Rule 15.1 provides in pertinent part:
>
> > A party who moves for leave to file an amended pleading must attach a copy of the proposed amended pleading as an exhibit to the motion.

Leave to amend, however, is by no means automatic. *Little v. Liquid Air Corporation, 952 F.2d 841, 845-46 (5th Cir. 1992).* n6 The above-captioned case is set for trial in this court on July 22, 2002. The plaintiffs have waited too [*20] long before bringing their motion to amend. n7 At some point, a claimant's delay can become procedurally fatal. *Chitimacha Tribe of Louisiana v. Harry L. Laws Company, Inc., 690 F.2d 1157, 1163 (5th Cir. 1982), cert. denied, 464 U.S. 814, 78 L. Ed. 2d 83, 104 S. Ct. 69 (1983); Gregory v. Mitchell, 634 F.2d 199, 203 (5th Cir. 1981).* To allow the plaintiffs to amend their complaint at this late hour would either delay the trial date or impose an undue burden upon the defendants to respond to the newly asserted damage claims. Furthermore, as stated earlier, the court finds that the plaintiffs had a dilatory motive in disclosing their damages claim after the close of discovery and in failing to provide the defendants with supporting calculations for their damages claim.

> n6 *Little* was reheard *en banc,* but the *en banc* court endorsed the panel opinion on this point. *Little v. Liquid Air Corporation, 37 F.3d 1069, 1073 n.8 (5th Cir. 1994)* (en banc).

> n7 Under the court's scheduling order issued March 2, 2001, the deadline for amending pleadings was June 4, 2001. Order Establishing Schedule and Certain Pretrial Requirements P 3(a) (docket entry 39). Although this scheduling order was supplanted in many respects by the scheduling order of November 14, 2001 (docket entry 145), the deadline for amending pleadings was not extended, largely because the movants for continuance of the original trial setting did not ask that it be extended. *See generally* Third Party Defendants, Gene E. Phillips and A. Cal Rossi's Motion for Continuance, Motion to Modify and

Extend Deadlines for Pretrial Requirements and Motion to Extend Mediation Deadline and Brief in Support Thereof (docket entry 115).

**[*21]**

Against these factors, the plaintiffs have failed to provide tenable reasons for their delay in seeking to amend their complaint. See *Matter of Southmark Corp., 88 F.3d 311, 315-16 (5th Cir. 1996)* (in denying leave to amend complaint, a trial court may properly consider (1) an unexplained delay following the original complaint and (2) whether the facts underlying the amended complaint were known to the party when the original complaint was filed), *cert. denied, 519 U.S. 1057, 136 L. Ed. 2d 611, 117 S. Ct. 686 (1997); Barrett v Independent Order of Foresters, 625 F.2d 73, 75 (5th Cir. 1980)* (affirming denial of leave to amend, although bad faith and dilatory motive were not found, where "amendment sought to add several . . . additional counts" and "even though the motion was not filed until nearly ten months after the original complaint, there would appear to be no matters . . . which could not have been raised initially"); *Layfield v. Bill Heard Chevrolet Co., 607 F.2d 1097, 1099 (5th Cir. 1979)* (upholding denial of leave to amend, although bad faith and dilatory motive were not found, where "all of the facts relevant to the proposed amendment were **[*22]** known to the [movant] at the time she filed her original complaint"), *cert. denied, 446 U.S. 939, 64 L. Ed. 2d 793, 100 S. Ct. 2161 (1980).*

Accordingly, the plaintiffs' motion to supplement their discovery responses and to amend their complaint is denied.

III. CONCLUSION

For the reasons discussed above, the motion of the defendants to exclude evidence of damages arising from securities liquidated due to margin calls is **GRANTED.** The motion of the plaintiffs to supplement their discovery responses and to amend their complaint is **DENIED.**

**SO ORDERED.**

July 10, 2002.

A. JOE FISH

CHIEF JUDGE

# Exhibit B

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# Exhibit C

**THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY**

# Exhibit D

**THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY**

# Exhibit E

**THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY**

# Exhibit F

1 of 1 DOCUMENT

Cited
As of: Apr 06, 2007

**AUTO METER PRODUCTS, INC., Plaintiff, v. MAXIMA TECHNOLOGIES & SYSTEMS, LLC, Defendant.**

**No. 05 C 4587**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

***2006 U.S. Dist. LEXIS 81687***

**November 6, 2006, Decided**

**COUNSEL:** [*1] For Auto Meter Products, Inc., an Illinois Corporation, Plaintiff: Philip T. Petti, Rudy I. Kratz, Fitch, Even, Tabin & Flannery, Chicago, IL.; Charles W. Saber, Dickstein Shapiro LLP, Washington, DC.; Merritt R. Blakeslee, deKieffer & Horgan, Washington, DC, US.; Steven M. War, Dickstein Shapiro L.L.P., Washington, DC, US.

For Maxima Technologies & Systems, LLC, a Delaware Limited Liability Company, Defendant: George C. Werner, Kendra D. McGuire, Barley Snyder LLC, Lancaster, PA, US.; Matthew Austin Griffin, Robert M. Newbury, Robert W. Sacoff, Sanjiv D. Sarwate, Pattishall, McAuliffe, Newbury, Hillard & Geraldson, Chicago, IL.; Salvatore Anastasi, Salvatore Anastasi, Attorney at Law, Berwyn, PA, US.

For Auto Meter Products, Inc., an Illinois Corporation, Counter Defendant: Charles W. Saber, Dickstein Shapiro LLP, Washington, DC.; Merritt R. Blakeslee, deKieffer & Horgan, Washington, DC, US.; Steven M. War, Dickstein Shapiro L.L.P., Washington, DC, US.

**JUDGES:** NAN R. NOLAN, United States Magistrate Judge.

**OPINION BY:** NAN R. NOLAN

**OPINION:**

**MEMORANDUM OPINION AND ORDER**

Plaintiff Auto Meter Products, Inc. has filed suit against Defendant Maxima Technologies & Systems, LLC alleging [*2] trademark infringement and unfair competition under *15 U.S.C. §§ 1114* and *1125*, and under Illinois common law. Currently before the court is Auto Meter's motion to compel complete answers to Interrogatory Nos. 12, 13, and 15. For the reasons set forth below, the motion is granted in part and denied in part.

**BACKGROUND**

Auto Meter develops, manufactures, and sells automotive measuring instruments, such as tachometers, speedometers, and gauges for measuring oil pressure, oil temperature, water temperature, vacuum, fuel pressure, and fuel levels. In connection with that business, Auto Meter owns the Super Bezel Trademark, Principal Registration No. 2,883,435 (the '435 Registration), and the "ULTRA-LITE" trademark, Principal Registration No. 1,967,655 (the '655 Registration). It also owns the trade dress for the "Monster Tachometer."

On May 16, 2003, Auto Meter filed a complaint with the International Trade Commission ("ITC") seeking to stop 19 respondents from importing and selling imitation tachometers and gauges that infringe Auto Meter trademarks. Maxima was not a respondent in that action, but was involved as a third party [*3] and produced documents to the named respondents. In this lawsuit against Maxima, Auto Meter alleges that Maxima's "Stewart Warner Performance" series of tachometers, gauges, and speedometers infringes the '435 and '655 Registrations, and the Monster Tachometer Trade Dress.

Prior to the close of fact discovery, Auto Meter served Maxima with several contention interrogatories, including the following:

Interrogatory No. 12: State fully the basis, including all supporting facts, documents, exhibits, testimony and/or expert opinions, for Maxima's allegations in paragraphs 1-5 of its affirmative defenses that Auto Meter's Super Bezel Trademark, Associated Trade Dress, and Monster Tachometer Trade Dress are functional and that Auto Meter is not entitled to any trade dress protection; that Auto Meter's Super Bezel Trademark, Associated Trade Dress, and Monster Tachometer Trade Dress are not inherently distinctive and have not acquired secondary meaning; that the relief requested in Auto Meter's Complaint is barred by laches and that Auto Meter unreasonably delayed in filing suit; and that Maxima's use of the term "Ultra-Shift Light" constitutes a fair use.

Interrogatory [*4] No. 13: State fully the basis, including all supporting facts, documents, exhibits, testimony and/or expert opinions, for Maxima's allegation that its accused products do not infringe Auto Meter's trade dress and trademark rights asserted in this action.

Interrogatory No. 15: State fully the basis, including all supporting facts, documents, exhibits, testimony, and/or expert opinions, for Maxima's counterclaim.

Maxima initially responded to these interrogatories on February 7, 2006, directing Auto Meter to its amended answer and stating that "other facts may be disclosed in the course of discovery." (Ex. 4 to Pl. Mem., at 9-11.) On June 30, 2006, Maxima submitted supplemental responses stating that "[d]iscovery is on-going and Maxima will supplement this response as discovery progresses." With respect to Interrogatory No. 15, Maxima further directed Auto Meter to "the documents produced in response to Auto Meter's document requests." (Ex. 5 to Pl. Mem., at 9-10.)

Maxima supplemented its discovery responses a second time on September 6, 2006, the original deadline for fact discovery. n1 Auto Meter found these responses inadequate and ultimately filed a motion to [*5] compel on September 29, 2006. On October 5, 2006, Auto Meter conducted a continued deposition of Maxima's President and CEO Oddie Leopando, who had been designated as the company's *Rule 30(b)(6)* witness and who was originally deposed on August 17, 2006. During the continued deposition, Auto Meter questioned Mr. Leopando about the September 6, 2006 supplemental responses. On October 17, 2006, Maxima supplemented its responses a third time, adding still new contentions in support of its defenses and counterclaim. (Ex. B to Def. Resp.) Auto Meter insists that Maxima should be barred from relying on "any contentions, factual bases, and documents not fully disclosed in its October 17 supplemental response, or in its August 17 and October 5 *Rule 30(b)(6)* depositions." Auto Meter also seeks to recover attorneys' fees and costs incurred in pursuing this motion to compel.

n1 On September 11, 2006, the court agreed to extend fact discovery to October 6, 2006. (Minute Order of 9/11/06, Doc. 51.)

**DISCUSSION**

Contention [*6] interrogatories, such as those at issue here, basically "require the answering party to commit to a position and give factual specifics supporting its claims." *Ziemack v. Centel Corp., 1995 U.S. Dist. LEXIS 18192 at 5, No. 92 C 3551, 1995 WL 729295, at *2 (N.D. Ill. Dec. 7, 1995)*. "When one party poses contention interrogatories after considerable discovery, and the opposing party refuses to answer the interrogatories, courts routinely compel the resisting party to answer the interrogatories." *Calobrace v. American Nat'l Can Co., No. 93 C 999, 1995 U.S. Dist. LEXIS 1371, at *3 (N.D. Ill. Feb. 3, 1995)* (citing *Rusty Jones, Inc. v. Beatrice Co., 1990 U.S. Dist. LEXIS 12116 at 2-3, No. 89 C 7381, 1990 WL 139145, at *2 (N.D. Ill. Sept. 14, 1990))*.

**A. Interrogatory Nos. 12 and 15**

Interrogatory No. 12 seeks information regarding Maxima's affirmative defenses. Interrogatory No. 15 requests the facts and documents supporting Maxima's counterclaim, which seeks cancellation of Auto Meter's Super Bezel Trademark based on Maxima's affirmative defenses. Auto Meter argues that Maxima has engaged in a pattern of providing deficient answers to these interrogatories, and then serially supplementing those [*7] answers with new allegations and citations. For example, at his October 5, 2006 30(b)(6) deposition, Mr. Leopando purported to disclose all of the factual bases and evidence for Maxima's functionality defense. (Leopando Dep., at 517, 518-91.) In the October 17, 2006 supplemental response, however, Maxima newly asserted that it is additionally relying on "documents addressing functionality from the International Trade Commission proceeding." (Ex. B to Def. Resp., at 3.) According to Auto Meter, the ITC record consists of more than 75,000 pages, but Maxima has not identified

"a single one of the documents from that mountain of materials that it expects to rely upon for its functionality allegations." (Pl. Reply, at 6.)

Similarly, with respect to Maxima's defense that Auto Meter's trademarks/trade dress lack secondary meaning, Maxima produced at the October 5 deposition three old gauges made by the now defunct Sun Electric Company in the 1960s and 1970s. (Pl. Reply, at 6 n.7.) Mr. Leopando then testified that these were the only historical Sun products upon which Maxima intended to rely. (Ex. E to Def. Resp., at 598-609, 615.) In the October 17, 2006 supplemental response, however, Maxima **[*8]** referenced some 36 additional gauges listed in the expert report of a Mr. Behrens from the ITC case. (Ex. B. to Def. Resp., at 5; Pl. Reply, at 6.) Maxima also stated for the first time that "evidence concerning third-party gauges and tachometers can be found in the production of documents and gauges which Auto Meter inspected on September 26, 2006." (Ex. B to Def. Resp., at 5.) This production apparently comprises approximately 36 bankers boxes of old gauges, automotive magazines, brochures, and documents. Auto Meter claims that Maxima has not identified which materials from those boxes support its defenses or counterclaim. Auto Meter also objects that Maxima "continues to withhold its contentions . . . concerning the facts necessary to establish the relevance of those old gauges (or the other gauges it relies upon) to the use of 'secondary meaning,' *e.g.*, the channels of trade into which they are sold, their market position and market segments, features relevant to consumers, their sales and market share, etc." (Pl. Reply, at 7.)

In addition, Maxima apparently raised an entirely new contention supporting its secondary meaning defense in the October 17 supplemental response; **[*9]** namely, that Auto Meter's small percentage of sales to private label and original equipment customers ("OEM") eliminate the secondary meaning of the Super Bezel trademark. (Ex. B to Def. Resp., at 5.) Maxima claims that unspecified "licensed third-parties" to the Super Bezel mark and unspecified "documents produced by Auto Meter concerning OEM and private label sales and customers, artwork for OEM and private label dial faces" support this new assertion.

As for Maxima's laches defense, the company still has not produced documents Mr. Leopando mentioned at his deposition that purportedly show that Auto Meter received certain "strategic information" about Maxima's products during a Maxima plant tour. (Pl. Reply, at 8-9.) Nor has Maxima identified the individuals involved in that plant tour, or the Auto Meter personnel who allegedly spoke about the Maxima products during a trade show. (*Id.*)

At this late stage of the case, the court agrees that it is time for Maxima to fully and completely answer Auto Meter's interrogatories. Fact discovery is at an end, yet Maxima is still referencing new documents and materials supporting its defenses and counterclaim. As noted, contention interrogatories **[*10]** "require the answering party to commit to a position and give factual specifics supporting its claims." *Thomas & Betts Corp. v. Panduit Corp., 1996 U.S. Dist. LEXIS 4494 at 7, No. 93 C 4017, 1996 WL 169389, at *2 (N.D. Ill. Apr. 9, 1996)*. The Federal Rules, moreover, "are designed to promote liberal discovery in an effort to narrow the issues for trial and prevent unfair surprise." *Wright v. Touhy, 2003 U.S. Dist. LEXIS 19167, No. 97 C 742, 2003 WL 22439864, at *4 (N.D. Ill. Oct. 28, 2003)*.

Maxima is ordered to identify (1) the specific ITC documents that support its functionality defense; (2) the specific gauges and documents from the September 26, 2006 inspection and the Behrens report that it intends to rely upon for its secondary meaning defense; (3) the facts supporting the relevance of these third-party gauges; (4) the documents Mr. Leopando mentioned at his deposition, and any other documents that purportedly show that (a) Auto Meter received certain "strategic information" about Maxima's products during a Maxima plant tour, and (b) Maxima suffered prejudice from Auto Meter's delay in pursuing its claims; (5) the Auto Meter personnel who participated in the Maxima plant tour and/or attended the trade **[*11]** show, and the specific statements they made which support Maxima's laches defense; and (6) the specific documents and data supporting Maxima's assertion that Auto Meter's small percentage of sales to private label and original equipment customers eliminate the secondary meaning of the Super Bezel trademark. Any facts or documents not so disclosed cannot be relied upon in this case.

