# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BRIDGESTONE SPORTS CO., LTD., and BRIDGESTONE GOLF, INC., | ) ) ) | |
| Plaintiffs, | ) ) | C. A. No. 05-132 (JJF) |
| v. | ) ) | **PUBLIC VERSION** |
| ACUSHNET COMPANY, | ) ) | |
| Defendant. | ) ) | |

## ACUSHNET'S MEMORANDUM IN SUPPORT
## OF ITS MOTION FOR SUMMARY JUDGMENT
## <u>OF NON-INFRINGEMENT OF U.S. PATENT NO. 5,743,817</u>

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P. O. Box 951
Wilmington, DE 19899-0951
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant*
*Acushnet Company*

OF COUNSEL:

Alan M. Grimaldi
Joseph P. Lavelle
Kenneth W. Donnelly
Brian S. Seal
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel: (202) 783-0800

Dated: April 13, 2007
Public Version Dated: April 20, 2007
790313 / 28946

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................1

II.     NATURE AND STAGE OF PROCEEDINGS .......................................1

III.    SUMMARY OF ARGUMENT ..............................................................1

IV.     STATEMENT OF FACTS .....................................................................3

        A.      Bridgestone's Test Data Shows That None of the Accused
                Golf Balls Has a Core With "a Distortion of 2.9 to 4.0 mm
                Under a Load of 100 kg." ..........................................................4

        B.      Each of the Accused Acushnet Golf Balls Has a Cover
                Made from a Blend of Surlyn Resins with a Nonionomeric
                Resin. ........................................................................................8

        C.      Bridgestone Measured the Cover Thickness of the ◄NXT
                Tour► and ◄NXT•Tour► Golf Balls to Be Less Than
                "1.3 to 1.8 mm."........................................................................9

        D.      The Data and Documents On Which Bridgestone Relies
                Show That None of the Accused Acushnet Golf Balls Has a
                Cover With "a Shore D Hardness of Up to 60." ........................10

V.      THE APPLICABLE LEGAL STANDARDS ........................................12

        A.      Summary Judgment ...................................................................12

        B.      Literal Infringement ..................................................................13

        C.      The Doctrine of Equivalents .....................................................13

        D.      Burdens of Proof.......................................................................14

VI.     ARGUMENT........................................................................................14

        A.      None of the Accused Golf Balls Has "a Core Distortion of
                2.9 to 4.0 mm Under a Load of 100 kg."....................................14

                1.      None of the Accused Golf Balls Literally Infringes
                        This Limitation..............................................................14

                2.      Bridgestone Is Estopped from Asserting
                        Infringement of This Limitation Under the Doctrine
                        of Equivalents. .............................................................16

B.  None of the Accused Acushnet Golf Balls Include a Cover That "Consists of an Ionomer Resin as a Resin Component." .................................................................................17

C.  The ◄NXT Tour► and ◄NXT●Tour► Golf Balls Do Not Have a Cover Thickness of "1.3 to 1.8 mm." ....................................20

1.  The ◄NXT Tour► and ◄NXT●Tour► Golf Balls Do Not Literally Meet This Limitation..........................................20

2.  The ◄NXT Tour► and ◄NXT●Tour► Golf Balls Do Not Meet This Limitation Under the Doctrine of Equivalents.................................................................................20

D.  None of the Accused Acushnet Golf Balls Has a Cover With "a Shore D Hardness of Up to 60." ....................................................21

VII.  CONCLUSION........................................................................................23

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................ 12

*Auto Meter Prods. v. Maxima Techs. & Sys., LLC*,
    2006 U.S. Dist. LEXIS 81687 (N.D. Ill. Nov. 6, 2006) ........................ 17

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ...................................................................... 12, 14

*Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*,
    2007 U.S. App. LEXIS 6415 (Fed. Cir. Mar. 20, 2007) .................. 13, 16

*Dependahl v. Falstaff Brewing Corp.*,
    84 F.R.D. 416 (E.D. Mo. 1979) ............................................................ 16

*eSpeed, Inc. v. BrokerTec USA, L.L.C.*,
    342 F. Supp. 2d 244 (D. Del. 2004) ...................................................... 16

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
    452 F.3d 1312 (Fed. Cir. 2006) ............................................................ 20

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
    215 F. Supp. 2d 482, 500 (D.N.J. 2002) .............................................. 15

*J&M Corp. v. Harley-Davidson, Inc.*,
    269 F.3d 1360 (Fed. Cir. 2001) ............................................................ 21

*King v. E.F. Hutton & Co.*,
    117 F.R.D. 2 (D.D.C. 1987) .................................................................. 16

*Loctite v. Ultraseal*,
    781 F.2d 861 (Fed. Cir. 1985) .............................................................. 13

