# EXHIBIT 14

Page 1

```
 1              IN THE UNITED STATE DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE
 2
      BRIDGESTONE SPORTS CO., LTD.,       )
 3    AND BRIDGESTONE GOLF, INC.,         )
                                          )
 4         Plaintiffs,                    )
                                          )    C.A. No. 05-132
 5    vs.                                 )    (JJF)
                                          )
 6    ACUSHNET COMPANY,                   )
                                          )    HIGHLY
 7         Defendant.                     )    CONFIDENTIAL
      _____)
 8    ACUSHNET COMPANY,                   )
                                          )
 9         Counterclaim Plaintiff,        )
                                          )
10    vs.                                 )
                                          )
11    BRIDGESTONE SPORTS CO., LTD.,       )
      AND BRIDGESTONE GOLD, INC.,         )
12                                        )
           Counterclaim Defendants.       )
13
14
                       Lisle, Illinois
15              Thursday, March 29th, 2007
16         The Videotape Deposition of:  EDWARD CAULFIELD,
      Ph.D., called for oral examination by counsel for
17    Plaintiffs/Counterclaim Defendant Pursuant to Notice,
      at 3003 Corporate West Drive, Lisle, Illinois, before
18    Shannon M. Frey, CSR No. 84-002277, RMR, CRR,
      beginning at 9:00 a.m., when were present on behalf of
19    the respective parties:
      ---------------------------------------------------
20                 DIGITAL EVIDENCE GROUP
              1111 16th Street, NW Suite 410
21                 Washington, DC 20036
                     (202) 232-0646
22
23
24
```

Page 79

```
 1          A.    Yes, for statistical surveys dealing with

 2    operators of equipment random sample, but all we're

 3    really trying to do here is not pick the balls out of

 4    the sleeves in any particular fashion.

 5               We get a dozen golf balls, randomly

 6    pick the balls from the particular dozen that we may

 7    have with that particular serial number.

 8          Q.    Okay.  Well, I think I'm looking at it in

 9    two ways.

10               I mean, did you have a -- I mean,

11    there's sort of two -- you have to pick the packaging

12    and then you have to pick the balls out of the

13    packaging?

14          A.    Right.

15          Q.    Okay.  So did you have a sampling plan for

16    actually selecting the packaging -- the packages?

17          A.    No.  It turned out to be random by the way

18    we did it, but we didn't really have a plan to make it

19    random.  We just basically bought golf balls through

20    various sources across the United States and some from

21    Japan or they were supplied to us by the attorneys,

22    particularly the ones that came over from Japan.

23          Q.    Okay.

24          A.    So that's, in my opinion, pretty random.
```

# EXHIBIT 15

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| BRIDGESTONE SPORTS CO., LTD., and BRIDGESTONE GOLF, INC., | Case No. 05-CA-132 (JJF) |
| Plaintiffs, | |
| v. | |
| ACUSHNET COMPANY, | **EXPERT REPORT OF DR. CLIFTON D. SUTTON** |
| Defendant. | |
| ACUSHNET COMPANY, | **HIGHLY CONFIDENTIAL – SUBJECT TO STIPULATED PROTECTIVE ORDER** |
| Counterclaimant, | |
| v. | |
| BRIDGESTONE SPORTS CO., LTD., and BRIDGESTONE GOLF, INC., | |
| Counterdefendant. | |

neither articulates how the balls that were tested are representative of the accused products at large, nor applies the proper statistical methods to reach a defensible conclusion about what Dr. Caulfield's tests of the sample balls can tell us about the entire universe of accused balls. This approach has lead to obviously erroneous results.[3]

14.    Mr. Cadorniga offers only one conclusory statement as a justification for his sweeping infringement conclusions. On page 6 of his expert report on invalidity, he states:

> [T]he number of samples of the accused Acushnet golf balls tested is more than sufficient to comprise a statistically significant sample.

Mr. Cadorniga does not explain this conclusion and I do not agree with it. His conclusions are not supported by sufficient data because the tested golf balls are an inadequate basis upon which to draw conclusions about the entire population of accused golf balls. Mr. Cadorniga has failed to follow the necessary procedures and methods to ensure that the tested balls provide adequate data from which to extrapolate results on the entirety of the accused products.

15.    First, Mr. Cadorniga and Dr. Caulfield have not shown that the balls tested were randomly selected from the entire population of interest. Neither have Dr. Caulfield nor Mr. Cadorniga provided any explanation of how the balls they have tested are representative of all of the accused products.[4] Yet it is a basic principle of statistical

---

[3] For example, in Section G of Exhibit E, he has concluded that the accused Pro V1 golf balls "literally have a core surface hardness that is higher than the hardness at the center of the core by 8 to 20 degrees JIS-C," apparently basing the conclusion on his calculated sample mean of 19.5. However, his analysis ignored the fact that two of the five tested golf balls had hardness differences of 20.4 and 20.8. This shows that his reliance on the sample mean is flawed because his data set contained balls that did not fall within the claim, yet he concluded that all of the accused products fell within it.

[4] Based upon my review of Dr. Caulfield's report I understand that Dr. Caulfield obtained the balls tested primarily though purchasing them at retail outlets. *See* Caulfiled Inf. Rep., Ex. 4 at 1. Based upon discussions with Dr. Felker, who had reviewed the photographs in Exhibit 34 to the Caulfield Infringement Report, I understand that the majority of these balls were obtained between 2005 and 2006. Because we do

inference that the members of a sample should be representative of the population that they will be used to make inferences about. In this case, the balls tested should be representative of the entire population of accused golf balls. In reaching his infringement conclusions, Mr. Cadorniga has ignored the fact that there are constant changes, both intentional and unintentional, to the properties of golf balls as they are manufactured, and that balls produced in one time period may not have the same properties as those produced in another time period. It is my opinion that the products sampled must be selected so as to be representative of the entire breadth of conditions under which they were produced. Mr. Cadorniga and Dr. Caulfield have, at most, provided data sufficient to determine the properties of golf balls produced under the exact conditions that the tested balls were produced.

16.     Further, it is well known that to be proper, a set of experimental units should be randomly drawn from the population of interest. That is, steps must be taken to ensure that the balls are selected randomly, and are not selected from a narrower set than the entire population at large. Mr. Cadorniga bases his opinion on balls that were not randomly selected from the population at large. He considers balls that were selected from a relatively small number of boxes, which may be representative of only a small proportion of the population of accused golf balls.

17.     Second, Mr. Cadorniga does not show that the number of balls tested is sufficiently large so as to form reliable conclusions. It is a fundamental principle of statistics that, when the sample size is decreased, the amount of uncertainty in the conclusions that can be drawn based upon that sample is increased. Mr. Cadorniga

---

not know if these balls were manufactured at many different times over the accused period, we cannot know that the balls tested are representative of the entire populations of the accused balls.

27.    To illustrate the danger in making an inference based on a small sample which may not be representative of the population from which it was drawn, we can consider the core surface hardness values for the D2 golf balls. If just the 12 balls from the FF group are used to produce a 95% confidence interval for the mean core surface hardness, the resulting interval is (74.3, 75.9). Thus using just the 12 balls from the FF group results in 95% confidence that the population mean is between 74.3 and 75.9. Yet when all 84 of the D2 balls are used to produce an estimate of the mean core surface hardness, the estimate is 82.5. This estimate falls well outside of the confidence interval obtained from the 12 balls in the FF group. Since an estimate of the population mean obtained from using all of the D2 balls should be considered to be more trustworthy than an estimate based on just the 12 balls from the FF group, it can be seen that the inference based on just the small sample of balls from the FF group appears to be rather misleading.

28.    It is therefore my conclusion that the sample of five P2 balls that Dr. Caulfield studied is a poor basis for drawing any statistically sound conclusions about the population of ◄Pro V1●392► balls. As a practicing statistician, I would always feel uncomfortable making any conclusions about a large, more than 100 million count population using a sample of only five observations, particularly if the sample was not randomly selected from the population in a careful manner. That is, based upon this data, I could not say as a statistician with any reasonable degree of scientific certainty that the property at issue exists across the population, as Mr. Cadorniga has so opined.

### B.  Mr. Cadorniga Inappropriately Focuses on the Sample Mean

29.    Dr. Caulfield and Mr. Cadorniga err further in focusing on estimates of means in their reports. This approach, relying on a simple point estimate of a mean, does

11

not by itself express the uncertainty which should be associated with the estimate. Since the uncertainty can be considerable when the sample size is very small, it is useful to consider an interval estimate for the mean hardness gradient of ◄Pro V1●392► golf balls. A 95% confidence interval for the mean hardness gradient based on Student's *t* statistic is (18.0, 21.0).[9] This suggests that one cannot be highly confident that the mean is below 20 (since the confidence interval includes values greater than 20). If one does a hypothesis test to determine if there is statistically significant evidence that the population mean is less than 20, the resulting p-value is 0.43.[10] Put simply, the p-value of 0.43 indicates that when the variability in the data is taken into account, a sample mean of 19.5 should not be taken to be meaningful evidence that the population mean is less than 20.[11]

      30.     It should be kept in mind that because we do not know how representative the five balls in the sample are of the entire population of ◄Pro V1●392► balls, there is additional uncertainty associated with the inferences reported here that cannot be accurately expressed in a quantitative manner.

      31.     It should be noted further that even though the use of a confidence interval conveys to some degree the uncertainty associated with estimating the mean, *the estimation of the mean is not the proper focus for the situation under consideration for*

---

[9] This is based upon an assumption of normality (that is, it is assumed that the distribution of hardness gradient values for ◄Pro V1●392► balls is a normal distribution). With such a small sample of observations, the reasonableness of this assumption cannot be adequately checked, which is another reason the sample size selected by plaintiff is unreliably too small. With a large sample size this interval estimation procedure is somewhat robust, meaning that in some cases it can perform decently even if the distribution underlying the sample values is not exactly normal. But with the small sample size here we should not expect much robustness and additional uncertainty should be attached to the result due to a violation of the assumptions on which the derivation of the procedure is based.

[10] Student's one-sample *t* test was used to obtain this p-value. It is sensitive to nonnormality, particularly when the sample size is very small, but with a sample size of only five there is little more that one can do other than to rely on the robustness of the *t* test.

[11] A small p-value, like 0.05 or 0.01, could be taken as strong evidence that the population mean is less than 20.

the ◄Pro V1●392► balls. Unless it is known that the distribution of hardness gradients for ◄Pro V1●392► balls is symmetric, it could be that the majority of hardness gradients exceed 20 even though the distribution mean is less than 20. (This could be the case if the hardness gradient distribution is negatively skewed.)

32.    Mr. Cadorniga has focused his analysis on the sample mean of the hardness gradient for the P2 balls. But inferences about the population mean give little information about the population proportions of hardness gradient values above and below 20. The confidence interval for the proportion of ◄Pro V1●392► balls having a hardness gradient greater than 20 better addresses what should be the main focus. Yet due to the extremely small sample size, it is impossible to give an accurate estimate for this proportion. A 95% confidence interval for the proportion suggests that the percentage of ◄Pro V1●392► balls having a hardness gradient greater than 20 could be as great as 85.3 or as low as 5.3.

33.    In summary, Mr. Cadorniga's focus on the sample mean is misleading: it does not show the uncertainty that results from his reliance on a small sample size, and it does not convey much information about the proportion of accused balls that may be in infringement.[12]

C. Estimating the Proportion of Balls with a Hardness Gradient of at Least 20

34.    It is my opinion that the sample of P2 balls that Dr. Caulfield tested is inadequate to form a statistically sound conclusion about the population of ◄Pro V1●392► balls. However, for the purpose of illustration only, I have performed several

---

[12] The fact that a hypothesis test does not lead to the conclusion that the population mean is less than 20 indicates that the sample mean being less than 20 should not be taken as sufficient evidence that the population mean is less than 20. The data is not inconsistent with the hypothesis that the population mean is greater than or equal to 20.

analyses to illustrate the types of inferences that are meaningful for addressing the patent infringement claims under consideration. There is a large amount of uncertainty associated with these inferences due to the small amount of available data.

35.    Using the available data, and making the pure assumption that the five hardness measurements were obtained from a random sample of balls, an estimate of the proportion of P2 balls having a hardness gradient greater than 20 is 0.4 (corresponding to 40 percent).[13] Because the sample size is so small, there is a large amount of uncertainty associated with this estimate. One way to express the uncertainty associated with trying to estimate a population proportion from a random sample is to give an interval estimate (also known as a confidence interval) instead of a point estimate. A 95% confidence interval for the proportion of P2 balls having a hardness gradient greater than 20 is (0.053, 0.853).[14] This confidence interval is very wide due to the small sample size, and the wideness of the interval suggests that there is a great deal of uncertainty associated with trying to estimate a population proportion based on a sample of only five golf balls.

36.    Although it is very wide because of the uncertainty in the estimate, the confidence interval suggests that as many as 85% of all ◀Pro V1●392▶ balls could have a hardness gradient greater than 20.[15] It should be kept in mind again that because we do not know how representative the five balls in the sample are of the entire

---

[13] This is based upon the observation that two of the five balls measured, or 40%, had a hardness difference greater than 20.

[14] One could also consider a 90 percent or a 99 percent confidence interval. Ninety five percent is a commonly used confidence level.

[15] The Clopper-Pearson interval estimator, which is exact, was used instead of the commonly used approximate Wald confidence interval, since the Wald interval estimator can be extremely inaccurate when the sample size is small. The Blyth-Still-Casella interval is another possibility. It is less commonly used than the Clopper-Pearson interval. For the situation under consideration, the Blyth-Still-Casella method results in a 95% confidence interval of (0.076, 0.811).

14

# EXHIBIT 16

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF DELAWARE

 3    - - - - - - - - - - - - - - - -x

 4    BRIDGESTONE SPORTS CO., LTD.,   :

 5    And BRIDGESTONE GOLF, INC.,     :

 6         Plaintiffs,                :

 7    v.                             : C.A. NO. 05-132(JJF)

 8    ACUSHNET COMPANY,               :

 9         Defendant.                 :

10    - - - - - - - - - - - - - - - -x

11    ACUSHNET COMPANY,               :

12         Counterclaim Plaintiffs,   :

13    v.                             : C.A. NO. 05-132(JJF)

14    BRIDGESTONE SPORTS CO., LTD.,   :

15    And BRIDGESTONE GOLF, INC.,     :

16         Counterclaim Defendant.    :

17    - - - - - - - - - - - - - - - -x HIGHLY CONFIDENTIAL

18     Livenote/Videotaped Deposition of DR. CLIFTON SUTTON

19                    Washington, D.C.

20                 Saturday, March 3, 2007

21                      9:00 A.M.

