# EXHIBIT 19

LEXSEE 2002 U.S. DIST. LEXIS 22385



Caution
As of: Apr 13, 2007

UNITED STATES OF AMERICA v. DAVID LEE FISHER

CR. NO. 01-769-1

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

*2002 U.S. Dist. LEXIS 22385*

November 19, 2002, Decided
November 19, 2002, Filed; November 20, 2002, Entered

**SUBSEQUENT HISTORY:** Subsequent appeal at, *Remanded by United States v. Fisher, 2005 U.S. App. LEXIS 4847* (3d Cir. Pa., Mar. 25, 2005)

**DISPOSITION:** Government's motion in limine to preclude defendant from introducing expert opinion regarding whether condition of firearm is consistent with having been thrown onto hard paved surface granted.

**COUNSEL:** [*1] For DAVID LEE FISHER, DEFENDANT: PATRICK J. EGAN, PHILADELPHIA, PA USA.

TERRI A. MARINARI, U.S. ATTORNEY'S OFFICE, PHILA, PA USA.

**JUDGES:** ROBERT F. KELLY, Sr. J.

**OPINION BY:** ROBERT F. KELLY

**OPINION:**

MEMORANDUM

ROBERT F. KELLY, Sr. J.

NOVEMBER 19, 2002

David Lee Fisher has been charged in a one count indictment with possession of a firearm by a convicted felon in violation of *18 U.S.C. § 922(g)(1)*. The Government has filed a Motion in Limine to Preclude the Defendant from introducing expert opinion regarding whether the condition of the firearm is consistent with having been thrown onto a hard paved surface. Testimony was taken on this Motion and from that testimony I make the following

FINDINGS OF FACT

1. Frederick M. Wentling is employed as an independent firearm and toolmark examiner, having previously been employed by the Pennsylvania State Police as a firearm and toolmark examiner from 1988 to 1998 (Transcript of Hearing on July 15, 2002 ("Tr.") 35).

2. Mr. Wentling has a Bachelor of Science in Education from Shippensburg State University. He later graduated from the Pennsylvania State Police Academy. In September 1988, after a two-year training period, he

2002 U.S. Dist. LEXIS 22385, *2

[*2] was certified by the Pennsylvania State Police in the field of forensic firearm and toolmark examination. He is a member of the Association of Firearm and Toolmark Examiners. Mr. Wentling does not hold any professional licenses (Tr. 38-39).

3. Mr. Wentling's experience in conducting "drop testing" of a firearm consists of the performance of what the Pennsylvania State Police refer to as the "shock and drop" test. This test consisted of dropping a firearm "perhaps a foot" above a hard surface onto the butt of the firearm with the hammer cocked. The firearm was also struck several times with a soft mallet. The purpose of the "shock and drop" test was to determine if the firearm had accidently discharged after being dropped (Tr. 39-40).

4. Mr. Wentling testified that he is not familiar with any standards in his field or any other field employed in the drop-testing of a firearm (Tr. 41).

5. Mr. Wentling testified that prior to his being hired in this case, he had performed a "simulation" in which he had dropped a firearm "somewhere around five times" for use in Court proceedings. He testified that he's done a hundred drop tests, but only five times he could remember were they used for

2002 U.S. Dist. LEXIS 22385, *3

[*3] Court. He acknowledged that part of the problem that arises in conducting a "simulation" is "how do you standardize on a non-standard event" (Tr. 41-42, 84).

6. Mr. Wentling was hired by the Federal Defender's Association to examine a firearm in the case of United States v. Fisher, the instant matter (id.) On May 30, 2002, Mr. Wentling examined a firearm in the custody of the Norristown Police Department. He viewed the firearm through a plastic bag and manipulated it within the plastic bag. He examined it with his unaided eye and "with a proximate seven power hand lens" (Tr. 42-43).

7. Mr. Wentling stated that he performed a test on two new Sturm Roger & Company, Model P-97 DC, caliber 45 automatics, the same make and model as the firearm in question. He then "framed tests" to test an assertion, the assertion being that markings would be present if the firearm were thrown from approximately waist height, approximately 36-39 inches off the ground, onto a paved surface. Each gun was dropped once on a concrete sidewalk and once on an asphalt or macadam paving. He admitted that he did not perform the test drops to these two Ruger handguns until June 26, 2002, which was approximately

2002 U.S. Dist. LEXIS 22385, *4

[*4] three weeks after he rendered his written opinion in this case (Tr. 46-47, 81).

8. Mr. Wentling testified that he "couldn't replicate the concrete surface in the city of Norristown because he was unaware as to what surface it may have been" (Tr. 48). He selected a representative concrete surface (id.). He took photographs of the concrete sidewalk at the corner of DeKalb and Penn Streets in Norristown and the asphalt paving on De Kalb Street as well as photographs of his two test surfaces (Tr. 49).

9. Mr. Wentling testified that he conducted his two tests by holding the firearm in his hand in the normal firing position, at approximately 36 inches from the ground, and throwing it in a motion from his left to his right, using his right, or stronger, hand (Tr. 51).

10. Mr. Wentling stated that he "had no way of knowing what position the individual was in" when the firearm was actually thrown (id.).

11. Mr. Wentling testified that in his report, he reached the conclusion that a gun of this type, model, and weight, would rotate and strike a certain side first because of its weight and gravity rotation (Tr. 47). He stated that he based his conclusion on his theory that two bodies

Case 1:05-cv-00132-JJF   Document 397-3   Filed 04/20/2007   Page 6 of 143

Page 5
2002 U.S. Dist. LEXIS 22385, *5

[*5] in a vacuum will fall at the same rate (Tr. 48). In this case where "the firearm was given movement and velocity," the heavy side will, if there is sufficient distance and time, come around and go first (id.).

12. Mr. Wentling testified that he is not an engineer and has not had any training in the field of engineering (Tr. 55). Similarly, he is not a mechanical engineer and has not had any training in mechanical engineering (id.). He also has no background or training in kinematics (Tr. 57).

13. Mr. Wentling's only formal education in the field of physics has been an advanced placement physics course in high school, from which he graduated in 1967 (Tr. 55-56).

14. Mr. Wentling has conducted numerous "shock and drop" tests at the Pennsylvania State Police Lab (Tr. 58-59). This testing was not done using any specific standard such as a manufacturer (of a firearm) would use (Tr. 58).

15. Mr. Wentling admitted that while he was employed at the Pennsylvania State Police, he had never made a determination that was included or written in any report that a particular firearm was, in fact, dropped or not dropped (Tr. 59).

16. Mr. Wentling stated that, in one previous instance

2002 U.S. Dist. LEXIS 22385, *6

[*6] in February or March of this year, he had been hired by the Federal Defender's Association to determine (1) whether a firearm had been dropped or thrown and (2) whether the firearm had skidded across a paved highway (Tr. 60). In that one instance, he concluded that the firearm had been dropped based on the "markings, the striation of the firearm itself" that he observed (Tr. 60-61). He did not testify in that case and, therefore, that opinion was never tested in court (id.). He did not remember the name of the case (id.).

17. Mr. Wentling testified that during the period 1988 through 1998 there were "perhaps five" cases in which he rendered an opinion that a particular firearm had struck a hard surface. He was unable to recall either the name or the citation of any of these five cases (Tr. 61-63).

18. When questioned further, Mr. Wentling stated that he recalled that the first case involved the question of whether a lever action rifle had been dropped and struck a surface. He gave an opinion to the prosecutor during pretrial conferences that "it did not appear to have been." He did not testify so his opinion was never tested in court. In connection with that opinion, he performed

2002 U.S. Dist. LEXIS 22385, *7

[*7] a "shock and drop" test where the primary purpose was to determine the mechanical integrity of the rifle. The test was conducted by dropping the rifle on its butt on a hard oak board and not on concrete or asphalt (Tr. 61-66).

19. Mr. Wentling stated that the second case involved the question of whether a .22 caliber rifle discharged when the muzzle struck the floor of the barn. He gave an opinion to the prosecutor that the rifle was capable of discharging when dropped onto a concrete surface. That particular issue was never raised in court so his opinion was never tested in court or at trial. In one test that he performed, he dropped a similar rifle on its butt from "a foot or so" onto a concrete surface to see if it would discharge upon being struck. The purpose of that test was to determine operability (Tr. 67-68).

20. Mr. Wentling stated that he recalled a third case which involved the question of whether a shotgun had struck either a large stone or had been dropped or handled roughly. He gave an opinion to the prosecutor that the shotgun had not been dropped, had not struck a hard subject and had not been roughly handled. The specific issue in that case was faulty mechanics

2002 U.S. Dist. LEXIS 22385, *8

[*8] and/or accidental discharge and not the condition of the shotgun. He performed a variety of tests using a similar shotgun including a "shock and drop" test. Although he did not testify in court and, therefore, was not subject to cross examination, other experts based their opinions on his work (Tr. 68-70).

21. Mr. Wentling stated that he recalled a fourth case, in Dauphin County, which involved the issue of operability of the firearm. He testified that the firearm had been dropped onto a surface but there was no cross-examination as to that point. He did not refer to any pre-trial testing (Tr. 70-71).

22. Mr. Wentling stated that he recalled a fifth case, in Cumberland County, which involved the question of whether a double action revolver had been dropped or thrown onto a paved surface. He testified in court as to the condition of the revolver - that it "was marked up and that it could have been" thrown. The issue was not the main focus of his testimony and he does not recall whether he was questioned during cross examination about his opinion that the revolver could have been thrown. He did not refer to any pre-trial testing of this revolver (Tr. 71-72).

23. Mr. Wentling acknowledged

[*9] that he was not present when the Ruger handgun in question was allegedly dropped or thrown. He also had never interviewed or spoken with any of the police officers who were present. Therefore, other than the information from the preliminary hearing transcript, he had no knowledge of the actual height from which the Ruger handgun was thrown or dropped (Tr. 73-76).

24. Mr. Wentling admitted that, in rendering his opinion, he had no way of knowing a number of factors or variables present in the throwing or dropping of the Ruger handgun, including: the movement or speed of the individual throwing or dropping the firearm, the horizontal velocity, the vertical velocity, whether the firearm was revolving laterally, whether the firearm was spinning after it left the individual's hand, and the angle from which the firearm was thrown or dropped (Tr. 76-80).

25. Mr. Wentling admitted that in conducting his "test" he did not attempt to recreate exactly what occurred in this incident because he could not determine the exact conditions that existed when the Ruger handgun was dropped or thrown. Instead, he conducted his "test" based on assumptions he made from reading the preliminary hearing testimony

[*10] of the police officers (Tr. 83, 85).

26. Mr. Wentling admitted that if the conditions that existed when the Ruger handgun was actually dropped or thrown in this case varied from the conditions used in his test or simulation, "then the results may well vary either more severe or less" (Tr. 85).

27. Mr. Wentling admitted that generally "if a harder item strikes a softer item, there can be a transfer - a marking of the softer item." However, he admitted that he could not eliminate the possibility that there would be no marking (Tr. 86).

28. Mr. Wentling admitted that at the time he rendered his written opinion in this case, he had never dropped this particular Ruger handgun at issue in this case (Tr. 87).

29. Mr. Wentling admitted that his "test", consisting of dropping two Ruger handguns, produced examples of "the marks that can result from such a dropping or throwing" (Tr. 88).

30. Mr. Wentling admitted that he did not rely upon, nor is he aware of, any published reports, studies or tests that address the issue of the marking(s) that will occur when a firearm is dropped or thrown (Tr. 89).

31. Mr. Wentling admitted that the several markings on different places of the Ruger handgun

2002 U.S. Dist. LEXIS 22385, *11

[*11] at issue could be the result of the gun's striking a hard paved surface (Tr. 93).

32. Mr. Wentling admitted that he has never been qualified as an expert in any court in the specific area of what damage or marking(s) would result from the dropping or throwing of a firearm (Tr. 90).

33. Lester W. Roane has been employed as the chief engineer at the H.P. White Laboratory in Maryland since 1984. He received a Bachelor of Science Degree in Aeronautical Engineering from Virginia Tech. He received a Master's Degree in Public Administration from Harvard University. He is currently a licensed Professional Engineer in Maryland. His prior employment includes NACA (the space agency before it was renamed NASA), the Atomic Energy Commission (what is now the Nuclear Regulatory Agency) and the United States Army. He was a division chief for the Army's Small Arms Program at the Aberdeen Proving Grounds (Tr. 106-108, 120).

34. Mr. Roane also taught physics and mathematics at Cecil Community College in Maryland for approximately two years before his employment with H. P. White Laboratory (Tr. 108-109).

35. Mr. Roane has been qualified to testify as an expert in the field of ballistics in state and

2002 U.S. Dist. LEXIS 22385, *12

[*12] federal court on numerous occasions (Tr. 109-10).

36. Mr. Roane testified that H. P. White Laboratory specializes in testing guns, armor and ammunition and since 1984, he, as the chief engineer, has overseen all testing procedures done there (Tr. 106-107).

37. Mr. Roane testified that he is familiar with the drop-testing of all types of firearms and the standards applied in the industry by the firearm and ammunition manufacturers, including the association known in the industry as "SAAMI" which stands for the Sporting Arms and Ammunition Manufacturers Institute. He has tested or supervised the testing for hundreds of firearms, utilizing the standards established by SAAMI (Tr. 111).

38. In the drop-testing conducted according to the SAAMI standards, each firearm is dropped six times in each of its principal orientations or sides onto a hard rubber mat. Although the purpose of the test is to determine the mechanical integrity of the firearm, there is the added requirement that the firearm be checked for any damage between drops. Mr. Roane testified that in his experience in conducting hundreds of these tests, he has seldom seen any damage on handguns (Tr. 113-114).

39. Mr. Roane

2002 U.S. Dist. LEXIS 22385, *13

[*13] testified he has also conducted drop-testing of handguns according to the more rigorous standards established by the states of Massachusetts and California. Using these standards, each handgun is dropped six or seven times in each of its cardinal or principal orientations onto concrete. Each handgun is checked for damage between drops. In his experience in dropping at least 60 guns, including semi-automatic handguns similar to the Ruger handgun in question, he has observed that most guns show no visible damage, and in the worst case, very little scratching (Tr. 111, 114-116).

40. Mr. Roane testified that he examined the Ruger .45 caliber handgun in question and based on his experience, he was able to render an opinion to a reasonable degree of scientific certainty that the condition of the Ruger handgun was completely consistent with being dropped or thrown onto a hard paved surface (Tr. 116-117).

41. Mr. Roane testified that there was no way to establish that the Ruger handgun has not been dropped or thrown, "because you can't prove a negative and there was nothing to uniquely identify it with having been damaged in any particular way" (Tr. 117).

42. Mr. Roane testified that after

2002 U.S. Dist. LEXIS 22385, *14

[*14] reviewing Frederick Wentling's two reports and listening to his testimony in this case, he believed that Mr. Wentling's test, consisting of dropping two Ruger handguns, once on each of two different surfaces, was of little probative value in this case since the conditions or variables existing at the time the handgun struck the surface are unknown. Without knowing all of those variables, there is no way one could ever conduct a simulation of what occurred on May 12, 2001, the date of the instant crime (Tr. 117-118).

44. Mr. Roane also stated that Mr. Wentling's opinion or conclusion as to how the Ruger handgun - referred to in his report as an irregularly-shaped object -

would have struck the surface with its butt or muzzle striking first is contrary to the basic principles of physics.

45. There is no way of establishing that the pistol in question has not been thrown because there are an infinite number of variables. Some of these variables would include how the pistol would rotate, which side it was on when it struck the surface and its velocity when it was thrown (Tr. 118).

46. When asked to comment on Mr. Wentling's report, Mr. Roane responded, "Most charitably I would refer

2002 U.S. Dist. LEXIS 22385, *15

[*15] to it as uninformed. More realistically, it's fantastic. It simply ignores basic physics - physical principles" (Tr. 119).

47. When asked to explain this answer further, Mr. Roane said "Because as he correctly says, that one an irregular body is moving in free fall through the air, it moves - rotates and moves around its center of gravity. The center of gravity is, by definition, the point at which the mask is equally distributed in every direction. There isn't any heavy side and light side around the center of gravity, by definition. It simply doesn't exist. If there were - if you consider a heavy side and a light side, then you're not moving around the center of gravity" (Tr. 119).

48. Mr. Roane testified that because you know absolutely nothing about the conditions under which it was launched, or dropped, or thrown, you can't possibly know what the conditions were when it hit the ground. Therefore, there would be no way of telling whether the butt of the pistol or the muzzle of the pistol hit first (Tr. 119-120).

49. The Court finds that Mr. Roane's testimony is reliable and persuasive for the following reasons:

> (a) He is a graduate engineer with over twenty years training

2002 U.S. Dist. LEXIS 22385, *16

[*16] and experience in the field of firearms testing.

(b) He has had extensive experience in performing drop or throw tests for firearms manufacturers and in accordance with the requirements of the states of California and Massachusetts. This is significant for our purposes because those tests require that a record of damage to the firearm after it has been dropped or thrown six or seven times must be recorded.

(c) Mr. Roane has conducted drop tests involving at least 60 handguns for the state of Massachusetts. These tests require that a handgun be dropped six or seven times on each of its principal orientations or sides onto concrete. He has performed this test on semi-automatic handguns similar to the Ruger handgun in question. As a result of his experience in conducting these tests, he has observed slight to no visible damage to the handguns tested.

(d) Based on his experience in conducting tests on firearms, Mr. Roane explained that there are far too many unknown variables or conditions under which the Ruger handgun in question could have been dropped or thrown for anyone to be in a position to conduct a simulation of what occurred in the case at hand.

50. Although Mr. Wentling

2002 U.S. Dist. LEXIS 22385, *17

[*17] has been qualified as an expert in the field of firearms and toolmark identification, he has never testified in any Court where the specific issue was whether a handgun had been dropped or thrown based on the markings or lack of markings on the firearm.

51. Mr. Wentling testified that he was not relying on any published reports, literature or other studies in rendering his opinion in this case.

52. Mr. Wentling stated that he performed his test or simulation involving the two Ruger handguns based upon conditions that he assumed from his reading of the transcript of the Preliminary Hearing. He admitted that he could not determine the exact conditions that existed

when the Ruger handgun in question was actually dropped or thrown. He also admitted that if the conditions that existed at the time the Ruger handgun was actually dropped or thrown were different from the conditions he employed in conducting his test, then the results might very well vary.

