IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BRIDGESTONE SPORTS CO., LTD.<br>and BRIDGESTONE GOLF, INC., | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 05-132 (JJF) |
| v. | ) ) ) | **REDACTED –**<br>**PUBLIC VERSION** |
| ACUSHNET COMPANY, | ) ) ) | |
| Defendant. | ) | |

**BRIDGESTONE'S ANSWERING BRIEF IN OPPOSITION TO
ACUSHNET'S MOTION FOR SUMMARY JUDGMENT OF
NON-INFRINGEMENT OF U.S. PATENT NO. 5,782,707**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Leslie A. Polizoti (#4299)
1201 N. Market St.
P.O. Box 1347
Wilmington, DE 19801
(302) 658-9200

*Attorneys for Bridgestone Sports Co., Ltd.
and Bridgestone Golf, Inc.*

OF COUNSEL:
Robert M. Masters
Scott M. Flicker
PAUL, HASTINGS, JANOFSKY & WALKER LLP
875 15th St., N.W.
Washington, DC 20005
(202) 551-1700

Original Filing Date: April 30, 2007
Redacted Filing Date: May 7, 2007

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES                                                              iv

NATURE AND STAGE OF THE PROCEEDINGS                                               1

SUMMARY OF ARGUMENT                                                               1

STATEMENT OF FACTS                                                                3

    A.    The '707 Patent                  3

    B.    JIS-C Hardness                     4

    C.    Accused Products                   4

    D.    Acushnet's Contemporaneous Testing of the Accused Products          5

    E.    Acushnet's Legal Opinion Regarding Invalidity and Non-Infringement of the '707 Patent          7

    F.    Bridgestone's Infringement Contentions          7

    G.    Dr. Caulfield's Testing of the Accused Balls          7

    H.    Expert Analysis Of Sample Size By Dr. Caulfield          9

    I.    Expert Analysis By Mr. Cadorniga          11

    J.    Acushnet's Deposition of Bridgestone Validity Expert - John Calabria          12

ARGUMENT                                                                          13

    I.    LEGAL PRINCIPLES REGARDING SUMMARY JUDGMENT          13

    II.    LEGAL PRINCIPLES REGARDING INFRINGEMENT          13

    III.    LEGAL PRINCIPLES REGARDING ADMISSIBILITY OF EXPERT REPORTS          14

    IV.    ACUSHNET'S MOTION MUST FAIL BECAUSE THE EVIDENCE OF RECORD WEIGHS IN FAVOR OF BRIDGESTONE          17

V.      ACUSHNET'S MOTION MUST FAIL BECAUSE IT
        DOES NOT INCLUDE A DETERMINATION OF THE
        SCOPE OF CLAIM 1 OF THE '707 PATENT                          17

VI.     ACUSHNET'S MOTION MUST FAIL BECAUSE MR.
        CADORNIGA'S    PROPOSED    TESTIMONY    IS
        CLEARLY ADMISSIBLE UNDER THE FIRST PRONG
        OF FRE 702                                                   18

        A.      Mr. Cadorniga Is Qualified To Offer An Opinion In
                The Golf Ball Art                                    18

        B.      Acushnet's Arguments Regarding Mr. Cadorniga's
                Statistical Experience Are Irrelevant                19

VII.    ACUSHNET'S MOTION MUST FAIL BECAUSE MR.
        CADORNIGA'S    PROPOSED    TESTIMONY    IS
        CLEARLY  ADMISSIBLE  UNDER  THE  SECOND
        PRONG OF FRE 702                                             22

        A.      Mr. Cadorniga's Proposed Testimony Is Based On
                Reliable Evidence                                    22

        B.      Acushnet's Arguments Regarding The Reliability
                Of This Evidence Are Incorrect And Irrelevant        24

VIII.   ACUSHNET'S MOTION MUST FAIL BECAUSE MR.
        CADORNIGA'S    PROPOSED    TESTIMONY    IS
        CLEARLY ADMISSIBLE UNDER THE THIRD PRONG
        OF FRE 702                                                   27

IX.     ACUSHNET'S    OTHER    ARGUMENTS    ARE
        INCORRECT AND UNSUPPORTED                                    28

        A.      There Is No Requirement To Measure One Specific
                Golf Ball To Show Infringement                       29

        B.      Mr. Cadorniga Does Consider Change Notices In
                His Analysis                                         29

        C.      Mr. Calabria's Report And Testimony Are Not
                Directly Relevant To Mr. Cadorniga's Analysis        30

        D.      Whether Or Not Acushnet Designed To A Specific
                Core Hardness Is Irrelevant                          30

        E.      No Analysis Of A Percentage of Infringing Accused
                Products Is Necessary                                31

X.      IT WOULD NOT BE PROPER TO EXCLUDE ALL OF
        EXHIBIT E BASED ON ACUSHNET'S ARGUMENTS                    33

CONCLUSION                                                         33

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Abbott Labs. v. Geneva Pharms., Inc.*,
    182 F.3d 1315 (Fed. Cir. 1999)..................................................................................13, 16

*Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*,
    261 F.3d 1329 (Fed. Cir. 2001)..........................................................................................13

*Advanced Med. Optics, Inc. v. Alcon Inc.*,
    2005 U.S. Dist. LEXIS 5803 (D. Del. 2005) ....................................................................20

*Aloe Coal Co. v. Clark Equipment Co.*,
    816 F.2d 110 (3d Cir. 1987)................................................................................................20

*Applied Med. Res. Corp. v. United States Surgical Corp.*,
    448 F.3d 1324 (Fed. Cir. 2006)..........................................................................................13

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
    424 F.3d 1293, 1311 (Fed. Cir. 2005)................................................................................14

*Daubert v. Merrell Dow Pharms.*,
    509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 ............................................................16

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
    2006 U.S. App. LEXIS 28673 (Fed. Cir. 2006) ................................................................14

*Elcock v. Kmart Corp.*,
    233 F.3d 734 (3d Cir. 2000)................................................................................... *passim*

*GE v. Joiner*,
    522 U.S. 136 (U.S. 1997)....................................................................................................27

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994)....................................................................................14, 15, 17

*Intel Corp. v. United States Int'l Trade Comm'n*,
    946 F.2d 821 (Fed. Cir. 1991)............................................................................................30

*Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*,
    315 F. Supp. 2d 589 (D. Del. 2004)..................................................................................25

*J & J Snack Foods Corp. v. Earthgrains Co.*,
    220 F. Supp. 2d 358 (D.N.J. 2002) ..................................................................................24

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (U.S. 1999)....................................................................................................15

*L & W, Inc. v. Shertech, Inc.*,
    471 F.3d 1311 (Fed. Cir. 2006)..........................................................................................25

*Meyers v. Pennypack Woods Home Ownership Ass'n*,
    559 F.2d 894 (3d Cir. 1977)................................................................................................15

v.

