# EXHIBIT 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## KSR INTERNATIONAL CO. *v.* TELEFLEX INC. ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

No. 04–1350.   Argued November 28, 2006—Decided April 30, 2007

To control a conventional automobile's speed, the driver depresses or releases the gas pedal, which interacts with the throttle via a cable or other mechanical link. Because the pedal's position in the footwell normally cannot be adjusted, a driver wishing to be closer or farther from it must either reposition himself in the seat or move the seat, both of which can be imperfect solutions for smaller drivers in cars with deep footwells. This prompted inventors to design and patent pedals that could be adjusted to change their locations. The Asano patent reveals a support structure whereby, when the pedal location is adjusted, one of the pedal's pivot points stays fixed. Asano is also designed so that the force necessary to depress the pedal is the same regardless of location adjustments. The Redding patent reveals a different, sliding mechanism where both the pedal and the pivot point are adjusted.

  In newer cars, computer-controlled throttles do not operate through force transferred from the pedal by a mechanical link, but open and close valves in response to electronic signals. For the computer to know what is happening with the pedal, an electronic sensor must translate the mechanical operation into digital data. Inventors had obtained a number of patents for such sensors. The so-called '936 patent taught that it was preferable to detect the pedal's position in the pedal mechanism, not in the engine, so the patent disclosed a pedal with an electronic sensor on a pivot point in the pedal assembly. The Smith patent taught that to prevent the wires connecting the sensor to the computer from chafing and wearing out, the sensor should be put on a fixed part of the pedal assembly rather than in or on the pedal's footpad. Inventors had also patented self-contained modular sensors, which can be taken off the shelf and attached to any

Syllabus

mechanical pedal to allow it to function with a computer-controlled throttle. The '068 patent disclosed one such sensor. Chevrolet also manufactured trucks using modular sensors attached to the pedal support bracket, adjacent to the pedal and engaged with the pivot shaft about which the pedal rotates. Other patents disclose electronic sensors attached to adjustable pedal assemblies. For example, the Rixon patent locates the sensor in the pedal footpad, but is known for wire chafing.

After petitioner KSR developed an adjustable pedal system for cars with cable-actuated throttles and obtained its '976 patent for the design, General Motors Corporation (GMC) chose KSR to supply adjustable pedal systems for trucks using computer-controlled throttles. To make the '976 pedal compatible with the trucks, KSR added a modular sensor to its design. Respondents (Teleflex) hold the exclusive license for the Engelgau patent, claim 4 of which discloses a position-adjustable pedal assembly with an electronic pedal position sensor attached a fixed pivot point. Despite having denied a similar, broader claim, the U. S. Patent and Trademark Office (PTO) had allowed claim 4 because it included the limitation of a fixed pivot position, which distinguished the design from Redding's. Asano was neither included among the Engelgau patent's prior art references nor mentioned in the patent's prosecution, and the PTO did not have before it an adjustable pedal with a fixed pivot point. After learning of KSR's design for GMC, Teleflex sued for infringement, asserting that KSR's pedal system infringed the Engelgau patent's claim 4. KSR countered that claim 4 was invalid under §103 of the Patent Act, which forbids issuance of a patent when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art."

*Graham* v. *John Deere Co. of Kansas City,* 383 U. S. 1, 17–18, set out an objective analysis for applying §103: "[T]he scope and content of the prior art are . . . determined; differences between the prior art and the claims at issue are . . . ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." While the sequence of these questions might be reordered in any particular case, the factors define the controlling inquiry. However, seeking to resolve the obviousness question with more uniformity and consistency, the Federal Circuit has employed a "teaching, suggestion, or motivation" (TSM) test, under which a pat-

Syllabus

ent claim is only proved obvious if the prior art, the problem's nature, or the knowledge of a person having ordinary skill in the art reveals some motivation or suggestion to combine the prior art teachings.

The District Court granted KSR summary judgment. After reviewing pedal design history, the Engelgau patent's scope, and the relevant prior art, the court considered claim 4's validity, applying *Graham*'s framework to determine whether under summary-judgment standards KSR had demonstrated that claim 4 was obvious. The court found "little difference" between the prior art's teachings and claim 4: Asano taught everything contained in the claim except using a sensor to detect the pedal's position and transmit it to a computer controlling the throttle. That additional aspect was revealed in, *e.g.,* the '068 patent and Chevrolet's sensors. The court then held that KSR satisfied the TSM test, reasoning (1) the state of the industry would lead inevitably to combinations of electronic sensors and adjustable pedals, (2) Rixon provided the basis for these developments, and (3) Smith taught a solution to Rixon's chafing problems by positioning the sensor on the pedal's fixed structure, which could lead to the combination of a pedal like Asano with a pedal position sensor.

Reversing, the Federal Circuit ruled the District Court had not applied the TSM test strictly enough, having failed to make findings as to the specific understanding or principle within a skilled artisan's knowledge that would have motivated one with no knowledge of the invention to attach an electronic control to the Asano assembly's support bracket. The Court of Appeals held that the District Court's recourse to the nature of the problem to be solved was insufficient because, unless the prior art references addressed the precise problem that the patentee was trying to solve, the problem would not motivate an inventor to look at those references. The appeals court found that the Asano pedal was designed to ensure that the force required to depress the pedal is the same no matter how the pedal is adjusted, whereas Engelgau sought to provide a simpler, smaller, cheaper adjustable electronic pedal. The Rixon pedal, said the court, suffered from chafing but was not designed to solve that problem and taught nothing helpful to Engelgau's purpose. Smith, in turn, did not relate to adjustable pedals and did not necessarily go to the issue of motivation to attach the electronic control on the pedal assembly's support bracket. So interpreted, the court held, the patents would not have led a person of ordinary skill to put a sensor on an Asano-like pedal. That it might have been obvious to try that combination was likewise irrelevant. Finally, the court held that genuine issues of material fact precluded summary judgment.

*Held:* The Federal Circuit addressed the obviousness question in a narrow, rigid manner that is inconsistent with §103 and this Court's

precedents. KSR provided convincing evidence that mounting an available sensor on a fixed pivot point of the Asano pedal was a design step well within the grasp of a person of ordinary skill in the relevant art and that the benefit of doing so would be obvious. Its arguments, and the record, demonstrate that the Engelgau patent's claim 4 is obvious. Pp. 11–24.

1. *Graham* provided an expansive and flexible approach to the obviousness question that is inconsistent with the way the Federal Circuit applied its TSM test here. Neither §103's enactment nor *Graham*'s analysis disturbed the Court's earlier instructions concerning the need for caution in granting a patent based on the combination of elements found in the prior art. See *Great Atlantic & Pacific Tea Co.* v. *Supermarket Equipment Corp.*, 340 U. S. 147, 152. Such a combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results. See, *e.g., United States* v. *Adams*, 383 U. S. 39, 50–52. When a work is available in one field, design incentives and other market forces can prompt variations of it, either in the same field or in another. If a person of ordinary skill in the art can implement a predictable variation, and would see the benefit of doing so, §103 likely bars its patentability. Moreover, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond that person's skill. A court must ask whether the improvement is more than the predictable use of prior-art elements according to their established functions. Following these principles may be difficult if the claimed subject matter involves more than the simple substitution of one known element for another or the mere application of a known technique to a piece of prior art ready for the improvement. To determine whether there was an apparent reason to combine the known elements in the way a patent claims, it will often be necessary to look to interrelated teachings of multiple patents; to the effects of demands known to the design community or present in the marketplace; and to the background knowledge possessed by a person having ordinary skill in the art. To facilitate review, this analysis should be made explicit. But it need not seek out precise teachings directed to the challenged claim's specific subject matter, for a court can consider the inferences and creative steps a person of ordinary skill in the art would employ. Pp. 11–14.

(b) The TSM test captures a helpful insight: A patent composed of several elements is not proved obvious merely by demonstrating that each element was, independently, known in the prior art. Although common sense directs caution as to a patent application claiming as

Syllabus

innovation the combination of two known devices according to their established functions, it can be important to identify a reason that would have prompted a person of ordinary skill in the art to combine the elements as the new invention does. Inventions usually rely upon building blocks long since uncovered, and claimed discoveries almost necessarily will be combinations of what, in some sense, is already known. Helpful insights, however, need not become rigid and mandatory formulas. If it is so applied, the TSM test is incompatible with this Court's precedents. The diversity of inventive pursuits and of modern technology counsels against confining the obviousness analysis by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasizing the importance of published articles and the explicit content of issued patents. In many fields there may be little discussion of obvious techniques or combinations, and market demand, rather than scientific literature, may often drive design trends. Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may, for patents combining previously known elements, deprive prior inventions of their value or utility. Since the TSM test was devised, the Federal Circuit doubtless has applied it in accord with these principles in many cases. There is no necessary inconsistency between the test and the *Graham* analysis. But a court errs where, as here, it transforms general principle into a rigid rule limiting the obviousness inquiry. Pp. 14–15.

(c) The flaws in the Federal Circuit's analysis relate mostly to its narrow conception of the obviousness inquiry consequent in its application of the TSM test. The Circuit first erred in holding that courts and patent examiners should look only to the problem the patentee was trying to solve. Under the correct analysis, any need or problem known in the field and addressed by the patent can provide a reason for combining the elements in the manner claimed. Second, the appeals court erred in assuming that a person of ordinary skill in the art attempting to solve a problem will be led only to those prior art elements designed to solve the same problem. The court wrongly concluded that because Asano's primary purpose was solving the constant ratio problem, an inventor considering how to put a sensor on an adjustable pedal would have no reason to consider putting it on the Asano pedal. It is common sense that familiar items may have obvious uses beyond their primary purposes, and a person of ordinary skill often will be able to fit the teachings of multiple patents together like pieces of a puzzle. Regardless of Asano's primary purpose, it provided an obvious example of an adjustable pedal with a fixed pivot point, and the prior art was replete with patents indicating that such a point was an ideal mount for a sensor. Third, the

court erred in concluding that a patent claim cannot be proved obvious merely by showing that the combination of elements was obvious to try. When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. Finally, the court drew the wrong conclusion from the risk of courts and patent examiners falling prey to hindsight bias. Rigid preventative rules that deny recourse to common sense are neither necessary under, nor consistent with, this Court's case law. Pp. 15–18.

2. Application of the foregoing standards demonstrates that claim 4 is obvious. Pp. 18–23.

(a) The Court rejects Teleflex's argument that the Asano pivot mechanism's design prevents its combination with a sensor in the manner claim 4 describes. This argument was not raised before the District Court, and it is unclear whether it was raised before the Federal Circuit. Given the significance of the District Court's finding that combining Asano with a pivot-mounted pedal position sensor fell within claim 4's scope, it is apparent that Teleflex would have made clearer challenges if it intended to preserve this claim. Its failure to clearly raise the argument, and the appeals court's silence on the issue, lead this Court to accept the District Court's conclusion. Pp. 18–20.

