IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BRIDGESTONE SPORTS CO., LTD. and BRIDGESTONE GOLF, INC.,<br><br>                Plaintiffs,<br><br>    v.<br><br>ACUSHNET COMPANY,<br><br>                Defendant. | C.A. No. 05-132 (JJF)<br><br>REDACTED –<br>PUBLIC VERSION |

**BRIDGESTONE'S DAUBERT MOTION TO PRECLUDE DR. JACK KOENIG
FROM OFFERING TESTIMONY REGARDING INFRINGEMENT OF
U.S. PATENT NO. 6,818,705**

This is a patent infringement action brought by Plaintiffs Bridgestone Sports Co., Ltd. and Bridgestone Golf, Inc. (collectively "Bridgestone") against Defendant Acushnet Company ("Acushnet") in March 2005. Bridgestone asserts that various Acushnet golf balls infringe seven of Bridgestone's patents, and Acushnet counterclaimed that various Bridgestone golf balls infringe four Acushnet patents, one of which is U.S. Patent No. 6,818,705 (the "'705 patent").

On January 16, 2007, Acushnet served the Infringement Expert Report of Dr. Jack Koenig regarding alleged infringement of U.S. Patent No. 6,818,705 (the "Report")[1] (Ex. 1). This is the patent for which – after two years of litigation, extensive discovery and claim

---

[1] Dr. Koenig presented two expert reports, one on the alleged invalidity of Bridgestone's '652 and '961 patents and one on the alleged infringement of Acushnet's '705 patent. Only Dr. Koenig's report and testing on alleged infringement of Acushnet's 705 patent is raised in this motion.

construction briefing and argument – Acushnet's damages expert opined that Bridgestone should pay a total of ~~REDACTED~~ . It is no wonder that Dr. Koenig had no involvement in any of the testing or analysis of the purported "proof" of infringement.

Dr. Koenig's opinions come directly from Acushnet's lawyers, and Dr. Koenig admittedly was not involved in the testing described in his Report.   Therefore, Bridgestone requests that the Court preclude Dr. Koenig from offering any testimony that the accused Bridgestone golf balls infringe the '705 patent.

## STATEMENT OF FACTS

A.     Dr. Koenig Did What Acushnet's Lawyers Told Him.

Even though Dr. Koenig said in his report that he "directed" Acushnet employees to perform testing (Ex. 1, Koenig Report at ¶ 36), Dr. Koenig then provided sworn testimony that he had no role in the testing that Acushnet's employees performed and he confirmed that tests were performed at the request of Acushnet's lawyers:

REDACTED

(Ex. 2, Koenig Dep. Tr. at 266:15-267:6; *see also id.* at 275:16-276:19; 268:16-269:18).   Dr. Koenig does not even know which Acushnet employees performed the testing –

REDACTED

Acushnet's lawyers also told Dr. Koenig to make his "opinion on the basis of certain assumptions" (*id.* at 307:14-310:6). One assumption is actually a limitation in the '705 patent – claim 1 recites "a material [formed] from the ***conversion reaction of at least a cis-to-trans catalyst and a polybutadiene.***" (emphasis added). A critical test to analyze infringement, therefore, is measuring cis-to-trans isomer conversion during the reaction. Acushnet's lawyers, however, told Dr. Koenig to "assume" that limitation – that "the center of the solid golf ball is made using a polybutadiene rubber in which some cis-isomer has been converted to trans-isomer through the use of a cis-to-trans catalyst" (*see* Ex. 1, Koenig Report at ¶ 32).

Dr. Koenig testified that he followed counsel's instruction,

REDACTED

Dr. Koenig admitted

that neither he nor Acushnet employees tested for a cis-to-trans isomer conversion:

REDACTED

(*Id.* at 325:12-326:11; *see also id.* at 291:2-292:14).

Dr. Koenig's final opinion in his Report is that Bridgestone's golf balls "meet every limitation of claim 4 of the '705 patent and therefore infringe that claim" (Ex. 1, Koenig Report at ¶ 43). He gave that opinion because Acushnet told him that some of the limitations in the '705 patent were met. It was Acushnet's lawyers who told Dr. Koenig to "assume" that a cis-to-trans conversion occurred. Dr. Koenig improperly allowed Acushnet to conduct an infringement analysis without his involvement and then justified the limited testing in his Report on just two samples as being reflective of additional testing that Acushnet would have performed:

REDACTED

(Ex. 2, Koenig Dep. Tr. at 329:19-330:3; *see also id.* at 327:5-329:18).

      B.     Dr. Koenig Was Not Involved In The Testing In His Report.

      There were two tests that Acushnet employees performed: testing for molecular weight and testing for resilience index. Dr. Koenig said he "could not have possibly taken an active role" in the tests and testified that he left the testing up to Acushnet as they saw fit --

REDACTED

(Ex. 2, Koenig Dep. Tr. at 276:20-280:3).

      In addition, Dr. Koenig did not even know for sure that Acushnet's employees conducted tests on the accused golf balls. For example, he         REDACTED

REDACTED

<u>ARGUMENT</u>

A.    <u>Legal Standard.</u>

Rule 702 provides that an expert witness with "scientific, technical, or other specialized knowledge" may testify in the form of an opinion "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Rule 703 further provides that the "sufficient facts or data" referenced in Rule 702 must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the trial court is a "gatekeeper" to provide preliminary adjudication of whether or not the proffered

expert evidence is admissible. "Thus, trial judges are responsible for determining whether the *knowledge* of the expert, whether scientific, technical, or specialized, is based upon the application of reliable theories or techniques." *DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140, 1146-47 (N.D. Cal. 2003) (emphasis added). The trial court has broad discretion in determining how to assess the competence of a purported expert witness. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999). The "proponent of the testimony must establish admissibility by a preponderance of the evidence." *Id.* (*citing Bourjaily v. United States*, 483 U.S. 171, 175-76 (1988)).

