# EXHIBIT 1

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 2

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 3

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 4

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 5

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 6

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 7

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 8

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 9

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 10

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 11

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 12

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 13

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1534786 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

H
Callaway Golf Co. v. Dunlop Slazenger Group
Americas, Inc.
D.Del.,2004.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
CALLAWAY GOLF COMPANY,
Plaintiff/Defendant-in-Counterclaim,
v.
DUNLOP SLAZENGER GROUP AMERICAS,
INC., d/b/a Maxfli, Defendant/Plaintiff-in-
Counterclaim.
**No. Civ.A. 01-669-KAJ.**

May 21, 2004.

Jack B. Blumenfeld, Morris, Nichols, Arsht &
Tunnell, Wilmington, DE, for Plaintiff/Counter
Defendant.
David J. Ferry, Jr., Ferry, Joseph & Pearce, P.A.,
Wilmington, DE, for Defendant/Counter Claimant.

*MEMORANDUM ORDER*
JORDAN, J.

I. Introduction

**\*1** Presently before me is a motion by Callaway Golf
Company ("Callaway") to exclude the testimony of
Dr. Lewis M. Koppel ("Dr.Koppel") (Docket Item
["D.I."] 316), a motion by Callaway to exclude
portions of Dr. John Jepson's ("Dr.Jepson")
testimony (D.I.318), and a motion by Callaway to
exclude the testimony of Dr. Daniel Klempner
("Dr.Klempner") (D.I.320), all expert witnesses of
Dunlop Slazenger Group Americas, Inc. d/b/a Maxfli
("Dunlop"). Also before me is a motion by Callaway
for partial summary judgment on grounds that
Dunlop cannot prove damages on its trade secret,
common law, or false advertising claims. (D.I.312.) I
have jurisdiction over this case pursuant to 28 U.S.C.
§ § 1331, 1338, and 1367. For the reasons set forth
below, the motion to exclude Dr. Koppel's testimony
will be granted in part and denied in part, the motion
to exclude portions of Dr. Jepson's testimony will be
granted, and the motion to exclude Dr. Klempner's
testimony will be granted. The motion for partial
summary judgment will be denied.

II. Background

Because the factual and procedural history of this
case is set forth in three prior rulings, *see*
Memorandum Opinion dated May 13, 2004
(D.I.359), Memorandum Opinion dated May 18,
2004 (D.I.362), and Memorandum Order dated May
18, 2004 (D.I.360), it will not be repeated herein.
Rather, the facts pertinent to the motions currently
before me are incorporated in the discussion below.

III. Standard of Review

The motions to exclude evidence are committed to
the court's discretion. See *In re Paoli R.R. Yard PCB
Litig.*, 35 F.3d 717, 749, 777-78 (3d Cir.1994) (on a
motion to exclude proffered expert testimony, the
trial court's inquiry is a flexible one, and its decision
to admit or exclude expert testimony is reviewed
under an "abuse of discretion" standard).

The summary judgment standard is well known. Rule
56 of the Federal Rules of Civil Procedure provides
that summary judgment shall be entered if "there is
no genuine issue as to any material fact and ... the
moving party is entitled to judgment as a matter of
law." "[T]he availability of summary judgment turn
[s] on whether a proper jury question ... [has been]
presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
"[T]he judge's function is not himself to weigh the
evidence and determine the truth of the matter but to
determine whether there is a genuine issue for trial."
*Id.* In making that determination, the Court is
required to accept the non-moving parties' evidence
and draw all inferences from the evidence in the non-
moving parties' favor. *Id.* at 255; *Eastman Kodak Co.
v. Image Technical Servs., Inc.*, 504 U.S. 451, 456,
112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).
Nevertheless, the non-moving party must, in
opposing a summary judgment motion, "identify
those facts of record which would contradict the facts
identified by the movant." *Port Authority of New
York and New Jersey v. Affiliated FM Ins. Co.*, 311
F.3d 226, 233 (3d Cir.2002) (internal quotes
omitted).

IV. Discussion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1534786 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

**\*2** Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable. *See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).* The Rule provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702 (2003). The party offering the expert testimony has the burden of proving admissibility. *Daubert, 509 U.S. at 592 n. 10.* The subject of an expert's testimony must be grounded in the methods and procedures of science and based on more than a subjective belief or speculation. *Id.* at 589-590. Further, Rule 702 requires that expert testimony assist the trier of fact, in other words, it must "fit" the issues in the case by having a "valid scientific connection to the pertinent inquiry." *Id.* at 591-92.

In determining "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact," the court must assess whether the methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts in issue. *Id.* at 592-93. As part of that inquiry, the court must examine the expert's conclusions in order to determine whether they reliably follow from the facts known to the expert and the methodology used. *See Heller v. Shaw Indus., Inc., 167 F.3d 146, 153 (3d Cir.1999).*

A party cannot qualify a person as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue. *Redman v. John D. Brush & Co., 111 F.3d 1174, 1179 (4th Cir.1997); Barrett v. Atl. Richfield Co., 95 F.3d 375, 382 (5th Cir.1996).* Moreover, testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the fact-finder. *McGowan v. Cooper Indus., Inc., 863 F.2d 1266, 1273 (6th Cir.1987); STX, Inc. v. Brine, Inc., 37 F.Supp.2d 740, 768 (D.Md.1999)* (quotation omitted), *aff'd, 211 F.3d 588 (Fed.Cir.2000); SEC v. Lipson, 46 F.Supp.2d 758, 763 (N.D.Ill.1998).*

### A. Dr. Koppel

Dunlop has retained Dr. Koppel, as an expert, to quantify Dunlop's economic damages resulting from Callaway's alleged misappropriation of trade secrets

described in the documents that Henry Felipe ("Felipe") took with him to Callaway after he was laid off at Dunlop (the "Felipe binder"),[FN1] and from Callaway's alleged misappropriation of Dunlop's polyurethane technology through Pijush Dewanjee ("Dewanjee").[FN2] (D.I. 327 at 24; D.I. 322 at Ex. A; D.I. 327 at 5-16.) First, Dr. Koppel estimated that Callaway was unjustly enriched in the amount of $10.4 million because of avoided research and development costs through Callaway's use of the Felipe binder. (D.I. 327 at 25.) Second, Dr. Koppel asserts that Dunlop lost profits in the amount of $8.1 million from decreased golf ball sales during the years 2000 through 2006 because of Callaway's use of the Felipe binder. (*Id.* at 25-26.) Third, Dr. Koppel claims that Dunlop is entitled to approximately $11.3 million in royalty damages for the research and development costs that Callaway avoided by having the information in the Felipe binder rather than creating it independently, and for the head start, or accelerated market entry, that Callaway received by using that information. (*Id.* at 26.) Finally, Dr. Koppel claims that Dunlop is entitled to about $11 .3 million in royalty damages for Callaway's misappropriation of Dunlop's polyurethane technology.[FN3]

> FN1. The Felipe binder includes Dunlop's "Golf Ball Specifications and Process Manual."

> FN2. In my May 13, 2004 Memorandum Opinion, I held as a matter of law that Callaway, through Dewanjee, had not misappropriated trade secrets. (D.I.359.)

> FN3. Specifically, Dunlop claims that "Dr. Koppel uses the connection between [Dunlop's] Polyurethane Trade Secrets and [Callaway's U.S. Patent No. 6,117,024 (the " '024 patent") ] to substantiate his use of analyses most commonly used in patent valuation." (D.I. 327 at 27.)

