IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BRIDGESTONE SPORTS CO., LTD., and BRIDGESTONE GOLF, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ACUSHNET COMPANY, <br><br> Defendant. | ) ) ) ) C. A. No. 05-132 (JJF) ) ) ) **PUBLIC VERSION** ) ) ) ) ) |

**ACUSHNET'S MEMORANDUM IN SUPPORT OF ITS
DAUBERT MOTION TO EXCLUDE PORTIONS OF
THE EXPERT TESTIMONY OF KIM BLAIR AND JOHN CALABRIA**

OF COUNSEL:

Alan M. Grimaldi
Joseph P. Lavelle
Kenneth W. Donnelly
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel: (202) 783-0800

Dated: May 8, 2007
Public Version Dated: May 15, 2007
795622/28946

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P. O. Box 951
Wilmington, DE 19899-0951
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant
Acushnet Company*

# TABLE OF CONTENTS

I. INTRODUCTION ..........................................................................................................1

II. NATURE OF STAGE OF PROCEEDINGS................................................................1

III. SUMMARY OF ARGUMENT .....................................................................................1

IV. STATEMENT OF FACTS ............................................................................................2

V. ARGUMENT...................................................................................................................4

    A. *Daubert* Standard................................................................................................4

    B. Dr. Blair's "Opinions" in Sections VIII-XI of His Report Are Not Expert Opinions Pursuant to *Daubert* and Rule 702 ...................................5

        1. Dr. Blair offers nothing more than a layperson's opinion regarding the "Introduction of the Performance Solid Ball" ...........6

        2. Dr. Blair cannot assist the trier of fact in understanding Bridgestone's "Innovations in Solid Ball Technology"...................6

        3. Dr. Blair admits he is merely speculating regarding "Acushnet's Entry into the Performance Solid Ball Market"..........8

        4. Dr. Blair offers nothing more than a layperson's opinion regarding "Acushnet's Commercial Success with the Pro V1 Ball" ..................................................................................................9

    C. Mr. Calabria Has No Reliable Basis for His Statements Regarding Acushnet's Entrance into the Solid Ball Market..........................................9

VI. CONCLUSION..............................................................................................................10

# TABLE OF AUTHORITIES

## CASES

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
  350 F.3d 316 (3d Cir. 2003) .................................................................................. 5

*Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.*,
  No. 01-669-KAJ, 2004 WL 1534786 (D. Del. May 21, 2004) ..................................... 5

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) ............................................................................. 5, 8

*Elcock v. Kmart Corp.*,
  233 F.3d 734 (3d Cir. 2000) .................................................................................. 4

*General Electric Co. v. Joiner*,
  522 U.S. 136 (1997) ........................................................................................... 5, 7

*Kerrigan v. Maxon Industries*,
  223 F. Supp. 2d 626 (E.D. Pa 2002) ....................................................................... 4

*Oddi v. Ford Motor Co.*,
  234 F.3d 136 (3d Cir. 2000) .................................................................................. 5

*In re Paoli R.R. Yard PCB Litigation*,
  35 F.3d 717 (3d Cir. 1994) .................................................................................... 4

*In re TMI Litigation*,
  193 F.3d 613 (3d Cir. 1999) .................................................................................. 4

*Waldorf v. Shuta*,
  142 F.3d 601 (3d Cir. 1998) .................................................................................. 4

## OTHER AUTHORITIES

Fed. R. Evid. 702 ................................................................................................ 2, 4, 5, 9

## I.  INTRODUCTION

Defendant Acushnet Company ("Acushnet") hereby moves to exclude Sections VIII-XI of the Expert Report of Kim Blair. Acushnet also moves to exclude the expert testimony of John Calabria related to the subject matter of Acushnet's entry into the performance solid ball market upon which he opined on pages 16 and 17 of his January 16, 2007 expert report.

## II.  NATURE OF STAGE OF PROCEEDINGS

This is a patent infringement action involving eleven patents. Bridgestone has asserted seven of those patents against Acushnet. On April 13, 2007, the parties filed summary judgment motions. On April 30, 2007, the parties filed oppositions to those motions. Trial is scheduled for June 18, 2007.

