# EXHIBIT 1

## WITNESSES BRIDGESTONE INTENDS TO CALL IN PERSON

Bridgestone presently intends to call the witnesses identified below to testify in person at trial, or by deposition if unavailable. Bridgestone reserves the right to call any witness identified on Acushnet's witness list, and to call rebuttal witnesses as appropriate.[1]

### FACT WITNESSES

| NAME | ADDRESS |
|---|---|
| Dan Murphy | Bridgestone Golf, Inc.<br>14320 Lochridge Blvd.<br>Covington, GA 30014 |
| Seisuka Tomita | c/o Bridgestone Sports Co., Ltd.<br>Omori Bellport E Bldg., 6-22-7<br>Minami-oi, Shinagawa-ku, Tokyo<br>140-0013 Japan |
| Michael Jordan | c/o Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
| Yoshinori Egashira | Bridgestone Sports Co., Ltd.<br>Omori Bellport E Bldg., 6-22-7<br>Minami-oi, Shinagawa-ku, Tokyo<br>140-0013 Japan |
| Hideo Watanabe | Bridgestone Sports Co., Ltd.<br>Omori Bellport E Bldg., 6-22-7<br>Minami-oi, Shinagawa-ku, Tokyo<br>140-0013 Japan |
| Jun Shindo | Bridgestone Sports Co., Ltd.<br>Omori Bellport E Bldg., 6-22-7<br>Minami-oi, Shinagawa-ku, Tokyo<br>140-0013 Japan |
| Hiroshi Higuchi | Bridgestone Sports Co., Ltd.<br>Omori Bellport E Bldg., 6-22-7<br>Minami-oi, Shinagawa-ku, Tokyo<br>140-0013 Japan |
| Jun Ichinose | Bridgestone Sports Co., Ltd. |

---

[1]    A revised list of witnesses will be provided once the Court determines whether or how the trial of this case will be phased.

| | Omori Bellport E Bldg., 6-22-7 Minami-oi, Shinagawa-ku, Tokyo 140-0013 Japan |
|---|---|
| Atsuki Kasashima | Bridgestone Sports Co., Ltd. Omori Bellport E Bldg., 6-22-7 Minami-oi, Shinagawa-ku, Tokyo 140-0013 Japan |
| Shigeru Nakayama | Bridgestone Golf, Inc. 14320 Lochridge Blvd. Covington, GA 30014 |
| Akihiko Morikawa | JSR Corporation Hamarikyu Park Side Place 5-6-10 Tsukiji, Chuo-ku Tokyo 104-8410 Japan |
| Peter Voorheis | c/o Acushnet Company 333 Bridge Street Fairhaven, MA 02719 |
| Shenshen Wu | c/o Acushnet Company 333 Bridge Street Fairhaven, MA 02719 |
| Stan Grissinger | Nike Golf One Bowerman Dr. (RG3038) Beaverton, OR 97005-6453 |

## EXPERT WITNESSES

| NAME | ADDRESS |
|---|---|
| John Calabria | Double Eagle Consulting, LLC 741 Shefwood Drive Easly, SC 29642 |
| Nick Price | c/o Bridgestone Golf, Inc. 14320 Lochridge Blvd. Covington, GA 30014 |
| Dr. Edward M. Caulfield, Ph.D., P.E. | Packer Engineering, Inc. P.O. Box 353 1950 N. Washington St. Naperville, IL 60566-0353 |
| Larry Cadorniga | LCC International B179 Namunga Rosario, Baangas Philippines 4225 |

| Dr. E. Bryan Coughlin | Department of Polymer Science and Engineering<br>Room A612, Conte Research Center<br>University of Massachusetts<br>120 Governors Drive<br>Amherst, MA 01003 |
| --- | --- |
| Dr. Kim B. Blair | Massachusetts Institute of Technology<br>Department of Aeronautics and Astronautics, 7-110<br>77 Massachusetts Avenue<br>Cambridge, MA 02139-4307 |
| Dr. Avraam I. Isayev | The University of Akron<br>Institute of Polymer Engineering<br>Akron, OH 44325-0301 |
| Dr Rabindra D. Mehta | Fluid Mechanics Laboratory<br>Mail Stop 260-1, NASA Ames Research Center<br>Moffett Field, CA 94035-1000 |
| John C. Jarosz | Analysis Group<br>1899 Pennsylvania Avenue N.W., Suite 200<br>Washington, DC 20006 |

## Specialties of the Experts to be called as witnesses

Summaries of the specialties of the experts Bridgestone intends to call are set out below. Further details are set out in their expert reports and CVs attached thereto.

