# EXHIBIT 1

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 2



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1898839 (N.D.Ill.)
(Cite as: 2000 WL 1898839 (N.D.Ill.))

**H**
Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
PACTIV CORPORATION, formerly known as Tenneco Packaging and Consumer Products,
Inc., Plaintiff,
v.
S.J. JOHNSON & SON, INC. and KCL Corporation,
Defendants.
No. 98 C 2679.

Nov. 29, 2000.

*MEMORANDUM OPINION AND ORDER*
KENNELLY, J.

*1 In this patent infringement action, plaintiff Pactiv Corp. (formerly known as Tenneco Packaging and Consumer Products, Inc.), the manufacturer of Hefty One Zip reclosable plastic storage bags, claims that the Slide-Loc reclosable plastic storage bag, manufactured by defendant KCL Corporation for defendant S.J. Johnson & Son, Inc., infringes U.S. Patent No. 5.007.143, which Pactiv holds. Just over a year ago, the Court issued a Memorandum Opinion and Order in which it construed four disputed terms found in various claims in the '143 patent. *Tenneco Packaging Specialty and Consumer Products, Inc. v. S.C. Johnson & Son, Inc., No. 98 C 2679, 1999 WL 1044840 (N.D.Ill. Nov. 16, 1999).* Now that discovery has been completed, the parties have filed a series of motions seeking summary judgment on various claims and defenses and to limit evidence on certain issues. Among other motions, defendants have moved for summary judgment on the issue of infringement, and plaintiff has likewise moved for summary judgment on that issue. For the reasons that follow, the Court denies plaintiff's motion and grants defendants' motion.

Background
Pactiv's One Zip bags open and close by means of a "rolling action zipper profile," *see* U.S. Patent No. 5.007.143, col. 1, line 9, which consists of a slider that passes over and interlocks or disengages the male and female (or rib and groove) elements of the zipper. The profile is designed to make the bags both resealable and leakproof. Defendants' Slide-Loc bags also include a zipper with rib and groove elements and a slider that passes over those elements, interlocking or disengaging them.

The One Zip bag consists of a single rib and a single groove. The following diagrams, derived from figures in the '143 patent, illustrate a cross-section of the zipper and slider and show how the zipper closes:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1898839 (N.D.Ill.)
(Cite as: 2000 WL 1898839 (N.D.Ill.))

Page 2



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 2000 WL 1898839 (N.D.Ill.)
**(Cite as: 2000 WL 1898839 (N.D.Ill.))**

The Slide-Loc bag includes two rib-groove pairs,
rather than just one like the One Zip bag. Each rib in-
cludes a hook-like protrusion that ultimately engages
a similar protrusion on the lower side of each groove.
The following diagrams, taken from photographs of
cross-sections of a Slide-Loc bag, illustrate the con-
figuration:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1898839 (N.D.Ill.)
(Cite as: 2000 WL 1898839 (N.D.Ill.))

Page 4



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1898839 (N.D.Ill.)
(Cite as: 2000 WL 1898839 (N.D.Ill.))

Page 5

Pactiv claims that the Slide-Loc bag infringes a number of the claims of the '143 patent. The language on which our decision turns appears in each of these claims. [FN1] For illustrative purposes, we quote in full Claim 1, with the language in question in bold type:

> FN1. The one exception is claim 11, but that claim uses the term "rolling action," which we have held means the same thing as "rolling" as that term is used in the other claims.

A plastic reclosable fastener with slider particularly suited for thermoplastic bags and the like comprising a pair of flexible plastic strips having separate fastener means extending along the length thereof comprising reclosable interlocking male and female profile elements on the respective strips, said strips including profiled tracks extending along the length thereof parallel to the male and female elements, said male and female elements having complimentary cross sectional shapes such that they are closed by pressing the bottom of the elements together first and then rolling the elements to a closed position toward the top thereof, a straddling slider on said tracks for closing or opening the reclosable fastener elements comprising an inverted U-shaped plastic member having a back for moving along the top edges of said tracks with side walls depending therefrom for cooperating with said tracks and extending from an opening end of the slider to a closing end, said side walls having a greater spacing at the opening end than the closing end, a separator finger depending from said back between said side walls and inserted between said tracks, said separator finger being shaped throughout the length thereof for first holding the top of the male and female elements open while the slider first presses the bottom of the elements together and then permitting the slider to press the top of the elements together while the slider moves in a closing directing, said slider having shoulder projecting inwardly from said depending side walls and shaped throughout the length thereof for cooperation with said depending separator finger in

creating the rolling action in opening and closing said reclosable interlocking male and female profile elements.

*2 U.S. Patent No. 5,007,143, col. 6, line 53--col. 7, line 17 (emphasis added).

Construction of the terms "rolling" and "rolling action" as used in the '143 patent was the primary disputed issue at the *Markman* hearing. As noted above, the claims disclose "male and female elements having complimentary cross sectional shapes such that they are closed by pressing the bottom of the elements together first and then rolling the elements to a closed position toward the top thereof." The Court concluded that the term "rolling" was used in the claims to describe the nature of the motion used to close the bag from bottom to top, and that it referred to a rotational motion, achievable because of the shape of the male and female elements and the flexibility of the material with which they are made. *Tenneco Packaging,* 1999 WL 1044840, at * 4.

In its motion for summary judgment on infringement, Pactiv argues that the evidence shows beyond dispute that "rolling" takes place in opening and closing the rib and groove elements of the Slide-Loc bag. In their motion for summary judgment of non-infringement, Defendants argue that the evidence shows beyond dispute that the Slide-Loc bag does not open or close in the manner described in the claims of the '143 patent.

### Discussion

An infringement analysis entails two steps. The first is determining the meaning and scope of the patent claims alleged to be infringed. The second step is comparing the properly construed claims to the device accused of infringing. *See, e.g., Bayer AG v. Elam Pharmaceutical Research Corp.,* 212 F.3d 1241, 1247 (Fed.Cir.2000); *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed.Cir.1995) (*en banc* ), *aff'd,* 517 U.S. 270 (1996). To prove literal infringement, the patent holder must show that the accused device contains every limitation in the asserted claims. *Elkay Manufacturing Co. v. Ebco Manufacturing Co.,* 192 F.3d 973, 980 (Fed.Cir.1999). To

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1898839 (N.D.Ill.)
(Cite as: 2000 WL 1898839 (N.D.Ill.))

Page 6

prove infringement under the doctrine of equivalents, the patent holder must show that the accused device contains each limitation of the claim or its equivalent; an element in an accused product is equivalent to a claim limitation if the differences between the two are insubstantial to one of ordinary skill in the art. *Warner-Jenkinson Co. v. Hilton Davis Chemical Co ., 520 U.S. 17, 40 (1997); KCJ Corp. v. Kinetic Concepts, Inc., 223 F.3d 1351, 1359 (Fed.Cir.2000).* Conversely, "[f]or any given claim, 'infringement is avoided when one element (or substitute falling within a permissible range of equivalents) is absent." ' *Watts v. XL Systems, Inc.,* No. 99-1256, 2000 WL 1693057, at *7 (Fed.Cir. Nov. 14, 2000) (quoting *Senmed, Inc. v. Richard-Allen Medical Industries, Inc.,* 888 F.2d 815, 818 n. 2 (Fed.Cir.1989)); *see also Elkay,* 192 F.3d at 980.

