# EXHIBIT 1

LEXSEE 1992 U.S. DIST. LEXIS 5807



Positive
As of: May 14, 2007

# EDWARD FRITZ v. CONSOLIDATED RAIL CORPORATION

## CIVIL ACTION NO. 90-7530

## UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### 1992 U.S. Dist. LEXIS 5807

### April 22, 1992, Decided
### April 23, 1992, Filed; April 24, 1992, Entered

**DISPOSITION:** [*1] DENIED

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff brought an action under the Federal Employers' Liability Act (FELA) for damages resulting from injuries allegedly caused by defendant rail corporation. The jury found that defendant was negligent, but that it was not the cause of the injuries sustained by plaintiff. Judgment was entered for defendant. Plaintiff thereafter filed a motion for a new trial.

**OVERVIEW:** Experts testified that plaintiff's back injuries could have been caused solely by plaintiff's pre-existing back condition or by defendant's negligence. The court denied the motion for a new trial. First, the court held that its failure to strike two potential jurors for cause was not prejudicial error. On the basis of the court's own voir dire of the potential jurors, the answers the potential jurors gave, and their reactions, the court decided that there was no reason to strike the jurors for cause. Plaintiff did not demonstrate that he was prejudiced by the use of his peremptory strikes on these jurors or that some other juror or jurors on the panel were partial. Second, the court held that an expert could testify beyond the scope of his report absent surprise or bad faith. Third, the court held that there was sufficient evidence to justify a charge instructing the jury that defendant was not liable if the injury was solely the result of plaintiff's pre-existing condition. Finally, when conflicting testimony and credibility were primary issues, a jury's determination of causation should not be lightly overturned.

**OUTCOME:** The court denied plaintiff's motion for a new trial in plaintiff's action under FELA for damages against defendant.

**LexisNexis(R) Headnotes**

*Civil Procedure > Federal & State Interrelationships > Abstention*
*Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials*
*Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend*
[HN1] *Fed. R. Civ. P. 59(a)* provides that a court may order a new trial in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States. *Fed. R. Civ. P. 59(a).* A new trial may be granted where there was substantial error in the admission or exclusion of evidence; error in the court's instruction to the jury; excessive or inadequate jury interrogatories; or where the verdict is against the weight of the evidence. The decision to grant a new trial is committed to the sound discretion of the trial court. A jury verdict will not be set aside unless the jury has reached a seriously erroneous result that would amount to a miscarriage of justice if left standing. The court should abstain from interfering with the jury verdict unless it is quite clear that the jury has reached a seri-

1992 U.S. Dist. LEXIS 5807, *

ously erroneous result. In addition, where the subject matter of litigation is simple and does not require complex factual determinations, the court has less freedom to scrutinize the jury's verdict.

*Civil Procedure > Judicial Officers > Judges > Discretion*
*Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials*
*Criminal Law & Procedure > Juries & Jurors > Disqualification & Removal of Jurors > Judicial Discretion*
[HN2] A litigant is entitled only to a fair trial and not a perfect trial. A trial judge has substantial discretion in excusing a potential juror for cause.

*Civil Procedure > Discovery > Methods > Expert Witness Discovery*
*Civil Procedure > Appeals > Standards of Review > Reversible Errors*
*Evidence > Testimony > General Overview*
[HN3] Testimony of an expert on matters within the expert's expertise but outside of the expert's report is not only permissible at trial, but the exclusion of such testimony at trial may be reversible error. An expert may testify beyond the scope of his report absent surprise or bad faith.

*Civil Procedure > Trials > Jury Trials > Jury Instructions > General Overview*
[HN4] The trial court has broad discretion in the form and language used in the charge. If the jury charge taken as a whole is not confusing or misleading in presenting the law, then the charge will be upheld.

*Governments > Federal Government > Claims By & Against*
*Torts > Transportation Torts > Rail Transportation > Federal Employers' Liability Act*
[HN5] In a case under the Federal Employers' Liability Act, the primary issue for jury determination is whether the negligence of the defendant was a cause no matter how slight of the plaintiff's injuries.

*Civil Procedure > Trials > Jury Trials > Jury Instructions > General Overview*
[HN6] The trial court commits error when the court charges the jury on an issue upon which insufficient evidence has been presented.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials*
[HN7] A district court should only grant a new trial on the ground that the verdict was against the weight of the evidence if a miscarriage of justice would result by allowing the verdict to stand. In other words, the verdict must cry out on the record to be overturned or the verdict shocks the court's conscience. If the subject matter of the litigation is simple and within the understanding of a layman, the district court has less freedom to grant a new trial.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials*
[HN8] Where conflicting testimony and credibility are primary issues, a jury's determination of causation should not be lightly overturned.

**COUNSEL:** FOR EDWARD FRITZ, PLAINTIFF, RICHARD HAAZ, LISS, HAAZ & TINTENFASS, P.C., 121 S. 13TH STREET, SUITE 300, PHILADELPHIA, PA 19107.

FOR CONSOLIDATED RAIL CORP. t/a CONRAIL, DEFENDANT, PAUL F. X. GALLAGHER, GALLAGHER, WHEELER, REILLY & LACHAT, 12 S. 12TH STREET, 3100 P.S.F.S. BLDG., PHILA, PA 19107, USA. WILFRED T. MILLS, JR., 12 S. 12TH STREET, 3100 PSFS BLDG., PHILADELPHIA, PA 19107, USA.

**JUDGES:** HUTTON

**OPINION BY:** BY THE COURT; HERBERT J. HUTTON

**OPINION:**

*MEMORANDUM AND ORDER*

HUTTON, J.

April 22, 1992

Presently before the Court is plaintiff's Motion for New Trial, defendant's response, plaintiff's Memorandum in Support, and Defendant's Memorandum in Opposition. For the following reasons, plaintiff's Motion is DENIED.

This action is a claim for damages arising under the Federal Employers' Liability Act for damages resulting

from injuries allegedly caused by the defendant, Consolidated Rail Corporation ("Conrail"). A jury trial commenced on January 29, 1992 and concluded with a jury verdict on February 4, 1992. The jury found that Conrail was negligent, but was not the cause of the injuries sustained by the plaintiff.

Timely post-trial motions followed the entry of judgment in favor of the defendant, [*2] wherein the plaintiff sets forth four grounds for a new trial. The plaintiff alleges errors during the voir dire, trial and charge which require a new trial. The plaintiff also alleges that the verdict was against the weight of the evidence. For the following reasons, the Court finds that no errors were made and that the verdict is not against the weight of the evidence.

### A. Standard

[HN1] Rule 59(a) of the Federal Rules of Civil Procedure provides that a court may order a new trial "in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the Courts of the United States . . . ." Fed.R.Civ.P. 59(a). A new trial may be granted where there was substantial error in the admission or exclusion of evidence; error in the court's instruction to the jury; excessive or inadequate jury interrogatories; or where the verdict is against the weight of the evidence. Northeast Women's Center v. McMonagle, 689 F. Supp. 465 (E.D. Pa.), aff'd in part and rev'd in part, 886 F.2d 1342 (3d Cir. 1988).

The decision to grant a new trial is committed to the sound discretion [*3] of the trial court. See Smith v. United News Co., 413 Pa. 243, 196 A.2d 302 (1964). A jury verdict will not be set aside unless the jury has reached a seriously erroneous result that would amount to a miscarriage of justice if left standing. Lind v. Schenley Industries, Inc., 278 F.2d 79, 89 (3d Cir. 1959), cert. denied, Schenley Industries, Inc. v. Lind, 364 U.S. 835 (1960); 6A Moore's Federal Practice, P59.08[5], at 59-150 (2d ed. 1989). The Court should abstain from interfering with the jury verdict "unless it is quite clear that the jury has reached a seriously erroneous result." Marley v. City of Allentown, 774 F. Supp. 343, 345 (E.D. Pa. 1991). In addition, where the subject matter of litigation is simple and does not require complex factual determinations, the Court has less freedom to scrutinize the jury's verdict. Williamson v. Consolidated Rail Corp., 926 F.2d 1344 (3d Cir. 1991).

### B. Analysis

#### 1. Voir Dire

The plaintiff's essential allegation regarding error in the voir dire process is that the Court should have struck two potential jurors for cause [*4] and the Court's failure to do so was prejudicial error. The alleged prejudice is caused by the plaintiff having to use two of his peremptory strikes to remove the two potential jurors who allegedly should have been stricken for cause. The plaintiff has not indicated whether there were jurors on the panel for whom he would have used a peremptory challenge to strike or even whether he used his third peremptory challenge. The sole basis of prejudice is that he may have wanted to use these two peremptory challenges but could not. He has not stated which juror, if any, was prejudiced against him or plaintiffs in general.

Civil voir dire in this district is normally conducted outside the presence of the judge. Sweiboda v. Black & Decker Manuf. Co., 1987 WL 7397 * 2 (E.D. Pa., Fullam, J., March 4, 1987). In this case, the deputy clerk and counsel from both sides conducted the voir dire until a problem arose which required the Court's attention. The Court conducted a further voir dire of the potential jurors and excused one for cause and rejected all other challenges for cause. At no point in time from the Court ruling on the challenges for cause until the motion for a new trial did [*5] the plaintiff raise an objection that the panel was partial or prejudiced against him. The plaintiff also did not raise an objection to any juror who was serving on the jury stating that some particular juror was unfair or partial to the defense. Indeed, plaintiff did not inform the Court of his concern regarding possible bias of the jury until the filing of plaintiff's motion, and even the motion does not reveal the substance of plaintiff's concern. This inability to demonstrate actual prejudice alone is sufficient to deny the plaintiff's motion on this point. Sweiboda, at * 2. However, the Court will address the merits of the plaintiff's contentions.

The Supreme Court has stated that [HN2] a litigant is entitled only to a fair trial and not a perfect trial. McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 553 (1984). In considering a motion for a new trial based upon an alleged problem in the jury selection, n1 the Supreme Court stated the following about the voir dire process:

One touchstone of a fair trial is an impartial trier of fact - - "a jury capable and willing to decide the case solely on the evidence before it." . . . Voir dire examination serves [*6] to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors. Demonstrated bias in the responses to questions on voir dire may result in a jurors being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges.

Id. at 554. The United States Court of Appeals for the Third Circuit while examining a related jury selection

issue held that a trial judge has substantial discretion in excusing a potential juror for cause. *United States v. Calabrese, 942 F.2d 218, 227 (3d Cir. 1991).* The trial judge observes the juror's conduct during voir dire and evaluates the juror's answers to the voir dire questions. Id. The discretion then lies with the trial judge as to whether the juror should be excused for cause.

> n1 The McDonough case is distinguishable from the present case. In McDonough one juror gave an honest but mistaken response to a voir dire question. If the juror had responded to the question correctly, he possibly would have been stricken for cause or the response might have prompted a peremptory challenge. The Supreme Court held that his inclusion as a juror did not prejudice the plaintiff.

[*7]

In this case, at counsel's request, the Court conducted a voir dire of the jurors who were requested by plaintiff's counsel to be stricken for cause. On the basis of the Court's own voir dire of the potential jurors, the answers the potential jurors gave, and their reactions, the Court decided that there was no reason to strike the jurors for cause. The Court found that the answers of the potential jurors did not rise to the level of demonstrated bias which requires a removal for cause. The plaintiff, therefore, used his peremptory strikes. See *McDonough, 454 U.S. at 554.* The plaintiff has not demonstrated that he was prejudiced by the use of his peremptory strikes on these jurors or that some other juror or jurors on the panel were partial. Because the Court finds that its original decision based upon the voir dire denying the challenges for cause was correct and that the plaintiff has proven no prejudice as a result of that decision, the Court denies plaintiff's motion on this point.

