# EXHIBIT 1

# David L. Felker, PhD
8852 Harmony Grove Road
Escondido, CA 92029
760-468-0816(mobile)
760-480-7515 x13(office)

## 2/01-present  Owner, Sanford Rose Associates- Escondido

- Retained executive search firm filling primarily Director to CEO positions in the Pharmaceutical and Biotechnology industries throughout the USA.

## 1/01 – present  Golf Ball Industry Consultant/Expert Witness

- Provide technical advice and expert testimony in golf ball technology-relayed cases.
- Perform patent analysis and provide technical advice.
- Lead scientific efforts to demonstrate performance differences between golf products for the purpose of providing evidence to support the client's legal position.
- Perform/direct physical property testing and outdoor performance comparison testing efforts.
- Direct/perform statistically designed experiments and thorough analysis of data.

### Depositions:

5/8/01  Callaway Golf v. Bridgestone Sports Co. Ltd.,  Civil Action No. 1 00-CV-1871-JEC

3/6/02  Callaway Golf Company v. Dunlop Slazenger Group Americas, Inc.
Civil Action No. 01-CV-669 RRM

5/22/02  Callaway Golf Company v. Dunlop Slazenger Group Americas, Inc.
Civil Action No. 01-CV-669 RRM

2003 Nitro Leisure Products, LLC  v. Acushnet Company, US District Court Southern District of Florida, Case No. 02-14008-CIV-Middlebrooks

### Declarations:

Callaway Golf v. Acushnet Company, 7/00

Callaway Golf v. Bridgestone Sports Co. Ltd., 8/00

Acushnet Company v. Nitro Leisure Products, LLC dba Golf ballsdirect.com and Second Chance, and Nitro Leisure Services, LLC dba Nitro Golf and Nitrogolf.com, US District Court Southern District of Florida, Case No. 02-14091-CIV-Roettger, 4/19/02

Nitro Leisure Products, LLC  v. Acushnet Company, US District Court Southern District of Florida, Case No. 02-14008-CIV-Middlebrooks, 6/11/02

Nitro Leisure Products, LLC  v. Acushnet Company, US District Court Southern District of Florida, Case No. 02-14008-CIV-Middlebrooks, 8/6/02

Nitro Leisure Products, LLC  v. Acushnet Company, US District Court Southern District of Florida, Case No. 02-14008-CIV-Middlebrooks, 5/28/03

**Expert Reports:**
"Remanufactured Golf Ball Testing and Results", 4/18/02

Expert Report for Nitro Leisure Products, LLC v. Acushnet Company, US District Court Southern District of Florida, Case No. 02-14008-CIV-Middlebrooks, 7/8/03

**Courtroom Testimony:**
8/04 Callaway Golf Company v. Dunlop Slazenger Group Americas, Inc.
Civil Action No. 01-CV-669 RRM

## 12/96-10/00   Vice President of Research & Development, Callaway Golf Ball Company, Carlsbad, CA   (Start-Up Company wholly owned subsidiary of Callaway Golf Company)

- Charter member of executive team that built $170 M Start-up Company from scratch.
- Designed and developed the entire R&D function and company's first products; $6M R&D annual operating budget; jointly responsible for Golf Ball Company P&L.
- Lead the effort that produced four *Demonstrably Superior and Pleasingly Different* (DSPD) golf ball models: *Rule 35, CTU 30, CB-1* and *HX*". Total sales for these four products were $55M in 2001. The Rule 35's performance set a new standard that stunned the golf ball industry. Additionally, the "HX" is revolutionary in that it is a "dimple free" golf ball.
- Lead the patent effort that enabled the introduction of patented products in an extremely crowed art; did so without legal issues at product launch.
- Inventor of golf ball/club products and golf ball manufacturing processes.

    ### PATENTS
    - 5,984,807  Golf Ball
    - 6,200,512  Method of Manufacturing a Golf Ball
    - 6,213,892  Multi-layer Golf Ball
    - 6,245,386  Method and system for finishing a golf ball
    - 6,390,932  Compliant polymer face golf club head
    - 6,440,346  Method for making golf ball
    - 6,607,451  Compliant polymer face golf club head
    - 6,786,837  Golf balls and methods of manufacturing the same

## 11/94-12/96: Technology Superintendent – Neoprene, DuPont Dow Elastomers, Louisville, KY

- Responsible for: World-wide Neoprene Adhesives and Latex  Development & Technical Services, Hypalon™ Adhesives Development & Tech Services, Louisville Manufacturing Technical Support (worlds largest polychloroprene facility), Capital Project Implementation ($15-25M in capital projects/yr), World-wide Neoprene Research & Development, Technical support of Quality Control and Environmental Laboratories
- Directed 50 person organization; $6M Technology Budget
- Leader of high priority Task Team of scientists from DuPont, DuPont-Dow Elastomers and various Universities working on the next generation process and products.

**9/91-11/94: Technical Area Superintendent – Neoprene, DuPont Company, Louisville, KY**
- Responsible for: Manufacturing Engineering & Process Support, Capital Project Implementation ($10-40M in Capital projects/yr), ISO 9000 Certification, Quality Control and Environmental Laboratories, and Technical Computing Upgrade. Managed 16 person organization; $2M Technology Budget.
- Working-Leader of International Task Team that solved 40 yr old Neoprene Quality/Manufacturing problem, delivering >$10M/yr ATOI.

**9/90-9/91:  Hypalon™ Technology Area Superintendent**
**Elastomers Division,   DuPont Beaumont Works,  Beaumont, TX**
Responsibilities same as 9/89-9/90 position plus responsible for :

- Research & Development of a CCl$_4$-free Commercial HYPALON™ Process.
- Process development and production of chlorinated EVA/PE polymer in elastomer plant.
- Montreal Protocol liaison for HYPALON™ Business.
- Assembled and lead task team of scientists, lobbyists, and lawyers who developed and implemented a creative win/win solution to a HYPALON™ environmental problem that literally saved the business ($>30M NPV). Received DuPont Board of Directors Award for preventing Shutdown of HYPALON™ Business.

**9/89-9/90:  Hypalon™ Manufacturing Technology Area Superintendent**
- Managed group of 10 responsible for Plant Manufacturing Engineering, Capital Project Implementation, Technical support of Quality Control and Environmental Laboratories
- Received DuPont Award for increasing plant production of Cl-EVA 400% using fundamental process understandings and statistically designed experiments.

**9/86-9/87:  Product Development Engineer:  Nylon Compounding/Elastomer Toughened Polymers,  DuPont Washington Works Plant,  Parkersburg, WV**
Developed family of elastomer toughened/reinforced ZYTEL™ compounded products with super high flow properties.  Responsible for plant engineering support for carbon black filled Nylon and polyester products.

