# EXHIBIT 1

# EXHIBIT 1

## STATEMENT OF ADMITTED FACTS

1.     Bridgestone Sports Co., Ltd. ("Bridgestone Sports") is a Japanese corporation organized and existing under the laws of Japan, with a principal place of business in Tokyo, Japan.

2.     Bridgestone Golf, Inc. is a U.S. subsidiary of Bridgestone Sports Co., Ltd. and located in and has a principal place of business in Covington, Georgia.

3.     Acushnet Company ("Acushnet") is a corporation organized and existing under the laws of Delaware, with a principal place of business at 333 Bridge Street, Fairhaven, Massachusetts 02719.

4.     The following facts are admitted with respect to U.S. Patent No. 5,553,852 ("the '852 patent"), entitled *Three-Piece Solid Golf Ball*:

     a.     the '852 patent was issued by the U.S. Patent and Trademark Office ("USPTO") on September 10, 1996;

     b.     the '852 patent was filed in the USPTO on July 8, 1994

     c.     the '852 patent claims priority to JP 5-193065, which was filed in the Japanese Patent Office ("JPO") on July 8, 1993, and the '852 patent is entitled to this priority date; and

     d.     the '852 patent is assigned to Bridgestone Sports Co., Ltd. and it owns all right, title and interest in the '852 patent.

5.     The following facts are admitted with respect to U.S. Patent No. 5,782,707 ("the '707 patent"), entitled *Three-Piece Solid Golf Ball*:

     a.     the '707 patent was issued by the USPTO on July 21, 1998;

     b.     the '707 patent was filed in the USPTO on March 10, 1997;

     c.     the '707 patent claims priority to JP 8-082121, which was filed in the JPO on March 11, 1996, and the '707 patent is entitled to this priority date; and

d.   the '707 patent is assigned to Bridgestone Sports Co., Ltd. and it owns all right, title and interest in the '707 patent.

6.   The following facts are admitted with respect to U.S. Patent No. 6,679,791 ("the '791 patent"), entitled *Golf Ball*:

a.   the '791 patent was issued by the USPTO on January 20, 2004;

b.   the '791 patent was filed in the USPTO on January 15, 2001;

c.   the '791 patent claims priority to JP 2000-190640, which was filed in the JPO on June 26, 2000, and the '791 patent is entitled to this priority date; and

d.   the '791 patent is assigned to Bridgestone Sports Co., Ltd. and it owns all right, title and interest in the '791 patent.

7.   The following facts are admitted with respect to U.S. Patent No. 5,252,652 ("the '652 patent"), entitled *Solid Golf Ball*:

a.   the '652 patent was issued by the USPTO on October 12, 1993;

b.   the '652 patent was filed in the USPTO on May 10, 1990;

c.   the '652 patent claims priority to JP 1-118460, which was filed in the JPO on May 11, 1989; and

d.   the '652 patent is assigned to Bridgestone Sports Co., Ltd. and it owns all right, title and interest in the '652 patent.

8.   The following facts are admitted with respect to U.S. Patent No. 6,634,961 ("the '961 patent"), entitled *Multi-Piece Solid Golf Ball*:

a.   the '961 patent was issued by the USPTO on October 21, 2003;

b.   the '961 patent was filed in the USPTO on May 30, 2002;

c.   the '961 patent claims priority to JP 2001-163238, which was filed in the JPO on May 30, 2001, and the '961 patent is entitled to this priority date; and

d.   the '961 patent is assigned to Bridgestone Sports Co., Ltd. and it owns all right, title and interest in the '961 patent.

9.   The following facts are admitted with respect to U.S. Patent No. 5,743,817 ("the

'817 patent"), entitled *Golf Ball*:

    a.    the '817 patent was issued by the USPTO on April 28, 1998;

    b.    the '817 patent was filed in the USPTO on September 29, 1995;

    c.    the '817 patent claims priority to JP 6-276109, which was filed in the JPO on October 14, 1994, and to JP 6-333024, which was filed in the JPO on December 14, 1994, and the '817 patent is entitled to these priority dates; and

    d.    the '817 patent is assigned to Bridgestone Sports Co., Ltd. and it owns all right, title and interest in the '817 patent.

10.    The following facts are admitted with respect to U.S. Patent No. 5,803,834 ("the '834 patent"), entitled *Two-Piece Solid Golf Ball*:

    a.    the '834 patent was issued by the USPTO on September 8, 1998;

    b.    the '834 patent was filed in the USPTO on February 27, 1997;

    c.    the '834 patent claims priority to JP 8-071135, which was filed in the JPO on March 1, 1996, and the '834 patent is entitled to this priority date; and

    d.    the '834 patent is assigned to Bridgestone Sports Co., Ltd. and it owns all right, title and interest in the '834 patent.

11.    Those facts admitted in Acushnet's responses to Bridgestone's requests for admission.

12.    The following facts are admitted with respect to U.S. Patent No. 6,818,705 ("the '705 patent"):

    a.    Acushnet is the assignee of the '705 patent and owns all right, title and interest in the '705 patent;

    b.    The '705 patent issued on November 16, 2004;

    c.    The applicants of the '705 patent claimed priority to a provisional application filed on December 24, 1998; and

    d.    Shenshen Wu, Edmund A. Hebert, Laurent Bissonnette, David A. Bulpett, Murali Rajagopalan, Peter Voorheis, Mark Wrigley are the named inventors of the technology claimed in the '705 patent.

13.    The following facts are admitted with respect to U.S. Patent No. 4,729,861 ("the '861 patent"):

    a.    Acushnet is the assignee of the '861 patent and owns all right, title and interest in the '861 patent;

    b.    The '861 patent issued on March 8, 1988;

    c.    The applicants of the '861 patent claimed priority to an application dated March 20, 1972 and the '861 patent is entitled to that priority date; and

    d.    Francis deS. Lynch, John W. Jepson, Robert A. Brown are the named inventors of the technology claimed in the '861 patent.

14.    The following facts are admitted with respect to U.S. Patent No. 4,936,587 ("the '587 patent"):

    a.    Acushnet is the assignee of the '587 patent and owns all right, title and interest in the '861 patent;

    b.    The '587 patent issued on June 26, 1990;

    c.    The applicants of the '587 patent claimed priority to an application dated March 20, 1972 and the '587 patent is entitled to that priority date; and

    d.    Francis deS. Lynch, John W. Jepson, Robert A. Brown are the named inventors of the technology claimed in the '587 patent.

15.    The following facts are admitted with respect to U.S. Patent No. 5,080,367 ("the '367 patent"):

    a.    Acushnet is the assignee of the '367 patent and owns all right, title and interest in the '861 patent;

    b.    The '367 patent issued on January 14, 1992;

    c.    The applicants of the '367 patent claimed priority to an application dated March 20, 1972 and the '367 patent is entitled to that priority date; and

    d.    Francis deS. Lynch, John W. Jepson, Robert A. Brown are the named inventors of the technology claimed in the '367 patent.

# EXHIBIT 2

**EXHIBIT 2**

BRIDGESTONE'S STATEMENT OF THE ISSUES OF FACT THAT REMAIN TO BE
LITIGATED

Bridgestone contends that the issues of fact that remain to be litigated at trial are

as follows.  To the extent that any issues of law set forth in Exhibit 4 of the Proposed Joint Pre-

Trial Order may be considered issues of fact, Bridgestone incorporates them by reference.  To

the extent any of the issues of fact set forth in this Exhibit 2 may be considered issues of law,

Bridgestone incorporates them by reference also.

I.    BRIDGESTONE'S PATENTS

A.    Infringement[1]

1.    Whether Bridgestone has shown by a preponderance of the evidence that:

(i) the accused Acushnet golf balls (the ◄•Pro V1 392•►;  ◄Pro V1-392►;  ◄Pro V1* 392►;

◄•Pro V1x 332•►;  ◄Pro V1x-332►;  ◄NXT►;  ◄-NXT -►;  ◄NXT Tour►;  ◄NXT-

Tour►;  DT So/Lo/PTS So/Lo;  ◄DT So/Lo►/◄PTS So/Lo►;  Exception; and Exception airfoil

logo) infringe any of the asserted claims 1 and 9 of Bridgestone's '652 Patent; and (ii) the

accused Acushnet golf balls (the ◄•Pro V1 392•►;  ◄Pro V1-392►;  ◄Pro V1* 392►;  ◄•Pro

V1x 332•►;  ◄Pro V1x-332►) infringe asserted claim 5 of Bridgestone's '652 Patent.

2.    Whether Bridgestone has shown by a preponderance of the evidence that

the accused Acushnet golf balls (the Pro V1 392; Pro V1 392 (stretched);  ◄Pro V1•392►;

◄•Pro V1 392•►;  ◄Pro V1-392►;  ◄Pro V1* 392►;  ◄•Pro V1x 332•►; and ◄Pro V1x-

332►) infringe any of the asserted claims 1, 6 and 7 of Bridgestone's '852 Patent.

---

[1] Because the Court has stayed discovery and trial on willfulness (D.I. 158, Aug. 2, 2006 Tr. at
23), Bridgestone does not include any willfulness issues in this pretrial order.

3.    Whether Bridgestone has shown by a preponderance of the evidence that the accused Acushnet golf balls (the ◀NXT•Tour▶; ◀NXT Tour▶; ◀NXT-Tour▶; DT So/Lo/PTS So/Lo; ◀DT So/Lo▶/◀PTS So/Lo▶; Exception; and Exception airfoil logo) infringe asserted claim 1 of Bridgestone's '817 Patent.

4.    Whether Bridgestone has shown by a preponderance of the evidence that the accused Acushnet golf balls (the Pro V1 392; Pro V1 392 (stretched); and ◀Pro V1•392▶) infringe asserted claim 1 of Bridgestone's '707 Patent.

5.    Whether Bridgestone has shown by a preponderance of the evidence that the accused Acushnet golf balls (the ◀NXT▶; ◀-NXT -▶; ◀DT So/Lo▶/◀PTS So/Lo▶; Exception; and Exception airfoil logo) infringe asserted claim 1 of Bridgestone's '834 Patent.

6.    Whether Bridgestone has shown by a preponderance of the evidence that the accused Acushnet golf ball (the ◀Pro V1-392▶) infringes asserted claim 2 of Bridgestone's '961 Patent.

7.    Whether Bridgestone has shown by a preponderance of the evidence that the accused Acushnet golf balls (the ◀•Pro V1 392•▶; ◀Pro V1-392▶; ◀•Pro V1x 332•▶; and ◀Pro V1x-332▶) infringe any of the asserted claims 11, 13, 16 and 26 of Bridgestone's '791 Patent.

B.    <u>Damages</u>

1.    Whether Bridgestone is entitled to reasonable royalty damages, and, if so, what amount it has proven by a preponderance of the evidence.

2.    The amount of prejudgment interest to which Bridgestone is entitled on the damages award.

3.    Whether Bridgestone should be awarded its reasonable attorneys' fees,

expenses, and costs due to this case being exceptional under 35 U.S.C. § 285.

    4.    The nature and scope of the injunction to which Bridgestone is entitled.[2]

    C.    <u>Validity</u>

    1.    Whether Acushnet has proven by clear and convincing evidence that its alleged prior art (Japanese Publication No. 02-092378; United States Patent No. 4,556,220; "Mastication of Rubber;" and United States Patent No. 4,722,977) qualifies as prior art to any of the asserted claims 1, 5 and 9 of Bridgestone's '652 Patent.

    2.    Whether Acushnet has proven by clear and convincing evidence that Japanese Publication No. 02-092378 discloses all of the elements of any of the asserted claims 1, 5 and 9 of Bridgestone's '652 Patent.

    3.    Whether Acushnet has proven by clear and convincing evidence that the inventions of the asserted claims 1, 5 and 9 of Bridgestone's '652 Patent would have been obvious to a person of ordinary skill in the art at the time the claimed invention was made, in light of the scope and content of the prior art (Japanese Publication No. 02-092378), the differences between each asserted claim of the patents-in-suit and the prior art, the level or ordinary skill in the art at that time, and objective indicia of non-obviousness.

    4.    Whether Acushnet has proven by clear and convincing evidence that the inventions of the asserted claims 1, 5 and 9 of Bridgestone's '652 Patent would have been obvious to a person of ordinary skill in the art at the time the claimed invention was made, in light of the scope and content of the prior art (a combination of United States Patent No. 4,556,220, "Mastication of Rubber" and United States Patent No. 4,722,977), the differences

---

[2]    The amount of prejudgment interest and injunctive relief are issues for the Court.

between each asserted claim of the patents-in-suit and the prior art, the level or ordinary skill in the art at that time, and objective indicia of non-obviousness.

5.     Whether Acushnet has proven by clear and convincing evidence that the inventions of the asserted claims 1, 5 and 9 of Bridgestone's '652 Patent would have been obvious to a person of ordinary skill in the art at the time the claimed invention was made, in light of the scope and content of the prior art (a combination of Japanese Publication No. 02-092378 and United States Patent No. 4,556,220), the differences between each asserted claim of the patents-in-suit and the prior art, the level or ordinary skill in the art at that time, and objective indicia of non-obviousness.

6.     Whether Bridgestone has shown evidence of secondary considerations to show non-obviousness of any of the asserted claims 1, 5 and 9 of Bridgestone's '652 Patent.

7.     Whether Acushnet has proven by clear and convincing evidence that its alleged prior art (Japanese Publication No. 02-092378) enables one of ordinary skill in the art to make and use any of the asserted claims 1, 5 and 9 of Bridgestone's '652 Patent without undue experimentation.

8.     Whether Acushnet has proven by clear and convincing evidence that its alleged prior art (a combination of United States Patent No. 4,556,220, "Mastication of Rubber" and United States Patent No. 4,722,977) enables one of ordinary skill in the art to make and use any of the asserted claims 1, 5 and 9 of Bridgestone's '652 Patent without undue experimentation.

9.     Whether Acushnet has proven by clear and convincing evidence that its alleged prior art (a combination of Japanese Publication No. 02-092378 and United States Patent No. 4,556,220) enables one of ordinary skill in the art to make and use any of the asserted claims 1, 5 and 9 of Bridgestone's '652 Patent without undue experimentation.

10.    Whether Acushnet has proven by clear and convincing evidence that its alleged prior art (United States Patent No. 4,431,193; United States Patent No. 5,314,187; and twelve "Wilson Ultra Tour Balata 90" golf balls) qualifies as prior art to any of the asserted claims 1, 6 and 7 of Bridgestone's '852 Patent.

11.    Whether Acushnet has proven by clear and convincing evidence that United States Patent No. 4,431,193 discloses all of the elements of any of the asserted claims 1, 6 and 7 of Bridgestone's '852 Patent.

12.    Whether Acushnet has proven by clear and convincing evidence that the inventions of the asserted claims 1, 6 and 7 of Bridgestone's '852 Patent would have been obvious to a person of ordinary skill in the art at the time the claimed invention was made, in light of the scope and content of the prior art (United States Patent No. 4,431,193), the differences between each asserted claim of the patents-in-suit and the prior art, the level or ordinary skill in the art at that time, and objective indicia of non-obviousness.

13.    Whether Acushnet has proven by clear and convincing evidence that the inventions described and claimed in any of the asserted claims 1, 6 and 7 of Bridgestone's '852 Patent would have been obvious to a person of ordinary skill in the art at the time the claimed invention was made, in light of the scope and content of the prior art (a combination of United States Patent No. 5,314,187 and the twelve "Wilson Ultra Tour Balata 90" balls), the differences between each asserted claim of the patents-in-suit and the prior art, the level or ordinary skill in the art at that time, and objective indicia of non-obviousness.

14.    Whether Bridgestone has shown evidence of secondary considerations to show non-obviousness of the asserted claims 1, 6 and 7 of Bridgestone's '852 Patent.

15.    Whether Acushnet has proven by clear and convincing evidence that its

alleged prior art (United States Patent No. 4,431,193) enables one of ordinary skill in the art to make and use any of the asserted claims 1, 6 and 7 of Bridgestone's '852 Patent without undue experimentation.

16.    Whether Acushnet has proven by clear and convincing evidence that its alleged prior art (United States Patent No. 5,314,187 and the twelve "Wilson Ultra Tour Balata 90" balls) enables one of ordinary skill in the art to make and use any of the asserted claims 1, 6 and 7 of Bridgestone's '852 Patent without undue experimentation.

17.    Whether Acushnet has proven by clear and convincing evidence that its alleged prior art (Japanese Publication No. 60-163673) qualifies as prior art to asserted claim 1 of Bridgestone's '817 Patent.

18.    Whether Acushnet has proven by clear and convincing evidence that Japanese Publication No. 60-163673 discloses all of the elements of asserted claim 1 of Bridgestone's '817 Patent.

19.    Whether Acushnet has proven by clear and convincing evidence that the invention of asserted claim 1 of Bridgestone's '817 Patent would have been obvious to a person of ordinary skill in the art at the time the claimed invention was made, in light of the scope and content of the prior art (Japanese Publication No. 60-163673), the differences between each asserted claim of the patents-in-suit and the prior art, the level or ordinary skill in the art at that time, and objective indicia of non-obviousness.

20.    Whether Bridgestone has shown evidence of secondary considerations to show non-obviousness of asserted claim 1 of Bridgestone's '817 Patent.

21.    Whether Acushnet has proven by clear and convincing evidence that its alleged prior art (Japanese Publication No. 60-163673) enables one of ordinary skill in the art to

make and use asserted claim 1 of Bridgestone's '817 Patent without undue experimentation.

22.     Whether Acushnet has proven by clear and convincing evidence that its alleged prior art (European Publication No. 0 633 043) qualifies as prior art to asserted claim 1 of Bridgestone's '707 Patent.

23.     Whether Acushnet has proven by clear and convincing evidence that the invention of asserted claim 1 of Bridgestone's '707 Patent would have been obvious to a person of ordinary skill in the art at the time the claimed invention was made, in light of the scope and content of the prior art (European Publication No. 0 633 043), the differences between each asserted claim of the patents-in-suit and the prior art, the level or ordinary skill in the art at that time, and objective indicia of non-obviousness.

24.     Whether Acushnet has proven by clear and convincing evidence that its alleged prior art (European Publication No. 0 633 043) enables one of ordinary skill in the art to make and use asserted claim 1 of Bridgestone's '707 Patent without undue experimentation.

25.     Whether Bridgestone has shown evidence of secondary considerations to show non-obviousness of asserted claim 1 of Bridgestone's '707 Patent.

26.     Whether Acushnet has proven by clear and convincing evidence that its alleged prior art (six "Precept EV Extra Spin" golf balls; and six "Wilson Ultra Competition" golf balls) qualifies as prior art to asserted claim 1 of Bridgestone's '834 Patent.

27.     Whether Acushnet has proven by clear and convincing evidence that the "Precept EV Extra Spin" discloses all of the elements of asserted claim 1 of Bridgestone's '834 Patent.

28.     Whether Acushnet has proven by clear and convincing evidence that the "Wilson Ultra Competition" discloses all of the elements of asserted claim 1 of Bridgestone's

'834 Patent.

29.      Whether Acushnet has proven by clear and convincing evidence that its alleged prior art ("Precept EV Extra Spin") enables one of ordinary skill in the art to make and use asserted claim 1 of Bridgestone's '834 Patent without undue experimentation.

30.      Whether Acushnet has proven by clear and convincing evidence that its alleged prior art ("Wilson Ultra Competition") enables one of ordinary skill in the art to make and use asserted claim 1 of Bridgestone's '834 Patent without undue experimentation.

31.      Whether Acushnet has proven by clear and convincing evidence that its alleged prior art (United States Patent No. 6,612,940 and United States Patent No. 6,486,261) qualifies as prior art to asserted claim 2 of Bridgestone's '961 Patent.

32.      Whether Acushnet has proven by clear and convincing evidence that United States Patent No. 6,612,940 discloses all of the elements of asserted claim 2 of Bridgestone's '961 Patent.

33.      Whether Acushnet has proven by clear and convincing evidence that the invention of asserted claim 2 of Bridgestone's '961 Patent would have been obvious to a person of ordinary skill in the art at the time the claimed invention was made, in light of the scope and content of the prior art (United States Patent No. 6,612,940), the differences between each asserted claim of the patents-in-suit and the prior art, the level or ordinary skill in the art at that time, and objective indicia of non-obviousness.

34.      Whether Acushnet has proven by clear and convincing evidence that the invention of asserted claim 2 of Bridgestone's '961 Patent would have been obvious to a person of ordinary skill in the art at the time the claimed invention was made, in light of the scope and content of the prior art (United States Patent No. 6,486,261), the differences between each

asserted claim of the patents-in-suit and the prior art, the level or ordinary skill in the art at that time, and objective indicia of non-obviousness.

35.    Whether Acushnet has proven by clear and convincing evidence that the invention of asserted claim 2 of Bridgestone's '961 Patent would have been obvious to a person of ordinary skill in the art at the time the claimed invention was made, in light of the scope and content of the prior art (a combination of United States Patent No. 6,612,940 and United States Patent No. 6,486,261), the differences between each asserted claim of the patents-in-suit and the prior art, the level or ordinary skill in the art at that time, and objective indicia of non-obviousness.

36.    Whether Acushnet has proven by clear and convincing evidence that its alleged prior art (United States Patent No. 6,612,940) enables one of ordinary skill in the art to make and use asserted claim 2 of Bridgestone's '961 Patent without undue experimentation.

37.    Whether Acushnet has proven by clear and convincing evidence that its alleged prior art (United States Patent No. 6,486,261) enables one of ordinary skill in the art to make and use asserted claim 2 of Bridgestone's '961 Patent without undue experimentation.

38.    Whether Acushnet has proven by clear and convincing evidence that its alleged prior art (a combination of United States Patent No. 6,612,940 and United States Patent No. 6,486,261) enables one of ordinary skill in the art to make and use asserted claim 2 of Bridgestone's '961 Patent without undue experimentation.

39.    Whether Bridgestone has shown evidence of secondary considerations to show non-obviousness of asserted claim 2 of Bridgestone's '961 Patent.

40.    Whether Acushnet has proven by clear and convincing evidence that any of the asserted claims 11, 13, 16 and 26 of Bridgestone's '791 Patent are not supported by a

written description such that one of ordinary skill in the art would understand that the inventor had possession of the claimed invention.

41.     Whether Acushnet has proven by clear and convincing evidence that Bridgestone's '791 Patent does not enable one of ordinary skill in the art to make and use any of its asserted claims 11, 13, 16 and 26 without undue experimentation.

D.     Unenforceability[3]

1.     Whether Acushnet has proven by clear and convincing evidence that Bridgestone's '817 Patent is unenforceable due to inequitable conduct for not disclosing the Precept EV Extra Spin to the Patent Office.

2.     Whether Acushnet has proven by clear and convincing evidence that Bridgestone's '707 Patent is unenforceable due to inequitable conduct for not disclosing European Publication 0 633 043 to the Patent Office.

E.     Unclean Hands

1.     Whether Acushnet has proven by clear and convincing evidence that Bridgestone is acting with unclean hands in asserting the '817 Patent due to inequitable conduct for not disclosing the Precept EV Extra Spin to the Patent Office.

2.     Whether Acushnet has proven by clear and convincing evidence that Bridgestone is acting with unclean hands in asserting the '707 Patent due to inequitable conduct for not disclosing the European Publication 0 633 043 to the Patent Office.

_____

[3] Unenforceability, Unclean Hands, and Laches, Waiver and Estoppel defenses will be tried by the Court.

- 10 -

F.    Laches, Wavier and Estoppel

1.    Whether Acushnet has proven that Bridgestone has violated the doctrines of laches, waiver or estoppel with respect to asserting its '652 Patent.

2.    Whether Acushnet has proven that Bridgestone has violated the doctrines of laches, waiver or estoppel with respect to asserting its '817 Patent.

3.    Whether Acushnet has proven that Bridgestone has violated the doctrines of laches, waiver or estoppel with respect to asserting its '852 Patent.

4.    Whether Acushnet has proven that Bridgestone has violated the doctrines of laches, waiver or estoppel with respect to asserting its '707 Patent.

5.    Whether Acushnet has proven that Bridgestone has violated the doctrines of laches, waiver or estoppel with respect to asserting its '834 Patent.

G.    Notice

1.    Whether Bridgestone has proven by a preponderance of the evidence that it is entitled to recover damages from Acushnet for infringement of the '652 Patent as of at least June 2001.

2.    Whether Bridgestone has proven by a preponderance of the evidence that it is entitled to recover damages from Acushnet for infringement of the '817 Patent as of at least June 2001.

3.    Whether Bridgestone has proven by a preponderance of the evidence that it is entitled to recover damages from Acushnet for infringement of the '852 Patent as of at least July 2000.

4.      Whether Bridgestone has proven by a preponderance of the evidence that it is entitled to recover damages from Acushnet for infringement of the '707 Patent as of at least July 2000.

5.      Whether Bridgestone has proven by a preponderance of the evidence that it is entitled to recover damages from Acushnet for infringement of the '834 Patent as of at least September 2002.

6.      Whether Bridgestone has proven by a preponderance of the evidence that it is entitled to recover damages from Acushnet for infringement of the '961 Patent as of at least November 2004.

7.      Whether Bridgestone has proven by a preponderance of the evidence that it is entitled to recover damages from Acushnet for infringement of the '791 Patent as of at least January 2004.

EXHIBIT 3

## EXHIBIT 3

## ACUSHNET'S STATEMENT OF ISSUES OF FACT

Acushnet expects that it will present the listed issues of fact at trial.  Further details of these proofs have been explained at length in Acushnet's interrogatory responses, expert reports and by the experts and fact witnesses in their depositions.

To the extent that any issues of law set forth in Exhibit 5 may be considered issues of fact, Acushnet incorporates these portions of Exhibit 5 by reference.  These issues of fact may change based on the Court's decisions on the pending summary judgment motions and motions in limine currently before the court.

### I.     BRIDGESTONE PATENTS

#### A.     U.S. Patent No. 5,252,652

1.     Whether the Asserted Claims of the '652 patent are invalid.

2.     Whether Bridgestone has proven by a preponderance of the evidence how many or that any of the following golf balls bearing the sidestamps: ◄●Pro V1 392●►; ◄Pro V1-392►; ◄●Pro V1x 332●►; ◄Pro V1x-332►; ◄Pro V1* 392►; ◄NXT►; ◄-NXT-►; ◄NXT●Tour►; ◄NXT Tour►; ◄NXT-Tour►; ◄DT So/Lo►; DT So/Lo; ◄PTS So/Lo►; PTS So/Lo; Exception; Exception airfoil logo infringe claims 1, 5 and/or 9 of the '652 patent.

3.     Whether Bridgestone added new matter during the prosecution of the '652 patent.

4.     Whether the '652 patent is entitled to rely on its Japanese foreign filing date for priority purposes.

#### B.     U.S. Patent No. 5,553,852

1.     Whether the Asserted Claims of the '852 patent are invalid because they are anticipated under 35 U.S.C. §102.

2.      Whether Bridgestone has proven by a preponderance of the evidence how many or that any of the golf balls bearing the following sidestamps: Pro V1 392; Pro V1 392 (stretched); ◄Pro V1●392►; ◄●Pro V1 392●►; ◄Pro V1-392►; ◄●Pro V1x 332●►; ◄Pro V1x-332►; ◄Pro V1* 392► infringe claims 1, 6 and/or 7 of the '852 patent.

### C.      U.S. Patent No. 6,634,961

1.      Whether the Asserted Claims of the '961 patent are invalid.

2.      Whether Bridgestone has proven by a preponderance of the evidence how many or that any of the golf balls bearing the following sidestamps: ◄Pro V1-392► infringes claim 2 of the '961 patent.

### D.      U.S. Patent No. 5,743,817

1.      Whether Acushnet has demonstrated that the '817 patent is invalid.

2.      Whether Bridgestone has proven by a preponderance of the evidence how many or that any of the golf balls bearing the following sidestamps: ◄NXT●Tour►; ◄NXT Tour►; ◄NXT-Tour►; ◄DT So/Lo►; DT So/Lo; "◄PTS So/Lo►; PTS So/Lo; Exception airfoil logo, Exception infringe claim 1 of the '817 patent.

### E.      U.S. Patent No. 5,782,707

1.      Whether claim 1 of the '707 patent is invalid.

2.      Whether Bridgestone has proven by a preponderance of the evidence how many or that any of the golf balls bearing the following sidestamps: Pro V1 392; Pro V1 392 (stretched); ◄Pro V1●392 ► infringe claim 1 of the '707 patent.

### F.      U.S. Patent No. 5,803,834

1.      Whether claim 1 of the '834 patent is invalid.

2.      Whether Bridgestone has proven by a preponderance of the evidence how many or that any of the following golf balls bearing the sidestamps: ◄NXT►; ◄-NXT-►;

◄DT So/Lo►; DT So/Lo; ◄PTS So/Lo►; PTS So/Lo; Exception; Exception airfoil logo infringe claim 1 of the '834 patent.

