IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRIDGESTONE SPORTS CO., LTD., and :
BRIDGESTONE GOLF, INC., :
 :
    Plaintiffs, :  C.A. No. 05-132 (JJF)
  v. :
 :
ACUSHNET COMPANY, :
 :
    Defendant. :

## REPORT AND RECOMMENDATION OF SPECIAL MASTER

This Report and Recommendation follows the appointment by the court on April 13,

2007 of the undersigned to rule upon three then-pending motions deriving out of discovery

differences between the parties as follows:

 1. a Motion to Preclude Bridgestone From Relying On Certain Evidence
Regarding Infringement, Invalidity and Damages  (D.I. 294) filed by Defendant
Acushnet Co. (Acushnet);

 2. a Motion for Sanctions (D.I. 304) filed by Bridgestone Sports Co., Ltd.
(Bridgestone); and

 3. a Motion to Withdraw Its Admissions to Bridgestone's Request for Admission
No. 7-8 (D.I. 310) filed by Acushnet.

This Report and Recommendations follows submissions of briefs and exhibits by the

parties and a hearing held in Wilmington, DE on May 7, 2007.  In making these ruling the

Special Master has addressed them in the approximate topical order that they were

presented at the hearing with the consent of the parties. (See Hearing Transcript at Pages 2-3).

## A.    Defendant's Supplements of March 1 and March 7, 2007

This part of plaintiff's motion for sanctions concerns the claim that the defendant, contrary to court order supplemented its expert's report twice after the court had ruled that it should not do so on February 26, 2007.

The first supplement dated March 2, 2007 concerned Dr. Felker's invalidity opinion with respect to plaintiff's '817 (Exhibit 3).[1]  The second alleged supplement concerning the '707 patent came by email on March 7, 2007 (Exhibit 4).  The Special Master has examined these references and the district court's ruling concerning the prohibition against supplementing defendant's expert report.  The Special Master believes that the information provided by defendant in plaintiff's Exhibit 3 is not a supplement as contemplated by the court in its memorandum order of February 26, 2007.  Though characterized as a supplement, it is more akin to the obligation under federal rule of civil procedure 26(e)(1) to supplement an expert report this is incomplete.  A reading of the additional material provided by Dr. Felker in this supplement to his previous report suggests that it is not new or different grounds upon which defendant will proceed, but more complete confirmation of the earlier position taken by Dr. Felker.  This is a supplement permitted during the expert discovery period and allowed under Rule 26(e)(1).

---

[1]    All references in this Order concerning plaintiffs exhibits refer to the exhibits provided to the Special Master in its motion for sanctions unless otherwise noted.

The other document concerns the March 7, 2007 report of defendant in respect to '707 testing (Exhibit 4). The background of this is that it is a report from defendant's engineers who conducted a series of tests beginning at or about February 1, 2007 which was completed on or about March 7, 2007 and provided to Dr. Felker. The engineers claim to have prepared four batches of ingredients to make cores for certain accused golf ball products, cured them and then conducted hardness tests in accordance with a patent of plaintiffs known in this case as the EP 043 reference. The laboratory goal here was to see what range of hardness these tests would show as they related to plaintiff's '707 patent, which claims a range of hardness between 8 and 20. In the first of four batches of cores allegedly created and tested there were hardness gradings less than 8 which is below the limitations of '707. The other three batches fell within the 8 – 20 range covered by '707 patent. The defendant's laboratory report states in regard to Batch 1 that showed the hardness outside the range of the limitation of Patent '707, "we did not retain the cores or the measurement results." The Special Master will consider this email as a supplement to Dr. Felker's report respecting his earlier opinion on the invalidity of patent '707 that appears in plaintiff's Exhibit #1 of its motion for sanctions. That invalidity report dated January 16, 2007 already contains Dr. Felker's opinion that Patent '707 is obvious in light of European 0 633 043 (EP '043). That opinion remains part of Dr. Felker's report and the opinion is not affected by the dispute regarding the February 2007 test done in defendant's laboratory also in regard to '707. Defendant urged in its brief that the March 7, 2007 communication of test

3

results indeed is not a supplement to Dr. Felker's report, but is a laboratory report of

defendant simply sent to Dr. Felker to advise him of recent laboratory tests. It should be

noted that the email of March 7, 2007 communicating the results stated "please find

attached results from additional testing by Acushnet regarding the EP '043 reference

completed and provided to Dr. Felker as of this date." No one expects this not to be a

supplement to Dr. Felker's report if the test results are not precluded. For purposes of this

motion, the Special Master considers this to be defendant's version of a supplement filed in

accordance with Federal Rule of Civil Procedure 26(e)(1). Defendant argues that the court

did not contemplate barring all supplements, under all circumstances in its ruling of

February 26, 2007. It also argues in its brief that this new information merely confirms Dr.