Contrary to Maxima's assertion, none of this information constitutes protected work product. (Def. Resp., at 8.) Auto Meter is requesting the identification of facts, documents, individuals, statements, and products supporting Maxima's defenses and counterclaim, and not Maxima's legal theories or analyses. Responses to these requests will not, as Maxima suggests, provide Auto Meter with "a 'playbook' of how Maxima will present its defenses and counterclaim at trial." (*Id.* at 10-11.) *See, e.g., Fridkin v. Minnesota Mut. Life Ins. Co., 1998 U.S. Dist. LEXIS 1017 at 13, No. 97 C 332, 1998 WL 42322, at *4 (N.D. Ill. Jan. 29, 1998)* (work-product privilege did not protect defendant from producing documents, witnesses, and industry/company policy supporting its defense); *Mead Corp. v. Riverwood Natural Resources, Corp., 145 F.R.D. 512, 517-18 (D. Minn. 1992)* **[*12]** (rejecting alleged infringer's work-product immunity defense to answering interrogatories that sought "objec-

tive facts upon which defenses interposed were based and the identity of persons with knowledge of those facts.") Auto Meter's motion to compel the above information is granted.

**B. Interrogatory No. 13**

Interrogatory No. 13 seeks information supporting Maxima's defense of non-infringement. In the October 17, 2006 supplemental response, Maxima states that it is relying on "the overall different look and impression of its products as compared to Auto Meter's; the prominent display of distinguishing brand names and the use of distinguishing packaging; [and] that there have been no instances of confusion." (Ex. B to Def. Resp., at 9.) Maxima refuses, however, to identify (1) how the Maxima products create a different look and impression, including identification of distinguishing features; (2) the distinguishing brand names, how they are displayed, and how their display supports Maxima's contention of non-infringement; and (3) the distinguishing packaging and how its use supports Maxima's contention of non-infringement. (Def. Resp., at 9.) Maxima argues that engaging **[*13]** in a detailed comparison of the parties' products and packages "would require Maxima to reveal its legal strategy and positions with regard to the entire case." (*Id.*) The court disagrees.

As with Interrogatory No. 12, Auto Meter seeks the facts upon which Maxima's non-infringement defense is based, and not any legal theory or analysis. Indeed, Maxima cannot prevail on its non-infringement defense in the absence of specific facts. *See, e.g., Homefront, Inc. v. Cashmere Crafts, Inc., 2005 U.S. Dist. LEXIS 40401 at 21, No. C 05-0597 PJH, 2005 WL 3369988, at *8 (N.D. Cal. Dec. 12, 2005)* ("[S]imply to assert that the accused products did not actually infringe Homefront's copyrights is far from providing facts that support a defense of non-infringement.") The motion to compel is granted with respect to Interrogatory No. 13.

**C. Expert Opinions**

In addition to the information discussed above, Interrogatory Nos. 12, 13, and 15 all seek expert opinions supporting Maxima's defenses and counterclaim. The court agrees with Maxima that these disclosures are properly addressed pursuant to the expert discovery schedule set by this court on September 11, 2006. (Minute Order of 9/11/06, Doc. 51.) This portion of **[*14]** Auto Meter's motion to compel is denied.

**D. Sanctions**

In light of the above ruling, the court finds that Auto Meter has not been harmed by Maxima's delay in responding to the contention interrogatories and declines to award sanctions. *Commonwealth Ins. Co. v. Titan Tire Corp., 398 F.3d 879, 888 (7th Cir. 2004)* ("A district court enjoys broad discretion in declining to impose discovery sanctions and exclude evidence."); *Najieb v. Chrysler-Plymouth, 2002 U.S. Dist. LEXIS 24927 at 12 n.10, No. 01 C 8295, 2002 WL 31906466, at *3 n.10 (N.D. Ill. Dec. 31, 2002)* ("Th[e] Court has broad discretion to determine whether to issue discovery sanctions.")

**CONCLUSION**

For the reasons stated above, Auto Meter's motion to compel [Doc. 54] is granted in part and denied in part. Maxima is ordered to provide Auto Meter with further answers to Interrogatory Nos. 12, 13, and 15 consistent with this opinion by November 30, 2006.

Dated: November 6, 2006

NAN R. NOLAN

United States Magistrate Judge

# EXHIBIT G

LEXSEE 1996 U.S. DIST. LEXIS 4494

Analysis
As of: Apr 09, 2007

**THOMAS & BETTS CORPORATION and THOMAS & BETTS HOLDINGS, INC., New Jersey corporations, Plaintiffs, v. PANDUIT CORP., a Delaware corporation, and JEFFERY WIMMER, an individual, Defendants.**

**No. 93 C 4017**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1996 U.S. Dist. LEXIS 4494*

**April 8, 1996, DATED**
**April 9, 1996, DOCKETED**

**DISPOSITION:** **[*1]** Panduit's Motion to Compel Complete and Proper Responses to Defendant Panduit's First Set of Interrogatories to Plaintiffs be, and the same hereby is, GRANTED in part, and DENIED in part.

**COUNSEL:** For THOMAS & BETTS CORP, New Jersey corporation, THOMAS & BETTS HOLDINGS INC, New Jersey Corporations, plaintiffs: Robert W. Queeney, [COR LD NTC A], Jonathan Edward Strouse, [COR], Stacey Lee Prange, [COR], Jerry Kronenberg, [COR], George M. Sanders, [COR], McBride, Baker & Coles, Chicago, IL. James Hay, [COR], Lewis & McKenna, Saddle River, NJ.

For PANDUIT CORP, defendant: Charles R. Wentzel, [COR], Mark D. Hilliard, [COR], Panduit Corp., Legal Department, Tinley Park, IL. James L. Coghlan, [COR LD NTC A], Anita M. D'Arcy, [COR], Debra Marie Cyranoski, [COR], Elizabeth A Longo, [COR], Coghlan, Joyce, Kukankos, Urbut & D'Arcy, Chicago, IL. For JEFFERY WIMMER, defendant: Richard William Austin, [COR], John J. Walsh, III, [COR LD NTC A], Mark Peter Standa, [COR], Pretzel & Stouffer, Chtd., Chicago, IL.

**JUDGES:** ARLANDER KEYS, United States Magistrate Judge. Judge James B. Moran

**OPINION BY:** ARLANDER KEYS

**OPINION:**

**MEMORANDUM OPINION AND ORDER**

This matter comes before **[*2]** the Court on Panduit's Motion to Compel Complete and Proper Responses to Defendant Panduit's First Set of Interrogatories to Plaintiffs. For the following reasons, the Court grants in part, and denies in part Panduit's motion.

**BACKGROUND**

Plaintiffs, Thomas & Betts Corporation and Thomas & Betts Holdings, Inc. (collectively "T&B"), brought this unfair trade practices action against Defendants, Panduit Corporation ("Panduit") and Jeffrey Wimmer, on July 2, 1993. T&B and Panduit are competing manufacturers of various electrical products. Wimmer was a Vice-President at T&B until his termination in February of 1992. After his termination from T&B, Wimmer became Panduit's National Distribution Marketing Manager. T&B claims that Wimmer misappropriated confidential information which he and Panduit allegedly used to unfairly compete with T&B.

The matter immediately before this Court involves yet another discovery dispute between T&B and Panduit. Panduit seeks more complete responses to all of the questions posed in its First Set of Interrogatories.

**DISCUSSION**

Of course, no motion in this case would be complete without a rehashing of the same old arguments: Panduit decries **[*3]** T&B's attempt to "reverse engineer" its

claim of damages while T&B protests that it has not yet received the documents (from Panduit) necessary to properly move forward in the discovery process. Specifically at issue here are T&B's answers to Panduit's First Set of Interrogatories. T&B made quite a few objections to the interrogatories, including the fact that many are contention interrogatories. T&B also objects to a number of interrogatories on the grounds that they require production of privileged information and/or are irrelevant.

Notwithstanding T&B's objections, the purpose of discovery is to uncover exactly the type of information sought by Panduit. Panduit needs T&B's answers in order to properly defend itself against the lawsuit that T&B brought. Further, the information Panduit seeks is the kind contemplated and authorized by the Federal Rules of Civil Procedure, which allow discovery of any non-privileged matter that is relevant to the subject matter of the action. n1 8 WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE, CIVIL 2d § 2007 at 95 (1994). The term "relevant" is much more liberally construed during the discovery stage, under the Federal Rules of Civil [*4] Procedure, than at trial, where the Federal Rules of Evidence govern. *Id.* § 2008 at 99-100. Thus, despite T&B's protestations to the contrary, the Court finds that the information Panduit seeks is relevant and reasonably bears upon the issues in this case.

n1 The scope of discovery should be broad in order to aid the search for the truth. *See Hickman v. Taylor, 329 U.S. 495, 500-501, 91 L. Ed. 451, 67 S. Ct. 385 (1964); Cf. United States v. White, 950 F.2d 426, 430 (7th Cir. 1991); Allendale Mut. Ins. Co. v. Bull Data Sys. Inc., 152 F.R.D. 132, 135 (N.D. Ill. 1993).*

T&B has also made vague claims of privilege: "Plaintiffs object to each interrogatory to the extent that it seeks privileged or confidential information protected by, for example, the attorney-client or work product privilege." (Panduit's Motion to Compel Complete and Proper Responses to Defendant Panduit's First Set of Interrogatories to Plaintiffs at Ex. A, p.4.) Such nonspecific objections are inappropriate. If any privilege [*5] exists, it should be clearly articulated and the reason for its invocation given in such a manner that the Court can properly assess its applicability.

In determining whether to raise future objections on the ground of privilege, T&B should note that courts commonly look unfavorably upon anything that significantly restricts the broad scope of discovery. *Allendale, 152 F.R.D. at 135.* Because the attorney-client privilege and work-product doctrine obscure the search for the truth, both are confined to their narrowest possible limits to minimize the impact upon the discovery process. *White, 950 F.2d at 430* (the scope of the privilege is narrow, because it is in 'derogation of the search for truth'); *Radiant Burners, Inc. v. American Gas Ass'n, 320 F.2d 314, 319, 323 (7th Cir. 1963); Allendale, 152 F.R.D. at 135.* As to claims of attorney work-product protection, the work-product doctrine is distinct from the attorney-client privilege and must, therefore, be analyzed separately. *United States v. Nobles, 422 U.S. 225, 238, n.11, 45 L. Ed. 2d 141, 95 S. Ct. 2160 (1975)* (citing *Hickman v. Taylor, 329 U.S. 495, 91 L. Ed. 451, 67 S. Ct. 385 (1947)); see also Radiant* [*6] *Burners, 320 F.2d at 323.* Further, the party seeking to invoke either attorney-client privilege or work-product protection bears the burden of establishing all of that privilege's elements. *White, 950 F.2d at 430; Allendale, 152 F.R.D. at 137.* Moreover, the claim of privilege cannot be a blanket claim; it must be established on a document-by-document basis. *White, 950 F.2d at 430.* n2

n2 For further discussion of the attorney-client privilege and work-product doctrine, see this Court's opinion in *Ziemack v. Centel Corp.*, No. 92 C 3551, *1995 U.S. Dist. LEXIS 6942, 1995 WL 314526* (N.D. Ill. May 19, 1995). Additionally, the Court notes that any non-privileged "confidential" information is covered by the protective order specifically limiting access to the attorneys of record and their authorized employees.

Finally, T&B objects that most of Panduit's interrogatories are premature contention interrogatories. "The phrase 'contention interrogatory' is used imprecisely to refer to many different kinds of questions." *In re Convergent* [*7] *Technologies Sec. Litig., 108 F.R.D. 328, 332 (N.D. Cal. 1985).* Some people classify as contention interrogatories questions asking the opposing party to indicate what it contends or whether it makes some specified contention. *Id.* Other people classify as contention interrogatories questions asking an opposing party to: state all facts or evidence upon which it bases some specific contention; take a position and apply law and facts in defense of that position; or explain the theory behind some specified contention. *Id; see also Fischer and Porter Co. v. Tolson, 143 F.R.D. 93, 95-96 (E.D. Pa. 1992).*

Basically, contention interrogatories require the answering party to commit to a position and give factual specifics supporting its claims. The general policy is to defer contention interrogatories until discovery is near an end. However, courts have the discretion to allow use of contention interrogatories before discovery is complete. *Rusty Jones, Inc. v. Beatrice Co.*, No. 89 C 7381, *1990*

*U.S. Dist. LEXIS 12116*, at *4 (N.D. Ill. Sept. 11, 1990); *In re Arlington Heights Funds Consol. Pretrial*, No. 89 C 701, *1989 U.S. Dist. LEXIS 8177*, at *1 (N.D. Ill. July 7, 1989) (generalizations **[*8]** about proper timing of contention interrogatories cannot substitute for specific analysis of their propriety on a case by case basis).

Although discovery in this case has not yet closed, there is no apparent end in sight. The discovery process has been stalled by ongoing disputes and constant bickering for two years. Had the parties comported themselves properly, discovery here would be, at the very least, significantly completed. In light of both parties' purposeful delay of discovery in this case, the Court finds that contention interrogatories are timely. n3 In fact, the Court is quite interested in narrowing the issues and finding out exactly what T&B actually contends. Thus, T&B must answer any contention interrogatories at issue here with whatever information is currently available. Because no ending date for discovery has been set at this time, the Court notes that T&B may augment its responses as it deems appropriate.

n3 The Court declines to decide, at this time, whether Interrogatories No. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 16, and 18 are contention interrogatories.

**[*9]**

**CONCLUSION**

The Court finds that Panduit is entitled to more complete responses to its First Set of Interrogatories. The Court expects that T&B's responses to Panduit's First Set of Interrogatories will be made no later than April 17, 1996. n4 Of course, after receiving Panduit's concurrent production of documents, T&B can, and should, supplement any responses so requiring.

n4 The Court is issuing contemporaneously herewith two other opinions: another motion to compel and a motion for sanctions for failure to comply with discovery requests.

Panduit's request for attorney's fees and expenses incurred in bringing this motion to compel are denied. T&B did not entirely fail to answer the interrogatories, and the Court has decided to give T&B one last free shot. Although the Court finds that sanctions are not appropriate in this particular situation, both sides are now on notice that, unless the parties start seriously responding to discovery requests, *sua sponte* fees, costs, and sanctions will **[*10]** issue all around.

**IT IS THEREFORE ORDERED** that Panduit's Motion to Compel Complete and Proper Responses to Defendant Panduit's First Set of Interrogatories to Plaintiffs be, and the same hereby is, **GRANTED** in part, and **DENIED** in part, consistent with this Opinion.

DATED: 4/8/96

ENTER:

ARLANDER KEYS

United States Magistrate Judge

# EXHIBIT H

**H**
Briefs and Other Related Documents
Edward Lowe Industries, Inc. v. Oil-Dri Corp. of AmericaN.D.Ill.,1995.Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
EDWARD LOWE INDUSTRIES, INC., Plaintiff,
v.
OIL-DRI CORPORATION OF AMERICA and Marcal Paper Mills, Inc., Defendants.
**No. 94 C 7568.**

July 7, 1995.

Brian Edward Martin, John William Rotunno, Bell, Boyd & Lloyd, Chicago, IL, Barry Warren Sufrin, John T. Gabrielides, Tim C. Meece, Laff, Whitesel, Conte & Saret, Chicago, IL, for plaintiff.
Talivaldis Cepuritis, Kathryn Elizabeth Garipay, Arne M. Olson, Olson & Hierl, Chicago, IL, Craig M. White, Wildman, Harrold, Allen & Dixon, Chicago, IL, Robert S. Swecker, William C. Rowland, Allen R. Baum, Burns, Doane, Swecker & Mathis, Alexandria, VA, for defendants.

*MEMORANDUM OPINION AND ORDER*
CONLON, District Judge.
*1 Edward Lowe Industries, Inc. ("ELI") sues Oil-Dri Corporation of America ("Oil-Dri") and Marcal Paper Mills, Inc. ("Marcal") (collectively "defendants") for patent infringement. Marcal moves to compel ELI to produce documents and to answer interrogatories.