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) (en banc),
    aff'd., 517 U.S. 370 (1996) .................................................................. 13

*Mas-Hamilton Group v. LaGard, Inc.*,
    156 F.3d 1206 (Fed. Cir. 1998) ............................................................ 14

*McGill, Inc. v. John Zink Co.*,
    736 F.2d 666 (Fed. Cir. 1984) .............................................................. 13

*Nike Inc. v. Wolverine World Wide, Inc.*,
    43 F.3d 644 (Fed. Cir. 1994) ................................................................ 12

*Novartis Pharm. Corp. v. Eon Labs Mfg., Inc.*,
    363 F.3d 1306 (Fed. Cir. 2004)............................................................................... 13

*Rohm & Haas Co. v. Brotech Corp.*,
    127 F.3d 1089 (Fed. Cir. 1997)............................................................................... 19

*S. Bravo Sys. v. Containment Techs. Corp.*,
    96 F.3d 1372 (Fed. Cir. 1996)................................................................................. 14

*Scimed Life Sys. v. Advanced Cardiovascular Sys.*,
    242 F.3d 1337 (Fed. Cir. 2001)......................................................................... 13, 20

*Under Sea Indus., Inc. v. Dacor Corp.*,
    833 F.2d 1551 (Fed. Cir. 1987)............................................................................... 14

*Wesley-Jessen Corp. v. Pilkington Visioncare*,
    844 F. Supp. 987 (D. Del. 1994)............................................................................. 16

## RULES

Fed. R. Civ. P. 56(c) ................................................................................................. 12, 14

Defendant Acushnet Company ("Acushnet") files this Opening Memorandum in Support of Its Motion for Summary Judgment of Invalidity and Non-Infringement of U.S. Patent No. 5,743,817 ("the '817 patent") (Exhibit A).

## I.      INTRODUCTION

Plaintiffs Bridgestone Sports Co. Ltd. and Bridgestone Golf, Inc. ("Bridgestone") accuse certain golf balls made by Acushnet of infringing the '817 patent. Specifically, Bridgestone asserts that Acushnet golf balls bearing the following sidestamps infringe claim 1 of the '817 patent:  Pinnacle Exception, Exception, DT So/Lo, ◄DT So/Lo►, PTS So/Lo, ◄PTS So/Lo►, ◄NXT•Tour►, ◄NXT Tour►, and ◄NXT-Tour►.

By this motion, Acushnet will show that it is entitled to summary judgment of non-infringement of the '817 patent on each of these golf balls. No reasonable jury could find on infringement based on the evidence Bridgestone has adduced. Hence, summary judgment of non-infringement of the '817 patent is proper.

## II.      NATURE AND STAGE OF PROCEEDINGS

This patent infringement suit involves eleven patents and is scheduled for trial, starting June 18, 2007. Bridgestone alleges that Acushnet infringes seven patents-in-suit. Acushnet alleges that Bridgestone infringes four patents-in-suit.  Fact and expert discovery is finished and a pre-trial conference will be held on May 25, 2007. The Court held a *Markman* hearing on November 29, 2006, but has not yet issued a *Markman* decision as a step in construing the claims of the asserted patents.

Under the Scheduling Order, as amended, case dispositive motions are now due. Briefing of dispositive motions must follow and be made "pursuant to D. Del. LR 7.1.2." (D.I. 219 at 1).

## III.      SUMMARY OF ARGUMENT

Summary judgment should be granted in favor of Acushnet on the '817 patent for several independent reasons.

*First*, Bridgestone's own test data shows that none of the accused Acushnet products have a core that "has a distortion of 2.9 to 4.0 mm under a load of 100 kg," as required by claim 1 of the '817 patent. The parties agree that the most reliable method to determine the distortion of a core under a load of 100 kg is to measure it directly. The raw testing data acquired and relied upon by Bridgestone's experts, however, shows ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ .

In addition, because Bridgestone amended this limitation during prosecution of the '817 patent, it is estopped from asserting infringement under the doctrine of equivalents. Regardless, Bridgestone has not presented any analysis under the doctrine of equivalents for any distortions greater than the claimed range.

*Second*, none of the accused Acushnet golf balls has a cover that "consists of an ionomer resin as a resin component," as required by claim 1 of the '817 patent. While this limitation is subject to the Court's pending *Markman* opinion, both parties agree that the covers cannot include a nonionomeric resin. ████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████ . Nor has Bridgestone asserted infringement of this limitation under the doctrine of equivalents and, in fact, is estopped from doing so because it amended this limitation during prosecution of the '817 patent.