22    Reported by:  Cassandra E. Ellis, RPR
```

Page 40

1    contain the true value.

2         Q.    Okay.  If you go to page four of your

3    report, in footnote two -- I'm sorry, strike that

4    -- I'm going to go to page five, paragraph 15, the

5    first sentence of that paragraph you see, first,

6    Mr. Cadorniga and Dr. Caulfield have not shown the

7    balls tested were randomly selected from the entire

8    population of interest; do you see that sentence?

9         A.    Yes.

10        Q.    Okay.  How would you show that the balls

11   were randomly selected from the entire population

12   of interest?

13             MR. DUBIANSKY:  Object to form.

14   BY MR. WHITE:

15        Q.    What would you want to see to be satisfied

16   that Dr. -- Mr. Cadorniga and Dr. Caulfield

17   selected their golf balls randomly from the entire

18   population of interest?

19        A.    I would need to see a description of how

20   they chose the golf balls and -- and see whether or

21   not it conformed to random sampling.

22        Q.    Okay.  Do you know, if you were to go to a

1    sporting goods store today, and buy a dozen

2    Titleist golf balls, do you know whether or not you

3    would be able to determine when those balls were

4    made?

5            MR. DUBIANSKY:   Object to form.

6        A.   I -- I'm not that familiar with the

7    packaging of the golf balls.

8        Q.   Okay.

9        A.   Whether they have dates on them or not, I

10   don't know.

11       Q.   Let's assume that they do not, for the

12   next question.   If that were the case, how would

13   you know whether you have accurately covered the

14   entire population of interest?

15       A.   Are you still referring to buying one box

16   of golf balls, or --

17       Q.   Well, if you're going to select -- if you

18   cannot tell from purchasing golf balls when they

19   were made how would you then ensure that the golf

20   balls were randomly selected from the entire

21   population of interest?

22       A.   I'm not sure that one could be certain

Sutton, Dr. Clifton                    HIGHLY CONFIDENTIAL                    March 3, 2007
                                        Washington, DC

Page 42

1    that something was a random selection if the date

2    was important.

3         Q.    But in our case you've been asked to

4    assume that the date was important because there

5    are changes over time; is that correct?

6              MR. DUBIANSKY:  Object to form.

7         A.    I was told that I could assume that.

8         Q.    And you did, in fact, assume that; is that

9    correct?

10             MR. DUBIANSKY:  Object to form.

11        A.    I don't think I really needed to make that

12   assumption.  The data, itself, strongly indicates a

13   lack of homogeneity in the population of these golf

14   balls.

15        Q.    Okay.  And you have no information as to

16   how Acushnet distributes its golf balls, and

17   whether they ship all their balls to a certain

18   location for an entire year or --

19        A.    That is correct, I do not know.

20        Q.    Okay.  And do you know whether or not if

21   you purchase a -- a box of a dozen golf balls

22   whether or not each of those golf balls would have

Sutton, Dr. Clifton

HIGHLY CONFIDENTIAL
Washington, DC

March 3, 2007

Page 45

1     Q.    Okay.

2     A.    And you could break up the time period

3   under consideration into disjoint intervals.   And

4   then would you randomly sample golf balls from each

5   of those different time periods.   I think that

6   would be a good way to -- to have sampled, here.

7     Q.    When you say break up the time period do

8   you mean the time period of manufacture of the golf

9   balls?

10    A.    Yes, like the -- the years covered by the

11   golf balls that we're concerned with, here.

12    Q.    Okay.  So if a golf ball's manufactured

13   over a two-year period of time you would want to

14   get some balls manufactured at the beginning of

15   that two-year period and some at the middle and

16   some at the end, is that what you mean by break up

17   the time period?

18    A.    Yes, that's the idea, right.

19    Q.    Okay.  Do you know how in this case, with

20   respect to the Titleist golf balls, how you would

21   ensure that you had selected golf balls that were

22   manufactured each of those time periods?

Page 46

```
 1        A.    I am not sure that one could --

 2        Q.    Okay.

 3        A.    -- ensure that.

 4        Q.    If you couldn't ensure that how would you

 5    then attempt to satisfy your condition on the

 6    selection of golf balls?

 7        A.    I didn't select any golf balls.

 8        Q.    Well, how would one -- what would satisfy

 9    you, if you assume that you cannot break up the --

10    you cannot select balls from different time

11    periods?

12        A.    You know, it may well be that there is not

13    going to be a good way to ensure that you have a --

14    a good, random sample, here.