53. Mr. Wentling never rendered his opinion to a reasonable degree of scientific certainty.

54. The Ruger handgun that is the subject of the present inquiry does in fact have markings or scratches on various places. Mr. Wentling admitted

2002 U.S. Dist. LEXIS 22385, *18

[*18] that these could be the result of this handgun having struck a hard paved surface. It is for these reasons that I find that Frederick M. Wentling is not qualified to give an expert opinion on the issue of whether or not the handgun, which is the subject of the present litigation, had been dropped or thrown by the defendant on May 12, 2001 as the defendant was allegedly running from the police.

CONCLUSIONS OF LAW

1. The first requirement under Rule 702 is that the witness "proffered to testify to specialized knowledge must be an expert." *Surace v. Caterpillar, Inc., 111 F.3d 1039, 1055 (1997).* See also *In re Unisys Sav. Plan Admin., 173 F.3d 145, 156 (3d Cir. 1999).* While there is no set litmus test to qualify as an expert, there must be some evidence to suggest that the proposed expert possess sufficient knowledge of the subject matter, either through training or experience, to testify as an expert. *Surace, 111 F.3d at 1055.*

2. While Mr. Wentling is qualified as a firearms expert in the usual sense, i.e., for the purpose of determining whether a firearm is operable or whether a bullet has been fired from a particular firearm, he

2002 U.S. Dist. LEXIS 22385, *19

[*19] does not have sufficient expertise to qualify as an expert on the issue of whether the firearm in question had been dropped or thrown onto a paved surface while the Defendant was allegedly running from police.

3. While Mr. Wentling has performed drop tests in the past, they were almost all for the purpose of determining whether a particular firearm would accidently discharge when dropped, not for the purpose of determining what marks were left on the firearm as a result of being dropped.

4. According to the Third Circuit, to assess an expert's methodology under Rule 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)* and *Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999)*, a district court must be mindful of the following factors:

    a. whether a method consists of a testable hypothesis;

    b. whether the method has been subjected to peer review;

    c. the known or potential rate of error;

    d. the existence and maintenance of standards controlling the technique's operation;

    e. whether the method is generally accepted;

    f. the relationship of the technique

2002 U.S. Dist. LEXIS 22385, *20

[*20] to methods which have been established to be reliable;

    g. the qualifications of the expert witness testifying based on the methodology; and

    h. the non-judicial uses to which the method has been put."

*Oddi v. Ford Motor Co., 234 F.3d 136, 145 (3d Cir. 2000)* (citations omitted); *Booth v. Black & Decker, Inc., 166 F. Supp. 2d, 215, 219 (E.D. Pa. 2001).*

5. Mr. Wentling has not done sufficient testing to provide a reliable opinion that the numerous different factors, such as the height from which the gun was dropped, the speed of the individual throwing or dropping the firearm, the horizontal velocity, the vertical velocity, whether the firearm was revolving laterally, whether the firearm was spinning after it left the individual's hand, could be said to have been duplicated by considering the possible range of the different variables. Likewise, since Mr. Wentling had issued his initial written opinion before conducting his limited simulation of dropping two guns, it is not clear to me that Mr. Wentling placed any reliance on the two limited tests when he rendered his opinion concerning the handgun at issue.

6. Likewise, because of Mr. Wentling's

2002 U.S. Dist. LEXIS 22385, *21

[*21] lack of expertise pertaining to the issue here, and the absence of sufficient testing, his proposed testimony would not "assist the trier of fact to understand or determine a fact in issue." Id. at 592-93. Moreover, his proposed testimony may likely lead the factfinder to an erroneous conclusion. *In re TMI Litigation, 193 F.3d 613, 665-666 (3d Cir. 1999).*

7. Mr. Wentling admittedly made no attempt to duplicate the exact conditions present at the time of the incident in question; therefore, his attempt at simulation is unreliable. Hence, Mr. Wentling's simulation does not "fit" the facts of this case. *In re Paoli Railroad Yard PCB Litigation, 35 F.3d 717, 743 (3d Cir. 1994).*

8. Finally, because Mr. Wentling testified that the firearm in issue could have been dropped or thrown onto a hard paved surface as alleged by the government, I further find that his proposed testimony does not reflect a degree of scientific certainty in his ultimate opinion which would assist the trier of fact within the meaning of *Fed. R. Evid. 702.*

Wherefore, the Court enters the following Order.

ORDER

AND NOW, this 19th day of NOVEMBER, 2002, upon consideration of the

2002 U.S. Dist. LEXIS 22385, *22

[*22] Government's Motion to Preclude the Defendant from Introducing Expert Opinion Regarding Whether the Condition of the Firearm is Consistent with Having Been Thrown onto a Paved Surface, it is hereby

ORDERED that said Motion is hereby GRANTED. The Defendant is precluded from introducing such

testimony.

BY THE COURT:

ROBERT F. KELLY, Sr. J.

# EXHIBIT 20

LEXSEE 2001 U.S. DIST. LEXIS 1951



Warning
As of: Apr 13, 2007

**SOUTHERN CLAY PRODUCTS, INC., Plaintiff, v. UNITED CATALYSTS, INC., Defendant.**

**CIVIL ACTION NO. H-98-1756**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

*2001 U.S. Dist. LEXIS 1951; 61 U.S.P.Q.2D (BNA) 1297*

**February 1, 2001, Decided**
**February 2, 2001, Entered**

**COUNSEL:** [*1] For SOUTHERN CLAY PRODUCTS, INC., plaintiff: Danny Lloyd Williams, Williams Morgan et al, Houston, TX. Thomas J Wimbiscus, McAndrews Held and Malloy, Chicago, IL, James R. Nuttall, Patricia J McGrath, Michael B Harlin, Dean A Pelletier, McAndrews Held et al, Chicago, IL.

For UNITED CATALYSTS, INC., defendant: Lester L Hewitt, Akin Gump et al, Houston, TX, Donald L Cox, Lynch Cox et al, Louisville, KY. Michael J. McCabe, II, Richard L Rainey, Finnegan Henderson et al, Atlanta, GA. Donald R Dunner, Finnegan Henderson et al, Washington, DC.

For UNITED CATALYSTS INC., counter-claimant: Lester L Hewitt, Akin Gump et al, Houston, TX.

For SOUTHERN CLAY PRODUCTS, INC., counter-defendant: Danny Lloyd Williams, Williams Morgan et al, Houston, TX. Thomas J Wimbiscus, McAndrews Held and Malloy, Chicago, IL.

**JUDGES:** KENNETH M. HOYT, United States District Judge.

**OPINION BY:** KENNETH M. HOYT

**OPINION:**

**MEMORANDUM OPINION**

**I. INTRODUCTION**

This is a patent infringement case brought by the plaintiff, Southern Clay Products, Inc., ("Southern Clay"), pursuant to *35 U.S.C. § 101 et. seq.,* against the defendant, United Catalysts, Inc., ("United"). In this suit, Southern

2001 U.S. Dist. LEXIS 1951, *2; 61 U.S.P.Q.2D (BNA) 1297

[*2] Clay contends that United is violating and causing others to violate two (2) patents owned by Southern Clay, i.e., (U.S. Patent No. 4,664,842 (the "842 patent"); and U.S. Patent No. 5,110,501 (the "501 patent"). n1 This dispute centers on the interpretation of the language of the patents' claims, thus, the Court is to construe the disputed language to facilitate a trial on other unresolved facts. (See Instrument # 241). *See Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995) (in banc), aff'd 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996).*

n1 Prior to trial, the parties entered into an agreement concerning U.S. Patent No. 4,473,675; thus, no issues remain concerning that patent.

The Court made *Markman* determinations and then proceeded to trial on Southern Clay's infringement claims and United's defenses and counterclaim. At the conclusion of Southern Clay's testimonial presentations, and following substantial factual testimony from United, the Court

2001 U.S. Dist. LEXIS 1951, *3; 61 U.S.P.Q.2D (BNA) 1297

[*3] was persuaded that the '842 and the '501 patents were being, literally, infringed. n2 The remaining disputes centered on the scientific evidence that United relied upon as invalidating the '842 and '501 patents and as supporting its counterclaim.

> n2 Southern Clay's witnesses included most if not all of United's fact witness. Therefore, with United's evidentiary proffer, the facts surrounding the dispute were before the Court.

In this Memorandum, the Court addresses: (1) the post trial issues raised by United and Southern Clay; (2) United's counterclaim; and (3) Southern Clay's oral motion for judgment as a matter of law concerning United's defenses and counterclaim.

In summary, the Court considered the evidence, United's proffers, the jury verdict, the *Markman* determinations, the applicable law and the arguments of counsel and determines that judgment should be entered on behalf of Southern Clay and that United's counterclaim and defenses should be dismissed.

## II. THE MARKMAN DETERMINATIONS

2001 U.S. Dist. LEXIS 1951, *4; 61 U.S.P.Q.2D (BNA) 1297

[*4] n3

    n3 Here the Court substantially restates the claim determinations that it entered prior to trial.

*II-A. Description of Invention and its Function* n4

    n4 The science associated with the two (2) patents is not in dispute. Therefore, the Court relates the general science underlying the patents based on Southern Clay's proffered facts and the

evidence.

    Southern Clay's infringement suit seeks claim construction involving two (2) patents: the '842 patent and the '501 patent. These patents concern the manufacture of "organoclays." "Organoclays are industrial chemicals used as gelling agents or thixotropes designed to thicken and otherwise improve the performance of oil or organic solvent based greases, inks, paints, [and] coatings." n5 The technology is such that organoclays may be used with petroleum-based products to make a thick

Page 5

2001 U.S. Dist. LEXIS 1951, *5; 61 U.S.P.Q.2D (BNA) 1297

[*5] grease or with polyester resin products to make fiberglass products. In both instances, the process requires submitting smectite-type clay to a chemical process that produces organoclay.

n5 See Southern Clay's Brief on Claim Construction 1 (Inst. # 139).

The '842 and '501 patents require that smectite-type clay be prepared in slurry form, and passed through a Manton-Gaulin homogenizer at high pressure so that the slurry, as it passes through a narrow gap, undergoes a rapid increase in velocity with a corresponding decrease in pressure followed by cavitation as the velocity decreases beyond the gap. The end product is an organoclay product that enhances the gelling properties in oil and organic solvents.

United also manufactures organoclays. Thus, it is Southern Clay's assertion that United uses the Manton-Gaulin process to manufacture its organoclays, and therefore, infringes claims, 1, 2, 3, 4, 5 and 6 of the '842 patent and claims 1 and 2 of the '501 patent.

*II-B. Standard of Proof/Burden of Proof*

2001 U.S. Dist. LEXIS 1951, *6; 61 U.S.P.Q.2D (BNA) 1297

Page 6

[*6]

The Court's analysis under a summary judgment standard presumes that Southern Clay's patents are valid. *See 35 U.S.C. § 282 (2000)*. To overcome the presumption, United must prove invalidity by "clear and convincing" evidence. *See In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig., 71 F.3d 1573, 1576 (5th Cir. 1995)*. Ordinarily, this standard of proof creates disputed fact issues requiring jury submissions. However, the failure on the part of the nonmoving party to offer proof concerning an essential element of its case necessarily renders all other facts immaterial and mandates a finding that no genuine issue of fact exists. *See Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991)*. With the patent validity presumption established, the Court turns to the review standards that apply to this case.

*II-B-1. Summary Judgment Standard*

*Rule 56(c) of the Federal Rules of Civil Procedure* provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue

2001 U.S. Dist. LEXIS 1951, *7; 61 U.S.P.Q.2D (BNA) 1297

[*7] as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Fed. R. Civ. P. 56(c).* The moving party bears the initial burden of informing the court of the basis for its motion, and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* The court reviews the record by drawing all inferences most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)* (citing *United States v. Diebold, Inc., 369 U.S. 654, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962)).*

However, once the moving party carries its burden, the adverse party "may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(c).* The adverse party must show more than "some metaphysical doubt as to the material facts." *Matsushita, 475 U.S. at 586.*

[*8] If an adverse party completely fails to make an offer of proof concerning an essential element of that party's case, on which that party bears the burden of proof, then all other facts are necessarily rendered immaterial and the moving party is entitled to summary judgment. *See Celotex, 477 U.S. at 322-323.*

II-B-2. *Directed Verdict Standard*

Southern Clay presented a motion for judgment as a matter of law under *Fed. R. Civ. P. 50* at the conclusion of its case. It sought judgment that its patents were valid, enforceable and were being willfully infringed by United

in violation of federal law.

A trial court may grant a judgment as a matter of law when a party has been fully heard on an issue(s). *See Fed. R. Civ. P. 50(a)(1)* and *52(c)*(2000). When such a motion is presented, a court may inform the non-movant of deficiencies in his case and permit an opportunity for the non-movant to correct the deficiency(s). *See Union Oil Co. v. Atlantic Richfield Co., 208 F.3d 989 (Fed. Cir. 2000). See also Allied Colloids, Inc. v. American Cyanamid Co., 64 F.3d 1570 (Fed. Cir. 1995).* Having before it the movant's case and the non-movant's

Page 9

2001 U.S. Dist. LEXIS 1951, *9; 61 U.S.P.Q.2D (BNA) 1297

[*9] response, a court looks at the evidence favorable to the non-movant, draw reasonable inferences favorable to the non-movant, and determines credibility without substituting the court's judgment for that of the jury. *See Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259 (Fed. Cir. 1999).* However, when the court determines that the non-movant position cannot be maintained when viewed in a favorable light, a verdict for the movant on that issue(s), as a matter of law is appropriate. *See C.R. Bard Inc. v. M3 Systems, Inc., 157 F.3d 1340 (Fed. Cir. 1998).*

*II-B-3. Patent Review Standard*

The dispute here, as with all patent disputes, concerns the claim language. When interpreting a patent claim, a court must construe the language in the manner of a person "skilled in the art to which [the patent] pertains." *35 U.S.C. § 112* (2000). Initially, a court should consider the language of the patent itself. See *Vitronics Corp. V. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996); Bell Communications Research, Inc. v. Vitalink Communications Corp., 55 F.3d 615, 619-20 (Fed. Cir. 1995).*

Following

Page 10

2001 U.S. Dist. LEXIS 1951, *10; 61 U.S.P.Q.2D (BNA) 1297

[*10] an examination of the patent language, a court may turn to the "specifications" n6 and "prosecution history" n7 of the patent in order to place the patent language in the appropriate context. *See Eastman Kodak Co. v. Goodyear Tire & Rubber Co., 114 F.3d 1547, 1552 (Fed. Cir. 1997).* Extrinsic evidence, such as expert testimony, inventor testimony, or treatises, may be used to clarify ambiguous patent language, but may not be used to vary or contradict the language of the patent itself. *Markman, 52 F.3d at 980-81.*

n6 The specifications precede the claims. They describe the claims and provide examples of the invention.

n7 The prosecution history represents the complete history of all proceedings and communications with the Patent Office regarding a patent.

*II-C. The '842 Patent Claim Interpretation*

*II-C-1. Introduction*

With regard to Southern Clay's claims of infringement associated with the '842 patent, the parties dispute the meaning of the phrase "substantial average

Page 11

2001 U.S. Dist. LEXIS 1951, *11; 61 U.S.P.Q.2D (BNA) 1297

[*11] particle size reduction" recited in Claims 1 through 6. Southern Clay contends that properly construed, the phrase means a reduction in average particle size sufficient to provide an "enhancement of the gelling properties" of organoclays. To understand Southern clay's patent position a review of the science and the claim language is appropriate.

### II-C-2. The Science of the '842 Patent

The science of smectite clay teaches that clay is water-loving (hydrophilic) and, thus an oil-hating (oleophilic) organic substance. This characteristic makes it naturally impossible for oil based organic solvents to attach to the surface of the clay. However, hydrophilic organic substances, such as clay, may attach to oleophilic organic solvents through use of "quats." Quats are organic compounds with two ends, one hydrophilic and one oleophilic. This characteristic permits quats to link with clay on one end and an oil-based solvent on the other. Thus, when the clay's surface is sufficiently exposed, quats cover the entire surface and the clay becomes oleophilic, permitting attachment to oil-based solvents. With the science in focus, the Court moves to the claim language.

### II-C-3. The Patent

2001 U.S. Dist. LEXIS 1951, *12; 61 U.S.P.Q.2D (BNA) 1297

Page 12

[*12] *Language*

Claim 1 of the '842 patent is the broadest of its six claims. Thus, an interpretation of the language in Claim 1 will impact the remaining claims. It reads in its entirety as follows:

> 1. In a process for manufacture or an organoclay by reacting a smectiti-type [sic] clay with a higher alkyl containing quaternary ammonium compound; the improvement enabling enhancement of the gelling properties of said clay comprising:

> subjecting the clay as a pumpable slurry, to high speed fluid shear *and substantial average particle size reduction,* prior to the said reaction thereof with said ammonium compound, by passing said slurry through narrow gap across which a pressure differential is maintained *causing the slurry at high pressure entering the gap to undergo a rapid increase in velocity with a corresponding decrease in pressure, followed by cavitation as the velocity decreases beyond the gap.*

'842 patent (Col. 8, lines 54-68).

*II-C-4. United's Contentions*

Relying upon the prosecution history and the language of the specifications, United contends that the phrase requires that the reduction in the particle size be in the range of 42-53% as opposed to an

2001 U.S. Dist. LEXIS 1951, *13; 61 U.S.P.Q.2D (BNA) 1297

[*13] unspecified reduction as asserted by Southern Clay. The proof of this limitation, according to United, is established by the fact that the phrase was added to the claim language to overcome rejection by the United States Patent and Trademark Office ("PTO") because of prior art. United points out that the additional language is not found in the specifications. The relevant portion of the '842 patent specifications pertaining to Claim 1 that evinces the absence of the phrase reads:

> Among other things, however, the effect of the Manton-Gaulin mill on particle size characteristics of the bentonite samples, has been evaluated independently of the processing of the present Examples. In one

such instance, the feed particle average size was thus 0.756 microns. It was found that where the energy input to the Manton-Gaulin mill was 210 horsepower hours per ton of clay, the average particle size was reduced to 0.438 microns. In a second instance where the input particle size was the same, 0.756 microns, and the energy input 700 horsepower hours per ton of clay, the average particle size was reduced to 0.352 microns. This data indicates a very substantial average particle size reduction

2001 U.S. Dist. LEXIS 1951, *14; 61 U.S.P.Q.2D (BNA) 1297

[*14] is one consequence of the passage through such mill.