*Moleculon Research Corp. v. CBS, Inc.*,
   793 F.2d 1261 ......................................................................................28

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
   133 F.3d 1473 (Fed. Cir. 1998)...........................................................13

*Oddi v. Ford Motor Co.*,
   234 F.3d 136 (3d Cir. 2000)..........................................................15, 26

*Ortiz v. Yale Materials Handling Corp.*,
   2005 U.S. Dist. LEXIS 18424 (D.N.J. 2005) .......................................27

*Pharmastem Therapeutics v. Viacell, Inc.*,
   2004 U.S. Dist. LEXIS 25176 (D. Del. 2004) ......................................31

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)...........................................................13

*Player v. Motiva Enters. LLC*,
   2006 U.S. Dist. LEXIS 2288 (D. N.J. 2006) ........................................20

*San Huan New Materials High Tech v. ITC*,
   161 F.3d 1347 (Fed. Cir. 1998)...........................................................23

*Serio-US Indus. v. Plastic Recovery Techs. Corp.*,
   459 F.3d 1311 (Fed. Cir. 2006)...........................................................13

*Surace v. Caterpillar, Inc.*,
   111 F.3d 1039 (3d Cir. 1997)..............................................................20

*United States v. Fisher*,
   2002 U.S. Dist. LEXIS 22385 (E.D. Pa. 2002) ...................................20

## OTHER AUTHORITIES

Federal Rule of Evidence 702............................................................ *passim*

## NATURE AND STAGE OF THE PROCEEDINGS

This is a patent infringement action brought by Plaintiffs Bridgestone Sports Co., Ltd. and Bridgestone Golf, Inc. ("Bridgestone") against Defendant Acushnet Company ("Acushnet") in March 2005. Bridgestone is currently asserting claims from seven patents against various Acushnet products. Among these seven patents is U.S. Patent No. 5,782,707 ("the '707 Patent"), which is directed to structural features of a golf ball.

Acushnet filed nine motions for summary judgment on April 13, 2007. This is Bridgestone's answering brief in opposition to Acushnet's Motion for Summary Judgment of Non-Infringement with respect to the '707 Patent.

## SUMMARY OF ARGUMENT

Claim 1 of the '707 Patent requires, *inter alia*, a golf ball having a core, intermediate layer, and cover, where "the core surface hardness is higher than the core center hardness by 8 to 20 degrees." Internal Acushnet documents show that the accused Pro V1 balls have this property, along with the other properties required by claim 1 of the '707 Patent. In addition, testing conducted by Bridgestone's testing expert, Dr. Caulfield, confirms that the accused Pro V1 brand golf balls literally infringe this claim. In fact, every single piece of evidence of record in this litigation shows that the accused Pro V1 balls literally infringe this claim.

To do an end run around this evidence, Acushnet argues that Bridgestone's infringement expert, Mr. Larry Cadorniga, should have the portion of his Expert Report dealing with the '707 Patent excluded because it somehow doesn't meet the standard for admissibility

under Federal Rule of Evidence 702.[1]  Acushnet attempts to portray Mr. Cadorniga as basing his infringement opinion regarding the '707 Patent <u>entirely</u> on a statistical analysis of Dr. Caulfield's testing, and tries to bootstrap itself into an inadmissibility argument by establishing instances where Mr. Cadorniga's "statistical" analysis is improper.   Acushnet's arguments are without merit.   Cardoniga did not rely solely on Dr. Caulfield's testing – he actually relied on a lot of other evidence, including Acushnet's internal documents, Acushnet's internal testing, his own personal inspection of the accused products, and his industry experience of over 30 years.

Acushnet also seeks to have Mr. Cadorniga barred from providing testimony about the entirety of his many opinions with respect to the '707 Patent – although Acushnet complains only about the part of Mr. Cadorniga's analysis that compares the balls tested by Dr. Caulfield with respect to the '707 Patent.  This is overreaching.

---

[1]     This argument is difficult to understand, as Mr. Cadorniga's expert report is not "evidence" in this case.

## STATEMENT OF FACTS

### A.     The '707 Patent

The '707 Patent (Ex. 1) is directed to a golf

ball, such as is shown in Figure 1 to the

right.  The example includes a solid core (2),

an intermediate layer (3), and a cover (4),

each having specific properties.  The core

(2) has a JIS-C center hardness up to 75, a

JIS-C surface hardness of up to 85, and a

difference between the center and surface



hardnesses of 8-20.  This combination of features provides "a ball that travels farther on full

shots with a driver and is well controllable on approach shots with [a] No. 5 iron or sand wedge."

Ex. 1, Cols. 1:67-2:4.

Bridgestone has asserted that various Acushnet products infringe claim 1 of the

'707 Patent, which recites:

> 1. A three-piece solid golf ball of the three-layer structure comprising a solid core, an intermediate layer, and a cover, having a plurality of dimples in the ball surface wherein
>
> the solid core, intermediate layer, and cover each have a hardness as measured by a JIS-C scale hardness meter wherein the core center hardness is up to 75 degrees, the core surface hardness is up to 85 degrees, the core surface hardness is higher than the core center hardness by 8 to 20 degrees, the intermediate layer hardness is higher than the core surface hardness by at least 5 degrees, and the cover hardness is lower than the intermediate layer hardness by at least 5 degrees, and
>
> the dimples occupy at least 62% of the ball surface.

Ex. 1, Cols. 3-5.

The parties have agreed that "core center hardness" should be defined as "hardness measured at the center of the core." D.I. 228, p. 13. No other terms of claim 1 are in dispute.

B.     JIS-C Hardness

Claim 1 of the '707 Patent recites the hardness properties of a ball's core, intermediate layer and cover on the JIS-C scale. The JIS-C scale runs from 0 (softest) to 100 (hardest), and represents how hard the material is. Due to the nature of the underlying tests, the JIS-C scale has some variability. Mr. Larry Cadorniga, Bridgestone's expert, has offered his opinion that measurements on the JIS-C scale have an accuracy of about 1 or 2 points – *i.e.*, "20" is the same as "21" or a bit over. Ex. 2, pp. 273:2-275:13. Acushnet's expert, Dr. David Felker, has agreed, indicating that "66" JIS-C and "67.4" JIS-C are "equivalent," and that "reproducibility for tests conducted at different laboratories is roughly 16%." Ex. 3, pp. 43, 49.