(b) The District Court correctly concluded that when Engelgau designed the claim 4 subject matter, it was obvious to a person of ordinary skill in the art to combine Asano with a pivot-mounted pedal position sensor. There then was a marketplace creating a strong incentive to convert mechanical pedals to electronic pedals, and the prior art taught a number of methods for doing so. The Federal Circuit considered the issue too narrowly by, in effect, asking whether a pedal designer writing on a blank slate would have chosen both Asano and a modular sensor similar to the ones used in the Chevrolet trucks and disclosed in the '068 patent. The proper question was whether a pedal designer of ordinary skill in the art, facing the wide range of needs created by developments in the field, would have seen an obvious benefit to upgrading Asano with a sensor. For such a designer starting with Asano, the question was where to attach the sensor. The '936 patent taught the utility of putting the sensor on the pedal device. Smith, in turn, explained not to put the sensor on the pedal footpad, but instead on the structure. And from Rixon's known wire-chafing problems, and Smith's teaching that the pedal assemblies must not precipitate any motion in the connecting wires,

Syllabus

the designer would know to place the sensor on a nonmoving part of the pedal structure. The most obvious such point is a pivot point. The designer, accordingly, would follow Smith in mounting the sensor there. Just as it was possible to begin with the objective to upgrade Asano to work with a computer-controlled throttle, so too was it possible to take an adjustable electronic pedal like Rixon and seek an improvement that would avoid the wire-chafing problem. Teleflex has not shown anything in the prior art that taught away from the use of Asano, nor any secondary factors to dislodge the determination that claim 4 is obvious. Pp. 20–23.

  3. The Court disagrees with the Federal Circuit's holding that genuine issues of material fact precluded summary judgment. The ultimate judgment of obviousness is a legal determination. *Graham*, 383 U. S., at 17. Where, as here, the prior art's content, the patent claim's scope, and the level of ordinary skill in the art are not in material dispute and the claim's obviousness is apparent, summary judgment is appropriate. P. 23.

119 Fed. Appx. 282, reversed and remanded.

  KENNEDY, J., delivered the opinion for a unanimous Court.

Cite as: 550 U. S. ____ (2007)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 04–1350

## KSR INTERNATIONAL CO., PETITIONER *v.* TELEFLEX INC. ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

[April 30, 2007]

JUSTICE KENNEDY delivered the opinion of the Court.

Teleflex Incorporated and its subsidiary Technology Holding Company—both referred to here as Teleflex—sued KSR International Company for patent infringement. The patent at issue, United States Patent No. 6,237,565 B1, is entitled "Adjustable Pedal Assembly With Electronic Throttle Control." Supplemental App. 1. The patentee is Steven J. Engelgau, and the patent is referred to as "the Engelgau patent." Teleflex holds the exclusive license to the patent.

Claim 4 of the Engelgau patent describes a mechanism for combining an electronic sensor with an adjustable automobile pedal so the pedal's position can be transmitted to a computer that controls the throttle in the vehicle's engine. When Teleflex accused KSR of infringing the Engelgau patent by adding an electronic sensor to one of KSR's previously designed pedals, KSR countered that claim 4 was invalid under the Patent Act, 35 U. S. C. §103, because its subject matter was obvious.

Section 103 forbids issuance of a patent when "the differences between the subject matter sought to be pat-

ented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

In *Graham* v. *John Deere Co. of Kansas City*, 383 U. S. 1 (1966), the Court set out a framework for applying the statutory language of §103, language itself based on the logic of the earlier decision in *Hotchkiss* v. *Greenwood*, 11 How. 248 (1851), and its progeny. See 383 U. S., at 15–17. The analysis is objective:

> "Under §103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Id.*, at 17–18.

While the sequence of these questions might be reordered in any particular case, the factors continue to define the inquiry that controls. If a court, or patent examiner, conducts this analysis and concludes the claimed subject matter was obvious, the claim is invalid under §103.

Seeking to resolve the question of obviousness with more uniformity and consistency, the Court of Appeals for the Federal Circuit has employed an approach referred to by the parties as the "teaching, suggestion, or motivation" test (TSM test), under which a patent claim is only proved obvious if "some motivation or suggestion to combine the prior art teachings" can be found in the prior art, the nature of the problem, or the knowledge of a person having ordinary skill in the art. See, *e.g., Al-Site Corp.* v. *VSI*

Opinion of the Court

*Int'l, Inc.*, 174 F. 3d 1308, 1323–1324 (CA Fed. 1999). KSR challenges that test, or at least its application in this case. See 119 Fed. Appx. 282, 286–290 (CA Fed. 2005). Because the Court of Appeals addressed the question of obviousness in a manner contrary to §103 and our precedents, we granted certiorari, 547 U. S ___ (2006). We now reverse.

## I

### A

In car engines without computer-controlled throttles, the accelerator pedal interacts with the throttle via cable or other mechanical link. The pedal arm acts as a lever rotating around a pivot point. In a cable-actuated throttle control the rotation caused by pushing down the pedal pulls a cable, which in turn pulls open valves in the carburetor or fuel injection unit. The wider the valves open, the more fuel and air are released, causing combustion to increase and the car to accelerate. When the driver takes his foot off the pedal, the opposite occurs as the cable is released and the valves slide closed.

In the 1990's it became more common to install computers in cars to control engine operation. Computer-controlled throttles open and close valves in response to electronic signals, not through force transferred from the pedal by a mechanical link. Constant, delicate adjustments of air and fuel mixture are possible. The computer's rapid processing of factors beyond the pedal's position improves fuel efficiency and engine performance.

For a computer-controlled throttle to respond to a driver's operation of the car, the computer must know what is happening with the pedal. A cable or mechanical link does not suffice for this purpose; at some point, an electronic sensor is necessary to translate the mechanical operation into digital data the computer can understand.

Before discussing sensors further we turn to the me-

Opinion of the Court

chanical design of the pedal itself.   In the traditional
design a pedal can be pushed down or released but cannot
have its position in the footwell adjusted by sliding the
pedal forward or back.  As a result, a driver who wishes to
be closer or farther from the pedal must either reposition
himself in the driver's seat or move the seat in some way.
In cars with deep footwells these are imperfect solutions
for drivers of smaller stature.   To solve the problem, in-
ventors, beginning in the 1970's, designed pedals that
could be adjusted to change their location in the footwell.
Important for this case are two adjustable pedals disclosed
in U. S. Patent Nos. 5,010,782 (filed July 28, 1989) (Asano)
and 5,460,061 (filed Sept. 17, 1993) (Redding).  The Asano
patent reveals a support structure that houses the pedal
so that even when the pedal location is adjusted relative to
the driver, one of the pedal's pivot points stays fixed.  The
pedal is also designed so that the force necessary to push
the pedal down is the same regardless of adjustments to
its location.  The Redding patent reveals a different, slid-
ing mechanism where both the pedal and the pivot point
are adjusted.

   We return to sensors.  Well before Engelgau applied for
his challenged patent, some inventors had obtained pat-
ents involving electronic pedal sensors for computer-
controlled throttles.  These inventions, such as the device
disclosed in U. S. Patent No. 5,241,936 (filed Sept. 9, 1991)
('936), taught that it was preferable to detect the pedal's
position in the pedal assembly, not in the engine.  The '936
patent disclosed a pedal with an electronic sensor on a
pivot point in the pedal assembly.   U. S. Patent No.
5,063,811 (filed July 9, 1990) (Smith) taught that to pre-
vent the wires connecting the sensor to the computer from
chafing and wearing out, and to avoid grime and damage
from the driver's foot, the sensor should be put on a fixed
part of the pedal assembly rather than in or on the pedal's
footpad.

In addition to patents for pedals with integrated sensors inventors obtained patents for self-contained modular sensors. A modular sensor is designed independently of a given pedal so that it can be taken off the shelf and attached to mechanical pedals of various sorts, enabling the pedals to be used in automobiles with computer-controlled throttles. One such sensor was disclosed in U. S. Patent No. 5,385,068 (filed Dec. 18, 1992) ('068). In 1994, Chevrolet manufactured a line of trucks using modular sensors "attached to the pedal support bracket, adjacent to the pedal and engaged with the pivot shaft about which the pedal rotates in operation." 298 F. Supp. 2d 581, 589 (ED Mich. 2003).

The prior art contained patents involving the placement of sensors on adjustable pedals as well. For example, U. S. Patent No. 5,819,593 (filed Aug. 17, 1995) (Rixon) discloses an adjustable pedal assembly with an electronic sensor for detecting the pedal's position. In the Rixon pedal the sensor is located in the pedal footpad. The Rixon pedal was known to suffer from wire chafing when the pedal was depressed and released.

This short account of pedal and sensor technology leads to the instant case.

### B

KSR, a Canadian company, manufactures and supplies auto parts, including pedal systems. Ford Motor Company hired KSR in 1998 to supply an adjustable pedal system for various lines of automobiles with cable-actuated throttle controls. KSR developed an adjustable mechanical pedal for Ford and obtained U. S. Patent No. 6,151,976 (filed July 16, 1999) ('976) for the design. In 2000, KSR was chosen by General Motors Corporation (GMC or GM) to supply adjustable pedal systems for Chevrolet and GMC light trucks that used engines with computer-controlled throttles. To make the '976 pedal compatible with the

trucks, KSR merely took that design and added a modular sensor.

Teleflex is a rival to KSR in the design and manufacture of adjustable pedals. As noted, it is the exclusive licensee of the Engelgau patent. Engelgau filed the patent application on August 22, 2000 as a continuation of a previous application for U. S. Patent No. 6,109,241, which was filed on January 26, 1999. He has sworn he invented the patent's subject matter on February 14, 1998. The Engelgau patent discloses an adjustable electronic pedal described in the specification as a "simplified vehicle control pedal assembly that is less expensive, and which uses fewer parts and is easier to package within the vehicle." Engelgau, col. 2, lines 2–5, Supplemental App. 6. Claim 4 of the patent, at issue here, describes:

"A vehicle control pedal apparatus comprising:

a support adapted to be mounted to a vehicle structure;

an adjustable pedal assembly having a pedal arm moveable in for[e] and aft directions with respect to said support;

a pivot for pivotally supporting said adjustable pedal assembly with respect to said support and defining a pivot axis; and

an electronic control attached to said support for controlling a vehicle system;

said apparatus characterized by said electronic control being responsive to said pivot for providing a signal that corresponds to pedal arm position as said pedal arm pivots about said pivot axis between rest and applied positions wherein the position of said pivot remains constant while said pedal arm moves in fore and aft directions with respect to said pivot." *Id.,* col.

Opinion of the Court

6, lines 17–36, Supplemental App. 8 (diagram numbers omitted).

We agree with the District Court that the claim discloses "a position-adjustable pedal assembly with an electronic pedal position sensor attached to the support member of the pedal assembly. Attaching the sensor to the support member allows the sensor to remain in a fixed position while the driver adjusts the pedal." 298 F. Supp. 2d, at 586–587.