Expert testimony based upon a filtered set of facts or data of legal counsel's choosing is inherently unreliable. Attorneys cannot select information to funnel to the expert because they are not competent to determine whether particular material should be relied upon or rejected. *Montgomery County v. Microvote Corp.*, 320 F.3d 440, 448-49 (3d Cir. 2003); *In re TMI Litigation*, 193 F.3d 613, 697-98 (3d Cir. 1999); *Crowley v. Chait*, 322 F. Supp. 2d 530, 546-47 (D.N.J. 2004). In *Crowley*, for example, the District Court of New Jersey excluded an expert witness who was "spoonfed depositions [that] led him to draw questionable conclusions. . .that he might not have drawn had he properly reviewed all of the depositions in an unfiltered fashion." *Id.* at 547. "By reviewing only those depositions provided to him by Plaintiff's counsel, and by reviewing what appears to be for the most part only pre-selected excerpts of those depositions, [the expert] relied upon information that is simply too unreliable to be trusted." *Id.*

B.    Dr. Koenig Cannot Rely On Acushnet's Lawyers.

Dr. Koenig testified that tests were "done at the request of counsel" (Ex. 2, Koenig Dep. Tr. at 267:2-6).                    REDACTED

REDACTED

In *Crowley*, an alleged expert's testimony was excluded for this very reason – when the expert relied on summaries prepared by counsel, while conducting very little independent investigation into the witnesses beyond the summaries prepared for him. *Crowley*, 322 F. Supp. 2d at 546-47.

In this case, all of the testing was conducted by Acushnet employees at the direction of Acushnet's attorneys and then the results were provided directly to Acushnet's attorneys and if they were provided to Dr. Koenig at all, they were provided to him through the attorneys. Accordingly, Dr. Koenig has no personal knowledge of the testing or basis to opine as to the reliability of the testing. Dr. Koenig's infringement opinions, therefore, are unreliable. He should be precluded from testifying about Acushnet's testing.

C.    Dr. Koenig Had No Involvement With The Testing That He Relies On In His Report.

Dr. Koenig's testimony is not based on sufficient or reliable facts or data. All of the tests that Dr. Koenig relies on in his Report were performed by Acushnet employees who gave them to counsel for Acushnet instead of directly to Dr. Koenig. Acushnet's counsel then picked the tests they wanted and gave the results to Dr. Koenig. Dr. Koenig does not know who did the tests or how they were done.

Without having performed or supervised any of the testing, Dr. Koenig does not have knowledge of sufficient facts regarding the details of the testing to confirm their reliability to the trier of fact. Dr. Koenig, for example, does not have knowledge of the testing, the testing

protocols, the testing equipment, the background and experience of the testers, the condition and source of the materials tested, the manner in which the materials were tested and the actual raw data supporting the averages given in his Report.[2] Without access to all of the test results and data, it is impossible for Dr. Koenig to verify their accuracy or to understand the significance of those results that were provided to him in light of what was not given to him.

Dr. Koenig's experience is not at issue here. The issue is whether an otherwise qualified expert may opine about infringement testing that he had little or no say in, or opine about facts that he cannot point to any testing to support. Dr. Koenig's lack of involvement in the testing is fatal to the reliability of any testimony, and the *Daubert* factors support exclusion of his Report and testimony.

## CONCLUSION

Bridgestone requests that the Court preclude Acushnet from presenting testimony of Dr. Koenig suggesting that any of the Bridgestone golf balls infringe the '705 patents either literally or under the doctrine of equivalents.

---

[2]  REDACTED

9.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Leslie A. Polizoti*

Jack B. Blumenfeld (#1014)
Leslie A. Polizoti (#4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19801
(302) 658-9200
    *Attorneys for Plaintiffs*

OF COUNSEL:

Robert M. Masters
Scott M. Flicker
Terrance J. Wikberg
Brandon M. White
PAUL, HASTINGS,
    JANOFSKY & WALKER LLP
825 15th Street, N.W.
Washington, DC  20005
(202) 551-1700

Original Filing Date:  May 8, 2007
Redacted Filing Date:  May 10, 2007

<u>CERTIFICATE OF SERVICE</u>

I certify that on May 10, 2007 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to Richard L. Horwitz and David E. Moore.

I further certify that I caused copies to be served upon the following on May 10, 2007 in the manner indicated:

**BY E-MAIL & HAND**

Richard L. Horwitz, Esquire
POTTER ANDERSON & CORROON LLP
1313 N. Market Street
Wilmington, DE  19801

**BY E-MAIL & FEDERAL EXPRESS**

Joseph P. Lavelle, Esquire
HOWREY LLP
1299 Pennsylvania Avenue, NW
Washington, DC  20004

*/s/ Leslie A. Polizoti*
Leslie A. Polizoti (#4299)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Wilmington, DE  19801
(302) 658-9200
lpolizoti@mnat.com

# EXHIBIT 1

REDACTED

# EXHIBIT 2

REDACTED