**\*3** Callaway argues that Dr. Koppel's testimony should be excluded under *Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)* because Dr. Koppel's methodology and conclusions "are speculative and unreliable, do not fit the facts and circumstances of this case, and are inconsistent with damage measures required by law." (D.I. 317 at 2.) First, Callaway argues that Dr. Koppel's unjust enrichment analysis, which considers Callaway's avoided research and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1534786 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

development costs, does not take into account the extent to which Callaway actually used or benefitted from the information contained in the Felipe binder. (*Id.*) Callaway states that Dr. Koppel "deliberately chose to assess [Callaway's] avoided [research and development] expenses by calculating the amount that [Callaway] would have had to spend to recreate all of the information contained in the Felipe [binder] without analyzing what information from the Felipe [binder] [Callaway] actually used." (*Id.* at 15.) Callaway also claims that Dr. Koppel did not consider whether Callaway's research and development spending would have been different if it did not have the Felipe binder, and, as a result, included the cost of an item in his avoided research and development costs even if Callaway incurred the cost. (*Id.*)

Second, Callaway argues that Dr. Koppel's $10.4 million damages figure makes numerous erroneous factual assumptions, including the assumption that the Felipe binder contains information on 82 different golf balls [FN4] (*Id.* at 16-17), the assumption that the Felipe binder describes 82 different paint systems [FN5] (*Id.* at 18-19), and the assumption that the Felipe binder contains information on patent searches and competitive golf ball analyses. [FN6] (*Id.* at 19-20.)

> FN4. Callaway asserts that there are 82 separate specification sheets contained in the Felipe binder, but many of those describe identical golf balls.

> FN5. Callaway claims that there are at most two paint systems described in the Felipe binder.

> FN6. Competitive golf ball analyses provide information about other companies' balls, which is obtained by taking the balls apart and examining them. Callaway says that there is no information about patent searches or competitive golf ball analyses in the Felipe binder.

Third, Callaway argues that Dr. Koppel's measure of damages for the profits Dunlop lost as a result of Callaway's entrance into the golf ball market sooner than it would have if Callaway did not have the Felipe binder damages is not supported by evidence. Specifically, Callaway claims that Dr. Koppel's opinion that it should have take Callaway five years to develop its first golf ball is flawed and that Dr. Koppel erroneously assumes that Callaway would

have made no golf ball sales until 2007 without the Felipe binder. (*Id.* at 21-22.)

Fourth, Callaway argues that Dr. Koppel's calculation for royalties should be excluded because it is based on his avoided research and development costs and lost profits conclusions, which, according to Callaway, are inadmissible. (*Id.* at 23.)

Finally, Callaway argues that Dr. Koppel should be excluded from testifying on the damages allegedly resulting from Callaway's use of the '024 patent because, among other things, Callaway did not misappropriate Dunlop's trade secrets in the '024 patent. (*Id.* at 23-28.)

As to that fifth and final argument, because Callaway did not misappropriate trade secrets related to polyurethane technology, as I held in the May 13, 2004 Memorandum Opinion (D.I.359), Dr. Koppel's testimony on those points will be excluded. However, as to Dr. Koppel's testimony regarding the information contained in the Felipe binder, Callaway's arguments are matters for cross examination because Dr. Koppel's opinions, while arguably flawed and open to attack, are not so devoid of fit or reliability as to be inadmissible. Therefore, the motion to exclude Dr. Koppel's testimony will be granted in part and denied in part.

### B. Dr. Jepson

*4 Dunlop has retained Dr. Jepson, who "has worked in the golf industry for some 30 years" (D.I. 328 at 12), to testify regarding "Callaway's accelerated entry into the golf ball market as a result of misappropriating Dunlop's alleged proprietary information. (*Id.* at 7.) Dunlop states that Dr. Jepson "is not a 'forensic economic expert' who will offer a formal valuation opinion," and that it "has no intent to offer any calculations by [Dr.] Jepson as a competing valuation to the economic analysis offered by Dr. Lewis Koppel." (*Id.* at 6-7.) Rather, Dunlop claims that "Dr. Jepson's opinions merely add 'real world' corroboration to [Dr.] Koppel['s] valuation" and "suggest[ ] that [Dr.] Koppel['s] valuations are conservative." (*Id.* at 1.) Callaway asserts that Dr. Jepson has opined that Callaway's alleged misappropriation of the Felipe binder and Dunlop's polyurethane technology resulted in at least $74 million in unjust enrichment to Callaway. (D.I. 319 at 4; D.I. 323 at Ex. J, pp. 12-13.)

Callaway does not challenge Dr. Jepson's opinions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1534786 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

that the trade secrets at issue are "valuable," and that Callaway allegedly acquired "valuable information" that "greatly accelerated Callaway's entry into the golf ball market." (D.I. 344 at 3) (quoting D.I. 328 at 2, 11, 17). Remarkably, Callaway also does not challenge Dr. Jepson's "generic" opinion that "Dr. Koppel's forensic damages number is conservative." (D.I. 344 at 3.) Rather Callaway argues that Dr. "Jepson's testimony should not extend to asserting dollar figures purporting to 'quantify' the value of the trade secret information" because Dr. Jepson's unjust enrichment values and dollar amounts fail to meet the reliability and relevance standards under Fed.R.Evid. 702 and *Daubert*. (D.I. 344 at 3-4.) I agree.

Dunlop's Answering Brief and Dr. Jepson's expert report both fail to explain how Dr. Jepson arrived at his claim that Callaway was unjustly enriched by $74 million from the misappropriation of Dunlop's trade secrets. (*See* D.I. 328; D.I. 323 at Ex. J.) Therefore, Dr. Jepson's unjust enrichment estimate appears to be based solely on his personal knowledge and experience rather than any methodology, analysis, or factual support. Under *Daubert*, such evidence is not reliable. *See Primavera Familienstifung v. Askin*, 130 F.Supp.2d 450, 530 (S.D.N.Y.2001) (An expert "must do more than simply aver conclusorily that his experience led to his opinion"); *LinkCo., Inc., v. Fujistsu Ltd.*, No. 00 Civ. 7242(SAS), 2002 WL 1585551 at *4 (S.D.N.Y. July 16, 2002) ("[A] court cannot permit experts to 'offer credentials rather than analysis' ") (citation omitted). In addition to proffering unreliable testimony, Dunlop concedes that Dr. Jepson is "not qualified to independently opine on trade secrets quantification." (D.I. 328 at 3.) Therefore, Callaway's motion to exclude Dr. Jepson from opining or testifying as to the dollar amounts set forth in his expert report will be granted.

### C. Dr. Klempner

*5 Dunlop has retained Dr. Klempner, a polymer chemist, to testify that Callaway misappropriated Dunlop's trade secrets through Dewanjee's systematic incorporation of each and every ingredient of Dunlop's proprietary polyurethane formula into the initial Callaway cover formula. This includes a polyurethane cove formulation using a diisocyanate with a PTMEG polyol to form a prepolymer, cured with a curing agent blend, such as is disclosed, or should have been disclosed, in the Dunlop February, 1997 Patent Application and/or Dewnajee's Dunlop laboratory notebook. This also includes the use of PPDI as the

diisocyanate component of a polyurethane-based cover formulation, in general, and specifically as the diisocyanate component of Dunlop's polyurethane cover system.

(D.I.329.) Dr. Klempner also opines that Callaway's development of its two polyurethane-based cover formulations was expedited by its use of Dunlop's trade secret technology.

As earlier stated, I have already ruled on summary judgment that Callaway did not misappropriate Dunlop's trade secrets in relation to Dewanjee's work. Therefore, the motion to exclude Dr. Klempner's testimony will be granted.

### D. Motion for Partial Summary Judgment

Callaway brings a motion for partial summary judgment on grounds that Callaway cannot prove damages on its trade secret, common law, or false advertising claims. (D.I.312.) Callaway argues that "[i]f this Court grants [Callaway's] motion to exclude Koppel's testimony and damage measures ... [Dunlop] can make no showing that it suffered any damages recoverable under the UTSA-even if [Dunlop] is entitled to summary judgment on [Dunlop's] trade secret claim," and is thus entitled to summary judgment on Dunlop's trade secret misappropriation claim. (D.I. 313 at 6.) Since Callaway's motion to exclude Dr. Koppel's testimony is denied as to the information in the Felipe binder, the summary judgment motion is likewise denied as to Dunlop's misappropriation and common law claims involving that information.[FN7]

FN7. As to damages related to Dunlop's claim that Callaway misappropriated polyurethane technology, the present motion is moot because summary judgment has already been granted against Dunlop on that claim. (*See* D.I. 359.)