## III.  SUMMARY OF ARGUMENT

Dr. Kim Blair is unqualified as an expert witness to testify as to the "the innovation of solid, multi-layer technology compared to thread wound balls, and the innovation and impact of Bridgestone's golf ball technology compared to conventional thread-wound golf ball technology,"[1] including but not limited to Acushnet's entry into the performance solid ball market and its success with the Pro V1.

Dr. Blair has no experience in the golf ball industry, except to supervise two undergraduate theses in the aerodynamics of dimple design at MIT, and has never read a golf ball patent, except the patents-in-suit. He never bothered to determine which Bridgestone golf balls, if any, incorporate the claimed technology. His testimony will

---

[1] Bridgestone identifies this is as the subject matter of Dr. Blair's expert testimony in its draft pre-trial submissions to Acushnet. (Ex. 1, Bridgestone's 5/2/07 Trial Witness List). Specifically, however, Acushnet moves to exclude any testimony from Dr. Blair related to the subject matter identified in Sections VIII-X1 of the Expert Report of Kim Blair submitted on January 16, 2007. (Ex. 2, Blair 1/16/07 Expert Report at 16-26).

provide no assistance to the trier of fact in assessing the inventiveness of the patents or Bridgestone's alleged innovation in solid golf ball technology.

Dr. Blair has admitted that many of his so-called opinions regarding Acushnet's entrance into the market and Pro V1 success are speculative and based solely on articles obtained by him from his own internet searches and evidence cherry-picked for him by Bridgestone's counsel. None of Dr. Blair's testimony is reliable and is simply based on his own ipse dixit, which he admits may not be true. None of this testimony is proper expert opinion testimony under Rule 702 of the Federal Rules of Evidence, nor is it relevant.

John Calabria's testimony regarding Acushnet's entrance into the solid ball market also should be excluded to the extent he speculates in his expert report that in 1995-96, Acushnet "finally began to recognize the significance of this new multilayer solid ball technology," but it was not until 2000 that Acushnet "appears to have had no choice but to rush to produce a multilayer solid ball." (Ex. 3, Calabria 1/16/2007 Report at 16-17). Such evidence is also unreliable under Rule 702.

## IV.   STATEMENT OF FACTS

Dr. Blair is the founder of the Sports Innovation Group, LLC, a consultancy focused on providing technology and business strategy, as well as the founding director of the MIT Center for Sports Innovation, a sports product development research and educational center. In connection with this case, Dr. Blair submitted an expert report where he opined on "the innovation and impact of Bridgestone's golf ball technology compared to conventional thread-wound golf ball technology." (Ex. 2, Blair 1/16/07 Report at 2). What relevance this may have to the issues in this case are unclear, but in its pre-trial submissions, Bridgestone confirmed that it intends to call Kim Blair as an expert to testify as to this subject matter. (Ex. 1, Bridgestone's 5/2/07 Trial Witness List).

Although undoubtedly accomplished, Dr. Blair had *never* devoted any professional time to working on golf-related research or investigations until the year 2000. (Ex. 4, Blair Tr. at 11:13-24). Only twice in his career had he been involved in matters specific to golf balls before working on this case for Bridgestone – and both of those were his supervision of MIT undergraduate thesis related to the aerodynamics and dimple patterns on golf balls.[2] (*Id.* at 35:20-36:3; 11:22-13:10; 15:13-16:5).

Dr. Blair has *never* authored any papers on golf balls or golf ball technology, never made golf balls, worked for a golf ball company or conducted any professional research in the area of golf balls. (*Id.* at 74:1-19).

Other than the patents in suit, Dr. Blair has *never* read a patent related to golf balls - not even the one he refers to on p. 17 of his report, which claimed the first multi-layer solid golf ball. In his deposition testimony, Dr. Blair stated: "That was just a quote from an article or something like that." (*Id.* at 68:5-70:2).