### John Calabria
*Owner, Principal Consultant, Double Eagle Consulting, LLC*

Mr. Calabria has more than 20 years of research, development and manufacturing experience specific to the golf industry. During his career, he has worked for the largest golf companies.

From 2005 until the present, Mr. Calabria has been the owner of, and principal consultant for, Double Eagle Consulting, LLC where his responsibilities include consulting to the golf ball industry in the areas of tooling, manufacturing improvements, product enhancements, equipment design and intellectual property issues. From 2003 through the end of 2004, Mr. Calabria was employed by TaylorMade-adidas Golf as Head of Golf Ball Technical Operations. From 1995 through the end of 2003, Mr. Calabria was employed by Dunlop Slazenger Group as Vice President – Golf R&D Worldwide. From 1988 through 1995, Mr. Calabria was employed by

Titleist/FootJoy Worldwide as a Senior Project Manager – R&D (1988-1993) and Senior Project Manager – Urethane (1993-1995). Mr. Calabria also worked at Spalding Sports Worldwide as a Manager, Industrial Engineering.

Mr. Calabria earned a Bachelor of Science Degree in Zoology and Chemistry in 1972 from the University of Massachusetts in Amherst, MA. He earned a Master of Science Degree in Mechanical Engineering in 1976 from the University of Massachusetts in Amherst, MA.

Mr. Calabria's testimony will cover the game of golf in general. He will testify as to golf ball performance characteristics, and the effects of different design parameters on performance. Mr. Calabria will also testify as to the historical development of golf ball technology, in particular, the transition from wound ball to solid ball technology. Mr. Calabria may also offer testimony rebutting assertions by Acushnet that Bridgestone's patents are invalid.

<u>**Nick Price**</u>
*Member, PGA Champions Tour*

Mr. Price is a professional golfer on the PGA's Champions Tour. He began his professional golf career in 1977 on the Southern Africa Tour, before moving to the European Tour and then to the PGA Tour in 1983. Mr. Price has 18 PGA Tour wins.

Mr. Price has many other wins on the European Tour and in other sanctioned tournaments. By the mid-90s, Mr. Price was regarded as the best player in the world, and in 1994 he won two majors back-to-back, The Open Championship (*a.k.a*, the British Open) and the PGA Championship, adding to his first major (also the PGA Championship) from 1992. He topped the PGA Tour money list in 1993 and 1994, setting a new earnings record each time, and spent 43 weeks at number 1 in the Official World Golf Rankings. Mr. Price was inducted into the World Golf Hall of Fame in 2003. In 2005, he was awarded the Bob Jones Award, the highest honor given by the United States Golf Association in recognition of distinguished sportsmanship in golf.

Mr. Price will testify as to the historical development of golf ball technology, in particularly, the transition from wound ball technology to solid ball technology, how a golf ball

is evaluated by a golfer, including the parameters of spin, feel, distance, control, and compression. Mr. Price will also testify as to Bridgestone's role in the development of solid golf ball technology.

### Dr. Edward Caulfield, Ph.D., P.E.
*President and Chief Technical Officer*
*Packer Engineering, Inc.*

Dr. Caulfield is the President and Chief Technical Officer of Packing Engineering, Inc. Packer Engineering is a multi-disciplinary engineering consulting and technical services company with locations in Naperville, Illinois, Washington D.C., and Ann Arbor, Michigan.

Dr. Caulfield received his doctorate in theoretical and applied mechanics from the University of Illinois at Champaign/Urbana in 1978. He is a registered Professional Engineer in the States of Illinois and Florida. Prior to joining Packer Engineering in 1979, Dr. Caulfield was an Assistant Professor in the Department of Mechanical Engineering at the University of Illinois. At the University of Illinois, he taught courses in dynamics, vibration, material science and design of machinery. Dr. Caulfield is a member of Sigma Xi (Scientific Honorary Society) and has published and/or presented over 20 technical papers. Dr. Caulfield's expertise encompasses a wide array of engineering disciplines, including material properties, behavior of materials, and testing those properties and behaviors.

Dr. Caulfield will testify as to testing and analysis conducted by him and protocols of testing the accused Acushnet golf balls as well as the results of those test. He will also testify as to the testing done on alleged prior art golf balls and golf ball cores. Dr. Caulfield will also testify in rebuttal as to testing done on articles related to Acushnet's invalidity positions.