Infringement is a question of fact. *See, e.g., Moore U.S.A., Inc. v. Standard Register Co.,* 229 F.3d 1091, 1105 (Fed.Cir.2000). However, if no fact finder reasonably could find that the patent's claims literally read on the accused device, summary judgment of no literal infringement is appropriate. *Johnston v. IVAC Corp.,* 885 F.2d 1574, 1580 (Fed.Cir.1989). Similarly, where the evidence is such that no reasonable jury could determine two elements to be equivalent, "a district court is obliged to grant summary judgment of non-infringement" under the doctrine of equivalents. *Warner-Jenkinson,* 520 U.S. at 39 n. 8.

A. Pactiv's motion for summary judgment on infringement

*3 Pactiv contends that it is entitled to summary judgment on the issue of literal infringement. It argues that the undisputed evidence demonstrates that "rolling" takes place in the opening and closing of the Slide-Loc bag. Pactiv's own experts, Dr. Steven J. Grossman and Dr. James G. Conley, say this is so; we will discuss the particulars of their testimony when we address defendants' motion for summary judgment. *Infra* at 10-14.

According to Pactiv, defendants have effectively admitted that their device closes by means of rolling or rolling action as the '143 patent uses that term. The Slide-Loc bag is said to represent the commercial embodiment of U.S. Patent No. 5,664,299. The specification found in the '299 patent says that the device described by the patent can be closed by squeezing the lower rib and groove and the upper rib and groove together at approximately the same time, or "[a]lternatively, the profiles can be interlocked by a rolling action, as described in U.S. Pat. No. 5,007,143." U.S. Patent No. 5,664,299, col. 4, lines 24-25. According to Pactiv, this is an admission that the Slide-Loc closes by way of rolling action as the Court has construed that term with respect to the '143 patent . [FN2]

> FN2. Defendants acquired the rights to the '299 patent from Dow Brands, to whom the inventors had assigned the patent. For purposes of this discussion, we assume but do not decide that any "admissions" made by the inventors in the patent would be binding on defendants (a proposition that defendants dispute).

The Court does not agree. The fact that the '299 patent uses the same terminology as the '143 patent is actually of little assistance here. We are required to compare the claims of the '143 patent not with another patent but rather with the alleged infringing product itself, i.e., the Slide-Loc bag. *Cf. Hap Corp. v. Heyman Manufacturing Co.,* 311 F.2d 839, 843 (1st Cir.1962) ("The question is not what [a device] might have been made to do, but what it was intended to do and did do."), quoted in *High Tech Medical Instrumentation, Inc. v. New Image Industries, Inc.,* 49 F.3d 1551, 1555 (Fed.Cir.1995). Moreover, there is no evidence that Elisabeth Jozwiak, the Dow Chemical patent attorney who drafted the '299 patent, had any knowledge of how a Slide-Loc device actually closed.

Pactiv also argues that defendants' experts have effectively admitted that some "rolling" as we have defined that term takes place in closing the Slide-Loc bag. Specifically, Pactiv contends that Dr. Charles F. Reinholtz, Dr. Karthik Ramani, and Steven Ausnit all conceded that some rotation or rolling takes place in the course of closing or opening a Slide-Loc bag. Though acknowledging that these experts all contend that any rotation they observed is incidental and/or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2000 WL 1898839 (N.D.Ill.)
(Cite as: 2000 WL 1898839 (N.D.Ill.))

insignificant to the process of opening or closing the bag, Pactiv argues that neither the '143 patent nor our claim construction decision require any particular amount of "rolling." So long as some rolling occurs in closing the Slide-Loc bag, Pactiv says, the '143 patent reads on the defendants' device in this regard.

Once again, the Court does not agree. Pactiv's argument is based on a misunderstanding of what the claims require. This misunderstanding is illustrated by Pactiv's description of our inquiry: it says we are to determine whether "each of the four disputed '143 claim limitations--(1) 'rolling,' (2) 'profiled tracks,' (3) 'reclosable interlocking rib and groove profile elements on the respective sides of the bag mouth,' and (4) a separator finger 'shaped throughout the length thereof'--is literally present in Slide-Loc." Pactiv Summ. Judgt. Reply Mem. at 2. That misstates the issue--at least with respect to "rolling." An element of a claim must be read as a whole, not as a series of disjointed words; the claim terms cannot be divorced from the context in which they are presented. The claims do not say that the closing and opening of the bag involves a process that includes rolling, or that some rolling takes place during the process. Rather, "rolling" *is* the process by which the rib and groove elements are closed. Thus the question is not, as Pactiv puts it, whether " 'rolling' ... is literally present in the Slide-Loc," or whether "rolling" occurs at some point during the opening or closing of the Slide-Loc. Rather, the question is whether the Slide-Loc closes "by pressing the bottom of the elements together first and then rolling the elements to a closed position toward the top thereof." And as this Court construed the term, "rolling" takes place in the device described by the '143 patent because of the shape of the elements, as well as their composition. *Tenneco Packaging,* 1999 WL 1044840, at *4.

*4 According to defendants' experts, this is not the way that the Slide-Loc bag closes. We will discuss their testimony in greater detail in the following section of this Memorandum Opinion; for present purposes, suffice it to say that defendants' experts state that the opening and closing motion of the Slide-Loc bag's ribs and grooves consists principally of sliding and deformation, not rolling, and that any rotation or rolling is slight and is purely incidental to the pro-

cess. And lest it be objected that the experts' testimony consists mainly of describing their visual observations of how the Slide-Loc device actually works, the Court has reviewed the photographs and animations of the Slide-Loc submitted by the parties and concludes that the experts' descriptions of what occurs are supported by the evidence. *See also infra* at 9-10.

For these reasons, the Court disagrees with Pactiv regarding the effect of the claimed admissions by defendants' experts. The experts' so-called admissions are not sufficient to entitle Pactiv to summary judgment. Rather, if the claim terms are read in context, using the construction we have previously determined, the photographs and animations of the Slide-Loc, together with the testimony of defendants' experts, are sufficient to preclude entry of summary judgment in Pactiv's favor.

B. Defendants' motion for summary judgment of non-infringement

Defendants have moved for summary judgment on both the theory of literal infringement and that of infringement by equivalents.

As we have noted, defendants' experts say that the opening and closing motion of the Slide-Loc consists of sliding and deformation, not rolling. As they describe it, the hooks (the rib elements) on either side of the fastener come into contact and slide across each other. The hook (or rib) element is wider than the groove opening, so each hook deforms the other in order to allow the hook to enter the groove. After the hooks pass by each other, they snap back into shape, preventing them from opening easily. This process, according to defendants' experts, cannot be described as "rolling," using the Court's definition of the term. There may be some slight "rolling" (as we have defined that term) at the end of the process, but that, defendants' experts say, is incidental to the overall process.

The Court has likewise reviewed and examined the photographs and animations of the Slide-Loc device. They depict the profiled tracks of the Slide-Loc as they approach each other and interlock. The Slide-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1898839 (N.D.Ill.)
(Cite as: 2000 WL 1898839 (N.D.Ill.))

Loc closes from bottom to top and opens from top to bottom; thus the lowermost of the Slide-Loc's two sets of ribs and grooves approach each other first. As they do so, the rib element (depicted on the left in the photographs and animations) begins to slide across the lower side of the groove element. However, because the advancing end of the rib element includes a hook-shaped protrusion, that element is larger than the groove opening. As a result, deformation and displacement takes place, and must take place, in order for the rib to enter the groove so that the device can close. The rib element pushes apart the sides of the groove element (there appears to be more displacement on the upper side than on the lower side), and the hook-shaped protrusion on the end of the approaching rib compresses or deforms as it comes into contact with the two sides of the groove opening. The combination of these movements permits the rib to enter the groove. Once it does so, both elements return to their original shapes and positions. This same process is then repeated, though with less displacement and deformation, with respect to the upper rib and groove elements.