*2. Expert Testimony*

The plaintiff also complains that the Court erred during trial by allowing the expert witnesses of the defendant to testify beyond the scope of their [*8] reports and address issues of whether the surgery on the plaintiff was proper. This objection whether based upon surprise or possible jury confusion must be overruled.

[HN3] Testimony of an expert on matters within the expert's expertise but outside of the expert's report is not only permissible at trial, but the exclusion of such testimony at trial may be reversible error. *DeMarines v. KLM Royal Dutch Airlines, 580 F.2d 1193 (3d Cir. 1978); Kelly v. GAF Corp., 115 F.R.D. 257, 258 (E.D. Pa. 1987).* There is no rule of law or statute which prohibits an expert from testifying beyond the scope of his report. *Kelly, 115 F.R.D. at 258. Fed.R.Civ.Pro.*

26(b)(4) provides the exclusive method for discovering an expert's testimony, but it does not state that an expert report is the only method of discovery nor does it state that such a report restricts the expert's testimony at trial. Id. In the art or science that the expert is qualified to express an opinion, there is no rule which requires that the expert confine his testimony to his report. *McElroy v. Cessna Aircraft Co., 506 F. Supp. 1211, 1216 (W.D. Pa. 1981).* [*9]

The testimony at trial established that there were two surgeries performed on the plaintiff. The plaintiff's doctor stated that the second surgery was required because of the first surgery. The trial deposition of Dr. Kalko and the cross-examination of Dr. Khavarian at trial indicated that the issue of the appropriateness of surgery had been raised prior to the testimony of the defense experts. The Court permitted Dr. Hoffman to testify on this issue but instructed Dr. Shuman not to testify on this issue. The Court found that the testimony of Dr. Hoffman was within the area of his expertise. The Court struck the testimony of Dr. Shuman and instructed the jury to disregard the testimony. The Court further instructed the jury in the charge to disregard any evidence of negligence by the treating physicians. n2

> n2 The Court gave the following instruction in the charge regarding this issue:
>
> You are not permitted to reduce any award to which you may find that the plaintiff is entitled, because of unproven allegations that the plaintiff's treating physicians were negligent and may have caused him to suffer harm. These allegations of negligence have not been proven as a matter of law. I instruct you that there is not sufficient evidence in the record for you to find that any actions by those physicians who treated or operated upon the plaintiff were acts of such extraordinary negligence so as to relieve the defendant of negligence, if you have found any, for which the defendant may be liable.

[*10]

The Court did not err by allowing Dr. Hoffman to testify beyond the scope of his written report. An expert may testify beyond the scope of his report absent surprise or bad faith. *Kelly, 115 F.R.D. at 258; McElroy, 506 F. Supp. at 1216.* There was no bad faith, and given the prior testimony of the plaintiff's experts there was no prejudicial surprise. Any possible jury confusion was prevented by the Court by charging the jury to disregard the possible negligence of the plaintiff's doctors.

*3. Charge on Causation*

The following portion of the charge and, in particular, the last sentence of this paragraph was objected to by the plaintiff at trial and in this motion:

I further instruct that a defendant is subject to liability for harm to a plaintiff, although the physical condition of the plaintiff which is neither known or should be known to the defendant makes the injury greater than that which the defendant should have foreseen as a probable result of its conduct. Therefore, if the pre-existing condition in a plaintiff is aggravated by the negligence of the defendant, the plaintiff may recover for his damages which flow from the negligence, [*11] even though those damages are greater than what would normally be foreseen. However, if the injury is solely the result of the pre-existing condition and the defendant's negligence played no part in causing the injury, then the plaintiff has failed to prove causation.

The basis for the objection by the plaintiff is not that the charge is an improper statement of the law. The objection is that there is no basis in the record from the evidence for a charge on pre-existing injury. Therefore, because there was no evidence which would require such a charge, the jury was confused when the Court gave the charge.

[HN4] The trial court has broad discretion in the form and language used in the charge. *Cope v. Burlington Northern R. Co., 907 F.2d 67, 70 (6th Cir. 1990); Savarese v. Agriss, 883 F.2d 1194, 1202 (3d Cir. 1989).* If the jury charge taken as a whole is not confusing or misleading in presenting the law, then the charge will be upheld. *Cope, 907 F.2d at 70; Savarese, 883 F.2d at 1202.* [HN5] In a FELA case the primary issue for jury determination is whether the negligence of the defendant was a cause no matter [*12] how slight of the plaintiff's injuries. *Wilson v. Burlington Northern R. Co., 804 F.2d 607, 609 (10th Cir. 1986).* [HN6] The trial court commits error when the court charges the jury on an issue upon which insufficient evidence has been presented. *Jones v. Consolidated Rail Corp., 800 F.2d 590, 592 (6th Cir. 1986).* The Court's analysis on this issue focuses not on whether the law as stated in the challenged portion of the charge is correct. That issue has not been raised. The Court's analysis focuses upon whether there was sufficient evidence to justify the portion of the charge set forth above.

Dr. Shuman testified that there was evidence of degenerative disk disease in the MRI of the plaintiff taken at the time of the accident. She further stated that it had to have begun prior to the accident because it takes several years for such a condition to be evident on an MRI. She also stated with reasonable medical certainty that the plaintiff's injuries could have been caused simply by stepping off the truck. She also stated that the injuries could have been caused by falling out of the truck. Dr. Hoffman gave a similar opinion regarding the cause of the [*13] plaintiff's injuries. The plaintiff's treating physicians stated that the MRI disclosed a prior degenerative disk condition. He further stated that a person with the plaintiff's condition could suffer similar injuries by merely bending over and tying his shoes. There was sufficient evidence presented by both parties on this issue of the pre-existing degenerative condition in the plaintiff's back. Based upon this evidence, a charge on pre-existing condition was required.

The plaintiff requested a series of points for charge dealing with the issues of pre-existing condition. By requesting these points the plaintiff admits that there was sufficient evidence to establish that a pre-existing condition existed regarding the plaintiff's back. All of the requested points stated that the defendant would be liable for all damages which would flow from the defendant's negligence even if the injuries would have been less if the plaintiff did not have the pre-existing condition. That charge is incorporated in the Court's charge. The plaintiff asked for and received a charge instructing the jury that the defendant takes the plaintiff as it finds him with all of his faults and pre-existing conditions. [*14] The plaintiff cannot now complain of a charge on pre-existing condition when he requested it himself.

The last sentence of the challenged portion of the charge concerns causation:

However, if the injury is solely the result of the pre-existing condition and the defendant's negligence played no part in causing the injury, then the plaintiff has failed to prove causation.

This sentence stated first that the Jury should determine if the injuries the plaintiff suffered were solely the result of his pre-existing degenerative back problem. To find this the jury would have to consider whether anything the defendant did caused the injuries. The Court then reemphasized the point and further instructed the jury to determine whether the defendant's negligence played a part in causing the plaintiff's injuries. The Court forced the jury to look at both sides of the causation coin in order to point out the minimal level of causation, any part no matter how small, which the plaintiff had to prove for the defendant to be liable. As stated above, all of the doctors who testified told the jury that given the plaintiff's pre-existing condition, the plaintiff's injuries could have been caused by [*15] simply stepping out of the truck or some other twisting of the back. Therefore, a charge that the pre-existing condition could have been the sole cause was warranted.

There was sufficient evidence in the record to warrant a charge on whether the pre-existing condition was

1992 U.S. Dist. LEXIS 5807, *

the sole cause of the injuries. The testimony of the defendant's experts put the issue before the jury. The plaintiff had even requested a charge on pre-existing condition. The whole charge on causation instructed the jury that if the defendant's negligence played any part no matter how small, the defendant was liable. The charge as a whole was not misleading or confusing and was based upon the evidence in the record. *Cope v. Burlington Northern R. Co., 907 F.2d 67, 70 (6th Cir. 1990); Savarese v. Agriss, 883 F.2d 1194, 1202 (3d Cir. 1989).* The plaintiff's objection on this point is overruled.

### 4. Jury Verdict

When a district court grants a motion for a new trial based upon a verdict against the weight of the evidence, the district court necessarily has substituted its judgment of the facts and the credibility of the witnesses for that of the jury. *Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1352 (3d Cir. 1991).* [*16] Therefore, [HN7] a district court should only grant a new trial on that ground, if a miscarriage of justice would result by allowing the verdict to stand. Id. In other words, the verdict must cry out on the record to be overturned or the verdict "shocks [the court's] conscience." *Id. at 1353.* If the subject matter of the litigation is simple and within the understanding of a layman, the district court has less freedom to grant a new trial. *Id. at 1352.* The verdict in this case does not shock the conscience of the Court nor does it result in a miscarriage of justice.

The jury found that the defendant was negligent in maintaining the truck which the plaintiff was using on the date of the accident. From the testimony presented the jury had several options based upon the evidence as to causation. They could have found that the hole in the truck was the sole cause of the plaintiff's injuries. The jury also could have found that the pre-existing condition of the plaintiff was aggravated by the way the plaintiff

was forced to exit the truck due to the defendant's negligence. They could have found that the plaintiff caused his own injuries by his own [*17] action of stepping out of the truck in a way which injured his back regardless of his pre-existing condition or defendant's negligence. They also could have found that the plaintiff had a pre-existing condition which the plaintiff aggravated by the way he stepped out of the truck, the defendant's negligence having no effect nor in any way causing the injury. The jury obviously found that one of the latter two scenarios fit the evidence.

The plaintiff presented one version of the accident at trial and also gave several other versions in statements prior to trial. The credibility of the plaintiff was a primary issue for jury resolution. The Court, in the previous section discussing the appropriateness of the charge, considered the relevant evidence on causation and will not restate it here. The jury was presented with conflicting testimony and credibility are primary issues, a jury's determination of causation should not be lightly overturned. *Williamson, 926 F.2d at 1352-53.* The plaintiff's Motion for New Trial is *DENIED.* An appropriate Order follows.

### ORDER

AND NOW, this 22nd day of April, 1992, upon consideration [*18] of Plaintiff's Motion for New Trial, Defendant's response, Plaintiff's Memorandum in Support, and Defendant's Memorandum in Opposition, IT IS HEREBY ORDERED that Plaintiff's Motion for New Trial is *DENIED.*

BY THE COURT:

HERBERT J. HUTTON, J.

# EXHIBIT 2

Westlaw.

Slip Copy                                                                 Page 1
Slip Copy, 2006 WL 2435083 (D.Del.)
**(Cite as: Slip Copy)**

**H**
Power Integrations, Inc. v. Fairchild Semiconductor
Intern., Inc.
D.Del.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
POWER INTEGRATIONS, INC., a Delaware
corporation, Plaintiff,
v.
FAIRCHILD SEMICONDUCTOR
INTERNATIONAL, INC., a Delaware corporation,
and Fairchild Semiconductor Corporation, a
Delaware corporation, Defendants.
**No. C.A. 04-1371-JJF.**

Aug. 22, 2006.

William J. Marsden, Jr., Sean Paul Hayes, Fish &
Richardson, P.C., John M. Seaman, Bouchard,
Margules & Friedlander, P.A., Wilmington, DE, for
Plaintiff.
John G. Day, Steven J. Balick, Lauren E. Maguire,
Tiffany Geyer Lydon, Ashby & Geddes, Bas De
Blank, George Guy Guy, III, Pro Hac Vice,
Wilmington, DE, for Defendants.