**9/87-9/89  Manufacturing Engineer: DuPont Advanced Glazing Venture, Parkersburg, WV**
Part of Team that successfully developed and introduced the Anti-Lacerative Windshield™ and SpallShield™.  Primarily responsible for pilot plant operation and managing contract coating operations with w/ Polaroid Corp, Custom Coating & Laminating Inc. and Rexham Corp.

**10/84-9/86:    Research Engineer    Long Range Research Group**
**Polymer Products Department,  DuPont Experimental Station,  Wilmington, DE**
Product and Process R&D focused on a ARYLON™ (new aromatic polyester targeted at the auto industry).

**EDUCATION**:
Aug 1984: Iowa State University, Ames, Iowa
Ph.D. Chemical Engineering. Thesis: Electrochemical dissolution of copper sulphide minerals using a Fluidized Bed Electrochemical Reactor.
Recipient of the Iowa State University Mining & Mineral Resources Research Institute Fellowship, 1981-1983. Overall G.P.A. 3.69/4.00

M.S. Chemical Engineering Aug 1982. Thesis work included experimental and mathematical studies dealing with the electrodeposition of copper using a fluidized bed electrochemical reactor. Overall G.P.A. 3.68/4.00

University of Wisconsin-Eau Claire, Eau Claire, Wisconsin 1976-1979
Received B.S. in Chemistry May of 1979. Class work included advanced organic chemistry and several semesters of independent research. Overall G.P.A. 3.20/4.00

**OTHER ACADEMIC RESEARCH EXPERIENCE**:
1979--National Science Foundation Undergraduate Research Participant. Worked under the guidance of Dr. George A. Kraus, Department of Chemistry, Iowa State University. Research included the investigation of the reaction of dienolate anions with Michael acceptors.

1977-1979--Research Assistant at the University of Wisconsin-Eau Claire. Worked under the guidance of Dr. William C. Groutas. Research included the synthesis of functionalized alpha methylene valerolactones fused to substituted aromatic rings, pancreatic elastase inhibiting imidazole-N-carboxamides, and N,N'-ethylene bis [2(2-hydroxy-5bromophenyl)l glycine.

**PAPERS PUBLISHED**
William C. Groutas and David L. Felker, "Synthetic applications of Cyanotrimethylsilane, Iodotrimethylsilane, Azidotrimethylsilane, and Methylthiotrimethylsilane," Synthesis, No. 11, 861-868, November (1980).

William C. Groutas, David L. Felker, David R. Magnin, George Meitzner, and Terry Gaynor, "Synthesis of Functionalized Alpha-Methylene Lactones" Synthetic Communications 10 (1), 1-9 (1980)

William C. Groutas, David L. Felker and David R. Magnin, "Synthesis of Aromatic AlphaMethylene Lactones", Synthetic Communications 10 (5), 355-362 (1980).

William C. Groutas, R.C. Badger, T.D. Ocain, D.L. Felker, J. Frankson and M. Theodorakis, "Mechanism-Based Inhibitors of Elastase", Biochemical and Biophysical Research Communications, Vol. 95, No. 4, 1980-1894 (1980).

Michael C. Theodorakis, William C. Groutas, Alex J. Bermudez, David L. Felker, StavroulaVani Stefanakou, David R. Magin, and Terry Gaynor, "Localization of Technetium-99mN,N'-ethylene-bis [2(2-hyd roxy-5-b romophenyl)] glycine and Technetium-99m-[N-2(2mercapto-l-oxo-propylglycine)] in the Hepatobiliary System",
Submitted to J. Pharmaceutical Sciences for publication.

4

David L. Felker and Renato G. Bautista, "The Electrowinning of Copper Using a Side-By-Side Fluidized Bed Electrochemical Reactor", published in IE&C Process Design and Development.

David L. Felker and Renato G. Bautista, Electrochemical Processes in Recovering Metals from Ores, Journal of Metals, April 1990, 60-63.

Videotape : How to Grow Gourmet Oyster Mushrooms, April 1995

"Advances in Neoprene Technology", 1996 (definitive scientific text internally published in DuPont under my direction)

**PAPERS PRESENTED:**
22nd Undergraduate Chemistry Symposium, Minnesota Chapter of the American Chemical Society, Bethel College, Spring 1978, "Design and Synthesis of Potential Cytotoxic Agents", coauthored by William C. Groutas and David L. Felker, presented by David L. Felker.

Society of Mining Engineers of the AIME Fall Meeting and Exhibit, Minneapolis Auditorium and Convention Hall, Minneapolis, Minn., Oct. 22-24, 1980, "The Electrowinning of Copper from Sulphate Solutions in a Fluidized Bed Electrochemical Reactor", coauthored by Chang C. Ko, David L. Felker, Harvey Jensen, and Renato G. Bautista, presented by David Felker.

The Metallurgical Society of the AIME Annual Meeting, Dallas Convention Center, Dallas, Texas, Feb. 14-18, 1982, "Design Considerations for the Scale-Up of a Fluidized Bed Electrochemical Reactor (FBER)", coauthored by David L. Felker and Renato G. Bautista, presented by David L. Felker.

The Metallurgical Society of the AIME Annual Meeting, Hyatt Regency Hotel, Atlanta, Georgia, March 6-10, 1983, "A Model for Predicting the Concentration-Time Relationship using a FBER", coauthored by David L. Felker and Renato G. Bautista, presented by Renato G. Bautista.

TMS-SME Annual Mtg, Denver, Colorado, Feb 24-27, 1987 , "A mathematical model for the electrochemical reduction of chalcopyrites using a fluidized bed electrochemical reactor", coauthored by David L. Felker and Renato G. Bautista, presented by David L. Felker.

TMS-SME Annual Mtg, Denver, Colorado, Feb 24-27, 1987 , "The two-stage dissolution and separation of Cu, Fe, and S from chalcopyrite using a fluidized bed electrochemical reactor", coauthored by David L. Felker and Renato G. Bautista, presented by David L. Felker.

Proprietary Presentations at DuPont Polymer Products Department annual TECH-CON, 1985, 1986.

Proprietary Presentation at DuPont Polymer Products Department annual Polymer Compounding Conference, Parkersburg WV, 1987.

**PERSONAL DATA:**
U.S. Citizen, married, born 6/10/57, 6'1", 200 lbs., excellent health.
Hobbies and interests include swimming, painting, hiking, skiing, tennis, flying military aircraft, golf and fly-fishing.

# EXHIBIT 2

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 3

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 4

IN UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

BRIDGESTONE SPORTS CO., LTD., AND
BRIDGESTONE GOLF, INC.,

*Plaintiffs,*

*v.*

ACUSHNET COMPANY,

*Defendant.*

C.A. No. 05-132(JJF)

DEMAND FOR JURY TRIAL

## EXPERT REPORT OF JOHN CALABRIA

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

[26]        Further, under 35 U.S.C. §112, a claim may be found to be invalid if the claim recites features that are not described in the specification in such a manner as to enable one of ordinary skill in the art to make and use the invention without undue experimentation. This is also known as the "enablement" requirement.