### G.    U.S. Patent No. 6,679,791

1.    Whether claims 11, 13, 16, and 26 of the '791 patent are invalid.

2.    Whether Bridgestone has proven by a preponderance of the evidence how many or that any of the following golf balls bearing the sidestamps: ◄●Pro V1 392●►; ◄Pro V1-392►; ◄●Pro V1x 332●►; ◄Pro V1x-332► infringe claims 11, 13, 16 and 26 of the '791 patent.

### H.    Laches

1.    Whether Bridgestone delayed filing suit for an unreasonable and inexcusable length of time and its delay operated to the prejudice and/or injury of Acushnet.

### I.    Damages

1.    If Bridgestone has proven that Acushnet infringes any valid and enforceable claim of the patents-in-suit, what is the appropriate amount of damages.

## II.    ACUSHNET PATENTS

### A.    U. S. Patent No. 6,818,705

1.    Whether Acushnet has shown by a preponderance of the evidence that the Bridgestone Tour B330, Precept U-Tri Extra Distance, Precept U-Tri Extra Spin, Nike One Black, Nike One Platinum, Nike One Gold, Nike One TW golf balls infringe claim 4 of the '705 patent.

2.    Whether Bridgestone has shown by clear and convincing evidence that the '705 patent is invalid.

**B.    U.S. Patent Nos. 4,729,861; 4,936,587; 5,080,367 ("the Lynch patents")**

1.    Whether Acushnet has shown by a preponderance of the evidence that the Precept U-Tri Tour, the Bridgestone Tour B330 and the Precept Laddie golf balls infringe claim 1 of the Lynch patents.

2.    Whether Bridgestone has shown by clear and convincing evidence that the Lynch patents are invalid.

**C.    Damages**

1.    If Acushnet has proven that Bridgestone infringes any valid and enforceable claim of the patents-in-suit, what is the appropriate amount of damages.

EXHIBIT 4

## **EXHIBIT 4**

PLAINTIFFS' STATEMENT OF ISSUES OF LAW

***ISSUES ON WHICH PLAINTIFFS BEAR THE BURDEN OF PROOF***

INFRINGEMENT[1]

35 U.S.C. § 271(a) states:

> Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

"The patent document [] grants the patentee a right to exclude others. . . .   The Supreme Court has likened patent claims to the description of real property in a deed which sets the bounds to the grant which it contains." *General Foods Corp. v. Studiengesellschaft Kohle*, 972 F.2d 1272, 1273 (Fed. Cir. 1992) (citation omitted). "With respect to . . . infringement . . . the claims define the patent owner's property rights whereas infringement is the act of trespassing upon those rights." *Hoechst-Roussel Pharms. Inc. v. Lehman*, 109 F.3d 756, 759 (Fed. Cir. 1997).

"A patent is infringed if any claim is infringed . . . for each claim is a separate statement of the patented invention." *Pall Corp. v. Micron Separations Inc.*, 66 F.3d 1211, 1220 (Fed. Cir. 1995), *cert. denied*, 520 U.S. 1115 (1997).

---

[1]     Because the Court has stayed discovery and trial on willfulness, Bridgestone does not include any willfulness issues in this pretrial order.

"Determination of infringement, whether literal or under the doctrine of equivalents, is a question of fact." *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1341 (Fed. Cir. 2001) (citing *Bai v. L&L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998)). "Infringement requires proof by a preponderance of the evidence." *Seal-Flex Inc. v. Athletic Track & Court Constr.*, 172 F.3d 836, 842 (Fed. Cir. 1999). "To show infringement of a patent, a patentee must supply sufficient evidence to prove that the accused product or process contains, either literally or under the doctrine of equivalents, every limitation of the properly construed claim." *Id.*

### Literal Infringement

"A patent infringement analysis requires two steps. First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Hilgraeve Corp.*, 265 F.3d at 1341 (citing *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1476 (Fed. Cir. 1998)).

Claim Construction

The first step of the infringement analysis, claim construction, is a question of law. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1451, 1454 (Fed. Cir. 1998) (*en banc*). When construing a claim, its words "'are generally given their ordinary and customary meaning'" – "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005). The person of ordinary skill in the art is deemed to read the claim term in the context of the entire patent, including the specification. *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).

2

The parties disagree as to the meaning of some of the terms in the patents-in-suit. The Court held a *Markman* hearing on November 29, 2006 with respect to these terms, but has not yet issued a claim construction.

Comparing the Properly Construed Claims to the Accused Product

"After claim construction, the next step in an infringement analysis is comparing the properly construed claims with the allegedly infringing devices.  This comparison is a question of fact." *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1364 (Fed. Cir. 2001).

"Infringement . . . is determined by comparing an accused product not with a preferred embodiment described in the specifications . . . but with the properly and previously construed claims in suit." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).  "[C]laims are infringed, not specifications." *Id.*  "[L]imitations cannot be read into the claims from the specification or the prosecution history." *Burke*, 183 F.3d at 1340.  The Federal Circuit "has consistently adhered to the proposition that courts cannot alter what the patentee has chosen to claim as his invention, that limitations appearing in the specification will not be read into the claims, and that interpreting what is meant by a word in a claim is not to be confused with adding an extraneous limitation appearing in the specification, which is improper." *Id.* (quoting *Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989) (citations omitted)).  *See also Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).

"An accused device cannot escape infringement by merely adding features, if it otherwise has adopted the basic features of the patent." *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1482 (Fed. Cir. 1984) (citation omitted).  Likewise, an accused method "does not

3

avoid literally infringing a method claim . . . simply because it employs additional steps." *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1380 (Fed. Cir. 2001) (quoting *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1271 (Fed. Cir. 1986), *cert. denied*, 479 U.S. 1030 (1987)).

Many of the asserted claims use the phrase "comprising" or "comprises," which is open-ended. *See Genentech Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) ("'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim.").

### Infringement Under the Doctrine of Equivalents

As the Supreme Court has stated:

> The language in the patent claims may not capture every nuance of the invention or describe with complete precision the range of its novelty. If patents were always interpreted by their literal terms, their value would be greatly diminished. Unimportant and insubstantial substitutes for certain elements could defeat the patent, and its value to inventors could be destroyed by simple acts of copying.")

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 731 (2002). Accordingly, "[t]he scope of a patent is not limited to its literal terms but instead embraces all equivalents to the claims described." *Id. See also Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997) ("[A] product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention.").

Technology developed after the date of invention is "the 'quintessential example of an enforceable equivalent.'" *Varco, L.P. v. Pason Systems USA Corp.*, 436 F.3d 1368, 1376 (Fed Cir. 2006) (quoting *Smithkline Beecham Corp. v. Excel Pharm., Inc.*, 356 F.3d 1357, 1364 (Fed. Cir. 2004)). Generally, "[t]he law does not require the impossible. Hence, it does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention." *SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1121 (Fed. Cir. 1985) (*en banc*).

"[T]here is no basis for treating an infringing equivalent any differently than a device that infringes the express terms of the patent. Application of the doctrine of equivalents, therefore, is akin to determining literal infringement, and neither requires proof of intent." *Warner-Jenkinson*, 520 U.S. at 35. "Infringement under the doctrine of equivalents is an equitable doctrine devised for 'situations where there is no literal infringement but [where] liability is nevertheless appropriate to prevent what is in essence a pirating of the patentee's invention.'" *Insta-Foam Prods. Inc. v. Universal Foam Sys. Inc.*, 906 F.2d 698, 702 (Fed. Cir. 1990) (quoting *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 870 (Fed. Cir. 1985)). "The doctrine of equivalents is an equitable doctrine designed to prevent parties from realizing the benefits of another's patent by designing around the patent's literal language." *BOC Health Care, Inc. v. Nellcor Inc.*, 892 F. Supp. 598, 604 (D. Del. 1995). "Infringement under the doctrine of equivalents may be found where those limitations of a claim not found exactly in the accused device are met equivalently." *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1568 (Fed. Cir. 1996).

The "essential inquiry" in determining infringement under the doctrine of equivalents is: "Does the accused product or process contain elements identical or equivalent to

each claimed element of the patented invention?" *Warner-Jenkinson*, 520 U.S. at 40.   The doctrine of equivalents requires an element-by-element comparison of the accused method or product and the claim.   *Id.*   One test for whether a step of an accused method is equivalent to a claim element is whether that step performs substantially the same function in substantially the same way, to obtain substantially the same result.   *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608 (1950);  *see also Abraxis Bioscience, Inc. v. Mayne Pharma (USA), Inc.*, 467 F.3d 1370, 1379 (Fed. Cir. 2006).

"Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1016-17 (Fed. Cir. 2006) (quoting *Warner-Jenkinson*, 520 U.S. at 29).  In applying the "all elements rule" to determine infringement under the doctrine of equivalents, it is appropriate to identify "the role played by each element in the context of the specific patent claim." *Warner-Jenkinson*, 520 U.S. at 40. "This analysis . . . will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element." *Id.*

The accused method must contain every claim element, but "not necessarily in a corresponding component." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1259 (Fed. Cir. 1989).  "A patentee is, for example, free to frame the issue of equivalency, if it chooses, as equivalency to a combination of limitations." *Id.* at 1259 n. 6 (citation omitted). Courts have held that "'[o]ne-to-one correspondence of components is not required, and elements or steps may be combined without ipso facto loss of equivalency.'" *Ethicon Endo-*

6

*Surgery Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1320 (Fed. Cir. 1998) (quoting *Sun Studs,*

*Inc. v. ATA Equip. Leasing Inc.*, 872 F.2d 978, 989 (Fed. Cir. 1989), *overruled on other grounds*,

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020 (Fed. Cir. 1992)).   A finding of

infringement under the doctrine of equivalents is permissible unless "no reasonable jury could

conclude that an element of an accused device is equivalent to an element called for in the claim,

or that the theory of equivalence to support the conclusion of infringement otherwise lacks legal

sufficiency."   *Depuy Spine*, 469 F.3d at 1018-19 (reversing for legal error District Court's

holding precluding application of doctrine of equivalents as a matter of law).

REMEDIES

### Injunction

Under § 283, "[t]he several courts having jurisdiction of cases under th[e patent]

title may grant injunctions in accordance with the principles of equity to prevent the violation of

any right secured by patent, on such terms as the court deems reasonable."   35 U.S.C. § 283

(2006).   "[T]he decision whether to grant or deny injunctive relief rests within the equitable

discretion of the district courts, and that such discretion must be exercised consistent with

traditional principles of equity. . . ."   *eBay, Inc. v. MercExchange, L.L.C.*, 126 S. Ct. 1837, 1841

(2006).   Further, "the Patent Act also declares that 'patents shall have the attributes of personal

property,' § 261, including 'the right to exclude others from making, using, offering for sale, or

selling the invention,' § 154(a)(1)."   *Id.* at 1840.

According to well-established principles of equity, a plaintiff seeking a permanent

injunction must satisfy a four-factor test before a court may grant such relief.   "A plaintiff must

demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such

as monetary damages, are inadequate to compensate for that injury; (3) that, considering the

balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and

(4) that the public interest would not be disserved by a permanent injunction." *Id*. at 1839.

In one recent case, when applying the four-factor test in a case in which the

infringer competed directly with the patent holder, the court observed:

> Justice Kennedy [concurring in *eBay*] recognized that "[t]o the
> extent earlier cases establish a pattern of granting an injunction
> against patent infringers almost as a matter of course, this
> pattern simply illustrates the result of the four-factor test in the
> contexts then prevalent." . . . Since a patent grants the right to
> exclude others from practicing the invention . . . the right to
> exclude remains a relevant issue for courts to consider when
> weighing the equities for and against an application for
> permanent injunction. Although GSF argues that it is not using
> Transocean's invention to influence common customers, GSF
> admits that "Transocean and GlobalSantaFe have the same
> customers in the deepwater rig market." GSF has not cited any
> case in which a continuing infringer in direct competition with a
> patent holder has not been permanently enjoined from using the
> patented invention to compete against the patent holder.

*Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.*, No. H-03-2910, 2006

WL 3813778, *3 (S.D. Tex., Dec. 27, 2006) (granting injunction to patentee) (citations omitted).

### Damages

35 U.S.C. § 284 states:

> Upon finding for the claimant the court shall award the
> claimant damages adequate to compensate for the infringement,
> but in no event less than a reasonable royalty for the use made
> of the invention by the infringer, together with interest and costs
> as fixed by the court.

"The measurement of patent damages is a question of fact." *Crystal

Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1345 (Fed. Cir. 2001).

The patent statute "imposes no limitation on the types of harm resulting from infringement that the statute will redress. The section's broad language awards damages for any injury as long as it resulted from the infringement." *King Instruments Corp. v. Perego*, 65 F.3d 941, 947 (Fed. Cir. 1995), *cert. denied*, 517 U.S. 1188 (1996). "The phrase 'damages *adequate to compensate*' means full compensation for 'any damages' [the patent owner] suffered as a result of the infringement." *Grain Processing Corp. v. American Maize-Prods. Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999) (citing *General Motors Corp. v. Devex Corp.*, 461 U.S. 648 (1983)). A damage award shall be "in no event less than a reasonable royalty," which sets the floor below which a damage award may not fall. *See Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1544 (Fed. Cir.), *cert. denied*, 516 U.S. 867 (1995). "[T]he Supreme Court has interpreted [35 U.S.C. § 284] to mean that 'adequate' damages should approximate those damages that will *fully compensate* the patentee for infringement." *Id.* at 1545.

The patent owner must prove the amount of its damages by a preponderance of the evidence. *See SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 926 F.2d 1161, 1164 (Fed. Cir. 1991). The patentee, however, need not prove its damages with absolute certainty. *See W.R. Grace & Co.-Conn. v. Intercat, Inc.*, 60 F. Supp. 2d 316, 321 (D. Del. 1999). "[I]t will be enough if the evidence show [sic] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Story v. Parchment Paper Co.*, 282 U.S. 555, 563 (1931). Moreover, "any doubt about the correctness [of damages] is resolved against the infringer." *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1576 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 1022 (1990); *W.R. Grace*, 60 F. Supp. 2d at 321. "[F]undamental principles of justice require us to throw the risk of any uncertainty upon the wrongdoer instead of

upon the injured party." *Paper Converting Machine Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 22 (Fed. Cir. 1984).

Reasonable Royalty

"A reasonable royalty is the amount of money that would be agreed to in a hypothetical arms length negotiation between the owners of the patent rights and the infringer, with both operating under the assumption that the negotiated patent is not invalid and is infringed." *Johns Hopkins*, 894 F. Supp. at 838. "[W]hat an infringer would prefer to pay is not the test for damages." *Rite-Hite*, 56 F.3d at 1555. "[T]hat the parties might have agreed to a lesser royalty is of little relevance, for to look only at that question would be to pretend that the infringement never happened; it would also make an election to infringe a handy means for competitors to impose a compulsory license policy upon every patent owner." *Id.* "There is no rule that a royalty be no higher than the infringer's net profit margin." *State Indus.*, 883 F.2d at 1580.

The hypothetical negotiation is presumed to take place on the eve of first infringement. *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1079 (Fed. Cir. 1983). "The Court also must assume, for purposes of the hypothetical negotiation, that all parties would have known all relevant information." *Mobil Oil Corp. v. Amoco Chem. Co.*, 915 F. Supp. 1333, 1353 (D. Del. 1995). The hypothetical negotiation speaks of negotiations as of the time infringement began, yet a court may look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothetical negotiators. *Studiengesellschaft Kohle GmbH v. Start Indus. Inc.*, 862 F.2d 1564, 1571-72 (Fed. Cir. 1988).

In determining a reasonable royalty, courts often apply the fifteen factors first enunciated in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir.), *cert. denied*, 404 U.S. 870 (1971). *See Unisplay, S.A. v. American Elec. Sign Co.*, 69 F.3d 512, 517, n.7 (Fed. Cir. 1995) (citing to *Georgia-Pacific* factors).  These factors are:

1.      The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

2.      The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3.      The nature and scope of the license, as exclusive or non-exclusive; or as restricted or nonrestricted in terms of territory or with respect to whom the manufactured product may be sold.

4.      The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5.      The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promotor [sic].

6.      The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7.      The duration of the patent and the term of the license.

8.      The established profitability of the product made under the patent; its commercial success; and its current popularity.

9.      The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10.      The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11.      The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12.      The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13.      The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14.      The opinion testimony of qualified experts.

15.      The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Georgia Pacific*, 318 F. Supp. at 1120.

### Enhanced Damages

35 U.S.C. § 284 states in pertinent part that "the court may increase the damages up to three times the amount found or assessed." The Court may enhance damages, up to trebling the actual damages, upon a finding of willful infringement. *Johns Hopkins*, 152 F.3d at 1364. In exercising its discretion to enhance damages, the Court should consider the weight of the evidence of the infringer's culpability in light of the following factors:

1.  whether the infringer copied the ideas or design of another,

2.  whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good faith belief that it was invalid or that it was not infringed,

3.  the infringer's behavior as a party to the litigation,

4.  the infringer's size and financial condition,

5.  the closeness of the case,

6.  the duration of the infringer's misconduct,

7.  any remedial action of the infringer,

8.  the infringer's motivation for harm, and

9.  whether the infringer attempted to conceal its misconduct.

*Id.* at 1352 n.16 and 1364-65. *See also Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GMBH*, 408 F.3d 1374, 1377 (Fed. Cir. 2005) ("[The Federal Circuit] has identified several criteria for assessing damages, including, *inter alia,* whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed, and the duration of defendant's misconduct").

### Attorneys' Fees

35 U.S.C. § 285 provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." Determining whether a case is exceptional and whether attorneys' fees should be granted under 35 U.S.C. § 285 is a two-step process. *Tate Access Floors*, 222 F.3d at 964. The first step is a factual determination whether the case is exceptional, and the second step, the Court exercises its discretion to determine whether attorneys' fees should be awarded. *Id.*

The types of conduct that can form the basis for finding a case to be exceptional include willful infringement, misconduct during litigation and vexatious litigation. *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989). Such conduct must be supported by clear and convincing evidence. *Id.*

### Prejudgment Interest

The patent statute authorizes awards of prejudgment interest. 35 U.S.C. § 284. The Supreme Court has held that "prejudgment interest should ordinarily be awarded." *General Motors*, 461 U.S. at 655. "An award of prejudgment interest serves to make the patentee whole because the patentee also lost the use of its money due to infringement." *Crystal Semiconductor*, 246 F.3d at 1361. In *General Motors*, the Supreme Court held that prejudgment interest is the rule, not the exception. *Id.*

"The rate of prejudgment interest and whether it should be compounded or uncompounded are matters left largely to the discretion of the district court. . . . In exercising that discretion, however, the district court must be guided by the purpose of prejudgment interest, which is 'to ensure that the patent owner is placed in as good a position as he would

14

have been had the infringer entered into a reasonable royalty agreement.'" *Bio-Rad*, 807 F.2d at

969 (citation omitted).

### *ISSUES ON WHICH DEFENDANT BEARS THE BURDEN OF PROOF*

VALIDITY

35 U.S.C. § 282 states in pertinent part:

> A patent shall be presumed valid.  Each claim of a patent
> (whether in independent, dependent or multiple dependent form)
> shall be presumed valid independently of the validity of other
> claims; dependent or multiple dependent claims shall be
> presumed valid even though dependent upon an invalid claim.
> The burden of establishing invalidity of a patent or any claim
> thereof shall rest on the party asserting such in validity.

"A party seeking to establish that particular claims are invalid must overcome the

presumption of validity in 35 U.S.C. § 282 by clear and convincing evidence." *Nystrom v. TREX*

*Co., Inc.* 424 F.3d 1136, 1149 (Fed. Cir. 2005) (quoting *State Contracting & Eng'g Corp. v.*

*Condotte Am., Inc.,* 346 F.3d 1057, 1067 (Fed. Cir. 2003)).  "Clear and convincing evidence has

been described as evidence which proves in the mind of the trier of fact 'an abiding conviction

that the truth of [the] factual contentions are highly probable.'"  *Intel Corp. v. U.S. Int'l Trade*

*Comm'n*, 946 F.2d 821, 830 (Fed. Cir. 1991) (quoting *Colorado v. New Mexico*, 467 U.S. 310,

316 (1984)).

The presumption of validity "exists at every stage of the litigation."  *Canon*

*Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1088 (Fed. Cir. 1998).  "[T]he burden

of persuasion is and remains always upon the party asserting invalidity."  *American Hoist &*

*Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1358 (Fed. Cir.), *cert. denied*, 469 U.S. 821

(1984) (emphasis in original).   "The presumption is never annihilated, destroyed or even

weakened, regardless of what facts are of record."  *ACS Hosp. Sys., Inc. v. Montefiore Hosp.*,

732 F.2d 1572, 1574-75 (Fed. Cir. 1984) (emphasis in original).  "[T]he burden of proving invalidity never shifts from the party asserting invalidity."  *Imperial Chem. Indus., PLC v. Danbury Pharmacal, Inc.*, 777 F. Supp. 330, 368 (D. Del. 1991), *aff'd w/o op.*, 972 F.2d 1354 (Fed. Cir. 1992).

"The burden of proof arises from the presumption that the Patent Office properly carried out its administrative functions."  *BOC Health Care*, 892 F. Supp. at 602.  "It is not necessary that the court hold a patent valid; it is only necessary that it hold that the patent challenger has failed to carry its burden."  *Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*, 1996 WL 621830 at *5 (D. Del. 1996), *aff'd*, 228 F.3d 1338 (Fed. Cir. 2000).  "[W]here the challenger fails to identify any persuasive evidence of invalidity, the very existence of the patent satisfies the patentee's burden on the validity issue."  *Canon Computer Sys., Inc.*, 134 F.3d at 1088.

Where the art relied on at trial was considered by the Patent Office, the party asserting invalidity "has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents."  *American Hoist & Derrick*, 725 F.2d at 1359.

The United States Supreme Court "has consistently held that failure of the patentee to make use of a patented invention does not affect the validity of the patent."  *Special Equipment Co. v. Coe*, 324 U.S. 370, 378-79 (1945).

**Prior Art**

One who challenges the validity of a patent bears the burden of establishing that a reference is "prior art" by clear and convincing evidence. *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576 (Fed. Cir. 1996). The *Mahurkar* Court held:

> By challenging the validity of the '155 patent, Bard bore the burden of persuasion by clear and convincing evidence on all issues relating to the status of the Cook catalog as prior art.

"The presumption of validity . . . requires those challenging validity to introduce clear and convincing evidence on all issues relating to the status of a particular reference as prior art." *Sandt Tech. Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001).

"[O]ne of the fundamental principles of patent law" is "that prior art be available to the public." *Scimed Life Sys., Inc. v. Johnson & Johnson*, C.A. No. 99-904-SLR, slip op. at 9 (D. Del. Aug. 15, 2001). A secret prior method or process does not qualify as prior art, even if the product of that process is disclosed to the public. *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed. Cir. 1983), *cert. denied*, 469 U.S. 851 (1984).

**Anticipation**

35 U.S.C. § 102 states in pertinent part:

> A person shall be entitled to a patent unless —
>
> (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

Anticipation is a question of fact. *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 995 (Fed. Cir. 2006). "Invalidity based upon lack of novelty (often called 'anticipation') requires that the same invention, including each element and limitation of the claims, was known or used by others before it was invented by the patentee." *Oney v. Ratliff,* 182 F.3d 893, 895 (Fed. Cir. 1999) (citing *Hoover Group, Inc. v. Custom Metalcraft, Inc.*, 66 F.3d 299, 302 (Fed. Cir. 1995)).

"A claim is anticipated and therefore invalid only when a single prior art reference discloses each and every limitation of the claim." *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir.), *cert. denied*, 516 U.S. 908 (1995). "Anticipation requires a showing that each limitation of a claim is found in a single reference, either expressly or inherently." *Atofina*, 441 F.3d at 999 (quoting *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1369 (Fed. Cir. 2005)). "There must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991).

"For a prior art reference to anticipate a claim, the reference must disclose each and every element of the claim with sufficient clarity to prove its existence in the prior art." *Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1473 (Fed. Cir. 1997). "Although this disclosure requirement presupposes the knowledge of one skilled in the art of the claimed invention, that presumed knowledge does not grant a license to read into the prior art reference teachings that are not there. An expert's conclusory testimony, unsupported by the documentary evidence, cannot supplant the requirement of anticipatory disclosure in the prior art reference itself." *Id.*

18

"Prior art does not 'anticipate' for purposes of § 102 even 'if the general aspects are the same and the differences in minor matters [is] [sic] . . . such as would suggest itself to one of ordinary skill in the art.'"  *BOC Health Care*, 892 F. Supp. at 603 (quoting *Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 716 (Fed. Cir. 1984)).  *See also Jamesbury Corp. v. Litton Indus. Prod., Inc.*, 756 F.2d 1556, 1560 (Fed. Cir. 1985) ("A prior art disclosure that 'almost' meets [the] standard . . . does not anticipate.").

To anticipate, "[a] reference must describe the applicant's claimed invention sufficiently to have placed a person of ordinary skill in the field of the invention in possession of it."  *In re Spada*, 911 F.2d 705, 708 (Fed.Cir.1990).  Thus, "[t]o anticipate a claim, a reference must disclose every element of the challenged claim and enable one skilled in the art to make the anticipatory subject matter."  *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1566 (Fed. Cir. 1996). "What a prior art reference discloses in an anticipation analysis is a factual determination." *Yoon Ja Kim v. Conagra Foods, Inc.*, 465 F.3d 1312, 1325 (Fed. Cir. 2006) (quoting *Novo Nordisk Pharm., Inc. v. Bio-Tech. Gen. Corp.*, 424 F.3d 1347, 1355 (Fed. Cir. 2005)).  "Invalidity by anticipation requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000)). "Whether making and using the invention would have required undue experimentation, and thus whether the disclosure is enabling, is a legal conclusion based upon several underlying factual inquiries." *Amgen, Inc. v. Biogen, Inc.*, 973 F. Supp. 39, 43 (D. Mass. 1997) (quoting *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997)).

19

To show an inherent disclosure, the extrinsic evidence "must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). Inherency "requires that the missing descriptive material is 'necessarily present,' not merely probably or possibly present." *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002) (citations omitted). The mere fact that "a certain thing may result from a given set of circumstances is not sufficient" to show inherency. *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) (citations omitted).

"The inherent teaching of a prior art reference, a question of fact, arises both in the context of anticipation and obviousness." *In re Napier*, 55 F.3d 610, 613, 34 USPQ2d 1782, 1784 (Fed. Cir. 1995).

"The law has long looked with disfavor upon invalidating patents on the basis of mere testimonial evidence absent other evidence that corroborates that testimony." *Finnigan Corp. v. Int'l Trade Com'n*, 180 F.3d 1354, 1366 (Fed. Cir. 1999). As a matter of law, uncorroborated testimonial evidence, without more, cannot constitute clear and convincing evidence sufficient to invalidate a patent under 35 U.S.C. § 102. *See*, *e.g.*, *IMX, Inc. v. LendingTree, LLC*, 469 F.Supp.2d 203, 215 (D. Del. 2007) ("Corroboration of a witness' oral testimony is required to invalidate a patent under 35 U.S.C. § 102.").

### Obviousness

35 U.S.C. § 103(a) states in pertinent part:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a

whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

"Whether a claimed invention is unpatentable as obvious under 35 U.S.C. § 103 is a question of law based on underlying findings of fact." *Okajima v. Bourdeau*, 261 F.3d 1350, 1354 (Fed. Cir. 2001) (citation omitted). The underlying factual considerations were originally specified by *Graham v. John Deere Co. Of Kansas City*, 383 U.S. 1 (U.S. 1966), which held:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

*Id.* at 17-18. *See also KSR Int'l Co. v. Teleflex Inc*. No. 04-1350, slip op. at 2 (U.S. Apr. 30, 2007). "[Federal Circuit] precedent clearly establishes that the district court must make [*Graham*] findings before invalidating a patent for obviousness." *Ruiz v. A.B. Chance Co*., 234 F.3d 654, 663 (Fed. Cir. 2000). "Throughout the obviousness determination, a patent retains its statutory presumption of validity, *see* 35 U.S.C. § 282, and the movant retains the burden to show the invalidity of the claims by clear and convincing evidence as to underlying facts." *McGinley*, 262 F.3d at 1349 (quoting *Rockwell Int'l. Corp. v. United States*, 147 F.3d 1358, 1364 (Fed. Cir. 1998)).

### The Invention As A Whole Must Be Considered

"35 U.S.C. § 103 requires that obviousness be determined with respect to the invention as a whole." *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1143 (Fed. Cir.

1985).  This is essential for "virtually all [inventions] are combinations of old elements."  *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998) (citing *Environmental Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 698 (Fed. Cir. 1983), *cert. denied*, 464 U.S. 1043 (1984)).  "Thus, every element of a claimed invention may often be found in the prior art.  However, identification in the prior art of each individual part claimed is insufficient to defeat patentability of the whole claimed invention."  *In re Kotzab*, 217 F.3d 1365, 1369-70 (Fed. Cir. 2000) (citing *In re Rouffet*, 149 F.3d at 1357).  "A patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art."  *KSR*, No. 04-1350, slip op. at 14.