Felker's previously disclosed opinion that the '707 patent is invalid as obvious in light of the

EP '043 reference. Defendant claims prejudice if this new February 2007 is precluded,

because it will have no physical evidence left to support the invalidity of the '707 patent. It

considers this evidence stronger than the evidence regarding the defense of invalidity of the

'707 patent presented in Dr. Felker's report of January 16, 2007. Plaintiff argues that this

February 2007 testing by defendant was occurring at the same time that the court was

considering the motion to preclude supplementation having to do with prior art references

which was the subject of the hearing on February 2, 2007. The court rendered a bench

ruling at that time precluding certain prior art references, and a confirmation of that opinion

in its memorandum of February 15, 2007, and thereafter in its denial of defendant's motion

for partial reconsideration on February 26. 2007. The court's rulings make it plain that a variety of factors were considered by the court including the history of the parties' relationship in this litigation that was characterized as contentious and difficult. The court also noted the fact that there had been considerable time expended by the parties in discovery, and that the schedule had been established and extended on several occasions for certain tasks to be completed in contemplation of a June trial. The court relied principally for the rulings on the factors considered in In Re Paoli RR Yard PCB Litigation, 35 F.3d, 717, 747 (3d Circ. 1994) and Meyers v. Pennypack Woods Home Ownership Association, 559 F.2d, 894, 905 (3d Cir. 1977). The Special Master agrees with the defendant that the court's ruling in its Memorandum Order denying defendant's motion for partial reconsideration of its previous order excluding prior art references was not a blanket prohibition against any supplement of any kind to an expert's report in this litigation. The court set forth a series of reasons for its ruling, but there is no reason to conclude that supplementation would be denied by the court if good cause was shown. It would of course be wise for a movant in that regard to be aware of the concerns the court expressed at that time about supplementation of an expert report. The real question here is whether the March 7th laboratory report is a supplement envisioned by Federal Rule of Civil Procedure 26(e)(1). In the first place, it is plain that the laboratory report will only have evidentiary value if it becomes part of Dr. Felker, or some other expert's report so we should assume it is, or expect it to be a supplement to an expert's report.

5

Plaintiff and defendant both refer to the existence of the defense of non-infringement based on obviousness to the '707 patent. It is already an opinion Dr. Felker is prepared to offer to by reason of its presence in his report of January 16, 2007. Defendant does not want to go with that alone because it does not have the "physical evidence" to present to a jury that would add persuasiveness to the doctor's opinion. The core used in that earlier experiment does not exist anymore, and that is a concern to the defendant. In its brief at page 34, it states "and given the unavailability of the core's use for the previous testing under the EP 043 reference, should the court now preclude evidence of Acushnet's updated testing, Acushnet will have no physical evidence left to support the invalidity of the '707 patent." Also at Page 6 of the same brief, it states "in early February 2007, Dr. Felker learned that the EP 043 data on which he relied to opine on the invalidity of the '707 patent came from a core manufactured and tested some years earlier (before the litigation) and which no longer existed." As a result, Acushnet engineers set out to make additional cores so that physical specimens will be available for use at the trial. Plaintiff argues here that quite aside from what the court meant by its non-supplementation ruling on February 26, 2007, the March 7 2007 report is not a supplement permitted by Federal Rule of Civil Procedure 26(e)(1). Experts may supplement reports under that rule, in circumstances where information previously disclosed is incomplete or incorrect and the additional or corrective information is not otherwise known to the other party. There is nothing in Dr. Felker's January 16, 2007 report that is cited as incorrect that is in someway made correct

by the March 2007 laboratory report. That report speaks about new testing with newly manufactured cores and does not refer to any incorrect feature of the EP '043 testing regarding the '707 patent in the January 16, 2007 expert report of Dr. Felker. The February 2007 testing however does render Dr. Felker's earlier opinion concerning invalidity of '707 due to obviousness when tested through the use of EP '043 more complete. The March 7, 2007 supplement was provided during expert discovery and satisfies Rule 26(e)(1). The right to supplement an expert's report under 26(e)(i) is not absolute. Abuse by repeated and excessive supplementation or supplementation after the time specified for disclosures under Rule 26(a)(3) are subject to relief by the court. The March 7, 2007 supplement was filed in time under 2(e)(i).