*BACKGROUND*

This is an action for infringement of two patents: United States Patent No. 4,560,527 ("the '527 patent"), entitled "Method of Making Agglomerated Cellulosic Particles Using a Substantially Horizontal Rotating Drum," and United States Patent No. 4,621,011 ("the '011 patent"), entitled "Agglomerated Cellulosic Particles" (collectively "the ELI patents"). Complaint, ¶¶ 4, 5. Both patents were issued to the Kimberly-Clark Corporation ("Kimberly-Clark"); Kimberly-Clark assigned its rights to ELI. *Id.* ¶¶ 4-5, Exs. A-B. ELI's suit asserts that defendants infringed and continue to infringe the ELI patents by manufacturing and selling cellulosic granules. *Id.* ¶ 7.

*DISCUSSION*

I. *ELI's Commercial Process*

Marcal interrogatory no. 10 and Marcal document requests nos. 2, 5, 15-18, 21, 22, and 38-43 request information regarding the process and apparatus employed by ELI in manufacturing cellulosic particles. Marcal Ex. D. ELI objects to these discovery requests as irrelevant.

Fed. R. Civ. P. 26(b)(1) provides, in relevant part:
Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action .... The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Relevancy for the purposes of Rule 26 is broadly construed. *Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed. Cir. 1993); *AM International, Inc. v. Eastman Kodak Co.*, 100 F.R.D. 255, 257 (N.D. Ill. 1981). Discovery is considered relevant where there is any possibility that the information sought may be relevant to the subject matter of the action. *In re Folding Carton Antitrust Litigation*, 76 F.R.D. 420, 431 (N.D. Ill. 1977).

ELI contends that discovery regarding its commercial process is irrelevant because its process is not at issue. ELI notes that patent infringement is determined by comparing the accused product or process to the patent's claims, not to the patentee's commercial embodiment of the patented product or process. *Zenith Laboratories, Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1423 (Fed. Cir. 1994); *Martin v. Barber*, 755 F.2d 1564, 1567 (Fed. Cir. 1985).

Marcal offers several arguments in support of discovery. First, Marcal asserts that information concerning ELI's commercial process will aid in interpreting the scope of the '527 patent's claims.[FN1] A party may obtain discovery in patent infringement proceedings to determine exactly what the patent's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claims are. *See* Babcock & Wilcox Co. v. Foster Wheeler Corp., 54 F.R.D. 474, 479 (D.N.J. 1971). However, it is unclear how discovery of ELI's commercial process will illuminate the scope of the '527 patent's claims. In clarifying the meaning of disputed claim terms, reference is made to the patent's specifications, prosecution history, and prior art, not to the patent's commercial embodiment. *See* Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc., 976 F.2d 1559, 1576 (Fed. Cir. 1992); Jonsson v. Stanley Works, 903 F.2d 812, 819 (Fed. Cir. 1990).[FN2]

*2 Marcal also contends that the commercial success of ELI's process is relevant to a patent invalidity defense. The commercial success of a patented process is generally relevant in determining whether the process is nonobvious. *See, e.g.,* Truswal Systems Corp. v. Hydro-Air Engineering, Inc., 813 F.2d 1207, 1212 (Fed. Cir. 1987); Pentec, Inc. v. Graphic Controls Corp., 776 F.2d 309, 315 (Fed. Cir. 1985). However, ELI has disclaimed any intention to rely on commercial success to demonstrate the nonobviousness of the process described in the '527 patent. Marcal Ex. G. at 2. Marcal cannot use evidence of a lack of commercial success to demonstrate that the patented process is obvious. The absence of commercial success is neutral; commercial failure does not weigh in favor of obviousness. Miles Laboratories, Inc. v. Shandon, Inc., 997 F.2d 870, 878 (Fed. Cir. 1993), *cert. denied,* 114 S. Ct. 943 (1994); Custom Accessories, Inc. v. Jeffrey-Allan Industries, 807 F.2d 955, 960 (Fed. Cir. 1986).

Finally, Marcal asserts that the development history of the ELI process may prove relevant to an obviousness defense. Evidence of independent development of a patented device is indicative of obviousness when the circumstances of the development are shown to be similar to the state of the art when the patent was filed. Pratt & Whitney Canada v. United States, 17 Cl. Ct. 777, 12 U.S.P.Q.2d 1497, 1504 (1989). The '527 patent was filed by Kimberly-Clark on April 24, 1984. Complaint, Ex. A. Evidence that ELI independently developed its commercial process on or before April 24, 1984 would therefore be relevant to a claim of obviousness. Accordingly, ELI is properly required to produce any documents addressing the development history of its commercial process prior to April 24, 1984. Marcal's motion to compel responses to Marcal interrogatory no. 10 and Marcal document requests nos. 5, 15-18, 21, 22, and 38-43 is denied in all other respects.

II. *Marcal Interrogatories 1 and 2*

Marcal interrogatories nos. 1 and 2 request ELI to identify all facts upon which ELI bases its allegation that defendants infringed the ELI patents, including "the identification of all documents, all statements of employees of ELI, all statements of persons not employed by ELI, and descriptions of all apparatus or process steps used by Marcal to make Marcal's absorbent product." Marcal Ex. I. ELI responded to these interrogatories by stating, subject to claims of privilege, that its suit was based on tests and measurements performed on products made by Marcal and sold by Oil-Dri. *Id.* ELI's response includes a comparison of Oil-Dri's product on a claim-by-claim basis with the '011 patent. *Id.* ELI did not produce any documents concerning the tests and measurements it performed.

Marcal asserts that ELI's failure to produce records of the tests and measurements it performed in response to interrogatories 1 and 2 was improper. [FN3] Marcal's argument is without merit. Although ELI admits that it received an expert analysis of the Marcal/Oil-Dri product, ELI states that it has not yet decided whether the expert preparing the report will be called to testify at trial. The reports of non-testifying experts are not generally discoverable; Fed. R. Civ. P. 26(b)(4)(B) provides that a party is entitled to discovery of the facts or opinions known by a non-testifying expert only "upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means." *See* Grindell v. American Motors Corp., 108 F.R.D. 94, 95 (W.D.N.Y. 1985). In contrast, an expert whom a party intends to call as a witness must be disclosed prior to trial and may be deposed by an opposing party. Fed. R. Civ. P. 26(a)(2)(B); Fed. R. Civ. P. 26(a)(4)(A).

*3 Marcal fails to show the exceptional circumstances requiring the disclosure of reports prepared by a non-testifying expert. Marcal notes that it is ELI's duty to identify the basis for its suit. Loctite Corp. v. Fel-Pro, Inc., 667 F.2d 577, 582 (7th Cir. 1981). However, Marcal may establish a basis for suit by relying on a testifying expert. Furthermore, ELI's response provides Marcal with a summary of the facts underlying its claims -- the response explains that tests were performed on products produced by Marcal and that the tests revealed that Marcal's products fell within the scope of the '011 patent's claims.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Marcal is entitled to the discovery of any reports prepared by experts who will testify on ELI's behalf. Fed. R. Civ. P 26(a)(2)(B). However, until ELI determines which of its experts will be called at trial, ELI need not disclose expert reports responsive to Marcal interrogatories 1 and 2.[FN4]

III. *Marcal Interrogatories 5-7*

Marcal interrogatories 5-7 seek ELI's contentions regarding (1) the need in the industry for the process and product described by the ELI patents, (2) other attempts to solve any problem addressed by the ELI patents, and (3) the commercial success of the process and products described in the ELI patents; the interrogatories also require ELI to identify evidence supporting its contentions. Marcal Ex. I. The information requested by interrogatories 5-7 is relevant in determining whether the product and process described in the ELI patents are nonobvious. *See Graham v. John Deere Co.,* 383 U.S. 1, 17-18 (1966). ELI refuses to disclose either its contentions or any evidence in support of its contentions. Marcal Ex. I.

ELI objects to interrogatories 5-7 on grounds that the requests are premature. ELI notes that Marcal has failed to identify the factual basis of its invalidity defense. ELI Ex. A. ELI notes that evidence of "secondary considerations" including need, commercial success, and other attempts to solve the problem addressed by the patent is relevant to the obviousness inquiry only after a *prima facie* showing of invalidity by the party challenging the patent. *See Cable Elec. Prods. v. Genmark, Inc.,* 770 F.2d 1015, 1022 (Fed. Cir. 1985); *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1534 (Fed. Cir. 1983).

ELI's argument is unpersuasive. As ELI correctly notes, considerations of judicial economy and party convenience frequently dictate that answers to contention interrogatories be delayed until the end of discovery. *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.,* 135 F.R.D. 101, 111 (D.N.J. 1990). However, contention interrogatories may be proper even early in discovery when

> there is good reason to believe that answers ... will contribute meaningfully to clarifying issues in the case, narrowing the scope of the dispute, or setting up early settlement discussion.

*Fischer & Porter Co. v. Tolson,* 143 F.R.D. 93, 96 (E.D. Pa. 1992) (citing *In re Convergent Technologies Securities Litigation,* 108 F.R.D. 328, 339 (N.D. Cal. 1985)). The information requested by interrogatories 5-7 will contribute meaningfully to clarifying issues in this case. Answers to interrogatories 5-7 will establish the importance and scope of secondary evidence of nonobviousness, and presumably will inform Marcal's decision to pursue or abandon an invalidity claim. The court also notes that it is hardly "early" in the discovery period. Written discovery closed on April 1, 1995; fact discovery will close on August 15, 1995, and expert discovery on October 1, 1995. *See* Order, No. 94 C 7568 (N.D. Ill. Feb. 9, 1995). Accordingly, ELI is directed to respond to Marcal interrogatories 5-7.

*CONCLUSION*

*4 Defendant Marcal Paper Mills' first motion to compel is granted in part. Plaintiff Edward Lowe Industries is directed to produce by July 14, 1995 any documents addressing the development history of its commercial process prior to April 24, 1984 in response to Marcal Interrogatory No. 10 and Marcal document requests nos. 2, 5, 15-18, 21, 22, and 38-43. Plaintiff Edward Lowe Industries is also directed to answer Marcal interrogatories 5-7 by July 14, 1995. The parties are directed to fully comply with Fed. R. Civ. P. 26(a)(2) by August 15, 1995.

FN1. In support of its contention that clarification of the '527 patent's claims is necessary, Marcal asserts that ELI has taken inconsistent positions on whether its commercial process is covered by the '527 patent. However, the only evidence of this confusion is a letter from Marcal purporting to summarize a telephone conversation with ELI. Marcal Ex. F. ELI responded by stating that Marcal's understanding of its position was incorrect. Marcal Ex. G.

FN2. Marcal further contends that any difference between the ELI process and the process described in the '527 patent would be relevant to a false marking claim against ELI under 35 U.S.C. § 292. However, Marcal has not asserted a false marking claim against ELI.

FN3. Marcal contends that any report should have been produced in response to Marcal document request no. 5, which requests "[a]ll documents and things that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

record, describe, illustrate, or make reference to the development or testing of granules, or processes for producing granules of the type described in the patents-in-suit."

FN4. The parties' proposed discovery schedule, adopted by the court, makes no provision for compliance with Fed. R. Civ. P. 26(a)(2). *See* Order, No. 94 C 7568 (N.D. Ill. Feb. 9, 1995). The resultant uncertainty regarding when testifying experts must be disclosed appears to have fueled Marcal's motion to compel. Accordingly, the parties are directed to fully comply with Fed. R. Civ. P. 26(a)(2) by August 15, 1995.

N.D.Ill.,1995.
Edward Lowe Industries, Inc. v. Oil-Dri Corp. of America
Not Reported in F.Supp., 1995 WL 399712 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 1:94CV07568 (Docket) (Dec. 20, 1994)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT I

LEXSEE 2004 U.S. APP. LEXIS 11300

Positive
As of: Apr 09, 2007

**RAMADA FRANCHISE SYSTEMS, INC., a Delaware Corporation v. JAGDISH PATEL, an individual; RITA PATEL, an individual, Appellants**

**NO. 03-3494**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

***2004 U.S. App. LEXIS 11300***

**May 28, 2004, Submitted Under Third Circuit LAR 34.1(a)**
**June 8, 2004, Filed**

**NOTICE:** [*1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal from the United States District Court for the District of New Jersey. (D.C. Civil No. 02-CV-597). District Judge: Hon. John C. Lifland.

**DISPOSITION:** Affirmed.

**COUNSEL:** For RAMADA FRANCHISE SYS, a Delaware Corporation, Appellee: Elizabeth J. Sher, Pitney, Hardin, Kipp & Szuch, Morristown, NJ.

For JAGDISH PATEL, a individual, RITA PATEL, an individual, Appellant: Frank A. Weiser, Los Angeles, CA.

**JUDGES:** Before: SCIRICA, FISHER, and ALARCON*, Circuit Judges

*Hon. Arthur L. Alarcon, Senior Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation .

**OPINION BY:** ALARCON

**OPINION:** OPINION OF THE COURT

ALARCON, Circuit Judge.

Jagdish Patel and Rita Patel ("the Patels") appeal from the order striking their answer and entering default judgment against them because of their failure to comply with the court's discovery orders. They seek reversal on five grounds:

> One. The district court lacked subject-matter jurisdiction over this diversity action.
>
> Two. The district court abused its discretion in sanctioning [*2] the Patels because Ramada failed to provide reciprocal discovery.
>
> Three. The district court abused its discretion in attributing the Patels' willful failure to abide by its discovery orders solely to the Patels themselves.
>
> Four. The district court denied the Patels their *First Amendment* right to have access to the courts by ordering their out-of-state attorney to associate local counsel because he was not a member of the bar of the United States District Court for the District of New Jersey.
>
> Five. The order barring the Patels from their choice of counsel was void pursuant to *28 U.S.C. § 636(c)* because they did not voluntarily consent to the issuance of a dispositive order by a magistrate judge.

We affirm because we conclude that each of these contentions lacks merit.

I

Because the parties are familiar with the factual and procedural background of this case, we summarize only those facts that are pertinent to our disposition of this appeal.

On February 8, 2002, Ramada Franchise Systems, Inc. ("Ramada") filed a complaint against the Patels for breach of a motel-franchise agreement the two parties had entered into on May 19, 1999. The Patels filed [*3] a pro se answer on May 17, 2002. The parties entered into a joint discovery plan dated May 15, 2002 in which they agreed to exchange their initial disclosures pursuant to *Rule 26 of the Federal Rules of Civil Procedure* by May 31, 2002.

Ramada served its initial disclosures by May 31, 2002. The Patels did not do so. Ramada unsuccessfully attempted to contact the Patels' California counsel, Frank A. Weiser, to discuss production of the Patels' initial disclosures. On July 2, 2002, Ramada sent a letter to Mr. Weiser, informing him that the Patels' initial disclosures had yet to be produced, and that Ramada would seek the assistance of the court if the Patels did not serve their initial disclosures by July 9, 2002. Because the Patels did not transmit the initial disclosures by July 9, 2002, Ramada sent a letter to the court asking that the matter be addressed at the July 16, 2002 status conference.

Mr. Weiser participated in the July 16, 2002 status conference by means of a telephone conference call. Magistrate Judge Stanley R. Chesler continued the status conference until August 6, 2002, after Mr. Weiser alleged that his medical condition prevented [*4] him from responding to Ramada's discovery request.

At the August 6, 2002, status conference, Judge Chesler advised Mr. Weiser that he could no longer appear before the court on the Patels' behalf because he was not admitted to practice before the court and had not retained local counsel. The court also entered a pretrial scheduling order requiring the Patels to serve their *Rule 26* initial disclosures by August 20, 2002, and that all discovery be completed by October 15, 2002. The Patels failed to serve their *Rule 26* initial disclosures by August 20, 2002, or respond to Ramada's discovery requests.

Ramada requested leave to file a motion to strike the answer and for default judgment on August 26, 2002. Judge Chesler granted this request on September 3, 2002. Judge Chesler entered an amended pretrial scheduling order on November 4, 2002, extending the discovery window to January 15, 2003. Ramada filed its motion to strike the answer and for default judgment on December 3, 2002. The Patels did not file a response to the motion.