*Third*, two of the accused Acushnet products – the ◄NXT Tour► and ◄NXT•Tour► golf balls – do not have covers with "a thickness of 1.3 to 1.8 mm," as required by claim 1 of the '817 patent. ██████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████ . Further, the patentees expressly disclaimed cover

thicknesses ▮▮▮▮▮▮▮, so Bridgestone is not entitled to a finding of infringement under the doctrine of equivalents.

*Fourth*, Bridgestone's own test data and the documents relied upon by Bridgestone show that none of the accused Acushnet golf balls has a cover with "a Shore D hardness of up to 60," as required by claim 1 of the '817 patent. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Nor has Bridgestone offered any analysis to support a finding of infringement under the doctrine of equivalents.

Because there is no genuine issue as to any material fact needed to establish non-infringement, Acushnet is entitled to judgment as a matter of law.

## IV.    STATEMENT OF FACTS

The '817 patent pertains to golf balls that allegedly exhibit improved feel, spin properties and iron control "without detracting from the trajectory and flying distance inherent to the solid golf ball." (Ex. A – '817 patent, col. 1, ll. 28-33).    The patent covers solid golf balls having a core and a cover enclosing the core. (*Id.* at col. 1, ll. 34-36). Claim 1, the only asserted claim, reads:

> A golf ball comprising a core and a cover wherein said core and said ball has a core hardness and a ball hardness respectively, wherein said core has a distortion of 2.9 to 4.0 mm under a load of 100 kg, the ratio of a core distortion under a load of 100 kg divided by a ball distortion under a load of 100 kg ranges from 1.0 to 1.3, and said cover consists of an ionomer resin as a resin component and has a thickness of 1.3 to 1.8 mm and a Shore D hardness of up to 60.

(*Id.* at col. 6, ll. 48-56) (emphasis added).

During the prosecution of the '817 patent, Bridgestone amended the limitation regarding core distortion. The original U.S. application claimed a core distortion of "at

least 2.2 mm under a load of 100 kg." (Ex. B – Orig. App. at 11). The patent examiner rejected the claims "as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention." (Ex. C – 9/3/96 Office Action at 2). In addition, the examiner rejected the claims as covering "only inherent features of the reference golf balls." (*Id.*). The examiner stated that "[a]ny possible distinctions over said golf balls are deemed obvious arbitrary variants thereof, simply to provide comparative examples." (*Id.* at 3). In response, Bridgestone amended the claims. It removed the reference to core distortion being "at least 2.2 mm under a load of 100 kg" and replaced it with a core distortion "of 2.9 to 4.0 mm under a load of 100 kg." (Ex. D – 3/4/97 Amendment at 1).

### A.    Bridgestone's Test Data Shows That None of the Accused Golf Balls Has a Core With "a Distortion of 2.9 to 4.0 mm Under a Load of 100 kg."

Claim 1 of the '817 patent requires a golf ball with a core that "has a distortion of 2.9 to 4.0 mm under a load of 100 kg." (Ex. A – '817 patent, col. 6, ll. 50-51). In its efforts to prove infringement, Bridgestone relied on measurements taken by its expert, Dr. Edward Caulfield. Although the limitation specifies distortion in terms of millimeters under a load of 100 kilograms, Caulfield measured the distortion data in inches under a variable pound load. (Ex. E – Caulfield 1/16 Report at Ex. 7, pp. 1-2). In order to express the results in the form of the limitation, Caulfield had to convert the inch and pound data to millimeters and kilograms, which is done using standard conversion constants. (Ex. F – Jones Dep. at 193-96). One inch equals 25.4 millimeters, so in order to convert inches to millimeters, one must multiply the inch value by 25.4. (Ex. G – Conversion Tables). One pound equals 0.45359237 kilograms, so in order to convert pounds to kilograms, one must multiply the pound value by 0.45359237. (*Id.*).

To measure the core distortion, Caulfield placed the cores in a compression test device and applied a load that increased from 1 kg (approximately 2.20 lbs) to 175 kg

(approximately 385.81 lbs) at a rate of 20 inches per minute. (Ex. E – Caulfield 1/16 Report at Ex. 7, pp. 1-2). He recorded the data at regular intervals, so that he did not always measure the core compression at exactly 100 kg (equivalent to 220.46 lbs), but often at points close to 100 kg on either side. While Caulfield reported core distortion values within or near the range required by the '817 patent, a review of that raw data shows those reported values to be unsupported. For example,



. His raw data, however, does not support those values.