15        Q.    And if that were the case, that you cannot

16    ensure that you have a good, random sample --

17        A.    Mm-hmm.

18        Q.    -- would your opinion in any way change?

19        A.    No.

20        Q.    No?

21        A.    To make a statement about the population

22    we should have a good, random sample from that
```

# EXHIBIT 17

LEXSEE 2006 U.S. DIST. LEXIS 2288



Positive
As of: Apr 13, 2007

JEFF PLAYER, et al., Plaintiffs, v. MOTIVA ENTERPRISES LLC, a successor in
interest to Star Enterprises, Defendant.

Civil No. 02-3216 (RBK)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

*2006 U.S. Dist. LEXIS 2288*

January 20, 2006, Decided

**NOTICE:**

2006 U.S. Dist. LEXIS 2288, *1

[*1] NOT FOR PUBLICATION

COUNSEL: For JEFF PLAYER, CHERLY PLAYER, CHESTER J. BESARA, SUSAN BURCAW, LEWIS BURCAW, DONALD BURTON, JACKIE BURTON, BRIAN L. CHORZELEWSKI, THOMAS CLAUSS, MARGARET CLAUSS, TERRI CONCANNON, JOHN FLOLO, THOMAS HAAS, JEFF JOHNSON, CYNTHIA JOHNSON, MICHAEL KAMMERHOFF, SUSAN KAMMERHOFF, HARRY KLEMOWITZ, ELIZABETH KLEMOWITZ, PHILLIP KRAJEWSKI, COLLEEN KRAJEWSKI, MARK LEASON, MICHELLE LEASON, DARLEEN LITTON, JAMES LITTON, DAVID LODI, JOSEPH MINNER, JANICE MONAHAN, SAMUEL PALMUCCI, KATHLEEN PALMUCCI, DANIEL RODRIGUEZ, MARTHA RODRIGUEZ, TOM SANKIEWICZ, TINA SANKIEWICZ, CALVIN SIMMONS, NORMA SIMMONS, THOMAS SLONAKER, ROSEANNE SLONAKER, BILL STEPHENSON, DOROTHY STEPHENSON, BARBARA TANNER, JOHN WALLACE, MARIA WALLACE, PAT WOLFENDEN,

DAVID WOLFENDEN, Plaintiffs: KEITH A. MCKENNA, MCKENNA, MULCAHY & MCKENNA MONTCLAIR, NJ.

For MOTIVA ENTERPRISES, LLC A SUCCESSOR IN INTEREST TO STAR ENTERPRISES, Defendant: JEFFREY W. MORYAN, CONNELL FOLEY LLP, ROSELAND, NJ.

JUDGES: ROBERT B. KUGLER, United States District Judge.

OPINION BY: ROBERT B. KUGLER

OPINION:

   OPINION

KUGLER, United States District Judge:

   This matter comes before the Court upon motions by Defendant Motiva Enterprises,

2006 U.S. Dist. LEXIS 2288, *2

[*2] LLC, ("Defendant" or "Motiva") for summary judgment of the claims of Plaintiffs Jeff Player, et al. ("Plaintiffs"), and to exclude Plaintiffs' experts Michael Gochfeld, M.D., Ph.D. ("Gochfeld"), R. Brian Ellwood, Ph.D. ("Ellwood"), Bruce M. Gallo ("Gallo"), and Daniel McDonald ("McDonald"). For the reasons set forth below, Defendant's motions will be granted in part and denied in part.

I. Background n1

n1 The following facts are taken from Defendant's statement of undisputed material facts, filed June 24, 2005, ("Undisputed Facts") and Plaintiffs' counterstatement of undisputed facts, filed Oct. 14, 2005, ("Counterstatement Facts"). Plaintiffs did not provide a separate statement of undisputed facts.

Although Plaintiffs dispute the majority of Defendant's statements of fact, Plaintiffs' counterstatements typically provide additional facts without setting forth any conflicting evidence. Where no actual disputes are presented, Defendant's statements will be treated as undisputed. See e.g., *Tofano v. Reidel, 61 F. Supp. 2d 289, 292 n.1 (D.N.J. 1999)* (citing *Fed. R. Civ. P. 56(e)* ("This court will . . . not consider assertions without evidential support as creating genuine issues of disputed fact."); *Talbot v. United States, 2005 U.S. Dist. LEXIS 25700, 2005 WL 2917463, *2 (D.N.J. 2005)* (noting that where the nonmoving party does not submit facts in opposition, "it is entirely appropriate for this court to treat all facts properly supported by the movant to be uncontroverted") (quoting *Allebach v. Sherrer, No. 04-287, 2005 U.S. Dist. LEXIS 15626, at *5 (D.N.J. 2005)*.

More generally, Plaintiffs' brief suffers from numerous typographical errors and a dearth of citations to page numbers in the record. This "alone warrants exclusion of the evidence." See *Orr v. Bank of America, NT & SA, 285 F. 3d 764, 774-75 (9th Cir. 2002)* (holding that party's failure to cite page and line numbers when referencing the deposition merits exclusion of evidence); *Huey v. UPS, Inc., 165 F. 3d 1084, 1085 (7th Cir. 1999)* ("Judges need not paw over the files without assistance from the parties."); *Nissho-Iwai Am. Corp. v. Kline, 845 F.2d 1300, 1307 (5th Cir. 1988)* (parties must designate specific facts and their location in the record).

2006 U.S. Dist. LEXIS 2288, *3

[*3]

This environmental contamination suit is brought by the current and former owners of twenty-seven parcels of residential property located in the Spring Hollow Subdivision in Gloucester Township, New Jersey. n2 Plaintiffs allege that emissions from Defendant's nearby Texaco gasoline service station contaminated their property and the Kirkwood Cohansey Aquifer, the underground water source for their potable wells.

n2 Among the original litigants to the suit were also former plaintiffs Michael and Susan Kammerhoff and Norma Simmons. The Kammerhoff plaintiffs were voluntarily dismissed, and plaintiff Norma Simmons died on August 26, 2000.

Contamination of the aquifer was first detected on April 5, 2000, when significant concentrations of the gasoline-related compound methyl tertiary butyl ether ("MTBE") was discovered in a drinking fountain at Camden County Community College. New Jersey Consumers Water Company ("Consumers"), the entity responsible for providing water to the college, conducted sampling of some of

2006 U.S. Dist. LEXIS 2288, *4

[*4] its wells and discovered significant amounts of gasoline-related compounds in municipal supply well number 8 ("CW-8"). Consumers took the well offline on April 10.

While investigating the contamination, the New Jersey Department of Environmental Protection ("NJDEP") detected a discharge of volatile organic compounds ("VOCs") from Defendant's service station, located at 585 Berlin Cross Keys Road ("Motiva site" or "contamination site"). n3 The NJDEP issued a Field Directive on April 12, 2000, requiring Motiva to investigate the source and extent of the discharge, to implement an interim treatment system, and to submit a remedial action work plan to the NJDEP. Defendant installed an interim recovery system and twenty-five monitoring and recovery wells between April and June 2000.

n3 VOCs generally associated with gasoline discharge include MTBE, benzene, toluene, ethylbenzene, xylene (collectively "BTEX"), and tertiary butyl alcohol ("TBA"). The NJDEP has issued a Ground Water Quality Standard ("GWQS") for each of these VOCs, also known as "gasoline-related compounds." MTBE, for example, has a GWQS of 70 parts per billion ("ppb").

2006 U.S. Dist. LEXIS 2288, *5

[*5]

The NJDEP issued a second directive on May 5, 2000, ordering Defendant to cease gasoline retail operations and provide treatment or an alternate source of water to replace CW-8. Defendant replaced the interim system with a permanent ground water recovery and treatment system in June 2000, and installed forty-one additional monitoring wells from June 2000 to present. As further required by the NJDEP, Defendant regularly sampled potable wells located on approximately forty residential properties in the vicinity of the Motiva site. Defendant detected small amounts of MTBE in thirteen of the residential wells it sampled. n4

n4 Although Motiva detected MTBE in thirteen residential wells, not all of these wells are owned by Plaintiffs to this litigation. Of the twenty-seven parcels of property at issue in this suit, only eight of the properties contain wells that ever tested positive for any gasoline-related compound.

Per the NJDEP directive, Motiva submitted a Remedial Investigation Work Plan/Remedial Investigation

2006 U.S. Dist. LEXIS 2288, *6

[*6] report on July 2000 and a Remedial Action Workplan ("RAW") on November 14, 2000. In its RAW, Defendant requested permission to cease sampling of the residential wells, contending that the MTBE detected in those wells could not have come from the Motiva site since the wells are located upgradient n5 or sidegradient from the site, and no emissions were detected in most of the monitoring wells between the Motiva site and the potable wells. n6 Motiva also claimed that recent literature indicated that traces of MTBE in groundwater could likely result from "non-point sources." (March 2001 Directive at 2.)

　　n5 The direction of water's flow in an aquifer is described as "downgradient," and the direction against the current is "upgradient."

　　n6 In particular, testing revealed emissions in monitoring wells 6-Shallow ("MW-6S") and 7-Deep ("MW-7D"), which lie between the Motiva site and the residential properties. However, the majority of upgradient monitoring wells did not test positive for gasoline-related contaminants. (NJDEP Directive, March 21, 2001 ("March 2001 Directive"), Mairo Cert. in Supp. Def.'s Mot. Summ. J., filed June 24, 2005 ("Mairo Cert."), Ex. 0, at 4.)

2006 U.S. Dist. LEXIS 2288, *7

[*7]

Plaintiffs' expert, R. Brian Ellwood, Ph.D ("Ellwood"), submitted a response to the RAW on January 17, 2001. In his report, Ellwood notes that as of January 17, 2001, "control of contamination at depth beneath the site, control of offsite contamination, and possibly control of contamination at the northern site boundary, has not been established." (Preliminary Report Sicklerville Road Groundwater Contamination ("Ellwood Report"), McKenna Cert. in Opp. to Def.'s Mot. Summ. J., filed Oct. 12, 2005 ("McKenna Cert."), Ex. F, at 2.) Ellwood also offered possible theories to demonstrate the plausibility of Defendant's responsibility for the MTBE in spite of Motiva's arguments to the contrary.

The NJDEP ultimately rejected Defendant's request to cease sampling of the residential wells in its March 2001 Directive on the basis that "there is insufficient evidence for Equiva to conclude that the MTBE detected in the 13 potable wells in the area did not originate from the Cross Keys Texaco site" and "that regardless of the source of the MTBE in these wells, which is obviously debatable, ongoing sampling of these wells is required *primarily due to their proximity to the site."* (March 2001

[*8] Directive at 2) (emphasis in original).

Also in the March 2001 Directive, the NJDEP approved a Classification Exemption Area ("CEA") for the site that excluded all but 1/10 of an acre of 583 Berlin Cross Keys Road (the Wallace Property). The CEA establishes the boundaries of a ground water plume where VOCs exceed the GWQS. n7

> n7 Plaintiffs dispute Defendant's characterization of the CEA, (Counterstatement Facts P 31), on the basis that Defendant proposed the CEA prior to conducting an actual delineation of the plume and that "the Plaintiffs' residential wells could only had [sic] been included in the CEA, if Defendant intended to supply a permanent public water supply to Plaintiffs' properties." While Plaintiffs' contention with the CEA is not entirely clear, Plaintiffs have not provided any evidence indicating that the NJDEP improperly approved the CEA or that the CEA was an inaccurate representation of the boundaries of contaminants in excess of the GWQS.

Through summer 2004, the NJDEP regularly reduced

2006 U.S. Dist. LEXIS 2288, *9

[*9] the testing requirements. By August 18, 2003, the NJDEP required only:

> annual sampling of the wells at 4, 7, 11, 13 and 14 Donna Marie Court; 2, 4, 6, and 8 Latham Way; 12 and 20 Spring Hollow Drive, and; 937 and 948 Sicklerville Road. For all the sampling events of the aforementioned potable wells conducted April 2002, the Department notes that all wells continue to exhibit no gasoline related contamination in excess of the Department's Drinking Water Quality Standards.

(NJDEP Directive, Aug. 18, 2003, McKenna Cert., Ex. D.)

The NJDEP approved shut down of the recovery and treatment system on April 30, 2004. (NJDEP Correspondence, Aug. 9, 2004, Mairo Cert., Ex. S., at 2.) Finally, on August 9, 2004, the NJDEP determined that "Defendant's Remedial Action Progress Reports "meet the conditions of the March 21, 2001 Remedial Action Workplan (RAW) approval. Shell Oil Products U.S. (Shell OPUS) is, therefore, in compliance with N.J.A.C. 7:14B-6." (Aug. 9, 2004, NJDEP Correspondence, Mairo Cert., Ex. S., at 1.)

**B. The Residential Properties**

Plaintiffs own twenty-seven respective residential properties near Defendant's gasoline station. n8 Twenty-six of the twenty-seven

[*10] properties-all but 583 Berlin Cross Keys Road ("the Wallace property")-contain potable wells located in the Kirkwood Cohansey Aquifer. Because Plaintiffs' properties are north/northeast of the contamination site, (Undisputed Facts p 38), they are considered upgradient or sidegradient of the contamination site, depending on whether CW-8 is pumping. n9

> n8 Plaintiffs' properties are: 850 Sicklerville Road; 565, 569, 581, and 583 Berlin-Cross Keys Road; 6, 9, 10, 12, 13, 14, 1, 16, 17, 18, 20 Spring Hollow; 2, 4, 6, and 8 Latham Way; 3, 4, 5, 7, 12, 14, and 15 Donna Marie Court.

> n9 CW-8 is located approximately 1,000 feet downgradient of the contamination site. (March 2001 Directive at 2.) While active, CW-8 pumps approximately 500 gallons per minute and causes the groundwater to flow southwest. (Ellwood Report at 2.) When CW-8 is not pumping, the groundwater flow is more westerly. (Ellwood Report at 2.)

Consistent with the requirements of the NJDEP directives, Defendant tested the Plaintiffs' residential wells

2006 U.S. Dist. LEXIS 2288, *11

[*11] for six gasoline-related compounds: benzene, toluene, ethylbenzene, xylenes, MTBE, and TBA. No testing detected any gasoline-related compound on eighteen of the properties. n10 Detection of compounds on the remaining eight properties was as follows:

. A single detection of 0.79 ppb toluene and ten detections of MTBE (highest at 15.5 ppb) at 4 Latham Way,
. Three detections of MTBE (highest at 0.76 ppb) at 14 Donna Marie Court,
. Three detections of MTBE (highest at 1.4 ppb) at 6 Latham Way,
. A single detection of 1.4 ppb toluene at 850 Sicklerville Road,
. A single detection of 0.4 ppb MTBE at 4 Donna Marie Court,
. A single detection of 0.3 ppb MTBE at 12 Donna Marie Court,
. A single detection of 1.2 ppb MTBE at 8 Latham Way, and
. A single detection of 0.3 ppb MTBE at 20 Spring Hollow Road.

The GWQS for toluene is 1,000 ppb and the GWQS for MTBE is 70 ppb. No gasoline-related compound was detected on any Plaintiff's property after April 2001.

n10 Plaintiff disputes these facts on the basis that:

> The Defendant has no data for any portable [sic] water supply of the Plaintiffs prior to July 2000. The Defendant never performed any delineation of the groundwater plume in the areas of the residential properties despite having actual knowledge of such contamination in MW-6, MW-7 and MW-12. See Gallo Certification and Exhibits C, D and E.

(Counterstatement Facts PP 46-48.) However, because Defendant makes no averment of the presence or absence of contamination prior to July 2000, Defendant's statements are not actually in dispute. Plaintiffs provide no fact indicating an inaccuracy in Defendant's statements regarding the testing of Plaintiffs' wells. Consequently, there is no actual dispute regarding the presence or amount of *detected* gasoline-related compounds.

2006 U.S. Dist. LEXIS 2288, *12

[*12]

According to the Certification of Julian Davies, a Project Manager for EnviroTrac, Ltd., an environmental consulting firm retained by Defendant to remediate the Motiva site, the NJDEP never restricted the consumption of water from Plaintiffs' potable wells, and never required Defendant to treat the water, provide Plaintiffs with an alternate source of water, or collect soil samples from the residential properties. n11 (Julian Davies Cert., Mairo Cert., Ex. R, at 2.)

n11 Plaintiffs dispute these statements by citing to Exhibit F of the McKenna certification; however, Exhibit F is the Ellwood report and therefore is not indicative of the NJDEP requirements. Plaintiffs nowhere cite of a statement by the NJDEP requiring Defendant to treat their water or provide them with an alternate water source, and therefore this fact is undisputed.

Since the fact of the contamination became known, several Plaintiffs have sold their property. Maria and John Wallace sold 583 Berlin Cross Keys Road for $ 350,000.00 in September

[*13] 2001, Plaintiffs Thomas and Tina Stankiewics sold 9 Spring Hollow Drive in July 2002 for $ 143,000.00, Barbara Tanner sold 17 Spring Hollow Drive for $ 134,000.000 in February 2002, Daniel and Maria Rodriguez sold 18 Spring Hollow Drive for $ 138,000.00 in July 2003, David Lodi sold 5 Donna Marie Court for $ 104,000.00 in September 2001, 13 Donna Marie Court was sold for $ 109,900.00 in July 2000, and 19, Spring Hollow Drive was sold for $ 133,900.00 in May 2001.

Defendant filed motions for summary judgment and to exclude experts on June 24, 2005, after requesting and receiving permission from this Court to extend by one week the date for the filing of dispositive and in limine motions. Briefs in opposition were due July 22, 2005, however, Plaintiffs instead filed an untimely request for an extension on August 2, 2005, and a second request on September 6, 2005, moving the deadline to September 30, 2005. On October 5, 2005, Plaintiffs filed another untimely request for an extension, and ultimately did not submit a complete Opposition until October 14, 2005. Nevertheless, because a district court should not grant a motion for summary judgment without examining the merits, *Stackhouse v. Mazurkiewicz, 951 F.2d 29,*.

2006 U.S. Dist. LEXIS 2288, *14

[*14] *30 (3d Cir. 1991)* (citing *Anchorage Assoc. v. Virgin Islands Bd. of Tax Rev., 922 F. 2d 168 (3d Cir. 1990))*, this Court will exercise its discretion to consider Plaintiffs' Opposition, even though it is untimely. Local Civ. R. 7.1(d)(5).

## II. Standard

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. A genuine issue of material fact exists only if

"the evidence is such that a reasonable jury could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. *Celotex, 477 U.S. at 330.* The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient

2006 U.S. Dist. LEXIS 2288, *15

[*15] to establish an essential element of the nonmoving party's case. *Id. at 331.*

Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*. To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Serbin v. Bora Corp., 96 F.3d 66, at 69 n.2 (quoting Celotex, 477 U.S. at 322);* *Heffron v. Adamar of N.J., Inc., 270 F. Supp. 2d 562, 568-69 (D.N.J. 2003)*. "If the non-movant's evidence on any essential element of the claims asserted is merely 'colorable' or is 'not significantly probative,' the court must enter summary judgment in favor of the moving party." *Heffron, 270 F. Supp. 2d at 569*