'842 Patent (Col. 5, lines 48-62). Thus, United's argument is one of limitation. United argues that Claim 1's reach should not get beyond the language in the specifications because there is no other definition or interpretation of the phrase found in the patent.

### II-C-5. Southern Clay's Contentions

Southern Clay asserts that United's production and sale of organoclays infringes Claims 1 through 6 of the '842 patent. Southern Clay contends that the phrase "substantial average particle size reduction" simply means a reduction in average particle size sufficient to accomplish the objective of the patent: *i.e.*, enhancement of the gelling properties of the organoclay by the process as recited in Claim 1 of the '842 patent.

Southern Clay also asserts that the parties do not dispute that the term "reduction" means to diminish in size or that the phrase "average particle size" has a specific meaning that persons of ordinary skill in the art would agree upon. Thus, as to these terms and the term "substantial," Southern Clay would accord their ordinary meanings or a meaning that is understood by one of ordinary skill in the

2001 U.S. Dist. LEXIS 1951, *15; 61 U.S.P.Q.2D (BNA) 1297

[*15] art. From this position, Southern Clay argues that taken together these words or the phrase should be interpreted in context with reference to the purpose or consequence intended by the process. Therefore, Claim 1 should not suffer a limitation simply because an identical phase is not found in the specifications.

*II-C-6. Discussion*

To ascertain the meaning of a claim, the Court may consider the claim, the specifications, and the prosecution history associated with it. *Markman, 52 F.3d at 967; Graham v. John Deere Co., 383 U.S. 1, 33, 15 L. Ed. 2d*

*545, 86 S. Ct. 684 (1966).* In construing a claim, terms are given their ordinary and accustomed meaning unless examination of the specifications, prosecution history, and other claims indicate that the inventor intended otherwise. *Nike, Inc. v. Wolverine World Wide, Inc., 43 F.3d 644, 646 (Fed. Cir. 1994)* (citing *Carroll Touch, Inc. v. Electro Mechanical Systems, Inc., 15 F.3d 1573, 1577 (Fed. Cir. 1993).* Thus, where the meaning of the phrase is sufficiently clear in the patent specifications, that meaning must apply. *Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1478 (Fed. Cir. 1998).*

2001 U.S. Dist. LEXIS 1951, *16; 61 U.S.P.Q.2D (BNA) 1297

Page 16

[*16]

Because the parties do not dispute the meaning of the separate terms, the Court focuses on the effect of combining the terms that result in a phrase to determine whether, when taken together and within the context of Claim 1, the phrase connotes a meaning that contradicts or is outside the specifications.

United suggests that the phrase permits Claim 1 to "swallow" the specifications. Thus, the phrase in the Claim 1 is greater in meaning than stated in the specifications. The Court disagrees with United's interpretation of the relationship between the Claim 1 and the specifications. Applying the ordinary meaning of the terms, and the ordinary and accustomed meaning of the phrase, no variance exists between phrase "substantial average particle size reduction" as used in Claim 1, and the specifications that describe, by example, two instances of particle size reduction. n8

n8 In one instance, the particle size of the smectite-type clay is reduced from 0.756 microns to 0.438 microns (a 42% decrease) and in another from 0.756 microns to 0.352 microns (a 52% decrease).

Page 17

2001 U.S. Dist. LEXIS 1951, *17; 61 U.S.P.Q.2D (BNA) 1297

[*17]

This conclusion is appropriate because, contrary to United's position, the term "substantial" when used with the remainder of the phrase describes a "sufficiency." When the term substantial is understood as describing a state of sufficiency for the purpose or consequence intended by the patent, no confusion is engendered.

Recall that the object of the patent is to produce organoclays that improve the performance of oil or organic solvent-based greases, inks and paints by thickening them. In order to produce that result, smectite-type clay must be submitted to a chemical process that is sufficient to produce the reduced particle size necessary to accomplish the bonding process intended. Certainly, there are other processes that accomplish this objective. Therefore, it is not the results that is protected by the '842 patent—it is the process.

*II-C-7. Conclusion*

The Court concludes that there is nothing in the specifications, the prosecution history, or Claim 1 that does violence to the definition of the phrase as used by Southern Clay and as expressed, otherwise, in the '842 patent. Moreover, the prosecution history reveals that the essentials of the Claim 1 language were present

Page 18

2001 U.S. Dist. LEXIS 1951, *18; 61 U.S.P.Q.2D (BNA) 1297

[*18] before the amendment, and did not change with the amendment. Therefore, the presumption of validity obtains. *See 35 U.S.C. § 282 (2000).*

Finally, Claims 2, 3, 4, 5 and 6 are dependent claims and rely upon the validity of Claim 1 for meaning. They are narrower in scope. The nature of a dependent claim is to feature the invention that, standing alone, would not constitute an invention. Therefore, if Claim 1 is valid, dependent claims 2 through 6 are valid. Specifically, Claims 2 and 3 state an invention in accordance with Claim 1, by ". . . *further including impacting the clay at a high velocity beyond said gap. . .* or one *wherein the said pressure differential [a] is in the range. . . .* Because Claim 1 and the specifications language are not at odds, the specifications language does not create a limitation for Claim 1 or the remaining claims. Thus, United has failed to overcome the presumption of validity by clear and convincing evidence. *See In re Mahurkar, 71 F.3d at 1576.*

*II-D. The '501 Patent Interpretation*

*II-D-1. The Science of the '501 Patent*

Organoclays are made primarily from smectite-type clay that naturally

Case 1:05-cv-00132-JJF    Document 397-3    Filed 04/20/2007    Page 43 of 143

Page 19
2001 U.S. Dist. LEXIS 1951, *19; 61 U.S.P.Q.2D (BNA) 1297

[*19] occurs in the environment. The principal ingredient used in organoclays appears in nature as individual platelets. These platelets usually aggregate into particles of various shapes and form agglomerates. Agglomerates appear in both individual clay platelets and in simple or complex clusters of platelet stacks. Breaking up clay agglomerates in a manner that exposes larger surfaces enhances the exchange capacity of clay. The exchange science described in the '842 patent applies to the '501 patent. Like the clay in the '842 patent, increasing the exchange capacity in the '501 patent also increases the clay particle's surface thereby permitting the entire surface of the clay particle to become oleophilic.

United disputes the meaning of the language in Southern Clay's '501 patent. As stated earlier herein, the '501 patent requires that smectite-type clay be submitted to a chemical process whereby the clay passes through a Manton-Gaulin homogenizer at high pressures undergoing a rapid increase in velocity while correspondingly experiencing a decrease in pressure. The end product is an organophilic clay gellant based on separating clay agglomerates. Claim 1 reads:

A process for

Page 20

2001 U.S. Dist. LEXIS 1951, *20; 61 U.S.P.Q.2D (BNA) 1297

[*20] preparing an organophilic clay gellant comprising:

(a) subjecting a slurry of smectite-type clay having a cation exchange capacity of at least 75 milliequivalents per 100 grams of clay to high shear conditions achieved by passing the slurry at least one time through a Manton-Gaulin homogenizer whereby clay agglomerates are separated, said smectite-clay having been previously treated to remove non-clay impurities.

(b) reacting the smectite-type clay with organic cation whereby at least some of the cation exchange sites of the smectite-type clay are substituted with organic cation thereby forming an organophilic clay gellant,

(c) separating the organophilic clay gellant; and

(d) drying the organophilic clay gellant.

'501 Patent (Col. 4, lines 28-44). The '501 patent is distinguished from the '842 patent in that it does not require "substantial average particle size reduction. Instead, the '501 patent claims to improve gelling efficiency in organic solvents by using the Manton-Gaulin homogenizer to separate clay agglomerates.

*II-D-2. United's Contentions*

United focuses its argument on the phrase "whereby clay agglomerates are separated." It argues that

Page 21

2001 U.S. Dist. LEXIS 1951, *21; 61 U.S.P.Q.2D (BNA) 1297

[*21] neither the '501 patent application nor the specifications contains the disputed phrase. Relating the file history of the '501 patent, United asserts, and it is undisputed, that the '501 patent was a result of continuing Application No. 219,831 that was based on Application No. 828,044 originally filed February 10, 1986.

United points out that the '831 application was involved in an "Interference." (Interference Cause No. 102,210). The fact that an Interference was declared, argues United, means that the PTO concluded that the claimed invention was the same invention claimed in the opposing patent, patent 4,695,402 (NL/Rheox, '402 patent). Thus, United asserts that Southern Clay was

required to amend its application adding the words, "clay agglomerates."

Concluding its review of the history of the application, United argues that the phrase "whereby clay agglomerates are separated" relates to the '831 application discussion about the reduction in the particle size of the clay particles. United directs the Court to the '831 application phrase, "reduction in average particle size" and the phrase in the '501 patent "whereby clay agglomerates are separated, noting that the term "agglomerates"

2001 U.S. Dist. LEXIS 1951, *22; 61 U.S.P.Q.2D (BNA) 1297

[*22] is not found in the '831 application. Therefore, the '501 patent is not "patentably distinct" from Southern Clay's '842 patent, which also uses the "reduction in average particle size" language.

### II-D-3. Southern Clay's Contentions

Southern Clay asserts that the '501 patent should not be limited because of the term "whereby." Southern Clay defines the phrase "whereby clay agglomerates are separated" as describing "an inherent result of the process step of passing the slurry at least one time through a Manton-Gaulin homogenizer, which involves the reduction of agglomerates to primary particle size." Thus,

Southern Clay argues that no limitation in the claim should be determined. Moreover, it contends that if any limitation is assigned, the limitation should permit the phrase to mean that "some clusters of smectite-clay particles are disconnected or disassociated, broken or forced apart into two or more parts."

In summation, Southern Clay argues that Claim 1 of the '501 patent is distinguished from Claim 1 of the '842 patent in that "substantial" separation is not mandated by Claim 1 of the '501 patent. Regarding United's argument concerning the Interference, Southern Clay asserts

Page 23

2001 U.S. Dist. LEXIS 1951, *23; 61 U.S.P.Q.2D (BNA) 1297

[*23] that NL/Rheox's '402 patent refers to agglomerates in the alternative, whereas Southern Clay, by amending the '501 patent, is required to reduce the size of agglomerates.

### II-D-4. Discussion

United's same invention challenge to Southern Clay's '501 patent raises an "enablement" argument. Section 112 requires an inventor to describe "the manner and process of using [the invention], in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains. . . to make and use the same." *See 35 U.S.C. § 112 (2000); In re Vaeck, 947 F.2d 488, 495*

*(Fed. Cir. 1991).* Failing to do so could result in the PTO not issuing a patent or, a court declaring the patent invalid.

Organoclays were manufactured before 1980. Thus, the '501 patent is not about manufacturing organoclays; rather, it pertains to the method. The Court rejects United's request to adopt the same meaning for the phrase, "whereby clay agglomerates are separated" as the phrase "substantial average particle size reduction. "While it is possible that the size of the clay particles in the '501 patent process may fit the "substantial' definition

[*24] found in the '842 patent, obtaining a "substantial average size particle" is not required. United's enablement argument is unavailing.

### II-D-5. Conclusion

The Court holds that: (1) the specifications supported the amendment at the time of the Interference; (2) it is appropriate to rely upon the ordinary meaning of the terms or phrase in arriving at a meaning for the phrase; (3) one skilled in the art would understand the phrase and make an appropriate application; (4) the '501 patent claims, specifications, and history adequately describe a method for separating agglomerates that is "patentably distinct" from the method described in the '842 patent for reducing the size of particles; and, (5) the '501 patent requires more than a minimum degree of separation of agglomerates.

Claims 2 and 3 of the '501 patent are dependent claims; therefore, they are substantiated by the Court's holding concerning Claim 1. The Court, therefore, concurs in Southern Clay's proffered definition of the phrase.

## III. UNITED'S DEFENSES AND COUNTERCLAIM

### III-A. United's Use of Manton-Gaulin Homogenizer Infringes

As stated more fully, heretofore, the '842 and '501 patents teach a process

2001 U.S. Dist. LEXIS 1951, *25; 61 U.S.P.Q.2D (BNA) 1297

[*25] where smectite-type clay platelets are passed through a Manton-Gaulin homogenizer at high pressure. The end product is an organoclay product that enhances the gelling properties of clay in oil and other organic solvents. Relying upon the Court's previous rulings, the patents' claim language and conclusions gleaned from the trial evidence, the Court holds that United's use of the Manton-Gaulin homogenizer process in manufacturing organoclays *literally* infringes the '842 and '501 patents. Therefore, the remainder of this Memorandum addresses United's defenses and counterclaim as presented through the evidence and proffers.

### III-B. Dr. Dean Harper's Particle Size Analysis

*Testimony*

In disputing the Court's announcement that United's use of the Manton-Gaulin process constituted infringement and that Southern Clay was entitled to a judgment as a matter of law, United proffered Dr. Dean Harper's "mean percent volume" method for measuring particle size distribution of clay particles. This method uses statistical analysis to measure particle size reduction. He opined that his method debunks Southern Clay's assertion that there is a substantial average particle size reduction in the

Case 1:05-cv-00132-JJF    Document 397-3    Filed 04/20/2007    Page 50 of 143

Page 26

2001 U.S. Dist. LEXIS 1951, *26; 61 U.S.P.Q.2D (BNA) 1297

[*26] clay platelets or particles by the use of the Manton-Gaulin process. Thus, United argues that because average particle size reduction cannot be measured, no infringement is proved.

The Court rejects this conclusion because Dr. Harper's testimony does not satisfy the strictures of the law. *See Daubert v. Merrell Dow Pharm. Inc. 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).* Case law and *Rule 702 of the Federal Rules of Evidence* permit the admission of expert testimony from one who has "knowledge, skill, experience, training or education" concerning the technology at issue. The trial judge has the responsibility to determine the qualification of an expert to give the testimony that he proffers. *Daubert, 509 U.S. at 591.*

The Court determines that, while Dr. Harper is eminently qualified in related technology, he demonstrates that he is unqualified to opine on laser light scattering technology. In fact, Dr. Harper admitted in his deposition that he was unfamiliar with laser light scattering technology prior to being employed by United. After familiarizing himself with the method, Dr. Harper set out to test the method through a statistical method

2001 U.S. Dist. LEXIS 1951, *27; 61 U.S.P.Q.2D (BNA) 1297

[*27] (mean percent volume) that he created. It is undisputed that Dr. Harper's method for testing laser light scattering has not undergone peer-review and ignores the particle size data produced in this case. In fact, another statistical expert, Dr. Stanley M. Deming, declared Dr. Harper's method misleading, incorrect, and an inappropriate method for comparing particle size distribution data. *Id.*

### III-C. Conclusion

The Court finds that Dr. Harper is unqualified by training or experience to render an opinion that contradicts the data evincing particle size reduction measured by laser light scattering technology. The methodology chosen by Dr. Harper is not scientific and is unreliable or misleading. Therefore, Dr. Harper's statistical methodology is of no evidentiary value to the Court's analysis. *See M3 Systems, Inc., 157 F.3d 1340.*

As a further holding, the Court determines that the Manton-Gaulin process does separate clay agglomerate clusters to primary particle size ( '501 patent) and further reduces the average particle size sufficiently to produce "enhancement of the gelling properties" of the organoclays ( '842 patent). Because Dr. Harper's methodology fails to

2001 U.S. Dist. LEXIS 1951, *28; 61 U.S.P.Q.2D (BNA) 1297

Page 28

[*28] satisfy the strictures of the law, the evidence of particle size reduction offered by Southern Clay is undisputed. Equally significant though, average particle size reduction makes sense, both intellectually and as revealed in United's own testings and products. It is convicting that United's sedimentation tests confirm particle size reduction. Moreover, United's product performance and quality show improvement when the Manton-Gaulin process is used.

### III-D. The Tixogel MP Series

United has developed a series of organoclays that it has designated as the "Tixogel MP" series. n9 It is undisputed that the Manton-Gaulin process is used in the manufacture of the Tixogel MP organoclays. United also admits that it uses the Manton-Gaulin process in the manufacture of other United "maximum" performing organoclay products.

n9 The entire series was not included in the charge to the Jury: Tixogel VP-HS, Tixogel VP-CGj, Tixogel VP-W; Tixogel VZ Export; and Tixogel VZ-MP. However, this omission is insubstantial because it is the manufacturing process that infringes.

2001 U.S. Dist. LEXIS 1951, *29; 61 U.S.P.Q.2D (BNA) 1297

[*29]

However, United argues that it does not utilize the Manton-Gaulin process to manufacturing other organoclays, but uses the process only for quality control and to meet performance requirements. This argument is illogical. The sole purpose in using the process is to improve quality control and meet performance requirements. Thus, this argument is unavailing and disingenuous in light of United's substantial investment in Manton-Gaulin equipment.

An inspection of United's plant reveals that the Manton-Gaulin homogenizer is included in United's equipment inventory. Moreover, the equipment, as situated, is an integral part of the organoclay manufacturing process, whether used or not. In other words, no separate physical production plant for manufacturing, what United alleges are non-infringing products, exists.

Admittedly, United can produce organoclays without utilizing the Manton-Gaulin process. Thus, the burden rests on United to establish by clear and convincing evidence that the process that is in use in its plant, is not the Manton-Gaulin process. *See In re Mahurkar, 71 F.3d at 1576.* Notably, it is the process that is in use, and United's records fail to sufficiently

2001 U.S. Dist. LEXIS 1951, *30; 61 U.S.P.Q.2D (BNA) 1297

[*30] delineate the Manton-Gaulin process use from other alleged processes. Significantly, the evidence presented by United fails to reach the necessary evidentiary threshold for a jury submission to quantify United's Manton-Gaulin process use. Its records are woefully incomplete and inaccurate.

There is no genuine issue of material fact that United utilizes the Manton-Gaulin process in the manner and for the uses described in the '501 and '842 patents, and that its use separates clay agglomerates resulting in a "substantial average particle size reduction" of smectite-type clay. No reasonable jury could find otherwise. *See Union Oil Co. v. Atlantic Richfield Co.,*

*208 F.3d 989 (Fed. Cir. 2000); see also Fed. R. Civ.P. Rule 50(a)(1).*

### III-E. Inequitable Conduct Allegations

United also asserts that the inventors failed to disclose material information to the PTO with the intent to mislead. The prosecution history of the '842 patent reveals that the application was initially filed with the PTO on October 3, 1980. An application for the '501 patent was filed on or about February 10, 1986. Both patents eventually issued, but not before a "Notice of Allowance" was filed

Page 31

2001 U.S. Dist. LEXIS 1951, *31; 61 U.S.P.Q.2D (BNA) 1297

[*31] with the PTO. The Notice of Allowance arose when a search report was issued by the European Patent Office concerning another of Southern Clay's patent application, the '548 application. The report cited to a French and English patent. Nevertheless, the allowance was permitted and the prosecution ended.