C.     Accused Products

Bridgestone has asserted claim 1 of the '707 Patent against three models of Acushnet's "Pro V1" brand of golf balls – the Pro V1 392, Pro V1 392 (stretched) and ◄Pro V1•392►. These models were successively sold from the beginning of 2001 until the end of 2002.

According to Jeffrey Dalton, Acushnet's 30(b)(6) designee with respect to the design of the Pro V1 brand,



D.    Acushnet's Contemporaneous Testing of the Accused Products

Acushnet often tested the physical properties of the various models of the Pro V1 balls during their manufacture.  These physical properties include core hardness gradient, as shown in the testing records that Acushnet produced.  Ex. 9.  The core hardness values shown in these test records are reproduced in the following table.

---

2     As Dr. Felker explained, there is a conversion chart between Shore D and JIS-C (Ex. 3, p. 60) – using this conversion, the IML hardnesses range from about 90 to 93.  As Mr. Cadorniga has explained, this conversion does not provide a high level of accuracy, but here it is sufficient to show that the claim limitations are met.

E.      Acushnet's Legal Opinion Regarding Invalidity and Non-
        Infringement of the '707 Patent

Prior to introduction of the "Pro V1" model line in the fall of 2000 (the first three

models of which were the Pro V1 392, Pro V1 392 (stretched) and ◄Pro V1•392►), Acushnet

obtained an opinion of counsel with respect to the '707 Patent.  Ex. 13.[3]



F.      Bridgestone's Infringement Contentions

Bridgestone's infringement contentions state that the Pro V1 392, Pro V1 392

(stretched) and ◄Pro V1•392► golf balls literally infringed each element of claim 1 of the '707

Patent.  To support this contention, Bridgestone relies on dozens of Acushnet documents (such as

the testing documents discussed above), along with various deposition testimony.  Ex. 14.

G.      Dr. Caulfield's Testing of the Accused Balls

The last ball model in the succession of accused Pro V1 brand golf balls, the

◄Pro V1•392►, was replaced in 2003. Ex. 5, p. 177:16-22.  Thus, the ◄Pro V1•392► ball

model has been off the market for over four years, and the Pro V1 392 and Pro V1 392

---

[3]

(stretched) have been off the market even longer.   Golf balls are generally not retained on the shelf or kept for several years before use, and examples of these old ball models proved difficult to obtain.   Despite this, Dr. Caulfield was able to obtain 10 examples of the ◄Pro V1•392►.



---

[4]     Mr. Cadorniga reviewed and agreed with Dr. Caulfield's protocols.  Ex. 10, p. 6.

[5]     Thus, Acushnet's allegation that: (1) Dr. Caulfield "only reported the *average* hardness gradient of all five balls" (D.I. 370, p. 6, *emphasis* in the original) is plainly inaccurate.

H.      Expert Analysis Of Sample Size By Dr. Caulfield

Dr. Caulfield[6] testified that the results of his testing of five ◄Pro V1•392► balls are sufficient to extrapolate the properties of an entire production run of this ball model.  First, he testified that smaller sample sizes are sufficient when standard deviations are reasonably small and close.



Ex. 16, p. 91:13-92:10.  Then, he explained that one does not have to use a large sample size when analyzing tightly controlled products to conclude, to a level of engineering certainty, that the hardness value is within a particular range:



---

[6]      Dr. Caulfield has over 30 years of experience in testing, and has provided expert testimony in this regard in dozens of cases.  Ex. 15, EX-1.

10.



I.       Expert Analysis By Mr. Cadorniga

In his January 16, 2007 Expert Report, Mr. Cadorniga[7] opined that each of the Pro V1 392, Pro V1 392 (stretched) and ◄Pro V1•392► ball models infringe claim 1 of the '707 Patent. Ex. 10, pp. E1-E15.  He supports this opinion with a detailed comparison of the accused balls with each limitation of claim 1.  Ex. 10, pp. E2-E15.  Mr. Cadorniga separately analyzed each of claim 1's recitations: (1) of a "three-piece solid golf ball of the three-layer structure;" (2) of "a solid core;" (3) of "an intermediate layer;" (4) of a "cover, having a plurality of dimples in the ball surface;" (5) that the "solid core, intermediate layer, and cover each have a hardness as measured by a JIS-C scale hardness meter wherein the core center hardness is up to 75 degrees;" (6) that "the core surface hardness is up to 85 degrees;" (7) that "the core surface hardness is higher than the core center hardness by 8 to 20 degrees;" (8) that "the intermediate layer hardness is higher than the core surface hardness by at least 5 degrees;" (9) that "the cover hardness is lower than the intermediate layer hardness by at least 5 degrees;" and (10) that "the dimples occupy at least 62% of the ball surface."  Ex. 10, pp. E2-E15.

For each, Mr. Cadorniga considers many sources of evidence, not just Dr. Caulfield's test results.  Ex. 10, pp. E2-E15.  ████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

---

[7]       Mr. Cadorniga has over 30 years of experience in the fields of golf ball design, development, and manufacture.  Ex. 10, Exhibit A.

J.      Acushnet's Deposition of Bridgestone Validity Expert - John Calabria

John Calabria, another Bridgestone expert, provided a report regarding the validity of Bridgestone's '707 Patent.  Even though Acushnet's motion is directed to alleged non-infringement of the '707 Patent, Acushnet cites to arguments presented, and testimony elicited, from Mr. Calabria's validity analysis.  Thus, a brief review of the validity issues (which are more fully discussed in a pending Bridgestone *Motion for Summary Judgment of No Invalidity* – D.I. 347) is necessary.

Acushnet's expert, Dr. Felker, had opined that claim 1 of the '707 Patent is invalid as being obvious in view of EP 0 633 043 (EP '043).  Ex. 3, p. 48-49.  To support this opinion, Dr. Felker has alleged that example ball 2 shown in Tables 1 and 2 of EP '043 inherently discloses a particular center hardness.  Ex. 3, p. 48-49.  Dr. Felker made this inherency argument because example 2 does not disclose the hardness of the core center.