Before issuing the Engelgau patent the U. S. Patent and Trademark Office (PTO) rejected one of the patent claims that was similar to, but broader than, the present claim 4. The claim did not include the requirement that the sensor be placed on a fixed pivot point. The PTO concluded the claim was an obvious combination of the prior art disclosed in Redding and Smith, explaining:

> "'Since the prior ar[t] references are from the field of endeavor, the purpose disclosed . . . would have been recognized in the pertinent art of Redding. Therefore it would have been obvious . . . to provide the device of Redding with the . . . means attached to a support member as taught by Smith.'" *Id.*, at 595.

In other words Redding provided an example of an adjustable pedal and Smith explained how to mount a sensor on a pedal's support structure, and the rejected patent claim merely put these two teachings together.

Although the broader claim was rejected, claim 4 was later allowed because it included the limitation of a fixed pivot point, which distinguished the design from Redding's. *Ibid.* Engelgau had not included Asano among the prior art references, and Asano was not mentioned in the patent's prosecution. Thus, the PTO did not have before it an adjustable pedal with a fixed pivot point. The patent issued on May 29, 2001 and was assigned to Teleflex.

Upon learning of KSR's design for GM, Teleflex sent a

Opinion of the Court

warning letter informing KSR that its proposal would violate the Engelgau patent. "'Teleflex believes that any supplier of a product that combines an adjustable pedal with an electronic throttle control necessarily employs technology covered by one or more'" of Teleflex's patents. *Id.*, at 585. KSR refused to enter a royalty arrangement with Teleflex; so Teleflex sued for infringement, asserting KSR's pedal infringed the Engelgau patent and two other patents. *Ibid.* Teleflex later abandoned its claims regarding the other patents and dedicated the patents to the public. The remaining contention was that KSR's pedal system for GM infringed claim 4 of the Engelgau patent. Teleflex has not argued that the other three claims of the patent are infringed by KSR's pedal, nor has Teleflex argued that the mechanical adjustable pedal designed by KSR for Ford infringed any of its patents.

### C

The District Court granted summary judgment in KSR's favor. After reviewing the pertinent history of pedal design, the scope of the Engelgau patent, and the relevant prior art, the court considered the validity of the contested claim. By direction of 35 U. S. C. §282, an issued patent is presumed valid. The District Court applied *Graham*'s framework to determine whether under summary-judgment standards KSR had overcome the presumption and demonstrated that claim 4 was obvious in light of the prior art in existence when the claimed subject matter was invented. See §102(a).

The District Court determined, in light of the expert testimony and the parties' stipulations, that the level of ordinary skill in pedal design was "'an undergraduate degree in mechanical engineering (or an equivalent amount of industry experience) [and] familiarity with pedal control systems for vehicles.'" 298 F. Supp. 2d, at 590. The court then set forth the relevant prior art, in-

Opinion of the Court

cluding the patents and pedal designs described above.

Following *Graham*'s direction, the court compared the teachings of the prior art to the claims of Engelgau. It found "little difference." 298 F. Supp. 2d, at 590. Asano taught everything contained in claim 4 except the use of a sensor to detect the pedal's position and transmit it to the computer controlling the throttle. That additional aspect was revealed in sources such as the '068 patent and the sensors used by Chevrolet.

Under the controlling cases from the Court of Appeals for the Federal Circuit, however, the District Court was not permitted to stop there. The court was required also to apply the TSM test. The District Court held KSR had satisfied the test. It reasoned (1) the state of the industry would lead inevitably to combinations of electronic sensors and adjustable pedals, (2) Rixon provided the basis for these developments, and (3) Smith taught a solution to the wire chafing problems in Rixon, namely locating the sensor on the fixed structure of the pedal. This could lead to the combination of Asano, or a pedal like it, with a pedal position sensor.

The conclusion that the Engelgau design was obvious was supported, in the District Court's view, by the PTO's rejection of the broader version of claim 4. Had Engelgau included Asano in his patent application, it reasoned, the PTO would have found claim 4 to be an obvious combination of Asano and Smith, as it had found the broader version an obvious combination of Redding and Smith. As a final matter, the District Court held that the secondary factor of Teleflex's commercial success with pedals based on Engelgau's design did not alter its conclusion. The District Court granted summary judgment for KSR.

With principal reliance on the TSM test, the Court of Appeals reversed. It ruled the District Court had not been strict enough in applying the test, having failed to make "'finding[s] as to the specific understanding or principle

within the knowledge of a skilled artisan that would have
motivated one with no knowledge of [the] invention' . . . to
attach an electronic control to the support bracket of the
Asano assembly." 119 Fed. Appx., at 288 (brackets in
original) (quoting *In re Kotzab*, 217 F. 3d 1365, 1371 (CA
Fed. 2000)). The Court of Appeals held that the District
Court was incorrect that the nature of the problem to be
solved satisfied this requirement because unless the "prior
art references address[ed] the precise problem that the
patentee was trying to solve," the problem would not
motivate an inventor to look at those references. 119 Fed.
Appx., at 288.

Here, the Court of Appeals found, the Asano pedal was
designed to solve the "'constant ratio problem'"—that is,
to ensure that the force required to depress the pedal is
the same no matter how the pedal is adjusted—whereas
Engelgau sought to provide a simpler, smaller, cheaper
adjustable electronic pedal. *Ibid.* As for Rixon, the court
explained, that pedal suffered from the problem of wire
chafing but was not designed to solve it. In the court's
view Rixon did not teach anything helpful to Engelgau's
purpose. Smith, in turn, did not relate to adjustable ped-
als and did not "necessarily go to the issue of motivation to
attach the electronic control on the support bracket of the
pedal assembly." *Ibid.* When the patents were inter-
preted in this way, the Court of Appeals held, they would
not have led a person of ordinary skill to put a sensor on
the sort of pedal described in Asano.

That it might have been obvious to try the combination
of Asano and a sensor was likewise irrelevant, in the
court's view, because "'"[o]bvious to try" has long been
held not to constitute obviousness.'" *Id.*, at 289 (quoting
*In re Deuel*, 51 F. 3d 1552, 1559 (CA Fed. 1995)).

The Court of Appeals also faulted the District Court's
consideration of the PTO's rejection of the broader version
of claim 4. The District Court's role, the Court of Appeals

Opinion of the Court

explained, was not to speculate regarding what the PTO might have done had the Engelgau patent mentioned Asano. Rather, the court held, the District Court was obliged first to presume that the issued patent was valid and then to render its own independent judgment of obviousness based on a review of the prior art. The fact that the PTO had rejected the broader version of claim 4, the Court of Appeals said, had no place in that analysis.

The Court of Appeals further held that genuine issues of material fact precluded summary judgment. Teleflex had proffered statements from one expert that claim 4 "'was a simple, elegant, and novel combination of features,'" 119 Fed. Appx., at 290, compared to Rixon, and from another expert that claim 4 was nonobvious because, unlike in Rixon, the sensor was mounted on the support bracket rather than the pedal itself. This evidence, the court concluded, sufficed to require a trial.

## II

### A

We begin by rejecting the rigid approach of the Court of Appeals. Throughout this Court's engagement with the question of obviousness, our cases have set forth an expansive and flexible approach inconsistent with the way the Court of Appeals applied its TSM test here. To be sure, *Graham* recognized the need for "uniformity and definiteness." 383 U. S., at 18. Yet the principles laid down in *Graham* reaffirmed the "functional approach" of *Hotchkiss*, 11 How. 248. See 383 U. S., at 12. To this end, *Graham* set forth a broad inquiry and invited courts, where appropriate, to look at any secondary considerations that would prove instructive. *Id.*, at 17.

Neither the enactment of §103 nor the analysis in *Graham* disturbed this Court's earlier instructions concerning the need for caution in granting a patent based on the combination of elements found in the prior art. For over a

Opinion of the Court

half century, the Court has held that a "patent for a combination which only unites old elements with no change in their respective functions . . . obviously withdraws what is already known into the field of its monopoly and diminishes the resources available to skillful men." *Great Atlantic & Pacific Tea Co.* v. *Supermarket Equipment Corp.*, 340 U. S. 147, 152 (1950). This is a principal reason for declining to allow patents for what is obvious. The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results. Three cases decided after *Graham* illustrate the application of this doctrine.

In *United States* v. *Adams*, 383 U. S. 39, 40 (1966), a companion case to *Graham*, the Court considered the obviousness of a "wet battery" that varied from prior designs in two ways: It contained water, rather than the acids conventionally employed in storage batteries; and its electrodes were magnesium and cuprous chloride, rather than zinc and silver chloride. The Court recognized that when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result. 383 U. S., at 50–51. It nevertheless rejected the Government's claim that Adams's battery was obvious. The Court relied upon the corollary principle that when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious. *Id.*, at 51–52. When Adams designed his battery, the prior art warned that risks were involved in using the types of electrodes he employed. The fact that the elements worked together in an unexpected and fruitful manner supported the conclusion that Adams's design was not obvious to those skilled in the art.

In *Anderson's-Black Rock, Inc.* v. *Pavement Salvage Co.*, 396 U. S. 57 (1969), the Court elaborated on this approach.

Opinion of the Court

The subject matter of the patent before the Court was a device combining two pre-existing elements: a radiant-heat burner and a paving machine. The device, the Court concluded, did not create some new synergy: The radiant-heat burner functioned just as a burner was expected to function; and the paving machine did the same. The two in combination did no more than they would in separate, sequential operation. *Id.*, at 60–62. In those circumstances, "while the combination of old elements performed a useful function, it added nothing to the nature and quality of the radiant-heat burner already patented," and the patent failed under §103. *Id.*, at 62 (footnote omitted).

Finally, in *Sakraida* v. *AG Pro, Inc.*, 425 U. S. 273 (1976), the Court derived from the precedents the conclusion that when a patent "simply arranges old elements with each performing the same function it had been known to perform" and yields no more than one would expect from such an arrangement, the combination is obvious. *Id.*, at 282.

The principles underlying these cases are instructive when the question is whether a patent claiming the combination of elements of prior art is obvious. When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, §103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill. *Sakraida* and *Anderson's-Black Rock* are illustrative—a court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions.

Following these principles may be more difficult in other

Opinion of the Court

cases than it is here because the claimed subject matter
may involve more than the simple substitution of one
known element for another or the mere application of a
known technique to a piece of prior art ready for the im-
provement. Often, it will be necessary for a court to look
to interrelated teachings of multiple patents; the effects of
demands known to the design community or present in the
marketplace; and the background knowledge possessed by
a person having ordinary skill in the art, all in order to
determine whether there was an apparent reason to com-
bine the known elements in the fashion claimed by the
patent at issue. To facilitate review, this analysis should
be made explicit. See *In re Kahn*, 441 F. 3d 977, 988 (CA
Fed. 2006) ("[R]ejections on obviousness grounds cannot be
sustained by mere conclusory statements; instead, there
must be some articulated reasoning with some rational
underpinning to support the legal conclusion of obvious-
ness"). As our precedents make clear, however, the analy-
sis need not seek out precise teachings directed to the
specific subject matter of the challenged claim, for a court
can take account of the inferences and creative steps that
a person of ordinary skill in the art would employ.