### V. Conclusion

Accordingly, and as explained herein, IT IS HEREBY ORDERED that the motion to exclude Dr. Koppel's testimony (D.I.316) is GRANTED in part and DENIED in part, the motion to exclude the challenged portions of Dr. Jepson's testimony (D.I.318) is GRANTED, and the motion to exclude Dr. Klempner's testimony (D.I.320) is GRANTED. The motion for partial summary judgment on grounds

Not Reported in F.Supp.2d                                          Page 5
Not Reported in F.Supp.2d, 2004 WL 1534786 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

that Callaway cannot prove damages on its trade
secret, common law, or false advertising claims
(D.I.312) is DENIED.

D.Del.,2004.
Callaway Golf Co. v. Dunlop Slazenger Group
Americas, Inc.
Not Reported in F.Supp.2d, 2004 WL 1534786
(D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 14

LEXSEE 2005 U.S. DIST LEXIS 18424



Caution
As of: May 08, 2007

**DANIEL ORTIZ, Plaintiff v. YALE MATERIALS HANDLING CORP., Defendant**

**Civil No. 03-3657 (FLW)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*2005 U.S. Dist. LEXIS 18424*

**August 24, 2005, Decided**
**August 24, 2005, Filed**

**NOTICE:** [*1] NOT FOR PUBLICATION

**DISPOSITION:** Defendant's motion to strike testimony of Plaintiff's expert, John B. Sevart, and motion for summary judgment granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff injured forklift operator sued defendant forklift manufacturer and distributor for design defect and products liability under the New Jersey Products Liability Act, *N.J. Stat. Ann. § 2A:58C-1* et. seq., after he sustained injuries while operating a forklift manufactured by the manufacturer. The manufacturer moved to bar the testimony of the forklift operator's expert witness and for summary judgment.

**OVERVIEW:** The forklift operator alleged that the forklift design was defective because it should have had (1) a latched rear door to restrain the operator, and (2) warnings advising the operator to stay inside the operator compartment in the event of a tip-over. The court held that, given the expert's admission that a biomechanical engineer was needed to reconstruct and understand the accident, he was not qualified to offer testimony as to the accident dynamics or the forces acting on the forklift operator during the accident. Further, the expert's tests were unreliable, his methodology questionable, and his conclusions not generally accepted by others in the relevant scientific/expert community. It was highly doubtful that his testimony would be helpful to a jury in determining whether the forklift design was defective. Without the expert's testimony, the forklift operator would be unable to present evidence about alternative forklift designs and theories of forklift operator safety and thus unable to show that the manufacturer's forklift design was defective. Furthermore, without expert testimony, a jury could only speculate as to whether a design defect proximately caused the injuries.

**OUTCOME:** The court barred the proposed testimony of the forklift operator's expert and granted summary judgment in favor of the manufacturer.

**LexisNexis(R) Headnotes**

*Torts > Products Liability > General Overview*
[HN1] To state a products liability claim in New Jersey, a plaintiff must establish that the product was defective, that the defect existed when the product left the defendant's control, and that the defect caused injury to a reasonably foreseeable user. Liability should be imposed only when the manufacturer is responsible for the defective condition.

*Evidence > Procedural Considerations > Circumstantial & Direct Evidence*
*Torts > Products Liability > General Overview*
[HN2] In New Jersey, to prove the existence of a product defect, a plaintiff may rely on the testimony of an expert who has examined the product or offers an opinion on the product's design. Alternatively, a plaintiff may produce circumstantial evidence of a defect, such as proof of proper use, handling or operation of the product and the

2005 U.S. Dist. LEXIS 18424, *

nature of the malfunction, which may be enough to satisfy the requirement that something is wrong with the product.

*Evidence > Testimony > Experts > Admissibility*
*Evidence > Testimony > Experts > Helpfulness*
*Torts > Products Liability > General Overview*
[HN3] Where an allegedly defective product involves a complex instrumentality, a plaintiff is required to provide expert testimony. Expert testimony is necessary to assist the fact finder in understanding the mechanical intricacies of the instrumentality and in excluding other possible causes of the accident.

*Civil Procedure > Summary Judgment > Standards >*
*Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards >*
*Materiality*
[HN4] Summary judgment is appropriate where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.

*Civil Procedure > Summary Judgment > Standards >*
*Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards >*
*Materiality*
[HN5] On a motion for summary judgment, a genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the nonmoving party.

*Civil Procedure > Discovery > Methods > General*
*Overview*
*Civil Procedure > Summary Judgment > Motions for*
*Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Opposition >*
*General Overview*
[HN6] On a motion for summary judgment, a nonmoving party may not rest upon mere allegations, general denials, or vague statements in opposition to a summary judgment motion. Instead, the nonmoving party must set forth specific facts by means of affidavits, depositions, answers to interrogatories, or admissions that show there is a genuine issue for the trier of fact to resolve. If the nonmoving party's evidence is merely colorable, or not significantly probative, summary judgment may be granted.

*Civil Procedure > Summary Judgment > Burdens of*
*Production & Proof > General Overview*

*Civil Procedure > Summary Judgment > Standards >*
*Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards >*
*Materiality*
[HN7] On a motion for summary judgment, conclusory allegations do not meet the non-moving party's duty to set forth specific facts showing that a genuine issue of material fact exists and a reasonable factfinder could rule in its favor.

*Civil Procedure > Summary Judgment > Standards >*
*Genuine Disputes*
[HN8] At the summary judgment stage, it is not the role of the court to weigh the evidence or to evaluate its credibility, but to ascertain whether there is a genuine issue for trial. Therefore, the court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party.

*Evidence > Testimony > Experts > General Overview*
[HN9] See *Fed. R. Evid. 702.*

*Evidence > Testimony > Experts > General Overview*
[HN10] *Fed. R. Evid. 702* imposes three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit.

*Evidence > Testimony > Experts > Daubert Standard*
[HN11] The United States Supreme Court in Daubert clarified the operation and scope of *Fed. R. Evid. 702* with regard to expert testimony, holding that an expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief. The standards set forth in Daubert operate as a framework to ensure the relevance and reliability of expert testimony. It is the trial judge's role to serve as the gate-keeper in scrutinizing the evidentiary relevance and reliability of the proposed expert submission.

*Evidence > Testimony > Experts > Admissibility*
*Evidence > Testimony > Experts > Qualifications*
[HN12] The first step of a *Fed. R. Evid. 702* inquiry is to determine whether the expert is properly qualified. Before an expert witness may offer an opinion pursuant to Rule 702 he must first be qualified by virtue of specialized knowledge" with regard to the area he is testifying about. Practical experience or academic training and credentials can form the basis of this specialized knowl-

edge. The United States Court of Appeals for the Third Circuit has interpreted the specialized knowledge requirement liberally, and has stated that this policy of liberal admissibility of expert testimony 'extends to the substantive as well as the formal qualifications of experts. However, at a minimum, a proffered expert witness must possess skill or knowledge greater than the average layman.

*Evidence > Testimony > Experts > General Overview*
[HN13] After determining whether an expert is properly qualified, the court must determine whether the expert's testimony is reliable. The court's inquiry must be based solely on principles and methodology, not on the conclusions they generate. However, because conclusions and methodology are not entirely distinct from one another, the court must also examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used. It is the trial court's responsibility to evaluate not only the principles and methodologies of the expert, but also whether the expert has properly applied those principles and methods to the facts of the case.

*Evidence > Testimony > Experts > Daubert Standard*
[HN14] The United States Supreme Court and the United States Court of Appeals for the Third Circuit have recognized certain factors to guide a trial court's assessment of the reliability of proffered scientific expert testimony. These factors include: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Evidence > Testimony > Experts > Admissibility*
*Evidence > Testimony > Experts > Daubert Standard*
[HN15] The inquiry into the reliability of proffered scientific expert testimony is a flexible one, and in the United States Court of Appeals for the Third Circuit, it has been held that this list of factors is "nonexclusive" and that each factor need not be applied in every case. Rather, the court must tailor its inquiry to the facts of each case and should consider the specific factors identified in Daubert where such factors are reasonable measures of the reliability of the expert testimony. However, the Third Circuit has also recognized that an expert's

testimony need not be flawless for it to be reliable and admissible, stating that the grounds for the expert's opinion merely have to be good, they do not have to be perfect.