Dr. Blair *never* read the prosecution histories of any of the patents-in-suit; nor did he read any of the prior art cited in connection with the prosecution of any of these patents. (*Id.*)

Dr. Blair *never* found any treatises or articles discussing methodologies or analyses for determining whether a patent was innovative or not (and therefore failed to base his analysis on any such methodologies), despite being aware of the debate that currently wages in economic and legal circles about whether the patent system promotes innovation. (*Id.* at 106:14-108:12).

The first time Dr. Blair ever visited a golf ball manufacturing facility was when he visited Bridgestone's Covington, Georgia facility in connection with this case. Other

---

[2] Not surprisingly, Dr. Blair's initial discussions regarding his work on this case, prior to Bridgestone dropping its dimple patents, involved the possibility of Bridgestone conducting aerodynamic testing at the MIT wind tunnel. (Ex. 4, Blair Tr. at 72:3-16).

3

than Bridgestone's VP of Marketing and the Covington facilities' manufacturing manager, Dr. Blair has not spoken to anyone else from Bridgestone, any one of the inventors of the patents-in-suit, anyone from Acushnet, or any professional golfers. (*Id.* at 77:5-79:6).

Instead, Dr. Blair chose to rely solely on his own internet research on Google, on-line golf websites, business databases such Lexis Nexis, as well as selected exhibits from Bill Morgan's deposition testimony. (*Id.* at 49:16-54:21; 56:9 -58:19).

Turning a blind eye, he admits that he never asked counsel if there was additional information regarding Acushnet's entrance into the solid ball market. He had no idea if there is other information other than what counsel provided to him or the articles he got on-line; and apparently, he did not care to know. (*Id.* at 83:4-85:8). Dr. Blair's testimony is just a report of what the documents said, which is nothing more than a layman's report; and therefore inadmissible as expert testimony. (*Id.* at 128:8-130:4).

## V.   ARGUMENT

### A.   *Daubert* Standard

The Third Circuit has held that Rule 702 of the Federal Rules of Evidence provides three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994). The plaintiff must establish the expert's qualifications and the reliability and fit of the proposed testimony by a "preponderance of proof." *See Kerrigan v. Maxon Indus.*, 223 F. Supp. 2d 626, 630 (E.D. Pa 2002); *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999).

First, a proffered expert witness must possess skill or knowledge greater than the average layman. *See Waldorf v. Shuta*, 142 F. 3d 601, 625 (3d Cir. 1998).

Second, to be considered reliable, an expert's opinion must be based on the "methods and procedures of science" rather than on "subjective belief or unsupported

speculation," and the expert must have "good grounds" for his conclusions. *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003); *Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.*, No. 01-669-KAJ, 2004 WL 1534786 (D. Del. May 21, 2004) (Ex. 5). In addition to determining whether the expert has a proper basis for his opinion, the Court must determine if the expert's conclusions could reliably flow from the facts known to the expert and the methodology used. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145-46 (3d Cir. 2000); *Callaway*, 2004 WL 1534786. If the analytic gap between the data relied upon and the opinion proffered is simply too great, the opinion should be excluded. *Gen. Elect. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Oddi*, 234 F.3d at 146. Where there are "deficiencies in the foundation of the opinion," the expert's conclusions are "mere speculation" and inadmissible. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000).

The third requirement is that the expert's testimony fit, or that it assists the trier of fact. *See Oddi*, 234 F.3d at 145. The opinion must be based on valid reasoning and reliable methodology. *Id.*

In *General Electric*, the Supreme Court identified the need to provide justification for an expert's results.

> Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data by only the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

522 U.S. 136, 146.

### B. Dr. Blair's "Opinions" in Sections VIII-XI of His Report Are Not Expert Opinions Pursuant to *Daubert* and Rule 702

Dr. Blair admits that with respect to most of the most pertinent segments of sections VIII-XI of his report, he read articles and simply summarized what he felt was important to him, many times not even remembering what the article stated. (Ex. 4, Blair

5

Tr. 70:3-71:18). Dr. Blair's testimony is not that of one with "specialized knowledge" in any field, nor is it based on a reliable methodology, but as he admitted, is simply, in most cases, mere speculation based on his subjective conclusions. Allowing Dr. Blair to testify as an expert on these topics would not assist the trier of fact, but instead would prejudice, mislead, and confuse them; therefore, it should be excluded.