### Larry C. Cadorniga
*Principal, LCC Consulting*

Mr. Cadorniga has more than 30 years of experience in research and development in the golf industry. Mr. Cadorniga is the inventor of many U.S. Patents. During his career, Mr. Cadorniga has successfully developed, introduced and manufactured over 55 unique products for the golf industry. He has worked for the largest companies in the golf industry, including

Bridgestone Sports v. Acushnet Company
Civil Action No. 05-132(JJF)
Pre-Trial Order, Exhibit __ .

Page 5 of 13

Acushnet/Titleist, Wilson Sporting Goods, Dunlop-Slazenger Corp., MacGregor Golf Company and Bobby Grace Golf Designs. He has held positions of Director of Golf Ball Operations, Director of Research and Development, Senior Chemist, Manufacturing Manager, Manager of Product Engineering, Manufacturing Supervisor, and Manager of Product Development.

Mr. Cadorniga studied chemical engineering at the University of Santo Tomas in Manila, Philippines and has taken courses in the field of rubber technology and management at the Philips Cross Quality College in Atlanta, Georgia.

Mr. Cadorniga will testify as to Acushnet's infringement of the Bridgestone patents-in-suit. Mr. Cadorniga may also offer testimony rebutting assertions by Acushnet witnesses that the Bridgestone patents-in-suit are invalid.

### Dr. E. Bryan Coughlin
*Association Professor of Polymer Science and Engineering*
*University of Massachusetts*

Dr. Coughlin is an Associate Professor of Polymer Science and Engineering. He earned his B.A. Chemistry from Grinnell College 1988 and his Ph.D. in Chemistry from the California Institute of Technology in 1993.

Dr. Coughlin has received many awards, including the National Science Foundation (NSF) Career Award in 2003, the 3M Non-Tenured Faculty Awards in 2000, 2001 and 2002, the OMNOVA Solutions Signature University Faculty Award in 2000 and the DuPont Young Faculty Award in 2003, 2004 and 2005.

Dr. Coughlin will testify as to Acushnet's infringement of some of the Bridgestone patents-in-suit. Dr. Coughlin may also offer testimony rebutting assertions by Acushnet that the Bridgestone patents-in-suit are invalid.

### Dr. Kim B. Blair
*Director, Center for Sports Innovation*
*Massachusetts Institute of Technology*

Dr. Blair is the Founding Director of the MIT Center for Sports Innovation ("CSI"). CSI develops new technologies and products enhancing all aspects of the sporting experience, as well

as processes and technologies for related performance analyses. As a result of their contributions to the sporting industry, Mr. Blair and CSI have been nationally recognized and have been featured in *Forbes* magazine, the *Boston* Globe, *Outside* magazine, *GQ* magazine, and programs by CNN, the Discovery Channel, NPR, and local network affiliates.

Dr. Blair provides a wide variety of consulting services to the sports industry, including leading product development projects, conducting performance testing of existing and prototype products, and creating concepts for enhancing the experience for sports spectators. As a member of the board of advisors for emerging companies developing innovative sports products using advanced technology, Dr. Blair provides expertise on business and strategic planning, technology assessment and development, development of strategic alliances, and assistance with raising capital.

A recognized expert in sport technology and innovation, Dr. Blair has spoken at the Lemelson Foundation, the Boston Museum of Science, The University of London, and Loughborough University in the UK, and the MIT Center for Innovation and Product Development. Dr. Blair is a technical advisor on sports equipment design for the United States Olympic Committee.

Dr. Blair's professional affiliations include membership in the International Sports Engineering Association, the American Society of Mechanical Engineers, the American Society of Testing and Materials, and the American Society of Biomechanics. He has served as a reviewer for Journal of Sound and Vibration, AIAA Journal of Aircraft and the Journal of Sports Engineering.

Dr. Blair earned a B.A. in Psychology and a B.S. in Mechanical Engineering at the University of Nebraska. At Purdue University, he earned an M.S. in Mechanical Engineering and a Ph.D in Aeronautics and Astronautics.

Dr. Blair will testify as to advancement of technology in sports, including golf, the innovation of solid, multi-layer technology compared to thread wound balls, and the innovation and impact of Bridgestone's golf ball technology compared to conventional thread-wound golf ball technology.

**Dr. Avraam I. Isayev**
*Distinguished Professor of Polymer Engineering*
*University of Akron*

Dr. Isayev is the Distinguished Professor of Polymer Engineer at the University of Akron's Institute of Polymer Engineering. Dr. Isayev earned a Masters of Science in Chemical Engineering from the Azerbaijan Institute of Oil and Chemistry in 1964, a Masters of Science in Applied Mathematics from the Institute of Electronic Machine Building in Moscow in 1965 and his Ph.D. in Polymer Engineering from the Institute of Petrochemical Synthesis of the USSR in 1970.