*5 Pactiv's experts Dr. Steven Grossman and Dr. James Conley both say that what they call "rolling" takes place in the process of closing and opening the Slide-Loc. Grossman's report is illustrative of his explanation for his conclusion:

As noted above, the Slide-Loc elements are: (1) shaped such that the profiles engage in a bottom to top, sequential engagement, and disengage in reverse manner; (2) shaped such that the male element rotates across the female element as they engage and disengage; and (3) made from polyethylene, which is known to be well-suited as a material which will flex in response to a given force. As depicted by the curved arrows identified in "Ziploc4 New Style Photo # 8," a rotational motion occurs in the Slide-Loc due to the shape-flexibility of the elements as the elements are first closed by pressing the bottoms of the elements together and then rolling towards the top.

The rotational motion is best illustrated in the accompanying animation file of "Ziploc 4 New Style." As the slider proceeds to a closing position, the action of the slider causes flex in the polyethyl-

ene zipper and profile elements and the interlocking male (rib) elements and female (groove) elements rotate together as they contact and interlock. In addition, as the interlocking male (rib) and female (groove) elements come in contact with one another, the zipper profile and profile elements flex and there is rotational motion as the male and female elements move across one another. The reverse occurs upon opening.

For all of the above reasons (rotational motion achieved because of the shape of the elements and materials [from] which the elements are made, i.e., flexible plastic) the elements of the Slide-Loc are rolled together to a closed position toward the top thereof, and the element of rolling is literally present.

Pltf. Ex. 2, pp. 7-8. Dr. Conley states the following:

In evaluating the rolling action described in this claim element, I have adopted the language of the *Markman* ruling. The Court defined rolling as "a rotational motion which is achieved because of the shape of the elements and because of the materials from which the elements are made, i.e., flexible plastic." As shown in the animations, when the slider is moving in a closing direction, the flexible plastic male and female elements in the Defendant's product cooperate with the slider in a manner that rolls the male and female elements together from bottom to top. Specifically, in the bottom to top rolling sequence, the flexible plastic strips including male and female elements roll together as would two sheets of flexible plastic material unrolling against each other. Furthermore, as shown in the animation during the closing sequence the male element contacts the female element, rotates into it, and interlocks because of the elements' shape and flexible materials of construction. The reverse occurs during the opening of the fastener (While claim 1 does not address rolling during the opening of the fastener, I include it here because rolling open is referenced in later claims of the '143 Patent.). As such this claim element is literally present in the Defendant's product.

*6 Pltf. Ex. 9, pp. 7-8.

In large part, Grossman and Conley describe what they see in examining the Slide-Loc as well as photo-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1898839 (N.D.Ill.)
(Cite as: 2000 WL 1898839 (N.D.Ill.))

graphs and animations depicting the device, viewed by cross-section, as it opens and closes. It is not entirely clear why or how any of the experts' visual observations are entitled to any weight at all; we are skeptical whether their descriptions of what the Court and jurors can just as easily observe for themselves would truly assist the jury. [FN3] *See* Fed.R.Evid. 702. We will nonetheless analyze Grossman and Conley's opinions to determine whether they are sufficient to give rise to a triable issue on literal infringement.

> FN3. The same, of course, is true of plaintiffs' experts' descriptions of what they observed.

Both Grossman and Conley seem to talk about two types of what they call "rolling," the first an overall motion that they claim is present in the closing of the Slide-Loc, and the second a particular type of movement that they say occurs as the hook-shaped end of the advancing rib element enters the groove element. What they mean by the former is best illustrated by a diagram attached to Grossman's report (the "Ziploc 4 New Style Photo # 8" referenced in the quoted section of his report), in which he has inserted arrows that trace what he refers to as the "rolling" or rotational movement:



Essentially

what Grossman and Conley are saying is that the upper parts of the elements move a greater distance than the lower parts; they describe this as a rotational or rolling motion. The only way, however, that this con-

stitutes "rolling" within the meaning of the '143 patent is if the claim term is redefined to mean closing from bottom to top and opening from top to bottom. For if the closing process begins by pressing together the bottom parts of the elements (as the '143 patent requires by its clear terms), the upper parts of the elements *necessarily* will travel further than the lower parts, and the overall movement thus *necessarily* will trace some sort of an arc. But bottom to top closing and top to bottom opening is the very definition proposed by Pactiv that the Court rejected in its claim construction ruling. *Tenneco Packaging,* 1999 WL 1044840, at *3-4. In short, what Grossman and Conley rely upon for their first type of "rolling" is outside the definition of the claim term as determined by the Court.

The second aspect of what Grossman and Conley call "rolling" or rotation takes place as the rib element enters the groove element. As we have described (and as Grossman describes it in the section of his report quoted above), the end of the advancing rib element deforms as it must in order to enter the groove, and then after entering the groove it returns to its original shape. The motion by which it returns to its original shape is a counterclockwise rotation motion of sorts. Grossman and Conley may also be referring to what then happens as the rib settles into its final closed position: the hook-shaped protrusion on the end of the rib travels in a downward direction so that it ultimately engages with the hook-shaped protrusion found on the lower side of the groove. "Rotation" is conceivably one way to describe that particular motion.

*7 Both of these types of so-called rotational motion are incidental to the process of closing the Slide-Loc. The fact that the first type--the movement by which the hook-shaped protrusion springs back to its original form--takes place cannot possibly mean that the Slide-Loc device closes by rolling as that term is used in the '143 patent: the rotation takes place in the opposite direction from that which occurs in the device described in the '143 patent, and it is very much a footnote to the process of closing the Slide-Loc (indeed, it occurs only because of the particular shape of the Slide-Loc rib elements). And the fact that the very last part of what occurs in the Slide-Loc closing-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1898839 (N.D.Ill.)
(Cite as: 2000 WL 1898839 (N.D.Ill.))

- when the hook-shaped protrusion settles into place-
-arguably may be described as a rotational-type movement likewise does not mean that the process of closing the device consists of rotation. The flaw in Grossman and Conley's conclusions is essentially the same flaw contained in Pactiv's argument--they take the term "rolling" out of context and assume that if some rolling occurs, then the '143 patent reads on the Slide-Loc device. That is not so, for the reasons previously discussed.

When the Court referred to rotation in its claim construction ruling, we were referring to the fact that because of the shape of the elements on the One Zip device and the manner in which they approach each other, a rotational movement takes place by which the rib element engages the groove element at the bottom and then rotates into place. This motion, which defendants' expert Dr. Charles Reinholtz refers to as "rolling contact," is described on pages 6 and 8 of Dr. Reinholtz's report and is depicted at page 7 of that report. That is not the motion by which the Slide-Loc closes and opens.

The fundamental difference between the '143 patent and the Slide-Loc in this regard, essentially ignored by Pactiv's experts, is that the '143 patent describes closing by a rolling action, whereas the Slide-Loc closes by deformation and displacement, with incidental rolling taking place at the very end of the process. The fact that some incidental rotation occurs does not alter the fact that the Slide-Loc closes in a very different manner than the '143 patent describes. Under the circumstances, we conclude that no reasonable jury could find that the Slide-Loc closes by "rolling" in the way that the '143 patent uses that term. Because this element is missing from the accused device, defendants are entitled to summary judgment on the issue of literal infringement.