*MEMORANDUM ORDER*
FARNAN, J.
**\*1** Pending before the Court is a Motion in Limine
(D.I.272) filed by Plaintiff, Power Integrations, Inc.
("Power Integrations"), requesting the Court to
preclude Defendants, Fairchild Semiconductor
International, Inc. and Fairchild Semiconductor
Corporation (collectively, "Fairchild") from
presenting expert testimony beyond the scope of their
technical experts' reports. Specifically, Power
Integrations contends that Dr. Peter Gwozdz provided
a "Supplementary" expert report the evening before
his deposition which changed his analysis of the
Eklund '075 patent and relied on "new" prior art that
he had not addressed in his opening expert report.
Power Integrations also contends that after the
Court's discovery cut-off, Dr. Paul Horowitz
improperly offered an opinion that certain prior art
references rendered the patents-in-suit obvious, even
though his expert report contained only conclusory
statements about obviousness. Dr. Horowitz also
produced revised claim charts the morning of his
deposition, which Power Integrations contends was
inappropriate.

Fairchild has filed a Response to Power Integrations'
Motion acknowledging that experts generally should
not be permitted to testify regarding information not
contained in their expert reports. However, Fairchild
contends that an exception exists with respect to the
testimony of Dr. Gwozdz because (1) Power
Integrations withheld the prior art which caused Dr.
Gwozdz to have to supplement his report, and (2) Dr.
Gwozdz properly responded to arguments raised by
Power Integrations' experts and his opinions in this
regard were consistent with his expert report. As for
Dr. Horowitz, Fairchild contends that Dr. Horowitz'
report fully and timely disclosed his opinions and that
the charts and notes used by Dr. Horowitz during his
deposition narrowed, rather than expanded his expert
opinion.

Pursuant to Federal Rule of Evidence 26(a)(2)(B), an
expert report "shall contain a complete statement of
all opinions to be expressed and the basis and reasons
therefor." Failure to disclose information required by
this Rule may result in the exclusion of evidence
based on that information, unless the failure to
disclose is harmless. Fed.R.Civ.P. 37(c)(1). The
determination of whether to exclude evidence is
committed to the Court's discretion. *In re Paoli R.R.
Yard PCB Litig.,* 35 F.3d 717, 749 (3d Cir.1994) (on
a motion to exclude proffered expert testimony, the
trial court's inquiry is a flexible one, and its decision
to admit or exclude expert testimony is reviewed
under an "abuse of discretion" standard) (internal
citations omitted).

The Court has reviewed the Supplemental Report of
Dr. Gwozdz in light of the disclosures in his original
expert report and the arguments of the parties and
concludes that Dr. Gwozdz Supplemental Expert
Report should not be excluded. Although Fairchild
timely requested Power Integrations to supply it with
the documents from the Motorola litigation and
relevant prior art, it appears that Power Integrations
did not comply fully with this request and failed to
disclose to Fairchild the "Sun Thesis" and the
"Wacyk Reference." Having failed to properly
disclose these references in the first instance, the
Court concludes that the Supplemental Report of Dr.
Gwozdz addressing these references should not be
precluded from evidence. In addition, the Court is
persuaded that Dr. Gwozdz supplemental analysis of
the Eklund notes and the '075 analysis is consistent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2435083 (D.Del.)
(Cite as: Slip Copy)

with the opinions he referenced in his original report, and a proper elaboration of those opinions in response to the new testimony offered by Mr. Shields at his deposition which took place two and half months after Fairchild's initial expert report was served. Further, the Court is not persuaded by Power Integrations' argument that it is prejudiced by Dr. Gwozdz Supplemental Report. Although Power Integrations points out that Dr. Gwozdz produced his Supplemental Report the day before his deposition was to be scheduled, Power Integrations fails to mention that Dr. Gwozdz actual deposition was postponed, at the request of Power Integrations, for an additional 18 days after service of his Supplemental Report. In these circumstances, the Court concludes that Power Integrations had ample opportunity to review Dr. Gwozdz Supplemental Report and question him about its contents at his deposition, and therefore, Power Integrations will not be prejudiced by the admission of Dr. Gwozdz Supplemental Report.

*2 As for the "revised" claim charts produced by Dr. Horowitz the morning of his deposition, the Court notes that these "revised" charts consist of Dr. Horowitz's handwritten notes in the margins of the claim charts contained in his original expert report. Dr. Horowitz produced these notes in compliance with Power Integrations' subpoena requesting all his notes and documents. The Court has reviewed the notes made by Dr. Horowitz and concludes that they contain either minor corrections to the claim charts of a typographical nature, or are opinions that are consistent with or narrower than those which were disclosed in the body of his original expert report. For example, Dr. Horowitz's notes strike out invalidity arguments that he no longer wished to advance and corrected designations to certain references. Power Integrations also generally contends that Dr. Horowitz's claim charts do not provide any detailed support for his conclusions regarding invalidity. In the Court's view, however, Dr. Horowitz's original expert report, as well as the attached claim charts, are sufficiently detailed to support his opinions. Accordingly, the Court will deny Power Integrations' motion to exclude the testimony of Dr. Horowitz as it relates to invalidity.

NOW THEREFORE, IT IS HEREBY ORDERED that Power Integrations' Motion In Limine (D.I.272) to exclude the supplemental report of Dr. Gwozdz and the testimony of Dr. Horowitz as beyond the scope of their expert reports is *DENIED*.

D.Del.,2006.

Power Integrations, Inc. v. Fairchild Semiconductor Intern., Inc.
Slip Copy, 2006 WL 2435083 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 4

Westlaw.

Slip Copy                                                                                      Page 1
Slip Copy, 2007 WL 81673 (W.D.La.)
(Cite as: Slip Copy)

Mahoney v. Pilgrim's Pride Corp.
W.D.La.,2007.
Only the Westlaw citation is currently available.
United States District Court,W.D. Louisiana.
James A. MAHONEY
v.
PILGRIM'S PRIDE CORP.
No. Civ.A. 05-2156.

Jan. 9, 2007.

James R. Herron, Monroe, LA, for James A. Mahoney.
Troy J. Charpentier, Kean Miller et al (BR), Baton Rouge, LA, for Pilgrim's Pride Corp.

MEMORANDUM RULING
JAMES, J.
*1 Pending before the Court is Defendant Pilgrim's Pride Corporation's ("PPC's") Motion to Exclude Testimony from Frank Loeffler [Doc. No. 10]. For the following reasons, PPC's Motion is GRANTED IN PART and DENIED IN PART.

I. PPC'S MOTION TO EXCLUDE

A. CAUSE AND ORIGIN OF THE EXPLOSION

PPC argues that Frank Loeffler ("Loeffler"), Plaintiff James A. Mahoney's ("Mahoney's") expert witness, is not qualified to offer an opinion regarding the cause and origin of the explosion. Loeffler admits he is not an expert in the field of fire science, or the investigation and determination of the cause and origin of fires and explosions. [Doc. No. 10, Exh. A, p. 37, lines 10-18; hereinafter referred to as "Depo."]. Loeffler also testified that he has no formal education or training in this field [Depo. p. 37, lines 19-24]; he has never been accepted by a court as an expert in this field [Depo. p. 39, lines 1-4]; and he did not review the recognized standard in the field prior to issuing his opinion [Depo. p. 46, lines 5-12].

Mahoney argues that although Loeffler is not a cause and origin expert, he has technical knowledge as to what causes grain conveyor systems to fail and how to prevent fires from occurring. He has been accepted

as an expert in the design of conveyor systems [Depo. pp. 23-30] and employed in the investigation of several conveyor fires [Depo. pp. 37-38, 129-131].

"When an expert witness honestly and forthrightly testifies that he is not qualified in a particular area ... the witness is unqualified, under *Daubert*, to provide an expert opinion in that area ..." and his testimony must be excluded. *Shelter Ins. Co. v. Ford Motor Co.*, No. 06-60295, 2006 U.S.App. LEXIS 31120, at *7 (5th Cir. Dec.18, 2006) (unpublished decision).

In *Shelter Insurance Company*, the plaintiffs alleged that the failure of a switch in a car manufactured by Ford caused a fire in their garage. They retained an automotive expert who admitted that he was not trained in the field of fire science. The district court excluded his testimony on the actual cause of the fire, despite the fact that he had investigated approximately 190 vehicle fires. The district court reasoned that "[i]n this case, an expert is needed to demonstrate that with a reasonable scientific certainty, the subject switch actually caused the subject fire. Miller does not possess the training or education in fire science necessary to do this. Experience alone in fire science is insufficient." *Shelter Ins. Co. v. Ford Motor Co.*, No. 03-150, 2006 U.S. Dist. LEXIS 15238, at *10-11 (N.D.Miss. Feb. 8, 2006), *affirmed, Shelter Ins. Co.*, 2006 U.S.App. LEXIS 31120.

The facts of this case are analogous. While Loeffler is undisputedly qualified and permitted to opine whether the conveyor system malfunctioned, he is not qualified to render an expert opinion on the precise cause and origin of the explosion. *Id.* at 11-12 (reasoning that the expert was "qualified by knowledge, skill, experience, training, or education to opine that the subject switch was defectively designed").

*2 Therefore, PPC's Motion to Exclude is GRANTED.

B. OCCUPATIONAL HEALTH AND SAFETY ADMINISTRATION ("OSHA") REGULATION § 1910.272(q)

PPC contends that Loeffler should not be allowed to testify regarding PPC's compliance with §

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1910.272(q) because it does not apply to the facility in question. PPC argues that § 1910.272(q) only applies to "grain elevators" with "inside bucket elevators." 29 C.F.R. § 1910.272(b)(2) ("Paragraphs (o), (p), and (q) of this section apply only to grain elevators."). While "feed mill" is not defined, "grain elevator" is defined as a facility "engaged in the receipt, handling, and storage of bulk raw agricultural commodities...." 29 C.F.R. § 1910.272(c). Compared to feed mills, grain elevators store and process a larger amount of bulk raw agricultural commodities, at a higher belt speed, and primarily process grain. Because the facility in question operates at a lower speed (15,000 bushels per hour) than the average grain elevator (40-50,000 bushels per hour), PPC argues it should be characterized as a feed mill.

PPC also contends that § 1910.272(q) only applies to grain elevators with an "inside bucket elevator," or a bucket elevator with more than twenty (20) percent of its total leg height enclosed in the grain elevator. 29 C.F.R. § 1910.272(c). PPC argues that Loeffler admitted he guessed regarding the percentage of the leg that is enclosed. [Depo. pp. 100-101].

Mahoney argues that the distinction between a "grain elevator" and a "feed mill" is based on the risk of explosion. Loeffler opines that this is a dual purpose facility because it receives and stores a large amount of grain, and the belt speed and processing capacity are significantly higher than that of a typical feed mill. PPC's facility is subject to the stricter requirements of § 1910.272(q) because processing a large of amount of grain at a high belt speed increases the risk of explosion.

Mahoney also argues that PPC has refused to exchange complete drawings of the facility which would allow a more accurate analysis of the structure. However, he contends that Loeffler reviewed a drawing of the elevator produced by PPC and estimated that the percentage of the leg that is enclosed is more than thirty-five (35) percent.

The Court finds that Loeffler's opinion that the facility is a grain elevator and a feed mill is consistent with the rationale of OSHA regulations. PPC has not demonstrated that Loeffler's interpretation of OSHA regulations is unreasonable, nor that Loeffler's estimate of the percentage is unreliable.

Therefore, PPC's Motion to Exclude is DENIED.

### C. 2006 NATIONAL FIRE PROTECTION ASSOCIATION ("NFPA") STANDARDS

PPC contends that Loeffler should not be allowed to testify regarding PPC's compliance with 2006 NFPA standards because it does not apply to the facility in question. PPC contends that the facility was constructed in 1990, before 2006 NFPA standards were in effect.

*3 Mahoney argues that the PPC facility was modified in 2001, and, therefore, required to comply with 2000 NFPA standards, which Loeffler claims are substantially similar to 2006 NFPA standards.[FN1] Because PPC has failed to produce complete drawings of the facility, Loeffler compared a drawing of the facility dated in 2001 and photos taken immediately after the explosion. He contends that the 2001 drawing does not show several "chutes" which are depicted in the post-accident photos.