## V.    ONE OF ORDINARY SKILL IN THE ART

[27]        Regarding the subject matter of the Bridgestone patents at issue in this report, it is my opinion that one of ordinary skill in the art would be someone who has: (1) a technical undergraduate degree (*e.g.*, mechanical engineering, physics, materials science, chemical engineering, or chemistry); and (2) at least five years of experience working in the golf ball industry as design and/or development engineer. Five years of manufacturing experience alone would not suffice.

## VI.    SUMMARY OF CONCLUSIONS

[28]        My analysis concerning each of the Bridgestone patents-in-suit on which I have an opinion is set forth on a patent-by-patent basis in Appendices A-E to this report.

[29]        In summary, I have found that each of the Bridgestone patents-in-suit is not invalid over the various bases alleged by Dr. Felker.

## VII.    GENERAL TOPICS RELATED TO DR. FELKER'S REPORT

### A.    Current Testing of Decade-Old Golf Balls Is Inaccurate

[30]        In his report, Dr. Felker appears to rely on recent testing of physical characteristics of several fairly old golf ball models (*e.g.*, the "Wilson Ultra Tour Balata 90," "Wilson Ultra Competition," and "Precept EV Extra Spin").

[31]        To the extent that this appearance is fact, Dr. Felker provides no evidence that shows that physical characteristics recently tested have not varied as the golf balls aged in the years since they were manufactured. In fact, it is my understanding that the very physical

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 5

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 6

# HOWREY LLP

1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
www.howrey.com

**Joseph P. Lavelle**
Partner
T 202.383.6888
F 202.383.6610
AOL IM: joelavelledc
lavellej@howrey.com
File 00634.0002.000000

January 16, 2007

<u>BY EMAIL</u>

Robert M. Masters, Esq.
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, D.C. 20005

Re:     **Rule 26(a)(2)(A) Disclosures**
        **Bridgestone Sports Co. v. Acushnet Co.**
        **C.A. No. 05-132 (JJF) (D. Del.)**

Dear Rob:

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(A), Acushnet discloses the following Acushnet employees who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence:

- Jeff Dalton
- Steve Aoyama
- Jay Williams
- Traci Olson
- Scott Gleadow
- Ken Weichman
- Rasto Gajic
- Pat Elliott
- David Bulpett
- Dr. Murali Rajagopalan
- Larry Bissonnette

Very truly yours,

Joseph P. Lavelle *By J. Polman*

AMSTERDAM  BRUSSELS  CHICAGO  EAST PALO ALTO  HOUSTON  IRVINE  LONDON
LOS ANGELES  NEW YORK  NORTHERN VIRGINIA  PARIS  SALT LAKE CITY  SAN FRANCISCO  TAIPEI  WASHINGTON, DC

# EXHIBIT 7

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 8

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3    - - - - - - - - - - - - - - - -x

 4    BRIDGESTONE SPORTS CO., LTD.,    :

 5    And BRIDGESTONE GOLF, INC.,      :

 6         Plaintiffs,                 :

 7    v.                               : C.A. NO. 05-132 (JJF)

 8    ACUSHNET COMPANY,                :

 9         Defendant.                  :

10    - - - - - - - - - - - - - - - -x

11    ACUSHNET COMPANY,                :

12         Counterclaim Plaintiffs,    :

13    v.                               : C.A. NO. 05-132 (JJF)