Just because an invention is simple does not mean that it is obvious under 35 U.S.C. § 103.  "'[S]imple and obvious are not synonymous terms.'"  *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 906 (Fed. Cir.), *cert. denied*, 474 U.S. 843 (1985).  "[T]he simplicity of new inventions is oftentimes the very thing that is not obvious before they are made."  *Application of Van Wanderham*, 378 F.2d 981, 987 (C.C.P.A. 1967).  "Indeed, simplicity may even be some evidence of invention."  *Id.*  "The fact that the invention seems simple after it is made is not determinative of the question of obviousness."  *Id.*  In fact, "[w]hen the art in question is relatively simple, as is the case here, the opportunity to judge by hindsight is particularly tempting.  Consequently, the tests of whether to combine references need to be applied rigorously."  *McGinley*, 262 F.3d at 1351; *Ruiz*, 234 F.3d at 664.

### Considered From the Viewpoint of One of Ordinary Skill in the Art At The Time of The Invention

"A critical step in analyzing the patentability of claims pursuant to section 103(a) is casting the mind back to the time of the invention, to consider the thinking of one of ordinary

22

skill in the art, guided only by the prior art references and the then-accepted wisdom in the field." *In re Kotzab*, 217 F.3d at 1369. Thus "[t]he decision of obviousness *vel non* is made not from the viewpoint of the inventor, but from the viewpoint of a person of ordinary skill in the field of the invention." *Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*, 119 F.3d 953, 956 (Fed. Cir. 1997). "The purpose is to assure an appropriate perspective of the decisionmaker, and to focus on conditions as they existed when the invention was made." *Id.* As the Federal Circuit held in *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985):

> The issue of obviousness is determined entirely with reference to a *hypothetical* "person having ordinary skill in the art." It is only that hypothetical person who is presumed to be aware of all the pertinent prior art. The actual inventor's skill is irrelevant to the inquiry, and this is for a very important reason. The statutory emphasis is on a person of *ordinary* skill. Inventors, as a class, according to the concepts underlying the Constitution and the statutes that have created the patent system, possess something -- call it what you will -- which sets them apart from the workers of *ordinary* skill, and one should not go about determining obviousness under § 103 by inquiring into what *patentees* (i.e. inventors) would have known or would likely have done, faced with the revelations of references. A person of ordinary skill in the art is also presumed to be one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate, whether by patient, and often expensive systematic research or by extraordinary insights, it makes no difference which.

### Hindsight Reasoning Is Improper

"The invention must be viewed not with the blueprint drawn by the inventor, but in the state of the art that existed at the time." *Interconnect Planning*, 774 F.2d at 1138. Thus, the pertinent obviousness inquiry takes place at the time of the invention. *In re Dembiczak*, 175 F.3d 994, 999 (Fed. Cir. 1999). *Dembiczak* states:

> Measuring a claimed invention against the standard established by section 103 requires the oft-difficult but critical step of

23

casting the mind back to the time of the invention, to consider the thinking of one of ordinary skill in the art, guided only by the prior art references and the then-accepted wisdom in the field.

*Id.* at 999 (citations omitted).  *See also Ecolochem, Inc. v. Southern California Edison Co.*, 227 F.3d 1361, 1371 (Fed. Cir. 2000), *cert. denied*, 121 S. Ct. 1607 (2001).  The finder of fact should "resist the temptation to read into the prior art the teachings of the invention in issue." *Graham*, 383 U.S. at 36.  *See also KSR*, No. 04-1350, slip op. at 17 ("A factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning.").

There Must Be A Reason To Modify The Prior Art

To guard against the application of hindsight reasoning, the Court of Customs and Patent Appeals established a requirement that a teaching, suggestion, or motivation to combine known elements be shown in order to prove obviousness.  *KSR*, No. 04-1350, slip op. at 14.  The Federal Circuit has recently explained this test as an analysis of "whether a person of ordinary skill in the art would have been motivated to combine the prior art to achieve the claimed invention and whether there would have been a reasonable expectation of success in doing so." *Dystar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006). "Combining prior art references without evidence of such a suggestion, teaching, or motivation simply takes the inventor's disclosure as a blueprint for piecing together the prior art to defeat patentability--the essence of hindsight." *In re Dembiczak*, 175 F.3d 994, 999 (Fed. Cir. 1999).

However, the Federal Circuit has found that this analysis "is not a rigid categorical rule.  The motivation need not be found in the references sought to be combined, but may be found in any number of sources, including common knowledge, the prior art as a whole,

24

or the nature of the problem itself. *Dystar Textilfarben GmbH v. C.H. Patrick Co*., 464 F.3d 1356, 1361 (Fed. Cir. 2006).

While the suggestion to combine may come from the nature of the problem to be solved, the Court may not define the problem "in terms of its solution." As the Federal Circuit stated in *Ecolochem,* 227 F.3d at 1372 (citations omitted):

> Although the suggestion to combine references may flow from the nature of the problem . . . defining the problem in terms of its solution reveals improper hindsight in the selection of the prior art relevant to obviousness.

> Nor can the range of sources available "diminish the requirement for actual evidence. That is, the showing must be clear and particular . . . [citation omitted]. Broad conclusory statements regarding the teaching of multiple references, standing alone, are not "evidence." *Dembiczak*, 175 F.3d at 999. Nor can the assertion that the "knowledge may have been within the province of the ordinary artisan does not in and of itself make it so, absent clear and convincing evidence." *Smiths Indus. Med Sys. Inc. v. Vital Signs Inc.*, 183 F.3d 1347, 1356-57 (Fed. Cir. 1999). "There still must be an explanation of "the reasons one of ordinary skill in the art would have been motivated to select the references and to combine them to render the claimed invention obvious." *Rouffet*, 149 F.3d at 1359; *Kotzab*, 217 F.3d at 1370.

The Supreme Court confirmed that the teaching, suggestion, or motivation requirement provides helpful insight, because "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *Id.* at 14. Rather, it "can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the

claimed new invention does." *Id.* at 15.  But, the Supreme Court cautioned against ignoring "common sense" when applying such an analysis. *Id.* at 17.

### It Is Rare That Suggestion Can Be Supplied By The Level Of Skill In The Art

It is rare that such a suggestion can be supplied simply by the level of skill in the art.  In *Al-Site, Inc. v. VSI Int'l*, 174 F.3d 1308, 1324 (Fed. Cir. 1999), the Court stated:

> Rarely, however, will the skill in the art component operate to supply missing knowledge or prior art to reach an obviousness judgment . . . Skill in the art does not act as a bridge over gaps in substantive presentation of an obviousness case, but instead supplies the primary guarantee of objectivity in the process.

*See also Ecolochem*, 227 F.3d at 1372; *Dembiczak*, 175 F.3d at 1000; *Kotzab,* 217 F.3d at 1371.

### Teaching Away

The Federal Circuit stated in *Tec Air, Inc. v. Denso Mfg. Michigan Inc.*, 192 F.3d 1353, 1359-60 (Fed. Cir. 1999) (citations omitted):

> To establish a *prima facie* case of obviousness, [the defendant] must show "some objective teaching in the prior art that knowledge generally available to one of ordinary skill in the art would lead that individual to combine the relevant teachings of the references." . . .   There is no suggestion to combine, however, if a reference teaches away from its combination with another source. . . .  "A reference may be said to teach away when a person or ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant . . . [or] if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant." . . .  If when combined, the references "would produce a seemingly inoperative device," then they teach away from their combination.

Similarly, a suggested modification of a prior art reference that would require a substantial reconstruction and redesign of that reference, or a change in its the basic principles of operation, would not be sufficient to render claims obvious. *In re Ratti*, 46 C.C.P.A. 976, 981 (C.C.P.A. 1959).   "If proposed modification would render the prior art invention being modified unsatisfactory for its intended purpose, then there is no suggestion or motivation to make the proposed modification." *In re Gordon, 733 F.2d 900 (Fed. Cir. 1984).*

Objective Indicia of Nonobviousness Must be Considered

Objective indicia or secondary considerations of nonobviousness must be considered prior to reaching a conclusion of nonobviousness.  *Ashland Oil, Inc. v. Delta Resins & Refractories*, 776 F.2d 281, 306 (Fed. Cir. 1985), *cert. denied*, 475 U.S. 1017 (1986).  Such evidence, such as commercial success and long-felt need, is both highly relevant and "a necessary part of the obviousness determination."  *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999).  These secondary considerations include "commercial success, long-felt but unresolved need, failure of others, copying and unexpected results."  *Ruiz*, 234 F.3d at 662-63; *Tec Air*, 192 F.3d at 1361.   These indicia "are often [the] most probative and determinative of the ultimate conclusion of obviousness or nonobviousness."  *Pro-Mold & Tool Co. v. Great Lakes Plastics*, *Inc.,* 75 F.3d 1568, 1573 (Fed. Cir. 1996).  *See also Tec Air*, 192 F.3d at 1361 (sales figures alone are evidence of commercial success sufficient to rebut *prima facie* obviousness).

"In *Graham* the Supreme Court explained that the public and commercial response to an invention is a factor to be considered in determining obviousness, and is entitled to fair weight. . . .   The so-called 'secondary considerations' provide evidence of how the

27

patented device is viewed by the interested public: not the inventor, but persons concerned with the product in the objective arena of the marketplace." *Arkie Lures*, 119 F.3d at 957.

"When a patentee asserts that commercial success supports its contention of nonobviousness, there must of course be a sufficient relationship between the commercial success and the patented invention.  The term 'nexus' is often used, in this context, to designate a legally and factually sufficient connection between the proven success and the patented invention, such that the objective evidence should be considered in the determination of nonobviousness.  The burden of proof as to this connection or nexus resides with the patentee." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir.), *cert. denied*, 488 U.S. 956 (1988).

"In meeting its burden of proof, the patentee in the first instance bears the burden of coming forward with evidence sufficient to constitute a prima facie case of the requisite nexus. . . .  A prima facie case of nexus is generally made out when the patentee shows both that there is commercial success and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent." *Id.*; *Tec Air*, 192 F.3d at 1361.

"When the patentee has presented a prima facie case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger. . . .  It is thus the task of the challenger to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention, such as advertising, superior workmanship, etc." *Id.* at 1393.

"[W]hen differences that may appear technologically minor nonetheless have a practical impact, particularly in a crowded field, the decision maker must consider the obviousness of the new structure in this light.  Such objective indicia as commercial success, or

28

filling an existing need, illuminate the technological and commercial environment of the inventor, and aid in understanding the state of the art at the time the invention was made." *Continental Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1273 (Fed. Cir. 1991).

"[L]ong-felt need is analyzed as of the date or of an articulated identified problem and evidence of efforts to solve that problem." *Texas Instr., Inc. v. United States Int'l Trade Comm'n*, 988 F.2d 1165, 1178 (Fed. Cir. 1993). "Nonobviousness is suggested by the failure of others to 'find a solution to the problem which the patent[s] in question purport[] to solve. Such evidence shows indirectly the presence of a significant defect [in the prior art]. . . .'" *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578-79 (Fed. Cir. 1991).

### Validity Under § 112

Written Description

The first paragraph of 35 U.S.C. § 112 requires that the specification of a patent contain a written description of the invention. "[I]nvalidating a claim requires a showing by clear and convincing evidence that the written description requirement has not been satisfied." *Invitrogen Corp. v. Clonotech Labs., Inc*., 429 F.3d 1052, 1072 (Fed. Cir. 2005). "The written description requirement does not require the applicant to 'describe exactly the subject matter claimed, [instead] the description must clearly allow persons of ordinary skill in the art to recognize that [he or she] invented what is claimed.'" *Union Oil Co. of California v. Atlantic Richfield Co.*, 208 F.3d 989, 997 (Fed. Cir. 2000). The requirement "ensures that, as of the filing date, the inventor conveyed with reasonable clarity to those of skill in the art that he was in possession of the subject matter of the claims." *Id.* The Federal Circuit "has continued to apply the rule that disclosure of a species may be sufficient written description support for a later

29

claimed genus including that species." *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1124 (Fed. Cir. 2004).

"[C]ompliance with the written description requirement is a question of fact." *Invitrogen Corp.*, 429 F.3d at 1072. "In order to satisfy the written description requirement, the disclosure as originally filed does not have to provide in haec verba support for the claimed subject matter at issue." *Crown Operations Int'l., Ltd v. Solutia, Inc.*, 289 F.3d 1367, 1376 (Fed. Cir. 2002). An invention need not have been reduced to practice to have been adequately described. *Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1366 (Fed. Cir. 2006). The "requirement is satisfied by the patentee's disclosure of such descriptive means as words, structures, figures, diagrams, formulas, etc., that fully set forth the claimed invention." *Id.* Examples are not necessary for a patent's disclosure to be adequate, nor is the length of the description relevant provided it communicates possession to one of skill in the art. *See id.* (quoting *In re Hayes Microcomputer Prods., Inc. Patent Litig.*, 982 F.2d 1527, 1534 (Fed. Cir. 1992) ("[T]he adequacy of the description of an invention depends on its content in relation to the particular invention, not its length.").

There is a strong presumption that an adequate written description of the claimed invention is present when the application is filed. *In re Wertheim*, 541 F.2d 257, 263, 191 U.S.P.Q. 90, 97 (C.C.P.A. 1976).

Enablement

Section 112 also requires that the specification describe the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112. This requirement "is satisfied when one skilled in the art, after reading the specification, could

practice the claimed invention without undue experimentation." *AK Steel Corp. v. Sollac and Ugine*, 344 F.3d 1234, 1244 (Fed. Cir. 2003).  Whether a patent specification is sufficiently enabling is a question of law based on underlying factual inquiries.  *Falkner v. Ingils*, 448 F.3d 1357, 1363 (Fed. Cir. 2006).  Invalidating a claim requires a showing by clear and convincing evidence that the enablement requirement is not satisfied.  *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1156 (Fed. Cir. 2004).

Although a specification must enable the subject matter claimed, it need not enable a commercially viable embodiment to have met that standard.  *See CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1338 (Fed. Cir. 2003) ("Enablement does not require an inventor to meet lofty standards for success in the commercial marketplace. Title 35 does not require that a patent disclosure enable one of ordinary skill in the art to make and use a perfected, commercially viable embodiment absent a claim limitation to that effect.").  This "is because the patent specification is written for a person of skill in the art, and such a person comes to the patent with the knowledge of what has come before[, … thus], it is unnecessary to spell out every detail of the invention in the specification; only enough must be included to convince a person of skill in the art that the inventor possessed the invention and to enable such a person to make and use the invention without undue experimentation."  *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005).

The full scope of the claimed system is defined *by the claim terms* as construed by the Court.  *See National Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1195-96 (Fed. Cir. 1999); *AK Steel Corp.* 344 F.3d at 1243-44.  Thus, a proper enablement analysis consists of comparing the claims as construed to the specification to see if they are enabled.  *AK Steel*, 344 F.3d at 1243-44.

31

"[W]hether undue experimentation is needed is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations." *Warner-Lambert Co., v. Teva Pharms., U.S.A., Inc.*, 418 F.3d 1326, 1337 (Fed. Cir. 2005). The factual considerations that may be weighed include "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *Id.* (quoting *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988)). When considering these factors, the Federal Circuit has emphasized that it is "undue" experimentation that is required to invalidate – even complex experimentation is not undue if the art typically engages in such experimentation. *Massachusetts Institute of Technology v. A.B. Fortia*, 774 F.2d 1104, 227 USPQ 428 (Fed. Cir. 1985).

If an invention pertains to an art where the results are predictable, *e.g.*, in the mechanical arts, then disclosure of even a single embodiment can enable a broad claim. *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524 (Fed. Cir. 1987).

Indefiniteness

Section 112 ¶2 requires that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112 (emphasis added). Whether a claim meets this statutory requirement or is invalid as "indefinite" is a question of law. *See Aero Prods. Int'l, Inc. v. Intex Recreation Corp.*, 466 F.3d 1000, 1015 (Fed. Cir. 2006). "If a claim is amenable to construction, 'even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree,' the claim is not indefinite." *Id.* at 1016 (quoting *Exxon Res. & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001)).

INEQUITABLE CONDUCT

### General Requirements to Show Inequitable Conduct

"Patent applicants and those substantively involved in the preparation or prosecution of a patent application owe a 'duty of candor and good faith' to the PTO," and a breach of this duty may render the issued patent unenforceable for inequitable conduct. *M. Eagles Tool Warehouse, Inc. v, Fisher Tooling Co.*, 439 F.3d 1335, 1339 (Fed. Cir. 2006) (citations omitted). "To prove that a patent is unenforceable due to inequitable conduct, the alleged infringer must provide clear and convincing evidence of (1) affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information and (2) an intent to deceive." *Impax Labs., Inc. v. Aventis Pharms., Inc.*, 488 F. 3d 1366, 1374 (Fed. Cir. 2006). If the accused infringer has proven "threshold level[s]" of both materiality and intent, each by clear and convincing evidence, the trial court then balances materiality and intent to determine whether the conduct was inequitable, and the entire patent thus unenforceable. *Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, No. 05-1396, 2006 WL 3792689 at *9 (Fed. Cir. Dec. 26, 2006). "It was to mitigate the 'plague' whereby every patentee's imperfections were promoted to 'inequitable conduct' that [the Federal Circuit] reaffirmed that both materiality and culpable intent must be established." *Allied Colloids, Inc. v. Am. Cyanamid Co.,* 64 F.3d 1570, 1578 (Fed. Cir. 1995).

### Materiality

To determine what constitutes material information, courts may look to the definition of materiality provided by 37 C.F.R. § 1.56, which sets forth the PTO's definition of materiality, the "reasonable examiner" standard, or any of the older standards for materiality. *See Impax*, 239 F.3d at 1374 (quoting *Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1316 (Fed. Cir. 2006)).

33

Under the "reasonable examiner" standard, information is material if "a reasonable examiner would have considered such prior art important in deciding whether to allow the parent application."  *Id.* (quoting *Digital Control*, 437 F.3d at 1316).  The "older standards" include:

> (1) the objective "but for" standard, "where the misrepresentation was so material that the patent should not have issued," (2) the subjective "but for" test, "where the misrepresentation actually caused the examiner to approve the patent application when he would not otherwise have done so," and (3) the "but it may have" standard, "where the misrepresentation may have influenced the patent examiner in the course of prosecution."

*Id.* (quoting *Digital Control*, 437 F.3d at 1316).

> Under Rule 1.56:
>
> Information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
>
> (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim;  or
>
> (2) It refutes, or is inconsistent with, a position the applicant takes in:
>
> (i) Opposing an argument of unpatentability relied on by the Office, or
>
> (ii) Asserting an argument of patentability.
>
> A prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability

37 C.F.R. § 1.56.  Importantly, this provision was substantially narrowed in 1992 in response to the widespread perception that the defense of inequitable conduct had become an abusive allegation.  As the Federal Circuit stated:

> ***the habit of charging inequitable conduct in almost every major patent case has become an absolute plague.***  Reputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest grounds, to represent their client's interests adequately, perhaps.  They get anywhere with the accusation in but a small percentage of the cases, but such charges are not inconsequential on that account.  They destroy the respect for one another's integrity, for being fellow members of an honorable profession, that used to make the bar a valuable help to the courts in making a sound disposition of their cases, and to sustain the good name of the bar itself.  A patent litigant should be made to feel, therefore, that an unsupported charge of "inequitable conduct in the Patent Office" is a negative contribution to the rightful administration of justice.

*Burlington Indus., Inc. v. Dayco Corp.,* 849 F.2d 1418, 1422 (Fed. Cir. 1988) (emphasis added).

As the first sentence of Rule 1.56 makes clear, however, information cannot be material for purposes of inequitable conduct if it is "cumulative to information already of record or being made of record in the application."  *See also Digital Control*, 437 F.3d at 1319 ("a withheld otherwise material prior art reference is *not* material for the purposes of inequitable conduct if it is merely cumulative to that information considered by the examiner") (emphasis in original).  Whether a reference is cumulative to other before the examiner depends on the teachings of the references, questions of fact.  *Id.*

Conduct during the prosecution of a related application is not material to the prosecution of a patent's claims unless the related application deals with the same subject matter as the claims.  *See Baxter Int'l v. McGaw, Inc.*, 149 F.3d 1321, 1332 (Fed. Cir. 1998), ("where the claims are subsequently separated from those tainted by inequitable conduct through a divisional application, and where the issued claims have no relation to the omitted prior art, the

35

patent issued from the divisional application will not also be unenforceable due to inequitable conduct committed in the parent application.")  Likewise, prior litigation involving an ancestor application is not per se material to the prosecution of a later divisional application.  *See Kothmann Enters., Inc. v. Trinity Indus., Inc.*, 455 F. Supp. 2d 608, 626 (S.D. Tex. 2006) ("In applying the MPEP, the [Federal Circuit] did not merely examine whether the patent-in-suit and the patent-in-prosecution involved similar claimed inventions, but specifically analyzed the claim terms at issue in both the litigation and the patent prosecution to see whether and how the litigation affected the patentability of the invention claimed in the application.").

### Intent

To establish inequitable conduct, an accused infringer must also prove by clear and convincing evidence that the material conduct was performed with the deliberate intent to mislead the PTO.  *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 552 (Fed. Cir. 1990) ("'Materiality does not presume intent, which is a separate and essential component of inequitable conduct.'  Appellants must show by clear and convincing evidence that Manville acted inequitably by *intending to mislead or deceive* the PTO.") (quoting *Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556, 1567 (Fed. Cir. 1988)) (emphasis original).

A finding of "gross negligence" is not sufficient to meet the threshold standard of intent.  *Eli Lilly & Co.*, 2006 WL 3792689 at *9 (citing *Kingsdown Med. Consultants*, 863 F.2d at 876).  When examining intent, "[t]he simple absence of a reference from the prosecution record does not prove deceptive intent; there must be evidence sufficient to show, clearly and convincingly, the intent to withhold material information in order to deceive or mislead the examiner."  *Jazz Photo Corp. v. U.S. Int'l Trade Comm'n*, 264 F.3d 1094, 1110 (Fed. Cir. 2001). The Federal Circuit has made clear that "intent to deceive can not be inferred solely from the fact

that information was not disclosed; there must be a factual basis for a finding of deceptive intent." *Catalina Lighting, Inc. v. Lamps Plus, Inc.* 295 F.3d 1277, 1289 (Fed. Cir. 2002). Where the reasons given for the withholding are plausible, intent to deceive cannot be inferred simply from the decision to withhold the reference. *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1367 (Fed. Cir. 2003). Rather, "the record must contain clear and convincing evidence that the applicant made a deliberate decision to withhold a known material reference. Beyond that, the applicant must have withheld the material subject matter with the intent to deceive." *Eli Lilly & Co.*, 2006 WL 3792689 at *9.

**Balancing**

If threshold levels of both materiality and intent have been established by clear and convincing evidence, the Court must weigh the facts, including *all* evidence of the patentee's good faith, to determine the ultimate question of inequitable conduct and whether that conduct renders the patent unenforceable. *Id.*; *Kingsdown Med. Consultants v. Hollister, Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988) (requiring consideration of any evidence of patentee's good faith).

In weighing materiality and intent, the more material the omission or the misrepresentation, the lower the level of intent required to establish inequitable conduct, and vice versa. *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1261 (Fed. Cir. 2001). However, if either materiality or intent is not found, then no further analysis need be performed, and the patent is not unenforceable. *Id.*

TABLE OF CONTENTS

PLAINTIFFS' STATEMENT OF ISSUES OF LAW ......................................................... 1

I.      ISSUES ON WHICH PLAINTIFFS BEAR THE BURDEN OF PROOF ............ 1

        A.      INFRINGEMENT ........................................................................................ 1

                1.      Literal Infringement ...................................................................... 2

                2.      Infringement Under the Doctrine of Equivalents ......................... 4

        B.      REMEDIES .................................................................................................. 7

                1.      Injunction ...................................................................................... 7

                2.      Damages ........................................................................................ 8

                3.      Enhanced Damages ..................................................................... 13

                4.      Attorneys' Fees ........................................................................... 14

                5.      Prejudgment Interest ................................................................... 14

II.     ISSUES ON WHICH DEFENDANT BEARS THE BURDEN OF PROOF ...... 15

        A.      VALIDITY ................................................................................................. 15

                1.      Prior Art ...................................................................................... 17

                2.      Anticipation ................................................................................. 17

                3.      Obviousness ................................................................................ 20

                4.      Validity Under § 112 ................................................................... 29

        B.      INEQUITABLE CONDUCT ...................................................................... 33

                1.      General Requirements to Show Inequitable Conduct .................. 33

                2.      Materiality ................................................................................... 33

                3.      Intent ........................................................................................... 36

                4.      Balancing ..................................................................................... 37

EXHIBIT 5

## EXHIBIT 5

### ACUSHNET'S STATEMENT OF ISSUES OF LAW

To the extent that any issues of fact set forth in Exhibit 3 may be considered issues of law, Acushnet incorporates these portions of Exhibit 3 by reference. These issues of law may change based on the Court's decisions on the pending summary judgment motions and motions in limine currently before the court.

### I.    VALIDITY

#### A.    Anticipation

35 U.S.C. §102 (a) states:

A person shall be entitled to a patent unless the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant.

35 U.S.C. §102 (e) states in pertinent part:

A person shall be entitled to a patent unless the invention was described in a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent

Anticipation requires that a single prior art reference discloses each and every limitation of the claimed invention. *Schering Corp. v. Geneva Pharmaceuticals*, 339 F.3d 1373, 1379-80 (Fed. Cir. 2003). There is no requirement that each claim limitation be found in a single example of the single prior art reference. *See Glaxo Group Ltd. v. Apotex, Inc*., 376 F.3d 1339, 1349 (Fed. Cir. 2004) ("[A]nticipation requires that all limitations of the claimed invention are described in a single reference, rather than a single example in the reference.").

"[A] prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference."  *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343 (Fed. Cir. 2005); *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). As such, "anticipation does not require actual performance of suggestions in a disclosure. Rather, [it] only requires that those suggestions be enabling to one of skill in the art." *Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F.3d 1368, 1378 -1381 (Fed. Cir. 2001).

"Where... the result is a necessary consequence of what was deliberately intended, it is of no import that the article's authors did not appreciate the results." *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1366 (Fed. Cir. 1999); *Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1348-49 (Fed. Cir. 1999).  In some cases, the inherent property corresponds to a claimed new benefit or characteristic of an invention otherwise in the prior art.  In those cases, the new realization alone does not render the old invention patentable.  *See Atlas Powder*, 190 F.3d at 1347.

Material incorporated by reference into a document may be considered in an anticipation determination. *Advanced Display Systems, Inc. v. Kent State University*, 212 F.3d 1272, 1282 (Fed. Cir. 2000).  "Incorporation by reference provides a method for integrating material from various documents into a host document—a patent or printed publication in an anticipation determination—by citing such material in a manner that makes clear that the material is effectively part of the host document as it is were explicitly contained therein." *Id.*

B.    Obviousness

35 U.S.C. §103 (a) states:

A patent may not be obtained though the invention is not
identically disclosed or described as set forth in section 102 of
this titled, if the differences between the subject matter sought
to be patented and the prior art are such that the subject matter
as a whole would have been obvious at the time the invention
was made to a person having ordinary skill in the art to which
said subject matter pertains. Patentability shall not be
negatived by the manner in which the invention was made.

A claim may be obvious under 35 U.S.C. § 103 when the differences between the

subject matter sought to be patented and the prior art are such that the subject matter as a whole

would have been obvious at the time the invention was made to a person having ordinary skill

in the art. *KSR Int'l Co. v. Teleflex, Inc.*, No. 04-1350, slip op. at 1-2 (U.S. April 30, 2007); *see*

*also Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1289 (Fed. Cir. 2006); *In re Kahn*, 441

F.3d 997, 985 (Fed. Cir. 2006) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 13, 14 (1966);

*Merck & Co. v. Biocraft Labs., Inc.*, 874 F.2d 804, 807 (Fed. Cir. 1989)).

Obviousness is a question of law based upon underlying factual questions, which are (1)

the scope and content of the prior art; (2) the level of ordinary skill in the prior art; (3) the

differences between the claimed invention and the prior art; and (4) objective evidence of non-

obviousness." *Alza Corp.*, 464 F.3d at 1289-90; *see also Dippin' Dots, Inc. v. Mosey*, 476 F.3d

1337, 1343 (Fed. Cir. 2007); *Pfizer v. Apotex, Inc.*, 480 F.3d 1348 (Fed. Cir. 2007).