Aside from the foregoing however, there is a fundamental fairness issue associated with the allowance of the testing data in the March 7th report. Defendant wants to use the test of these four batches to support its claim that the '707 patent is obvious to one skilled in the art. Dr. Felker can be expected to testify that one so skilled who takes the EP '043 patent and uses common chemicals will, three out of four times, come up with a core that invalidates the '707 patent. Dr. Felker's expected testimony is that this means that a person with reasonable skill in the art, and without undue experimentation can easily make the invention claimed in plaintiff's '707 and it is therefore invalid based on obviousness. It is easy to see that at the crux of this opinion, if permitted, is a need that the test data be both reliable, and for litigation purposes, be subject to cross examination. If the evidence that

remains of these February 2007 tests are permitted, it will allow the defendant to have present contemporaneous test measurements and the cores for batches 2, 3 and 4 available for use before the jury, together with the laboratory witnesses that will support its position. It will however hobble plaintiffs' right of cross examination because of the absence of the missing evidence regarding Batch 1 experiment being the 6 cores used and measurements taken, if they ever existed. This seems to the Special Master to make the playing field seriously uneven. The Special Master has added hesitation because of the explanation of the absence of the cores and the measurements. The report written at the time and shown in plaintiff's exhibit 3 states as to batch No. 1 "Acushnet and engineers measured the surface hardness and center hardness of two or three cores. The cores had a hardness grade less than 8. We did not retain the cores or the measurement results." The language suggests that there was some a choice made about retaining the cores and the measurements and it was decided not to keep them even though they were being done for litigation purposes. The cores and measurements were retained on Batches 2, 3 and 4. At the hearing on Page 23 of the transcript, counsel for the defendant stated that defendant's laboratory technician in a declaration said that the cores from Batch 1 at the end of the day had been put on a laboratory bench and "they got cleaned up." (See Declaration of Douglas Goguen at Exhibit I in Appendix to defendant's opposition brief.) The explanation by the laboratory technician explaining how the routine of laboratory activity resulted in the cores being accidentally cleaned up has a different ring than the March 7th

report that was prepared to show that at the time the tests were performed that states "we did not retain the cores or the measurement results". There is no explanation by defendant's laboratory technician Douglas Goguen or anyone else as to what happened to the record of the measurements if the tests took place and if a record was made. This is a troublesome explanation because it is the entire experiment that is pertinent to the report's conclusion that it renders '707 invalid because of obviousness. As noted earlier, the defendant contends that it will be severely prejudiced if it is unable to use the March 7th testing data, because it will have no physical evidence left to support the invalidity of the '707 patent. The problem is that the plaintiff is severely prejudiced by the use of the March 7, 2007 test results if allowed because of the absence of both the physical evidence of the cores and the measurements of the Batch 1 test. The discovery master agrees that plaintiff's inability to cross examine defendant about the alleged test on Batch 1 is prejudice that outweighs the defendant's prejudice in not having the March 2007 physical evidence of batches 2, 3 and 4 and the measurement record that goes with them as an additional ground to show that '707 is invalid. All that we have is the word of defendant's laboratory technician that the test of Batch 1 took place, what the results of it were, and what the factors are concerning the six cores that were used. The absence of the measurements is extremely troubling. There is no evidence of the disposition of the measurements if they were ever taken. Evidence concerning the testing of Batch 1, if it took place, is crucial because it is the comparison of the experiments that adds legitimacy to the reasons for it

9

being offered. While the explanation of the absence of the cores and more importantly the

measurements is suspect, even if it was totally accidental, it still occurred under

circumstances that were under the easy control of the defendant and not the plaintiff. Both

parties agree that the physical evidence of the cores is significant in regard to these tests,

as are contemporaneous records of the measurements regarding these tests. On this

ground alone, the evidence should be precluded because of incompleteness. The Special

Master concludes that the March 7, 2000 testing evidence should be precluded.

## B.    Destruction of Evidence

Plaintiff seeks a sanction based upon its claim that the defendant destroyed

evidence in regard to the February 2007 tests. The Special Master in its ruling on the issue

concerning defendant's supplements of March 1 and March 7, 2007 has ruled that the test

results should be precluded because  the cores for Batch 1 and the measurements of the

tests of those cores are missing, even though the cores and measurements for the tests

were Batches 2, 3 and 4 still exist. That ruling is a sanction that satisfies the standards of

Schmid v. Milwaukee Electric Tool Corp., 13 F.3d 76 (3rd Cir. 1994). While the Special

Master did not conclude that the defendant intentionally destroyed evidence nor does the

record indicate fraud or desire to suppress the truth as referred to in Brewer v. Quaker State

Oil Refining Corporation, 72 F.3d 326 (3rd Cir. 1995), the absence of crucial evidence from

the entire experiment warranted preclusion of all of the test results. The Special Master

noted in the earlier ruling that it was the defendant's fault that the property was lost because

10

it was under the control of the defendant, that the plaintiff was prejudiced, and it now rules

that there is no lesser sanction that will avoid substantial unfairness to the plaintiff.