On February 5, 2003, Magistrate Judge Mark Falk sent the Patels a letter in which he stated that they were being provided "one more opportunity to respond" to [*5] the motion to strike their answer and for the entry of a default by February 20, 2003. Although the Patels signed the return receipt for the court's letter, they failed to submit a response.

On April 23, 2003, Judge Falk filed his report and recommendation. He recommended that Ramada's motion should be granted. District Court Judge John C. Lifland adopted the recommendation and issued an order on July 18, 2003 striking the answer, and entered judgment in favor of Ramada awarding it $ 186,941.46 plus prejudgment interest of $ 15,726.36. The Patels have timely appealed from that order.

II

A.

The Patels contend that the court lacked subject-matter jurisdiction to enter the default judgment because it failed to make a finding that the parties were diverse and that the amount in controversy exceeded $ 75,000. No authority was cited to support this contention. It is frivolous.

The complaint alleges in paragraph 1 that Ramada is a Delaware corporation which has its principal place of business in New Jersey. It also alleges in paragraphs 2 and 3 that the Patels are each residents of California. The amount in controversy is alleged to exceed $ 75,000. In their answer, the Patels [*6] admit the facts set forth in paragraphs 1, 2, and 3. In a facial attack on subject-matter jurisdiction, the factual allegations in a complaint are accepted as true. See *Turicentro, S.A. v. Am. Airlines Inc., 303 F.3d 293, 300 n. 4 (3rd Cir. 2002)* (factual findings and an evidentiary hearing are not required where no factual challenge is raised regarding the court's jurisdiction). We note also that the Patels concede in their opening brief that the amount in controversy exceeded that jurisdictional amount. The district court had subject-matter jurisdiction to enter a default judgment in this matter.

B.

The Patels assert the district court abused its discretion in sanctioning them for failure to comply with the disclosure orders. This court reviews a district court's decision regarding a discovery sanction for abuse of discretion. *Quinn v. Consol. Freightways Corp., 283 F.3d 572, 576 (3d Cir. 2002)*.

Pursuant to *Rule 37(a)(2)(A) of the Federal Rules of Civil Procedure*, "[i] f a party fails to make a disclosure required by *Rule 26(a)*, n1 any other party may move to compel disclosure and for appropriate sanctions. [*7] "

*Fed. R. Civ. P. 37(a)(2)(A)*. Entry of a default judgment is an available sanction for failure to comply with a court's discovery order. *Hoxworth v. Blinder, Robinson & Co., Inc., 980 F.2d 912, 919 (3d Cir. 1992)*.

n1 *Rule 26(a)* provides in pertinent part: (a) Required Disclosures; Methods to Discover Additional Matter. (1) Initial Disclosures. Except in categories of proceedings specified in *Rule 26(a)(1)(E)*, or to the extent otherwise stipulated or directed by order, a party must, without awaiting a discovery request, provide to other parties: (A) the name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information; (B) a copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment ...

**[*8]**

In determining whether to enter a default judgment against a party that fails to comply with a discovery order, a court must consider:

> (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party of the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense.

*Id. at 919* (quoting *Poulis v. State Farm Fire & Cas. Co., 747 F.2d 863, 868 (3d Cir. 1984))*. It is not necessary, however, that all the Poulis factors have to be met in order to uphold a sanction of default judgment. Id.; *Mindek v. Rigatti, 964 F.2d 1369, 1373 (3d Cir 1992)*.

The Patels argue that the sanction imposed by the court was improper because Ramada did not comply with its reciprocal discovery obligations under *Rule 26(a)*. The Patels did not cite any authority in support of this contention, nor did they demonstrate that Ramada's disclosures **[*9]** were deficient. Furthermore, the Patels' argument is contrary to *Rule 26*' s express mandate that "[a] party ...is not excused from making its discovery disclosures ...because it challenges the sufficiency of another party's disclosures or because another party has not made its disclosures." *Fed. R. Civ. P. 26(a)(1)*. Accordingly, the Patels' allegation that Ramada's *Rule 26(a)* disclosures were insufficient does not excuse their failure to comply with the court's discovery order.

C.

The Patels also argue that the district court misapplied the first Poulis factor, i. e., the extent of the party's personal responsibility. The Patels cite *Cmty. Dental Servs. v. Tani, 282 F.3d 1164 (9th Cir. 2002)*, in support of this proposition. In Tani, the court held "that where the client has demonstrated gross negligence on the part of his counsel, a default judgment against the client may be set aside pursuant to *Rule 60(b)(6)*." *Id. at 1169*. The Patels' reliance on Tani is misplaced. In this matter, the Patels appeared pro se throughout the proceedings. The district court did not abuse its discretion in **[*10]** attributing the Patels' willful failure to abide by its discovery orders solely to the Patels themselves.

D.

The Patels next contend that the district court deprived them of their rights under the *First Amendment* by not allowing them to be represented by Mr. Weiser. This contention is also meritless.

The Patels filed a pro se answer in this matter. They appeared pro se throughout these proceedings. At no time did Mr. Weiser make a motion to represent the Patels pro hac vice, nor did he or the Patel's challenge the constitutionality of the district court's local rules. Thus, the question whether the requirement in *New Jersey Local Civil Rule 101.1(c)(1)* that attorneys who appear pro hac vice must "assign local counsel for purposes of receiving and serving court filings, and comply with the court's disciplinary rules" is not properly before us.

E.

Finally, the Patels contend that the order barring them from their choice of counsel was void pursuant to *28 U.S.C. § 636(c)* because they did not voluntarily consent to the issuance of a dispositive order by a magistrate judge. As discussed above, the Patels appeared pro se throughout these proceedings and never **[*11]** moved to have Mr. Weiser represent them pro hac vice. Accordingly, the magistrate judge did not enter an order, dispositive or otherwise, barring the Patels from their choice of counsel. To the extent that the magistrate judge instructed the Patels to comply with the local rules regarding the procedure for pro hac vice admission, we find no error. See *Baylson v. Disciplinary Bd. of Sup. Ct., 975*

*F.2d 102, 107 (3d Cir. 1992)* (stating that a district court may enforce local rules regulating the conduct of attorneys practicing before them).

Therefore, for the reasons set forth above, we AFFIRM the order entering a default judgment against the Patels.

# EXHIBIT J

LEXSEE 2007 U.S. DIST. LEXIS 13956

Analysis
As of: Apr 09, 2007

**KONINKLIJKE PHILIPS ELECTRONICS N.V., a Netherlands corporation, Plaintiff, vs. KXD TECHNOLOGY, INC., et al., Defendants.**

**Case No. 2:05-cv-01532-RLH-GWF, Case No. 2:06-cv-00101-RLH-GWF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA**

***2007 U.S. Dist. LEXIS 13956***

**February 21, 2007, Decided**

**SUBSEQUENT HISTORY:** Motion granted by *Koninklijke Philips Elecs. N.V. v. KXD Tech., Inc., 2007 U.S. Dist. LEXIS 17540 (D. Nev., Mar. 8, 2007)*

**COUNSEL:** **[*1]** For Koninklijke Philips Electronics N.V., Plaintiff: Anthony M. Keats, Gary P. Simonian, Jai H. Rho, Jeffrey K. Joyner, LEAD ATTORNEYS, Jan Jensen, Keats McFarland & Wilson LLP, Beverly Hills, CA US; Todd L. Bice, LEAD ATTORNEY, Brownstein Hyatt Farber Schreck, Las Vegas, NV.

For Koninklijke Phillips Electronics, Plaintiff: Jai H. Rho, Jan Jensen, Linden Bierman-Lytle, Wendy Freeman, LEAD ATTORNEYS,Anthony M. Keats, Gary P. Simonian, Jeffrey K. Joyner, Keats McFarland & Wilson, LLP, Beverly Hills, CA US; Todd L. Bice, Brownstein Hyatt Farber Schreck, Las Vegas, NV.

For KXD Technology, Inc., Astar Electronics, Inc., Shenzhen KXD Multimedia Co., Ltd, Shenzhen Kaixinda Electronics Co., Ltd, KXD Digital Entertainment, Ltd, Jingyi Luo, also known as James Luo, Sungale Group, Inc, Sungale Electronics (Shenzhen), Ltd, Defendant: Anas Akel, LEAD ATTORNEY, San Diego, CA; Anton N. Handal, Gabriel G. Hedrick, Pamela C. Chalk, LEAD ATTORNEYS, Handal & Associates, San Diego, CA.

For Amoi Electronics, Inc, Defendant: Domino Wang, LEAD ATTORNEY, Law Offices of Domino Wang, Alhambra, CA US; Gabriel G. Hedrick, LEAD ATTORNEY, Handal & Associates, San Diego, CA; Joshua L. Harmon, LEAD ATTORNEY, Harmon & Davies, P.C., Las Vegas, NV.

For Amoi Electronics Co., Ltd, Amoi Electronics, Ltd, Defendant: Domino Wang, LEAD ATTORNEY, Law Offices of Domino Wang, Alhambra, CA US; Joshua L. Harmon, LEAD ATTORNEY, Harmon & Davies, P.C., Las Vegas, NV.

For International Norcent Technology, Inc., Defendant: Mark R. **[*2]** Borghese, Weide & Miller, Ltd., Las Vegas, NV.

For Norcent Holdings, Inc, Defendant: Michael K. Friedland, LEAD ATTORNEY, Knobbe, Martens, Olson & Bear LLP, Irvine, CA; Mark R. Borghese, Weide & Miller, Ltd., Las Vegas, NV.

For Amoisonic Electronics, Inc., Defendant: Gabriel G. Hedrick, LEAD ATTORNEY, Anton Handal, Handal & Associates, San Diego, CA; Anas Akel, San Diego, CA.

For Shanghai Hongsheng Technology Co., Ltd, Defendant: Robert D. Martin, LEAD ATTORNEY, Las Vegas, NV.

**JUDGES:** GEORGE FOLEY, JR., U.S. MAGISTRATE JUDGE.

**OPINION BY:** GEORGE FOLEY, JR.

**OPINION:**

**ORDER**

This matter is before the Court on Plaintiff Koninklijke Philips Electronics N.V.'s ("Philips") Motion to

Compel Discovery from Defendants Amoi Electronics, Inc.; Amoi Electronics, Ltd.; and Amoi Electronics Co. ("Amoi Defendants") (# 488), filed on December 21, 2006; Defendants' Opposition to Motion of Plaintiff Koninklijke Philips Electronics N.V. to Compel Discovery from Defendants Amoi Electronics, Inc.; Amoi Electronics, Ltd.; and Amoi Electronics Co. (# 87), filed on January 5, 2007; and Reply to Amoi's Opposition to Plaintiff Koninklijke Philips Electronics N.V. Motion to Compel Discovery from Defendants Amoi Electronics, Inc.; Amoi Electronics, Ltd.; and Amoi Electronics Co., Ltd. (# 523), filed on January 19, 2007. The Court conducted a hearing on this matter on January 12, 2007.

**BACKGROUND**

In its Complaint (# 1), filed under seal on December 28, 2005, Plaintiff [*3] alleges that Defendants are unlawfully using Philips' DVD+RW trademark in connection with the sale and distribution of DVD discs and DVD recorders. Plaintiff's Complaint alleges causes of action against Defendants for Federal Trademark Infringement and Counterfeiting, *15 U.S.C. § 1114(1)*; Federal Unfair Competition & False Designation of Origin, *15 U.S.C. § 1125(a)*; Federal Trademark Dilution, *15 U.S.C. § 1125(c)*; Deceptive Trade Practices, *NRS § 598.0915*; and Common Law Trademark Infringement and Unfair Competition. On January 5, 2006, the Court entered a temporary restraining and seizure order (# 39) which temporarily restrained Defendants from using Plaintiff's DVD+RW mark and from destroying or otherwise making unavailable the counterfeit products, promotional and advertising materials, etc. that reproduce, copy, imitate, or bear Plaintiff's DVD+RW mark, and any documents, or tangible things, electronic files, and business records that pertain to the manufacture, sale, offer of sale, distribution, advertising and marketing of the counterfeit products. The order also authorized [*4] the United States Marshal and other law enforcement officers, with the assistance of Philips, to seize and impound all such products, documents and records. In accordance with the seizure order, Philips seized allegedly infringing products and/or documents from Defendant Sungale's offices on or about January 6, 2006.

On March 15, 2006, the Court granted a preliminary injunction (# 252) in favor of the Plaintiff. The Court found and concluded that it has jurisdiction over Defendants because they have committed tortious acts in the District of Nevada, that Plaintiff is the exclusive owner of the DVD+RW mark, and the trademark is distinctive of the goods with which they are associated, has gained national public recognition, and is therefore a very strong mark. The Court also found that Defendants have adopted and affixed copies of the DVD+RW mark on the same types of goods with which the DVD+RW mark is associated, but in particular with DVD recorders, DVD computer disc drives and DVD discs. The Court also found that Defendants are manufacturing, advertising, distributing, offering for sale, or selling products which bear counterfeits of the DVD+RW mark and placing them in commerce in [*5] the United States. *Id.*, pages 2-3. The Court found and concluded that Plaintiff is likely to succeed on its infringement claims against the Defendants. *Id.*, pages 3-4. The Court enjoined Defendants from using Plaintiff's DVD+RW mark and also enjoined Defendants from destroying or making unavailable the counterfeit products, promotional and advertising materials and any documents, or tangible things, electronic files, and business records that pertain to the manufacture, sale, offer of sale, distribution, advertising and marketing of the counterfeit products.

On August 24, 2006, Plaintiff served on the Amoi Defendants its First Set of Interrogatories and Requests for Production of Documents and Things. On October 9 and 27, 2006, the Amoi Defendants served their responses to Plaintiff's discovery requests. For the most part, the Defendants' discovery responses consisted of their general objections and specific objections to each of Plaintiff's requests for production and interrogatories. Defendants did not produce any documents responsive to Plaintiff's requests. Following receipt of Defendants' discovery responses, Plaintiff sent Defendants a "meet and confer" letter on November 20, 2006, outlining [*6] the alleged invalidity of Defendant's objections and lack of substantive responses or production of documents. On November 28, 2006, counsel for the parties conducted a telephonic meet and confer conference, which did not resolve the discovery dispute. Defendants argue that during this meet and confer conference, they agreed to produce supplemental discovery responses if Plaintiff's discovery requests were clarified and limited in key respects and once a protective order regarding confidential and propriety information was entered. Prior to the hearing in this matter, a protective order governing the production of confidential and propriety information was entered.

Defendants argue that Plaintiff seeks to require Defendants to produce documents that had been previously seized by Plaintiff pursuant to the January 6, 2006 seizure order. Defendants argued that the seized documents had never been returned to them by Plaintiff and they are unable to produce them. Plaintiff counters this assertion by arguing that a copy of the seized documents were returned to the Amoi Defendants in early 2006 and that Plaintiff subsequently offered to make a second copy of the documents on computer disc [*7] or hard drive for Defendants. Plaintiff argued that as of the hearing date, Defendants had not produced any documents in response to Plaintiff's requests for production of documents.

**DISCUSSION**

*Fed.R.Civ.Pro. 37(a)(2)(B)* requires that a motion to compel include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make discovery in an effort to secure the information or material without court action. *See Shuffle Master, Inc. v. Progressive Games, Inc., 170 F.R.D. 166, 170 (D. Nev. 1996)*. In this case, the parties' counsel conducted a three hour meet and confer conference on November 28, 2006. It does not appear to the Court, however, that this conference was conducted by either party in the manner contemplated by the rules to reach agreement on the scope of Defendants' discovery responses. *Cotracom Commodity Trading Co. v. Seaboard Corp., 189 F.R.D. 456, 459 (D.Kan. 1999)*, states in this regard as follows:

> When the dispute involves objections to requested discovery, parties do not satisfy the conference requirements simply **[*8]** by requesting or demanding compliance with the requests for discovery. The parties need to address and discuss the propriety of asserted objections. They must deliberate, confer, converse, compare views, or consult with a view to resolve the dispute without judicial intervention. They must make genuine efforts to resolve their dispute by determining precisely what the requesting party is actually seeking; what responsive documents or information the discovering party is reasonably capable of producing; and what specific, genuine objections or other issues, if any, cannot be resolved without judicial intervention.