Caulfield measured a handful of values close to 100 kg (approximately 220.46 pounds) for that ball. The table below shows the four measurements closest to 100 kg – one on either side as the load increased, and one on either side as the load decreased – with the recorded distortions in inches and also converted into millimeters:

| Caulfield's Raw Data for the NT2.UU.05 Ball | | | | |
|---|---|---|---|---|
| Time Recorded | Load (lbs) | Load (kg) | Distortion (in) | Distortion (mm) |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

(Ex. I – Caulfield "NT2.UU.05.asc" File).



| Caulfield's Raw Data for the NT2.UU.20 Ball | | | | | |
|---|---|---|---|---|---|
| Time Recorded | | Load (lbs) | Load (kg) | Distortion (in) | Distortion (mm) |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

(Ex. J – Caulfield "NT2.UU.20.asc" File).

Indeed, none of Caulfield's raw core distortion data for the ◄NXT Tour► ("NT2") golf ball taken at points at or around a load of 100 kg lie within the range of 2.9 mm to 4.0 mm as required by claim 1 of the '817 patent. (*See* Exhibit K).

The same is true for Caulfield's raw core distortion data for the ◄NXT-Tour► ("NT3") golf ball (collected at Exhibit K), the DT So/Lo (and PTS So/Lo) ("D1") and ◄DT So/Lo► (and ◄PTS So/Lo►) ("D2") golf balls (collected at Exhibit L), and the Pinnacle Exception ("E1") and Exception ("E2") golf balls (collected at Exhibit M). None of the data points taken at or around a load of 100 kg for any of those golf balls lie within the range of 2.9 mm to 4.0 mm as required by claim 1 of the '817 patent.[1]

---

[1] Acushnet raised this issue with the Court in its motion to preclude, filed on March 20, 2007. (D.I. 295 at 9-11). Bridgestone's only response was that "Acushnet's assertions are based on what appears to be a misunderstanding of the data." (D.I. 321 at 10).

Bridgestone was unable to measure the core distortion of the ◀NXT•Tour▶ golf ball due to market unavailability. (Ex. N – Cadorniga 1/16 Report at D-9). Nevertheless, Bridgestone's expert Larry Cadorniga opined that he "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." (*Id.* at D-10).

As discussed above, however, ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

In addition to relying on Caulfield's data, Cadorniga also calculates the 100 kg distortion of the various NXT Tour golf balls by converting Acushnet's target compression specifications – which use a different measurement than 100 kg distortion – into 100 kg values, using an empirical conversion formula published by Jeff Dalton. (Ex. N – Cadorniga 1/16 Report at D-8 to D-9).[2] In doing so, however, Cadorniga stated that he "do[es] not believe that such correlations are appropriate to use to determine the properties of golf balls" and in fact relied on the conversion only "[t]o the extent Acushnet intends to rely on Mr. Dalton's correlation in this case ...." (*Id.* at D-9). Acushnet, however, is not relying on Mr. Dalton's conversion.

---

[2] Cadorniga did not perform a similar conversion for any other of the accused Acushnet golf balls.

**B.    Each of the Accused Acushnet Golf Balls Has a Cover Made from a Blend of Surlyn Resins with a Nonionomeric Resin.**

In his report, Cadorniga provided the following table, which identifies the cover formulations for each of the accused Acushnet golf balls:



(Ex. N – Cadorniga 1/16 Report at D-13).  The table shows that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  The parties agree that Surlyn is "a trademarked product name for a line of ionomer resins manufactured by E.I. du Pont de Nemours and Company."  (*Id.*).  The table further shows ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████. (Ex.

O – Coughlin Report at 23-24).[4]

### C.    Bridgestone Measured the Cover Thickness of the ◄NXT Tour► and ◄NXT•Tour► Golf Balls to Be Less Than "1.3 to 1.8 mm."

Bridgestone's experts determined the cover thickness of the ◄NXT Tour► and ◄NXT•Tour► golf balls by relying on (1) mean cover thickness measurements taken by Caulfield and (2) "cover thicknesses specified in Acushnet's manufacturing guidelines." (Ex. N – Cadorniga Report at D-15 and D-16). For the ◄NXT Tour► golf ball, however, both values are outside the range of 1.3 mm to 1.8 mm, as shown in Table D-8 of Cadorniga's report, part of which is reproduced below.



(Ex. N – Cadorniga Report at D-16).

In deriving his "mean measured cover thickness," Caulfield cut sample golf balls along a plane, thus exposing a cross-section of the cover and core for each sample. (Ex. E – Caulfield Report at Ex. 8, pp. 1-2). He then used a microscope and digital imaging software to measure the thickness of each cover at six separate points. (*Id.* at Ex. 8, p. 3). He then averaged the six measurements to obtain an average cover thickness for each

---

[3] As stated by Cadorniga, ████████████████████████████████████████ ██████████████████." (Ex. N – Cadorniga 1/16 Report at D-13).