[*16]  (citing *Anderson, 477 U.S. at 249-50*).

### III. Motion to Exclude Expert Daniel McDonald

Defendant moves to exclude the testimony of Plaintiffs' expert Daniel McDonald ("McDonald") on the grounds that he is unqualified and his report is unreliable. n12 Admissibility of expert testimony is governed by *Federal Rule of Evidence 702* and the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*. n13 In the Third Circuit, the admissibility of expert testimony is contingent on the "qualifications" of the expert and the "reliability" of his methodology. *In re Paoli R.R. Yard PCB Litig., 35 F.3d 717 (3d Cir. 1994)* (interpreting *Daubert*); see also *Oddi v. Ford Motor Co., 234 F.3d 136, 145 (3d Cir. 2000)*.

> n12 Because this Court will grant Defendant's motion for summary judgment, it will not reach the merits of Defendant's motions to exclude experts Gochfeld, Ellwood, and Gallo.

> n13 After Daubert, *Rule 702* was amended to encompass the Daubert analysis:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Fed. R. Evid. 702.* While Daubert itself addressed only the admissibility of scientific evidence, the Court has since noted that courts' gatekeeping obligations extend to all expert testimony. *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 151, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)*.

2006 U.S. Dist. LEXIS 2288, *16

[*17]

## A. In Limine Hearing

In certain instances, courts are obligated to provide in limine hearings before applying Daubert to exclude expert testimony. *Padillas v. Stork-Gamco, Inc., 186 F.3d 412 (3d Cir. 1999).* A hearing is required, for example, where the court excludes an expert's conclusions on the grounds that they are "insufficiently explained and the reasons and foundations for them inadequately and perhaps confusingly explicated." Id. In other words, where a report is "conclusory and did not adequately

explain the basis for [the expert's] opinion or the methodology employed in reaching his conclusions," the "plaintiff needs an 'opportunity to be heard' on the critical issues of scientific reliability and validity." *Oddi, 234 F.3d 136, 152 (3d Cir. 2000)* (holding that the district court did not err "in granting summary judgment here without an in limine hearing") (quoting *Padillas, 186 F.3d at 417*). Where the evidentiary record is substantial, however, or the court has before it the information necessary to determine that the expert lacks "good grounds" for his conclusions, an in limine hearing

[*18] may be unnecessary. *Id. at 153.*

The evidence before this Court clearly establishes the process by which McDonald "arrived at his conclusions," *Oddi, 234 F.3d at 152*, and McDonald's report and deposition details the methodology underlying his determinations. As discussed below, this Court will exclude McDonald's testimony on the grounds that his analysis and methodology are baseless and inconclusive, not because his report is insufficiently explained. Additionally, Defendant's motion for summary judgment alerted Plaintiffs to the Daubert challenge, yet Plaintiffs neither requested a hearing nor offered any affidavit or evidence in support of McDonald. Accordingly, an in limine hearing is unnecessary.

## B. Qualifications

The Third Circuit instructs courts to "liberally" evaluate an expert's qualifications. *Oddi v. Ford Motor Co., 234 F.3d 136, 145 (3d Cir. 2000).* In particular, the Circuit has "eschewed overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications." *In re Paoli, 35 F.3d at 741* (citing *Hammond v. International Harvester Co., 691 F.2d 646, 652-53 (3d Cir. 1982)*)

2006 U.S. Dist. LEXIS 2288, *19

[*19] and *Knight v. Otis Elevator Co., 596 F.2d 84, 87-88 (3d Cir. 1979)).* This liberal treatment extends to the expert's substantive qualifications as well as his formal qualifications. Id.

Nevertheless, the Third Circuit has "also set a floor with respect to an expert witness's qualifications." *Elcock v. Kmart Corp., 233 F.3d 734, 742 (3d Cir. 2000).* To demonstrate when an expert would not be qualified under *Rule 702,* the Elcock Court offered the pre-Daubert case *Aloe Coal Co. v. Clark Equip. Co., 816 F.2d 110 (3d Cir. 1987),* which held a tractor salesperson unqualified to testify as an expert about the cause of a tractor fire. *Elcock, 233 F.3d at 742* (citing *Aloe Coal, 816 F.2d 110).*

In Elcock itself, the Court determined with "misgivings" that the district court had not abused its discretion by concluding that a psychologist with experience in obtaining employment for disabled individuals was qualified to testify to the possibility for vocational rehabilitation of the injured plaintiff. However, the Court acknowledged that it also would have upheld a decision to exclude the expert

2006 U.S. Dist. LEXIS 2288, *20

[*20] since "he seems most qualified to testify on a micro-level regarding the ability of a disabled individual to return to a specific job; he does not appear particularly qualified to testify on the macro-level regarding the number of jobs in the national or local economy that the disabled individual is able to perform." n14 *Elcock, 233 F.3d at 744.* Taken together, *Elcock* and *Aloe Coal* indicate that where a proposed expert's area of experience is adjacent to, but not actually encompassing, the subject matter of his testimony, he may be deemed unqualified.

> n14 The Court noted that it had "misgivings" about the expert's qualifications in spite of:
>> (1) [the expert's] general training in "assessing" individuals, which he received while earning his Ph.D. in psychology; (2) his experience, twenty years previous, helping drug addicts reenter the workforce; (3) his experience primarily in the last two years dealing with the Virgin Islands Division of Workers' Compensation, which he had advised regarding the ability of approximately fifty to sixty-five disabled employees to return to their previous jobs; (4) his past experience as an expert witness making lost earning capacity assessments; (5) his attendance at two seminars regarding vocational rehabilitation, and his stated familiarity with the literature in the area; (6) his membership in two vocational rehabilitation organizations, both of which place no restrictions on membership; and (7) the fact that when [the expert] was in school, a degree in vocational rehabilitation therapy was not available, but that he received similar training nonetheless.

> *Elcock, 233 F.3d at 741.*

2006 U.S. Dist. LEXIS 2288, *21

[*21]

McDonald has worked as a licensed appraiser in New Jersey for approximately twenty-two years. Defendant argues that McDonald is nevertheless unqualified to testify to the diminution in value of Plaintiffs' properties because McDonald has no experience in appraising contaminated property. Defendant notes that McDonald has never appraised property allegedly contaminated by emissions from a gasoline station and has never acted as an expert in a situation involving contamination of the groundwater or allegations of a leaking underground storage tank. (Daniel McDonald Dep. ("McDonald Dep."), Mairo Cert.

in Supp. Def.'s Mot. to Exclude Plaintiffs' Expert Daniel McDonald, Ex. C, at 23-24.) Defendant also points out that McDonald did not entirely understand the Ellwood and Gallo reports upon which he relied, including the charts indicating the presence and degree of contaminating agents on the property. (McDonald Dep. at 55-56.)

This case lies squarely between *Aloe Coal* and *Elcock*. Although McDonald is an experienced appraiser, no evidence indicates that he has any experience appraising contaminated properties or is qualified to value the effects of stigma on property values. Just

2006 U.S. Dist. LEXIS 2288, *22

[*22] as a psychologist experienced in assisting individuals to find work may be unqualified to testify about the general availability of jobs in the economy, an individual able to appraise an uncontaminated property may have no grounds for appreciating the devaluation of the same property under unique conditions of contamination or stigma. Because nothing in McDonald's experience indicates knowledge or expertise in issues of contamination, he is unqualified to testify to the loss of value to Plaintiffs' properties arising from the alleged contamination.

### C. Reliability

Because expert testimony has the potential to bear considerable weight with a jury, the district court functions as a gatekeeper responsible for assuring "that the scientific methodology upon which the expert opinion is founded is reliable" and that "the expert's conclusion is based on good grounds." *In re Paoli, 35 F.3d at 732-33.* To ascertain "reliability," the court must examine a number of factors, both those established in *Daubert* and those previously enumerated by the Third Circuit in *United States v. Downing, 753 F.2d 1224 (3d Cir. 1985). Oddi, 234 F.3d 136, 145*

2006 U.S. Dist. LEXIS 2288, *23

[*23] (citing *Paoli II, 35 F.3d at 742*). In particular, the court must consider:

(1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Paoli II, 35 F.3d at 742 n.8*; see also *Elcock, 233 F.3d at 746* (noting that "each factor need not be applied in every case"). The party wishing to introduce the testimony bears the burden of establishing "by a preponderance of the evidence that their opinions are reliable." *Paoli, 35 F.3d at 744.*

Of course, an expert's opinion need not be "perfect," and judges may not substitute their opinions for those of an expert. *Paoli, 35 F.3d at 744*; see also *Crowley v. Chait, 322 F. Supp. 2d 530, 536 (D.N.J. 2004).*

2006 U.S. Dist. LEXIS 2288, *24

[*24] However, courts also need not admit mere conclusions or "opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 608 (D.N.J. 2002)* (quoting *General Elec. Co. v. Joiner, 522 U.S. 136, 145-46, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)).*

Mere assumptions, without causal evidence or methodological analysis may be inadmissible. *In re TMI Litig., 193 F.3d 613, 667-68 (3d Cir. 1999).* Conclusions based only on the expert's experience, *Oddi, 234 F.3d at 140-41,* and testimony founded on methods that are not generally accepted or lack testable hypotheses may also fail to surmount the *Daubert* standard, *Elcock, 233 F.3d at 746.* Furthermore, conclusions based on analogies that are too dissimilar to the subject of the testimony may also merit exclusion. *General Elec., 522 U.S. at 144* (rejecting expert testimony that plaintiff's cancer was due to exposure to PCBs when the testimony was based on animal studies

2006 U.S. Dist. LEXIS 2288, *25

[*25] of infant mice that had developed cancer after exposure to PCBs).

In response to Defendant's motion to exclude McDonald's testimony, Plaintiffs argue that "Mr. McDonald's opinions are based upon credible facts, NJDEP records, the reports of Plaintiffs' liability experts and individual appraisal reports prepared for each residential property." (Pls' Opp. Def.'s Mot. Summ. J. ("Opp."), filed Oct. 12, 2005, at 30.) However, McDonald testified in his deposition that he relied only on the Gallo and Ellwood Reports, and he specifically testifies that he did *not* "review any correspondence from the NJDEP related to this site." (McDonald Dep. at 15.)

n15

n15 Plaintiffs also argue that "Defendant does not attack the methodology, standard or factual basis for the opinions," (Opp. at 31), however, it is quite clear from Defendant's motion that the reliability of McDonald's methodology is hotly disputed.

In spite of Plaintiffs' arguments to the contrary, this Court cannot avoid the conclusion that McDonald's methodology

[*26] is entirely unreliable. In his report, McDonald determines that the value of Plaintiffs' properties with no evidence of contamination should be discounted 35% percent and property with onsite contamination should be discounted by 66%. (McDonald Report ("McDonald Report"), Mairo Cert. in Support of Def.'s Mot. Exclude Pl.s' Expert Daniel McDonald, Ex. B., at 31, 33.) McDonald reached the 35% and 66% figures without discussing, or even recognizing, the extent to which the property was actually contaminated. As demonstrated by his ignorance of the "ND"/Not Detected signifier in the Gallo and Ellwood Reports, McDonald did not know how to read the charts denoting the levels of contamination. (McDonald Dep. at 56.) Nor had McDonald ever conducted any physical inspection of or visit to the properties prior to writing the report. n16 (McDonald Dep. at 15-16.)

        n16 McDonald also appeared unaware of the fact that Plaintiffs' properties are served by potable wells, even though the potable wells contain the evidence of contamination.

        Q: Do you know whether or not the plaintiffs' properties have potable wells?

        A: It's my understanding that they are hooked to a public water system.

Q: If each of the properties did in fact have a potable well, would that be a factor that you were consider relevant in your analysis?
Mr. McKenna: You may want to review the documents that you referenced in your report to assist you in this area. Just separate the Ellwood and Gallo reports. I'm going to go to the men's room.
(Whereupon, a recess is taken.)
Mr. Mairo: I am going to object that Mr. McKenna was basically coaching the witness.

        Back on the record.
A: Your question about whether or not each of these houses were, was, had their own private well on site –
Q: Uh-huh?
A: –it's my understanding that each house is served by wells within and around the neighborhood and that Consumer, Consumers Water Company owns those wells and supplies that water to the homes.
(McDonald Dep. at 36.)

[*27]

Furthermore, to quantify the stigma attached to Plaintiffs' properties, McDonald relies upon a highly misleading analogy with a site of profoundly contaminated residential properties in Dover Township. (McDonald Report at 27.) Specifically, McDonald compares Plaintiffs' properties with "an area of Dover Township that had ground water contamination from Union Carbide and . . . Ciba Geigy that resulted in what was commonly known as a cancer cluster among children," meaning "an inordinate number of children with cancer." (McDonald Dep. at 158-59.) McDonald selected the Dover site not because of its comparability, but because McDonald "didn't know of any other cases that, where the data was as readily available." (McDonald Dep. at 159.)

Employing the Dover analogy, McDonald determined that the property in the Dover site is in the final stages of recovery and continues to suffer a stigma loss of 13%. Because McDonald considered Plaintiffs' properties in the early stages of recovery, McDonald determined that they must bear a stigma discount of at least two or three times that of the Dover site, resulting in a discount of 35%. n17 However, the severity of the contamination and resulting

[*28] illness among Dover residents undercuts any grounds for comparison with Plaintiffs' properties where there were few detections of contaminants and no reported physiological effects.

n17 McDonald reaches the 35% devaluation figure with the following methodology:

> The subject properties are in the early stages of monitoring, and clean up of the ground water contamination. The properties from Dover Twp. are beyond the clean up stage and into the final stage of recovery, yet they still show a 13% loss in value as compared to similar properties outside of the contaminated area. The subject area is in stage D of recovery, which is the beginning of the remediation process. Based on the acceptance of the Detrimental Condition Model as a viable process for valuing Detrimental Conditions to Real Estate, by the appraisal community and the Subcommittee on Housing and Community Opportunity of the House Committee on Financial Services, it would be logical to assume that the discount to the properties which are the subject of this report, would be 2 to 3 times that of properties in the final stage of recovery. In this case a discount of 35% would be considered reasonable.

(McDonald Report at 31.)

[*29]

The methodology employed to reach the 66% figure is equally unreliable. To assess the value of properties with some evidence of contamination, McDonald sent an email to thirteen financial lenders to determine whether they would "lend on a property that has known contamination, or the stigma of contamination, to the ground water." (McDonald Report at 32.) Of the thirteen lenders, six replied. One of those refused to comment, and one said that it would loan given certain circumstances. The other four lenders stated that they would not lend on a property that is contaminated, but the content of their brief responses suggested that they understood the email hypothetical to denote property that was actually contaminated and out of compliance with state requirements. n18

n18 Interbay Funding, for example, qualified their statement that they would not lend by noting, "The property would have to be completely cleaned up. They would have to file all necessary documents to the state of NJ and we would require something from the state telling us the property is cleaned up." (McDonald Report at 32.) From this, McDonald concluded that Interbay Funding would not lend on properties such as Plaintiffs', without considering that none of Plaintiffs' properties were contaminated in excess of state standards.

[*30]

From the results of the email test, McDonald concludes that there would be no buyers other than those who could pay cash. n19 McDonald then assessed the discount in value given cash-only buyers, extrapolating from this a discount of 66%. (McDonald Report at 33.) However, the reliability of the 66% figure is entirely invalidated by the overemphasis placed on the four responses to the email hypothetical, the misleading implication in the email hypothetical, suggesting a much greater contamination of the property than actually present, and the unclear calculations and assumptions underlying McDonald's arrival at 66%.

n19 In evaluating this data, McDonald states: The lenders that did respond have overwhelmingly stated that they would not approve the loan at all, or they would require substantial conditions to the loan. In the case of the subject properties, it can be assumed that a purchaser with private financing or cash would be the only potential buyer of houses in this area.

(McDonald Report at 32.)

2006 U.S. Dist. LEXIS 2288, *31

[*31]