Concerning the LaPorte '828 patent, the testimonial evidence shows that Dr. Knudson did not receive it until October 16, 1986, after the '842 patent issued. Moreover, Southern Clay contends that at the time that the LaPorte patent was cited in its '548 application, the LaPorte patent was expressed in much broader, generic terms than the language used in the '842 patent. Therefore the LaPorte patent was immaterial to the prosecution of the '842 patent. In addition, Southern Clay argues that the LaPorte patent does not teach or suggest the use of the Manton-Gaulin homogenizer.

Assuming that citation to the LaPorte patent was intentionally withheld by Southern Clay during the prosecution of the '842 application, United has the burden of establishing its materiality. United has presented no evidence during trial or in its proffer that establishes by clear and convincing evidence the materiality

Page 32

2001 U.S. Dist. LEXIS 1951, *32; 61 U.S.P.Q.2D (BNA) 1297

[*32] of the LaPorte patent.

United also points to the invalidation of NL/Rheox's '402 patent as a basis for invalidation of the '842 patent. United argues that the technique disclosed in the NL/Rheox patent for "breaking the bonds" in the clay particle aggregates is similar or identical to the technique taught in the LaPorte patent. Because the '842 patent technique is the same as the NL/Rheox '402 patent, United asserts that it, too, is invalid.

The Court notes that the operative language in both the LaPorte and the NL/Rheox patents is "shear or high shear and abrasion." However, neither patent refers to the Manton-Gaulin homogenizer. The evidence is undisputed that when the LaPorte and NL/Rheox patents were issued, the Waring Blender and the Cowles dissolver were generally used to effect the "high shear" process. There is no evidence that the Manton-Gaulin homogenizer was the desired equipment. Any doubt in the Court's mind on this point is resolved by the prosecution history of the '501 patent that disclosed the LaPorte patent.

During the prosecution of the '501 patent, the patent examiner queried whether the Wright '974 patent, which teaches "high speed fluid shear," obviated the

Page 33

2001 U.S. Dist. LEXIS 1951, *33; 61 U.S.P.Q.2D (BNA) 1297

[*33] '501 patent. Concluding that one skilled in the art would substitute the Manton-Gaulin homogenizer for the Waring Blender, the examiner found that the claims of the '501 patent were patentable. A comparison of the Wright with the LaPorte patents shows that the Wright patent is more revealing and specific than the LaPorte patent. Thus, the Court concludes that the claims of the Wright patent were more material to the prosecution of the '842 and '501 patents than the claims of the LaPorte patent.

In addition to the "high shear" disclosure, the Wright patent reveals the specific equipment that accomplishes the high shear process and the expected results. Notably, the Wright patent is revealed in both the '842 and '501 patents. Thus, the Court concludes, as a matter of law, that the claims of the LaPorte patent were relevant but immaterial to the prosecution history of the '842 patent because, unlike the LaPorte patent, the '842 patent describes the use of a specific and single piece of equipment to accomplish its claimed high shear process. The Court also concludes that a decision by a different court concerning the validity of NL/Rheox patent is not controlling or material to this Court's

2001 U.S. Dist. LEXIS 1951, *34; 61 U.S.P.Q.2D (BNA) 1297

[*34] duty to review the '842 and '501 patents.

United also asserts inequitable conduct by Southern Clay in failing to disclose an article; *Simon, et. al. Effects of Processing on the Rheology of Thixotropic Suspensions,* 50 Pharm. Science 830(1961). (the "Simon article"). United admits that Southern Clay did not learn of the Simon article until Southern Clay was faced with the Interference and knowledge of the current litigation between United and NL/Rheox.

Southern Clay could not have intentionally failed to disclose the Simon article because it was unaware of it at the relevant time. Moreover, the materiality of the article must also be proved by clear and convincing evidence.

*Applied Materialss, Inc. v. Advanced Semi Conductor Material, Inc., 98 F.3d 1563, 1569 (Fed. Cir. 1996).* United has failed in both respects, as a matter of law. n10 *See Hebert v. Lisle Corp., 99 F.3d 1109, 1115.*

n10 The evidence reveals that the Perry and Chilton book may have been more relevant to the prosecution history of the '842 and '501 patents than the Simon article. *See Perry* and *Chilton, Chemical Engineers' Handbook* (McGraw-Hill 5th Ed.) (Dx -423).

*III-F.*

2001 U.S. Dist. LEXIS 1951, *35; 61 U.S.P.Q.2D (BNA) 1297

[*35]  *Patent Validity Presumption*

A challenge to the validity of a patent must overcome the presumption of validity by clear and convincing evidence. *See 35 U.S.C. § 282 (2000)*. After considering the evidence presented by United, including its proffer, the presumption remains unabated. There is no evidence that the disclosures made by Southern Clay were insufficient for the PTO to exercise its discretion. Moreover, there is insufficient evidence that the allegedly undisclosed materials were more material to the PTO's decision than those disclosed. Therefore, the Court holds that the presumption of validity remains.

*III-G. Are The '842 and '501 Patents Anticipated?*

United argues that the '842 and '501 patents were anticipated by the Clocker '878 patent and, the Cohn ('778, '790, '791, and RE 25, 965) patents. In order to prevail on this claim, United is required to establish, by clear and convincing evidence, that every element in '842 and/or '501 patents is present in, and arranged as in, the opposed patent(s). *See C.R. Bard, Inc. v. M3 Systems, Inc., 157 F.3d 1340, 1349 (Fed. Cir. 1998)*. Generally speaking, anticipation is limited to

Case 1:05-cv-00132-JJF    Document 397-3    Filed 04/20/2007    Page 60 of 143

Page 36

2001 U.S. Dist. LEXIS 1951, *36; 61 U.S.P.Q.2D (BNA) 1297

[*36] the reference. Thus, reading beyond the reference to prove anticipation is seeking to prove anticipation beyond what is required by statute. *See 35 U.S.C. § 102 (2000).* The evidence presented and proffered by United is insubstantial and fails to prove by clear and convincing evidence that the '842 and '501 patents were anticipated by either of the opposed patents. Laying each of the referenced patents side-by-side with the '842 and/or '501 patents reveals that the claims of the '842 and '501 patents are not arranged similar to the Clocker or Cohn patents.

United's "incorporation by reference" contention also fails. Here, United asserts that the Clocker patent incorporates the Cohn patents by reference. Therefore, by collective reference the Clocker patent anticipates the claims of the '842 and/or '501 patents. This argument, however, is contrary to case law. *See Advanced Display Systems, Inc. v. Kent State Univ., 212 F.3d 1272, 1282 (Fed. Cir. 2000).* Therefore, the Court rejects this argument. *See Ultradent Prods. v. Life-Like Cosmetics 127 F.3d 1065 (Fed. Cir. 1997).*

*III-H. Are The '842 and '501 Patents Obvious?*

United next asserts that Southern Clay's

2001 U.S. Dist. LEXIS 1951, *37; 61 U.S.P.Q.2D (BNA) 1297

[*37] '842 and '501 patents are obvious under *35 U.S.C. § 103* (2000). United's method for determining obviousness combines the Clocker and Cohn patents, the LaPorte patent, and the Simon article. However, United admits that the prior art does not suggest that a person of ordinary skill in the art should combine the Clocker, LaPorte and Cohn patents, and the Simon article to determine what the prior art teaches. Therefore, this contention fails under § 103(a).

United does not suggest that the Simon article teaches such a practice. In fact, United proffered the testimony of Dr. Constantine D. Armeniades who admitted that he was unaware of any teaching that would combine patents and articles as the standard for determining obviousness. Thus, the argument fails as a matter of law. Similarly, the facts and the inferences to be drawn from the facts, would not lead a reasonable juror to conclude that combining patents and articles is appropriate.

The evidence does not reach the threshold legal level required by law for jury submission. Thus, the Court concludes that the Clocker, Cohn and LaPorte patents when joined with the Simon article do not disclose all the claimed

2001 U.S. Dist. LEXIS 1951, *38; 61 U.S.P.Q.2D (BNA) 1297

[*38] elements of the '842 and '501 patents. On the contrary, the evidence of non-obviousness is sufficiently compelling.

### III-I. Are '842 And '501 Patents Invalid Due To Prior Invention?

Next, United asserts that the '842 and '501 patents are invalid because of the research done by Dr. John Jordan while working at NL/Rheox. It is noteworthy that the Interference referred to earlier was filed by NL/Rheox during the prosecution of the '501 patent. It was resolved between NL/Rheox and Southern Clay whereby NL/Rheox conceded that the Manton-Gaulin process was invented by Southern Clay. This concession is based in part on the fact that NL/Rheox has no laboratory records to substantiate Dr. Jordan's research claim. n11

> n11 The undisputed evidence shows that Dr. Jordan's Manton-Gaulin experiments occurred in 1969 and were abandoned in 1976.

The Court is obligated to treat United's prior invention argument in the same manner that NL/Rheox treated Dr. Jordan's data; it was of little or no consequence and was considered

2001 U.S. Dist. LEXIS 1951, *39; 61 U.S.P.Q.2D (BNA) 1297

Page 39

[*39] a secret. n12 In its best light, the evidence fails to meet the minimum requirement necessary to constitute a prior invention. Section 102(g) requires that evidence of a prior invention exclude abandonment, suppression or concealment by the inventor. *See 35 U.S.C. § 102(g)* (2000). The evidence proffered, including Dr. Jordan's testimony, leads to the conclusion that NL/Rheox suppressed, concealed or abandoned data evidencing use of the Manton-Gaulin process. Thus, as a matter of law, Dr. Jordan's prior work, if any, cannot be characterized as a prior invention.

n12 Dr. Knudson also worked for NL but was unfamiliar with Dr. Jordan's work concerning clay

slurry shearing utilizing the Manton-Gaulin process. United has proffered no evidence to contradict Dr. Knudson's testimony.

*III-J. Does NL Rheox's Prior Commercialization Invalidate The '842 and '501 Patents?*

United seeks to invalidate the '842 and '501 patents on the basis that NL/Rheox commercially manufactured organoclays using the Manton-Gaulin process before the '842 and '501 patents were invented. United relies upon the proffered testimony of Dr. Jordan, Henry Stuchell and Paul Matejowsky. Interestingly,

2001 U.S. Dist. LEXIS 1951, *40; 61 U.S.P.Q.2D (BNA) 1297

[*40] no one testified that the Manton-Gaulin process was used to produce the organoclays that N/L Rheox commercially sold. Moreover, there are no records establishing the use of the process, experimental or otherwise. The witnesses admitted that they were not privy to an N/L Rheox's manufacturing process that resulted in commercial sales of organoclays.

The Court concludes that the absence of laboratory data to confirm use of the Manton-Gaulin process conclusively establishes that any use was not for commercial sales. However, assuming that organoclays manufactured by the process were sold, any sales were either test sales or sales that were indistinguishable from other non-Manton-Gaulin process sales. In sum, the Court concludes that no prior commercial sales were proved by clear and convincing evidence. *See D.L. Auld Co. v. Chroma Graphics, Corp. 714 F.2d 1144, 1147-48 (Fed. Cir. 1983).*

*III-K. Are The '842 and '501 Patents Derivatives?*

It is also United's position that the '842 and '501 patents are derivatives of NL/Rheox's '402 patent. United argues that Dr. Knudson, while employed by NL/Rheox, learned the subject matter of the '842 and '501 patents from another

Page 41

2001 U.S. Dist. LEXIS 1951, *41; 61 U.S.P.Q.2D (BNA) 1297

[*41] employee of NL/Rheox. The extent of this claim is defined by United's proffer. United's proffer includes the assertion by Dr. Jordan that he assigned the "repeat and refine" task associated with the NL/Rheox patent to one of his assistants, with whom Dr. Knudson worked in the late 1960's. However, Dr. Knudson denies any such collaboration.

The Court is of the opinion that United's reliance on Dr. Jordan's testimony is unavailing. First, Dr. Jordan has yet to produce documentation to substantiate his claim that he did any laboratory work. Second, Dr. Jordan's testimony came during the Interference between NL/Rheox and Southern Clay while the prosecution

history of the '501 patent was being developed. The Interference was settled favorably to Southern Clay.

Finally, United's claim of derivation overlooks United's own evidence that NL/Rheox admitted that the earliest date that NL/Rheox used the Manton-Gaulin process was between 1983 and 1984. *See* (Dx 325). To conclude otherwise is to give undue weight to the unsupported testimony of Dr. Jordan when the law requires otherwise.

As asserted by Southern Clay, derivation requires proof by clear and convincing evidence that a prior conception

Page 42

2001 U.S. Dist. LEXIS 1951, *42; 61 U.S.P.Q.2D (BNA) 1297

[*42] existed and that a communication of that concept occurred. *See Woodland Trust v. Flowertree Nursery. Inc., 148 F.3d 1368, 1373 (Fed. Cir. 1998).* Establishing that a concept existed requires proof beyond the testimony of the inventor. *Id.* To date, no clear and convincing evidence of a concept and a communication have been produced. Therefore, the Court concludes that, to the extent that a concept was fashioned in the mind of Dr. Jordan, it was not corroborated by laboratory data and was not communicated to anyone.

*III-L. Is There Invalidity Due To A Violation of § 135(c)?*

After discovery was concluded and the case was positioned for trial, United sought to amend its pleadings to assert an affirmative defense that the full settlement agreement between Southern Clay and N/L Rheox concerning the Interference was not on file with the PTO as required by *35 U.S.C. § 135(c)(2000).* Section 135(c) requires that:

> Any agreement or understanding between parties to an interference, including any collateral agreements referred to therein, made in connection with or in contemplation of the termination of the interference, shall be in writing

2001 U.S. Dist. LEXIS 1951, *43; 61 U.S.P.Q.2D (BNA) 1297

[*43] and a true copy thereof filed in the Patent and Trademark Office before the termination of the interference as between the said parties to the agreement or understanding . . . Failure to file the copy of such agreement or understanding shall render permanently unenforceable such agreement or understanding and any patent of such parties involved in the interference or any patent subsequently issued on any application of such parties so involved.

The record shows that the PTO issued a receipt, acknowledging that a copy of the settlement agreement had been filed on May 14, 1991. Thus, an evidentiary presumption arises. The PTO would not have issued such a receipt save an appropriate settlement agreement had been filed, pursuant to section 135(c). To overcome this presumption, something more than the absence of portions of the settlement agreement in the PTO's archives is required. United has presented nothing more. Therefore, even if the Court had permitted United to amend its pleadings, the evidence proffered would not meet the threshold requirement to rebut the presumption.

In light of the record, the Court concludes that the amended pleading was properly denied. Alternatively,

Page 44

2001 U.S. Dist. LEXIS 1951, *44; 61 U.S.P.Q.2D (BNA) 1297

[*44] the evidence favored the finding and conclusion that a section 135(c), violation did not occur.

### III-M. Is There Invalidity Due To Judicial Estoppel?

During the Interference litigation between Southern Clay and NL/Rheox, the issue of the validity of both NL/Rheox's '402 patent and Southern Clay's '842 patent arose, in light of the Clocker '850 patent. Because of pleadings filed by Southern Clay during the Interference litigation, United argues that Southern Clay should be judicially estopped from denying admissions made in that litigation. The text of the pleadings relied upon by United states:

> Defendants' previously filed motion for a

temporary stay (sic). For example, NL claims the common mailer of the interfering patents to be anticipated by a patent issued to Clocker, *et. al.* in 1976. This allegation, if true, would invalidate NL's patent under *35 U.S.C. § 102*(b), as well as ECCA's patent.

*See* (Dx 12 at 17, United's Motion for Summary Judgment).

There are at least two foundational problems with United's analysis that undermine its judicial estoppel argument. First, United is reading the pleading out of context. Earlier in the

2001 U.S. Dist. LEXIS 1951, *45; 61 U.S.P.Q.2D (BNA) 1297

[*45] pleadings, Southern Clay argues that the validity of the '842 patent was based on distinctions in the details between the NL/Rheox '402 and its '842 patents. The Court agrees and finds that there is no concession by Southern Clay in these statements.

The second of United's foundational problems is that the pleadings are stated in conditional terms and do not embrace as true the proposition for which they are being offered. The statements relied upon by United expresses nothing more than an opinion based on facts not yet established *i.e.,* that Southern Clay's '842 patent may be invalid. Opinion statements based on assumptions will not support a finding of a judicial admission. *See In re*

*Coastal Plains, Inc., 179 F.3d 197, 206 (5th Cir. 1999).* Thus, United's judicial admission defense is unavailing.

## IV. UNITED'S ANTITRUST COUNTERCLAIM

*IV-A. United's Antitrust Allegations* n13

n13 The following summary, more or less, is found in United's response to Southern Clay's motion for partial summary judgment, which motion challenged United's Antitrust Counterclaim.

2001 U.S. Dist. LEXIS 1951, *46; 61 U.S.P.Q.2D (BNA) 1297

Page 46

[*46]

United asserts three bases for its antitrust counterclaim against Southern Clay. First, United asserts that Southern Clay knowingly attempted to enforce fraudulently obtained patents as prohibited under *Walker Process Equip., Inc. v. Food Machine and Chemical Corp., 382 U.S. 172, 15 L. Ed. 2d 247, 86 S. Ct. 347 (1965)*. United contends that this claim finds validity in its inequitable and fraudulent conduct arguments concerning Southern Clay's conduct before the PTO.

The second basis for United's antitrust counterclaim arises from allegations of bad faith litigation by Southern Clay in pursuing this case knowing of both, the invalidity and unenforceability of the two patents involved. In this respect, United cites to opinions involving identical parties that substantiates its bad faith litigation claim. *See Handgards, Inc. v. Ethicon, Inc., 601 F.2d 986 (9th Cir. 1979) cert. denied, 444 U.S. 1025, 62 L. Ed. 2d 659, 100 S. Ct. 688, 100 S. Ct. 689 (1980)* and *743 F.2d 1282 (9th Cir. 1984) cert. denied, 469 U.S. 1190 (1985)*.