Mr. Calabria disagreed with this inherency argument in his expert report, namely that the core center of example 2 of EP '043 necessarily has (*i.e.*, must have) a particular core center hardness.  Ex. 17, App. C, pars. 17-28.  Mr. Calabria supported this conclusion by pointing out, *inter alia*, that EP '043 failed to disclose: (1) a specific core "recipe" (*i.e.*, the name brands of materials); (2) how the materials are mixed prior to molding; (3) the pressure that the core was molded at; and (4) the specific cavity size and shape used to form the cores.  *Id*. Because of this lack of specificity, one of ordinary skill could freely choose various materials, mixing processes, pressures, and cavities to form the invention disclosed in EP '043 (which itself has nothing to do with core gradients).  But, these various materials, mixing processes, pressures, and cavities could result in cores that have gradients outside the claimed range of 8 to 20 – as both Bridgestone and Acushnet's testing shows. Ex. 17, App. C, pars. 47-51; Ex. 7, p. 1.  Due to this variability, Mr. Calabria concluded that example ball 2 of EP '043 cannot be said to

inherently disclose any one particular core center hardness – and is therefore useless to show an inherent disclosure thereof.  Ex. 17, App. C, pars. 20 and 28.

Thus, the positions and testimony of Mr. Calabria cited by Acushnet were provided specifically in connection with an analysis of inherency, not infringement.

ARGUMENT

I.      LEGAL   PRINCIPLES   REGARDING   SUMMARY   JUDGMENT

"Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." *Abbott Labs. v. Geneva Pharms., Inc.*, 182 F.3d 1315, 1317 (Fed. Cir. 1999) (affirming summary judgment of invalidity).

II.     LEGAL PRINCIPLES REGARDING INFRINGEMENT

"Determining infringement requires two steps. 'First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device.'" *Applied Med. Res. Corp. v. United States Surgical Corp.*, 448 F.3d 1324, 1332 (Fed. Cir. 2006).  Claim construction is a question of law, while comparing the construed claim to the accused device is a question of fact.  *Serio-US Indus. v. Plastic Recovery Techs. Corp.*, 459 F.3d 1311, 1316 (Fed. Cir. 2006).

When construing a claim, its words "'are generally given their ordinary and customary meaning'" – "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).  The person of ordinary skill in the art is deemed to read the claim term in the context of the entire patent, including the specification.  *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).

Once the proper construction of the claims is determined, the patent holder shows infringement by establishing by a preponderance of the evidence that a patent claim reads on the accused device. *Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*, 261 F.3d 1329, 1336 (Fed. Cir. 2001). This infringement may be shown either literally or under the doctrine of equivalents. "Literal infringement requires that each and every limitation set forth in a claim appear in an accused product." *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1311 (Fed. Cir. 2005) (internal citation omitted). Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 2006 U.S. App. LEXIS 28673 (Fed. Cir. 2006).

III.   LEGAL PRINCIPLES REGARDING ADMISSIBILITY OF EXPERT REPORTS

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). The first prong of the Rule 702 analysis involves an inquiry into whether the proposed witness is qualified, has sufficient knowledge, skill, training, education or experience to testify with authority on the particular issue on which he or she proposes to opine. "A broad range of knowledge, skills, and training" will qualify a witness as an expert, as courts have "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994).

The second requirement involves an inquiry as to whether the expert's testimony is reliable.  *In re Paoli*, 35 F.3d at 742.  Courts have identified at least the following factors to take into account during this inquiry:

> (1) whether a method consists of a test-able hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Elcock*, 233 F.3d at 745-46.  But, these are "meant to be helpful, not definitive."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (U.S. 1999).  They may not apply "in every instance in which the reliability of scientific testimony is challenged," as, for example, some analyses might "never been the subject of peer review, for the particular application at issue may never previously have interested any scientist."  *Id*.  Further, the relevant reliability concerns of a particular case, "may focus upon personal knowledge or experience," rather than "scientific foundations."  *Id*.

The final prong of Rule 702 requires that the expert testimony "fit" by assisting the trier of fact."  *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000).  Admissibility under this standard depends in part on the proffered connection between the test result to be offered and the particular factual disputes of the case. *Id*.  However, this standard does not require that the plaintiff prove that the opinions of their experts are correct – only reliable.  *Id*.

When considering the admissibility of expert testimony, the Third Circuit has recognized that the Federal Rules of Evidence display a preference for admissibility, and has warned against setting the threshold of admissibility too high.  *In re Paoli* at 749.  Further, the Third Circuit has recognized that "the exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence."  *Meyers v. Pennypack Woods Home Ownership Ass'n*,

559 F.2d 894, 905 (3d Cir. 1977).  To the extent that certain portions of testimony given by an expert may be less credible, the Supreme Court has held that the appropriate method of challenging such testimony is through cross-examination rather than exclusion. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 596, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

IV.  ACUSHNET'S MOTION MUST FAIL BECAUSE THE EVIDENCE OF RECORD WEIGHS IN FAVOR OF BRIDGESTONE

To obtain summary judgment, Acushnet must show that: (1) there is no genuine issue of material fact; and (2) it is entitled to a judgment as a matter of law.  *Abbott Labs*, 182 F.3d at 1317.  Here, even if Mr. Cadorniga's testimony were not considered, there are many facts in the record that demonstrate infringement of claim 1 of the '707 Patent by the accused Acushnet products.  Acushnet's internal testing documents by themselves show infringement. Ex. 9.  Infringement is also shown by the dozens of documents identified by Bridgestone in its interrogatory responses, and by Dr. Caulfield's testing itself.  Exs. 14, 15.

Acushnet does not dispute these facts in its motion.  It ignores most of them. They show, by themselves, that a reasonable jury could find for Bridgestone on the matter of infringement of the '707 Patent - and that summary judgment of non-infringement in favor of Acushnet should be denied.

V.  ACUSHNET'S MOTION MUST FAIL BECAUSE IT DOES NOT INCLUDE A DETERMINATION OF THE SCOPE OF CLAIM 1 OF THE '707 PATENT

Acushnet argues Dr. Caulfield's core hardness gradient testing shows that two of the five balls tested have gradients of 20.4 and 20.8, and therefore fall "outside of claim 1's range of "8 to 20."  D.I. 369, p. 8.  However, Acushnet provides no factual basis, or even improper attorney argument, as to what the scope of "8 to 20" is to support this argument –

Acushnet's failure in this regard is surprising considering the many facts of record that indicate how one of ordinary skill in the art at the time of the invention would interpret claim 1 of the '707 Patent.  For example, the Bridgestone (see Ex. 2, pp. 273:2-275:13) and Acushnet (Ex. 3, pp. 43, 49) experts agree the JIS-C hardness measurements - such as are recited in claim 1 - should be afforded the 1 to 2 point variation normally associated with hardness measurements.  Further, Acushnet's own attorneys have advised them that 20 is the same as at least 20.4.  Ex. 13, p. 21.