B

When it first established the requirement of demon-
strating a teaching, suggestion, or motivation to combine
known elements in order to show that the combination is
obvious, the Court of Customs and Patent Appeals cap-
tured a helpful insight. See *Application of Bergel,* 292
F. 2d 955, 956–957 (1961). As is clear from cases such as
*Adams,* a patent composed of several elements is not
proved obvious merely by demonstrating that each of its
elements was, independently, known in the prior art.
Although common sense directs one to look with care at a
patent application that claims as innovation the combina-
tion of two known devices according to their established

Opinion of the Court

functions, it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does. This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known.

Helpful insights, however, need not become rigid and mandatory formulas; and when it is so applied, the TSM test is incompatible with our precedents. The obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents. The diversity of inventive pursuits and of modern technology counsels against limiting the analysis in this way. In many fields it may be that there is little discussion of obvious techniques or combinations, and it often may be the case that market demand, rather than scientific literature, will drive design trends. Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may, in the case of patents combining previously known elements, deprive prior inventions of their value or utility.

In the years since the Court of Customs and Patent Appeals set forth the essence of the TSM test, the Court of Appeals no doubt has applied the test in accord with these principles in many cases. There is no necessary inconsistency between the idea underlying the TSM test and the *Graham* analysis. But when a court transforms the general principle into a rigid rule that limits the obviousness inquiry, as the Court of Appeals did here, it errs.

## C

The flaws in the analysis of the Court of Appeals relate

Opinion of the Court

for the most part to the court's narrow conception of the obviousness inquiry reflected in its application of the TSM test. In determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls. What matters is the objective reach of the claim. If the claim extends to what is obvious, it is invalid under §103. One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims.

The first error of the Court of Appeals in this case was to foreclose this reasoning by holding that courts and patent examiners should look only to the problem the patentee was trying to solve. 119 Fed. Appx., at 288. The Court of Appeals failed to recognize that the problem motivating the patentee may be only one of many addressed by the patent's subject matter. The question is not whether the combination was obvious to the patentee but whether the combination was obvious to a person with ordinary skill in the art. Under the correct analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.

The second error of the Court of Appeals lay in its assumption that a person of ordinary skill attempting to solve a problem will be led only to those elements of prior art designed to solve the same problem. *Ibid.* The primary purpose of Asano was solving the constant ratio problem; so, the court concluded, an inventor considering how to put a sensor on an adjustable pedal would have no reason to consider putting it on the Asano pedal. *Ibid.* Common sense teaches, however, that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a

puzzle. Regardless of Asano's primary purpose, the design provided an obvious example of an adjustable pedal with a fixed pivot point; and the prior art was replete with patents indicating that a fixed pivot point was an ideal mount for a sensor. The idea that a designer hoping to make an adjustable electronic pedal would ignore Asano because Asano was designed to solve the constant ratio problem makes little sense. A person of ordinary skill is also a person of ordinary creativity, not an automaton.

The same constricted analysis led the Court of Appeals to conclude, in error, that a patent claim cannot be proved obvious merely by showing that the combination of elements was "obvious to try." *Id.*, at 289 (internal quotation marks omitted). When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under §103.

The Court of Appeals, finally, drew the wrong conclusion from the risk of courts and patent examiners falling prey to hindsight bias. A factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning. See *Graham*, 383 U. S., at 36 (warning against a "temptation to read into the prior art the teachings of the invention in issue" and instructing courts to "'guard against slipping into the use of hindsight'" (quoting *Monroe Auto Equipment Co.* v. *Heckethorn Mfg. & Supply Co.*, 332 F. 2d 406, 412 (CA6 1964))). Rigid preventative rules that deny factfinders recourse to common sense, however, are neither necessary under our case law nor consistent with it.

We note the Court of Appeals has since elaborated a

Opinion of the Court

broader conception of the TSM test than was applied in
the instant matter. See, *e.g., DyStar Textilfarben GmbH
& Co. Deutschland KG* v. *C. H. Patrick Co.*, 464 F. 3d
1356, 1367 (2006) ("Our suggestion test is in actuality
quite flexible and not only permits, but *requires*, consid-
eration of common knowledge and common sense"); *Alza
Corp.* v. *Mylan Labs., Inc.*, 464 F. 3d 1286, 1291 (2006)
("There is flexibility in our obviousness jurisprudence
because a motivation may be found *implicitly* in the prior
art. We do not have a rigid test that requires an actual
teaching to combine . . ."). Those decisions, of course, are
not now before us and do not correct the errors of law
made by the Court of Appeals in this case. The extent to
which they may describe an analysis more consistent with
our earlier precedents and our decision here is a matter
for the Court of Appeals to consider in its future cases.
What we hold is that the fundamental misunderstandings
identified above led the Court of Appeals in this case to
apply a test inconsistent with our patent law decisions.

### III

When we apply the standards we have explained to the
instant facts, claim 4 must be found obvious. We agree
with and adopt the District Court's recitation of the rele-
vant prior art and its determination of the level of ordi-
nary skill in the field. As did the District Court, we see
little difference between the teachings of Asano and Smith
and the adjustable electronic pedal disclosed in claim 4 of
the Engelgau patent. A person having ordinary skill in
the art could have combined Asano with a pedal position
sensor in a fashion encompassed by claim 4, and would
have seen the benefits of doing so.

### A

Teleflex argues in passing that the Asano pedal cannot
be combined with a sensor in the manner described by

Opinion of the Court

claim 4 because of the design of Asano's pivot mechanisms. See Brief for Respondents 48–49, and n. 17. Therefore, Teleflex reasons, even if adding a sensor to Asano was obvious, that does not establish that claim 4 encompasses obvious subject matter. This argument was not, however, raised before the District Court. There Teleflex was content to assert only that the problem motivating the invention claimed by the Engelgau patent would not lead to the solution of combining of Asano with a sensor. See Teleflex's Response to KSR's Motion for Summary Judgment of Invalidity in No. 02–74586 (ED Mich.), pp. 18–20, App. 144a–146a. It is also unclear whether the current argument was raised before the Court of Appeals, where Teleflex advanced the nonspecific, conclusory contention that combining Asano with a sensor would not satisfy the limitations of claim 4. See Brief for Plaintiffs-Appellants in No. 04–1152 (CA Fed.), pp. 42–44. Teleflex's own expert declarations, moreover, do not support the point Teleflex now raises. See Declaration of Clark J. Radcliffe, Ph.D., Supplemental App. 204–207; Declaration of Timothy L. Andresen, *id.,* at 208–210. The only statement in either declaration that might bear on the argument is found in the Radcliffe declaration:

> "Asano . . . and Rixon . . . are complex mechanical linkage-based devices that are expensive to produce and assemble and difficult to package. It is exactly these difficulties with prior art designs that [Engelgau] resolves. The use of an adjustable pedal with a single pivot reflecting pedal position combined with an electronic control mounted between the support and the adjustment assembly at that pivot was a simple, elegant, and novel combination of features in the Engelgau '565 patent." *Id.,* at 206, ¶16.

Read in the context of the declaration as a whole this is best interpreted to mean that Asano could not be used to

Opinion of the Court

solve "[t]he problem addressed by Engelgau '565[:] to
provide a less expensive, more quickly assembled, and
smaller package adjustable pedal assembly with electronic
control." *Id.,* at 205, ¶10.

The District Court found that combining Asano with a
pivot-mounted pedal position sensor fell within the scope
of claim 4. 298 F. Supp. 2d, at 592–593. Given the sigifi-
cance of that finding to the District Court's judgment, it is
apparent that Teleflex would have made clearer chal-
lenges to it if it intended to preserve this claim. In light of
Teleflex's failure to raise the argument in a clear fashion,
and the silence of the Court of Appeals on the issue, we
take the District Court's conclusion on the point to be
correct.

## B

The District Court was correct to conclude that, as of the
time Engelgau designed the subject matter in claim 4, it
was obvious to a person of ordinary skill to combine Asano
with a pivot-mounted pedal position sensor. There then
existed a marketplace that created a strong incentive to
convert mechanical pedals to electronic pedals, and the
prior art taught a number of methods for achieving this
advance. The Court of Appeals considered the issue too
narrowly by, in effect, asking whether a pedal designer
writing on a blank slate would have chosen both Asano
and a modular sensor similar to the ones used in the
Chevrolet truckline and disclosed in the '068 patent. The
District Court employed this narrow inquiry as well,
though it reached the correct result nevertheless. The
proper question to have asked was whether a pedal de-
signer of ordinary skill, facing the wide range of needs
created by developments in the field of endeavor, would
have seen a benefit to upgrading Asano with a sensor.

In automotive design, as in many other fields, the inter-
action of multiple components means that changing one

Opinion of the Court

component often requires the others to be modified as well. Technological developments made it clear that engines using computer-controlled throttles would become standard. As a result, designers might have decided to design new pedals from scratch; but they also would have had reason to make pre-existing pedals work with the new engines. Indeed, upgrading its own pre-existing model led KSR to design the pedal now accused of infringing the Engelgau patent.

For a designer starting with Asano, the question was where to attach the sensor. The consequent legal question, then, is whether a pedal designer of ordinary skill starting with Asano would have found it obvious to put the sensor on a fixed pivot point. The prior art discussed above leads us to the conclusion that attaching the sensor where both KSR and Engelgau put it would have been obvious to a person of ordinary skill.

The '936 patent taught the utility of putting the sensor on the pedal device, not in the engine. Smith, in turn, explained to put the sensor not on the pedal's footpad but instead on its support structure. And from the known wire-chafing problems of Rixon, and Smith's teaching that "the pedal assemblies must not precipitate any motion in the connecting wires," Smith, col. 1, lines 35–37, Supplemental App. 274, the designer would know to place the sensor on a nonmoving part of the pedal structure. The most obvious nonmoving point on the structure from which a sensor can easily detect the pedal's position is a pivot point. The designer, accordingly, would follow Smith in mounting the sensor on a pivot, thereby designing an adjustable electronic pedal covered by claim 4.

Just as it was possible to begin with the objective to upgrade Asano to work with a computer-controlled throttle, so too was it possible to take an adjustable electronic pedal like Rixon and seek an improvement that would avoid the wire-chafing problem. Following similar steps to

Opinion of the Court

those just explained, a designer would learn from Smith to avoid sensor movement and would come, thereby, to Asano because Asano disclosed an adjustable pedal with a fixed pivot.