*Evidence > Testimony > Experts > Daubert Standard*
[HN16] The United States Supreme Court has noted that Daubert's general holding applies not only to scientific knowledge, but also to technical and other specialized knowledge. Moreover, some courts consider additional factors when determining reliability, such as: (i) whether the expert's proposed testimony grows naturally and directly out of the research the expert has conducted independent of the litigation, (ii) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, and (iii) whether the field of expertise asserted by the expert is known to reach reliable results for the type of opinion proffered by the expert, *Fed. R. Evid.* 702 advisory committee's notes.

*Evidence > Testimony > Experts > Daubert Standard*
[HN17] There is nothing in the Federal Rules of Evidence, Daubert, or its progeny, that requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Evidence > Testimony > Experts > General Overview*
[HN18] The last step of a *Fed. R. Evid.* 702 inquiry is to determine "fit"--whether there is a relevant connection between the scientific research or test result to be presented and particular disputed factual issues in the case. "Fit" requires that the expert's testimony not only be reliable, but that it assist the jury by providing it with relevant information for the purpose of the case.

*Evidence > Procedural Considerations > Preliminary Questions > General Overview*
*Evidence > Scientific Evidence > Daubert Standard*
*Evidence > Testimony > Experts > Daubert Standard*
[HN19] The United States Court of Appeals for the Third Circuit has established a process by which a court is to handle Daubert motions. At the outset, the court must determine, pursuant to *Fed. R. Evid.* 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. Although not required in all cases, the Third Circuit has stressed the importance of holding Daubert hearings to determine the qualifications of the expert and the reliability of his or her testimony.

The ultimate decision of whether to hold a hearing rests within the discretion of the district court. In a Daubert hearing, the party seeking to introduce the expert bears the burden of establishing admissibility by a preponderance of the evidence.

*Evidence > Testimony > Experts > Admissibility*
*Evidence > Testimony > Experts > Daubert Standard*
[HN20] Although it has been held that each Daubert factor need not be applied in every case for an expert's testimony to be admissible, an expert must have good grounds for his opinion, and in the case of alternative designs, testing is crucial.

*Evidence > Testimony > Experts > General Overview*
[HN21] A proffered expert witness must possess skill or knowledge greater than the average layman.

*Evidence > Testimony > Experts > Admissibility*
*Torts > Products Liability > General Overview*
[HN22] Where the allegedly defective product involves a complex instrumentality, a plaintiff is required to provide expert testimony. Such testimony is needed in order to help the fact-finder understand the mechanical intricacies of the instrumentality and help to exclude other possible causes of the accident.

*Evidence > Testimony > Experts > Helpfulness*
[HN23] Expert testimony is needed where the factfinder would not be expected to have sufficient knowledge or experience and would have to speculate without the aid of expert testimony.

*Torts > Products Liability > General Overview*
[HN24] An explanation of various design criteria is necessary in order to prove existence of a defective design.

*Torts > Products Liability > General Overview*
[HN25] The mere occurrence of an accident and the fact that someone was injured are not sufficient to demonstrate a design defect.

COUNSEL: For DANIEL ORTIZ, Plaintiff: ROBERT AARON PORTER, BAFUNDO PORTER BORBI & CLANCY, CHERRY HILL, NJ.

For YALE MATERIALS HANDLING CORP., HYSTER-YALE MATERIALS HANDLING, INC., Defen-

dants: WILLIAM J. RICCI, LAVIN, O'NEIL, RICCI, CEDRONE & DISIPIO, MOUNT LAUREL, NJ.

JUDGES: Honorable Freda L. Wolfson, United States District Judge.

OPINION BY: Freda L. Wolfson

OPINION:

MEMORANDUM OPINION

Daniel Ortiz ("Plaintiff" or "Ortiz") brings this action against Yale Materials Handling Corp. ("Defendant" or "Yale") for injuries that Plaintiff sustained while operating a forklift manufactured by Defendant. Plaintiff alleges that Defendant's forklift is defective in design because it should have had (1) a latched rear door to restrain the operator, and (2) warnings advising the operator to stay inside the operator compartment in the event of a tip-over. Defendant maintains that the design of its forklift is not defective, the forklift is safe for its intended use, and that operators who remain in the operator compartment in a tip-over are at risk for more severe [*2] injuries.

In support of its defect claim, Plaintiff seeks to introduce the testimony of one expert, John B. Sevart ("Sevart"), and Defendant responds with the testimony of two experts. Plaintiff has moved to strike Defendants' experts. Defendant has moved for summary judgment, asserting that Plaintiff's claim against it must fail because the testimony of Plaintiff's expert is inadmissible. For the following reasons, the Court bars the proposed testimony of Plaintiff's expert, Sevart, finds that Plaintiff's motions are now moot because without an expert to support Plaintiff's alternative design theory, Plaintiff's products liability claim against Defendant fails, n1 and thus, grants summary judgment in favor of Defendant.

> n1 In addition to the motions to strike the testimony of Defendant's experts, Plaintiff filed a motion to bar the defense of comparative negligence.

I. BACKGROUND

A. The accident

The following facts are not in dispute. On November 22, 2001, in the course of his employment [*3] with IKEA, Plaintiff was operating an open back, rear entry, stand-up forklift truck (model NR045AC), which was manufactured and assembled in October 1996 by Yale.

2005 U.S. Dist. LEXIS 18424, *

n2 At the time of the accident, Plaintiff was using the forklift truck in an IKEA warehouse to place a couch on a rack when the forklift tipped over and fell to the ground. There were no eyewitnesses to the accident, but Plaintiff's co-worker heard the accident, and then discovered the forklift lying on its side and Plaintiff lying beside it with his left foot pinned beneath the forklift's overhead guard. Def. Mot. Summ. J. at 2. Plaintiff testified that he tried to stay in the forklift during the tipover, but that he "naturally fell out." Ortiz Dep. at 76. Plaintiff also testified that he had been trained to jump from the forklift in the event of a tip-over, but because there was no room between the forklift and the wall, Plaintiff testified that his "best bet was to stay inside and try to ride it down." Id. at 86. As a result of the accident, Plaintiff's foot was amputated, and he has accumulated substantial medical bills. See Pl. Compl. P6. According to Plaintiff, he can no longer engage in many business and [*4] personal activities because of the injuries from the accident. See id.

n2 NACCO Materials Handling Group, Inc. is the successor-in-interest to Yale Materials Handling Corporation. See Def. Mot. Summ. J. at 1.

**B. Procedural history**

Plaintiff filed suit against Yale, the manufacturer and distributor of the forklift, asserting claims of design defect and products liability. See id. P5. Plaintiff claims that the forklift is defective in design because it lacked a latching rear door to the operator's compartment and thus failed to protect the operator in the event of a tip-over. Id. PP3-4.

In its answer, Defendant denies the existence of a design defect and asserts that Plaintiff has failed to state a cause of action under the New Jersey Products Liability Act, 2A:58C-1 et. seq. Def. Ans. at 4. On April 7, 2005, Defendant filed a motion for summary judgment and moved to bar the proposed testimony of Plaintiff's engineering expert because such testimony does not meet the standards for [*5] admissibility set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993). See Def. Mot. Summ. J. at 10. On July 7, 2005, the Court held a hearing pursuant to Fed.R.Evid. 104 to determine the admissibility of Plaintiff's proposed testimony.

n3 Plaintiff moved to bar the expert testimony of Defendant's biomechanical engineer expert on March 7, 2005, and Defendant's engineer-

ing expert on March 14, 2005. However, because this Court finds that the proposed testimony of Plaintiff's expert is inadmissible, Plaintiff's claim against Defendant fails and Plaintiff's motions to bar Defendant's experts and the defense of comparative negligence are now moot.