### 1. Dr. Blair offers nothing more than a layperson's opinion regarding the "Introduction of the Performance Solid Ball"

In Section VIII of his report, the Introduction of the Performance Solid Ball, Dr. Blair does little more than the average layperson would do in researching the history of the solid golf ball, which is exactly what makes him useless to the trier of fact as a witness.

He offers the unsupported opinion that the "performance solid ball revolution" began with the first multi-layered ball patent in 1984 and the introduction of Bridgestone's double-core balls in the mid-1980's. (Ex. 2, Blair 1/16/2007 Report at 17). Indeed, he admits that he never read the patent to which he refers, and has no idea the name of the Bridgestone ball. (Ex. 4, Blair Tr. at 68:12-70:2; 109:7-110:6). Further, Dr. Blair admits that his statement "[b]y the mid-1990's, most of industry had been turning away from wound balls," simply was the "opinion of manufacturers" in the industry that he read in the articles he found on-line. And, that he really had no idea what was going on at Acushnet when he said that "it appeared there was no effort to innovate in their [wound balls] design." (*Id.* at 122:20-124:8).

### 2. Dr. Blair cannot assist the trier of fact in understanding Bridgestone's "Innovations in Solid Ball Technology"

In Section IX of his report, Bridgestone's Innovations in Solid Ball Technology, Dr. Blair states that Bridgestone was a "leader in the development of new solid ball

6

technology, filing innovative patents and producing high performance golf balls." (Ex. 2, Blair 1/16/2007 Report at 18).

However, Dr. Blair has absolutely no reliable basis for his opinion. Indeed, Dr. Blair has no basis at all. Dr. Blair readily admits that he never read the prosecution histories of any of these patents; nor the prior art cited in the prosecution histories; nor any other golf ball patents at all. (Ex. 4, Blair Tr. 66:19-69:5).

Dr. Blair did not analyze the claims of the patent, nor did he identify which Bridgestone patents were used in which Bridgestone balls or if any of the patents were in use in the golf ball art at all. In assessing the significance of the patents, Dr. Blair states I "just read the patents." (*Id.* at 96:10-98:18). Although he read the patents, Dr. Blair has no idea what ball he is referring to when he mentions the Bridgestone ball that has a dual core. He simply read it some where. (*Id.* at 109:7-22).

Dr. Blair does not remember reading anywhere that Bridgestone was an "[i]nnovator in solid construction balls." (*Id.* at 111:2 – 114:11). This opinion simply come from reviewing the patents -- not analyzing the claims, the prior art, golf balls, nothing -- and looking at select documents from Bridgestone's counsel. (*Id.* at 99:3-101:18). It's as if Dr. Blair woke up one morning, did an internet search, reviewed the patents, and decided to state that the patents were innovative and inventive. The leap of faith that Dr. Blair is asking the trier of fact to make is too great based on the evidence. *See Gen. Elec.*, 522 U.S. at 146. (A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.).

Dr. Blair may have some experience generally in sports innovation, but he has no specific experience or knowledge of Bridgestone's innovation, if any, in solid ball technology or the inventiveness of the patents-in suit. Dr. Blair's testimony would not assist the trier of fact regarding these topics and, therefore should be excluded.

### 3. Dr. Blair admits he is merely speculating regarding "Acushnet's Entry into the Performance Solid Ball Market"

In Section X of his report, Blair states, without any support, that until the end of 2000, "Acushnet was quick to recognize, but slow to respond, to the industry shift in the 1990's and struggled to develop a successful entry into the performance solid ball market." (Ex. 2, Blair 1/16/2007 Report at 21).

Blair admits that this is merely speculation. Blair testifies that he did not "really feel that [] [he] had enough information about the details of the patents and what they were trying to do at that particular time" to opine whether or not Acushnet was having trouble designing around existing golf ball patents or "developing golf balls that were competitive on performance without infringing on Bridgestone's suite of intellectual property covering solid ball technology." (Ex. 4, Blair Tr. at 130:13-134:13).