Dr. Isayev has held numerous academic and professional positions during his career. In addition to his professorship at the Institute of Polymer Engineering at the University of Akron, a position he has held since 1983, Dr. Isayev has been a Director of Molding Technology Research and Development Center (MOLDTECH) since 1990, was an senior research associate at the Sibley School of Mechanical and Aerospace Engineering at Cornell University from 1979 to 1983, and was a senior research fellow at the Israel Institute of Technology from 1977 to 1979.

Dr. Isayev currently serves on the editorial board of the *Encyclopedia of Polymer Science* (since 2005) and *Technology and for the Journal of Elastomers and Plastics* (since 1992) and has previously served on the editorial board of the *Advances in Polymer Technology* journal. Dr. Isayev's research has been featured in *Business Week* (1993), *Popular Science* (1994), *Environmental Remediation* Technology (1993), *Vibrations*, The Newsletter of Ultrasonic Industry Association (1994), *Tire Business* (1995), *Technical Insights Newsletter* (1997), *Rubber and Plastics News* (1999), Chemical Engineering (1999), NSF Science News (2000), *AAAS Science Update* (2000), *Plastics Technology* (2001), *Boston Globe* (2002) and other publications and newspapers around the world

Dr. Isayev will testify as to the invalidity and non-infringement issues related to Acushnet's '705 patent.

**Dr. Rabindra D. Mehta**
*Research Scientist, Fluid Mechanics Laboratory*
*NASA Ames Research Center*

Dr. Mehta is a research scientist in the Fluid Mechanics Laboratory at NASA Ames Research Center, located in California's Silicon Valley. He also works as a consultant to the sports industry.

Dr. Mehta obtained a B.Sc. (Honours) degree in Aeronautical Engineering from Queen Mary College, University of London in 1975 and a Ph.D. degree from the Department of Aeronautics at Imperial College of Science and Technology, University of London, in 1979. His postgraduate specialization was in experimental fluid mechanics and aerodynamics.

Dr. Mehta has been studying sports ball aerodynamics for over 25 years. In particular, his experience extends to experimental testing of sports balls to measure their aerodynamic forces and performance. This includes specially designed studies which reveal the critical factors that affect the ball aerodynamics. His review article, *Aerodynamics of Sports Balls* published in 1985 was the first of its kind and it is still regarded as the baseline article on the subject.

Dr. Mehta has extensive knowledge and experience in the field of golf ball aerodynamics, including the design and impact of dimples on the aerodynamics of golf balls. He has also participated in outdoor range testing of golf balls with novel dimple designs and in the measurement of lift and drag forces on spinning golf balls using indoor testing facilities. He has studied the aerodynamics of baseballs, golf balls, cricket balls and volleyballs and has recently participated in a project on tennis balls. He has extensive expertise with all kinds of sports balls and their aerodynamics and has have written several articles on the subject. Dr. Mehta's mainline research work focuses on experimental studies of complex aerodynamic flows and advanced instrumentation development. Dr. Mehta has authored over 30 publications on sports ball and sports equipment aerodynamics (22 in the last 10 years) and over 115 publications on his mainline research work.

Dr. Mehta will testify on issues related to the non-infringement of Acushnet's '861, '587 and '367 patents.

### John C. Jarosz
*Managing Principal, Analysis Group*

Mr. Jarosz is a managing principal of Analysis Group, Inc. and director of the firm's Washington, DC office. Mr. Jarosz is an economist whose specialty is intellectual property valuation and monetary relief assessment. He has been involved in more than 200 such assessments spanning a broad range of industries, including sporting goods.

Mr. Jarosz earned his B.A. in Economics and Organizational Communication from Creighton University and his M.A. in Economics from Washington University where he was a Ph.D. candidate. Mr. Jarosz has also earned his J.D. from the University of Wisconsin.

Mr. Jarosz has testified at trial on intellectual property and related issues over three dozen times. He has significant expertise evaluating and testifying on damages in patent, trademark, copyright, trade secret, and unfair competition cases. He has worked on significant cases such as the Kodak/Polaroid patent infringement litigation, the Apple Computer/Microsoft/Hewlett-Packard copyright infringement litigation, and the *Michelson v. Medtronic* breach of contract litigation. He has assisted clients across a variety of industries, including semiconductors, computer hardware and software, medical devices, consumer products, biotechnology, and pharmaceuticals.