This brings us to the doctrine of equivalents. Equivalence is shown by evidence that the accused device contains an element that is not "substantially different" from the claim element, or that the claim element and the accused component "perform substantially the same function in substantially the same way to achieve substantially the same result." *Kraft Foods, Inc. v. International Trading Co., 203 F.3d*

1362, 1371 (Fed.Cir.2000)* (internal quotation and citation omitted). If either the function, or the way, or the result of the substitute structure is substantially different from that described in the claim, equivalence is not established. *E.g., Odetics, Inc. v. Storage Technology Corp., 185 F.3d 1259, 1267 (Fed.Cir.1999); see Warner-Jenkinson, 520 U.S. at 39-40.*

*8 Pactiv's claim of equivalence founders on the prong of the test requiring the accused component to act in substantially the same way as the claim element. For the reasons we have previously discussed, the manner in which the Slide-Loc closes and opens cannot reasonably be described as substantially the same as the way in which the device described by the '143 patent closes and opens. Drs. Grossman and Conley's conclusions that equivalence exists consist of nothing more than their say-so. This is insufficient to create a genuine issue of fact requiring denial of defendants' summary judgment motion. A district court is not required even to admit in evidence opinion testimony "that is connected to existing data only by the *ipse dixit* of the expert," *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 156-57 (1999); a fortiori* such testimony cannot possibly be sufficient to preclude summary judgment. *See Phillips Petroleum Co. v. Huntsman Polymers Corp., 157 F.3d 866, 876 (Fed.Cir.1998).*

"Although equivalence is a factual matter normally reserved for a fact finder, the trial court should grant summary judgment in any case where no reasonable fact finder could find equivalence." *Sage Products, Inc. v. Devon Industries, Inc., 126 F.3d 1420, 1423 (Fed.Cir.1997).* That is precisely the case here. Defendants are entitled to summary judgment on the claim of infringement by equivalents.

Conclusion

For the foregoing reasons, the Court denies plaintiff's motion for summary judgment of infringement [Docket Item # 175-1] and grants defendants' motion for summary judgment of non-infringement [122-1]. All remaining motions are terminated as moot [140-1, 152-1, 168-1, 173-1, 174-1, 174-2]. The Clerk is directed to enter judgment in favor of defendants.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 11
Not Reported in F.Supp.2d, 2000 WL 1898839 (N.D.Ill.)
**(Cite as: 2000 WL 1898839 (N.D.Ill.))**


Not Reported in F.Supp.2d, 2000 WL 1898839
(N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3



189 Fed.Appx. 965
189 Fed.Appx. 965, 2006 WL 2091197 (C.A.Fed.)
(Cite as: 189 Fed.Appx. 965)

Page 1

**H**

Wireless Agents LLC v. Sony Ericsson Mobile Communications AB
C.A.Fed.,2006.
This case was not selected for publication in the Federal Reporter.NOTE: Pursuant to Fed.Cir.R. 47.6, this order is not citable as precedent. It is public record.Please use FIND to look at the applicable circuit court rule before citing this opinion. Federal Circuit Rule 47.6. (FIND CTAF Rule 47.6.)
United States Court of Appeals,Federal Circuit.
WIRELESS AGENTS LLC, Plaintiff-Appellant,
v.
SONY ERICSSON MOBILE COMMUNICATIONS
AB and Sony Ericsson Mobile Communications
(USA), Inc., Defendants-Appellees.
No. 06-1054.

July 26, 2006.

**Background:** Owner of patent for physical configuration of hand-held electronic communication device sued mobile phone seller for infringement. Owner moved for preliminary injunction. The United States District Court for the Northern District of Texas, Sidney A. Fitzwater, J., 390 F.Supp.2d 532, denied the motion. Owner appealed.

**Holding:** The Court of Appeals, Dyk, Circuit Judge, held that term "alphanumeric keyboard," as used in patent, meant an input device that included a substantially full set of alphabetic and numeric keys, and did not include keypads on mobile telephone models that had only 12 digits.

Affirmed.
West Headnotes
**[1] Patents 291 ☞101(2)**

291 Patents
    291IV Applications and Proceedings Thereon
        291k101 Claims
            291k101(2) k. Construction in General.
Most Cited Cases
Term "alphanumeric keyboard," as used in patent for hand-held electronic communication device, meant

an input device that included a substantially full set of alphabetic and numeric keys, and did not include keypads on mobile telephone models that had only 12 digits.

**[2] Patents 291 ☞159**

291 Patents
    291IX Construction and Operation of Letters Patent
        291IX(A) In General
            291k159 k. Extrinsic Evidence in General.
Most Cited Cases
Expert's statement regarding meaning of term "alphanumeric keyboard" used in patent for hand-held electronic communication device, which was conclusory and unsupported by reference to any contemporaneous documents, was of no value in claim construction analysis.

**[3] Patents 291 ☞159**

291 Patents
    291IX Construction and Operation of Letters Patent
        291IX(A) In General
            291k159 k. Extrinsic Evidence in General.
Most Cited Cases
Where specification in patent for hand-held electronic communication device that used the term "alphanumeric keyboard" was clear, extrinsic evidence regarding related patent applications could not be used to contradict it.

**Patents 291 ☞328(2)**

291 Patents
    291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
        291k328 Patents Enumerated
            291k328(2) k. Original Utility. Most Cited Cases
6,665,173. Construed.

Before RADER, GAJARSA, and DYK, Circuit Judges.
**966** DYK, Circuit Judge.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*1** In this patent infringement case, Wireless Agents LLC ("Wireless") appeals from the district court's denial of a preliminary injunction to prevent Sony Ericsson Mobile Communications (USA) Inc. ("Sony") from selling the accused products. We affirm.

### BACKGROUND

Wireless is the assignee of U.S. Patent No. 6.665,173 B2 (filed Dec. 20, 2000) ("the '173 patent"), entitled "Physical Configuration of a Hand-Held Electronic Communication Device." Claim 1, the sole independent claim of the '173 patent, recites:

A hand-held, electronic computing device having a physical configuration comprising:

a body portion;

a display portion pivotally coupled to the body portion;

a constantly visible display carried by the display portion;

an *alphanumeric keyboard* carried by the body portion;

wherein the alphanumeric keyboard is at least partially concealed by the display portion when not in use; and

wherein the display portion pivots relative to the body portion in a plane that is generally parallel with the alphanumeric keyboard.

'173 patent, col. 13, ll. 30-41 (emphasis added).

On February 10, 2005, Wireless sued Sony [FN1] alleging that Sony's S700i and S710a mobile phones literally infringed claim 1 and several dependent claims. The accused phones have twelve keys-ten keys representing the numbers 0-9 as well as " * " and "# " keys. Each letter of the alphabet is assigned to one of the keys representing the numbers 2 to 9. Thus, approximately 3-4 alphabetic characters are associated with each number key. To select the alphabetic characters, the user switches to text-entry mode and presses a numeric key repeatedly until the desired alphabetic character is selected. The accused phones are also equipped with predictive text software which uses a built-in dictionary to predict common words' being entered by the user after a certain sequence of key presses.

> FN1. Wireless included Sony Ericsson Mobile Communications AB (a Swedish company) in its infringement suit but not in its preliminary injunction motion.