> FN1. Loeffler also claims that as a practical matter, grain facilities are ordinarily compliant with current NFPA standards to obtain insurance coverage and that current NFPA standards contain relevant information regarding the commercial availability and feasibility of safety devices. The Court notes that evidence regarding PPC's insurance coverage or the feasibility/availability of precautionary measures (not currently controverted by PPC) may raise other evidentiary issues. See Fed.R.Evid. 411; 407.

The Court finds that Loeffler's opinion that PPC is required to comply with 2000 NFPA standards is based on reliable evidence that the facility was modified in 2000-2001. Therefore, PPC's Motion to Exclude is DENIED.

### D. PPC'S SAFETY PROCEDURES

PPC contends that Loeffler should not be allowed to testify regarding whether PPC complied with its safety procedures because this testimony goes beyond the scope of Loeffler's report. Further, testimony regarding these procedures will not assist the jury because the procedures are not difficult to understand.

Mahoney contends that Loeffler's report and deposition testimony placed PPC on notice of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Loeffler's opinion that PPC failed to keep written records of its inspections as required internally and by OSHA. [Report, p. 6, ¶ F; Depo. p. 42, lines 1-12, p. 121, lines 4-8, pp. 121-129]. Additionally, because grain conveyor systems and regulations are complex and not easily understood, expert testimony will assist the jury.

The Court finds that expert testimony that explains the way a conveyor system works and PPC's related safety procedures will assist the jury in understanding the facts. Additionally, PPC was on notice of Loeffler's opinion regarding PPC's compliance with its safety procedures. *See Shelter Mut. Ins. Co. v. Culbertson's Ltd.,* No. 97-1609, 97-1969, 1999 U.S. Dist. LEXIS 3241, at *14 (E.D.La. Mar. 11, 1999) (quoting *Tauzier v. Dodge,* No. 97-2444, 1998 U.S. Dist. LEXIS 6424, at *4 (E.D.La. May 5, 1998)) ("[T]he purpose of an expert report is to notify opposing parties of the scope and content of the expert's proposed trial testimony."); *see also Southern Pac. Transp. Co. v. Builders Transp. Inc.,* No. 90-3177, 1993 U.S. Dist. LEXIS 7380, at *48 (E.D.La. May 25, 1993) (reasoning that where an expert is "questioned on the recently obtained information at his deposition, the deposition functions much like a supplemental expert report, and may be said to 'expand' the scope of the formal expert report.").

Therefore, PPC's Motion to Exclude is DENIED.

## II. CONCLUSION

For the following reasons, PPC's Motion to Exclude Testimony of Frank Loeffler [Doc. No. 10] is GRANTED IN PART AND DENIED IN PART.

MONROE, LOUISIANA, this *8* day of January, 2007.

W.D.La.,2007.
Mahoney v. Pilgrim's Pride Corp.
Slip Copy, 2007 WL 81673 (W.D.La.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

LEXSEE 1993 US DIST LEXIS 7380

⚠
Caution
As of: May 14, 2007

## SOUTHERN PACIFIC TRANSPORTATION CO. v. BUILDERS TRANSPORT, INC. ET AL.

### CIVIL ACTION NO. 90-3177 SECTION "N"

## UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

*1993 U.S. Dist. LEXIS 7380*

**May 25, 1993, Decided**
**May 25, 1993, Filed; May 26, 1993, Entered**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff train owner filed an action seeking damages against defendant, the owner of a tractor-trailer truck that collided with a train at a railroad crossing. The tractor-trailer owner filed a counter-claim alleging that the train owner and its crew were responsible for the accident.

**OVERVIEW:** This case arose out of a railroad crossing accident involving a train and a tractor-trailer truck. The train owner brought suit against the owner of the tractor-trailer and alleged that the driver of the tractor-trailer, an employee of the tractor-trailer owner, was at fault for the accident because the driver ignored the various warning signals and failing to stop at the grade crossing. The tractor-trailer owner filed a counter-claim, which alleged that the accident was the fault of the train owner and its crew because the train was traveling at an unreasonably dangerous speed. Defendant also alleged that the grade crossing, located on property owned and maintained by the train owner, lacked adequate warning devices, and the height of foliage on the crossing property dangerously obstructed the view of motorists stopped at the crossing. The court addressed a number of motions that were filed by the parties. Among other rulings, the court held that the state law negligence claims pertaining to the train's speed, but not the crossing warning devices, were pre-empted by the Federal Railroad Safety Act of 1970 (FRSA), *45 U.S.C.S. §§ 421-447*, and regulations promulgated thereunder.

**OUTCOME:** The court ruled on a number of motions and granted, in part, the train owner's motion in limine regarding the tractor trailer owner's negligence claim pertaining to the train's speed. The court ruled that such claim was preempted by federal law.

**LexisNexis(R) Headnotes**

*Transportation Law > Rail Transportation > Maintenance & Safety*
[HN1] The Federal Railroad Safety Act of 1970 (FRSA), at *45 U.S.C.S. § 434,* provides, in pertinent part: The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A state may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.

1993 U.S. Dist. LEXIS 7380, *

*Torts > Transportation Torts > Rail Transportation > General Overview*
*Transportation Law > Rail Transportation > Maintenance & Safety*
[HN2] Pursuant to *49 C.F.R. § 213.37*, vegetation on railroad property which is on or immediately adjacent to roadbed must be controlled so that it does not --(a) Become a fire hazard to track-carrying structures;(b) Obstruct visibility of railroad signs and signals;(c) Interfere with railroad employees performing normal trackside duties;(d) Prevent proper functioning of signal and communication lines; or(e) Prevent railroad employees from visually inspecting moving equipment from their normal duty stations.

*Civil Procedure > Federal & State Interrelationships > General Overview*
*Torts > Transportation Torts > Rail Transportation > General Overview*
*Transportation Law > Rail Transportation > Maintenance & Safety*
[HN3] *49 C.F.R. § 213.37* pre-empts a state law negligence claim concerning vegetation on or immediately adjacent to the roadbed, but does not pre-empt a state law negligence claim concerning vegetation elsewhere in the railroad's right-of-way.

*Energy & Utilities Law > Transportation & Pipelines > General Overview*
*Environmental Law > Litigation & Administrative Proceedings > Damages*
*Transportation Law > Carrier Duties & Liabilities > Hazardous Materials*
[HN4] *La. Civ. Code Ann. art. 2315.3* provides as follows: In addition to general and special damages, exemplary damages may be awarded, if it is proved that plaintiffs' injuries were caused by the defendant's wanton or reckless disregard for the public safety in the storage, handling, or transportation of hazardous or toxic substances. As used in this Article, the term hazardous or toxic substances shall not include electricity.

*Evidence > Procedural Considerations > Preliminary Questions > Admissibility of Evidence > General Overview*
*Evidence > Relevance > Subsequent Remedial Measures*
*Torts > Negligence > Proof > Evidence > Prior & Subsequent Events*
[HN5] Evidence of prior and subsequent accidents is admissible to prove a dangerous condition where the other accidents are substantially similar to the accident

involved in the litigation. Where notice of the dangerous condition is at issue, the requirement is relaxed to some extent.

*Torts > Negligence > Proof > Evidence > General Overview*
*Torts > Transportation Torts > Rail Transportation > Railroad Crossings*
*Transportation Law > Rail Transportation > Maintenance & Safety*
[HN6] *Fed. R. Evid. 404(b)* provides that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.

*Business & Corporate Law > Agency Relationships > Causes of Action & Remedies > Punitive Damages*
*Civil Procedure > Remedies > Damages > Punitive Damages*
*Torts > Negligence > General Overview*
[HN7] Where an agency relationship is conceded, and punitive damages are unavailable, a negligent entrustment action does not afford a complainant an additional avenue of recovery.

*Evidence > Relevance > Routine Practices*
[HN8] *Fed. R. Evid. 406* provides that evidence of the habit of a person is relevant to prove that the conduct of the person on a particular occasion was in conformity with the habit or routine practice.

*Evidence > Procedural Considerations > Preliminary Questions > Admissibility of Evidence > General Overview*
*Evidence > Relevance > Subsequent Remedial Measures*
*Torts > Negligence > Proof > Evidence > Prior & Subsequent Events*
[HN9] *Fed. R. Evid. 407* provides that when, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

1993 U.S. Dist. LEXIS 7380, *

*Evidence > Relevance > Subsequent Remedial Measures*
*Governments > Courts > Dicta*
[HN10] *Fed. R. Evid. 407* does not require the exclusion of evidence of subsequent repairs made by someone other than the defendant.

*Evidence > Relevance > Confusion, Prejudice & Waste of Time*
*Evidence > Relevance > Subsequent Remedial Measures*
[HN11] Although *Fed. R. Evid. 407* does not require the exclusion of evidence of remedial measures performed by a non-party, such evidence may be excluded under *Fed. R. Evid. 403* if its probative value is substantially outweighed by the danger of unfair prejudice.

*Governments > Public Improvements > Financing*
*Transportation Law > Commercial Vehicles > Maintenance & Safety*
*Transportation Law > Rail Transportation > Maintenance & Safety*
[HN12] *23 U.S.C.S. § 409* provides: Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled for the purpose of identifying evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144 and 152 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not he subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists or data.

*Evidence > Scientific Evidence > General Overview*
*Evidence > Testimony > Experts > Helpfulness*
*Evidence > Testimony > Experts > Qualifications*
[HN13] *Fed. R. Evid. 702* provides: If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

**JUDGES:** [*1] CLEMENT

**OPINION BY:** EDITH BROWN CLEMENT

**OPINION:**

ORDER AND REASONS

The following motions were decided this date on memoranda:

By Plaintiff Southern Pacific Transportation Co.:

1. Motion in Limine to Restrict Evidence of Prior and Subsequent Accidents: remains under submission.

2. Motion in Limine Concerning Subsequent Remedial Measures and Photographs that Depict Subsequent Improvements to the Crossing: DENIED.

3. Motion in Limine Concerning Evidence of Other Accidents Involving the Subject Train Crew: GRANTED.

4. Motion in Limine Concerning Federal Preemption of Builder's Transport's Claims Against Southern Pacific: GRANTED in part and DENIED in part.

5. Motion in Limine to Restrict or Limit Expert Testimony (of Robert Crommelin): DENIED in part and remains under submission in part.

6. Motion for Partial Dismissal of Claims by Builders Transport, Inc.: GRANTED.

By Defendant Builders Transport, Inc.:

1. Motion in Limine to Exclude Testimony of Ron M. Olson as an Expert Witness: GRANTED.

2. Motion to Exclude Punitive Damage Claims by Southern Pacific Transportation Company: remains under submission.

3. Motion in Opposition to Plaintiff's Motions in Limine to Exclude Evidence [*2] Under *23 U.S.C.A. § 409, 45 U.S.C.A. § 421* and *23 U.S.C.A. § 401*, et seq.: DENIED.

By Defendants Herman Myers and the train crew:

1. Motion in Limine (to exclude evidence of prior accidents, etc.): GRANTED.

2. Motion in Limine (to exclude evidence of collateral source benefits): remains under submission.

# I. BACKGROUND

This case arises out of a grade crossing accident occurring on June 11, 1990 in the Parish of St. Charles, Louisiana. A train owned by plaintiff Southern Pacific Transportation Co. (Southern) and operated by Joseph V. Lavergne, Herman G. Myers and James Philip, Jr. (collectively, the train crew) was proceeding in the easterly direction when it collided with a tractor-trailer unit owned by defendant Builders Transport, Inc. (Builders) and operated by its employee, defendant Jerry W. Condery. The Builders vehicle was proceeding in a southerly direction on Queenie Drive, exiting the Monsanto plant in Luling, Louisiana.