14    BRIDGESTONE SPORTS CO., LTD.,    :

15    And BRIDGESTONE GOLF, INC.,      :

16         Counterclaim Defendant.     :

17    - - - - - - - - - - - - - - - -x

18                  HIGHLY CONFIDENTIAL

19       Livenote/Videotaped Deposition of JEFF DALTON

20                    Washington, D.C.

21                 Friday, March 2, 2007

22                      9:00 A.M.
```

HIGHLY CONFIDENTIAL
                         Washington, DC

1        A    I got it from a -- a -- a -- handbook on

2    plastic properties, particularly with respect to

3    permeability, and I think he included that, maybe, in

4    one of these.  Maybe it was this report, maybe it was

5    the other report.

6        Q    Okay.  Do you know of anyone else within

7    Acushnet who assisted Dr. Felker in the drafting of

8    this report?  And this report is directed to the

9    invalidity of the Bridgestone's patents?

10       A    Anyone else who assisted him?  I think

11   there at one point Dr. Felker in -- and, again, I'm

12   not sure whether it's this report or his other

13   non-infringement report, but at one point Dr. Felker

14   came up to the Acushnet Company and he -- we gave him

15   a tour of our facility and -- and looked at the

16   equipment that we used to perform testing with regards

17   to this report.  And, at that time, Dave Bulpett was

18   also present, and he may have spoken with Dr. Felker,

19   as well, or answered some of his questions.

20       Q    And was that a one-day visit to Acushnet

21   Company?

22       A    I believe it was one day.

Dalton, Jeff                       HIGHLY CONFIDENTIAL                    March 2, 2007
                                    Washington, DC

1    off the record with tape number three.

2                (Recess.)

3                THE VIDEOGRAPHER:  The time is 2:00, and

4    we're back on the record with the continuation of tape

5    number three.

6    BY MR. WIKBERG:

7         Q   A quick question or two, back to the Ultra

8    Tour Balata balls, did anyone do a comparison to -- to

9    see if this data in Exhibit 13 was consistent with the

10   data tested for the Competitive Ball Database?

11        A   No, sir.

12        Q   And who designed the test protocols that

13   were used for the testing for Exhibit 13 and some of

14   the other testing?

15        A   That, the test protocol, evolved from a

16   couple of drafts.  I put together the first draft of a

17   test protocol, I sent it to our attorneys and to Dr.

18   Felker, who made some amendments to it, added a few

19   things, and sent it back to me, where we went through

20   -- I think -- I think we had a conversation about it,

21   and then we finalized the test protocols.  So it was a

22   combination of my drafts and Dr. Felker's input.

# EXHIBIT 9

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 10

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 11



Slip Copy
Slip Copy, 2006 WL 2845703 (D.N.J.)
**(Cite as: Slip Copy)**

Page 1

**H**
NN & R, Inc. v. One Beacon Ins. Group
D.N.J.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. New Jersey.
NN & R, INC., Plaintiff,
v.
ONE BEACON INSURANCE GROUP, and its suc-
cessor, derivative or acquiring entities and Triester,
Rossman & Associates, Inc., Defendants.
**Civil No. 03-5011 (JBS).**

Sept. 29, 2006.

Daniel B. Zonies. Esq., Law Offices of Daniel B.
Zonies, Cherry Hill, NJ, for Plaintiff.
Mark J. Hill. Esq., Diana L. Moro. Esq., Mark J. Hill
& Associates, P.C., Moorestown, NJ, for Defendant
One Beacon Insurance Group.
Cheryl M. Nicolson. Esq., Mallon & Blatcher, Media,
PA, for Triester, Rossman & Associates, Inc.
Eugene M. Purcell. Esq., Purcell, Ries, Shannon,
Mulcahy & O'Neill, Esqs., One Pluckemin Way,
Bedminster, NJ, for Third-Party Defendant W. Har-
grove Demolition Co., Inc.

**OPINION**
SIMANDLE, District Judge.

**I. INTRODUCTION**

*1 This action arises from the structural collapse of a
building at 326 Market Street, Camden, New Jersey.
Plaintiff NN & R, Inc. ("NN & R"), a New Jersey
corporation and the owner of a restaurant and apart-
ment units located at that address, alleges that the
building was severely damaged in February 2000
when the contiguous property collapsed and was then
legally demolished. Prior to that event, CGU Insur-
ance, the predecessor to OneBeacon Insurance Group
("OneBeacon"), issued insurance policies to NN & R
through Triester, Rossman & Associates, Inc.
("Triester" or "TRA") that provided property and li-
ability coverage. The factual and procedural history
of this matter is set forth more fully in the Court's
opinion of June 26. *NN & R, Inc. v. One Beacon Ins.*

*Group,* No. 03-5011, 2006 U.S. Dist. LEXIS 43109
(D.N.J. June 26, 2006).

Currently pending before the Court are motions *in
limine* of Defendants OneBeacon [Docket Item 83]
and Triester [Docket Item 97] to exclude or limit the
testimony and report of Plaintiff's proposed expert,
James Klagholz, and a motion by OneBeacon for
summary judgment against Triester [Docket Item 85]
upon Triester's cross-claims for indemnification and
contribution as well as OneBeacon's claim for indem-
nification. The Court heard oral argument on these
and other motions on Wednesday, May 18, 2006
[FN1], and in its June 26, 2006 opinion, the Court re-
served decision on the motions currently pending.
Because the Court finds that Klagholz's opinion is, in
large part, sufficiently reliable to be admitted at trial
under Fed.R.Evid. 702 but that certain aspects of his
testimony would be speculative or irrelevant, the
Court will deny the motions *in limine* in part and
grant them in part, as explained below. Because the
Court finds that there is a genuine issue of material
fact as to whether Triester failed to notify Plaintiff of
the insurance coverage change and as to whether
Triester and OneBeacon have rights of indemnifica-
tion, the Court will deny, in part, OneBeacon's mo-
tion for summary judgment against Triester, as ex-
plained below. However, because the Court finds that
there is no genuine issue of material fact as to
Triester's right of contribution, the Court will grant
OneBeacon's motion for summary judgment in part
and dismiss that claim.

> FN1. Although there was no extensive dis-
> cussion of the motions *in limine* at that hear-
> ing, the Court does not need an additional
> hearing because the parties were given an
> opportunity to be heard at that time and have
> presented the Court with sufficient briefing
> on the issue as well as the expert's report and
> excerpts from his deposition, from which the
> Court can decide the motions pursuant to
> Rule 78. Fed.R.Civ.P.

**II. DISCUSSION**

### A. Motion to Exclude Testimony of Klagholz

Plaintiff seeks to admit the expert testimony of James Klagholz, a licensed insurance producer in New Jersey, to establish that Defendants, OneBeacon and Triester, deviated from the established customs of the insurance industry in their dealings with Plaintiff. Defendants claim that the Court should exclude Klagholz's testimony because his opinions do not meet the standards for reliability set forth in Fed.R.Evid. 702, *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993) and *Kumho Tire v. Carmichael,* 526 U.S. 137 (1996). Defendants argue that Klagholz's opinions are not reliable because they are not supported by facts and Klagholz did not use a reliable methodology to reach them. Plaintiff opposes the motion *in limine,* arguing that its expert's opinions are reliable because they are based on sufficient facts to which he applied a proper methodology. Plaintiff argues that the facts on which its expert relied are not in dispute and, thus, it was not improper for him to learn of them through communications with Plaintiff's counsel rather than through firsthand examination of the insurance claim files. Further, Plaintiff argues, after Klagholz issued his report, counsel supplied the expert with all the relevant insurance claim documents. As to methodology, Plaintiff argues that because Plaintiff's expertise is based on his experience and training, it was appropriate under *Kumho Tire* for him to render his opinions based on that experience.

*2 Federal Rule of Evidence 702, which governs the admission of expert testimony in federal court, provides as follows:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In other words, when the Court evaluates proffered expert testimony, it must consider three requirements:(1) qualifications-whether the expert is quali-fied to speak with authority on a particular subject or issue; (2) reliability-whether the expert's methodology is sound and whether his or her opinion is supported by "good grounds;" and (3) fit-whether there is a relevant "connection between the scientific research or test result to be presented and particular disputed factual issues in the case."