If a person of ordinary skill can implement a predictable variation, § 103 likely bars its

patentability. Likewise, if a technique has been used to improve one device, and a person of

ordinary skill in the art would recognize that it would improve similar devices in the same way,

using the technique is obvious.  *KSR*, No. 04-1350, slip op. at 13.  "When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has a good reason to pursue the known options within his or her technical grasp.  If this leads to the anticipated success, it is likely the product not [sic] of innovation but of ordinary skill and common sense."  *Id*. at 17.  In conducting an obviousness analysis, the court need not seek out precise teachings directed to the specific subject matter of the challenged claim, but rather a court can take into account the inferences and creative steps that a person of ordinary skill would employ.  *Id*. at 14.

### C.    Secondary Considerations

Once presented with a prima facie case of invalidity based on obviousness, a patentee must come forward with rebuttal evidence if the patent is to be saved from a finding of invalidity.  *See Mas-Hamilton Group v. LaGard, Inc*., 156 F.3d 1206, 1216 (Fed. Cir.1998); *Pfizer Inc. v. Apotex*, 480 F.3d 1348, 1360 (Fed. Cir. 2007).  For this, the patentee may present evidence of objective indicia of non-obviousness, *i.e.* secondary considerations, such as commercial success, unexpectedly better results, failure of others, and copying.  *See Graham v. John Deere Co*., 383 U.S. 1, 17 (1966).

As part of this evidence, however, a "nexus must be established between the merits of the claimed invention and evidence of commercial success[, or other secondary considerations,] before that evidence may become relevant to the issue of obviousness."  *Iron Grip Barbell Co., Inc. v. USA Sports, Inc*., 392 F.3d 1317, 1324 (Fed. Cir. 2004) (quoting *Solder Removal Co. v. USITC*, 582 F.2d 628, 637 (1978)).

"[E]vidence of commercial success, or other secondary considerations, is only significant if there is a nexus between the claimed invention and the commercial success." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311-12 (Fed. Cir. 2006); *see also Stratoflex , Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed. Cir. 1983).

### D.    Specification (Written Description/Enablement/Best Mode/Indefiniteness)

35 U.S.C. §112, ¶1 states in pertinent part:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

The specification must describe the manner and process of making and using the invention so as to enable a person of skill in the art to make and use the full scope of the invention without undue experimentation.  *See Lizardtech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336 1345 (Fed. Cir. 2005); *AK Steel Corp. v. Sollac and Ugine*, 344 F.3d 1234, 1244 (Fed. Cir. 2003).

"[T]here must be sufficient disclosure, either through illustrative examples or terminology, to teach those of ordinary skill how to make and how to use the invention as broadly as it is claimed."  *In re Vaeck*, 947 F.2d 488, 496 (Fed. Cir. 1991); *see also Plant Genetic Systems, N.V. v. DeKalb Genetics Corporation*, 315 F.3d 1335 (Fed. Cir. 2003) ("the

scope of the claims must bear a reasonable correlation to the scope of enablement provided by the specification to persons of ordinary skill in the art.") (citations omitted); *National Recovery Technologies, Inc. v. Magnetic Separation Systems, Inc.*, 166 F.3d 1190. 1195-1196 (Fed. Cir. 1999) ("The enablement requirement ensures that the public knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims.) (citations omitted).

The Federal Circuit has stated that "[p]atent protection is granted in return for an enabling disclosure of an invention, not for vague intimation of general ideas that may or may not be workable." *Genentech Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365-66 (Fed. Cir. 1997). Where the claimed invention is the application of an unpredictable technology an enabling description in the specification must provide those skilled in the art with a specific and useful teaching. 108 F.3d at 1367-68; *see also In re Fisher*, 427 F.2d 833, 839 (C.C.P.A. 1970) (in cases involving unpredictable factors, such as most chemical reactions and physiological activity, the scope of the enablement obviously varies inversely with the degree of unpredictability of the factors involved.").

Where the specification teaches away from using the invention in a particular way, the teaching away "is itself evidence that at least a significant amount of experimentation would have been necessary to practice the claimed invention. *Liebel-Flarsheim Co. v. Medrad.*, No. 06-1156 2007 U.S. App. LEXIS 6607 at *19 (Fed. Cir. March 22, 2007) (quoting *AK Steel*, 344 F.3d at 1244).

A patent is clearly not enabled nor adequately described where it does not disclose in its specification embodiments of the invention covering points throughout the broad range claimed

by the applicants. *AK Steel*, 344 F.3d at 1244; *see also, e.g., In re Cook*, 439 F.2d 730, 735-36 (C.C.P.A. 1971) (claims properly rejected when applicants failed to establish support for range limitations in claims; although applicants disclosed six examples, they failed to disclose embodiments at "various points throughout the broader claimed range."); *In re Fisher*, 427 F.2d at 839 (claims properly rejected where claim required potency of "at least 1" but specification disclosed products having potencies from only 1.11 to 2.30); *Syngenta Seeds, Inc. v. Monsanto Co.*, 404 F.Supp.2d 594, 603-04 (D.Del. 2005) (affirming jury verdict that claims having "at least about 60%" limitation were invalid for lack of written description where the specification disclosed only one working gene in the claimed range).

The patent must describe the invention sufficiently to convey to a person of skill in the art that the patentee had possession of the claimed invention at the time of the application, i.e., that the patentee invented what is claimed. *Lizardtech*, 424 F.3d at 1345.   In other words, the court must decide whether the invention applicants seek to protect by their claims is part of the invention that is described in the specification. *In re Wertheim*, 541 F.2d 257, 263 (C.C.P.A. 1976)

Where the claims of the patent are broader than the invention applicants described in the patent specification, the patent does not satisfy the written description requirement. *Id*. at 263 (claim properly rejected where it recites a solids content range of "at least 35%," which is broader than the 25-65% range described in the patent); *see also In re Cook*, 439 F.2d 730, 735-36 (C.C.P.A. 1971) (claims properly rejected when applicants failed to establish support for range limitations in claims; although applicants disclosed six examples, they failed to disclose embodiments at "various points throughout the broader claimed range."); *In re Fisher*, 427 F.2d

at 839 (claims properly rejected where claim required potency of "at least 1" but specification disclosed products having potencies from only 1.11 to 2.30); *Syngenta Seeds, Inc. v. Monsanto Co.*, 404 F.Supp.2d 594, 603-04 (D.Del. 2005) (affirming jury verdict that claims having "at least about 60%" limitation were invalid for lack of written description where the specification disclosed only one working gene in the claimed range).

The two requirements of  35 U.S.C. §112, ¶1 usually rise and fall together.  "A recitation of how to make and use the invention across the full breadth of the claim is ordinarily sufficient to demonstrate that the inventor possesses the full scope of the invention, and vice versa." *Lizardtech*, 424 F.3d at 1345.

Section 112, ¶ 1 provides that a patent's specification "shall set forth the best mode contemplated by the inventor of carrying out his invention."  35 U.S.C. § 112, ¶ 1.  In order to prove that a patentee violated his obligation of disclosure, an accused infringer must show that (1) at the time he filed the patent application, the inventor had a best mode of practicing the invention and (2) that the specification does not adequately disclose what the inventor contemplated as the best mode so that those of ordinary skill in the art could practice it.  *See United States Gypsum Co. v. Nat'l Gypsum Co.*, 74 F.3d 1209, 1212 (Fed. Cir. 1996).

A claim is invalid under 35 U.S.C. § 112, ¶2 for indefiniteness if the clam, when read in light of the specification, fails to apprise those skilled in the art of its scope.  *See Smithkline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1340 (Fed. Cir. 2005).  The definiteness requirement of § 112 "focuses on whether the claims, as interpreted in view of the written description, adequately perform their function of notifying the public of the [scope of the]

patentee's right to exclude." *S3 Inc. v. nVIDIA Corp.,* 259 F.3d 1364, 1371-72 (Fed. Cir. 2001).

The Court must resort to the intrinsic record of the patent and its file history to determine whether the intrinsic record is adequate to permit an ambiguous claim limitation to be construed. *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1583 (Fed. Cir. 1996). If, after consulting the intrinsic record, the claim term remains "insolubly ambiguous," then no narrowing construction can be made and the claim is invalid as indefinite. *See Honeywell Int'l*, 341 F.3d 1332, 1340 (Fed. Cir. 2003).

### E.      Presumption of validity

35 U.S.C. § 282 states in pertinent part:

> A patent shall be presumed valid.  Each claim of a patent (whether in independent, dependent or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

A patent is presumed valid; however, the presumption is in no way dispositive.  Instead, "The courts are the final arbiter of patent validity and, although courts may take cognizance of, and benefit from, the proceedings before the patent examiner, the question is ultimately for the courts to decide, without deference to the rulings of the patent examiner." *Quad Envtl. Techs. Corp. v. Union Sanitary Dist.*, 496 F.2d 870, 876 (Fed. Cir. 1991).

## II.    INFRINGEMENT

### A.    Literal Infringement

35 U.S.C. § 271(a) states:

Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

Literal infringement is determined in a two-step analysis. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd., 517 U.S. 370 (1996).

Interpretation of the asserted claims is a question of law, and the court must determine the scope and meaning of the claims. *Id.* Claims are construed with reference to the claim language, the patent specification and the prosecution history, which together constitute the "intrinsic" evidence. *Loctite v. Ultraseal*, 781 F.2d 861, 867 (Fed. Cir. 1985). When determining the scope and meaning of the patent claims, the language of the claims in light of the specification is considered first. *McGill, Inc. v. John Zink Co.*, 736 F.2d 666, 672 (Fed. Cir. 1984).

In a patent case, the patentee bears the burden of proving infringement. *See Under Sea Indus., Inc. v. Dacor Corp.*, 833 F.2d 1551, 1557 (Fed. Cir. 1987). To establish infringement, in the second step, the patentee must demonstrate that the accused products contain each and every limitation of the asserted claim, either literally or by equivalence. *See S. Bravo Sys. v.*

10

*Containment Techs. Corp*., 96 F.3d 1372, 1376 (Fed. Cir. 1996). "If even one limitation is missing, there is no literal infringement." *Mas-Hamilton Group v. LaGard, Inc*., 156 F.3d 1206, 1211 (Fed. Cir. 1998).

### B.    Infringement under the Doctrine of Equivalents

If a product does not literally infringe the claims of an asserted patent, the product may still be found to infringe the patent under the Doctrine of Equivalents if there is "equivalence" between the accused product and each element of the patent's claims. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608 (1950); *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 28 (1997); *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 535 U.S. 722, 732 (2002). A claim limitation is equivalently present in an accused device if there are only "insubstantial differences" between the claim limitation and the corresponding aspect of the accused device. *CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG,* 224 F.3d 1308, 1317 (Fed. Cir. 2000). Thus, the doctrine of equivalents allows the patentee to claim those "*unimportant* and *insubstantial* changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim." *Festo VIII,* U.S. at 733 (emphasis added).

The doctrine of equivalents does not permit wholesale redrafting of a claim in order to capture an accused product; the deviation from the literal scope of the claim must be *insubstantial, Perkin-Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532 (Fed. Cir. 1987). The test for determining whether differences are "insubstantial" is objective: whether a person with ordinary skill in the relevant art would find the differences to be "insubstantial." *Hilton Davis Chem. Co. v. Warner-Jenkinson Co.,* 62 F.3d 1512, 1519 (Fed. Cir. 1995), *rev'd*

*on other grounds,* 520 U.S. 17 (1997).  Where the patent describes a narrow mechanical improvement in a crowded field, the scope of potential equivalents is narrow.  *Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n,* 805 F.2d 1558, 1563 (Fed. Cir. 1986).

The U.S. Supreme Court has recently reconfirmed the rule that where the scope of a claim is narrowed in order to obtain the patent, the patentee is presumed to have conceded an inability to claim the broader subject matter, and will thereafter be estopped to assert infringement under the Doctrine of Equivalents.  *Festo VIII*, 535 U.S. at 740; *Zenith Labs., Inc. v. Bristol-Myers Squibb Co.,* 19 F.3d 1418, 1424 (Fed. Cir. 1994), *cert. denied,* 115 S.Ct. 500 (1994).  The analysis of the prosecution history estoppel bar involves three steps.  First, the court determines whether the amendment was "narrowing" by comparing the original claim with the amended claim.  If the original claim would have captured the alleged equivalent, then the amendment is "narrowing."  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co,* 344 F.3d 1359, 1366 (Fed. Cir. 2003).  A claim may be "narrowed" either by amendment during the course of prosecution, or by presenting new claims in order to overcome an Examiner's rejection.  *Builder's Concrete, Inc. v. Bremerton Concrete Prods. Co.,* 757 F.2d 255, 260 (Fed. Cir. 1985).

Second, the court examines the patent's prosecution history to determine if the narrowing amendment was made for reasons "related to patentability."  *Festo IX*, 344 F.3d at 1366.  It is the *patentee's burden* to establish that the narrowing amendment was not "related to patentability" by reference only to the prosecution history.  *Pioneer Magnetics, Inc. v. Micro Linear Corp.*, 330 F.3d 1352, 1356 (Fed. Cir. 2003); *Festo IX*, 344 F.3d at 1366.  If the prosecution history reveals that the patentee intended to narrow the claim in order to overcome

an examiner's rejection, then prosecution history estoppel will apply. *Id.* Similarly, if the prosecution history reveals *no reason* for the narrowing, then the court shall presume that the amendment was related to patentability, and prosecution history estoppel will apply. *Id.* at 1366-67. The estoppel will apply regardless of whether the narrowing amendment was suggested by an examiner or was voluntarily proffered by the applicants. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558, 563 (Fed. Cir. 2000) ("*Festo XI*") ("[V]oluntary claim amendments are treated the same as other amendments.").

Third, if the patentee cannot prove that the prosecution history demonstrates that the reason for the amendment was not "related to patentability," then the court determines the scope of the estoppel. In determining the scope of the estoppel, the court begins with the presumption that the patentee intended to surrender *all territory* between the original claim limitation and the as-amended claim. *Festo XIII*, 535 U.S. at 740. The standards for rebuttal are exacting and very rarely have been met by a patentee. *See Festo VIII*, 535 U.S. at 740-41.

Since *Festo VIII* was decided, the Federal Circuit has consistently found, as a matter of law, that the patentee failed to rebut the presumption of total surrender and, therefore, could not establish infringement by equivalents. *See, e.g., Biagro*, 423 F.3d at 1307 (affirming summary judgment holding that plaintiff did not rebut the presumption of surrender and that prosecution history estoppel barred it from asserting infringement under the doctrine of equivalents); *Research Plastics, Inc. v. Fed. Packaging Corp.*, 421 F.3d 1290, 1299 (Fed. Cir. 2005) (stating that plaintiff could not rebut the presumption and, therefore, affirming summary judgment ruling of non-infringement); *Rhodia Chimie. v. PPG Indus., Inc.*, 402 F.3d 1371, 1383 (Fed. Cir. 2005) (holding that patentee failed to rebut presumption that it surrendered the range

between the original and amended claims and, therefore, affirming grant of summary judgment of non-infringement); *Bus. Objects, S.A. v. Microstrategy, Inc.*, 393 F.3d 1366, 1374-75 (Fed. Cir. 2005) (affirming Northern District of California Court's grant of summary judgment of non-infringement under doctrine of equivalents as to two claims because patentee failed to rebut presumption of total surrender but reversing summary judgment ruling that prosecution history estoppel applied to third claim because there was no narrowing amendment); *Glaxo Wellcome, Inc. v. IMPAX Labs., Inc.*, 356 F.3d 1348, 1356 (Fed. Cir. 2004) (affirming Northern District of California Court's grant of summary judgment of non-infringement where patentee failed to rebut the *Festo* presumption); *Talbert Fuel Sys. Patents Co. v. Unocal Corp.*, 347 F.3d 1355, 1360 (Fed. Cir. 2003) (holding that the patentee could not meet the rebuttal criteria required under *Festo VIII*); *Pioneer Magnetics*, 330 F.3d at 1357 (affirming summary judgment ruling of non-infringement under doctrine of equivalents because patentee failed to rebut the presumption of surrender under *Festo VIII*).

If a patentee can prove that, due to changes in technology between the time the asserted patent claims were filed and the equivalent was generated, the alleged equivalent was "unforeseeable at the time of the amendment and thus beyond a fair interpretation of what was surrendered," it may overcome the presumption of surrender. *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.,* 370 F.3d 11311, 1140 (Fed. Cir. 2004).

The range of equivalents may be further limited by specific disavowals of claim scope contained within the patent itself. *Scimed Life Sys. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) ("Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the

14

patents, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question."); *see also*, *Honeywell Int'l Inc. v. ITT Indus., Inc.,* 452 F.3d 1312 (Fed. Cir. 2006); *J&M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 11360 (Fed. Cir. 2001).

### III.    REMEDIES

#### A.    Laches

35 U.S.C. § 286 states in pertinent part:

> No recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action.

To invoke the defense of laches, a defendant must prove that (1) the plaintiff "delayed filing suit for an unreasonable and inexcusable length of time" and (2) the "delay operated to the prejudice or injury of the defendant."  *A.C. Auckerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992).

#### B.    Marking

35 U.S.C. § 287 states in pertinent part:

> In the event of failure to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

#### C.    Damages

35 U.S.C. § 284 states:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

In determining a reasonable royalty, courts often apply the fifteen factors first enunciated in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir.), *cert. denied*, 404 U.S. 870 (1971). *See Unisplay, S.A. v. American Elec. Sign Co.*, 69 F.3d 512, 517, n.7 (Fed. Cir. 1995) (citing to *Georgia-Pacific* factors).  These factors are:

1.     The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

2.     The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3.     The nature and scope of the license, as exclusive or non-exclusive; or as restricted or nonrestricted in terms of territory or with respect to whom the manufactured product may be sold.

4.     The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5.     The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promotor [sic].

6.      The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7.      The duration of the patent and the term of the license.

8.      The established profitability of the product made under the patent; its commercial success; and its current popularity.

9.      The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10.     The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11.     The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12.     The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13.     The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14.     The opinion testimony of qualified experts.

15.    The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Georgia Pacific*, 318 F. Supp. at 1120..

### D.    Injunctions

35 U.S.C. § 283 states in pertinent part:

> The several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable.

"[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity. . . ."    *eBay, Inc. v. MercExchange, L.L.C.*, 126 S. Ct. 1837, 1841 (2006).

According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  "A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering

the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id*. at 1839.

### E.    Attorneys Fees

35 U.S.C. § 285 provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  Determining whether a case is exceptional and whether attorneys' fees should be granted under 35 U.S.C. § 285 is a two-step process.  *Tate Access Floors*, 222 F.3d at 964.  The first step is a factual determination whether the case is exceptional, and the second step, the Court exercises its discretion to determine whether attorneys' fees should be awarded.  *Id.*

EXHIBIT 6

**EXHIBIT 6**
**BRIDGESTONE'S EXHIBIT LIST/ACUSHNET OBJECTIONS**

| No. | Beg Bates | End Bates | Date | Description | Objections |
|---|---|---|---|---|---|
| 1 | BSP 202200 | BSP 203826 | April 28, 1998 | U.S. Patent No. 5,743,817 -- Ribbon Copy | 105; 802, 805 |
| 2 | | | July 21, 1998 | U.S. Patent No. 5,782,707 -- Ribbon Copy | 105; 802, 805 |
| 3 | | | September 8, 1998 | U.S. Patent No. 5,803,834 -- Ribbon Copy | 105; 802, 805 |
| 4 | | | October 21, 2003 | U.S. Patent No. 6,634,961 -- Ribbon Copy | 105; 802, 805 |
| 5 | | | January 20, 2004 | U.S. Patent No. 6,679,791 -- Ribbon Copy | 105; 802, 805 |
| 6 | | | October 12, 1993 | U.S. Patent No. 5,252,652 -- Ribbon Copy | 105; 802, 805 |
| 7 | | | | U.S. Patent No. 5,553,852 -- Ribbon Copy | 105; 802, 805 |
| 8 | BSP 202885 | BSP 203020 | | U.S. Patent No. 5,743,817 -- File History | 105; 802, 805; 901 |
| 9 | BSP 203021 | BSP 203127 | | U.S. Patent No. 5,252,652 -- File History | 105; 802, 805; 901 |
| 10 | BSP 203287 | BSP 203370 | September 10, 1996 | U.S. Patent No. 5,553,852 -- File History | 105; 802, 805; 901 |
| 11 | BSP 203371 | BSP 203435 | | U.S. Patent No. 5,782,707 -- File History | 105; 802, 805; 901 |
| 12 | BSP 203488 | BSP 203655 | | U.S. Patent No. 5,803,834 -- File History | 105; 802, 805; 901 |
| 13 | BSP 203656 | BSP 203783 | | U.S. Patent No. 6,634,961 -- File History | 105; 802, 805; 901 |
| 14 | BSP 242777 | BSP 242792 | November 5, 1989 | U.S. Patent No. 6,679,791 -- File History | 105; 802, 805; 901 |
| 15 | BSP 242793 | BSP 242813 | July 8, 1993 | U.S. Patent No. 5,252,652 -- Certified Priority Document Translation (JP 1-118460) | 105; 802, 805; 901 |
| 16 | BSP 242814 | BSP 242830 | October 14, 1994 | U.S. Patent No. 5,553,852 -- Certified Priority Document Translation (JP 5-193065) | 105; 802, 805; 901 |
| 17 | BSP 242831 | BSP 242857 | March 11, 1996 | U.S. Patent No. 5,743,817 -- Certified Priority Document Translation (JP 6-276109) | 105; 802, 805; 901 |
| 18 | BSP 242858 | BSP 242880 | March 1, 1996 | U.S. Patent No. 5,782,707 -- Certified Priority Document Translation (JP 8-082121) | 105; 802, 805; 901 |
| 19 | | | | U.S. Patent No. 5,803,834 -- Certified Priority Document Translation (JP 8-071135) | 105; 802, 805; 901 |

| No. | | | Date | Description | |
|---|---|---|---|---|---|
| 20 | BSP 242881 | BSP 242910 | May 30, 2001 | U.S. Patent No. 6,634,961 -- Certified Priority Document Translation (JP 2001-163238) | 105, 802, 805, 901 |
| 21 | BSP 242911 | BSP 242928 | June 26, 2000 | U.S. Patent No. 6,679,791 -- Certified Priority Document Translation (JP 2000-190640) | 105, 802, 805, 901 |
| 22 | | | December 14, 1994 | U.S. Patent No. 5,743,817 -- Certified Priority Document Translation (JP 6-333024) | 105, 802, 805, 901 |
| 23 | | | July 21, 1998 | U.S. Patent No. 5,782,707 | 105, 802, 805, 901 |
| 24 | | | September 8, 1998 | U.S. Patent No. 5,803,834 | 105, 802, 805, 901 |
| 25 | | | October 21, 2003 | U.S. Patent No. 6,634,961 | 105, 802, 805, 901 |
| 26 | | | January 20, 2004 | U.S. Patent No. 6,679,791 | 105, 802, 805, 901 |
| 27 | | | September 10, 1996 | U.S. Patent No. 5,553,852 | 105, 802, 805, 901 |
| 28 | | | April 28, 1998 | U.S. Patent No. 5,743,817 | 105, 802, 805, 901 |
| 29 | | | October 12, 1993 | U.S. Patent No. 5,252,652 | 105, 802, 805, 901 |
| 30 | | | November 16, 2004 | U.S. Patent No. 6,818,705 | 105, 802, 805, 901 |
| 31 | | | | U.S. Patent No. 6,818,705 -- File History | 105 |
| 32 | | | March 8, 1998 | U.S. Patent No. 4,729,861 | 105 |
| 33 | | | | U.S. Patent No. 4,729,861 -- File History | 105 |
| 34 | | | June 26, 1990 | U.S. Patent No. 4,936,587 | 105 |
| 35 | | | | U.S. Patent No. 4,936,587 -- File History | 105 |
| 36 | | | January 14, 1992 | U.S. Patent No. 5,080,367 | 105 |
| 37 | | | | U.S. Patent No. 5,080,367 -- File History | 105 |
| 38 | AB 0000162 | AB 0000189 | 2005-2006 | ▲-NXT-▼ and ▲NXT▼ Construction Basics | 105 |
| 39 | AB 0038761 | AB 0038762 | | Manufacturing and Construction information | 802, 805, 403, 105 |
| 40 | AB 0039305 | AB 0039314 | | New Product Reviews | |
| 41 | AB 0048178 | | | Manufacturing and Construction information | 802, 805, 403, 105 |
| 42 | AB 0050820 | AB 0050834 | | Manufacturing and Construction information | 802, 805, 403, 105 |
| 43 | AB 0051522 | AB 0051526 | 1999-2003 | Manufacture and construction information | 802, 805, 403, 105 |
| 44 | AB 0052046 | AB0052049 | | Manufacturing and Construction information | 802, 805, 403, 105 |

| | | | | |
|---|---|---|---|---|
| 45 | AB 0052057 | AB 0052059 | | Manufacturing and Construction information | 802, 805, 403, 105 |
| 46 | AB 0052269 | | 1999-2003 | Manufacturing and Construction information | 802, 805, 403, 105 |
| 47 | AB 0052820 | AB 0052827 | | Manufacturing and Construction information | 401, 402, 604, 802, 805 |
| 48 | AB 0086634 | AB 0086638 | | Manufacturing and Construction information | 802, 805, 403, 105 |
| 49 | AB 0086660 | AB 0086667 | | Manufacturing and Construction information | 802, 805, 403, 105 |
| 50 | AB 0087052 | | | Manufacturing and Construction information | 802, 805, 403, 105 |
| 51 | AB 0004619 | AB 0004621 | June 3, 2005 | Pinnacle Exception Testing Log | 802, 805, 403, 105 |
| 52 | AB 0004622 | AB 0004630 | June 30, 2005 | DT So/Lo Testing Log | 802, 805, 403, 105 |
| 53 | AB 0004631 | AB 0004642 | May 18, 2005 | Pro V1 Testing Log | 802, 805, 403, 105 |
| 54 | AB 0004643 | AB 0004644 | May 18, 2005 | NXT Testing Log | 802, 805, 403, 105 |
| 55 | AB 0004645 | AB 0004646 | June 30, 2005 | DT So/Lo Testing Log | 802, 805, 403, 105 |
| 56 | AB 0004647 | AB 0004658 | May 18, 2005 | NXT Tour Testing Log | 802, 805, 403, 105 |
| 57 | AB 0004659 | AB 0004664 | May 18, 2005 | NXT Testing Log | 802, 805, 403, 105 |
| 58 | AB 0004665 | AB 0004667 | May 18, 2005 | Pro V1 Testing Log | 802, 805, 403, 105 |
| 59 | AB 0004668 | AB 0004671 | May 11, 2005 | Pro V1x Testing Log | 802, 805, 403, 105 |
| 60 | AB 0004672 | AB 0004682 | May 18, 2005 | NXT Tour Testing Log | 802, 805, 403, 105 |
| 61 | AB 0004683 | AB 0004709 | May 18, 2005 | Pro V1 and Pro V1x Testing Logs | 802, 805, 403, 105 |
| 62 | AB 0086631 | AB 0086633 | January 25, 2002 | Pro V1* Testing Logs | 802, 805, 403, 105 |
| 63 | BSP046550 | BSP046553 | | B330 packaging and display | 105, 1002, 901, 401, 402 |
| 64 | BSP048011 | BSP048011 | | Tour B330 box | 105, 1002, 901, 401, 402 |
| 65 | BSP048012 | BSP048014 | | Precept Laddie Xtreme and Lady Pearl packaging | 105, 1002, 901, 401, 402 |
| 66 | BSP050537 | BSP050538 | | Precept new Lady ball packaging (Lady Diamond) | 105, 1002, 901, 401, 402 |
| 67 | BSP050539 | BSP050539 | | Precept U-Tri Extra Distance ball packaging | 105, 1002, 901, 401, 402 |
| 68 | BSP050540 | BSP050540 | | Precept U-Tri Extra Spin ball packaging | 901, 1002, 105, 401, 402, |
| 69 | BSP050541 | BSP050542 | | Precept U-Tri Tour ball packaging | 901, 1002, 105, 401, 402 |
| 70 | BSP050543 | BSP050544 | | Mc Lady Packaging | 901, 1002, 105, 401, 402 |
| 71 | BSP050545 | BSP050545 | | Precept Mc Lady Packaging | 901, 1002, 105, 401, 402 |
| 72 | BSP050546 | BSP050547 | | MC Lady Packaging | 901, 1002, 105, 401, 402 |