## C.    In Re Mesabi

Plaintiff seeks an order that will preclude the defendant and its experts from relying

on all information from the Mesabi database and all information from the weight – feed

database to be precluded.

Plaintiff first requested information stored in defendant's weight – feed system

(Mesabi) in July 2006 (Exhibit 20, No. 122). This request for the data in the Mesabi system

was refused on September 6, 2006 by defendant on the ground that it contained 2000

recipes, and would be unduly burdensome to produce. Defendant added that the data

represented an implementation of the data previously produced to plaintiff in the form of

defendant's manufacturing guidelines, change notices, and recipe changes. (See Exhibit

26). Plaintiff's complaint is that in November 2006 Dr. Felker asked the defendant to create

the same information plaintiff was seeking about the accused products based on timelines

and defendant promptly complied. Plaintiff contends that the information provided to Dr.

Felker is the same information requested in Interrogatory No. 52 served on the defendant in

July 2006 and refused in September. What Dr. Felker requested would show the precise

amounts of ingredients in the core of each of the accused products as they were

manufactured over time. Defendant told Dr. Felker that the way to get the best information

possible would be to get it from the Mesabi database, and they did so for Dr. Felker within a

11

month. (Exhibit 5 at 266). Defendant has insisted that plaintiff has sufficient information from all of the manufacturing guidelines, documentation, and change notices to get the information that it needs and that the Mesabi database is not necessary to produce. (Exhibit 26 and 29). Plaintiff counters that Mr. Rastko Gajic, a defendant engineer testified at his deposition ordered by the court and taken March 1, 2007 that the Mesabi data is necessary if you are trying to get the ingredient information from just the manufacturing guidelines and change notices. (Exhibit 19 at 92). There was an upgrade to this system in November 2006 that made access to Mesabi easier for the defendant. That upgrade was never provided as a supplement to defendant's discovery response to plaintiff's outstanding request for the Mesabi database. See the notes of testimony at the hearing on Page 76. Defendant conceded at the hearing it should have supplemented the interrogatory answer, but argues that defendant knew by then plaintiff was not relying on the change notices or anything else other than the manufacturing guidelines. Defendant made the judgment that access to the Mesabi database with the upgrade was not necessary for plaintiff to have. (See Page 69 notes of testimony hearing). The essence of defendant's argument is that the data that the plaintiff's are attempting to block from the defendant is relevant to defendant's case, but not relevant to plaintiff's case. There are two problems with that position. First, it is not up to the defendant to determine what opinions plaintiff may choose to develop once it gets all of the information it is entitled to. Secondly, even if the plaintiff is relying on manufacturing guidelines and/or change notices and not information from the Mesabi

12

database in support of its contentions, it is plainly entitled to a full range of discovery regarding the Mesabi database with respect to the right to cross examine the defendant's experts or others who have used or will rely on the data, or for comparison or verification purposes.

The period from September 3, 2006 when the Mesabi database was characterized, *inter alia,* too burdensome to produce to plaintiff until March 1, 2007 when the court ordered deposition of defendant's representative concerning the Mesabi database be taken, represents a disappointing example of short-term strategy getting in the way of long-term discovery obligations. When the Mesabi database was refused on the ground of burdensomeness in September 2006, defendant knew that the characterization in considerable measure disappeared in November / December 2006 when an upgrade to the system allowed the access to the database that the defendant promptly used in a response request from Dr. Felker for precise data that was promptly provided. This was a material change in the availability of Mesabi database data and with all due respect to the accolades concerning counsel provided by the court on Page 5 of its February 15, 2007 opinion, it could not have been overlooked as a significant change in the value of the information contained in the Mesabi database in respect to its accessibility. It was used by defendant and its expert.

Based on the foregoing, the Special Master rules as follows on this claim:

A.    The defendant shall be permitted to use data from the Mesabi database.

B.    By reason of the failure of the defendant to supplement its response to plaintiff's request for access to the database by promptly providing to the plaintiff the means of access by reason of the November / December 2006 upgrade to the Mesabi database and defendant shall pay the fair and reasonable costs incurred by plaintiff and its counsel in its continuing effort to seek access to the Mesabi database from the date that the defendant had the upgrade until plaintiff's counsel was provided access to the database in March 2007.