A number of Plaintiff's requests for production and interrogatories were broadly stated and clearly lent themselves to clarification and further good faith discussions between the parties as to precisely what documents and information Plaintiff was actually seeking and what responsive documents or information the Defendants were reasonably capable of producing; and what specific, genuine objections Defendants actually had to Plaintiff's requests. Given the manner in which the meet and confer conference is described, it does not appear that the parties actually attempted **[*9]** to engage in such a good faith conference. The Court must, however, balance this conclusion against the fact that Defendants have not produced any documents in response to Plaintiff's requests. Plaintiff appears to have a reasonable basis for its infringement claims against Defendants and a right to obtain discovery of relevant information both as to the existence and extent of the alleged infringement and the profits that Defendants have obtained through their alleged infringement activities. The Court is also mindful of the need to complete discovery in this matter and move it toward a resolution. Given these considerations, the Court exercises its discretion to consider the motion to compel but will take account of Plaintiff's failure to engage in a meaningful meet and confer conference as it relates to the imposition of any sanctions under *Rule 37*. *See Shuffle Master, 170 F.R.D. at 172 (D. Nev. 1996)* (court declined to award attorney's fees where moving party failed to satisfy meet and confer requirements.)

*Fed.R.Civ.Pro. 26(b)(1)* authorizes discovery regarding any matter, not privileged, that is relevant to the claim **[*10]** or defense of any party. Under *Rule 26 (b)(2)*, however, the court may limit discovery if it determines that the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive, or that the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

In *EEOC v. Caesars Entm't, Inc., 237 F.R.D. 428, 431-32 (D. Nev. 2006)*, the court recently noted that the purpose of the 2000 amendment to *Fed.R.Civ.P. 26(b)* was not only to narrow the scope of discovery, but also to address the rising costs and delay of discovery. Although there is general consensus that the amendments to *Rule 26(b)* "do not dramatically alter the scope of discovery," the purpose of the amendment was to require a greater degree of scrutiny in weighing the relevance versus the burden of the discovery. In deciding whether to restrict **[*11]** discovery under *Rule 26(b)(2)*, "the court should consider the totality of the circumstances, weighing the value of the material sought against the burden of providing it, and taking into account society's interest in furthering the truth-seeking function in the particular case before the court. (citations omitted.)" *Id.*

In this case, Defendants have objected to Plaintiff's discovery requests on grounds that they are irrelevant, vague, ambiguous, unintelligible, overbroad, and unduly burdensome and oppressive. Defendants also object to the requests for production to the extent that Plaintiff requests production of documents that have already been seized by Plaintiff pursuant to the seizure order entered in this case. In addition, Defendants assert objections based on the attorney-client privilege or work-product doctrine, or that they seek proprietary or confidential business information.

The party opposing discovery has the burden of showing the discovery is overly broad, unduly burdensome or not relevant. *Graham v. Casey's General Stores,*

*206 F.R.D. 251, 253-4 (S.D.Ind. 2000)*. To meet this burden, the objecting party must specifically detail the reasons why **[*12]** each request is irrelevant. *Id.*, citing *Schaap v. Executive Indus., Inc., 130 F.R.D. 384, 387 (N.D. Ill. 1990.) Walker v. Lakewood Condominium Owners Assoc., 186 F.R.D. 584, 587 (C.D. Cal. 1999)*, further states:

> Boilerplate, generalized objections are inadequate and tantamount to not making any objection at all. *See Josephs v. Harris Corp., 677 F.2d 985, 992 (3rd Cir. 1982)* ("mere statement by a party that the interrogatory was 'overly broad, burdensome, oppressive and irrelevant' is not adequate to voice a successful objection"); *Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1121 (3rd Cir. 1986)* (objecting party must show a particularized harm is likely to occur if the requesting party obtains the information that is the subject of the particular objections; generalized objections are insufficient).

*Farber and Partners, Inc. v. Garber, 234 F.R.D. 186 (C.D. Cal. 2006)*, further states that boilerplate relevancy objections that do not set forth any argument or explanation why the requested documents are irrelevant are also improper.

In this case, the court has granted Plaintiff a preliminary **[*13]** injunction against Defendants and has found that Plaintiff is likely to succeed on the merits in proving that Defendants have or are infringing on Plaintiff's DVD+RW mark. *See A & M Records v. Napster, Inc., 239 F.3d 1004, 1013 (9th Cir. 2001)*. Although not dispositive as to all objections based on lack of relevancy, the preliminary injunction clearly demonstrates the relevant basis for Plaintiff's discovery requests and further demonstrates that Defendants' "boilerplate" relevancy objections are without merit. The great majority of Defendants discovery responses do not provide any specific argument or explanation for the basis of their relevancy objections to each and every request or for their failure to produce any information or documents in response to Plaintiff's interrogatories and requests for production.

Defendants argue that Plaintiff's motion to compel should be denied because Plaintiff has asserted the same type of "boilerplate" objections to Defendants' discovery requests, and Plaintiff has allegedly not produced any documents to Defendants to support Plaintiff's claims in this case. The failure of the moving party to comply with the rules in regard to **[*14]** its own discovery responses is not, however, a defense for the non-moving party's failure to provide proper discovery responses. Each party is required to comply with the Federal Rules of Civil Procedure in responding to discovery. If Plaintiff has failed to provide proper discovery responses, then Defendants' remedy is to file a motion to compel, which they have done. Defendants are not, however, justified in asserting improper objections and in refusing to provide proper discovery responses because the Plaintiff has allegedly been guilty of the same type of discovery misconduct. Additionally, Defendants' argument that Plaintiff has not produced any documents to support its claims against them is belied by the fact that the Court has entered a temporary restraining order and preliminary injunction against the Defendants based on documents and other information submitted to the Court in support of Plaintiff's motions.

In regard to Defendants' objections based on the attorney-client privilege or work-product doctrine, Defendants were required to provide privilege logs regarding documents they claim are privileged. In *Diamond State Insurance Co. v. Rebel Oil Co., 157 F.R.D. 691, 698 (D.Nev. 1994)*, **[*15]** the court stated that the party asserting the attorney-client privilege has the burden of making a *prima facie* showing that the privilege protects the information. This burden is met by demonstrating that the information adheres to the essential elements of the attorney-client privilege and is generally accomplished by the submission of a privilege log. A privilege log or affidavits supporting application of the work-product doctrine are also required. In this case, Defendants attached to their Opposition (# 87), Exhibit "M", a privilege log regarding various email messages exchanged between Defendant's counsel and Defendant after this lawsuit was filed. This privilege log does not comply with the requirements of *Diamond State Insurance Co., supra, 157 F.R.D. at 698-99*, because it does not provide information as to the dates of the various email communications or the recipients of the communications. Defendants' privilege assertions, however, appear limited to these email messages between Defendant and its counsel. Defendants have failed to demonstrate that any other documents are protected by the attorney-client privilege or work-product doctrine, and the Court, **[*16]** therefore, holds that Defendants' objections based on the attorney-client or work-product privileges are waived, other than in regard to the emails listed in Exhibit "M" to Defendants' Opposition (# 87). Defendants are also ordered to provide a privilege log regarding the documents identified in Exhibit "M" that fully complies with the requirements of a privilege log under *Diamond State Insurance Co., supra.*

A stipulated protective order regarding the production of confidential and proprietary information has been entered in this case, and the absence of such a confidentiality order is no longer an excuse for not producing

relevant documents. Therefore, Defendants are required to produce relevant documents or information subject to the provisions of the protective order regarding confidential, proprietary or trade secret information.

Defendants also object to Plaintiff's Request for Production for documents that were previously seized by Plaintiff pursuant to the seizure order. Defendants argue that the seized documents were never returned to them. Plaintiff disputes this and also argues that it previously offered to produce another copy of the seized documents if [*17] Defendants' counsel provides Plaintiff's counsel with a hard drive on which to copy the seized documents. The Court will, therefore, order that Defendants' counsel provide a hard drive to Plaintiff's counsel so that Defendants may obtain a copy of the seized documents if they, in fact, do not have a copy of the documents.

In support of its argument that Defendants should also be required to produce previously seized documents, Plaintiff cites this Court's statements and order during the August 11, 2006 hearing regarding Plaintiff's motion to compel Co-Defendant Norcent Technology and Norcent Holdings, Inc. ("Norcent") to supplement its initial disclosures under *Fed.R.Civ.Pro. 26(a)*. The Court's order regarding Norcent, however, is distinguishable from the instant motion. *Rule 26(a)(1)(B)* requires the disclosing party to produce a copy of, or description by category and location of all documents in its possession, custody, or control that it *may use* to support its claims or defenses. Defendant Norcent's initial disclosures did not provide any documents or description of the specific documents that it intended to use to support of its defenses [*18] and simply asserted that Plaintiff was in possession of the documents by virtue of the seizure order. The Court held that Plaintiff was not required to guess which documents Norcent may rely on or use in support of its defense and directed that Norcent produce or provide an adequate description of the documents it may use to support its defense regardless of whether the documents were previously obtained by Plaintiff through the seizure order. The scope of required disclosures under *Rule 26(a)(1)(B)*, however, is narrower than the scope of relevant discovery under *Rule 26(b)*. While there may be good reason for requiring a party to produce documents pursuant to a discovery request that have already been obtained by the opposing party through other means, this Court's order regarding Norcent's *Rule 26(a)* disclosures does not provide the basis for requiring the Amoi Defendants to produce documents in response to a *Rule 34* request for production that are already in Plaintiff's possession.

**A. Plaintiff's Requests for Production of Documents.**

Plaintiff's Requests 1 and 2 request that Defendants produce all documents that support each denial in Defendants' answer or that support [*19] each affirmative defense in Defendants' answer. Notwithstanding Defendants' "boilerplate" objections, these requests appear overbroad on their face. *See Kidwilder v. Progressive Paloverde Ins. Co., 192 F.R.D. 193 (N.D.W.Va. 2000)*; *Hilt v. SFC, Inc., 170 F.R.D. 182, 186-87 (D. Kans. 1997)*; *Grynberg v. Total S.A., 2006 U.S. Dist. LEXIS 85496, 2006 WL 1186836 *6 (D.Colo. 2006)*. Arguably, however, Requests 1 and 2 simply seek production of documents that Defendants may use in support of their denials and affirmative defenses and which Defendants have an affirmative duty to produce under *Rule 26(a)(1)(B)*. A party who fails to timely make *Rule 26(a)(1)(B)* disclosures will be barred from using undisclosed documents at trial, on a motion or at a hearing. Defendants' *Rule 26(a)* disclosures have not been provided to the Court; and it is, therefore, unknown what documents have been produced or identified by Defendants. Request No. 3 requests Defendants to produce the documents identified in their initial disclosures, which suggests that Defendants have not produced their *Rule 26(a)(1)(B)* documents to Plaintiff.

The Court will therefore treat Requests 1-3 as a request for [*20] documents that Defendants may use in support of their defense. This case has been pending more than a year and Defendants have had more than sufficient time in which to identify the documents that they may use in support of their defense. Defendants are therefore directed to produce all documents which they have an affirmative duty to disclose under *Rule 26(a)(1)(B)* within 14 days of the date of this order. Failure to produce such documents will result in the imposition of sanctions which may include an order precluding Defendants from introducing such documents at trial, on a motion, or at a hearing.

Defendants argue that they cannot respond to the other requests for production because the definition of "ACCUSED PRODUCTS" in the requests for production is vague and overbroad. The Court does not find the definition of this term to be vague or overbroad and finds that it is capable of being reasonably understood by Defendants. Clearly, Plaintiff is seeking discovery of records that relate to Defendants' use of the "ACCUSED PRODUCTS" as defined in the requests for production and as alleged in Plaintiff's complaint. Under this definition, Defendants can reasonably determine the documents [*21] that relate to the "ACCUSED PRODUCTS" and reasonably distinguish documents that have no bearing on those products. The Court finds that it is not reasonable for Defendants to fail to provide any documents in response to the requests for production on the grounds that the definition of "ACCUSED PRODUCTS" might

be given an overbroad meaning. Defendants' objections to these requests based on the vagueness of this term are overruled, and Defendants are ordered to produce documents responsive to the requests for production.

Defendants also argue that the meaning of the terms "DEDUCTIBLE EXPENSES" and "GROSS REVENUE" are "problematic because the definitions incorporate terms that may be defined differently in China -- where two of the defendants are located." The Court also finds this objection to be without merit. The definitions of these terms in Plaintiff's Requests state that "GROSS REVENUE" and "DEDUCTIBLE EXPENSES" mean and refer, respectively, to Defendants' "sales revenues" and "elements of cost or deductible n1 (sic) claimed" under *15 U.S.C. § 1117*. These terms are simple and not open to uncertainty as to meaning. Defendants have not explained how such **[*22]** terms might have different meanings in China. Nor have Defendants shown that any such different meanings of these terms cannot be translated into their equivalents under *15 U.S.C. § 1117*. Defendants' objections on this ground are overruled and Defendants are ordered to provide documents responsive to Plaintiff's requests for production.

n1 The statute uses the term "deduction" and the Court infers that this is the intended word in the definition of "DEDUCTIBLE EXPENSES."

Defendants also object to discovery of their financial statements and tax returns. In order to determine the profits that Defendants have allegedly obtained through violation of Plaintiff's trademark, Plaintiff is entitled to obtain information regarding the Defendants' financial condition, incomes, expenses and deductions. Defendants' financial statements and tax returns are likely to contain relevant evidence or lead to the discovery of admissible evidence regarding Defendants' profits. In evaluating the damages sustained **[*23]** by the alleged infringement, however, Plaintiff should not be forced to rely on what Defendants selectively identify as relevant financial information. Under the circumstances of this case, the Court finds that Plaintiff should be able to obtain, review and analyze Defendants' financial records and tax returns in order to make its own determination as to the profits or income that Defendants have generated from their alleged infringement of Plaintiff's trademark. Defendants are ordered to respond to these requests.

Plaintiff's Request 11 requests that Defendants produce all documents that relate to any litigation or administrative procedures and/or seizures by the United States Custom Service with which Defendants have ever been involved, whether as a plaintiff or defendant, which involve or relate to legal or factual matters similar to those in this litigation, including but not limited to, allegations of copyright infringement, trademark infringement, unfair competition, trade dress infringement, or other intellectual property claims. Request 12 requests production of all documents relating to any United States Custom Service ruling or inquiry relating to Defendants regarding copyrights, **[*24]** trademarks, trade dress, or other intellectual property rights. The Court finds that these requests are relevant to the issue of willful infringement by Defendants. Documents need not be admissible in order to be relevant and discoverable. Documents relating to other litigation or enforcement proceedings against Defendants for similar acts of infringement, or U.S. Customs Service rulings or inquiries relating to Defendants and their affiliates, are sufficiently relevant to warrant discovery. Although no time restrictions have been placed on the requests for this information, the Court has also not been provided with information as to how long Defendants have been in existence which would allow the Court to determine whether the potential period covered by the requests is excessive. Defendants have not made the requisite showing of undue burden that would justify denial of the motion to compel on this ground. Defendants are ordered to produce relevant documents, if any, responsive to these requests.

Defendants are ordered to provide proper responses to requests for production of documents within 14 days of the date of this order.

In regard to the production of documents that were **[*25]** previously seized by Plaintiff pursuant to the seizure order, the Court cannot determine whether Defendants, in fact, have copies of the seized documents. The Court will therefore order that Defendants provide Plaintiff with the necessary discs or hard drive so that Plaintiff can provide Defendants with another copy of the seized documents. It appears that Plaintiff's requests for production regarding the previously seized documents is to require Defendants to identify any documents contained therein which it may use in support of its defenses. *See the above discussion regarding Requests 1-3*. Defendants should identify any such documents contained in the seized documents which they are required to identify pursuant to *Rule 26(a)(1)(B)*. Otherwise, the Court sees no purpose to requiring Defendants to reproduce the documents previously seized by Plaintiff.