[4] ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████).

sample golf ball. (*Id.*). He tested 23 samples of the ◄NXT Tour► ("NT2") golf ball, none of which had an average cover thickness within the range of 1.3 mm to 1.8 mm, as required by claim 1 of the '817 patent. In fact,



. (Ex. Q – Caulfield "NT2 – Cover Thickness.xls" File).

With regard to the ◄NXT•Tour► golf balls, Cadorniga notes that Caulfield was unable to test their cover thickness "because of their marketplace unavailability." (Ex. N – Cadorniga Report at D-18). Nevertheless, he notes that "



Further, the Acushnet documents on which Bridgestone relies show that

. (*Id.* at D-16).

### D. The Data and Documents On Which Bridgestone Relies Show That None of the Accused Acushnet Golf Balls Has a Cover With "a Shore D Hardness of Up to 60."

Cadorniga states that "[t]he term 'cover … has … a Shore D hardness of up to 60' refers to a plaque hardness measurement, as opposed to an on-the-ball measurement." (Ex. N – Cadorniga Report at D-19). Working with Cadorniga, Caulfield developed protocols to create and test plaques of the cover material used in the accused Acushnet golf balls. (Ex. R – Caulfield Dep. at 286:23-287:13). First, Caulfield removed the covers from a number of samples and prepared four circular disks from each sample

cover. (Ex. E – Caulfield Report at Ex. 12, p. 1). He then stacked between eight and twelve such disks into a compression molding machine that applied heat and pressure to mold the stack of disks into a plaque. (*Id.* at Ex. 12, pp. 1-2). He prepared three such plaques for each of the ◄NXT Tour►, ◄NXT-Tour►, DT So/Lo, ◄DT So/Lo►, Pinnacle Exception, and Exception golf balls.

After forming the plaques, Caulfield took four Shore D measurements on each plaque, which he then used to determine an average Shore D hardness for that plaque. (*Id.* at Ex. 12, p. 2). Finally, he used the three plaque averages for each ball type to derive a ball type average. (*Id.* at Ex. 23). None of the ball type averages was 60 or less:

| Ball type | Caulfield's Reported Average Shore D Hardness | |
|---|---|---|
| ◄NXT Tour► ("NT2") | | |
| ◄NXT-Tour► ("NT3") | | |
| DT So/Lo ("D1") | | |
| ◄DT So/Lo► ("D2") | | |
| Pinnacle Exception ("E1") | | |
| Exception ("E2") | | |

(Ex. S – Caulfield's "Cover Hardness (Packer).xls" Spreadsheet).



In fact,                              . (*Id.*).

Further, the Acushnet documents on which Bridgestone relies show that

. (Ex. N – Cadorniga Report at D-20, Table D-10). Specifically, the

Acushnet documents on which he relies show



The documents relied upon by Bridgestone further show that

Still further, the documents relied upon by Bridgestone show that

. (*Id.*).

## V.    THE APPLICABLE LEGAL STANDARDS

### A.    Summary Judgment

The court is familiar with the standards of summary judgment, and Acushnet, therefore, will not repeat them at length here. In general, summary judgment should be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); Fed. R. Civ. P. 56(c). The use of summary judgment is particularly appropriate in complex patent infringement actions because it is a useful tool to secure a just and speedy determination of the action and to simplify and pare down the issues in such complex cases. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed. Cir. 1994) ("Summary judgment is appropriate in a patent case, as in other

cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.").

## B.    Literal Infringement

Literal infringement is determined in a two-step analysis.    The first step, interpretation of the asserted claims, is a question of law, and the court must determine the scope and meaning of the claims.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd., 517 U.S. 370 (1996).  Claims are construed with reference to the claim language, the patent specification and the prosecution history which together constitute the "intrinsic" evidence.  *Loctite v. Ultraseal*, 781 F.2d 861, 867 (Fed. Cir. 1985).  When determining the scope and meaning of the patent claims, the language of the claims in light of the specification is considered first.  *McGill, Inc. v. John Zink Co.*, 736 F.2d 666, 672 (Fed. Cir. 1984).

## C.    The Doctrine of Equivalents

Infringement may also fall under the doctrine of equivalents, which "requires that any differences between the claim elements at issue and the corresponding elements of the accused product be insubstantial." *Novartis Pharm. Corp. v. Eon Labs Mfg., Inc.*, 363 F.3d 1306, 1312 (Fed. Cir. 2004).  The range of allowable equivalents, however, may be limited due to prosecution history estoppel, which "prevents a patentee from recapturing under the doctrine of equivalents subject matter surrendered during prosecution to obtain a patent." *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*, 2007 U.S. App. 6415, at *13 (Fed. Cir. Mar. 20, 2007) (Ex. T).  The range of equivalents may be further limited by specific disavowals of claim scope contained within the patent itself. *Scimed Life Sys. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) ("Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patents, even though the

language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question.").