Ultimately, McDonald's report does not fulfil any of the reliability factors. His method is untestable and arbitrary, without a generally accepted, established, or peer reviewed methodology, and his evaluation was conducted without any real standards. Because McDonald is unqualified and his evaluation is unreliable, Defendant's motion in limine to exclude his testimony will be granted.

## IV. Plaintiffs' Claims

### A. Negligence and Gross Negligence

To surmount a motion for summary judgment of a negligence claim, Plaintiffs must provide evidence such that a reasonable jury could find "breach of a duty of care and actual damages sustained as a proximate cause of the breach." *Muise v. GPU, Inc., 371 N.J. Super. 13, 35, 851 A.2d 799 (App. Div. 2004)* (citing *Weinberg v. Dinger, 106 N.J. 469, 484, 524 A.2d 366 (1987)); Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 45, 477 A.2d 1224 (1984)* ("The plaintiff must show a breach of duty and resulting damage to prevail in a negligence action."). Motiva argues that Plaintiffs have failed to establish damages and causation and requests summary judgment of Plaintiffs' gross negligence claim on the same basis.

[*32] n20

n20 Because the Court now finds that there is no evidence of any actual injury arising from Defendant's negligence, this Court will not address Defendant's causation argument.

The absence of an injury will preclude a negligence claim, even where a clear breach of duty is present. *Rocci v. MacDonald-Cartier, 323 N.J. Super. 18, 24-25, 731 A.2d 1205 (App. Div. 1999)* (affirming summary judgment for insufficient evidence of damages in defamation case and noting that "a plaintiff must present proof of a material question of fact as to both liability and damages") (citing *Norwood Easthill Assoc. v. Norwood Easthill Watch, 222 N.J. Super. 378, 384, 536 A.2d 1317 (App. Div. 1988)* (affirming summary judgment of malicious interference claim on basis that "plaintiff has suffered no injury or damage")). At the summary judgment stage, Plaintiffs must provide actual evidence of injury and cannot simply rely upon "unsubstantiated allegations." *Trap Rock Indus., Inc. v. Local 825, 982 F.2d 884, 890 (3d Cir. 1992)*

2006 U.S. Dist. LEXIS 2288, *33

[*33] (reversing district court's denial of summary judgment). Just as "a residential customer not in residence during a power loss, or a commercial customer whose store was closed, might have no damages except the inconvenience of resetting clocks," *Muise, 371 N.J. Super, at 49*, the release of contaminants into the groundwater aquifer does not itself generate damages, unless Plaintiffs can show that they suffered harm.

Plaintiffs concede that they "have not presented and will not present claims for the present manifested bodily injury." (Undisputed Facts P 67.) However, they argue that they have adequately established damages for medical monitoring and property damage. They do not address their claim for emotional distress. n21

n21 Plaintiff argues that Defendant's motion for summary judgment of its negligence claim

should be denied on the basis of the doctrine of res ipsa loquitur. However, res ipsa loquitur acts only to "permit[] an inference of defendant's negligence" (i.e., that defendant acted in an unreasonable manner) under particular circumstances. *Jerista v. Murray, 185 N.J. 175, 192, 883 A.2d 350 (2005)*. The doctrine does not establish either causation or the presence of damages. See e.g., *Bahrle v. Exxon Corp., 279 N.J. Super. 5, 35, 652 A.2d 178 (App. Div. 1995)* (holding res ipsa doctrine inapplicable where "there was a factual dispute as to whether the contamination was a result of plaintiffs' own voluntary acts or neglect"). Accordingly, because Defendant is contesting only causation and damages, the res ipsa doctrine does not apply.

2006 U.S. Dist. LEXIS 2288, *33

[*34]

### 1. Medical Monitoring

Damages for medical monitoring are appropriate where a plaintiff exhibits no physical injury, but nevertheless requires medical testing as a proximate result of a defendant's negligent conduct. *Ayers v. Jackson Twp., 106 N.J. 557, 600, 525 A.2d 287 (1987).* The risk of injury need not be quantified to merit medical surveillance damages; however, the plaintiff must establish that the risk of serious disease is "significant." *Id. at 599-600; Campo v. Tama, 133 N.J. 123, 131, 627 A.2d 135 (1993)* (awarding medical monitoring damages to a plaintiff with a "fifty- to seventy-five-percent chance of suffering a recurrence of cancer" due to the delay resulting from defendant doctor's malpractice). In the case of toxic exposure, "medical-surveillance damages may be awarded only if a plaintiff reasonably shows that medical surveillance is required because the exposure caused a distinctive increased risk of future injury." *Theer v. Philip Carey Co., 133 N.J. 610, 627, 628 A.2d 724 (1993).* Such damages are "not available for plaintiffs who have not experienced direct and hence discrete exposure to a toxic substance and who have not suffered

2006 U.S. Dist. LEXIS 2288, *35

[*35] an injury or condition resulting from that exposure." *Id. at 628.*

Low level contamination, "that is, contamination below the minimum level set by DEP for water remediation," typically is insufficient to establish injurious toxic exposure. *Muralo Co., Inc. v. Employers Ins. of Wausau, 334 N.J. Super. 282, 290-291, 759 A.2d 348 (App. Div. 2000)* ("Since it is clear that no untreated groundwater is ever entirely pure, we are satisfied that DEP standards are the most reliable guide for determining whether contamination causing damage . . . has occurred."). Here, contaminants have been detected in only eight of Plaintiffs' wells, and no detection has been even close to the GWQS. The NJDEP never restricted Plaintiffs' use of water from their potable wells, nor required Defendant to treat Plaintiffs' wells or to provide Plaintiffs with an alternate water source.

Plaintiffs rely on the testimony of Dr. Michael Gochfeld, Ph.D. ("Gochfeld"), to establish the significant health risks and necessity of medical surveillance following from the alleged contamination of Plaintiffs' property. However, nothing in Gochfeld's report concludes that the individual Plaintiffs themselves

2006 U.S. Dist. LEXIS 2288, *36

[*36] require medical monitoring under the circumstances. Rather, Gochfeld's report creates a medical monitoring program for a hypothetical target population without taking into consideration the actual exposure of any plaintiff. n22 (Gochfeld Dep. at 26-29.) Gochfeld prepared his report under the assumption that "there were known or actual or potential exposure to a variety of constituents of gasoline." (Gochfeld Dep. at 12.) He states in deposition that he had "no specific factual knowledge of the actual exposures in this case," and he confirms that he has never examined the individual Plaintiffs. (Gochfeld Dep. at 10, 29.)

n22 Gochfeld testifies in his deposition that he created his report without any specific information about the Plaintiffs:

Q: So, for example, in determining the percentage of the target population that was in high exposure category, that wasn't based on the ground water, your review of the ground water tables that were attached to Mr. Gallo's report?

A: It was not.

Q: That was based purely on just an assumption of yours?

A: It was an assumption based on experience with previous programs or programs that are currently underway in our communities.

Q: Having no specific factual knowledge of the actual exposures in this case?

A: That's correct, these are hypotheticals.

(Gochfeld Dep. at 28-29.)

2006 U.S. Dist. LEXIS 2288, *37

[*37]

Gochfeld himself notes that "whether a person exposed to MTBE requires medical monitoring depends in large measure on the level of exposure and the time over which it occurred" and notes that "clearly people that are exposed to MTBE casually would not require one." (Gochfeld Dep. at 24.) Furthermore, Gochfeld stated that he "probably would not" recommend medical monitoring for the minor and often single detections of MTBE on Plaintiffs' properties. n23 (Gochfeld Dep. at 46-50.) Consequently, Gochfeld's report does not establish that Plaintiffs require medical monitoring.

n23 Gochfeld also states that he would not even recommend medical monitoring for the one property with by far the highest detection of MTBE (13.8 ppb at 4 Latham Way) "on this data alone" because "it is possible that a person living there would only be drinking bottled water, would not be in the house very much." (Gochfeld Dep. at 50.)

Plaintiffs also appear to argue that their wells may have been more contaminated prior to the initiation of

[*38] Defendant's testing in July 2000. (Opp. at 20.) However, Plaintiffs provide no evidence suggesting that such exposure actually occurred or that any exposure prior to July 2000 was more than minimal. Plaintiffs also argue for the first time in their Opposition that they may have ingested water from contaminated sources besides the potable wells on their property. (Opp. at 20.) However, Plaintiffs offer no evidence that any Plaintiff actually consumed water from CW-8. Without any evidence supporting their theories, Plaintiffs cannot establish a claim for medical monitoring sufficient to survive summary judgment.

Because Plaintiffs have provided no evidence of a "distinctive increased risk of future injury" from the exposure, Plaintiffs are not entitled to damages for medical monitoring.

## 2. Property Damage

Defendant requests summary judgment of Plaintiffs' claims of property damage on the grounds that the contamination caused no actual damage to Plaintiffs' properties. n24 Instead of claiming that their property was physically harmed, Plaintiffs contend that the news of the contamination stigmatized their property, reducing its value in the minds of potential buyers.

n24 Defendant argues further that New Jersey law does not permit Plaintiffs to recover for stigma damages in the absence of some physical harm to their property. Because Plaintiffs have provided no evidence of any stigma to their property, the Court will not reach Defendant's alternative argument.

[*39]

In support of their claim for stigma damages, Plaintiffs offer the expert testimony of Daniel McDonald. However, as discussed previously, McDonald's testimony must be excluded as unreliable. Plaintiffs also argue that the testimony of individual Plaintiffs establishes a stigma discount to their property:

> Plaintiff Marie Wallace has submitted sworn Interrogatory statements documenting a $ 150,000.00 loss on the sale of her property. See Exhibit O to McKenna Certification. Other Plaintiffs have similarly provided certified answers to Interrogatories and Deposition testimony as to the loss in value through sales transactions, which occurred from the discharge. See Exhibit N-R to the McKenna Certification.

(Opp. at 20-21.)

This evidence fails to establish an injury. Exhibits N-R consist of contracts for sale and unexecuted contracts for sale of three of Plaintiffs' properties, including the Wallace property, leaving it to the Court's imagination to ascertain how these contracts demonstrate a loss in value. Wallace's testimony also fails to establish a stigma injury to the property.

Specifically, Wallace claims that she received a verbal offer for her asking price of

2006 U.S. Dist LEXIS 2288, *40

[*40] $ 500,000.00 from a man named "Amin," whose last name she cannot recall. (Marie Wallace Dep., McKenna Cert., Ex. 0, M.) Wallace claims that he reneged from the agreement after she told him about the release, however, the alleged offeror never gave Wallace the offer in writing and she has no evidence of the offer or "Amin's" motive for withdrawing, aside from her own testimony. Consequently, even construing this evidence in the light most favorable to Plaintiffs, no reasonable jury could find that Plaintiffs' properties were stigmatized on the basis of this evidence alone.

### 3. Emotional Distress

Defendant also moves for summary judgment of Plaintiffs' claim for emotional distress. Plaintiffs do not respond to this argument in their Opposition, and Defendant is entitled to summary judgment of Plaintiffs' emotional distress claim for Plaintiffs' failure to present evidence of significant distress or physical injury.

A claim for emotional distress cannot succeed absent evidence of physical injury or "severe and substantial" emotional distress, even where a person has a reasonable concern of an enhanced risk of future disease. *Ironbound Health Rights Advisory Com'n v. Diamond Shamrock Chem. Co., 243 N.J. Super. 170, 174-75, 578 A.2d 1248 (App. Div. 1990)*

[*41] (noting that "in the absence of physical injury, damages are allowed where the resultant emotional distress is severe and substantial" and listing cases). Without some physical injury, mere exposure to toxic chemicals does not give rise to a claim for emotional distress damages. *Id.* (holding plaintiffs unable to sustain emotional distress claim for exposure to chemicals manufactured at plant near their residences); *see also Mauro v. Raymark Indus., Inc., 116 N.J. 126, 137, 561 A.2d 257 (1989); Troum v. Newark Beth Israel Med. Ctr., 338 N.J. Super. 1, 17, 768 A.2d 177 (App. Div. 2001).* Because Plaintiffs provided no evidence of significant emotional distress or physical injury, Defendant's motion for summary judgment will be granted.

## B. Trespass

Defendant moves for summary judgment of Plaintiffs' claim for trespass. Plaintiffs argue that Defendant's "intentional refusal" to remove the contamination from their property and failure to install remediation equipment amounts to an intentional trespass. n25 (Opp. at 25.)

n25 It is unclear whether Plaintiffs allege negligent trespass since they discuss only the *Restatement (Second) of Torts § 158*, Intentional Trespass, in their Opposition. Unlike intentional trespass, negligent or reckless trespass requires evidence of "harm to the land, to the possessor, or to a thing a third person." *Rest. Torts 2d § 165; see also Burke v. Briggs, 239 N.J. Super. 269, 271, 571 A.2d 296 (App. Div. 1990)* (citing *Rest. 2d Torts § 158* with approval for another premise); *Karpiak v. Russo, 450 Pa. Super. 471, 481, 676 A.2d 270 (Pa. Super. 1996)* (affirming dismissal of trespass claim for entry of dust onto property since the "evidence failed to establish that the dust caused appellants harm"). As discussed previously, Plaintiffs have not provided any evidence of injury to their persons or property. Consequently, to the extent that Plaintiffs are claiming negligent trespass, Defendant is entitled to summary judgment.

[*42]

The Restatement (Second) of Torts defines intentional trespass as:

> One who intentionally and without a consensual or other privilege
> (a) enters land in possession of another or any part thereof or causes a thing or third person so to do, or
> (b) remains thereon, or
> (c) permits to remain thereon a thing which the actor or his predecessor in legal interest brought thereon in the manner stated in §§ 160 and 161, is liable as a trespasser to the other irrespective of

whether harm is thereby caused to any of his legally protected interests. *Rest. (2d) Torts § 158.*

As Defendant argues, New Jersey has moved away from "such common law claims as trespass and nuisance" in environmental pollution cases. *Mayor and Council of Borough of Rockaway v. Klockner & Klockner, 811 F. Supp. 1039, 1053 (D.N.J. 1993); Kenney v. Scientific, Inc., 204 N.J. Super. 228, 256, 497 A.2d 1310 (1985)* ("There is no need for us . . . to torture old remedies to fit factual patterns not contemplated when those remedies were fashioned."). Regardless of the continuing viability of trespass claims in the environmental context, however, Plaintiffs have

[*43] failed to come forward with any evidence supporting their claim and cannot survive summary judgment.

Plaintiffs note that they are "not arguing that Defendants intentionally caused the contamination of their property," but rather are claiming that "defendants have repeatedly refused to perform the horizontal and vertical delineation of the soil and groundwater contamination in the area of the residential properties." (Opp. at 25.) However, no evidence suggests that such measures were necessary to remove contaminants from Plaintiffs' properties. Rather, the record indicates that Defendant consistently complied with NJDEP requirements, including the installation and maintenance of a groundwater recovery system to rehabilitate the aquifer, and the NJDEP never required Defendant to install any sort of remediation equipment on any of the residences. Given that there has been no detection of a gasoline-related contaminant in any Plaintiff's potable well since April 2001, the argument that Defendant permitted contamination to remain on Plaintiffs' properties lacks any viable evidentiary foundation. Defendant's motion for summary judgment of Plaintiffs' trespass claim will be granted.

2006 U.S. Dist. LEXIS 2288, *44

[*44] **C. Strict Liability**

Plaintiffs originally claimed a cause of action for strict liability under the theory that the handling, storage, or use of gasoline constitutes an abnormally dangerous activity. However, Plaintiffs voluntarily dismissed this claim in their Opposition. (Pl.'s Opp. at 3.) Accordingly, the Court will not address the merits of Plaintiffs' strict liability claim.

**D. Environmental Statutes**

**1. New Jersey Environmental Rights Act**

Plaintiffs allege a right to recover under the New Jersey Environmental Rights Act ("ERA"), *N.J.S.A. 2A:35A-1 et seq.* Defendant requests summary judgment on the grounds that Plaintiffs have not satisfied the ERA'S notice provision, *N.J.S.A. 2A:35A-11*, and that an ERA claim is not actionable where the NJDEP has acted to institute and oversee remediation of the contamination.

*Section 4(a) of the ERA*, permits "any person" to "maintain an action in a court of competent jurisdiction against any other person to enforce, or to restrain the violation of, any statute, regulation or ordinance which is designed to prevent or minimize pollution, impairment or destruction

[*45] of the environment." *N.J.S.A. 2A:35A-4(a)*. Although the ERA itself does not create substantive rights, it confers standing on private persons to enforce other environmental statutes, including the New Jersey Spill Compensation and Control Act ("Spill Act"). *Rockaway, 811 F. Supp. at 1054*; *Allied Corp. v. Frola, 701 F. Supp. 1084, 1091 (D.N.J. 1988)*.