The third basis for United's antitrust counterclaim alleges patent pooling between

Page 47

2001 U.S. Dist. LEXIS 1951, *47; 61 U.S.P.Q.2D (BNA) 1297

[*47] Southern Clay and NL/Rheox when they settled the Interference proceeding and cross-licensed NL/Rheox's '402 and Southern Clay's '842 patents. United argues that this cross-licensing arrangement, constitutes pooling of patents that together constitute a single invention. According to United, Southern Clay licensed NL/Rheox in exchange for NL/Rheox dismissing its suit against Southern Clay. As a result, United argues, the marketplace is closed to competitor such as United. The totality of this conduct, argues United, violates the Sherman Act.

*IV-B. Analysis and Discussion*

The heart of United's antitrust counterclaim is its assertion that Southern Clay and NL/Rheox, knowing the invalidity of their patents, set out to perpetuate a fraud on the PTO and competitors by a cross-licensing agreement. This assertion is validated in United's mind because a federal district court in New Jersey held NL/Rheox's '402 patent invalid. *See Rheox v. UCI, 1995 U.S. Dist. LEXIS 13054, 1995 WL 526542 at 7* (D.N.J. Apr. 25, 1995). However, this Court is of the opinion that United's assertions and arguments are factually unfounded. The fact that Southern Clay and NL/Rheox entered into a settlement that included cross-licensing

2001 U.S. Dist. LEXIS 1951, *48; 61 U.S.P.Q.2D (BNA) 1297

[*48] does not, *ipso facto*, constitute an antitrust violation. *See Standard Oil Co. (Indiana) v. United States, 283 U.S. 163, 75 L. Ed. 926, 51 S. Ct. 421 (1931).* Moreover, a patent, whether held by Southern Clay alone or conjoined with NL/Rheox leaves United in the same market position. This conduct does not evidence a conspiracy.

Specifically, the cross-licensing agreement appears to be based on the reasoned evaluations of wise men. The parties evaluated their respective positions and reached an accommodation based on business judgments. Neither United's pleadings nor its proffers support the view that the cross-licensing agreement blocked or threatened technology, or created a false market. On the contrary, the market appears to be thriving.

Following United's invalidity arguments to their end overlooks the fact that United would likely be entangled in litigation with N/L Rheox or the owners of the Clocker and LaPorte patents. Thus, litigation or license would be United's future in either circumstances. The Court concludes that Southern Clay's conduct does not establish a competitive injury and, furthermore, United has no identifiable injury.

Summary judgment is

2001 U.S. Dist. LEXIS 1951, *49; 61 U.S.P.Q.2D (BNA) 1297

[*49] appropriate where there is an absence of a genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)* (2000); *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. The Court holds, based on its rulings heretofore set out in this Memorandum that there is no genuine issue of material fact and the evidence is insubstantial, failing to support United's antitrust claim. Moreover, there is a complete absence of proof of damages. Therefore, the Court grants summary judgment against United's federal and state antitrust claim.

## V. THE JURY VERDICT AND OTHER PENDING MOTIONS

### V-A. The Jury Verdict

After the Court granted Southern Clay motion for judgment on the issue of infringement and dismissed United's defenses and counterclaim, United proffered the testimony of several additional witnesses. United claimed that this testimonial proffer contradicted Southern Clay's case and would compel the Court to withdraw its rulings. However, United's own admissions concerning use of the Manton-Gaulin process compels the submission of the remaining issues to a jury. The interrogatories

Case 1:05-cv-00132-JJF    Document 397-3    Filed 04/20/2007    Page 74 of 143

Page 50

2001 U.S. Dist. LEXIS 1951, *50; 61 U.S.P.Q.2D (BNA) 1297

[*50] submitted to the jury and the answers returned are:

Interrogatory No. 1

What sum of money do you find by a preponderance of the evidence represents damages adequate to compensate Southern Clay for UCI's infringement of Southern Clay's '842 and '501 patents for damages through March 31, 2000?

| Answer in dollars and cents, if any. | $ 20.9 million |
|---|---|

Interrogatory No. 2

Has Southern Clay proven by clear and convincing evidence that United Catalysts' infringement of the following claims of the '842 patent was willful?

Answer "Yes" or "No"

| Answer | Yes | NO |
|---|---|---|
| Claim 1 | X | |
| Claim 2 | X | |
| Claim 3 | X | |
| Claim 4 | X | |
| Claim 5 | X | |
| Claim 6 | X | |

Interrogatory No. 3

Has Southern Clay proven by clear and convincing evidence that United Catalysts's infringement of the following claims of '501 patent was willful?

Answer "Yes" or "No"

| Answer | Yes | No |
|---|---|---|
| Claim 1 | X | |
| Claim 2 | X | |

The Court received the jury's findings and incorporates them into the Court's Memorandum as its findings and conclusions.

*V-B. Southern Clays Motion For Enhanced Damages*

Southern Clay

2001 U.S. Dist. LEXIS 1951, *51; 61 U.S.P.Q.2D (BNA) 1297

[*51] seeks an enhanced award of damages due to United's willful infringement. The jury determined that United's conduct was willful. It is the Court's opinion that the jury's fact findings on willfulness are based on a legally sufficient foundation. Specifically, the evidence overwhelmingly shows that around 1990, United realized that it had been "left behind" in organoclay technology. Testimony from United's technical staff revealed that the prospect of maintaining a market presence depended upon United developing high performance organoclays. Although United could have produced high performance organoclays without use of the Manton-Gaulin process, the production methods were wasteful, costly and lacked the uniformity and production levels necessary to remain competitive. Therefore, United invested substantially in Manton-Gaulin homogenizer equipment.

United's fear of market loss share is also evidenced in an internal memo that records a December 19, 1990, meeting of United's technical staff. The meeting topic, "Patent Situation in Connection with the Manton-Gaulin Homogenizer," focused on the effects of Southern Clay's '842, the European EPS 220, 346, and NL/Rheox's '402 patents on United's

Page 52

2001 U.S. Dist. LEXIS 1951, *52; 61 U.S.P.Q.2D (BNA) 1297

[*52] market presence. The memo reveals that, were Southern Clay's '842 patent to be held valid, United's ability to manufacture the Tixogel MP-series without infringing would be impossible. On the other hand, if NL/Rheox's '402 patent prevailed, United *might* be able to produce Tixogel MP if produced above 50 (degrees) C, reading the NL/Rheox's '402 patent as limited by the drying temperature of the organoclays. In addition, United concluded that the NL/Rheox '402 patent prevent United from offering Tixogel MP in its polyester resins because the patent did not teach a temperature limitation on polysterenes.

The internal memo, thus, revealed United's alternatives; either obtain a license or violate its competitors' patent(s). United chose the latter course, setting out on a course of dishonesty and deception that also complicated the discovery process. United overlaid its dishonesty and deception in this litigation by raising frivolous defenses and a counterclaim. Revealing also is the fact that United's trial position is contrary to what United knew as truth. United never disputed using the Manton-Gaulin process or that improved products were manufactured through the process. Rather,

2001 U.S. Dist. LEXIS 1951,*53; 61 U.S.P.Q.2D (BNA) 1297

[*53] United relied on Southern Clay's inability to discover its conduct and prove infringement.

The Court has considered the financial condition of United and determines that United will not be financially destroyed by the award of enhanced damages. Moreover, the egregiousness of United's conduct dictates strong medicine. Therefore, the Court holds that because United's conduct was willful, enhanced damages are appropriate. The Court holds that the jury award of $ 20,900,000 in damage award should be tripled, resulting in total damages of $ 62,700,000.

*V-C. Attorney's Fee Request*

The Court determines that this case is exceptional for all the reasons stated heretofore. However, the facts reveal that this case should not have been as complex as it turned out to be. United's deliberate conduct and its failure to disclose the true facts to its own patent attorney further complicated the case. Even now United's patent attorney's statement, that he did not "know [United was] using the Manton-Gaulin in the claimed process," remains unexplained. The effect of United's failing is to have no credible patent attorney opinion. Thus, the Court finds and holds that this is an exceptional case

2001 U.S. Dist. LEXIS 1951, *54; 61 U.S.P.Q.2D (BNA) 1297

[*54] and that a reasonable attorney's fee should be awarded based on the submissions of the parties which the Court finds are undisputed. Therefore, the Court awards $ 2,917,550 in attorney's fees.

### V-D. Pre-judgment and Post-judgment Interest

Southern Clay's motion for prejudgment interest on the damage award is well founded and is, therefore, granted under *35 U.S.C. § 284*. The Court adopts the calculations proffered by Southern Clay in its motion for prejudgment interest. *See* (Instrument No. 313). Through June 30, 2000, the Court awards interest in the amount of $ 8,279,414. From July 1, 2000, through January 31, 2001, interest is assessed at 10% per annum on the total judgment for additional accrued interest of $ 4,140,466. Post-judgment interest shall accrue at the rate of 6.052% per annum on damages and attorneys fees from the date of this judgment.

### V-E. Motion For Permanent Injunction

Also before the Court is Southern Clay's motion for a permanent injunction and United's response. In its response, United claims that an injunction should not issue because: (a) no final judgment has been entered; (b) Southern Clay will not be substantially injured

2001 U.S. Dist. LEXIS 1951, *55; 61 U.S.P.Q.2D (BNA) 1297

[*55] in the interim; (c) the patents-in-suit are invalid; (d) United will be irreparably injured; (e) the public interest dictates against an injunction; (f) the scope of the injunction sought is too broad; and (g) United is likely to succeed on appeal.

The Court has previously addressed each of the concerns in its discussions. These concerns are invalid in light of United's admitted egregious conduct. Based on the Court's findings and conclusions already stated, the Court finds and holds that failure to issue an injunction would be contrary to the express and implied rights that appertain to ownership of the '842 and '501 patents. Therefore, the Court holds that the following injunction shall issue:

United together with its officers, agents, servants, employees, assigns, attorneys, and each and every person in active concert or participation with them, are hereby permanently enjoined as follows:

1. From infringing or contributing to the infringement of U.S. Patent Nos. 4,664,842 and 5,110,501 within the United States until May 12, 2004; and

2. From the manufacture, use, offer for sale, or sale of any organoclay made through the use of the Manton-Gaulin process, including but not limited

2001 U.S. Dist. LEXIS 1951,*56; 61 U.S.P.Q.2D (BNA) 1297

[*56] to the following products:

Tixogel MP, Tixogel MP 50, Tixogel MP 100, Tixogel MP 150, Tixogel W 200, Tixogel MP 250, Tixogel MP 275, Tixogel NT 300, Tixogel MP 350, Tixogel MPG, Tixogel MPR, Tixogel DS, Tixogel DS-MP, Tixogel TE-MP, Tixogel DS-USPI, Tixogel EPA, Tixogel EZ AQUALON, Tixogel EZ- 100, Tixogel EZ-100 Export, Tixogel EZ-100 INK, Tixogel EZ-200, Tixogel LG, Tixogel OP-1194, Tixogel PLA, Tixogel PLS, Tixogel TE, Tixogel TP, Tixogel TP-2, Tixogel TP-100, Tixogel VP, Tixogel VP-BRK, Tixogel VP-CG, Tixogel VP EXPORT, Tixogel VP-GS, Tixogel VP-GS-DB, Tixogel VP-HS, Tixogel VP-LS, Tixogel VP-LS INK, Tixogel VP-USPI, Tixogel VP-W, Tixogel VP-ZB, Tixogel VZ, Tixogel VZ Export, Tixogel VZ-MP, Britone A, Britone B, LUBAD, Viscogel B4, Viscogel B7, Viscogel B8 and Viscogel GM;

3. United shall discontinue manufacturing organoclays until it has removed any and all of its Manton-Gaulin homogenizer equipment from its plant;

4. United shall provide Southern Clay with quarterly verified written assurances (affidavits) executed by the Chief Operations Officer until May 12, 2004, stating that (1) United has taken the necessary steps to comply with this order; and (2) United is

Page 57

2001 U.S. Dist. LEXIS 1951, *57; 61 U.S.P.Q.2D (BNA) 1297

[*57] not infringing and has not infringed any of the claims of the '842 or '501 patents;

5. Southern Clay shall have the right to designate a third-party to enter United's premises during business hours upon four (4) hours notice, to verify compliance with this order;

6. The Permanent Injunction includes without limitation the prohibitions set out in *35 U.S.C. § 271*(f)(1) and (2).

7. This Court retains jurisdiction to interpret and enforce the provisions of this Permanent Injunction, including any future question of its violation or of infringement by United.

*V-F. Other Motions*

The Court has reviewed Southern Clay's motion for the appointment of a fraud examiner based on allegations of continuing fraud on the part of United. While the Court recognizes the frustration experienced, the Court determines that such an appointment would not be productive. Therefore, the motion is denied without prejudice.

All other pending motions not addressed in this Memorandum are Denied. IT IS SO ORDERED.

Signed this 1st day of February, 2001.

KENNETH M. HOYT

United States District Judge

**FINAL JUDGMENT**

Pursuant to the Memorandum Opinion entered in this case, Southern

2001 U.S. Dist. LEXIS 1951, *58; 61 U.S.P.Q.2D (BNA) 1297

[*58] Clay Products, Inc., shall have judgment against United Catalysts, Inc., for actual damages, an attorney's fee, pre-judgment and post-judgment interest, costs of court, and Injunctive relief as follows:

a) Actual damages                                    $ 62,700,000;

b) Pre-judgment interest                             $ 12,419,880

c) Attorney's fee                                    $ 2,917,550

d) Post-judgment interest at the rate of 6.052% per annum on damages,

interest and attorney's fees

e) Cost of Court; and,

f) Injunctive relief as follows:

United together with its officers, agents, servants, employees, assigns, attorneys, and each and every person in active concert or participation with them, are hereby permanently enjoined as follows:

1. From infringing or contributing to the infringement of U.S. Patent Nos. 4,664,842 and 5,110,501 within the United States until May 12, 2004; and

2. From the manufacture, use, offer for sale, or sale of any organoclay made through the use of the Manton-Gaulin process, including but not limited to the following products:

Tixogel MP, Tixogel MP 50, Tixogel MP 100, Tixogel MP 150, Tixogel W 200, Tixogel MP 250, Tixogel MP 275, Tixogel NT 300, Tixogel MP 350, Tixogel MPG, Tixogel MPR, Tixogel

Page 59

2001 U.S. Dist. LEXIS 1951, *59; 61 U.S.P.Q.2D (BNA) 1297

[*59] DS, Tixogel DS-MP, Tixogel TE-MP, Tixogel DS-USPI, Tixogel EPA, Tixogel EZ AQUALON, Tixogel EZ- 100, Tixogel EZ-100 Export, Tixogel EZ-100 INK, Tixogel EZ-200, Tixogel LG, Tixogel OP- 1194, Tixogel PLA, Tixogel PLS, Tixogel TE, Tixogel TP, Tixogel TP-2, Tixogel TP-1 00, Tixogel VP, Tixogel VP-BRK, Tixogel VP-CG, Tixogel VP EXPORT, Tixogel VP-GS, Tixogel VP-GS-DB, Tixogel VP-HS, Tixogel VP-LS, Tixogel VP-LS INK, Tixogel VP-US P1, Tixogel VP-W, Tixogel VP-ZB, Tixogel VZ, Tixogel VZ Export, Tixogel VZ-MP, Britone A, Britone B, LUBAD, Viscogel B4, Viscogel B7, Viscogel B8 and Viscogel GM;

3.United shall discontinue manufacturing organoclays until it has removed any and all of its Manton-Gaulin homogenizer equipment from its plant;

4. United shall provide Southern Clay with quarterly verified written assurances (affidavits) executed by the Chief Operations Officer until May 12, 2004, stating that (1) United has taken the necessary steps to comply with this order; and (2) United is not infringing and has not infringed any of the claims of the '842 or '501 patents;

5. Southern Clay shall have the right to designate a third-party to enter United's premises during business hours upon

Page 60

2001 U.S. Dist. LEXIS 1951, *60; 61 U.S.P.Q.2D (BNA) 1297

[*60] four (4) hours notice, to verify compliance with this order;

6. The Permanent Injunction includes without limitation the prohibitions set out in *35 U.S.C. § 271(f)(1) and (2)*.

7. This Court retains jurisdiction to interpret and enforce the provisions of this Permanent Injunction, including any future question of its violation or of infringement by United.

This is a Final Judgment.

Signed this 1st day of February, 2001.

KENNETH M. HOYT

United States District Judge

# EXHIBIT 21

LEXSEE 2005 U.S. DIST. LEXIS 18424



Positive
As of: Apr 13, 2007

DANIEL ORTIZ, Plaintiff v. YALE MATERIALS HANDLING CORP., Defendant

Civil No. 03-3657 (FLW)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

*2005 U.S. Dist. LEXIS 18424*

**August 24, 2005, Decided**
**August 24, 2005, Filed**

NOTICE:

2005 U.S. Dist. LEXIS 18424, *1

[*1] NOT FOR PUBLICATION

**DISPOSITION:** Defendant's motion to strike testimony of Plaintiff's expert, John B. Sevart, and motion for summary judgment granted.

**COUNSEL:** For DANIEL ORTIZ, Plaintiff: ROBERT AARON PORTER, BAFUNDO PORTER BORBI & CLANCY, CHERRY HILL, NJ.

For YALE MATERIALS HANDLING CORP., HYSTER-YALE MATERIALS HANDLING, INC., Defendants: WILLIAM J. RICCI, LAVIN, O'NEIL, RICCI, CEDRONE & DISIPIO, MOUNT LAUREL, NJ.

**JUDGES:** Honorable Freda L. Wolfson, United States District Judge.

**OPINION BY:** Freda L. Wolfson

**OPINION:**

### MEMORANDUM OPINION

Daniel Ortiz ("Plaintiff" or "Ortiz") brings this action against Yale Materials Handling Corp. ("Defendant" or "Yale") for injuries that Plaintiff sustained while operating a forklift manufactured by Defendant. Plaintiff alleges that Defendant's forklift is defective in design because it should have had (1) a latched rear door to restrain the operator, and (2) warnings advising the operator to stay inside the operator compartment in the event of a tip-over. Defendant maintains that the design of its forklift is not defective, the forklift is safe for its intended use, and that operators who remain in the operator compartment in a tip-over are at risk for more severe

[*2] injuries.