Taking this into account, there is no question that balls having a 20.4 or 20.8 hardness gradient do indeed fall within the scope of the claimed range of "8 to 20," as properly construed.  This is recognized by Bridgestone's expert, Mr. Cadorniga (Ex. 2, p. 273:10-16), as it was by Acushnet's attorneys in 2001.  Ex. 13, p. 21.

VI.    ACUSHNET'S MOTION MUST FAIL BECAUSE MR. CADORNIGA'S PROPOSED TESTIMONY IS CLEARLY ADMISSIBLE UNDER THE FIRST PRONG OF FRE 702

A.    Mr. Cadorniga Is Qualified To Offer An Opinion In The Golf Ball Art

The first prong of the Rule 702 analysis involves an inquiry into whether the proposed witness is qualified.  "A broad range of knowledge, skills, and training" will qualify a witness as an expert, as courts have "eschewed imposing overly rigorous requirements of expertise" and have "been satisfied with more generalized qualifications."  *In re Paoli*, 35 F.3d at 741.

Bridgestone has two experts who were involved with the testing about which Acushnet complains.  Dr. Caulfield, who performed the testing and provided the results, has over 30 years of experience in testing protocols, procedures, and analysis.  He has provided expert

testimony in numerous cases.  Ex. 15, EX-1.  Mr. Cadorniga, who compared the results to the

'707 Patent, has over 30 years of experience in golf ball research, development, design and

manufacture.  He has previously been qualified to testify as an expert witness in this art area.

Ex. 10, Exhibit A.  Both Dr. Caulfield and Mr. Cadorniga are clearly experts in their respective

fields – which are precisely the fields at issue here.

In stark contrast, Acushnet's infringement and validity expert, Dr. Felker, gained

his entire "experience" in the golf ball art from less than four years in a managerial role in

research and development at Callaway Golf Co.  Ex. 3, Tab 1.  Acushnet cannot possibly

complain about the credentials of Bridgestone's experts when their very own expert has such

limited experience.

>       B.       Acushnet's   Arguments   Regarding   Mr. Cadorniga's
>                Statistical Experience Are Irrelevant

Acushnet attempts to construct an argument that Mr. Cadorniga is somehow

unqualified to testify as to the contents of his expert report by alleging that: (1) he is not an

expert in statistics or manufacturing variability; and (2) that his opinion "that each one of the

approximately ███████████ Pro V1 golf balls" infringe the '707 Patent based on the

"average hardness gradient of five" balls requires specialized statistical and manufacturing

variability knowledge.  D.I. 369, p. 11.[8]

---

[8]     Acushnet is bases its entire motion on an unclear portion of Mr. Cadorniga's deposition
        transcript (Ex. 2, p. 289:5-293:1).  This portion of Mr. Cadorniga's deposition occurred
        very late in a very long day – one in which Acushnet used three different attorneys to
        "tag-team" him on various overlapping issues.  Nevertheless, Mr. Cadorniga testified that
        he did rely on Acushnet documents in addition to Dr. Caulfield's testing.  Ex. 2, p. 291:2-
        6.  Further, as explained in his report, the data is Table E-4 was developed in accordance
        with his review of the various Acushnet documents and testing, and his experience.
        Ex. 10, p. E-8-9.

However, Mr. Cadorniga's opinion that the accused products infringe claim 1 of the '707 Patent is <u>not</u> based solely on Dr. Caulfield's testing of five of the accused products. As explained in detail above, for each of ten limitations of claim 1, Mr. Cadorniga considered <u>many</u> sources of evidence. Ex. 10, pp. E2-E15. ████████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

Further, while Mr. Cadorniga admittedly does not have a statistics degree, he does have over 30 years of design and manufacturing experience with golf balls, and has specifically selected various core compositions and molding parameters in production golf balls. Ex. 15, Exhibit A. He also has experience in sample testing. Ex. 2, p. 280:13-16.[9] This experience alone qualifies him to provide the testimony contained in Exhibit E of his report - particularly when buttressed with the Acushnet documents of record and the testing performed by Dr. Caulfield.

---

[9]     Acushnet incorrect assumes that the Mr. Cadorniga has only performed such tests "in the context of research and development." That is not what a fair reading of his testimony indicates. Mr. Cadorniga indicates that he has done such comparisons - and provides an example that the R&D lab would run "about a thousand." Ex. 2, p. 281:8-9. Mr. Cadorniga specifies that this is only for the R&D lab, and that a manufacturing comparison would be larger. Ex. 2, p. 281:12-15. Acushnet's questions end there – they did not elicit testimony from Mr. Cadorniga as to whether he was involved with such manufacturing comparisons.

The cases cited by Acushnet to support their argument that courts "have repeatedly excluded the testimony of experts" who have only general expertise (D.I. 370, p. 13) are not on point.   In *Player v. Motiva Enters. LLC*, 2006 U.S. Dist. LEXIS 2288 (D.N.J. 2006), a property appraiser was excluded because he had not appraised contaminated property before.   In *Aloe Coal Co. v. Clark Equipment Co.*, 816 F.2d 110, 114 (3d Cir. 1987) a tractor salesman, who did not have engineering experience, was excluded from testifying about equipment fires.   In *Advanced Med. Optics, Inc. v. Alcon Inc.*, 2005 U.S. Dist. LEXIS 5803 at *27 (D. Del. 2005), an ophthalmologist who did not have engineering experience was excluded from testifying regarding the inner workings of devices that he used in his practice.   In *United States v. Fisher*, 2002 U.S. Dist. LEXIS 22385 at *18 (E.D. Pa. 2002), an analyst of firearm misfirings was excluded from testifying about marks on the outside of a firearm that had been dropped.   In *Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1055 (3d Cir. 1997), an electrical engineer with only design experience was excluded from testifying about safety equipment in manufacturing environments. These cases would apply in the instant dispute to someone who has only a cursory knowledge of golf ball design and manufacturing, but offers testimony on such topics – someone like Acushnet's expert, Dr. David Felker.   They would not apply to Mr. Cadorniga, who offers testimony on precisely his expertise – the design, manufacture and testing of golf balls.

Thus, Mr. Cadorniga is fully qualified to testify as an expert with respect to the actual analysis in his report.

VII.   ACUSHNET'S MOTION MUST FAIL BECAUSE MR. CADORNIGA'S PROPOSED TESTIMONY IS CLEARLY ADMISSIBLE UNDER THE SECOND PRONG OF FRE 702

A.   Mr. Cadorniga's Proposed Testimony Is Based On Reliable Evidence

The second prong of the Rule 702 analysis involves an inquiry into whether the methods utilized by the expert are reliable.  Courts have identified at least the following non-exclusive factors to take into account during this inquiry:

> (1) whether a method consists of a test-able hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Elcock v. Kmart Corp.*, 233 F.3d 734, 745-46 (3d Cir. 2000).