Teleflex indirectly argues that the prior art taught away from attaching a sensor to Asano because Asano in its view is bulky, complex, and expensive. The only evidence Teleflex marshals in support of this argument, however, is the Radcliffe declaration, which merely indicates that Asano would not have solved Engelgau's goal of making a small, simple, and inexpensive pedal. What the declaration does not indicate is that Asano was somehow so flawed that there was no reason to upgrade it, or pedals like it, to be compatible with modern engines. Indeed, Teleflex's own declarations refute this conclusion. Dr. Radcliffe states that Rixon suffered from the same bulk and complexity as did Asano. See *id.,* at 206. Teleflex's other expert, however, explained that Rixon was itself designed by adding a sensor to a pre-existing mechanical pedal. See *id.,* at 209. If Rixon's base pedal was not too flawed to upgrade, then Dr. Radcliffe's declaration does not show Asano was either. Teleflex may have made a plausible argument that Asano is inefficient as compared to Engelgau's preferred embodiment, but to judge Asano against Engelgau would be to engage in the very hindsight bias Teleflex rightly urges must be avoided. Accordingly, Teleflex has not shown anything in the prior art that taught away from the use of Asano.

Like the District Court, finally, we conclude Teleflex has shown no secondary factors to dislodge the determination that claim 4 is obvious. Proper application of *Graham* and our other precedents to these facts therefore leads to the conclusion that claim 4 encompassed obvious subject matter. As a result, the claim fails to meet the requirement of §103.

We need not reach the question whether the failure to

Opinion of the Court

disclose Asano during the prosecution of Engelgau voids
the presumption of validity given to issued patents, for
claim 4 is obvious despite the presumption. We neverthe-
less think it appropriate to note that the rationale under-
lying the presumption—that the PTO, in its expertise, has
approved the claim—seems much diminished here.

IV

A separate ground the Court of Appeals gave for revers-
ing the order for summary judgment was the existence of a
dispute over an issue of material fact. We disagree with
the Court of Appeals on this point as well. To the extent
the court understood the *Graham* approach to exclude the
possibility of summary judgment when an expert provides
a conclusory affidavit addressing the question of obvious-
ness, it misunderstood the role expert testimony plays in
the analysis. In considering summary judgment on that
question the district court can and should take into ac-
count expert testimony, which may resolve or keep open
certain questions of fact. That is not the end of the issue,
however. The ultimate judgment of obviousness is a legal
determination. *Graham*, 383 U. S., at 17. Where, as here,
the content of the prior art, the scope of the patent claim,
and the level of ordinary skill in the art are not in mate-
rial dispute, and the obviousness of the claim is apparent
in light of these factors, summary judgment is appropri-
ate. Nothing in the declarations proffered by Teleflex
prevented the District Court from reaching the careful
conclusions underlying its order for summary judgment in
this case.

*        *        *

We build and create by bringing to the tangible and
palpable reality around us new works based on instinct,
simple logic, ordinary inferences, extraordinary ideas, and
sometimes even genius. These advances, once part of our

shared knowledge, define a new threshold from which innovation starts once more. And as progress beginning from higher levels of achievement is expected in the normal course, the results of ordinary innovation are not the subject of exclusive rights under the patent laws. Were it otherwise patents might stifle, rather than promote, the progress of useful arts. See U. S. Const., Art. I, §8, cl. 8. These premises led to the bar on patents claiming obvious subject matter established in *Hotchkiss* and codified in §103. Application of the bar must not be confined within a test or formulation too constrained to serve its purpose.

KSR provided convincing evidence that mounting a modular sensor on a fixed pivot point of the Asano pedal was a design step well within the grasp of a person of ordinary skill in the relevant art. Its arguments, and the record, demonstrate that claim 4 of the Engelgau patent is obvious. In rejecting the District Court's rulings, the Court of Appeals analyzed the issue in a narrow, rigid manner inconsistent with §103 and our precedents. The judgment of the Court of Appeals is reversed, and the case remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# EXHIBIT 2

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 3

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 4

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 5

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY

# EXHIBIT 6

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 7

FOCUS - 62 of 147 DOCUMENTS



Analysis
As of: May 02, 2007

HAROLD MALIN and SANDRA JOAN MALIN REVOCABLE TRUST, Individu-
ally and On Behalf of Others Similarly Situated, Plaintiff, vs. XL CAPITAL LTD., et
al., Defendants.

Civil No. 3:03cv2001 (PCD)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

*2005 U.S. Dist. LEXIS 27089; Fed. Sec. L. Rep. (CCH) P93,516*

August 26, 2005, Decided
September 1, 2005, Filed

**SUBSEQUENT HISTORY:** Motion granted by *Malin
v. XL Capital Ltd., 2007 U.S. Dist. LEXIS 8417 (D.
Conn., Feb. 6, 2007)*

**DISPOSITION:** [*1] Defendants' Motion to Dismiss
[Doc. No. 99] granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, shareholders,
alleged, inter alia, violations of § 10(b) of the Securities
Exchange Act, *15. U.S.C.S. § 78j(b)*, and Rule 10b-5
promulgated thereunder, *17 C.F.R. § 240.10b-5*. Defen-
dants, a company and certain of its officers, moved to
dismiss for lack of subject matter jurisdiction.

**OVERVIEW:** The shareholders alleged that the com-
pany and officers knowingly issued false and misleading
statements regarding the company's financial condition
by failing to adequately reserve for losses in its reinsur-
ance operations. As a consequence of these misrepresen-
tations, securities shares sold at inflated prices which
later fell after the truth became known to the market. The
company and officers argued, based on United States
Supreme Court precedent, that the shareholders' allega-
tions regarding an inflated purchase price and causation
were insufficient. While a sale was not necessary or the
only way a shareholder could plead economic loss under
the circumstances, pursuant to *15 U.S.C.S. § 78u-4(e)*, a
price fluctuation without any realization of an economic
loss was functionally equivalent to the Supreme Court's

rejection of an artificially inflated purchase price alone
as economic loss. If the current value was commensurate
to the purchase prices, there was no loss, regardless of
whether the purchase price was artificially inflated. Thus,
the shareholders' allegations of an economic loss were
insufficient when considered in conjunction with the
evidence of price recovery.

**OUTCOME:** The company and officers' motion to dis-
miss was granted. The shareholders were given thirty
days to move to amend the complaint.

**COUNSEL:** For Harold Malin, Ind & o/b/o all others
similarly situated, Sandra Joan Malin Revocable Trust,
Ind & o/b/o all others similarly situated, Plaintiffs: David
A. Rosenfeld, Cauley Geller Bowman & Rudman, LLP,
Melville, NY; George Edward Barrett, Barrett, Johnston
& Parsley, Nashville, TN; James W. Oliver, Shawn A.
Williams, Lerach Coughlin Stoia Geller, Rudman &
Robbins, San Francisco, CA; Patrick A. Klingman,
Sheperd Finkelman Miller & Shah, Chester, CT; Ramzi
Abadou, Milberg Weiss Bershad & Schulman, San
Diego, CA; David Randell Scott, Scott & Scott, Colches-
ter, CT.

For XL Capital Ltd., Brian M. O'Hara, Jerry De St Paer,
Defendants: Howard G. Sloane, Leonard A. Spivak, Ca-
hill, Gordon & Reindel, New York, NY; James F. Staple-
ton, Terence J. Gallagher, III., Thomas D. Goldberg,
Day, Berry & Howard, Stamford, CT.

2005 U.S. Dist. LEXIS 27089, *; Fed. Sec. L. Rep. (CCH) P93,516

For Ronald L. Bornhuetter, Defendant: Dorit S. Heimer, Westport, CT; Howard G. Sloane, Leonard A. Spivak, Cahill, Gordon & Reindel, New York, NY; Jeremy L. Wallison, Peter N. Wang, Foley & Lardner LLP, New York, NY.

For Charles V. Keeling, Nicholas M. Brown, Jr., Defendants: Howard G. Sloane, Cahill, Gordon [*2] & Reindel, New York, NY; James F. Stapleton, Terence J. Gallagher, III., Thomas D. Goldberg, Day, Berry & Howard, Stamford, CT.

For Louisiana School Emp Retirement Sys, Movant: David A. Rosenfeld, Cauley Geller Bowman & Rudman, LLP, Melville, NY; Nancy A. Kulesa, Schatz & Nobel-Htfd, Hartford, CT; Patrick A. Klingman, Sheperd Finkelman Miller & Shah, Chester, CT; Richard A. Maniskas, Schiffrin & Barroway, Radnor, PA.

For Thomas Palfreeman, Movant: David A. Rosenfeld, Cauley Geller Bowman & Rudman, LLP, Melville, NY; Nancy A. Kulesa, Schatz & Nobel-Htfd, Hartford, CT; Richard A. Maniskas, Schiffrin & Barroway, Radnor, PA.

For Alaska Ironworkers Pension Trust, Movant: David Randell Scott, Erin Green Comite, Scott & Scott, Colchester, CT; James W. Oliver, Shawn A. Williams, Lerach Coughlin Stoia Geller, Rudman & Robbins, San Francisco, CA; Terence J. Gallagher, III., Day, Berry & Howard, Stamford, CT.

JUDGES: Peter C. Dorsey, U.S. District Judge, United States District Judge.

OPINION BY: Peter C. Dorsey

OPINION:

## RULING ON DEFENDANTS' SUPPLEMENTAL MOTION TO DISMISS

Pursuant to *Fed. R. Civ. P. 12(b)(1)*, Defendants move to dismiss the Second [*3] Amended Complaint for lack of subject matter jurisdiction. For the reasons stated below, Defendants' Motion [Doc. No. 99] is **granted.**

## I. BACKGROUND: n1

n1 A detailed summary of the allegations in the Amended Complaint is not necessary. As needed, additional allegations will be discussed below.

Plaintiffs bring this action alleging violations of *§ 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b),* and Rule 10b-5 promulgated thereunder, *17 C.F.R. § 240.10b-5,* (Count One); as well as *§ 20(a) of the Securities Exchange Act* (Count Two). The crux of Plaintiffs' allegations is that Defendants knowingly issued false and misleading statements regarding the Company's financial condition by failing to adequately reserve for losses in its "Nac Re" reinsurance operations. As a consequence of these misrepresentations, securities shares sold at inflated prices which later fell after the truth became known to the market.

On February 3, 2005, Defendants [*4] filed a Motion to Dismiss the Amended Complaint pursuant to *Fed. R. Civ. P. 12(b)(6)* and *9(b)*. That Motion is currently pending before the Court. Subsequently, on August 1, 2005, after the Supreme Court's decision in *Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)*, Defendants filed another Motion to Dismiss pursuant to *Fed. R. Civ. P. 12(b)(1)* alleging a failure to meet the standard set forth in Dura Pharmaceuticals. The latter Motion is the subject of this Ruling.

## II. STANDARD OF REVIEW:

Defendants characterize the Motion as made pursuant to *Fed. R. Civ. P. 12(b)(1)*. A *Rule 12(b)(1)* motion seeks dismissal of a complaint for lack of subject matter jurisdiction. *Fed. R. Civ. P. 12(b)(1)*. The burden of establishing subject matter jurisdiction lies with the plaintiff. *Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996)*

Plaintiffs contend, however, that the Motion is not properly considered [*5] under 12(b)(1) and is more appropriately considered under *Rule 12(b)(6)*. To the extent that Plaintiffs are correct, such a motion is only properly granted when "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 69 (2d Cir. 2001)*, quoting *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984)*. A motion to dismiss must be decided on the facts alleged in the complaint. *Merritt v. Shuttle, Inc., 245 F.3d 182, 186 (2d Cir. 2001)*. All facts in the complaint are assumed to be true and are considered in the light most favorable to the non-movant. *Manning v. Utilities Mut. Ins. Co., Inc., 254 F.3d 387, 390 n.1 (2d Cir. 2001)*.