**II. DISCUSSION**

[HN1] To state a products liability claim in New Jersey, a plaintiff must establish "that the product was defective, that the defect existed when the product left the defendant's control, and that the defect caused injury to a reasonably foreseeable user." Milanowicz v. The Raymond Corp., 148 F.Supp.2d 525, 528 (D.N.J. 2001) [*6] (citations omitted). "Liability should be imposed only when the manufacturer is responsible for the defective condition." Id. (quoting Reiff v. Convergent Techs., 957 F. Supp. 573, 578 (D.N.J. 1997) (citations omitted)). [HN2] To prove the existence of a defect, a plaintiff may rely on the testimony of an expert who has examined the product or offers an opinion on the product's design. Lauder v. Teaneck Volunteer Ambulance Corps, 368 N.J.Super. 320, 331, 845 A.2d 1271 (App. Div. 2004) (citing Scanlon v. General Motors Corp., 65 N.J. 582, 326 A.2d 673 (1974)). Alternatively, a plaintiff may produce circumstantial evidence of a defect, "such as proof of proper use, handling or operation of the product and the nature of the malfunction, [which] may be enough to satisfy the requirement that something is wrong with [the product]." Id. [HN3] Where the allegedly defective product involves a complex instrumentality, a plaintiff is required to provide expert testimony. Lauder, 368 N.J.Super. at 331 (citing Rocco v. New Jersey Transit Rail Operations, Inc., 330 N.J.Super. 320, 341, 749 A.2d 868 (App. Div. 2000)). Expert testimony is necessary to assist [*7] the fact finder in understanding "the mechanical intricacies of the instrumentality" and in excluding other possible causes of the accident. Lauder, 368 N.J.Super. at 331 (citing Jimenez v. GNOC, Corp., 286 N.J.Super. 533, 546, 670 A.2d 24 (App. Div. 1996)).

**A. Standard of review**

[HN4] Summary judgment is appropriate where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). [HN5] A genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). However, [HN6] a nonmoving party may not rest upon mere alle-

2005 U.S. Dist. LEXIS 18424, *

gations, general denials, or vague statements in opposition to a summary judgment motion. *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Engineers, 982 F.2d 884, 890-91 (3d Cir.1992)* (internal citations omitted). Instead, the nonmoving party must set forth specific facts "by means of affidavits, depositions, answers to [*8] interrogatories, or admissions ... that show there is a genuine issue for the trier of fact to resolve." *Cooper v. Cape May County Board of Social Servs., 175 F.Supp.2d 732, 741 (D.N.J. 2001)* (citations omitted). If the nonmoving party's evidence is merely colorable, or not significantly probative, summary judgment may be granted. *Bowles v. City of Camden, 993 F.Supp. 255, 261 (D.N.J. 1998)* (citations omitted). [HN7] Conclusory allegations do not meet the non-moving party's duty to set forth specific facts showing that a genuine issue of material fact exists and a reasonable factfinder could rule in its favor. See *Ridgewood Board of Ed. v. Stokley, 172 F.3d 238, 252 (3d Cir.1999)*. [HN8] At the summary judgment stage, it is not the role of this Court to weigh the evidence or to evaluate its credibility, but to ascertain whether there is a genuine issue for trial. See *Anderson, 477 U.S. at 249*. Therefore, the Court must "view the inferences to be drawn from the underlying facts in the light most favorable to the [nonmoving] party." *Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir.2002)* (quoting *Bartnicki v. Vopper, 200 F.3d 109, 114 (3d Cir.1999)*). [*9]

**B. *Fed.R.Evid. 702* and Daubert**

In its motion for summary judgment, Yale contends that the report and proposed testimony of Plaintiff's expert, John B. Sevart, are inadmissible. The admission of expert testimony is governed by *Fed.R.Evid. 702*, which provides that:

> [HN9] If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts in the case.

*Fed.R.Evid. 702*. [HN10] "*Rule 702* imposes three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Crowley v.*

*Chait, 322 F.Supp.2d 530, 535 (D.N.J. 2004)* (quoting *Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir.2000)*). [*10]    [HN11] The Supreme Court in Daubert clarified the operation and scope of *Rule 702* with regard to expert testimony. In that case, the Supreme Court held that an "expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation;' the expert must have 'good grounds' for his or her belief." *Crowley, 322 F.Supp.2d at 535* (citing *In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 (3d Cir.1994)* (hereinafter "Paoli") (quoting *Daubert, 509 U.S. at 590*)). The standards set forth in Daubert operate as a framework to ensure the relevance and reliability of expert testimony. *Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 151, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999)*. It is the trial judge's role to serve as the gate-keeper in scrutinizing the evidentiary relevance and reliability of the proposed expert submission. See *Daubert, 509 U.S. at 588-89, 595-97*.

[HN12] The first step of the *Rule 702* inquiry is to determine whether the expert is properly qualified. "Before an expert witness may offer an opinion pursuant to *Rule 702* he must first be qualified by virtue of specialized expertise. [*11]    " *Elcock, 233 F.3d at 741*. *Rule 702* requires the expert to have "specialized knowledge" with regard to the area he is testifying about. Practical experience or academic training and credentials can form the basis of this specialized knowledge. See *id*. The Third Circuit has "interpreted the specialized knowledge requirement liberally, and has stated that this policy of liberal admissibility of expert testimony 'extends to the substantive as well as the formal qualifications of experts.' However, 'at a minimum, a proffered expert witness ... must possess skill or knowledge greater than the average layman ....'" *Id*. (citing *Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir.1998)* (citations omitted)); see also *Paoli, 35 F.3d at 741*.

[HN13] Next, the court must determine whether the expert's testimony is reliable. Here, the court's inquiry must be based "solely on principles and methodology, not on the conclusions they generate." *Crowley, 322 F.Supp.2d at 539* (quoting *Daubert, 509 U.S. at 595*). However, because "conclusions and methodology are not entirely distinct from one another," *General Electric Co. v. Joiner, 522 U.S. 136, 146, 139 L. Ed. 2d 508, 118 S. Ct. 512 (1997)*, [*12] the court must also "examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." *Heller v. Shaw, 167 F.3d 146, 153 (3d Cir. 1999)*. It is the trial court's responsibility to evaluate not only the principles and methodologies of the expert, but also whether the expert has properly applied those principles and methods to the facts of the

case. *Magistrini v. One Hour Martinizing Dry Cleaning, 180 F.Supp.2d 584, 595 (D.N.J. 2002)* (citing *Fed.R.Evid. 702*).

[HN14] The U.S. Supreme Court and the Third Circuit have recognized certain factors to guide a trial court's assessment of the reliability of proffered scientific expert testimony. These factors include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; [*13] (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

See *Daubert, 509 U.S. at 593-94; Paoli, 35 F.3d at 742 n.8; Milanowicz, 148 F.Supp.2d at 531*. As the Supreme Court noted in Daubert, [HN15] this inquiry is a flexible one, and in this Circuit, it has been held that this list of factors is "nonexclusive" and that "each factor need not be applied in every case." *Crowley, 322 F.Supp.2d at 535* (citing *Elcock, 233 F.3d at 746*). Rather, the court must tailor its inquiry to the facts of each case and "should consider the specific factors identified in Daubert where [such factors] are reasonable measures of the reliability of the expert testimony." *Id.* (quoting *Kumho Tire, 526 U.S. at 150, 152* (noting that Daubert factors may or may not be useful depending on "nature of the issue, the expert's particular expertise, and the subject of his testimony") (citations omitted)). However, the Third Circuit has also recognized that an expert's testimony need not be flawless for it to be [*14] reliable and admissible, stating that "the grounds for the expert's opinion merely have to be good, they do not have to be perfect." *Paoli, 35 F.3d at 744*.

[HN16] The Supreme Court has also noted that Daubert's general holding applies not only to scientific knowledge, but also to technical and other specialized knowledge. *Crowley, 322 F.Supp.2d at 536* (citing *Kumho Tire, 526 U.S. at 150*). Moreover, some courts consider additional factors when determining reliability, such as: (i) whether the expert's proposed testimony grows naturally and directly out of the research the expert has conducted independent of the litigation, see *Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1317 (9th Cir. 1995)*, (ii) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, see *Joiner, 522 U.S. at 146*), and (iii) whether the field of expertise asserted by the expert is known to reach reliable results for the type of opinion proffered by the expert, see *Kumho Tire, 526 U.S. 137, 149-150, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999))*. See also *Magistrini, 180 F.Supp.2d at 594-95*; [*15] *Fed.R.Evid. 702* advisory committee's notes. [HN17] There is nothing in the Federal Rules of Evidence, Daubert, or its progeny, that "requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Oddi v. Ford Motor Co., 234 F.3d 136, 158 (3d Cir.2000)*; See also *Magistrini, 180 F.Supp.2d at 595* (citing *Joiner, 522 U.S. at 145-46*).