Although Dr. Blair talks about the shift in the market and discusses Bridgestone's balls at the time, Dr. Blair admits that the article that he cites does not state that the market was heading to solid cores in the early 1990's and he does not know the construction of any of the Bridgestone balls to which he refers. (*Id.* at 126:3- 128:12).

In connection with Tiger Woods' switch to the Nike Tour Accuracy, Blair states that his opinion that the ball helped Tiger's performance is based on what he read in the articles he found on the internet. Although he states that Tiger's win with that ball "validated" Acushnet's evaluation of Bridgestone's ball, Dr. Blair did not attempt to determine which, if any, of the Bridgestone patents were used in the design of the Nike ball that Tiger used. (Ex. 4, Blair Tr. at 134:14-136:20).

Other than the few articles he read, Dr. Blair does not know what was going on in the golf ball industry in 2000, and he admittedly has no idea what was going on at Acushnet during that time period. Since Dr. Blair's testimony is pure speculation, it should be excluded. *Concord Boat,* 207 F.3d at 1057 (where there are "deficiencies in

8

the foundation of the opinion," the expert's conclusions are "mere speculation" and inadmissible).

### 4. Dr. Blair offers nothing more than a layperson's opinion regarding "Acushnet's Commercial Success with the Pro V1 Ball"

In Section XI of his report, Dr. Blair again simply relies on the articles obtained from the internet and Mr. Boehm's testimony to form his opinion regarding Acushnet's commercial success with the Pro V1 ball. (*See* Ex. 2, Blair 1/16/07 Report at 24-25). This is nothing more than a layperson would do and therefore his testimony should be excluded.

### C. Mr. Calabria Has No Reliable Basis for His Statements Regarding Acushnet's Entrance into the Solid Ball Market

Although Acushnet is not challenging Mr. Calabria's qualifications as an expert in the golf ball industry, Acushnet does challenge the admissibility of his testimony regarding Acushnet's entrance into the solid ball market. Bridgestone simply uses Mr. Calabria as another "talking head" to speculate on what was happening inside Acushnet in 2000 to support Bridgestone's innuendo that Acushnet was forced to copy Bridgestone's patents. On pages 16 and 17 of his opening expert report, Mr. Calabria opines that 1995-96, Acushnet "finally began to recognize the significance of this new multilayer solid ball technology," but it was not until 2000 that Acushnet "appears to have had no choice but to rush to produce a multilayer solid ball." (Ex. 3, Calabria 1/16/2007 Report at 16-17). Mr. Calabria has no support for this statement and his equivocation is obvious in the use of the phrase "appears to." This unreliable and speculative testimony is inadmissible under Rule 702.

9

## VI.  CONCLUSION

For the foregoing reasons, Acushnet respectfully requests the Court grant its motion to exclude the portions of the expert testimony of Kim Blair and John Calabria identified above.

POTTER ANDERSON & CORROON LLP

| OF COUNSEL: | By: /s/ David E. Moore |
|---|---|
|  | Richard L. Horwitz (#2246) |
| Alan M. Grimaldi | David E. Moore (#3983) |
| Joseph P. Lavelle | Hercules Plaza, 6th Floor |
| Kenneth W. Donnelly | 1313 N. Market Street |
| HOWREY LLP | P.O. Box 951 |
| 1299 Pennsylvania Ave., N.W. | Wilmington, DE  19899-0951 |
| Washington, DC  20004 | (302) 984-6000 |
| Telephone: (202) 783-0800 | rhorwitz@potteranderson.com |
|  | dmoore@potteranderson.com |
| Dated:  May 8, 2007 |  |
| Public Version Dated:  May 15, 2007 | *Attorneys For Defendant* |
| 795622/28946 | *Acushnet Company* |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**CERTIFICATE OF SERVICE**

I, David E. Moore, hereby certify that on May 15, 2007, the attached document was hand delivered to the following persons and was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading:

Jack B. Blumenfeld
Maryellen Noreika
Leslie A. Polizoti
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
Wilmington, DE 19801

I hereby certify that on May 15, 2007, I have Electronically Mailed the documents to the following:

Robert M. Masters
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, D.C. 20005
RobMasters@paulhastings.com

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

680012 / 28946