Mr. Jarosz is a frequent lecturer and writer on intellectual property issues and has been both a columnist and advisory board member of *The IP Litigator*. He is an active member of the Licensing Executives Society and belongs to the American Economic Association and the American and Wisconsin Bar Associations.

Mr. Jarosz will offer testimony relating to a reasonable royalty and as to the damages to which Bridgestone is entitled due to Acushnet's infringement of the Bridgestone patents-in-suit.

## WITNESSES BRIDGESTONE INTENDS TO CALL BY DEPOSITION

Bridgestone presently intends to call the witnesses identified below to testify in person or by deposition at trial. Bridgestone reserves the right to call any witness identified on Acushnet's witness list, and to call rebuttal witnesses as appropriate.[2]

### FACT WITNESSES

| NAME | ADDRESS |
|---|---|
| Steven Aoyama | Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
| Eric Bartsch | Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
| Jerry Bellis | Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
| Laurent Bissonnette | Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
| Herb Boehm | Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
| Dave Bulpett | Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
| William Burke | Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
| Chris Cavallaro | Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |

---

[2]    A revised list of witnesses will be provided once the Court determines how the trial of this case will be phased.

| | |
|---|---|
| Jeff Dalton | Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
| Patrick Elliott | Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
| Rastko Gajic | Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
| Ed Hebert | Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
| Michael Jordan | c/o Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
| Doug Jones | Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
| Derek Ladd | Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
| Troy Lester | Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
| Francis deS. Lynch | c/o Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
| Bill Morgan | Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
| Joseph Nauman | Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
| Traci Olson | Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
| Murali Rajagopalan | Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |

| Peter Voorheis | c/o Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
|---|---|
| Ken Welchman | Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
| Jay Williams | Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |
| Shenshen Wu | c/o Acushnet Company<br>333 Bridge Street<br>Fairhaven, MA 02719 |

# EXHIBIT 2

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 3

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 4

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 5



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1534786 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

Callaway Golf Co. v. Dunlop Slazenger Group
Americas, Inc.
D.Del.,2004.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
CALLAWAY GOLF COMPANY, Plaintiff/Defendant-in-Counterclaim,
v.
DUNLOP SLAZENGER GROUP AMERICAS,
INC., d/b/a Maxfli, Defendant/
Plaintiff-in-Counterclaim.
**No. Civ.A. 01-669-KAJ.**

May 21, 2004.

Jack B. Blumenfeld, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Plaintiff/Counter Defendant.
David J. Ferry, Jr., Ferry, Joseph & Pearce, P.A., Wilmington, DE, for Defendant/Counter Claimant.

*MEMORANDUM ORDER*
JORDAN, J.

### I. Introduction

*1 Presently before me is a motion by Callaway Golf Company ("Callaway") to exclude the testimony of Dr. Lewis M. Koppel ("Dr.Koppel") (Docket Item ["D.I."] 316), a motion by Callaway to exclude portions of Dr. John Jepson's ("Dr.Jepson") testimony (D.I.318), and a motion by Callaway to exclude the testimony of Dr. Daniel Klempner ("Dr.Klempner") (D.I.320), all expert witnesses of Dunlop Slazenger Group Americas, Inc. d/b/a Maxfli ("Dunlop"). Also before me is a motion by Callaway for partial summary judgment on grounds that Dunlop cannot prove damages on its trade secret, common law, or false advertising claims. (D.I.312.) I have jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1338, and 1367. For the reasons set forth below, the motion to exclude Dr. Koppel's testimony will be granted in part and denied in part, the motion to exclude portions of Dr. Jepson's testimony will be granted, and the motion to exclude Dr. Klempner's testimony will

be granted. The motion for partial summary judgment will be denied.

### II. Background

Because the factual and procedural history of this case is set forth in three prior rulings, *see* Memorandum Opinion dated May 13, 2004 (D.I.359), Memorandum Opinion dated May 18, 2004 (D.I.362), and Memorandum Order dated May 18, 2004 (D.I.360), it will not be repeated herein. Rather, the facts pertinent to the motions currently before me are incorporated in the discussion below.

### III. Standard of Review

The motions to exclude evidence are committed to the court's discretion. See *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 749, 777-78 (3d Cir.1994) (on a motion to exclude proffered expert testimony, the trial court's inquiry is a flexible one, and its decision to admit or exclude expert testimony is reviewed under an "abuse of discretion" standard).