On April 28, 2005, Wireless filed a motion for a preliminary injunction seeking to enjoin Sony from selling the accused products in the United States. The district court (Judge Sidney A. Fitzwater) denied Wireless's motion, finding that Wireless had not demonstrated a likelihood of success on the merits of its infringement claim under the district court's construction of the term "alphanumeric keyboard." *Wireless Agents, LLC v. Sony Ericsson Mobile Commc'ns AB,* 390 F.Supp.2d 532, 540 (N.D.Tex.2005). The district court construed "alphanumeric keyboard" to mean an "input device having a QWERTY, FITALY, or Dvorak layout or any other alphanumeric layout that includes a substantially full set of alphabetic and numeric keys." *Id.* at 538-39 (internal quotation marks omitted). The "QWERTY" layout is the standard keyboard arrangement which includes a key for each letter of the alphabet, and the "FITALY" and "Dvorak" layouts are other arrangements which also include a full set of keys. The district court concluded that "[t]he Sony devices do not have an 'alphanumeric keyboard,' as the term is properly construed." *Id.* at 539. Wireless timely appealed. We have jurisdiction pursuant to 28 U.S.C. §§ 1292(a)(1) and 1292(c)(1).

### \*967 DISCUSSION

**\*\*2** This appeal turns entirely on the correct construction of the term "alphanumeric keyboard." We construe the term "alphanumeric keyboard" without deference to the district court's claim construction. *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.,* 423 F.3d 1343, 1347 (Fed.Cir.2005).

[1] The scope of the term "alphanumeric keyboard" is not readily apparent from the face of the claim, and there is no common dictionary definition of this term.[FN2] However, the term "alphanumeric keyboard" "must be read in view of the specification, of which [it is] a part." *Phillips,* 415 F.3d at 1315 (internal quotation marks and citation omitted). The specification is "the single best guide to the meaning

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

189 Fed.Appx. 965                                                                     Page 3
189 Fed.Appx. 965, 2006 WL 2091197 (C.A.Fed.)
(Cite as: 189 Fed.Appx. 965)

of a disputed term." *Id.* (internal quotation marks omitted). Here, it is clear to us, as it was to the district court, that an "alphanumeric keyboard' is an input device having a QWERTY, FITALY, or Dvorak layout or any other alphanumeric layout that includes a substantially full set of alphabetic and numeric keys, and that it does not include a twelve-digit keypad.

> FN2. *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1314 (Fed.Cir.2005) (en banc) (noting that where the meaning of a claim term is readily apparent, claim construction involves "little more than the application of the widely accepted meaning of commonly understood words" and, in such cases, "general purpose dictionaries may be helpful").

First, the description of the invention in the "Summary of the Invention" section of the specification states:

The keyboard may be a keyboard with a layout such as the common "QWERTY" layout, but need not be limited to this particular layout. Other layouts may include the "FITALY" layout, the "Dvorak" layout *or any other alphanumeric layout that includes a substantially full set of alphanumeric keys.*

'173 patent, col. 5, ll. 6-11 (emphasis added). The description clearly depicts the claimed invention as having "the common 'QWERTY' layout" or "any other alphanumeric layout that includes a substantially full set of alphanumeric keys." This description is not merely referring to a preferred embodiment; rather, as part of the "Summary of the Invention," it is "commensurate with the invention as claimed." 37 C.F.R. § 1.73 (2004). Therefore, to allow Wireless to claim a keyboard with less than a substantially full set of keys would injure the public's right "to take the patentee at [his] word." *Honeywell Int'l, Inc. v. ITT Indus. Inc.,* 452 F.3d 1312, 1318 (Fed.Cir.2006).

Wireless argues that the specification cannot be used to define the term "alphanumeric keyboard" because at the end of the specification the '173 patent contains the following boilerplate language:

Although the invention has been described with reference to a particular embodiment, this description is not meant to be construed in a limiting sense. Various modifications of the disclosed embodiments as well as alternative embodiments of the invention will become apparent to persons skilled in the art.... It is therefore contemplated that the appended claims will cover any such modifications or embodiments that fall within the scope of the invention.

'173 patent, col. 13, ll. 20-28. We see nothing in this language that contradicts our reading of the specification.

**\*\*3** Second, the specification explicitly references the disadvantages of keypads that have only twelve digits, such as the accused device. For example, in describing the disadvantage of the mobile phone twelve-digit keypad, the specification states:

**\*968** The mobile phone configuration has the following disadvantages ... the keypad is typically a twelve-digit keypad designed for numeric data entry, although the keyboard usually supports alphanumeric character entry ... whereby the commonly used method of accessing alphanumeric characters is to switch the device into a text entry mode, then press a key repeatedly to access a particular one of a subset of characters available for each key, *this method being extremely slow, awkward, error prone, and not appropriate for a device intended to transfer textual data on a regular basis ....*

'173 patent, col. 2, ll. 39-58 (emphasis added). Further, the specification distinguishes the "alphanumeric keyboard" from the keypads on most mobile phones by stating "[t]he alphanumeric keyboard is easier and faster to use and learn than the keypads and touch screens on most mobile phones and personal digital assistants." '173 patent, col. 5, ll. 4-6.

We have previously recognized that "[w]here the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *SciMed Life Sys., Inc. v. Advanced Cardiovascular*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

189 Fed.Appx. 965                                                                                      Page 4
189 Fed.Appx. 965, 2006 WL 2091197 (C.A.Fed.)
(Cite as: 189 Fed.Appx. 965)

_Sys., Inc._ 242 F.3d 1337, 1341 (Fed.Cir.2001). In _Honeywell Int'l, Inc.,_ 452 F.3d 1312, a case involving similar circumstances, we found that the claim term "electrically conductive fibers" excluded carbon fibers because the specification's "repeated derogatory statements concerning one type of material [ (carbon fibers) ] [was] the equivalent of disavowal of that subject matter from the scope of the patent's claims." _Id.,_ 452 F.3d at 1320. Here too, the specification's repeated derogatory statements about the twelve-digit keypad convince us that the "alphanumeric keyboard" does not include a twelve-digit keypad.[FN3]

> FN3. This is not a case like _Gemstar-TV Guide International v. International Trade Commission,_ 383 F.3d 1352 (Fed.Cir.2004), where the references to problems with the prior art appear only in the description of the preferred embodiment. _Id._ at 1365.

[2] Wireless also urges that we look to extrinsic evidence, including a statement by its expert witness that "an 'alphanumeric keyboard' is _a regular arrangement of keys._" J.A. at 407 (emphasis added). Wireless's expert concluded that the accused device "includes a regular arrangement of keys, _i.e.,_ a keyboard, which allows users to generate all the letters of the alphabet and the numbers 0 through 9." J.A. at 415. We find that the expert's statement is conclusory and is unsupported by reference to any contemporaneous document and therefore of no value in our claim construction analysis. _Phillips,_ 415 F.3d at 1318.

[3] Wireless also points to the fact that the Patent and Trademark Office allowed certain claims of Wireless's related patent application ("the '802 application") to cover a twelve-digit keyboard. The allowed claims of the '802 application do not include an "alphanumeric keyboard." That allowance has no bearing on the construction of the term "alphanumeric keyboard." Wireless also cites to various patent applications filed by Sony, arguing that Sony's patents describe a twelve-digit keypad as an alphanumeric keyboard. None of the references cited by Wireless contains a definition of alphanumeric keyboard that is contrary to the district court's claim construction here. In any event, the specification here

is clear and the expert testimony*969 and other extrinsic evidence cannot be used to contradict it.

**4 For the foregoing reasons, we conclude that the district court's claim construction was correct. The undisputed evidence established that the accused device utilized twelve keys rather than a substantially full set of alphanumeric keys. The preliminary injunction was therefore properly denied. We affirm.