Southern and the train crew contend that the signal lights and bells at the crossing were properly activated, and that the train [*3] crew properly gave notice of the train's approach by blowing the train's horn. Southern and the train crew contend that the accident was the fault of Condery, for ignoring the various warning signals and failing to stop at the grade crossing. Southern initiated this action by bringing suit against Builders and Condery.

Builders contends that the accident was the fault of Southern and the train crew. Builders contends that (1) the train was traveling at an unreasonably dangerous speed, (2) the grade crossing, located on property owned and maintained by Southern, lacked adequate warning devices, and (3) the height of foliage on Southern's property dangerously obstructed the view of motorists stopped at the grade crossing. Builders has filed counterclaims against Southern and the train crew.

The train crew contends that its members suffered personal injuries as a result of the accident. The train crew has filed counterclaims against Builders and Condery, and has also brought a claim against Southern for assignment of its virile share of fault in connection with the accident.

# II. FEDERAL PRE-EMPTION

Southern has filed a motion 'in limine' concerning the issue of federal pre-emption [*4] of Builders' claims. Specifically, Southern contends that Builders' state law negligence action based on (1) the alleged excessive speed of the train, (2) obstructions caused by vegetation adjacent to the track, and (3) inadequate warning devices and signals, is pre-empted by the Federal Railroad Safety Act of 1970 (FRSA), *45 U.S.C. §§ 421-447* and regulations promulgated thereunder.

[HN1] Section 434 of Title 45 provides, in pertinent part:

> The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A state may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating [*5] an undue burden on interstate commerce.

Thus, the relevant inquiry is as follows: (1) has the Secretary adopted a rule, regulation, order or standard covering the subject matter of train speed, warning devices or track-side vegetation? and (2) if so, has Louisiana adopted a rule, regulation, order or standard to eliminate an essentially local hazard that is not inconsistent with the Federal law, rule, regulation, order or standard?

The Supreme Court has recently addressed these issues in *CSX Transportation, Inc. v. Easterwood, Nos. 91-790 and 91-1206, 61 U.S.L.W. 4346* (April 21, 1993). In Easterwood, the widow of a truck driver who was killed at a grade crossing brought suit against the railroad, alleging common law negligence based on the excessive speed of the train, the inadequacy of warning devices, and failure to control vegetation which obstructed the view of motorists.

## A. Excessive Speed

### 1. Pre-emption of State Law Cause of Action

The Supreme Court held that the FRSA and its regulations pre-empted the plaintiff's state law negligence claim based on excessive train speed. The Court noted that the Secretary had issued regulations [*6] setting maximum allowable operating speeds for passenger and freight trains, and concluded that these regulations pre-empted the application of any state common law negligence rule. *61 U.S.L.W. at 4350;* See *49 C.F.R. §*

1993 U.S. Dist. LEXIS 7380, *

*213.9(a).* The Court further reasoned that a common law negligence rule could not be seen as eliminating essentially local hazards, as such a rule would "address all hazards caused by lack of due care, not just those owing to unique local conditions." *61 U.S.L.W. at 4351.* Accordingly, Builders' excessive speed claim is pre-empted by the FRSA.

### 2. Private Grade Crossing?

Without attempting to cite any authority, Builders contends that Easterwood's holding does not apply to railroad tracks proceeding through "private" grade crossings.

Under Builders' interpretation of Easterwood (or "Eastwood," as Builders refers to it), the speed limit for trains would depend upon the status of highways that cross the railroad's right-of-way. The federal regulations would govern the train's speed until it approached a private roadway, and then, all of a sudden, federal law would stop preempting state law while the [*7] train crossed the grade crossing. This argument has no merit.

### 3. Violation of Federal Speed Limit?

In the alternative, Builders contends that it can assert a cause of on based on Southern's violation of the federal speed limit. Of course, if the train was traveling in excess of the federal speed limit, Builders' claim will not be pre-empted. Compare *Easterwood, 61 U.S.L.W. at 4350* ("respondent concedes that petitioner's train was traveling at less than [the federal speed limit]").

It is not disputed that the federally-imposed speed limit for the section of track including the Queenie Drive crossing was 80 miles per hour. Southern contends that the train was traveling at a rate of 61 miles per hour. Presumably, Builders contends that the train was traveling at a rate greater than 80 miles per hour. n1

> n1 In its "Supplemental Memorandum in Opposition to Motion in Limine Concerning Federal Pre-emption of Builder's Transport's Claims Against Southern Pacific," filed on May 18, 1993, Builders argues as follows:
>
> > Simply stated, Builder's Transport is claiming that Southern Pacific violated the regulations issued by the Secretary pursuant to F.R.S.A. codified at *49 CFR 213.9(a)* (1992) which sets maximum allowable operating speeds for all freight and passenger trains for each class or track on which they travel. As a matter of fact, Southern Pacific's own accident reports

and documents will disclose the violations of the federal regulations and federal speed limit.

Compare this position with Builders' "Opposition to Plaintiff's Motion in Limine to Exclude Prior and Subsequent Accidents," submitted on July 8, 1991:

> On July 11, 1990, the accident presently before this Court occurred with a five car train proceeding at a speed of approximately 61 m.p.h.

[*8]

Unfortunately, none of the parties have directed the Court's attention to evidence of the train's speed. Moreover, the speed of the train is listed as a contested issue of fact in the most recent version of the Pre-Trial Order. Consequently, the Court will be unable, prior to trial, to rule on whether Builders' excessive speed claim is pre-empted.

### B. Warning Devices

The Easterwood Court held that FRSA and its regulations did not preempt a claim of inadequate warning devices. The Court held that 23 CFR pt. 924, which requires the states (in order to qualify for federal highway funds) to establish a priority list of grade crossings that need improvement, did not preempt state common law negligence rules. The Court reasoned that the provisions of part 924 only "establish the general terms of the bargain between the federal and state governments," and were not inconsistent with a state common law negligence regime. *Id. at 4349.*

The Court also rejected the argument that *23 CFR §§ 646.214(b)(1)* and *655.603,* which require the states to employ warning devices that conform to standards set out in FHWA's Manual on Uniform Traffic Control Devices for Streets [*9] and Highways (MUTCD), somehow pre-empts a common law negligence cause of action. The Court noted that the MUTCD provides that "it is the intent that the provisions of this Manual be standards for traffic control devices installation, but not a legal requirement for installation." Id.

The Court held that there were other regulations which did establish warning device requirements, and might, in some circumstances, pre-empt state law. *Id. at 4349.* The Court cited *23 CFR §§ 646.214(b)(3)* and (4), which provide:

1993 U.S. Dist. LEXIS 7380, *

(3) (i) *Adequate warning devices,* under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions are met:

(A) Multiple mail line railroad tracks.

(B) Multiple track at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.

(C) High speed train operation combined with limited sight distance at either single or multiple track crossings.

(D) A combination of high speeds and moderately [*10] high volumes of highway and railroad traffic.

(E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of school buses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.

(F) A diagnostic team recommends them.

(ii) In individual cases where a diagnostic team justifies that the gates are not appropriate, FHWA may find that the above requirements are not applicable.

(4) For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA.

Thus, §§ 646.214(b)(3) and (4), the central inquiry is whether "Federal-aid funds participated in the installation of the devices" at the relevant crossing. In Easterwood, the Supreme Court noted that although a "gate was planned for [a grade crossing at the accident site] and funds set aside for the project . . ., the plan for the gate was shelved and the funds allocated for use in another project." 61 [*11] U.S.S.W. at 4350. Accordingly, the Court determined that federal funds were not used to install warning devices at the grade crossing in question, and concluded that the plaintiff's state law negligence action was not pre-empted. Id.

In this case, Southern contends that federal funds did "participate" in the installation of warning devices for purposes of the regulations. Southern argues as follows:

The evidence at trial will show that the Queenie Drive crossing had been rated, evaluated and listed with the Federal Railway Administration under the DOTD No. 757798P. It was thus prioritized and in line to receive an upgrading to gates using federally provided funds in accordance with the La. DOTD's determination of the need for gates at this particular crossing.

"Supplemental Memorandum in Support of Motion in Limine Concerning Federal Preemption of Builder's Transport's Claims Against Southern Pacific," pp. 5-6.

As noted above, the Easterwood Court expressly held that the mere placement of a crossing on a state priority list (which must be prepared in order for the state to receive federal highway funds) does not require the pre-emption of state law. *61 U.S.L.W. at 4348-49.* [*12]

The remaining question, then, is whether the existence of the State's alleged n2 plan to earmark federal funds for the grade crossing establishes that "Federal aid funds participated" in the installation of the devices for purposes of the regulations. In Easterwood, the Supreme Court looked to whether federal funds were actually spent on improvements to the grade crossing, not whether funds were merely allocated for the project. n3 In this case, it is not disputed that no federal funds have been used to upgrade the Queenie Drive crossing.

1993 U.S. Dist. LEXIS 7380, *

n2 Although Southern's preemption motion is labeled as a motion "in limine," it is, in fact, a motion for partial summary judgment. It is well-settled that the summary judgment movant has the burden of establishing that it is entitled to judgment based on uncontradicted facts, and that all evidence must be viewed in a light most favorable to the nonmovant. Southern has not submitted any evidence in support of its contention that federal funds were earmarked for the Queenie Drive crossing. Nonetheless, in order to resolve this issue conclusively, the Court will assume, pro arguendo, that the State of Louisiana did designate the Queenie Drive crossing for the receipt of federal funds.

[*13]

n3 In Easterwood, "a gate was . . . planned [for the crossing] and funds set aside for the project," but federal funds were never spent on the project.

Southern contends that Easterwood is distinguishable from this case, because the Queenie Drive crossing's designation for federally-funded improvement was never withdrawn:

> Distinguishing the facts contained in Easterwood, the State of Louisiana had made no such decision to not upgrade the Queenie Drive crossing, and had Monsanto company not stepped in and paid for the improvements to (the) gates, gates would have eventually been installed using federal funds. Monsanto's funding of the improvements shortly after the accident, did not negate Louisiana's participation in the federal project to upgrade existing crossings, nor was this crossing taken out of the interstate system simply because Monsanto stepped in and improved the crossing at its expense.

The Court finds this argument unpersuasive. The purpose of 23 CFR §§ 646.214(b)(3) and (4) is to provide a standard for grade crossings paid for, in whole or part, with federal funds. [*14] Southern's position is that these regulations take effect, and pre-empt state law, as soon as federal funds are earmarked for a particular grade crossing. Under Southern's construction of the regulations, all grade crossings designated to be improved with federal funds (but not already meeting federal standards) would be in violation of the federal regulations between the time they are selected for improvement and the time they are actually improved. This makes no sense.

The clear effect of 23 CFR §§ 646.214(b)(3) and (4) and Easterwood is that state law governs the adequacy of grade crossing warning devices prior to any federally-funded installation of warning devices, and federal law governs after such installation. Accordingly, Builders' state law negligence claim based on inadequacy of warning devices is not preempted.

**C. Vegetation**

The federal government has promulgated a regulation governing certain vegetation on a railroad's right-of-way:

> [HN2]
> **§ 213.37 Vegetation**
>
> Vegetation on railroad property which is on or immediately adjacent to roadbed must be controlled so that it does not --
>
> > (a) Become a fire hazard to track-carrying structures;
> >
> > (b) Obstruct visibility [*15] of railroad signs and signals;
> >
> > (c) Interfere with railroad employees performing normal trackside duties;
> >
> > (d) Prevent proper functioning of signal and communication lines; or
> >
> > (e) Prevent railroad employees from visually inspecting moving equipment from their normal duty stations.