*Yarchak v. Trek Bicycle Corp.,* 208 F.Supp.2d 470, 494 (D.N.J .2002) (quoting *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 741-43 (3d Cir.1994)). The burden is on the proponent of the testimony to prove its admissibility by a preponderance of proof. *Id. at* 744 (citing *Bourjaily v. United States,* 483 U.S. 171, 175 (1987)). However,[t]his standard is not intended to be a high one, nor is it to be applied in a manner that requires the plaintiffs "to prove their case twice-they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable."

*Oddi v. Ford Motor Co.,* 234 F.3d 136, 145 (3d Cir.2000) (quoting *Paoli,* 35 F.3d at 744).

Defendants claim that Mr. Klagholz's opinion is not reliable under Rule 702. To be reliable, an expert's opinion must be "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.' " *Paoli,* 35 F.3d at 742 (quoting *Daubert,* 509 U.S. at 590). Defendants claim that Mr. Klagholz relied on facts presented to him by Plaintiff's counsel and employed no reliable methodology in formulating his conclusions. Plaintiff counters that the opinion is reliable because the facts Mr. Klagholz used are undisputed and the attack on methodology is misplaced, as Mr. Klagholz's opinion is based not on scientific testing, but on his experience working in the insurance industry. As *Kumho* confirmed, areas of reliable methodology are not confined to the scientific, but extend to non-scientific disciplines and professions as well.

Although Plaintiff correctly argues that the Court should apply a unique evaluative framework to proffered non-scientific expert testimony, Defendants correctly point out that all expert testimony must be

Slip Copy
Slip Copy, 2006 WL 2845703 (D.N.J.)
(Cite as: Slip Copy)

Page 3

reliable and relevant.

*3 The objective of [the Court's gatekeeping role] is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Kumho,* 526 U.S. at 152. Further, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id* . Thus, even when the proffered testimony is not scientific and the expert is concededly qualified based on specialized experience, as in this case, the Court retains an obligation to determine the reliability of the proffered testimony under Rule 702.

In Klagholz's report, he indicates familiarity with several pieces of correspondence between the parties and quotes documents relevant to formulating an opinion as to whether Defendants adhered to the customs of the New Jersey insurance industry. These opinions appear to the Court to be formulated after reviewing the correspondence between the parties as well as Plaintiff's version of the facts. Defendants' claims that Klagholz deviated from his preferred method of evaluation by failing to examine the claim files personally, bolstered by Klagholz's deposition testimony, are proper subjects for cross-examination at trial. This is not a situation in which Plaintiff's counsel supplied the expert with a skewed version of the facts without a footing in the evidence expected to be offered at trial. Cf. *Crowley v. Chait,* 322 F.Supp.2d 530, 542 (D.N.J.2004). Defendants point to no misstatement that Klagholz relied on that may have tainted his understanding of the parties' dealings, whether his understandings were derived from real evidence or form counsel's synopsis. Although Klagholz's opinions may be assailable at trial on cross-examination because he failed to personally examine the insurance claim files or other key documents, it appears to the Court that the expert's opinion and methodology are sufficiently reliable and relevant to meet the requirements of Fed.R.Evid. 702.

However, if an expert's opinion is based upon conjec-ture or speculation, it may be stricken. *Fedorczyk v. Caribbean Cruise Lines, Ltd.,* 82 F.3d 69, 75 (3d Cir.1996). Portions of Klagholz's report are based merely on conjecture and, therefore, the Court will grant the motion in part, strike these portions of the report and preclude the expert from testifying about them at trial. In paragraph 10 of his report, Klagholz opines that Plaintiff would have "maintained the appropriate amount of insurance for the building" if Defendants had behaved differently. This is mere speculation and the Court will not admit that opinion at trial. Paragraph 13 is a restatement of this improper speculation. These statements are inadmissible because they are based merely on conjecture; experts are not permitted to make such speculative statements at trial, unaided by reliable methods, and fact-finders may not consider them. (Of course, nothing prevents the insured from offering circumstantial or direct evidence of his own intent regarding insurance coverage.)

*4 Furthermore, certain elements of the expert's report are inadmissible because they are not relevant to any fact at issue. In its June 26 opinion, the Court determined that there was no mid-term reduction in Plaintiff's insurance coverage, and even if there had been a reduction in the amount or type of coverage, that reduction would be irrelevant to this dispute because Plaintiff accepted the changes. *NN & R, Inc. v. One Beacon Ins. Group,* No. 03-5011, 2006 U.S. Dist. LEXIS 43109, at *20-22 (D.N.J. June 26, 2006). Therefore, the expert's opinions about mid-term reductions in coverage are irrelevant and he is not permitted to testify about the customs in New Jersey regarding such changes nor is he permitted to opine that such a change occurred in this case. The opinions Klagholz expressed in paragraph 9 of his report that relate to mid-term changes are therefore not admissible. The accompanying Order will be entered upon this motion.

### B. Motion for Summary Judgment

#### 1. *Summary Judgment Standard*

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2845703 (D.N.J.)
(Cite as: Slip Copy)

to judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.' " _Hunt v. Cromartie, 526 U.S. 541, 552 (1999)_ (quoting _Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986))_. The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." _Liberty Lobby, 477 U.S. at 250; Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 329-30 (3d Cir.1995)_ (citation omitted).

OneBeacon seeks summary judgment on three issues. First, OneBeacon claims Triester is collaterally estopped from arguing that it provided notice to Plaintiff of the change in business income loss coverage in Plaintiff's insurance policy. Second, OneBeacon claims that Triester had a contractual duty to notify Plaintiff of the automatic change in business loss coverage and that its failure to do so requires it to indemnify OneBeacon for all damages arising from that failure. And third, OneBeacon claims that it is entitled to judgment as a matter of law on Triester's cross-claim for indemnification and contribution from OneBeacon. As explained below, the Court will deny summary judgment on the first two issues, because genuine issues of material fact remain as to whether Triester notified Plaintiff of the change in business income loss coverage. The Court will grant summary judgment, in part, on the third issue because Plaintiff has no surviving claim against Triester and OneBeacon for which Triester could assert a contribution claim.

### 2. Collateral Estoppel

**\*5** OneBeacon argues that the findings of the New Jersey Department of Banking and Insurance collaterally estop Triester from arguing that it provided notice to Plaintiff of the change in business income loss coverage in Plaintiff's policy. Triester argues that the agency's decision is not entitled to preclusive effect because it was not rendered in a quasi-judicial pro-

ceeding and did not include Triester. Specifically, Triester claims that the proceeding was a settlement aided by the Office of the Insurance Claims Ombudsman, who did not hear any testimony or employ any other procedures similar to those used in a court of law. Therefore, Triester claims, it may continue to assert its notification of Plaintiff as a defense to claims against it by Plaintiff and OneBeacon.

In this diversity action, the Court must apply New Jersey's rules of collateral estoppel in determining whether to give preclusive effect to the prior decision of the New Jersey Department of Banking and Insurance. _Hartmann v. Time, Inc., 166 F.2d 127, 137-38 (3d Cir.), cert. denied, 334 U.S. 838 (1948)_. Under New Jersey law, judicial determinations by administrative agencies may be entitled to preclusive effect if they meet the generally-accepted standards for issue preclusion and are rendered in proceedings that merit such deference. _Olivieri v. Y.M.F. Carpet, Inc., 186 N.J. 511, 522 (2006)_. Under the generally-accepted standards, collateral estoppel operates to foreclose relitigation of an issue when the party asserting the bar shows that: (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court or agency in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding. _In Re Estate of Dawson, 136 N.J. 1, 20-21, 641 A.2d 1026 (1994); Hennessey v. Winslow Twp., 183 N.J. 593, 599 (2005)_.