3

| 73 | BSP050548 | BSP050548 | Precept Laddie Packaging | 901, 1002, 105, 401, 402 |
| 74 | BSP050550 | BSP050551 | Tour 330 Packaging | 901, 1002, 105, 401, 402 |
| 75 | BSP050552 | BSP050553 | Precept Laddie Extreme Packaging | |
| 76 | BSP087986 | BSP087986 | Precept MC Senior Golf Ball Packaging | 901, 1002, 105, 401, 402 |
| 77 | BSP087987 | BSP087987 | Precept MC Lady Golf Ball Packaging | 901, 1002, 105, 401, 402 |
| 78 | BSP087988 | BSP087992 | Precept MC Tour Premium Ball Packaging | 901, 1002, 105, 401, 402 |
| 79 | BSP087993 | BSP087997 | Precept MC Tour Advantage Golf Ball Packaging | 901, 1002, 105, 401, 402 |
| 80 | BSP087998 | BSP087999 | Precept Tour Premium LS Golf Ball Packaging | 901, 1002, 105, 401, 402 |
| 81 | BSP088000 | BSP088000 | Precept MC Double Cover Golf Ball Packaging | 901, 1002, 105, 401, 402 |
| 82 | BSP088001 | BSP088002 | Precept Extra Distance Golf Ball Packaging | 901, 1002, 105, 401, 402 |
| 83 | BSP088003 | BSP088004 | Bridgestone EV Classic Spin Golf Ball Packaging | 901, 1002, 105, 401, 402 |
| 84 | BSP088005 | BSP088005 | Precept MC Spin Golf Ball Packaging | 901, 1002, 105, 401, 402 |
| 85 | BSP094585 | BSP094585 | Bridgestone EV Classic Distance | 901, 1002, 105, 401, 402 |
| 86 | BSP094586 | BSP094587 | Precept Tour - Premium | 901, 1002, 105, 401, 402 |
| 87 | BSP094588 | BSP094589 | Precept Extra Spin Packaging | 901, 1002, 105, 401, 402 |
| 88 | BSP094590 | BSP094592 | Precept Pwrdrive Packaging | 901, 1002, 105, 401, 402 |
| 89 | BSP094593 | BSP094594 | Bridgestone EV Classic Distance Packaging | 901, 1002, 105, 401, 402 |
| 90 | BSP094595 | BSP094596 | Precept D - Force Packaging | 901, 1002, 105, 401, 402 |
| 91 | BSP094597 | BSP094598 | Precept Tour Advantage Packaging | 901, 1002, 105, 401, 402 |
| 92 | BSP094599 | BSP094600 | Precept D-Feel Packaging | 901, 1002, 105, 401, 402 |
| 93 | AB 90094 | AB 90270 | 2001 Competitive Ball Review | 901, 1002, 105, 401, 402 |
| 94 | AB 90271 | AB 90382 | 2002 Competitive Ball Review | |
| 95 | AB 90383 | AB 90438 | 2003 Competitive Ball Review | |
| 96 | AB 90439 | AB 90484 | 2004 Competitive Ball Review | |
| 97 | AB 90485 | AB 90553 | 2005 Competitive Ball Review | |
| 98 | AB 0013145 | AB 0015262 | Change Notice | |
| 99 | AB 0015272 | AB 0015273 | Change Notice | |
| 100 | AB 0015636 | AB 0016036 | Change Notices | |

4

| | | | Date | Description | Numbers |
|---|---|---|---|---|---|
| 101 | AB 0035141 | AB 0035144 | December 12, 2002 | Change Notice All Plants | |
| 102 | AB 0035148 | AB 0035149 | November 15, 2002 | Change Notice All Plants | |
| 103 | AB 0035709 | AB 0035712 | | Change Notice | |
| 104 | AB 0037636 | AB 0037638 | October 3, 2000 | Change Notice All Plants | |
| 105 | AB 0037882 | AB 0037886 | January 15, 2001 | Change Notice BPII | |
| 106 | AB 0038639 | AB 0038642 | | Change Notices | |
| 107 | AB 0091268 | AB 0092335 | | Change Notice | |
| 108 | AB 0091268 | AB 0092335 | | Change Notices | |
| 109 | B 0110474 | B 0111866 | | Change Notices | |
| 110 | AB 0110474 | AB 0111866 | | Change Notices | |
| 111 | AB 0110542 | AB 0110547 | November 30, 2000 | Change Notice BPII | |
| 112 | | | | Chart re: catalyst, grades, molecular weight, etc. | |
| 113 | | | November 25, 1998 | Struktol Technical Data (Jeff Dalton Deposition Exh. 21 (7/21/06)) | **401, 402, 802, 805, 901** |
| 114 | AB 0000034 | AB 0000036 | July 25, 2006 | Memo from Soft and Fast Research and Product Team re: Minutes from 11/30 and 12/7 | 802, 805, 401, 402, 403, 1006, 105 |
| 115 | AB 0000057 | AB 0000061 | July 26, 2005 | M. Rajagopalan memorandum re: Struktol A95 peroxide ladder | 802, 805, 401, 402, 403, 1006, 1005 |
| 116 | AB 0000068 | AB 0000070 | July 26, 2005 | Memo from P. Voorheis to M. Rajagopalan re: DTDS soft and fast core with CB23 | 802, 805, 401, 402, 403, 1006, 105 |
| 117 | AB 0000071 | AB 0000075 | July 26, 2005 | Memo from P. Voorheis to M. Rajagopalan re: Zinc salt of pentachlorothiophenol in core formulations | 802, 805, 401, 402, 403, 1006, 105 |
| 118 | AB 0000076 | AB 0000080 | July 26, 2005 | M. Rajagopalan memorandum re: Low Levels of ZDA in a PCTP Cure | 802, 805, 401, 402, 403, 1006, 105 |
| 119 | AB 0000100 | AB 0000105 | August 30, 2002 | Memo from P. Voorheis to M. Rajagopalan re: Core aging/drying | 802, 805, 402, 403, 1006, 105 |
| 120 | AB 0024491 | AB 0024494 | February 27, 2003 | Zinc Salt of Pentachlorothiophenol supplier and shipment information | 401, 402, 802, 805, 1006 |
| 121 | AB 0038767 | AB 0038770 | | Zinc/Pentachlorothiophenol/Filler/Rubber Experiment | 802, 805, 402, 403, 1006 |

| No. | | | Date | Title | |
|---|---|---|---|---|---|
| 122 | AB 0044782 | AB 0044786 | | Titleist and Foot-Joy, Worldwide, *Transfication Where are we now and where are we going? Part I* | 401, 402, 403, 802, 805, 1006 |
| 123 | AB 0045453 | AB 0045468 | January 30, 2002 | ZnPCTP MRC Update | 802, 805, 401, 402 |
| 124 | AB 0045628 | AB 0045634 | August 30, 2005 | M. Rajagopalan memorandum re: pentachlorothiophenol | 802, 805, 401, 402 |
| 125 | AB 0054955 | AB 0055142 | 11/00/98 | Operator's Manual RPA 2000 for use with OS/2 | |
| 126 | BSP241493 | BSP241760 | | JSR Handbook (Japanese) | 901, 1006, 802, 805, 105, 403 |
| 127 | LAN0001 | LAN0027 | April 14, 1999 | LANXESS Document | 901, 1006, 802, 805, 105, 401, 402, 403 |
| 128 | SB 11106 | SB 11113 | September 26, 2001 | Pro V1* 392 Outer Core Formulations | 105, 401, 402, 403, 802, 805 |
| 129 | | | June 7, 2004 | Pro V1 392 chart (L. Bissonette Deposition Exh. 8 (11.15.06)) | **105, 802, 805, 1002, 1006** |
| 130 | | | | Franics deS. Lynch – Exhibit 5-10; Drawings | 802, 805, 602, 901 |
| 131 | AB 0001237 | | | TS392-4vp6 Dimple Layout | 401, 402 |
| 132 | AB 0001530 | AB 0001532 | | TS 392-5 Dimple Layout | 401, 402 |
| 133 | AB 0087844 | AB 0087858 | | Graphs | |
| 134 | | | May 1, 2006 | Acushnet's 2nd Supplement to Responses to Bridgestone's 2nd Interrogatories (Nos. 25-39) | Compound, 401, 402, 403 |
| 135 | | | July 6, 2006 | Acushnet's 3rd Supplement to Responses to Bridgestone's 2nd Interrogatories (Nos. 25-39) | Compound, 401, 402, 403 |
| 136 | | | December 18, 2006 | Acushnet's 3rd Supplement to Responses to Bridgestone's 2nd Interrogatories (Nos. 25-39) | Compound, 401, 402, 403 |
| 137 | | | December 18, 2006 | Acushnet's 6th Supp. Responses to Bridgestone's 1st Interrogatories (Nos. 1-24) | Compound, 401, 402, 403 |
| 138 | | | December 18, 2006 | Acushnet's Responses to Bridgestone's 6th Interrogatories (Nos. 54-69) | Compound, 401, 402, 403 |
| 139 | | | December 18, 2006 | Acushnet's Supp. Responses to Bridgestone's 5th Interrogatories (Nos. 52-53) | Compound, 401, 402, 403 |

| 140 | June 20, 2005 | Acushnet's Initial Disclosure Pursuant to Rule 26(a)(1) | Compound, 401, 402, 403 |
|---|---|---|---|
| 141 | February 8, 2006 | Acushnet's 1st Supplement to Responses to Bridgestone's 2nd Interrogatories (Nos. 25-39) | Compound, 401, 402, 403 |
| 142 | October 6, 2006 | Acushnet's 2nd Supplemental Initial Disclosures Pursuant to Rule 26(a)(1) | Compound, 401, 402, 403 |
| 143 | July 6, 2006 | Acushnet's 5th Supp. Responses to Bridgestone's 1st Interrogatories (Nos. 1-24) | Compound, 401, 402, 403 |
| 144 | July 7, 2005 | Acushnet's Responses to Bridgestone's 1st Interrogatories (Nos. 1-24) | Compound, 401, 402, 403 |
| 145 | July 7, 2005 | Acushnet's Responses to Bridgestone's 1st Requests for the Production of Documents (Nos. 1-100) | Compound, 401, 402, 403 |
| 146 | August 29, 2005 | Acushnet's Responses to Bridgestone's 2nd Interrogatories (Nos. 25-39) | Compound, 401, 402, 403 Compound, 401, 402, 403 |
| 147 | January 9, 2006 | Acushnet's Responses to Bridgestone's 3rd Interrogatories (Nos. 40-42) | Compound, 401, 402, 403 |
| 148 | August 7, 2006 | Acushnet's Responses to Bridgestone's 2nd Interrogatories (Nos. 43-51) | Compound, 401, 402, 403 |
| 149 | August 24, 2006 | Acushnet's Responses to Bridgestone's 5th Interrogatories (Nos. 52-53) | Compound, 401, 402, 403 |
| 150 | August 29, 2005 | Acushnet's Responses to Bridgestone's 2nd Set of Requests for the Production of Documents (Nos. 101-155) | Compound, 401, 402, 403 |
| 151 | December 18, 2006 | Acushnet's Responses to Bridgestone's Requests for Admission | Compound, 401, 402, 403 |
| 152 | September 28, 2005 | Acushnet's Supp. Responses to Bridgestone's 1st Interrogatories (Nos. 1-24) | Compound, 401, 402, 403 |
| 153 | February 8, 2006 | Acushnet's Supp. Responses to Bridgestone's 1st Interrogatories (Nos. 1-24) | Compound, 401, 402, 403 |

7

| | | | |
|---|---|---|---|
| 154 | May 1, 2006 | Acushnet's Supp. Responses to Bridgestone's 1st Interrogatories (Nos. 1-24) | Compound, 401, 402, 403 |
| 155 | December 18, 2006 | Acushnet's Supp. Responses to Bridgestone's 3rd Interrogatories (Nos. 40-42) | Compound, 401, 402, 403 |
| 156 | December 18, 2006 | Acushnet's Supp. Responses to Bridgestone's 4th Interrogatories (Nos. 43-51) | Compound, 401, 402, 403 |
| 157 | October 3, 2006 | Acushnet's Supplemental Initial Disclosures Pursuant to Rule 26(a)(1) | Compound, 401, 402, 403 |
| 158 | September 12, 2006 | Bridgestone's Amended Initial Disclosures Pursuant to Rule 26(a) | Compound, 401, 402, 403 |
| 159 | June 20, 2005 | Bridgestone's Initial Disclosures Pursuant to Rule 26(a) | Compound, 401, 402, 403 |
| 160 | September 29, 2005 | Bridgestones' 1st Supp. Responses to Acushnet's 1st Interrogatories | Compound, 401, 402, 403 |
| 161 | January 6, 2006 | Bridgestones' 2nd Supp. Responses to Acushnet's 1st Interrogatories | Compound, 401, 402, 403 |
| 162 | January 30, 2006 | Bridgestones' 3rd Supp. Responses to Acushnet's 1st Interrogatories | Compound, 401, 402, 403 |
| 163 | March 30, 2006 | Bridgestones' 4th Supp. Responses to Acushnet's 1st Interrogatories (Nos. 10 and 23) | Compound, 401, 402, 403 |
| 164 | May 1, 2006 | Bridgestones' 5th Supp. Responses to Acushnet's 1st Interrogatories | Compound, 401, 402, 403 |
| 165 | May 9, 2006 | Bridgestones' 6th Supp. Responses to Acushnet's 1st Interrogatories | Compound, 401, 402, 403 |
| 166 | June 28, 2006 | Bridgestones' 7th Supp. Response to Acushnet's 1st Interrogatories | Compound, 401, 402, 403 |
| 167 | July 14, 2006 | Bridgestones' 8th Supp. Responses to Acushnet's 1st Interrogatories | Compound, 401, 402, 403 |

| No. | | | Date | Description | Numbers |
|---|---|---|---|---|---|
| 168 | | | December 18, 2006 | Bridgestones' 9th Supp. Responses to Acushnet's 1st Interrogatories (Nos. 1-28) | Compound, 401, 402, 403 |
| 169 | | | July 11, 2005 | Bridgestones' Responses to Acushnet's 1st Interrogatories | Compound, 401, 402, 403 |
| 170 | | | January 17, 2006 | Bridgestones' Responses to Acushnet's 2nd Interrogatories | Compound, 401, 402, 403 |
| 171 | | | February 21, 2006 | Bridgestones' Responses to Acushnet's 3rd Interrogatories | Compound, 401, 402, 403 |
| 172 | | | September 11, 2006 | Bridgestones' Responses to Acushnet's 4th Interrogatories (Nos. 45-53) | Compound, 401, 402, 403 |
| 173 | | | December 18, 2006 | Bridgestones' Responses to Acushnet's 5th Interrogatories (Nos. 54-60) and to Acushnet's 6th Interrogatories s (Nos. 61-66) | Compound, 401, 402, 403 |
| 174 | | | December 18, 2006 | Bridgestones' Supp. Responses to Acushnet's 2nd Interrogatories (Nos. 25-38) | Compound, 401, 402, 403 |
| 175 | | | December 18, 2006 | Bridgestones' Supp. Responses to Acushnet's 4th Interrogatories s (Nos. 46-53) | Compound, 401, 402, 403 |
| 176 | | | January 20, 2007 | Expert Report of Francis deS Lynch | 403 |
| 177 | | | January 20, 2007 | Expert Report of John Jarosz | 802, 805, 702, 403, 1006 |
| 178 | | | January 20, 2007 | Expert Report of Nick Price | 403 |
| 179 | | | January 20, 2007 | Expert Reports of Avraam Isayev | 802, 805, 702, 403, 1006 |
| 180 | | | January 20, 2007 | Expert Reports of Dr. E. Bryan Coughlin | 802, 805, 702, 403, 1006 |
| 181 | | | January 20, 2007 | Expert Reports of Edward M. Caulfield | 802, 805, 702, 403, 1006 |
| 182 | | | January 20, 2007 | Expert Reports of John Calabria | 802, 402, 403, 805, 702, 403, 1006 |
| 183 | | | January 20, 2007 | Expert Reports of Kim B. Blair | 802, 402, 403, 805, 702, 403, 1006 |
| 184 | | | January 20, 2007 | Expert Reports of Larry C. Cadorniga | 401, 402, 403, 802, 805, 702, 1006 |
| 185 | AB 0048297 | AB 0048309 | | Acushnet Financial Documents | 105, 401, 402, 403 |

9

| 186 | AB 0048320 | AB 0048334 | Acushnet Financial Documents | 105 |
| 187 | AB 0070061 | AB 0070062 | Pinnacle Team Meeting Minutes | 802, 805, 401, 402 |
| 188 | AB 0073770 | AB 0073772 | NXT Product Brief | 802, 805, 105 |
| 189 | AB 0084261 | AB 0084266 | Acushnet Japanese Sales | 105, 401, 402, 403 |
| 190 | AB 0084267 | AB 0084417 | Acushnet Financial Documents | 105, 401, 402, 403 |
| 191 | AB 0084296 | AB 0084300 | Acushnet Financial Documents | 105, 401, 402, 403 |
| 192 | AB 0084322 | AB 0843223 | Acushnet Financial Documents | 105, 401, 402, 403 |
| 193 | AB 0084344 | AB 0084350 | Acushnet Financial Documents | 105, 401, 402, 403 |
| 194 | AB 0084371 | AB 0084399 | Acushnet Financial Documents | 105, 401, 402, 403 |
| 195 | AB 0084400 | AB 0084417 | Acushnet Financial Documents | 105, 401, 402, 403 |
| 196 | AB 0084496 | AB 0084500 | Acushnet Financial Documents | 105, 401, 402, 403 |
| 197 | AB 0084538 | AB 0084543 | Acushnet Financial Documents | 105, 401, 402, 403 |
| 198 | AB 0084556 | AB 0084561 | Acushnet Financial Documents | 105, 401, 402, 403 |
| 199 | AB 0084605 | AB 0084609 | Acushnet Financial Documents | 105, 401, 402, 403 |
| 200 | AB 0084673 | AB 0084693 | Acushnet Financial Documents | 105, 401, 402, 403 |
| 201 | AB 0084694 | AB 0084758 | Acushnet Financial Documents | 105, 401, 402, 403 |
| 202 | AB 0084774 | AB 0084778 | Acushnet Financial Documents | 105, 401, 402, 403 |
| 203 | AB 0084943 | AB 0084946 | Acushnet Financial Documents | 105, 401, 402, 403 |
| 204 | AB 0085420 | AB 0085428 | Agreement | 105, 401, 402, 403 |
| 205 | AB 0085430 | AB 0085499 | Acushnet Financial Documents | 105, 401, 402, 403 |
| 206 | AB 0085430 | AB 0085499 | Acushnet Financial Documents | 105, 401, 402, 403 |
| 207 | AB 0085482 | AB 0085483 | Acushnet Financial Documents | 105, 401, 402, 403 |
| 208 | AB 0086248 | AB 0086262 | Acushnet Settlement | 105, **401, 402, 403** |
| 209 | AB 0086263 | AB 0086265 | Agreement | 105, **401, 402, 403** |
| 210 | AB 0086266 | AB 0086268 | Agreement | 105, **401, 402, 403** |
| 211 | AB 0086270 | AB 0086276 | Acushnet License | 105, **401, 402, 403** |
| 212 | AB 0086603 | | | 105 |

10

| | | | | |
|---|---|---|---|---|
| 213 | AB 0087773 | AB 0087795 | Acushnet License | 105, 401, 402, 403 |
| 214 | AB 0087859 | AB 0087865 | Acushnet Financial Documents | 105, **401, 402, 403** |
| 215 | AB 0090062 | AB 0090065 | Acushnet Settlement | 401, 402, 408 |
| 216 | AB 0090066 | AB 0090085 | Acushnet Settlement | 401, 402, 408 |
| 217 | AB 0090086 | AB 0090093 | Acushnet License | 401, 402, 408 |
| 218 | AB 0112455 | AB 0112456 | Ball Report | 105, 401, 402 |
| 219 | AB 0112457 | AB 0112458 | Ball Report | 401, 402, 105 |
| 220 | AB 0112459 | AB 0112460 | Ball Report | 105, 401, 402 |
| 221 | AB 0112461 | AB 0112462 | Ball Report | 105, 401, 402 |
| 222 | AB 0112463 | AB 0112464 | Ball Report | 105, 401, 402 |
| 223 | AB 0113325 | AB 0113337 | Ball Report | 105, 401, 402 |
| 224 | AB 0113338 | AB 0113341 | Ball Report | 105, 401, 402 |
| 225 | AB 0113359 | AB 0113362 | Ball Report | 105, 401, 402 |
| 226 | AB 0113363 | AB 0113377 | Ball Report | 105, 401, 402 |
| 227 | BSP 004689 | BSP 007418 | Golf Data Tech Reports | Compound, 803, 901 |
| 228 | BSP 008679 | BSP 008871 | NGF Analysis | Compound, 803, 901 |
| 229 | BSP 036207 | BSP 036214 | Agreement | **Duplicate of PX 204** |
| 230 | BSP 242701 | BSP 242768 | Bridgestone Product Line Analysis | Compound, 901 |
| 231 | BSP 242929 | BSP 243216 | Golf Ball Sales | Compound, 105 |
| 232 | SB 12173 | SB 12191 | Acushnet Settlement | Compound, 105, Incomplete Range, Otherwise Duplicate of PX 213 |
| 233 | SB 12192 | SB 12198 | Agreement | Compound, 105, Duplicate of PX 204 and PX 229 |
| 234 | SB 12199 | SB 12218 | Acushnet Settlement | Compound, 105, Duplicate of PX 216 |
| 235 | | | Bridgestone Corporation 2005 Annual Report. | 105, 802, 805, 401, 402 |

11

| | | | | |
|---|---|---|---|---|
| 236 | | | Callaway Golf Company, SEC Form 10-K for the fiscal year ended December 31, 2005. | 105, 802, 805, 401, 402 |
| 237 | | | Callaway Golf Company, SEC Form 10-Q for the period ended March 31, 1998. | 105, 802, 805, 401, 402 |
| 238 | | | Fortune Brands, Inc., SEC Form 10-K for the fiscal year ended December 31, 2005. | 105, 802, 805, 401, 402, 1006, 901 |
| 239 | | | Bloomberg. | Bridgestone failed to adequately describe the exhibit or product. |
| 240 | | | Callaway Golf Co., SEC Form 8-K, Press Release, Callaway Golf Announces Acquisition of Top-Flite (June 30, 2003), available at http://ir.callawaygolf.com (viewed January 15, 2007). | 105, 802, 805, 901, 401, 402, 1006 |
| 241 | | | Chuck Stogel, Brandweek (July 10, 2006), available at http://www.brandweek.com (viewed January 6, 2007). | 802, 805, 401, 402, 901, 1006 |
| 242 | | | Daniel Burns, DCF Analyses in Determining Royalty, Les Nouvelles (September 1995). | 802, 901, 401, 402, 1006, 805 |
| 243 | | | Daniel M. McGavock, David A. Haas and Michael P. Patin, Licensing Practices, Business Strategy, and Factors Affecting Royalty Rates: Results of a Survey, 13 Licensing Law and Business Report N6 (March-April 1991). | 802, 805, 901, 401, 402, 1006 |
| 244 | | | *Exhibit Withdrawn* | |
| 245 | | | E. Michael Johnson, Mortally Wound-ed?, Golf Digest (June 2001), available at http://www.golfdigest.com. | 802, 805, 901, 401, 402, 1006 |
| 246 | | | Federal Reserve Statistical Release Form H.15, Secondary Market, 3-month T-Bill Rate. | Bridgestone failed to adequately describe the exhibit. |
| 247 | | | Golf Pyramid of Influence.ppt. | Bridgestone failed to adequately describe the exhibit. |

| | | | |
|---|---|---|---|
| 248 | | Gordon V. Smith and Russell L. Parr, Valuation of Intellectual Property and Intangible Assets (2nd ed. 1994). | 802, 805, 901, 401, 402, 1006 |
| 249 | | Gordon V. Smith and Russell L. Parr, Valuation of Intellectual Property and Intangible Assets (3rd ed. 2000). | 802, 805, 401, 402, 901, 1006 |
| 250 | | Jaime Diaz, Right on the SEAM - Titleist Pro V1, Golf Ball - Evaluation, Golf Digest (August 2001). | 802, 805, 105, 901, 401, 402, 1006 |
| 251 | | John C. Jarosz, Considering Taxes in the Computation of Lost Business Profits, 25 Creighton L. Rev. 41 (1991). | 802, 805, 401, 402, 901, 1006 |
| 252 | | Mark Seal, The Coming Golf Ball Wars - Golf Industry, Golf Digest (February 1999). | 802, 805, 901, 401, 402, 1006 |
| 253 | | Paul M. Janicke, Contemporary Issues in Patent Damages, 42 Am. U. L.R. 691 (Spring 1993). | 802, 805, 105401, 402, 901, 1006 |
| 254 | | Richard Razgaitis, Valuation and Pricing of Technology-Based Intellectual Property (2003). | 802, 805, 401, 402, 901, 1006 |
| 255 | | Robert F. Reilly and Robert P. Schweihs, Valuing Intangible Assets (1999). | 802, 805, 901, 401, 402, 1006 |
| 256 | | Robert Goldscheider and Michael A. Epstein, Determining The Value Of Technology and Setting Royalty Rates, 4 J. Proprietary Rights N10 (October 1992). | 802, 805, 401, 402, 901, 1006 |
| 257 | | Robert Goldscheider, John Jarosz, and Carla S. Mulhern, Use of the 25 Percent Rule in Valuing IP, 37 Les Nouvelles N4 (December 2002). | 802, 805, 401, 402, 1006, 901, **1002** |
| 258 | | Robert Goldscheider, Litigation Backgrounder for Licensing, 29 Les Nouvelles N1 20 (March 1994). | 802, 805, 401, 402, 1006, 901 |
| 259 | | *Exhibit Withdrawn* | |
| 260 | | Shannon P. Pratt, Robert F. Reilly and Robert P. Schweihs, Valuing a Business: The Analysis and Appraisal of Closely Held Companies (4th ed. 2000). | 802, 805, 401, 402, 901, 1006 |

| No. | Date | Description | Objections |
|---|---|---|---|
| 261 | | Shannon P. Pratt, Robert F. Reilly and Robert P. Schweihs, Valuing Small Businesses and Professional Practices (2nd ed. 1993). | "Not Produced;" 401, 402, 802, 805, 901, 1006 |
| 262 | | *Exhibit Withdrawn* | |
| 263 | | Stephen A. Degnan and Corwin Horton, A Survey of Licensed Royalties, 32 Les Nouvelles N2 91 (June 1997). | 802, 805, 401, 402, 901, 1006 |
| 264 | | Data from Daniel M McGavock, David A Haas, and Michael P Patin, Licensing Practices, Business Strategy, and Factors Affecting Royalty Rates: Results of a Survey, 13 Licensing Law and Business Report N6 (March-April 1991) | 802, 805, 401, 402, 901, 1006 |
| 265 | | Data from Standard & Poor's Compustat database | "Not Produced;" 401, 402, 805, 901, 1006 |
| 266 | | Data from Stephen Degnan and Corwin Horton, A Survey of Licensed Royalties, 32 Les Nouvelles N2 (June 1997) | 802, 805, 401, 402, 901, 1006 |
| 267 | | Player rankings from http://www.wpgatour.com/r/stats/2006/186_print.html (viewed January 8, 2007) | **401, 402, 403, 802, 805, 901, 1002, 1006** |
| 268 | | RoyaltySource® Intellectual Property Database (see Jarosz Tab 34) | "Not Produced;" 401, 402, 802, 805, 901, 1006 |
| 269 | January 22, 2007 | B. Seal 2007 e-mail correspondence re: Meet and Confer | 401, 402, 403, 802, 805 |
| 270 | September 6, 2006 | Facsimile and letter from B. Seal to B. White re: Acushnet's Recipe Formula | 401, 402, 403, 802, 805 |
| 271 | September 6, 2006 | Facsimile and letter from B. Seal to B. White re: Acushnet's recipe formulas | 401, 402, 403, 802, 805 |
| 272 | March 10, 2006 | Facsimile from M. Biswas to R. Masters forwarding Acushnet's formulas | 401, 402, 403, 802, 805 |
| 273 | September 6, 2006 | Letter from B. Seal to B. White re: Acushnet's recipe formulas | 401, 402, 403, 802, 805 |
| 274 | February 13, 2007 | Letter from R. Stasio to B. White inspection and testing of golf balls | 401, 402, 403, 802, 805 |

| | | | | | |
|---|---|---|---|---|---|
| 275 | | | February 28, 2007 | Letter from R. Stasio to B. White re: upcoming depositions | 401, 402, 802, 805 |
| 276 | AB 0118603 | AB 0118709 | March 7, 2007 | Letter from D. Chase to R. Masters forwarding Bates range AB0118603 - AB 0118709 (11/04/03 deposition of David Lloyd Felker, Ph.D. | 401, 402, 602, 802, 805, 403 |
| 277 | | | | Letter from B. Seal to R. Saliba re: golf ball inventory | 802, 805, 401, 402, 403 |
| 278 | AB 0085420 | AB 0085428 | March 29, 1991 | Agreement between Bridgestone and Titleist | Duplicate of PX 204 |
| 279 | AB 0086248 | AB 0086262 | October 6, 1989 | Agreement between Acushnet and Polaris Parties | Duplicate of PX 208 |
| 280 | AB 0086263 | AB 0086265 | September 4, 1980 | Agreement between American Ball and Titleist | Duplicate of PX 209 |
| 281 | AB 0086266 | AB 0086268 | January 11, 1991 | Agreement between American Ball and Titleist | Duplicate of PX 210 |
| 282 | AB 0086270 | AB 0086276 | January 1, 1999 | License Agreement between Acushnet and Callaway Golf Ball Co. | Duplicate of PX 211 |
| 283 | AB 0087773 | AB 0087795 | April 4, 2001 | License Agreement between Acushnet and Callaway | Duplicate of PX 213 |
| 284 | AB 0090062 | AB 0090065 | June 30, 2000 | Settlement Agreement between Acushnet and Dunlop Maxfli Sports Corp. | 401, 402, 408 |
| 285 | AB 0090066 | AB 0090085 | August 5, 1998 | Settlement Agreement between Spalding, Lisco and Acushnet | 401, 402, 408 |
| 286 | AB 0090086 | AB 0090093 | June 30, 2000 | License Agreement between Acushnet and Dunlop Maxfli Sports Corp. | 401, 402, 408 |
| 287 | BSP036207 | BSP036213 | March 29, 2001 | Agreement between Bridgestone and Titleist | Duplicate of PX 204, PX 229, PX 233 |
| 288 | AB 0015274 | AB 0015290 | 10/00/02 | DT So/Lo Manufacturing Guidelines Manual | 401, 402, 802, 805, 403, 105 |
| 289 | AB 0015291 | AB 0015303 | 09/00/04 | DT So/Lo Manufacturing Guidelines Manual | 401, 402, 802, 805, 403, 105 |
| 290 | AB 0015304 | AB 0015320 | May 23, 2003 | Pinnacle Exception Manufacturing Guidelines Manual | 401, 402, 802, 805, 403, 105 |
| 291 | AB 0015321 | AB 0015337 | 08/00/05 | Pinnacle Exception (2005) Manufacturing Guidelines Manual | 401, 402, 802, 805, 403, 105 |
| 292 | AB 0015338 | AB 0015355 | October 24, 2002 | NXT Manufacturing Guidelines Manual | 401, 402, 802, 805, 403, 105 |
| 293 | AB 0015356 | AB 0015373 | 10/00/04 | NXT Manufacturing Guidelines Manual | 401, 402, 802, 805, 403, 105 |