C.    Because of the unjustified delay of providing access to the Mesabi database by defendant to plaintiff, Dr. Felker or any other person, including other witnesses or counsel are precluded from any direct or indirect criticism of plaintiff or its witnesses or experts for not using the Mesabi database in respect to any issue in this litigation. Criticism precluded here will be both direct and indirect criticism. Direct criticism relates to any reference on behalf of the defendant that criticizes the work, opinion or by any representative of the plaintiff because it did not rely on the Mesabi database. Indirect criticism will include any reference that the Mesabi database is superior, better, preferable, more reliable, or of a higher level of reliability than any other source of data relied on by plaintiff in this litigation.

### D.    QAS Data

Plaintiff seeks sanctions for the failure of defendant to provide the QAS database. This database contains quality assurance information and it is routinely used by the defendant in the ordinary course of business to confirm or learn whether or not manufacturing quality requirements are being met in the manufacture of its golf balls. (Exhibit 19 at 204.)

Defendant argues that it did not produce the QAS data for the accused Japanese Market Golf Balls on which its expert relied because QAS data for the Japanese Market Golf balls is specific to those golf balls only, and is not "concerning performance testing between the US and Japan versions of the Pro VI golf balls." The point here is that Dr. Felker used testing data from defendant's QAS base of the Japanese versions of some of the accused golf balls for his opinions and plaintiff had requested discovery from the testing of those accused golf balls.

In response to the discovery request by the plaintiff, the defendant in August 2005 produced the QAS data in what has been described as "native" format that was current up until that date. This simply means it is unreadable other than comma-separated numerical values. No one has seriously disputed that this format is unreadable including defendant's own witnesses. For openers, we begin with Federal Rule of Civil Procedure 34(a), which provides, among other things, that this sort of data, when it is produced ". . . . must be translated if necessary by the respondent into reasonably usable form." Plaintiff complained

about this and defendant responded to these complaints by assuring, over time that it would

provide this discovery in readable form. Document discovery began promptly and was

scheduled for conclusion on or about September 1, 2006. Fact discovery was scheduled to

conclude on October 10, but was extended by agreement of the parties to December 18,

2006. Expert discovery was to be completed by March 30, 2007. On February 20, 2007,

defendant served a non-infringement report from its expert, Dr. Felker concerning

Bridgestone's '961,' 652, '852, '817, '707, '834, '791 Patents. In regard to '652 and '852,

this report contained opinions by Dr. Felker that relied on produced documents, but also on

data that defendant never produced as promised to plaintiff from its QAS quality control

system to show that some of the accused golf balls do not infringe the '652 and '852

patents. In that report he claimed non-infringement in respect to the defendant's Pro VI and

Pro Vx and NXT golf ball by using data from the Japanese market from January 2006.

(See Dr. Felker's Exhibit 12). In Dr. Felker's report at Exhibit 19, he claimed non-

infringement in respect to defendant's NXT, Pro V1, Pro Vx, and Pro V1* golf balls. None

of this QAS data, readable or otherwise, was provided to the plaintiff from the Japanese

market. In this regard, the defendant contends that it offered to produce what the plaintiff

requested, but that any data created after March 7, 2005 (which was when this lawsuit was

filed) could be burdensome, particularly because of work product or attorney-client privilege.

The defendant adds that in December 2006 it offered this database for the plaintiff to

inspect, but plaintiff declined to do so. Plaintiff disagrees with that and contends that it

requested the data several times and defendant repeatedly promised to produce it but never did. In August and November 2006, defendant said it had already produced all of its QAS data, except the Pro V1 Star, in respect to which that QAS data was promised to be produced by defendant "shortly" and which was again promised to be provided "shortly" in both letters from defendant to the plaintiff. (See plaintiff's Exhibit 25 and 29 respectively). On November 3, 2006, defendant stated in a letter from Brian S. Seal that it gave plaintiff all of the QAS data except for the Pro V 1 Star golf ball. (Exhibit 29). Plaintiff's contention is that the Pro V 1 Star golf ball infringes plaintiff's Claim 1 of plaintiff's '652 golf ball. That claim speaks to the improved rebound property based upon certain rubber content in the golf ball. Dr. Felker in his non-infringement report produced on February 20, 2007 stated that neither the Pro V 1 or the NXT infringe plaintiff's '652 patent because they do not meet the improved rebound property in that claim.

The August 2005 offer of unreadable QAS data was followed by requests and promises by the defendant to correct the problem. From that period for nearly a year, plaintiff did not pursue its insistence on having the QAS data produced in readable form. While both parties had their own explanation for this gap of time, the point is, nothing out of routine was happening for nearly a year on the QAS request. Finally, in October / November 2006, plaintiff focused on the QAS matter, which resulted in the December 18, 2006 offer by defendant to inspect QAS, and plaintiff thereafter in January filing a motion to compel the deposition of a defendant employee to explain the QAS data. At the deposition

on March 1,2007, the defendant's technician Rastko Gegic made it plain that the QAS data as produced could not be read. (Exhibit 19, 196-200).