**B. Plaintiff's Interrogatories.**

**1. Interrogatories 1, 3, 4 and 14.** Interrogatory 1 asks for the identity of all of Defendants' employees during the past four years. Interrogatory 14 asks for the identity of all persons who participated or are participating in any manner in the design, manufacture, advertising, **[*26]** creation, production, importation, packaging, distribution, sale or offer for sale of each of the AC-

CUSED PRODUCTS. Defendants object to these interrogatories on the grounds that they are overbroad and seek the identity of employees regardless of whether they have any relevant knowledge or information. Defendants further assert in their Opposition that they have approximately 20,000 employees and that responding to these interrogatories to identify all such employees would be unduly burdensome and expensive. These interrogatories are overbroad on their face. The Court will, therefore, limit the Defendants' answers to this interrogatory to Defendants' officers, directors, key employees; i.e., managerial employees or department head employees. The Court will also place a similar limitation on Defendants' answers to Interrogatories 3 and 4 which ask for the identity of persons who operate, manage or control Defendants' website and email files. It will be a sufficient response to these interrogatories to identify the persons who are responsible for the management of the operation and control of Defendants' web site and email files.

**2. Remaining Interrogatories.** The Court finds **[*27]** that Defendants can properly and fully respond to the remaining interrogatories which seek relevant and discoverable information. Defendants' objections to these interrogatories are hereby overruled and Defendants are ordered to provide responsive answers to the Interrogatories.

Defendants are hereby ordered to serve responsive supplemental answers to interrogatories within 10 days of the date of this order.

**C. Plaintiff's Request for Audit at Defendants' Expense.** Plaintiff has not demonstrated in its Motion to Compel that the Court should order an audit of Defendants' records at Defendants' expense at this time. This request is denied, without prejudice.

**D. Plaintiff's Request for Sanctions.** *Rule 37(a)(4)(A)* provides that if the motion to compel is granted, the moving party shall be awarded its reasonable expenses in making the motion, unless the court finds that the motion was filed without the moving party first making a good faith effort to obtain discovery without court action or that the opposing party's response or objection was substantially justified, or that other circumstances make an award of expenses unjust. In this case, sanctions would be appropriate **[*28]** based on the failure of Defendants to produce any documents in response to Plaintiff's request for production of documents or to serve reasonably responsive answers to interrogatories. Additionally, Defendants' objections regarding the alleged vagueness or overbreadth of the terms "ACCUSED PRODUCTS," "DEDUCTIBLE EXPENSES" and "GROSS REVENUE" lack reasonable merit. Nevertheless, it appears to the Court that Plaintiff did not engage or attempt to engage in the type of meet and confer conference required by *Rule 37(a)(4)(A)*. Defendants argue that during the meet and confer conference, they sought to obtain clarification of the discovery requests and agreed to provide discovery responses if clarification was provided and a protective order regarding confidential information was entered. Although a motion to compel may still have been necessary even if the parties had properly engaged in a meet-and-confer conference, any opportunity to resolve the discovery dispute without judicial intervention appears to have been doomed by the manner in which Plaintiff conducted the meet-and-confer conference. The Court will, therefore, exercise its discretion not to award sanctions against Defendants **[*29]** based on Plaintiff's counsel's failure to engage in a meaningful meet and confer conference as described in *Cotracom Commodity Trading Co. v. Seaboard Corp., 189 F.R.D. 456, 459 (D.Kan. 1999)*. Sanctions will be imposed, however, if Defendants fail to timely produce documents and information in accordance with this order.

**IT IS HEREBY ORDERED** that Plaintiff Koninklijke Philips Electronics N.V.'s Motion to Compel Discovery from Defendants Amoi Electronics, Inc.; Amoi Electronics, Ltd.; and Amoi Electronics Co. (# 488) is **granted** in accordance with the foregoing provisions of this Order.

**IT IS FURTHER ORDERED** that Defendants are to provide proper responses to requests for production of documents within 14 days of the date of this order.

**IT IS FURTHER ORDERED** that Defendants are to serve responsive supplemental answers to interrogatories within 10 days of the date of this order.

**IT IS FURTHER ORDERED** that Defendants are to serve a proper privilege log regarding the email communications listed in Exhibit "M" of their Opposition (# 87).

DATED this 21st day of February, 2007.

GEORGE FOLEY, JR.

U.S. MAGISTRATE JUDGE

# EXHIBIT K

US005080367A

# United States Patent [19]

Lynch et al.

[11] Patent Number: 5,080,367

[45] Date of Patent: Jan. 14, 1992

[54] GOLF BALL

[75] Inventors: Francis deS. Lynch, Mattapoisett; John W. Jepson, Marion; Robert A. Brown, Mattapoisett, all of Mass.

[73] Assignee: Acushnet Company, New Bedford, Mass.

[*] Notice: The portion of the term of this patent subsequent to Jun. 26, 2007.

[21] Appl. No.: 543,968

[22] Filed: Jun. 26, 1990

Related U.S. Application Data

[63] Continuation of Ser. No. 213,056, Dec. 4, 1980, Pat. No. 4,936,587, which is a continuation of Ser. No. 91,087, Nov. 5, 1979, abandoned, which is a continuation of Ser. No. 920,396, Jun. 29, 1978, abandoned, which is a continuation of Ser. No. 816,882, Jul. 18, 1977, abandoned, which is a continuation of Ser. No. 716,100, Aug. 20, 1976, abandoned, which is a continuation of Ser. No. 363,353, May 24, 1973, abandoned, which is a continuation-in-part of Ser. No. 236,318, Mar. 20, 1972, abandoned.

[51] Int. Cl.[5] ........ A63B 37/14

[52] U.S. Cl. ........ 273/232; 273/218

[58] Field of Search ........ 273/232

[56] References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 27,441 | 7/1897 | Dunn | D21/205 |
| D. 29,949 | 1/1899 | Barnes | D21/205 |
| D. 30,378 | 3/1899 | Foulis | D21/205 |
| D. 34,557 | 5/1901 | Cooper | D21/205 |
| D. 41,327 | 4/1911 | Pearce | D21/205 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 201159 | 3/1955 | Australia | 273/232 |
| 1005479 | 2/1977 | Canada | 273/232 |
| 12884 | of 1914 | United Kingdom | 273/232 |
| 1-06134 | 12/1916 | United Kingdom | 273/232 |
| 377354 | 7/1932 | United Kingdom | 273/232 |
| 757183 | 9/1956 | United Kingdom | 273/232 |

OTHER PUBLICATIONS

"The Curious History of the Golf Ball, Mankinds Most Fascinating Sphere", Horizon Press, New York, 1968, pp. 127–130.
USGA, "The Rules of Golf", 1970, pp. 12–13.
"Golf-Exercise of One's Brains", p. 208 (Japan).
"A Guide to Golf Ball Engineering", pp. 772–773 (Japan).
"An Evening Newspaper of the Mainichi" (Japan).
"Iwanami's Dictionary of Mathematics", Feb. 20, 1971, pp. 581–582.
"Manual of Mechanical Engineering", Sep. 15, 1970, pp. 2–18.
"Encyclopedia of Science", Oct. 20, 1971, p. 168.

*Primary Examiner*—George J. Marlo
*Attorney, Agent, or Firm*—Lucas & Just

[57] ABSTRACT

A finished, painted golf ball is disclosed. Dimples on the golf ball are interrelated by dimple number, dimple diameter and dimple depth and are arranged on the surface of the golf ball in a manner which enables the golf ball to travel further. At least about 80% of the edges of distances between the closest points of the edges of adjacent dimples are less than about 0.065 inches and at least about 55% of the distances between the closest points of the edges of adjacent dimples are greater than about 0.001 inches.

Dimple number, dimple diameter and dimple depth are also interrelated in a specific manner according to the formula:

$$S = \left[\frac{831.5(d - x) - 55.56(D - y)}{a}\right]^2 + \left[\frac{83.15(D - y) + 555.6(d - x)}{b}\right]^2$$

wherein:

d=average depth of all dimples in inches

D=average diameter of all dimples in inches

S=computed unknown (1.0 or less for present invention)

x, y, a and b are dependent on the number of dimples.

25 Claims, 13 Drawing Sheets

315 DIMPLES (FORMULA I)



## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 41,698 | 8/1911 | Royce | D21/205 |
| D. 41,817 | 10/1911 | Pearce | D21/205 |
| D. 42,164 | 2/1912 | Breakspear | D21/205 |
| D. 43,673 | 3/1913 | Johnston | D21/205 |
| D. 44,109 | 5/1913 | Penney | D21/205 |
| D. 44,175 | 6/1913 | Martin et al. | D21/205 |
| D. 44,176 | 6/1913 | Martin et al. | D21/205 |
| D. 44,177 | 6/1913 | Martin et al. | D21/205 |
| D. 44,227 | 6/1913 | Wood | D21/205 |
| D. 44,408 | 7/1913 | Martin et al. | D21/205 |
| D. 46,778 | 12/1914 | Pearce | D21/205 |
| D. 46,783 | 12/1914 | Worthington | D21/205 |
| D. 47,159 | 3/1915 | Kempshall | D21/205 |
| D. 49,905 | 11/1916 | Martin | D21/204 |
| D. 50,512 | 3/1917 | Johnston | D21/205 |
| D. 50,553 | 4/1917 | Cochrane | D21/204 |
| D. 50,883 | 6/1917 | Cochrane | D21/204 |
| D. 51,722 | 2/1918 | Eddy | D21/204 |
| D. 52,500 | 9/1918 | Valle | D21/205 |
| D. 52,706 | 11/1918 | Robertson | D21/205 |
| D. 52,712 | 11/1918 | Turner | D21/205 |
| D. 55,330 | 5/1920 | Robertson | D21/204 |
| D. 59,366 | 10/1921 | Martin | D21/204 |
| D. 60,979 | 5/1922 | Cigol | D21/204 |
| D. 72,692 | 7/1927 | Beldam | D21/204 |
| D. 72,693 | 7/1927 | Beldam | D21/204 |
| D. 73,046 | 7/1927 | Penfold | D21/204 |
| D. 74,213 | 1/1928 | Cigol | D21/204 |
| D. 75,198 | 5/1928 | Young | D21/205 |
| D. 75,422 | 6/1928 | Gioggia | D21/205 |
| D. 78,311 | 4/1929 | Perry | D21/205 |
| D. 79,223 | 8/1929 | Binnie | D21/205 |
| D. 79,224 | 8/1929 | Binnie | D21/205 |
| D. 79,458 | 9/1929 | Des Rosiers | D21/205 |
| D. 80,740 | 3/1930 | Perry | D21/205 |
| D. 91,919 | 4/1934 | Burbank | D21/205 |
| D. 94,403 | 1/1935 | Burbank | D21/205 |
| D. 100,206 | 6/1936 | Davis | D21/205 |
| D. 102,940 | 1/1937 | Cavignac | D21/205 |
| D. 107,066 | 11/1937 | Cavignac | D21/205 |
| D. 108,063 | 1/1938 | Cavignac | D21/205 |
| D. 176,470 | 12/1955 | Martin | D21/205 |
| D. 228,394 | 9/1973 | Martin | 273/232 |
| 697,417 | 4/1902 | Kempshall | 273/218 |
| 705,766 | 7/1902 | Kempshall | 273/220 |
| 710,753 | 10/1902 | Cavanagh | 273/230 |
| 716,945 | 12/1902 | Selzer | 273/230 |
| 878,254 | 2/1908 | Taylor | 273/232 |
| 922,773 | 5/1909 | Kempshall | 273/232 |
| 1,182,604 | 5/1916 | Wadsworth | 273/232 |
| 1,182,605 | 5/1916 | Wadsworth | 273/214 |
| 1,265,036 | 5/1918 | Bendelow | 273/232 |
| 1,286,834 | 12/1918 | Taylor | 273/232 |
| 1,418,220 | 5/1922 | White | 273/232 |
| 1,517,514 | 12/1924 | Hunt | 273/232 |
| 1,656,408 | 1/1928 | Young | 273/232 |
| 1,666,699 | 12/1928 | Hagen | 273/232 |
| 1,681,167 | 8/1928 | Beldam | 273/232 |
| 1,716,435 | 6/1929 | Fotheringham | 273/232 |
| 1,855,448 | 4/1932 | Hazeltine | 273/232 |
| 1,862,708 | 6/1932 | Rosenberg | 273/213 |
| 2,002,726 | 5/1935 | Young | 273/232 |
| 2,106,704 | 2/1938 | Davis | 273/232 |
| 2,135,210 | 11/1938 | Farrar | 273/232 |
| 2,728,576 | 12/1955 | Martin et al. | 273/232 |
| 4,090,716 | 5/1978 | Martin et al. | 273/232 |
| 4,936,587 | 6/1990 | Dex Lynch | 273/232 |

FIG. 1




FIG. 2






FIG. 3




FIG. 4




FIG. 5




FIG. 6




FIG. 7




FIG. 8


112
114
116
118
120
122
124
126
128
130
132
134
136
138
140
142
144
146
148

FIG. 9



FIG. 10




FIG. 11




FIG. 12




FIG. 13




FIG. 14

FIG. 15

FIG. 16

FIG. 17

FIG. 18

FIG. 19.



182 DIMPLES (FORMULA I)
.23
.22
.21
.20
.19
.18
.17
DIAMETER
.010
.011
.012
.013
.014
.015
.016
DEPTH

FIG. 20.

252 DIMPLES (FORMULA I)



FIG. 21.



315 DIMPLES (FORMULA 1)
.19
.18
.17
.16
.15
.14
.13
DIAMETER
.008
.009
.010
.011
.012
.013
.014
DEPTH

FIG. 22.


332 DIMPLES (FORMULA 1)
.19
.18
.17
.16
.15
.14
.13
DIAMETER
.008
.009
.010
.011
.012
.013
.014
DEPTH

FIG. 23.


340 DIMPLES (FORMULA 2)
.19
.18
.17
.16
.15
.14
.13
DIAMETER
.008
.009
.010
.011
.012
.013
.014
DEPTH

FIG. 24.


392 DIMPLES (FORMULA Z)
.17
.16
.15
.14
.13
.12
.11
DIAMETER
.007
.008
.009
.010
.011
.012
.013
DEPTH

FIG. 25.


362 DIMPLES (FORMULA 2)
.18
.17
.16
.15
.14
.13
.12
DIAMETER
.008
.009
.010
.011
.012
.013
.014
DEPTH

## GOLF BALL

This application is a continuation of application Ser. No. 213,056 filed Dec. 4, 1980, now U.S. Pat. No. 4,936,587 issued June 26, 1990, which in turn was a continuation of application Ser. No. 091,087 filed Nov. 5, 1979, now abandoned, which in turn was a continuation of application Ser. No. 920,396 filed June 29, 1978, now abandoned, which in turn was a continuation of application Ser. No. 816,882 filed July 18, 1977, now abandoned, which in turn was a continuation of application Ser. No. 716,100 filed Aug. 20, 1976, now abandoned, which in turn was a continuation of application Ser. No. 363,353 filed May 24, 1973, now abandoned, which in turn was a continuation-in-part of application Ser. No. 236,318 filed Mar. 20, 1972, now abandoned.

The present invention relates to the spatial relationships of dimples on the surface of golf balls. By having most of the adjacent dimples no more than about 0.065 inches apart, the golf ball will travel further than a standard golf ball which is identical except for the spatial arrangement of the dimples.