### D. Burdens of Proof

In a patent case, the patentee bears the burden of proving infringement. *See Under Sea Indus., Inc. v. Dacor Corp.*, 833 F.2d 1551, 1557 (Fed. Cir. 1987). To establish infringement, the patentee must prove that the accused products contain each and every limitation of the asserted claim, either literally or by equivalence. *See S. Bravo Sys. v. Containment Techs. Corp.*, 96 F.3d 1372, 1376 (Fed. Cir. 1996). "If even one limitation is missing, there is no literal infringement." *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998).

Where, as here, the nonmoving party has the burden of proof at trial, the moving party need only point to a lack of evidence and has no burden to disprove the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The non-moving party must then come forward with evidence demonstrating a genuine issue as to a material fact, and such evidence must consist not merely of denials or assertions that a fact is challenged. *See id.* at 324. If the non-moving party fails to make a sufficient factual showing as to any element of its case on which it bears the burden of proof at trial, the "plain language of Rule 56(c) mandates the entry of summary judgment." *Id.* at 322.

## VI. ARGUMENT

### A. None of the Accused Golf Balls Has "a Core Distortion of 2.9 to 4.0 mm Under a Load of 100 kg."

#### 1. None of the Accused Golf Balls Literally Infringes This Limitation.

While Bridgestone's experts claim to have measured the core distortion of the accused Acushnet balls to have core distortions within the claimed range of 2.9 mm to 4.0 mm, the actual test data they acquired shows that to be untrue. As described above,

all of Bridgestone's raw core distortion data, taken at points at or around 100 kg, is well outside the range of 2.9 mm to 4.0 mm. (*See* Exs. K-M).

Bridgestone was unable to measure the core distortion of the ◄NXT•Tour► golf ball due to market unavailability. (Ex. N – Cadorniga 1/16 Report at D-9). Nevertheless, Bridgestone's expert Larry Cadorniga opined that he ███████████████████████

███████████████████████████████████████████████

███." (*Id.* at D-10). As shown in Exhibits I-K, however, ████████████████████████

███████████████████████████████████. (*See* Exs. K-M). Thus, Cadorniga's reliance on any correlation between that ball and the ◄NXT•Tour► golf balls shows that the ◄NXT•Tour► golf ball does not have a core distortion in the range of 2.9 mm to 4.0 mm as required by claim 1 of the '817 patent.

Bridgestone has offered no explanation for the discrepancy between its raw test data and the numbers it relied on in its expert reports. When Acushnet raised this issue in connection with its motion to preclude (D.I. 295), Bridgestone's only response was that "Acushnet's assertions are based on what appears to be a misunderstanding of the data." (D.I. 321 at 10). Acushnet, however, simply converted Bridgestone's raw data from inches and pounds to millimeters and kilograms using standard conversion constants, a method that was confirmed by Bridgestone's expert. (Ex. F – Jones Dep. at 193-96). In any event, Bridgestone's unsubstantiated disagreement does not rise to the level required to create a material dispute of fact. *See Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 215 F. Supp. 2d 482, 500 (D.N.J. 2002) ("mere disagreement … falls short of establishing a genuine dispute of material fact").

Thus, there is no genuine dispute of material fact that Bridgestone's own data shows that the accused Acushnet balls it measured do not have core distortions under a

load of 100 kg within the claimed range, and none of the accused balls literally infringe that limitation.

      2.      **Bridgestone Is Estopped from Asserting Infringement of This Limitation Under the Doctrine of Equivalents.**

Bridgestone is not entitled to claim infringement of this limitation under the doctrine of equivalents because it amended this limitation during prosecution of the '817 patent application. By doing so, Bridgestone surrendered any claim to the doctrine of equivalents for core distortions between 2.2 mm and 2.9 mm or over 4.0 mm under a load of 100 kg. *See Cross Med. Prods.*, 2007 U.S. App. LEXIS 6415, at *13-14 ("Prosecution history estoppel prevents a patentee from recapturing under the doctrine of equivalents subject matter surrendered during prosecution to obtain a patent") (Ex. T); *eSpeed, Inc. v. BrokerTec USA, L.L.C.*, 342 F. Supp. 2d 244, 250-51 (D. Del. 2004) (holding that the patentee was barred from asserting the doctrine of equivalents for a limitation that it amended during prosecution). As a result, Bridgestone is estopped from asserting infringement of this limitation under the doctrine of equivalents.