The NJDEP is "entrusted initially with the right to determine the primary course of action to be taken." *Howell Township v. Waste Disposal, Inc., 207 N.J. Super. 80, 95, 504 A.2d 19 (App. Div. 1986)* ("In order to be effective, [the NJDEP] must normally be free to determine what solution will best resolve a problem on a state or regional basis given its expertise and ability to view those problems and solutions broadly."). Consequently, the right of private parties to sue under the EPA is "an alternative to inaction by the government which retains primary prosecutorial responsibility." *Superior Air Prod. Co. v. NL Indus., Inc., 216 N.J. Super. 46, 58, 522 A.2d 1025 (App. Div. 1987)*; *Rockaway, 811 F. Supp. at 1054* ("The primary goal of the ERA is to limit

2006 U.S. Dist. LEXIS 2288, *46

[*46] lawsuits by private litigants to those instances where the government has not acted.").

A private ERA suit may be permitted even in the absence of complete government inaction if the NJDEP has "failed in its mission . . . failed or neglected to act in the best interest of the citizenry or has arbitrarily, capriciously or unreasonably acted." *Howell, 207 N.J. Super. at 96; Morris County Transfer Station, Inc. v. Frank's Sanitation Serv., Inc., 260 N.J. Super. 570, 578, 617 A.2d 291 (App. Div. 1992)* (permitting private ERA action where the NJDEP would not address violation for three years and had taken no enforcement actions against

contaminating defendant who continued operating its illegal facility two months after receiving a violation notice). Where NJDEP "action subsequently proves sufficient to protect the environment," however, NJDEP "action under the Spill Act is preemptive of private rights under ERA." *Superior Air Prod., 216 N.J. Super. at 61.* The permissibility of private action must be evaluated on a case-by-case basis. Id.

Here the record indicates consistent and pervasive NJDEP oversight of the remediation process, requiring Defendant

2006 U.S. Dist. LEXIS 2288, *47

[*47] to regularly test Plaintiffs' wells and institute interim and permanent groundwater recovery systems. Plaintiffs have not claimed that the NJDEP failed to act or acted unreasonably, and there are no grounds for finding NJDEP inaction sufficient to permit a private ERA suit. Furthermore, as discussed below, Plaintiffs failed to give the NJDEP the requisite notice of their private suit. Accordingly, Defendant's motion for summary judgment of Plaintiffs' ERA claim will be granted.

**2. Notice**

Before a private party may commence an action under the ERA, the party must "at least 30 days prior to the commencement thereof, direct a written notice of such intention by certified mail, to the Attorney General, the Department of Environmental Protection, the governing body of the municipality in which the alleged conduct has, or is likely to occur, and to the intended defendant." *N.J.S.A. 2A:35A-11*. The notice provision is intended to give the government an adequate opportunity to intervene in the litigation and to allow the NJDEP:

> to exercise value judgments in individual cases, e.g., whether it will join in that litigation or enforcement proceeding,

2006 U.S. Dist. LEXIS 2288, *48

[*48] whether other actions it may have taken already with respect to the particular problem or offender would render the litigation subject to collateral estoppel or res judicata principles, whether its expertise would assist the court, whether broad State interests would be sacrificed unduly to regional or personal interests by the instigators of that litigation, etc.

*Howell*, 504 A.2d at 95; *Morris County*, 260 N.J. Super. at 578 (quoting Howell for same).

Because Plaintiffs did not provide the required thirty day notice to the NJDEP or the Attorney General, they are barred from further pursuing their claim under the ERA. Plaintiffs argue that Defendant is judicially estopped from claiming lack of notice for failure to raise this issue at an earlier stage in the case. Plaintiffs analogize the ERA requirement to that of an affidavit of merit, required in certain cases to avoid "unmeritorious and frivolous malpractice lawsuits at an early stage of litigation." *Knorr v. Smeal, 178 N.J. 169, 197-98, 836 A.2d 794 (2003)* (holding judicially estopped defendant's request for summary judgment for plaintiff's failure to file affidavit of merit) (citing

[*49] *Palanque v. Lambert-Woolley, 168 N.J. 398, 404, 774 A.2d 501, 505 (2001)*); *Ferreira v. Rancocas Orthopedic Assocs., 178 N.J. 144, 836 A.2d 779 (2003)* (same).

Defendant argues that the ERA notice requirement is more analogous to the notice of intent in the Resource Conservation and Recovery Act (RCRA), which the Supreme Court held to be a jurisdictional prerequisite to suit in *Hallstrom v. Tillamook County, 493 U.S. 20, 31, 110 S. Ct. 304, 107 L. Ed. 2d 237 (1989)* ("Compliance with the 60-day notice provision is a mandatory, not optional, condition precedent for suit."); *Public Interest Research Group of N.J., Inc. v. Windall, 51 F.3d 1179,* *1189 (3d Cir. 1995)* (holding notice provision jurisdictional in context of Clean Water Act ("CWA")); *Hawksbill Sea Turtle v. Federal Emergency Mgmt. Agency, 126 F.3d 461, 471, 37 V.I. 526 (3d Cir. 1997)* (holding notice provision jurisdictional in context of Endangered Species Act ("ESA")).

However, the language of the notice requirement in RCRA is not entirely analogous to that of the ERA. RCRA states, under the heading of "Actions prohibited" that "No action may be commenced . . . prior to 60 days after the plaintiff has

[*50] given notice of the violation to" the Administrator, the state and the alleged violator. *42 U.S.C.A. § 6972*. The ERA lacks the "no action may be commenced" language of the RCRA, CWA, and ESA, and states only that notice must be sent "at least 30 days prior to the commencement" of suit. Consequently, the argument that the plain language of the statute creates a jurisdictional bar is not as strong in the context of the ERA.

Nevertheless, because the purpose of the notice provision is to provide the Attorney General and NJDEP with notice of the suit and opportunity to intervene, *Howell, 504 A.2d at 95*, and not merely to protect defendants, as in the case of the affidavit of merit,

Defendant is not judicially estopped from raising Plaintiffs' lack of compliance with the notice provision and is entitled to summary judgment of Plaintiffs' ERA claim.

**E. Spill Act Claim**

In their complaint, Plaintiffs assert a private right of action under the Spill Act, *N.J.S.A. 58:10-23.11 et seq.* n26 As amended in 1991, the Spill Act authorizes a private cause of action for individuals to recover costs for environmental

2006 U.S. Dist. LEXIS 2288, *51

[*51] damage to their property. *Housing Auth. of City of New Brunswick v. Suydam Inv., L.L.C., 177 N.J. 2, 18, 826 A.2d 673 (2003)*. Actions under the Spill Act are limited to clean up and removal costs, *Bahrle v. Exxon Corp., 145 N.J. 144, 155, 678 A.2d 225 (1996)*, defined as:

> all direct costs associated with a discharge, and those indirect costs that may be imposed by the department pursuant to section 1 of P.L.2002, c. 37 associated with a discharge, incurred by the State or its political subdivisions or their agents or any person with written approval from the department in the: (1) removal or attempted removal of hazardous substances, or (2) taking of reasonable measures to prevent or mitigate damage to the public health, safety, or welfare, including, but not limited to, public and private property.

*N.J.S.A. 58:10-23.11b(d)*. The Act does not authorize "damages arising from emotional distress, enhanced risk of disease, loss of enjoyment of property, and other economic and financial harm." *Bahrle, 145 N.J. at 155*.

n26 It is unclear whether Plaintiffs also raise a claim for cleanup and removal costs from the Spill Compensation Fund under *N.J.S.A. 58:10-23.11g(a)*. (Opp. at 12-13.) However, the appropriate procedure to obtain compensation under the Fund is by filing a claim with the administrator of the Fund, "not later than one year after the date of discovery of damage. The administrator shall prescribe appropriate forms and procedures for such claims." *N.J.S.A. 58:10-23.11k*. In the event "a party, including a potentially responsible party . . . contests the amount or validity of" a claim for reimbursement from the Spill Fund, "the dispute is referred to an arbitrator whose decision may be appealed to the Appellate Division," and the arbitrator's decision will be final unless it was "arbitrary, capricious, or unreasonable." *Lacey Municipal Util. Auth. v. New Jersey Dept. of Envir. Prot., Envir. Claims Admin., 369 N.J. Super. 261, 273, 848 A.2d 843 (App. Div. 2004)*. Accordingly, this is an improper forum for a Spill Compensation Fund claim.

2006 U.S. Dist. LEXIS 2288, *52

[*52]

Plaintiffs maintain that the investigation conducted by Ellwood was a reimbursable clean up and removal cost under the Spill Act. As Plaintiffs suggest, because "a discharge cannot be addressed until the contaminants are defined and the extent of the discharge determined," certain forms of investigative costs are implicitly included in the Act. *Metex Corp. v. Federal Ins. Co., 290 N.J. Super. 95, 115, 675 A.2d 220 (App. Div. 1996).*

However, for a private party to obtain reimbursement under the Act, the party must have obtained "written approval from the department," for example, in a memorandum of agreement, prior to incurring the cost. *N.J.S.A. 58:10-23.11b(d)*; Id. Such approval permit's the NJDEP to "review and approve or disapprove its investigation to date, its proposed remedial action, and its report of the implementation of its action." Id.; see also *Interfaith Cmty Org. v. Honeywell Intern., Inc., 263 F. Supp. 2d 796, 867 (D.N.J. 2003)* (concluding "that such costs were approved by and/or incurred at the direction of NJDEP and thus are recoverable under the Spill Act."). Because Plaintiffs have not obtained NJDEP approval

2006 U.S. Dist. LEXIS 2288, *53

[*53] for any cost incurred, including the Ellwood report, Defendant is entitled to summary judgment of Plaintiffs' Spill Act Claim.

The accompanying Order shall enter today.

Dated: January 20, 2006

s/ Robert B. Kugler

ROBERT B. KUGLER

United States District Judge

**ORDER**

This matter having come before the Court upon motion by Defendant Motiva Enterprises, LLC ("Defendant"), for summary judgment of the claims of Plaintiffs Jeff Player, et al., and upon Defendant's motions to exclude Plaintiffs' experts Daniel McDonald,

Michael Gochfeld, M.D., Ph.D., R. Brian Ellwood, Ph.D., and Bruce M. Gallo; and the Court having considered the moving papers, and the opposition thereto; and for the reasons expressed in the Opinion issued this date;

IT IS hereby **ORDERED** that Defendant's motion to exclude Plaintiffs' expert Daniel McDonald is **GRANTED;**

IT IS FURTHER **ORDERED** that Defendant's motion for summary judgment is **GRANTED;**

IT IS FURTHER **ORDERED** that Defendant's motions to exclude Plaintiffs' experts Michael Gochfeld, M.D., Ph.D., R. Brian Ellwood, Ph.D., and Bruce M. Gallo are **DENIED** as moot.

Dated: January 20, 2006

s/ Robert

2006 U.S. Dist. LEXIS 2288, *54

[*54]  B. Kugler                                    United States District Judge

ROBERT B. KUGLER

# EXHIBIT 18

LEXSEE 2005 U.S. DIST. LEXIS 5803



Caution
As of: Apr 13, 2007

ADVANCED MEDICAL OPTICS, INC., a Delaware corporation, Plaintiff, v.
ALCON INC., a Swiss corporation, and ALCON LABORATORIES,
INCORPORATED, a Delaware corporation, Defendants.

Civil Action No. 03-1095-KAJ

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2005 U.S. Dist. LEXIS 5803*

April 7, 2005, Decided

**SUBSEQUENT HISTORY:** Findings of fact/conclusions of law at *Advanced Med. Optics, Inc. v. Alcon Labs., Inc., 2005 U.S. Dist. LEXIS 33369 (D. Del., Dec. 16, 2005)*

**PRIOR HISTORY:** *Advanced Med. Optics, Inc. v. Alcon Inc., 361 F. Supp. 2d 404, 2005 U.S. Dist. LEXIS 4897 (D. Del., 2005)*

**COUNSEL:** [*1]  Richard L. Horowitz, Esq. and David E. Moore, Esq., Potter Anderson & Corroon LLP, Wilmington, Delaware, for Plaintiff. Of Counsel: A. James Isbester, Esq. and Gillian W. Thackray, Esq., Isbester & Associates, Berkeley, California.

Josy W. Ingersoll, Esq. and Melanie K. Sharp, Esq., Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, for Defendants. Of Counsel: Robert G. Krupka, Esq. and Erica S. Olson, Esq., Kirkland & Ellis, LLP, Los Angeles, California.

**JUDGES:** JORDAN, District Judge.

**OPINION BY:** Kent Jordan

**OPINION:**

MEMORANDUM OPINION

Wilmington, Delaware
April 7, 2005

**JORDAN, District Judge**

**I. INTRODUCTION**

This is a patent infringement case. Presently before me are two *Daubert* motions n1 filed by defendants Alcon Laboratories, Inc. and Alcon Manufacturing, Ltd. (collectively, "Alcon") seeking to exclude the testimony of two experts, Dr. Randall Olson (*see* Docket Item ["D.I."] 156) and Mr. Harold Walbrink (*see* D.I. 160), offered by Advanced Medical Optics, Inc. ("AMO") pursuant to *Federal Rule of Evidence 702*. Jurisdiction is proper under *28 U.S.C. §§ 1331* and *1338*. For the reasons

[*2] that follow, Alcon's motions will be granted in part and denied in part.

n1 The motions are based upon *Federal Rule of Evidence 702* and the Supreme Court's direction in *Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)*, and later cases that district court judges are to perform a "gatekeeping" function when considering the admissibility of expert testimony. (D.I. 156; 160.)

## II. BACKGROUND

The background related to the patents in suit is set forth in the Opinion construing the disputed claim terms. (D.I. 238 at 1-5.)

## III. STANDARD OF REVIEW

Motions to exclude evidence are committed to the court's discretion. *See In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 749 (3d Cir. 1994)* (on a motion to exclude proffered expert testimony, the trial court's inquiry is a flexible one, and its decision to admit or exclude expert testimony is reviewed under an "abuse of discretion" standard) (internal citations omitted). n2

2005 U.S. Dist. LEXIS 5803, *3

[*3] "When the district court's exclusionary evidentiary rulings with respect to scientific opinion testimony will result in a summary or directed judgment," the Court of Appeals will give those rulings "a 'hard look' to determine if a district court has abused its discretion in excluding evidence as unreliable." *Id. at 750.*

n2 The Federal Circuit applies the law of the regional circuit in reviewing decisions on whether to admit expert testimony, and, therefore, the Third Circuit's holdings on the issue are binding precedent. *Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387, 1390-91 (Fed. Cir. 2003)* ("Whether proffered evidence should be admitted in a trial is a procedural issue not unique to patent law, and therefore we ... [apply] the law of the regional circuit... .").

## IV. DISCUSSION

*Federal Rule of Evidence 702* obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable. *See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).*

[*4] *Rule 702* provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise ...." The party offering the expert testimony has the burden of proving admissibility. *See Daubert, 509 U.S. at 592 n. 10* (citation omitted). The subject of an expert's testimony must be grounded in the methods and procedures of science and based on more than a subjective belief or speculation. *Id. at 589-90.* Further, *Rule 702* requires that expert testimony assist the trier of fact, in other words, it must "fit" the issues in the case by having a "valid scientific connection to the pertinent inquiry." *Id. at 591-92.*

In determining "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact," the court must assess whether the methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts at issue. *Id. at 592-93.*

2005 U.S. Dist. LEXIS 5803, *5

[*5] As part of that inquiry, the court "must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." *Heller v. Shaw Indus., Inc., 167 F.3d 146, 153 (3d Cir. 1999).*

Expert testimony can only be received from someone who has specialized knowledge or training sufficient to qualify him to opine on an issue within his field of expertise, and the expert's opinion must be confined to that field. *See Redman v. John D. Brush & Co., 111 F.3d 1174, 1179 (4th Cir. 1997)* (metallurgist not qualified to testify about industry standards for safes); *Barrett v. Atl. Richfield Co., 95 F.3d 375, 382 (5th Cir. 1996)* (expert not qualified to testify about correlation of chemical effects on rats and on humans). Moreover, testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the fact-finder. *See McGowan v. Cooper Indus., Inc., 863 F.2d 1266, 1273 (6th Cir. 1987)* (expert permitted to testify as to the customary duty of factory representatives in the air compressor industry, but should

2005 U.S. Dist. LEXIS 5803, *6

[*6] not have been permitted to opine on breach of such duty because the jury was equally qualified to make that determination); *S.E.C. v. Lipson, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998)* ("Expert testimony may not be used merely to repeat or summarize what the jury independently has the ability to understand.").

A. Dr. Olson

Pursuant to *Federal Rule of Evidence 702*, Alcon seeks to preclude Dr. Olson from testifying in regard to four categories of issues (D.I. 156), each of which will be discussed in turn.

1. General sales and market analysis

Alcon seeks to preclude Dr. Olson from testifying in regards to a general sales and market analysis of phacoemulsification devices. (D.I. 157 at 7-11.) Specifically, Alcon notes four opinions rendered by Dr. Olson on this topic:

(1) "In regards to companies selling phacoemulsification equipment, I believe there is a competitive disadvantage for any company that does not have Occlusion Mode on its equipment. (D.I. 158, Ex. 1 at A019, Dr. Olson's Revised Expert Disclosure at 18.)

(2) "I think that [if] that information [on Occlusion Mode were] out there and appropriately marketed

2005 U.S. Dist. LEXIS 5803, *7

[*7] [it] would produce a huge competitive advantage for whoever had occlusion mode." (D.I. 158, Ex. 3 at A172, Dep. of Dr. Olson at 58:14-17, Oct. 11, 2004.)

(3) "Fluidics drives sales, because removing the air reduces the post-occlusion surge and therefore allows high aspiration levels to be used safely." (D.I. 158, Ex. 1 at A022, Dr. Olson's Revised Expert Disclosure at 21.)