In support of its defect claim, Plaintiff seeks to introduce the testimony of one expert, John B. Sevart ("Sevart"), and Defendant responds with the testimony of two experts. Plaintiff has moved to strike Defendants' experts. Defendant has moved for summary judgment, asserting that Plaintiff's claim against it must fail because the testimony of Plaintiff's expert is inadmissible. For the following reasons, the Court bars the proposed testimony of Plaintiff's expert, Sevart, finds that Plaintiff's motions are now moot because without an expert to support Plaintiff's alternative design theory, Plaintiff's products liability claim against Defendant fails, n1 and thus, grants summary judgment in favor of Defendant.

n1 In addition to the motions to strike the testimony of Defendant's experts, Plaintiff filed a motion to bar the defense of comparative negligence.

## I. BACKGROUND

### A. The accident

The following facts are not in dispute. On November 22, 2001, in the course of his employment

[*3] with IKEA, Plaintiff was operating an open back, rear entry, stand-up forklift truck (model NR045AC), which was manufactured and assembled in October 1996 by Yale. n2 At the time of the accident, Plaintiff was using the forklift truck in an IKEA warehouse to place a couch on a rack when the forklift tipped over and fell to the ground. There were no eyewitnesses to the accident, but Plaintiff's co-worker heard the accident, and then discovered the forklift lying on its side and Plaintiff lying beside it with his left foot pinned beneath the forklift's overhead guard. Def. Mot. Summ. J. at 2. Plaintiff testified that he tried to stay in the forklift during the tip-over, but that he "naturally fell out." Ortiz Dep. at 76. Plaintiff also testified that he had been trained to jump from the forklift in the event of a tip-over, but because there was no room between the forklift and the wall, Plaintiff testified that his "best bet was to stay inside and try to ride it down." Id. at 86. As a result of the accident, Plaintiff's foot was amputated, and he has accumulated substantial medical bills. See Pl. Compl. P6. According to Plaintiff, he can no longer engage in many business and

[*4] personal activities because of the injuries from the accident. See id.

> n2 NACCO Materials Handling Group, Inc. is the successor-in-interest to Yale Materials Handling Corporation. See Def. Mot. Summ. J. at 1.

**B. Procedural history**

Plaintiff filed suit against Yale, the manufacturer and distributor of the forklift, asserting claims of design defect and products liability. See id. P5. Plaintiff claims that the forklift is defective in design because it lacked a latching rear door to the operator's compartment and thus failed to protect the operator in the event of a tip-over. Id. PP3-4.

In its answer, Defendant denies the existence of a design defect and asserts that Plaintiff has failed to state a cause of action under the New Jersey Products Liability Act, *2A:58C-1 et. seq.* Def. Ans. at 4. On April 7, 2005, Defendant filed a motion for summary judgment and moved to bar the proposed testimony of Plaintiff's engineering expert because such testimony does not meet the standards for

[*5] admissibility set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).* n3 Def. Mot. Summ. J. at 10. On July 7, 2005, the Court held a hearing pursuant to *Fed.R.Evid. 104* to determine the admissibility of Plaintiff's expert's proposed testimony.

> n3 Plaintiff moved to bar the expert testimony of Defendant's biomechanical engineer expert on March 7, 2005, and Defendant's engineering expert on March 14, 2005. However, because this Court finds that the proposed testimony of Plaintiff's expert is inadmissible, Plaintiff's claim against Defendant fails and Plaintiff's motions to bar Defendant's experts and

the defense of comparative negligence are now moot.

## II. DISCUSSION

To state a products liability claim in New Jersey, a plaintiff must establish "that the product was defective, that the defect existed when the product left the defendant's control, and that the defect caused injury to a reasonably foreseeable user." *Milanowicz v. The Raymond Corp., 148 F.Supp.2d 525, 528 (D.N.J. 2001)*

[*6] (citations omitted). "Liability should be imposed only when the manufacturer is responsible for the defective condition." Id. (quoting *Reiff v. Convergent Techs., 957 F. Supp. 573, 578 (D.N.J. 1997)* (citations omitted)). To prove the existence of a defect, a plaintiff may rely on the testimony of an expert who has examined the product or offers an opinion on the product's design. *Lauder v. Teaneck Volunteer Ambulance Corps, 368 N.J.Super. 320, 331, 845 A.2d 1271 (App. Div. 2004)* (citing *Scanlon v. General Motors Corp., 65 N.J. 582, 326 A.2d 673 (1974)*). Alternatively, a plaintiff may produce circumstantial evidence of a defect, "such as proof of proper use, handling or operation of the product and the nature of the malfunction, [which] may be enough to satisfy the requirement that something is wrong with [the product]." Id. Where the allegedly defective product involves a complex instrumentality, a plaintiff is required to provide expert testimony. *Lauder, 368 N.J.Super. at 331* (citing *Rocco v. New Jersey Transit Rail Operations, Inc., 330 N.J.Super. 320, 341, 749 A.2d 868 (App. Div. 2000)*). Expert testimony is necessary to assist

2005 U.S. Dist. LEXIS 18424, *7

[*7] the fact finder in understanding "the mechanical intricacies of the instrumentality" and in excluding other possible causes of the accident. *Lauder, 368 N.J.Super. at 331* (citing *Jimenez v. GNOC, Corp., 286 N.J.Super. 533, 546, 670 A.2d 24 (App. Div. 1996)).*

## A. Standard of review

Summary judgment is appropriate where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* A genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* However, a nonmoving party may not rest upon mere allegations, general denials, or vague statements in opposition to a summary judgment motion. *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Engineers, 982 F.2d 884, 890-91 (3d Cir.1992)* (internal citations omitted). Instead, the nonmoving party must set forth specific facts "by means of affidavits, depositions, answers to

[*8] interrogatories, or admissions ... that show there is a genuine issue for the trier of fact to resolve." *Cooper v. Cape May County Board of Social Servs., 175 F.Supp.2d 732, 741 (D.N.J. 2001)* (citations omitted). If the nonmoving party's evidence is merely colorable, or not significantly probative, summary judgment may be granted. *Bowles v. City of Camden, 993 F.Supp. 255, 261 (D.N.J. 1998)* (citations omitted). Conclusory allegations do not meet the non-moving party's duty to set forth specific facts showing that a genuine issue of material fact exists and a reasonable factfinder could rule in its favor. See *Ridgewood Board of Ed. v. Stokley, 172 F.3d 238, 252 (3d Cir.1999)*. At the summary judgment stage, it is not the role of this Court to weigh the evidence or to evaluate its credibility, but to ascertain whether there is a genuine issue for trial. See *Anderson, 477 U.S. at 249*. Therefore, the Court must "view the inferences to be drawn from the underlying facts in the light most favorable to the [nonmoving] party." *Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir.2002)* (quoting *Bartnicki v. Vopper, 200 F.3d 109, 114 (3d Cir.1999)*).

2005 U.S. Dist. LEXIS 18424, *9

[*9]

### B. *Fed.R.Evid. 702* and Daubert

In its motion for summary judgment, Yale contends that the report and proposed testimony of Plaintiff's expert, John B. Sevart, are inadmissible. The admission of expert testimony is governed by *Fed.R.Evid. 702*, which provides that:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto

in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts in the case.

*Fed.R.Evid. 702.* "*Rule 702* imposes three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Crowley v. Chait, 322 F.Supp.2d 530, 535 (D.N.J. 2004)* (quoting *Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir.2000))*.

2005 U.S. Dist. LEXIS 18424, *10

[*10] The Supreme Court in *Daubert* clarified the operation and scope of *Rule 702* with regard to expert testimony. In that case, the Supreme Court held that an "expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation;' the expert must have 'good grounds' for his or her belief." *Crowley, 322 F.Supp.2d at 535* (citing *In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 (3d Cir.1994)* (hereinafter "Paoli") (quoting *Daubert, 509 U.S. at 590)).* The standards set forth in Daubert operate as a framework to ensure the relevance and reliability of expert testimony. *Kumho Tire Co., Ltd.*

*v. Carmichael, 526 U.S. 137, 151, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999).* It is the trial judge's role to serve as the gate-keeper in scrutinizing the evidentiary relevance and reliability of the proposed expert submission. See *Daubert, 509 U.S. at 588-89, 595-97.*

The first step of the *Rule 702* inquiry is to determine whether the expert is properly qualified. "Before an expert witness may offer an opinion pursuant to *Rule 702* he must first be qualified by virtue of specialized expertise.

[*11] " *Elcock, 233 F.3d at 741*. *Rule 702* requires the expert to have "specialized knowledge" with regard to the area he is testifying about. Practical experience or academic training and credentials can form the basis of this specialized knowledge. See id. The Third Circuit has "interpreted the specialized knowledge requirement liberally, and has stated that this policy of liberal admissibility of expert testimony 'extends to the substantive as well as the formal qualifications of experts.' However, 'at a minimum, a proffered expert witness ... must possess skill or knowledge greater than the average layman ....'" Id. (citing *Waldorf v. Shuta, 142*

*F.3d 601, 625 (3d Cir.1998)* (citations omitted)); see also *Paoli, 35 F.3d at 741*.

Next, the court must determine whether the expert's testimony is reliable. Here, the court's inquiry must be based "solely on principles and methodology, not on the conclusions they generate." *Crowley, 322 F.Supp.2d at 539* (quoting *Daubert, 509 U.S. at 595*). However, because "conclusions and methodology are not entirely distinct from one another," *General Electric Co. v. Joiner, 522 U.S. 136, 146, 139 L. Ed. 2d 508, 118 S. Ct. 512 (1997),*

2005 U.S. Dist. LEXIS 18424, *12

[*12] the court must also "examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." *Heller v. Shaw, 167 F.3d 146, 153 (3d Cir. 1999).* It is the trial court's responsibility to evaluate not only the principles and methodologies of the expert, but also whether the expert has properly applied those principles and methods to the facts of the case. *Magistrini v. One Hour Martinizing Dry Cleaning, 180 F.Supp.2d 584, 595 (D.N.J. 2002)* (citing *Fed.R.Evid. 702*).

The U.S. Supreme Court and the Third Circuit have recognized certain factors to guide a trial court's assessment of the reliability of proffered scientific expert testimony. These factors include:

(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable;

2005 U.S. Dist. LEXIS 18424, *13

[*13] (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

See *Daubert, 509 U.S. at 593-94; Paoli, 35 F.3d at 742 n.8; Milanowicz, 148 F.Supp.2d at 531.* As the Supreme Court noted in Daubert, this inquiry is a flexible one, and in this Circuit, it has been held that this list of factors is "nonexclusive" and that "each factor need not be applied in every case." *Crowley, 322 F.Supp.2d at 535* (citing

*Elcock, 233 F.3d at 746*). Rather, the court must tailor its inquiry to the facts of each case and "should consider the specific factors identified in Daubert where [such factors] are reasonable measures of the reliability of the expert testimony." *Id.* (quoting *Kumho Tire, 526 U.S. at 150, 152* (noting that Daubert factors may or may not be useful depending on "nature of the issue, the expert's particular expertise, and the subject of his testimony") (citations omitted)). However, the Third Circuit has also recognized that an expert's testimony need not be flawless for it to be

2005 U.S. Dist. LEXIS 18424, *14

[*14] reliable and admissible, stating that "the grounds for the expert's opinion merely have to be good, they do not have to be perfect." *Paoli, 35 F.3d at 744.*

The Supreme Court has also noted that Daubert's general holding applies not only to scientific knowledge, but also to technical and other specialized knowledge. *Crowley, 322 F.Supp.2d at 536* (citing *Kumho Tire, 526 U.S. at 150*). Moreover, some courts consider additional factors when determining reliability, such as: (i) whether the expert's proposed testimony grows naturally and directly out of the research the expert has conducted independent of the litigation, see *Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1317 (9th Cir. 1995)*, (ii) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, see *Joiner, 522 U.S. at 146*), and (iii) whether the field of expertise asserted by the expert is known to reach reliable results for the type of opinion proffered by the expert, see *Kumho Tire, 526 U.S. 137, 149-150, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999)*). See also *Magistrini, 180 F.Supp.2d at 594-95;*

[*15] *Fed.R.Evid. 702* advisory committee's notes. There is nothing in the Federal Rules of Evidence, Daubert, or its progeny, that "requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Oddi v. Ford Motor Co., 234 F.3d 136, 158 (3d Cir.2000)*; See also *Magistrini, 180 F.Supp.2d at 595* (citing *Joiner, 522 U.S. at 145-46*).

The last step of a *Rule 702* inquiry is to determine "fit" - whether there is a relevant "connection between the scientific research or test result to be presented and particular disputed factual issues in the case." *Milanowicz, 148 F.Supp.2d at 531* (quoting *Paoli, 35 F.3d at 741-43*). "Fit" requires that the expert's testimony not only be reliable, but that it assist the jury by providing it with relevant information for the purpose of the case. *Paoli, 35 F.3d at 743.*

**C. Daubert hearing**

The Third Circuit has established a process

2005 U.S. Dist. LEXIS 18424, *16

[*16] by which a court is to handle Daubert motions. *Crowley, 322 F.Supp.2d at 536.* At the outset, the court must determine, pursuant to *Fed.R.Evid. 104(a)*, whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Id. at 536-37* (citing *Daubert, 509 U.S. at 592*). Although not required in all cases, the Third Circuit has stressed the importance of holding Daubert hearings to determine the qualifications of the expert and the reliability of his or her testimony. *Crowley, 322 F.Supp.2d at 537* (citing

*Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 417-18 (3d Cir.1999)).* The ultimate decision of whether to hold a hearing rests within the discretion of the district court. *Padillas, 186 F.3d at 418.* In a Daubert hearing, the party seeking to introduce the expert bears the burden of establishing admissibility by a preponderance of the evidence. *Crowley, 322 F.Supp.2d at 537* (citing *Daubert, 509 U.S. at 592 n. 10*).

2005 U.S. Dist. LEXIS 18424, *17

[*17] D. Daubert analysis

In its motion for summary judgment, Defendant challenges the admissibility of the testimony of Plaintiff's engineering expert, Sevart. Defendant argues that the effect of a Daubert analysis on Sevart's proposed testimony will result in the exclusion of such testimony, and that as a result, Plaintiff's products liability claim against Defendant fails. Defendant contends that Sevart's methodology and conclusions - that the rear entry, stand-up forklift should have a rear latching door and stay-in-the-truck warning - are unreliable, and that the limited testing Sevart has performed does not properly "fit" with the facts of this case.

1. Sevart's qualifications n4

n4 At the Daubert hearing, Defendant also raised questions regarding Sevart's qualifications. See Tr. 5:7-6:5. Although Defendant does not specifically discuss Sevart's qualifications in its motion for summary judgment, the Court will nevertheless address the issue since an expert's qualifications are part of the Daubert analysis.

2005 U.S. Dist. LEXIS 18424, *18

[*18]

Sevart has a Bachelor's degree and Master's degree in mechanical engineering and has completed course work for a Doctor of Science degree in controls engineering, which is "a hybrid of mechanical engineering, electrical engineering, statistics and electrical hardware." Transcript of July 7, 2005 Hearing, ("Tr.") 6:21-7:12. Sevart has been a licensed engineer for approximately 30 years and has taught mechanical design classes at Wichita State University for 20 years. Tr. 7:13-23. Sevart is a member of the American Society of Mechanical Engineering, the American Society of Agricultural Engineering, the National Society of Automotive Engineering, and the American National Standards Institute ("ANSI"), a non-profit organization that oversees the writing and distribution of various U.S. industry standards, which until recently included forklift safety standards. Tr. 8:15-25.

Sevart has personally investigated over 600 forklift accidents involving all types of forklifts. Tr. 31:6-10. However, he is not a statistician, an expert in biomechanics as a science, or an expert in human factors as a science. Tr. 86:9-20. In fact, during the hearing, Sevart stated that Plaintiff's attorney should

2005 U.S. Dist. LEXIS 18424, *19

[*19] retain a biomechanical engineer to reconstruct the dynamics and kinematics of the accident at issue in this case, because he is not "an expert in that area." Tr. 122:13-123:4, 123:23-124:7.

In light of Sevart's own admission that a biomechanical engineer is needed to reconstruct and understand the accident, even when liberally construing the *Daubert* qualification requirements, the Court finds that Sevart is not qualified to offer testimony as to the dynamics of this particular accident or the forces acting on Plaintiff at the time of such accident.

### 2. Reliability

According to Sevart, stand-up forklift operators are safer staying in the operator compartment during a tip-over than jumping out of the compartment. Sevart also contends that the stand-up forklift that caused Plaintiff's injuries was defective because it did not have a self-latching rear door to the entrance of the operator's compartment and a stay-in-the-truck warning inside the compartment. Pl. Opp. at 1. Defendant, on the other hand, argues that Sevart's testimony should be excluded on Daubert grounds because of the lack of relevant testing and the unreliable methodology employed by Sevart in connection

2005 U.S. Dist. LEXIS 18424, *20

[*20] with the formulation of his opinion. Although it has been held that each Daubert factor need not be applied in every case for an expert's testimony to be admissible, see *Crowley, 322 F.Supp.2d at 535* (citation omitted), an expert must have 'good grounds' for his opinion, and in the case of alternative designs, testing is crucial. See *Dhillon v. Crown Controls Corp., 269 F.3d 865, 870 (7th Cir.2001)* (citations omitted). Here, Sevart has never performed any dynamic testing with a moving forklift, either with a dummy or human, nor has he done any computer simulations to test his proposed rear door

alternative design and stay-in-the-truck theory with the Yale forklift model at issue in this case. Def. Mot. Summ. J. at 5. In fact, Sevart himself acknowledged that he did not perform any tests with a stand-up forklift, with or without a rear door, in a lateral tip-over, which is the type of accident at issue in this case. Tr. 64:12-18. Sevart also admitted that he did not conduct any analysis or tip-over tests using the particular Yale model forklift that Plaintiff was operating at the time of the accident. In fact, Sevart never saw or operated the Yale

2005 U.S. Dist. LEXIS 18424, *21

[*21] model forklift involved in Plaintiff's accident. Tr. 31:11-17, 32:19-23.

In forming his opinion, Sevart relied heavily on the Crown Accident Reports, which consist of 804 accident reports collected over a 15 year period by Crown, a forklift manufacturer, Tr. 33:1-6, 34:14-21. However, Sevart could not confirm that a single one of these reports was completed by a representative of Crown. Instead, each report was completed by someone at the scene of the accident who did not work directly for Crown. Tr. 84:14-85:9. Moreover, Sevart admitted that he accepted the contents of the documents provided by Mr. Dunlap, a Crown employee, without investigating exactly what

happened in any of the accidents or how the severity of injuries was determined. Tr. 85:10-24. Furthermore, Sevart made no attempt to correlate Plaintiff's accident to the Crown accidents in order to determine if any of the 804 accidents involved a substantially similar or identical forklift to the Yale forklift model involved in this case. Tr. 99:17-24.