The standards and protocols utilized by Dr. Caulfield to test the core hardness gradient of the accused products are detailed in his expert report, and include ASTM and JIS standards.  Ex. 15, EX-3, EX-9.  Dr. Felker cites the same standards in his expert report when discussing hardness testing.  Ex. 3, Tabs 41, 42.  Thus, there can be no serious argument that the correct standards and protocols were not utilized.

The actual testing of the core center hardness and core surface hardness of five ◄Pro V1•392► model golf balls was performed by Dr. Caulfield using these protocols.  Ex. 15, p. 9, par. 23.  Dr. Caulfield reported the individual results of this testing in his report, along with an average value, minimum and maximum values, and a standard deviation.  Ex. 15, EX-18.  Dr. Caulfield has also testified that the five balls tested are enough to extrapolate the properties of the entire production run of accused products in view of the reported standard deviation, and in

view of Acushnet's tight tolerances.   Ex. 16, p. 91:13-95:7.   Acushnet has not attacked the propriety of Dr. Caulfield's results, or his testimony that five balls are sufficient.

Thus, Dr. Caulfield's results: (1) consist of a testable hypothesis due to its documentation; (2) have many non-judicial uses due to its use in everyday testing; (3) were determined by an expert - Dr. Caulfield; and (4) have been subjected to peer review, have a known rate of error, are performed in accordance with standards, are generally accepted, and are directly related to reliable methods via their direct reliance on the ASTM and JIS standards. Thus, most, if not all, of the factors mentioned in *Elcock* are met, and there can be no serious argument that Dr. Caulfield's testing is incorrect or inadmissible.   Indeed, Acushnet does not attack Dr. Caulfield's results in any manner.[10]

Mr. Cadorniga then utilized the results generated by Dr. Caulfield, in conjunction with Acushnet documents, Acushnet deposition testimony, Acushnet testing results, and his own experience, to compare the accused products with each of ten separate limitations of claim 1 of the '707 Patent.   Ex. 10, pp. E1-E15.   Regarding the core hardness difference limitation, Mr. Cadorniga considered the data reported by Dr. Caulfield.   Ex. 15, EX-18.   In contrast to Acushnet's allegations (D.I. 369, p. 6), this information includes average, minimum, maximum, and standard deviation data of both the center and surface hardness.   Ex. 15, EX-18.   Mr. Cadorniga then utilized this information (in conjunction with the other evidence of record) to determine that the accused products met the core hardness difference limitation.

---

[10]     In fact, Acushnet relies on Dr. Caulfield's testing when it wants to utilize his data – in the case where two of the tested balls had core hardness gradients of 20.4 and 20.8.

Mr. Cadorniga's analysis therefore, consisted of a testable hypothesis.  Also, it has a known error rate, because Dr. Caulfield reported minimum, maximum, and standard deviation data, and because hardness testing has known error rates described in the ASTM/JIS standards.  This method of measuring and comparing is also  generally accepted by the industry to show ball properties, and has many non-judicial uses, as exemplified by Acushnet's very own test records, which show average hardness values.  Ex. 9.  Further, this method is related directly to reliable methods that have been subject to peer review, because it relies directly on the ASTM/JIS standards for hardness testing.  Lastly, this method was deemed appropriate by Mr. Cadorniga – who is indisputably an expert in the golf ball art.  Thus, the *Elcock* factors are met, and there can be no serious argument that Mr. Cadorniga's analysis is incorrect or inadmissible.

B.     Acushnet's Arguments Regarding The Reliability Of This Evidence Are Incorrect And Irrelevant

Acushnet argues that Mr. Cadorniga's opinions are not reliable because he: (1) "bases his entire opinion on a 'mean value' analysis (D.I. 370, p. 14);" (2) has an improper sampling plan (D.I. 370, pp. 16-18); (3) is relying on only five balls (D.I. 370, p. 18); and (4) does not perform any testing of the Pro V1 and Pro V1 (stretched) ball models (D.I. 370, pp. 18-19).  Acushnet's arguments again assume that Mr. Cadorniga relied solely on the five example balls tested by Dr. Caulfield to support his infringement position.  That is inaccurate, for at least the reasons discussed above.

As Mr. Cadorniga did not rely solely on the five balls tested by Dr. Caulfield, he is also not relying solely on the "mean" value reported by Dr. Caulfield.  Further, there is nothing wrong with using a "mean" value to show the properties of a population.  *See, e.g.*, *San Huan New Materials High Tech v. ITC*, 161 F.3d 1347, 1360 (Fed. Cir. 1998).  Acushnet uses such a value in its own testing documents (Ex. 9), and the JIS standards specify the use of average

values in its measurements (Ex. 15, EX-3).  The criticisms identified by Acushnet of the "mean value" by Dr. Sutton (D.I. 370, p. 15) are all based on his mistaken understanding that some of the balls tested by Dr. Caulfield fell outside of the claimed range "8 to 20."  As discussed above, all of the balls tested by Dr. Caulfield fall in the claimed range – as properly construed – so there is no secondary analysis necessary as to how many balls of the entire population fall inside or outside the claimed range.

Similarly, as Mr. Cadorniga did not rely solely on the five balls tested by Dr. Caulfield, he also did not rely solely on the sampling plan instituted by Dr. Caulfield.  The balls tested by Dr. Caulfield were obtained in the best manner possible considering their age – as they have not been on sale for 5 years.  It is hard to imagine that they could be any more randomly selected, and – outside of Acushnet's internal documents – they represent the best evidence. Acushnet's citation of *J & J Snack Foods Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358 (D.N.J. 2002) as somehow being critical of Bridgestone's sampling methods is far from being on point. It is directed to <u>trademark</u> surveys – an area of law with special rules and standards.  Acushnet has cited no precedent that would support the application of trademark survey law to testing in a patent infringement context.

Further, as Mr. Cadorniga did not rely solely on the five balls tested by Dr. Caulfield, Dr. Sutton's opinion that five tested balls were not a large enough sample set is irrelevant.  Also, Dr. Caulfield – who Acushnet does not contend is unqualified to offer his statistical opinion - specifically disagrees with Dr. Sutton, based on engineering certainty and the reported standard deviation.  Ex. 16, p. 91:13-95:7.  Dr. Sutton has not considered these points. Ex. 18.