When a party moves to dismiss under *Fed. R. Civ. P. 12(b)(1)* as well as other bases such as *12(b)(6)*, "the court should consider the *Rule 12(b)(1)* challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be [*6] deter-

2005 U.S. Dist. LEXIS 27089, *; Fed. Sec. L. Rep. (CCH) P93,516

mined." *Rhulen Agency, Inc. v. Alabama Ins. Guaranty Ass'n, 896 F.2d 674, 678 (2d Cir. 1990).*

## III. DISCUSSION:

Plaintiffs argue that Defendants' Motion "is nothing more than a transparent attempt to improperly file a second 12(b)(6) motion." Pl. Mem. Opp. Mot. at 1. As a consequence, Plaintiffs argue because the arguments raised in this Motion were not raised in the first Motion to Dismiss, *Fed. R. Civ. P. 12(g)* requires that the arguments be considered waived. Id. While *Rule 12(g)* does provide for waiver of certain arguments if not made in a motion or responsive pleading, the argument that a party fails to state a claim under *12(b)(6)* is expressly excluded from that provision by *12(h)(2).* See *Fed. R. Civ. P. 12(h)(2)* ("A defense of failure to state a claim upon which relief can be granted ... may be made in any pleading permitted or ordered under *Rule 7(a),* or by motion for judgment on the pleadings, or at the trial on the merits"). Indeed, the Second Circuit has stated that "the defense of failure to state a claim is not waivable." *Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001).* [*7] n2 Furthermore, as Defendants' original Motion has not yet been ruled on, the Court could simply treat this Motion as a supplement to the former. Thus, under either standard, 12(b)(1) or 12(b)(6), the Court may consider the arguments raised.

> n2 This is not to encourage piecemeal motion practice or to hold that parties may file motions whenever they please. The Court has the power to enter a scheduling order which may set deadlines for the filing of motions and for a which a party much show good cause to amend. See *Fed. R. Civ. P. 16(b).* Under the circumstances, namely the Supreme Court's recent decision in *Dura Pharmaceutical,* the Court finds good cause.

As to whether Defendants' Motion is properly considered under *12(b)(1)* or *12(b)(6),* it is appropriate to look to the basis of the Motion, namely the Supreme Court's decision in *Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005).* The [*8] procedural history of that case makes clear that the district court dismissed pursuant to *12(b)(6),* see *In re Dura Pharms., Inc. Secs. Litig., Civil No. 99cv0151-L(NLS), 2001 U.S. Dist. LEXIS 25907 (D. Cal. Nov. 2, 2001),* and nowhere in the Supreme Court's decision is jurisdiction mentioned. Rather, the Supreme Court deals with the issue of causation, which it expressly described as an element of the offense. See *Dura Pharmaceuticals., 125 S. Ct. at 1631* (listing material misrepresentation,

scienter, connection with the purchase or sale of a security, reliance, economic loss, and loss causation as the "basic elements" of a case "involving publicly traded securities and purchases or sales in public securities markets"). It goes without saying that causation is a basic element of any tort action. Defendants argue that because Plaintiffs' causation theory and allegations of economic loss are flawed, there is no case or controversy and by extension, no jurisdiction. Def. Reply Br. at 9. To agree with this argument would render any 12(b)(6) motion challenging damages or causation as reaching both standing and the Court's jurisdiction. This is simply not [*9] the case. As stated, economic loss and loss causation are elements of the offense, *Dura Pharmaceuticals., 125 S. Ct. at 1631,* which the Supreme Court dealt with on appeal from the grant of a 12(b)(6) motion, not *12(b)(1).* The Court therefore construes Defendants' Motion as made under *12(b)(6)* and considers it as such.

The Supreme Court in Dura Pharmaceuticals rejected the Ninth Circuit's legal conclusion that, in order to establish loss and causation, a plaintiff need only prove that "the price on the date of purchase [of the securities at issue] was inflated because of the misrepresentation." *125 S. Ct. at 1631* (quotation omitted). As such, the plaintiff's allegations that they paid artificially inflated prices and suffered damages were insufficient, as an "'artificially inflated purchase price' is not itself a relevant economic loss" and "the complaint nowhere else provides the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation." *Id. at 1634.* Specifically, the Court noted that "as a matter of pure logic" an artificially inflated [*10] purchase price is not by itself an economic loss at the moment of the transaction as the immediate value of the security is equivalent to the inflated purchase price. *Id. at 1631.* There may of course be a loss if price subsequently drops and the purchaser sells, however, the inflated price must be causally connected to the misrepresentations and the price drop must be as a consequence of the truth reaching the market. Id. In Dura Pharmaceuticals, it was clear from the complaint that prices subsequently dropped, but plaintiffs failed to allege that drop occurred after the truth became known and failed to establish a causal connection between the two events, resting only on the allegation of an inflated price. *Id. at 1634.* As such, the complaint was deficient.

It is important to note, however, that while inflated prices and the mere existence of a misrepresentation are not enough to properly plead a securities law violation, the Supreme Court made it clear that there is no heightened pleading standard for allegations regarding economic loss and causation. A plaintiff need only "provide a defendant with some indication of the loss and the

2005 U.S. Dist. LEXIS 27089, *; Fed. Sec. L. Rep. (CCH) P93,516

[*11] causal connection that the plaintiff has in mind." Id.

Defendants argue, based on Dura Pharmaceuticals, that Plaintiffs' allegations regarding an inflated purchase price and causation are insufficient as a matter of law. Plaintiffs respond by distinguishing Dura Pharmaceuticals on the facts, arguing that they have alleged not only an inflated price and a price drop, but that the inflated prices were caused by the misrepresentations and that the price drop was causally connected to the truth reaching the market. Pl. Mem. Opp. Mot. to Dismiss at 4-6 (summarizing allegations in the Amended Complaint). Plaintiffs therefore do not rely solely on the allegation of an inflated price and a misrepresentation, rather they indicate their intention to prove a subsequent price drop that was causally connected to the truth reaching the market. Considered as such, these allegations meet the pleading requirement set forth in Dura Pharmaceuticals, 125 S. Ct. at 1634.

However, Defendants present evidence that prices returned to the pre-disclosure trading price on January 12, 2004 shortly after the class period ending in October, 2003. Def. Mem. Supp. Mot. at 9-11. n3 Furthermore, [*12] Defendants' brief points out the lack of any allegation of a sale during the class period which would have realized the economic loss. Def. Mem. Supp. Mot. at 15-16. Plaintiffs point to no allegation of a sale in the Amended Complaint. n4 Plaintiffs choose instead to rely solely on an inference of economic loss based on the price drop. See Pl. Mem. Opp. Mot. at 7-8 (arguing that all they need plead is a causal connection between the misrepresentation and the price drop). Defendants' information negates that inference. n5

n3 The Court may take judicial notice of publicized stock prices without converting a motion to dismiss into summary judgment. See Ganino v. Citizens Utils. Co., 228 F.3d 154, 167 n.8 (2d Cir. 2000) (stock prices were not attached to the complaint or incorporated by reference, but judicial notice was permitted); Frazier v. Vitalworks, Inc., 341 F. Supp. 2d 142, 162 n.9 (D. Conn. 2004) ("The Court takes judicial notice of [] published stock prices").

n4 Plaintiff points to an attachment to Defendants Memorandum alleging a sale. Pl. Mem. Opp. Mot. at 12; citing Def. Mem. Supp. Mot. at Tab 4. There is no indication that this allegation was included in the Complaint or is otherwise properly considered here and will not therefore be accepted as allegation of a sale.

[*13]

n5 The Court does not accept Defendants' theory that this also negates the causal connection between the misrepresentation and price decline. See e.g. Def. Reply Br. at 8-9. Defendants' argument is a competing theory of causation and raises factual questions not suitable for resolution on a motion to dismiss. See Manning v. Utilities Mut. Ins. Co., Inc., 254 F.3d 387, 390 n.1 (2d Cir. 2001) (All facts in the complaint are assumed to be true and are considered in the light most favorable to the non-movant).

While a sale is not necessary or the only way a plaintiff could plead economic loss under the circumstances, see 15 U.S.C. § 78u-4(e) (allowing for plaintiff to hold shares past 90-day period), a price fluctuation without any realization of an economic loss is functionally equivalent to the Supreme Court's rejection of an artificially inflated purchase price alone as economic loss. If the current value is commensurate to the purchase prices, there is no loss, regardless of whether the purchase price was artificially inflated. Thus, under [*14] the circumstances, Plaintiffs' allegations of an economic loss are insufficient when considered in conjunction with the evidence of price recovery. Defendants' Motion is granted.

Defendants request that the Complaint be dismissed with prejudice. Def. Mem. Supp. Mot. at 16-18. Conversely, Plaintiffs request permission to amend any deficiencies found. Pl. Mem. Opp. Mot. at 12-13. There is no basis to grant Defendants' request. The merits of any motion to amend, however, will be addressed once that motion is properly before the Court.

**IV. CONCLUSION:**

For the reasons stated herein, Defendants' Motion to Dismiss [Doc. No. 99] is granted. As a consequence, Defendants' earlier filed Motion to Dismiss [Doc. No. 77] is denied as moot without prejudice to renew, if necessary. Plaintiffs are given thirty days (30) from the date of this Ruling to move to amend the Complaint. Should they fail to do so, the Clerk will close the file.

SO ORDERED.

Dated at New Haven, Connecticut, August 26, 2005.

/s/

Peter C. Dorsey, U.S. District Judge United States District Court

# EXHIBIT 8

LEXSEE 2002 U.S. DIST. LEXIS 5178



Cited
As of: May 02, 2007

**FORD OXAAL, Plaintiff and Counter-Defendant, v. INTERNET PICTURES CORPORATION, Defendant and Counter-Claimant.**

No. 00-CV-1863 (LEK/DRH)

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK

*2002 U.S. Dist. LEXIS 5178*

**March 27, 2002, Decided**

**DISPOSITION:** Defendant's motion to file amended answer and counterclaim granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff commenced an action alleging patent infringement against defendant corporation. The corporation moved pursuant to *Fed. R. Civ. P. 15(a)* and *16(b)* for leave to file and serve an amended answer and counterclaim.

**OVERVIEW:** The corporation sought leave to amend its answer after the deadline in the uniform pretrial scheduling order. Therefore, he needed to demonstrate good cause to extend that deadline. The court held that case law recently decided provided a legal basis for the corporation to assert the defense of prosecution laches. It was reasonable for the corporation to conclude that the defense did not previously exist. Moreover, the corporation acted promptly to assert the defense upon learning of its availability. The corporation, therefore, demonstrated good cause to seek leave to amend its answer after the deadline previously established for doing do had passed.