[HN18] The last step of a *Rule 702* inquiry is to determine "fit" - whether there is a relevant "connection between the scientific research or test result to be presented and particular disputed factual issues in the case." *Milanowicz, 148 F.Supp.2d at 531* (quoting *Paoli, 35 F.3d at 741-43*). "Fit" requires that the expert's testimony not only be reliable, but that it assist the jury by providing it with relevant information for the purpose of the case. *Paoli, 35 F.3d at 743*.

## C. Daubert hearing

[HN19] The Third Circuit has established a process [*16] by which a court is to handle Daubert motions. *Crowley, 322 F.Supp.2d at 536*. At the outset, the court must determine, pursuant to *Fed.R.Evid. 104(a)*, whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Id. at 536-37* (citing *Daubert, 509 U.S. at 592*). Although not required in all cases, the Third Circuit has stressed the importance of holding Daubert hearings to determine the qualifications of the expert and the reliability of his or her testimony. *Crowley, 322 F.Supp.2d at 537* (citing *Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 417-18 (3d Cir.1999))*. The ultimate decision of whether to hold a hearing rests within the discretion of the district court. *Padillas, 186 F.3d at 418*. In a Daubert hearing, the party seeking to introduce the expert bears the burden of establishing admissibility by a preponderance of the evidence. *Crowley, 322 F.Supp.2d at 537* (citing *Daubert, 509 U.S. at 592 n. 10)*.

## [*17] D. Daubert analysis

In its motion for summary judgment, Defendant challenges the admissibility of the testimony of Plaintiff's engineering expert, Sevart. Defendant argues that the

2005 U.S. Dist. LEXIS 18424, *

effect of a Daubert analysis on Sevart's proposed testimony will result in the exclusion of such testimony, and that as a result, Plaintiff's products liability claim against Defendant fails. Defendant contends that Sevart's methodology and conclusions - that the rear entry, stand-up forklift should have a rear latching door and stay-in-the-truck warning - are unreliable, and that the limited testing Sevart has performed does not properly "fit" with the facts of this case.

### 1. Sevart's qualifications n4

> n4 At the Daubert hearing, Defendant also raised questions regarding Sevart's qualifications. See Tr. 5:7-6:5. Although Defendant does not specifically discuss Sevart's qualifications in its motion for summary judgment, the Court will nevertheless address the issue since an expert's qualifications are part of the Daubert analysis.

[*18]

Sevart has a Bachelor's degree and Master's degree in mechanical engineering and has completed course work for a Doctor of Science degree in controls engineering, which is "a hybrid of mechanical engineering, electrical engineering, statistics and electrical hardware." Transcript of July 7, 2005 Hearing, ("Tr.") 6:21-7:12. Sevart has been a licensed engineer for approximately 30 years and has taught mechanical design classes at Wichita State University for 20 years. Sevart is a member of the American Society of Mechanical Engineering, the American Society of Agricultural Engineering, the National Society of Automotive Engineering, and the American National Standards Institute ("ANSI"), a non-profit organization that oversees the writing and distribution of various U.S. industry standards, which until recently included forklift safety standards. Tr. 8:15-25.

Sevart has personally investigated over 600 forklift accidents involving all types of forklifts. Tr. 31:6-10. However, he is not a statistician, an expert in biomechanics as a science, or an expert in human factors as a science. Tr. 86:9-20. In fact, during the hearing, Sevart stated that Plaintiff's attorney should [*19] retain a biomechanical engineer to reconstruct the dynamics and kinematics of the accident at issue in this case, because he is not "an expert in that area." Tr. 122:13-123:4, 123:23-124:7.

In light of Sevart's own admission that a biomechanical engineer is needed to reconstruct and understand the accident, even when liberally construing the Daubert qualification requirements, the Court finds that Sevart is not qualified to offer testimony as to the dy-

namics of this particular accident or the forces acting on Plaintiff at the time of such accident.

### 2. Reliability

According to Sevart, stand-up forklift operators are safer staying in the operator compartment during a tip-over than jumping out of the compartment. Sevart also contends that the stand-up forklift that caused Plaintiff's injuries was defective because it did not have a self-latching rear door to the entrance of the operator's compartment and a stay-in-the-truck warning inside the compartment. Pl. Opp. at 1. Defendant, on the other hand, argues that Sevart's testimony should be excluded on Daubert grounds because of the lack of relevant testing and the unreliable methodology employed by Sevart in connection [*20] with the formulation of his opinion. [HN20] Although it has been held that each Daubert factor need not be applied in every case for an expert's testimony to be admissible, see Crowley, 322 F.Supp.2d at 535 (citation omitted), an expert must have 'good grounds' for his opinion, and in the case of alternative designs, testing is crucial. See Dhillon v. Crown Controls Corp., 269 F.3d 865, 870 (7th Cir.2001) (citations omitted). Here, Sevart has never performed any dynamic testing with a moving forklift, either with a dummy or human, nor has he done any computer simulations to test his proposed rear door alternative design and stay-in-the-truck theory with the Yale forklift model at issue in this case. Def. Mot. Summ. J. at 5. In fact, Sevart himself acknowledged that he did not perform any tests with a stand-up forklift, with or without a rear door, in a lateral tip-over, which is the type of accident at issue in this case. Tr. 64:12-18. Sevart also admitted that he did not conduct any analysis or tip-over tests using the particular Yale model forklift that Plaintiff was operating at the time of the accident. In fact, Sevart never saw or operated the Yale [*21] model forklift involved in Plaintiff's accident. Tr. 31:11-17, 32:19-23.

In forming his opinion, Sevart relied heavily on the Crown Accident Reports, which consist of 804 accident reports collected over a 15 year period by Crown, a forklift manufacturer. Tr. 33:1-6, 34:14-21. However, Sevart could not confirm that a single one of these reports was completed by a representative of Crown. Instead, each report was completed by someone at the scene of the accident who did not work directly for Crown. Tr. 84:14-85:9. Moreover, Sevart admitted that he accepted the contents of the documents provided by Mr. Dunlap, a Crown employee, without investigating exactly what happened in any of the accidents or how the severity of injuries was determined. Tr. 85:10-24. Furthermore, Sevart made no attempt to correlate Plaintiff's accident to the Crown accidents in order to determine if any of the 804 accidents involved a substantially similar or identical

2005 U.S. Dist. LEXIS 18424, *

forklift to the Yale forklift model involved in this case. Tr. 99:17-24.

The most troubling aspect with the reliability of the Crown data is that Sevart did not use any methodology or analysis to reach his conclusion regarding operator safety in [*22] forklifts. According to Sevart, Crown did not conduct any statistical analyses or inquiries to assess the validity or reliability of the accident reports. Tr. 46:15-18. Sevart even testified that there is no conclusion to be drawn from these tables of Crown accident reports, but rather, that the reports merely show a statement of fact; namely "that the operator is better protected by staying in the confines of the forklift than if he tried to jump." Tr. 47:9-19. For example. Table 7.2 of the Crown Stand-Up Forklift Accident Reports ("Report") compares the severity of injury sustained by forklift operators during tip-over accidents with the various actions taken by such operators - either "Ejected," "Jumped," "Jumped/Ejected," "Stayed," or "Unknown." n5 Pl. Opp. Ex. 4 at 20. According to this table, 8 operators were ejected, 63 jumped, 1 jumped/ejected, 29 stayed and 26 were unknown. Id. The Report shows that the only category of individuals who sustained a fatal injury were those operators who "jumped" from the forklift. Id. In every other category, a number of operators sustained minor or no injuries, except for the one operator who sustained a major injury when he "jumped/ejected" [*23] from the forklift. Id. In light of this data, the Court repeatedly asked Sevart what statistical analysis he performed to account for the fact that there were substantially more operators who jumped from the forklift than stayed in the operator compartment. Sevart merely responded that the data did not reflect "a sophisticated analysis," Tr. 50:21-22, and that he did not conduct any technical, statistical, or mathematical analyses with respect to such data. Tr. 50:1-18.

n5 Of those operators who were "ejected" from the forklift, 2 operators sustained no injuries, 4 sustained minor injuries and 2 suffered major injuries. Pl. Opp. Ex. 4 at 20. Of those operators who "jumped" from the forklift, 1 was fatally injured, 4 sustained major injuries, 6 sustained minor injuries and 52 sustained no injury. Id. The one operator who "jumped/ejected" from the forklift received a major injury. Id. Of those operators who "stayed" in the machine, 11 sustained minor injuries, 15 suffered no injury, and 3 were unknown. Id. The Report also contained an "Unknown" category where 18 operators sustained no injury, 5 suffered minor injuries and 3 were unknown. Id.