The summary judgment standard is well known. Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." "[T]he availability of summary judgment turn[s] on whether a proper jury question ... [has been] presented." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* In making that determination, the Court is required to accept the non-moving parties' evidence and draw all inferences from the evidence in the non-moving parties' favor. *Id.* at 255; *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Nevertheless, the non-moving party must, in opposing a summary judgment motion, "identify those facts of record which would contradict the facts identified by the movant." *Port Authority of New York and New*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1534786 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

*Jersey v. Affiliated FM Ins. Co.,* 311 F.3d 226, 233 (3d Cir.2002) (internal quotes omitted).

## IV. Discussion

**\*2** Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Rule provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702 (2003). The party offering the expert testimony has the burden of proving admissibility. *Daubert,* 509 U.S. at 592 n. 10. The subject of an expert's testimony must be grounded in the methods and procedures of science and based on more than a subjective belief or speculation. *Id.* at 589-590. Further, Rule 702 requires that expert testimony assist the trier of fact, in other words, it must "fit" the issues in the case by having a "valid scientific connection to the pertinent inquiry." *Id.* at 591-92.

In determining "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact," the court must assess whether the methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts in issue. *Id.* at 592-93. As part of that inquiry, the court must examine the expert's conclusions in order to determine whether they reliably follow from the facts known to the expert and the methodology used. *See Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 153 (3d Cir.1999).

A party cannot qualify a person as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue. *Redman v. John D. Brush & Co.,* 111 F.3d 1174, 1179 (4th Cir.1997); *Barrett v. Atl. Richfield Co.,* 95 F.3d 375, 382 (5th Cir.1996). Moreover, testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the fact-finder. *McGowan v.*

*Cooper Indus., Inc.,* 863 F.2d 1266, 1273 (6th Cir.1987); *STX, Inc. v. Brine, Inc.,* 37 F.Supp.2d 740, 768 (D.Md.1999) (quotation omitted), *aff'd,* 211 F.3d 588 (Fed.Cir.2000); *SEC v. Lipson,* 46 F.Supp.2d 758, 763 (N.D.Ill.1998).

### A. Dr. Koppel

Dunlop has retained Dr. Koppel, as an expert, to quantify Dunlop's economic damages resulting from Callaway's alleged misappropriation of trade secrets described in the documents that Henry Felipe ("Felipe") took with him to Callaway after he was laid off at Dunlop (the "Felipe binder"),[FN1] and from Callaway's alleged misappropriation of Dunlop's polyurethane technology through Pijush Dewanjee ("Dewanjee").[FN2] (D.I. 327 at 24; D.I. 322 at Ex. A; D.I. 327 at 5-16.) First, Dr. Koppel estimated that Callaway was unjustly enriched in the amount of \$10.4 million because of avoided research and development costs through Callaway's use of the Felipe binder. (D.I. 327 at 25.) Second, Dr. Koppel asserts that Dunlop lost profits in the amount of \$8.1 million from decreased golf ball sales during the years 2000 through 2006 because of Callaway's use of the Felipe binder. (*Id.* at 25-26.) Third, Dr. Koppel claims that Dunlop is entitled to approximately \$11.3 million in royalty damages for the research and development costs that Callaway avoided by having the information in the Felipe binder rather than creating it independently, and for the head start, or accelerated market entry, that Callaway received by using that information. (*Id.* at 26.) Finally, Dr. Koppel claims that Dunlop is entitled to about \$11 .3 million in royalty damages for Callaway's misappropriation of Dunlop's polyurethane technology.[FN3]

> FN1. The Felipe binder includes Dunlop's "Golf Ball Specifications and Process Manual."

> FN2. In my May 13, 2004 Memorandum Opinion, I held as a matter of law that Callaway, through Dewanjee, had not misappropriated trade secrets. (D.I.359.)

> FN3. Specifically, Dunlop claims that "Dr. Koppel uses the connection between

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1534786 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

[Dunlop's] Polyurethane Trade Secrets and [Callaway's U.S. Patent No. 6,117,024 (the " '024 patent") ] to substantiate his use of analyses most commonly used in patent valuation." (D.I. 327 at 27.)