No costs.

C.A.Fed.,2006.
Wireless Agents LLC v. Sony Ericsson Mobile Communications AB
189 Fed.Appx. 965, 2006 WL 2091197 (C.A.Fed.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4



Slip Copy
Slip Copy, 2007 WL 150606 (S.D.Tex.)
(Cite as: Slip Copy)

Page 1

**H**

MGM Well Services, Inc. v. Mega Lift Systems, LLC
S.D.Tex.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. Texas,Houston Division.
MGM WELL SERVICES, INC., Plaintiff,
v.
MEGA LIFT SYSTEMS, LLC, Defendant.
**Civil Action No. H-05-1634.**

Jan. 16, 2007.

Joseph Dean Lechtenberger, Howrey LLP, Houston, TX, for Plaintiff.
Kent A. Rowald, Ira Phillip Domnitz, Seyfarth Shaw LLP, Houston, TX, for Defendant.

### MEMORANDUM AND ORDER

NANCY F. ATLAS, United States District Judge.
**\*1** This patent case is before the Court on the Motion Seeking Exclusion of the Expert Report and Testimony of Dr. Charles W. Alworth ("Motion") [Doc. # 104] filed by Plaintiff MGM Well Services, Inc. ("MGM"), to which Defendant Mega Lift Systems, LLC ("Mega Lift") filed a Response [Doc. # 131], and MGM filed a Reply [Doc. # 144]. Having considered the parties' submissions, the evidence in the record, and the applicable legal authorities, the Court concludes that Plaintiff's Motion should be **granted.**

### I. FACTUAL AND PROCEDURAL BACKGROUND

The factual background of this case has been set forth in prior opinions by the Court in this case. Briefly, MGM is the owner of United States Patent No. 6,719,060 ("the 060 Patent") which was issued on April 13, 2004. Generally, the 060 Patent relates to what is referred to as a "two-piece plunger lift" system for use in gas wells to remove accumulated liquids and thereby increase the gas flow through the well to the surface. MGM alleges that Mega Lift is marketing an infringing product called the "Chaser" system.

Mega Lift designated Dr. Charles W. Alworth as an expert, both on the technology at issue in the case and on patent law issues. MGM has moved to exclude Alworth's report and testimony on patent law because he lacks adequate education, training, or knowledge to qualify as a patent expert. MGM also moved to exclude Alworth's report and testimony on the technology issues because he lacks the proper qualifications and because his methodology involved little more than adopting what he was told by Mega Lift's President, James Bartley. The Motion has been fully briefed and is ripe for decision.

### II. ANALYSIS

#### A. Standards for Expert Testimony

"[A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify ... in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. The trial judge must determine as an initial matter whether the proffered witness is qualified to give the expert opinion he seeks to express. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 156, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Under Daubert, the district court is to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid [reliability] and of whether that reasoning or methodology can be applied to the facts at issue [relevance]." Skidmore v. Precision Printing And Packaging, Inc., 188 F.3d 606, 617 (5th Cir.1999) (citing Daubert, 509 U .S. at 592-93). This so-called "gate-keeping" obligation applies to all types of expert testimony, not just "scientific" testimony. Id. at 617-618 (citing Kumho, 526 U.S. at 147). The district court's responsibility "is to make certain that an expert, whether basing testimony upon professional

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 150606 (S.D.Tex.)
(Cite as: Slip Copy)

studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho, 526 U.S. at 151.* The Court "must ensure the expert uses reliable methods to reach his opinions; and those opinions must be relevant to the facts of the case." *Guy v. Crown Equipment Corp., 394 F.3d 320, 325 (5th Cir.2004).*

**\*2** Reliability and validity do not require certainty, but must be demonstrated by evidence that the knowledge is more than speculation. *Daubert, 509 U.S. at 590.* To demonstrate reliability, the proponent of the expert testimony must present "some objective, independent validation of the expert's methodology. The expert's assurances that he has utilized generally accepted scientific methodology is insufficient." *Moore v. Ashland Chemical, Inc., 151 F.3d 269, 276 (5th Cir.1998) (en banc), cert. denied, 526 U.S. 1064, 119 S.Ct. 1454, 143 L.Ed.2d 541 (1999).* The Court must consider (1) the validity of the scientific principles used; (2) the accuracy of the data relied upon by the expert; and (3) the correctness of the application of the scientific principles to the relevant data. *See, e.g., Watkins v. Telsmith, Inc., 121 F.3d 984, 989 (5th Cir.1997); Marcel v. Placid Oil Co., 11 F.3d 563, 567 (5th Cir.1994).* Four factors to consider in determining the reliability of proffered scientific evidence are (1) whether the theory or procedure has been subjected to testing; (2) whether it has been subjected to peer review and publication; (3) the rate of error and the existence of standards controlling the theory or procedure; and (4) whether it has attained general acceptance. *Watkins, 121 F.3d at 989* (citing *Daubert, 509 U.S. at 593-94).* This analysis, however, is a flexible one. "[N]ot every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy, 394 F.3d at 325.*

Rule 704 of the Federal Rules of Evidence provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." *Fed.R.Evid. 704.* The Fifth Circuit, however, "has repeatedly held that Rule 704 does not allow an expert to render conclusions of law." *United States v. \$9,041,598.68, 163 F.3d 238, 255 (5th Cir.1998)*

(citing *Snap-Drape, Inc. v. Comm'r of Internal Revenue, 98 F.3d 194 (5th Cir.1996)).*

The burden is on the party offering the expert testimony to establish by a preponderance of the evidence that it is admissible. *Moore, 151 F.3d at 276.* The party offering the challenged expert opinions need not, however, prove "that the expert's testimony is correct." *Id.*

### B. Patent Law Expert

Mega Lift has designated Alworth as an expert on patent law. Initially, the Court questions whether expert testimony on patent law would assist the trier of fact in this case. The Court will instruct the jury on the law they are to apply, and an expert is not permitted to give legal conclusions. *See United States v. \$9,041,598.68, 163 F.3d 238, 255 (5th Cir.1998).*

Additionally, the Court finds that Alworth does not have the education, training or experience to offer expert opinions on patent law. Alworth received his law degree from the University of Tulsa in December 1992, but he did not study any intellectual property law courses while in law school. Beginning in June 1995, he has been the principal of his own firm, Alworth Law and Engineering. He has not worked as a patent examiner or in any other position with the United States Patent and Trademark Office, and he has represented clients in only two patent litigation matters. He has written two papers on the general topic of intellectual property, but each paper was simply a "general overview" of patent, trademark, and copyright law. He has drafted and filed patent applications, and is the named inventor on several patents. He has never been qualified to testify as an expert on patent law.

**\*3** Alworth's lack of expertise in the area of patent law is demonstrated many times in his report. For example, Alworth opines that MGM's 060 Patent is unenforceable because the named inventor and his attorney failed to perform a "hand search of the prior art" before filing the patent application. The Manual of Patent Examining Procedures, however, notes specifically that the "filing of an information disclosure statement shall not be construed as a representation

Slip Copy
Slip Copy, 2007 WL 150606 (S.D.Tex.)
(Cite as: Slip Copy)

Page 3

that a search has been made" and that there is "no re-quirement that an applicant for a patent make a pat-entability search." *See* Manual of Patent Examining Procedure, Exh. F to Motion, § 609 (citing 37 C.F.R. § 1.97).