49 CFR § 213.37. In Easterwood, the vegetation issue was not raised before the Supreme Court.

In Missouri Pacific Ry. Co. v. Railroad Commission of Texas, 833 F.2d 570 (5th Cir. 1987), various railroads sought injunctive relief against the Railroad Commission of Texas. The railroads alleged that various Texas rail-

1993 U.S. Dist. LEXIS 7380, *

road regulations were pre-empted by federal law. The Fifth Circuit held that *49 CFR § 213.37* did not preempt a Texas regulation concerning vegetation on portions of the right-of-way property not "on the roadbed" or "immediately adjacent thereto." *Id. at 577.* The court found that the Texas regulation was designed "to apply where the federal requirements end." Id. Because the Texas regulation did "not govern vegetation control on the roadbed and area immediately adjacent thereto," the court held that it was not pre-empted [*16] by § 213.37. Id.

In *Easterwood, supra,* the vegetation issue was addressed by the *Eleventh Circuit. 933 F.2d at 1554.* The court applied the reasoning of Missouri Pacific v. Railroad Commission in the common law tort context, holding that § 213.37 pre-empted all state law claims concerning vegetation on, or immediately adjacent to, the roadbed. Id. The court held that the regulation did not pre-empt claims regarding vegetation "near but not immediately adjacent to, the tracks," as those areas were not within the scope of the regulation. Id.

This Court concurs. By negative inference, Missouri Pacific v. Railroad Commission stands for the proposition that the federal government has chosen to regulate vegetation on or immediately adjacent to the roadbed, and that state law is pre-empted in that area. As the Eleventh Circuit held in Easterwood, this Court holds that [HN3] *49 CFR § 213.37* pre-empts a state law negligence claim concerning vegetation on or immediately adjacent to the roadbed, but does not pre-empt a state law negligence claim concerning vegetation elsewhere in the railroad's right-of-way.

## III.  [*17] PUNITIVE DAMAGES

Builders has filed a motion to "exclude" n4 Southern's punitive damages claim. Builders contends that (1) the Court has decided the issue, and (2) Southern cannot establish essential elements of a claim pursuant to *La. Civ. Code art. 2315.3.*

n4 In effect, Builders motion is a motion for partial summary judgment on the issue of punitive damages. Entire claims are not "excluded." Evidence is "excluded," claims are "dismissed."

### A. Ruling From the Court?

Builders states that, at a pre-trial conference on July 1, 1991, the Court (McNamara, J.) "stated that punitive damages were not at issue and would not be in the suit." However, the Minute Entry issued following that pretrial conference does not contain any ruling on the punitive damages issue. Although Judge McNamara may

have informally stated that it was his intention to grant judgment as a matter of law on the issue at trial, he did not enter any order into the record dismissing Southern's punitive damages claim. If Builders wanted this claim [*18] dismissed prior to trial, it should have filed the appropriate motion before Judge McNamara.

### B. *La. Civ. Code art. 2315.3*

[HN4] *La. Civ. Code art. 2315.3* provides as follows:

> In addition to general and special damages, exemplary damages may be awarded, if it is proved that plaintiff's injuries were caused by the defendant's wanton or reckless disregard for the public safety in the storage, handling, or transportation of hazardous or toxic substances. As used in this Article, the term hazardous or toxic substances shall not include electricity.

Builders contends that Southern's claim does not meet two important criteria of *La. Civ. Code art. 2315.3*: (1) the requirement that the substance be hazardous, and (2) that the defendant act with "wanton or reckless disregard for public safety."

### 1. Was the Substance Hazardous?

At the time of the accident, Builders' vehicle was transporting N-phosphonomethyliminodiacetic acid or "MON 5735," manufactured by Monsanto. Builders points out that an internal Monsanto document entitled "Monsanto Material Safety Data" contains the notation that "MON 5735 is not classified as a hazardous substance." However, it is not clear exactly who made [*19] that determination.

The same Monsanto document indicates that MON 5735 is "identified as a hazardous chemical under the criteria of the OSHA Hazard Communication Standard ( *29 CFR 1910.1200*)." The document further provides that MON 5735 "MAY CAUSE IRRITATION TO EYES, SKIN AND RESPIRATORY TRACT," and encourages handlers of the substance to "avoid contact with eyes, skin and clothing," "avoid breathing dust," "use with adequate ventilation," and to "wash thoroughly after handling." The Monsanto document is far from conclusive as to whether MON 5735 is a hazardous substance. Builders has not met its burden of proving that there are no genuine issues of material fact as to whether MON 5735 is a hazardous substance for purposes of *La. Civ. Code art. 2315.3.*

1993 U.S. Dist. LEXIS 7380, *

## 2. Wanton or Reckless Disregard

Builders contends that Southern has no evidence that Builders acted with wanton and reckless disregard for the public safety. Indeed, Southern, in its opposition memorandum, has not attempted to cite any evidence of such "wanton and reckless disregard." If the Court were addressing a competent motion for partial summary judgment on the issue of punitive damages, that motion would be granted in favor [*20] of Builders.

However, the Court is not addressing a motion for partial summary judgment, but, rather, a purported evidentiary motion to "exclude" evidence, filed on October 13, 1992, just six days before an October 19, 1992 trial setting. The memoranda submitted by the parties in connection with this motion are an inadequate basis for the granting of partial summary judgment. The movant for summary judgment meets its burden by "informing the court of the basis for its motion, and by identifying portions of the record which highlight the absence of genuine factual issues," and the nonmovant meets its burden by "tendering depositions, affidavits, and other competent evidence to buttress its claim." *Topalian v. Ehrman, 954 F.2d 1125, 1131-32 (5th Cir. 1992)*. Neither side has met its burden. Accordingly, the Court will reserve consideration of this issue until trial.

## IV. BUILDERS' CLAIM AGAINST MONSANTO

One element of damages of Builders' claim against Southern is $ 271,110.00, which allegedly represents an amount claimed by Monsanto for losses of product, clean up costs, and storage of clean up caused by the accident. Southern contends that this [*21] claim is not actionable because Builders has not paid Monsanto any damages for the loss of Monsanto's property, and, apparently, is under no legal obligation to do so. Monsanto is not a party to this litigation. Southern has filed a motion to dismiss this claim. n5

> n5 This issue, like many of the other issues discussed in this epic Order and Reasons, should have been the subject of a formal motion for summary judgment. Instead, it is the subject of a last-minute "motion for partial dismissal," for which the parties have each submitted 1 1/2 page memoranda devoid of legal authorities.

The nature of Builders' claim is not clear from the parties' memoranda. Perhaps Builders contends that it is subrogated to Monsanto's position? Perhaps Builders contends that it is entitled to contribution or indemnification from Southern?

Nonetheless, there do not appear to be any disputed issues of material fact to prevent the Court from ruling on this issue. Presumably, if (1) Monsanto had obtained a judgment against Builders, (2) [*22] Builders had voluntarily reimbursed Monsanto for the lost cargo, or (3) Monsanto had somehow assigned its right of action to Builders, Builders would have informed the Court of that transaction. In the absence of such a transaction, Builders does not have standing to assert a claim to recover losses incurred by Monsanto, as Builders itself has not incurred these losses.

Accordingly, Southern's motion for partial dismissal will be granted.

## IV. OTHER ACCIDENTS

### A. Accidents at the Queenie Drive Crossing

Builders intends to introduce evidence of prior and subsequent accidents occurring at the Queenie Drive grade crossing. Builders intends to introduce this evidence to prove that Southern had knowledge of the dangerous condition of the crossing, that a dangerous and defective condition existed, and that Southern had the ability to remedy the situation. Southern has moved in limine to have evidence of the prior and subsequent accidents excluded from evidence.

The Fifth Circuit has held that [HN5] evidence of prior and subsequent accidents is admissible to prove a dangerous condition where the "other" accidents are "substantially similar" to the accident involved in the litigation. [*23] *Rodriquez v. Crown Equip. Corp., 923 F.2d 416, 418 (5th Cir. 1991); McGonigal v. Gearhart Industries, Inc., 851 F.2d 774, 777-78 (5th Cir. 1988); Jackson v. Firestone Tire & Rubber Co., 788 F.2d 1070, 1082-83 (5th Cir. 1986)*. Where notice of the dangerous condition is at issue, as in negligence cases such as this one, the requirement is relaxed to some extent *McGonigal, 851 F.2d at 778; Jackson, 788 F.2d at 1083*.

Even under the more relaxed standard applied in negligence cases, the Court must carefully compare the circumstances of the "other" accidents to the collision at issue in this case before determining whether evidence of the other accidents may be admitted. From the scant information n6 provided by the parties, the prior and subsequent accidents can be summarized as follows:

| Date | Motorist n7 | Train Direction n8 | Motorist Direction | Train Speed n9 | Time of day | Cause |
|------|-------------|--------------------|--------------------|----------------|-------------|-------|

1993 U.S. Dist. LEXIS 7380, *

| | | | | | | |
|---|---|---|---|---|---|---|
| 1. 11/26/79 | ? | West | South | ? | ? | ? |
| 2. 7/8/87 | Cook | West | South | 45 mph | ? | ? |
| 3. 2/13/88 | Duhe | ? | ? | 45 mph | ? | ? |
| 4. 1/9/89 | ? | ? | ? | 65 mph | 5:15a n10 | ? |
| 5. 8/16/89 | Kramer | West | South | 35 mph | ? | |
| (6/11/90 | Condery | East | South | 61 mph? | 1:15p? | TBA) |
| 6. 7/10/90 | Wilson | ? | ? | 40 mph | ? | ? |

[*24]
In their memoranda, the parties have provided little analysis comparing the "other" accidents to the accident involved in this case. Nonetheless, based on the information provided, the Court will attempt to provide the parties with some guidance as to what evidence of other accidents will be admitted at trial.

n6 In the final pre-trial order, the parties shall complete the "other accident" chart, below.

n7 Information provided by Builders, but not supported by any exhibits or testimony.

n8 Information provided by Southern, but not supported by any exhibits or testimony.

n9 Information provided by Builders, but not supported by any exhibits or testimony.

n10 Information provided by Southern, but not supported by any exhibits or testimony.

### 1. Excessive Speed

None of the other accidents are relevant to Builders' excessive speed claim, as none of the trains were traveling in excess of 80 miles per hour. Builders is preempted from arguing that speeds between 35 and 65 miles per hour, or any [*25] speeds under 80 miles per hour, are excessive.

### 2. Warning Devices

Train direction is probably irrelevant to Builders' warning devices claim, as the motorist will be presented with the same set of warning devices no matter which direction the train is proceeding. n11 Motorist direction also appears to be an irrelevant variable. n12 Thus, evidence of other accidents involving both eastbound and westbound trains, and northbound and southbound motorists, will probably be relevant to proving the existence of a dangerous condition and Southern's awareness

thereof if the inadequacy of warning devices was a contributing cause of those accidents.

n11 There might be a difference if the triggering mechanism functioned differently for eastbound and westbound trains, but the parties have not addressed this possibility.

n12 There might be a difference if the north and south sides of the grade crossing were equipped differently. The parties have not addressed this possibility.

### 3. Vegetation/Poor Visibility

Accidents [*26] involving westbound trains or northbound motorists are unlikely to be relevant to Builders' poor visibility claim, as the motorists in those instances could not have had their views obstructed by the same vegetation or other obstructions that allegedly obstructed Condery's view. However, they could be relevant to the issue of whether Southern had notice of a visibility problem if there is evidence that obtrusive vegetation or other obstruction was a cause of the accident. n13

n13 Of course, the July 1990 accident cannot be relevant to the notice issue.

Collisions between eastbound trains and southbound motorists, like Condery's accident, would be relevant to prove a dangerous vegetation condition, and Southern's awareness thereof, if there is evidence that obtrusive vegetation was a cause of the accident.

### 4. Conclusion

The most important consideration for the Court in determining whether the other accidents are "substantially similar" is whether they were caused by the same phenomena which Builders and Condery [*27] allege caused the accident in this case. For example, was motorist Duhe bothered by obtrusive vegetation? Did motorist Cook complain that the warning devices could not be

seen? Such accidents would be relevant. On the other hand, was motorist Kramer drunk? Was motorist Wilson asleep? If so, those accidents would be of little relevance.