Under New Jersey's additional requirement that the agency proceedings must be of the type that "merit such deference," _Olivieri, 186 N.J. at 522_, the New Jersey Supreme Court has indicated that an agency decision must have been rendered in a quasi-judicial proceeding in order to merit preclusive effect, _id. at 524_. ("There are significant procedural and substantive safeguards that attend an action presided over by either a judge or an administrative law judge in this State and to which collateral estoppel effect is given.") For example, New Jersey courts will not give preclusive effect to the informal, unrecorded hearings

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 5
Slip Copy, 2006 WL 2845703 (D.N.J.)
(Cite as: Slip Copy)

of the Unemployment Compensation Board, *id.,* or to the non-adjudicative decisions of the Address Confidentiality Program, *Sacharow v. Sacharow,* 177 N.J. 62, 77 (2003). Indeed, New Jersey refuses to apply collateral estoppel to the decisions of its agencies that have "none of the hallmarks of a quasi-judicial adjudication-notice, hearing, and the exercise of judgment on the merits." *Id.*

\*6 In this matter there were two phases of agency decision-making. In the first phase, there was an investigation by the Department, which determined, as far as the record reveals, that "the company" acted "in accordance with the policy contract provisions, applicable statutes and regulations." (DOBI 0027). The Department made this determination based on the written submissions of Plaintiff, OneBeacon and Triester; however, as the Department noted in its letter of findings addressed to Plaintiff, this was not a quasi-judicial determination and the agency has no authority "to question under oath [or] verify the validity of statements and written responses. When parties disagree as to events and written and/or verbal responses, [the Department] must consider the situation a question of fact [that] would need to be addressed in a judicial setting." (DOBI 0007). This first decision by the agency is not the decision OneBeacon seeks to use. However, OneBeacon argues that because Triester participated in this phase of the dispute, he was a party to the agency action and can be precluded from litigating the agency's later determination. As discussed below, it is not clear whether Triester participated in the later phase of the dispute in which the Department determined that Plaintiff had not been notified of the policy change.

After the Department's investigator determined that "the company" had not behaved unlawfully, the Department referred the matter to the Office of the Insurance Ombudsman. In this second phase, the record indicates that the Ombudsman was able to settle the claim by Plaintiff against OneBeacon in part, by securing payment of the business interruption portion of Plaintiff's claim for up to one year. (DOBI 0006). In addition, the Ombudsman sent a letter to OneBeacon that indicates the "issue" to which OneBeacon seeks to give preclusive effect. The Ombudsman wrote, "In this instance, the insured was not in-

formed of the automatic coverage reduction of his Business Interruption coverage when he elected to reduce his property coverage to Actual Cash Value from Replacement Cost coverage." (DOBI 0029). OneBeacon claims that this a finding by the agency that precludes Triester from arguing that it notified Plaintiff of the policy change. The Court finds that this statement is not an agency determination entitled to preclusive effect in this action.

The record does not indicate, and OneBeacon has failed to show, that this agency determination meets the necessary elements of collateral estoppel. Although the issue to be precluded might be identical to the issue decided in the prior proceeding, the issue was not actually litigated in the prior proceeding; the agency did not issue a final judgment on the merits; the determination of the issue was not essential to the prior decision, a settlement; and it does not appear that Triester was a party to the proceeding before the Ombudsman. Further, OneBeacon has not shown that the proceedings before the Ombudsman were sufficiently similar to judicial proceedings to warrant this Court's application of issue preclusion. *See Olivieri,* 186 N.J. at 524 (no collateral estoppel if new determination of issue is warranted by differences in quality or extensiveness of procedures). The letters from the Department that OneBeacon submitted indicate that there was a settlement after an investigation and not a determination of facts, as there would be in a judicial proceeding. The Court finds that the informal decision of the Insurance Ombudsman is not the type of agency decision that is entitled to such deference under New Jersey law and therefore will deny the motion for summary judgment insofar as it seeks to preclude Triester from arguing that it notified Plaintiff of the reduction in business interruption loss coverage.

### 3. *Indemnification of OneBeacon for Failure to Notify*

\*7 For similar reasons, the Court will deny summary judgment on OneBeacon's claim that Triester must indemnify it for any damages caused by Triester's alleged failure to notify Plaintiff of changes in the business loss coverage. Although there is a contract between OneBeacon and Triester that includes an indemnification provision ("agency agreement"), genu-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2845703 (D.N.J.)
(Cite as: Slip Copy)

ine issues of material fact exist as to whether Triester failed to notify Plaintiff of the policy change, whether any losses incurred by OneBeacon were the "direct result" of Triester's actions, and whether OneBeacon contributed to Triester's actions. Because the agency agreement on which OneBeacon bases its indemnification claim requires that these facts be resolved before the agent's indemnification obligation arises, the Court must deny OneBeacon's motion for summary judgment as to this claim.

### 4. Triester's Contribution and Indemnification Claims

On July 19, 2004, Triester filed a cross-claim against OneBeacon for contribution and/or indemnity. OneBeacon argues that Triester's claims against it for contribution and indemnification are mutually exclusive because contribution claims are available for joint tort liability while indemnification is available only as a matter of contract. Further, OneBeacon claims that its only potential liability would be the indemnity obligations in its agency agreement with Triester and that those claims must fail by the terms of the agreement because the facts do not support a finding of its liability. Triester claims that Plaintiff has claims against it and OneBeacon for which a jury might find them jointly and severally liable and in which case Triester could seek contribution for OneBeacon's share of those damages. In addition, Plaintiff claims, the agency agreement between it and OneBeacon gives it a contractual right to seek indemnification for any damages-including attorney's fees and costs-associated with defending an action that OneBeacon's errors or omissions caused.

While OneBeacon correctly points out that there is a difference between contribution and indemnification, the two claims are not mutually exclusive. The Court agrees with Triester that it would be able seek contribution from OneBeacon if the parties were held liable to Plaintiff as joint tortfeasors and Triester pays more than its share of the liability, N.J.S.A. 2A:15-5.1 to -5.3; however, there are no surviving tort claims against the Defendants for which they could be held jointly and severally liable. Therefore, the Court will grant summary judgment to OneBeacon on Triester's contribution claim.

Nevertheless, the agency agreement between One-Beacon and Triester may provide Triester the right to indemnification for, among other things, attorney's fees that it may incur as the result of OneBeacon's errors or omissions. Therefore, the Court will deny OneBeacon's motion for summary judgment with regard to Triester's indemnification claim.