15

| | | | | | |
|---|---|---|---|---|---|
| 294 | AB 0015374 | AB 0015390 | 06/00/01 | NXT Tour Manufacturing Guidelines Manual | 401, 402, 802, 805, 403, 105 |
| 295 | AB 0015391 | AB 0015407 | 10/00/02 | NXT Tour Manufacturing Guidelines Manual | 401, 402, 802, 805, 403, 105 |
| 296 | AB 0015408 | AB 0015429 | 09/00/04 | NXT Tour Manufacturing Guidelines Manual | 401, 402, 802, 805, 403, 105 |
| 297 | AB 0015430 | AB 0015449 | 2003-2004 | ▲●Pro V1 392●▼ Manufacturing Guidelines | 401, 402, 802, 805, 403, 105 |
| 298 | AB 0015450 | AB 0015470 | 12/00/00 | Pro V1 392 Manufacturing Guidelines | 401, 402, 802, 805, 403, 105 |
| 299 | AB 0015471 | AB 0015497 | 10/00/04 | Pro V1x-332 Manufacturing Guidelines | 401, 402, 802, 805, 403, 105 |
| 300 | AB 0015498 | AB 0015518 | 2000 | Pro V1 392 Manufacturing Guidelines | 401, 402, 802, 805, 403, 105 |
| 301 | AB 0015498 | AB 0015541 | 12/00/00 | Pro V1 Manufacturing Guidelines | 401, 402, 802, 805, 403, 105 |
| 302 | AB 0015519 | AB 0015541 | 2005-2006 | ▲Pro V1-392▼ Manufacturing Guidelines | 401, 402, 802, 805, 403, 105 |
| 303 | AB 0015542 | AB 0015562 | 11/00/02 | Pro V1 392 Manufacturing Guidelines | 401, 402, 802, 805, 403, 105 |
| 304 | AB 0015563 | AB 0015587 | 12/00/02 | Pro V1x 332 Manufacturing Guidelines | 401, 402, 802, 805, 403, 105 |
| 305 | AB 0015588 | AB 0015617 | 12/00/02 | Pro V1x 332 Manufacturing Guidelines | 401, 402, 802, 805, 403, 105 |
| 306 | AB 0036381 | AB 0036405 | 09/00/04 | NXT Tour Manufacturing Guidelines Manual | 401, 402, 802, 805, 403, 105 |
| 307 | AB 0038212 | AB 0038232 | 08/00/00 | Veneer (Pro V1-392) Manufacturing Guidelines | 401, 402, 802, 805, 403, 105 |
| 308 | AB 0038279 | AB 0038299 | 12/00/00 | Pro V1 392 Manufacturing Guidelines | 401, 402, 802, 805, 403, 105 |
| 309 | AB 0038341 | AB 0038361 | 11/00/02 | Pro V1 392 Manufacturing Guidelines | 401, 402, 802, 805, 403, 105 |

16

| 310 | AB 0038532 | AB 0038560 | 11/00/04 | Pro V1 392 Manufacturing Guidelines | 401, 402, 802, 805, 403, 105 |
|---|---|---|---|---|---|
| 311 | AB 0038793 | AB 0038811 | 2000 | Pro V1 392 Manufacturing Guidelines | 401, 402, 802, 805, 403, 105 |
| 312 | AB 0056201 | AB 0056217 | September 12, 2003 | Pinnacle Exception Manufacturing Guidelines Manual | 401, 402, 802, 805, 403, 105 |
| 313 | AB 0086277 | AB 0086304 | 01/00/06 | Pro V1 392 (Japan) Manufacturing Guidelines Manual | 401, 402, 802, 805, 403, 105 |
| 314 | AB 0086305 | AB 0086331 | 01/00/06 | Pro V1x 332 (Japan)Manufacturing Guidelines Manual | 401, 402, 802, 805, 403, 105 |
| 315 | AB 0086332 | AB 0086350 | 01/00/06 | Titleist NXT (Japan) Manufacturing Guidelines Manual | 401, 402, 802, 805, 403, 105 |
| 316 | AB 0086351 | AB 0086372 | 01/00/06 | NXT Tour (Japan) Manufacturing Guidelines | 401, 402, 802, 805, 403, 105 |
| 317 | AB 0086373 | AB 0086385 | 01/00/06 | Titleist DT So Lo (Japan) Manufacturing Guidelines Manual | 401, 402, 802, 805, 403, 105 |
| 318 | AB 0086386 | AB 0086402 | 01/00/06 | Pinnacle Exception (2005) (Japan) Manufacturing Guidelines Manual | 401, 402, 802, 805, 403, 105 |
| 319 | AB 0086603 | AB 0086630 | 09/00/01 | Pro V1* 392 Manufacturing Guidelines | 401, 402, 802, 805, 403, 105 |
| 320 | AB 0111726 | AB 0111753 | 08/00/01 | Dual Core Veneer Manufacturing Guidelines | 401, 402, 802, 805403, 105 |
| 321 | AB 0111755 | AB 0111782 | 09/00/01 | Pro V1 * 392 Manufacturing Guidelines | 401, 402, 802, 805, 403, 105 |
| 322 | AB 0111784 | AB 0111803 | 08/00/00 | Veneer (Pro V1-392) Manufacturing Guidelines Manual | 401, 402, 802, 805, 403, 105 |
| 323 | AB 0111826 | AB 0111844 | 10/00/00 | Veneer (Pro V1-392) Manufacturing Guidelines Manual | 401, 402, 802, 805, 403, 105 |
| 324 | AB 0111963 | AB 0111990 | 03/00/02 | Pro V1 * 392 Manufacturing Guidelines | 401, 402, 802, 805, 403, 105 |
| 325 | AB 30829 | | | | 401, 402, 901 |
| 326 | BSP 096734 | BSP 096755 | | | 901 |

17

| | | | | | |
|---|---|---|---|---|---|
| 327 | | | | Box from Titleist Pro V1x Golf Balls (Felker Depo. Ex. 23) | **401, 402, 802, 805, 901** |
| 328 | AB 0000001 | AB 0000011 | August 24, 2001 | Callaway Golf Company, Time Survey, R&D Tax Credit Study, Year Ended 2000 (Felker Depo. Ex. 2) | **106, 401, 402, 403, 802, 805, 901** |
| 329 | | | | Compression by Another Other Name, *Science and Golf IV* | 401, 402, 802, 805 |
| 330 | | | | Curriculum Vitae of Kevin Jones | 802, 805 |
| 331 | | | | Sidestamp list (W. Burke Depo. Ex. 5) | **401, 402, 403, 602, 802, 1006** |
| 332 | | | November 6, 1998 | Meeting Report | 802, 805 |
| 333 | AB 0000124 | AB 0000130 | 2003-2004 | Marketing Strategy for DT So/Lo | 401, 402, 802, 805 |
| 334 | AB 0000206 | AB 0000231 | | Presentation - The Road To Our Present Day | |
| 335 | AB 0000233 | AB 0000235 | August 6, 2004 | Handwritten letter from H. Boehm to S. Tomita | 401, 402, 408 |
| 336 | AB 0000538 | | February 1, 2004 | S. Tomita 2004 e-mail correspondence | **105, 401, 402, 408, 802, 805** |
| 337 | AB 0000682 | AB 0000686 | February 11, 2004 | S. Tomita 2004 e-mail correspondence | 802, 805 |
| 338 | AB 0000735 | AB 0000737 | January 16, 2004 | H. Boehm 2003 e-mail correspondence | **105, 401, 402, 408, 802, 805** |
| 339 | AB 0000780 | AB 0000782 | January 15, 2003 | H. Boehm 2003 e-mail correspondence | 802, 805 |
| 340 | AB 0000790 | AB 0000792 | February 27, 2003 | S. Tomita 2003 e-mail correspondence | **105, 401, 402** |
| 341 | AB 0000796 | | June 6, 2003 | H. Boehm 2003 e-mail correspondence | 401, 402, 802, 805 |
| 342 | AB 0000797 | | August 21, 2003 | S. Tomita 2003 e-mail correspondence | 401, 402, 802, 805 |
| 343 | AB 0000873 | | March 8, 2005 | E-mail correspondence | 401, 402, 403, 802, 805 |
| 344 | AB 0000880 | AB 0000881 | March 6, 2000 | B. Morgan 2000 e-mail correspondence | 802, 805, 401, 402 |
| 345 | AB 0002254 | AB 0002258 | June 30, 1998 | D. Ladd 1998 e-mail correspondence | 802, 805 |
| 346 | AB 0004647 | AB 0004658 | | Testing information | 802, 805 |
| 347 | AB 0004727 | | August 3, 2000 | J. Dalton 2000 e-mail correspondence | 802, 805, 401, 402 |
| 348 | AB 0004805 | | June 3, 2003 | J. Dalton 2003 e-mail correspondence | 802, 805 |
| 349 | AB 0004806 | | June 2, 2003 | H. Boehm 2003 e-mail correspondence | 802, 805 |
| 350 | AB 0004810 | AB 0004811 | August 25, 2003 | J. Dalton 2003 e-mail correspondence | 802, 805 |
| 351 | AB 0004825 | AB 0004827 | October 25, 2004 | J. Dalton 2004 e-mail correspondence | 401, 402, 403, 802, 805 |

18

| No. | Bates Begin | Bates End | Date | Description | Objections |
|---|---|---|---|---|---|
| 352 | AB 0004830 | AB 0004832 | May 2, 2004 | Formula guidelines | |
| 353 | AB 0004833 | AB 0004834 | June 13, 2005 | C. Cavallaro 2005 e-mail correspondence | 802, 805, 401, 402 |
| 354 | AB 0004834 | | March 8, 2005 | B. Morgan 2005 e-mail correspondence | 802, 805 |
| 355 | AB 0004836 | AB 004837 | March 3, 2005 | B. Morgan 2005 e-mail correspondence | 802, 805, 401, 402 |
| 356 | AB 0004839 | AB 0004840 | | Ball Properties | 802, 805, 401, 402 |
| 357 | AB 0011632 | AB 0011637 | January 11, 2000 | E-mail correspondence re: Veneer Platform Team Minutes | 802, 805 |
| 358 | AB 0011789 | AB 0011790 | April 25, 2003 | C. Cavallaro 2003 e-mail correspondence | 802, 805, 401, 402 |
| 359 | AB 0012320 | AB 0012321 | March 6, 2000 | B. Morgan 2000 e-mail correspondence | 802, 805, 401, 402 |
| 360 | AB 0015272 | AB 0015273 | | Surlyn Recipe Forumulas | Compound (first page 401, 402) |
| 361 | AB 0016780 | AB 0016806 | 08/00/02 | B. Morgan - Tour Distance SF and The Next Generation Product | |
| 362 | AB 0016807 | AB 0016827 | | Partners Conference - Fall 2000 | 802, 805 |
| 363 | AB 0016828 | AB 0016855 | 01/00/01 | Sales Meeting | **105, 401, 402** |
| 364 | AB 0016886 | AB 0016970 | 07/00/01 | July 2001 Sales Meeting | 802, 805 |
| 365 | AB 001692 | | October 23, 1998 | Titleist and Foot-Joy Worldwide Analytical Services Results | 401, 402, 802, 805 |
| 366 | AB 0017301 | | January 2, 2001 | E-mail correspondence | **401, 402** |
| 367 | AB 0017318 | AB 0017320 | March 19, 2001 | B. Morgan 2001 e-mail correspondence | 802, 805 |
| 368 | AB 0017328 | | April 12, 2001 | B. Morgan 2001 e-mail correspondence | **802, 401, 402** |
| 369 | AB 0017363 | AB 0017366 | May 17, 2004 | K. Harris 2004 e-mail correspondence | 802, 805 |
| 370 | AB 0017367 | AB 0017380 | April 19, 2004 | M. Rajagopalan 2004 e-mail correspondence | 802, 805 |
| 371 | AB 0017417 | AB 0017419 | January 18, 1996 | Titleist and Foot-Joy Worldwide Inter-Office Correspondence re: Meeting Notes 1/16/96 | 802, 805 |
| 372 | AB 0017440 | AB 0017450 | February 21, 1996 | New Product Directive, Project X Technology | 802, 805, 401, 402 |
| 373 | AB 0017451 | AB 0017455 | | B. Morgan - Bill's Update for The Product Strategy Team | 802, 805, 401, 402 |
| 374 | AB 0017456 | AB 0017458 | | B. Morgan e-mail correspondence | 802, 805, 401, 402 |
| 375 | AB 0017459 | AB 0017463 | May 10, 1996 | New Product Directive Project X Technology | 802, 805, 401, 402 |
| 376 | AB 0017474 | AB 0017476 | | B. Morgan memo re: Layered Covered Product Strategy Considerations | 802, 805, 401, 402 |

| 377 | AB 0017483 | | July 3, 1996 | The Evolution of the LOW SPIN Project X Balls | 802, 805, 401, 402 |
|---|---|---|---|---|---|
| 378 | AB 0017506 | AB 0017510 | | BDouble Cover Product Strategy | 802, 805, 401, 402 |
| 379 | AB 0017575 | AB 0017582 | March 4, 1999 | J. Dalton 1999 e-mail correspondence | 802, 805, 401, 402, 403 |
| 380 | AB 0017575 | AB 0017576 | March 3, 1999 | Veneer Product Platform Team Minutes | 802, 805, 401, 402, 403 |
| 381 | AB 0017579 | AB 0017580 | March 4, 1999 | B. Morgan 1999 e-mail correspondence | 802, 805, 401, 402, 403 |
| 382 | AB 0017622 | AB 0017626 | February 29, 2000 | Titleist and Foot-Joy Inter-Office Correspondence re: Golf Ball Product Development Team Meeting - 02/28/00 | 802, 805, 401, 402 |
| 383 | AB 0017646 | AB 0017648 | April 4, 2000 | Acushnet inter-office correspondence re: product development team meeting | 802, 805, 401, 402 |
| 384 | AB 0017654 | AB 0017657 | April 28, 2000 | C. Cavallaro 2000 e-mail correspondence | 802, 805, 401, 402 |
| 385 | AB 0017671 | AB 0017673 | May 25, 2000 | Acushnet inter-office correspondence re: product development team meeting | 802, 805, 401, 402 |
| 386 | AB 0017674 | AB 0017686 | May 30, 2000 | B. Morgan 2000 e-mail correspondence | 802, 805, 401, 402 |
| 387 | AB 0017677 | AB 0017679 | May 30, 2000 | E. Abrain 2000 e-mail correspondence | Compound, 401, 402, 802, 805 |
| 388 | AB 0017732 | AB 0017745 | September 22, 2003 | J. Ichinose 2003 e-mail correspondence | Compound, 408, 401, 402 |
| 389 | AB 0017960 | AB 0017961 | November 15, 1998 | Letter from S. Tomita to H. Boehm | |
| 390 | AB 0017962 | | January 5, 1999 | Letter from S. Tomita to H. Boehm | |
| 391 | AB 0017963 | | January 19, 1999 | Letter from H. Boehm to S. Tomita | |
| 392 | AB 0017964 | | April 29, 1999 | Model, distance and episode information | 802, 805, 401, 402, 602 |
| 393 | AB 0017965 | AB 0017984 | | Operating Procedure For Durometer Hardness Measurements | |
| 394 | AB 0017985 | AB 0017986 | July 6, 1999 | Memo from J. Ichinose to H. Boehm re: letter from S. Tomita | |
| 395 | AB 0017989 | AB 0017991 | August 7, 1999 | Memo from H. Boehm to S. Tomita re: cross license, episode, HP2 distance | |
| 396 | AB 0030335 | AB 0030336 | April 1, 2005 | Doug Jones - Exhibit 14 Chart re: Pro V1x Mantle Red | Incomplete, 802, 805, 403 |
| 397 | AB 0034583 | AB 0034829 | October 1, 2002 | Improved Pro VI - I | Compound, 802, 805, 401, 402, 403 |

| No. | AB No. | AB No. | Date | Description | Codes |
|---|---|---|---|---|---|
| 398 | AB 0034804 | AB 0034805 | September 3, 2002 | C. Cavallaro 2002 e-mail correspondence | 802, 805, 401, 402, 403 |
| 399 | AB 0034830 | AB 0035195 | | Improved Pro VI - II | Compound, 802, 805, 401, 402, 403 |
| 400 | AB 0035156 | AB 0035158 | October 31, 2002 | Jeff Dalton - Exhibit 11 Subj: SBR 1502 Rubber | 802, 805, 401, 402 |
| 401 | AB 0035160 | AB 0035170 | October 10, 2002 | Mixer 2 Batch Report | 802, 805, 401, 402 |
| 402 | AB 0035659 | | August 22, 2002 | Troy Lester - Exhibit 14 E-mail correspondence | 802, 805, 401, 402 |
| 403 | AB 0035709 | AB 0035712 | | Email -- ZnPCTP Usage for 2002 | Compound, 802, 805, 401, 402 |
| 404 | AB 0035748 | AB 0035749 | September 25, 2002 | M. Jordan 2002 e-mail correspondence | 802, 805 |
| 405 | AB 0035781 | AB 0035783 | October 4, 2002 | M. Costa 2002 e-mail correspondence | 802, 805 |
| 406 | AB 0035789 | | October 4, 2002 | E-mail correspondence | 802, 805, 401, 402, 403 |
| 407 | AB 0035813 | | October 6, 2002 | E-mail correspondence | 802, 805, 401, 402 |
| 408 | AB 0035851 | | October 18, 2002 | K. Harris 2002 e-mail correspondence | 802, 805, 401, 402, 403 |
| 409 | AB 0035869 | AB 0035872 | October 23, 2002 | M. Jordan 2002 e-mail correspondence | 802, 805 |
| 410 | AB 0036017 | | November 8, 2002 | B. Williams 2002 e-mail correspondence | 802, 805, 401, 402, 403 |
| 411 | AB 0036060 | AB 0036061 | January 29, 2003 | P. Elliott 2003 e-mail correspondence | 802, 805, 401, 402, 403 |
| 412 | AB 0036095 | | September 8, 2003 | B. Lacy 2003 e-mail correspondence | 802, 805 |
| 413 | AB 0036142 | | July 9, 2003 | P. Elliott e-mail correspondence | 802, 805, 401, 402 |
| 414 | AB 0036205 | | June 22, 2004 | M. Sullivan 2004 e-mail correspondence | Incomplete, 802, 805, 401, 402, 403 |
| 415 | AB 0036260 | AB 0036262 | August 25, 2004 | F. Rizzotti 2004 e-mail correspondence | 802, 805 |
| 416 | AB 0036290 | AB 0036292 | September 7, 2004 | M. Jordan 2004 e-mail correspondence | 802, 805 |
| 417 | AB 0036412 | | October 6, 2004 | P. Elliott 2004 e-mail correspondence | Incomplete, 802, 805, 401, 402, 403 |
| 418 | AB 0036485 | AB 0036489 | November 9, 2004 | E-mail correspondence | 802, 805, 401, 402, 403 |
| 419 | AB 0036865 | | November 12, 2002 | J. Dalton 2002 e-mail correspondence | 802, 805, 401, 402 |
| 420 | AB 0036867 | AB 0036869 | October 28, 2002 | J. Dalton 2002 e-mail correspondence | 802, 805 |

| No. | Bates | Bates | Date | Description | Notes |
|---|---|---|---|---|---|
| 421 | AB 0036890 | AB 0036891 | September 25, 2002 | M. Jordan 2002 e-mail correspondence | 802, 805 |
| 422 | AB 0036923 | | October 7, 2002 | New Product Implementation | 802, 805 |
| 423 | AB 0036925 | | May 2, 2004 | Formula Information | 802, 805 |
| 424 | AB 0038208 | AB 0038209 | August 29, 2000 | B. Morgan 2000 e-mail correspondence | 802, 805 |
| 425 | AB 0038429 | AB 0038424 | September 14, 2004 | E-mail correspondence | 802, 805, 401, 402 |
| 426 | AB 0038490 | AB 0038492 | November 10, 2004 | J. Dalton 2004 e-mail correspondence | 802, 805, 401, 402 |
| 427 | AB 0038525 | AB 0038526 | January 21, 2005 | C. Cavallaro 2005 e-mail correspondence | 802, 805 |
| 428 | AB 0038605 | AB 0038606 | November 16, 2004 | M. Jordan 2004 e-mail correspondence | 802, 805, 401, 402 |
| 429 | AB 0038617 | AB 0038619 | June 17, 2002 | C. Cavallaro 2002 e-mail correspondence | Compound, 802, 805, 401, 402, 403 |
| 430 | AB 0038620 | AB 0038624 | May 12, 2003 | DT So/Lo ZnPCTP Reduction - Experiment #1 | Compound, 802, 805, 401, 402, 403 |
| 431 | AB 0038626 | | May 14, 2003 | C. Cavallaro 2003 e-mail correspondence | 802, 805, 401, 402 |
| 432 | AB 0038631 | AB 0038633 | May 28, 2003 | C. Cavallaro 2003 e-mail correspondence | 802, 805, 401, 402, 403 |
| 433 | AB 0038638 | | August 18, 2003 | B. Fletcher 2003 e-mail correspondence | 802, 805, 401, 402 |
| 434 | AB 0038682 | AB 0038683 | November 4, 2003 | C. Cavallaro 2003 e-mail correspondence | 802, 805 |
| 435 | AB 0038777 | AB 0038778 | June 1, 2003 | Lab Manufactured | Incomplete, 802, 805 |
| 436 | AB 0039156 | AB 0039193 | June 27, 1905 | Titleist Summer Sales Meeting | 802, 805, 401, 402 |
| 437 | AB 0039307 | AB 0039308 | | New Titleist Pro V1x Product Preview | |
| 438 | AB 0044745 | AB 0044834 | October 28, 1998 | D. Ladd 1998 e-mail correspondence and Trans-Center Multi-Core, Round 2 | Compound, 802, 805, 401, 402 |
| 439 | AB 0045223 | AB 0045326 | August 23, 2001 | D. Martin 2001 e-mail correspondence | 802, 805, 401, 402 |
| 440 | AB 0045333 | | October 5, 2001 | D. Jones 2001 e-mail correspondence | 802, 805, 401, 402 |
| 441 | AB 0045334 | | October 12, 2001 | M. Rajagopalan 2001 e-mail correspondence | 802, 805, 401, 402 |
| 442 | AB 0045343 | AB 0045344 | November 9, 2001 | M. Rajagopalan 2001 e-mail correspondence | 802, 805, 401, 402 |
| 443 | AB 0045371 | AB 0045372 | September 18, 2002 | M. Rajagopalan 2002 e-mail correspondence | 802, 805 |
| 444 | AB 0045383 | AB 0045384 | October 10, 2002 | E. Isaac 2002 e-mail correspondence | 802, 805 |
| 445 | AB 0045920 | | January 15, 2002 | Rhein Cheme Masterbatch Meeting 1/15-1/16/02 | 802, 805 |
| 446 | AB 0048227 | AB 0048251 | July 4, 2004 | Titleist and Foot-Joy Worldwide Product Analysis | Incomplete |

22

| 447 | AB 0048310 | AB 0048319 | December 31, 2004 | Titleist and Foot-Joy Worldwide Product Analysis | Incomplete |
|---|---|---|---|---|---|
| 448 | AB 0050764 | AB 0050768 | April 22, 2002 | B. Morgan 2002 e-mail correspondence | 802, 805 |
| 449 | AB 0050859 | | July 9, 2004 | J. Dalton 2004 e-mail correspondence | 802, 805 |
| 450 | AB 0050890 | AB 0050895 | February 17, 2004 | J. Dalton 2004 e-mail correspondence | 802, 805 |
| 451 | AB 0050954 | AB 0050958 | January 6, 2004 | E-mail correspondence | **401, 402**, 802, 805 |
| 452 | AB 0050964 | AB 0050968 | November 19, 2003 | J. Dalton 2003 e-mail correspondence | **401, 402**, 802, 805 |
| 453 | AB 0051027 | | March 11, 2003 | D. Jones 2003 e-mail correspondence | 802, 805, 401, 402 |
| 454 | AB 0051106 | AB 0051110 | April 22, 2002 | B. Morgan 2002 e-mail correspondence | 802, 805, 401, 402 |
| 455 | AB 0051414 | | March 6, 2002 | E-mail correspondence | 802, 805, 401, 402 |
| 456 | AB 0051434 | AB 0051435 | December 6, 2001 | B. Morgan 2001 e-mail correspondence | Compound, 802, 805 |
| 457 | AB 0051527 | | January 23, 2003 | B. Morgan handwritten notes | 802, 805, 401, 402, 408 |
| 458 | AB 0051982 | AB 0051984 | November 8, 1995 | Titleist and Foot-Joy Worldwide Inter-Office Correspondence re: Meeting Notes 10/30/95 and 11/06/95 | 401, 402, 802, 805 |
| 459 | AB 0051993 | AB 0052003 | December 22, 1999 | H. Boehm Interoffice Correspondence re: Golf Ball Product Development Team Meeting | 401, 402, 802, 805 |
| 460 | AB 0052014 | AB 0052040 | August 25, 2000 | Acushnet Inter-Office Correspondence re: Golf Ball Product Development Team Meeting, 08/24/00 | 401, 402, 802, 805 |
| 461 | AB 0052050 | | August 13, 2001 | E-mail correspondence | 802, 805, 401, 402 |
| 462 | AB 0052058 | AB 0052046 | February 9, 2001 | V Series Project Work | Incomplete, 401, 402 |
| 463 | AB 0059107 | AB 0059111 | September 20, 2004 | G. Sine 2004 e-mail correspondence | 802, 805 |
| 464 | AB 0071363 | AB 0071364 | March 3, 2005 | B. Morgan e-mail correspondence | 802, 805, 401, 402 |
| 465 | AB 0074807 | AB 0074808 | June 4, 2003 | J. Dalton 2003 e-mail correspondence | 802, 805, 401, 402 |
| 466 | AB 0074845 | AB 0074846 | June 20, 2003 | J. Dalton 2003 e-mail correspondence | 802, 805, 401, 402 |
| 467 | AB 0074886 | AB 0074887 | June 26, 2003 | J. Dalton 2003 e-mail correspondence | 802, 805, 401, 402 |
| 468 | AB 0074943 | AB 0074944 | July 15, 2003 | D. Jones 2003 e-mail correspondence | 802, 805 |
| 469 | AB 0079724 | AB 0079838 | | 1993 Sales Meeting | 802, 805 |