In the 2006 to 2007 period, the plaintiff had conducted its own tests and was relying on its own tests for its litigation position on its claims.

The Special Master will allow the QAS data to be used by the defendant that was produced in unreadable form in August 2005. The initial difficulty of plaintiff acquiring that data as we turn the corner into 2006 and into early 2007 might have been avoided had more vigorous efforts been made by plaintiff earlier in discovery in 2005 and 2006 through the court if necessary to get the QAS data made available to Dr. Felker.

The Special Master precludes the data used by Dr. Felker in Exhibit 12 and of Exhibit 19 in his February 20, 2007 non-infringement report. These reports are based upon QAS data relied upon him covering periods after August 2005 in respect to his opinion concerning non-infringement of the golf balls on these exhibits shown for which QAS data was given to Dr. Felker but not fully to plaintiff.

### E.    October 2008 – Opinion of Counsel

Plaintiff seeks to preclude the use by the defendant of an October 2000 opinion of counsel letter and test data that are referred to in that letter, all of which occurred in 2000 when the defendant was manufacturing its Pro V1 golf ball. The opinion of counsel was sought by defendant regarding whether or not there were issues with respect to plaintiffs' '707 Patent. Defendant at that time was relying on the EP '043 reference, as it does today

18

in support of its opinion that EP '043 was reliable prior art. According to defendant, the testing showed that it was found to invalidate '707 in 2000, as it was also found in 2007 by defendant's Dr. Felker. Part of the test data that Dr. Felker was given by the defendant was data developed by Jeffrey Dalton, defendant's Vice President of Intellectual Property in 2000. Dr. Felker relied on this test data, but neither he nor defendant is relying on the opinion of counsel according to defendant. Plaintiff claims that if it had the opinion of counsel, it could have inquired into the testing in that regard of Mr. Dalton. At the May 7, 2007 hearing, counsel for plaintiff stated that they had the data involved with the 2000 opinion of counsel before this lawsuit was filed, and it had been discussed with Bridgestone in settlement negotiations between the parties. Defendant concedes that plaintiff did not have the opinion of counsel, but it had the data and it also knew that defendant was relying in this case on EP '043 for its invalidity position to '707. Defendant adds that once it was determined that willfulness was not an issue, the opinion of counsel was not an issue either, and it was turned over to Dr. Felker and within a week, given to counsel for the plaintiff. Counsel for plaintiff stated on Page 49 of the hearing transcript that it had the underlying data since 2005 although not the opinion of counsel concerning that data. Defendant stated at the hearing on May 7, 2007 that it was not relying on the opinion. Transcript 41, lines 21-24; 43 lines 7-14.

Based on the foregoing, it is the special master's conclusion that the October 2000 opinion of counsel is not to be relied on by the defendant or its expert in support of any of its

contentions in this litigation; the test data associated with that opinion of counsel can be relied on by defendant's expert, Dr. Felker in support of his opinion to which that data applies. Dr. Felker did see the opinion of counsel and plaintiff may cross examine Dr. Felker in regard to that opinion if it chooses to do so.

## F.    The Dimple Chart

Plaintiff Bridgestone seeks to preclude the use by the defendant of a chart provided on January 16, 2007 as an exhibit to its expert's invalidity report. This chart is a summary of the dimple characteristics of more than 130 golf balls. The summary came from data generated from defendant's competitive test data in 1992-1994. Plaintiff had requested in its document request of June 7, 2005 documents and things making reference to competitive analysis of any golf ball which included, inter alia, tests, inspections comparisons of the design features functionality and/or performance of such golf ball products. The underlying data of the chart has never been produced to plaintiff. Dr. Felker contended in his deposition that he was relying on this chart as "prior art" in terms of "the dimple area, percentage coverage". (See Felker rough transcript at 250-51 in Exhibit 5). Defendant resists this motion to preclude regarding the dimple coverage chart designated as Exhibit 48 in its expert's report contending that it is simply a summary that an expert is permitted to attach to its expert's report in accordance with Federal Rule of Civil Procedure 26(a)(2)(B). This chart was created by defendant's engineers at Dr. Felker's request after the close of fact discovery on October 10, 2006. Defendant also says that plaintiff should

take no issue with the underlying fact that the vast majority of golf balls produced in the

early 1990s have a dimple coverage of more than 62%. It adds that more than a dozen golf