For many years golf balls have had dimples on their surfaces in order to increase their aerodynamic properties whereby the ball will travel further than a smooth golf ball. By the term "dimple" it is meant an indentation in the surface of a golf ball. There have been various attempts to improve the distance obtained from a golf ball by varying the configuration of an individual dimple such as by making its diameter larger, its depth shallower, or even changing the dimple from a round to a square configuration. It has now been discovered that increased yardage can be obtained from a golf ball in which the spatial relationships of the dimples are controlled so that at least about 80% of the land distances of adjacent dimples are less than about 0.065 inches and at least about 55% of the land distances of adjacent dimples are greater than about 0.001 inches. By the term "land distance" it is intended to mean the distance between the edges of two dimples at their closest points. The edge of the dimple is defined as the point at which the periphery of the golf ball or its continuation intersects a tangent to the sidewall of the dimple and will be hereinafter more fully explained. Since only about 55% of the land distances are greater than about 0.001 inches, it will be understood that some of the dimples may overlap. Overlapping dimples may have a negative land distance as land distance is herein defined.

It has further been discovered that when the land area between adjacent dimples is controlled within the limits as set forth in this specification, the relative size and number of the dimples is unimportant. Standard golf balls contain about 336±10 dimples on their surface. It has been found that the number of dimples on the golf ball can be varied substantially and that increased yardage will still be obtained when the limits on land distances as taught in this specification and claims are followed. It has additionally been found that the shape of the dimple is not critical. Although the preferred dimple is round, the dimple may be oval, pentagonal, hexagonal, octagonal or other shapes. In addition, more than one shape of dimple may be used on a single ball, if desired. When the term diameter is used herein, it is defined as the distance from edge to edge when the dimple is circular. When the dimple is non-circular, the term diameter is defined as the diameter of a circle which would have the same area as the area of the non-circular dimple. When the term depth is used herein it is defined as the distance from the continuation of the periphery line to the deepest part of a dimple which is a section of a sphere. When the dimple is not a section of a sphere, the depth in accordance with the present invention is computed by taking a cross section of the dimple at its widest point. The area of the cross section is computed and then a section of a circle of equal area is substituted for the cross section. The depth is the distance from the continuation of the periphery line to the deepest part of the section of the circle. Golf balls according to the present invention have been made with 122 dimples, 182 dimples, 252 dimples, 332 dimples and 392 dimples among others.



The critical values in accordance with the present invention are that at least about 80% of the distances between the closest points of the edges of adjacent dimples must be less than about 0.065 inches and at least about 55% of the distances between the closest points of the edges of adjacent dimples must be greater than about 0.001 inches.

There is additional advantage in controlling the depth to diameter ratio of the individual dimples. In determining the depth to diameter ratio it is necessary to include the number of dimples to be used on the ball. The basic formula for this determination is as follows:

$$S=\left[\frac{831.5(d-x)-55.56(D-y)}{a}\right]^2+\left[\frac{83.15(D-y)+555.6(d-x)}{b}\right]^2$$

wherein:

d=average depth of all dimples in inches

D=average diameter of all dimples in inches

S=computed unknown (1.0 or less for present invention)

In accordance with the present invention, the computed unknown, S, will always be 1.0 or less. S can be equal to 0 but it will otherwise always be a positive number.

For a golf ball having from about 182 to about 332 dimples, the values of x, y, a, and b in accordance with the present invention will be:

$y=0.323-0.0896\,N+0.0122\,N^2$

$x=0.0186-0.00406\,N+0.000550\,N^2$

$a=6.30-3.30\,N+0.693\,N^2$

$b=3.11-1.03\,N+0.155N^2$

N=the exact number of dimples divided by 100

This is designated as Formula 1.

For a golf ball having from 333 to about 392 dimples the same basic formula is used with the following x, y, a, and b values:

$y=0.287-0.0383\,N$

$x=0.0162-0.00150\,N$

$a=4.66-0.500\,N$

$b=5.00-1.08\,N$

N=the exact number of dimples divided by 100

This is designated as Formula 2. Again, when S is equal to or less than 1 the depth to diameter relationship is in accordance with the present invention.

For golf balls having from 182 to 332 dimples, even better results are obtained with the basic formula when:

$y=0.323-0.0896\,N+0.0122\,N^2$

$x=0.0186-0.00406\,N+0.000550\,N^2$

$a=4.54-2.78\,N+0.674\,N^2$

$b=3.09-1.97\,N+0.412\,N^2$

N=the exact number of dimples divided by 100

This is designated as Formula 3. It is to be pointed out that all golf balls included in Formula 3 are also included in Formula 1.

For golf balls having from 333 to 392 dimples, even better results are obtained with the basic formula when:

y=0.240−0.0242 N

x=0.0225−0.00340 N

a=13.6−3.28 N

b=5.25−1.25 N

N=the exact number of dimples divided by 100

This is designated as Formula 4. It is to be pointed out that all golf balls included in Formula 4 are also included in Formula 2.

It will be understood that there is not a sharp break between 332 and 333 dimples and that, in fact, the formulas given hereinbefore overlap in this general area. Different sets of formulas have been given for 182–332 and 333–392 dimpled balls only for the purpose of simplification since a single set of formulas for all balls would be unduly complicated. However, no matter which set of formulas is used, best results are obtained when the golf ball has from about 315 to about 340 dimples and the following values are employed in the basic formula:

x=0.0117

y=0.156

a=1.1

b=0.55

This is designated as Formula 5. Golf balls which are within this best results formula will also be included within Formulas 2 and 4 and thus necessarily within Formulas 1 and 3.

The preferred method of applying the formulas is to plot a graph of d vs. D vs. N, holding S at 1. (For Formula 5, since there is no "N" in the formula the graph will simply be a plot of d vs. D holding S at 1). The plotting of this graph is well within the skill of the art. Representative graphs are illustrated in FIGS. 19–25 as discussed hereinafter. Once the graph has been plotted, selection of one of the variables on the graph will automatically yield the other two variables.

An alternative method of applying the formulas is to first select the number of dimples to be used and then arbitrarily select a diameter and depth. If when these numbers are inserted in the appropriate formula S=1 or less, then the depth and diameter are in accordance with the present invention. For Formula 5, the depths and diameters can be the same whether the number of dimples is about 315 or about 340 or any number therebetween.

The following will serve as illustrative examples of selecting diameter and depth according to the present invention. Of course, the dimples were positioned on the ball in accordance with the present invention.

## EXAMPLE 1

In this case it was decided to have 252 dimples which comes within Formula 1. The diameter was selected as 0.175 inches and the depth as 0.0145 inches. These values were substituted into Formula 1 and S computed as about 1.9. Since S is greater than 1.0, the depth to diameter relationship is not in accordance with the present invention.

## EXAMPLE 2

Example 1 was repeated holding the dimple number at 252 and the diameter at 0.175 inches. In this case, however, the depth of the dimple was decreased to



0.0135 inches. When these values were substituted into Formula 1, S equalled about 0.7 which is less than 1.0 and thus the depth to diameter relationship was in accordance with the present invention. These distances are shown on FIG. 2 since they are within the present invention.

## EXAMPLE 3

Example 2 was repeated using the same values i.e., 252 dimples, diameter of 0.175 inches and depth of 0.0135 inches. In this case, however, the values were substituted into Formula 3 to find out whether or not these values give "better" results. S was computed to be about 2.3 which is greater than 1.0 thereby indicating that these values, while within the present invention, do not give "better" results.

## EXAMPLE 4

Example 3 was repeated holding the dimple number at 252 and the diameter at 0.175 inches but in this case the depth of the dimple was decreased to 0.0125 inches. When these values were substituted into Formula 3, S equalled about 0.4 which is less than 1.0 thereby indicating that these values give "better" results.

## EXAMPLE 5

In this case it was decided to use 392 dimples, which comes within Formula 2. The diameter was selected as 0.130 inches and the depth as 0.009 inches. When these values were substituted into Formula 2, S was found to be about 3.0. Since S is greater than 1, the depth and diameter are not in the proper ratio in accordance with the present invention.

## EXAMPLE 6

Example 5 was repeated holding the number of dimples at 392 and the depth at 0.009 inches. However, the diameter was increased to 0.140 inches. In this case S is 0.6 which is less than 1.0 and thus the depth to diameter relationship is within the limits of the present invention.

## EXAMPLE 7

When Example 6 was repeated using the same values, i.e., 392 dimples, depth of 0.009 inches and diameter of 0.140 inches, but using Formula 4, S was computed to be 2.3. Since Formula 4 is the formula to be used to obtain "better" results and since the values of this example give a value greater than 1.0 in Formula 4, it is seen that these values, while within the present invention, do not give "better" results.

## EXAMPLE 8

Example 7 was repeated holding the dimple number at 392 and the depth at 0.009 inches but in this case the diameter was increased to 0.145 inches. When these values were substituted into Formula 4, S was found to be 0.1. Since S is less than 1.0, these values give "better" results.

## EXAMPLE 9

In this case it was decided to have 315 dimples which comes within the best results formula i.e., Formula 5. The diameter was selected as 0.150 inches and the depth as 0.0125 inches. These values were substituted into Formula 5 and S computed as about 0.8. Since S was less than 1.0, the depth to diameter relationship is within the "best results" of the present invention.

EXAMPLE 10

Example 9 was repeated using the same depth and diameter i.e., 0.150 inches and 0.0125 inches but in this case the golf ball had 340 dimples. Again, the S value equalled 0.8 and thus the ball was within the "best results" region of the present invention.

These and other aspects of the present invention may be more fully understood with reference to the following drawings in which:

FIG. 1 is the top half of a golf ball with dimples arranged as in today's standard golf ball;

FIG. 2 is the top half of a golf ball showing dimples in accordance with the present invention;

FIGS. 3-5 are cross sections of dimples showing the method of determining the edge of the dimple;

FIGS. 6-9 show a series of dimples and illustrate what is an "adjacent" dimple;

FIGS. 10-13 show one suitable method of arranging the dimples on the surface of the golf ball;

FIG. 14 shows the method of measuring the depth and diameter of a spherically shaped dimple;

FIGS. 15 and 16 show the method of computing the diameter of an irregularly shaped dimple;

FIGS. 17 and 18 show the method of computing the depth of an irregularly shaped dimple; and

FIGS. 19-25 show plots of diameter versus depth for 182, 252, 315, 332, 340, 392 and 362 dimples, respectively.

Referring now to FIG. 1, there is seen a golf ball partially in section with dimples arranged in the manner customarily employed today. Virtually, all golf balls on the market today have dimples arranged in accordance with this pattern. For each hemisphere of the golf ball 10, the dimples 12 are arranged in two large rectangles 14 and 16, two small rectangles 18 and 20, and four triangles 22, 24, 26, and 28. Because of molding techniques, the opposite side of the golf ball virtually always has the same dimple pattern. It has been found that more than 33% of the land areas of adjacent dimples are more than 0.065 inches apart in this golf ball, even if the dimples are as large as 0.155 inches.

In FIG. 2 there is shown a golf ball made in accordance with the present invention. As indicated on the drawing, at least about 80% of the land areas of adjacent dimples are no greater than about 0.065 inches and no more than about 55% of the land areas of adjacent dimples are less than about 0.001 inches. As can be seen with reference to dimples 30 and 32, the distance 34 between the closest points of these two dimples may be more than 0.065 inches. It is only necessary that the distance between adjacent dimples be less than 0.065 inches for at least about 80% of such distances. Similarly, as can be seen with reference to dimples 36 and 38, there is a negative distance between the edges of the dimple since the edges overlap. In accordance with the present invention it is only necessary that at least about 55% of the distances between dimples at their closest points be greater than 0.001 inches. However, where the dimples overlap, the negative distance should in most cases be no greater than about 0.02 inches. The size of the dimples is relatively unimportant and can be varied within the diameters and depths as given hereinbefore. Different size dimples may be used on the same golf ball, if desired, provided that the critical distances between the edges of adjacent dimples at their closest points is maintained within the values as set forth herein.

Referring to FIGS. 3-5, there is seen the method of determining the point which comprises the edge of the dimple. The edge of the dimple is defined as that point at which the periphery of the golf ball or its continuation intersects a tangent to the sidewall of the dimple, said tangent being at a point about 0.003 inches from the periphery of the ball or its continuation.

In FIG. 3 is seen in cross section a golf ball having periphery 40 and continuation thereof 41 and dimple 12. The periphery and its continuation are a substantially smooth section of a sphere. Arc 42 is about 0.003 inches below curve 40-41-40 and intersects the dimple 12 at points A and B. Tangents 43 and 43' are tangent to the dimple 12 at points A and B respectively and intersect periphery 40 at points C and D respectively. Points C and D are the edges of the dimple.

In FIG. 4 is seen a golf ball with dimple 12 which has a rounded top 44. The dimple, in three dimensions, is a section of a sphere. Arc 42 is about 0.003 inches below curve 40-41-40 and intersects dimple 12 at points A and B. Tangents 43 and 43' are tangent to the dimple 12 at points A and B respectively and intersect periphery continuation 41 at points E and F respectively. Points E and F are the edges of the dimple.

Turning now to FIG. 5 there is shown a golf ball in cross section having dimples 12 and 12' partially shown with rounded tops 44 and 44'. Arc 42 is about 0.003 inches below curve 41-40-41 and intersects dimples 12 and 12' at points B and G respectively. Tangents 43' and 43" are tangent to the dimples 12 and 12' at points B and G respectively. Tangents 43' and 43" intersect periphery continuation 41 at points F and H respectively. Points F and H are the edges of dimples 12 and 12' respectively. The "land distance" between dimples 12 and 12' is measured along curve 41-40-41 from point F to point H.

Referring to FIGS. 6-9 there is seen the method of determining what is an "adjacent" dimple. An adjacent dimple is defined as one in which a triangle constructed of lines passing through the center points of 3 dimples has no included angle less than about 30°, and has no part of another dimple included therein.

Turning now to FIG. 6 there are shown 4 dimples, 45, 46, 48 and 50, having centers 52, 54, 56, and 58 respectively. If the center point of dimples 46, 48 and 50 are joined by lines, a triangle is formed having sides 60, 62, and 64 as shown. As can be seen, each of the included angles in this triangle is greater than about 30° and no part of another dimple is included within the triangle. Therefore, dimple 46 is adjacent to dimple 48, dimple 46 is adjacent to dimple 50, and dimple 48 is adjacent to dimple 50. Since in accordance with the present invention all dimples are circular or are converted to the circular, the closest points between the two dimples on the edges of the dimple will fall on the line which passes through the center of the two adjacent dimples. The closest points at the edges between dimples 46 and 48 are edge points 66 and 68, and therefore, the critical land distance as described hereinbefore is measured between points 66 and 68 for these adjacent dimples.

In FIG. 7 is shown a set of dimples 70, 72, 74, 76, 78, and 80, having centers 82, 84, 86, 88, 90, and 92, respectively. As shown with reference to FIG. 6, dimples 76 and 78 are "adjacent." If a triangle is formed by drawing lines through the center points of dimples 72, 78, and 76, it is seen that dimples 72 and 78 are not adjacent

since the included angles formed by lines 94, 96, and by lines 94, 98 are less than 30°.

Referring to FIG. 8, there is again shown dimples 70, 72, 74, 76, 78, and 80, as well as dimples 100, 102 and 104. Lines 106, 108, and 110 form a triangle, passing through the centers of dimples 72, 78 and 104. Each of the included angles of this triangle is greater than 30°. However, dimple 72 is not adjacent to dimple 78 since at least a part of another dimple is included within the triangle. In this case, the entire dimple 76 is included within the triangle and half of the dimple 80 is included within the triangle.

In FIG. 9 is shown a series of dimples 112, 114, 116, 118, 120, 122, 124, 126, 128, 130, 132, 134, 136, 138, 140, 142, 144, 146, and 148. Referring to dimple 130, dimples 120, 122, 128, 132, 138, and 140 are adjacent thereto since a triangle can be formed with lines passing through the center points of each of these dimples without including at least a portion of another dimple and each included angle of the said triangles will be greater than about 30°. None of dimples 112, 114, 116, 118, 124, 126, 134, 136, 142, 144, 146, or 148 are adjacent to dimple 130 since no triangle can be drawn through the center point of three dimples including one of these dimples and dimple 130 which will not include at least a section of another dimple and which will have no angle of the triangle less than about 30°.