Further, Bridgestone should be precluded from asserting infringement under the doctrine of equivalents because it failed to identify the factual bases in support of any such argument in response to Acushnet's contention interrogatories. (*See* D.I. 295 at 6-8 and Ex. Q). In such a case, preclusion is the appropriate remedy. *See* Fed. R. Civ. P. 37(b)(2); *Wesley-Jessen Corp. v. Pilkington Visioncare*, 844 F. Supp. 987, 990 (D. Del. 1994) ("the Court will not allow it to offer into evidence in its case in chief any documents or testimony supporting that contention that are not disclosed in its response"); *Dependahl v. Falstaff Brewing Corp.*, 84 F.R.D. 416, 420 (E.D. Mo. 1979) (striking defense and counterclaim for failure to answer contention interrogatory); *King v. E.F. Hutton & Co.*, 117 F.R.D. 2, 7 n.6 (D.D.C. 1987) (plaintiffs "will be precluded from testifying at trial to any facts in support of the losses not mentioned in their respective

depositions or answers to interrogatories"); *Auto Meter Prods. v. Maxima Techs. & Sys., LLC*, 2006 U.S. Dist. LEXIS 81687, at *10 (N.D. Ill. Nov. 6, 2006) (Ex. U) ("[a]ny facts or documents not so disclosed cannot be relied upon in this case"). Thus, in light of Bridgestone's failure to provide the factual bases for its contentions under the doctrine of equivalence, it should be precluded from asserting the doctrine now.

**B.    None of the Accused Acushnet Golf Balls Include a Cover That "Consists of an Ionomer Resin as a Resin Component."**

This limitation is subject to the Court's pending *Markman* opinion on claim construction. Under Acushnet's proposed construction, the term "consists of an ionomer resin as a resin component" means that the resin component of the cover includes only one ionomer resin and excludes other resins or blends of ionomer resins. (D.I. 230 at 17). There is no dispute that the cover of each of the accused Acushnet golf balls includes ▮ ▮. (Ex. N – Cadorniga 1/16 Report at D-13). Thus, the accused golf balls do not infringe under Acushnet's proposed construction.

Under either construction, however, the accused Acushnet golf balls do not infringe this limitation. The parties agree that the resin component of the cover must be ionomer resin. (*See* D.I. 229 at 15). Each of the accused Acushnet golf balls, however, ▮ ▮. (Ex. N – Cadorniga 1/16 Report at D-13). Bridgestone addressed just such a situation during prosecution of the '817 patent application when it distinguished the '817 patent application from Saito '924, which disclosed a blend of an ionomer resin with a flexible resin:

> A cover consisting of an ionomer resin has superior durability *as compared with a cover composed of a mixture of an ionomer resin and another resin* because of compatibility.

> Therefore, the cover of Saito '924 contains as an essential component the flexible resin. On the other hand, the cover of the presently claimed invention consists of an ionomer resin as a resin component. *A cover consisting of an ionomer resin has superior durability as compared with*

> ***a cover composed of a mixture of an ionomer resin and another resin because of compatibility****.*

(Ex. D – 3/4/97 Amendment at 4) (underlines in original; bold italics added).

Thus, the applicants themselves considered the blend of an ionomer resin with another resin to be outside the scope of their invention.   Here, ███████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████ ."

Bridgestone's only argument in support of infringement is a theoretical opinion regarding ████████████████████████████████████████████████████████
███████████████████████████.   Even if credited despite the prosecution history of the patent, however, that opinion falls short of establishing infringement.

Specifically ████████████████████████████████████████████████
███████████████████████████



(Ex. O – Coughlin Report at pg. 24).   In summary, Coughlin's opinion is based on a belief that ████████████████████████████████████████████████████████
███████████████████████.

In order to establish infringement under its own claim construction, however, Bridgestone must show that



With regard to

(Ex. O – Coughlin Report at 24). Such conclusory and unsupported statements cannot meet Bridgestone's burden of showing infringement. *See Rohm & Haas Co. v. Brotech Corp.*, 127 F.3d 1089, 1091-92 (Fed. Cir. 1997) (affirming district court's finding that expert's conclusory opinion failed to establish a prima facie case of infringement). For example, Coughlin offers no explanation, evidence or testing for his belief that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇"

Thus, Bridgestone has not shown that any cover for an accused Acushnet golf ball that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ – is not a cover "consisting of an ionomer resin as a resin component" even under Bridgestone's proposed construction.

Bridgestone has not offered any opinion that this limitation is infringed under the doctrine of equivalents.

**C.   The ◀NXT Tour▶ and ◀NXT•Tour▶ Golf Balls Do Not Have a Cover Thickness of "1.3 to 1.8 mm."**

The ◀NXT Tour▶ and ◀NXT•Tour▶ golf balls do not meet this limitation, either literally or under the doctrine of equivalents.

**1.   The ◀NXT Tour▶ and ◀NXT•Tour▶ Golf Balls Do Not Literally Meet This Limitation.**

As shown above, Bridgestone's own analysis and the documents on which it relies show that the ◀NXT Tour▶ and ◀NXT•Tour▶ golf balls do not literally meet this limitation. ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████." Thus, the ◀NXT Tour▶ and ◀NXT•Tour▶ do not literally meet this limitation.

**2.   The ◀NXT Tour▶ and ◀NXT•Tour▶ Golf Balls Do Not Meet This Limitation Under the Doctrine of Equivalents.**

Nor do the ◀NXT Tour▶ and ◀NXT•Tour▶ golf balls meet this limitation under the doctrine of equivalents. In discussing this limitation in the '817 patent, the inventors state that "[a]ccording to the invention, the cover has a radial thickness of 1.3 to 1.8 mm, especially 1.4 to 1.8 mm. *Outside the range, the objects of the invention cannot be achieved.* A cover of thinner than 1.3 mm is less resistant against top damage and liable to be broken." (Ex. A – '817 patent, col. 2, ll. 58-62) (emphasis added).

"Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patents, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *Scimed Life Sys.*, 242 F.3d at 1341. *See also Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1319 (Fed. Cir. 2006) ("based on the disclosure in the written description, which demeaned the properties of carbon fibers, we conclude that the patentee thereby disavowed carbon fibers from the scope of the '879 patent's claims"); *J&M Corp. v.*

*Harley-Davidson, Inc.*, 269 F.3d 1360, 1366 (Fed. Cir. 2001) ("The scope of equivalents may [] be limited by statements in the specification that disclaim coverage of certain subject matter."). Because the patentees disavowed the use of cover thicknesses less than 1.3 mm, Bridgestone cannot now recapture that subject matter under the doctrine of equivalents.

### D.    None of the Accused Acushnet Golf Balls Has a Cover With "a Shore D Hardness of Up to 60."

Cadorniga states that "[t]he term 'cover ... has ... a Shore D hardness of up to 60' refers to a plaque hardness measurement, as opposed to an on-the-ball measurement." (Ex. N – Cadorniga Report at D-19).    As shown above, however, the plaque measurements obtained by Bridgestone, however, show that ███████████████████ ████████████████████████████████████████████:

| Ball type | Caulfield's Reported Average Shore D Hardness | |
|---|---|---|
| ◄NXT Tour► ("NT2") | | ███ |
| ◄NXT-Tour► ("NT3") | | ███ |
| DT So/Lo ("D1") | | ███ |
| ◄DT So/Lo► ("D2") | | ███ |
| Pinnacle Exception ("E1") | | ███ |
| Exception ("E2") | | ███ |

(Ex. S – Caulfield's "Cover Hardness (Packer).xls" Spreadsheet).

Thus, the data provided by Caulfield shows that, even when measured using the method preferred by Cadorniga, none of the accused Acushnet golf balls has a cover with "a Shore D hardness of up to 60" as required by claim 1 of the '817 patent.

Even disregarding Caulfield's Shore D hardness measurements, as Cadorniga does, the data upon which Cadorniga actually relies shows that certain ◄NXT●Tour►,

DT So/Lo and PTS So/Lo golf balls have a cover Shore D hardness greater than 60. (Ex. N – Cadorniga Report at D-20, Table D-10). Specifically, the Acushnet documents on which he relies show



. Thus,

Bridgestone has offered no analysis of this limitation under the doctrine of equivalents.

## VII.    CONCLUSION

For the foregoing reasons, Acushnet respectfully requests that the Court grant its motion.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Alan M. Grimaldi
Joseph P. Lavelle
Kenneth W. Donnelly
Brian S. Seal
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel: (202) 783-0800

Dated: April 13, 2007
Public Version Dated: April 20, 2007
790313 / 28946

By:  /s/ David E. Moore
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 North Market Street
P. O. Box 951
Wilmington, DE 19899-0951
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant*
*Acushnet Company*

23

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### <u>CERTIFICATE OF SERVICE</u>

I, David E. Moore, hereby certify that on April 20, 2007, the attached document was hand

delivered to the following persons and was electronically filed with the Clerk of the Court using

CM/ECF which will send notification to the registered attorney(s) of record that the document

has been filed and is available for viewing and downloading:

Jack B. Blumenfeld
Maryellen Noreika
Leslie A. Polizoti
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
Wilmington, DE 19801

I hereby certify that on April 20, 2007, I have Electronically Mailed the documents to the

following:

Robert M. Masters
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, D.C. 20005
RobMasters@paulhastings.com

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

680012 / 28946