(4) General comments on Alcon's financial size and market strength. For example, "they're the 800 pound gorilla," (D.I. 158, Ex. 3 at A134, Dep. of Dr. Olson at 8:25, Oct. 11, 2004 ), "they're the biggest.

They're the strongest." (*Id.* at A138, 12:12.)

(D.I. 157 at 8.) Alcon asserts that "these opinions venture outside Dr. Olson's general area of cataract surgery because they require specific knowledge about how the phacoemulsification market has responded to Occlusion Mode and the '765 patent, and should be excluded for that reason." (*Id.*) In support of its position, Alcon argues that Dr. Olson admitted during his deposition that he lacks specialized training in analyzing sales or market trends for phacoemulsification machines:

Q. You don't claim to have any special knowledge or

2005 U.S. Dist. LEXIS 5803, *8

[*8] training in the analysis of sales and market trends for phacoemulsification machines, right?

A. *I'm not in sales and marketing,* but I do see sales and marketing figures. ... I think I have an interest, *but I don't claim any special expertise.*

(D.I. 158, Ex. 3 at A206-07, Dep. of Dr. Olson at 173:21-174:4, Oct. 11, 2004 (emphasis added).)

In response, AMO argues that Dr. Olson, as an "expert consumer" of phacoemulsification products, should be permitted to address the jury in regards to the competitive advantage that a phacoemulsification machine having the invention of each of the two patents in suit would have in the market. (D.I. 185 at 6.) For support, AMO asserts that Dr. Olson is a sophisticated consumer of phacoemulsification machines because he is familiar with various phacoemulsification machines, has been performing cataract surgery for thirty years, and because he approves all purchases by his department at the Moran Eye Center. (*Id.*) Additionally, AMO asserts that Dr. Olson provided four reasons why he believes Occlusion Mode offers a competitive advantage:

1) Alcon would not have added it to its systems if Alcon did not believe it was important

[*9] to do so, 2) his conversations and interactions with leading surgeons such as Bruce Wallace and Howard Fine led him to conclude that some surgeons would not purchase equipment that did not have occlusion mode, ... 3) [his] review of the trade literature regarding occlusion mode suggests that occlusion mode is an important feature to a number of leading surgeons, and 4) [his] own study of the problem of thermal injury leads him to conclude that the use of occlusion mode can reduce thermal injury eight fold.

(*Id.* at 8-9.)

Because Dr. Olson lacks expertise in the analysis of sales and market trends for phacoemulsification machines, he will be precluded from testifying on this topic. He has admitted that he has no expertise in this particular area. Being an "expert consumer," as AMO puts it, does not remedy this deficiency. Further, the "main basis" for Dr. Olson's opinions are "the fact that Alcon decided to put occlusion mode on its latest equipment." (D.I. 158, Ex. 3 at A169, Dep. of Dr. Olson at 55:12, 1-2, Oct. 11, 2004.) That reason, as AMO admits, is "more a matter of plain common sense than special expertise." (*See* D.I. 185 at 9.)

Additionally, Dr. Olson's

2005 U.S. Dist. LEXIS 5803, *10

[*10] opinion regarding the general preferences of other surgeons is speculative and not supported by reliable data. The basis for his opinion on this point is that two of his collegues have preferences for devices with Occlusion Mode, and even as to them, he testified that he could only be certain one of them would actually insist on buying a machine with Occlusion Mode. Dr. Olson testified during his deposition as follows:

> Q. Is there any other basis for your statement?

> A. I do feel there are people out there who use occlusion mode and feel its important, and I think that they -- I mean, the Alcon people know. You could ask them, but I'm sure they have surveys. And I'm sure there are people who would not buy the equipment without it, so I think that that's got to be it as well. But my main basis is the fact that Alcon put it in their equipment.

> Q. You say that you're sure that there were people who would not buy the equipment without it having occlusion mode. *Why are you sure that there are people who would not buy a phacoemulsification system if it didn't have occlusion mode?*

> A. Because there are people talking about occlusion mode and how you should have it.

2005 U.S. Dist. LEXIS 5803, *11

[*11] There are many names listed there, Bruce Wallace most recently in the meeting I was just at, *so I know one, Bruce Wallace.* I mean, from what he said, I don't think Bruce Wallace would buy anything without an occlusion mode. He talked about the fact that occlusion-mode phaco was important. *So there have to be others. If there were none, why would Alcon add it to their equipment in face of a patent? It makes no sense.*

Q. Other than Bruce Wallace, can you identify anyone else who you believe would not purchase a phacoemulsification system if it didn't have occlusion mode?

A. *Not without talking to them.* There's others, who talk about it here, but I -- the only one I'm aware who's talked to very recently is Bruce Wallace. Whether Howard Fine still thinks it's important or not, he certainly in there will say he feels it's very important.

Q. And when you're saying in there, you're referring to the articles that Ms. Thackray sent to you, right?

A. Yes, that you now have, yes.

(D.I. 158, Ex. 3 at A169-70, Dep. of Dr. Olson at 55:6-56:13, Oct. 11, 2004 (emphasis added).)

In that testimony, Dr. Olson admits that he has not talked to any other surgeons,

[*12] besides Bruce Wallace, about whether they would only buy machines with Occlusion Mode. The articles to which he refers do not support his opinion in this regard either, because as he admits, he cannot tell without talking to those surgeons whether they would only buy machines with the occlusion mode feature. His comments also reveal that he does not know whether other surgeons agree with Bruce Wallace's view, nor has he conducted a survey to find out. Thus, his testimony on the viewpoints of other surgeons is purely speculative.

Lastly, Dr. Olson testified that his opinion on the sales and marketing aspects of Occlusion Mode were based on extrapolations from a survey he conducted on wound burns. That survey, however, which was unpublished and not peer reviewed, did not ask its respondents whether Occlusion Mode was enabled during the surgery, and did not even mention the Occlusion Mode feature. (D.I. 158, Ex. 6 at A341-56, Wound Burn Survey Questionnaire; *see* D.I. 158, Ex. 3 at A190-91, Dep. of Dr. Olson at 97:25-98:6, Oct. 11, 2004 ("Q. Now, the survey didn't ask whether the occlusion mode feature was active, correct? A. [It] did not. Q. So it could be that occlusion mode was

2005 U.S. Dist. LEXIS 5803, *13

[*13] enabled during some of the wound burns that the ... study found? A. It's possible.").) Thus, it is not a reliable basis from which an opinion on the general market and physician preferences could be based.

Therefore, because Dr. Olson does not have sufficient expertise in the sales and marketing of phacoemulsification devices, and his opinion on such matters is not supported by reliable bases, he will be precluded from testifying to any sales and market analysis of phacoemulsification devices, including testimony addressing the economic advantages of phacoemulsification devices incorporating Occlusion Mode and the '765 patent as they pertain to the market.

Dr. Olson will be permitted, however, to testify about his own preferences for certain features in phacoemulsification machines and what he considers advantageous from his perspective, based on his many years of experience using such machines in the performance of cataract surgery, to the extent such opinions were disclosed in his expert report.

2. Infringement by Alcon of the '240 or '765 patent

Alcon seeks to preclude Dr. Olson from offering testimony relating to whether Alcon infringes either the '240 patent or the '765 patent.

[*14] (D.I. 157 at 11-12.) According to Alcon, "Dr. Olson implied at numerous times throughout his deposition that Alcon's phacoemulsification systems infringed the '240 and '765 patents, and that Alcon's alleged infringement was knowing and deliberate." (*Id.* at 11.) Alcon argues that Dr. Olson "lacks the expertise that would enable him to perform a claim construction analysis of the patents to determine whether they are infringed by the Infiniti system ... [because he] admitted that he lacks specialized training in engineering and patents." (*Id.* (citing D.I. 158, Ex. 3 at A141, Dep. of Dr. Olson at 18:11-13, Oct. 11, 2004.))

AMO asserts that "Dr. Olson has not done an element-by-element analysis of the patents against the accused products and AMO has no intention of asking him to do so... ." (D.I. 185 at 9.) Rather, AMO argues that Dr. Olson's view that Alcon's device is so similar to AMO's device that it appears to have been copied is both competent and pertinent. (*Id.* at 10.)

Dr. Olson will not be permitted to testify in regards to infringement of either patent. *Federal Rule of Civil Procedure 26(a)(2)(B)* states, in relevant part,

2005 U.S. Dist. LEXIS 5803, *15

[*15] that "the [expert] report shall contain a complete statement of all opinions to be expressed... ." Dr. Olson did not disclose an opinion on infringement of either patent in his expert report, and as such he may not offer one at trial. *See Fed. R. Civ. P. 26(a)(2)(B)*. Additionally, in its Answering Brief in Opposition to Alcon's Motion, AMO lists six things upon which Dr. Olson has been asked to opine, not one of which concerns infringement or copying. n3 (*See* D.I. 185 at 3.) Thus, it is clear that Dr. Olson may not properly offer an opinion on infringement, and it is equally clear that AMO did not intend for him to do so. Therefore, Dr. Olson will not be permitted to offer testimony relating to whether Alcon infringes either patent in suit.

n3 AMO asserts that it asked Dr. Olson to provide expert testimony in the following six areas: "(i) a tutorial into the physiology and treatment of cataracts; (ii) the importance, from the surgeon's point of view, of each of the patents in suit; (iii) the problem of thermal injury; (iv) the difficulty in manual detection of occlusion; (v) the increased safety of the automatic response to occlusion of the system described in the '240 patent; and (vi) the inapplicability of the Shimizu reference to [the] invention of the '240 patent." (D.I. 185 at 3.)

[*16]

### 3. Occlusion Mode and Safety of Phacoemulsification

Alcon seeks to preclude Dr. Olson from offering testimony "relating to his opinion that Occlusion Mode made phacoemulsification safer, and consequently a mainstream procedure in cataract surgery because it enabled surgeons to rely on the Occlusion Mode feature to prevent the occurrence of thermal injury to the eye." (D.I. 156 at 1.) More specifically, Alcon objects to five opinions on this topic offered in Dr. Olson's report: (i) that the invention of Occlusion Mode "solves this problem [of thermal injury] by automatically shifting the parameters so that the surgeon can no longer use the ultrasound to a dangerous level" (D.I. 158, Ex. 1 at A018, Dr. Olson's Revised Expert Disclosure at 17); (ii) that "Occlusion Mode is one of the safety features that many feel should be standard with modern phacoemulsification equipment" (*id.* at A019); (iii) that "the overall effect of the Occlusion Mode invention described in the ['240] patent was to make phacoemulsification safer and therefore more mainstream (*id.* at A018); and, in the same vein, (iv) that "Occlusion Mode is one of the breakthroughs that have made phacoemulsification

2005 U.S. Dist. LEXIS 5803, *17

[*17] widely available and used by most cataract surgeons in the United States today" (*id.* at A019); and again (v) that "[Occlusion Mode] put the phacoemulsification technology in the hands of surgeons who previously were afraid of using phacoemulsification, and so has made cataract surgery available for more patients" (*id.*).

Alcon asserts that these opinions rendered by Dr. Olson are "inadmissible because they lack adequate foundation, and therefore fail to 'assist the trier of fact.'" (D.I. 157 at 13.) Specifically, Alcon asserts that they are based in large part on "(1) biased information supplied almost exclusively by AMO attorneys, (2) materials that Dr. Olson himself labels as 'scanty,' (3) a partial analysis of an unpublished survey, and (4) unsupported assumptions that are speculative at best." (*Id.*)

AMO argues in response that Dr. Olson reviewed whatever publications were available, not merely those provided by AMO, concerning the use of Occlusion Mode in phacoemulsification, and that "Dr. Olson did not rely on peer-reviewed articles on occlusion mode because none existed." (D.I. 185 at 10, 12.) AMO asserts that reliance on peer-reviewed journals is not a prerequisite

2005 U.S. Dist. LEXIS 5803, *18

[*18] to admissibility and that the articles on which Dr. Olson relied were "written by respected and well-known practitioners in the field." (*Id.*) Further, AMO argues that "Dr. Olson is well qualified to survey fellow practitioners on the incidence of wound burn, and to opine on the value of occlusion mode in reducing it." (*Id.*)

"The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." *Fed. R. Evid. 702* advisory committee's note. The main issue raised by Alcon is the reliability of the opinions offered by Dr. Olson. Alcon does not challenge

Dr. Olson's expertise to offer such opinions, but rather challenges the bases upon which he relies to render them. (See D.I. 207 at 5.) Each challenged opinion is discussed below.

a. That the invention of Occlusion Mode "solves this problem [of thermal injury] by automatically shifting the parameters so that the surgeon can no longer use the ultrasound to a dangerous level"

Alcon challenges Dr. Olson's opinion that the invention of Occlusion Mode "solves this problem [of thermal injury] by automatically

[*19] shifting the parameters so that the surgeon can no longer use the ultrasound to a dangerous level." (D.I. 158, Ex. 1 at A018, Dr. Olson's Revised Expert Disclosure at 17.) Dr. Olson testified at his deposition that "occlusion mode *could* dramatically decrease wound burn... ." (D.I. 158, Ex. 3 at A183, Dep. of Dr. Olson at 77:5-6, Oct. 11, 2004 (emphasis added).) In his report, Dr. Olson was more emphatic, stating that Occlusion Mode actually did have that effect. (D.I. 158, Ex. 1 at A018, Dr. Olson's Revised Expert Disclosure at 17.) Dr. Olson indicated that his opinion in this regard is largely based upon his survey. (*See* D.I. 158, Ex. 3 at A182-83, Dep. of Dr. Olson at 76:21-77:6, Oct. 11, 2004.) As discussed earlier, however, *see supra* Part IV.A.1., Dr. Olson's survey did not inquire whether Occlusion Mode was enabled during the procedures being reported, nor did it mention Occlusion Mode at all. (D.I. 158, Ex. 6 at A341-56, Wound Burn Survey Questionnaire; *see* D.I. 158, Ex. 3 at A190-91, Dep. of Dr. Olson at 97:25-98:6, Oct. 11, 2004.) Thus, it is not a reliable basis of support for the type of definitive conclusion rendered in Dr. Olson's report. Dr. Olson will

[*20] be permitted to testify as to whether he thinks Occlusion Mode "could" decrease wound burn, based on his years of experience n4 and the various articles he has reviewed, but he cannot testify that Occlusion Mode in fact decreases instances of wound burn because his survey does not provide a reliable basis for such a conclusion, and because, as he admits, "there's basically no studies on this subject or anything." (D.I. 158, Ex. 3 at A145, Dep. of Dr. Olson at 26:24-25, Oct. 11, 2004.)

n4 Dr. Olson's experience with Occlusion Mode is apparently limited, however, because, as he admits, he does not use Occlusion Mode himself. (D.I. 158, Ex. 3 at A173-74, Dep. of Dr. Olson at 59:25-60:2, Oct. 11, 2004.)

b. "Occlusion Mode is one of the safety features that many feel should be standard with modern phacoemulsification equipment."

Alcon challenges Dr. Olson's opinion that "Occlusion Mode is one of the safety features that many feel should be standard with modern phacoemulsification equipment." (D.I. 158, Ex. 1 at A019,

2005 U.S. Dist. LEXIS 5803, *21

[*21] Dr. Olson's Revised Expert Disclosure at 18.) Alcon asserts that Dr. Olson lacks a reliable basis to conclude what "many" feel about modern phacoemulsification equipment. (D.I. 157 at 18.) At his deposition, however, Dr. Olson testified that he based his opinion on the articles he reviewed in which various experts have stated preferences for Occlusion Mode. Although Dr. Olson has testified that he considers these articles to be "throw-away" articles, in that "you usually look at them, and [then] you throw them away" (D.I. 158, Ex. 3 at A146, Dep. of Dr. Olson at 27:11-12, Oct. 11, 2004), they do provide an adequate basis for this specific opinion. Alcon's citation to *Tuman v. Genesis Associates,*

*935 F. Supp. 1375, 1385 (E.D. Pa. 1996),* is unavailing because, as that court held, the expert's opinion was not "fundamentally unsupported." Neither is Dr. Olson's in this instance, and, as such, Alcon's objections go to the weight of Dr. Olson's opinion, not its admissibility.

c. "The overall effect of the Occlusion Mode invention described in the ['240] patent was to make phacoemulsification safer and therefore more mainstream."

Alcon's next challenge is to Dr. Olson's

[*22] opinions that "the overall effect of the Occlusion Mode invention described in the ['240] patent was to make phacoemulsification safer and therefore more mainstream." (D.I. 158, Ex. 1 at A019, Dr. Olson's Revised Expert Disclosure at 18.) Alcon's main objection is that this particular conclusion is misleading "because he overstates his propositions." (D.I. 157 at 18.)

I agree with Alcon that, in light of his deposition testimony, Dr. Olson has perhaps overstated this conclusion in his report. When asked about his basis for concluding that Occlusion Mode is one of the breakthroughs that have made phacoemulsification widely available and used by most cataract surgeons in the United States today, Dr. Olson replied, "I think its one of the steps that has made the procedure safer. *There's others,* but in totality, *all of those different steps are the reason why it's the predominant procedure today.*" (D.I. 158, Ex. 3 at A167, Dep. of Dr. Olson at 53:10-13, Oct. 11, 2004 (emphasis added).) Dr. Olson clarifies that it is the totality of "all of those different steps" that has led to phacoemulsification being the predominant procedure today, not just Occlusion Mode.

In light of that

2005 U.S. Dist. LEXIS 5803, *23

[*23] qualification, I do not believe that his testimony will mislead the jury. He will be subject to cross-examination by Alcon, whose efforts will no doubt highlight the limitations Dr. Olson admitted on this point in his deposition. Alcon has not demonstrated that this opinion is inadmissible under *Federal Rule of Evidence 702* and, therefore, he will not be precluded from giving it at trial.

d. "Occlusion Mode is one of the breakthroughs that have made phacoemulsification widely available and used by most cataract surgeons in the United States today."

Alcon makes the same challenge to Dr. Olson's opinion that "Occlusion Mode is one of the breakthroughs that have made phacoemulsification widely available and used by most cataract surgeons in the United States today." (D.I. 158, Ex. 1 at A019, Dr. Olson's Revised Expert Disclosure at 18.) Again, I agree with Alcon that Dr. Olson has perhaps overstated this conclusion in his report. When asked about his basis for concluding that Occlusion Mode made phacoemulsification safer and put the technology in the hands of surgeons who were previously afraid of using phacoemulsification, Dr. Olson replied that ".

2005 U.S. Dist. LEXIS 5803, *24

[*24] .. it is *one of many* features that have made phaco safer... ." (D.I. 158, Ex. 3 at A165, Dep. of Dr. Olson at 51:11-12, Oct. 11, 2004 (emphasis added).) Dr. Olson's testimony indicates that there are other features which contributed to the safety of phacoemulsification as well. However, for the same reasons discussed, *supra* Part IV.A.3.c., Alcon has not demonstrated that this opinion is inadmissible under *Federal Rule of Evidence 702* and, therefore, he will not be precluded from giving it at trial.

e. "[Occlusion Mode] put the phacoemulsification technology in the hands of surgeons who previously were afraid of using phacoemulsification, and so has made

cataract surgery available for more patients."

Dr. Olson also opined that Occlusion Mode "put the phacoemulsification technology in the hands of surgeons who previously were afraid of using phacoemulsification, and so has made cataract surgery available for more patients." (D.I. 158, Ex. 1 at A019, Dr. Olson's Revised Expert Disclosure at 18.) When asked whether he was aware of any surgeons who were previously afraid of using phacoemulsification before they could use occlusion mode, Dr.

2005 U.S. Dist. LEXIS 5803, *25

[*25] Olson relied: "I don't have any survey. There's no study or published [sic], so this was just my opinion. I don't have anything other specifically than my opinion for that statement ... if there was scientific literature, if we had studies, if we had — we don't. I mean, all we have is a few opinions, so therefore, when you have nothing else to depend upon, then you can only use your opinion." (D.I. 158, Ex. 3 at A166-67, Dep. of Dr. Olson at 52:12-53:3, Oct. 11, 2004.) Furthermore, Dr. Olson testified that he believes Occlusion Mode is not used by most surgeons (id. at A167, 53:20), but that, in fact, he doesn't "know how many use it and how many do not" (id. at A168, 54:17-18). Thus, Dr. Olson admits that he has no reliable basis for this opinion, and, he will be precluded from testifying to it at trial.

### 4. Maximizing Air Removal

Alcon seeks to preclude Dr. Olson from offering testimony "related to his opinion that [the '765 patent] disclosed a method and apparatus that maximized air removal from the fluidics system of phacoemulsification devices and enabled phacoemulsification devices incorporating its claims to reach, for the first time, aspiration levels of 500 mmHg

2005 U.S. Dist. LEXIS 5803, *26

[*26] or higher while maintaining chamber stability." (D.I. 156 at 2.) Alcon asserts that Dr. Olson's opinions on the '765 patent are based on unsupported suppositions as opposed to facts (D.I. 157 at 19), and that he lacks the necessary experience to offer expert testimony on fluidics devices (D.I. 207 at 10-11).

In response, AMO asserts that Dr. Olson's opinions are based on his knowledge and experience of using phacoemulsification devices in the field of opthalmological surgery. (D.I. 185 at 12-13.) Thus, AMO argues that Dr. Olson's testimony meets the threshold of admissibility. (*Id.* at 13.)

In *Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 324 (3d Cir. 2003)*, the Third Circuit noted that although a proffered expert has "extensive experience with jet skis," his testimony on the safety of an accelerating mechanism was properly excluded because the expert "had no education or experience in product design of jet skis or accelerating mechanisms; nor did he provide scientific, statistical or other evidence evaluating the relative safety of different jet ski models or the accelerating mechanisms." Similarly, Dr. Olson's qualifications as a renowned ophthalmologist

2005 U.S. Dist. LEXIS 5803, *27

[*27] are not questioned, but he is not qualified to render an opinion on fluidics systems or chamber stability. He is not an engineer and has not conducted any studies to analyze whether different systems can achieve an aspiration level of 500 mmHg while maintaining excellent chamber stability. (D.I. 158, Ex. 3 at A203, Dep. of Dr. Olson at 136:15, Oct. 11, 2004.) Thus, like the expert in *Calhoun,* Dr. Olson would be outside his area of expertise if permitted to testify in this regard. Accordingly, he will be precluded from so testifying. "While [his] . . . background, education, and training may provide [him] with general knowledge to testify about general matters, more specific knowledge is required to support more specific opinions." *Calhoun, 350 F.3d at 322.*

**B. Mr. Walbrink**

Alcon seeks to exclude three discrete areas of testimony by Mr. Walbrink. (D.I. 160.)

**1. Infringement Opinions**

Alcon asserts that Mr. Walbrink should be precluded from offering testimony on infringement of the '240 and '765 patents by Alcon's phacoemulsification systems, the Legacy with Advantec and the Infiniti. (D.I. 160 at 1.) Alcon argues that Mr. Walbrink's testimony contravenes *Rule*

2005 U.S. Dist. LEXIS 5803, *28

[*28] *702* because his opinions on infringement "are pulled directly from litigation positions crafted by AMO's attorneys, as opposed to conclusions drawn from his own independent assessment of the claims at issue." (D.I. 161 at 6.)

In response, AMO asserts that *Federal Rule of Civil Procedure 26(a)(2)(B)* "does not preclude counsel from providing assistance to experts in preparing [the expert's] report." (D.I. 186 at 4 (quoting *Fed. R. Civ. P. 26(a)(2)(B)* advisory committee's note).) Furthermore, AMO argues that Mr. Walbrink did not merely adopt the opinions of AMO's counsel, but rather "engaged in extensive telephone conversations with AMO counsel regarding claim interpretation" (*id.* at 13) and "participated in the compilation, drafting, editing, and organization of his report" (*id.* at 15).

Alcon's position is untenable. It admits that *Rule 26* does not preclude counsel from assisting an expert in preparing a report, but it argues that Mr. Walbrink's report merely represents the substantive conclusions of counsel. (D.I. 161 at 5-6.) Alcon's citations to cases in which expert reports were excluded are

2005 U.S. Dist. LEXIS 5803, *29

[*29] distinguishable from the facts of this case because Mr. Walbrink did contribute his expertise to the drafting of the report. *See Crowley v. Chait, 322 F. Supp. 2d 530, 543 (D.N.J. 2004)* (noting that counsel may not draft the entire report without prior "substantive input" from the expert); *Stein v. Foamex Int'l, Inc., 2001 U.S. Dist. LEXIS 12211, No. CIV A. 00-2356, 2001 WL 936566, at *5 (E.D. Pa. Aug. 15, 2001)* (the rules do not permit "blanket adoption of reports prepared by counsel") (internal citation omitted). Mr. Walbrink testified at his deposition as follows:

> Q. Would you describe for me the process that you went through to develop the report that we've marked as Exhibit 179.

A. First, we discussed the issues at hand.

Q. And when you say "we," you mean you and Ms. Thackray?

A. And Jamie Isbester, as well, collectively. *I drafted some of it, worked on claim construction with one of their other associates* — I believe his name is Bob — then met with Gillian, Ms. Thackray, and Jamie Isbester at their facility in Berkeley, and worked for a day, I think, further drafting and pulling it together. And then over the course of several days after that,

2005 U.S. Dist. LEXIS 5803, *30

[*30] there were multiple drafts and revisions, and then we submitted it.

Q. Now, you said you drafted some of it. What parts did you draft?

A. That would be hard because, I mean, *I was involved in most of it.* The claim construction was primarily done by -- I believe it was Bob. But as far as the content of the body of the report, it was a collaborative effort. It would be hard to single out what I did versus someone else.

(D.I. 162, Ex. 3 at A131-32, Dep. of Mr. Walbrink at 22:8-23:5, Oct. 19, 2004 (emphasis added).) The foregoing testimony supports AMO's contention that Mr. Walbrink collaborated with AMO's counsel and was involved in the creation of his expert report. Thus, Mr. Walbrink's testimony on infringement cannot be excluded as simply reflecting the opinions or work product of AMO's counsel.

2. Commercial success of AMO's systems

Alcon asserts that Mr. Walbrink should be precluded from offering testimony on the commercial success of AMO's two phacoemulsification systems, the Diplomax and the Sovereign, because his opinion is based solely on what AMO's counsel has told him and is therefore unreliable. (D.I. 161 at 9.) Further, Alcon argues that *Rule 26(a)(2)(B)*

2005 U.S. Dist. LEXIS 5803, *31

[*31] requires that an expert's report "contain a complete statement of all opinions to be expressed *and the basis and reasons thereof.*" (D.I. 208 at 9 (quoting *Fed. R. Civ. P. 26(a)(2)(B)*) (emphasis added).) Thus, Alcon asserts that the four new bases for his opinion identified in the declaration he submitted after his deposition and after the close of discovery should not be considered because those reasons were not presented in his Rebuttal Report. (*Id.* at 9.)

In response, AMO asserts that "counsel for Alcon failed to develop further testimony regarding the content of Mr. Walbrink's discussions with AMO's counsel and failed to acknowledge the further bases set forth in Mr. Walbrink's Rebuttal Report...." (D.I. 186 at 17.) AMO points to Mr. Walbrink's statement in his Rebuttal Report that "it would appear to me, as discussed in my opening report on infringement, that the Advantec upgrade to Alcon's Legacy model and the Infinity model of phacoemulsification machines have adopted the exact same technology" (D.I. 162, Ex. 2 at A99-100, Rebuttal Report of Mr. Walbrink at 14-15) as a basis for his opinion on commercial success. (D.I. 186 at

[*32] 17-18.) Additionally, AMO notes that Mr. Walbrink's declaration further discusses the bases for his opinion. (*Id.* at 18.)

Under *Rule 26(a)(2)(B),* an expert's report must contain "the basis and reasons" for the expert's opinions. It is clear that none of Mr. Walbrink's Reports submitted during discovery contains the challenged reasons on which he now seeks to rely for his opinion on commercial success attributable to Occlusion Mode. Thus, based on *Rule 26(a)(2)(B),* Mr. Walbrink's Rebuttal Report is critically deficient in this regard. At his deposition, Mr. Walbrink testified as follows:

> Q. Sure. It's at the bottom of page 14. You say, "it is my understanding that the occlusion mode has been an important feature of two successful phacoemulsification machines sold by

AMO, the Diplomax line and the Sovereign line." Did I read that correctly?

A. Yes.

Q. What is the basis for that statement?

A. *Discussions with counsel. And I can't tell you what else may have been considered in that.*

Q. So the only basis, as you sit here today, that you can identify is that AMO's counsel told you that, right?

A. *That's all I can identify today, yes.*

(D.

2005 U.S. Dist. LEXIS 5803, *33

[*33] I. 162, Ex. 3 at A163-64, Dep. of Mr. Walbrink at 197:19-198:7, Oct. 19, 2004 (emphasis added).) The foregoing shows that the only disclosed basis Mr. Walbrink had for this opinion was the "discussions [he had] with [AMO's] counsel." (*See id.*) Therefore, Mr. Walbrink's deposition cannot cure the deficiency of his Rebuttal Report. n5 If there were other bases for Mr. Walbrink's opinion, they were not disclosed as required. Simply claiming to have an understanding, without providing the bases for that understanding, fails to meet the disclosure requirements of the Federal Rules of Civil Procedure.

n5 This is not meant to say that if Mr. Walbrink had testified to other bases, such testimony would necessarily have been sufficient under *Rule 26(a)(2)(B)* to remedy his deficient expert report.

Mr. Walbrink's last ditch declaration (D.I. 189) does not remedy this deficiency, for at least two reasons. First, it was submitted long after the close of discovery, as an exhibit to AMO's Answering Brief on this motion.

[*34] (D.I. 186.) I agree with Alcon that acceptance of such a late submission would be unfairly prejudicial and would make "a mockery of the Rules' requirements for discovery and expert disclosure." (See D.I. 208 at 9.) Second, Mr. Walbrink has admitted that he is "not versed in the financial aspects of these products," yet he purports to offer four reasons for his opinion, each of which relate to the financial aspects of AMO's products. He cannot disclaim expertise in an area and then opinion on it. Thus, for these independent reasons, Mr. Walbrink will be precluded from testifying on the issue of commercial success.

3. The '765 patent and the achievement of an aspiration level of 500 mmHg while maintaining chamber stability

Alcon asserts that Mr. Walbrink should be precluded from testifying that "the Sovereign fluidics system, incorporating the invention of the '765 patent, was the first phacoemulsification system to achieve the 500 mg [sic] Hg aspiration level while maintaining excellent chamber stability" because his opinion is based solely on AMO's brochures and promotional materials and Dr. Olson's opinion. (D.I. 161 at 9-10.)

In response, AMO asserts that Mr. Walbrink's opinion

[*35] was based on his review of product brochures and promotional materials, the expert report of Dr. Olson, his background and experience, many hours of deliberation, and his examination of Alcon's Infiniti system. (D.I. 186 at 19.) AMO argues that these matters are the proper subject of cross-examination before the jury, not "the basis for a motion to exclude." (*Id.* at 21.) I disagree.

First, Alcon correctly notes that Mr. Walbrink's opinion is directed to AMO's Sovereign system, not Alcon's Infiniti system, and that Mr. Walbrink's examination of the Infiniti system does not provide a reliable basis for his conclusions regarding the Sovereign system. Second, Mr. Walbrink admitted in his deposition testimony that he "has not used the Sovereign." (D.I. 162, Ex. 3 at A154, Dep. of Mr. Walbrink at 142:6, Oct. 19, 2004.) Third, he testified that he only has "incidental knowledge" of the Sovereign system, which he gained by reading Dr. Olson's expert report and "brochures or promotional materials" provided exclusively by AMO. (*Id.* at A154, 142:13, 19.) But as earlier discussed, *supra* Part IV.A.4., Dr. Olson will be precluded from testifying about the invention in the '765 patent

2005 U.S. Dist. LEXIS 5803, *36

[*36] achieving an aspiration level of 500 mmHg while maintaining chamber stability. Thus, all that remains as Mr. Walbrink's basis for his opinion are the brochures or promotional materials provided exclusively by AMO. As noted in *Tuman,* an expert's testimony may be unreliable if the expert "relied almost exclusively on information from one source who was clearly biased." *Tuman, 935 F. Supp. at 1385* (internal citations omitted). This is such a case. The only remaining basis for this opinion from Mr. Walbrink is information that was provided exclusively by AMO, a party to the case. Thus, Mr. Walbrink will be precluded from testifying with regard to the achievement of an aspiration level of 500 mmHg while maintaining chamber stability.

## V. CONCLUSION

Based on the foregoing reasons and authorities, Alcon's motion to exclude the testimony of Dr. Olson (D.I. 156) will be granted in part and denied in part, and Alcon's motion to exclude the testimony of Mr. Walbrink (D.I. 160) will be granted in part and denied in part. An appropriate order will follow.

### ORDER

For the reasons set forth in the Memorandum Opinion issued in this matter today, IT IS HEREBY ORDERED

2005 U.S. Dist. LEXIS 5803, *37

[*37] that the Defendants' motion to exclude the testimony of Dr. Olson (D.I. 156) is GRANTED IN PART, to the extent that Dr. Olson will not be permitted to offer testimony on the analysis of sales and market trends for phacoemulsification machines, infringement by Defendants of the '240 or '765 patent, that Occlusion Mode in fact decreases instances of wound burn, that "[Occlusion Mode] put the phacoemulsification technology in the hands of surgeons who previously were afraid of using phacoemulsification, and so has made cataract surgery available for more patients," and that the '765 patent disclosed a method and apparatus that maximized air removal from the fluidics system of phacoemulsification devices and enabled phacoemulsification devices incorporating its claims to reach, for the first time, aspiration levels of 500 mmHg or higher while maintaining chamber stability, and DENIED IN PART, as to the remainder of Dr. Olson's opinions which have been challenged by Defendants.

Further, IT IS ORDERED THAT Defendants' motion to exclude the testimony of Mr. Walbrink (D.I. 160) is GRANTED IN PART, to the extent that Mr. Walbrink will not be permitted to offer testimony on the issue of commercial

2005 U.S. Dist. LEXIS 5803, *38

[*38] success and the achievement of an aspiration level of 500 mmHg while maintaining chamber stability, and DENIED IN PART, as to the remainder of Mr. Walbrink's opinions which have been challenged by Defendants.

Kent Jordan

UNITED STATES DISTRICT JUDGE

Wilmington, Delaware
April 7, 2005