The most troubling aspect with the reliability of the Crown data is that Sevart did not use any methodology or analysis to reach his conclusion regarding operator safety in

2005 U.S. Dist. LEXIS 18424, *22

[*22] forklifts. According to Sevart, Crown did not conduct any statistical analyses or inquiries to assess the validity or reliability of the accident reports. Tr. 46:15-18. Sevart even testified that there is no conclusion to be drawn from these tables of Crown accident reports, but rather, that the reports merely show a statement of fact; namely "that the operator is better protected by staying in the confines of the forklift than if he tried to jump." Tr. 47:9-19. For example, Table 7.2 of the Crown Stand-Up Forklift Accident Reports ("Report") compares the severity of injury sustained by forklift operators during tip-over accidents with the various actions taken by such operators - either "Ejected," "Jumped," "Jumped/Ejected," "Stayed," or "Unknown." n5 Pl. Opp. Ex. 4 at 20. According to this table, 8 operators were ejected, 63 jumped, 1 jumped/ejected, 29 stayed and 26 were unknown. Id. The Report shows that the only category of operators who sustained a fatal injury were those operators who "jumped" from the forklift. Id. In every other category, a number of operators sustained minor or no injuries, except for the one operator who sustained a major injury when he "jumped/ejected"

2005 U.S. Dist. LEXIS 18424, *23

[*23] from the forklift. Id. In light of this data, the Court repeatedly asked Sevart what statistical analysis he performed to account for the fact that there were substantially more operators who jumped from the forklift than stayed in the operator compartment. Sevart merely responded that the data did not reflect "a sophisticated analysis," Tr. 50:21-22, and that he did not conduct any technical, statistical, or mathematical analyses with respect to such data. Tr. 50:1-18.

n5 Of those operators who were "ejected" from the forklift, 2 operators sustained no injuries, 4 sustained minor injuries and 2 suffered major injuries. Pl. Opp. Ex. 4 at 20. Of those operators who "jumped" from the forklift, 1 was fatally injured, 4 sustained major injuries, 6 sustained minor injuries and 52 sustained no injury. Id. The one operator who "jumped/ejected" from the forklift received a major injury. Id. Of those operators who "stayed" in the machine, 11 sustained minor injuries, 15 suffered no injury, and 3 were unknown. Id. The Report also contained an "Unknown" category where 18 operators sustained no injury, 5 suffered minor injuries and 3 were unknown. Id.

2005 U.S. Dist. LEXIS 18424, *24

[*24]

Because a layperson could easily read raw numbers in a chart and formulate some sort of conclusion regarding such numbers, the Court directed Sevart to a chart in the Report where there appeared to be some breakdown of the numbers with respect to lateral tip-overs of forklifts. Tr. 55:14-56:5. This chart shows the type of injury the operator suffered during a side or lateral tip-over, based on whether the operator "stayed" in the forklift or performed some "other" act during an accident. See Pl. Opp. Ex. 4 at 22. However, the chart does not specify those operators who jumped or were ejected from the forklift. n6 See id. After addressing the discrepancy in numbers, the Court again asked Sevart about the methodologies he employed to reach his conclusion. Sevart merely responded that there was "no specific mathematical model created. It's simply the numbers themselves were compared." Tr. 55:14-56:15.

n6 Of the 82 total incidents, 60 operators suffered no injury. In these 60 incidents, 11 operators stayed in the forklift and 41 came out of the forklift; however, the actions of 9 operators were unknown. See Pl. Opp. Ex. 4 at 22. Furthermore, the chart shows that out of the 16 operators who suffered minor injuries, 8 stayed in the forklift and 4 came out; however, the actions of 4 operators were not accounted for. Id. There were 2 major injuries and 1 fatality, all suffered by operators who came out of the forklift. Id.

2005 U.S. Dist. LEXIS 18424, *25

[*25]

"[A] proffered expert witness . . . must possess skill or knowledge greater than the average layman . . . .'" *Elcock, 233 F.3d at 741* (citing *Waldorf, 142 F.3d at 625* (citations omitted)); see also *Paoli, 35 F.3d at 741.* Sevart's simple review of the numbers in the chart, which does not incorporate any kind of statistical or mathematical analysis, offers no substantial support for his opinion that operators are safer staying inside a forklift rather than jumping out during a lateral tip-over, and that a stand-up forklift should come equipped with a rear door and a warning. It is clear from Sevart's testimony during the hearing that he employed no special skill or technique different from a layperson in forming his opinion and conclusions regarding forklift safety. Sevart did not use any methodology to account for the difference in the number of operators who jumped from the forklift versus those who remained in the operator compartment during a tip-over.

Similarly, Sevart's "tests" with forklifts are unreliable and unhelpful for numerous reasons. In 1992, Sevart re-created accident tip-overs with a stand-up forklift truck using

2005 U.S. Dist. LEXIS 18424, *26

[*26] a live subject (the "Berry Test"). See Pl. Opp. at 6; Ex. 7. However, there are several crucial differences between Plaintiff's accident and the simulated tip-overs. First, the Berry test was performed using a Yale forklift different from the one at issue in this case, and it was equipped with a rear door. Second, the simulated accident was a rear tip-over, not a lateral tip-over which caused Plaintiff's injury. Third, Mr. Berry, the test subject and senior engineer with Sevart's company, remained inside the operator compartment during the tip-over and was equipped with a helmet and the knowledge that a tip-over was imminent. Finally, handholds were added in the forklift's operator compartment to enable Mr. Berry to better restrain himself during the tip-over. See id. Ex. 7 at 2-3; Tr. 105:6-14. In short, the Berry Test bears little resemblence to the facts here or even the type of forklift at issue in this case.

The Court also finds Sevart's fatigue and reaction time tests unreliable. The fatigue test analyzed the impact of a forklift's latching door on an operator who opened and closed such door 100 times in a short period of time. See Pl. Opp. Ex. 6 at 1. However, there

2005 U.S. Dist. LEXIS 18424, *27

[*27] is no information available as to the age, experience, physical strength, or general health of the test subjects. The only information available was that the subjects consisted of 4 men and 1 woman. Id. Without providing any kind of analysis, Sevart concluded that "[a] subjective test of the rear door indicates that the provision of a latching rear door on a standup, rear entry, end control forklift does not provide any increase in fatigue or have undue tiresome effects of the forklift." Id. Even if this conclusion were proven valid, it provides no support for Sevart's conclusion that remaining inside the operator compartment is safer than jumping out of the forklift

during a lateral tip-over.

The same problems of reliability exist with Sevart's reaction time tests. In 1991, Sevart conducted a study to assess the reaction time of eight male test subjects when exiting a stand-up forklift, both with and without a rear door. See Pl. Opp. at 7; Ex. 5. Sevart reported that there was a .5 second increase in exit time with a door; an increase which he considered to be minimal. Id. at 7. However, similar to the fatigue tests, Sevart did not include any information on the

2005 U.S. Dist. LEXIS 18424, *28

[*28] age, experience, physical strength, or general health of the test subjects.

Furthermore, during the Daubert hearing, Sevart had great difficulty recalling the specifics of his tests, including the subjects involved in such tests and the manner in which those tests were conducted. See Tr. 20:4-11; 26:8-27:15; 44:17-47:14; 61:18-62:19. Sevart also appeared confused by the Court's repeated requests to him to clarify whether he performed any kind of analysis of tip-over accidents which showed that an operator is safer remaining inside a forklift. See Tr. 44:17-47:14.

Moreover, disparaging the science of testing and accident reconstruction, Sevart opined that without live human subjects, all accident reconstructions are "bogus" and akin to "reading tea leaves." n7 Tr. 141:14-23. The Court finds incredulous Sevart's position that there is no way to test and obtain reliable answers in the area of forklift safety and lateral tip-overs without using human subjects. See Tr. 136:2-23. While the Federal Rules of Evidence do not have specific provisions governing the admission of computer-generated simulations, reconstruction and animation as substantive evidence, such computer-generated

[*29] evidence has long been accepted as an appropriate means to communicate complex issues to a lay audience, so long as the expert's testimony indicates that the processes and calculations underlying the reconstruction or simulation are reliable. See 57 Am. Jur. Proof of Facts 3d 455 (2005). To restrict accident reconstructions to those involving only human test subjects not only places such individuals in physical danger but also is a further indication of the unreliability of Sevart's methodologies and opinions.

        n7 "The Court: ... Mr. Sevart, ... it is your scientific view that in any accident, only real live people are the only way you can really test. Everything else out there in the accident reconstruction field, or elsewhere, is really bogus because if you are not using a live person in accidents, you can't get the real results?

    Sevart: I would say that's a pretty good description. I personally equated it as to reading tea leaves before I quit doing it." Tr. 141:14-23.

In addition to the unreliability

[*30] of tests conducted by Sevart, the testimony and evidence presented at the Daubert hearing demonstrate that Sevart's conclusions regarding operator safety in a forklift tip-over accident are not generally accepted by others in the relevant scientific/expert community. The Crockett report, a 1995 study on operator safety in stand-up forklifts by Jennifer Crockett, a biomechanical engineer, and David Miller, a product safety engineer, which Plaintiff submitted to the Court, see Pl. Opp. Ex. A, and which Sevart relies upon to support his opinion, see Tr. 66:2-23, actually supports Defendant's position because the Crockett report shows that any device, such

as a latching door, which slows or prevents an operator's egress in an emergency situation, such as a tip-over or off-dock accident, creates an unacceptable risk of severe injury or death. See Tr. 90:11-24; Pl. Opp. Ex. A at 113. The report also states that although a rear door may save "the loss of a foot or leg," it is at the expense of death when the truck is tipped over or driven off the dock. Pl. Opp. Ex. A at 113. Moreover, the Occupational Safety & Health Administration instructs operators to exit stand-up lift

2005 U.S. Dist. LEXIS 18424, *31

[*31] trucks in the event of a tip-over. See Def. Mot. Summ. J. at 8. In addition to the fact that the entire lift truck industry adheres to the opposite view of Sevart, Sevart's rear door theory has been rejected twice by ANSI. n8 Tr. 100:20-101:13. In fact, no forklift manufacturer offers a stand-up forklift with a rear door as standard equipment. Tr. 95:8-96:11.

n8 In the last 15 years, ANSI has twice rejected Sevart's proposed rear door design. Each time there was a vote with respect to such proposal, Sevart's design only received a vote of 1 or 2 - one vote coming from Mr. Berry, a chief engineer with Sevart's company, who was instructed to vote in Sevart's favor. Tr. 100:20-101:21.

Sevart's methodology has also been extensively questioned in another circuit. In two Seventh Circuit cases, Sevart was retained to explain how certain forklifts were improperly designed because they lacked latching rear doors. See *Dhillon, 269 F.3d 865*; *Phillips v. The Raymond Corp., 364 F.Supp.2d 730 (N.D.Ill. 2005)*.

2005 U.S. Dist. LEXIS 18424, *32

[*32] In Phillips, the court found that Sevart's tests, which had been previously criticized in Dhillon, "did not include any testing to indicate whether his design would be feasible, and he never created or tested a prototype or other tangible demonstration of his design." *Phillips, 364 F.Supp.2d at 738.* Similarly, in this case, there is no peer review or publication of Sevart's methods, and the complete lack of methodology behind his conclusions indicates that his testing is unreliable.

During the hearing, the Court frequently asked Sevart which test he was referring to and relying upon, because much of what he opined was unsupported by the studies and tests that Plaintiff had submitted to the Court. See Tr. 138:22-139:16. Sevart stated that he relied only on the Crown Accident Reports, the Berry test, the fatigue test, and the reaction time test to form his opinion. See Tr. 139:20-141:2. Given the complete lack of testing Sevart conducted with stand-up forklifts in lateral tip-overs and his inability to provide a basis for the conclusions in his own charts and findings, it is highly doubtful that Sevart's testimony would be helpful to a jury in determining

[*33] whether the design of Defendant's forklift was defective.

Therefore, Plaintiff has failed to meet his burden of establishing the admissibility of Sevart's testimony by a preponderance of the evidence, and Sevart's proffered testimony - that operators are safer remaining in a forklift during a tip-over and that a stand-up forklift should come equipped with a latching rear door - is, at best, mere speculation unsupported by sound scientific principles and methodologies.

**3. Fit**

Sevart has also not demonstrated a relevant connection between his research and Plaintiff's claim that the design of Defendant's forklift was defective. Sevart never conducted any tests with the Yale forklift model at issue in this case. In fact, he never even saw the particular forklift involved in Plaintiff's accident. See Tr. 31:11-17, 32:19-23. In addition, Sevart has not performed any lateral tip-over testing with forklifts, which is the kind of accident that caused Plaintiff's injuries. The only relevant "testing" Sevart has performed is his review of lateral tip-overs using the data in the Crown Accident Reports. See Tr. 64:12-18; see also *Oddi, 234 F.3d at 158* (excluding

2005 U.S. Dist. LEXIS 18424, *34

[*34] expert opinion in defective design case where expert conducted no tests and failed to calculate forces on plaintiff or truck in accident); *Kass ex rel. Kass v. West Bend Co., 2004 U.S. Dist. LEXIS 22217, 2004 WL 2475606, at *6 (E.D.N.Y. Nov. 4, 2004)* (stating that "courts have repeatedly rejected expert testimony where a proposed theory or alternative design was not properly tested.") (citations omitted). Furthermore, Sevart has not performed any new tests or analyses to determine how Plaintiff was allegedly ejected from the forklift and pinned beneath the machine's overhead guard. It is this Court's responsibility to evaluate whether the expert properly applied accepted principles and methods to the facts of the case. *Magistrini, 180 F.Supp.2d at 595*. Clearly, Sevart has not done so here.

Therefore, Sevart's testing does not "fit" with the facts of this case. There is too great an analytical gap between the data and his opinion that the design of Defendant's forklift was defective. Many of the tests which Sevart relies on, such as the fatigue and reaction time tests, do not address a crucial fact in dispute here - whether the Yale model forklift that injured Plaintiff was defective in design.

[*35] Because Sevart's conclusion regarding forklift design and operator safety is merely unsupported speculation, the Court concludes that his testimony will not be helpful to a jury and is therefore inadmissible.

### E. Summary judgment

"Where the allegedly defective product involves a complex instrumentality, a plaintiff is required to provide expert testimony." *Lauder, 368 N.J.Super. at 331* (citation omitted). Such testimony "is needed in order to help the fact-finder understand 'the mechanical intricacies of the instrumentality' and help to exclude other possible causes of the accident." *Rocco, 330 N.J.Super. at 341* (citation omitted); see *Jimenez, 286 N.J.Super. at 547*; *Sparrow v. La Cachet, Inc., 305 N.J.Super. 301, 304-05, 702 A.2d 503 (App. Div. 1997)*. The instrumentality at issue in this case, a forklift, is a complicated piece of equipment that consists of many intricate mechanical parts. Therefore, a jury would not be able to simply look at its design and determine whether or not it was defective. Rather, an expert's testimony is necessary to assist the jury in understanding the complex safety issues involved in forklift

[*36] design and lateral forklift tip-over accidents. See *Torres v. Schripps, Inc., 342 N.J.Super. 419, 430, 776 A.2d 915 (App. Div. 2001)* (stating that "expert testimony is needed where the factfinder would not be expected to have sufficient knowledge or experience and would have to speculate without the aid of expert testimony.") (citing *Kelly v. Berlin, 300 N.J.Super. 256, 268, 692 A.2d 552 (App. Div.1997)).* In this matter, expert testimony would also show the jury how Plaintiff's accident more likely than not was attributable to the forklift's defective design. See *Lauder, 845 A.2d at 1277* (stating that an explanation of various design criteria is necessary in order to prove existence of a defective design). Without Sevart's testimony, however, Plaintiff will be unable to present evidence with respect to alternative forklift designs and theories of forklift operator safety and thus unable to show that Defendant's forklift was defective in design. Furthermore, without expert testimony, a jury can only speculate as to whether a design defect proximately caused Plaintiff's injuries. "The mere occurrence of an accident and the fact that someone

2005 U.S. Dist. LEXIS 18424, *37

[*37] was injured are not sufficient to demonstrate a defect." *Lauder, 845 A.2d at 1277* (citing *Scanlon, 65 N.J. at 591*). Here, Plaintiff's inability to present evidence regarding the alleged design defect and whether such alleged defect was the proximate cause of his injuries is a fatal flaw to Plaintiff's burden of proof. The Court notes that it is not merely concerned with the weaknesses or shortcomings of Plaintiff's case. Rather, the question is whether Plaintiff has met the essential elements of a products liability claim based on design defect. Without Sevart's testimony, Plaintiff cannot meet his burden of proof and thus does not have a viable products liability claim against Defendant.

## III. CONCLUSION

For the foregoing reasons, Defendant's motion to strike the testimony of Plaintiff's expert, John B. Sevart, and motion for summary judgment are granted. The Court will issue an appropriate Order.

Dated: August 24, 2005

    Honorable Freda L. Wolfson

    United States District Judge

### ORDER

    This matter having been opened to the Court by Daniel Ortiz ("Plaintiff" or "Ortiz"), seeking to bar the expert testimony offered by Yale

2005 U.S. Dist. LEXIS 18424, *38

[*38] Materials Handling Corporation ("Defendant"), and Defendant, seeking summary judgment on Plaintiff's claim, asserting that the proposed testimony of Plaintiff's expert is inadmissible; and the Court having held a hearing on July 7, 2005 to determine the admissibility of the testimony of Plaintiff's expert; and for the reasons set forth in the Memorandum Opinion filed herewith; and for good cause shown,

IT IS on this 24th day of August, 2005,

ORDERED that Defendant's motion for summary judgment on Plaintiff's Complaint is

GRANTED; and it is further

ORDERED that Plaintiff's motions to bar the proposed testimony of Defendant's experts and to bar the defense of comparative negligence are now rendered MOOT; and it is further

ORDERED that the Clerk of the Court shall mark this case CLOSED.

Honorable Freda L. Wolfson

United States District Judge

# EXHIBIT 22

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 23

LEXSEE 2004 U.S. DIST LEXIS 25176



Analysis
As of: Apr 13, 2007

## PHARMASTEM THERAPEUTICS, INC., Plaintiff, v. VIACELL, INC., et al., Defendants.

### Case No. 02-148 GMS

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2004 U.S. Dist. LEXIS 25176*

### December 14, 2004, Decided

**SUBSEQUENT HISTORY:** Appeal dismissed by *Pharmastem Therapeutics, Inc. v. Viacell, Inc., 2005 U.S. App. LEXIS 12444 (Fed. Cir., June 2, 2005)*

**PRIOR HISTORY:** *Pharmastem Therapeutics, Inc. v. ViaCell Inc., 2004 U.S. Dist. LEXIS 18638 (D. Del., Sept. 15, 2004)*

**DISPOSITION:** Defendants' motion for partial reconsideration of post-trial rulings granted. Judgment to enter in favor of defendants and against plaintiff on claim of infringement of *U.S. Patent No. 5,004,681.*

**COUNSEL:** [*1] For PHARMASTEM THERAPEUTICS INC., Plaintiff: Philip A. Rovner, Potter Anderson & Corroon, LLP, Wilmington, DE.

For VIACELL INC, Defendant: Jeffrey L. Moyer, Richards, Layton & Finger, Wilmington, DE; David Allan Felice, Cozen & O'Connor, Wilmington, DE.

For CYRO-CELL INTERNATIONAL INC, CORCELL INC, STEMCYTE INC, BIRTHCELLS TECHNOLOGY INC, BIO-CELL INC, Defendants: Robert F. Stewart, Jr., Dilworth Paxson LLP, Wilmington, DE.

For CBR SYSTEMS INC FKA CORD BLOOD REGISTRY INC, Defendant: Richard D. Kirk, Morris, James, Hitchens & Williams, Wilmington, DE.

For VIACELL INC, Counter-claimant: Jeffrey L. Moyer, Richards, Layton & Finger, Wilmington, DE.

For PHARMASTEM THERAPEUTICS INC., Counter-defendant: Philip A. Rovner, Potter Anderson & Corroon, LLP, Wilmington, DE.

For STEMCYTE INC, BIRTHCELLS TECHNOLOGY INC, CORCELL INC, CYRO-CELL INTERNATIONAL INC, Counter-claimants: Robert F. Stewart, Jr., Dilworth Paxson LLP, Wilmington, DE.

For VIACELL INC, Counter-claimant: Jeffrey L. Moyer, Richards, Layton & Finger, Wilmington, DE; David Allan Felice, Cozen & O'Connor, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

2004 U.S. Dist. LEXIS 25176, *2

OPINION: [*2]

MEMORANDUM

I. INTRODUCTION

On February 22, 2002, PharmaStem Therapeutics, Inc. ("PharmaStem") filed this lawsuit against ViaCell, Inc. ("ViaCell"), Cryo-Cell International, Inc. ("Cryo-Cell"), CorCell, Inc. ("CorCell"), StemCyte, Inc. ("StemCyte"), CBR Systems, Inc. ("CBR"), Birthcells Technology, Inc. ("Birthcells"), Nustem Technologies, Inc. ("Nustem"), and Bio-Cell, Inc. ("Bio-Cell") (collectively, the "defendants") n1, alleging infringement of United States Patents Nos. B1 5,004,681 ("*681 Patent*") and 5,192,553 ("*553 Patent*"). On October 29, 2003, the jury returned a unanimous verdict on all claims

in favor of Pharmastem. The parties then filed several post-trial motions. n2 On September 15, 2004, the court issued a Memorandum Opinion and Order (the "Post-trial Order") addressing the post-trial motions. The court concluded that the defendants do not infringe the '553 patent and granted a partial new trial on the issue of infringement and damages with respect to the '681 Patent. n3

n1 A default judgment was subsequently rendered against NuStem on July 10, 2002. StemCyte and PharmaStem entered a settlement agreement before trial, and StemCyte accordingly was dismissed from this action on October 21, 2003.

2004 U.S. Dist. LEXIS 25176, *3

[*3]

n2 ViaCell filed a renewed motion for judgment as a matter of law, and, in the alternative, a motion for a new trial or for a remittitur, in which the defendants CBR, CorCell, and Cryo-Cell joined. ViaCell filed another alternative motion, in which the other defendants also joined, for findings by the court and/or to alter or amend judgment pursuant to *Federal Rule of Civil Procedure 52, 59(e)* and/or the court's equitable power. PharmaStem filed a motion for enhanced damages, attorneys' fees, pre-judgment interest and post judgment interest, a motion for a permanent injunction, and a motion to strike the

affidavit of Chris Adams submitted in support of ViaCell's motion to alter or amend the judgment.

n3 For a complete recitation of the facts, procedural history, and post-trial rulings of this case, please see *Pharmastem Therapeutics v. Viacell, Inc., 2004 U.S. Dist. LEXIS 18638, C.A. No. 02-148 GMS, 2004 WL 2127192 (D. Del. Sept. 15, 2004).*

Following the Post-trial Order, CorCell and Cryo-Cell filed a motion for partial reconsideration of the court's post-trial rulings. CBR and Viacell joined the motion and

2004 U.S. Dist. LEXIS 25176, *4

[*4] submitted individual memoranda that addressed issues specific to each of them. In addition, ViaCell filed a motion for entry of separate and final judgment pursuant to *Federal Rule of Civil Procedure 54(b)* and a motion for certification for interlocutory appeal pursuant to *28 U.S.C. § 1292(b)*, in which CBR, CorCell, and Cryo-Cell joined. PharmaStem filed a motion for a preliminary injunction, as well as a motion for entry of separate and final judgment pursuant to *Federal Rule of Civil Procedure 54(b)*. For the following reasons, the court will grant the defendants' motion for partial reconsideration, reverse its post-trial ruling as to the '681 patent, and enter judgment as a matter of law ("JMOL") that the defendants do not infringe the '681 patent. n4.

n4 The court will deny the plaintiff's and the defendants' motions for entry of separate and final judgment pursuant to *Federal Rule of Civil Procedure 54(b)*, the defendants' motion for certification for interlocutory appeal pursuant to *28 U.S.C. § 1292(b)*, and the plaintiff's motion for preliminary injunction, because the court's ruling on the motion for reconsideration renders them moot.

2004 U.S. Dist. LEXIS 25176, *4

[*5]

## II. STANDARDS OF REVIEW

### A. Motion For Reconsideration

As a general rule, motions for reconsideration should be granted only "sparingly." *Tristrata Tech., Inc. v. ICN Pharms., Inc., 313 F. Supp. 2d 405, 407 (D. Del. 2004); Karr v. Castle, 768 F. Supp. 1087, 1090 (D. Del. 1991).* In this district, these types of motions are granted only if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension. *See, e.g., Schering Corp. v. Amgen, Inc., 25 F. Supp. 2d 293, 295 (D. Del. 1998); Brambles USA, Inc. v. Blocker, 735 F. Supp. 1239, 1240 (D. Del. 1990)* (citing *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc., 99 F.R.D. 99 (E.D. Va. 1983));* see also *Karr, 768 F. Supp. at 1090* (citing same). Moreover, even if the court has committed one of these errors, there is no need to grant a motion for reconsideration if it would not alter the court's initial decision. *See Pirelli Cable Corp. v. Ciena Corp., 988 F. Supp. 424, 435 (D. Del. 1998).*

2004 U.S. Dist. LEXIS 25176, *6

[*6] Finally, motions for reconsideration "should not be used to rehash arguments already briefed." *TI Group Auto. Sys. v. VDO N. Am., 2002 U.S. Dist. LEXIS 1018 (D. Del. 2002)* (citation omitted); *see also Quaker Alloy Casting v. Gulfco Industries, Inc., 123 F.R.D. 282, 288 (N.D. Ill. 1988)* ("This Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure.").

**B. Renewed Motion for Judgment as a Matter of Law**

Pursuant to *Federal Rule of Civil Procedure 50*, a court may render JMOL after the moving party is fully heard on an issue at trial, if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1238 (3d Cir. 1993)* (citation omitted). If the court denies a motion for JMOL during trial, the motion may be renewed within ten days of entry of judgment in the case. *FED. R. CIV. P. 50(b)*. To prevail on a renewed motion for JMOL following a jury trial, a party "'must show that the jury's findings, presumed or express,

2004 U.S. Dist. LEXIS 25176, *7

[*7] are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings.'" *Pannu v. Iolab Corp., 155 F.3d 1344, 1348 (Fed. Cir. 1998)* (quoting *Perkin-Elmer Corp. v. Computervision Corp., 732 F.2d 888, 893 (Fed. Cir. 1984))*. "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer Corp., 732 F.2d. at 893*. In assessing the sufficiency of the evidence, the court must draw all reasonable inferences from the evidence in the light most favorable to the nonmovant. *Id.; Richardson-Vicks Inc. v. UpJohn Co., 122 F.3d 1476, 1479 (Fed. Cir. 1997)*. The appropriate inquiry is whether a reasonable jury, given the facts before it, could have arrived at the conclusion it did. *Dawn Equip. Co. v. Kentucky Farms, Inc., 140 F.3d 1009, 1014 (Fed. Cir. 1998)*. The court may not determine the credibility of the witnesses nor "substitute its choice for that of the jury between conflicting elements of

2004 U.S. Dist. LEXIS 25176, *8

[*8] the evidence." *Perkin-Elmer Corp., 732 F.2d at 893.*

## III. DISCUSSION

In the Post-trial Order, dated September 15, 2004, the court denied the defendants' motion for JMOL on the issue of infringement and damages with respect to the '681 patent, but granted the defendants' motion in the alternative for a new trial on this issue. By their motion, the defendants request the court to reconsider its Post-trial Order and grant the motion for JMOL.

The defendants contend that Pharmastem failed to meet its burden with respect to infringement of the '681 patent because: (1) the issue before the jury, as Pharmastem chose to try the case, was whether all of the cord blood units processed and cryopreserved by the defendants infringe the '681 patent, and they do not; and (2) Pharmastem was obligated, as a matter of law, to adduce evidence with respect to specific units of cord blood stored by the defendants and to show with respect to those specific units that they contain sufficient stem cells to reconstitute a human adult, and did not meet this obligation. The defendants rely on the Post-trial order for support.

In response, Pharmastem asserts that it adduced substantial

2004 U.S. Dist. LEXIS 25176, *9

[*9] evidence at trial that the defendants infringe the '681 patent. Pharmastem also asserts that the scientific and medical evidence support cord blood transplantation in adults, and that the defendants use that evidence to promote their cord blood banking services for adult use. Pharmastem supports its assertions with statements from the defendants' marketing materials regarding the potential for adult transplantation. Pharmastem also relies on the defendants' testimony regarding their marketing materials, the threshold quantity of cord blood they collect, and the threshold amount of cells they require. Lastly, Pharmastem relies on the Post-trial Order, which states, "the record suggests that at least some of the defendants' cord blood units infringe in that there is evidence of successful transplants of the defendants' compositions into human adults." *Pharmastem Therapeutics, Inc. v. Viacell, Inc., 2004 U.S. Dist. LEXIS 18638, C.A. No. 02-148 GMS, 2004 WL 2127192, at *11 (D. Del. Sept. 15, 2004).*

The parties agree that the only disputed issue at trial was which of the defendants' cord blood units contain stem cells in an amount sufficient to effect hematopoietic reconstitution of an adult. According to Pharmastem's

2004 U.S. Dist. LEXIS 25176, *10

[*10] presentation to the jury, the answer to that issue was that 100%. In other words, Pharmastem's position at trial was that "all" of the defendants' cord blood units infringe the '681 patent. n5 Pharmastem's post-trial motions, as well as its motion for preliminary injunction are unclear as to whether it has changed its position regarding infringement. For example, Pharmastem's opposition to CBR's motion for judgment as a matter of law states that "CBR's admissions in its marketing documents, the standard operating procedures of the company, as well as the testimony of Dr. Harris support a finding that **all** of the samples infringe. . . ." (D.I. 418, at 3). In addition, Pharmastem's opening brief in support of its motion for preliminary injunction defines the issue as follows: "As the Court recognizes, the dispute is not whether any of the defendants' cord blood units infringe, as 'the record suggests that at least some of the defendants' cord blood units infringe . . .', but whether *all (i.e., every single one)* of the defendants' cord blood units infringe." (D.I. 559, at 5) (emphasis added). Pharmastem's opposition brief to the motion for reconsideration, however, states that "there

2004 U.S. Dist. LEXIS 25176, *11

[*11] is abundant medical, scientific, and party proof that the vast majority, if not all, of the defendants cord blood units contain stem cells in an amount sufficient to effect hematopoietic reconstitution of an adult." (D.I. 571, at 14). After reviewing the record, the post-trial motions, and the motion for reconsideration, the court concludes that Pharmastem's position, prior to its briefing on the motion for reconsideration, was that 100% of the defendants cord blood units infringe the '681 patent. n6 Therefore, in order to meet its burden, Pharmastem had to adduce evidence that 100% of the defendants' cord blood units contained stem cells in a sufficient amount to reconstitute a human adult. Pharmastem, however, did not meet its burden.

n5 Indeed, when referring to question fourteen of the verdict form during closing arguments (*i.e.* the question that directed the jury to enter the number of cord blood units that infringe the '681 patent), counsel for Pharmastem told the jury to base the number of units that infringe on the numbers provided by the defendants -- that is, 34,293 for ViaCell; 49,646 for Cryo-Cell; 4,640 for CorCell; and 34,649 for CBR. These numbers are equivalent to the total number of cord blood units stored by each of the defendants. Further, Pharmastem did not refer to any specific unit or units in presenting its case to the jury. Rather, Pharmastem referred to the defendants' cord blood units as a whole.

2004 U.S. Dist. LEXIS 25176, *12

[*12]

n6 The court will hold Pharmastem to its presentation to the jury, as well as its assertions in its post-trial motions and its motion for preliminary injunction.

First, the court has already determined that "the record overwhelmingly indicates that cord blood units will not all contain sufficient cells to reconstitute an adult." *Pharmastem Therapeutics, Inc. v. Viacell, Inc., et al., 2004 U.S. Dist. LEXIS 18638, No. C.A. 02-148 GMS,*

*2004 WL 2127192, at *11 (D. Del. Sept. 15, 2004).* For example, the '681 patent illustrates that each cord blood sample will vary in terms of its cell count. '681 patent Table III (providing cord blood samples with different total volumes and total nucleated blood cells). In addition, Pharmastem represented to the PTO that cord blood units "are highly variable in their stem cell content such that any particular cord blood collection may have low or no stem cells." Tr. Ex. 1370, at 30; *see* Wagner Tr. at 1270. The court, therefore, will affirm its post-trial conclusion that "the jury's finding that *all* of the defendants' cord blood units infringe the '681 patent . . . was against the

2004 U.S. Dist. LEXIS 25176, *13

[*13] great weight of the evidence." *Pharmastem, 2004 U.S. Dist. LEXIS 18638, 2004 WL 2127192, at *11.*

Second, even assuming that "at least some of the defendants' cord blood units infringe in that there is evidence of successful transplants of the defendants' compositions into human adults," the court finds that Pharmastem presented no evidence to the jury from which it could conclude that any specific cord blood unit or units stored by any of the defendants contained stem cells in a sufficient amount to reconstitute a human adult. All of the defendants made available to Pharmastem their data with respect to individual units. Pharmastem,

however, did not have its infringement expert, Dr. Mary Hendrix ("Dr. Hendrix"), testify regarding whether the data indicated that any of the defendants' units infringed. In fact, Dr. Hendrix testified that she did not review the defendants' data. Hendrix Tr. at 1038. Rather, Dr. Hendrix based her infringement opinion on the fact that the defendants "promise stem cells for pediatric and adult transplantation." *Pharmastem, 2004 U.S. Dist. LEXIS 18638, 2004 WL 2127192, at *11.*

In addition, Pharmastem presented no evidence to the court regarding how to quantify the defendants'

2004 U.S. Dist. LEXIS 25176, *14

[*14] infringement and damages flowing from the infringement. Instead, Pharmastem chose to offer the evidence of successful adult transplants to prove that 100% of the defendants' units infringe. However, evidence of one successful adult transplant with a single cord blood unit does not prove that any other unit has sufficient stem cells to reconstitute a human adult because, as previously stated, cord blood units are highly variable in their stem cell content. As such, the court will not infer that 100% of the defendants' units infringe based on the defendants' statements regarding adult transplantation. Pharmastem failed to present evidence to the jury from which it could conclude that any specific cord blood unit or units stored by any of the defendants contained stem cells in a sufficient amount to reconstitute a human adult. The court, therefore, cannot determine which or how many of the defendants' units infringe, or how to quantify damages for infringement. Thus, the defendants are entitled to JMOL because there was no legally sufficient evidentiary basis for a reasonable jury to find that all, or any specific number, of the defendants cord blood units infringe the *'681 patent*.

Dated:

2004 U.S. Dist. LEXIS 25176, *15

[*15] December 14, 2004

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

**ORDER**

For the reasons set forth in the court's Memorandum issued contemporaneously herewith, IT IS HEREBY ORDERED that:

1. The Motion by ViaCell, Inc., Cryo-Cell, Inc., CorCell, Inc., CBR Systems, Inc. for Partial Reconsideration of the Court's Post-Trial Rulings (D.I. 547, 551, 552) is GRANTED.

2. PharmaStem, Inc.'s Motion for a Preliminary Injunction (D.I. 558) is DENIED as moot.

3. The Motion by ViaCell, Inc., Cryo-Cell, Inc., CorCell, Inc., CBR Systems, Inc. for Entry of Separate and Final Judgment Pursuant to *Federal Rule of Civil Procedure 54(b)* (D.I. 547, 548, 552) is DENIED as moot.

4. The Motion by ViaCell, Inc., Cryo-Cell, Inc., CorCell, Inc., CBR Systems, Inc. for Certification for Interlocutory Appeal Pursuant to *28 U.S.C. § 1292(b)* (D.I. 547, 549, 552) is DENIED as moot.

5. Pharmastem, Inc.'s Motion for Entry of Final Judgment Pursuant to *Federal Rule of Civil Procedure 54(b)* (D.I. 563) is DENIED as moot.

6. The clerk shall enter judgment in favor of the defendants and against the plaintiff on the claim of infringement of U.S. Patent No.

2004 U.S. Dist. LEXIS 25176, *16

[*16]  B1 5,004,681.

Gregory M. Sleet

Dated: December 14, 2004

UNITED STATES DISTRICT JUDGE