Lastly, Acushnet asserts that Mr. Cadorniga "does not rely on any testing to support his opinion" that the Pro V1 392 and Pro V1 392 (stretched) ball models infringe, and instead just "assumes that these balls have the same hardness gradients as the ◄Pro V1•392►." D.I. 370, pp. 18, 23.  Acushnet's arguments are, again, legally and factually incorrect.

Mr. Cadorniga does not simply "assume" that the earlier ball models have the same hardness difference.



Acushnet argues that this opinion is Mr. Cadorniga's *ipse dixit*, and cites two cases - *L & W, Inc. v. Shertech, Inc.*, 471 F.3d 1311, 1316 (Fed. Cir. 2006) and *Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*, 315 F. Supp. 2d 589 (D. Del. 2004) for the proposition that expert assumptions regarding untested products are not enough to show infringement.  D.I. 369, pp. 19, 23.  Acushnet's assertions are unsupported, and its citation to *L & W* and *Izumi* are not on point.  In *L & W*, the patentee's expert reviewed one heat shield out of 16 allegedly infringing products, and simply asserted in his report that this one heat shield was "typical," without any other evidence.  *L & W* at 1316.  Similarly, in *Izumi*, the patentee's expert reviewed only 2 out of 116 different blade models, and simply asserted that the remaining 114 performed the same.

*Izumi* at 602.  That is not the case here, as Mr. Cadorniga has based his opinion on Acushnet's own admission that the Pro V1 392 and Pro V1 392 (stretched) are the same as the ◄Pro V1•392►, and on Acushnet's own testing of the earlier products.  Mr. Cadorniga did consider the design of the Pro V1 392 and Pro V1 392 (stretched) in his conclusions, unlike the experts in *L & W* and *Izumi*.

Thus, Mr. Cadorniga's testimony is "reliable."

## VIII.   ACUSHNET'S MOTION MUST FAIL BECAUSE MR. CADORNIGA'S PROPOSED TESTIMONY IS CLEARLY ADMISSIBLE UNDER THE THIRD PRONG OF FRE 702

The final prong of Rule 702 requires that the expert testimony "fit" by assisting the trier of fact."  *Oddi* 234 F.3d at 145.  Here, Dr. Caulfield's test results provide independent, third-party, testing of the properties of the accused products, and Mr. Cadorniga's analysis compares this independent testing to: (1) Acushnet's own testing; and (2) both to the limitations of claim 1 of the '707 Patent.  Thus, there can be no serious argument that this testimony does not "fit" the case, and would not assist the trier of fact.  Indeed, Acushnet does not seem to attack Dr. Caulfield's or Mr. Cadorniga's reports on this basis.

Acushnet, instead, rehashes its previous arguments as to the methods employed by Mr. Cadorniga.  Specifically, it alleges that Mr. Cadorniga: (1) "has put forth no support for his assumption that the five balls he tested are representative" of all of the accused products; and (2) has offered only layman's commentary.  D.I. 369 at 19-20.

But, Mr. Cadorniga's opinion is far more than a simple comparison of five tested balls to the population of accused products.  Mr. Cadorniga's opinion was 15 pages long, and compared each of ten separate features of claim 1 of the '707 Patent to the accused products.  Ex. 10, pp. E-1 to E-15.  When performing these comparisons, Mr. Cadorniga physically reviewed the accused products (where available), reviewed Acushnet documents, and reviewed testing

data provided by Dr. Caulfield.  This is precisely what expert witnesses are supposed to do to determine whether a product infringes.  Accordingly, there was no need for Mr. Cadorniga to "put forth support" for statistical propositions that he didn't make in his expert report.

The instant facts are also quite different from those of the case cited by Acushnet to support its argument - *GE v. Joiner*, 522 U.S. 136 (U.S. 1997).  In *GE*, the court found that dissimilar testing, such as animal testing instead of human testing, can provide the basis for exclusion *GE at 146*.  But, that is not the case here.  The testing performed by Dr. Caulfield and analyzed by Mr. Cadorniga is on the very same products that are accused – and are done in an industry-accepted manner.   There is no argument that: (1) the testing was done in an inappropriate manner; or (2) the test specimens were not actually accused products.

Nor is Mr. Cadorniga's testimony that of a layman.  Mr. Cadorniga has analyzed both Acushnet and Bridgestone test data on the balls in question, and Acushnet's own manufacturing documents and deposition testimony, and used his expertise to form his opinion that Acushnet's products infringe.  This is different from the case cited by Acushnet - *Ortiz v. Yale Materials Handling Corp.*, 2005 U.S. Dist. LEXIS 18424 (D.N.J. 2005) -  in which the expert reviewed neither the defective product nor any particular testing regarding that product. *Ortiz* at *19 - *30.

Thus, Mr. Cadorniga's testimony "fits" the evidence, and should be allowed.

IX.    ACUSHNET'S  OTHER  ARGUMENTS  ARE  INCORRECT
         AND UNSUPPORTED

Acushnet also advances some other non-infringement arguments in its Motion that are incorrect and/or unsupported.

A.    There Is No Requirement To Measure One Specific Golf
      Ball To Show Infringement

Acushnet first argues that "[n]either Mr. Cadorniga nor Dr. Caulfield present any specific measurements performed on individual golf balls for any measurement.  Rather, they report averages and numbers gleaned from Acushnet documents."  D.I. 369, p. 23.  Acushnet argues that such an approach is improper because "Bridgestone has not measured one single golf ball for all of the limitations in claim 1 of the '707 patent."  D.I. 369, p. 23.

Bridgestone can use evidence from any source, including Acushnet documents, to show infringement.  Indeed, infringement can be shown even by circumstantial evidence. *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272, 229 U.S.P.Q. (BNA) 805, 813 (Fed. Cir. 1986).  Acushnet's own internal testing documents clearly show infringement.  Ex. 9.  Other documents and testimony show infringement.  Ex. 14.  Dr. Caulfield's testing shows infringement.  Ex. 15, EX-18.  Bridgestone, and Mr. Cadorniga, can rely on any of these, in any combination, to show infringement.  It is for the fact-finder – not Acushnet – to then determine whether Bridgestone has met its burden.

B.    Mr. Cadorniga Does Consider Change Notices In His Analysis

Acushnet also argues that Mr. Cadorniga fails to consider manufacturing variability and change notices.  D.I. 369, p. 7.  This is incorrect.  As he explained in his expert report, Mr. Cadorniga did consider change notices.  Ex. 10, p. 7-9.  However, he also relied on

Indeed, Acushnet has not provided any specific argument, or shown any factual basis to argue, that even one change notice actually did change

the core hardness enough to remove the accused products from the claimed range.  This is simply attorney argument.

 

C.      Mr. Calabria's Report And Testimony Are Not Directly
         Relevant To Mr. Cadorniga's Analysis

Acushnet also appears to argue that because Bridgestone's invalidity expert, Mr. Calabria, has pointed out that many variables can affect a core's hardness gradient, it was somehow difficult for Mr. Cadorniga to opine that all of the accused balls infringe.  D.I. 370, p. 4-5.

Acushnet's arguments are incorrect.  As discussed above, Mr. Calabria concluded that, in order to <u>inherently</u> disclose a specific core center hardness absent any knowledge beforehand (such as by testing), a reference such as EP '043 would have to disclose specific brand names of its materials, a specific recipe used for the core, and specific molding parameters.

 

This information, either alone or in combination, provides more than enough evidence to show infringement of the '707 Patent by the accused products.

D.      Whether Or Not Acushnet Designed To A Specific Core
         Hardness Is Irrelevant

 

These arguments are factually incorrect and irrelevant.



In any event, if Acushnet's golf balls have the claimed properties, they infringe - there is no intent requirement for direct infringement. *Intel Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991).

      E.      No Analysis Of A Percentage of Infringing Accused Products Is Necessary

Acushnet also argues that, although "Mr. Cadorniga has opined that all accused Pro V1 golf balls infringe claim 1 of the '707 patent[, …] Dr. Caulfield's raw data shows that there is a ball-to-ball variation in hardness gradient, and that some golf balls literally have a hardness gradient greater than 20."  D.I. 369, p. 23.  Based on this reasoning, Acushnet argues that some percentage of the accused balls do not infringe, and therefore bootstraps itself into the argument that "Mr. Cadorniga has not put forth any data or analysis to quantify how many accused Pro V1 golf balls infringe."  D.I. 270, p. 24.

Acushnet has failed to provide any evidence of how one of ordinary skill in the art would interpret the claimed range of "8 to 20" – a failure that dooms its motion.  There is nothing in Acushnet's summary judgment motion that addresses this most basic consideration. Thus, Acushnet has no basis from which to argue that any of the balls tested by Dr. Caulfield fall inside or outside the claimed range.

In reality, all of the balls tested by Dr. Caulfield fall within the properly construed claim range. As discussed above, both Acushnet's and Bridgestone's experts agree that JIS-C measurements have some variance – up to 1 or 2 points. Ex. 2, pp. 273:2-275:13, Ex. 3, pp. 43, 49. ████████████████████████████████████████████████████████████

████ Thus, there can be no argument that 20.4 and 20.8 would mean 20 to one of ordinary skill – as Mr. Cadorniga opined when asked in his expert deposition. Thus, Acushnet's arguments that some of the balls tested by Dr. Caulfield fall outside of the claimed range is unsupported.

Further, as discussed above, all of Acushnet's internal testing of the accused balls shows that they fall within the claimed range. Ex. 9. Acushnet ignores this in its Motion – because it also is sufficient to defeat Acushnet's summary judgment motion.

Because: (1) all of the balls tested by Dr. Caulfield; and (2) all of the balls tested by Acushnet fall within the scope of claim 1 of the '707 Patent, it is completely unnecessary for Mr. Cadorniga to consider what percentage of accused balls might fall outside of the claimed range.

Acushnet's citation of *Pharmastem Therapeutics v. Viacell, Inc.*, 2004 U.S. Dist. LEXIS 25176 (D. Del. 2004) is also not on point. In *Pharmastem*, the evidence of record showed that the parameter at issue was highly variable, and thus the court found that a single test was inappropriate. *Pharmastem* at *13-*14. In the instant dispute, there is no such issue. All of the testing of record, including testing from Acushnet (Ex. 9) and Dr. Caulfield (Ex. 15, EX-18), and all of the other documentation and Acushnet testimony (e.g., Exs. 4-6, 10, 11 and 13) indicate that the parameter in question – the core hardness profile – is fairly constant, at least within the claimed range.

For all of these reasons, Mr. Cadorniga's opinion that all of the accused products fall within the scope of claim 1 of the '707 Patent is well-reasoned.

## X.   IT WOULD NOT BE PROPER TO EXCLUDE ALL OF EXHIBIT E BASED ON ACUSHNET'S ARGUMENTS

Lastly, Acushnet argues that the entirety of Exhibit E of Mr. Cadorniga's expert report fails to meet the standards for admissibility because of his reliance on only five tested balls to show infringement.  D.I. 369, p. 21.  However, these issues are only directly related to the core surface and core center hardness measurements discussed in Mr. Cadorniga's report. They have no bearing on the balance of his report, which compares eight other features of claim 1 of the '707 Patent to the accused products.  Accordingly, Acushnet's request that the entirety of Exhibit E of Mr. Cadorniga's expert report be deemed inadmissible is simply overreaching.

## CONCLUSION

For the reasons set forth above, Bridgestone respectfully requests that the Court DENY Acushnet's Motion for Summary Judgment of Non-Infringement of the '707 Patent.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Leslie A. Polizoti*
Jack B. Blumenfeld (#1014)
Leslie A. Polizoti (#4299)
1201 N. Market St.
P.O. Box 1347
Wilmington, DE 19801
(302) 658-9200
*Attorneys for Bridgestone Sports Co., Ltd.*
*and Bridgestone Golf, Inc.*

OF COUNSEL:

Robert M. Masters
Scott M. Flicker
PAUL, HASTINGS, JANOFSKY & WALKER LLP
875 15th St., N.W.
Washington, DC 20005
(202) 551-1700

April 30, 2007
814462

CERTIFICATE OF SERVICE

I certify that on May 7, 2007 I electronically filed the foregoing with the

Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the

following:

> Richard L. Horwitz, Esquire
> POTTER ANDERSON & CORROON LLP
> Hercules Plaza, 6th Floor
> 1313 North Market Street
> Wilmington, DE  19801

I further certify that I caused copies to be served upon the following on

May 7, 2007 in the manner indicated:

**BY HAND & E-MAIL**

> Richard L. Horwitz, Esquire
> POTTER ANDERSON & CORROON LLP
> 1313 N. Market Street
> Wilmington, DE  19801

**BY E-MAIL and FEDERAL EXPRESS**

> Joseph P. Lavelle, Esquire
> HOWREY LLP
> 1299 Pennsylvania Avenue, NW
> Washington, DC  20004

> _/s/ Leslie A. Polizoti_
> Leslie A. Polizoti (#4299)
> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> Wilmington, DE  19801
> (302) 658-9200
> lpolizoti@mnat.com