**OUTCOME:** The corporation's motion for leave to file and serve an amended answer and counterclaim was granted.

**COUNSEL:** [*1] DANIEL M. SLEASMAN, ESQ., GIRVIN & FERLAZZO, P.C., Attorney for Plaintiff Oxaal, Albany, New York.

CHRISTOPHER MASSARONI, ESQ., DeGRAFF, FOY, HOLT-HARRIS & KUNZ, LLP, Attorney for Defendant Internet Pictures Corporation, Albany, New York.

ROBERT F. ALTHERR, ESQ., THOMAS H. JACKSON, ESQ., CHRISTOPHER L. McKEE, ESQ., BANNER & WITCOFF, LTD., Attorney for Defendant Internet Pictures Corporation, Washington, D.C.

**JUDGES:** DAVID R. HOMER, U.S. MAGISTRATE JUDGE.

**OPINION BY:** DAVID R. HOMER

**OPINION:** DAVID R. HOMER
U.S. MAGISTRATE JUDGE

**MEMORANDUM-DECISION AND ORDER**

Presently pending is the motion of defendant Internet Pictures Corporation ("iPIX") for an order pursuant to *Fed. R. Civ. P. 15(a)* and *16(b)* granting leave to file and serve an amended answer and counterclaim. Docket No. 13. Plaintiff Ford Oxaal ("Oxaal") opposes the motion. Docket No. 15. For the reasons which follow, the motion is granted.

**I. Background**

Oxaal commenced this action on December 5, 2000 by filing a complaint alleging patent infringement. Compl. (Docket No. 1). iPIX filed and served an answer and counterclaim on February 1, 2001. Docket No. 5. On

2002 U.S. Dist. LEXIS 5178, *

March 27, 2001, a Uniform Pretrial Scheduling Order (UPSO) [*2] was entered which established a deadline of August 31, 2001 for amendment of pleadings and May 1, 2002 for completion of discovery. Docket No. 10. iPIX filed the instant motion on February 1, 2002 seeking leave to file and serve an amended answer and counterclaim asserting an addition defense based on a recent decision by the United States Court of Appeals for the Federal Circuit. Docket No. 13 & Ex. 9 at P24.

## II. Discussion

Because iPIX seeks leave to amend its answer after the deadline in the UPSO for doing so has passed, it must first demonstrate "good cause" to extend that deadline. See Parker v. Columbia Pictures Indus., 204 F.3d 326, 340 (2d Cir. 2000); see also N.D.N.Y.L.R. 16.1(f) ("Deadlines . . . shall be strictly enforced and shall not be modified by the court except upon a showing of good cause"); UPSO, P1 (same). For purposes of Rule 16(b), "'good cause' requires 'the party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension.'" Robinson v. Town of Colonie, 1993 U.S. Dist. LEXIS 7464, No. 91-CV-1355, 1993 WL 191166, at *3 (N.D.N.Y. June 3, 1993) (McCurn, J.); see also Julian v. Equifax Check Services, Inc., 178 F.R.D. 10, 16; [*3] Pulsecard, Inc. v. Discover Card Services, Inc., 168 F.R.D. 295, 301 (D. Kan. 1996). The inquiry focuses on the moving party's reason for requesting the extension. Julian v. Equifax Check Services, Inc., 178 F.R.D. 10, 16 (D. Conn. 1998). Events occurring after the entry of a scheduling order which were reasonably unforeseeable may suffice to establish good cause. See, e.g., Deghand v. Wal-Mart Stores, Inc., 904 F. Supp. 1218, 1220-21 (D. Kan. 1995) (discovery of ground for additional cause of action ten weeks after deadline had passed for amendment of pleadings established good cause for extension); Robinson v. Town of Colonie, 1993 U.S. Dist. LEXIS 7464, 1993 WL 191166, at *3 (good cause to extend deadline to amend pleadings found one year after deadline had passed where party learned of basis for amendment during discovery).

Here, iPIX contends that good cause is established by the holding in Symbol Technologies, Inc. v. Lemelson Med., 277 F.3d 1361 (Fed. Cir. 2002), holding that an equitable defense of prosecution laches could be asserted against a claim of patent infringement commenced after an unreasonable and [*4] unexplained delay even though the plaintiff complied with all pertinent statutes and rules. That decision was filed on January 24, 2002. iPIX filed the instant motion eight days later and five months after the deadline for amendment of pleadings established in the UPSO. iPIX contends that the legal basis for the defense of prosecution laches did not exist until the decision in Symbol Technologies, thus provid-

ing good cause under Rule 16(b). Oxaal contends that the decision in Symbol Technologies merely restated a legal principle which has existed for eighty years and, therefore, affords iPIX no good cause for failing to assert the defense previously.

It appears clear from a review of the Symbol Technologies decision that it marked a significant change in the law. First, it reversed the district court's determination that a claim of prosecution laches was unavailable as a matter of law. Second, it rejected as precedent two prior "non-precedential" opinions of the Federal Circuit holding that a claim of prosecution laches was unavailable as a matter of law. Symbol Technologies, 277 F.3d at 1366-68. Third, the dissenting opinion describes the holding as establishing [*5] a new rule of law and departing from the court's "long-standing rule." Id. at 1369. Finally, the fact that six amici curiae briefs were received by the court further confirms the significance of the case. Thus, it appears that the Symbol Technologies decision provided a legal basis for iPIX to assert the defense of prosecution laches, it was reasonable for iPIX to conclude that this defense did not previously exist, and iPIX acted promptly to assert the defense upon learning of its availability of the defense. iPIX has, therefore, demonstrated good cause to seek leave to amend its answer after the deadline previously established for doing do has passed.

The question then becomes whether iPIX has satisfied the requirements of Rule 15(a). That rule requires that leave to amend a pleading be "freely given when justice so requires." This "facilitate[s] a proper decision on the merits" and identifies the material issues of the case. Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962). Oxaal offers no substantive reason why leave to file and serve the proposed amended answer should be denied and none appears from the face of the [*6] proposed amended answer and counterclaim. Accordingly, iPIX's motion will be granted. n1

        n1 Oxaal contends that if iPIX's motion is granted, it will require an extension of the present discovery deadline to allow discovery on the newly asserted defense. Pl. Mem. of Law (Docket No. 15) at 6-7. A status conference will be held to consider any extensions necessitated by this amendment.

## III. Conclusion

For the reasons stated above, it is hereby

ORDERED that iPIX's motion for leave to file and serve an amended answer and counterclaim (Docket No. 13) is GRANTED, and iPIX shall file and serve the

2002 U.S. Dist. LEXIS 5178, *

amended answer and counterclaim on or before **April 5, 2002**; and

    **IT IS FURTHER ORDERED** that a status conference will be held with counsel for both parties on **April 10, 2002 at 10:00 a.m.** in the chambers of the undersigned.

**IT IS SO ORDERED.**

DATED: March 27, 2002

    Albany, New York

    DAVID R. HOMER

    UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 9

FOCUS - 1 of 1 DOCUMENT



Analysis
As of: May 01, 2007

**POWER INTEGRATIONS, INC., a Delaware corporation, Plaintiff, v. FAIRCHILD SEMICONDUCTOR INTERNATIONAL, INC., a Delaware corporation, and FAIRCHILD SEMICONDUCTOR CORPORATION, a Delaware corporation, Defendants.**

**C.A. No. 04-1371-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 87259*

**November 30, 2006, Decided**

**PRIOR HISTORY:** *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., 2006 U.S. Dist. LEXIS 72718 (D. Del., Oct. 5, 2006)*

**COUNSEL:** [*1] For Power Integrations, Inc., a Delaware corporation, Plaintiff: William J. Marsden, Jr., LEAD ATTORNEY, Fish & Richardson, P.C., Wilmington, DE; John M. Seaman, Bouchard, Margules & Friedlander, P.A., Wilmington, DE.

For Fairchild Semiconductor International, Inc., a Delaware corporation, Fairchild Semiconductor Corporation, a Delaware corporation, Defendants: John G. Day, Steven J. Balick, LEAD ATTORNEYS, Ashby & Geddes, Wilmington, DE; Bas de Blank, Pro Hac Vice; George Guy Guy, III., Pro Hac Vice; Lauren E. Maguire, Tiffany Geyer Lydon, Ashby & Geddes, Wilmington, DE.

For LG Electronics USA Inc., Material Witness: Steven J. Balick, LEAD ATTORNEY, Ashby & Geddes, Wilmington, DE; Tiffany Geyer Lydon, Ashby & Geddes, Wilmington, DE.

For Intersil Corporation, Movant: John G. Day, LEAD ATTORNEY, Ashby & Geddes, Wilmington, DE.

For Fairchild Semiconductor International, Inc., Fairchild Semiconductor Corporation, Counter Claimants: Steven J. Balick, LEAD ATTORNEY, Ashby & Geddes, Wilmington, DE.

For Power Integrations, Inc., Counter Defendant: William J. Marsden, Jr., LEAD ATTORNEY, Fish & Richardson, P.C., Wilmington, DE.

For Fairchild Semiconductor International, [*2] Inc., a Delaware corporation, Fairchild Semiconductor Corporation, a Delaware corporation, Counter Claimants: John G. Day, LEAD ATTORNEY, Ashby & Geddes, Wilmington, DE.

**JUDGES:** Joseph J. Farnan Jr., UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Joseph J. Farnan Jr.

**OPINION:**

### MEMORANDUM ORDER

On Thursday, November 30, 2006, the Court conducted a teleconference with the parties in the above-captioned action. At the Court's request, the parties previously submitted letters addressing the possible impact on this case of *KSR Int'l Co. v. Teleflex, Inc., S. Ct. , 127 S. Ct. 30, 165 L. Ed. 2d 1009, 2006 WL 3257150 (Mem)*, U.S., which is currently before the United States Supreme Court. Also relevant to the issues discussed by the Court during the teleconference is Defendants' request to use eleven prior art references during the validity phase of the trial. n1

n1 Defendants' request was conveyed to the Court in the context of an Opening Brief that was

not linked to any motion pending on the Court's docket. For purposes of this decision, the Court will refer to the Opening Brief (D.I. 423) as the Motion.

[*3]

After reviewing the parties' submissions and their respective arguments regarding both Defendants' Motion and the KSR case, the Court concludes that an approximate five month stay of the validity trial is warranted in the interests of achieving an efficient and effective resolution of this case. In the Court's view, this stay will not work any undue prejudice to Plaintiff. The Court is further persuaded that the stay will provide the parties and the Court with the opportunity to have the benefit of a decision from the Supreme Court on the issue of obviousness, which permeates the validity contentions in this case. However, if the Supreme Court has not reached its decision in the KSR case by the time of the rescheduled trial date, the Court will move forward with the rescheduled trial using modified jury interrogatories and/or instructions, as well as other appropriate measures intended to minimize any post-trial or appellate impact of the Supreme Court's decision in KSR on the issues in this case.

As for Defendants' request to use additional prior art references during the validity trial in this matter, the Court concludes that Defendants may rely on eleven (11) prior [*4] art references to support its invalidity contentions. In reaching this conclusion, the Court finds that Plaintiff had some notice of the prior art upon which Defendants intend to rely either through Dr. Horowitz's reports or through interrogatories and other submissions by Defendants. However, the Court agrees with Plaintiff that Dr. Horowitz's expert report lacks a detailed discussion and/or application of that prior art in light of the factors to be considered in an obviousness inquiry. To cure this deficiency and prevent any undue prejudice to

Plaintiff, the Court will require Defendants to submit a supplemental expert report by Dr. Horowitz detailing his obviousness analysis in light of the prior art references by December 29, 2006. In addition, Dr. Horowitz will be subject to further deposition by Plaintiff, and Plaintiff will be permitted the opportunity to submit a rebuttal expert report followed by Defendants' deposition of Plaintiff's expert. To the extent that this additional discovery is ordered, the Court finds that the stay of the trial will remove any prejudice to Plaintiff by providing it with full notice and an opportunity to prepare for the invalidity contentions raised [*5] by Defendants.

NOW THEREFORE, IT IS HEREBY ORDERED that:

1. The trial scheduled for Monday, December 4, 2006, is CANCELED.

2. Trial is rescheduled to commence on **Monday, May 7, 2007 at 9:30 a.m.** The Trial Management Order dated November 21, 2006, remains in effect.

3. Defendants request (D.I. 423) to use additional prior art references during the validity trial in this matter is **GRANTED.**

4. Defendants shall submit a supplemental report of their expert witness, Dr. Horowitz, no later than **Friday, December 29, 2006.**

5. Depositions of Dr. Horowitz and the expert selected by Plaintiff for rebuttal shall be completed by **Friday, March 23, 2007.**

November 30, 2006

Date

Joseph J. Farnan Jr.

UNITED STATES DISTRICT JUDGE

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| TEXTRON INNOVATIONS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-486 (GMS) |
| | ) | |
| THE TORO COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

On July 12, 2005, the plaintiff, Textron Innovations Incorporated ("Textron") filed the above-captioned action against The Toro Company ("Toro"), alleging infringement of United States Patent Nos. 6,047,530, 6,336,311, and 6,336,312, involving technology related to the type of rotary mower used to cut golf course roughs. On August 15, 2005, Toro filed a separate action in Minnesota against Textron, Inc. and Jacobsen, a division of Textron, Inc., alleging that their products infringe two Toro patents relating to hydraulic drive system technology for riding mowers. This case is scheduled for an eight-day trial commencing on June 25, 2007. Presently before the court is Toro's expedited motion to stay this action pending reexamination of the patents in both suits by the United States Patent and Trademark Office ("PTO"). For the following reasons, the court will grant the motion.

In deciding whether to stay an action, the court's discretion is guided by the following factors: (1) whether a stay would unduly prejudice Textron or present a clear tactical advantage for Toro, (2) whether a stay will simplify the issues, and (3) whether discovery is complete and whether a trial date has been set. *See Xerox Corp v. 3Comm Corp.*, 69 F. Supp. 2d 404, 406 (W.D.N.Y.

1999) (citing cases); *cf. United Sweetner USA, Inc. v. Nutrasweet Co.*, 766 F. Supp. 212, 217 (D. Del. 1991) (stating a similar test).

Numerous courts have cited a number of advantages of granting a stay pending PTO reexamination: (1) all prior art presented to the court at trial will have been first considered by the PTO with its particular expertise, (2) many discovery problems relating to the prior art can be alleviated, (3) if the patent(s) are declared invalid, the suit will likely be dismissed, (4) the outcome of the reexamination may encourage a settlement without further involvement of the court, (5) the record of the reexamination would probably be entered at trial, reducing the complexity and the length of the litigation, (6) issues, defenses, and evidence will be more easily limited in pre-trial conferences and (7) the cost will likely be reduced both for the parties and the court. *See, e.g., Braintree Labs., Inc.*, Civ. A. No. 96-2459-JWL, 1997 WL 94237, at *9 (D. Kan. Feb. 26, 1997); *Hamilton Indus. v. Midwest Folding Prods. Mfg.*, Civ. A. No. 89-C-8689, 1990 WL 37642, at *1-*2 (N.D. Ill. March 20, 1990) (citing cases). Almost all of these potential advantages are present, to some degree, if the court imposes a stay of the proceedings pending the outcome of the PTO's reexamination, assuming the PTO decides to reexamine the patents in suit.

Textron opposes the stay for the following reasons: "(1) the motion is untimely; (2) the requested stay will not promote judicial efficiency; (3) the reexaminations will not resolve or even narrow the issues in this litigation; and (4) the requested stay will inequitably reward Defendant for its dilatory behavior and prejudice Textron's rights in enforcing its patents." (D.I. 231 at 1.) Textron places great emphasis on the timeliness of Toro's motion. In considering a motion to stay at such a late stage in the litigation, the court must be cognizant of the possibility that a party is using the court in gamesmanship or dilatory tactics. It is difficult, however, for the court to conclude

nefarious motive on the part of Toro, with the information presented. Textron expends much of its answering brief arguing that it would be unduly prejudicial for Toro to continue its willful infringement pending a reexamination. Willful infringement, however, is a conclusion yet to be determined by the factfinder. Moreover, this action is not the first in which a party has moved for, and the court has granted, a stay within a few months of a scheduled trial.[1] *See Gioello Enters. Ltd. v. Mattel, Inc.*, C.A. No. 99-375-GMS, 2001 WL 125340 (D. Del. Jan. 29, 2001).

In this case, as the court did in *Gioello*, the court must consider all of the factors that affect the court and the parties in staying the action; such factors include, but are not limited, to the timeliness of the motion. That being said, the court is not persuaded that Toro couldn't have filed its reexamination requests earlier. Toro states that "[i]t was reasonable for Toro to wait until it had all of the printed prior art it believed to exist before filing the requests for reexamination." (D.I. 229 at 16.) This excuse, however, is unavailing. Indeed, a party to a patent litigation will never know if it has *all of the prior art* that exists or it believes to exist. It will always come down to a judgment call, and one in which the litigants should know that the risk of delaying the reexamination request may result in a denial of a motion to stay.

Having agreed that timeliness poses a problem for Toro's motion, the court looks to the other considerations pertinent to a request for a stay. The court disagrees with Textron's statement that a stay would not promote judicial efficiency. While it is true that discovery is completed, and the court has expended considerable time in resolving numerous discovery disputes between the parties, that time that cannot be recovered no matter how the litigation proceeds from here. What is germane to whether judicial efficiency will be achieved is what work remains on the part of the court and the

---

[1] The court notes that the parties in *Gioello* ultimately settled the case later that year.

-3-

parties if the action proceeds while the patents are being reexamined, and while a Supreme Court decision that could affect the legal standard for obviousness is pending. Reexamination of the patents in suit could potentially narrow the case, or even prompt a pre-trial resolution of the case. As one court noted:

> . . . if the parties continue to litigate the validity of the claims in this Court, and the PTO subsequently finds that some or all of the claims in issue here are invalid, the Court will have wasted time and the parties will have spent additional funds addressing an invalid claim or claims. Thus, although the denial of a stay can have no effect whatsoever on past events, the grant of a stay will maximize the likelihood that neither the Court nor the parties expend their assets addressing invalid claims.

*Softview Computer Prods. Corp. and Ergo View Techs. Corp. v. Haworth, Inc.*, No. 97 Civ. 8815 KMW HBP, 2000 WL 1134471, at *3 (S.D.N.Y. Aug. 10, 2000). Since the PTO cannot stay the reexamination once a request has been granted, the court's issuance of a stay is the only way to avoid the potential for conflict. *See Hamilton*, 1990 WL 37642, at *2 (citing *Ethicon, Inc. v. Quigg*, 849 F.2d 1422 (Fed. Cir. 1988). For many of the reasons outlined in Toro's discussion of this factor in its brief, the court agrees with Toro that a significant amount of work remains to be done, despite the fact that discovery is completed. At a minimum, granting a stay pending the Supreme Court's decision in *KSR v. Teleflex* may obviate a retrial of the invalidity portion, should the Supreme Court modify the legal standard for obviousness. *See Power Integrations Inc. v. Fairchild Semiconductor Int'l Inc.*, C.A. No. 04-1371, 2006 U.S. Dist. LEXIS 87259 (D. Del. Nov. 30, 2006) (Farnan, J.).

As to Textron's claim that reexamination would not resolve or even narrow the case, the court is not persuaded. Both Toro and Textron cite to probabilities and statistics for concluding each parties' likelihood of success in a reexamination proceeding. The court is confident that the PTO examines each matter on its own merit, so although the court finds the statistics interesting, they bear

-4-

little weight on the court's decision because, ultimately, neither party can accurately foretell the outcome of the reexaminations, should the PTO accept Toro's requests. While reexamination may not resolve every single issue involved in the litigation, the issues in this case are narrow enough that reexamination could potentially make a significant difference in what needs to be tried. *But cf. Cognex Corp. v. Nat'l Instr. Corp.*, 2001 WL 34368283 (D. Del. 2001) (denying stay, in part because Cognex's complaint alleges a variety of claims which would require a trial regardless of the outcome of reexamination). Moreover, not staying the proceedings runs the risk of inconsistent adjudications or the issuance of advisory opinions.

Last, Textron argues that the requested stay will inequitably reward Toro for its dilatory behavior and prejudice Textron's rights in enforcing its patents. The court doesn't take the decision to stay lightly, precisely for the reason that the procedure, i.e. staying litigation pending reexamination, can be abused. Further, the court recognizes that Textron is prejudiced by having its day in court delayed further. The court does not, however, find that a stay will reward Toro. Indeed, Toro has put its own patents in reexamination, which puts the enforceability of its intellectual property at risk as well. As Toro points out, because this is a suit for money damages, a stay does not *unduly* prejudice Textron in that it does not compete with Toro for sales. *See Gioello, 2001 WL 125430* (finding no merit in the plaintiff's claim of undue prejudice because the plaintiff was "not selling or actively licensing goods or services related to the '434 patent; money damages is an adequate remedy for any delay in redress")

Accordingly, the court will stay the case at this time. The court will consider lifting the stay, upon motion, pending the outcome of the Supreme Court case in *KSR v. Teleflex*, and the PTO's

decision on the requests for reexamination. Although the court will hold a status conference in July 2007, the parties should advise the court of any earlier developments that affect the litigation.

Therefore, IT IS HEREBY ORDERED that:

    1.     Toro's motion to stay the proceeding (D.I. 228) is GRANTED. The proceedings are stayed from the date of this order until further notice.

    2.     The parties shall advise the court of any decision of the PTO that relates to the patents in suit.

    3.     The parties shall submit a joint status report in advance of the status teleconference, to be convened on July 31, 2007 at 9:30 a.m.

Dated: April 25, 2007                    /s/ Gregory M. Sleet
                                         UNITED STATES DISTRICT JUDGE