[*24]

Because a layperson could easily read raw numbers in a chart and formulate some sort of conclusion regarding such numbers, the Court directed Sevart to a chart in the Report where there appeared to be some breakdown of the numbers with respect to lateral tip-overs of forklifts. Tr. 55:14-56:5. This chart shows the type of injury the operator suffered during a side or lateral tip-over, based on whether the operator "stayed" in the forklift or performed some "other" act during an accident. See Pl. Opp. Ex. 4 at 22. However, the chart does not specify those operators who jumped or were ejected from the forklift. n6 See id. After addressing the discrepancy in numbers, the Court again asked Sevart about the methodologies he employed to reach his conclusion. Sevart merely responded that there was "no specific mathematical model created. It's simply the numbers themselves were compared." Tr. 55:14-56:15.

n6 Of the 82 total incidents, 60 operators suffered no injury. In these 60 incidents, 11 operators stayed in the forklift and 41 came out of the forklift; however, the actions of 9 operators were unknown. See Pl. Opp. Ex. 4 at 22. Furthermore, the chart shows that out of the 16 operators who suffered minor injuries, 8 stayed in the forklift and 4 came out; however, the actions of 4 operators were not accounted for. Id. There were 2 major injuries and 1 fatality, all suffered by operators who came out of the forklift. Id.

[*25]

[HN21] "[A] proffered expert witness . . . must possess skill or knowledge greater than the average layman . . .'" *Elcock*, 233 F.3d at 741 (citing *Waldorf*, 142 F.3d at 625 (citations omitted)); see also *Paoli*, 35 F.3d at 741. Sevart's simple review of the numbers in the chart, which does not incorporate any kind of statistical or mathematical analysis, offers no substantial support for his opinion that operators are safer staying inside a forklift rather than jumping out during a lateral tip-over, and that a stand-up forklift should come equipped with a rear door and a warning. It is clear from Sevart's testimony during the hearing that he employed no special skill or technique different from a layperson in forming his opinion and conclusions regarding forklift safety. Sevart did not use any methodology to account for the difference in the number of operators who jumped from the forklift versus those who remained in the operator compartment during a tip-over.

Similarly, Sevart's "tests" with forklifts are unreliable and unhelpful for numerous reasons. In 1992, Sevart re-created accident tip-overs with a stand-up forklift truck using [*26] a live subject (the "Berry Test"). See Pl. Opp. at 6; Ex. 7. However, there are several crucial

differences between Plaintiff's accident and the simulated tip-overs. First, the Berry test was performed using a Yale forklift different from the one at issue in this case, and it was equipped with a rear door. Second, the simulated accident was a rear tip-over, not a lateral tip-over which caused Plaintiff's injury. Third, Mr. Berry, the test subject and senior engineer with Sevart's company, remained inside the operator compartment during the tip-over and was equipped with a helmet and the knowledge that a tip-over was imminent. Finally, handholds were added in the forklift's operator compartment to enable Mr. Berry to better restrain himself during the tip-over. See id. Ex. 7 at 2-3; Tr. 105:6-14. In short, the Berry Test bears little resemblence to the facts here or even the type of forklift at issue in this case.

The Court also finds Sevart's fatigue and reaction time tests unreliable. The fatigue test analyzed the impact of a forklift's latching door on an operator who opened and closed such door 100 times in a short period of time. See Pl. Opp. Ex. 6 at 1. However, there [*27] is no information available as to the age, experience, physical strength, or general health of the test subjects. The only information available was that the subjects consisted of 4 men and 1 woman. Id. Without providing any kind of analysis, Sevart concluded that "[a] subjective test of the rear door indicates that the provision of a latching rear door on a standup, rear entry, end control forklift does not provide any increase in fatigue or have undue tiresome effects of the forklift." Id. Even if this conclusion were proven valid, it provides no support for Sevart's conclusion that remaining inside the operator compartment is safer than jumping out of the forklift during a lateral tip-over.

The same problems of reliability exist with Sevart's reaction time tests. In 1991, Sevart conducted a study to assess the reaction time of eight male test subjects when exiting a stand-up forklift, both with and without a rear door. See Pl. Opp. at 7; Ex. 5. Sevart reported that there was a .5 second increase in exit time with a door; an increase which he considered to be minimal. Id. at 7. However, similar to the fatigue tests, Sevart did not include any information on the [*28] age, experience, physical strength, or general health of the test subjects.

Furthermore, during the Daubert hearing, Sevart had great difficulty recalling the specifics of his tests, including the subjects involved in such tests and the manner in which those tests were conducted. See Tr. 20:4-11; 26:8-27:15; 44:17-47:14; 61:18-62:19. Sevart also appeared confused by the Court's repeated requests to him to clarify whether he performed any kind of analysis of tip-over accidents which showed that an operator is safer remaining inside a forklift. See Tr. 44:17-47:14.

Moreover, disparaging the science of testing and accident reconstruction, Sevart opined that without live human subjects, all accident reconstructions are "bogus" and akin to "reading tea leaves." n7 Tr. 141:14-23. The Court finds incredulous Sevart's position that there is no way to test and obtain reliable answers in the area of forklift safety and lateral tip-overs without using human subjects. See Tr. 136:2-23. While the Federal Rules of Evidence do not have specific provisions governing the admission of computer-generated simulations, reconstruction and animation as substantive evidence, such computer-generated [*29] evidence has long been accepted as an appropriate means to communicate complex issues to a lay audience, so long as the expert's testimony indicates that the processes and calculations underlying the reconstruction or simulation are reliable. See 57 Am. Jur. Proof of Facts 3d 455 (2005). To restrict accident reconstructions to those involving only human test subjects not only places such individuals in physical danger but also is a further indication of the unreliability of Sevart's methodologies and opinions.

> n7 "The Court: ... Mr. Sevart, ... it is your scientific view that in any accident, only real live people are the only way you can really test. Everything else out there in the accident reconstruction field, or elsewhere, is really bogus because if you are not using a live person in accidents, you can't get the real results?
>
> Sevart: I would say that's a pretty good description. I personally equated it as to reading tea leaves before I quit doing it." Tr. 141:14-23.

In addition to the unreliability [*30] of tests conducted by Sevart, the testimony and evidence presented at the Daubert hearing demonstrate that Sevart's conclusions regarding operator safety in a forklift tip-over accident are not generally accepted by others in the relevant scientific/expert community. The Crockett report, a 1995 study on operator safety in stand-up forklifts by Jennifer Crockett, a biomechanical engineer, and David Miller, a product safety engineer, which Plaintiff submitted to the Court, see Pl. Opp. Ex. A, and which Sevart relies upon to support his opinion, see Tr. 66:2-23, actually supports Defendant's position because the Crockett report shows that any device, such as a latching door, which slows or prevents an operator's egress in an emergency situation, such as a tip-over or off-dock accident, creates an unacceptable risk of severe injury or death. See Tr. 90:11-24; Pl. Opp. Ex. A at 113. The report also states that although a rear door may save "the loss of a foot or leg," it is at the expense of death when the truck is tipped over or driven off the dock. Pl. Opp. Ex. A at 113. Moreover, the Occupational Safety & Health Administration in-

structs operators to exit stand-up lift [*31] trucks in the event of a tip-over. See Def. Mot. Summ. J. at 8. In addition to the fact that the entire lift truck industry adheres to the opposite view of Sevart, Sevart's rear door theory has been rejected twice by ANSI. n8 Tr. 100:20-101:13. In fact, no forklift manufacturer offers a stand-up forklift with a rear door as standard equipment. Tr. 95:8-96:11.

> n8 In the last 15 years, ANSI has twice rejected Sevart's proposed rear door design. Each time there was a vote with respect to such proposal, Sevart's design only received a vote of 1 or 2 - one vote coming from Mr. Berry, a chief engineer with Sevart's company, who was instructed to vote in Sevart's favor. Tr. 100:20-101:21.

Sevart's methodology has also been extensively questioned in another circuit. In two Seventh Circuit cases, Sevart was retained to explain how forklifts were improperly designed because they lacked latching rear doors. See *Dhillon, 269 F.3d 865; Phillips v. The Raymond Corp., 364 F.Supp.2d 730 (N.D.Ill. 2005).* [*32] In Phillips, the court found that Sevart's tests, which had been previously criticized in Dhillon, "did not include any testing to indicate whether his design would be feasible, and he never created or tested a prototype or other tangible demonstration of his design." *Phillips, 364 F.Supp.2d at 738.* Similarly, in this case, there is no peer review or publication of Sevart's methods, and the complete lack of methodology behind his conclusions indicates that his testing is unreliable.

During the hearing, the Court frequently asked Sevart which test he was referring to and relying upon, because much of what he opined was unsupported by the studies and tests that Plaintiff had submitted to the Court. See Tr. 138:22-139:16. Sevart stated that he relied only on the Crown Accident Reports, the Berry test, the fatigue test, and the reaction time test to form his opinion. See Tr. 139:20-141:2. Given the complete lack of testing Sevart conducted with stand-up forklifts in lateral tip-overs and his inability to provide a basis for the conclusions in his own charts and findings, it is highly doubtful that Sevart's testimony would be helpful to a jury in determining [*33] whether the design of Defendant's forklift was defective.

Therefore, Plaintiff has failed to meet his burden of establishing the admissibility of Sevart's testimony by a preponderance of the evidence, and Sevart's proffered testimony - that operators are safer remaining in a forklift during a tip-over and that a stand-up forklift should come equipped with a latching rear door - is, at best, mere speculation unsupported by sound scientific principles and methodologies.

### 3. Fit

Sevart has also not demonstrated a relevant connection between his research and Plaintiff's claim that the design of Defendant's forklift was defective. Sevart never conducted any tests with the Yale forklift model at issue in this case. In fact, he never even saw the particular forklift involved in Plaintiff's accident. See Tr. 31:11-17, 32:19-23. In addition, Sevart has not performed any lateral tip-over testing with forklifts, which is the kind of accident that caused Plaintiff's injuries. The only relevant "testing" Sevart has performed is his review of lateral tip-overs using the data in the Crown Accident Reports. See Tr. 64:12-18; see also *Oddi, 234 F.3d at 158* (excluding [*34] expert opinion in defective design case where expert conducted no tests and failed to calculate forces on plaintiff or truck in accident); *Kass ex rel. Kass v. West Bend Co., 2004 U.S. Dist. LEXIS 22217, 2004 WL 2475606, at *6 (E.D.N.Y. Nov. 4, 2004)* (stating that "courts have repeatedly rejected expert testimony where a proposed theory or alternative design was not properly tested.") (citations omitted). Furthermore, Sevart has not performed any new tests or analyses to determine how Plaintiff was allegedly ejected from the forklift and pinned beneath the machine's overhead guard. It is this Court's responsibility to evaluate whether the expert properly applied accepted principles and methods to the facts of the case. *Magistrini, 180 F.Supp.2d at 595.* Clearly, Sevart has not done so here.

Therefore, Sevart's testing does not "fit" with the facts of this case. There is too great an analytical gap between the data and his opinion that the design of Defendant's forklift was defective. Many of the tests which Sevart relies on, such as the fatigue and reaction time tests, do not address a crucial fact in dispute here - whether the Yale model forklift that injured Plaintiff was defective in design. [*35] Because Sevart's conclusion regarding forklift design and operator safety is merely unsupported speculation, the Court concludes that his testimony will not be helpful to a jury and is therefore inadmissible.

### E. Summary judgment

[HN22] "Where the allegedly defective product involves a complex instrumentality, a plaintiff is required to provide expert testimony." *Lauder, 368 N.J.Super. at 331* (citation omitted). Such testimony "is needed in order to help the fact-finder understand 'the mechanical intricacies of the instrumentality' and help to exclude other possible causes of the accident." *Rocco, 330 N.J.Super. at 341* (citation omitted); see *Jimenez, 286 N.J.Super. at 547; Sparrow v. La Cachet, Inc., 305 N.J.Super. 301, 304-05, 702 A.2d 503 (App. Div. 1997).* The instrumentality at issue in this case, a forklift, is a complicated piece of equipment that consists of many

intricate mechanical parts. Therefore, a jury would not be able to simply look at its design and determine whether or not it was defective. Rather, an expert's testimony is necessary to assist the jury in understanding the complex safety issues involved in forklift [*36] design and lateral forklift tip-over accidents. See *Torres v. Schripps, Inc., 342 N.J.Super. 419, 430, 776 A.2d 915 (App. Div. 2001)* (stating that [HN23] "expert testimony is needed where the factfinder would not be expected to have sufficient knowledge or experience and would have to speculate without the aid of expert testimony.") (citing *Kelly v. Berlin, 300 N.J.Super. 256, 268, 692 A.2d 552 (App. Div.1997))*. In this matter, expert testimony would also show the jury how Plaintiff's accident more likely than not was attributable to the forklift's defective design. See *Lauder, 845 A.2d at 1277* (stating that [HN24] an explanation of various design criteria is necessary in order to prove existence of a defective design). Without Sevart's testimony, however, Plaintiff will be unable to present evidence with respect to alternative forklift designs and theories of forklift operator safety and thus unable to show that Defendant's forklift was defective in design. Furthermore, without expert testimony, a jury can only speculate as to whether a design defect proximately caused Plaintiff's injuries. [HN25] "The mere occurrence of an accident and the fact that someone [*37] was injured are not sufficient to demonstrate a defect." *Lauder, 845 A.2d at 1277* (citing *Scanlon, 65 N.J. at 591*). Here, Plaintiff's inability to present evidence regarding the alleged design defect and whether such alleged defect was the proximate cause of his injuries is a fatal flaw to Plaintiff's burden of proof. The Court notes that it is not merely concerned with the weaknesses or shortcomings of Plaintiff's case. Rather, the question is whether Plaintiff has met the essential elements of a products liability claim based on design defect. Without Sevart's testimony, Plaintiff cannot meet his burden of proof and thus does not have a viable products liability claim against Defendant.

## III. CONCLUSION

For the foregoing reasons, Defendant's motion to strike the testimony of Plaintiff's expert, John B. Sevart, and motion for summary judgment are granted. The Court will issue an appropriate Order.

Dated: August 24, 2005

Honorable Freda L. Wolfson

United States District Judge

### ORDER

This matter having been opened to the Court by Daniel Ortiz ("Plaintiff" or "Ortiz"), seeking to bar the expert testimony offered by Yale [*38] Materials Handling Corporation ("Defendant"), and Defendant, seeking summary judgment on Plaintiff's claim, asserting that the proposed testimony of Plaintiff's expert is inadmissible; and the Court having held a hearing on July 7, 2005 to determine the admissibility of the testimony of Plaintiff's expert; and for the reasons set forth in the Memorandum Opinion filed herewith; and for good cause shown,

IT IS on this 24th day of August, 2005,

ORDERED that Defendant's motion for summary judgment on Plaintiff's Complaint is

GRANTED; and it is further

ORDERED that Plaintiff's motions to bar the proposed testimony of Defendant's experts and to bar the defense of comparative negligence are now rendered MOOT; and it is further

ORDERED that the Clerk of the Court shall mark this case CLOSED.

Honorable Freda L. Wolfson

United States District Judge