*3 Callaway argues that Dr. Koppel's testimony should be excluded under *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) because Dr. Koppel's methodology and conclusions "are speculative and unreliable, do not fit the facts and circumstances of this case, and are inconsistent with damage measures required by law." (D.I. 317 at 2.) First, Callaway argues that Dr. Koppel's unjust enrichment analysis, which considers Callaway's avoided research and development costs, does not take into account the extent to which Callaway actually used or benefitted from the information contained in the Felipe binder. (*Id.*) Callaway states that Dr. Koppel "deliberately chose to assess [Callaway's] avoided [research and development] expenses by calculating the amount that [Callaway] would have had to spend to recreate all of the information contained in the Felipe [binder] without analyzing what information from the Felipe [binder] [Callaway] actually used." (*Id.* at 15.) Callaway also claims that Dr. Koppel did not consider whether Callaway's research and development spending would have been different if it did not have the Felipe binder, and, as a result, included the cost of an item in his avoided research and development costs even if Callaway incurred the cost. (*Id.*)

Second, Callaway argues that Dr. Koppel's $10.4 million damages figure makes numerous erroneous factual assumptions, including the assumption that the Felipe binder contains information on 82 different golf balls [FN4] (*Id.* at 16-17), the assumption that the Felipe binder describes 82 different paint systems [FN5] (*Id.* at 18-19), and the assumption that the Felipe binder contains information on patent searches and competitive golf ball analyses. [FN6] (*Id.* at 19-20.)

> FN4. Callaway asserts that there are 82 separate specification sheets contained in the Felipe binder, but many of those describe identical golf balls.

> FN5. Callaway claims that there are at most two paint systems described in the Felipe binder.

> FN6. Competitive golf ball analyses provide information about other companies' balls, which is obtained by taking the balls apart and examining them. Callaway says that there is no information about patent searches or competitive golf ball analyses in the Felipe binder.

Third, Callaway argues that Dr. Koppel's measure of damages for the profits Dunlop lost as a result of Callaway's entrance into the golf ball market sooner than it would have if Callaway did not have the Felipe binder damages is not supported by evidence. Specifically, Callaway claims that Dr. Koppel's opinion that it should have take Callaway five years to develop its first golf ball is flawed and that Dr. Koppel erroneously assumes that Callaway would have made no golf ball sales until 2007 without the Felipe binder. (*Id.* at 21-22.)

Fourth, Callaway argues that Dr. Koppel's calculation for royalties should be excluded because it is based on his avoided research and development costs and lost profits conclusions, which, according to Callaway, are inadmissible. (*Id.* at 23.)

Finally, Callaway argues that Dr. Koppel should be excluded from testifying on the damages allegedly resulting from Callaway's use of the '024 patent because, among other things, Callaway did not misappropriate Dunlop's trade secrets in the '024 patent. (*Id.* at 23-28.)

As to that fifth and final argument, because Callaway did not misappropriate trade secrets related to polyurethane technology, as I held in the May 13, 2004 Memorandum Opinion (D.I.359), Dr. Koppel's testimony on those points will be excluded. However, as to Dr. Koppel's testimony regarding the information contained in the Felipe binder, Callaway's arguments are matters for cross examination because Dr. Koppel's opinions, while arguably flawed and open to attack, are not so devoid of fit or reliability as to be inadmissible. Therefore, the motion to exclude Dr.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1534786 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Koppel's testimony will be granted in part and denied in part.

### B. Dr. Jepson

*4 Dunlop has retained Dr. Jepson, who "has worked in the golf industry for some 30 years" (D.I. 328 at 12), to testify regarding "Callaway's accelerated entry into the golf ball market as a result of misappropriating Dunlop's alleged proprietary information. (*Id. at 7.*) Dunlop states that Dr. Jepson "is not a 'forensic economic expert' who will offer a formal valuation opinion," and that it "has no intent to offer any calculations by [Dr.] Jepson as a competing valuation to the economic analysis offered by Dr. Lewis Koppel." (*Id. at 6-7.*) Rather, Dunlop claims that "Dr. Jepson's opinions merely add 'real world' corroboration to [Dr.] Koppel['s] valuation" and "suggest[ ] that [Dr.] Koppel['s] valuations are conservative." (*Id. at 1.*) Callaway asserts that Dr. Jepson has opined that Callaway's alleged misappropriation of the Felipe binder and Dunlop's polyurethane technology resulted in at least $74 million in unjust enrichment to Callaway. (D.I. 319 at 4; D.I. 323 at Ex. J, pp. 12-13.)

Callaway does not challenge Dr. Jepson's opinions that the trade secrets at issue are "valuable," and that Callaway allegedly acquired "valuable information" that "greatly accelerated Callaway's entry into the golf ball market." (D.I. 344 at 3) (quoting D.I. 328 at 2, 11, 17). Remarkably, Callaway also does not challenge Dr. Jepson's "generic" opinion that "Dr. Koppel's forensic damages number is conservative." (D.I. 344 at 3.) Rather Callaway argues that Dr. "Jepson's testimony should not extend to asserting dollar figures purporting to 'quantify' the value of the trade secret information" because Dr. Jepson's unjust enrichment values and dollar amounts fail to meet the reliability and relevance standards under Fed.R.Evid. 702 and *Daubert*. (D.I. 344 at 3-4.) I agree.

Dunlop's Answering Brief and Dr. Jepson's expert report both fail to explain how Dr. Jepson arrived at his claim that Callaway was unjustly enriched by $74 million from the misappropriation of Dunlop's trade secrets. (*See* D.I. 328; D.I. 323 at Ex. J.) Therefore, Dr. Jepson's unjust enrichment estimate appears to be based solely on his personal knowledge and experience rather than any methodology, analysis, or factual support. Under *Daubert*, such evidence is not reliable. *See Primavera Familienstiftung v. Askin*, 130 F.Supp.2d 450, 530 (S.D.N.Y.2001) (An expert "must do more than simply aver conclusorily that his experience led to his opinion"); *LinkCo., Inc., v. Fujitsu Ltd.*, No. 00 Civ. 7242(SAS), 2002 WL 1585551 at *4 (S.D.N.Y. July 16, 2002) ("[A] court cannot permit experts to 'offer credentials rather than analysis' ") (citation omitted). In addition to proffering unreliable testimony, Dunlop concedes that Dr. Jepson is "not qualified to independently opine on trade secrets quantification." (D.I. 328 at 2.) Therefore, Callaway's motion to exclude Dr. Jepson from opining or testifying as to the dollar amounts set forth in his expert report will be granted.

### C. Dr. Klempner

*5 Dunlop has retained Dr. Klempner, a polymer chemist, to testify that Callaway misappropriated Dunlop's trade secrets
through Dewanjee's systematic incorporation of each and every ingredient of Dunlop's proprietary polyurethane formula into the initial Callaway cover formula. This includes a polyurethane cove formulation using a diisocyanate with a PTMEG polyol to form a prepolymer, cured with a curing agent blend, such as is disclosed, or should have been disclosed, in the Dunlop February, 1997 Patent Application and/or Dewnajee's Dunlop laboratory notebook. This also includes the use of PPDI as the diisocyanate component of a polyurethane-based cover formulation, in general, and specifically as the diisocyanate component of Dunlop's polyurethane cover system.

(D.I.329.) Dr. Klempner also opines that Callaway's development of its two polyurethane-based cover formulations was expedited by its use of Dunlop's trade secret technology.

As earlier stated, I have already ruled on summary judgment that Callaway did not misappropriate Dunlop's trade secrets in relation to Dewanjee's work. Therefore, the motion to exclude Dr. Klempner's testimony will be granted.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1534786 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

### D. Motion for Partial Summary Judgment

Callaway brings a motion for partial summary judgment on grounds that Callaway cannot prove damages on its trade secret, common law, or false advertising claims. (D.I.312.) Callaway argues that "[i]f this Court grants [Callaway's] motion to exclude Koppel's testimony and damage measures ... [Dunlop] can make no showing that it suffered any damages recoverable under the UTSA-even if [Dunlop] is entitled to summary judgment on [Dunlop's] trade secret claim," and is thus is entitled to summary judgment on Dunlop's trade secret misappropriation claim. (D.I. 313 at 6.) Since Callaway's motion to exclude Dr. Koppel's testimony is denied as to the information in the Felipe binder, the summary judgment motion is likewise denied as to Dunlop's misappropriation and common law claims involving that information.[FN7]

> **FN7.** As to damages related to Dunlop's claim that Callaway misappropriated polyurethane technology, the present motion is moot because summary judgment has already been granted against Dunlop on that claim. (*See* D.I. 359.)

### V. Conclusion

Accordingly, and as explained herein, IT IS HEREBY ORDERED that the motion to exclude Dr. Koppel's testimony (D.I.316) is GRANTED in part and DENIED in part, the motion to exclude the challenged portions of Dr. Jepson's testimony (D.I.318) is GRANTED, and the motion to exclude Dr. Klempner's testimony (D.I.320) is GRANTED. The motion for partial summary judgment on grounds that Callaway cannot prove damages on its trade secret, common law, or false advertising claims (D.I.312) is DENIED.

D.Del.,2004.
Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.
Not Reported in F.Supp.2d, 2004 WL 1534786 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.