Although it is clear that Alworth has some very lim-ited experience in patent matters, Mega Lift has failed to establish that Alworth has the education, training or experience to serve as an expert on patent law. MGM's Motion to exclude Alworth's expert re-port and testimony on patent law is granted.

### C. *Technical Expert-Qualifications*

Alworth received a Bachelor of Science in electrical engineering from the University of Oklahoma in 1965. He received a Master of Science in electrical engineering in 1967, and a Ph.D. in electrical engi-neering in 1969. He has taught electrical engineering at the University of Oklahoma and at Texas A & M University. He served as Chairman of the Department of Electrical Engineering at the University of Texas at Tyler. He worked for Conoco for over fifteen years.

Alworth clearly has extensive education, training, and experience in the field of electrical engineering. He does not, however, have expertise in the area of plunger lift systems. Indeed, he has little education, training or experience, if any, in the field of plunger lift systems used in the deliquification of oil and gas wells. During his electrical engineering education, he did not study any courses in petroleum engineering, any courses relating to the deliquification of oil and gas wells, or any courses relating to plunger lift tech-nology. Similarly, none of Alworth's teaching in-volved oilfield technology.

Alworth worked as an oilfield engineer for Conoco, but he describes his work and "electrical and instru-mentation design." *See* Alworth Report, Exh. B to Motion, p. 66. His work involved control and safety shut down systems, facility construction, and acci-dent investigation, and it required electrical and chemical engineering. *Id.*

Alworth drafted patents relating to the electronic con-trols used in plunger lift systems, but his work did not involve these systems in any meaningful way, and any familiarity with the relevant technology he may have obtained while working on the patents for elec-tronic controls does not rise to the level of expertise in the actual plunger lift systems.

Mega Lift argues that Alworth has the necessary qualifications because he "has more than six years experience in working with plunger lift systems." *See* Response, p. 2. It is clear, however, that this experi-ence was in his capacity as an attorney for Bartley and Mega Lift, and his work relating to plunger lift systems was sporadic at best. Indeed, he admitted in his deposition that over the past three years, he has spent less than one percent of his time on work relat-ing to plunger lift technology.

*4 Alworth has not engaged in engineering services of any kind or practiced as an engineer in any capa-city since June 1995 when he formed Alworth Law and Engineering. The "Engineering" in "Alworth Law and Engineering" relates exclusively to work as an expert witness and only in the field of electrical engineering. This is the first case in which he has been offered as an expert on the topic of plunger lift systems. There is no indication that Alworth has been accepted by any court as an expert on any subject.

Although Alworth would perhaps be qualified to ex-press an opinion in the field of electrical engineering, he lacks the necessary qualifications to offer expert opinions on the technology at issue in this case. *See, e.g., Watkins v. Telsmith, Inc., 121 F.3d 984 (5th Cir.1997)* (affirming exclusion of civil engineer proffered as mechanical engineering expert).

### D. *Technical Expert-Reliability and Relevance*

Perhaps because he lacks the necessary qualifications in the area of plunger lift systems, Alworth's opinions are based almost entirely on information from Bartley, an interested party, rather than on Alworth's independent evaluation of the information in the re-cord. For example, Alworth did not perform his own calculations, but opined that MGM's calculations were incorrect because Bartley told him so. Similarly, he did not review data from testing that Bartley al-legedly performed on Mega Lift's plunger system,

Slip Copy

Slip Copy, 2007 WL 150606 (S.D.Tex.)

(Cite as: Slip Copy)

Page 4

testifying in his deposition that he was not aware of the test and had not seen any of the results.

Opinions are excludable if they are supported only by the *ipse dixit* of the expert. *See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); Guile v. United States, 422 F.3d 221, 227 (5th Cir.2005).* A court should "exclude expert testimony where ... there is 'too great an analytical gap between the data and the opinion proffered.' " *Burleson v. Texas Dept. of Crim. Justice, 393 F.3d 577, 587 (5th Cir.2004)* (quoting *Joiner, 522 U.S. at 146).* "If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury." *Viterbo v. Dow Chem. Co., 826 F.2d 420, 422 (5th Cir.1987)* (quoted in *Guile, 422 F.3d at 227).*

Alworth's opinions appear to be mere *ipse dixit,* presenting little more than a parroting of Bartley's personal views. Rather than conduct and report the results of critical, independent analysis, it appears that Alworth relied heavily, if not exclusively, on what Bartley told him. His expert report is at best an effort to synthesize Defendant's positions and present them summarily as an expert opinion. Mega Lift has not shown, and the Court is unpersuaded, that Alworth applied in his work for Mega Lift in this case the same rigor an expert would apply or that Alworth would have applied to his work in the field of electrical engineering. Consequently, Alworth's opinions are not adequately reliable to be admissible.

### IV. CONCLUSION AND ORDER

*5 Alworth lacks adequate knowledge, skill, experience, education or training to qualify as an expert on patent law. Although Alworth has significant and impressive education, training, and experience in electrical engineering, he lacks relevant knowledge necessary to qualify as an expert in this patent case involving a two-piece plunger lift system. Additionally, his opinions on technical issues are unreliable, in part because he lacks the proper qualifications and in part because he failed to use an acceptable methodology.

As a result, it is hereby

**ORDERED** that Plaintiff's Motion Seeking Exclusion of the Expert Report and Testimony of Dr.

Charles W. Alworth [Doc. # 104] is **GRANTED.**

S.D.Tex.,2007.

MGM Well Services, Inc. v. Mega Lift Systems, LLC

Slip Copy, 2007 WL 150606 (S.D.Tex.)

END OF DOCUMENT

# EXHIBIT 5

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 6

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 7

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 8

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 9

5252652

*5252652*

| SERIAL NUMBER | PATENT DATE | PATENT NUMBER |
|---|---|---|
| 07/521,618 (Series of 1997) | | |

| SERIAL NUMBER | FILING DATE | CLASS | SUBCLASS | GROUP ART UNIT | |
|---|---|---|---|---|---|
| 07/521,618 | 05/10/90 | 273 52 | 318 392 | 159B | Tong Lee |

**APPLICANTS**

YOSHINORI EGASHIRA, SAITAMA-KEN, JAPAN; KAZUYUKI TAKAHASHI, YOKOHAMA, JAPAN; SEISUKE TOMITA, TOKOROZAWA, JAPAN;

**CONTINUING DATA****************
VERIFIED

**FOREIGN/PCT APPLICATIONS************
VERIFIED    JAPAN    1-118460    11/05/89

| Foreign priority claimed 35 USC 119 conditions met Verified and Acknowledged | ☐ yes ☒ no ☐ yes ☐ no Examiner's Initials | AS FILED | STATE OR COUNTRY | SHEETS DRWG. | TOTAL CLAIMS | INDEP. CLAIMS | FILING FEE RECEIVED | ATTORNEY'S DOCKET NO. |
|---|---|---|---|---|---|---|---|---|
| | | | JPX | 1 | 6 | 1 | $ 370.00 | 823105 |

**ADDRESS**

SUGHRUE, MION, ZINN, MACPEAK & SEAS
2100 PENNSYLVANIA AVE., N., W.
WASHINGTON, DC 20037

**TITLE**

SOLID GOLF BALL

U.S. DEPT. of COMM.—Pat. & TM Office—PTO-436L (rev. 10-78)

**PARTS OF APPLICATION FILED SEPARATELY**

| NOTICE OF ALLOWANCE MAILED | PREPARED FOR ISSUE | CLAIMS ALLOWED | |
|---|---|---|---|
| 4/4/ 3-21-93 | | Total Claims 13 | Print Claim |
| | Assistant Examiner    Docket Clerk | | |

| ISSUE FEE | | | | | DRAWING | | |
|---|---|---|---|---|---|---|---|
| Amount Due 1170.00 | Date Paid bal 7-09-93 | KHIELLION S. MORGAN PRIMARY EXAMINER ART UNIT 159B    Primary Examiner | | | Sheets Drwg. 4 | Figs. Drwg. 2 | Print Fig. |

| | ISSUE CLASSIFICATION | | ISSUE BATCH NUMBER |
|---|---|---|---|
| Label Area | Class 529 | Subclass 392 | M11 |

WARNING: The information disclosed herein may be restricted. Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 388. Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only.

Form PTO-436A

-9-

CLAIMS:

1. A solid golf ball ~~comprising a rubber composition~~ containing a base rubber, an ~~unsaturated~~ carboxylic acid metal salt, and a ~~sulfur~~ compound selected from the group consisting of an organic sulfur compound and a metal-containing organic sulfur compound.

2. The golf ball of claim 1 wherein said rubber composition contains

   100 parts by weight of the base rubber,

   about 25 to about 40 parts by weight of the unsaturated carboxylic acid metal salt, and

   about 0.05 to about 2 parts by weight of the sulfur compound.

3. The solid golf ball of claim 1 which is a one-piece golf ball, the ball being formed of said rubber composition.

4. The solid golf ball of claim 1 which is a multi-layered golf ball comprising a core and a cover enclosing the core, said core being formed of said rubber composition.

5. The solid golf ball of claim 4 which is a two-piece ball wherein the core is directly enclosed in the cover.

6. The solid golf ball of claim 4 which further includes an intermediate layer disposed between the core and the cover.

Serial No. 521,618                                    -2-

Art Unit 151

15.    Claims 1-6 are rejected under 35 U.S.C. 112,
first and second paragraphs, as the claimed invention is not
described in such full, clear, concise and exact terms as to
enable any person skilled in the art to make and use the
same, and/or for failing to particularly point out and
distinctly claim the subject matter which applicant regards
as the invention.

Claims 1 and 3-6 are indefinite in their
failure to recite the proportions of the ingredients of the
solid golf ball in accordance with the written description of
the invention.  Note, for example, lines 8 and 9, page 4;
lines 24-26, page 4; and lines 1 and 2, page 5 of the
specification.  It seems evident that said written
description of the invention is inadequate to support claims
which are not limited in the manner discussed above.

Claims 1-6 should be limited to the type of
diene rubber disclosed as suitable in the specification, as
in lines 18-31, page 3.  It is seen that the performance in
the claimed solid golf ball made with the recited ingredients
could not be predicted if the rubber used in the golf ball
composition were, for example, a polyurethane elastomer.

RECEIVED: GROUP 150

1991 APR 19 PM 3: 55

PATENT APPLICATION

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

re application of

Yoshinori EGASHIRA et al

Filed: May 10, 1990

Group Art Unit:  151

Examiner:  Lieberman, A.

For:

AMENDMENT

Honorable Commissioner of
Patents and Trademarks
Washington, D.C. 20231

Sir:

This Amendment is in response to the Office Action dated
December 12, 1990 in the above-identified application and is
accompanied by a Petition for a One-Month Extension of Time.

Please amend the application as follows:

IN THE CLAIMS:

1.    (Amended)  A  solid  golf  ball  comprising  a  rubber
composition containing 100 parts by weight of a base rubber
selected from the group consisting of polybutadiene rubber, natural
rubber, polyisoprene rubber and styrene-butadiene rubber, about 25
to about 40 parts by weight of an unsaturated carboxylic acid metal
salt, [and] about 0.05 to about 2 parts by weight of a sulfur
compound selected from the group consisting of an organic sulfur

AMENDMENT                                    PATENT APPLICATION
USSN  07/521,618

     Claim 1 as amended recites proportions for all of the recited ingredients.

     (2)  The Examiner states that claims 1-6 should be limited to the type of diene rubber disclosed as suitable in the specification (page 3, lines 18-31).  The Examiner further states that performance of the claimed solid golf ball made with the recited ingredients could not be predicted if the rubber used in the golf ball composition was, for example, polyurethane elastomer.

     Claim 1 as amended now recites that a base rubber is selected from the group consisting of polybutadiene rubber, natural rubber, polyisoprene rubber and styrene-butadiene rubber as found on page 3, lines 18-31 of the specification.

     (3)  The Examiner states that claims 1-6 should be limited to the sulfur compound which is disclosed as providing a measurable difference in the golf balls made from the composition containing it.  The Examiner further states that it seems evident that disclosure of the zinc salt of pentachlorothiophenol does not provide sufficient basis in the written description of the invention for claims which read on any sulfur compound.

     This ground of the rejection is respectfully traversed.

     An enabling disclosure appears in the specification at page 14, lines 15-23 which recites various types of sulfur compounds and specific examples thereof.  Based on the disclosure as a whole, one

- 6 -

AMENDMENT                                    PATENT APPLICATION
USSN  07/521,618

    In view of the foregoing, each of the specific grounds of the

rejection under 35 U.S.C. §112 is deemed to have been overcome.

Withdrawal is requested.

    In paragraph 16 of the Office Action, claims 1 and 3-6 stand

rejected under 35 U.S.C. §103 as being unpatentable over Isaac.

For convenience, the Examiner's reasoning is set forth below.

            The Examiner states that in view of the
        fact that claims 1 and 3-6 require the
        presence of a negligible amount of sulfur
        compound because of their failure to recite
        the quantities of the ingredients present,
        claims 1 and 3-6 are unpatentable over Isaac.
        The Examiner further states that Isaac is
        representative of the prior art solid golf
        ball prepared from a composition comprising a
        diene rubber, a metal salt of an unsaturated
        carboxylic acid and a free radical initiator.
        The Examiner concludes that in view of the
        prior art teachings as represented by Isaac,
        one of ordinary skill in the art would have
        been motivated to prepare a solid golf ball
        which is not patentably distinct from the golf
        ball of claims 1 and 3-6.

    This rejection is traversed with respect to claim 1, as

amended.

    Isaac fails to disclose or suggest a sulfur compound selected

from the group consisting of an organic sulfur compound and a

metal-containing organic sulfur compound as recited in Applicant's

- 8 -

AMENDMENT                                              PATENT APPLICATION
USSN  07/521,618

now amended claim 1, and, therefore, fails to disclose or suggest
the present invention.  Thus, a prima facie case of obviousness has
not been set forth.

Claim 1 as amended includes the quantities of the ingredients
in the golf ball of Applicant's claim 1.  Therefore, in light of
the fact that a rejection was not sustained over claim 2 which
recites such amounts, claim 1 which now recites the required
amounts, along with dependent claims 3-20, are considered to be in
condition for allowance.

Accordingly, withdrawal of the outstanding rejection under
§103 is respectfully requested.

Early indication of allowability is respectfully requested.
Should any minor points remain prior to issuance of a Notice of
Allowance, the Examiner is requested to telephone the undersigned
at the below listed telephone number.

                                    Respectfully submitted,

SUGHRUE, MION, ZINN,                _Mark Boland_
MACPEAK & SEAS                      Mark Boland
2100 Pennsylvania Avenue, N.W.      Registration No. 32,197
Washington, D.C. 20037-3202
(202) 293-7060

Date:  April 12, 1991

- 9 -