Because the parties have not submitted any evidence on the causes of the other accidents, the Court cannot make a determination of their admissibility.

### B. Prior Accidents Involving the Train Crew

Builders contends that the train crew was negligent in operating the train at an excessive speed, and that Southern was negligent in entrusting the train crew with the train given the crew's performance record. Builders intends to introduce evidence of prior accidents involving the train crew. Southern and the train crew have moved in limine to exclude this evidence. n14

> n14 It should be noted here that this motion will be rendered moot if Builders' excessive speed claim is preempted by federal law (i.e., if the train was traveling at a rate of speed of 80 miles per hour or less). As noted above, the Court is unable to determine the speed of the train from the parties' submissions.

[*28]

### 1. Admissibility of Character Evidence . . .

Builders contends that evidence of other accidents is admissible under *Fed. R. Evid. 404*, which allows the admission of character evidence in a few narrow circumstances.

#### a. . . . to Prove Negligence of the Train Crew

Evidence of the train crew's prior negligent acts is not admissible to prove that its members were negligent on June 11, 1990. [HN6] *Fed. R. Evid. 404(b)* provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." See *Jones v. Southern Pacific Railroad, 962 F.2d 447, 449 (5th Cir. 1992)* (prior safety record of train conductor not admissible to prove negligence in grade crossing accident).

#### b. . . . to Prove Negligent Entrustment

Builders contends that evidence of the train crew's performance record is admissible to prove negligent entrustment, i.e., that Southern was negligent in entrusting a dangerous instrumentality to an incompetent train crew.

Builders is correct that the train crew's performance record is relevant to its negligent entrustment claim (to the extent that it has a  [*29] negligent entrustment claim). The advisory note to *Fed. R. Evid. 404* indicates

that character evidence is relevant to determining "the competency of a driver in an action for negligently entrusting a motor vehicle to an incompetent driver."

However, Builders' negligent entrustment claim is subsumed in its respondeat superior claim. To recover on a theory of respondeat superior, Builders must establish that the train crew was acting within the scope of its duties, and that its negligence was a proximate cause of Builders' damages. Because it is not disputed that the train crew was acting within the scope of its duties, Builders need only establish negligence and proximate cause. To recover on a theory of negligent entrustment, Builders must establish negligence, proximate cause, and that Southern negligently entrusted the train crew with the dangerous instrumentality.

The Court is not aware of any Louisiana decisions on the question of whether a party may assert a negligent entrustment or negligent hiring cause of action where it is not disputed that the negligent actor was acting within the scope of its duties as an employee of the defendant. n15 Most courts in other jurisdictions [*30] have determined that the two causes of action are mutually exclusive where the agency relationship is conceded by the defendant and punitive damages are unavailable. *Hackett v. Washington Metropolitan Area Transit Authority, 736 F. Supp. 8, 9-11 (D. D.C. 1990); Whidby v. Columbine Carrier, Inc., 182 Ga. App. 638, 356 S.E.2d 709, 711 (1982); Estate of Earl Arrington v. Fields, 578 S.W.2d 173, 178 (Tex. App. 12th Dist. 1979). Cf. Quinonez v. Andersen, 144 Ariz. 193, 696 P.2d 1342 (1984). But see Rocky Mountain Helicopters v. Bell Helicopters, 805 F.2d 907, 916-17 (10th Cir. 1986).* These courts have determined that the driving record of an alleged negligent actor is inadmissible (to prove negligent entrustment) where the agency relationship between the actor and his employer is established, and punitive damages are unavailable. This Court concurs. [HN7] Where the agency relationship is conceded, and punitive damages are unavailable, a negligent entrustment action does not afford a complainant an additional avenue [*31] of recovery.

> n15 The parties have not submitted authorities from any jurisdiction.

It is well-settled that punitive damages are not available under Louisiana law unless expressly provided for by statute. *Gagnard v. Baldridge, 612 So.2d 732, 1993 La. LEXIS 70 at *12 (La. 1993).* Thus, the only advantage to Builders in asserting a negligent entrustment claim is that it allows the introduction of evidence that would be inadmissible to prove the negligence of the train crew. Accordingly, the Court holds that Builders'

1993 U.S. Dist. LEXIS 7380, *

negligent entrustment claim is subsumed in its respondeat superior claim, that the presentation of evidence of the train crew's performance record would be a "waste of time," and that such evidence is thus inadmissible under *Fed. R. Evid. 403*.

**2. Admissibility of Habit Evidence to Prove Negligence**

[HN8] *Fed. R. Evid. 406* provides that "evidence of the habit of a person . . . is relevant to prove that the conduct of the person . . . on a particular occasion was [\*32] in conformity with the habit or routine practice."

In *Jones v. Southern Pacific Railroad, supra,* a grade crossing accident case, the Fifth Circuit held that prior safety infractions of a train engineer were inadmissible, both under *Fed. R. Evid. 404* and *406. 962 F.2d at 449-50*. The court reasoned that the engineer's "prior safety infractions, nearly all of which occurred several years before the accident took place, were collateral to the issues involved" in the case. *Id. at 450*. The Court concluded that the safety infractions "were not admissible to show that [the engineer] was negligent on the day of the accident, or that he had a habit of conducting trains negligently." Id.

The train crew has submitted as an exhibit excerpts from its members' personnel files. The personnel files contain several varied disciplinary entries, only three of which are conceivably relevant:

> 1. On January 17, 1979, Myers "failed to hold whistle signal over entire crossing."
>
> 2. On January 22, 1979, Myers "failed to properly control speed and allowed cars to couple in excess of 4 m . . ." [entry is cut off]
> [\*33]
> 3. On November 13, 1984, Phillip "failed to operate train at yard speed, to stop short of train damage engine and derailing another" and was dismissed.

To the extent that the information submitted by the train crew is the entirety of the evidence sought to be introduced by Builders, n16 it is inadmissible under *Jones, supra.* These isolated failures to control speed or to signal properly do not establish that any of the members of the train crew had a habit of doing so, or were otherwise incompetent. Accordingly, Southern's and the train crew's motions to exclude this evidence will be granted.

n16 The Court will assume that the information submitted by the train crew is the entirety of the evidence sought to be admitted by Builders, as Builders has not responded to the train crew's motion by submitting exhibits of its own describing other incidents that are more similar to the accident in this case.

**V. PRIOR AND SUBSEQUENT REMEDIAL MEASURES**

**A. Subsequent Remedial Measures [\*34]**

**1. *Fed. R. Evid. 407***

In September 1990, three months after the accident occurred, gates and other improvements n17 were installed at the Queenie Drive crossing. Southern contends that evidence of these improvements is inadmissible under *Fed. R. Evid. 407*. Builders contends that this evidence should be admitted.

> n17 The other improvements consisted of (1) installation of a "Don't Stop on Track" sign, (2) installation of a warning sign which shows the symbol of a railroad crossing, (3) painting of warnings on the pavement, (4) painting of "limiting" lines on the pavement, and (5) installation of new rumble strips on the pavement.

[HN9]

*Fed. R. Evid. 407* provides:

> When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as [\*35] proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Builders contends that evidence of subsequent measures taken to improve the Queenie Drive crossing is admissible (1) to establish the feasibility of precautionary measures, (2) to refute Southern's allegation that Condery was negligent, and (3) to establish the condition of the cross-

1993 U.S. Dist. LEXIS 7380, *

ing at the time of the accident at issue. Builders further contends that evidence of subsequent measures is admissible because Monsanto, which is not a party to this action, effectuated the improvements, and because improvements were planned for the crossing prior to the accident.

The Fifth Circuit has held that [HN10] Rule 407 does not require the exclusion of evidence of subsequent repairs "made by someone other than the defendant." *Granada Steel Industries v. Alabama Oxygen Co., 695 F.2d 883, 889 (5th Cir. 1983)*. See also *Myers v. Pennzoil Co., 889 F.2d 1457, 1461-62 (5th Cir. 1989)* (dictum) ("the prohibition of [Rule 407] applies only to a party"); *Herrington v. Hiller, 883 F.2d 411, 415 n.2 (5th Cir. 1989)* (dictum); [*36] *Koonce v. Quaker Safety Products & Mfg. Co., 798 F.2d 700, 719-20 (5th Cir. 1986); Louisville & Nashville Ry. v. Williams, 370 F.2d 839, 843-44 (5th Cir. 1966)*. Because the remedial measures in this case were performed by Monsanto, which is not a defendant, evidence of such measures cannot be excluded under Rule 407.

**2. Probative Value v. Prejudice - Rule 403**

[HN11] Although Rule 407 does not require the exclusion of evidence of remedial measures performed by a non-party, such evidence may be excluded under Rule 403 if its "probative value is substantially outweighed by the danger of unfair prejudice." In *Granada Steel, supra,* for example, the Fifth Circuit held that the district court properly excluded evidence of a third party's alternative product design developed after the accident involving the defendant's allegedly dangerous product. *695 F.2d at 889*. See also *Koonce, 798 F.2d at*  .

In this case, the probative value of the subsequent remedial measures is extremely high. If the pre-existing warning devices were adequate, Monsanto would have been less likely [*37] to improve the crossing. It is doubtful that Monsanto, or any prudent corporation, would squander its resources on unnecessary equipment.

Southern has not attempted to argue that it would be unfairly prejudiced by the admission of this evidence, and the Court does not foresee any prejudicial effect. Consequently, it cannot be said that the probative value of this evidence "is substantially outweighed by the danger of unfair prejudice." Accordingly, Southern's motion in limine will be denied.

**B. Prior Safety Evaluations/Plans - 23 U.S.C. § 409**

**1. Procedural Note**

By Minute Entry dated April 28, 1993, the Court informed the parties that it was aware of nine pending motions in this matter. n18 One of these motions is Builders'

motion entitled "Motion in Opposition to Plaintiff's Motions in Limine to Exclude Evidence Under 23 U.S.C.A. § 409, 45 U.S.C.A. § 421 and 23 U.S.C.A. § 401 et seq." Presumably, Southern had previously filed motions to exclude evidence under these federal statutes. However, the Court does not have copies of, and [*38] cannot find in the record, any such motions. n19

> n18 Most of the motions were filed in 1991 (prior to the transfer of this case to this section of Court) and were delivered to chambers rather than filed into the record.

> n19 In the Minute Entry, the Court requested that the parties inform the Court of the existence of any other pending motions. The parties did not inform the Court of any other pending motions.

Accordingly, the only motion before the Court on this issue is Builders' "Motion in Opposition to Plaintiff's Motions in Limine to Exclude Evidence Under 23 U.S.C.A. § 409, 45 U.S.C.A. § 421 and 23 U.S.C.A. § 401 et seq." In the minute entry, the Court informed the parties that it had not received any memoranda in opposition to this motion. Southern has since filed its "Reply Memorandum to Opposition to Exclude Evidence Under 23 U.S.C. § 409." In that memorandum, [*39] Southern does not discuss the effect of 45 U.S.C. § 421 or 23 U.S.C. § 401 et seq. (excluding 23 U.S.C. § 409) on the admission of evidence, but limits its analysis to 23 U.S.C. § 409. The Court will do the same.

**2. Analysis**

[HN12] Section 409 of Title 23 provides:

> Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled for the purpose of identifying evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144 and 152 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not he subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or ad-

1993 U.S. Dist. LEXIS 7380, *

dressed in such reports, surveys, schedules, lists or data.

The plain language of section 409 requires [*40] the exclusion from evidence of any information compiled for the purpose of identifying or evaluating railway-highway crossings which may be improved using federal highway funds. Builders contends that Queenie Drive is a "private road," and, thus, the Queenie Drive crossing is not a crossing that may be improved using federal funds. Southern contends that the statute does not make a distinction between "private" and "public" roads.

Section 130 of Title 23 establishes federal funding for grade crossing improvements. Section 130(a) provides, in pertinent part:

> Except as provided in subsection (d) of section 120 of this title and subsection (b) of this section, the entire cost of construction of projects for the elimination of hazards of railway-highway crossings, including the separation or protection of grades at crossings, the reconstruction of existing railroad grade crossing structures, and the relocation of highways to eliminate grade crossings, may be paid from sums apportioned in accordance with section 104 of this title. (Emphasis Added).

In addition, section 130(d) provides:

> Each state shall conduct and systematically maintain a survey of all highways [*41] to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose. At a minimum, such a schedule shall provide signs for all railway-highway crossing. (Emphasis Added).

Thus, subsections (a) and (d) of section 130 establish that federal funding is available for the improvement of railroad crossings on all "highways," n20 not just "public roads" n21 or "Federal-aid highways." n22 See *Harrison v. Burlington Northern Ry. Co., 965 F.2d 155, 159 (7th Cir. 1992)*. In this sense, section 130 stands in stark contrast to the other two sections referred to in section 409. Section 144 limits the federal funding of bridge improvements to bridges on "any Federal-aid system" or on

"any public road," and section 152 limits the federal funding of road hazard elimination to "any public road." If Congress had intended to limit the funding of grade crossing improvements under *23 U.S.C. § 130* to "public roads" or "Federal-aid systems," it would have done so explicitly, as it did in other sections of title 23.

> n20 Section 101(a) of title 23 provides that "the term 'highway' includes roads, streets and parkways . . ."

[*42]

> n21 Section 101(a) provides that "the term 'public road' means any road or street under the jurisdiction of and maintained by a public authority and open to public travel."

> n22 Section 101(a) provides that "the term "Federal-aid highways" means highways located on one of the Federal-aid systems described in section 103 of" title 23. Section 103 provides that "Federal aid" highways include the Interstate System and the National Highway System. The latter includes the Interstate System, other urban and rural principal arterials and highways which provide motor vehicle access between such an arterial and an intermodal transportation facility, and highways of strategic significance. Id.

Although it is not part of a "Federal-aid system," and may not be a "public road," Queenie Drive is clearly a "highway." Accordingly, all "reports, surveys, schedules, lists, or data compiled for the purpose of identifying evaluating, or planning the safety enhancement of" the Queenie Drive grade crossing will be excluded from evidence.

## VI. EVIDENCE OF RECEIPT FROM COLLATERAL SOURCES

As part of its [*43] Motion in Limine, the train crew has moved to exclude any evidence of its members' receipt of hospitalization and disability insurance benefits. None of the other parties have responded to this portion of the train crew's motion, perhaps because the Court did not refer to this portion of the motion in its April 28, 1993 Minute Entry listing pending motions.

The train crew's motion appears to have merit. If another party intends to introduce evidence of the train crew's receipt of benefits from collateral sources, that party must submit, in its pre-trial memorandum, authorities to rebut the arguments presented in the train crew's

motion. Failure to provide such authorities will be deemed a waiver of the right to present collateral source evidence, in which case the Court will grant the train crew's motion as unopposed.

## VII. EXPERT TESTIMONY

### A. Robert Crommelin

Southern has filed a motion to exclude or limit the testimony of Robert Crommelin, Builders' railroad safety expert. Southern contends that the information relied upon by Crommelin is not the type of data reasonably relied upon by experts in the field.

Crommelin visited the accident site on two occasions. On September [*44] 6, 1989, six months prior to the accident, he visited the accident site to perform an investigation in connection with the Cook collision litigation. Because the Cook collision of July 8, 1987 involved a westbound train and southbound motorist, Cook's investigation of visibility at the crossing focused on the ability of southbound motorists to view trains approaching from the east.

On May 28, 1991, Crommelin issued an expert report. Not surprisingly, Crommelin concluded that the crossing was unreasonably dangerous due to poor visibility to view high speed trains, and inadequate warning devices. In addition to his 1989 visit, Crommelin allegedly relied on "depositions, reports, correspondence, photographs and a survey."

On June 24, 1991, one year after the accident, the day before his deposition, Crommelin paid a second visit to the site. During that investigation performed for purposes of this litigation, Crommelin focused on visibility towards the west. At Crommelin's deposition on June 25, 1991, he was cross-examined on the subject of both his 1989 and 1991 visits to the site.

Southern has advanced three reasons to exclude various portions of Crommelin's testimony:

> 1. Crommelin [*45] cannot reasonably rely on observations made in 1989 or 1991 visits to evaluate a 1990 accident.
>
> 2. Crommelin did not make measurements of the northwest quadrant of the area in his 1989 visit, and, thus, did not have adequate information to make visibility conclusions in his May 1991 expert report, and Crommelin's June 1991 measurements cannot form the basis for his expert opinion because they were taken after his expert report was submitted.

### 1. State of the Crossing in 1989, 1990 and 1991

Southern has cited various authorities for the proposition that there is no automatic presumption that a condition existing prior to, or subsequent to, an event, also existed at the time of the event. Because such a presumption cannot be made, Builders must introduce evidence to indicate that the conditions investigated by Crommelin were sufficiently similar on the date of the accident to the way they were during his visits. For example, if there is sufficient evidence in the record for the jury to determine that the warning devices installed at the crossing were the same at the time of his 1989 visit as they were at the time of the accident, Crommelin will be permitted to testify about the [*46] inadequacy of warning signals.

The parties have submitted unsupported conclusions as to whether the accident site changed materially between September 6, 1989 and June 11, 1990, and between June 11, 1990 and June 24, 1991. The parties have not submitted any testimony or exhibits comparing the status of the crossing (with respect to warning devices or vegetation) on those three occasions. Accordingly, the Court is unable to determine whether the conditions at the site were sufficiently similar at the time of Crommelin's visits to the conditions at the time of the accident.

### 2. The 1991 Measurements

Southern further contends that Crommelin cannot rely on visibility measurements taken in 1991, because they were taken after his expert report was submitted. Because Crommelin's 1989 measurements are not relevant to the visibility of an eastbound train, the exclusion of the 1991 measurements would leave Crommelin without any measurements to testify about at trial.

It should be noted here that Crommelin may offer a general opinion on the visibility issue whether or not he is permitted to rely on his 1991 measurements, as he has relied on other sources of information in analyzing the visibility [*47] issue. n23 The Court's inquiry here is limited to the question of whether Crommelin may testify about his 1991 measurements and conclusions specifically based on them.

> n23 Crommelin testified in his deposition that he did make observations of the entire north side of the track during his 1989 visit, even though his measurements were limited to the northwest area. He has further testified that he reviewed a survey by Lucien Gassen, showing "the relationship between Queenie Drive and the view obstructions that are present on the North side of the tracks by Southern Pacific right-of-way." He also reviewed several photographs, mostly from

the time of the Cook accident investigation in 1989.

It is the practice within this district that expert testimony is limited to the scope of the expert's report. Expert reports are required to be furnished no later than 60 or 90 days n24 prior to the Pre-Trial Conference date. The question, then, is whether an expert (1) may provide an opinion at trial based, at least in part, upon [*48] information obtained after his formal report is submitted but prior to his deposition, or (2) must submit a formal supplemental report if he is to rely on information obtained after his initial report is submitted.

n24 90 days for plaintiffs, 60 days for defendants.

The purpose of an expert report is to put the opposing party on notice of the scope of the expert's testimony at trial. Where an expert obtains information between the time his formal expert report is submitted and the time of his deposition, and the expert is questioned on the recently obtained information at his deposition, the deposition functions much like a supplemental expert report, and may be said to "expand" the scope of the formal expert report.

In this case, Crommelin was deposed about the information he obtained after the submission of his formal expert report, and that information did not affect any of the conclusions contained in that report. Southern has since had two years to consider this deposition testimony, and, thus, has clearly received [*49] adequate notice of the scope of Crommelin's testimony at trial. Under the circumstances, Crommelin's deposition testimony concerning the July 1991 measurements served to expand the scope of his expert report by giving notice to Southern that he would testify about those measurements. Accordingly, Crommelin may testify about those measurements and any conclusions based on them.

**B. Ron M. Olson**

Southern intends to introduce the expert testimony of Ron M. Olson, a public services engineer and Public Services Manager of the Eastern Region for Southern. In his pathetic May 1, 1991 expert report, Olson, allegedly upon review of "the facts of the case," concludes that Southern did not own, or have an obligation to maintain, the Queenie Drive grade crossing at the time of the accident.

[HN13] *Fed. R. Evid. 702* provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Builders contends that Olson's expert testimony is cumulative and will not [*50] "assist the trier of fact," and has moved to have the testimony excluded from evidence.

It does not appear that Olson has "any specialized knowledge" that could assist the jury in resolving any ambiguities in the contracts. If the contracts are unambiguous, the Court will interpret the contracts without reference to extrinsic evidence, as the interpretation of unambiguous contracts is a question of law. See *La. Civ. Code art. 2046*. If there are contracts are ambiguous, the jury will resolve the ambiguities with instruction from the Court. See *La. Civ. Code art. 2045*; *Fireman's Fund Ins. Co. v. Murchison, 937 F.2d 204, 207 (5th Cir. 1991)*; *Godchaux v. Conveying Techniques, Inc., 846 F.2d 306, 314 (5th Cir. 1988)*.

Presumably, the contracts in question are ambiguous. Otherwise, someone should have filed a motion for partial summary judgment long ago, so that the Court could resolve the issue. Where contracts are ambiguous, they are to be "construed according to the intent of the parties." *La. Civ. Code art. 2045*. The most important extrinsic evidence of the parties' intentions would be the fact testimony of the Monsanto [*51] and Southern personnel who authored and signed the various agreements. The testimony of a random engineer from Southern that, in his humble, unbiased opinion, Southern had no obligation to maintain the grade crossing would provide absolutely no assistance to the jury.

**VIII. CONCLUSION**

For the reasons stated above,

IT IS ORDERED:

Southern Pacific Transportation Co.'s . . .

1. Motion in Limine to Restrict Evidence of Prior and Subsequent Accidents remains under submission;

2. Motion in Limine Concerning Subsequent Remedial Measures and Photographs that Depict Subsequent Improvements to the Crossing is DENIED;

1993 U.S. Dist. LEXIS 7380, *

3. Motion in Limine Concerning Evidence of Other Accidents Involving the Subject Train Crew is GRANTED;

4. Motion in Limine Concerning Federal Preemption of Builder's Transport's Claims Against Southern Pacific is GRANTED in part and DENIED in part;

5. Motion in Limine to Restrict or Limit Expert Testimony (of Robert Crommelin) is DENIED in part and remains under submission in part; and

6. Motion for Partial Dismissal of Claims by Builders Transport, Inc. is GRANTED.

Builders Transport, Inc.'s . . .

1. Motion in Limine to Exclude Testimony of Ron [*52] M. Olson as an Expert Witness is GRANTED;

2. Motion to Exclude Punitive Damage Claims by Southern Pacific Transportation Company remains under submission; and

3. Motion in Opposition to Plaintiff's Motions in Limine to Exclude Evidence Under *23 U.S.C.A. § 409, 45 U.S.C.A. § 421* and *23 U.S.C.A. § 401,* et seq. is DENIED.

Herman Myers and the train crew's . . .

1. Motion in Limine (to exclude evidence of prior accidents, etc.) is GRANTED; and

2. Motion in Limine (to exclude evidence of collateral source benefits) remains under submission.

New Orleans, Louisiana, this 25th day of May, 1993.

EDITH BROWN CLEMENT

UNITED STATES DISTRICT JUDGE