### III. CONCLUSION

*8 For the reasons set forth in this opinion, the Court will deny in part and grant in part the motions *in limine* and exclude portions of the expert's opinion that are conjectural or irrelevant; deny OneBeacon's motion for summary judgment against Triester with regard to OneBeacon's claims for issue preclusion and indemnification and Triester's claim for indemnification; and grant OneBeacon's motion for summary judgment as to Triester's right of contribution and dismiss that claim.

The accompanying Order will be entered.

D.N.J.,2006.
NN&R, Inc. v. One Beacon Ins. Group
Slip Copy, 2006 WL 2845703 (D.N.J.)

END OF DOCUMENT

# EXHIBIT 12

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 13

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 14

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 15

Westlaw.

Slip Copy
Slip Copy, 2007 WL 141058 (W.D.Pa.)
**(Cite as: Slip Copy)**

H

Totty v. Chubb Corp.
W.D.Pa.,2007.
Only the Westlaw citation is currently available.
   United States District Court,W.D. Pennsylvania.
      Helen TOTTY, an individual, Plaintiff,
                    v.
   The CHUBB CORPORATION, d/b/a The Chubb
   Group of Insurance Companies, and Great Northern
         Insurance Company, Defendants.
            **Civil Action No. 05-111.**

                  Jan. 17, 2007.

Maurice A. Nernberg, Jr., Maurice A. Nernberg &
Associates, Pittsburgh, PA, for Plaintiff.
Daniel L. Rivetti, Dennis St. John Mulvihill, Robb
Leonard Mulvihill, Pittsburgh, PA, for Defendants.

        *OPINION AND ORDER OF COURT*
AMBROSE, Chief District Judge.
**\*1** The factual and procedural details of this case are
well known to the parties, and I need not repeat them
in detail here. In short, Plaintiff, Helen Totty
("Plaintiff" or "Totty"), seeks payment under a
homeowners' insurance policy issued to her by De-
fendant Great Northern Insurance Company
("Defendant" or "Great Northern") for damage to her
home allegedly caused by a vibratory compactor
which the City of Pittsburgh used to repave the road
outside her home in July 2002. Plaintiff claims that
vibratory waves from the compactor caused densific-
ation of sand layers in the underlying soil, resulting
in the alleged damage.

Defendant offers the expert testimony of Randal L.
Exley of ARCCA Inc. ("Exley") with respect to the
causation issue. Exley disagrees with the causation
theories of Plaintiff's experts and opines, *inter alia*,
that much of the alleged damage to Plaintiff's home
was instead caused by "creep." Pending is Plaintiff's
Motion in Limine (Docket No. 51) seeking to exclude
Exley's testimony at trial on various grounds. I held a
*Daubert* hearing on this issue on December 19, 2006.
After careful consideration of the testimony and evid-
ence presented at the hearing, as well as the parties'

pre-and post-hearing submissions and attachments
thereto, the Motion in Limine is denied.

                 *I. ANALYSIS*

        **A. Daubert Standard and Rule 702**

In *Daubert*, the Supreme Court held that:
[f]aced with a proffer of expert scientific testimony,
... the trial court judge must determine at the outset ...
whether the expert is proposing to testify to (1) sci-
entific knowledge that (2) will assist the trier of fact
to understand or determine a fact in issue. This en-
tails a preliminary assessment of whether the reason-
ing or methodology underlying the testimony is sci-
entifically valid and of whether that reasoning or
methodology properly can be applied to the facts in
issue.

*Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579,
592-93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
More recently, in *Kumho Tire Co., Ltd. v. Carmi-*
*chael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143
L.Ed.2d 238 (1999), the Supreme Court clarified any
confusion regarding the intended reach of the
Daubert decision, by declaring that the trial judge
must perform this "basic gatekeeping obligation" to
all expert matters, not just "scientific" matters. In the
Third Circuit, the trial court's role as a "gatekeeper"
announced in *Daubert* requires: (1) proof that the
proffered witness is qualified as an expert; (2) the ex-
pert must testify about matters requiring scientific,
technical, or specialized knowledge; and (3) the ex-
pert's testimony must "fit" the facts of the case. *In re*
*Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 741-42 (3d
Cir.1994). Thus, pursuant to *Daubert*, the gatekeep-
ing function requires the court to ensure that the ex-
pert testimony is both reliable and relevant. *Daubert,*
509 U.S. at 589; *Kumho Tire Co.,* 526 U.S. at 147.

As to the first requirement-qualification-the Court of
Appeals for the Third Circuit has "eschewed impos-
ing overly rigorous requirements of expertise and
[has] been satisfied with more general qualifica-
tions." *Paoli,* 35 F.3d at 741. "Rule 702's liberal
policy of admissibility extends to the substantive as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                        Page 2
Slip Copy, 2007 WL 141058 (W.D.Pa.)
(Cite as: Slip Copy)

well as the formal qualification of experts." *Id.* Thus, an expert can qualify based on a broad range of knowledge, skills, training and experience.

**\*2** The second inquiry focuses on methodology. The inquiry into methodology is designed to ensure that an expert's opinions are based upon " 'methods and procedures of science' rather than on subjective belief or unsupported speculation." *Id.* at 742. Factors used to assess reliability include whether: (1) the theory or technique can be tested; (2) the theory or technique has been peer reviewed; (3) there is a high rate of known or potential error; (4) there are standards of control; (5) the theory is "generally accepted"; (6) there is a sufficient relationship between the technique and methods which have been established to be reliable; (7) the expert's qualifications are sufficient; and (8) the method has been put to non-judicial uses. See *Magistrini v. One Hour Martinizing Dry Cleaning, 180 F.Supp.2d 584, 594 (D.N.J.2002), aff'd, 68 F. App'x 356 (3d Cir.2003)*. "Some courts also consider additional factors relevant in determining reliability, including: (i) whether the expert's proposed testimony grows naturally and directly out of research the expert has conducted independent of the litigation ...; (ii) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion ...; (iii) whether the expert has adequately accounted for alternative explanations ...; (iv) whether the expert is being as careful as he would be in his professional work outside of the litigation context ...; and (v) whether the field of expertise asserted by the expert is known to reach reliable results for the type of opinion proffered by the expert...." *Id.* at 594-95 (citations omitted).

Although this list of factors is lengthy, not each factor will be relevant to every reliability analysis. The "test of reliability is 'flexible.' " *Kumho, 526 U.S. at 141*. According to the Supreme Court, "*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts." *Id.* The relevance of the *Daubert* factors depends "on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 150 (internal quotation marks and citations omitted).

Finally, *Daubert* and Rule 702 require that the ex-

pert's testimony "fit" the facts of the case. " 'Fit' requires that the proffered testimony must in fact assist the jury, by providing it with relevant information, necessary to a reasoned decision of the case." *Magistrini, 180 F.Supp.2d at 595* (citing *Paoli, 35 F.3d at 743*).

### B. Exley's Qualifications

Plaintiff does not argue that Exley is unqualified to testify as an expert in this case, and I find, based on the record before me, that Exley is sufficiently qualified to testify as an expert under Federal Rule of Evidence 702 with respect to the cause of the alleged damage to Plaintiff's home.[FN1]

> FN1. Among other things, Exley graduated *cum laude* from the University of Pittsburgh with a degree in civil engineering and is a Certified Professional Engineer. Exley has been inspecting homes to determine the causes of structural distress since 1994 and currently performs approximately 250-270 home inspections per year, 70-80% of which are residential inspections. Hearing Trans. at 41-42 & Ex. A.

### C. Exley's Methodology and Opinions on Causation

Plaintiff first objects to the admissibility of testimony regarding Exley's opinion that "creep" caused certain damage to Plaintiff's home that is at issue in this case.[FN2] Specifically, Plaintiff contends that Exley's methodology is unreliable and, therefore, his testimony must be excluded under *Daubert* and the Federal Rules of Evidence. In support of her argument, Plaintiff complains that Exley based his opinions solely on a visual observation of the home and a review of four other reports created in the case. She contends that Exley did not test the wood; did not provide calculations to support his theory; did not cite to relevant treatises or references; did not explain his conclusions; and did not explain his methodology. I disagree. As set forth below, these objections are either inaccurate or otherwise do not warrant exclusion of Exley's testimony.

> FN2. Exley defines creep in his report as "long-term deflection of wood framing

Slip Copy                                                                Page 3
Slip Copy, 2007 WL 141058 (W.D.Pa.)
(Cite as: Slip Copy)

members" and as an engineering term for "time dependent deformation." Exley Report at 25 (Docket No. 52, Ex. 1). Exley explains that "[c]reep in wood members occurs as the wood fibers in the member gradually slip against one another." *Id.* He also lists as commonly-observed symptoms of creep: sagging and sloping floors; doors and their frames becoming out of square; random cracking of ceiling plaster due to sagging of floor joists; and diagonal cracking of wall plaster due to sagging of the support structure under the walls. *Id.* at 26. Exley states in his report that he observed all of these "symptoms" in Plaintiff's home. *Id.*

*3 At the *Daubert* hearing, Exley explained the methodology he used to form his opinions. Specifically, he testified that he conducts visual inspections of the property to review the geometry of the structure, determine crack patterns, and to gain an understanding of how structural members deflect. He then applies the geometry to the structural movement and stresses that would occur during that type of movement to reach a conclusion as to causation. *See* Hearing Trans. at 25-27, 30-32, 43-45. In Plaintiff's case, Exley applied this methodology by visually inspecting the exterior and interior of the home to look for crack patterns consistent with foundation settlement.[FN3] When Exley did not observe any cracks normally associated with settlement, he looked for alternative causes. *Id.* at 43-47. Based on his inspection, Exley concluded that long-term deflection of the wood framing ("creep") and thermal expansion and contraction caused the damage at issue. *Id.*[FN4]

> FN3. Exley explained that there are well-documented crack types that are associated with foundation settlement. Hearing Trans. at 43.

> FN4. As set forth in his 28-page report, Exley thoroughly examined every room, hallway, and stairway in Plaintiff's home, and documented his inspection with over 250 photographs. Exley Report at 7-22.

Exley further testified that the visual inspection meth-

od that he employed in Plaintiff's case is the type of method commonly used by structural engineers in determining the cause of foundational and other types of stresses in the home. *Id.* at 44-46, 64-65. Contrary to Plaintiff's arguments, Exley also listed a number of reference materials that support his opinions. Defendant introduced copies of these reference materials as Exhibit C at the hearing, and I agree that they lend support to his conclusions.[FN5] In addition to these materials, Exley reviewed various other reports and evaluations that had been prepared concerning the cause and/or extent of damage to Plaintiff's home, including reports concerning rainfall records and subsurface soil conditions. Exley Report at 2-7.

> FN5. Whether or not Exley's references are the best and/or only references is a question of weight, not admissibility.

Based upon my review of Exley's report, testimony, and supporting documentation, I agree with Defendant that the methodology Exley applied to determine the cause of damage to Plaintiff's home is reliable, helpful to the trier of fact, and otherwise meets the criteria established by *Daubert* and the Federal Rules of Evidence.

The fact that Exley did not analyze the type of wood contained in the house, did not test the wood (as to moisture content, size, etc.), and/or did not provide calculations to support his theory, does not change my conclusion. Exley testified that these factors had no bearing on his conclusions regarding causation, including his opinion that creep caused much of the damage at issue. Hearing Trans. at 30-31, 56-60. He also explained that structural engineers routinely provide similar opinions without knowing this information. *Id.* at 59-60. Plaintiff's concerns more appropriately go to the weight, not the admissibility or reliability, of Exley's testimony, and she remains free to highlight these perceived weaknesses through effective cross-examination at trial. *See Walker v. Gordon,* 46 F. App'x 691, 695-96 (3d Cir.2002) ( "Determinations regarding the weight to be accorded, and the sufficiency of, the evidence relied upon by the proffered expert, are within the sole province of the jury."); *Daubert,* 509 U.S. at 596.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

\*4 Finally, Plaintiff argues that Exley should not be permitted to opine at trial that he disagrees with the McQuade and Milhalcin expert report submitted by Plaintiff. In that report, Plaintiff's experts concluded that vibrations from the construction equipment caused densification of the loose to medium dense sand layer in the Carmichael Deposit under Plaintiff's home and that resultant settlement of the very stiff to hard silty clay layers above the Carmichael Deposit occurred and caused settlement of Plaintiff's home. In his report, Exley reviews and disagrees with McQuade and Milhalcin's conclusions.

I disagree with Plaintiff that Exley's opinion in this regard must be excluded. Although Plaintiff argues that Exley does not provide a reason for his conclusion, Exley's report and his testimony at the *Daubert* hearing do not support that argument. To the contrary, Exley fully explains that he disagrees that relevant settlement of any type occurred because he did not observe any of the well-documented crack types associated with settlement damage. *See, e.g.,* Exley Report at 22-23. As set forth above, the visual inspection methodology Exley applied to reach this conclusion is reliable and helpful to the trier of fact. Again, Plaintiff is free to vigorously cross-examine Exley regarding these issues at trial.

## II. CONCLUSION

For all of the reasons set forth above, Plaintiff's Motion in Limine to Exclude the Report and Testimony of Randal L. Exley is denied.

### ORDER OF COURT

THEREFORE, this **17th** day of January, 2007, after careful consideration and for the reasons set forth in the accompanying Opinion, it is Ordered that Plaintiff's Motion in Limine to Exclude the Report and Testimony of Randal L. Exley of ARCCA Inc. (Docket No. 51) is DENIED.

W.D.Pa.,2007.
Totty v. Chubb Corp.
Slip Copy, 2007 WL 141058 (W.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*4 Finally, Plaintiff argues that Exley should not be permitted to opine at trial that he disagrees with the McQuade and Milhalcin expert report submitted by Plaintiff. In that report, Plaintiff's experts concluded that vibrations from the construction equipment caused densification of the loose to medium dense sand layer in the Carmichael Deposit under Plaintiff's home and that resultant settlement of the very stiff to hard silty clay layers above the Carmichael Deposit occurred and caused settlement of Plaintiff's home. In his report, Exley reviews and disagrees with McQuade and Milhalcin's conclusions.

I disagree with Plaintiff that Exley's opinion in this regard must be excluded. Although Plaintiff argues that Exley does not provide a reason for his conclusion, Exley's report and his testimony at the *Daubert* hearing do not support that argument. To the contrary, Exley fully explains that he disagrees that relevant settlement of any type occurred because he did not observe any of the well-documented crack types associated with settlement damage. *See, e.g.,* Exley Report at 22-23. As set forth above, the visual inspection methodology Exley applied to reach this conclusion is reliable and helpful to the trier of fact. Again, Plaintiff is free to vigorously cross-examine Exley regarding these issues at trial.

## II. CONCLUSION

For all of the reasons set forth above, Plaintiff's Motion in Limine to Exclude the Report and Testimony of Randal L. Exley is denied.

## ORDER OF COURT

THEREFORE, this 17th day of January, 2007, after careful consideration and for the reasons set forth in the accompanying Opinion, it is Ordered that Plaintiff's Motion in Limine to Exclude the Report and Testimony of Randal L. Exley of ARCCA Inc. (Docket No. 51) is DENIED.

W.D.Pa.,2007.
Totty v. Chubb Corp.
Slip Copy, 2007 WL 141058 (W.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.