23

| | | | | | |
|---|---|---|---|---|---|
| 470 | AB 0080234 | AB 0080238 | March 28, 1995 | Titleist and Foot-Joy Worldwide Inter-Office Correspondence re: 1995/1996 Golf Ball Product Line/Meeting Notes of 03/16/95 | |
| 471 | AB 0080254 | AB 0080259 | February 14, 1996 | Titleist and Foot-Joy Worldwide Inter-Office Correspondence re: Golf Ball New Product Team Meeting | Compound, 802, 805, 401, 402 |
| 472 | AB 0080297 | AB 0080298 | July 24, 1996 | Titleist and Foot-Joy Inter-Office Correspondence re: Urethane Veneer Ball Update | 802, 805 |
| 473 | AB 0080308 | AB 0080329 | 07/00/96 | Titleist Summary Sales Meeting | Compound, 802, 805, 401, 402 |
| 474 | AB 0080347 | AB 0080349 | July 24, 1997 | B. Morgan 1997 e-mail correspondence | 802, 805, 401, 402 |
| 475 | AB 0080355 | AB 0080356 | May 30, 2000 | E. Abrain 2000 e-mail correspondence | 802, 805, 401, 402 |
| 476 | AB 0080681 | | October 20, 1998 | B. Morgan 1998 e-mail correspondence | 802, 805, 401, 402 |
| 477 | AB 0080689 | | October 20, 1998 | J. Dalton 1998 e-mail correspondence | 802, 805, 401, 402 |
| 478 | AB 0080734 | AB 0080736 | September 1, 1998 | S. Giosetti 1998 e-mail correspondence | 802, 805, 401, 402 |
| 479 | AB 0082612 | AB 0082616 | | Chart re: statistics | |
| 480 | AB 0082617 | AB 0082621 | | Chart re: statistics | |
| 481 | AB 0082660 | AB 0082667 | 01/00/05 | Golf Ball Sales, Off Course Shops | 802, 805, 401, 402, 403, 901 |
| 482 | AB 0082668 | AB 0082675 | 01/00/05 | Golf Ball Sales, On Course Shops | 802, 805, 401, 402, 403, 901 |
| 483 | AB 0083288 | AB 0083294 | March 31, 2002 | Golf Ball Sales Report | 802, 805, 401, 402, 403, 901 |
| 484 | AB 0084670 | AB 0084693 | December 31, 2000 | Acushnet Statement of Income as of Dec. 31, 2000 | Duplicate Compound, 401, 402, 403, 901 |
| 485 | AB 0084930 | AB 0084942 | December 31, 2004 | Titleist and Foot-Joy Worldwide Product Analysis | 401, 402, 403 |
| 486 | AB 0084954 | AB 0084956 | February 2, 2005 | Titleist and Foot-Joy Worldwide Product Analysis | 401, 402, 403 |
| 487 | AB 0085217 | AB 0085419 | June 23, 1905 | Titleist catalog | |
| 488 | AB 0087054 | AB 0087068 | December 6, 2001 | B. Morgan 2001 e-mail correspondence | Compound, 802, 805 |
| 489 | AB 0087059 | AB 0087064 | June 20, 2002 | Zn-PCTP In The Vstar Outer Core | 802, 805 |
| 490 | AB 0087077 | AB 0087083 | September 16, 2002 | J. Dalton 2002 e-mail correspondence | 802, 805, 401, 402, 403 |

24

| | | | | | |
|---|---|---|---|---|---|
| 491 | AB 0087393 | AB 0087394 | | Improved Pro V1 and Pro V1 Star | 802, 805, 401, 402, 403 |
| 492 | AB 0087432 | AB 0087433 | October 1, 2001 | C. Cavallaro 2001 e-mail correspondence | 802, 805, 401, 402, 403 |
| 493 | AB 0087859 | AB 0087865 | December 31, 2000 | Acushnet's Income Statements for 12/31/00 thru 12/31/06 | Compound, 401, 402, 403 |
| 494 | AB 0088363 | AB 0088365 | 01/00/04 | Ball Manufacturing Information by Category | 401, 402, 802, 805 |
| 495 | AB 0088826 | AB 0088827 | September 25, 2003 | Letter from W. Burke to C. Omtvedt re: Acushnet strategic plan | 802, 805, 401, 402 |
| 496 | AB 0088838 | AB 0088857 | February 2, 2004 | Letter from W. Burke to C. Omtvedt re: highlights of 2004-2006 strategic plan for Acushnet | Compound, 802, 805, 401, 402 |
| 497 | AB 00088669 | AB 00088870 | | Signature page by W. Burke and 9/24 Forecast | Incomplete, 802, 805, 401, 402 |
| 498 | AB 0088880 | AB 0088888 | February 2, 2004 | Letter from D. Shenk to C. Omtvedt re: 2002 Financial Forecast | 802, 805, 401, 402 |
| 499 | AB 0089012 | AB 0089014 | December 16, 2004 | P. Elliott 2004 e-mail correspondence | 802, 805, 401, 402 |
| 500 | AB 0089017 | AB 0089017 | December 14, 2004 | K. Welchman 2004 e-mail correspondence | 802, 805, 401, 402 |
| 501 | AB 0089902 | AB 0089903 | August 18, 2005 | Price and Policy Memo | 401, 402, 802, 805 |
| 502 | AB 0089904 | AB 0089905 | August 18, 2005 | Titleist Price and Policy PP06-03 - Golf Balls | 401, 402, 802, 805 |
| 503 | AB 0089913 | AB 0089914 | July 1, 2005 | Titleist Price and Policy PP06-07 - Golf Balls | 401, 402, 802, 805 |
| 504 | AB 0090017 | | September 1, 2005 | Titleist On Course Exclusive Stocking Partners Program 2005/2006 | 401, 402, 802, 805 |
| 505 | AB 0091229 | AB 0091236 | April 29, 1993 | Titleist and Foot-Joy Intra-Company Correspondence re: C.O.R. Results - Wilson Ultra Tour Balata | |
| 506 | AB 0110901 | AB 0110910 | October 29, 2001 | Intra-Company Correspondence re: Manufacturing Review Committee Minutes | |
| 507 | AB 0111133 | AB 0111135 | October 7, 2004 | Acushnet Intra-Company Correspondence re: MRC Meeting Minutes - 10/06/04 | 802, 805 |
| 508 | AB 0111146 | AB 0111153 | January 15, 2004 | MRC Meeting Minutes | Incomplete, 802, 805, 401, 402 |
| 509 | AW 334 | AW 337 | | Arnold Worldwide Document | Incomplete, 802, 805 |
| 510 | AW000314 | AW000317 | August 8, 2001 | B. Harwood 2001 e-mail correspondence | 802, 805, 901, 401, 402, 403 |

| No. | Begin | End | Date | Description | Objections |
|---|---|---|---|---|---|
| 511 | AW000334 | AW000336 | March 27, 2002 | R. DeMello 2002 e-mail correspondence | 802, 805, 901, 401, 402, 403 |
| 512 | AW000341 | AW000344 | March 27, 2002 | R. DeMello 2002 e-mail correspondence | 802, 805, 901, 401, 402, 403 |
| 513 | AW000345 | AW000360 | April 1, 2002 | R. DeMello 2002 e-mail correspondence | 802, 805, 901, 401, 402, 403 |
| 514 | AW001292 | AW001375 | June 28, 1905 | Titleist Golf Ball Business Review & Plans | 802, 805 |
| 515 | AW002157 | AW002159 | January 26, 1999 | Arnold Advertising - Strategy Platform - Titleist | 802, 805, 401, 402, 403 |
| 516 | AW002707 | AW002737 | April 14, 2005 | K. Miller 2005 e-mail correspondence | 802, 805, 401, 402 |
| 517 | AW002866 | AW002867 | April 17, 2003 | B. Harwood 2003 e-mail correspondence | 802, 805, 401, 402 |
| 518 | AB 38532 | AB 38560 | | | 105, 401, 402, 403, 802, 805 |
| 519 | AB 38534 | AB 38535 | | | 105, 401, 402, 403, 802, 805, 1006 |
| 520 | AB 54955 | AB55142 | November 1, 1998 | RPA 2000 Operators Manual | Incomplete, 802, 805, |
| 521 | BSP 96734 | BSP 96755 | | | Incomplete, 802, 805, 901 |
| 522 | BSP 97180 | BSP 97184 | | | 802, 805 |
| 523 | LAN 0024 | | | | 802, 805 |
| 524 | | | | Isayev Exhibit 1 - Resume of Avraam Isayev | 802, 805, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 525 | | | | Isayev Exhibit 2 - Table Mooney of Viscosity Various Polybutadienes - BR 18 & CB 23 | 802, 805, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 526 | | | | Isayev Exhibit 3 - Measure Loss Tangents and Calculate Resilence Index for BR 18 on RPA 2000 | 802, 805, 401, 402, 403, 602, 702, 802, 805, 901, 902 |

26

| | | | |
|---|---|---|---|
| 527 | | Isayev Exhibit 4 - Measure Loss Tangents and Calculate Resilience Index for BR 18 on APA 2000 | 802, 805, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 528 | | Isayev Exhibit 5 - Measure Loss Tangents and Calculate Resilience Index for CB 23 on RPA 2000 | 802, 805, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 529 | | Isayev Exhibit 6 - Measure Loss Tangents and Calculate Resilience Index for CB 23 on APA 2000 | 802, 805, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 530 | | Isayev Exhibit 7 - Weight and Number Average Molecular Weight of BR 18 (BR 18 JSR Lot# 83031-4-10993) | 802, 805, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 531 | | Isayev Exhibit 8 - Invalidity Claim Charts ('705, '872, '154) | 802, 805, 1006, 401, 402, 403, 602, 702, 805, 901, 902 |
| 532 | | U.S. Patent No. 6,336,872 | 802, 805, 901 |
| 533 | | U.S. Patent No. 6,319,154 | 802, 805, 901 |
| 534 | | Coughlin Exhibit A - Curriculum Vitae E.Bryan Coughlin | 802, 805, 401, 402, 403, 602, 702, 805, 901, 902 |
| 535 | | Coughlin Exhibit B - Report of Documents Reviewed | 802, 805, 401, 402, 403, 602, 702, 805, 901, 902 |
| 536 | | Coughlin Exhibit C - Report of Analysis of CB 23 | 802, 805, 401, 402, 403, 602, 702, 805, 901, 902 |
| 537 | | Coughlin Exhibit D - CB 23 Viscosity - 5 wt% Solution in Toluene @ 25 C | 802, 805, 401, 402, 403, 602, 702, 805, 901, 902, 1006 |
| 538 | 1/04/2007 | Coughlin Exhibit E - THF GPS50.plw   Brad   Buna23 | 802, 805, 401, 402, 403, 602, 702, 805, 901, 902 |
| 539 | | Coughlin Exhibit F - Shell 1220 Viscosity - 5 wt% Solution in Toluene @ 25 C | 802, 805, 401, 402, 403, 602, 702, 805, 901, 902, 1006 |

| | | | |
|---|---|---|---|
| 540 | | Coughlin Exhibit G - DuPont Polymer Modifiers - Fusabond grafted resins http://www.dupont.com/industrial-polymers/plastics/polymers/fusabond.html | Compound Exhibit, 401, 402, 403 |
| 541 | Nov 2004 | Coughlin Exhibit H - DuPont Nucrel 960 Data Sheet Doc. Ref. x54128d.pdf | 401, 402, 802, 805, 403 |
| 542 | 2006 | Coughlin Exhibit H - DuPont Nucrel acid copolymer resins | 403, 802, 805, 401, 402 |
| 543 | 1/16/2007 | Opening Expert Report of Edward Caulfield | 802, 805, 401, 402, 403, 602, 702, 805, 901, 902 |
| 544 | | Caulfield Exhibit 1 - Resume of Edward Caulfield | 802, 805, 401, 402, 403, 602, 702, 805, 901, 902 |
| 545 | 1/3/2007 | Caulfield Exhibit 2 - File Material (Materials Reviewed and Considered) | 802, 805, 401, 402, 403, 602, 702, 805, 901, 902 |
| 546 | | Caulfield Exhibit 3 - Test Standards | Compound |
| 547 | | Caulfield Exhibit 4 - Gold Ball Testing Protocols: General Instructions | 105, 802, 805, 401, 402, 403, 602, 702, 805, 901, 902 |
| 548 | | Caulfield Exhibit 5 - Gold Ball Testing Protocols: Protocol for Specific Gravity of Golf Ball Covers, Intermediate Layers and Cores | 802, 805, 401, 402, 403, 602, 702, 805, 901, 902 |
| 549 | | Caulfield Exhibit 6 - Gold Ball Testing Protocols: Protocol for Rebound | 802, 805, 401, 402, 403, 602, 702, 805, 901, 902 |
| 550 | | Caulfield Exhibit 7 - Gold Ball Testing Protocols: Protocol for Ball and Core Compression Under 100kg Load | 802, 805, 401, 402, 403, 602, 702, 805, 901, 902 |
| 551 | | Caulfield Exhibit 8 - Gold Ball Testing Protocols: Protocol for Thickness Measurement of Golf Ball Covers and Intermediate Layers | 105, 802, 805, 401, 402, 403, 602, 702, 805, 901, 902 |
| 552 | | Caulfield Exhibit 9 - Gold Ball Testing Protocols: Protocol for Core Hardness and Diameter Measurements | 105, 802, 805 |

| | | | |
|---|---|---|---|
| 553 | | Caufield Exhibit 10 - Gold Ball Testing Protocols: Protocol for Intermediate Layer Hardness Measurements | 802, 805, 401, 402, 403, 602, 702, 805, 901, 902 |
| 554 | | Caufield Exhibit 11 - Gold Ball Testing Protocols: Protocol for Cover Hardness (Acushnet Prepared Plaques) | 802, 805, 401, 402, 403, 602, 702, 805, 901, 902 |
| 555 | | Caufield Exhibit 12 - Gold Ball Testing Protocols: Protocol for Cover Layer Hardness Measurements (Packer Engineering Prepared Plaques) | 802, 805, 401, 402, 403, 602, 702, 805, 901, 902 |
| 556 | | Caufield Exhibit 13 - Table I Specific Gravity Results Pro V1x, Pro V 1 and Pro V 1 Star | 802, 805, 401, 402, 403, 602, 702, 805, 901, 902, 1006 |
| 557 | | Caufield Exhibit 14 - Table II Core Rebound Results Pro V1x, Pro V 1 NXT Tour, NXT and DT So/lo | 802, 805, 401, 402, 403, 602, 702, 805, 901, 902, 1006 |
| 558 | | Caufield Exhibit 15 - Table III Compression - Distortion Under 100kg Load NXT Tour, NXT, DT So/lo and Pinnacle Exception | 802, 805, 401, 402, 403, 602, 702, 805, 901, 902, 1006 |
| 559 | | Caufield Exhibit 16 - Table IV Cover and Intermediate Layer Thickness Results Pro V1x, Pro V 1 and Pro V 1 Star | 105, 802, 805, 401, 402, 403, 602, 702, 805, 901, 902, 1006 |
| 560 | | Caufield Exhibit 17 - Table V Cover Thickness Results NXT Tour, NXT, DT So/lo and Pinnacle Exception | 802, 805, 401, 402, 403, 602, 702, 805, 901, 902, 1006 |
| 561 | | Caufield Exhibit 18 - Table VI Core Hardness Results (JIS C) Pro V1, Pro V1 Star, NXT, DT So/lo and Pinnacle Exception | 802, 805, 401, 402, 403, 602, 702, 805, 901, 902, 1006 |
| 562 | | Caufield Exhibit 19 - Table VII Pro V1x Core Hardness Gradient Results (JIS C) | 802, 805, 401, 402, 403, 602, 702, 805, 901, 902, 1006 |
| 563 | | Caufield Exhibit 20 - Table VIII Pro V1 Core Hardness Gradient Results (JIS C) | 105, 802, 805, 401, 402, 403, 602, 702, 802, 805, 901, 902, 1006 |

| | | | |
|---|---|---|---|
| 564 | | Caulfield Exhibit 21 - Table IX Intermediate Layer (IML) Hardness Results (Packer Engineering Prepared Plaques) Pro V1x, Pro V 1 and Pro V 1 Star | 802, 805, 401, 402, 403, 602, 702, 802, 805, 901, 902, 1006 |
| 565 | | Caulfield Exhibit 22 - Table X Core Hardness Results (Acushnet Prepared Plaques) NXT Tour, NXT, DT So/lo | 802, 805, 401, 402, 403, 602, 702, 802, 805, 901, 902, 1006 |
| 566 | | Caulfield Exhibit 23 - Table XI Core Hardness Results (Packer Engineering Prepared Plaques) NXT Tour, NXT, DT So/lo and Pinnacle Exception | 802, 805, 401, 402, 403, 602, 702, 802, 805, 901, 902, 1006 |
| 567 | | Caulfield Exhibit 24 - Table XII Ball Diameter Results Pro V1x, Pro V1, Pro V1 Star, NXT Tour, NXT, DT So/lo and Pinnacle Exception | 802, 805, 401, 402, 403, 602, 702, 802, 805, 901, 902, 1006 |
| 568 | | Caulfield Exhibit 25 - Table XIII Core Diameter Results Pro V1x, Pro V1, Pro V1 Star, NXT Tour, NXT, DT So/lo and Pinnacle Exception | 802, 805, 401, 402, 403, 602, 702, 802, 805, 901, 902, 1006 |
| 569 | | Caulfield Exhibit 26 - Average Cover Thickness Distribution (Various Pro V Models) | 105, 802, 805, 401, 402, 403, 602, 702, 802, 805, 901, 902, 1006 |
| 570 | | Caulfield Exhibit 27 - Average Intermediate Layer Thickness Distribution (Various Models) | 105, 802, 805, 401, 402, 403, 602, 702, 802, 805, 901, 902, 1006 |
| 571 | | Caulfield Exhibit 28 - Average Cover Thickness Distribution (Various NXT, DT Sol/lo & Pinnacle Exception Models) | 105, 802, 805, 401, 402, 403, 602, 702, 802, 805, 901, 902, 1006 |
| 572 | | Caulfield Exhibit 29 - Core Hardness Difference Distribution (Various Models) | 105, 802, 805, 401, 402, 403, 602, 702, 802, 805, 901, 902, 1006 |
| 573 | | Caulfield Exhibit 30 - Core Hardness Gradient Pro V1x | 105, 802, 805, 401, 402, 403, 602, 702, 802, 805, 901, 902, 1006 |
| 574 | | Caulfield Exhibit 31 - Core Hardness Gradient Pro V1x | 105, 802, 805, 401, 402, |

| No. | Date | Description | Numbers |
|---|---|---|---|
|  |  |  | 403, 602, 702, 802, 805, 901, 902, 1006 |
| 575 |  | Caulfield Exhibit 32 - Core Hardness Gradient Pro V1 | 105, 802, 805, 401, 402, 403, 602, 702, 802, 805, 901, 902, 1006 |
| 576 |  | Caulfield Exhibit 33 - Core Hardness Gradient Pro V1 | 105, 802, 805, 401, 402, 403, 602, 702, 802, 805, 901, 902, 1006 |
| 577 |  | Caulfield Exhibit 34 - CD labled "Ball Identification and Test Photographs" | 105, 401, 402, 602, 702, 802, 805, 901, 902, 1002 |
| 578 |  | Raw Data from Testing of Acushnet Balls Produced To Acushnet | 105, 401, 402, 602, 702, 802, 805, 901, 902, 1006 |
| 579 |  | Test Samples Made Available to Acushnet During the Inspection at Packer Engineering on February 8-9, 2007 | **105, 106, 402, 901** |
| 580 | 1/16/2007 | Opening Expert Report of John Calabria | 105, 401, 402, 602, 702, 802, 805, 901, 902 |
| 581 |  | Calabria Exhibit 2 - The Golf Ball Book by Udo Machat & Larry Dennis | 105, 401, 402, 602, 702, 802, 805, 901, 902 |
| 582 |  | Calabria Exhibit 3 - Titleist: Technology & Tradition: Preserving the Balance | 105, 401, 402, 602, 702, 802, 805, 901, 902 |
| 583 |  | Calabria Exhibit 4 - USGA Championships List of Conforming Golf Balls (Condition: Rules 36-1 and 2-3) | 105, 401, 402, 602, 702, 802, 805, 901, 902 |
| 584 | 5/27/2000 | Calabria Exhibit 5 - Golf World article by Gene Yasuda re Tiger Woods' experimenting with Nike Golf ball | 802, 805, 401, 402, 403, 901, 1002, 602, 702, 902 |
| 585 | 1994 | Calabria Exhibit 6 - Articles from Science and Golf II: 51 The relationship between golf ball construction and performance by M.J. Sullivan and T.Melvin 56 The golf equipment market 1984-1994 by S.K. Proctor | 105, 401, 402, 602, 702, 802, 805, 901, 902 |

31

| No. | Date | Description | Exhibit Numbers |
|---|---|---|---|
| 586 | | Calabria Exhibit 7 - Golf Industry White Book (white paper) by Yano Research Institute Ltd. "Ball sales shift with respect to ball species (structures)" | 105, 401, 402, 602, 702, 802, 805, 901, 902, 604 |
| 587 | 1/16/2007 | Opening Expert Report of John C. Jarosz (including Exhibits 1-40) | Compound, 105, 401, 402, 602, 702, 802, 805, 901, 902 |
| 588 | | Opening Expert Report of Kim Blair | 105, 401, 402, 602, 702, 802, 805, 901, 902 |
| 589 | 9/17/2001 | Blair Exhibit 1 - High-tech helps sports gear biz keep its swing, By H. Lee Murphy (Technology is helping sell golf and ski products) | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1002 |
| 590 | 2004 | Blair Exhibit 2 - The business of golf technology By A. Chou, Chou Golf Design Labs, Santa Rosa, CA, USA | 401, 402, 602, 702, 802, 805, 901, 902 |
| 591 | 11/17/2004 | Blair Exhibit 3 - Factiva - Nanotech Golf balls that make hacks look good By Kevin Maney USA Today | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1002 |
| 592 | 12/18/2005 | Blair Exhibit 4 - Going down easy - Technological advancements make latest ski models a joy underfoot By Mike Whitaker | 401, 402, 403, 602, 702, 802, 805, 901, 902, |
| 593 | 12/15/2006 | Blair Exhibit 5 - Draft Copy - Materials In Sports Equipment Vol 2 By Kim B. Blair, Ph.D. | 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 594 | 1/6/2007 | Blair Exhibit 6 - Aqua Shift: TYR Sport Online Store http://www.tyr.com/shop//technical-aqua-shift-c-30_31_52_87.html | 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 595 | N/A | Blair Exhibit 7 - Speedo Fastskin - http://www.speedpfastskin.com/ | 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 596 | 3/31/2000 | Blair Exhibit 8 - Design Innovation: Good or Bad For Sports? Radio National's The Sports Factor with Amanda Smith | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1002 |
| 597 | 1/6/2007 | Blair Exhibit 9 - Swim Outlet - Men's Swimwear: Men's Technical Suits http://www.swimoutlet.comMens_Technical_Suits_s/278.htm | 401, 402, 403, 602, 702, 802, 805, 901, 902 |

| | | | |
|---|---|---|---|
| 598 | 1/16/2007 | Blair Exhibit 10 - Lance Armstrong's War By Daniel Coyle | 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 599 | 7/17/2006 | Blair Exhibit 11 - Bill Tancer - Hitwise US: Does the Tour de France Affect Bike Sales? http://weblogs.hitwise.com/bill-tancer/2006/07/does_the_tour_de_france_sell_b.html | 401, 402, 802, 805, 901 |
| 600 | 4/17/1995 | Blair Exhibit 12 - Image Repositioning: Techno-Legit at Wilson (Wilson Sporting Goods is in the midst of an image repositing in a bid to re-energize the 81-yr-old firm) | 1002, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 601 | 2/1/1996 | Blair Exhibit 13 - The Aerospace Connection By Joe Skorupa | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1002 |
| 602 | 7/13/2006 | Blair Exhibit 14 - ISEA: International Sports Engineering Association. http://www.sportsengineering.org/ | 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 603 | | Blair Exhibit 15 - The impact of science and technology on golf equipment - a personal view By A. J. Cochran | 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 604 | 5/10/2003 | Blair Exhibit 16 - Golf science research at the beginning of the twenty-first century By M.R Farrally, A.J. Cochran, D.J. Crews M.J. Hurdzan, R.J. Price, J.T. Snow and P.R. Thomas | 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 605 | 1/24/2005 | Blair Exhibit 17 - Q&A  Breaking out from the pack: while overall growth in the golf industry has slowed, this young CEO keeps all facets of his business going strong | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1003 |
| 606 | 6/26/1905 | Blair Exhibit 18 - Chapter 2 Engineering Methodology in Gulf Studies By Arthur C.P. Chou | 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 607 | | Blair Exhibit 19 - The Rules of Golf  APPENDIX III The Ball | 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 608 | | Blair Exhibit 20 - Coefficient of Restitution -- from Eric Weisstein's World of Physics http://scienceworld.wolfram.com/physics/CoefficientofRestitution.html | 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 609 | Sep-01 | Blair Exhibit 21 - Materials in Sports Designing for BALL IMPACTS By Gary M. Michal and Mark D. Novak | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1003 |

| | | | |
|---|---|---|---|
| 610 | 1994 | Blair Exhibit 22 - 51 The relationship between golf ball construction and performance By M.J. Sullivan and T. Melvin | 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 611 | 7/18/2005 | Blair Exhibit 23 - GOLF BALLS Polymer chemistry has played a key role in the evolution of the golf ball | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1002 |
| 612 | | Blair Exhibit 24 - Chapter 51 History and Construction of Non-Wound Golf Balls By R.D. Nesbitt, M.J. Sullivan, and T. Melvin Spalding Sports World Wide, Chicopee, MA, USA; Chapter 52 The Curious Persistence of the Wound Ball by Jeffrey L. Dalton Titleist and Foot-Joy Worldwide | 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 613 | 1984-1994 | Blair Exhibit 25 - 56 The golf equipment market 1984-1994 By S.K. Proctor Sports Marketing Surveys Ltd, Byfleet Business Centre, Chertsey Road, Byfleet, Surrey, UK | 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 614 | Nov-88 | Blair Exhibit 26 - EQUIPMENT Manufacturers refine their ball designs | 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 615 | | Blair Exhibit 27 - The core of the matter The Business equipment By E. Michael Johnson Golf world Business | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1002 |
| 616 | 6/15/2000 | Blair Exhibit 28 - Rolling clones: Does Your Golf Ball Beep, Tick, Perform Some Special Trick? By James P. Sterba, The Wall Street Journal (Golfer Tiger Woods' decision to switch from using titleist to Nike golf balls is leading to a war in the industry) | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1002 |
| 617 | Sep-96 | Blair Exhibit 29 - The Corning Golf Ball Wars By Scott Kramer (Club makers set to enter the $740-mil golf ball market; some fear confused consumers due to too many products) | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1002 |
| 618 | 9/12/1996 | Blair Exhibit 30 - Golf-equipment makers drive price out of sight (Anonymous) Machine Design pg. 20 | 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 619 | May-97 | Blair Exhibit 31 - Balls (Table ranks companies by 1996 golf balls sales; 51 mil dozen balls sold in 1996 by Craig Better | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1002 |

| | | | | |
|---|---|---|---|---|
| 620 | | Jul-04 | Blair Exhibit 32 - Making History: From wood to feathers to liquid centers and beyond-the story of the golf ball By Josha Hill http://www.golfonline.com/golfonline/equipment/features/article/0,1 7742,653003,00.html | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1003 |
| 621 | | 1/18/1999 | Blair Exhibit 33 - Nike's New Golf Balls Aim Straight up Fairway By Terry Lefton (Nike is supporting its entry into the golf ball market with a television and print advertising campaign, using asn accuracy product positioning | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1002 |
| 622 | | 4/5/1999 | Blair Exhibit 34 - RUBBER KEY IN DOZEN GOLF BALL INTRODUCTIONS BY Ryan Van Benthuysen | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1002 |
| 623 | | 2/5/2000 | Blair Exhibit 35 - Golf Ball Market in Uproar Over New Callaway Entries  (Complaints and Challenges at Introduction) By Dennis Blank | 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 624 | | Jun-01 | Blair Exhibit 36 - Mortally wound-ed?  Hot, new solid-core balls have nearly KO'd their wound-ball rivals By E. Michael Johnson | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1002 |
| 625 | | 8/12/2000 | Blair Exhibit 37 - Wound or Solid? | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1002 |
| 626 | | 10/20/1997 | Blair Exhibit 51 - Callaway commits to build new facility By Marty Whitford (Callaway Golf Co has committed up to $100 mil to open a gold ball plant in Carlsbad, Ca) | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1002 |
| 627 | | 3/14/2001 | Blair Exhibit 57 - The ball that's turning GOLF upside down Titleist's solid-core Pro V1 is credited for wins, records By Jerry Potter | 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 628 | | 6/8/2000 | Blair Exhibit 61 - Woods gets industry's attention with ball switch to Nike By Bob Harig | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1002 |
| 629 | | 5/27/2000 | Blair Exhibit 62 - Tiger Woods experimented with a Nike Golf Ball for the first time in tournament play at the Deutsche Bank SAP Open May 18-21, opening a flood of questions: By Gene Yasuda | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1002 |

| | | | | |
|---|---|---|---|---|
| 630 | | 2/26/2001 | Blair Exhibit 65 - Nike: Great Balls Afire: Will Golf Clubs Be Next? (In the year ended 11/00, Nike boosted its share of the $750 mil golf ball market in the US to 3.9% vs 0.9% after Tiger Woods began using Nike's Tour Accuracy) | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1003 |
| 631 | | 9/22/2000 | Blair Exhibit 66 - Going to great lengths By Tim Rosaforte | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1002 |
| 632 | | 6/11/2001 | Blair Exhibit 67 - Driving For Innovation: Labs and links By H. Lee Murphy (The Golf equipment market is involved in as innovation frenzy) | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1002 |
| 633 | | Aug-01 | Blair Exhibit 68 - Right on the seam Equipment Digest By Jaime Diaz (GolfDigest.com Forums) | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1002 |
| 634 | | 8/18/2001 | Blair Exhibit 69 - Byline By John Steinbreder | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1002 |
| 635 | | Feb-02 | Blair Exhibit 70 - What's Driving the Jump in Distance? By Frank Thomas | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1002 |
| 636 | | N/A | Blair Exhibit 71 - Technology in Golf: Past, Present and Future | 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 637 | | Feb-04 | Blair Exhibit 72 - The Hot List: Balls Editor' Choice Titleist Pro V1/V1x | 401, 402, 403, 602, 702, 802, 805, 901, 902, 1002 |
| 638 | | 1/16/2007 | Opening Expert Report of Larry C. Cadorniga (including Tabs A-I) | Compound, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 639 | | | Opening Expert Report of Nick Price | 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 640 | | October 21, 2003 | File History for Patent No. 6,635,716 | 802, 805, 901 |
| 641 | | September 15, 1932 | Patent Specification, 377,354 - Correction of Clerical Error | 802, 805, 901 |
| 642 | | December 10, 1953 | U.S. Patent No. 2,728,576 | 802, 805, 901 |
| 643 | | December 16, 1997 | U.S. Patent No. 5,697,856 | 802, 805, 901 |
| 644 | | November 9, 1999 | U.S. Patent No. 5,980,396 | 802, 805, 901 |
| 645 | | November 16, 1999 | U.S. Patent No. 5,984,807 | 802, 805, 901 |

| No. | | | Date | Description | |
|---|---|---|---|---|---|
| 646 | | | March 13, 2001 | U.S. Patent No. 6,200,512 B1 | 802, 805, 901 |
| 647 | | | April 3, 2001 | U.S. Patent No. 6,210,294 B1 | 802, 805, 901 |
| 648 | | | April 10, 2001 | U.S. Patent No. 6,213,892 B1 | 802, 805, 901 |
| 649 | | | June 12, 2001 | U.S. Patent No. 6,245,386 B1 | 802, 805, 901 |
| 650 | | | May 21, 2002 | U.S. Patent No. 6,390,932 B1 | 802, 805, 901 |
| 651 | | | August 27, 2002 | U.S. Patent No. 6,440,346 B1 | 802, 805, 901 |
| 652 | | | August 19, 2003 | U.S. Patent No. 6,607,451 B2 | 802, 805, 901 |
| 653 | | | December 16, 2003 | U.S. Patent No. 6,663,508 B1 | 802, 805, 901 |
| 654 | | | September 7, 2004 | U.S. Patent No. 6,786,837 B2 | 802, 805, 901 |
| 655 | | | November 16, 2004 | U.S. Patent No. 6,818,724 B2 | 802, 805, 901 |
| 656 | | | April 25, 2006 | U.S. Patent No. 7,033,287 B2 | 901 |
| 657 | AB 0039771 | AB 0039786 | January 30, 2001 | U.S. Patent No. 6,180,722 B1 | 901 |
| 658 | AB 0039973 | AB 0039987 | December 19, 2000 | U.S. Patent No. 6,162,135 | 802, 805, 901 |
| 659 | AB 0039988 | AB 0040007 | October 15, 2002 | U.S. Patent No. 6,465,578 B1 | 901 |
| 660 | AB 0040008 | AB 0040027 | November 26, 2002 | U.S. Patent No. 6,486,261 B1 | 901 |
| 661 | AB 0043740 | AB 0043856 | November 26, 2002 | File History for Patent No. 6,488,261 | 802, 805, 901 |
| 662 | AB 0052958 | AB 0052607 | September 28, 2004 | U.S. Patent No. 6,796,912 B2 | 802, 805, 901 |
| 663 | AB 0086458 | AB 0086527 | August 20, 1976 | File History for Serial No. 716,100 | 802, 805, 901 |
| 664 | AB 0086528 | AB 0086602 | November 5, 1979 | File History for Serial No. 091,087 | 802, 805, 901 |
| 665 | AB 0087437 | AB 0087485 | July 18, 1977 | File History for Serial No. 816,882 | 802, 805, 901 |
| 666 | AB 0087486 | AB 0087592 | June 29, 1978 | File History for Serial No. 920396 | 802, 805, 901 |
| 667 | BSP 094601 | BSP 095344 | | File History for Serial No. 06213056 | 802, 805, 901 |
| 668 | BSP094601 | BSP095344 | | File History for Patent No. 4,936,587 | 802, 805, 901 |
| 669 | BSP095345 | BSP095855 | March 8, 1988 | File History for Patent No. 4,729,861 | 901 |
| 670 | BSP096173 | BSP096407 | March 22, 1999 | File History for Application No. 09/274,015 | 802, 805, 901 |
| 671 | BSP096408 | BSP096486 | April 3, 2002 | File History for Patent No. 6,210,294 | 802, 805, 901 |
| 672 | BSP096590 | BSP096768 | October 15, 2002 | File History for Patent No. 6,465,578 | 802, 805, 901 |
| 673 | BSP097053 | BSP097232 | September 27, 2002 | File History for Application No. 10/256,011 | 802, 805, 901 |

| | | | | | |
|---|---|---|---|---|---|
| 674 | BSP097977 | BSP098058 | March 20, 1972 | File History for Serial No. 236,318 | 802, 805, 901 |
| 675 | BSP098059 | BSP098221 | May 24, 1973 | File History for Serial No. 363,353 | 802, 805, 901 |
| 676 | BSP098222 | BSP098279 | December 24, 1998 | File History for Application No. 60/113,949 | 802, 805, 901 |
| 677 | BSP098856 | BSP096094 | January 14, 1992 | File History for Patent No. 5,080,367 | 802, 805, 901 |
| 678 | SB 08041 | SB 08069 | May 23, 2002 | Facsimile from J. Mulgrew to United States Patent and Trademark Office forwarding Petition for Extension of Time, Response to Office Action, Declaration of L. Bissonnette and Fee Transmittal | 802, 805, 901, 401, 402, 403 |
| 679 | | | | U.S. Patent No. 6,635,716 | 802, 805, 901 |
| 680 | | | | United States Patent No. 5,948,862 | 802, 805, 901 |
| 681 | AB 27524 | AB 29405 | | Acushnet Purchased Material Specifications | Compound, 802, 805 |
| 682 | AB 0113396 | AB 0113404 | November 18, 2004 | Pro V1 392 - Physical Matrix - SPC Code : 3V | |
| 683 | AB 24588 | | | Acushnet QAS/SPC Information on CD | |
| 684 | AB 0011057 | AB 0011178 | August 16, 1972 | Francis S. Lynch Design and Computation Book | |
| 685 | AB 0011179 | AB 0011379 | August 30, 1972 | Francis S. Lynch Design and Computation Book | |
| 686 | AB 0011380 | AB 0011515 | August 17, 1976 | Francis S. Lynch Design and Computation Book | |
| 687 | AB 0011516 | AB 0011616 | July 31, 1978 | Francis S. Lynch Design and Computation Book | |
| 688 | AB 0012450 | AB 13144 | | Chris Cavallaro Notebooks | Compound, 802, 805, 401, 402 |
| 689 | AB 0016037 | AB 0016124 | October 31, 2000 | Peter Voorheis Design and Computation Book | Compound, 802, 805, 401, 402 |
| 690 | AB 0016125 | AB 16198 | | Chris Cavallaro Notebooks | 802, 805, 401, 402 |
| 691 | AB 0016199 | AB 16219 | | Mike Jordan File/Notebook on NXT and Pro V1 | 802, 805, 401, 402 |
| 692 | AB 0016220 | AB 16296 | | Derek Ladd Core Research Notebooks | 802, 805, 401, 402 |
| 693 | AB 0016297 | AB 0016374 | May 17, 2002 | P. Voorheis Design and Computation Book | 802, 805, 401, 402 |
| 694 | AB 0016375 | AB 0016456 | | Derek Ladd Core Research Notebooks | 802, 805, 401, 402 |
| 695 | AB 0016457 | AB 0016552 | | P. Voorheis Research Notebook re: Core Materials | 802, 805, 401, 402 |
| 696 | AB 0016586 AB 0016622 | AB 0016625 | July 18, 2001 | P. Voorheis Design and Computation Book | 802, 805, 401, 402 |

| 697 | AB 0035196 | AB 35658 | | P. Puniello's RPIM Notebooks | Compound, 802, 805, 401, 402 |
| --- | --- | --- | --- | --- | --- |
| 698 | AB 0036538 | AB 37027 | | Vortheis Notebooks | Compound, 802, 805, 401, 402 |
| 699 | AB 0037028 | AB 0037256 | September 13, 2000 | Veneer Vol. 1 Notebook | Compound, 802, 804, 401, 402 |
| 700 | AB 0037257 | AB 0037523 | | Veneer Vol. II Notebook | Compound, 802, 805, 401, 402 |
| 701 | AB 0037524 | AB 0037706 | | Veneer Vol. III Notebook | Compound, 802, 805, 401, 402 |
| 702 | AB 0037707 | AB 0037935 | | Veneer Vol. IV Notebook | Compound, 802, 805, 401, 402 |
| 703 | AB 0037936 | AB 0038022 | | Veneer Vol. V Notebook | Compound, 802, 805, 401, 402 |
| 704 | AB 0038023 | AB 0038207 | | Vortheis Notebooks | Compound, 802, 805, 401, 402 |
| 705 | AB 0044882 | AB0044978 | January 27, 1999 | D. Ladd Design and Computation Book | Compound, 802, 805, 401, 402 |
| 706 | AB 0044882 | AB 0044978 | | Vortheis Notebooks | Compound, 802, 805, 401, 402 |
| 707 | AB 0044979 | AB 0045134 | July 24, 1998 | D. Ladd Design and Computation Book | Compound, 802, 805, 401, 402 |
| 708 | AB 0045135 | AB0045302 | November 19, 1997 | D. Ladd Design and Computation Book | Compound, 802, 805, 401, 402 |
| 709 | AB 0051196 | AB 0051318 | | NXT Replacement Notebook | Compound, 802, 805, 401, 402 |
| 710 | AB 0087796 | AB 0087820 | March 10, 1970 | F. Lynch Research Notebook | 802, 805, 105 |
| 711 | AB 0004672 | AB 0004682 | | Testing information | 802, 805 |
| 712 | AB 0015263 | AB 0015263 | May 14, 1997 | How To Weigh Balls | 802, 805 |
| 713 | AB 0015264 | AB 0015266 | January 17, 2001 | How To Check The DCM For Proper Calibration | 802, 805 |
| 714 | AB 0015270 | AB 0015271 | March 8, 2001 | How to Calibrate the 5-Way Sizer | 802, 805 |

| 715 | AB 0015618 | AB 0015635 | February 26, 2001 | BPIII Inner Components - How to Check the Calibration of the Core Scale | 802, 805, 401, 402 |
|-----|------------|------------|-------------------|-------------------------------------------------------------------------|---------------------|
| 716 | AB 0022937 | AB 0023118 | | Description of Tests | 802, 805, 401, 402 |
| 717 | | | July 5, 2006 | USGA - Conforming Golf Balls - List | 802 , 805 |
| 718 | AB 53357 | AB 53411 | | USGA Specifications | 802, 805 |
| 719 | | | | Complaint -- Bridgestone v. Acushnet lawsuit | |
| 720 | | | | Reply -- Bridgestone v. Acushnet lawsuit | 105 |
| 721 | | | | Reply -- Bridgestone v. Acushnet lawsuit | Duplicate |

40

| 722 | | | Pro V1 Platform Team Meeting Minutes | Compound, 802, 805, 401, 402, 403 |
|---|---|---|---|---|
| AB 35813;<br>AB 38318 -<br>AB 38323;<br>AB 38328 -<br>AB 38339;<br>AB 38362 -<br>AB 38367;<br>AB 38393-<br>96;<br>AB 45375 -<br>AB 45377;<br>AB 45381;<br>AB 46692 -<br>AB 46701;<br>AB 46930 -<br>AB 46932;<br>AB 46943 -<br>AB 46948;<br>AB 50840 -<br>AB 50843;<br>AB 51405 -<br>AB 51406;<br>AB 58729 -<br>AB 58730 | | | | |

41

| | | | |
|---|---|---|---|
| 723 | AB 4780-84; AB 50838-839; AB 35673-74; AB 35670-71; AB 35964; AB 45358-60; AB 45362-63; AB 52228-30; AB 51342-43; AB 35971 | NXT Platform Team Meeting Minutes | Compound, 802, 805, 401, 402, 403 |
| 724 | 35748-35749; 36044-45; 35960-961; 35965-68; 35931-32; 35934-35; 35869-72; 35864-36; AB 45881; 35810-12; 35813; 71211-12; 71216-20; 36247-49 | NXT & DT Platform Team Meeting Minutes | Compound, 802, 805, 401, 402, 403 |

| 725 | AB 0050764 | AB 0050768 | Product Development & Aero Update | 802, 805, 401, 402, 403 |
| 726 | AB 0050849-853; AB 0058663; AB 0058718-19; AB 0058725-26; AB 0058743-44; AB 0058905-06; AB 0058907-08; AB 8430-32 | | Pinnacle Meeting Minutes | Compound, 802, 805, 401, 402, 403 |

43

| 727 | AB 0034813-14; AB 0036266-69; AB 0036301-306; AB 0036431-33; AB 0036447-49; AB 0036460-62; AB 0038393-96; AB 0038425-28; AB 0038462-64; AB 0038471-73; AB 0038478-480; AB 0038490-92; AB 0038501-02; AB 0038503-04 | | New Product Process Meeting Minutes | Compound, 802, 805, 401, 402, 403 |
| --- | --- | --- | --- | --- |

44

| 728 | AB 34588;<br>AB 50769 -<br>AB 50771;<br>AB 50902 -<br>AB 50914;<br>AB 51055 -<br>AB 51090;<br>AB 51093 -<br>AB 51150;<br>AB 51323 -<br>AB 51326;<br>AB 51328 -<br>AB 51332;<br>AB 51335 -<br>AB 51341;<br>AB 51344 -<br>AB 51347;<br>AB 60894 -<br>AB 60896 | | Product Development and Aero Meeting | Compound, 802, 805,<br>401, 402, 403 |
|---|---|---|---|---|

45

| 729 | AB 875 - AB 1046; AB 4712 - AB 04714; AB 4761 - AB 4764; AB 11621 - AB 11647; AB 12271 - AB 12379; AB 17253 - AB 17275; AB 17299 - AB 17300; | | Pro V1 Platform Team Meeting Minutes | Compound, 802, 805, 401, 402, 403 |
| 730 | AB 17575 - AB 17629; AB 17642 - AB 17676; AB 17687 - AB 17688; AB 34683 - AB 34690; AB 34698 - AB 34703; AB 34709; AB 34756 - AB 34765 | | Pro V1 Platform Team Meeting Minutes | Compound, 802, 805, 401, 402, 403 |
| 731 | BSP 089049 - BSP 089094 | | Powerpoint Present | 401, 402, 408, 802, 805 |
| 732 | BSP 059000 - BSP 059004 | | Emails on patent dispute | 401, 402, 408, 802, 805 |

46

| No. | Exhibit | Exhibit | Date | Description | Compound |
|---|---|---|---|---|---|
| 733 | BSP 089013 | BSP 089290 | | | **Compound, 401, 402, 403, 408, 802, 805** |
| 734 | AB 000780 | AB 000781 | | | Compound, 401, 402, 403, 408, 802, 805 |
| 735 | BSP 036215 | BSP 036229 | | | |
| 736 | | | February 20, 2007 | Expert Report of Larry C. Cadorniga | **Compound, 105, 401, 402, 403, 408, 802, 805** |
| 737 | | | | Cadorniga Exhibit A - Curriculum Vitae of Larry C. Cadorniga | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 738 | | | May 16, 2007 | Cadorniga Exhibit B - Letter from John M. Spitzer to Larry Cadorniga | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 739 | | | February 20, 2007 | Expert Report of John Calabria | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 740 | | | | Calabria Appendix A - '852 Patent | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 741 | | | | Calabria Appendix B - '817 Patent | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 742 | | | | Calabria Appendix C - '707 Patent | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 743 | | | | Calabria Appendix D - '834 Patent | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 744 | | | | Calabria Appendix E - '791 Patent | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 745 | | | | Calabria Exhibit 1 - Curriculum Vitae | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 746 | | | | Calabria Exhibit 2 - DuPont publication - Surlyn, Increases Packaging Efficiency and Package Performance | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 747 | | | | Calabria Exhibit 3 - File History for Patent No. 4,431,193 | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 748 | | | | Calabria Exhibit 4 - U.S. Patent No. 6,386,922 B1 | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 749 | | | | Calabria Exhibit 5 - U.S. Patent No. 5,832,889 | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |

| | | | | |
|---|---|---|---|---|
| 750 | | | Calabria Exhibit 6 - other Acushnet patents which indicate the layers of US. '193 can be foamed | 702, 802, 805, 901, 902 |
| 751 | | | Calabria Exhibit 7 - Patents to Spalding which discuss US '193 | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 752 | | | Calabria Exhibit 8 - Chart re: 1993-1995 PGA Ball (Bridgestone and Wilson Models) (Bridgestone Newing, Bridgestone Precept, Wilson Ultra and all Variants); Chart re: 1996-1999 PGA Ball (Bridgestone and Wilson Models)(Bridgestone Newing, Bridgestone Precep | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 753 | | February 20, 2007 | Expert Report of Edward M. Caulfield/Kevin Jones | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 754 | | | Caulfield Exhibit 36 - Standard Test Methods for Vulcanized Rubber and Thermoplastic Elastomers - Tension | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 755 | | | Caulfield Exhibit 37 - *Science and Golf IV* | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 756 | | | Caulfield Exhibit 38 - Kenneth M. Ralls, Thomas H. Courtney and John Wulff, Introduction to Materials Science and Engineering | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 757 | | | Caulfield Exhibit 39 - Richard W. Hertzberg, Deformation and Fracture Mechanics of Engineering Materials | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 758 | | | Caulfield Exhibit 40 - Figure 1 - Deformation Rate Comparison, Load vs Distortion for 100 kg Compression test (Taylor Made - TP Black Test Core) | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 759 | | April 19, 2006 | Caulfield Exhibit 41 - Steve Quintavalla, Do Long Hitters Get An Unfair Benefit? | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 760 | | | Caulfield Exhibit 42 - Steven J. Quintavalla, Ph.D., Experimental Determination of The Effects of Clubhead Speed on Driver Launch Conditions and The Effects on Drive Distance For Balls Uded By The PGA Tour | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 761 | | | Caulfield Exhibit 43 - Equipment Primer, United States Golf Association | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |

48

| | | | |
|---|---|---|---|
| 762 | February 20, 2007 | Expert Reports of Dr. E. Bryan Coughlin | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 763 | | Coughlin Exhibit A - Standard Test Method for Rubber Property - Durometer Hardness | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 764 | February 20, 2007 | Expert Reports of Avraam Isayev | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 765 | | Isayev Exhibit A - Measure Loss Tangents and Calculate Resilience Index of Golf Ball B330 Areas | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 766 | | Isayev Exhibit B - Measure Loss Tangents and Resilience Index of Sample AD703 | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 767 | | Isayev Exhibit C - Measure Loss Tangents and Reesilience Index of Cured Sample AD703 | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 768 | February 20, 2007 | Expert Report of Rabi Mehta | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 769 | | Mehta Exhibit A - Resume | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 770 | | Mehta Exhibit B - Materials & Depositions Considered | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 771 | | Mehta Exhibit C - Instructions for the Dimple Spacing Analysis | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 772 | | Mehta Exhibit D - B330 Dimple Layout | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 773 | | Mehta Exhibit E - Print outs of all spreadsheets used for Table 6 - (B330) | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 774 | | Mehta Exhibit F - Print outs of all spreadsheets used for Table 6 - (Laddie) | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 775 | | Mehta Exhibit G - Print outs of all spreadsheets used for Table 6 - (U-Tri Tour) | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 776 | February 20, 2007 | Expert Report of Edward M. Caulfield | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 777 | | Caulfield Exhibit 44 - Excerpts from Robert C. Weast, Ph.D., Handbook of Chemistry and Physics | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 778 | | Caulfield Exhibit 45 - Table XIV, Golf Ball Identification | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |

| No. | | Description | Codes |
|---|---|---|---|
| 779 | | Caulfield Exhibit 46 - Table XV, Specific Gravity Results, Wilson Ultra Tour Balata | 702, 802, 805, 901, 902 |
| 780 | | Caulfield Exhibit 47 - Table XVI, Cover and Intermediate Layer Thickness Results, Wilson Ultra Tour Balata | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 781 | | Caulfield Exhibit 48 - Table XVII, Cover Layer Hardness Results, Wilson Ultra Tour Balata | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 782 | | Caulfield Exhibit 49 - Table XVIII, Intermediate Layer Hardness Results, Wilson Ultra Tour Balata | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 783 | | Caulfield Exhibit 50 - Table XIX, Core Surface Hardness Results, Wilson Ultra Tour Balata | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 784 | | Caulfield Exhibit 51 - Table XX, Compression - Distortion Under 100 kg Load Results, Acushnet '673 Reference Balls | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 785 | | Caulfield Exhibit 52 - Table XXI, Cover Hardness (Shore D) Results, Acushnet '673 Reference Balls | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 786 | | Caulfield Exhibit 53 - Table XXII, Ball Diameter Measurement Results, Acushnet '673 Reference Balls | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 787 | | Caulfield Exhibit 54 - Table XXIII, Weight Measurement Results, Acushnet '673 Reference Balls | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 788 | | Caulfield Exhibit 55 - Table XXIV, Cover Layer Thickness Results, Bridgestone Precept EV Extra Spin | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 789 | | Caulfield Exhibit 56 - Table XXV, Distance From Core Perimeter to Hardness Impression, Bridgestone Precept EV Extra Spin | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 790 | | Caulfield Exhibit 57 - Table XXVI, Distance From Core Perimeter to Hardness Impression, Wilson Ultra Competition 90 | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 791 | | Caulfield Exhibit 58 - Table XXVII, Core Hardness Results, Bridgestone Cores | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 792 | | Caulfield Exhibit 59 - Table XXVIII, Specific Gravity Results, Bridgestone Cores | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |

50

| | | | |
|---|---|---|---|
| 793 | | Caulfield Exhibit 60 - Table XXIX, Core Diameter Results, Bridgestone Cores | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 794 | | Caulfield Exhibit 61 - CD from Packer Engineering regarding Inspection at Packer Engineering on Feb. 8 and 9, 2007 | 105, 401, 402, 403, 602, 702, 802, 805, 901, 902 |
| 795 | AB 24283 | Trigonox Certificate of Analysis | 105, 802, 805, 901, 902 |
| 796 | AB 4836 | Bill Morgan E-mail | 105, 802, 805 |
| 797 | | File History for Application Serial Number 11/11,974 (Reissue Application for '852 Patent) | 105, 802, 805, 901 |
| 798 | WSG 00001 WSG 00461 | Documents produced by Wilson Sporting Goods in response to Subpoena | Compound, Duplicate, 402, 403, 802, 805, 901, 902, 105, 1006 |
| 799 | | Ultra Tour Balata 90 Box Photo from Calabria Report | 105, 401, 402, 602, 702, 802, 805, 901, 902, 1002 |
| 800 | AB 17575 | Email regarding IML adhesion problem | 802, 805, 402 |
| 801 | | U.S. Patent No. 4,526,375 | 105, 802, 805, 901, 1002 |
| 802 | | U.S. Patent No. 4,570,937 | 105, 802, 805, 901, 1002 |
| 803 | | U.S. Patent No. 4,681,323 | 105, 802, 805, 901, 1002 |
| 804 | | U.S. Patent No. 4,840,381 | 105, 802, 805, 901, 1002 |
| 805 | | U.S. Patent No. 4,863,167 | 105, 802, 805, 901, 1002 |
| 806 | | U.S. Patent No. 4,929,678 | 105, 802, 805, 901, 1002 |
| 807 | | U.S. Patent No. 4,968,038 | 105, 802, 805, 901, 1002 |
| 808 | | U.S. Patent No. 5,009,428 | 105, 802, 805, 901, 1002 |
| 809 | | U.S. Patent No. 5,019,320 | 105, 802, 805, 901, 1002 |
| 810 | | U.S. Patent No. 5,024,444 | 105, 802, 805, 901, 1002 |
| 811 | | U.S. Patent No. 5,033,750 | 105, 802, 805, 901, 1002 |
| 812 | | U.S. Patent No. 5,048,838 | 105, 802, 805, 901, 1002 |
| 813 | | U.S. Patent No. 5,087,049 | 105, 802, 805, 901, 1002 |
| 814 | D.I. 346 | Bridgestone's Opening Brief in Support re of Its Motion for Summary Judgment of Non-Infringement of U.S. Patent No. 6,818,705 | 105, 401, 402, 403, 602, 802, 805, 901, 1002 |

| | | | |
|---|---|---|---|
| 815 | D.I. 350 | Bridgestone's Opening Brief in Support of Its Motion for Summary Judgment of No Invalidity of U.S. Patent No. 6,679,791 | 105, 401, 402, 403, 602, 802, 805, 1002 |
| 816 | D.I. 352 | Bridgestone's Opening Brief in Support of Its Motion for Summary Judgment of No Invalidity of U.S. Patent No. 5,743,817 | 105, 401, 402, 403, 602, 802, 805, 1002 |
| 817 | D.I. 348 | Bridgestone's Opening Brief in Support of Its Motion for Summary Judgment of No Invalidity of U.S. Patent No. 5,782,707 | 105, 401, 402, 403, 602, 802, 805, 1002 |
| 818 | BSP 44662-63 | Bridgetone golf ball documents | 105, 402, 602, 604, 802, 805, 901, 902 |
| 819 | | February 13, 2007 letter, Stasio to White | 402, 403 |
| 820 | D.I. 356 | Bridgestone's Opening Brief in Support of Its Motion for Summary Judgment That the "Wilson Ultra Tour Balata 90" Golf Balls, the "1993 Wilson Ultra Competition 90" Golf Balls and the "1996 Precept EV Extra Spin" Golf Balls Are Not Prior Art | 105, 401, 402, 403, 602, 802, 805, 1002 |
| 821 | D.I. 474 | Reply Brief in Support of Motion for Summary Judgment of No Invalidity of U.S. Patent No. 5,743,817 | 105, 401, 402, 403, 602, 802, 805, 1002 |
| 822 | D.I. 475 | Reply Brief in Support of Motion for Summary Judgment of No Invalidity of U.S. Patent No. 5,782,707 | 105, 401, 402, 403, 602, 802, 805, 1002 |
| 823 | D.I. 477 | Reply Brief in Support of Motion for Summary Judgment of No Invalidity of U.S. Patent No. 6,679,791 | 105, 401, 402, 403, 602, 802, 805, 1002 |
| 824 | D.I. 478 | Reply Brief in Support of Motion for Summary Judgment of Non-Infringement of U.S. Patent No. 6,818,705 | 105, 401, 402, 403, 602, 802, 805, 1002 |
| 825 | D.I. 479 | Reply Brief in Support of Motion for Summary Judgment That the "Wilson Ultra Tour Balata 90" Golf Balls, the "1993 Wilson Ultra Competition 90" Golf Balls and the "1996 Precept EV Extra Spin" Golf Balls Are Not Prior Art | 105, 401, 402, 403, 602, 802, 805, 1002 |

52

| 826 | D.I. 489 | | Reply Brief re: Emergency Motion to Amend/Correct Invalidity Expert Reports And To Reset Pretrial and Trial Dates in Light of the Supreme Court's Decision in KSR Int'l Co. v. Teleflex Inc | 105, 401, 402, 403, 602, 802, 805, 1002 |
| 827 | AB 0004466 | AB 0004467 | Competitive Ball Log for Wilson Ultra Competition 90 Ball | 105, 401, 402, 403, 802, 805 |
| 828 | AB 0004468 | AB 0004476 | Competitive Ball Log for Wilson Ultra Tour Balata | 105, 401, 402, 403, 802, 805 |
| 829 | AB 0004601 | AB 0004618 | Competitive Ball Log for Precept EV Extra Spin | 105, 401, 402, 403, 802, 805 |

53