balls listed on the exhibit are Bridgestone's own golf balls. These explanations by the

defendant are somewhat helpful, but if we stay with the basics here, we should know that a

chart offered by an expert in litigation if relevant can be admissible but, the evidentiary

support for the chart must be provided to the adversary. The fact that the defendant

believes defendant "must know" about the dimple coverage, or that a handful of the golf

balls out of the 130 on the chart were plaintiff's own golf balls, is not sufficient to satisfy this

requirement. It should be noted here that the underlying data was not assembled under the

supervision or guidance of the defendant's expert, but was prepared by defendant's own

engineers for purposes presumably having nothing to do with this litigation. It is simply a

series of facts developed by the defendant in the course of its business and without more

inquiry, adopted by the defendant's litigation expert as true, accurate, and properly

prepared.

Plaintiff's motion is granted and defendant is precluded from using or relying upon

Exhibit 48 to Dr. Felker's January 16, 2007 report.

### G.    **Defendant's Motion to Withdraw Admissions**

Plaintiff has accused defendant of infringing U.S. Patent #5,743,817 ("the '817

Patent"). This patent claims properties regarding the core distortion under a load of 100 kg.

Plaintiff served its request for admissions on defendant on September 8, 2006 and asked

defendant to admit that golf balls identified in that request had a core having a distortion under 100 kg that met the limitation in plaintiff's patent '817. The parties understood that the defendant did not routinely perform this test under a 100 kg load measurement but made the measurement on the Atti Scale, which is a device used to measure compression by the PGA. Defendant's response was due on December 18, 2006 after the October 10, 2006 close of fact discovery. On January 16, 2007, plaintiff had served its opening expert reports, and those included reports by plaintiff's expert, Larry C. Cadorniga. In that report, it was stated that Mr. Cadorniga relied on 100 kg distortion measurements for the NXT core golf balls. Defendant learned from those reports that plaintiff noted that the 100 kg distortion measurements for the NXT tour golf balls were outside of the '817 patent claim range. Plaintiff's measurements in its report were measured for the NXT tour and NXT-tour golf balls. Defendant contends that the plaintiff had this information by November 14, 2006, which was before defendant filed its admissions to Request Nos. 7 and 8. The Special Master has reviewed the response of plaintiff to defendant's motion to withdraw and contends that it relied on the admissions to support its own position generally and specifically for one version of the NXT tour ball that was unavailable for testing.

Federal Rule of Civil Procedure 26(b) sets forth under what circumstances a court may permit a withdrawal of a response to a request for an admission. See Coca-Cola Bottling Co. v. Coca-Cola Co., 123 F.R.D. 97, 102(D)(e)(l) (1988). The rule states that "the court may permit withdrawal or amendment when the presentation of the merits of the

action will be subserved thereby and the party who obtained the admission failed to satisfy the court that withdrawal or amendment will prejudice him in maintaining his action or defense on the merits." The admissions in question go to facts being developed in respect to a decision on the merits of this case. The evidence of the core distortion of the NXT tour golf balls appears in plaintiff's expert report which shows that they do not have a distortion under load of 100 kg within the claim range of patent '817. Defendant's admission is contrary to that evidence.

The Special Master concludes that allowing withdrawal of the motions will serve the merits of the case. Plaintiff has shown no prejudice.

Defendant's Motion to Withdraw is granted.

### H.    Defendant's Motion to Preclude

On March 20, 2007, the defendant filed a motion to preclude that asked the court to preclude any fact in support of plaintiff' claims that it failed to disclose during fact discovery or any facts or documents not identified by plaintiff in response to defendant's discovery request. This motion to preclude was filed on the same day that plaintiff filed its motion for sanctions presently before the court. A review of the briefs on this motion and the testimony provided at the hearing by counsel make reference on a number of occasions to the Order on the court's earlier motion by plaintiff to preclude certain prior art references that defendant had chosen to rely upon. The Special Master will avoid the invitation in this motion to preclude before it to engage in a comparison of the grounds that may obtain in

regard to ruling on this motion to preclude with the grounds and other circumstances associated with the matter presented to the court on plaintiff's motion to preclude defendant's prior art references. Before the Special Master is the claim by the defendant that all facts either not provided to the defendant or responded to in discovery responses should be precluded from this proceeding.

We begin with a statement by the court on an application by the defendant for the factual basis for plaintiff's contention facts. The court at that time ruled it was premature. The due date for the that submission was not until February 28th, which date was extended until May 1, 2006, and extended again by agreement of the parties until December 18, 2006. The testimony at the hearing tells us that during this period, defendant believed that it was entitled to the factual contentions concerning plaintiff's claims of infringement of defendant's products. Plaintiff contends that it gave substantial materials to defendant in that regard and defendant complains that what it was given were boxes and boxes of documents that in effect simply stated that these are the various claims on the various patents that we claim infringement against and your products violate these claims. The record seems clear that during this period between May 1, 2006 and December 18, 2006 other discovery was proceeding, including depositions, and in the period from August through December 2006 and into January 2007, the parties were conducted ongoing testing which included testing even through February 2007, which is referred to earlier in this Report and Recommendation to the court. Defendant's primary claim boils down to the fact

that it believes it should have had all the factual basis for plaintiff's claims by December 18, 2006, and it did not get that until January 16, 2007. Plaintiff answers that it provided its primary basis for its claims that it believed that it had good ground to conclude warranted the suit in the materials it turned over. It advised that it was conducting testing, had retained experts, and that was the basis upon which it was proceeding to be prepared to litigate. Plaintiff points out that this is essentially what the defendant did. Plaintiff argues that this is how these patent cases that involve scientific data are pleaded, prepared, discovered, and ultimately tried. Defendant asserts that it was entitled to ongoing or progressive discovery regarding the testing process by the plaintiff, but it provides no authority for form of discovery response, generally and certainly not in this case. Defendant does not point to any specific discovery piece such as plaintiff has pointed such as the Mesabi database or the QAS database, nor has defendant in its motion focused upon any specific discovery resource used by the plaintiff such as the Dalton Declaration, that plaintiff has refused to provide. Defendant simply claims its entitlement in sweeping terms to all facts that the defendant will rely on at trial, and all facts that defendant has requested in discovery. The Special Master knows of no authority that warrants that sort of a discovery response. If the December 18, 2006 date was the date all discovery defendant was entitled to was to be received, nothing has been suggested that it did not receive everything by January 16, 2007. The testimony of the hearing stated at Page 130-130 as follows:

SPECIAL MASTER BECHTLE: And is it your position that on September the 8, for example, you should have gotten this information?

25

MR. DONNELLY: Yes, Your Honor.

SPECIAL MASTER BECHTLE: And day by day? Come on.

MR. DONNELLY: Seasonably.

SPECIAL MASTER BECHTLE: What does that mean?

MR. DONNELLY: Well, the appropriate date here was December the 18th.

SPECIAL MASTER BECHTLE: Okay.

MR. DONNELLY: Because that was the date the parties had agreed they would supplement their final contentions and provide any additional documents and any addition other information they had in fact discovery. That was the fact discovery cutoff, at least according to Acushnet.

If we look at defendant's motion to preclude here, we see a broad-based motion to preclude practically everything because it did not receive what it was entitled to until 30 days later than it was entitled to receive it. There is certainly ample time between January 16th and the current trial date of June 18, 2007 for defendant to respond regarding the materials that were provided by January 16, 2007. It should be noted that from January 2007 until December 18, 2006, the parties were before the court on several occasions (May 1, 2006, July 10, 2006, August 2, 2006, and November 29, 2006) and this motion to preclude or other relief was never asked to be put on the court's calendar until March 20, 2007.

26

The Special Master concludes that the defendant is not entitled to have this motion granted because it has suffered no prejudice, because it has received all of the information that it is entitled to, and it has ample time to consider that information in preparation for the remaining stages of this litigation, including the trial.

## I.    EXHIBITS A-D JEFFREY DALTON'S DECLARATION

Plaintiff moves to preclude these documents complaining they were not produced until February 20,2 007.  The Special Master has reviewed the parties' briefs and the exhibits referred therein and concludes that the data involved in those documents plaintiff either had or the information was as accessible to the plaintiff as it was from the defendant and its experts.  Plaintiff's motion is denied.

In plaintiff's opening brief in support of its motion for sanctions at Page 21 and in its reply brief on Page 16, there is a reference to the assertion that defendant's Pro V1 golf ball infringes plaintiff's Patent '961.  Plaintiff refers to the Dalton Declaration documents as showing the extent of that alleged infringement as relating back to October 2003 when the '961 patent was issued.  It also claims that this information supports the claim against Pro V1x golf ball as well.  Plaintiff asked that any verdict in its favor also be ruled to include the Pro V1 golf ball infringed from October 2003 and the Pro V1x infringed entirely.

This is relief that is outside the authority of the Special Master and if sought, must be by application to the court.

This Special Master's Report and Recommendation will become a final Order of the court unless objection is timely taken pursuant to Federal Rule of Civil Procedure 53(g).


LOUIS C. BECHTLE,
Special Master

Date:  May 24, 2007