With further reference to FIG. 9, it will be understood that for dimple 122, adjacent dimples are 114, 116, 120, 124, 130 and 132. With reference to the dimple 140, the adjacent dimples are 130, 132, 138, 142, 146, and 148 and so forth with respect to each of the dimples. For determining the critical values of having at least about 80% of the dimples being no further apart than about 0.065 inches and at least about 55% of the dimples being no closer than about 0.001 inches, the distance between each dimple and each of its adjacent dimples is measured. However, duplicate measurements are not included. Thus, with respect to dimple 130, the distances between it and dimples 120, 122, 128, 132, 138, and 140, are included, but thereafter with respect to the dimple 122, the distance between it and dimple 130 would not be included since this has already been included with respect to dimple 130.

Maximum benefit is obtained when 100% of adjacent dimples have a distance between them at their closest points of less than about 0.065 inches and when 100% of the minimum distances between the closest points of adjacent dimples are greater than about 0.001 inches.

The mechanics of positioning the dimples on the golf ball is not our invention. One suitable method is to first determine the diameter of the dimple to be used. The diameter of the dimple is preferably within the range of about 0.125 inches to about 0.245 inches. The golf ball surface is then broken down into an icosahedron which, in effect, triangulates the surface of the golf ball as shown partially in FIG. 10. Each of the "triangles" of the icosahedron is equilateral as shown in FIG. 11. Vertex dimples 150, 152, and 154 are situated on each of the vertices of the triangle as shown with the center of the dimple being at the vertex of each angle. Additional dimples are then situated on the sides of the "triangle." The positioning of their centers is determined by the diameter of the dimple and the "land distance" between adjacent dimples which is held within the limits as previously given. The additional dimples on the sides of the "triangle" are shown in FIG. 12. Great circles are then made between dimples which are about equidistant from the vertex dimples connecting all of the center points of the dimples on the sides of the "triangle." Additional dimples are placed where these great circles intersect. As shown in FIG. 13, these great circles intersect at points 156, 158, and 160. These points are the center points for additional dimples. This procedure is then followed with respect to each of the other "triangles" of the icosahedron. Naturally, a dimple at the vertex of three contiguous "triangles" will be a vertex dimple for each of the three triangles. It will be understood that the number of dimples on the sides of the "triangle" will vary inversely with the diameter of the dimple. According to the number of dimples on the sides of the "triangle," the number of great circles will also vary and therefore the number of dimples within the "triangle" will also vary since an additional dimple is placed wherever the great circles intersect.

The above method is only illustrative and need not be adhered too rigidly and the dimples need not be evenly spaced so long as the spacing of the dimples is within the critical limitations as hereinbefore given. Golf balls are usually made with two mold "halves" and it is convenient to adjust the dimples in the vicinity of the mold line so that no dimples fall on the partition line of the molds. In this manner, there is less difficulty in removing any "flash" from a dimple.

In FIG. 14 is shown the method of measuring the depth and diameter of a spherically shaped dimple. The dimple in this case is shown in cross section and is the same dimple as shown in FIG. 4. The diameter is measured from the edges of the dimples, points E and F, along line 162 which is a straight line. Point J is the deepest part of the dimple 12. The depth is measured from point K on the continuation of the periphery 41 to point J and is indicated by line 164. Line 164 is perpendicular to line 162.

In FIGS. 15 and 16 is shown the method of computing the diameter of an irregularly shaped dimple. FIG. 15 shows the top of a hexagonally shaped dimple as one looks directly at it and all six sides 164 are shown at the edges of the dimple. The area of the hexagonally shaped dimple is approximately 0.01765 square inches. FIG. 16 is a circle which has an equivalent area to the hexagonal area of FIG. 15 i.e., the area of the circle of FIG. 16 is 0.01765 square inches. The diameter of FIG. 16 is shown as 166 and this diameter is approximately 0.150 inches. Thus, in accordance with the present invention, the diameter of the hexagonally shaped dimple of FIG. 15 is 0.150 inches. It is important to note that the diameter of an irregularly shaped dimple is not measured directly on the irregularly shaped dimple but is always a diameter of a circle which has an area equivalent to that of the irregularly shaped dimple.

In like manner, the depth of an irregularly shaped dimple is computed on the basis of a spherically shaped dimple. In FIG. 17 is shown a cross section of an irregularly shaped dimple which in this case is the same dimple as is shown in FIG. 15. For purposes of determining the depth of the dimple, the cross section is always taken across the widest part of the dimple which passes through the deepest part of the dimple. The edge of the dimple is shown at points L and M and was determined in accordance with the present invention as set out in FIGS. 3 and 4. The periphery is shown at 41 and the deepest point of the dimple is shown at point N. The area of the cross section of the dimple up to the continuation of the periphery (as shown, enclosed by lines M,N, N,L, and L,M along line 41) is computed and found to

be 0.00113 square inches. The equivalent area of a section of a circle is then substituted for the dimple as shown in FIG. 18. Points O and P are the edges of the diameter of an equivalent dimple as determined in accordance with FIGS. 15 and 16 and line 168 is a straight line between lines O and P and corresponds to the diameter line 166 of FIG. 16. Point R is the deepest part of the dimple and line 170 is perpendicular to line 168. Line 170 intersects the continuation of the periphery 41 at point S and the depth as measured from point S to point R is 0.0113 inches. It is important to note that in accordance with the present invention the depth of the dimple is measured from a cross section of a circle having an equivalent area to that of a cross section of the irregularly shaped dimple rather than being measured on the actual dimple.

As discussed hereinbefore, the preferred method of applying the various Formulas of the present invention is to plot a graph of dimple diameter against dimple depth at a given number of dimples and with S held at 1. Typical graphs are shown in FIGS. 19–25. FIG. 19 shows dimple and depth values for 182 dimples using Formula 1. FIG. 20 shows dimple and depth values for 252 dimples according to Formula 1. FIG. 21 shows dimple and depth values for 315 dimples according to Formula 1. FIG. 22 shows dimple and depth values for 332 dimples according to Formula 1. FIG. 23 shows dimple and depth values for 340 dimples according to Formula 2. FIG. 24 shows dimple and depth values for 392 dimples according to Formula 2. FIG. 25 shows dimple and depth values for 362 dimples according to Formula 2. As can be readily appreciated, the figures show a rotated ellipse. Thus, any value of S that is less than 1 is located within the ellipse and the center point of the ellipse is the point where S=0.

In all cases, measurements made in accordance with the present invention are made on a finished golf ball, since it is the final form of the golf ball which affects aerodynamic properties as opposed to some intermediate construction of the golf ball. In most cases, a finished golf ball will have one or more layers of paint affixed to the surface thereof and in these cases the measurements are made after the final coat of paint or other surface finish has been applied. With some of the new solid balls, however, a finished ball will not have any surface layer such as paint since it is not necessary. It will be understood that in these cases a finished ball means a ball that is unpainted. It will therefore be understood that the term "finished ball" can cover either a painted or an unpainted ball but in either case means the completed ball in the form in which it is intended to be sold to the consumer.

It will be understood that the claims are intended to cover all changes and modifications of the preferred embodiments of the invention, herein chosen for the purpose of illustration, which do not constitute departures from the spirit and scope of the invention.

What is claimed is:

1. A finished, painted golf ball which has from about 182 to about 392 dimples in the outer periphery thereof, the placement of the dimples being such that at least about 80% of the distances between the closest points of the edges of adjacent dimples is less than about 0.065 inches, and at least about 55% of the distances between the closest points of the edges of adjacent dimples is greater than about 0.001 inches, the edge of the dimple being defined as the point of intersection of the periphery of the golf ball or its continuation and a tangent to



the sidewall of the dimple at a point 0.003 inches below the periphery of the golf ball or its continuation, and wherein combinations of the diameter D and depth d of all dimples formed on the ball are defined by the relationship:

$$S=\left[\frac{831.5(d-x)-55.56(D-y)}{a}\right]^2+\left[\frac{83.15(D-y)+555.6(d-x)}{b}\right]^2$$

in which

S=a value of 0 to 1.0

d=average depth of all dimples in inches

D=average diameter of all dimples in inches

and wherein a value N is obtained by dividing the exact number of dimples by 100, and x, y, a and b are defined by the following relations as functions of N:

when the number of dimples is between 182 and 332:

$y=0.323-0.0896N+0.0122N^2$

$x=0.0186-0.00406N+0.000550N^2$

$a=6.30-3.30N+0.693N^2$

$b=3.11-1.03N+0.155N^2$

when the number of dimples is between 333 and 392:

$y=0.287-0.0383N$

$x=0.0162-0.00150N$

$a=4.66-0.500N$

$b=5.00-1.08N$

2. The golf ball of claim 1 wherein 100% of the distances between the closest points of the edges of adjacent dimples is less than about 0.065 inches.

3. The golf ball of claim 1 wherein 100% of the distances between the closest points of the edges of adjacent dimples is greater than 0.001 inches.

4. The golf ball of claim 1 wherein the perimeter of each dimple is circular.

5. A finished, painted golf ball having from about 182 to 332 dimples, the depth, diameter and number of dimples being defined by the relationship:

$$S=\left[\frac{831.5(d-x)-55.56(D-y)}{a}\right]^2+\left[\frac{83.15(D-y)+555.6(d-x)}{b}\right]^2$$

wherein

S=a value of 0 to 1.0

d=average depth of all dimples in inches

D=average diameter of all dimples in inches

$y=0.323-0.0896N+0.0122N^2$

$x=0.0186-0.00406N+0.000550N^2$

$a=6.30-3.30N+0.693N^2$

$b=3.11-1.03N+0.155N^2$

N=the exact number of dimples divided by 100

and the placement of the dimples being such that at least about 80% of the distances between the closest points of the edges of adjacent dimples is less than about 0.065 inches and at least about 55% of the distances between the closest points of adjacent dimples is greater than about 0.001 inches, the edge of the dimple being defined as the point of intersection of the periphery of the golf ball or its continuation and a tangent to the sidewall of the dimple at a point 0.003 inches below the periphery of the golf ball or its continuation.

6. The golf ball of claim 5 wherein 100% of the distances between the closest points of the edges of adjacent dimples is less than about 0.065 inches.

7. The golf ball of claim 5 wherein 100% of the distances between the closest points of the edges of adjacent dimples is greater than 0.001 inches.

8. The golf ball of claim 5 wherein the perimeter of each dimple is circular.

9. A finished, painted golf ball having from about 182 to about 332 dimples, the depth, diameter and number of dimples being defined by the relationship:

$$S=\left[\frac{831.5(d-x)-55.56(D-y)}{a}\right]^2+\left[\frac{83.15(D-y)+555.6(d-x)}{b}\right]^2$$

wherein

S=a value of 0 to 1.0

d=average depth of all dimples in inches

D=average diameter of all dimples in inches

$y=0.323-0.0896N+0.0122N^2$

$x=0.0186-0.00406N+0.000550N^2$

$a=4.54-2.78N+0.674N^2$

$b=3.09-1.97N+0.412N^2$

N=the exact number of dimples divided by 100

and the placement of the dimples being such that at least about 80% of the distances between the closest points of the edges of adjacent dimples is less than about 0.065 inches and at least about 55% of the distances between the closest points of adjacent dimples is greater than about 0.001 inches, the edge of the dimple being defined as the point of intersection of the periphery of the golf ball or its continuation and a tangent to the sidewall of the dimple at a point 0.003 inches below the periphery of the golf ball or its continuation.

10. The golf ball of claim 9 wherein 100% of the distances between the closest points of the edges of adjacent dimples is less than about 0.065 inches.

11. The golf ball of claim 9 wherein 100% of the distances between the closest points of the edges of adjacent dimples is greater than 0.001 inches.

12. The golf ball of claim 9 wherein the perimeter of each dimple is circular.

13. A finished, painted golf ball having from about 315 to about 340 dimples, the depth and diameter of the dimples being defined by the relationship:

$$S=\left[\frac{831.5(d-x)-55.56(D-y)}{a}\right]^2+\left[\frac{83.15(D-y)+555.6(d-x)}{b}\right]^2$$

wherein

S=a value of 0 to 1.0

d=average depth of all dimples in inches

D=average diameter of all dimples in inches

y=0.156

x=0.0117

a=1.1

b=0.55

and the placement of the dimples being such that at least about 80% of the distances between the closest points of the edges of adjacent dimples is less than about 0.065 inches and at least about 55% of the distances between the closest points of adjacent dimples is greater than about 0.001 inches, the edge of the dimple being defined as the point of intersection of the periphery of the golf ball or its continuation and a tangent to the sidewall of the dimple at a point 0.003 inches below the periphery of the golf ball or its continuation.

14. The golf ball of claim 13 wherein 100% of the distances between the closest points of the edges of adjacent dimples is less than about 0.065 inches.

15. The golf ball of claim 13 wherein 100% of the distances between the closest points of the edges of adjacent dimples is greater than 0.001 inches.

16. The golf ball of claim 13 wherein the perimeter of each dimple is circular.

17. A finished, painted golf ball having on the surface thereof from about 315 to about 340 dimples, each said dimple being a section of a sphere, each said dimple having a diameter of about 0.150 inches and a depth of about 0.0125 inches, the dimples being arranged on the surface of the golf ball in the pattern of an icosahedron and the placement of the dimples being such that 100% of the distances between the closest points of the edges of adjacent dimples is greater than about 0.001 inches and less than about 0.065 inches.

18. A finished, painted golf ball having from about 333 to about 392 dimples, the depth, diameter and number of dimples being defined by the relationship:

$$S=\left[\frac{831.5(d-x)-55.56(D-y)}{a}\right]^2+\left[\frac{83.15(D-y)+555.6(d-x)}{b}\right]^2$$

wherein

S=a value of 0 to 1.0

d=average depth of all dimples in inches

D=average diameter of all dimples in inches

$y=0.287-0.383N$

$x=0.0162-0.00150N$

$a=4.66-0.500N$

$b=5.00-1.08N$

N=the exact number of dimples divided by 100

and the placement of the dimples being such that at least about 80% of the distances between the closest points of the edges of adjacent dimples is less than about 0.065 inches and at least about 55% of the distances between the closest points of adjacent dimples is greater than about 0.001 inches, the edge of the dimple being defined as the point of intersection of the periphery of the golf ball or its continuation and a tangent to the sidewall of the dimple at a point about 0.003 inches below the periphery of the golf ball or its continuation.

19. The golf ball of claim 18 wherein 100% of the distances between the closest points of the edges of adjacent dimples is less than about 0.065 inches.

20. The golf ball of claim 18 wherein 100% of the distances between the closest points of the edges of adjacent dimples is greater than 0.001 inches.

21. The golf ball of claim 18 wherein the perimeter of each dimple is circular.

22. A finished, painted golf ball having from about 333 to about 392 dimples, the depth, diameter and number of dimples being defined by the relationship:

$$S = \left[\frac{831.5(d-x) - 55.56(D-y)}{a}\right]^2 + \left[\frac{83.15(D-y) + 555.6(d-x)}{b}\right]^2$$

wherein

S=a value of 0 to 1.0

d=average depth of all dimples in inches

D=average diameter of all dimples in inches

y=0.240−0.0242N

x=0.0225−0.00340N

a=13.6−3.28N

b=5.25−1.25N

N=the exact number of dimples divided by 100



and the placement of the dimples being such that at least about 80% of the distances between the closest points of the edges of adjacent dimples is less than about 0.065 inches and at least about 55% of the distances between the closest points of adjacent dimples is greater than about 0.001 inches, the edge of the dimple being defined as the point of intersection of the periphery of the golf ball or its continuation and a tangent to the sidewall of the dimple at a point 0.003 inches below the periphery of the golf ball or its continuation.

23. The golf ball of claim 22 wherein 100% of the distances between the closest points of the edges of adjacent dimples is less than about 0.065 inches.

24. The golf ball of claim 22 wherein 100% of the distances between the closest points of the edges of adjacent dimples is greater than 0.001 inches.

25. The golf ball of claim 22 wherein the perimeter of each dimple is circular.

* * * * *

# EXHIBIT L

**THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY**